

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| APPLE, INC., | ) | Civil Action No. |
| HACHETTE BOOK GROUP, INC., | ) | |
| HARPERCOLLINS PUBLISHERS L.L.C., | ) | |
| VERLAGSGRUPPE GEORG VON HOLTZBRINCK GMBH, | ) | |
| HOLTZBRINCK PUBLISHERS, LLC d/b/a MACMILLAN, | ) | |
| THE PENGUIN GROUP, A DIVISION OF PEARSON PLC, | ) | |
| PENGUIN GROUP (USA), INC., and SIMON & SCHUSTER, INC., | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action against Defendants Apple, Inc. ("Apple"); Hachette Book Group, Inc. ("Hachette"); HarperCollins Publishers L.L.C. ("HarperCollins"); Verlagsgruppe Georg von Holtzbrinck GmbH and Holtzbrinck Publishers, LLC d/b/a Macmillan (collectively, "Macmillan"); The Penguin Group, a division of Pearson plc and Penguin Group (USA), Inc. (collectively, "Penguin"); and Simon & Schuster, Inc. ("Simon & Schuster"; collectively with Hachette, HarperCollins, Macmillan, and Penguin, "Publisher Defendants") to obtain equitable relief to prevent and remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiff alleges:

## I.  INTRODUCTION

1.      Technology has brought revolutionary change to the business of publishing and selling books, including the dramatic explosion in sales of "e-books"—that is, books sold to consumers in electronic form and read on a variety of electronic devices, including dedicated e-readers (such as the Kindle or the Nook), multipurpose tablets, smartphones and personal computers.  Consumers reap a variety of benefits from e-books, including 24-hour access to product with near-instant delivery, easier portability and storage, and adjustable font size.  E-books also are considerably cheaper to produce and distribute than physical (or "print") books.

2.      E-book sales have been increasing rapidly ever since Amazon released its first Kindle device in November of 2007.  In developing and then mass marketing its Kindle e-reader and associated e-book content, Amazon substantially increased the retail market for e-books.  One of Amazon's most successful marketing strategies was to lower substantially the price of newly released and bestselling e-books to $9.99.

3.      Publishers saw the rise in e-books, and particularly Amazon's price discounting, as a substantial challenge to their traditional business model.  The Publisher Defendants feared that lower retail prices for e-books might lead eventually to lower wholesale prices for e-books, lower prices for print books, or other consequences the publishers hoped to avoid.  Each Publisher Defendant desired higher retail e-book prices across the industry before "$9.99" became an entrenched consumer expectation.  By the end of 2009, however, the Publisher Defendants had concluded that unilateral efforts to move Amazon away from its practice of offering low retail prices would not work, and they thereafter conspired to raise retail e-book prices and to otherwise limit competition in the sale of e-books.  To effectuate their conspiracy,

the Publisher Defendants teamed up with Defendant Apple, which shared the same goal of

restraining retail price competition in the sale of e-books.

4.      The Defendants' conspiracy to limit e-book price competition came together as

the Publisher Defendants were jointly devising schemes to limit Amazon's ability to discount e-

books and Defendant Apple was preparing to launch its electronic tablet, the iPad, and

considering whether it should sell e-books that could be read on the new device.  Apple had long

believed it would be able to "trounce Amazon by opening up [its] own ebook store," but the

intense price competition that prevailed among e-book retailers in late 2009 had driven the retail

price of popular e-books to $9.99 and had reduced retailer margins on e-books to levels that

Apple found unattractive.  As a result of discussions with the Publisher Defendants, Apple

learned that the Publisher Defendants shared a common objective with Apple to limit e-book

retail price competition, and that the Publisher Defendants also desired to have popular e-book

retail prices stabilize at levels significantly higher than $9.99.  Together, Apple and the Publisher

Defendants reached an agreement whereby retail price competition would cease (which all the

conspirators desired), retail e-book prices would increase significantly (which the Publisher

Defendants desired), and Apple would be guaranteed a 30 percent "commission" on each e-book

it sold (which Apple desired).

5.      To accomplish the goal of raising e-book prices and otherwise limiting retail

competition for e-books, Apple and the Publisher Defendants jointly agreed to alter the business

model governing the relationship between publishers and retailers.  Prior to the conspiracy, both

print books and e-books were sold under the longstanding "wholesale model."  Under this model,

publishers sold books to retailers, and retailers, as the owners of the books, had the freedom to

establish retail prices.  Defendants were determined to end the robust retail price competition in

3

e-books that prevailed, to the benefit of consumers, under the wholesale model. They therefore

agreed jointly to replace the wholesale model for selling e-books with an "agency model."

Under the agency model, publishers would take control of retail pricing by appointing retailers as

"agents" who would have no power to alter the retail prices set by the publishers. As a result, the

publishers could end price competition among retailers and raise the prices consumers pay for e-

books through the adoption of identical pricing tiers. This change in business model would not

have occurred without the conspiracy among the Defendants.

6.     Apple facilitated the Publisher Defendants' collective effort to end retail price

competition by coordinating their transition to an agency model across all retailers. Apple

clearly understood that its participation in this scheme would result in higher prices to

consumers. As Apple CEO Steve Jobs described his company's strategy for negotiating with the

Publisher Defendants, "We'll go to [an] agency model, where you set the price, and we get our

30%, and yes, the customer pays a little more, but that's what you want anyway." Apple was

perfectly willing to help the Publisher Defendants obtain their objective of higher prices for

consumers by ending Amazon's "$9.99" price program as long as Apple was guaranteed its 30

percent margin and could avoid retail price competition from Amazon.

7.     The plan – what Apple proudly described as an "aikido move" – worked. Over

three days in January 2010, each Publisher Defendant entered into a functionally identical

agency contract with Apple that would go into effect simultaneously in April 2010 and "chang[e]

the industry permanently." These "Apple Agency Agreements" conferred on the Publisher

Defendants the power to set Apple's retail prices for e-books, while granting Apple the assurance

that the Publisher Defendants would raise retail e-book prices at all other e-book outlets, too.

Instead of $9.99, electronic versions of bestsellers and newly released titles would be priced

4

according to a set of price tiers contained in each of the Apple Agency Agreements that determined de facto retail e-book prices as a function of the title's hardcover list price. All bestselling and newly released titles bearing a hardcover list price between $25.01 and $35.00, for example, would be priced at $12.99, $14.99, or $16.99, with the retail e-book price increasing in relation to the hardcover list price.

8.     After executing the Apple Agency Agreements, the Publisher Defendants all then quickly acted to complete the scheme by imposing agency agreements on all their other retailers. As a direct result, those retailers lost their ability to compete on price, including their ability to sell the most popular e-books for $9.99 or for other low prices. Once in control of retail prices, the Publisher Defendants limited retail price competition among themselves. Millions of e-books that would have sold at retail for $9.99 or for other low prices instead sold for the prices indicated by the price schedules included in the Apple Agency Agreements—generally, $12.99 or $14.99. Other price and non-price competition among e-book publishers and among e-book retailers also was unlawfully eliminated to the detriment of U.S. consumers.

