**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        Plaintiff,

           v.

APPLE INC., et al.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:

12-CV-2826 (DLC)


**APPLE INC.'S ANSWER**


GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197

*Attorneys for Defendant Apple Inc.*

# I. INTRODUCTION

The Government's Complaint against Apple is fundamentally flawed as a matter of fact and law.  Apple has not "conspired" with anyone, was not aware of any alleged "conspiracy" by others, and never "fixed prices."  Apple individually negotiated bilateral agreements with book publishers that allowed it to enter and compete in a new market segment – eBooks.  The iBookstore offered its customers a new outstanding, innovative eBook reading experience, an expansion of categories and titles of eBooks, and competitive prices.

The Government sides with monopoly, rather than competition, in bringing this case. The Government starts from the false premise that an eBooks "market" was characterized by "robust price competition" prior to Apple's entry.  This ignores a simple and incontrovertible fact:  before 2010, there was no real competition, there was only Amazon.  At the time Apple entered the market, Amazon sold nearly nine out of every ten eBooks, and its power over price and product selection was nearly absolute.  Apple's entry spurred tremendous growth in eBook titles, range and variety of offerings, sales, and improved quality of the eBook reading experience.  This is evidence of a dynamic, competitive market.  These inconvenient facts are ignored in the Complaint.  Instead, the Government focuses on increased prices for a handful of titles. The Complaint does not allege that all eBook prices, or even most eBook prices, increased after Apple entered the market.

The Government alleges that Apple conspired to eliminate retail price competition.  This is absurd.  Nothing Apple did reduced competition or fixed prices.  As an agent, Apple did not set prices.  Nor did Apple have an interest in higher prices for eBooks.  Indeed, Apple negotiated two *limits* on Publisher pricing – maximum prices to make sure electronic books cost considerably less than physical books, and the right to require a publisher to match in the iBookstore a

lower competitive price on new release titles being offered elsewhere.  The price matching term allowed exceptions for promotions, was not rigidly self-executing, and encouraged, not discouraged, competition, as publishers' respective titles could directly compete at retail against each other on the merits, including price.

Apple's entry has benefitted consumers.  Apple's entry brought competition where none existed.  Amazon still has a dominant share in eBook and physical distribution, with significant power it often leverages over the producers and consumers of books to the detriment of both.  But prior to Apple's entry, Amazon effectively stood alone and unchallenged.  No longer.  Amazon is now forced to compete with Apple, Barnes & Noble, and others.  And the pace of innovation has quickened, enticing more and more consumers to try eBooks.  Apple introduced a number of innovative features, such as color pictures, audio and video, the read and listen feature, and fixed display (critical for graphics-intensive books like cookbooks, travel books, and textbooks, many of which were unavailable before Apple's entry).  As a result—as even the Government is compelled to admit—output has exploded.  Consumers enjoy vastly increased choice.  Amazon has had to compete and innovate beyond its small black and white eReader, enriching the experience for consumers across all platforms.

Apple offered any Publisher interested in the iPad platform and iBookstore the ability to sell its eBooks directly to consumers, rather than dealing only with a single dominant buyer, Amazon.  It offered eBook consumers who had no interest in owning a Kindle eReader a new platform to obtain and read eBooks.  Apple's entry also provided new opportunities for self-publishing and smaller publishing houses.  Apple is not privy to Amazon's motivations when it adopted the agency model, but enabling entry and introducing new competition, which is all Apple did, cannot be a violation of the antitrust laws.

The Supreme Court has made clear that the antitrust laws are not a vehicle for Government intervention in the economy to impose its view of the "best" competitive outcome, or the "optimal" means of competition, but rather to address anticompetitive conduct.  Apple's entry into eBook distribution is classic procompetitive conduct, and for Apple to be subject to hindsight legal attack for a business strategy well-recognized as perfectly proper sends the wrong message to the market, and will discourage competitive entry and innovation and harm consumers.

## II.  RESPONSE TO INDIVIDUAL PARAGRAPHS

1.     Apple admits that "technology," in particular its transforming innovation in both hardware and software, has changed the business of publishing and that consumers reap "a variety of benefits from eBooks."  The innovations that Apple brought to the market with the launch of the iPad and iBookstore in 2010 ushered in a new era of innovation and competition. A market dominated by a simple, yet relatively expensive, black and white proprietary e-reader was transformed overnight.  Apple introduced a number of innovative features, such as color pictures, audio and video, the read and listen feature, and fixed display (particularly important for graphics-intensive books like cookbooks, travel books and textbooks, many of which were simply unavailable before Apple's entry) that have since been mimicked by its competitors.  The advances in technology and new competition have led to a "dramatic" increase in the number of eBooks sold and categories available.  Apple lacks sufficient information and belief to admit or deny whether eBooks are "considerably" cheaper to produce and distribute than print books, due to the substantial overlapping costs relating to the creation of the content itself, but admits that there are costs associated with print books that are not present with eBooks and that Apple has had a consistent business philosophy to seek to offer digital media for substantially less than

their physical counterparts.  Except as otherwise admitted, Apple denies the allegations of

paragraph 1.

2.      Apple admits that eBook sales have increased rapidly since November 2007, and

that growth accelerated when Apple began offering eBooks through its iBookstore.  Apple

admits that Amazon has at times set a $9.99 price level for certain newly released titles and New

York Times bestsellers.  Apple denies, however, that Amazon "substantially" lowered the price

of "newly released and best-selling eBooks."  There was no pre-existing established price level,

and Amazon's primary competition at that time was with print books, a market where it had

considerable pricing power.  Except as otherwise admitted, Apple denies the allegations of

paragraph 2.

