# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____ )
                                         )
                                         )
UNITED STATES OF AMERICA                 )
                                         )
                Plaintiff                )
v.                                       )          Civil Action No. 12-CV-2826 (DLC)
                                         )
APPLE, INC., ET AL                       )
                                         )
                Defendants               )
                                         )
_____ )


## MEMORANDOM IN SUPPORT OF MOTION OF BOB KOHN
## FOR LEAVE TO PARTICIPATE AS *AMICUS CURIAE*

## I.   INTRODUCTION

Bob Kohn, pursuant to 15 U.S.C. §16(f)(3), requests leave to participate as *amicus curiae* for the purpose of replying to the government's 55-page response to the public comments ("DOJ Response") and to its motion for entry of Final Judgment ("DOJ Motion").  The proposed *amicus curiae* brief challenges the underpinnings of the proposed Final Judgment, key support for which were set forth for the first time in the DOJ Response. The proposed brief first challenges the government's conclusion on the reasonableness of the proposed remedy by showing how the DOJ failed to consider the countervailing pro-competitive virtues of Defendants' conduct—something which the government's own U.S. Supreme Court authority cited in the DOJ Response requires. The brief then challenges the DOJ's factual foundation for its decision that Amazon did not engage in predatory pricing. The DOJ Response invented (citing no authority) a bizarre standard for predatory pricing that is entirely inconsistent with Second Circuit law. By applying the wrong law to these critical facts, the DOJ's conclusions about the remedy cannot be reasonable. In this Circuit, below marginal cost pricing is <u>presumed</u> illegal. To overcome the presumption, and to test the reasonableness of the government's conclusion, the Court must consider the materials and data reviewed by the DOJ in its stated investigation of Amazon's pricing policies. For this reason, Bob Kohn also moves that Court order the DOJ to file with the Court all documents and other materials collected and/or reviewed by the United States in connection with its investigation of Amazon's pricing practices.

By asking that the Court to rule on the DOJ Motion for Entry of Judgment without further amicus briefs and without hearing, the government is suggesting that those who submitted comments during the 60-day comment period must perform the impossible: that is, they should have anticipated precisely how the government would respond to those comments, including

citations of law that are inapt, entirely misleading, and some of which actually undermine the government's conclusions. Movant submits that *amicus curiae* should be permitted to reply to the DOJ Response for the purpose of clarifying the record and to assist this court in reaching conclusions that are in the public interest. To sustain opposition to *amicus* participation on the grounds that "voluminous material" has already been provided during the comment period would only incentivize future *amicus* to eschew the comment period altogether, and file a brief only after the government files its response to those who did provide comments. Accordingly, one who seeks participation as *amicus curiae* for the sole purpose of replying to the DOJ Response should not be turned away.

## II.   *AMICUS CURIAE* PARTICIPATION SHOULD BE ALLOWED TO REPLY TO THE DOJ'S RESPONSE TO PUBLIC COMMENTS

Section 16(f)(3) of the Tunney Act specifically empowers the Court, in connection with its public interest determination under Section 16(e), to "authorize full or limited participation in proceedings before the court by interested persons or agencies, including amicus curiae."

Participation by *amicus curiae* should be allowed if participation is not used merely to repeat arguments and assertions in public comments filed pursuant to 15 U.S.C. §16(b), but rather to *reply* to the memoranda filed by the United States in response to the public comments. *United States v. Microsoft Corp*., 2002 WL 319366 at 6 (D.C.C. Feb. 28, 2002). In *Microsoft*, Judge Colleen Kollar-Kotelly permitted *amicus curiae* to submit a 25-page memorandum to raise arguments responsive to the government's response to the public comments in that case. The *amicus* in that case had previously submitted to the DOJ a 93-page comment letter, accompanied by a separate economic analysis of the proposed judgment in that case. *Microsoft* at 2.

The district court also permitted the *amicus curiae* memorandum "to raise new issues and arguments which were not raised in [its] comments" submitted with the Justice Department. Id.

at 6. In addition, the court permitted *amicus curiae* to address the court in oral argument during its Tunney Act hearing, in which *amicus curiae* was allowed to "use this time to address issues not previously raised in its comments and/or to emphasize the most significant issues raised in its comments." Id.

The accompanying proposed *amicus curiae* brief does <u>not</u> repeat the arguments detailed in Movant's comments dated May 30, 2012 (ATC-0143, "Comments of Bob Kohn"). Rather the brief is entirely focused on *replying* to the Department of Justice's 55-page response to those various comments and the government's Memorandum supporting the DOJ Motion. Such reply is necessary (a) to correct misleading statements of law contained in the government's response (and specifically to address the applicability of a U.S. Supreme Court decision heretofore not raised by anyone in this proceeding until the government cited it in the DOJ Response), (b) to draw attention to law that none of the parties to this action have addressed, and (c) to show how the DOJ Response actually helped demonstrate the unreasonableness of the government's conclusions regarding the proposed Final Judgment.

