IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ | |
| ) | |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff ) | |
| v. ) | Civil Action No.12-CV-2826 (DLC) |
| ) | |
| APPLE, INC., ET. AL. ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

**BRIEF OF BOB KOHN[*] AS *AMICUS CURIAE***

---

[*] Bob Kohn is an individual consumer of e-books who, on May 30, 2012, submitted to the Department of Justice ("DOJ") a comment letter (ATC-0143, "Comments of Bob Kohn") explaining at some length why the proposed Final Judgment is not in the public interest. This brief responds to the DOJ's response to those comments ("DOJ Response") and other public comments submitted during the 60-day comment period. Amicus is also co-author of *Kohn On Music Licensing* (Wolters Kluwer, 4th Edition 2002), cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 57 U.S. 186 at fn 21 (2003), and other courts, including *Fred Ahlert Music Corp. v. Warner/Chappell Music*, 958 F.Supp. 170 (S.D.N.Y. 1997), *Woods v. Bourne*, 60 F.3d 978 (2d Cir. 1995), *Boosey & Hawkes v. Buena Vista Home Video*, 145 F.3d 481 (2d Cir. 1988), and *Bridgeport Music v. Dimension Films*, 410 F.3d 792 at fn 18 (6th Cir. 2005). He has testified before the District Court in *United States v. ASCAP*, 559 F.Supp.2d 332 (S.D.N.Y. 2008), regarding the digital transmissions of music over the Internet and before both the FTC (1995) and the DOJ/FTC (2002) regarding the intersections between copyright and antitrust law as they relate to the public interest in promoting innovation and competition. A more complete resume and disclosure of Kohn's background, qualifications and affiliations is contained in the Comments of Bob Kohn.

TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.   STANDARD OF REVIEW ........................................................................................ 2

III.  THE RELIEF SOUGHT IS AN INSTRUMENT OF WRONG TO THE PUBLIC ........................ 4

      A.    Impact of the Proposed Final Judgment on the Relevant Market or Markets ............................... 4

            1.    Court is Not Bound by the Relevant Market Plead in the Complaint ................................... 4

            2.    Characteristics of the Products At Issue ................................................................. 5

                  a.    E-Books Are Public Goods ................................................................. 6

                  b.    E-Books Are Systems Goods ................................................................. 8

                  c.    DOJ Failed to Take into Account the Impact of the Economic Characteristics of E-Books in Reaching Its Decision ................................................................. 9

            3.    The Markets In Which E-book Transactions Occur ................................................... 10

            4.    DOJ Reached an Unreasonable Conclusion About the Remedy By Failing to Consider the Pro-Competitive Effects of Defendants' Alleged Conduct ................................................ 11

            5.    U.S. Supreme Court & Second Circuit has Justified Horizontal Price Fixing When It is "Pro-Competitive" or When It Otherwise Contributes to "Efficiencies in the Operation of a Market" ................................................................................................ 12

            6.    Countervailing Pro-competitive Contributions to Efficiency in the Operation in the E-Book Market Justified Defendants' Conduct ........................................................... 15

                  a.    Countervailing Amazon's Monopsony Power ............................................. 15

                  b.    Countervailing Amazon's Monopoly Power & Specifically Its Predatory Pricing Practices ................................................................................... 16

      B.    Impact of the Proposed Final Judgment Upon the Public Generally .......................................... 23

IV.   CONCLUSION ...................................................................................................... 24

TABLE OF AUTHORITIES

## Cases

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519 (1983) ...........................21

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983) ....................................19

*Broadcast Music v. CBS*, 441 U.S. 1 (1979) ...................................................................................12

*Broadcast Music, Inc. v. Moor-Law, Inc.*, 527 F.Supp. 758 (D. Del. 1981)....................................6

*Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717 (1988)................................11

*CBS v. ASCAP*, 337 F.Supp. 394 (S.D.N.Y. 1972)..........................................................................12

*CBS v. ASCAP*, 400 F.Supp. 737 (1975)..........................................................................................14

*CBS v. ASCAP*, 620 F.2d 930 (2d Cir. 1980), *cert. denied* 450 U.S. 970 (1981) ..........................12

*Fashion Organizers' Guild of Am. v. FTC*, 312 U.S. 457 (1941)....................................................13

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 457 (1986)..................................................................12

*In Re Electronic Books Antitrust Litigation*, 11 MD 2293 (DLC) ....................................................9

*In Re Wireless Telephone Services Antitrust Litigation*, 385 F.Supp. 2d 392 (S.D.N.Y. 2003).....................5

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S.877 (2007) ..................................11

*Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, (2d. Cir. 1981), cert. denied, 455 U.S. 943 (1982) ..............................................................................................................18

*Ortho Diagnostic Systems v. Abbott Laboratories*, 920 F.Supp. 455 (S.D.N.Y. 1996).................18

*Re-Alco v. National Center for Health Educ.*, 812 F.Supp. 387 (S.D.N.Y. 1993)...........................5

*Todd v. Exxon Corp.*, 275 F.3d 191 (2nd Cir. 2001) .......................................................................16

*United States v. BNS, Inc.*, 858 F.2d 456 (9th Cir. 1988) ..................................................................3

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) .....................................................................15

*United States v. Keyspan Corp.*, 783 F. Supp.2d 633 (S.D.N.Y. 2011)..............................................1

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) .....................................................2

*United States v. SBC Commc'ns, Inc.*, 489 F.Supp. 2d 1 (D.D.C. 2007)...........................................1

*United States v. Swift & Co.*, 286 U.S. 106, 115 (1932) ....................................................................3

## Statutes

*Copyright Act*, 17 U.S.C. §501(a) .....................................................................................................7

*Sherman Act*, 15 U.S.C. §2 .............................................................................................................18

*Tunney Act,* 15 U.S.C.§16(f).............................................................................................................3

## Rules

*Antitrust Guidelines for the Licensing of Intellectual Property* (DOJ/FTC 1995) ...........................5

*Horizontal Merger Guidelines (DOJ/FTC 2010)* ...........................................................................10

## Articles & Treatises

Al Kohn & Bob Kohn, KOHN ON MUSIC LICENSING (4th Edition 2010, Wolters Kluwer)............................14

Carl Shapiro, *The Role of Innovation in Competitive Analysis*, THE ANTITRUST SOURCE (July, 2005).........8

Christopher R. Leshe, *Achieving Efficiency Through Collusion: A Market Failure Defense to Horizontal Price Fixing*, 81 CALIFORNIA LAW REV. 243 ..................................................................................24

Doreen Carvajal, *Small Publishers Feel Power of Amazon's Buy Button*, NEW YORK TIMES (June 16, 2008) ............................................................................................................................15

Douglas D. Leeds, *Raising the Standard: Antitrust Scrutiny of Standard-Setting Consortia in High Technology Industries*, FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 641 (1997) ...................17

Gellhorn, Kovacic & Calkins, ANTITRUST LAW AND ECONOMICS (Thomson West 2004) ..........................7

Herbert Hovenkamp, FEDERAL ANTITRUST POLICY (2d ed. 1999)..............................................................14

Jay Himes, *Judicial Review of Justice Department Consent Decrees: Is the Tunney Act Glass Half-Empty or Half-Full?* (February 28, 2007)...............................................................................................3

John Cirace, *CBS v. ASCAP: An Economic Analysis of a Political Problem*, 47 FORDHAM L. REV. 277, 293-94 (1978-79) .......................................................................................................................14

Joseph Farrell & Carl Shapiro, *Dynamic Competition with Switching Costs*, ECONOMICS WORKING PAPERS 8865, University of California, Berkeley (1988) ............................................................................9

M. Gallaugher & Yu-Ming Wang,*Network Effects and the Impact of Free Goods: An Analysis of the Web Server Market*, INTERNATIONAL JOURNAL OF ELECTRONIC COMMERCE, Vol.3, No. 4, Summer, pp. 67-88 (1999).......................................................................................................................................17

Michael L. Katz & Carl Shapiro, *Network Externalities Competition and Compatibility*, AMERICAN ECONOMIC REVIEW, Vol. 75, No. 3 (June, 1985)...........................................................................17

Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects* , JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 8, Issue 2 (Spring 1994).............................................................................17

Philip E. Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697 (1975)............................................................................18

