UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>APPLE, INC., )<br>HACHETTE BOOK GROUP, INC., )<br>HARPERCOLLINS PUBLISHERS L.L.C., )<br>VERLAGSGRUPPE GEORG VON )<br>    HOLTZBRINCK GMBH, )<br>HOLTZBRINCK PUBLISHERS, LLC )<br>    d/b/a MACMILLAN, )<br>THE PENGUIN GROUP, )<br>    A DIVISION OF PEARSON PLC, )<br>PENGUIN GROUP (USA), INC., and )<br>SIMON & SCHUSTER, INC., )<br>)<br>Defendants. )<br>) | Civil Action No. 12-CV-2826 (DLC) |

**REPLY MEMORANDUM IN SUPPORT OF THE**
**UNITED STATES' MOTION FOR ENTRY OF FINAL JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

I.    INTRODUCTION ........................................................................................................... 1

II.   APPLE ............................................................................................................................. 2

III.  PENGUIN ........................................................................................................................ 5

IV.   MACMILLAN ................................................................................................................. 7

V.    AMICI BARNES & NOBLE AND AMERICAN BOOKSELLERS
      ASSOCIATION ............................................................................................................... 9

VI.   CONCLUSION .............................................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902 F.2d 185 (2d Cir. 1990) ............................ 4-5

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) .................................................. 1-2

*Associated Press v. United States*, 326 U.S. 1 (1945) ................................................................... 1

*EEOC v. Pan Am. World Airways, Inc.*, 897 F.2d 1499 (9th Cir. 1990) ........................................ 3

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) .................................................................... 1

*HyperLaw, Inc. v. United States*, 159 F.3d 636, No. 97-5183,
  1998 WL 388807 (D.C. Cir. May 29, 1998) (table opinion) ...................................................... 6

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986) ..................... 3

*Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997) ............... 6

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ............................................... 1

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ............................................................ 9

*Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300 (2d Cir. 1996) ........................................................... 3

*United States v. Abitibi-Consolidated Inc.*, 584 F. Supp. 2d 162 (D.D.C. 2008) ........................... 8

*United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9 (D.D.C. 1993) ..................................... 9

*United States v. Alex. Brown & Sons, Inc.*, 169 F.R.D. 532  S.D.N.Y. 1996) ............................... 6

*United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) ................................................................ 5-6

*United States v. Graftech Int'l Ltd.*, No. 1:10-cv-02039, 2011 WL 1566781
  (D.D.C. Mar. 24, 2011) ............................................................................................................. 3

*United States v. Int'l Bus. Mach. Corp.*, 163 F.3d 737 (2d Cir. 1998) ........................................... 9

*United States v. SBC Commc'ns*, 489 F. Supp. 2d 1 (D.D.C. 2007) ........................................... 2-3

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ........................................................ 2

*United States v. Trans-Missouri Freight Association*, 166 U.S. 290 (1897) .................................. 1

*Zupnick v. Fogel*, 989 F.2d 93 (2d Cir. 1993) .................................................................................. 5

I. **INTRODUCTION**

A recurring theme in the various oppositions to entry of the consent decree is that the government fails to understand that the sale of e-books is unlike other businesses, and that the application here of long-settled prohibitions against price-fixing risks ruin for the industry.[1] While e-books are a relatively new arrival on the publishing scene, a plea for special treatment under the antitrust laws is an old standby. Railroads, publishers, lawyers, construction engineers, health care providers, and oil companies are just some of the voices that have raised cries against "ruinous competition" over the decades. Time and time again the courts have rejected the invitation to exempt particular businesses from the reach of the Sherman Act. *See, e.g.*, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 326-27 (1897) ("We think, after a careful examination, that the statute covers, and was intended to cover, common carriers by railroad."); *Associated Press v. United States*, 326 U.S. 1, 7 (1945) ("Member publishers of AP are engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything else people need or want. . . .  All are alike covered by the Sherman Act."); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787 (1975) ("The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act . . ."); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (all industries are subject to "a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."); *Arizona v.*

---

[1] This Reply addresses new arguments raised in responses authorized by the Court: those submitted by defendants Apple, Inc. ("Apple"), Penguin Group USA ("Penguin"), and Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"); as well as *amici* Barnes and Noble, Inc. ("B&N"), and American Booksellers Association ("ABA") (B&N and ABA collectively are referred to herein as "Amici"). For the arguments those entities repeat from their Tunney Act comments, the United States provides a chart in Appendix A listing where in the comments those arguments initially were made, and where in the United States' Response they were addressed. *See* Appendix A.

