UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :      12 Civ. 2826 (DLC)
                    Plaintiff,          :
                                        :
           -v-                          :      OPINION & ORDER
                                        :
APPLE, INC., et al.,                    :
                    Defendants.         :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiff the United States:

Mark W. Ryan
Stephanie A. Fleming
Lawrence E. Buterman
Laura B. Collins
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530

For defendants Penguin Group (USA), Inc. and The Penguin Group:

Daniel F. McInnis
David A. Donohoe
Allison Sheedy
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Ave., NW
Washington, DC 20036

For defendant Apple, Inc.:

Richard Parker
Omelveny & Myers LLP
1625 Eye Street
Washington, D.C. 20006

Andrew J. Frackman
Edward N. Moss
Omelveny & Myers LLP
7 Times Square New York, NY 10036

Daniel S. Floyd
Daniel G. Swanson
Gibson Dunn & Crutcher LLP
333 South Grand Ave.
Los Angeles California

For defendant Holtzbrinck Publishers, LLC d/b/a MacMillan:

Joel M. Mitnick
John J. Lavelle
Alexandra Shear
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019

For amici curiae American Booksellers Association and Barnes & Noble, Inc.:

David N. Wynn
Arent Fox LLP
1675 Broadway
New York, NY 10019

Deanne Ottaviano
Arent Fox LLP
1050 Connecticut Ave. NW
Washington, DC 20036

Stephen G. Larson
Arent Fox LLP
555 West Fifth St., 48th Floor
Los Angeles, CA

For amicus curiae The Authors Guild, Inc.:

Jan Friedman Levien
Paul D. Aiken
31 East 32nd Street, 7th Floor
New York, New York 10016-5509

For amicus curiae Bob Kohn:

Bob Kohn
140 E. 28th St.
New York, NY 10016

Steven Brower
Buchalter Nemer
18400 Von Karman Ave., Suite 800
Irvine, California 92612-0514

DENISE COTE, District Judge:

        Plaintiff the United States of America (the "Government")
brings this civil antitrust action against defendants Apple,
Inc. ("Apple"); Hachette Book Group, Inc. ("Hachette");
HarperCollins Publishers L.L.C. ("HarperCollins"); Verlagsgruppe
Georg Von Holtzbrinck GMBH and Holtzbrinck Publishers, LLC d/b/a
MacMillan (collectively, "MacMillan"); The Penguin Group, a
division of Pearson PLC and Penguin Group (USA), Inc.
(collectively, "Penguin"); and Simon & Schuster, Inc. ("Simon &
Schuster").  The Government has moved for entry of a proposed
Final Judgment with respect to defendants Hachette,
HarperCollins, and Simon & Schuster (the "Settling Defendants"),
pursuant to the Antitrust Procedures and Penalties Act, 15
U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act").  For the
following reasons, the motion for entry of Final Judgment is
granted.


                          BACKGROUND

I.   Factual Allegations

        Unless otherwise noted, the facts and allegations recounted
below are taken from the Government's complaint ("Complaint")

                              3

and Competitive Impact Statement ("CIS").  Defendant Apple
engages in a number of businesses, but as relevant here it sells
the iPad tablet device and distributes "e-books" through its
"iBookstore."  E-books are books that are sold to consumers in
electronic form, and that can and must be read on an electronic
device such as the iPad, the Barnes & Noble, Inc. ("Barnes &
Noble") Nook, or the Amazon.com, Inc. ("Amazon") Kindle.  Each
of the other five defendants (the "Publisher Defendants")
publishes both e-books and print books.  They represent five of
the six largest publishers of "trade" books in the United
States.[1]  Broadly speaking, the Complaint alleges that the
defendants conspired to raise, fix, and stabilize the retail
price for newly-released and bestselling trade e-books, to end
retail price competition among trade e-books retailers, and to
limit retail price competition among the Publisher Defendants in
violation of Section 1 of the Sherman Antitrust Act.  15 U.S.C.
§ 1.

In 2007, Amazon launched its Kindle device and quickly
became the market leader in the sale of e-books.  Amazon
utilized a discount pricing strategy whereby it charged $9.99
for newly released and bestselling e-books.  Even though the

---

[1] Trade books consist of general interest fiction and non-fiction
books.  They are to be distinguished from "non-trade" books such
as children's picture books, academic textbooks, reference
materials, and other texts.

$9.99 retail price point was close to the wholesale price at which Amazon purchased many e-books, the Complaint alleges that Amazon's e-books business was "consistently profitable."[2]  In order to compete with Amazon, other e-books retailers also adopted a $9.99 retail price for many titles.

The defendants' conspiracy to raise, fix, and stabilize e-books prices allegedly began no later than September 2008, when the Publisher Defendants' CEOs began to meet to discuss the growth of e-books and the role of Amazon in that growth. According to the Complaint, a central topic of discussion at these meetings was Amazon's discount pricing strategy, or what the CEOs termed "the $9.99 problem."

The Publisher Defendants feared that the $9.99 price point would have a number of pernicious effects on their short- and long-term profits.  In the short-term, they believed the price point was eating into sales of hardcover print books, which were often priced at thirty dollars or higher.  Over the long-term, they feared that consumers would grow accustomed to purchasing e-books at $9.99, that Amazon and other retailers would start to demand lower wholesale prices for e-books, that the $9.99 price point would erode hardcover book prices, that the rapid growth in e-books would threaten the survival of brick-and-mortar

---

[2] The non-settling defendants and a number of the public comments contend that the $9.99 price point was below the wholesale price Amazon paid for many e-books.

bookstores (the Publisher Defendants' preferred distributors), and that Amazon and other e-books retailers might enter the publishing industry and compete with the Publisher Defendants directly.[3]  According to the Complaint, the Publisher Defendants determined that they needed to act collectively to force Amazon to abandon its discount pricing model.

In late 2009, the Publisher Defendants began discussions with Apple about the upcoming launch of Apple's iPad tablet device, scheduled to occur in January 2010, and whether Apple would sell e-books that could be read on the new device.  Over the course of these discussions, the Publisher Defendants allegedly communicated competitively sensitive information to each other, and Apple allegedly helped transmit messages among them.  According to the Government, the defendants soon realized that they shared an interest in limiting retail price competition for e-books.  Apple did not want to compete with Amazon's $9.99 price point and the associated low margins on e-book sales; the Publisher Defendants did not want low e-books prices for the reasons addressed above.  The defendants allegedly agreed, together, to switch to a new sales model for e-books known as the "agency model."

---

[3]  In fact, Amazon announced in January 2010 that it would be entering the publishing industry.

