UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 12-CV-2826 (DLC) |
| | ) |
| v. | ) |
| | ) ECF Case |
| APPLE, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____)

## COMPETITIVE IMPACT STATEMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. §§ 16(b)-(h), Plaintiff United States of America ("United States") files this Competitive Impact Statement relating to the proposed Final Judgment against Defendants Verlagsgruppe George Von Holtzbrinck GmbH and Holtzbrinck Publishers, LLC d/b/a Macmillan (these two entities are referred to collectively herein as "Macmillan"), submitted on February 8, 2013, for entry in this antitrust proceeding.

**I.      NATURE AND PURPOSE OF THE PROCEEDING**

On April 11, 2012, the United States filed a civil antitrust Complaint alleging that Apple, Inc. ("Apple") and five of the six largest publishers in the United States ("Publisher Defendants") restrained competition in the sale of electronic books ("e-books"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Shortly after filing the Complaint, the United States filed a proposed final judgment ("Original Judgment") with respect to Defendants Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers L.L.C. ("HarperCollins"), and Simon & Schuster, Inc. ("Simon & Schuster"). That Original Judgment (Docket No. 119)

settled this suit as to those three defendants.  Following a thorough Tunney Act review process, the Court granted the United States' Motion for Entry of the Original Judgment (Docket No. 113).

On December 18, 2012, Defendants The Penguin Group, a Division of Pearson plc, and Penguin Group (USA), Inc. (collectively "Penguin") agreed to settle on substantially the same terms as those contained in the Original Judgment.  That proposed Final Judgment against Penguin (Docket No. 162-1) is now subject to a public comment period, which closes on March 5, 2013.  Pursuant to the Court's January 7, 2013 Order (Docket No. 169), the United States will file the public comments along with its response to the comments by April 5, 2013.  If the United States continues to believe that entry of the proposed Final Judgment against Penguin is appropriate, it will move the Court for entry by April 19, 2013, and the Court will have the opportunity to determine if the proposed Final Judgment against Penguin is in the public interest.

Macmillan has now agreed to settle on substantially the same terms as those contained in the Original Judgment.  A proposed Final Judgment with respect to Macmillan ("proposed Macmillan Final Judgment" or "PMFJ") that embodies that settlement was filed today.  The last remaining active Defendant is now Apple, Inc.

The proposed Macmillan Final Judgment is described in more detail in Section III below.  Because the language of the proposed Macmillan Final Judgment closely follows the language of the Original Judgment, this Competitive Impact Statement incorporates but does not repeat the extensive record relating to the Original Judgment.  (For the Court's convenience, redlines of the proposed Macmillan Final Judgment against both the Original Judgment and the proposed Penguin Final Judgment are attached as Exhibits A and B, respectively.)

The United States and Macmillan have stipulated that the proposed Macmillan Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent. Entry of the proposed Macmillan Final Judgment would terminate this action as to Macmillan, except to the extent that Macmillan has stipulated that it will cooperate in the United States' ongoing litigation against Apple, and that this Court would retain jurisdiction to construe, modify, and enforce the proposed Macmillan Final Judgment and to punish violations thereof.

## II. BRIEF SUMMARY OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION OF THE ANTITRUST LAWS

As described in detail in the United States' Complaint (Docket No. 1), and the two previous Competitive Impact Statements ("Original CIS," Docket No. 5 and "Penguin CIS," Docket No. 163), Publisher Defendants desired to raise retail prices for e-books. Compl. ¶ 3. They were primarily upset by Amazon.com, Inc.'s ("Amazon's") pricing of newly released and bestselling e-books at $9.99 or less. Compl. ¶¶ 32-34. Publisher Defendants feared that Amazon would resist any unilateral attempt to force an increase in e-book prices and that, even if an individual Publisher Defendant succeeded in such an attempt, that Publisher Defendant would lose sales to any competitors that had not forced the price of their books to supracompetitive levels. Compl. ¶¶ 35-36, 46. They met privately to discuss ways to collectively solve "the $9.99 problem." Compl. ¶¶ 39-45. Ultimately, Publisher Defendants agreed to act collectively to raise retail e-book prices. Compl. ¶¶ 47-50.