9.     The purpose of this lawsuit is to enjoin the Publisher Defendants and Apple from further violations of the nation's antitrust laws and to restore the competition that has been lost due to the Publisher Defendants' and Apple's illegal acts.

10.     Defendants' ongoing conspiracy and agreement have caused e-book consumers to pay tens of millions of dollars more for e-books than they otherwise would have paid.

11.     The United States, through this suit, asks this Court to declare Defendants' conduct illegal and to enter injunctive relief to prevent further injury to consumers in the United States.

5

## II.  DEFENDANTS

12.     Apple, Inc. has its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.  Among many other businesses, Apple, Inc. distributes e-books through its iBookstore.

13.     Hachette Book Group, Inc. has its principal place of business at 237 Park Avenue, New York, NY 10017.  It publishes e-books and print books through publishers such as Little, Brown, and Company and Grand Central Publishing.

14.     HarperCollins Publishers L.L.C. has its principal place of business at 10 E. 53rd Street, New York, NY 10022.  It publishes e-books and print books through publishers such as Harper and William Morrow.

15.     Holtzbrinck Publishers, LLC d/b/a Macmillan has its principal place of business at 175 Fifth Avenue, New York, NY 10010.  It publishes e-books and print books through publishers such as Farrar, Straus and Giroux and St. Martin's Press.  Verlagsgruppe Georg von Holtzbrinck GmbH owns Holtzbrinck Publishers, LLC d/b/a Macmillan and has its principal place of business at Gänsheidestraße 26, Stuttgart 70184, Germany.

16.     Penguin Group (USA), Inc. has its principal place of business at 375 Hudson Street, New York, NY 10014.  It publishes e-books and print books through publishers such as The Viking Press and Gotham Books.  Penguin Group (USA), Inc. is the United States affiliate of The Penguin Group, a division of Pearson plc, which has its principal place of business at 80 Strand, London WC2R 0RL, United Kingdom.

17.     Simon & Schuster, Inc. has its principal place of business at 1230 Avenue of the Americas, New York, NY 10020.  It publishes e-books and print books through publishers such as Free Press and Touchstone.

### III.  JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     Plaintiff United States of America brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to obtain equitable relief and other relief to prevent and restrain Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C § 1.

19.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

20.     This Court has personal jurisdiction over each Defendant and venue is proper in the Southern District of New York under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant transacts business and is found within the Southern District of New York.  The U.S. component of each Publisher Defendant is headquartered in the Southern District of New York, and acts in furtherance of the conspiracy occurred in this District.  Many thousands of the Publisher Defendants' e-books are and have been sold in this District, including through Defendant Apple's iBookstore.

21.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.  The Publisher Defendants sell e-books throughout the United States.  Their e-books represent a substantial amount of interstate commerce.  In 2010, United States consumers paid more than $300 million for the Publisher Defendants' e-books, including more than $40 million for e-books licensed through Defendant Apple's iBookstore.

### IV.  CO-CONSPIRATORS

22.     Various persons, who are known and unknown to Plaintiff, and not named as defendants in this action, including senior executives of the Publisher Defendants and Apple, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy.

7

## V.  THE PUBLISHING INDUSTRY AND BACKGROUND OF THE CONSPIRACY

*A.    Print Books*

23.    Authors submit books to publishers in manuscript form.  Publishers edit

manuscripts, print and bind books, provide advertising and related marketing services, decide

when a book should be released for sale, and distribute books to wholesalers and retailers.

Publishers also determine the cover price or "list price" of a book, and typically that price

appears on the book's cover.

24.    Retailers purchase print books directly from publishers, or through wholesale

distributors, and resell them to consumers.  Retailers typically purchase print books under the

"wholesale model."  Under that model, retailers pay publishers approximately one-half of the list

price of books, take ownership of the books, then resell them to consumers at prices of the

retailer's choice.  Publishers have sold print books to retailers through the wholesale model for

over 100 years and continue to do so today.

*B.    E-books*

25.    E-books are books published in electronic formats.  E-book publishers avoid some

of the expenses incurred in producing and distributing print books, including most manufacturing

expenses, warehousing expenses, distribution expenses, and costs of dealing with unsold stock.

26.    Consumers purchase e-books through websites of e-book retailers or through

applications loaded onto their reading devices.  Such electronic distribution allows e-book

retailers to avoid certain expenses they incur when they sell print books, including most

warehousing expenses and distribution expenses.

27.    From its very small base in 2007 at the time of Amazon's Kindle launch, the e-

book market has exploded, registering triple-digit sales growth each year.  E-books now

8

constitute at least ten percent of general interest fiction and non-fiction books (commonly known as "trade" books[1]) sold in the United States and are widely predicted to reach at least 25 percent of U.S. trade books sales within two to three years.

   D.     *Publisher Defendants and "The $9.99 Problem"*

   28.     The Publisher Defendants compete against each other for sales of trade e-books to consumers.  Publishers bid against one another for print- and electronic-publishing rights to content that they expect will be most successful in the market.  They also compete against each other in bringing those books to market.  For example, in addition to price-setting, they create cover art and other on-book sales inducements, and also engage in advertising campaigns for some titles.

   29.     The Publisher Defendants are five of the six largest publishers of trade books in the United States.  They publish the vast majority of their newly released titles as both print books and e-books.  Publisher Defendants compete against each other in the sales of both trade print books and trade e-books.

   30.     When Amazon launched its Kindle device, it offered newly released and bestselling e-books to consumers for $9.99.  At that time, Publisher Defendants routinely wholesaled those e-books for about that same price, which typically was less than the wholesale price of the hardcover versions of the same titles, reflecting publisher cost savings associated with the electronic format.  From the time of its launch, Amazon's e-book distribution business has been consistently profitable, even when substantially discounting some newly released and bestselling titles.

---

[1] Non-trade e-books include electronic versions of children's picture books and academic textbooks, reference materials, and other specialized texts that typically are published by separate imprints from trade books, often are sold through separate channels, and are not reasonably substitutable for trade e-books.

31.     To compete with Amazon, other e-book retailers often matched or approached Amazon's $9.99-or-less prices for e-book versions of new releases and *New York Times* bestsellers.  As a result of that competition, consumers benefited from Amazon's $9.99-or-less e-book prices even if they purchased e-books from competing e-book retailers.

32.     The Publisher Defendants feared that $9.99 would become the standard price for newly released and bestselling e-books.  For example, one Publisher Defendant's CEO bemoaned the "wretched $9.99 price point" and Penguin USA CEO David Shanks worried that e-book pricing "can't be $9.99 for hardcovers."