3.      Apple lacks sufficient information and belief to respond to the allegations of par-

agraph 3, and on that basis denies them, except Apple admits that certain book publishers

expressed publicly, and individually to Apple representatives, varying degrees of unhappiness

with Amazon's tactics, including its pricing.  Apple specifically denies the allegation that Apple

in any way conspired with the publishers, or that Apple had or "shared" a goal of "restraining

retail price competition" in the sale of eBooks.  Indeed, as an agent selling books on commission

through its iBookstore, and without a print book business like all other market participants,

Apple uniquely benefitted from a robust competitive environment leading to the growth of

eBook sales.

4.      Apple admits that at the time it was preparing to launch the iPad, it was consider-

ing whether it would sell eBooks that could be read on the iPad.  Apple did not believe it was

necessary to sell eBooks for the iPad to be successful, given the extraordinary capabilities of the

iPad in among other things, media, web-browsing, and communication, but concluded that if a

viable iBookstore model could be created, it would consider offering eBooks.  Apple believed

that its iPad was a revolutionary improvement on existing technology and that it would provide

additional competitive opportunities for a broad range of content, including eBooks.  After

having separate discussions with individual book publishers, and after otherwise researching and

evaluating the best approach to entering eBook distribution, Apple eventually individually

proposed to book publishers – large and small – that it would offer eBooks through its

iBookstore for a 30% commission.  Apple admits that absent the agency agreements it would not

have entered eBook distribution, given the circumstances of the business as it existed prior to

Apple's entry.  Except as otherwise admitted, Apple denies the allegations of paragraph 4.

Apple did not seek to limit eBook retail price competition, did not reach an agreement to cause

retail price competition to "cease" and did not agree that "retail eBook prices would increase

significantly."  Apple had no involvement, directly or indirectly, in Amazon's decisions concern-

ing pricing of eBooks sold through Amazon and made no decisions itself as to prices of eBooks

distributed through the iBookstore, except for the limits it negotiated on prices, and except for its

ability to require that competitive pricing be offered through the iBookstore on new releases.

     5.     Apple admits that it entered into individual bilateral contracts with book publish-

ers to offer eBooks through its iBookstore using an agency model.  Those contracts are the best

evidence of their contents.  Apple has always sold eBooks under the agency model.  That prac-

tice predated the iBookstore.  Apple's App Store, which has distributed more than 25 billion

applications ("apps"), has always been based on an agency model.  A number of individual

eBook titles were sold through the App Store prior to the opening of the iBookstore – each and

every sale under an agency agreement with the author or publisher.  Apple denies that its agency

agreements represented a change in Apple's business model but admits that absent the agency

agreements (not some purported "conspiracy") it would not have entered eBook distribution, given the circumstances of the business as it existed prior to Apple's entry.  Except as specifically admitted, Apple denies the allegations of paragraph 5.

6.      Apple denies the allegations of paragraph 6.  Apple did not agree to, nor did it "facilitate," the transition of other retailers to an agency model.  The Government's selective citation to hearsay from a small portion of Apple's former CEO's biography is irrelevant and has no place in this litigation.  In an agency model, the "principal," in this case the publisher, decides the price of its product in the retail marketplace.  If that principal believes a particular product is worth more or less than others are charging, it is free under our economic and legal system to offer that higher or lower price.  And it is perfectly legal for a principal and agent to discuss the pricing decisions of the principal.  There is no allegation that Apple ever had any communications or agreements, directly or indirectly, with *its* competitor, Amazon, on any of the issues raised in the complaint.

7.      Apple denies the allegations of paragraph 7.  The Government's reference to an "akido move" – another selective citation to the biography of Apple's former CEO – is flatly inconsistent with the concept of an agreement.  "Akido" is not a team sport like football with a quarterback directing the plays; it is a defensive martial art practiced one-on-one by individuals, requiring use of little strength or power, based on redirecting an attacker's own force.  The small excerpted portion at most describes the impact of the additional competition introduced by the launch of the iBookstore and the iPad.  This lawsuit wrongly seeks to condemn Apple based on the Government's apparent dissatisfaction with the impact of competitive entry, demand stimulation and innovation (ignoring significant indicia of consumer and market benefit), not based on any anticompetitive conduct by Apple.  This is contrary to law and sound economic policy.

8.      Apple lacks information and belief sufficient to respond to the allegations concerning the Publisher Defendants, and on that basis denies those allegations.  Otherwise, Apple denies the allegations of paragraph 8.

9.      Apple lacks information and belief to respond to the allegations as to the purpose of the lawsuit and on that basis denies the allegations.  Apple also denies that it has violated the antitrust laws or that the requested relief is needed to restore competition.

10.     Apple denies the allegations of paragraph 10.

11.     Paragraph 11 simply describes the Government's requested relief and requires no response.  Apple denies that any relief is appropriate.

12.     Apple admits the allegations of paragraph 12.

13.     Apple admits the allegations of paragraph 13.

14.     Apple admits the allegations of paragraph 14.

15.     Apple admits the allegations of paragraph 15.

16.     Apple admits the allegations of paragraph 16.

17.     Apple admits the allegations of paragraph 17.

18.     Paragraph 18 simply describes the statute under which the action is brought and references the Government's requested relief and therefore requires no response.  Apple denies that it has committed any legal violation and that any relief is appropriate.

19.     Apple admits the allegations of paragraph 19.

20.     Apple admits that the Court has personal jurisdiction over it and that venue is proper in this judicial district.  Apple denies that it committed any acts in furtherance of a conspiracy.