### III.  A RESPONSE IS NECESSARY TO CORRECT CERTAIN MISLEADING STATEMENTS OF LAW BY THE GOVERNMENT

The Department of Justice's response to the public comments contains several statements of law that could be misleading. Being that none of the <u>parties</u> will be objecting to the proposed Final Judgment, and given the limited purpose of the responses the Court has granted leave the parties to file, the Court should welcome *amicus curiae* participation to keep the United States <u>accountable</u> for its statements of law. Not to be repetitive, but to be specific, here are but two examples.

<u>First</u>, procedurally, the Court should note how the government has appeared to change its position regarding the standard of review that should be followed in this proceeding. Under the

standard originally cited by the DOJ in its Competitive Impact Statement, the Court is required "to consider the specific <u>enumerated factors</u> in making its public interest determination"[1] to evaluate "whether there is a factual foundation for the government's decisions <u>such that its conclusions regarding the proposed settlement are reasonable</u>."[2]  The foregoing is the standard formulated identically in both *Keyspan*[3] and *SBC Commc'ns*,[4] cited by the DOJ in the CIS, but apparently now abandoned by the government.

In the <u>DOJ Response</u>, the government favored an alternative standard of review, plucked mid-sentence from Judge Sullivan's opinion, which suggests that the government "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."[5] A standard formulated this way makes no sense in the present context. (This would have been clear if the government had provided the Court with the <u>full sentence</u> from Judge Sullivan's opinion.[6]) In *SBC Commc'ns*, the opposition commentators asserted that the remedy "didn't go far enough."[7] In its proposed *amicus curiae* brief, Movant is not asserting that the settlement is not "adequate" or will not "perfectly remedy" the harm—rather, that the

---

[1] *United States v. SBC Commc'ns, Inc*., 489 F.Supp. 2d 1, 13 (D.D.C. 2007). The enumerated factors are listed in 15 U.S.C. §16(e).

[2] *United States. v. Keyspan Corp.*, 763 F. Supp.2d 633, 637 (S.D.N.Y. 2011) (The "relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable," the identical formulation used in *SBC Commc'ns*, <u>at 16</u>).

[3] Id. The *Keyspan* formulation is set forth in CIS §VII (which misquotes *Keyspan* with the singular "decision," rather than plural), but is not mentioned in either the DOJ Response or Motion for Entry of Judgment.

[4] *SBC Commc'ns*, <u>at 16</u>. (The "relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable").

[5] SBC Commc'ns <u>at 17</u>. Cited in CIS at §VII for the purpose of supporting "proposed consent decrees following a finding of liability in a litigated matter."

[6] SBC Commc'ns <u>at 17</u>. ("The government need not prove that the settlements will perfectly remedy the alleged antitrust harms; it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms").

[7] In *SBC Commc'ns*, the opposition objected to the proposed remedy, because it did not require divestiture of ongoing businesses that could have replaced the competitive importance of the pre-merger status. In *Microsoft I*, the opposition contended that the proposed remedy, which addressed Microsoft's attempt to monopolize the market for PC operating systems, failed to address Microsoft's attempt to leverage that monopoly to monopolize the market for applications software (such as Lotus 1-2-3, WordPerfect, and Borland Quattro Pro). Thus, in *Microsoft I*, the court viewed the opposition to be asking the court to expand the allegations made in the government's complaint. See, *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) ("*Microsoft I*").

"remedy" itself is one which is actually harmful to consumer welfare.[8] Accordingly, the standard that should be followed is the *Keyspan* standard cited at footnote 2, *supra*.

Second, and more substantively, the government suggests that competitors may not "take the law into its own hands" (DOJ Response at 23), citing two U.S. Supreme Court decisions neither of which concerned actions by competitors to address market failures in the antitrust context. The difference is important, because it appears the DOJ is trying to pull the proverbial wool over the Court's eyes.

Using just one of those cases to illustrate the point, the unlawful practice at issue in *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447 (1986) was a violation of an Indiana statute prohibiting the unauthorized practice of dentistry. It was in that context the Court stated, "That a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it." Id. at 465 (quoted in the DOJ Response on page 23). While responding to the unauthorized practice of medicine is not a sufficient justification for collusion, conduct that has a countervailing pro-competitive virtue is. Id at 459. (Yes, id!).

To demonstrate how potentially misleading the government's citation was, the Court need only turn back 6 pages in the same opinion to where Justice White (who delivered the court's opinion in *Broadcast Music*[9] six years earlier) not only reiterated the Supreme Court's view that "redeeming virtue" will justify literal price fixing, but went on to elucidate, if not extend, *Broadcast Music* as follows:  Collusive conduct will be sustained <u>under the rule of reason</u> where there is a "countervailing procompetitive virtue—such as for example, the creation of <u>efficiencies in the operation of a market.</u>" *Indiana Fed'n of Dentists* at 459 (citing *Broadcast*

---

[8] In the DOJ Motion for Entry of Final Judgment (Memorandum at 3), perhaps to economize on space, the DOJ cites neither *Keyspan* nor *SBC Commc'ns*, but refers back to *Microsoft I* at 1461 to repeat the oft-cited mantra that settlements that are merely "within the reaches" of the public interest would pass muster under the Tunney Act.
[9] *Broadcast Music, Inc v. Columbia Broadcasting System, Inc*., 441 U.S. 1, 9 (1979).