R.G. Lipesy & Kevin Lancaster, *The General Theory of Second Best*, 24 REV. ECON. STUD. 11 (1956-57) ......................................................................................................................................24

Richard S. Wirtz, *Rethinking Price-Fixing*, 20 INDIANA L. REV. 531 (1987) ...............................14

Roger D. Blair & Jeffrey L. Harrison, *Monopsony*, ANTITRUST LAW AND ECONOMICS (1993)..................14

*Tunney Act*, 15 U.S.C. §16(e) ..................................................................................................................1

Yabing Jiang, *e-Book Platform Competition in the Presence of Two-Sided Network Externalities*, 2012 45th Hawaii International Conference on Systems Sciences, IEEE Computer Society 4777 (2012)...............11

## Constitutional Provisions

*U.S. Constitution*, Article I, §8 ................................................................................................................23

## Public Comments

Comments of Author's Guild (ATC-0214, June 25, 2012) .......................................................................15

Comments of Bob Kohn (ATC-0143, May 30, 2012) .................................................................................1

# I.    INTRODUCTION

Many of the public comments spoke to a truth that seems obvious to everyone, including the government: that Defendants' conduct made the e-book market more competitive, evidenced by Amazon's market share in e-books declining from 90% to 60% during the year following the industry's adoption of the agency model. This brief takes the obvious and establishes its legal underpinnings, challenging the government's conclusion on the reasonableness of the proposed remedy by showing how the DOJ failed to consider the countervailing pro-competitive virtues of Defendants' conduct—something which the government's own U.S. Supreme Court authority cited in the DOJ Response requires. The brief also challenges the government's factual foundation for its decision that Amazon did not engage in predatory pricing. The DOJ Response invented (citing no authority) a bizarre standard for predatory pricing that is entirely inconsistent with that followed by the Second Circuit. By applying the wrong law to their facts, the DOJ's conclusions cannot be reasonable. To test the reasonableness of its conclusions, the Court must see those facts.

In determining whether the proposed Final Judgment is in the public interest, the Court will be considering certain factors enumerated in the Tunney Act[1] to evaluate whether "there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable."[2]   The Comments of Bob Kohn showed how the factual foundation proffered by the government in its Complaint and CIS point to a conclusion about the proposed settlement that is unreasonable. This brief is focused on showing how the DOJ Response has actually helped demonstrate the unreasonableness of the government's conclusions.

The Court's public interest determination in this case is like few others: it hinges not upon whether the government has vigorously and faithfully represented the public interest by seeking a

[1] *United States v. SBC Commc'ns, Inc.*, 489 F.Supp. 2d 1, 13 (D.D.C. 2007). Factors are listed in 15 U.S.C. §16(e).
[2] *United States v. Keyspan Corp.*, 783 F. Supp.2d 633, 637 (S.D.N.Y. 2011).

remedy that "does not go far enough"; rather, it concerns whether the proposed remedy will harm consumers rather than benefit us.[3] This brief will show that, based upon the DOJ's own facts, arguments, and authority, the government's conclusions are unreasonable. Using the DOJ's own factual allegations (stripped of their <u>conclusions</u>, which is really the subject of this proceeding), this brief shows how Defendants' conduct benefited consumer welfare, and why those benefits should not be reversed by the proposed Final Judgment. While the Court should be "deferential to the government's predictions as to the effect of the proposed remedies,"[4] it should not do so when the government's conclusions supporting those predictions are unreasonable. *Keyspan* at 637.

The proposed Final Judgment, which unwinds these pro-competitive benefits, is antithetical to both consumer welfare and to the copyright rights of authors, a right founded through the U.S. Constitution by the public and for the public to promote Writings. Regardless of how one may view Defendants' conduct as alleged, a Final Judgment that is an "instrument of wrong" to consumers and the public generally cannot be in the public interest.

## II.    STANDARD OF REVIEW

Without rehashing the litany of the DOJ's citations that would appear to strip this Court of a sentient role in this proceeding, this brief proceeds on the basis of the standard of review set forth in *Keyspan*.[5] Accordingly, this Court need not engage in a "full-blown, lengthy and expensive trial" (DOJ Response at 44) to determine if the government's conclusions about the settlement are

---

[3] Unlike other Tunney Act proceedings, the question here is not whether the proposed remedy is "reasonably adequate." It concerns whether consumers are harmed by the proposed "remedy" such that the DOJ's <u>conclusions</u> about the settlement are <u>un</u>reasonable.

[4] *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) ("*Microsoft I*").

[5] *Keyspan* at 637 (The "relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable"). See also, *SBC Commc'ns, Inc*., 489 F.Supp. 2d 1, 16 (D.D.C. 2007). Compare the two alternative formulations of the standard in *SBC Commc'ns*: (1) "The "relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable"—*SBC Commc'ns* <u>at 16</u>,  and (2) "The government need not prove that the settlements will perfectly remedy the alleged antitrust harms; it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms"—*SBC Commc'ns*, <u>at 17</u>. As to why formulation (1) from *SBC Commc'ns*, the one followed by *Keyspan,* should be the one used in this proceeding, see accompanying Memorandum Supporting Motion for Leave to Participate as *Amicus Curiae* at 2.

reasonable. On the contrary, the Courts may inquire into the reasonableness of the DOJ's conclusions assuming all of the factual allegations regarding Defendants' conduct in the Complaint, stripped of their conclusory tint, are true, drawing all reasonable inferences in the government's favor. (The Court, of course, is not so constrained. Congress has provided the Court with the tools for a more complete examination of the factual foundation and reasonableness of the government's conclusions. 15 U.S.C. §16(f)). To defer to both the DOJ's alleged facts as well as their conclusions, as the DOJ appears to be urging, would indeed make "a mockery of judicial power."

In addition, we will not ask the Court to "reach beyond the complaint to evaluate claims the government did not make."[6] Nor will we ask that Court "construct [its] own hypothetical case and then evaluate the decree against the case,"[7] or "redraft the complaint to inquire into other matters that the United States did not pursue"[8] or "engage in an unrestricted evaluation of what relief would best serve the public."[9] We are asking the Court to rule that the proposed Final Judgment is not in the public interest. By so doing, the Court need not engage in any of the foregoing parade of horribles that are beyond the standard of review; it would simply be telling the DOJ to go back to the drawing board. If the Court eventually finds the Defendants' engaged in wrongdoing, so be it, but a consent decree that is harmful to the public should not be approved by a court.

> A consent decree "is not merely a contract between the parties. The decree's approval is a judicial act by a branch of our government. It is, therefore, <u>imperative that the court avoid allowing the decree to become "an instrument of wrong" to the public</u>."[10]

---

[6] *Microsoft*, 56 F.3d at 1459. From that, however, it does not follow that the Court should not reach out to facts to evaluate claims that the government did, in fact, make. Otherwise, Congress would not have given the Court the extensive fact-finding tools it clearly has under 15 U.S.C. §16(f), including the examination of witnesses and documentary materials. And there would be no independent means by which the court could evaluate whether the <u>factual</u> foundation of the governments decisions actually support its conclusions regarding the proposed remedy.
[7] CIS §VII (quoting *Microsoft*, 56 F.3d at 1459 and *Keyspan*, 783 F.Supp.2d at 638).
[8] CIS §VII (quoting *Microsoft*, 56 F.3d at 1459-60).
[9] See, *United States v. BNS, Inc*., 858 F.2d 456, 462 (9th Cir. 1988); see also, *Microsoft*, 56 F.3d at 1460-62.
[10] Former Chief of the Antitrust Bureau of the State of New York, Jay Himes, *Judicial Review of Justice Department Consent Decrees: Is the Tunney Act Glass Half-Empty or Half-Full?* at 6 (February 28, 2007) (quoting *United States v. Swift & Co*., 286 U.S. 106, 115 (1932) (Opinion of the U.S. Supreme Court delivered by Justice Cardozo), http://www.comptel.org/files/tunney-act_himes.pdf.