*Maricopa County Med. Soc'y*, 457 U.S. 332, 349 (1982) ("We are equally unpersuaded by the argument that we should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940) ("Congress has not left us with the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.  It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies.  It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination.").

 Suggestions that the antitrust laws are of no use when it comes to e-books are especially remarkable in light of the unmistakable consumer harm that resulted from the conspiracy in this case.  The conspirators eliminated the "wretched $9.99 price" that so attracted the reading public and so infuriated publishers, Compl. (Docket No. 1) ¶ 32, and made sure that Apple would not have to contend with what it viewed as senseless competition as it entered the e-book market.  Now those conspirators that have not settled with the United States seek to upset the settlements that have been reached, and thereby delay the restoration of competition.  Those efforts have no basis in law, and this Court should reject them.

## II. APPLE

 Apple objects to entry of the proposed Final Judgment before there has been a full trial on its defenses to the government's charges.  Apple is entitled to its trial, but it is not entitled to preclude the United States and Apple's co-defendants from obtaining the immediate benefits of their settlements, as it is well established that the United States "need not prove its underlying

2

allegations in a Tunney Act proceeding." *United States v. SBC Commc'ns*, 489 F. Supp. 2d 1, 20 (D.D.C. 2007). A policy of requiring claims against all defendants to be resolved before any settlement may take effect would be wholly new law, and could "fatally undermine the practice of settling cases," in clear contradiction of the intent of the Tunney Act. *Id.* Apple offers no support for the proposition that entering consent decrees while litigation continues against non-settling parties is in any way inconsistent with the Act. Apple cites no Tunney Act cases, and in none of the cases it does cite was a due process violation found, a delay ordered, or a decree modified — despite objections from non-settling defendants and third parties. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529-30 (1986) (intervenor may not prevent entry of a consent decree because the decree "does not bind [it] to do or not to do anything."); *EEOC v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1506-07 (9th Cir. 1990) (settlement approved despite third party claims of prejudice to private recovery); *Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 306-07 (2d Cir. 1996) (no due process violation in enforcing a consent decree against a successor-in-interest to a party bound by the underlying litigation). On the other hand, there is Tunney Act precedent for modifying the contractual rights of non-parties to a decree. *See, e.g.*, *United States v. Graftech Int'l Ltd.*, No. 1:10-cv-02039, 2011 WL 1566781, at *1 (D.D.C. Mar. 24, 2011) (entering a consent decree requiring modification of a contract with a non-party).

In suggesting to the Court that the proposed decree will cause Apple to forfeit valuable contract rights, Apple carefully avoids describing exactly what those rights are. Each settling defendant's Apple Agency Agreement essentially is a month-to-month contract that is explicitly

3

terminable by the publisher on thirty days' notice.[2] The HarperCollins Publishers L.L.C. and Simon & Schuster, Inc. agreements provide that they may be terminated "by either Party" for "any or no reason." While the language of the Hachette Book Group, Inc. agreement is slightly different, it too may be terminated "by either Party" upon "written notice of not less than thirty days." In short, when Settling Defendants terminate their Apple Agency Agreements, as required by the decree, their actions will be entirely consistent with the deal Apple struck with each of them.

Apple's last grievance, that the decree changes who has responsibility for setting pricing, is even more bewildering. Under the decree, retailers, including Apple, <u>gain</u> certain pricing discretion with respect to Settling Defendants' e-books. Given that Apple is free to not exercise that authority, *see* U.S. Response (Docket No. 81) at 50, it is difficult to understand how this contractual change possibly could harm Apple.