Previously, the Publisher Defendants sold e-books using the "wholesale model," meaning they sold titles to retailers at a wholesale price or discount off the price listed on the physical edition of the book or "list price."  Retailers were then free to sell titles to consumers at retail prices of their choosing. Under the agency model, by contrast, retailers never purchase titles from publishers; rather, publishers sell titles to consumers directly at prices set by the publishers with retailers serving as the publishers' "agents" and receiving a percentage of each sale as commission.

The Publisher Defendants signed functionally-identical agreements with Apple from January 24-26, 2010 (the "Agency Agreements"), just in time for Apple's January 27 media event announcing the iPad.  The Agency Agreements shared three main features.  Each agreement:

1. Established that the Publisher Defendant would sell e-books through Apple's iBookstore using the agency model, with Apple receiving a thirty percent commission on each sale;

2. Included a price-based "most-favored nation" ("MFN") clause, according to which the price for any e-book sold in Apple's iBookstore would be no higher than the price for that e-book at any other e-book retail store; if an e-book was sold for less at a competing store, the price at the iBookstore would drop automatically to match it; and

3. Established pricing tiers -- ostensibly price maximums but in reality actual prices -- that tied the price of newly released and bestselling e-books to the price of their corresponding hardcover print editions; these pricing tiers resulted in prices of $12.99 or $14.99 for most newly released and bestselling e-books.

According to the Complaint, the above features were intended to operate in tandem. Together, they ensured that the Publisher Defendants would sell their e-books exclusively through the agency model and that prices for their newly released and bestselling e-books would rise to the levels specified by the pricing tiers.[4] The Complaint further alleges that the Agency Agreements did not result from separate negotiations between Apple and each Publisher Defendant. Rather, the defendants agreed that each Publisher Defendant would sign an Agency Agreement with Apple only if a critical mass of other publishers did so.

By April 2010, when the iPad hit stores, the Publisher Defendants had reached agreements with all major e-books retailers to sell exclusively through the agency model. According to the Government, this effectively ended retail competition for the Publisher Defendants' e-books and resulted in higher prices: the average price for Publisher Defendants' e-books became fixed at the inflated levels specified in the Agency Agreements, and increased by over ten percent between the summer of 2009 and the summer of 2010.

The Government contends that the defendants' conspiracy and agreement constituted a _per se_ violation of Section 1 of the

---

[4] Critics of the proposed Final Judgment contend that prices for many e-books actually went down under the agency model.

Sherman Act, 15 U.S.C. § 1, and that no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations are necessary, however, the Complaint alleges that the relevant product market is trade e-books, the relevant geographic market is the United States, and the Publisher Defendants possess market power in the market for trade e-books.

II.  The Proposed Final Judgment

The proposed Final Judgment imposes the following obligations on the Settling Defendants:

1. They must terminate their Agency Agreements with Apple within seven days after entry of the proposed Final Judgment.  See Proposed Final Judgment § IV.A.

2. They must terminate those contracts with e-book retailers that contain either a) a restriction on the e-book retailer's ability to set the retail price of any e-book, or b) a "Price MFN," as defined in the proposed Final Judgment,[5] as soon as each contract permits starting thirty days after entry of the proposed Final Judgment.  See id. at § IV.B.

3. For at least two years, they may not agree to any new contract with an e-book retailer that restricts the retailer's discretion over e-book pricing.  See id. at § V.A–B.

4. For at least five years, they may not enter into an agreement with an e-book retailer that includes a Price MFN.  See id. at § V.C.

---

[5] The proposed Final Judgment defines this term broadly so as to include not only MFNs related to retail price, as found in the Agency Agreements, but also MFNs related to wholesale prices and revenue shares or commissions.  See id. at § II.M.

In addition, the proposed Final Judgment imposes prohibitions on retaliating against e-book retailers based on the retailer's e-book prices, see id. at § V.D., agreeing to raise or set e-book retail prices, see id. at § V.E, and conveying confidential or competitively sensitive information to other e-book publishers. See id. at § V.F.  It also establishes notification and reporting requirements: each Settling Defendant must notify DOJ before forming or modifying a joint venture between it and another publisher related to e-books, see id. at § IV.C, must provide to DOJ each e-book agreement entered into with any e-book retailer on or after January 1, 2012, and must continue to provide those agreements to DOJ on a quarterly basis.  See id. at § IV.D.

The proposed Final Judgment expressly permits certain activities.  The Settling Defendants may compensate retailers for promotional services that they provide to publishers or consumers, see id. at § VI.A, and may enter into contracts with e-book retailers that prevent the retailer from selling a Settling Defendant's e-books at a cumulative loss over the course of one year.  See id. at § VI.B.  Finally, the proposed Final Judgment requires each Settling Defendant to appoint an Antitrust Compliance Officer who will engage in certain antitrust awareness, training, certification, auditing, remedial, and reporting functions.  See id. at § VII.

10

III. Procedural History

The procedure governing acceptance of the proposed Final Judgment is set forth in Section 2(b) of the Tunney Act.  15 U.S.C. § 16(b)-(h).  The Government and the Settling Defendants stipulated that the proposed Final Judgment may be entered after compliance with these Tunney Act requirements.  Pursuant to this procedure, the Government filed the Complaint on April 11, 2012 and submitted the proposed Final Judgment and CIS, which invited public comment on the proposed Final Judgment, that same day. The Government published summaries of these documents and directions for submitting written comments in The New York Post and The Washington Post for seven days beginning on April 20. The Government also published these documents in the Federal Register on April 24, see United States v. Apple, et al., 77 Fed Reg. 24518, and on the Department of Justice Antitrust Division website, and furnished them to all persons requesting them.

The 60-day public comment period ended on June 25.  868 comments from the public were timely submitted.  The Government filed its Response to the public comments (the "Response") on July 23, and moved for entry of the proposed Final Judgment on August 3.  By Memorandum Opinion & Order of August 6, the Court permitted non-parties Barnes & Noble and the American Booksellers Association, Inc. ("ABA") to file a reply to the Government's Response as amici curiae.  The motion for entry of

11

the proposed Final Judgment was fully submitted on August 22.
By Order of August 28, the Court permitted non-parties the
Authors Guild, Inc. (the "Authors Guild") and Bob Kohn ("Kohn")
to file amicus briefs.  The Authors Guild's submission was
accepted on August 28; Kohn's submission was received on
September 4.  On September 5, the Court docketed and filed a
supplemental letter from Simon Lipskar ("Lipskar"), which had
been received on August 14.  Pursuant to a June 25 Scheduling
Order, a trial as to the non-settling defendants is to begin on
June 3, 2013.