Apple's entry into the e-book business provided a perfect opportunity to coordinate the Publisher Defendants' collective action to raise e-book prices. Compl. ¶ 51. At the suggestion of two Publisher Defendants, Apple began to consider selling e-books under an "agency model,"

3

whereby the publishers would set the prices consumers ultimately paid for e-books and Apple would take a commission as the selling agent. Compl. ¶¶ 52-54, 63. Apple recognized that its unique ability to organize the Publisher Defendants' efforts to upset Amazon's $9.99 pricing put it in a position to realize margins (30 percent on each sale) far in excess of what other retailers then averaged on their sales of newly released and bestselling e-books, at the cost of "the customer pay[ing] a little more." Compl. ¶ 56.

To achieve this goal, Apple first expressly proposed to each Publisher Defendant that it adopt an agency pricing model with every outlet that would compete with Apple for retail e-book sales, Compl. ¶ 58, and later replaced that express requirement with a unique most favored nation ("MFN") pricing provision that effectively enforced the Publisher Defendants' commitment to impose the agency pricing model on all other retailers. Compl. ¶¶ 65-66. This MFN protected Apple from price competition from other retailers, guaranteeing that its 30 percent margin would not be disturbed. Compl. ¶ 65. Apple kept each Publisher Defendant informed about the status of its negotiations with other Publisher Defendants. Compl. ¶ 61. In January 2010, Apple sent to each Publisher Defendant substantively identical term sheets that Apple told them were devised after "talking to all the other publishers." Compl. ¶¶ 62-64. Those term sheets formed the basis of the nearly identical agency agreements signed by each Publisher Defendant ("Apple Agency Agreements").

The purpose of these agreements was to raise and stabilize e-book prices while insulating Apple from competition. Compl. ¶ 66. Apple CEO Steve Jobs explained to one Publisher Defendant that the Apple Agency Agreements provided a path for the Publisher Defendants away from $9.99 and to higher retail e-book prices. Compl. ¶ 71. He urged the Publisher

Defendants to "[t]hrow in with Apple and see if we can all make a go of this to create a real mainstream e-books market at $12.99 and $14.99." *Id.* Apple and the Publisher Defendants adopted these price points in all of the Apple Agency Agreements, which all were signed within a three-day span in January 2010. Compl. ¶¶ 74-75. As a result of Defendants' illegal agreement, consumers have paid higher prices for e-books than they would have paid in a market free of collusion. Compl. ¶¶ 90-93.

## III. EXPLANATION OF THE PROPOSED MACMILLAN FINAL JUDGMENT

The language and relief contained in the proposed Macmillan Final Judgment is largely identical to the terms included in the Original Judgment and the proposed Penguin Final Judgment. Macmillan's decision to join with all the other Publisher Defendants in agreeing to the settlement terms will provide prompt, certain, and effective remedies that will continue the effort to restore competition to the marketplace. Settlement likely will lead to lower e-book prices for many Macmillan titles; prices for titles offered by HarperCollins, Hachette, and Simon & Schuster fell soon after those publishers entered into new contracts as a result of the Original Judgment.[1] The requirements and prohibitions included in the proposed Macmillan Final

---

[1] *See, e.g.,* Scott Nichols, *HarperCollins Offering Discounted eBooks After Price Fixing Settlement*, TechRadar (Sept. 12, 2012), http://www.techradar.com/news/portable-devices/portable-media/harpercollins-offering-discounted-ebooks-after-price-fixing-settlement-1096467 ("Bestselling ebooks from the publisher such as 'The Fallen Angel' and 'Solo' can now be found for $9.99 on Amazon, Barnes and Noble, and other online retailers."); Nate Hoffelder, *Hachette Has Dropped Agency Pricing on eBooks*, The Digital Reader (Dec. 4, 2012), http://www.the-digital-reader.com/2012/12/04/hachette-has-dropped-agency-pricing-on-ebooks/ ("Amazon is discounting the ebooks by $1 to $4 from the list price, and both Barnes & Noble and Apple are making similar discounts"); Jeremy Greenfield, *Simon & Schuster Has a New Deal With Amazon, Other Retailers*, Digital Book World (Dec. 9, 2012), http://www.digitalbookworld.com/2012/looks-like-simon-schuster-has-a-new-deal-with-amazon-other-retailers/ ("Ebook prices were lowered for Simon & Schuster titles over the weekend on sites like Amazon and Nook.com to levels several dollars below what they had been earlier in the week.").