33.     The Publisher Defendants believed the low prices for newly released and bestselling e-books were disrupting the industry.  The Amazon-led $9.99 retail price point for the most popular e-books troubled the Publisher Defendants because, at $9.99, most of these e-book titles were priced substantially lower than hardcover versions of the same title.  The Publisher Defendants were concerned these lower e-book prices would lead to the "deflation" of hardcover book prices, with accompanying declining revenues for publishers.  The Publisher Defendants also worried that if $9.99 solidified as the consumers' expected retail price for e-books, Amazon and other retailers would demand that publishers lower their wholesale prices, further compressing publisher profit margins.

34.     The Publisher Defendants also feared that the $9.99 price point would make e-books so popular that digital publishers could achieve sufficient scale to challenge the major incumbent publishers' basic business model.  The Publisher Defendants were especially concerned that Amazon was well positioned to enter the digital publishing business and thereby supplant publishers as intermediaries between authors and consumers.  Amazon had, in fact, taken steps to do so, contracting directly with authors to publish their works as e-books—at a

higher royalty rate than the Publisher Defendants offered. Amazon's move threatened the Publisher Defendants' traditional positions as the gate-keepers of the publishing world. The Publisher Defendants also feared that other competitive advantages they held as a result of years of investments in their print book businesses would erode and, eventually, become irrelevant, as e-book sales continued to grow.

E.   *Publisher Defendants Recognize They Cannot Solve "The $9.99 Problem" Alone*

35.   Each Publisher Defendant knew that, acting alone, it could not compel Amazon to raise e-book prices and that it was not in its economic self-interest to attempt unilaterally to raise retail e-book prices. Each Publisher Defendant relied on Amazon to market and distribute its e-books, and each Publisher Defendant believed Amazon would leverage its position as a large retailer to preserve its ability to compete and would resist any individual publisher's attempt to raise the prices at which Amazon sold that publisher's e-books. As one Publisher Defendant executive acknowledged Amazon's bargaining strength, "we've always known that unless other publishers follow us, there's no chance of success in getting Amazon to change its pricing practices." In the same email, the executive wrote, "without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react. . . ."

36.   Each Publisher Defendant also recognized that it would lose sales if retail prices increased for only its e-books while the other Publisher Defendants' e-books remained competitively priced. In addition, higher prices for just one publisher's e-books would not change consumer perceptions enough to slow the erosion of consumer-perceived value of books that all the Publisher Defendants feared would result from Amazon's $9.99 pricing policy.

11

## VI.  DEFENDANTS' UNLAWFUL ACTIVITIES

37.   Beginning no later than September 2008, the Publisher Defendants' senior

executives engaged in a series of meetings, telephone conversations and other communications

in which they jointly acknowledged to each other the threat posed by Amazon's pricing strategy

and the need to work collectively to end that strategy.  By the end of the summer of 2009, the

Publisher Defendants had agreed to act collectively to force up Amazon's retail prices and

thereafter considered and implemented various means to accomplish that goal, including moving

under the guise of a joint venture.  Ultimately, in late 2009, Apple and the Publisher Defendants

settled on the strategy that worked—replacing the wholesale model with an agency model that

gave the Publisher Defendants the power to raise retail e-book prices themselves.

38.   The evidence showing conspiracy is substantial and includes:

- Practices facilitating a horizontal conspiracy.  The Publisher Defendants regularly
  communicated with each other in private conversations, both in person and on the
  telephone, and in e-mails to each other to exchange sensitive information and
  assurances of solidarity to advance the ends of the conspiracy.

- Direct evidence of a conspiracy.  The Publisher Defendants directly discussed,
  agreed to, and encouraged each other to collective action to force Amazon to raise
  its retail e-book prices.

- Recognition of illicit nature of communications.  Publisher Defendants took steps
  to conceal their communications with one another, including instructions to
  "double delete" e-mail and taking other measures to avoid leaving a paper trail.

- Acts contrary to economic interests.  It would have been contrary to the economic
  interests of any Publisher Defendant acting alone to attempt to impose agency on
  all of its retailers and then raise its retail e-book prices.  For example, Penguin
  Group CEO John Makinson reported to his parent company board of directors that
  "the industry needs to develop a common strategy" to address the threat "from
  digital companies whose objective may be to disintermediate traditional
  publishers altogether" because it "will not be possible for any individual publisher
  to mount an effective response," and Penguin later admitted that it would have
  been economically disadvantaged if it "was the only publisher dealing with Apple
  under the new business model."

- <u>Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter.</u>  The Publisher Defendants were motivated by a desire to maintain both the perceived value of their books and their own position in the industry.  They received assurances from both each other and Apple that they all would move together to raise retail e-book prices.  Apple was motivated to ensure that it would not face competition from Amazon's low-price retail strategy.

- <u>Abrupt, contemporaneous shift from past behavior.</u>  Prior to January 23, 2010, all Publisher Defendants sold their e-books under the traditional wholesale model; by January 25, 2010, all Publisher Defendants had irrevocably committed to transition all of their retailers to the agency model (and Apple had committed to sell e-books on a model inconsistent with the way it sells the vast bulk of the digital media it offers in its iTunes store).  On April 3, 2010, as soon as the Apple Agency Agreements simultaneously became effective, all Publisher Defendants immediately used their new retail pricing authority to raise the retail prices of their newly released and bestselling e-books to the common ostensible maximum prices contained in their Apple Agency Agreements.

*A.*     *The Publisher Defendants Recognize a Common Threat*

39.     Starting no later than September of 2008 and continuing for at least one year, the Publisher Defendants' CEOs (at times joined by one non-defendant publisher's CEO) met privately as a group approximately once per quarter.  These meetings took place in private dining rooms of upscale Manhattan restaurants and were used to discuss confidential business and competitive matters, including Amazon's e-book retailing practices.  No legal counsel was present at any of these meetings.

40.     In September 2008, Penguin Group CEO John Makinson was joined by Macmillan CEO John Sargent and the CEOs of the other four large publishers at a dinner meeting in "The Chef's Wine Cellar," a private room at Picholene.  One of the CEOs reported that business matters were discussed.

41.     In January 2009, the CEO of one Publisher Defendant, a United States subsidiary of a European corporation, promised his corporate superior, the CEO of the parent company, that he would raise the future of e-books and Amazon's potential role in that future at an upcoming

meeting of publisher CEOs. Later that month, at a dinner meeting hosted by Penguin Group

CEO John Makinson, again in "The Chef's Wine Cellar" at Picholene, the same group of

publisher CEOs met once more.

42.     On or about June 16, 2009, Mr. Makinson again met privately with other

Publisher Defendant CEOs and discussed, *inter alia*, the growth of e-books and Amazon's role in

that growth.

43.     On or about September 10, 2009, Mr. Makinson once again met privately with

other Publisher Defendant CEOs and the CEO of one non-defendant publisher in a private room

of a different Manhattan restaurant, Alto. They discussed the growth of e-books and complained

about Amazon's role in that growth.