21.     Apple admits that its activities associated with its sale of eBooks took place in interstate commerce and have a substantial effect on interstate commerce.  Apple lacks information and belief as to the source of information underlying the allegations in paragraph 21 concerning how much United States consumers paid for eBooks, and on that basis denies those allegations.

22.     Apple denies that any of its senior executives or other personnel has participated as co-conspirators, and denies that Apple participated in any conspiracy.  Except as denied, Apple lacks sufficient information and belief to respond to the remaining allegations and on that basis denies them.

23.     Apple responds that paragraph 23 generally appears to provide an accurate high-level description of a portion of the print book business.  Apple has never participated in the print book business, and therefore lacks sufficient information and belief to respond beyond that.

24.     Apple responds that paragraph 24 generally appears to provide an accurate high-level description of a portion of the print book business.  Apple has never participated in the print book business, and therefore lacks sufficient information and belief to respond beyond that.

25.     Apple admits the allegations of paragraph 25, except that it lacks information and belief sufficient to respond to the allegations concerning specific categories of expenses, and on that basis denies those allegations.

26.     Apple admits the allegations of paragraph 26, except that it lacks information and belief sufficient to respond to the allegations concerning specific categories of expenses, and on that basis denies those allegations.

27.     Apple admits that eBook sales have grown explosively since their introduction, and since Apple's entry.  Apple lacks information and belief sufficient to respond to the state-

ments concerning the statistics alleged in this paragraph, and on that basis denies those allega-

tions.  Apple denies that non-trade eBooks are not substitutable for trade eBooks.

28.     Apple admits the allegations of paragraph 28.

29.     Apple admits the allegations of paragraph 29.

30.     Apple is informed and believes that wholesale prices for newly released and best-

selling eBooks were often above the $9.99 price referenced in paragraph 30, although Apple

lacks sufficient information and belief (including but not limited to the scope of the term "Ama-

zon's e-book distribution business") to respond to the allegations in paragraph 30, and on that

basis denies them.

31.     Apple lacks sufficient information and belief to respond to the allegations in para-

graph 31, and on that basis denies them.

32.     Apple lacks sufficient information and belief as to the state of mind of the Pub-

lisher Defendants to respond to those allegations and on that basis denies the allegations of

paragraph 32, except admits that publicly and privately in their individual discussions with

Apple, representatives of each of the publishers separately expressed varying degrees of unhap-

piness with Amazon's tactics, including its pricing.

33.     Apple lacks sufficient information and belief as to the state of mind of the Pub-

lisher Defendants to respond to those allegations and on that basis denies the allegations of

paragraph 33, except admits that publicly and privately in their individual discussions with

Apple, representatives of each of the publishers separately expressed varying degrees of unhap-

piness with Amazon's tactics, including its pricing.

34.     Apple lacks sufficient information and belief as to the state of mind of the Publisher Defendants to respond to those allegations and on that basis denies the allegations of paragraph 34.

35.     Apple lacks sufficient information and belief as to the allegations regarding the Publisher Defendants and on that basis denies the allegations of paragraph 35, except that Apple admits that Amazon was the dominant retailer of both print books and eBooks.

36.     Apple lacks sufficient information and belief as to the allegations regarding the Publisher Defendants to respond to those allegations and on that basis denies the allegations of paragraph 36.

37.     Apple lacks sufficient information and belief as to the allegations regarding the Publisher Defendants to respond to those allegations in paragraph 37.  Apple denies the remaining allegations that "Apple and the Publisher Defendants" in "late 2009" (or any time) settled on "the strategy" to "give the Publisher Defendants the power to raise retail eBook prices themselves."  It was perfectly lawful for Apple to offer an opportunity for individual publishers to sell eBooks directly to consumers with Apple as an agent on commission.  The Complaint acknowledges that Apple did not participate in the formation of a purported publisher conspiracy (*see, e.g.,* paragraph 53).  Indeed, the Complaint alleges that Apple did not hold "exploratory conversations" with the publishers until December 2009 (paragraph 53).  Although it alleges in conclusory terms that Apple and the Publishers apparently immediately agreed on a conspiratorial "strategy" in December 2009, there are no allegations that Apple was made aware of the purported underlying conspiracy between the publishers.  Proposing an agency model was in Apple's unilateral and independent business interests, and Apple's separate negotiations with each of the publishers over a period of weeks is directly inconsistent with the allegations in paragraph 37.

38.     Apple lacks sufficient information and belief as to the allegations regarding the Publisher Defendants to respond to those allegations and on that basis denies those allegations in paragraph 38.  Apple denies the remaining allegations, including the allegation that it provided "assurances" they "all would move together to raise retail eBook prices."  This allegation makes no sense.  Apple had no power in its agreements to set prices, except to require a publisher to match lower prices offered elsewhere for a very small number of individual titles.  The DOJ's Competitive Impact Statement filed with this Court highlights the lack of logic in this allegation.  It states, in pertinent part at page 6, that "[a]fter each round of negotiations with Apple over the terms of their agency agreements, Publisher Defendants' CEOs immediately contacted each other to discuss strategy and verify where each stood with Apple."  Such alleged communications among the publishers underscores the fact that Apple was negotiating independently with each publisher and not providing the purported assurances alleged.  The suggestion that Apple's decision to pursue an agency model supports a showing of conspiracy because it is inconsistent with "the vast bulk of the digital media it offers in its iTunes store" ignores (among other things) that Apple's "App Store" operates on an agency model.  Prior to the iBookstore, Apple sold a number of individual eBook titles on the App Store, all under the agency model.  Moreover, the use of the phrase "ostensible maximum prices" is conclusory rhetoric contrary to the facts – raising a price no higher than an "ostensible maximum" shows that it was in fact an actual maximum.  Finally, Apple admits that any "illicit" communications among the Publishers, to the extent they existed, were concealed from Apple.