*Music*).

The comments submitted by Movant included an extensive discussion of the applicability of *Broadcast Music* (Comments of Kohn at 3-4 and 21-24)—a discussion that the DOJ inexplicably failed to address in its Response. That discussion is <u>not</u> repeated in the proposed *amicus brief*. Rather, the amicus brief points out how the government's own authority,[10] first cited in the DOJ Response, actually further undermines the reasonableness of the DOJ's stated conclusions about the proposed Final Judgment, and Movant requests leave of this Court to allow the amicus brief to explain the point.

### IV.   A RESPONSE IS NECESSARY TO DRAW ATTENTION TO LAW THAT MAY OTHERWISE ESCAPE THE COURT'S CONSIDERATION

The classic role of amicus curiae is to assist the court "in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co, Inc. v. Comm'r of Labor and Industry*, 694 F.2d 203, 204 (9th Cir. 1982).

The public comments submitted to the DOJ were replete with references to Amazon's "below cost pricing," "predatory pricing," "artificially low pricing," etc. The DOJ even characterized this as "<u>the overarching theme" of the public comments</u>.[11] But in none of these submissions—nor in any of the pleadings filed by any of the parties in this action or in *In Re Electronic Books Antitrust Litigation*, 11 MD 2293 (DLC)—does anyone specifically elucidate just how Defendant's conduct in response to Amazon's pricing practices could not possibly harm consumer welfare under predatory pricing standard followed <u>by the Second Circuit</u>. Even the DOJ Response (at 22) admits that no objector has shown how Amazon threatens to drive out

---

[10] DOJ Response at 23, citing *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 459.
[11] DOJ Response at 2-3 ("Comments among this group include those from American Booksellers Association, The Authors Guild, a group of nine mid-tier Independent Publishers…and Amazon's two largest e-book retail competitors, Barnes & Noble…and Apple." Id.).

competition and obtain monopoly pricing power. The proposed amicus brief will show how the <u>DOJ Response</u> invents a bizarre standard for predatory pricing (citing no authority) while disregarding the standard established by the Second Circuit[12] and will further show, pursuant to this Circuit's standard, how the DOJ plead sufficient facts in its Complaint, read in conjunction with its CIS, to create a presumption of exclusionary conduct, which pulls the rug out from under its conclusions.

Nor has the applicability of *FTC v. Ind. Fed'n of Dentists*, which was not mentioned in any of the comments, been raised by any of Defendants in any of the pleadings in this action or in *In Re Electronic Books Antitrust Litigation.* Given that the parties will not be opposing the DOJ Motion for Entry, it is unlikely they will use a substantial portion of their five permitted-pages to summon the Court's attention to this U.S. Supreme Court case, and 30-years of U.S. Supreme Court evolution on the subject of horizontal price fixing. If Movant is not permitted to draw the Court's attention to the true applicability of *FTC v. Ind. Fed'n of Dentists*, raised <u>for the first time</u> in the DOJ Response, then it appears that no one will.

### V.  MOVANT IS UNIQUELY SUITED TO ASSIST THE COURT ON THE NATURE OF THE MARKET IN DIGITAL TRANSACTIONS AND THE APPLICABILITY OF *BROADCAST MUSIC* TO E-BOOK TRANSACTIONS

Although others may seek participation as *amicus curiae*, Movant believes he is uniquely qualified to assist the Court in appreciating the nature of the markets in which e-book transactions occur and the countervailing pro-competitive effects of Defendants' conduct—critical elements of the factual foundation of the government's decisions and essential to the Court's determination, under the *Keyspan* standard of review, about whether government's conclusions regarding the proposed settlement are reasonable.

---

[12] *Northeastern Telephone Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981).

During the course of Movant's 30-year career–working for entertainment, computer software, and internet companies–he has had responsibility and oversight for several high profile antitrust matters involving the adoption by consumers of technology products and copyrighted works, which operated in conjunction with each other, in a multi-sided market prone to attempted monopolization by dominant systems providers. Movant has testified on these subjects before both the FTC (1995) and joint hearings held by the DOJ and the FTC (2002).