III.     THE RELIEF SOUGHT IS AN INSTRUMENT OF WRONG TO THE PUBLIC

The government's conclusions regarding the proposed Final Judgment are contrary to consumer experience, common sense, U.S. Supreme Court and Second Circuit precedent, and nearly 20 years of U.S. government antitrust policy. Consistent with the *Keyspan* standard of review, this brief will enquire whether the government's <u>conclusions</u> regarding the settlement are <u>reasonable</u> considering the <u>enumerated factors</u> in 15 U.S.C 16(e). These factors include the impact of the proposed remedy: (a) upon the relevant market or markets[11] and (b) upon the public generally. Id. Because of its elementary error in formulating the proposed remedy, the DOJ's factual foundation actually supports the conclusion that the proposed Final Judgment is <u>not</u> in the public interest.

A.     Impact of the Proposed Final Judgment on the Relevant Market or Markets

The 2004 Tunney Reform Act, <u>for the first time,</u> made it a requirement that Court consider the impact of entry of the judgment "upon competition in the <u>relevant market or markets</u>." This is so, <u>even if</u> the Court believes or finds that the alleged activity was illegal *per se.* In its Response, the DOJ repeatedly waives the *per se* flag, but that has nothing to do with the <u>statutory requirement</u> compelling the Court to consider the impact of the proposed settlement upon competition in the relevant market or markets. As one of the <u>enumerated factors</u>, such impact must be considered in relation to evaluating whether the government's conclusions are reasonable.

1.     Court is Not Bound by the Relevant Market Plead in the Complaint

It should be self-evident that the Court is not bound to consider the impact of the proposed judgment solely upon those markets alleged in the Complaint.  <u>First</u>, the Court inherently has the power to dismiss the Complaint on a Rule 12(b)(6) motion for failing to plead an appropriate relevant market sufficient to state a claim upon which relief may be granted (or for failing to provide

---

[11] 15 U.S.C.§16(e)(1)(B).

a plausible explanation for why the market should be limited as it has been in the Complaint).[12] To suggest otherwise is to truly "make a mockery of judicial power." To drive home the point, suppose the DOJ, for whatever reason, did not, in fact, plead a relevant market. Then, what relevant markets would the Court consider in making its public interest determination, keeping in mind the Court <u>must</u> consider the impact of the proposed judgment upon competition relevant market or markets? The only answer to that question can be that the Court must consider the market or markets that <u>the Court</u> deems relevant.[13]

_Second_, one of the other enumerated factors the Court must consider is the impact of the proposed Final Judgment upon "the public generally." If the proposed remedy had no impact (or even a positive impact) upon the relevant market alleged in the Complaint, but destroyed competition in related markets (such as those which the IP Guidelines[14] require the DOJ to consider)—either upstream markets, such as the markets for e-book devices and platforms, or downstream markets, such as the markets for e-book distribution rights and author manuscript rights—to the detriment of consumers or the public generally, the Court should find that the government's <u>conclusions</u> regarding the proposed settlement are <u>unreasonable</u>.

## 2.      Characteristics of the Products At Issue

Before considering the impact of the settlement upon the relevant market or markets, one must first answer the question: market for what? Of all of the government decisions relevant to

---

[12] See, _In Re Wireless Telephone Services Antitrust Litigation_, 385 F.Supp. 2d 392 (S.D.N.Y. 2003) (citing _Todd v. Exxon Corp._, 275 F.3d 191,198 (2d Cir. 2001)) See, also _Re-Alco v. National Center for Health Educ._, 812 F.Supp. 387 (S.D.N.Y. 1993).

[13] In assessing the reasonableness of the government's conclusions as to the relevant market, the Court is not being asked to conduct "a wide-ranging inquiry" (_Microsoft_, 56 F.3d at 1459) into factual allegations that reaches beyond the scope of the Complaint. It is an assessment the Court customarily conducts every time it rules on 12(b)(6) motion. If Congress didn't intend the Court to consider the impact upon the market or markets that <u>the Court</u> deems relevant, it would not have <u>required</u> the Court to consider such impact nor would Congress have given the Court the tools with which to independently determine the markets relevant to the public interest determination. 15 U.S.C. §§16(e), 16(f).

[14] The antitrust policy of the U.S. with respect to copyrighted works is set forth in the _Antitrust Guidelines for the Licensing of Intellectual Property_ (DOJ/FTC 1995) (the "IP Guidelines"). The IP Guidelines, available today on the DOJ website, are fresh and relevant today as they were when they were first promulgated nearly 18 years ago. See, Carl Shapiro, _The Role of Innovation in Competitive Analysis_, THE ANTITRUST SOURCE (July, 2005).

determining whether its conclusions are reasonable, clearly the most important concerns the definition and nature of the product at issue—e-books. This is where the DOJ got it fundamentally wrong and why the government's factual foundation collapses under the mere weight of consumer experience and common sense.

The Complaint provides the following definition of e-books:

"—books sold to consumers in electronic form and read on a variety of devices, including dedicated e-readers (such as the Kindle or Nook), multipurpose tablets, smartphones and personal computers. Consumers reap a variety of benefits from e-books, including 24-hour access to product with near-instant delivery, easier portability and storage, and adjustable font size. E-books also are considerably cheaper to produce and distribute than physical (or "print") books." Complaint at ¶ 1.

In its discussion of the relevant market, the Complaint adds this:

"There are no technological alternatives to e-books, thousands of which can be stored on a single small device. E-books can be stored and read on electronic devices, while print books cannot. E-books can be located, purchased and downloaded anywhere a customer has an internet connection, while print books cannot." Complaint at ¶ 99.

Being the lens through which the government formulated its case and the proposed remedy, it is plain to see where it went wrong. The Complaint reads more like an advertisement for e-books than a reflection of sound antitrust policy. The antitrust policy of the United States, as embodied in the DOJ's own IP Guidelines, direct that the characteristics that distinguish the intellectual property at issue from other forms of property must be taken into account in evaluating the specific market circumstances in which e-book transactions occur.

### a.      E-Books Are Public Goods

E-books have the classic characteristics of what are known as, "public goods." See, *Broadcast Music, Inc. v. Moor-Law, Inc.*, 527 F.Supp. 758 (D. Del. 1981), *aff'd without published opinion*, 691 F.2d 490 (3d Cir. 1982). First, unlike private goods (e.g., apples or printed books), which can be withheld from the market and released only in exchange for payment, an e-book can

be consumed without leaving any less for others to consume.[15] Second, the digital nature of e-books facilitates the reproduction of perfect copies at virtually no cost, making it difficult for the copyright owner to exclude persons who do not pay for consuming the e-book—a problem known as the free rider problem,[16] misappropriation,[17] infringement,[18] illegal file sharing,[19] or piracy.

In economic terms, the supply curve operating in the market for public goods, such as e-books, is completely different from the supply curve in the market for private goods, such as printed books. For example, the supply curve of a printed book is typically the same as the book's marginal cost curve.[20]  This is because the cost of acquiring a copy of and consuming an additional underlined printed book costs the consumer something. By contrast, because of the free rider or piracy problem, the marginal cost of acquiring and consuming an additional e-book can be as low as zero. *Moor-Law,* 527 F.Supp. at 763. Accordingly, "the natural market forces of supply and demand do not operate normally on pricing in this market." Id.

Because of the public good characteristics of e-books, normal cost-based pricing is not feasible. Id. For example, the price that a publisher can charge for an e-book is subject to a natural constraint: illegal competitors charging zero for the same e-book. In *Moor-Law*, the District Court found, as an observed fact, that "the free rider problem does provide a significant constraint on the price BMI charges." By the same token, the publisher's cost of producing and marketing e-books are increased by the high costs of enforcing their legal rights and preventing their copyrighted works from being pirated (i.e., through technical and legal means). Id. "Since the free rider problem tends to make BMI's enforcement costs high and can, indeed, cause increased costs to more than consume increased revenue from a higher price, BMI considers this problem when setting a price". Id.

---

[15] See, *Moor-Law* at 763.
[16] Id.
[17] IP Guidelines at §1.0.
[18] *Copyright Act*, 17 U.S.C. §501(a).
[19] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011 (9th Cir. 2001).
[20] Gellhorn, Kovacic & Calkins, ANTITRUST LAW AND ECONOMICS at 71 (Thomson West 2004).