In reality, what troubles Apple is that the decree returns pricing discretion not just to Apple, but also to its retail competitors — competitors which Apple fears may choose to exercise that restored authority in order to lower e-book prices. In that event, Apple's e-book customers might find less expensive alternatives. Apple's desire to avoid price competition for as long as possible is the unstated reason why it seeks to undo or forestall the settlements.

"Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence."

---

[2] The decree requires that Hachette Book Group, Inc., HarperCollins Publishers L.L.C., and Simon & Schuster, Inc. (collectively "Settling Defendants") terminate their agency agreements with Apple within seven days of entry of the proposed Final Judgment. PFJ § IV.A. Apple does not state that the difference between its bargained-for contractual right to thirty days' notice, and operation of the proposed Final Judgment following entry is in any way a material difference.

*Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902 F.2d 185, 190 (2d Cir. 1990).  Apple disregards these principles and ignores Settling Defendants' judgment that it was in their best interest to settle the government's claims against them.  Apple's alternative request for a ten-month delay in entry of the Final Judgment similarly would deprive Settling Defendants, the United States, and consumers of the immediate benefits of the settlements for no reason other than to preserve the Apple Agency Agreements that, almost literally overnight, triggered substantial e-book price increases.  In short, Apple's own interests motivate its objections to the proposed decree, interests that are not in any way linked to the public interest inquiry mandated by the Tunney Act.[3]

### III.  PENGUIN

Penguin's central "observation" is that United States has not provided "any pre-existing empirical analyses done by the Government to support its proposed settlement."  Penguin at 5.  Penguin asserts that such analyses constitute "determinative documents" that must be produced pursuant to the Tunney Act.  *Id.* at 1.

Penguin misunderstands what constitutes a determinative document.  Under the law of this Circuit, "[t]he range of materials that are 'determinative' under the Tunney Act is fairly

---

[3] Nor does the partial settlement of this case threaten, as Apple suggests, to deprive the public of any "benefit" that may "be derived from a determination of the issues at trial."  15 U.S.C. § 16(e)(1)(B).  *See* Apple at 1.  After all, Apple has promised to persevere until it "has had its day in court."  *Id.* at 2, 5.  Apple's remark that it "would have to appeal" entry of the proposed Final Judgment and, therefore, entry would violate the Fed. R. Civ. P. 54(b) policy against "piecemeal appeals" is wholly unpersuasive.  *See* Apple at 5.  Even under the only case that Apple cited on this issue, *Zupnick v. Fogel*, Apple would not have standing to sustain an appeal, as it cannot demonstrate a "formal legal prejudice as a result of the settlement."  *See Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993) (non-settling defendants did not have standing to appeal because the entity they claimed an interest in "was not a viable entity and therefore" they were "not giving up anything of value.").

narrow," and extends only to documents that constituted "a substantial inducement to the government to enter the consent decree." *See United States v. Bleznak*, 153 F.3d 16, 20-21 (2d Cir. 1998) (citing *Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 784 (D.C. Cir. 1997)).  This is because Congress, in enacting the determinative document requirement, was more "concerned with exposing external influences on the consent decree process than it was with documents . . . reflecting the Government's internal evaluation of its evidence . . ." *United States v. Alex. Brown & Sons, Inc.*, 169 F.R.D 532, 542 (S.D.N.Y. 1996); *see also HyperLaw, Inc. v. United States*, 159 F.3d 636, No. 97-5183, 1998 WL 388807, at *2-3 (D.C. Cir. May 29, 1998) (table opinion) (mere government reliance on documents does not mean that "the documents were determinative within the meaning of the Tunney Act").  In fact, in the two Tunney Act cases Penguin cites, the court found government analyses of evidence not to constitute determinative documents.  *See Bleznak,* 153 F.3d at 20-21 (settlement memorandum was "the result of the internal effort of DOJ to organize its evidence for the purpose of evaluating its case" and was not a substantial inducement to enter the decree); *Alex. Brown*, 169 F.R.D. at 542.  Accordingly, there is simply no basis for Penguin's assertion that the United States must produce internal economic analyses to support its settlement.