On August 29, 49 states and five territories submitted a
motion for preliminary approval of settlements as to the
Settling Defendants in a related parens patriae action for
damages and injunctive relief on behalf of e-books consumers.
The settlement in this related action would provide $70.28
million in compensation to consumers who purchased e-books from
the Settling Defendants.


DISCUSSION

I.   Standard of Review Under the Tunney Act

Prior to entry of a proposed final judgment brought by the
Government in an antitrust case, the Tunney Act requires a court
to determine that entry is "in the public interest."  15 U.S.C.
§ 16(e)(1); see also United States v. Int'l Bus. Mach. Corp.,

163 F.3d 737, 740 (2d Cir. 1998).  Although the statute does not

define the phrase "in the public interest," it directs courts to

consider the following factors in making their public interest

determination:

> (A) the competitive impact of such judgment, including
> termination of alleged violations, provisions for
> enforcement and modification, duration of relief
> sought, anticipated effects of alternative remedies
> actually considered, whether its terms are ambiguous,
> and any other competitive considerations bearing upon
> the adequacy of such judgment that the court deems
> necessary to a determination of whether the consent
> judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon
> competition in the relevant market or markets, upon
> the public generally and individuals alleging specific
> injury from the violations set forth in the complaint
> including consideration of the public benefit, if any,
> to be derived from a determination of the issues at
> trial.

15 U.S.C. § 16(e)(1).  The Tunney Act allows, but does not

require, the court to conduct an evidentiary hearing and to

permit third parties to intervene.  See 15 U.S.C. § 16(e)(2),

(f).

Congress intended the Tunney Act to "prevent judicial

rubber stamping of proposed Government consent decrees," but

"the court's role in making the public interest determination is

nonetheless limited." United States v. Keyspan Corp., 763 F.

Supp. 2d 633, 637 (S.D.N.Y. 2011) (citation omitted); see also

United States v. Microsoft Corp., 56 F.3d 1448, 1458, 1460 (D.C.

Cir. 1995).  When assessing a consent decree, a court should

consider the relationship between the complaint and the remedy
secured, the decree's clarity, whether there are any foreseeable
difficulties in implementation, and whether the decree might
positively injure third parties.  See Microsoft, 56 F.3d at
1458, 1461-62.  The role of the court is not to determine
whether the decree results in the array of rights and
liabilities "that will best serve society, but only to ensure
that the resulting settlement is within the reaches of the
public interest."  Keyspan, 763 F. Supp. 2d at 637 (citation
omitted).  In making this determination, the court "is not
permitted to reject the proposed remedies merely because the
court believes other remedies are preferable."  Id.  Rather, the
court should be "deferential to the government's predictions as
to the effect of the proposed remedies."  Microsoft, 56 F.3d at
1461.  As such, the relevant inquiry is whether the Government
has established an ample "factual foundation for [its] decisions
such that its conclusions regarding the proposed settlement are
reasonable."  Keyspan, 763 F. Supp. 2d at 637-38 (citation
omitted).

      In most cases, the court is not permitted to "reach beyond
the complaint to evaluate claims that the government did not
make and to inquire as to why they were not made."  Microsoft,
56 F.3d at 1459; see also United States v. BNS Inc., 858 F.2d
456, 462-63 (9th Cir. 1988) ("[T]he APPA does not authorize a

district court to base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint."). Pursuant to certain amendments to the Tunney Act enacted in 2004, however, a court may reject a decree due to antitrust matters outside the scope of the complaint if, and only if, the complaint underlying the decree is drafted so narrowly such that its entry would appear "to make a mockery of judicial power." United States v. SBC Commc'ns, Inc., 489 F. Supp. 2d 1, 14 (D.D.C. 2007); see also Microsoft, 56 F. 3d at 1462.[6]  Regardless, the court must "give due respect to the government's perception of its case." Keyspan, 763 F. Supp. 2d at 638 (citation omitted); cf. BNS, 858 F.2d at 466

---

[6] The 2004 amendments to the Tunney Act substituted the word "shall" for "may" in instructing courts to consider the enumerated factors in making their public interest determinations, added and amended certain of these factors, and included a set of Congressional findings. See Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(b)(2) (codified at 15 U.S.C. § 16).  In its findings, Congress stated as follows:

> [T]he purpose of the Tunney Act was to ensure that the entry of antitrust consent judgments is in the public interest; and [] it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a "mockery of the judicial function".  [] The purpose of this section is to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest.

Id. § 221(a)(1).

("[P]rosecutorial functions vested solely in the executive branch could be undermined by the improper use of the APPA as an antitrust oversight provision.").

Entry of the proposed Final Judgment is appropriate pursuant to the standard outlined above.  The proposed judgment secures a remedy that is closely related to the violations alleged in the Complaint.  Whereas the Complaint alleges unlawful communications and industry collusion that gave rise to a series of agreements designed to ensure defendants' use of agency pricing for e-books, the proposed Final Judgment disallows such communications and unravels both the Agency Agreements and agreements with other e-book retailers implementing the broader shift to agency pricing.  By effectively disallowing the Settling Defendants from using the agency model for at least two years,[7] subject to limited exceptions, and from using Price MFNs for at least five, the proposed Final Judgment appears reasonably calculated to restore retail price competition to the market for trade e-books, to return prices to their competitive level, and to benefit e-books

---

[7] The Government and critics of the settlement dispute whether the decree effectively disallows agency pricing and therefore dictates a particular business model.  The Court states no opinion on this issue as it is largely semantic and irrelevant to the disposition of this matter.  The terms of the decree speak for themselves: they disallow restrictions on retail discounting for two years subject to certain limited exceptions.

consumers and the public generally, at least as to the
competitive harms alleged in the Complaint.

The two year limitation on retail price restraints and the
five year limitation on Price MFNs appear wholly appropriate
given the Settling Defendants' alleged abuse of such provisions
in the Agency Agreements, the Government's recognition that such
terms are not intrinsically unlawful, and the nascent state of
competition in the e-books industry.  The Government reasonably
describes these time-limited provisions as providing a "cooling-
off period" for the e-books industry that will allow it to
return to a competitive state free from the impact of
defendants' collusive behavior.  The time limits on these
provisions suggest that they will not unduly dictate the
ultimate contours of competition within the e-books industry as
it develops over time.

The decree clearly outlines the parties' rights and
obligations, and none of its terms are overly ambiguous or
suggest any foreseeable difficulties in implementation.  The
decree contains appropriate enforcement provisions; it also
directs the Court to retain jurisdiction over this action such
that the parties may apply for modification of the decree if
necessary or appropriate.  Although the Government reports that
it considered alternative remedies such as proceeding to trial
or implementing proposals that would have provided less relief

17

than is contained in the proposed Final Judgment, the Government concluded, reasonably, that entry of the proposed Final Judgment would more quickly restore retail price competition to consumers than a trial.