Judgment will eliminate Macmillan's illegal conduct, prevent recurrence of the same or similar conduct by Macmillan, and establish a robust antitrust compliance program.

      A.      <u>Differences Between the Proposed Macmillan Final Judgment and the Original Judgment and the Proposed Penguin Final Judgment</u>

Unlike the Original Judgment and the proposed Penguin Final Judgment, the proposed Macmillan Final Judgment requires Macmillan immediately to stop enforcing restrictions on discounting or promotions contained in its contracts with retailers.  The Original Judgment and the proposed Penguin Final Judgment allowed each settling publisher to choose whether to immediately allow discounting or, alternatively, to permit discounting only after the Court's approval of the settlement and the orderly termination of the publisher's existing contracts with retailers.  Each Publisher Defendant under the Original Judgment and proposed Penguin Final Judgment chose the latter option and several months passed before consumers saw the benefits of the settlements through lower retail prices on many of the settling publishers' e-books.  The two-year cooling-off period for those Publisher Defendants commenced when each terminated its previous contracts with retailers.

To provide for more prompt relief to consumers, the proposed Macmillan Final Judgment does not give Macmillan a choice.  Macmillan must allow its e-book retailers to discount within three business days of agreeing to the settlement, even if it has not formalized new contracts with retailers.  *See* PMFJ § IV.A.  To induce Macmillan to accept this more stringent term, the United States agreed that the two-year cooling-off period for Macmillan would run from December 18, 2012, the date on which Penguin signed its settlement.  *See* PMFJ §§ V.A-B.  Consumers are better served by bringing more immediate retail price competition to the market, and, given the

6

settlements of all the other Publisher Defendants, a 23-month cooling-off period is sufficient to ensure that future contracts entered into by these publishers will not be set under the collusive conditions that produced the Apple Agency Agreements.

The proposed Macmillan Final Judgment contains three other significant changes.  First, at the time they agreed to settle with the United States, the other settling publishers each continued to operate under the Apple Agency Agreements that were the products of the Publisher Defendants' conspiracy with Apple.  Because Macmillan has already terminated its Apple Agency Agreement and has entered a new Apple contract without an MFN, requiring Macmillan to terminate its existing contract with Apple would be superfluous.  Second, the proposed Macmillan Final Judgment expressly carves out the sale of electronic versions of academic textbooks from its requirements and prohibitions.  *See* PMFJ § II.D (defining the term "e-book" as used in the PMFJ to exclude "the electronically formatted version of a book marketed solely for use in connection with academic coursework").  The conspiracy among the Publisher Defendants and Apple challenged in the Complaint concerned the sale of trade e-books, not e-book versions of academic textbooks.  Compl. ¶¶ 27 n.1, 99.  Unlike the other Publisher Defendants, which publish only trade e-books, Macmillan also publishes e-textbooks.  Macmillan's settlement necessitates formalizing in the proposed Macmillan Final Judgment what the United States previously stated in its Response to Comments concerning the Original Judgment: "'e-books,' in the context of this case does not encompass '[n]on-trade e-books includ[ing] . . . academic textbooks . . . .'" Response to Comments (Docket No. 81) at 46-47 (quoting  Compl. ¶ 27 n.1).  Third, to make it clear that Defendant Verlagsgruppe Georg von Holtzbrinck, Macmillan's German parent, would be subject to all provisions of the proposed

7

Macmillan Final Judgment if it worked in concert with Macmillan to evade Macmillan's obligations under the settlement (*e.g.*, by having Macmillan transfer assets to its German parent), the Applicability section (PMFJ § III) now expressly binds Defendant Verlagsgruppe Georg von Holtzbrinck if it works with Macmillan in any such evasion.

For completeness, we describe below, in abbreviated form, the purposes of the other main provisions of the proposed Macmillan Final Judgment. These provisions mirror those of the Original Judgment and proposed Penguin Final Judgment.

      B.      <u>Required Conduct (Section IV)</u>

In order to reduce the risk that Macmillan may use future joint ventures to eliminate competition among Publisher Defendants, Section IV.C requires that Macmillan provide advance notice to the Department of Justice before forming or modifying a joint venture between it and another publisher related to e-books. *See also* Original CIS § III.A.2.