44.     In addition to the CEO dinner meetings, Publisher Defendants' CEOs and other

executives met in-person, one-on-one to communicate about e-books multiple times over the

course of 2009 and into 2010. Similar meetings took place in Europe, including meetings in the

fall of 2009 between executives of Macmillan parent company Verlagsgruppe Georg von

Holtzbrinck GmbH and executives of another Publisher Defendant's parent company.

Macmillan CEO John Sargent joined at least one of these parent company meetings.

45.     These private meetings provided the Publisher Defendants' CEOs the opportunity

to discuss how they collectively could solve "the $9.99 problem."

> B.     *Publisher Defendants Conspire To Raise Retail E-book Prices Under the Guise of*
> *Joint Venture Discussions*

46.     While each Publisher Defendant recognized that it could not solve "the $9.99

problem" by itself, collectively the Publisher Defendants accounted for nearly half of Amazon's

e-book revenues, and by refusing to compete with one another for Amazon's business, the

Publisher Defendants could force Amazon to accept the Publisher Defendants' new contract terms and to change its pricing practices.

47.     The Publisher Defendants thus conspired to act collectively, initially in the guise of joint ventures.  These ostensible joint ventures were not meant to enhance competition by bringing to market products or services that the publishers could not offer unilaterally, but rather were designed as anticompetitive measures to raise prices.

48.     All five Publisher Defendants agreed in 2009 at the latest to act collectively to raise retail prices for the most popular e-books above $9.99.  One CEO of a Publisher Defendant's parent company explained to his corporate superior in a July 29, 2009 e-mail message that "[i]n the USA and the UK, but also in Spain and France to a lesser degree, the 'top publishers' are in discussions to create an alternative platform to Amazon for e-books.  The goal is less to compete with Amazon as to force it to accept a price level higher than 9.99 . . . . I am in NY this week to promote these ideas and the movement is positive with [the other four Publisher Defendants]." (Translated from French).

49.     Less than a week later, in an August 4, 2009 strategy memo for the board of directors of Penguin's ultimate parent company, Penguin Group CEO John Makinson conveyed the same message:

> Competition for the attention of readers will be most intense from digital companies whose objective may be to disintermediate traditional publishers altogether.  This is not a new threat but we do appear to be on a collision course with Amazon, and possibly Google as well.  It will not be possible for any individual publisher to mount an effective response, because of both the resources necessary and the risk of retribution, so the industry needs to develop a common strategy.  This is the context for the development of the Project Z initiatives [joint ventures] in London and New York.

C.      *Defendants Agree To Increase and Stabilize Retail E-book Prices by Collectively Adopting an Agency Model*

50.     To raise e-book prices, the Publisher Defendants also began to consider in late 2009 selling e-books under an "agency model" that would take away Amazon's ability to set low retail prices.  As one CEO of a Publisher Defendant's parent company explained in a December 6, 2009 e-mail message, "[o]ur goal is to force Amazon to return to acceptable sales prices through the establishment of agency contracts in the USA . . . .  To succeed our colleagues must know that we entered the fray and follow us." (Translated from French).

51.     Apple's entry into the e-book business provided a perfect opportunity for collective action to implement the agency model and use it to raise retail e-book prices.  Apple was in the process of developing a strategy to sell e-books on its new iPad device.  Apple initially contemplated selling e-books through the existing wholesale model, which was similar to the manner in which Apple sold the vast majority of the digital media it offered in its iTunes store.  On February 19, 2009, Apple Vice President of Internet Services Eddy Cue explained to Apple CEO Steve Jobs in an e-mail, "[a]t this point, it would be very easy for us to compete and I think trounce Amazon by opening up our own ebook store."  In addition to considering competitive entry at that time, though, Apple also contemplated illegally dividing the digital content world with Amazon, allowing each to "own the category" of its choice—audio/video to Apple and e-books to Amazon.

52.     Apple soon concluded, though, that competition from other retailers – especially Amazon – would prevent Apple from earning its desired 30 percent margins on e-book sales.  Ultimately, Apple, together with the Publisher Defendants, set in motion a plan that would compel all non-Apple e-book retailers also to sign onto agency or else, as Apple's CEO put it, the Publisher Defendants all would say, "we're not going to give you the books."

53.     The executive in charge of Apple's inchoate e-books business, Eddy Cue, telephoned each Publisher Defendant and Random House on or around December 8, 2009 to schedule exploratory meetings in New York City on December 15 and December 16.  Hachette and HarperCollins took the lead in working with Apple to capitalize on this golden opportunity for the Publisher Defendants to achieve their goal of raising and stabilizing retail e-book prices above $9.99 by collectively imposing the agency model on the industry.

54.     It appears that Hachette and HarperCollins communicated with each other about moving to an agency model during the brief window between Mr. Cue's first telephone calls to the Publisher Defendants and his visit to meet with their CEOs.  On the morning of December 10, 2009, a HarperCollins executive added to his calendar an appointment to call a Hachette executive at 10:50 AM.  At 11:01 AM, the Hachette executive returned the phone call, and the two spoke for six minutes.  Then, less than a week later in New York, both Hachette and HarperCollins executives told Mr. Cue in their initial meetings with him that they wanted to sell e-books under an agency model, a dramatic departure from the way books had been sold for over a century.

55.     The other Publisher Defendants also made clear to Apple that they "certainly" did not want to continue "the existing way that they were doing business," *i.e.*, with Amazon promoting their most popular e-books for $9.99 under a wholesale model.

56.     Apple saw a way to turn the agency scheme into a highly profitable model for itself.  Apple determined to give the Publisher Defendants what they wanted while shielding itself from retail price competition and realizing margins far in excess of what e-book retailers then averaged on each newly released or bestselling e-book sold.  Apple realized that, as a result of the scheme, "the customer" would "pay[] a little more."

57.   On December 16, 2009, the day after both companies' initial meetings with Apple, Penguin Group CEO John Makinson had a breakfast meeting at a London hotel with the CEO of another Publisher Defendant's parent company. Consistent with the Publisher Defendants' other efforts to conceal their activities, Mr. Makinson's breakfast companion wrote to his U.S. subordinate that he would recount portions of his discussion with Mr. Makinson only by telephone.

58.   By the time Apple arrived for a second round of meetings during the week of December 21, 2009, the agency model had become the focus of its discussions with all of the Publisher Defendants. In these discussions, Apple proposed that the Publisher Defendants require *all* retailers of their e-books to accept the agency model. Apple thereby sought to ensure that it would not have to compete on retail prices. The proposal appealed to the Publisher Defendants because wresting pricing control from Amazon and other e-book retailers would advance their collusive plan to raise retail e-book prices.