39.     Apple lacks sufficient information and belief as to the allegations regarding the Publisher Defendants contained in paragraph 39 and on that basis denies the allegations.  The allegations in paragraph 39 (and other similar allegations in succeeding paragraphs) concerning

the Publisher Defendants' private communications without any involvement by Apple, if true, undermine the position that Apple's facilitation was necessary to communication or alleged agreement among the Publisher Defendants.  These allegations predate any Apple discussions with individual publishers concerning the sale of eBooks.  If Publisher Defendants had any "illicit" communications with each other, either before or after Apple began negotiations, Apple admits that those communications were concealed from Apple.

40.     Apple lacks sufficient information and belief as to the allegations in paragraph 40 to respond, and on that basis denies them.

41.     Apple lacks sufficient information and belief as to the allegations in paragraph 41 to respond, and on that basis denies them.

42.     Apple lacks sufficient information and belief as to the allegations in paragraph 42 to respond, and on that basis denies them.

43.     Apple lacks sufficient information and belief as to the allegations in paragraph 43 to respond and, on that basis denies them.

44.     Apple lacks sufficient information and belief as to the allegations in paragraph 44 to respond, and on that basis denies them.

45.     Apple lacks sufficient information and belief as to the allegations in paragraph 45 to respond, and on that basis denies them.

46.     Apple lacks sufficient information and belief as to the allegations in paragraph 46 to respond, and on that basis denies them.

47.     Apple lacks sufficient information and belief as to the allegations in paragraph 47 to respond, and on that basis denies them.

48.     Apple lacks sufficient information and belief as to the allegations in paragraph 48 to respond, and on that basis denies them.

49.     Apple lacks sufficient information and belief as to the allegations in paragraph 49 to respond, and on that basis denies them.

50.     Apple lacks sufficient information and belief as to the allegations in paragraph 50 to respond, and on that basis denies them.

51.     Apple admits that in late 2009 it considered whether it would create an iBookstore to offer eBooks to read on its new and yet-to-be announced iPad.  Apple considered whether it would utilize a wholesale model.  Apple admits that Mr. Cue wrote an email to Mr. Jobs on February 19, 2009, almost a year before the iPad launch, before Apple began its evaluation of the eBook business, and ten months before Apple had its individual exploratory conversations with each publisher.  That email is the best evidence of its contents.  Apple denies that it contemplated "dividing the digital content world with Amazon," and notes that there are no allegations in the Complaint of any communications between Apple and Amazon on any topic, much less a fictional market division that is not the subject of this, or any proceeding, because nothing of the sort was contemplated, much less acted upon.

52.     Apple denies the allegations of paragraph 52.  Apple chose to pursue an agency model because it concluded it was the best business approach for Apple to accomplish its legiti-mate independent business objectives.  Agency allowed Apple to enter at an effective lower cost than Amazon.  Apple was under no obligation to follow Amazon's business strategy.  At the time Amazon was trying to establish the dominance of a single purpose eReader through strategic loss-leader pricing, Apple sought to offer iPad customers additional content choices, at a compet-itive price, beyond the Apps and digital media already planned for the iPad.  Like all companies,

Apple did not want to lose money.  Apple denies that it sought or earned a 30% profit margin, as it incurred substantial costs in running and marketing the iBookstore.  Apple's commission was not "profit" to Apple; Apple first had to cover the costs associated with its operation of the iBookstore and its agency functions.

53.     Apple admits that Eddy Cue separately telephoned individual representatives of various book publishers to schedule separate in-person meetings on December 15 and 16, 2009, to learn more about the book business and to explore the potential for Apple to participate in the eBook business.  Apple admits that this was the first time that it met with publishers to discuss the possibility of opening a digital bookstore.  Apple lacks sufficient information or belief to respond to the remaining allegations, and on that basis denies them.

54.     Apple lacks sufficient information or belief to respond to the allegations of paragraph 54, and on that basis denies them, except that Apple admits that Hachette and HarperCollins in separate meetings described the agency model, and each separately indicated that it would be individually interested in attempting to negotiate with Apple an arrangement whereby Apple would sell books as an agent.

55.     Apple admits that it received separate feedback from individual representatives of each of the publishers that each publisher had varying degrees of unhappiness with Amazon having a dominant position in the distribution of eBooks, including its pricing strategy.  The comments echoed those made by the same publishers in articles in the New York Times, Wall Street Journal, and other media throughout 2009.  Apple otherwise denies the allegations of paragraph 55.

56.     Apple denies that its agency contracts were part of a "scheme," but admits that part of its motivation to start an iBookstore was to generate revenue and profits for the corpora-

tion and its shareholders and to avoid negative margins that it believed Amazon was incurring as it sold certain bestselling eBooks below cost.  Apple otherwise denies the allegations of paragraph 56.  Apple's commission does not reflect its profit margin on eBook sales.  Apple incurs substantial costs in running and marketing the iBookstore and in performing its agency function.

57.     Apple lacks sufficient information and belief as to the allegations in paragraph 57 to respond, and on that basis denies them, except that if Publisher Defendants had any "illicit" communications with each other, Apple agrees and admits that those communications were concealed from Apple.

58.     Apple admits that in early stages of its bilateral negotiations with individual publishers it made various proposals but denies that its motivation in its negotiations was ever to prevent or minimize competition on retail prices.  None of Apple's proposals ever implicated, or was intended to affect, competition among and between the publishers.  Except as admitted, Apple denies the allegations of paragraph 58.