Movant is co-author of KOHN ON MUSIC LICENSING (Wolters Kluwer, 4th Edition 2002), cited by the U.S. Supreme Court, the Second Circuit, the Sixth Circuit, and the Southern District of New York. Movant has testified as an expert before the District Court in *In Re Application of AOL, RealNetworks and Yahoo!* (related to *United States v. ASCAP), 559 F.Supp.2d 332* (S.D.N.Y.) (a rate hearing in which Movant provided testimony to the late District Judge William C. Conner on how music is transmitted and marketed on the Internet).[13]

As stated in Movant's Comments, during the time Movant served as general counsel of Borland International, Inc., he was responsible for overseeing the six-year litigation of *Lotus Development Corp. v. Borland International, Inc.*, 516 U.S. 233 (1996), where a divided Supreme Court let stand the 1st Circuit decision that the menu-command structure of Lotus 1-2-3 was an uncopyrightable "method of operation." *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995). The court adopted the "network externalities" theory raised by Borland and *amicus curiae* brief on appeal. The theory suggests that a single product may emerge as the *de facto* standard in a market, giving the proprietor of the standard a monopoly over which it may illegally exercise market power.

---

[13] A more complete resume and disclosure of the amicus curiae's background, qualifications and affiliations is contained in the Comments of Bob Kohn (ATC-0143, May 30, 2012).

Movant also oversaw and settled on behalf of Borland an antitrust action brought by the DOJ to stop Borland's acquisition of Ashton-Tate in 1991. This was an acquisition which the DOJ alleged would provide Borland overwhelming market share in database management software. In exchange for allowing the acquisition to proceed, the DOJ accepted Borland's offer to not enforce any copyright rights in the dBASE programming language for five years. The DOJ accepted Borland's theory that, without the ability to enforce any rights it may have had in the dominant database programming standard at the time, Borland would not be able to use the effects of network externalities to tip the database management market entirely in its favor.

Also during that time, Movant was called in by both the DOJ and FTC on several occasions in connection with the government's antitrust investigation of Microsoft Corp.  Movant met with four of the Commissioners of the FTC and then with the Assistant Attorney General for Antitrust of that time, Joel Klein. Beginning in the early 1990's, Borland claimed that Microsoft was leveraging their monopoly in PC operating systems to gain an illegal competitive advantage in the market for applications software, such as word processors, spreadsheets, and database management software. See, *Microsoft*, 56 F.3d at 1453.

In December, 1997, Movant co-founded eMusic (NASDAQ: EMUS), the first digital music download service to sell digital music "MP3" files for 99 cents per track, a business not unlike Amazon's Kindle or Barnes & Noble Nook platforms for e-book downloads.

Movant is licensed to practice law in California and is a member in good standing of the State Bar of California. He has taught law at Monterey College of Law, Monterey, California.

To participate as an *amicus curiae* one need not be a trade association, an established issue-oriented activist group, or an organization of any kind. Briefs of *amici curiae* have ranged from individual law professors, economists, computer scientists, an independent copyright

scholar, and individual consumers of the products at issue. See, *Lotus Development Corp. v. Borland, International, Inc.* 516 U.S. 233, fn * (1996). Thus, an individual can be as well-situated as any organization to help evaluate the government's conclusions as to a proposed settlement under the Tunney Act.

## VI.    CONCLUSION

It is not the objective of the accompanying proposed *amicus curiae* brief to repeat the arguments made in the Comments submitted by Movant on May 30, 2012, but solely to *reply* to the response of the DOJ to those Comments and several of the other public comments. Although other interested parties may seek to participate as *amicus curiae*, Movant believes that he is uniquely suited to assist the Court with respect to certain factors to be used in determining whether the government's conclusions about the proposed Final Judgment are reasonable.

Movant's arguments are completely focused on the public interest, taking the perspective of consumers of e-books and e-book service platforms and the public interest in the promotion of competition and innovation—especially as it concerns the promotion and creation of copyrighted works of authorship disseminated in digital form.

Accordingly, to assist the Court in its determination of whether the proposed Final Judgment satisfies the public interest requirements of the Tunney Act, Movant respectfully requests leave of Court to participate as *amicus curiae*, accepting Movant's Brief *Amicus Curiae* and permitting Movant to present oral argument at such time and in such manner as the Court may allow.

Dated: August 13, 2012                    Respectfully submitted,


                                          /s/ Bob Kohn
                                   _____

                                   BOB KOHN
                                   California Bar No. 100793
                                   140 E. 28th St.
                                   New York, NY 10016
                                   Tel. +1.408.602.5646
                                   Fax. +1.831.309.7222
                                   eMail: bob@bobkohn.com


                                          /s/ Steven Brower

                                   By: _____
                                       STEVEN BROWER
                                   California Bar No. 93568
                                   BUCHALTERNEMER
                                   18400 Von Karman Ave., Suite 800
                                   Irvine, California 92612-0514
                                   Tel: +1.714.549.5150
                                   Fax:  +1.949.224.6410
                                   Email: sbrower@buchalter.com

                                   *Pro Bono Counsel* to Bob Kohn
                                   (*Pro Hac Vice* Pending)

## APPENDIX

*(With the Court's permission, this Appendix would be added to the proposed* Amicus Curiae *brief at the end of Section III.B on page 24, just before Section IV ("Conclusion")).*

### [B.    Impact of the Proposed Final Judgment Upon the Public Generally]

The following section provides arguments that were impossible to provide during the comment period, because they are build directly upon the public comments, the DOJ Response to such comments, and the responsive arguments set forth in the first 25 pages of the amicus brief. In light of the foregoing, this section summarizes the impact of the proposed judgment upon the several constituents of the public affected, organizing such impact by the effect upon the public with respect to Amazon's monopoly powers and its monopsony powers.