### b.        E-Books Are Systems Goods

Another defining characteristic of e-books that distinguish them from other forms of property is their need to <u>interoperate</u> with other products to have value.[21] In this respect, e-books are considered, "systems" goods[22]—they have no use or value to a consumer in isolation. To have any value at all, e-books need to operate within a system comprised of "intermediate" or "final" goods. Id. at §3.2.1. Unlike a printed book, an e-book is only "one component among many in a production process and derives value from its combination with complementary factors."[23] Not just any factors: <u>complementary</u> factors.

This is important, because it is rarely true that an e-book, once sold to a consumer, can be read on "a variety of devices"; an e-book can only be read on the <u>particular kind</u> of device with which it was designed to interoperate—i.e., a "complementary" component that is "compatible" with the e-book's particular format. Nor can it necessarily be read, as stated in the proposed Final Judgment, on "other electronic devices capable of visually displaying E-books."[24] For example, an e-book designed to operate on a Kindle has no use or value to a consumer who owns only a Nook device. To read the Kindle-formatted e-book, the consumer would have to purchase a Kindle-compatible device—which in itself should tell you something about the cost of that e-book to the consumer: the price charged for the e-book is not the only factor in the consumer's purchase decision.

By contrast, consumers can read printed books right off the shelf, standing alone, without the aid of any kind of device and no compatibility requirements (other than the language of the person

---

[21] IP Guidelines at §2.1.
[22] The nature of "systems" products is discussed at length in Comments of Bob Kohn at pp. 24-27.
[23] IP Guidelines at §2.3. The owner of intellectual property has to arrange for its combination with other necessary factors to realize its commercial value. Id
[24] The definition, as rephrased in the proposed Final Judgment, is the same in all material respects: "'E-book' means an electronically formatted book designed to be read on a computer, a handheld device, or other electronic devices capable of visually displaying E-books."Proposed Final Judgment, §II (Definitions), D ("E-Book").

desiring to read the book) . The consumer need only consider the price of the printed book in relation to its perceived value; he or she need not consider other factors, such as compatibility with the consumer's devices, the costs of switching to another device to read the book, and other factors that have nothing to do with the price of the book itself. For example, an e-book could be given away for free, but a consumer concerned with switching costs may still not acquire it. By the same token, a consumer may be willing to pay twice as much (e.g., $18.98, rather than $9.99) for a copy of an e-book that operates on several incompatible devices, because consumers place a value on convenience and flexibility.[25]

> c.   **DOJ Failed to Take into Account the Impact of the Economic Characteristics of E-Books in Reaching Its Decision**

These critical distinctions between e-books and printed books were part of the <u>crucial factual foundation underlying the DOJ's decisions in this case.</u>[26] For the reasons explained above, the <u>natural market forces of supply and demand that operate in the market for printed books do not operate normally on pricing in the market for e-books</u>. Accordingly, antitrust analysis <u>must</u> take these differences into account in evaluating specific market circumstances in which transactions occur. IP Guidelines §2.3. This is because a "number of different goods markets may be relevant to evaluating the effects" of a restraint. Id. at §3.2.1. For example, a restraint of trade may have "competitive effects in markets for final or intermediate goods made using the copyrighted work, or it may have effects upstream, in markets for goods that are used as inputs, along with the copyrighted work, to the production of other goods." Id. In general, the delineation of relevant market in the intellectual property area is approached as stated in the DOJ's Horizontal Merger Guidelines (2010). Id. Under the Merger Guidelines, the government "will normally identify one or

---

[25] See generally, Joseph Farrell & Carl Shapiro, *Dynamic Competition with Switching Costs*, ECONOMICS WORKING PAPERS 8865, University of California, Berkeley (1988).
[26] Nor are e-books merely "electronic versions of books." See, Opinion and Order *In Re Electronic Books Antitrust Litigation*, 11 MD 2293 (DLC) (May, 15 2012). E-books are public goods; printed books are private goods. E-books are systems goods; printed books are non-system, or stand-alone goods.

more relevant markets" (Merger Guidelines at§4) and <u>will consider the "network effects" operating in such markets</u>. Id. at §2.2.3 (Example 2).

The CIS, the DOJ Response, and Motion for Entry are each devoid of any discussion whatsoever of these crucial characteristics that distinguish e-books from other forms of property, the impact of those distinctions in each of the markets affected by e-book transactions, and the network effects operating in these markets. By failing to take these considerations into account, the factual foundation of the government's decisions are such that their <u>conclusions</u> about the proposed remedy are <u>unreasonable</u>.

### 3.    The Markets In Which E-book Transactions Occur

Given the nature of products at issue, the market or markets in which e-book transactions occur have at least the following characteristics (a) the need of e-books to interoperate with other goods in order to give them value and (b) the need to compete in a market the marginal cost curve of which is zero—that is, a market in which there is one <u>quiet, but giant competitor</u>: free riders who can readily take advantage of their digital form to cheaply trade in pirated copies without payment.

But, in its approach this case and the proposed remedy, the DOJ treated the market for e-books as it would a market for any private (as opposed to public) good and any stand-alone (as opposed to system) good, such as apples or printed books. Compare, IP Guidelines at §2.3 and §3.2.1. The DOJ failed to consider that a restraint of trade in the market for the copyrighted work (e.g., e-book) may have competitive effects in markets for the "final" or other "intermediate" goods made using the copyrighted work (e.g., e-book devices and delivery systems), or it may have effects further upstream, in markets for goods that are used as inputs, along with the copyrighted work, to the production of other goods (e.g., the market for the acquisition of author manuscripts).[27]

---

[27] Id. This formulation of the relevant market concerning e-books has now been confirmed in the economic literature. "As readers need to consume e-books through a particular e-book platform, <u>the e-book market is best characterized as a two-sided market with network externalities</u>." Yabing Jiang, *e-Book Platform Competition in the Presence of Two-*

In summary, the e-book market is best characterized as a stack of interdependent markets, from upstream to downstream, comprised of (1) the acquisition of e-book manuscripts from authors, (2) the acquisition of e-book distribution rights from publishers (or directly from authors), (3) the sale of e-books to consumers, and (4) the sale of e-book devices (including the reader software that operates on them) and the systems that deliver the e-books to the devices and otherwise support the purchase, delivery, storage and other services related to consumer transactions in e-books.[28]

However one looks at these markets, as separate relevant markets or as markets that are interdependent with each other, if you are considering how a remedy affects consumers of e-books and the public generally, the analysis is the same. Recall, the Tunney Act specifically requires the Court to consider the impact of the proposed remedy upon "the relevant market <u>or markets</u>" *and* the impact of the proposed judgment on the <u>public generally</u>.  As noted above, even if the proposed remedy has positive impact upon the relevant market alleged in the Complaint, if it harms competition in related markets—such as upstream markets (e.g., markets for e-book devices and platforms) or downstream markets (e.g., markets for e-book distribution rights and author manuscript rights)—to the detriment of consumers or the public generally, the Court should find that the government's <u>conclusions</u> regarding the proposed settlement are <u>unreasonable</u>.

### 4.    DOJ Reached an Unreasonable Conclusion About the Remedy By Failing to Consider the Pro-Competitive Effects of Defendants' Alleged Conduct

The DOJ's own IP Guidelines specifically acknowledge that a <u>"number of different goods markets may be relevant to evaluating the effects"</u> of a restraint (IP Guidelines at §3.2.1) and the

---

*Sided Network Externalities*, 2012 45th Hawaii International Conference on Systems Sciences, IEEE Computer Society 4777 (2012). The other side of this two-sided market is the market for e-book reader devices and the "cloud" platform services that support e-book transactions. Related markets (or other sides to the multi-sided markets) affected by the proposed settlement are the market for acquiring e-book distribution rights from publishers and the market for acquiring e-book manuscripts from authors, both of which are <u>inputs</u> to e-books to be marketed to consumers.

[28] In the digital world, this is the economic reality and [T]he Sherman Act has always been discriminatingly applied in light of economic realities."See, *Broadcast Music*, 441U.S. at 9. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S.877 (2007) (Sherman Act evolves "to meet the dynamics of present economic conditions"). See also, *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 731 (1988) (The term "restraint of trade" in the Sherman Act "refers not to a particular list of agreements, but to a particular economic consequence").

government must inquire whether the restraint of trade in question is "likely to have anticompetitive effects and, if so, <u>whether the restraint is reasonably necessary to achieve procompetitive benefits that outweigh those anticompetitive effects</u>." IP Guidelines at §3.4 (emphasis added) (citing *Broadcast Music*, among other cases and a leading treatise on antitrust law).[29] The IP Guideline's citations, in this context, of *Broadcast Music*—<u>is significant</u>.