That said, Penguin does devote the majority of its paper to discussing whether the conspiracy resulted in higher e-book prices, and the United States cannot let Penguin's observations go unchallenged, (even though they are outside the scope of these Tunney Act proceedings).  Notably, Penguin itself is careful never affirmatively to challenge the proposition

6

that the conspiracy raised e-book prices — nor could it, given the information it possesses.[4] Nonetheless, Penguin directs the Court to certain commenters who, based on more limited information, make the incorrect assertion that the conspiracy lowered e-book prices. Penguin further sows confusion by only offering the Court price data for a period predating culmination of the conspiracy. *See* Penguin Ex. A, pp. 1-3. However, straightforward analysis of Penguin's prices before and after conspiracy culmination reveals that Penguin did indeed raise its prices as soon as it gained the power to do so. In four weeks spanning the time when Penguin took retail pricing power from Amazon, the average price for a Penguin e-book sold through Amazon increased 17 percent, and the average price for a Penguin "new release" e-book sold through Amazon increased 21 percent.[5] *See* Exhibits 1 & 2 to the Declaration of Karry Lu in Support of the United States' Motion for Entry of Judgment, dated August 22, 2012.

## IV.  MACMILLAN

Macmillan argues that the settlement will "result in an Amazon market share that is contrary to the public interest" and that the "government's failure to provide any factual foundation or analysis with respect to possible competitive effects on the market or third-parties" requires the Court to reject the proposed Final Judgment. Macmillan at 4-5. Macmillan further asserts that "[t]he public interest standard takes on heightened importance in this case" because

---

[4] Even Penguin's co-defendant Macmillan has acknowledged that the move to agency pricing was a direct response to Amazon's low pricing, and that the settlements likely would result in a return to e-book price discounting. Macmillan at 2, 5.

[5] There are many different ways to compare pre-conspiracy and conspiracy pricing. While we present only one of those methods here, different methodologies reveal the same phenomenon: average prices rose.

that the conspiracy raised e-book prices — nor could it, given the information it possesses.[4] Nonetheless, Penguin directs the Court to certain commenters who, based on more limited information, make the incorrect assertion that the conspiracy lowered e-book prices. Penguin further sows confusion by only offering the Court price data for a period predating culmination of the conspiracy. *See* Penguin Ex. A, pp. 1-3. However, straightforward analysis of Penguin's prices before and after conspiracy culmination reveals that Penguin did indeed raise its prices as soon as it gained the power to do so. In four weeks spanning the time when Penguin took retail pricing power from Amazon, the average price for a Penguin e-book sold through Amazon increased 17 percent, and the average price for a Penguin "new release" e-book sold through Amazon increased 21 percent.[5] *See* Exhibits 1 & 2 to the Declaration of Karry Lu in Support of the United States' Motion for Entry of Judgment, dated August 22, 2012.

## IV.  MACMILLAN

Macmillan argues that the settlement will "result in an Amazon market share that is contrary to the public interest" and that the "government's failure to provide any factual foundation or analysis with respect to possible competitive effects on the market or third-parties" requires the Court to reject the proposed Final Judgment. Macmillan at 4-5. Macmillan further asserts that "[t]he public interest standard takes on heightened importance in this case" because

---

[4] Even Penguin's co-defendant Macmillan has acknowledged that the move to agency pricing was a direct response to Amazon's low pricing, and that the settlements likely would result in a return to e-book price discounting. Macmillan at 2, 5.

[5] There are many different ways to compare pre-conspiracy and conspiracy pricing. While we present only one of those methods here, different methodologies reveal the same phenomenon: average prices rose.

e-book distributors "serve as a 'gatekeeper' over the dissemination of the ideas and information that are at the core of our free society." *Id.* at 1.

Macmillan offers no support for its contention that the proposed Final Judgment will somehow catapult Amazon's share toward 90 percent (Macmillan at 5), despite competition from established companies such as B&N, Google, Apple, and Sony. Certainly the recently announced investment by Microsoft in B&N's e-book business, and Sony's release of a new e-reader, do not reflect any reluctance on the part of sophisticated companies to seek to expand their sales of e-books.[6] Macmillan's remaining arguments relating to Amazon previously have been addressed by the United States. *See* U.S. Response (Docket No. 81) at 18-25.