The Complaint and CIS provide a sufficient factual foundation as to the existence of a conspiracy to raise, fix, and stabilize the retail price for newly-released and bestselling trade e-books, to end retail price competition among trade e-books retailers, and to limit retail price competition among the Publisher Defendants.  Although the Government did not submit any economic studies to support its allegations, such studies are unnecessary.  The Complaint alleges a straightforward, horizontal price-fixing conspiracy, which is per se unlawful under the Sherman Act.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 893 (2007).  The Complaint also details the defendants' public statements, conversations, and meetings as evidence of the existence of the conspiracy.  The decree is directed narrowly towards undoing the price-fixing conspiracy, ensuring that price-fixing does not immediately reemerge, and ensuring compliance.  Based on the factual allegations in the Complaint and CIS, it is reasonable to conclude that these remedies will result in a return to the pre-conspiracy status quo.  In this straightforward price-fixing case, no further showing is required.

It is not necessary to hold an evidentiary hearing before approving the decree.  Given the voluminous submissions from the public and the non-settling parties, which describe and debate the nature of the alleged collusion and the wisdom and likely impact of settlement terms in great detail, as well as the detailed factual allegations in the Complaint, the Court is well-equipped to rule on these matters.  A hearing would serve only to delay the proceedings unnecessarily.

II.  The Public Comments and Opposition Briefs

The Public Comments on the proposed Final Judgment were both voluminous and overwhelmingly negative.  More than 90 percent of the 868 comments opposed entry of the proposed Final Judgment.  Some comments were filled with extreme statements, blaming every evil to befall publishing on Amazon's $9.99 price for newly released and bestselling e-books, and crediting every positive event -- including entry of new competitors in the market for e-readers -- on the advent of agency pricing.  Other comments were very thoughtful.  They do not condone collusive price-fixing but seek to predict whether the consumer will be harmed or benefited from a suspension of the agency model for a two year period.

Many comments were submitted by third parties alleging that they would suffer significant harm if the judgment is entered. Other comments caution that the decree will positively harm e-

books consumers, or damage the marketplace of ideas and
information.  Comments were received from a variety of
interested individuals, companies, and industry groups,
including booksellers, authors, literary agents, publishing
consultants, a consumer activist group, and consumers
themselves.  In addition, defendants Penguin, MacMillan, and
Apple, as well as non-parties Barnes & Noble, the ABA, the
Authors Guild, and RoyaltyShare, Inc. Chairman and CEO Bob Kohn
("Kohn") submitted briefs in opposition to entry of the proposed
Final Judgment after the close of the 60-day comment period.

        In cases where third parties allege that they will suffer
harm, at least one circuit has cautioned that a court "might
well hesitate before assuming that the decree is appropriate."
Microsoft, 56 F.3d at 1462.  Given the sheer volume of comments
opposing entry of the proposed Final Judgment and the
significant harm that these comments fear may result, hesitation
is clearly appropriate in this case.  And there can be no
denying the importance of books and authors in the quest for
human knowledge and creative expression, and in supporting a
free and prosperous society.  To quote Emily Dickinson:

        There is no Frigate like a Book
        To take us Lands away,
        Nor any Coursers like a Page
        Of prancing Poetry --
        This Traverse may the poorest take
        Without oppress of Toll --
        How frugal is the Chariot

That bears a Human soul.

Emily Dickinson, "There is no Frigate like a Book (1263)," The Complete Poems of Emily Dickinson (Thomas H. Johnson ed., 1976), available at http://www.poets.org/viewmedia.php/prmMID/19730. Clearly, this is no ordinary Tunney Act proceeding.  Congress's purpose in enacting the Tunney Act to "prevent judicial rubber stamping of proposed Government consent decrees" seems particularly apropos in these circumstances.  Keyspan, 763 F. Supp. 2d at 637 (citation omitted).

It is not practical, however, to address every argument raised in the public comments and opposition briefs.  Broadly speaking, the comments in favor of the decree mirrored arguments presented by the Government.  They argued that the proposed Final Judgment will promote retail competition and benefit consumers by allowing for lower, competitive e-books prices.  A number of comments further argued that the decree will benefit industry stakeholders, like authors, by increasing their royalty payments and facilitating self-publishing.  Some comments claimed that the decree would be more effective if its time-limited provisions lasted longer, but nonetheless supported its entry.

Overall, the negative comments leveled four categories of criticism at the proposed Final Judgment.  First, they expressed concern that the proposed Final Judgment would actively harm

third-party industry stakeholders, such as brick-and-mortar
bookstores, e-book retailers, independent publishing houses, and
authors.  Second, they argued that the decree itself is
unworkable, goes too far in disallowing practices held to be
legal under the antitrust laws, and involves DOJ in "regulation"
of the e-books market.  Third, they questioned whether the
Government has established a sufficient factual basis for its
conclusions regarding the competitive impact of the decree.
Fourth, they alleged that defendants' collusive behavior had
substantial pro-competitive effects through, among other things,
limiting the negative impact of Amazon's monopoly; these
comments contend that the decree is not in the public interest
because it will facilitate retrenchment of Amazon's monopoly
practices.  These four categories of criticism will be addressed
in turn.

    A.   Harm to Third Parties

    Many comments suggest that the proposed Final Judgment will
enact substantial and irreversible harm on third-party industry
stakeholders.  For example, Barnes & Noble claims that the
decree will declare "null and void" its agency contracts with
the Settling Defendants and reduce its margins on e-books sales.
The ABA similarly claims that the decree will harm ABA member
booksellers by abrogating their e-books agency contracts,
including those with Google, Inc. ("Google"), which were

negotiated after April 2012.  Barnes & Noble, Books-a-Million, and the ABA, among others, fear that the decree will decimate brick-and-mortar and specialty bookstores by permitting Amazon to return to its discount pricing strategy.  The broader fear is that a loss in diversity of physical bookstores will damage the entire "literary ecosystem," as the Authors Guild terms it, and decrease the diversity of titles and authors to which consumers are exposed.

Many comments further note that brick-and-mortar bookstores effectively provide free advertising or promotional services to online retailers like Amazon by serving as physical showrooms for books, and that Amazon often avoids paying state sales tax. The implication is that agency pricing provided brick-and-mortar bookstores with much-needed compensation for these services and is therefore justified.