Additionally, to ensure Macmillan's compliance with the proposed Macmillan Final Judgment, Section IV.D requires that Macmillan provide, on a quarterly basis, each e-book agreement it has reached with any e-book retailer on or after January 1, 2012.

      C.      <u>Prohibited Conduct (Section V)</u>

In order to ensure that e-book retailers can compete on the price of e-books sold to consumers in the future, the proposed Macmillan Final Judgment also prohibits terms that prevent retail price competition. Sections V.A, V.B, and V.C limit Macmillan's ability to enter new agreements (and enforce old agreements) that contain either of two components of the Apple Agency Agreements: a ban on retailer discounting, or retail price-matching MFNs. Sections V.A. and V.B. prevent Macmillan, until December 18, 2014, from forbidding retailers

to offer price promotions or discounts on its e-books.  Prohibiting Macmillan, for a set period, from stopping e-book retailers from discounting will help ensure that Macmillan's future contracts will not be set under the collusive conditions that produced the Apple Agency Agreements.  *See* PMFJ §§ V.A–B.  For a five-year period, Section V.C also stops Macmillan from entering into an agreement with an e-book retailer that contains a Price MFN (defined as an MFN relating to price, revenue share, or commission available to any retailer).  This will eliminate Macmillan's ability to use such MFNs to achieve, for a second time, the results of the collusive agreements.  *See also* Original CIS § III.B.1.

Further, Macmillan may not retaliate against or punish an e-book retailer based on the retailer's e-book prices or its discounting or promotional choices.  PMFJ § V.D.  Nor may Macmillan attempt to retaliate by proxy, as this provision bars Macmillan from encouraging another company to retaliate against an e-book retailer on its behalf.  However, the anti-retaliation provision does not prohibit Macmillan from unilaterally entering into and enforcing agency agreements with e-book retailers after the 23-month proscription, required in Sections V.A and V.B, has expired.  *See also* Original CIS § III.B.2.

In addition to addressing terms used in the Apple Agency Agreements to implement the conspiracy, the proposed Macmillan Final Judgment also forbids a recurrence of the alleged conspiracy, and prohibits industry practices that facilitated it.  Section V.E prohibits Macmillan from agreeing with e-book publishers to raise or set e-book retail prices or coordinate terms relating to the licensing, distribution, or sale of e-books.  Section V.F likewise prohibits Macmillan from directly or indirectly conveying confidential or competitively sensitive information to any other e-book publisher.  Banning such communications is critical here, where

communications among publishing competitors were a common practice and facilitated the collusive agreement alleged in the Complaint. *See also* Original CIS § III.B.3.

  D.  <u>Permitted Conduct (Section VI)</u>

  The proposed Macmillan Final Judgment also specifically carves out some conduct, which normally is permitted under the antitrust laws, that Macmillan may pursue unilaterally. Section VI.A of the proposed Macmillan Final Judgment allows Macmillan to compensate e-book retailers for services that they provide to publishers or consumers to help promote or sell more e-books. Section VI.B permits Macmillan to negotiate a commitment from an e-book retailer that a retailer's aggregate expenditure on discounts and promotions of Macmillan's e-books will not exceed the retailer's aggregate commission under an agency agreement in which Macmillan sets the e-book price and the retailer is compensated through a commission. These provisions allow Macmillan to prevent a retailer selling its entire catalogue at a sustained loss, while still permitting retailers to offer discounts under Sections V.A and V.B. Absent the collusion here, the antitrust laws normally would permit a publisher unilaterally to negotiate for such protections. *See also* Original CIS § III.C.

  E.  <u>Antitrust Compliance (Section VII)</u>

  As outlined in Section VII, Macmillan also must designate an Antitrust Compliance Officer, who is required to distribute copies of the proposed Macmillan Final Judgment; ensure training related to the proposed Macmillan Final Judgment and the antitrust laws; certify compliance with the proposed Macmillan Final Judgment; and conduct an annual antitrust compliance audit. This compliance program is necessary considering the extensive

communication among competitors' CEOs that facilitated Defendants' agreement. *See also* Original CIS § III.D.

## IV.     ALTERNATIVES TO THE PROPOSED MACMILLAN FINAL JUDGMENT

The United States considered, as an alternative to the proposed Macmillan Final Judgment, a full trial on the merits against Macmillan. The United States believes that the relief contained in the proposed Macmillan Final Judgment will more quickly restore retail price competition to consumers.