59.   The Publisher Defendants acknowledged to Apple their common objective to end Amazon's $9.99 pricing. As Mr. Cue reported in an e-mail message to Apple's CEO Steve Jobs, the three publishers with whom he had met saw the "plus" of Apple's position as "solv[ing the] Amazon problem." The "negative" was that Apple's proposed retail prices – topping out at $12.99 for newly released and bestselling e-books – were a "little less than [the publishers] would like." Likewise, Mr. Jobs later informed an executive of one of the Publisher Defendant's corporate parents that "[a]ll major publishers" had told Apple that "Amazon's $9.99 price for new releases is eroding the value perception of their products in customer's minds, and they do not want this practice to continue for new releases."

60.     As perhaps the only company that could facilitate their goal of raising retail e-book prices across the industry, Apple knew that it had significant leverage in negotiations with Publisher Defendants. Apple exercised this leverage to demand a thirty percent commission—a margin significantly above the prevailing competitive margins for e-book retailers. The Publisher Defendants worried that the combination of paying Apple a higher commission than they would have liked and pricing their e-books lower than they wanted might be too much to bear in exchange for Apple's facilitation of their agreement to raise retail e-book prices. Ultimately, though, they convinced Apple to allow them to raise prices high enough to make the deal palatable to them.

61.     As it negotiated with the Publisher Defendants in December 2009 and January 2010, Apple kept each Publisher Defendant informed of the status of its negotiations with the other Publisher Defendants. Apple also assured the Publisher Defendants that its proposals were the same to each and that no deal Apple agreed to with one publisher would be materially different from any deal it agreed to with another publisher. Apple thus knowingly served as a critical conspiracy participant by allowing the Publisher Defendants to signal to one another both (a) which agency terms would comprise an acceptable means of achieving their ultimate goal of raising and stabilizing retail e-book prices, and (b) that they could lock themselves into this particular means of collectively achieving that goal by all signing their Apple Agency Agreement.

62.     Apple's Mr. Cue e-mailed each Publisher Defendant between January 4, 2010, and January 6, 2010 an outline of what he tabbed "the best approach for e-books." He reassured Penguin USA CEO David Shanks and other Publisher Defendant CEOs that Apple adopted the

approach "[a]fter talking to all the other publishers." Mr. Cue sent substantively identical e-mail messages and proposals to each Publisher Defendant.

63.     The outlined proposal that Apple circulated after consulting with each Publisher Defendant contained several key features. First, as Hachette and HarperCollins had initially suggested to Apple, the publisher would be the principal and Apple would be the agent for e-book sales. Consumer pricing authority would be transferred from retailers to publishers. Second, Apple's proposal mandated that every other retailer of each publisher's e-books – Apple's direct competitors – be forced to accept the agency model as well. As Mr. Cue wrote, "all resellers of new titles need to be in agency model." Third, Apple would receive a 30 percent commission for each e-book sale. And fourth, each Publisher Defendant would have identical pricing tiers for e-books sold through Apple's iBookstore.

64.     On January 11, 2010, Apple e-mailed its proposed e-book distribution agreement to all the Publisher Defendants. As with the outlined proposals Apple sent earlier in January, the proposed e-book distribution agreements were substantially the same. Also on January 11, 2010, Apple separately e-mailed to Penguin and two other Publisher Defendants charts showing how the Publisher Defendant's bestselling e-books would be priced at $12.99 – the ostensibly maximum price under Apple's then-current price tier proposal – in the iBookstore.

65.     The proposed e-book distribution agreement mainly incorporated the principles Apple set out in its e-mail messages of January 4 through January 6, with two notable changes. First, Apple demanded that the Publisher Defendants provide Apple their complete e-book catalogs and that they not delay the electronic release of any title behind its print release. Second, and more important, Apple replaced the express requirement that each publisher adopt the agency model with each of its retailers with an unusual most favored nation ("MFN") pricing

20

provision.  That provision was not structured like a standard MFN in favor of a retailer, ensuring

Apple that it would receive the best available wholesale price.  Nor did the MFN ensure Apple

that the Publisher Defendants would not set a higher retail price on the iBookstore than they set

on other websites where they controlled retail prices.  Instead, the MFN here required each

publisher to guarantee that it would lower the retail price of each e-book in Apple's iBookstore

to match the lowest price offered by any other retailer, even if the Publisher Defendant did not

control that other retailer's ultimate consumer price.  That is, instead of an MFN designed to

protect Apple's ability to compete, this MFN was designed to protect Apple from having to

compete on price at all, while still maintaining Apple's 30 percent margin.

66.     The purpose of these provisions was to work in concert to enforce the

Defendants' agreement to raise and stabilize retail e-book prices.  Apple and the Publisher

Defendants recognized that coupling Apple's right to all of their e-books with its right to demand

that those e-books not be priced higher on the iBookstore than on any other website effectively

required that each Publisher Defendant take away retail pricing control from all other e-book

retailers, including stripping them of any ability to discount or otherwise price promote e-books

out of the retailer's own margins.  Otherwise, the retail price MFN would cause Apple's

iBookstore prices to drop to match the best available retail price of each e-book, and the

Publisher Defendants would receive only 70 percent of those reduced retail prices.  Price

competition by other retailers, if allowed to continue, thus likely would reduce e-book revenues

to levels the Publisher Defendants could not control or predict.

67.     In negotiating the retail price MFN with Apple, "some of [the Publisher

Defendants]" asserted that Apple did not need the provision "because they would be moving to

an agency model with [the other e-book retailers,]" regardless.  Ultimately, though, all Defendants agreed to include the MFN commitment mechanism.

68.      On January 16, 2010, Apple, via Mr. Cue, offered revised terms to the Publisher Defendants that again were identical in substance.  Apple modified its earlier proposal in two significant ways.  First, in response to publisher requests, it added new maximum pricing tiers that increased permissible e-book prices to $16.99 or $19.99, depending on the book's hardcover list price.  Second, Apple's new proposal mitigated these price increases somewhat by adding special pricing tiers for e-book versions of books on the *New York Times* fiction and non-fiction bestseller lists.  For e-book versions of bestsellers bearing list prices of $30 or less, Publisher Defendants could set a price up to $12.99; for bestsellers bearing list prices between $30 and $35, the e-book price cap would be $14.99.  In conjunction with the revised proposal, Mr. Cue set up meetings for the next week to finalize agreements with the Publisher Defendants.

69.      Each Publisher Defendant required assurances that it would not be the only publisher to sign an agreement with Apple that would compel it either to take pricing authority from Amazon or to pull its e-books from Amazon.  The Publisher Defendants continued to fear that Amazon would act to protect its ability to price e-books at $9.99 or less if any one of them acted alone.  Individual Publisher Defendants also feared punishment in the marketplace if only its e-books suddenly became more expensive at retail while other publishers continued to allow retailers to compete on price.  As Mr. Cue noted, "all of them were very concerned about being the only ones to sign a deal with us."  Penguin explicitly communicated to Apple that it would sign an e-book distribution agreement with Apple only if at least three of the other "major[]" publishers did as well.  Apple supplied the needed assurances.