59.     Apple denies that the publishers "acknowledged" their alleged "common objective to end Amazon's $9.99 pricing."  Mr. Cue's e-mail communications with Mr. Jobs are the best evidence of their contents.  Apple admits that each of the publishers both publicly, and privately in individual communications to Apple, expressed varying degrees of unhappiness with Amazon's tactics, including its pricing.  Apple did not require that, as part of its proposed agency agreements, the publishers contractually adhere to a $9.99 price ceiling regardless of competitive or market conditions.  There is no antitrust doctrine that prevents pricing changes in a market, but Apple's agreements did not dictate such pricing changes.

60.     Apple denies the allegations of paragraph 60, except that Apple admits that any positive margin on sales by definition would be significantly above the negative prevailing

margin incurred by Amazon across at least some of its eBook sales.  Apple specifically denies

that the requested 30% agency commission represented a profit margin – instead it was a fee for

a combination of services having a considerable cost to Apple – or that it was a function of any

leverage or market power.  Instead, Apple's negotiating position was based entirely on its

consistent business model, and the attraction of its innovative new iPad and the iBookstore as a

distribution platform for book publishers who wanted to expand the market for eBooks.  This

was competition on the merits, with Apple providing a superior reading platform on a beautiful

10 inch iPad screen, with color, multi-media, and fixed display, and access to millions of future

iPad purchasers.  This is classic procompetitive behavior that should be celebrated, not con-

demned through litigation.  The Government's allegations highlight a fundamental problem with

its theory as to Apple.  Without Apple's entry, eBook distribution would essentially be ceded to a

single distributor (Amazon), who would then possess virtually unlimited power in the eBook

business.  Apple provided all publishers, large or small, similar opportunities to utilize Apple as

an agent to sell eBooks directly to consumers through the iBookstore on non-discriminatory

terms.

    61.    Apple denies that it "kept each Publisher Defendant informed of the status of its

negotiations with the other Publisher Defendants."  Apple admits that on occasion in the weeks

prior to the announcement of the iPad it provided individual publishers a general sense of

progress toward the conclusion of negotiations with a sufficient number of publishers in total to

warrant Apple's entry, but Apple denies that it provided any one publisher with individual or

specific information about any other publisher.  Apple had no interest in negotiating arbitrary

variations in agreements for the performance of an essentially identical agency role for similarly

situated publishers and had concrete efficiency-based justifications for seeking terms that were

not materially inconsistent across principals; accordingly, Apple admits and alleges that any assurances it made to individual publishers were consistent with these interests and justifications and wholly lawful.  Apple engaged in individual negotiations with each publisher, and reacted on an independent basis to the separate input of each publisher.  Apple had no intent to and did not facilitate a conspiracy among the publishers; it simply used commonsense and time-honored negotiating tactics to achieve its independent business interests as ultimately reflected in separate bilateral contracts between Apple and each Publisher Defendant, each of which is the best evidence of its contents.  Apple wanted pricing to be competitive, and its bilateral negotiations were intended to achieve that goal.  Apple denies that it knowingly allowed the publishers to signal to each other about agency terms at all, much less as part of an alleged "ultimate goal of raising or stabilizing retail eBook prices," or that it knowingly allowed them to signal "they could lock themselves into" a "particular means of collectively achieving that goal" by entering into an agency agreement with Apple to offer eBooks directly to consumers.

62.     Apple admits that it communicated individually with each publisher concerning its proposal for the publisher to participate in a proposed iBookstore, and that it communicated its genuine belief that its proposal was a good one.  The email communications referenced in this paragraph are the best evidence of their respective contents.  Apple further admits that at times its individual communications to each publisher were similar, because it was negotiating similar agreements on similar terms in a short-term timeframe in order to complete the negotiations ahead of the iPad announcement in late January.  Apple had no interest in negotiating arbitrary variations in agreements for the performance of an essentially identical agency role and had concrete efficiency-based justifications for seeking terms that were not materially inconsistent across principals.  Given the looming announcement of the iPad, each publisher would have been

17

aware that Apple was necessarily negotiating simultaneously with numerous publishers and was attempting to develop an approach that would attract a sufficient number of publishers in total to warrant Apple's entry.  None of Apple's proposed terms limited or otherwise was intended to affect inter-publisher competition, but rather set Apple's terms for acting as a publisher agent, where all the decisions relevant to the claims in this lawsuit were made by the individual publisher.  Except as specifically admitted, Apple denies the allegations of paragraph 62.

63.    Apple admits that it exchanged more than one proposal with the individual publishers, that they all were based on Apple acting as an agent, with the publisher as principal with pricing authority.  Each proposal is the best evidence of its contents; the same is true of the alleged email referenced in this paragraph.  Apple admits that these were mere intermediate proposals and that they differed from the integrated contracts eventually executed.  Apple denies that pricing authority was being "transferred," because Apple had never had such authority, so it had nothing to transfer.  Apple did not receive any commitments from any publisher as to how it would deal with any other distributor of eBooks.  Except as specifically admitted or denied, Apple generally denies the allegations of paragraph 63.

64.    Apple admits that it emailed separate proposed eBook distribution agreements individually to each publisher, and the proposals were similar.  The proposals and related documents referenced in this paragraph are the best evidence of their contents.  Except as specifically admitted or denied, Apple generally denies the allegations of this paragraph.