### 1.    Impact With Respect to Amazon's Monopoly Selling Powers

#### a.    Upon Consumers

As discussed in the previous section, selling below marginal cost leads to an improper allocation of resources and is harmful to consumer welfare.[14] The monopolist is not only incurring private losses but wasting social resources.[15] In addition, while consumers may pay lower prices for some best-selling e-books in the short run, they will pay potentially higher prices for e-books as Amazon successfully employs the three tipping strategies (described in the Comments) to maintain their monopoly of the e-book platform market.[16] The retail model never guaranteed that Amazon will price e-books any lower than what the publishers would charge under the agency model.

---

[14] *Northeastern*, 651 F.2d at 86-89.

[15] Areeda & Turner at 712.

[16] See Comments of Bob Kohn at 29-39. A monopolist would like to convince consumers that components (e.g. e-books) will be available at low prices in the future. Then, after consumers are locked in, this same monopolist may be tempted to raise price to the monopoly level. See, Michael I. Katz & Carl Shapiro, *Systems Competition and Network Effects*, THE JOURNAL OF ECONOMIC PERSPECTIVES, Vol 8, Issue 2 at 98-99 (Spring, 1994).

Moreover, because lower e-book prices offered by competing platforms may be a small factor in the consumer's decision to purchase an e-book (i.e., switching costs may be far more important),[17] Amazon will attempt to increase the cost of consumers desiring to switch from its e-book platform to a competitor's. To raise consumer switching costs, Amazon may, for example, begin charging consumers for access to the ancillary services that are now typically provided free to e-book users (e.g., storage of the consumers e-books, electronic bookmarks, highlights, notes, reading progress, ratings, and other information consumer may wish to maintain or share with others regarding their reading). Id.

With few consumers finding it economical to switch out of the Amazon's e-book platform, the public will see less innovation in e-book platforms. As Jeff Bezos, CEO of Amazon, told his shareholders earlier this year, "[E]ven well intentioned gatekeepers slow innovation."[18] Mr. Bezos could not have framed for consumers, or this Court, the potential harm of his own actions better.

### b.    Upon Other E-Book Service Providers

In its comments to the DOJ, Barnes & Noble—not only a retailer of printed books online and in "bricks & mortar" stores, but a provider of an e-book systems platform (i.e., Nook) that competes directly with Amazon (i.e., Kindle)—described the negative impact of the proposed settlement: "by *requiring* that settling publishers terminate their agency agreements with Barnes & Noble and by *forbidding* them to enter into similar agreements for two years, the Division is punishing Barnes & Noble—the wrong party."[19] Indeed, e-book platform providers who compete with Amazon will be harmed if Amazon is able to resume its predatory pricing practice,

---

[17] See, Kohn Comments at 6-7, 9-11, 25-29, 32-35, and 51-52.
[18] Jeff Bezos, *Letter to Our Shareholders,* AMAZON, INC. FORM 8-K (April 13, 2012), filed with SEC within two days after the DOJ filed this action.
[19] Comments of Barnes & Noble (ATC-0097, June 7, 2012) at 19 (emphasis in original).

which the agency model put a stop to. Defendant's conduct, resulting in Amazon's voluntary agreement to the agency model, has enabled Barnes & Noble, Apple, independent booksellers and others "to establish presences and begin to compete effectively for e-book sales." Id. at 3. This is because "Amazon's pricing (which priced most bestselling books sold by Barnes & Noble below Barnes & Noble's, and Amazon's, direct costs)," caused Barnes & Noble and other e-book platform competitors to lose substantial money in an effort to compete with Amazon's below marginal cost pricing and made them "unable to gain significant market share." Id. at 9.

### c.     Upon New Entrants to the E-Book Platform Market

Amusingly, the government suggests that its initiation of litigation in this case promoted the development of new devices, including Microsoft's *Surface* and Google's *Nexus 7*. At issue here is whether the "remedy"—by "evaporating" the effects of Defendants' alleged conduct— would discourage not the introduction of general purpose mobile devices, but new entry into the e-book system provider market. No more poignant evidence was submitted by the public, and ignored by the DOJ in its Response, than that provided in the Comments of Zola Books, a start up e-book retailer, which raised financing predicated upon the success of the agency model in stopping Amazon's below cost pricing. Comments of Zola Books (ATC-0679, June 25, 2012) at p. 1 ("The adoption of agency pricing allowed us to conceive Zola Books more than a year ago"). What this comment plainly suggests is that, had Zola's investors known that the start-up would have to sell e-books in competition with Amazon's below marginal cost pricing, it is not likely they would have made the investment. A much larger company went through a similar thought process: as Apple stated in its Answer to the Complaint in this action, "absent the agency agreements it would not have entered eBook distribution, given the circumstances of the business

as it existed prior to Apple's entry."[20]

In the DOJ Response (at 6), the government also suggests that its action in this case encouraged Microsoft investment in Barnes & Noble's Nook digital book business. Assuming this $605 million transaction was actually planned and consummated during the two week period following the filing of this action,[21] Microsoft's decision to proceed with its investment may equally have been predicated upon the prospects of the DOJ losing this case.