To determine the legality of a particular restraint, it must be assessed whether the restraint in question will contribute to a "countervailing pro-competitive virtue." See, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 457 (1986) (citing *Broadcast Music*, 441 U.S. at 16-24). See also, IP Guidelines at §3.4.[30] Since the CIS, the DOJ Response, and the Motion for Entry of Final Judgment all fail to address this precedent as established by the U.S. Supreme Court and Second Circuit[31] (which is specifically reflected in the IP Guidelines)—the reasonableness of any government conclusion as to the impact of the proposed remedy should be completely suspect.

5. **U.S. Supreme Court & Second Circuit has Justified Horizontal Price Fixing When It is "Pro-Competitive" or When It Otherwise Contributes to "Efficiencies in the Operation of a Market"**

In the DOJ Response, the government's cited *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 465 (1986) and *Fashion Organizers' Guild of Am. v. FTC*, 312 U.S. 457, 468 (1941) for the proposition that a competitor may not "take the law into its own hands." These citations are inapt,

---

[29] IP Guidelines at §4.1. This is also consistent with the 2004 Tunney Reform Act's addition of the enumerated factor that the Courts is required to consider in this proceeding: the impact upon "the relevant market <u>or markets</u>." As noted, the 2004 Reform Act was in part a response to what Congress judged to be the D.C. Circuit's deference to the government in *Microsoft*. In *Microsoft I*, Microsoft was accused of using its monopoly in PC operating system software to monopolize the downstream market for copyrightable software products, such as word processing, spreadsheet and database application software, each of which were "systems products" that had no value to consumers without technical interoperability with Microsoft Windows. It should be clear that Congress, by using the phrase "relevant market <u>or markets</u>" in the 2004 Reform Act intended future courts to look at the competitive effects of the proposed remedy in all markets upon which it may have impact. Accordingly, the Merger Guidelines (§2.2.3) have since been amended to consider the "network effects" operating in "one or more" relevant markets.

[30] The DOJ "will assess whether the restraint in question can be expected to contribute to an efficiency-enhancing integration of economic activity," citing *Broadcast Music*, 441 U.S. at 16-24. IP Guidelines at §3.4.

[31] *Broadcast Music v. CBS*, 441 U.S. 1 (1979); *CBS v. ASCAP*, 337 F.Supp. 394 (S.D.N.Y. 1972); *CBS v. ASCAP*, 620 F.2d 930 (2d Cir. 1980), *cert. denied* 450 U.S. 970 (1981).

because neither of them concerned actions by competitors to address market failures in the antitrust context, which the U.S. Supreme Court has recognized will sustain "literal" collusive conduct. The unlawful practice at issue in *Indiana Fed'n of Dentists* was a violation of an Indiana statute prohibiting the unauthorized practice of dentistry; in *Fashion Organizers',* it was the alleged tortious copying of dress designs. While responding to the unauthorized practice of medicine or tortious infringement of intellectual property is not a sufficient justification for collusion, conduct that has a "countervailing pro-competitive virtue" is. See, *Indiana Fed'n of Dentists*, the government's own authority for the opposite proposition, at 459!

The Court need only turn back 6 pages from the DOJ's citation in *Indiana Fed'n of Dentists* to find where Justice White (who delivered the court's opinion in *Broadcast Music* six years earlier) not only reiterated the U.S. Supreme Court's view that "redeeming virtue" will justify literal price fixing, but went on to elucidate, if not extend, *Broadcast Music* as follows: Collusive conduct will be sustained <u>under the rule of reason</u> where there is a "countervailing procompetitive virtue—such as <u>for example</u>[32], the creation of <u>efficiencies in the operation of a market</u>." Id. at 459 (citing *Broadcast Music*).[33] (Some would attribute the Supreme Court's justification for horizontal price fixing in *Broadcast Music* solely to the need for the music publishers and their licensees to reduce transaction costs. But this is a misunderstanding of the decision.).[34]

---

[32] Emphasis added to underscore the Supreme Court's receptiveness to <u>a range of</u> potential countervailing pro-competitive virtues that may justify collusive conduct.

[33] *FTC v. Ind. Fed'n of Dentists,* 476 U.S. <u>at 459</u>.

[34] The transaction cost explanation of *Broadcast Music* assumes a relevant market of thousands of buyers who need a more efficient means of licensing musical performances. But the relevant market actually at issue in *Broadcast Music* was the market for musical performances used by <u>television networks</u>. The plaintiff was CBS, not *Shanley's Caberet*. In 1979, there were only three buyers in that market: CBS, NBC and ABC. Thus, while thousands of restaurants and businesses need to keep the number of individual musical performance licenses and the costs of negotiating them to a manageable level, the District Court found that the three major networks were less like restaurants and cabarets and more like the film studios and producers in its use of music: direct licensing to network television producers, like to producers of motion pictures, was held by the District Court to be feasible, because they already have an efficient mechanism under which to negotiate and obtain synchronization licenses directly from music publishers and it could feasibly negotiate with them for performance rights. *CBS v. ASCAP*, 400 F.Supp. 737, 755-56, 760-61, 765 (1975). This finding was accepted by the Second Circuit and the U.S. Supreme Court. *CBS v. ASCAP*, 562 F.2d at 134-40; *Broadcast Music,* 441 U.S. at 21 ("With the advent of television and radio networks, market conditions changed, and

The most significant economic consideration in *Broadcast Music* was the substantial concentration on the buyers' side of the market for musical performance rights.[35] In the market for musical performance licenses for network television, there were three major buyers, CBS, NBC, and ABC.[36] When there are only three major buyers, those buyers have substantial *monopsony* power— the power to lower prices.[37] (Monopsony is "just as inconsistent with consumer welfare as monopoly is.")[38] The concentration of the television industry at that time enabled the networks to reduce the price of musical performance rights below the competitive level.[39] In short, if individual copyright owners were required to negotiate with the television networks or their program producers, bargaining power would be overwhelmingly with the networks. Id. "No system short of blanket licensing will adequately offset the monopsony power of network television." Id.

Thus, the horizontal price fixing by music publishers in *Broadcast Music* was justified by the need to balance the monopsony power of the three buyers of musical performances. As discussed below, that precedent similarly justifies the book publishers' far more limited, one-time (alleged) collusive conduct in this action.

---

the necessity for and advantages of a blanket license for those users may be far less obvious than is the case when the potential users are individual television or radio stations, or the thousands of other individuals and organizations performing copyrighted compositions in public"). See, John Cirace, *CBS v. ASCAP: An Economic Analysis of a Political Problem*, 47 FORDHAM L. REV. 277, 293-94 (1978-79). See also, Al Kohn & Bob Kohn, KOHN ON MUSIC LICENSING (4th Edition 2010, Wolters Kluwer) at pp. 1085 to 1140. Accordingly, <u>*Broadcast Music* represents a case <u>"uncloued by the issue of transaction costs." *Cirace* at 295.</u></u>

[35] *Cirace* at 295 (see notes at 33-34). In accord, Richard S. Wirtz, *Rethinking Price-Fixing*, 20 INDIANA L. REV. 531 (1987): "After *Broadcast Music* and *NCAA*, the question is not whether exceptions to the general prohibition against agreements among competitors will be recognized, but rather when. Potentially pro-competitive collaboration among competitors is to be encouraged, within limits, even if it involves agreement on prices." Id. at 627.

[36] See, *CBS v. ASCAP* 562 F.2d at 132.

[37] *Cirace*, at 281, fn 34.

[38] See, Herbert Hovenkamp, FEDERAL ANTITRUST POLICY at 13-16 (2d ed. 1999). A monopsony is no less a market failure, and no less harmful to consumers, than a monopoly. See, *Horizontal Merger Guidelines* of 2010 at §1 ("Enhancement of market power by buyers, sometimes called 'monopsony power,' has adverse effects comparable to enhancement of market power by sellers"). "A monopsonist impedes efficient resource allocation by setting lower prices for the affected input and using fewer resources than it would in a competitive market featuring many buyers." See, *Gellhorn, Kovacic & Calkins* at 80, citing, Roger D. Blair & Jeffrey L. Harrison, *Monopsony*, ANTITRUST LAW AND ECONOMICS at 36-61 (1993).