Further, Macmillan's argument regarding the United States' alleged failure to provide competitive effects analyses essentially mirrors arguments made by Penguin, and it fails for the same reasons. The United States adds here that Macmillan's reliance on *Abitibi-Consolidated* is misplaced, as that court was evaluating a settlement to resolve objections to a merger — not *per se* price fixing. The court requested a single declaration from a government economist as to the sufficiency of a divestiture to protect competition. *See United States v. Abitibi-Consolidated Inc.*, 584 F. Supp. 2d 162, 165-66 (D.D.C. 2008). Here, in contrast, there is no similar claim that the consent decree will not bring an end to the collusion that prompted the government's lawsuit.

---

[6] *See* Ingrid Lunden, *Microsoft Makes $300M Investment In New Barnes & Noble Subsidiary To Battle With Amazon And Apple In E-books*, TechCrunch (April 30, 2012), http://techcrunch.com/2012/04/30/microsoft-barnes-noble-partner-up-to-do-battle-with-amazon-and-apple-in-e-books/; Press Release, *Barnes & Noble, Microsoft Form Strategic Partnership to Advance World-Class Digital Reading Experiences for Consumers*, Microsoft News Center (April 30, 2012), http://www.microsoft.com/en-us/news/Press/2012/Apr12/04-30CorpNews.aspx; Press Release, *Sony's New eReader Provides Book Lovers with More Freedom to Read Anytime and Anywhere*, Sony Electronics News & Information (Aug. 16, 2012), https://news.sel.sony.com/en/press_room/consumer/computer_peripheral/e_book/release/63536.html.

With respect to Macmillan's fear that the settlement will make Amazon a stronger rival, as the United States previously noted, the Tunney Act is not a vehicle for firms to blunt competition. U.S. Response (Docket No. 81) at 51. "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *United States v. Int'l Bus. Mach. Corp.*, 163 F.3d 737, 741-42 (2d Cir. 1998) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)).

Finally, Macmillan joins in the chorus of those asking for special antitrust treatment of e-books, a request that should be rejected for reasons discussed above. *See* pp. 1-2, *infra*.

## V. AMICI BARNES & NOBLE AND AMERICAN BOOKSELLERS ASSOCIATION

The United States addresses the only new argument offered by B&N and ABA: that the volume of comments opposed to entry of the decree demonstrates that it is not in the public interest.

Simply put, the Court should reject the suggestion that the "public interest" is determined by the ability of interested parties to muster the largest number of comments in a Tunney Act proceeding. Certainly, it is not unprecedented for parties to oppose a settlement because they have a stake in an anticompetitive status quo. In *Airline Tariff Publ'g Co.*, for instance, over 700 comments were submitted, "the overwhelming majority of which oppose[d] entry" of the decree. *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993). The court, notwithstanding, entered the decree without holding a hearing, reasoning that the "balance struck by the government" was appropriate, and that several airlines already were complying with the decree without negative consequences. *Id.* at 14. Here, as the United States previously has noted, the majority of the comments received opposing the decree did not come from those

9

seeking to represent the public interest, but rather from those that benefited from the conspiracy and that have a vested interest in maintaining the status quo. *See* U.S. Response (Docket No. 81) at v-vi, 2-3.

## VI.  CONCLUSION

For the reasons set forth in this Memorandum and the United States' initial memorandum, the United States respectfully requests that the Court enter the proposed Final Judgment without further hearing.