To the extent harm to industry stakeholders like bookstores will result from the elimination of anticompetitive, collusive practices and a return to competition in the e-books retail market, this is not the type of harm that the Sherman Act is designed to prevent.  "The purpose of the Sherman Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." Int'l Bus. Machines, 163 F.3d at 741-42.  If unfettered e-books retail competition will add substantially to the competitive pressures

23

on physical bookstores, or if smaller e-book retailers are
unable to compete with Amazon on price, these are not reasons to
decline to enter the proposed Final Judgment.  The text of the
Tunney Act directs courts to consider the impact of a consent
decree "upon competition in the relevant market or markets, upon
the public generally and individuals alleging specific injury
from the violations set forth in the complaint"; it does not
require the Court to protect special interests from the impact
of the decree.  15 U.S.C. § 16(e)(1).  In this case, the
"individuals alleging specific injury from the violations set
forth in the complaint" are e-books consumers, not third-party
stakeholders like brick-and-mortar bookstores.  And although the
birth of a new industry is always unsettling, there is a limited
ability for anyone to foresee how the market will evolve.  What
is clear, however, is the need for industry players to play by
the antitrust rules when confronted with new market forces.  It
is not the place of the Court to protect these bookstores and
other stakeholders from the vicissitudes of a competitive
market.

    Moreover, the consent decree does not declare "void" the
Settling Defendants' contracts with Barnes & Noble, or ABA
member booksellers' contracts with Google or anyone else.
Rather, the decree requires the Setting Defendants to terminate
contracts with e-book retailers that contain retail price

restrictions and Price MFNs according to the termination
provisions of the relevant contracts themselves.  See Proposed
Final Judgment § IV.B.  In short, the decree merely enjoins the
Settling Defendants to act in accordance with their bargained-
for contractual rights.[8]  And the decree in no way impacts
contracts between publishers and other e-book retailers besides
the Settling Defendants, such as Google.

As to Amazon's alleged free-riding, the decree expressly
permits the Settling Defendants to compensate brick-and-mortar
bookstores directly for promotional services that they provide
to publishers or consumers.  See id. at § VI.A.  The Settling
Defendants should be willing to pay for these services if they
truly value them.  Regardless, Amazon's alleged free-riding in
no way justifies subsidizing brick-and-mortar bookstores by
virtue of an e-books price-fixing conspiracy.  See United States
v. Socony-Vacuum Oil Co., 310 U.S. 150, 221-22 (1940)
("[Congress] has no more allowed genuine or fancied competitive
abuses as a legal justification for [price-fixing] schemes than
it has the good intentions of the members of the combination.").
If such subsidies are critical to publishers, then it is up to
them to provide the subsidies in a lawful manner.  In the
meantime, under the Sherman Act all industries are subject to "a

---

[8] This is not the case as to the Settling Defendants' Agency
Agreements with Apple.  Apple's contractual rights are discussed
in detail below.

legislative judgment that ultimately competition will produce

not only lower prices, but also better goods and services."

Nat'l Soc. of Prof'l Engineers v. U. S., 435 U.S. 679, 695

(1978).[9]

B.   Breadth and Functionality of the Decree

Many comments suggest that the consent decree is overbroad

and cannot be implemented effectively.  The central objection is

that the decree seeks not merely to redress the violations

alleged in the Complaint, but to reshape the e-books market as a

whole by restricting certain practices that are wholly legal and

proper, and by improperly involving DOJ in the "regulation" of a

new and growing industry.  Barnes & Noble, for example, notes

that a number of elements in the consent decree go beyond the

remedies sought in the Complaint, and suggests that the decree

should simply enjoin collusion and punish the alleged colluders

rather than compelling the Settling Defendants to terminate

their contracts with third-party retailers.  Apple argues that

the decree should do no more than preclude the Settling

Defendants from coercing retailers to adopt the agency model,

since this is what the Complaint alleges that the defendants did

---

[9] Moreover, none of the public comments explain why the evils of
Amazon's alleged free-riding are limited to e-books.  It appears
that consumers can just as easily find a title through browsing
in a bookstore and then buy a physical book online from Amazon
as they can browse in a bookstore and then purchase an e-book
from the Kindle Store.  The same is true for the allegations as
to sales tax avoidance.

as to Amazon.  A variety of comments note that neither agency agreements nor vertical price restraints are necessarily disallowed under the antitrust laws.

On this latter point of law, at least, these comments are undoubtedly correct.  See Leegin, 551 U.S. at 882 (holding vertical price restraints subject to the rule of reason); United States v. Gen. Elec. Co., 272 U.S. 476, 488 (1926) (genuine contracts of agency are not antitrust violations).  But this is beside the point.  The Complaint alleges not merely that the defendants signed contracts of agency and utilized Price MFNs, but that they used these tools together in furtherance of a horizontal price-fixing conspiracy.

Moreover, the Tunney Act does not require a one-to-one correspondence between the relief requested in the Complaint and the elements of a decree.  A court "may not require that the remedies perfectly match the alleged violations." SBC Comm'ns, 489 F. Supp. 2d at 17.  Although elements of a Sherman Act decree may "involve[] the judiciary so deeply in the daily operation of [a] nation-wide business and promise[] such dubious benefits that [they] should not be undertaken," United States v. Paramount Pictures, 334 U.S. 131, 162 (1948), a decree may nonetheless prohibit acts that are "entirely proper when viewed alone." United States v. U.S. Gypsum Co., 340 U.S. 76, 89 (1950).  Relief "may range broadly through practices connected

27

with acts actually found to be illegal."  Id.; see also Nat'l Soc. of Prof'l Engineers, 435 U.S. at 697 ("Having found the [defendant] guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences."); Paramount Pictures, 334 U.S. at 149 (upholding dissolution of agreements used in collusion and injunction against future arrangements "of that character").[10]

Here, the Complaint makes out a conspiracy claim based on the combination of the defendants' collusive behavior, the use of Price MFNs, and the coordinated switch to the agency model. It does not attack any one of these elements in isolation.  The consent decree therefore properly restricts defendants' activities with respect to each of these elements of the conspiracy, with an eye to ending the price-fixing and preventing its recurrence.  See Gypsum, 340 U.S. at 89 ("The conspirators should, so far as practicable, be denied future

---

[10] Although U.S. Gypsum Co., Nat'l Soc. of Prof'l Engineers, and Paramount Pictures involve decrees entered after trial, a court generally has broader discretion to approve a proposed Final Judgment resulting from a settlement among the parties than it has in fashioning a remedy on its own.  See United States v. Am. Tel. & Tel. Co., 552 F. Supp. 131, 151 (D.D.C. 1982) ("[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of public interest." (citation omitted)).