## V.     REMEDIES AVAILABLE TO PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Macmillan Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Macmillan Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the Defendants.

## VI.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED MACMILLAN FINAL JUDGMENT

The United States and Macmillan have stipulated that the proposed Macmillan Final Judgment may be entered by this Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry of the decree upon this Court's determination that the proposed Macmillan Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Macmillan Final Judgment within which any person may submit to the United States written comments regarding the proposed Macmillan Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.

All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Macmillan Final Judgment at any time prior to the Court's entry of judgment.  The comments and the responses of the United States will be filed with the Court and published either in the Federal Register or, with the Court's permission, on the Department of Justice website.[2]  Written comments should be submitted to:

>John Read, Chief
>Litigation III Section
>Antitrust Division
>U.S. Department of Justice
>450 5th Street, NW, Suite 4000
>Washington, DC 20530

The proposed Macmillan Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for modification, interpretation, or enforcement of the Final Judgment.

---

[2]  The United States posts or links to all public materials submitted in relation to *United States v. Apple, Inc.* at: http://www.justice.gov/atr/cases/applebooks.html.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED MACMILLAN FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court is directed to consider:

> (A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. KeySpan Corp.*, 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011) (discussing Tunney Act standards); *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing standards for public interest determination).

In other words, under the Tunney Act, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995). The court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *Id.* at 1461; *accord United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 238 (S.D.N.Y. 1997) (quoting *Microsoft*, 56 F.3d at 1460), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998); *United States v. KeySpan*, 763 F. Supp. 2d at 637 (same). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Alex. Brown & Sons*, 963 F. Supp. at 238. Instead, the court should grant due respect to the United States' "prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case." *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003). After all, the court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" *Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted); *accord Alex. Brown*, 963 F. Supp. at 238.[3]

---

[3] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [Tunney Act] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Macmillan Final Judgment.

Dated:  February 8, 2013

                              Respectfully submitted,

                                s/ Mark W. Ryan
                              Mark W. Ryan
                              Lawrence E. Buterman
                              Daniel McCuaig
                              Stephanie A. Fleming
                              Attorneys for the United States
                              United States Department of Justice
                              Antitrust Division
                              450 Fifth Street, NW, Suite 4000
                              Washington, DC 20530
                              (202) 532-4753
                              Mark.W.Ryan@usdoj.gov

CERTIFICATE OF SERVICE

      I, Stephen T. Fairchild, hereby certify that on February 8, 2013, I caused a copy of the United States' Competitive Impact Statement to be served by the Electronic Case Filing System, which included the individuals listed below.

For Apple:
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 S. Grand Avenue, Suite 4600
Los Angeles, CA 90070
(213) 229-7148
dfloyd@gibsondunn.com

For Macmillan and Verlagsgruppe Georg Von Holtzbrinck GMBH:
Joel M. Mitnick
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
jmitnick@sidley.com

For Penguin U.S.A. and the Penguin Group:
Daniel F. McInnis
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue NW
Washington, DC 20036
(202) 887-4000
dmcinnis@akingump.com

For Hachette:
Walter B. Stuart, IV
Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
New York, NY 10022
(212) 277-4000
walter.stuart@freshfields.com

For HarperCollins:
Paul Madison Eckles
Skadden, Arps, Slate, Meagher & Flom
Four Times Square, 42nd Floor
New York, NY 10036
(212) 735-2578
pmeckles@skadden.com

For Simon & Schuster:
Yehudah Lev Buchweitz
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue, 25th Fl.
New York, NY 10153
(212) 310-8000 x8256
yehudah.buchweitz@weil.com

Additionally, courtesy copies of this Competitive Impact Statement have been provided to the following:

For the State of Connecticut:
W. Joseph Nielsen
Assistant Attorney General
Antitrust Division
Office of the Attorney General
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

For the State of Texas:
Gabriel R. Gervey
Assistant Attorney General
Antitrust Division
Office of the Attorney General of Texas
300 W. 15th Street
Austin, Texas 78701
(512) 463-1262
gabriel.gervey@oag.state.tx.us

For the Private Plaintiffs:
Jeff D. Friedman
Hagens Berman
715 Hearst Ave., Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com

    s/ Stephen T. Fairchild
Stephen T. Fairchild
Attorney for the United States
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
(202) 532-4925
stephen.fairchild@usdoj.gov