70.     While the Publisher Defendants were discussing e-book distribution terms with Apple during the week of January 18, 2010, Amazon met in New York City with a number of prominent authors and agents to unveil a new program under which copyright holders could take their e-books directly to Amazon – cutting out the publisher – and Amazon would pay royalties of up to 70 percent, far in excess of what publishers offered.  This announcement further highlighted the direct competitive threat Amazon posed to the Publisher Defendants' business model.  The Publisher Defendants reacted immediately.  For example, Penguin USA CEO David Shanks reported being "really angry" after "hav[ing] read [Amazon's] announcement."  After thinking about it for a day, Mr. Shanks concluded, "[o]n Apple I am now more convinced that we need a viable alternative to Amazon or this nonsense will continue and get much worse."  Another decisionmaker stated he was "p****d" at Amazon for starting to compete directly against the publishers and expressed his desire "to screw Amazon."

71.     To persuade one of the Publisher Defendants to stay with the others and sign an agreement, Apple CEO Steve Jobs wrote to an executive of the Publisher Defendant's corporate parent that the publisher had only two choices apart from signing the Apple Agency Agreement: (i) accept the status quo ("Keep going with Amazon at $9.99"); or (ii) continue with a losing policy of delaying the release of electronic versions of new titles ("Hold back your books from Amazon").  According to Jobs, the Apple deal offered the Publisher Defendants a superior alternative path to the higher retail e-book prices they sought:  "Throw in with Apple and see if we can all make a go of this to create a real mainstream e-books market at $12.99 and $14.99."

72.     In addition to passing information through Apple and during their private dinners and other in-person meetings, the Publisher Defendants frequently communicated by telephone to exchange assurances of common action in attempting to raise the retail price of e-books.

These telephone communications increased significantly during the two-month period in which the Publisher Defendants considered and entered the Apple Agency Agreements.  During December 2009 and January 2010, the Publisher Defendants' U.S. CEOs placed at least 56 phone calls to one another.  Each CEO, including Penguin's Shanks and Macmillan's Sargent, placed at least seven such phone calls.

73.     The timing, frequency, duration, and content of the Publisher Defendant CEOs' phone calls demonstrate that the Publisher Defendants used them to seek and exchange assurances of common strategies and business plans regarding the Apple Agency Agreements. For example, in addition to the telephone calls already described in this complaint:

- Near the time Apple first presented the agency model, one Publisher Defendant's CEO used a telephone call – ostensibly made to discuss a marketing joint venture – to tell Penguin USA CEO David Shanks that "everyone is in the same place with Apple."

- After receiving Apple's January 16, 2010 revised proposal, executives of several Publisher Defendants responded to the revised proposal and meetings by, again, seeking and exchanging confidential information.  For example, on Sunday, January 17, one Publisher Defendant's CEO used his mobile phone to call another Publisher Defendant's CEO and talk for approximately ten minutes.  And on the morning of January 19, Penguin USA CEO David Shanks had an extended telephone conversation with the CEO of another Publisher Defendant.

- On January 21, 2010, the CEO of one Publisher Defendant's parent company instructed his U.S. subordinate via e-mail to find out Apple's progress in agency negotiations with other publishers.  Four minutes after that e-mail was sent, the U.S. executive called another Publisher Defendant's CEO, and the two spoke for over eleven minutes.

- On January 22, 2010, at 9:30 a.m., Apple's Cue met with one Publisher Defendant's CEO to make what Cue hoped would be a "final go/no-go decision" about whether the Publisher Defendant would sign an agreement with Apple. Less than an hour later, the Publisher Defendant's CEO made phone calls, two minutes apart, to two other Publisher Defendants' CEOs, including Macmillan's Sargent.  The CEO who placed the calls admitted under oath to placing them specifically to learn if the other two Publisher Defendants would sign with Apple prior to Apple's iPad launch.

- On the evening of Saturday, January 23, 2010, Apple's Cue e-mailed his boss, Steve Jobs, and noted that Penguin USA CEO David Shanks "want[ed] an assurance that he is 1 of 4 before signing." The following Monday morning, at 9:46 a.m., Mr. Shanks called another Publisher Defendant's CEO and the two talked for approximately four minutes. Both Penguin and the other Publisher Defendant signed their Apple Agency Agreements later that day.

74.    On January 24, 2010, Hachette signed an e-book distribution agreement with Apple. Over the next two days, Simon & Schuster, Macmillan, Penguin, and HarperCollins all followed suit and signed e-book distribution agreements with Apple. Within these three days, the Publisher Defendants agreed with Apple to abandon the longstanding wholesale model for selling e-books. The Apple Agency Agreements took effect simultaneously on April 3, 2010 with the release of Apple's new iPad.

75.    The final version of the pricing tiers in the Apple Agency Agreements contained the $12.99 and $14.99 price points for bestsellers, discussed earlier, and also established prices for all other newly released titles based on the hardcover list price of the same title. Although couched as maximum retail prices, the price tiers in fact established the retail e-book prices to be charged by Publisher Defendants.

76.    By entering the Apple Agency Agreements, each Publisher Defendant effectively agreed to require all of their e-book retailers to accept the agency model. Both Apple and the Publisher Defendants understood the Agreements would compel the Publisher Defendants to take pricing authority from all non-Apple e-book retailers. A February 10, 2010 presentation by one Publisher Defendant applauded this result (emphasis in original): "The Apple agency model deal means that we will have to **shift to an agency model with Amazon which [will] strengthen our control over pricing.**"

77.    Apple understood that the final Apple Agency Agreements ensured that the Publisher Defendants would raise their retail e-book prices to the ostensible limits set by the

25

Apple price tiers not only in Apple's forthcoming iBookstore, but on Amazon.com and all other

consumer sites as well.  When asked by a *Wall Street Journal* reporter at the January 27, 2010

iPad unveiling event, "Why should she buy a book for . . . $14.99 from your device when she

could buy one for $9.99 from Amazon on the Kindle or from Barnes & Noble on the Nook?"

Apple CEO Steve Jobs responded, "that won't be the case . . . . the prices will be the same."

78.     Apple understood that the retail price MFN was the key commitment mechanism

to keep the Publisher Defendants advancing their conspiracy in lockstep.  Regarding the effect of

the MFN, Apple executive Pete Alcorn remarked in the context of the European roll-out of the

agency model in the spring of 2010:

> I told [Apple executive Keith Moerer] that I think he and Eddy
> [Cue] made it at least halfway to changing the industry
> permanently, and we should keep the pads on and keep fighting for
> it. I might regret that later, but right now I feel like it's a giant win
> to keep pushing the MFN and forcing people off the [A]mazon
> model and onto ours. If anything, the place to give is the pricing --
> long run, the mfn is more important. The interesting insight in the
> meeting was Eddy's explanation that it doesn't have to be that
> broad -- any decent MFN forces the model.