65.    Apple admits that the proposed agency agreements incorporated principles previously conveyed by Apple to individual publishers.  The proposals and related documents referenced in this paragraph are the best evidence of their contents.  Apple denies that it negotiated any restrictions on how a publisher dealt with another distributor.  Apple denies the characteriza-

tion of the MFN provisions in the respective proposals.  In particular, the Government states that the MFN did not "ensure Apple that the Publisher Defendants would not set a higher retail price on the iBookstore than they set on other websites where they controlled retail prices."  The paragraph does not allege what "other websites" are being referred to.  It is not surprising that the Government does not actually allege the language of the MFN, the best evidence of its terms, which applies on its face to any other eBook distributor.  The MFN says nothing about excluding eBook distributors acting as publisher agents.  If the MFN was not "standard," this was because de novo entry into an alleged market controlled by a single dominant distributor is not a standard event.  If the MFN was "unusual" this is only because it was sought by a party with no market power, it applied to a minimal share of sales (starting from zero), and it served a procompetitive purpose:  to allow Apple to enter eBook distribution assured that its iBookstore would be price competitive on new releases.  Apple denies that its commission was "a margin" – it was a negotiated fee for service as an agent that had associated costs.

66.     Apple denies the allegations of paragraph 66.  The DOJ's theory is that if Amazon remained on the wholesale model and continued to price at $9.99, the MFN would allow Apple to insist on a price match yielding the Publisher Defendants "only 70 percent of [$9.99]" on Apple sales, which supposedly would compel a publisher to compel Amazon (a monopolist) to flee the wholesale model.  Not so.  The courts and the DOJ itself have consistently recognized that for an MFN to exert inescapable compulsion of this sort (and, even then, only on non-dominant firms), the MFN must apply to a significant share of the market, as would typically be the case when imposed by a dominant firm holding market power due to its large market share.  As the senior DOJ official who signed the Complaint initiating this case recently said: "It's not that all MFNs lead to competitive harm.  But we take a close look at them when employed by

firms with significant market power."  Interview with Sharis A. Pozen, The Antitrust Source at 7 (April 2012), available at http://www.americanbar.org/publications/the_antitrust_source.html. But here, Apple was a new entrant with zero share and no market power.  Apple was bringing a new group of potential consumers to the eBooks market, who unlike a Kindle owner, could buy eBooks from any seller.  If Amazon had chosen to retain the wholesale model and continued to price selected books at $9.99, to the extent Apple sales yielded the publishers less money (70% of $9.99), this lower return would have been incurred on a very small base (starting from zero); at the same time, the publishers would have made more money from their growing Amazon sales, which constituted the bulk of the business.  And if the argument is that Amazon would insist upon better terms because of those negotiated by Apple on an agency basis, then logic refutes this speculation, since Apple's *entry* into the market can hardly be found to have in-creased *Amazon's* monopsony power.  Thus, there is no factual basis for an argument that the MFN exerted irresistible force on the publishers, much less any reason to disregard the MFN's lawful procompetitive purpose.

67.    Apple denies the allegations of paragraph 67, but notes that Apple's insistence on the limited price matching MFN establishes that Apple in fact believed it needed the protection upon entry, which is directly inconsistent with the theory that Apple and the publishers had somehow agreed in advance that the publishers would convince Amazon, the dominant distribu-tor in both print and eBooks, to change its business model.  The rational (and accurate) interpre-tation is that once Apple negotiated key terms such as the limited MFN and price tiers, sufficient assurances existed that iBookstore customers would be able to obtain competitive pricing, leaving Apple confident that any changes in how the publishers chose to price their books or deal with their other distributors would not be uncompetitive.

68.     Apple admits that, as a result of the individual negotiations with publishers, changes were made in the proposals, some applying to each agreement and some not.  The proposals and related documents referenced in this paragraph are the best evidence of their contents.  Apple admits that meetings were sought to finalize contracts with each Publisher Defendant.  Except as specifically admitted, Apple denies the allegations of paragraph 68.

69.     Apple admits that Mr. Cue wrote that "all of them were very concerned about being the only ones to sign a deal," but asserts that the entire communication referenced is the best evidence of its contents.  Apple admits that it had a legitimate business interest in having agency contracts with a sufficient number of publishers in advance of the iPad launch to warrant Apple's entry into eBook distribution, and had no interest in entering with only a few contracts; accordingly, Apple admits and alleges that any assurances it made to individual publishers were consistent with these legitimate independent interests.  Except as specifically admitted, Apple denies the allegations of paragraph 69.

70.     Apple lacks sufficient information and belief to respond to the allegations of paragraph 70, and on that basis denies them.

71.     Apple admits that Steve Jobs communicated with an executive with whom he was personally acquainted to discuss whether or not the publisher would sign up to offer eBooks on the iBookstore.  These types of individual negotiations, relating to the differing concerns and considerations of publishers (but conducted in this one case by Mr. Jobs), illustrate that there was not, at least from what Apple was seeing, a unified approach by the publishers, or any type of horizontal agreement.  Apple denies that the communication referenced in paragraph 71, which is the best evidence of its contents, is accurately characterized.  Except as specifically admitted, Apple denies the allegations of paragraph 71.

72.     Apple denies that publishers were "passing information" through it.  The allegation is inconsistent with other allegations that the publishers regularly communicated as part of a pre-existing conspiracy months before Apple began its exploratory discussions, and therefore would have no need to communicate "through Apple."  Apple lacks sufficient information and belief to respond to the remaining allegations of paragraph 72, and on that basis denies them.

73.     Apple admits that Mr. Cue met with a Publisher Defendant representative on January 22, 2010 and sent an email on January 23, 2010, which is the best evidence of its contents.  Apple lacks information and belief sufficient to respond to the remaining allegations of paragraph 73 relating to the state of mind or actions of the publishers, and on that basis denies them.