### d.    Upon Bricks & Mortar Bookstores

In responding to comments filed by Barnes & Noble, the American Bookseller Association (ATC-0265) and countless independent bookstores, the DOJ Response (at 18) maintains that "the third parties that the Court is directed to consider under the Tunney Act are the consumers of e-books, not the brick-and-mortar booksellers." This flies in the face of the statute itself, which requires the Court to consider the impact of the proposed settlement upon the "relevant market or markets" and the "public generally." The word "consumer" doesn't even appear in 15 U.S.C. §16.

Comments of Consumer Federation of America ("CFA")[22] on this subject—with which the DOJ Response (at 34-35) agrees—are misplaced. CFA argues that "digital disintermediation"—the replacement of physical bookstores by more efficient e-retailers—is inevitable. While this may true, no one is suggesting that a market-based shift to efficiency should be artificially impeded. But Amazon's predatory pricing is neither market-based nor efficient. CFA assertion that "bookstores cannot compete on price" is thus a circular argument. All the bookstores are effectively saying is that they can't compete with prices that were not set by competition on the merits. As Areeda & Turner (at 712) said, selling below marginal cost

---

[20] Answer of Apple Computer (May 22, 2012) at ¶ 4 (Docket No. 54)
[21] This action was filed on April 12, 2012 and Microsoft's investment was announced on April 30, 2012.
[22] Comments of Consumer Federation of America (June 25, 2012) (ATC-0775).

leads to an improper allocation of resources and "greatly increases the probability that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the monopolist." In accord, *Northeastern,* 651 F.2d at 87-88.

Accordingly, by allowing the market failure to resume for another five years, the proposed Final Judgment will cause the natural disintermediation of physical bookstores to occur faster than they would in a competitive market, putting at risk the businesses of physical retailers, large and small, perhaps years before the digital evolution of the book industry would otherwise cause their disintermediation. This is precisely the kind of massive misallocation of resources that predatory pricing causes and why the Second Circuit makes it presumptively illegal. To suggest that this is not the concern of the Tunney Act is to betray a complete misunderstanding of the purposes of antitrust enforcement.

### 2.    Impact With Respect to Amazon's Monopsony Buying Powers

#### a.    Upon Defendant Publishers

Defendants' conduct resulted in Amazon's e-book market share dropping from 90% to 60% over eighteen months following its acceptance of the agency model, which coincided with a corresponding drop in Amazon's monopsony power. Allowing Amazon to resume its predatory pricing practices, even for the so-called "brief cooling off period" (i.e., five years for the essential feature of the agency model that prevents Amazon's predatory pricing), would reverse the countervailing pro-competitive virtues of Defendants' conduct—described at length in the previous section of this brief.

In addition, in the same breath that the DOJ denies that it is prohibiting the agency model (DOJ Response at p. vi), it refuses to allow the Settling Defendants, as principals, to control

when price promotions become available on their e-books.[23] As discussed at length in the Comments of Bob Kohn (at pp. 52-53), whether they are offered by e-retailers under the retail model or publishers under the agency model, promotions constitute a form of price discrimination used by sellers to maximize profits.[24]   Consumers would normally be indifferent as to whether price promotions are controlled by e-retailers or book publishers. However, because the goods here are copyrighted works of authorship, the <u>public generally</u> is better off if book publishers control the ability to price discriminate, because most of the incremental profits will be driven back into the publisher's business to generate the writing of more books. By contrast, where, as here, the buyer of e-book rights has monopsony power, there is no assurance that the incremental profits will be passed down to consumers. See, *Horizontal Merger Guidelines* of 2010 at §12. Thus, the DOJ conclusion about the remedy is unreasonable, because it accomplishes nothing more than replacing the market's judgment with the DOJ's own as to who should benefit from price discrimination and then places that benefit into the hands of those who are least likely to pass a portion of the benefits down to consumers or the public generally.

　　　As noted above, Defendant Publishers are already constrained in the way they price their e-books by the free rider/piracy problem. A buyer with monopsony power will pay lower prices for goods, resulting in fewer goods produced. In the market for e-books, the implications are clear: were Amazon's monopsony power be allowed to continue, fewer books would have been authored and published, a result that is antithetical to the objective of the copyright law.

---

[23] See, §VI. B. of the proposed Final Judgment (which permits the e-retailer to run price promotions, provided that discounts over a period of a year do next exceed their agency commissioned earned during that time).
[24] See, Comments of Bob Kohn at 52-53.