[39] *Cirace* at 297.

### 6.   Countervailing Pro-competitive Contributions to Efficiency in the Operation in the E-Book Market Justified Defendants' Conduct

The countervailing pro-competitive virtue of Defendants' conduct was to restore efficiency to an e-book market distorted by both Amazon's <u>monopsony</u> power and <u>monopoly</u> power. The fact that such powers were promoted by Amazon's predatory pricing practices makes this justification even more compelling.  To find the pro-competitive virtues of Defendants' conduct, one need not look beyond the facts alleged in the Complaint.

### a.   Countervailing Amazon's Monopsony Power

Just as the music publishers were faced with a monopsony of three buyers in the market for musical performances in network television broadcasts, the book publishers were faced with a single buyer generating 90% of all of their revenues from e-book distribution.[40] See, DOJ Response at p. vi. As noted above, the Complaint itself alleges sufficient facts to demonstrate that Defendant Publishers faced in Amazon a buyer with palpable monopsony power. The concentration of its buying power allowed Amazon to, not only dictate terms to many publisher-sellers of e-books, but to repeatedly use what has been described by the *New York Times* as Amazon's buy button "nuclear option," a dramatic (but not the first[41]) example of which is alleged in the Complaint itself. One need only read paragraph 80 of the Complaint to appreciate how breathtakingly powerful Amazon's monopsony had become. When Amazon pulled the "buy" button for all of Macmillan's books (including e-books, as well as printed books) in the Amazon store, the nation's sixth largest book publisher was brought to its knees.[42] Had Amazon continued its boycott of Macmillan's books for short while longer, Macmillan would have been unable to solicit new manuscripts from authors and

---

[40] *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (in which 87% of the market constituted "monopoly power," citing *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) where "over 80%" constituted a "substantial monopoly" and *United States v. Aluminum Co. of America*, 148 F.2d, 416, 429 (2d Cir. 1945) where 90% of the market constituted market power).

[41] See, Comments of Author's Guild (ATC-0214, June 25, 2012), at 3, 5-6. Doreen Carvajal, *Small Publishers Feel Power of Amazon's Buy Button*, NEW YORK TIMES (June 16, 2008).

[42] 90% of Macmillan's e-book revenues and 25% of its printed book revenues vanished in an instant.

would have ceased publishing new books, effectively putting it out of business.

It has been said that a monopsony is the "mirror image" of monopoly.[43] Under the textbook economic definition, the monopsonist, in depressing the price of the goods purchased, transfers wealth to itself from the supplier of the goods. The government's suggestion that Amazon's exercise of its monopsony power to lower e-book prices is good for consumers is wrong. According to the DOJ's own 2010 Horizontal Merger Guidelines, the monopsonist will <u>not</u> pass along the lower price input to its downstream consumers.[44] And, as discussed infra, the use of monopsony power to reduce the price paid to publishers and authors for e-book distribution rights is antithetical to the exercise of the rights of copyright owners, whose pricing is already significantly constrained by the free-rider/piracy problem.[45]

Being the source of 90% of the book publishers' e-book revenues, Amazon was a clear monopsony in the market for acquiring license rights to e-books for distribution to the consumers. Moreover, Amazon's monopsony was not the result of competition on the merits, but rather it was fed by its monopoly in the market for e-book sales to consumers, which was promoted and sustained by Amazon's illegal predatory pricing.

       **b.**    **Countervailing Amazon's Monopoly Power & Specifically Its Predatory Pricing Practices**

In the DOJ Response, the government stated,

No objector to the proposed Final Judgment has supplied evidence that, in the dynamic and evolving e-book industry, Amazon threatens to drive out competition and obtain the monopoly pricing power which is the ultimate concern of predatory pricing.

No objector supplied evidence, because they didn't have to. Sufficient "evidence" of Amazon's exclusionary threat is alleged in the government's own Complaint and the CIS. As the

---

[43] *Todd v. Exxon Corp.*, 275 F.3d191, 202 (2nd Cir. 2001) (Opinion by Judge Sotomayor: "the equation for measuring market power in monopsony is a mirror image of the relationships that create market power in a seller"). See also, Merger Guidelines (2010) at §1.
[44] See Horizontal Merger Guidelines of 2010 at §12.
[45] *Moor-Law* at 763.

DOJ says, in its Complaint at ¶30 (and repeated in the DOJ Response on page 21), the government reviewed data from Amazon and others to investigate Amazon's e-book distribution business.  The Complaint then alleges that Amazon "lowered substantially the price of newly released and bestselling e-books," and according to the CIS, Amazon bought e-books from publishers for "a discount (usually around 50%) off the price printed on the physical edition of the book (the 'List Price')." [46] Thus, for example, an e-book with a List Price of $26.00 would be sold to Amazon for $13.00 and Amazon would sell that copy to a consumer for $9.99[47] —a marginal loss of over $3.00 per unit. In the economics terms, this practice is known as "penetration pricing," the practice of reducing the price of a component of the system (e.g., e-books) to initial adopters of the system (e.g., an e-book platform, such as Kindle), thereby enhancing the network effects operating in the market to spur the consumer adoption of the system.[48]  In legal terms, Amazon engaged in a clear case of "predatory pricing," an exclusionary practice that is illegal under federal and state antitrust laws.

In the DOJ Response at page 22, the government quotes *Brook Group v. Brown and Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993) for the proposition that "Antitrust law prohibits low prices only if the price is 'below an appropriate measure of…cost.'" While in *Brook Group* the Supreme Court had not yet filled in the ellipsis,[49] the DOJ completes the ellipsis with a standard for predatory pricing heretofore unknown in this jurisdiction or perhaps in any jurisdiction:

> As is alleged in the Complaint, the United States has concluded, based on its investigation and review of data from Amazon and others, that "[f]rom the time of its launch, Amazon's e-

---

[46] See, CIS §II.A.

[47] See Complaint, *in passim*.

[48] Comments of Bob Kohn 24-39. See, Douglas D. Leeds, *Raising the Standard: Antitrust Scrutiny of Standard-Setting Consortia in High Technology Industries*, FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 641, 656 (1997); See also, Michael L. Katz & Carl Shapiro, *Network Externalities Competition and Compatibility*, AMERICAN ECONOMIC REVIEW, Vol. 75, No. 3 (June, 1985); Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects* , JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 8, Issue 2 (Spring 1994); M. Gallagher & Yu-Ming Wang,*Network Effects and the Impact of Free Goods: An Analysis of the Web Server Market*, INTERNATIONAL JOURNAL OF ELECTRONIC COMMERCE, Vol.3, No. 4, Summer, pp. 67-88 (1999).

[49] *Ortho Diagnostic Systems v. Abbott Laboratories*, 920 F.Supp. 455, 466 (S.D.N.Y. 1996).

book distribution business has been <u>consistently profitable</u>, even when substantially discounting some newly released and bestselling titles." DOJ Response, p.21-22 (quoting Compl. ¶30, emphasis added).

The government provides no citation for the proposition that the standard for predatory pricing under Section 2 of the Sherman Act[50] is whether the perpetrator's business "has been consistently profitable."  Instead of cheerleading Amazon's pricing practices—characterizing them as "One of Amazon's most successful marketing strategies,"[51] it might have sought what this Circuit had to say on the subject. In the Second Circuit, "The relationship between a firm's prices and its marginal costs provides the best single determinate of predatory pricing."[52] Moreover, under the law in this Circuit, "prices below reasonably anticipated marginal cost will be <u>presumed illegal</u>." [53]

Because marginal cost typically cannot be determined from conventional accounting methods, the Second Circuit adopted "average variable cost" as its surrogate. *(Average variable cost is equal to the sum of all <u>variable</u> costs divided by output).* But this case is not typical. Marginal cost is traditionally defined as "the increment to total cost that results from producing an additional increment of output." *Northeastern* at 87 (quoting Areeda & Turner ¶712, at 155). Because Amazon's marginal cost is at least equal to the fixed wholesale price (e.g., $13.00, which is 50% of list price) it pays to the publishers for each additional e-book it sells, no surrogate for marginal cost is necessary.[54]

---

[50] 15 U.S.C. §2.