Dated:  August 22, 2012

                                              Respectfully submitted,

                                              /s/ Mark W. Ryan
                                              Mark W. Ryan
                                              Stephanie A. Fleming
                                              Lawrence E. Buterman
                                              Laura B. Collins
                                              United States Department of Justice
                                              Antitrust Division
                                              450 Fifth Street, N.W., Suite 4000
                                              Washington, DC 20530
                                              (202) 532-4753
                                              Mark.W.Ryan@usdoj.gov

                                              *Attorneys for Plaintiff United States of America*

**APPENDIX A**

| | CONCERNS REPEATED FROM TUNNEY ACT COMMENTS | | | |
|---|---|---|---|---|
| | Claim | Comment | Response /Amicus | U.S. Response |
| Apple | PFJ violates Apple's "due process." | 2, 5 | 2 | 48-49 |
| | PFJ "penalizes Apple." | 2 | 2-3 | 48-49 |
| | PFJ precludes the use of a business model. | 1, 7 | 3-4 | 16-17, 50 |
| Barnes & Noble | PFJ requires the United States become a "super-regulator." | 1, 20-25 | 1 | 25-27 |
| | PFJ outlaws agency as a business model. | 2, 3 | 4 | 16-17, 50 |
| | Remedies in the PFJ are beyond the scope of the conduct alleged. | 1-2 | 1, 4 | 25-26, 54-55 |
| | PFJ relief contrasts with the relief requested in the Complaint. | 1, 15 | 1 | 25-26 |
| | Factual allegations are inadequate to support relief. | 16, 18 | 4 | 31-33 |
| | Agency pricing resulted in lower e-book and hardback book prices. | 11-13 | 6 | 29-30 |
| | Agency pricing resulted in greater e-book diversity, quality, and availability. | 3, 13-14 | 5-6 | 30-31 |
| | Agency pricing is necessary to avoid competition with below-cost retailers. | 22-23 | 5, 8 | 20-23 |
| | PFJ applies to textbooks.[7] | -- | 7-8 | 46-47 |
| ABA | Agency "corrects a distortion" in the market caused by Amazon. | 1 | 8 | 20-23 |

---

[7] Neither B&N nor ABA made this argument in their comment, but Amici do adopt the comment submitted by the National Association of College Stores ("NACS") in their Amici brief.

11

**APPENDIX B**

| Settling Defendant | Termination Provision Text in Apple Agency Agreement | Paragraph |
|---|---|---|
| Hachette Book Group, Inc. | "'Term' means the period beginning on the Effective Date and continuing for one (1) year, and renewing for one-month successive periods, unless terminated earlier for breach of this Agreement or terminated at any time after the first year period by either Party upon advance written notice of not less than thirty (30) days."  (Signed January 24, 2010).  APPLETX00018481. | 1(m) |
| HarperCollins Publishers L.L.C. | "'Term' means the period beginning on the Effective Date and continuing for one year (the "Initial Term") followed by automatic monthly renewal periods, unless terminated, at any time after the Effective Date pursuant to Section 13(a), or, after the first anniversary of the Effective Date, for any or no reason by either Party upon advance written notice of not less than thirty (30) days."  (Signed January 26, 2010).  APPLETX00018446. | 1(m) |
| Simon & Schuster, Inc. | "'Term' means the period beginning on the Effective Date and continuing for one year followed by automatic monthly renewal periods, unless terminated, at any time after the Effective Date pursuant to Section 13(a), or, after the first anniversary of the Effective Date, for any or no reason by either Party upon advance written notice of not less than thirty (30) days."  (Signed January 25, 2010).  APPLETX00018462. | 1(m) |

CERTIFICATE OF SERVICE

    I, Stephanie A. Fleming, hereby certify that on August 22, 2012, I caused a copy of the Reply Memorandum in Support of the United States' Motion for Entry of Final Judgment to be served by the Electronic Case Filing System on all parties to this action. Additionally, courtesy copies were provided electronically to the following individuals:

For the State of Connecticut:
W. Joseph Nielsen
Assistant Attorney General
Antitrust Division
Office of the Attorney General
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

For the Private Plaintiffs:
Jeff D. Friedman
Hagens Berman
715 Hearst Ave., Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com

For the State of Texas:
Gabriel R. Gervey
Assistant Attorney General
Antitrust Division
Office of the Attorney General of Texas
300 W. 15th Street
Austin, TX 78701
(512) 463-1262
gabriel.gervey@oag.state.tx.us

    /s/ Stephanie A. Fleming
Stephanie A. Fleming
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
(202) 514-9228
stephanie.fleming@usdoj.gov

*Attorney for Plaintiff United States of America*

13