benefits from their forbidden conduct.").  The decree is
strictly limited in time (to two or five years for bans on
retail discounting restrictions and Price MFNs, respectively)
and by party (to the Settling Defendants).[11]  It cannot be fairly
characterized as either overbroad or over-"regulatory."[12]

A number of comments, such as Barnes & Nobles', Apple's,
and the Independent Book Publishers', claim that section VI.B of
the proposed Final Judgment is unenforceable.  As discussed
above, this provision permits the Settling Defendants to enter
into contracts with e-book retailers that prevent the retailer
from selling a Settling Defendant's e-books at a cumulative loss

---

[11] Despite the limited nature of the Government's requested
relief, there can be no denying the true passion reflected in
many of the public comments opposing the decree's two-year ban
on retail discounting restrictions.  It may be that unspoken by
all parties, including the Government, is an acknowledgment that
no single publisher will likely have either the will or the
ability to maintain agency pricing absent a critical mass of
other publishers doing the same.  See In re Elec. Books
Antitrust Litig., 11 MD 2293 DLC, 2012 WL 1946759, at *12
(S.D.N.Y. May 15, 2012) ("[F]rom the publishers' perspective,
the switch to the agency model had the hallmarks of a classic
collective action problem.").  In other words, even through the
relief in the decree is both well-tethered to the Complaint and
narrow, it may nonetheless effectively end agency pricing for e-
books.

[12] The National Association of College Stores ("NACS") expressed
concern that, even though the Complaint defines the relevant
market as "trade e-books," the decree does not limit its
remedies to this subset of the e-books market.  NACS postulates
that the decree could therefore impact the market for "e-
textbooks," and harm textbook publishers and retailers.  As the
Government points out, however, none of the Settling Defendants
sell e-textbooks, and the Complaint itself makes it clear that
the term "e-books" in the context of this case encompasses trade
e-books only.

over the course of one year.  See Proposed Final Judgment, at
§ VI.B.  Apple further argues that the provision will unfairly
benefit Amazon, because Amazon's larger annual sales means that
it can engage in more discounting.  Apple suggests that the
decree should instead limit discounting on a per unit basis.

The Government notes that it included this section in the
proposed Final Judgment at the behest of the Settling
Defendants, who were concerned about Amazon's discounting
practices.  The provision is entirely voluntary.  Accordingly,
if any Settling Defendant wishes to take advantage of the
provision it can do so by negotiating the requisite contractual
terms with e-books retailers, including provisions for
monitoring and enforcement.  As such, this section provides no
reason to deny entry of the decree.

C.   Factual Basis for the Government's Conclusions

Many of the comments and briefs contend that the Government
has not established a sufficient factual basis for its
conclusions regarding the decree.  Specifically, they note that
the Government has not presented any data showing that the
defendants' alleged conspiracy actually resulted in higher e-
books prices.  Some suggest that the Complaint and CIS obfuscate
the distinction between prices for newly-released and
bestselling e-books, and average prices for e-books as a whole.
While the former may have increased due to adoption of the

agency model, so the argument goes, the latter might have stayed the same or decreased because Amazon charged more than $9.99 for many e-books under the wholesale model.

Barnes & Noble submits data that it claims show a decrease in its average e-books prices since adoption of the agency model. Lipskar, the President of Writers House LLC, a literary agency, tries to make a similar showing with respect to Amazon's average e-books using publicly available data. The ABA avers that independent booksellers reported a two- to five-dollar decrease in the average prices they paid per e-book unit following adoption of the agency model. Penguin submits data showing that Amazon priced many new release Penguin e-books well above $9.99 under the wholesale model, and the price ceilings in the Agency Agreements resulted in lower prices for many titles.[13] And a number of other booksellers, such Books-a-Million and the Harvard Bookstore, claim that their e-books prices have decreased since the advent of agency pricing.

---

[13] The Government argues that the data from Barnes & Noble and others is incomplete and, in any case, suggests either a decline in a broader trend towards decreasing prices since the introduction of agency pricing, or price increases. The Government also presents an analysis of Amazon's average retail price for all Penguin e-books and new release Penguin e-books in the months immediately before and after introduction of the agency model, weighted by units sold. The Government contends that this data shows an increase in Amazon's average price for Penguin e-books.

The above critiques misconstrue both what the Government has stated and what it is required to state.  The Tunney Act requires that the Government provide the court with a CIS and proposed consent judgment, as well as "any other materials and documents which the United States considered determinative in formulating" the proposed decree.  15 U.S.C. § 16(b).  The Second Circuit has clarified that this provision requires submission of only a "fairly narrow" subset of the documents considered by the Government:

> The use of the word "determinative" in Section 16(b) rules out the claim to all the investigation and settlement material, and confines § 16(b) at the most to documents that are either "smoking guns" or the exculpatory opposite.  Indeed, were the law otherwise, "determinative" would come to mean "relevant."

United States v. Bleznak, 153 F.3d 16, 20 (2d Cir. 1998) (citation omitted).  In evaluating the sufficiency of the Government's submissions, it is necessary only that the submissions provide an ample "factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable."  Keyspan, 763 F. Supp. 2d at 637-38 (citation omitted).

The Government has more than met this minimal standard.  First, the Government has put forward detailed allegations as to the existence of a conspiracy to counter Amazon's discount pricing strategy, or "the $9.99 problem."  Second, it has

32

described the contents of the Agency Agreements, which are not
in dispute, explained how the pricing tiers in these agreements
determined actual prices for many newly-released and bestselling
e-books, and demonstrated how the agreements' pricing tiers and
MFN provisions forced a broader switch to agency pricing.
Third, regardless of what happened to average e-books prices, it
is undisputed that the Agency Agreements disallowed retail price
discounting.  After defendants' coordinated switch to agency
pricing, a consumer could not find Publisher Defendants' newly-
released and bestselling e-books for $9.99 at <u>any</u> retailer.
Fourth and finally, the Government has further explained how the
proposed Final Judgment will end price-fixing and prevent its
recurrence by limiting the Settling Defendants' ability to
collude, share information, and use retail price restrictions
and Price MFNs in contracts with e-books retailers.  Overall,
these detailed allegations and explanations provide ample
factual foundation for the Government's decisions regarding the
proposed Final Judgment.

    D.   Competitive Effects of Defendants' Alleged Collusion

    Perhaps the most forceful species of criticism leveled at
the decree is that it will have manifestly <u>anticompetitive</u>
effects.  The comments make a variety of arguments along these
lines; the gist of their critique, however, is that Amazon was a
monopolist engaged in predatory pricing and other

anticompetitive practices, defendants' use of the agency model reduced Amazon's market share and capacity to engage in these practices, and the consent decree will encourage a return to the anticompetitive status quo.