79.     Within the four months following the signing of the Apple Agency Agreements,

and over Amazon's objections, each Publisher Defendant had transformed its business

relationship with all of the major e-book retailers from a wholesale model to an agency model

and imposed flat prohibitions against e-book discounting or other price competition on all non-

Apple e-book retailers.

80.     For example, after it signed its Apple Agency Agreement, Macmillan presented

Amazon a choice:  adopt the agency model or lose the ability to sell e-book versions of new

hardcover titles for the first seven months of their release.  Amazon rejected Macmillan's

ultimatum and sought to preserve its ability to sell e-book versions of newly released hardcover

titles for $9.99.  To resist Macmillan's efforts to force it to accept either the agency model or

delayed electronic availability, Amazon effectively stopped selling Macmillan's print books and e-books.

81.    When Amazon stopped selling Macmillan titles, other Publisher Defendants did not view the situation as an opportunity to gain market share from a weakened competitor. Instead, they rallied to support Macmillan. For example, the CEO of one Publisher Defendant's parent company instructed the Publisher Defendant's CEO that "[Macmillan CEO] John Sargent needs our help!" The parent company CEO explained, "M[acm]illan have been brave, but they are small. We need to move the lines. And I am thrilled to know how A[mazon] will react against 3 or 4 of the big guys."

82.    The CEO of one Publisher Defendant's parent company assured Macmillan CEO John Sargent of his company's support in a January 31, 2010 email: "I can ensure you that you are not going to find your company alone in the battle." The same parent company CEO also assured the head of Macmillan's corporate parent in a February 1 email that "others will enter the battle field!" Overall, Macmillan received "hugely supportive" correspondence from the publishing industry during Macmillan's effort to force Amazon to accept the agency model.

83.    As its battle with Amazon continued, Macmillan knew that, because the other Publisher Defendants, via the Apple Agency Agreements, had locked themselves into forcing agency on Amazon to advance their conspiratorial goals, Amazon soon would face similar edicts from a united front of Publisher Defendants. And Amazon could not delist the books of all five Publisher Defendants because they together accounted for nearly half of Amazon's e-book business. Macmillan CEO John Sargent explained the company's reasoning: "we believed whatever was happening, whatever Amazon was doing here, they were going to face – they're going to have more of the same in the future one way or another." Another Publisher Defendant

similarly recognized that Macmillan was not acting unilaterally but rather was "leading the charge on moving Amazon to the agency model."

84.     Amazon quickly came to fully appreciate that not just Macmillan but all five Publisher Defendants had irrevocably committed themselves to the agency model across all retailers, including taking control of retail pricing and thereby stripping away any opportunity for e-book retailers to compete on price. Just two days after it stopped selling Macmillan titles, Amazon capitulated and publicly announced that it had no choice but to accept the agency model, and it soon resumed selling Macmillan's e-book and print book titles.

D.     *Defendants Further the Conspiracy by Pressuring Another Publisher To Adopt the Agency Model*

85.     When a company takes a pro-competitive action by introducing a new product, lowering its prices, or even adopting a new business model that helps it sell more product at better prices, it typically does not want its competitors to copy its action, but prefers to maintain a first-mover or competitive advantage. In contrast, when companies jointly take collusive action, such as instituting a coordinated price increase, they typically want the rest of their competitors to join them in that action. Because collusive actions are not pro-competitive or consumer friendly, any competitor that does not go along with the conspirators can take more consumer friendly actions and see its market share rise at the expense of the conspirators. Here, the Defendants acted consistently with a collusive arrangement, and inconsistently with a pro-competitive arrangement, as they sought to pressure another publisher (whose market share was growing at the Publisher Defendants' expense after the Apple Agency Contracts became effective) to join them.

86.     Penguin appears to have taken the lead in these efforts. Its U.S. CEO, David Shanks, twice directly told the executives of the holdout major publisher about his displeasure

with their decision to continue selling e-books on the wholesale model. Mr. Shanks tried to justify the actions of the conspiracy as an effort to save brick-and-mortar bookstores and criticized the other publisher for "not helping" the group. The executives of the other publisher responded to Mr. Shanks's complaints by explaining their objections to the agency model.

87.     Mr. Shanks also encouraged a large print book and e-book retailer to punish the other publisher for not joining Defendants' conspiracy. In March 2010, Mr. Shanks sent an e-mail message to an executive of the retailer complaining that the publisher "has chosen to stay on their current model and will allow retailers to sell at whatever price they wish." Mr. Shanks argued that "[s]ince Penguin is looking out for [your] welfare at what appears to be great costs to us, I would hope that [you] would be equally brutal to Publishers who have thrown in with your competition with obvious disdain for your welfare. . . . I hope you make [the publisher] hurt like Amazon is doing to [the Publisher Defendants]."

88.     When the third-party retailer continued to promote the non-defendant publisher's books, Mr. Shanks applied more pressure. In a June 22, 2010 email to the retailer's CEO, Mr. Shanks claimed to be "baffled" as to why the retailer would promote that publisher's books instead of just those published by "people who stood up for you."

89.     Throughout the summer of 2010, Apple also cajoled the holdout publisher to adopt agency terms in line with those of the Publisher Defendants, including on a phone call between Apple CEO Steve Jobs and the holdout publisher's CEO. Apple flatly refused to sell the holdout publisher's e-books unless and until it agreed to an agency relationship substantially similar to the arrangement between Apple and the Publisher Defendants defined by the Apple Agency Agreements.

E.      *Conspiracy Succeeds at Raising and Stabilizing Consumer E-book Prices*

90.     The ostensible maximum prices included in the Apple Agency Agreements' price schedule represent, in practice, actual e-book prices. Indeed, at the time the Publisher Defendants snatched retail pricing authority away from Amazon and other e-book retailers, not one of them had built an internal retail pricing apparatus sufficient to do anything other than set retail prices at the Apple Agency Agreements' ostensible caps. Once their agency agreements took effect, the Publisher Defendants raised e-book prices at all retail outlets to the maximum price level within each tier. Even today, two years after the Publisher Defendants began setting e-book retail prices according to the Apple price tiers, they still set the retail prices for the electronic versions of all or nearly all of their bestselling hardcover titles at the ostensible maximum price allowed by those price tiers.

91.     The Publisher Defendants' collective adoption of the Apple Agency Agreements allowed them (facilitated by Apple) to raise, fix, and stabilize retail e-book prices in three steps: (a) they took away retail pricing authority from retailers; (b) they then set retail e-book prices according to the Apple price tiers; and (c) they then exported the agency model and higher retail prices to the rest of the industry, in part to comply with the retail price MFN included in each Apple Agency Agreement.

92.     Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers led to an increase in the retail prices of newly released and bestselling e-books. Prior to the Defendants' conspiracy, consumers benefited from price competition that led to $9.99 prices for newly released and bestselling e-books. Almost immediately after Apple launched its iBookstore in April 2010 and the Publisher Defendants imposed agency model pricing on all retailers, the Publisher

Defendants' e-book prices for most newly released and bestselling e-books rose to either $12.99 or $14.99.