74.     Apple admits that it signed agency contracts with Hachette, Simon & Schuster, Macmillan, Penguin and HarperCollins within a few days before the public announcement of the launch of the iPad.  Those agency contracts are the best evidence of their contents.  The timing was driven by the desire to announce the launch of the iBookstore at the time of the launch of the iPad.  Apple further admits that the agreements became effective on the date of the launch of the iBookstore.  While paragraph 74 alleges that there was a "longstanding wholesale model for eBooks," this allegation ignores that eBooks had been available only for a few years, and were available primarily to Kindle owners on the platform of a single dominant player, Amazon, and therefore Apple denies that allegation.  It also ignores that Apple had previously sold eBooks on the App Store – under the agency model.  The Government's allegations fail to address why the agency model, long recognized as perfectly lawful, and in this instance consistent with Apple's legitimate business interests and prior business experience, should not have been utilized.  This would have meant Apple would not enter the market, and would have allowed Amazon to cement a long-term dominance in the sale of eBooks.

75.     Apple denies the allegations that the maximum pricing tiers "in fact established the retail eBook prices to be charged by Publisher Defendants."  The agency contracts are the best evidence of their contents.  Each pricing decision was made by an individual publisher without input from Apple, except where Apple requested a lower price pursuant to the MFN.

76.     Apple denies the allegations of paragraph 76 that it "understood" that its agency agreements "would compel the Publisher Defendants to take pricing authority from all non-Apple" eBook retailers.  Apple had no involvement or agreements as to how the publishers would deal with any other party, other than negotiating the ability to require competitive pricing in some circumstances on individual titles for iBookstore customers.  Apple lacks sufficient information or belief to respond to the remaining allegations of paragraph 76, and on that basis denies them.

77.     Apple denies the allegations of paragraph 77.  The Government mischaracterizes on its face the alleged statement of Steve Jobs to the press on January 27, 2010, which simply conveyed that a publisher would not have a particular eBook title priced at $9.99 through one distributor and $14.99 through another.  Apple's MFN provision would allow it to require the publisher to lower the price to $9.99 on the iBookstore.  Apple had no contractual rights to require a publisher to require that it, or any distributor of its products, charge more for eBooks than it chose in a competitive market.

78.     Apple denies the allegation that it "understood that the retail price MFN was the key commitment mechanism to keep the Publisher Defendants advancing their conspiracy in lockstep," or that the quoted excerpt from an Apple executive, not responsible for negotiating the agency agreements at issue, constitutes an admission.  Apple's MFN was very narrow – it generally simply allowed Apple to require a publisher to offer a competitive price on a new

release in the iBookstore.  The MFN excluded special promotions, for example, and was not self-executing.  It was not a breach of the MFN for a lower competitive price on an individual title to exist elsewhere; it simply gave Apple the right to require the publisher meet the price on certain new releases.  If as the Government alleges, pricing in the eBooks market was "competitive" prior to Apple's entry, then having Apple, an agent without pricing discretion, with limited rights to require publishers to meet those prices in the marketplace cannot be viewed as anticompetitive.  The eBooks price levels prior to Apple's entry were not "competitive," but simply reflected strategic decisions made by a 90% player to promote its long-term interests in preserving market dominance, and it would not be unexpected that significant entry and demand stimulation would change the pricing dynamics in the alleged market.

79.     Apple admits that Amazon agreed with each of the Publisher Defendants and with many others to sell eBooks utilizing some form of the agency model.  Except as otherwise admitted, Apple lacks sufficient information or belief to respond, and on that basis denies the allegations of paragraph 79.

80.     Apple admits that it was publicly disclosed that Amazon threatened Macmillan and refused to sell Macmillan print books and eBooks on Amazon's site in response to a proposal made by Macmillan.  Except as expressly admitted, Apple lacks sufficient information or belief to respond to the allegations of paragraph 80, and on that basis denies them.

81.     Apple lacks sufficient information and belief as to the allegations in paragraph 81 to respond, and on that basis denies them.

82.     Apple lacks sufficient information and belief as to the allegations in paragraph 82 to respond, and on that basis denies them.

83.     Apple lacks sufficient information and belief as to the allegations in paragraph 83 to respond, and on that basis denies them.

84.     Apple admits that Amazon agreed with each of the Publisher Defendants and with many others to sell eBooks utilizing some form of the agency model.  Except as otherwise admitted, Apple lacks sufficient information or belief to respond, and on that basis denies the allegations of paragraph 84.

85.     Insofar as paragraph 85 contains legal argument, no response is required.  Apple lacks sufficient information or belief as to the factual allegations in paragraph 85 to respond, and on that basis denies the allegations.  Apple denies that it sought to pressure a "hold out" publisher to move to the agency model.  Apple provided all publishers, large or small, similar opportunities to utilize Apple as an agent to sell eBooks directly to consumers through the iBookstore on non-discriminatory terms.  Apple did not "cajole" any publisher (a benign term meaning to persuade with flattery), but rather sought to explain the benefits of working with Apple.

86.     Apple lacks sufficient information or belief as to the allegations in paragraph 86 to respond, and on that basis denies the allegations.

87.     Apple lacks sufficient information or belief as to the allegations in paragraph 87 to respond, and on that basis denies the allegations.

88.     Apple lacks sufficient information or belief as to the allegations in paragraph 88 to respond, and on that basis denies the allegations.