### b.      Upon Independent Book Publishers

Nine of the largest independent book publishers in the United States submitted comments[25] explaining why the proposed settlement would adversely impact competition: by reversing the positive effects of the agency model which contributed dramatically to increased competition (promoting "a diversity of sources for e-books") and produced technical innovations that have enhanced the e-reading experience for consumers (including "color, backlit screens and audio/visual functions"). More important in this context, however, was the statement by these independent publishers that, while they and the public have benefited from the fact that the six largest publishers were able to adopt agency pricing arrangements with Amazon, the independent publishers <u>have never "been successful in establishing agency pricing relationships with Amazon</u>." This is a clear signal of the inferior bargaining leverage these independent publishers have with Amazon, which enjoys monopsony power in the e-book distribution market.

A more dramatic example of Amazon's leverage of its monopsony buying power over independent book publishers occurred earlier this year when Amazon refused to renew its agreement to publish e-books distributed by IPG, which serves as a distributor for hundreds of independent book publishers. Amazon refused to renew its agreement with IPG unless the publishers distributed by IPG agreed to terms more favorable to Amazon. Upon the expiration of the IPG agreement, Amazon again exercised its nuclear option, pulling the buy buttons from its Kindle store for all e-books published by those independent book publishers.[26] The titles

---

[25] Comments of Independent Book Publishers (ATC-0727, June 25, 2012) (Abrams Books, Chronicle Books, Grove/Atlantic, Chicago Review Press, W.W. Norton & Company, Perseus Books, The Rowman & Littlefield Publishing Group, and Workman Publishing).

[26] Michael Cader, "Amazon Removes Kindle Version of IPG Books After Distributor Declines to Change Selling Terms," *PublishersLunch.com* (February 22, 2012). See also, Corilyn Shropshire, "Amazon Yanks 5,000 titles from Independent Publishers Group, a Chicago book distributor," *Chicago Tribune* (February 23, 2012).

remained banned from Amazon until the dispute was settled three months later.[27]

As mentioned above, faced with a single buyer having 90% market share in e-books, all publishers, especially independent publishers, would eventually face what Steve Job predicted before his passing: "Keep going with Amazon at $9.99. You will make a bit more money in the short term, but in the medium term <u>Amazon will tell you they will be paying you 70% of $9.99</u>."[28] In light of Amazon's subsequent actions against independent publishers, Mr. Job's warning was prophetic.

### c.      Upon Published Authors

An author's unpublished, copyrighted manuscript is the primary input to any e-book. In determining the impact of the proposed remedy, the Court must look also to its impact on the market for the acquisition of author manuscripts.  The Author's Guild, the nation's oldest and largest professional society of published authors, representing over 8,000 writers, submitted comments[29] that are notable in this context for how it recounts Amazon's use of its "buy button nuclear option" to the detriment of not only book publishers,[30] but to professional authors trying to <u>self-publish</u> their out-of-print books. Comments of Authors Guild at p. 4-5. In January, 2008, Amazon removed the buy buttons from more than 1,000 self-published printed books and threatened that these books would be permanently removed from the Amazon website unless the books were published via Amazon's own BookSurge print-on-demand service. Id.

---

[27] Michael Cader, "Standoff Ends: IPG and Amazon Agree to Terms on eBooks and Titles are Restored," *PublishersLunch.com* (May 25, 2012). Terms of the new arrangement were not disclosed, but IPG president, Mark Suchomel, announced to his independent book publisher clients, "I only regret that we weren't able to make up for all the lost revenue when  your Kindle titles were not available" and agreed to waive IPG's distribution fee on Kindle sales for the following three months. Id.

[28] See, Proposed Second Amended Complaint at 82, *Electronic Books Litigation*, 11-md-02293 (DLC).

[29] Comments of Authors Guild (ATC-0214, June 25, 2012) at p. 2.

[30] See, for example, Doreen Carvajal, "Small Publishers Feel Power of Amazon's Buy Button," *New York Times* (June 16, 2008).

That 2008 incident was a precursor to what Amazon did to Macmillan on Friday, January 29, 2010. Complaint at ¶80. Had Amazon succeeded in putting Macmillan out of business, there would have been one less major publisher competing to acquire publishing rights from authors—resulting in authors being paid less for publication rights to their e-book manuscripts.

When an author creates a work of authorship, the copyright subsists the moment it is fixed in a tangible medium of expression. By custom and practice in the book industry, when the author grants exclusive book publication rights to a book publisher, the author retains the copyright. Being that e-books are public goods, authors and their publisher licensees are already competing with zero—the price a free rider pays for obtaining a pirated copy of the e-book. One court has found, as an observed fact, that the free rider problem provides "a significant constraint on the price" that copyright owners charge for public goods such as music, and e-books.[31] Moreover, the free rider problem tends to make copyright enforcement costs high and can, indeed, cause increased costs to more than consume increased revenue from a higher price. As a result, owners of such copyrighted works consider these enforcement costs when setting a price. Id.