[51] Complaint at ¶ 2.

[52] *Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, 86-89 (2d. Cir. 1981), cert. denied, 455 U.S. 943 (1982) (emphasis added). See also, *Ortho Diagnostic Systems v. Abbott Laboratories*, 920 F.Supp. 455, 465-70 (S.D.N.Y. 1996). See generally, Philip E. Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697 (1975)) ("Areeda & Turner"). A firm's costs fall into two rough categories: *variable* costs, those which fluctuate with a firm's output, and *fixed* costs, those which are independent of output. Variable costs typically include such items as materials, fuel, labor, maintenance, <u>licensing fees</u>, and depreciation occasioned by use. Fixed costs generally include management expenses, interest on bonded debt, the rate of return necessary to attract and maintain equity investment, irreducible overhead, and depreciation occasioned by obsolescence. The sum of the firm's fixed and variable costs divided by output equals average cost. See, *Northeastern* at 86 (citing, Areeda & Turner at 700, 712).

[53] *Northeastern* at 88.

[54] There are additional marginal costs, such as the cost of wirelessly delivering each e-book to an e-reader, but because Amazon sells e-books at a price that is so significantly below its marginal cost, considering these additional marginal

Monopolization under Section 2 has two elements: first, the "possession of monopoly power in the relevant market" and, second, the "acquisition or maintenance of that power" by improper means.[55] First, given that Amazon had 90% share of the e-book market[56], there should be no question Amazon had the requisite market power to meet the first element. The existence of such power ordinarily may be inferred from the predominant share of the market.[57] Second, as to whether Amazon attempted to maintain that power by improper means, we only need to turn to the DOJ's Complaint and its CIS, where we are informed that Amazon purchased e-books for $13.00 or $17.50 and then resold them for $9.99, a range of 23% to 42% below Amazon's minimum marginal cost.[58] (Not surprisingly, this coincides with the 30 to 50% increase in prices on many adult trade books that the DOJ says consumers witnessed after the switch to the agency model. CIS at 9; DOJ Response at 5).

Conduct, other than competition on the merits, that "reasonably appears capable of making a significant contribution" to creating or maintaining monopoly power, is exclusionary, and therefore illegal.[59] In the Second Circuit, such conduct is <u>presumed</u> to be a violation of Section 2 of the Sherman Act where the alleged predator is selling below marginal cost.[60] There is good reason for this. As former Circuit Court Judge Breyer elegantly explained, unless the price cutter can show that

---

costs would be superfluous. Amazon charges self-published authors a wireless delivery fee of 15 cents per megabyte to transfer an e-book to a consumer's Kindle if the author selects the 70% Royalty Option. Amazon absorbs the variable cost of wireless delivery when delivering e-books of authors who select the 35% Royalty Option. See, *Kindle Direct Publishing Agreement, Pricing Page* (as of July 28, 2012)).

[55] *Sherman Act*, 15 U.S.C. §2. For a lucid discussion of the maintenance of a monopoly using predatory pricing, see *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230-34 (1st Cir. 1983) (Opinion by Circuit Judge Breyer).

[56] Matt Phillips, *Amazon eBook Share to Fall From 90% to 35%, Analyst Says*, WALL STREET JOURNAL (February 16, 2010).

[57] *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (in which 87% of the market constituted "monopoly power," citing *American Tobacco Co. v. United States*, 328 U.S. 781, 797, where "over two-thirds of the entire domestic field of cigarettes, and…over 80% of the field of comparable cigarettes" constituted a "substantial monopoly" and *United States v. Aluminum Co. of America*, 148 F.2d, 416, 429, where 90% of the market constituted market power).

[58] See, CIS at §II.A. The bestselling biography of Steve Jobs by Walter Issacson has a list price of $35.00; under the retail model, Amazon's marginal cost would be $17.50; reselling the e-book for $9.99, a remarkable 42% below marginal cost, would result in a marginal loss of $7.51 per unit.

[59] See, *Barry Wright*, 724 F.2d 227, 230 (Opinion by then Circuit Judge Breyer, quoting Areeda & Turner, *supra*).

[60] *Northeastern*, 651 F.2d at 88.

its low price is purely promotional (e.g., a "free sample") or show that it expects costs to fall when sales increase, "the firm cannot rationally plan to maintain the low price; if it does not expect to raise its price, it would do better to discontinue production."[61]   "[E]qually efficient competitors cannot permanently match this low price and stay in business." Id. "[C]ompetitive industries are typically characterized by prices that are roughly equal to, not below, 'incremental' [i.e., 'marginal'] costs." Id. "At a minimum, one would wonder why this firm would cut prices" below its avoidable costs "unless it later expected to raise its prices and recoup its losses." Id. "These considerations have typically lead courts to question, and often to forbid, price cuts below incremental [i.e., marginal] costs."

Amazon sold <u>every newly-released and bestselling e-book</u> made available by the Defendant Publishers and by most, if not all, independent book publishers, at below its marginal cost, <u>consistently</u>, "[f]rom the time of its Kindle launch" (CIS §II.A.) until Amazon's acceptance of the agency model. This was no "promotion." This pricing regime was not the equivalent of "free samples" or "loss leaders." The only e-books we are aware of which Amazon did not sell below marginal cost at one time or another were books acquired from self-published authors under the terms of the Kindle Direct Publishing Agreement. Under that agreement, with terms similar to the agency model, Amazon guarantees itself a commission for every e-book sold, keeping 65% of the sales price or over 30% of the sales price (depending upon the royalty scheme chosen by the author).[62] Nor can Amazon expect its marginal cost for e-books to decrease with volume. Amazon's marginal cost for an e-book having a list price of $26.00 will always remain $13.00, whether Amazon sells one copy or one million copies. As Judge Breyer suggested, "At a minimum, one

---

[61] See, *Barry Wright,* 724 F.2d 227, 232. Amazon's $9.99 price for virtually all best-selling trade e-books was certainly not a "promotion." Since Amazon would always pay $13.00 for an e-book having a list price of $26.00, it can never expect its variable cost of acquiring the e-book will fall as sales increase.

[62] For a comparison of the Kindle Direct Publishing Agreement and traditional book publishing agreements, see Appendix §B(2)(d), *infra* or appended to Memorandum in Support of Motion to Participate as *Amicus Curiae.*

would wonder why this firm would cut prices" below its avoidable costs "unless it later expected to raise its prices and recoup its losses."

To make it clear this brief is not suggesting the DOJ sue Amazon or that the Court engage in "an unrestricted evaluation of what relief would best serve the public," here now is the relevance to this public interest determination. The Sherman Act "was enacted to assure customers the benefits of price competition."[63]  But Amazon's $9.99 price was not the result of price competition on the merits,[64] but of Amazon's illegal predatory pricing activity. As the Second Circuit has acknowledged, selling below marginal cost is antithetical to consumer welfare[65] and is presumptively illegal. Accordingly, the Defendants conduct could not, as a matter of law, have been aimed to illegally raise prices, as the Complaint alleges—unless the objective were to raise prices above Amazon's marginal cost.[66]

Accordingly, any alleged conduct that resulted in **raising illegally-low prices** up to the level of Amazon's marginal cost cannot be a violation of the Sherman Act, because the government cannot prove any consumer harm. See, *Northeastern* at 87. As Areeda & Turner explain, selling

---

[63] *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 538 (1983).

[64] In fact, the government admits that Amazon was not reacting to its competition when it started selling e-books at below marginal cost; on the contrary, its competitors were reacting to Amazon's predatory pricing. As stated in §II.A of the CIS, "From the time of its Kindle launch, Amazon offered a portion of its e-books catalog, primarily its newly released and New York Times-bestselling e-books to consumers for $9.99. To compete with Amazon, other e-book retailers often matched or at least approached Amazon's $9.99-or-less prices for e-book versions of many new releases and *New York Times* bestsellers." (emphasis added). Thus, Amazon's predatory pricing could not have been a reasonable response to price competition or "competition on its merits," because prior to the Kindle's launch, the competition was not charging below their marginal costs (which was virtually the same as Amazon's). In fact, one of Amazon's existing competitors at the time of the Kindle launch, the Sony E-Book Store, was selling e-books at prices above their marginal cost. As the government admits, Amazon's competitors only began matching Amazon's predatory price after the Kindle launch "to compete with Amazon." They not only had to reduce their prices to their marginal cost—the cost at which consumer's welfare is maximized—but to below marginal cost to respond to Amazon's illegal practice.