The comments claim that Amazon was pricing e-books below cost in order to cement its monopoly, and would eventually seek to reap the rewards of this monopoly by inflating prices and retarding innovation.  MacMillan, for one, claims that Amazon's below-cost pricing foreclosed any practical challenge to its 90 percent monopoly, and constituted the "willful maintenance" of a monopoly in violation of the Sherman Act.  See United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.").  Apple further claims that Amazon retaliates against publishers that try to take advantage of Apple's more advanced e-books platform.  And the Authors Guild contends that Amazon often removes the online "buy" buttons for titles from publishers that do not agree to Amazon's preconceived contract terms.  A number of comments complain about Amazon's exclusive distribution agreements with authors and broad contractual MFN clauses.

The comments further contend that agency pricing in the e-books industry is pro-competitive.  Because the publishing industry is less concentrated than the e-books retail industry, situating price-setting authority with the publishers supposedly encourages competition.  Nothing in the Agency Agreements prevents the Publisher Defendants from competing with each other on price and, according to a number of comments, the evidence suggests that the Publisher Defendants did in fact engage in rigorous price competition after switching to the agency model.

Moreover, it is undisputed that Amazon's market share in e-books decreased from 90 to 60 percent in the two years following the introduction of agency pricing.  The comments variously argue that during this period the availability and quality of e-books increased, retail and wholesale e-books prices decreased, and a number of new competitors, including industry giants like Apple, Google, and Barnes & Noble, as well as hundreds of independent bookstores, either entered the e-books market or were able to compete more effectively.  The CEO of e-books start-up Zola Books, for example, argues that the adoption of agency pricing allowed him to create his new company.  "[W]hen retailers could no longer lose money on every single e-book sold in order to gain market share," he writes, "we believed a new retailer could get a foothold in the market based on the quality of its product."  Many comments contend that the past two years

35

have seen unprecedented innovation in the market for e-readers
and tablets, resulting in rapidly improving devices and rapidly
decreasing prices.  In short, the comments contend that
competition in the e-books industry is alive and well, in no
small part due to the defendants' allegedly illegal cartel.
Even if such a cartel existed, its main accomplishment was to
allow industry participants to compete on a level playing field.

     In one of the more detailed public comments, Kohn offers
some economic theory in support of the above arguments and
observations.  Kohn contends that the Government has defined the
relevant market improperly.  Unlike physical books, e-books
cannot be utilized absent additional components like an e-reader
and an internet-based platform for purchasing and downloading
titles.  It therefore makes no sense to define the market as
simply "trade e-books."  E-books are inextricably linked to e-
readers and internet-based distribution platforms; the market
must therefore encompass the entire "e-books system."

     According to Kohn, the "e-books system" market, like the
markets for many emerging technologies, is characterized by
network externalities.  This means to him that each additional
user of a given e-books system confers benefits on existing
users of that system.  The more users of a system, the more each
user can be assured that the system will continue to support a
large number of programs or "apps" and a large variety of e-book

36

titles.   Markets characterized by network externalities tend to
tip towards a single, dominant firm, resulting in monopoly.   And
once a monopolist establishes itself in such a market, such as
Microsoft in the computer operating systems market and Apple in
the digital music market, the result is inflated prices and
retarded innovation.

Kohn further argues that because it is costly to switch
from one e-books system to another, consumers expectations about
the future of a given e-books system will tend to drive
purchasing decisions.   For example, the owner of a Kindle is
unable simply to purchase e-books through the iBookstore if
prices at the iBookstore are lower; to do so she must first
purchase an iPad.   Before investing in a given e-books system,
then, consumers will try to anticipate the likely future success
of the system vis-à-vis its competitors.   This dynamic means
that it may be difficult to displace a dominant firm in the e-
books system market once it establishes a monopoly.

The upshot of all of this is that Kohn's theory suggests
Amazon had enormous incentives to try to achieve a monopoly as
the e-books market emerged in the late 2000s; below cost,
predatory pricing was supposedly one of its more effective
strategies.[14]   The Agency Agreements prevented Amazon from taking

---

[14] Kohn also argues that Amazon exercised "monopsony" power as
the dominant wholesale purchaser of e-books, and did or would

advantage of this critical anticompetitive tool, and returning
discounting authority to Amazon will help it to reestablish its
monopoly power.  Kohn cites Broadcast Music, Inc. v. Columbia
Broadcasting, 441 U.S. 1 (1979), for the proposition that
horizontal price-fixing is lawful if it has a "redeeming
virtue."  Id. at 9.

     In response to these arguments by Kohn and others, DOJ
describes as "speculative" the fear that Amazon might use its
monopoly power to raise prices in the future.  DOJ claims that
it closely examined allegations that Amazon engaged in predatory
pricing, and found persuasive evidence lacking.  It further
notes that Barnes & Noble and Google had either entered or
planned to enter the e-books market well before the Agency
Agreements were signed.  Similarly, Barnes & Noble was able to
attract a $300 million investment from Microsoft in order to
compete with Amazon even after the filing of the proposed Final
Judgment shed doubt on the future of e-books agency pricing, and
Google recently announced a new investment in a tablet computer
intended to promote its e-book sales.

     The core of the Government's claim is that it is impossible
to draw a causal connection between investments by technology
giants like Apple, Microsoft, Google, and Sony in the e-books

_____

have used this power to demand below-market prices, and that
supply and demand do not function normally in the e-books market
because of illegal downloading.

and e-reader markets and the introduction of the agency model.
These investments, which are the true cause of the decline in
Amazon's market share, would almost certainly have happened
regardless.  What cannot be disputed is that the Agency
Agreements ended retail price discounting and eliminated
potential pricing innovations, such as "all-you-can-read"
subscription services, book club pricing specials, and rewards
programs.

The comments from Kohn and others are insufficient to
compel denial of entry of the proposed Final Judgment.  Firstly,
Broadcast Music merely held that the issuance of certain
"blanket licenses" of copyrighted material in the recorded music
industry did not constitute "price fixing" under the Sherman
Act, and was therefore not per se unlawful, in part due to the
"unique market conditions for performance rights to recorded
music."  Broadcast Music, 441 U.S. at 15 (citation omitted).  It
did not provide a blanket exception to the per se rule against
horizontal price fixing.  See id. at 8 (noting that "certain
agreements or practices are so plainly anticompetitive and so
often lack any redeeming virtue that they are conclusively
presumed illegal" (citation omitted)).