93.     Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers for their newly released and bestselling e-books also led to an increase in average retail prices of the balance of Publisher Defendants' e-book catalogs, their so-called "backlists." Now that the Publisher Defendants control the retail prices of e-books – but Amazon maintains control of its print book retail prices – Publisher Defendants' e-book prices sometimes are higher than Amazon's prices for print versions of the same titles.

## VII.  VIOLATION ALLEGED

94.     Beginning no later than 2009, and continuing to date, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This offense is likely to continue and recur unless the relief requested is granted.

95.     The conspiracy and agreement consists of an understanding and concert of action among Defendants and their co-conspirators to raise, fix, and stabilize retail e-book prices, to end price competition among e-book retailers, and to limit retail price competition among the Publisher Defendants, ultimately effectuated by collectively adopting and adhering to functionally identical methods of selling e-books and price schedules.

96.     For the purpose of forming and effectuating this agreement and conspiracy, some or all Defendants did the following things, among others:

      a.     Shared their business information, plans, and strategies in order to formulate ways to raise retail e-book prices;

b.      Assured each other of support in attempting to raise retail e-book prices;

c.      Employed ostensible joint venture meetings to disguise their attempts to raise retail e-book prices;

d.      Fixed the method of and formulas for setting retail e-book prices;

e.      Fixed tiers for retail e-book prices;

f.      Eliminated the ability of e-book retailers to fund retail e-book price decreases out of their own margins; and

g.      Raised the retail prices of their newly released and bestselling e-books to the agreed prices – the ostensible price caps – contained in the pricing schedule of their Apple Agency Agreements.

97.     Defendants' conspiracy and agreement, in which the Publisher Defendants and Apple agreed to raise, fix, and stabilize retail e-book prices, to end price competition among e-book retailers, and to limit retail price competition among the Publisher Defendants by fixing retail e-book prices, constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.     Moreover, Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on consumers in the trade e-books market by depriving consumers of the benefits of competition among e-book retailers as to both retail prices and retail innovations (such as e-book clubs and subscription plans), such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.     Where, as here, defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is trade e-books.  The anticompetitive acts

at issue in this case directly affect the sale of trade e-books to consumers. No reasonable substitute exists for e-books. There are no technological alternatives to e-books, thousands of which can be stored on a single small device. E-books can be stored and read on electronic devices, while print books cannot. E-books can be located, purchased, and downloaded anywhere a customer has an internet connection, while print books cannot. Industry firms also view e-books as a separate market segment from print books, and the Publisher Defendants were able to impose and sustain a significant retail price increase for their trade e-books.

100.    The relevant geographic market is the United States. The rights to license e-books are granted on territorial bases, with the United States typically forming its own territory. E-book retailers typically present a unique storefront to U.S. consumers, often with e-books bearing different retail prices than the same titles would command on the same retailer's foreign websites.

101.    The Publisher Defendants possess market power in the market for trade e-books. The Publisher Defendants successfully imposed and sustained a significant retail price increase for their trade e-books.   Collectively, they create and distribute a wide variety of popular e-books, regularly comprising over half of the *New York Times* fiction and non-fiction bestseller lists. Collectively, they provide a critical input to any firm selling trade e-books to consumers. Any retailer selling trade e-books to consumers would not be able to forgo profitably the sale of the Publisher Defendants' e-books.

102.    Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

> a.    Increasing the retail prices of trade e-books;
>
> b.    Eliminating competition on price among e-book retailers;

c.      Restraining competition on retail price among the Publisher Defendants;

d.      Restraining competition among the Publisher Defendants for favorable

relationships with e-book retailers;

e.      Constraining innovation among e-book retailers;

f.      Entrenching incumbent publishers' favorable position in the sale and

distribution of print books by slowing the migration from print books to e-books;

g.      Making more likely express or tacit collusion among publishers; and

h.      Reducing competitive pressure on print book prices.

103.    Defendants' agreement and conspiracy is not reasonably necessary to accomplish

any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish

any such objective.

## VIII.  REQUEST FOR RELIEF

104.    To remedy these illegal acts, the United States requests that the Court:

a.      Adjudge and decree that Defendants entered into an unlawful contract,

combination, or conspiracy in unreasonable restraint of interstate trade and commerce in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      Enjoin the Defendants, their officers, agents, servants, employees and

attorneys and their successors and all other persons acting or claiming to act in active

concert or participation with one or more of them, from continuing, maintaining, or

renewing in any manner, directly or indirectly, the conduct alleged herein or from

engaging in any other conduct, combination, conspiracy, agreement, understanding, plan,

program, or other arrangement having the same effect as the alleged violation or that

otherwise violates Section 1 of the Sherman Act, 15 U.S.C. § 1, through fixing the

method and manner in which they sell e-books, or otherwise agreeing to set the price or

release date for e-books, or collective negotiation of e-book agreements, or otherwise

collectively restraining retail price competition for e-books;

      c.      Prohibit the collusive setting of price tiers that can de facto fix prices;

      d.      Declare null and void the Apple Agency Agreements and any agreement

between a Publisher Defendant and an e-book retailer that restricts, limits, or impedes the

e-book retailer's ability to set, alter, or reduce the retail price of any e-book or to offer

price or other promotions to encourage consumers to purchase any e-book, or contains a

retail price MFN;

      e.      Reform the agreements between Apple and Publisher Defendants to strike

the retail price MFN clauses as void and unenforceable; and

      f.      Award to Plaintiff its costs of this action and such other and further relief

as may be appropriate and as the Court may deem just and proper.

DATED:  APRIL 11, 2012
FOR PLAINTIFF
UNITED STATES OF AMERICA:


SHARIS A. POZEN
Acting Assistant Attorney General for
Antitrust


JOSEPH F. WAYLAND
Deputy Assistant Attorney General


GENE KIMMELMAN
Chief Counsel for Competition Policy and
  Intergovernmental Relations


PATRICIA A. BRINK
Director of Civil Enforcement
MARK W. RYAN
Director of Litigation
mark.w.ryan@usdoj.gov


JOHN R. READ
Chief
DAVID C. KULLY
Assistant Chief
Litigation III Section
david.kully@usdoj.gov


DANIEL MCCUAIG
NATHAN P. SUTTON
MARY BETH MCGEE
OWEN M. KENDLER
WILLIAM H. JONES II
STEPHEN T. FAIRCHILD
 Attorneys for the United States
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 307-0520
Facsimile: (202) 514-7308
daniel.mccuaig@usdoj.gov
nathan.sutton@usdoj.gov
mary.beth.mcgee@usdoj.gov
owen.kendler@usdoj.gov
bill.jones2@usdoj.gov
stephen.fairchild@usdoj.gov