89.     Apple denies that it sought to pressure a "hold out" publisher to move to the agency model.  Apple provided all publishers, large or small, similar opportunities to utilize Apple as an agent to sell eBooks through the iBookstore.  Apple did not "cajole" any publisher (a benign term meaning to persuade with flattery), but rather sought to explain the benefits of

25

working with Apple.  Apple had no market power at all either in eBooks or print books, and had

no leverage except the value of its offering to "cajole" a book publisher to offer eBooks on the

iBookstore.

90.     Apple denies the allegations of paragraph 90.  The prices charged in the

iBookstore were set by the Publishers, except for the operation of the pricing limitations con-

tained in its agency agreements.  Apple lacks sufficient information and belief to respond to

allegations of how and why the individual publishers set prices for individual eBook titles, but

responds that there is a wide range of eBook prices on the iBookstore.

91.     Apple denies the allegations in paragraph 91.  Apple's only "facilitation" was to

provide a platform whereby publishers, in competition with each other, could directly offer

eBooks to customers.  The business model Apple adopted, acting as a publisher agent, is one

both legally approved and generally accepted.

92.     Apple denies that the $9.99 price level referenced in paragraph 92 was the result

of "price competition."  Rather it reflected a strategic pricing decision made by Amazon, with a

90% share of eBook sales, made almost exclusively to consumers who had purchased Amazon's

Kindle eReader.  Consumers who did not want to buy a Kindle because they did not find it an

attractive device or an attractive value proposition did not benefit from a $9.99 price, or any

price, no matter how ostensibly low.

93.     Apple lacks sufficient information and belief to respond to paragraph 93, and on

that basis denies the allegations.  Apple notes that the number of eBook titles and sales has

increased substantially since its entry, and it is unclear from the allegations what pricing compar-

isons are being made.

94.     Apple denies the allegations of paragraph 94.

95.     Apple denies the allegations of paragraph 95.

96.     Apple denies the allegations of paragraph 96, except that if any Publisher Defendants had any "illicit" communications on raising prices, Apple agrees and alleges that they concealed them from Apple.

97.     Apple denies the allegations of paragraph 97 and states that the per se rule does not apply to its conduct; to the extent constituting an agreement within the meaning of Section 1, Apple's conduct must be evaluated as a matter of law under the rule of reason, and is not susceptible to condemnation based on unjustified and unwarranted presumptions.

98.     Apple denies the allegations of paragraph 98.  Apple's entry into the alleged eBooks market, then dominated by Amazon, through its iPad and iBookstore is inherently procompetitive and has led to greater consumer choice, output, and quality in eBooks.

99.     Apple denies the allegations of paragraph 99.  Apple's conduct is not properly evaluated under the per se rule and is lawful if the rule of reason is applied.  Apple denies that "trade e-books" defines a separate and distinct relevant product market.

100.     Apple denies the allegations of paragraph 100.

101.     Apple denies the allegations of paragraph 101.

102.     Apple denies the allegations of paragraph 102.

103.     Apple denies the allegations of paragraph 103.

104.     Apple denies that any of the requested relief is properly awarded.

### III.  SEPARATE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Apple also asserts the following separate and additional defenses:

### FIRST SEPARATE AND ADDITIONAL DEFENSE

The relief sought in the Complaint is not in the public interest.

### SECOND SEPARATE AND ADDITIONAL DEFENSE

The Government's claims are barred, in whole or in part, under the doctrine of unclean hands.

### THIRD SEPARATE AND ADDITIONAL DEFENSE

The Government's claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH SEPARATE AND ADDITIONAL DEFENSE

The Government's Complaint fails to state a claim for relief.

### FIFTH SEPARATE AND ADDITIONAL DEFENSE

The Government has failed to join all parties necessary for a just adjudication of its purported claims.

### SIXTH SEPARATE AND ADDITIONAL DEFENSE

Apple alleges, without admitting any liability whatsoever, that at all times its conduct was reasonable and that its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition.

### SEVENTH SEPARATE AND ADDITIONAL DEFENSE

The Complaint is barred, in whole or in part, insofar as it challenges or seeks to impair the exercise of rights protected by the First Amendment of the United States Constitution and by the *Noerr-Pennington* doctrine.

### EIGHTH SEPARATE AND ADDITIONAL DEFENSE

The Complaint is barred, in whole or in part, insofar as it seeks to impose liability based on unjustified or irrebuttable presumptions, thereby violating Apple's rights to due process under the United States Constitution.

## NINTH SEPARATE AND ADDITIONAL DEFENSE

Apple has insufficient knowledge or information to determine whether it may have additional, as yet unstated, separate defenses available.  Apple has not knowingly and intentionally waived any applicable separate and additional defenses and reserves the right to raise additional defenses as they become known to it through discovery in this matter.  Apple further reserves the right to amend this Answer to add, delete, or modify defenses based upon legal theories that may be or will be divulged through clarification of the Government's Complaint, through discovery, or through further legal analysis of the Government's position in this litigation.

Dated:  May 22, 2012

Richard Parker (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
T:  202.383.5380; F:  202.383.5414
rparker@omm.com

Respectfully submitted,

/s/ Daniel S. Floyd
Daniel S. Floyd (admitted *pro hac vice*)
Daniel G. Swanson (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
T:  213.229.7000; F:  213.229.7520
dfloyd@gibsondunn.com
dswanson@gibsondunn.com

*Attorneys for Defendant Apple Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury pursuant to 28 U.S.C. § 1746, that on May 22,

2012, I electronically filed the foregoing document using the CM/ECF system which will send

notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted

on the Electronic Mail Notice List.


Dated:          Los Angeles, CA                                  /s/ Daniel S. Floyd
                May 22, 2012