But this is a natural problem that publishers and authors face when selling their e-books. As we have seen, they are also facing an unnatural problem caused by conduct in violation of Section 2 of the Sherman Act: a market for the acquisition of their e-book distribution rights that is dominated by a highly concentrated buyer exercising monopsony power. As the Author's Guild concludes in its comments, "Amazon really doesn't need the Justice Department's help."[32]

---

[31] See, *Broadcast Music, Inc. v. Moor-Law, Inc.*, 527 F.Supp. 758, 763 (D. Del. 1981).

[32] As to the adverse affect on authors, the literary agent community has also opposed the settlement. See, for example, Comments of Association of Authors' Representatives (ATC-0003, May 8, 2012) (opining that Amazon's practice of below cost pricing "threatened the entire marketplace for books," leading to "the demise of the independent bookstore" and making it "impossible for other businesses to enter the e-book marketplace"); See also, Comments of Simon Lipskar of Writer's House Literary Agency (ATC-0807, May 9, 2012).

By the same token, the "remedy" proposed by the DOJ imposes an unnatural double jeopardy upon owners of copyright, and exclusive rights under copyright, in e-books.

### d.      Upon Self-Published Authors

No doubt the government must feel heartened by the comment letters received by the DOJ from several self-published authors, supporting the government's action in this case. But self-published authors should understand the long-term context of the market in which they are operating. These authors have already seen Amazon use the buy button nuclear option against self-published authors when, in January, 2008, Amazon removed the buy buttons from more than 1,000 self-published printed books.[33] Self-published authors more recently saw Amazon use the nuclear option against thousands of independent publishers to force them to amend their agreements with terms more favorable to Amazon. Id. And, most recently, they witnessed Amazon raising its sights to cripple the business of the sixth largest U.S. book publisher. Complaint at ¶80. In this last instance, the publisher stood its ground and, for time being, Amazon did not get its way.

When Amazon is ready to turn their sights back to these self-published authors, it will have a far weaker target and an easier path to getting its way. A brief review of the provisions of Amazon's agreement with self-published authors should demonstrate why. Unlike typical book publishing agreements with the Defendant Publishers, which the publishers may not amend without the author's written consent, Amazon's Kindle Direct Publishing agreement specifically states, "[Amazon] reserves the right to change the terms of this Agreement at any time in our sole discretion."[34]

---

[33] Comments of Authors Guild at p. 4-5.
[34] Amazon Kindle Direct Publishing Agreement (last updated June 30, 2012) at https://kdp.amazon.com/self-publishing/help?topicId=APILE934L348N.

While Amazon requires authors to submit a list price of their e-books, Amazon can subsequently sell them for whatever price it wants.[35] Further, under the Kindle Direct Publishing agreement, self-published authors are subject to an elaborate schedule of price requirements, specifying Minimum List prices and Maximum List prices.[36] For example, under  the "70% Royalty Option," the author may not sell his or her book for less than $2.99 or more than $9.99, and the price must be 20% lower than the list price of the printed edition offered in any sales channel. In addition, under such option, Amazon deducts from the author's royalty fee a charge of 15 cents per megabyte to transfer an e-book to a consumer's Kindle. Thus, under the "70% Royalty Option," the royalty to the self-published author on an e-book having a file size of 10mg and list price of $2.99, would be $1.04 (just under 35%). The agreement also contains a "most favored nations" clause, a trap for the unwary who might attempt to do a promotion with a competing e-book provider.[37]

It is also important to note what the Amazon Kindle Direct Publishing Agreement does not say: Self-published authors do not share in any revenues that Amazon may derive from the ancillary services Amazon provides to e-book consumers. Amazon can reduce its costs and increase its profits to the extent it can shift the source of its revenues from e-books to these ancillary services. The cost of these ancillary services are fixed and become extremely profitable with scale (i.e., increase number of paying users). By contrast, the cost of acquiring e-books for sale is variable and determined by the publishers and authors. Thus, Amazon may exercise its right to give away a self-published e-book, paying the minimum royalty due, in order to promote

---

[35] "**5.3.1 List Price.** You will provide a list price for each Digital Book you submit to us in accordance with the then current Program procedures for list price submission ("List Price)….**5.3.2 Customer Price.** To the extent permissible under applicable laws, we have sole and complete discretion to set the retail price at which your Digital Books are sold through the Program." Id.

[36] Amazon Kindle List Price Requirements (undated) at https://kdp.amazon.com/self-publishing/help?topicId=A301WJ6XCJ8KW0.

[37] Amazon Kindle Pricing Page (last updated December 30, 2011) at https://kdp.amazon.com/self-publishing/help?topicId=A29FL26OKE7R7B

services that the author will never earn a penny on. Because Amazon can change the terms of the Agreement at any time, even the minimum royalty is something upon which the author cannot rely.