[65] *Northeastern,* 651 F.2d at 87.

[66] Not only is there no allegation of that, the Court can take judicial notice of the fact that no prices could have been raised under the agency agreements to above Amazon's marginal cost. For example, under the retail model, Amazon bought a book for $13.00 and resold it for $9.99. Under the agency model, that publisher would sell the book for either $12.99 or $14.99. Assuming a price of $14.99, Amazon's marginal cost for the book would be the agency price minus Amazon's 30% commission. Thus, Amazon's marginal cost under the agency model would be $10.49, or about $1.50 lower than its marginal cost under the retail model (i.e., $12.00).

below marginal cost leads to an improper allocation of resources and is inconsistent with competition on the merits.

> The monopolist is not only incurring private losses but wasting social resources when marginal costs exceed the value of what is produced. And pricing below marginal cost greatly increases the probability that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the monopolist. Accordingly, a monopolist pricing below marginal cost should be presumed to have engaged in a predatory or exclusionary practice." Areeda & Turner at 712. In accord, *Northeastern*, 651 F.2d at 87-88.

With such a presumption in hand, the DOJ should not be expecting from <u>objectors</u> evidence of Amazon's exclusionary threat (DOJ Response at 22), but disclosing to the Court facts that would overcome the <u>presumption</u> of that threat. Since the government has alleged in the Complaint that it has conducted an "<u>investigation</u>" into the facts of Amazon's pricing practices, it is within the power of the Court to the <u>exercise its power</u> under the Tunney Act "to take testimony of Government officials or such other expert witnesses as the court may deem appropriate" or to authorize "examination of witnesses or documentary materials" with respect to the result of the DOJ's investigation. As noted, the Complaint and CIS raise a <u>presumption</u> that Defendants' conduct was a legal countervailing pro-competitive response to Amazon's predatory pricing. Accordingly, if the DOJ does not provide transparency into the results of its "investigation," then the reasonableness of its conclusions cannot be sustained.

Because prices that are set below the seller's marginal cost are <u>presumptively harmful</u> to consumer welfare, the government has a heavy, if not impossible, burden to explain how any conduct to <u>raise</u> those prices to the level of Amazon's marginal cost could have resulted in harm to consumers. <u>Showing harm to consumers is fundamental to the factual foundation for the government's decisions. Without it, the government's conclusions regarding the proposed settlement are unreasonable</u>. See, *Keyspan* at 637.

**B.     Impact of the Proposed Final Judgment Upon the Public Generally**

This section of the brief summarizes the impact of the proposed judgment upon the several constituents affected, including the public generally. (Because of space limitations, however, subsections 1 and 2 of this Section B of the brief await the Court's permission to be added). [67]

While the public has a constitutionally recognized interest in the promotion of Writings,[68] it does not have any interest, as the DOJ would have this Court believe, in "low prices." This amicus was gob-smacked to read the DOJ declare that, "Low prices, of course, are one of the principal goals of the antitrust laws" (DOJ Response at 22) and that "low prices" are a "core ambition" of free markets (DOJ Response at 21). Somehow, the government finds support for these propositions in the following sentence written by Justice Brennan in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990): "Low prices benefit consumers regardless of how those prices are set." Of course that was not where Justice Brennan ended his sentence: "Low prices benefit consumers regardless of how those prices are set, <u>and so long as they are above predatory levels, they do not threaten competition</u>." Id. at 340.

The Antitrust Division seems to operating with a fundamental misunderstanding of both the antitrust laws and the free markets. *Low prices* are <u>not</u> the core ambition of either the law or the markets. *Efficient prices* are. As the Second Circuit has held, consumer welfare is not maximized by "low" pricing, but by "marginal cost" pricing. *Northeastern* 651 F.2d at 87-88. Upon this fundamentally flawed legal foundation, one should be hard pressed to find the reasonableness in the government's conclusion that the settlement is in the public interest.

---

[67] These subsections are set forth in the Appendix in Memorandum to Support Kohn's Amicus motion. The Appendix addresses (1) the impact of the proposed Final Judgment, with respect to Amazon's <u>monopoly</u> powers, (a) upon consumers, (b) upon other e-book service providers, and (c) upon new entrants to the e-book service provider market, and (2) the impact of the proposed Final Judgment with respect to Amazon's <u>monopsony</u> powers upon (a) upon Defendant Publishers, (b) upon independent book publishers, (c) upon published authors, and (d) upon self-published authors.
[68] *U.S. Constitution*, Article I, §8. *Copyright Act*, 17 U.S.C. §101 *et.seq.*

# IV.    CONCLUSION

Defendants' conduct was a reasonable means to accomplish a worthy end, a market-based solution aimed at correcting a serious market failure brought about by the predatory conduct of a dominant e-book systems provider. While not a "perfect remedy," it resulted in undeniably countervailing pro-competitive effects, which even the DOJ has not once denied in its Response.[69]

The Defendants actions were a measured response to the circumstances. In *Broadcast Music*, the monopsony faced by the music publishers justified the maintenance of collection societies each having annual cost of over $150 million dollars to administer their respective horizontal price fixing regimes, fee collection, and distribution operations. By contrast, as the Complaint alleges, "the effect of the Defendants' action was to alter the business model governing the relationship between publishers and retailers," a one-time shifting of that relationship from a retail to an agency model, requiring no administration society or pooling arrangement that would warrant rate hearings and the like. The means to this worthy end—with allegations of meetings in private dining rooms—may not look "pretty" to the unsophisticated, but they were no prettier than similar meetings held by the founders of ASCAP nearly 100 years ago. See Comments of Kohn at 21-23. Yet, the U.S. Supreme Court and the Second Circuit have long since recognized that ASCAP's collusive conduct, while constituting literal price fixing, is not illegal, because of its "countervailing pro-competitive virtues" and "creation of efficiencies in the operations of a market." *Indiana Fed'n of Dentists*, 476 U.S. at 459.

If the Defendants "literally" engaged in collusive activity, it was a one-time event necessary to countervail a serious market failure. Should the Court send the DOJ back to the drawing board,

---

[69] According to the general theory of second best, the public would be better off if the government did nothing under these circumstances. See, R.G. Lipesy & Kevin Lancaster, *The General Theory of Second Best*, 24 REV. ECON. STUD. 11 (1956-57).("The distorting effect of overconsumption could be made worse if, in cases of horizontal price fixing, antitrust laws are used to decrease prices"). See also, Christopher R. Leshe, *Achieving Efficiency Through Collusion: A Market Failure Defense to Horizontal Price Fixing*, 81 CALIFORNIA LAW REV. 243, 270.

the path to settling this case <u>with all Defendants</u> is clear: A <u>consent decree that enjoins any potentially collusive communications among the Defendants in the future</u>, with some appropriate monitoring of information exchanges for a limited period. This remedy—which would not "evaporate" the pro-competitive effects of Defendants' conduct or institute an unnecessary regulatory regime—may not be "perfect," but it would appear to be one that is certainly "within reaches of" the public interest.

But to punish the Defendant Publishers with a return to a market suffering from monopsony and monopoly power by a dominant systems provider (not only their biggest customer, but now their biggest competitor), simply because the publishers took the effective and limited steps necessary to correct a market failure caused by Amazon's below marginal cost pricing, would constitute a tragic miscarriage of justice. The Court would only compound that injustice by entering the proposed Final Judgment, <u>approving with the same stroke of the pen an instrument of wrong to consumers and the public generally</u>. Because the proposed settlement would reverse the pro-competitive effects of Defendants' conduct—whether such conduct is ultimately held reasonable or not—entry of the Final Judgment is not in the public interest.

Dated: August 13, 2012                               Respectfully submitted,


                                                     /s/ Bob Kohn
                                                     _____
                                                     BOB KOHN
                                                     (California Bar No. 100793)
                                                     140 E. 28th St.
                                                     New York, NY 10016
                                                     +1-408-602-5646
                                                     bob@bobkohn.com