Second, the Complaint asserts that Amazon's e-books
business was "consistently profitable."  Moreover, to hold a
competitor liable for predatory pricing under the Sherman Act,

one must prove more than simply pricing "below an appropriate measure of . . . costs." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993).  There must also be a "dangerous probability" that the alleged predator will "recoup[] its investment in below-cost prices" in the future. Id. at 224.  None of the comments demonstrate that either condition for predatory pricing by Amazon existed or will likely exist.  Indeed, while the comments complain that Amazon's $9.99 price for newly-released and bestselling e-books was "predatory," none of them attempts to show that Amazon's e-book prices as a whole were below its marginal costs.  See Ne. Tel. Co. v. Am. Tel. & Tel. Co., 651 F.2d 76, 88 (2d Cir. 1981) ("[P]rices below reasonably anticipated marginal cost will be presumed predatory.").

Third, even if Amazon was engaged in predatory pricing, this is no excuse for unlawful price-fixing.  Congress "has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies." Socony-Vacuum Oil Co., 310 U.S. at 221.  The familiar mantra regarding "two wrongs" would seem to offer guidance in these circumstances.

Fourth, the Government chose to address its Complaint to the trade e-books market, not the e-reader market or the "e-books system" market.  In light of the enormous economic

40

complexities involved, this choice appears eminently reasonable. As Writers House President Lipskar points out, "Ultimately . . . we can't possibly know what would have happened had agency not been implemented.  We can conjecture.  We can disagree." Although Lipskar argues that this lack of certainty disfavors entry of the decree, in fact it indicates the soundness of DOJ's decision to target a more comprehensible market.

Lastly, the Complaint is not drafted so narrowly such that entry of the decree would appear "to make a mockery of judicial power."  SBC Commc'ns, Inc., 489 F. Supp. 2d at 14.  The Court will therefore limit itself to addressing antitrust matters within the scope of the Complaint, which in this case means an inquiry into the impact of the proposed Final Judgment on the market for trade e-books only.  The additional antitrust concerns raised in the comments are simply not susceptible to judicial review under the Tunney Act.  And within this more limited market, the Government has more than established a "factual basis" for its decisions and judgment that the decree will enhance competition.

III. Apple's Submissions

Apple makes two unique arguments that merit additional attention.  First, Apple claims that the decree unfairly singles out Apple by requiring termination of the Settling Defendants' Agency Agreements within seven days.  Apple notes that the

41

Settling Defendants' agency contracts with other e-book retailers must only be terminated as soon as each contract permits, starting thirty days after entry of the proposed Final Judgment.  See Proposed Final Judgment, at § IV.B.  Apple points out that it has admitted no wrongdoing, and contends that due process requires it to be treated the same as its competitors. Apple cites to Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501 (1986), for the familiar proposition that "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree."  Id. at 529.

This argument is without merit.  The Government "need not prove its underlying allegations in a Tunney Act proceeding." SBC Commc'ns, 489 F. Supp. 2d at 20.  And the decree imposes no obligations on Apple.  Rather, the decree compels the Settling Defendants to terminate their Agency Agreements with Apple.  Cf. Local No. 93, Int'l Ass'n of Firefighters, 478 U.S. at 529-30 (intervenor may not prevent entry of decree that "does not bind [it] to do or not to do anything").

In addition, it is commonsensical that the decree would single out the Agency Agreements for early termination.  The Complaint alleges that these agreements with Apple were critical to initiating the Publisher Defendants' broader switch to agency pricing.  The Government's theory is that the Agency Agreements

ensured that the Publisher Defendants' subsequent contracts with
all e-books retailers would embrace the agency model.  Without
prior termination of the Agency Agreements, then, renegotiation
of these subsequent contracts would be fruitless.

Lastly, Apple does not dispute that the relevant Agency
Agreements allow for termination by the Settling Defendants
after thirty days notice.  Accordingly, the sum total of Apple's
complaint is that it bargained for twenty-three days more notice
of termination than what is provided by the decree.  In the
meantime, the consent decree was first filed with the Court on
April 11, 2012, and the Government's motion for entry of the
proposed Final Judgment was brought on August 3.  Apple has
therefore already had roughly five months' or more than one
months' notice of the Settling Defendants' intention to
terminate the Agency Agreements.  Accordingly, any imposition on
Apple's contractual rights is de minimis and provides no reason
to deny entry of the decree.  Cf. United States v. Graftech
Int'l Ltd., No. 1: 10-cv-02039, 2011 WL 1566781, at *1 (D.D.C.
Mar. 24, 2011) (entering consent decree that requires
modification of contract with a non-party to the decree).

Apple's second argument, which is echoed by MacMillan, is
that the Court should wait to enter the decree until after the
June 2013 trial resolves the relevant factual issues.  Apple
notes that it agreed to an accelerated discovery schedule and

early trial date, and argues that this delay would therefore not represent a significant imposition on the Settling Defendant or the Government.

Because the decree does not apply to all the defendants, the proposed Final Judgment may be entered before trial "only if the court expressly determines that there is no just reason for delay" pursuant to Fed. R. Civ. P. 54(b).  This determination is left "to the sound discretion of the district court," taking into account "judicial administrative interests as well as the equities involved."  Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980).  The Court should act to assure that application of the rule "preserves the historic federal policy against piecemeal appeals."  Id. (citation omitted).

 Apple claims that it will appeal any opinion entering the decree, and that entry would therefore result in unwarranted "piecemeal appeals."  Apple further claims that it will have standing to appeal because it will suffer "formal legal prejudice" as a result of entry of the decree.  See Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993) (citation omitted).

Even if Apple has standing to pursue an appeal, an issue which this Opinion does not decide, the interests of judicial administration and the equities involved weigh heavily in favor of immediate entry of judgment.  The Settling Defendants have elected to settle this dispute and save themselves the expense

44

of engaging in discovery.  They are entitled to the benefits of
that choice and the certainty of a final judgment.  Moreover,
the orderly, efficient management of discovery requires that the
Settling Defendants have a defined role in the ongoing
litigation.  Apple's proposal would leave them in a state of
legal limbo, forced to participate in discovery and defend this
action at trial for fear that their settlement may be thrown
out.  Most importantly, the Government alleges substantial
ongoing harm as a result of the Settling Defendants' illegal
activity.  E-books consumers should not be forced to wait until
after the June 2013 trial to experience the significant
anticipated benefits of the decree.

CONCLUSION

The Government's August 3, 2012 motion for entry of the
proposed Final Judgment is granted.

SO ORDERED:

Dated:     New York, New York
           September 5, 2012

_____
                 DENISE COTE
           United States District Judge

45