## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————— )
UNITED STATES OF AMERICA,                        )
                                                 )
                        Plaintiff,               )
                                                 )
            v.                                   )        Civil Action No. 12-cv-2826 (DLC)
                                                 )
APPLE, INC., et al.,                             )
                                                 )
                        Defendants.              )
————————————————————————)


———————————————————————— )
THE STATE OF TEXAS;                              )
THE STATE OF CONNECTICUT; et al.,                )
                                                 )
                        Plaintiffs,              )
                                                 )
            v.                                   )        Civil Action No. 12-cv-03394 (DLC)
                                                 )
PENGUIN GROUP (USA) INC. et al.,                 )
                                                 )
                        Defendants.              )
————————————————————————)


## PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

QUESTIONS OF LAW ...................................................................................................... 5

STATEMENT OF FACTS ................................................................................................. 6

    I.       Publisher Defendants Tried to Raise Retail Prices, but Lacked a Means of
           Coordination ....................................................................................................... 7

    II.      Apple Coordinated Publisher Defendants' Collective Move to the Agency
           Model and Higher Consumer Prices ................................................................. 11

           A.      Apple Structured the Agency Agreements Knowing That They Would
                  Necessarily Change the Distribution Model Across the Industry ..... 12

           B.      During Negotiations, Apple Assured Publisher Defendants of their
                  Common Commitment to Raising Retail E-book Prices via the
                  Agency Model ................................................................................... 16

           C.      The Apple Agency Agreements Succeeded in Raising Retail Prices of
                  E-books ............................................................................................. 19

           D.      With Apple's Support, Publisher Defendants Moved Together to
                  Export the Agency Model to All Other E-book Retailers. ................ 20

ARGUMENT ....................................................................................................................... 22

    I.       Apple Conspired with Publisher Defendants to Raise Retail E-book Prices and
           Restrain Retail Price Competition ................................................................... 24

           A.      Both Direct and Circumstantial Evidence Prove a Horizontal Price-
                  Fixing Agreement Among the Publishers ......................................... 24

           B.      Both Direct and Circumstantial Evidence Prove that Apple
                  Knowingly Participated in and Facilitated Publisher Defendants'
                  Horizontal Agreement ...................................................................... 26

           C.      Apple is Not Immune from Antitrust Liability Because it May Have
                  Been Acting in its Own Interest ....................................................... 31

    II.      Defendants' Agreement to Raise Retail E-book Prices is *Per Se* Unlawful ...... 33

III.    Under a Rule of Reason Analysis, the Harmful Effects to Consumers of
        Defendants' Agreement Outweigh any Procompetitive Benefits ..................... 34

CONCLUSION .............................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .............................. 24, 26

*Apex Oil Co. v. Dimauro*, 822 F.2d 246 (2d Cir. 1987)..................................................... 31

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982)........................................... 33

*Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir. 2010) ................... 36

*Board of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918) ................................ 35

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ............................................................ 35

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)........................................ 35

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992) ................................ 5, 27

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) .................................................... 23

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004)........................... 35

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997)................. 34

*In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003)............. 31

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)........................................ 24

*In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001)............................... 34

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012)................................... 4, 5, 32, 33

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939)................................................. 25, 27

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995)............................ 35

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211 (1951). .................................. 23

*Laumann v. Nat'l Hockey League*, ___ F. Supp. 2d ___, 2012 WL 6043225 (S.D.N.Y. Dec. 5, 2012) .................................................................................................................... 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). ............................... 33

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)........................................... 5, 23

*Nat'l Collegiate Athletic Ass'n  v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)........... 35

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)............................................ 35

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002)................................................ 25

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92 (2d Cir. 2000)............................ 22

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998)................................................ 34

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ............................................. 33

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001). ...................................................... 25

*Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000) ....................................... 4, 24, 28, 34

*United States v. All Star Indus.*, 962 F.2d 465 (5th Cir. 1992) ..................................... 33

*United States v. Gen Motors Corp.*, 384 U.S. 127 (1966). .......................................... 32

*United States v. MMR Corp.*, 907 F.2d 489 (5th Cir. 1990). ....................................... 34

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ...................................... 23, 38

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)................................... 33

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ......................................... 38

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001)............... 5, 23

**Statutes**

15 U.S.C. § 1 ................................................................................................... 22, 40

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03(b), at 14–25
   (4th ed. 2011) ............................................................................................ 32

VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434 (3d ed. 2010)................. 25

## INTRODUCTION

Apple conspired with five of the six largest U.S. trade book publishers to raise the prices at which consumers purchase electronic books ("e-books") and eliminate retail price competition.  Former Apple CEO Steve Jobs conceded the price-fixing conspiracy when, the day after publicly announcing Apple's forthcoming iBookstore, he explained to his authorized biographer that Apple had "told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.'"[1]  A year later, Penguin CEO David Shanks admitted Apple's role in facilitating the conspiracy in response to a suggestion that Penguin meet with other major publishers and booksellers to discuss how they all could work together to raise e-book prices in Canada:  "We would never meet with Barnes and all our competitors.  The Government would be all over that.  We would meet separately with Indigo being the facilitator and go between.  That is how we worked with Apple and the government is still looking into that."[2]

Apple wanted to sell e-books to the public, but did not want to compete against the low prices Amazon was setting.  Apple knew that the major publishers also disliked Amazon's low prices and saw Apple's potential entry as a pathway to higher retail prices industry-wide.  Against that backdrop, Apple and the "Big Six" publishers (*i.e.*, the five Publisher Defendants plus Random House) met in mid-December 2009 to discuss Apple's potential entry.  During those meetings, Publisher Defendants Hachette and HarperCollins each proposed that Apple adopt an agency model, then novel to the industry, wherein the publisher, instead of the retailer, would set the ultimate consumer price for each e-book.  HarperCollins explicitly explained to

---

[1] PX-0514, at p. 503.

[2] PX-0542, at PEN-LIT-00199145.

Apple that the purpose of its agency proposal was "to fix Amazon pricing,"[3] which Publisher Defendants believed was injuring their industry.

Within 48 hours of concluding its initial meetings, Apple had embraced the Hachette/HarperCollins agency proposal.  Apple's lead e-books negotiator, Eddy Cue, contacted the CEOs of Macmillan, Simon & Schuster, and non-defendant Random House to arrange meetings to describe the proposal and explain how it could resolve their collective problems with e-book pricing.[4]  In summarizing those meetings for Mr. Jobs, Mr. Cue noted that the publishers "saw . . . the plus" of the agency proposal—namely, that it "solves Amazon issue."[5]  The publishers recounted those same calls with greater detail.  According to Random House CEO Markus Dohle, Mr. Cue told him that "book prices are becoming too low" and "[t]herefore he suggests an 'agency model.'"[6]  Similarly, Simon & Schuster CEO Carolyn Reidy relayed that Mr. Cue told her that "new release eBooks should be priced at $12.99" and that "the only way" to get "some level of reasonable pricing" "is for the **industry to go to the agency model**."[7] And, according to Mr. Dohle, Mr. Cue counseled him that Random House could threaten to withhold e-books from Amazon to force Amazon to accept the agency model[8]—a strategy that Macmillan would later employ once it signed an agency agreement with Apple.[9]

In early January 2010, Mr. Cue e-mailed a substantively identical term sheet to the CEOs

---

[3] PX-0036, at APLEBOOK-01601745.

[4] Mr. Cue sent substantively identical e-mails to the three publishers' CEOs, asking for thirty minutes to "update you all my findings and thoughts."  *See* PX-0501, at MAC0042796; PX-0502, at DOJ-SS0075864; PX-0056, at RH-MDL-00026213.

[5] PX-0043, at APLEBOOK-00013734.

[6] PX-0336, at RH-USDOJ-00032366 ("I had a good conversation with Eddy Cue today.  He said he had meetings with all major houses to discuss their positions last week.").

[7] PX-0540, at SS00028855 (emphasis added).  Mr. Cue also told Ms. Reidy that Simon & Schuster would "have to 'get everyone else [*i.e.*, all other retailers] to go to the agency model.'"  *Id.*

[8] PX-0336, at RH-USDOJ-00032366.

[9] *See infra* text accompanying notes 93–94.

of each "Big Six" publisher.  The introduction to Apple's proposed terms varied depending on

whether the publisher was among those Mr. Cue had contacted in late December ("As we

discussed")[10] or not ("After talking to all the other publishers").[11]  Apple's term sheet included

retail price tiers of $12.99 and $14.99, and specifically included, as a condition of selling e-

books at those "realistic prices," that "all resellers of new titles need to be in agency model."[12]

To help ensure that all resellers were moved to an agency model, Apple ultimately settled

on a most favored nation ("MFN") clause—which Apple attorney Kevin Saul termed an "elegant

solution" to address Apple's concern of having to price compete with Amazon.[13]  Apple's

"elegant solution" mandated that publishers bound by the MFN match in the iBookstore any

lower prices set by retailers such as Amazon.  Accordingly, as Publisher Defendants admitted in

their motion to dismiss the Consolidated Amended Class Action Complaint, the Apple MFN

"heavily incentivized [them] to attempt to move to the agency model with Amazon and other

large retailers."[14]

Throughout their negotiations, Apple and Publisher Defendants all understood that the

common retail price tiers they were negotiating would be the *de facto* retail prices for most if not

all of their newly released and bestselling e-books once the Apple Agency Agreements went into

effect.[15]  And so they were:  in the five-month period following Publisher Defendants' switch to

agency, over 92% of all new-release e-books and over 99% of all bestseller e-books from

---

[10] PX-0476, at APLEBOOK00434151; PX-0021, at APLEBOOK00434150; PX-0473, at APLEBOOK00434608.

[11] PX-0041, at APLEBOOK-00012465; PX-0040, at APLEBOOK00434155; PX-0306, at APLEBOOK00434158. While Mr. Cue sent Mr. Sargent the "as we discussed" version of the letter on January 4, *see* PX-0476, at APLEBOOK00434151, for reasons unknown, on January 6, Mr. Cue sent Mr. Sargent the "after talking to all the other publishers" version of the letter, *see* PX-0483, at APLEBOOK-00012471.

[12] *See supra* notes 10–11.

[13] Kevin Saul Dep., at 163:14–16.

[14] PX-0800, at 27; *see also infra* note 61.

[15] Plaintiffs' Proposed Findings of Fact ("PF"), at ¶¶ 130–32.

Publisher Defendants sold on Apple's iBookstore were set at the "caps" negotiated in the Apple Agency Agreements.[16]

Apple knew that the plan it was proposing involved a "dramatic business change" for Publisher Defendants.[17]  Accordingly, Apple kept each Publisher Defendant aware that it was orchestrating and coordinating a common approach for all of them.  Apple informed each Publisher Defendant of the status of Apple's dealings with its competitors, and ensured each Publisher Defendant that it would receive materially the same deal as its competitors (including functionally identical pricing tiers and MFNs).[18]  When Publisher Defendants voiced fears that signing an Apple Agency Agreement would subject them to harsh market conditions unless the other Publisher Defendants signed too, Apple assured the publishers that they would be acting in concert to move the industry.[19]  As Apple made clear to individual Publisher Defendants, it had "come up with a way that would **move the whole market off 9.99**,"[20] and that its deal was "the best chance **for publishers to challenge the 9.99 price point**."[21]  As Simon & Schuster's Ms. Reidy described it, Apple's role was "herding us cats."[22]  Under the law, Apple's conduct made it the "ringmaster" of the conspiracy.  *Toys "R" Us v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000).

Stripped of the glitz surrounding e-books and Apple, this is an unremarkable and obvious price-fixing case appropriate for *per se* condemnation.  *See, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  Apple seeks to avoid liability by claiming Plaintiffs must

---

[16] Richard Gilbert Direct Testimony, at ¶¶ 139, 142 & tbl.4; *see also* Jonathan Baker Direct Testimony, at ¶ 107. This point is not in serious dispute.  Even Defendants' experts concede the vast majority of Publisher Defendants' e-books were priced at their caps in the iBookstore.  *See* Benjamin Klein Dep., at 184:10–14; PX-0829, at ¶ 48; PX-0831, at ¶ 50 & graph 7; PX-0833, at ex. 17.

[17] PX-0042, at APLEBOOK-00016369.

[18] PF, at ¶¶ 73–74.

[19] PF, at ¶¶ 154–62.

[20] PX-0174, at RH-USDOJ-00001850 (emphasis added).

[21] PX-0521, at HBG00013352 (emphasis added).

[22] PX-0782, at APLEBOOK00414549.

prove "there is *no possibility* that Apple acted in further[ance] of its own independent, rational and legitimate business interests."[23]  However, that argument was squarely rejected by this Circuit last August, *see Publ'n Paper Antitrust Litig.*, 690 F.3d at 63, and is especially inapplicable in circumstances such as exist here, where there is direct evidence of an agreement to fix prices, *see id.*, and the alleged conspirator is in a vertical relationship with its co-conspirators, *see Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 214 n.32 (3d Cir. 1992).  Thus, in this civil case, Plaintiffs need only prove by a preponderance of the evidence, *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 331 (S.D.N.Y. 2001), that Apple and Publisher Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotation omitted).  The evidence against Apple here easily satisfies that standard.

Under a rule of reason analysis, this matter is equally straightforward and appropriately resolved by a quick look at competitive effects.  The sharply higher prices consumers have paid for Publisher Defendants' e-books are the direct, quantifiable result of Defendants' conspiracy.  On the other side of the scale, Apple offers only vague, shifting claims with, at best, speculative ties to the Apple Agency Agreements.  None of Apple's three experts has even attempted to balance any procompetitive claims against the clear harm suffered by consumers.

## QUESTIONS OF LAW

This case presents three relatively straightforward questions of law.  First, what evidence is required to establish Apple's commitment to the unlawful agreement alleged?  Second, is Defendants' price-fixing agreement appropriately subject to *per se* condemnation despite the claim that it also facilitated Apple's entry as an e-books distributor?  Third, if not, was the

---

[23] Tr. of Telephone Conference, Mar. 13, 2013, at 11:11–15 (statement of Apple's counsel) (emphasis added).

agreement on balance nonetheless anticompetitive?

Long settled principles of antitrust law answer these questions.  As explained in the Argument section of this memorandum, Apple's conscious commitment to Defendants' common scheme designed to raise retail e-book prices and eliminate retail price competition is established through overwhelming documentary and testimonial evidence.  The price-fixing agreement does not escape *per se* treatment because Apple was an e-books distributor, as opposed to a competitor of Publisher Defendants.  Moreover, because price-fixing agreements are *per se* illegal, Apple's purported justification for joining the conspiracy—that the agreement was necessary to bring to the market a new competitor—is irrelevant.  And even if the agreement were subject to rule of reason analysis, Apple's justification would carry no weight because its key condition for entry was that prices be fixed.

## STATEMENT OF FACTS

An e-book is a book formatted for display on a variety of electronic devices, including dedicated e-readers (such as a Kindle or a Nook), multipurpose tablets (such as an iPad), smartphones, and personal computers.  Until April 2010, e-books were distributed on the same wholesale basis as had been used to distribute print books for decades.  Under the wholesale model, publishers set a digital list price for an e-book and then sold each copy of the e-book to a retailer for a discount off the list price (generally around 50%).  The retailer then took legal title of the e-book copy and was free independently to set the e-book's price to the consumer.

Amazon became the first e-book retailer to enjoy a widespread consumer following when it launched its Kindle e-reader device and associated e-book store in November 2007.  One of Amazon's most successful marketing strategies was to discount the retail price of most newly released and bestselling e-books to $9.99.  Some of those $9.99 e-books were sold below

Amazon's wholesale cost, especially once publishers began raising their digital list prices in late 2008 and early 2009. However, the $9.99 loss leaders represented a relatively small portion of Amazon's e-book sales, and Amazon generally realized positive margins on the balance of its e-book sales.[24] Until April 2010, Amazon's $9.99 prices for new releases and bestsellers often were matched, or at least approached, by Barnes & Noble and other e-book retailers.[25]

## I.   Publisher Defendants Tried to Raise Retail Prices, but Lacked a Means of Coordination.

Despite the fact that lower prices led to increased sales of their e-books, Publisher Defendants had long been dissatisfied with the prevailing $9.99 price for newly released and bestselling e-books. Publisher Defendants feared that $9.99 pricing posed at least three distinct threats to the viability of their businesses. First, Publisher Defendants feared $9.99 pricing would lead Amazon to dominate the sale of e-books to consumers, allowing Amazon eventually to seek lower wholesale prices.[26] Second, Publisher Defendants worried that what they perceived to be Amazon's increasing market share would enable Amazon to negotiate directly with authors and literary agents for the rights to publish their books—cutting them out of the value chain in a phenomenon known as "disintermediation."[27] Third, Publisher Defendants were concerned that consumers would come to expect $9.99 as the market price for all books, including physical hardcovers (where Publisher Defendants earned the majority of their revenues), making consumers less willing to pay more for those books.[28]

Publisher Defendants' fears played out against a backdrop of a close-knit publishing

---

[24] David Naggar Direct Testimony, at ¶ 9.

[25] PX-0180, at BN0001895 ("Can you make money selling books at $9.99? Yes. Unequivocally. Yes. . . . our pricing's very comparable with theirs.").

[26] See, e.g., PX-0319, at MCMLN-LIT-00076912–13; PX-0088, at MCMLN-LIT-00073699.

[27] See, e.g., PX-0505, at DOJ-SS0043165; PX-0438, at PEN013191; PX-0133, at PEN-LIT-00008100.

[28] See, e.g., PX-0129, at PEN013663; PX-0078, at MAC0146081–86; PX-0274, at HBG-NOUA000049238 ("There is that wretched $9.99 price point becoming a de facto standard.").

industry in which competitors frequently communicated about competitively sensitive information.  Through these communications, Publisher Defendants learned that they shared not just an antipathy to $9.99 e-book pricing, but also a willingness to do something about it.  For example, Publisher Defendants held "CEO dinners" in private rooms at upscale Manhattan restaurants in which they discussed the common threat they felt from Amazon and other business matters.[29]  Publisher Defendants also frequently used telephone and e-mail conversations to discuss their concerns with each other.[30]

Throughout 2009, Publisher Defendants considered various strategies, in an increasingly parallel manner, to pressure Amazon to change its pricing.  Simon & Schuster and Penguin, for example, considered setting minimum advertised pricing ("MAP") policies as a way to raise e-book prices, and contemplated involving other publishers in their efforts.[31]  Other publishers, such as Hachette, considered implementing forms of resale price maintenance.[32]  Some Publisher Defendants also considered forming joint ventures, the ostensible purpose of which was to provide an alternative marketing platform to Amazon, but, according to Hachette's Mr. Nourry, actually were a collective means to force Amazon to raise prices:

> In the USA and the UK, but also in Spain and France to a lesser degree, the "top publishers" are in discussions to create an alternative platform to Amazon for e-books.  **The goal is less to compete with Amazon as to force it to accept a price level higher than 9.99** . . . . I am in NY this week to promote these ideas and the movement is positive with [the four other Publisher Defendants].[33]

---

[29] *See, e.g.*, PX-0219, at HBG00091601 (Arnaud Nourry:  "I am told Random House is concerned about the future of e-books and the potentially dominant role played by Google and Amazon.  Would it make sense for the 2 of us to have meetings / din[n]er with Markus Dohle, Brian Murray, John Sargent and whoever, in order to discuss options?"; David Young:  "I am having dinner with that group on January 29 and will raise the matter then.")

[30] PF, at ¶¶ 40–44.

[31] PX-0783, at BN00600103; PX-0343, at SS00028648 (stating that the "only other option" to get Amazon to change its pricing is establishing MAP, and expressing "hope others would copy us if we move to do this").

[32] *See, e.g.*, PX-0293, at HBG00266540.

[33] PX-0392, at HBG-NOUA000016814 (translated from French) (emphasis added).

Less than a week after Mr. Nourry sent his e-mail, Penguin Group CEO John Makinson

conveyed the same message to his company's board of directors:

> Competition for the attention of readers will be most intense from digital
> companies whose objective may be to disintermediate traditional publishers
> altogether.  This is not a new threat but we do appear to be on a collision course
> with Amazon, and possibly with Google as well.  **It will not be possible for any
> individual publisher to mount an effective response, because of both the
> resources necessary and the risk of retribution, so the industry needs to
> develop a common strategy**.  This is the context for the development of the
> Project Z initiatives [joint ventures] in London and New York.[34]

None of these efforts had sufficient backing to get Amazon to raise its prices.  In fact, in some

instances, the mere concern of possible retaliation by Amazon was enough to cause the Publisher

Defendant(s) to abandon their plans before they were even implemented.

Windowing was another attempt by Publisher Defendants to pool their influence in the

hope of forcing Amazon to raise its $9.99 prices.  In late 2009, some Publisher Defendants

"windowed" a small number of e-book titles—that is, delayed their release until sometime after

the release of each title's corresponding hardcover edition—on an *ad hoc* basis, generally

accompanied by secret disclosures to one another.  For example, Hachette Book Group CEO

David Young e-mailed his corporate superior, Mr. Nourry, to say:  "Completely confidentially,

Carolyn [Reidy] has told me that they are delaying the new Stephen King, with his full support,

but will not be announcing this until after Labor Day so that she can have an enjoyable vacation!

. . . I think it would be prudent for you to double delete this from your email files when you

return to your office."[35]  These efforts intensified in December 2009 when, over a period of less

than two weeks, four Publisher Defendants announced policies to systematically window certain

---

[34] PX-0133, at PEN-LIT-00008100 (emphasis added).

[35] PX-0274, at HBG-NOUA000049238; *see also* PX-0416, at HC-DOJ-0151338 (e-mail from Arnaud Nourry to
Brian Murray, reacting to HarperCollins decision to window *Going Rogue* by Sarah Palin:  "Well done for the Palin
book and welcome to the Club!").

forthcoming e-books in an attempt to force Amazon to change its pricing strategy.[36]

On December 3, 2009, Hachette's Mr. Nourry met at breakfast with Amazon executive David Naggar and told him that Amazon's $9.99 pricing posed a "big problem" for the industry. According to Mr. Nourry, raising e-book prices by even one or two dollars would "solve the problem."  Mr. Naggar, however, did not agree.[37]  The following day, a Friday, Hachette and Simon & Schuster (along with Penguin) met at Hachette's offices, purportedly to discuss a joint venture.  Hachette informed Amazon later that day that it intended to window several of its e-book titles; Simon & Schuster informed Amazon of the same the following Monday, December 7.[38]  The first public announcement of these publishers' windowing policies did not come until a December 9 *Wall Street Journal* article.[39]  HarperCollins followed the next day with its own windowing announcement.[40]  And the following week, Macmillan joined the publishers that had announced windowing policies, despite its CEO's belief that windowing was "stupid" on its own terms, and useful only as a short-term tactical move.[41]  Ultimately, however, those selective windowing decisions by a subset of the publishers were not sufficient to provoke Amazon to raise its $9.99 price.

Thus, through 2009, Publisher Defendants learned that in order to accomplish their shared goal of forcing Amazon to change its pricing strategy, they needed to take dramatic action and be assured that their fellow publishers would act with them.  As Simon & Schuster's Ms. Reidy wrote to her boss, CBS CEO Leslie Moonves, "[W]e've always known that unless other

---

[36] PX-0087, at MAC0038800.

[37] David Naggar Direct Testimony, at ¶ 18.

[38] David Naggar Direct Testimony, at ¶¶ 19, 21; *see also* PX-0437, at HBG-NOUA000064463.

[39] PX-0617, at B1.

[40] David Naggar Direct Testimony, at ¶ 21.

[41] PX-0087, at MAC0038800; PX-0479, at MAC0038907.

publishers follow us, there's no chance of success in getting Amazon to change its pricing practices."  Ms. Reidy recognized that "without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react if we make a move like this. . . . [C]learly we need to 'gather more troops' and ammunition first!"[42]

## II.    Apple Coordinated Publisher Defendants' Collective Move to the Agency Model and Higher Consumer Prices.

Apple's entry into the e-books market provided Publisher Defendants with the coordinating presence they needed to take the dramatic action necessary to collectively raise industry e-book prices.  On December 15 and 16, 2009, Apple's Vice President of Internet Services, Eddy Cue, and others from Apple met in New York City with the CEOs of each Publisher Defendant and Random House to discuss Apple's potential entry as an e-book retailer, to coincide with its much-anticipated, forthcoming tablet device.  Apple made clear to the CEOs from the outset that it would be meeting with each of the "Big Six" publishers.[43]

Apple entered these meetings assuming that it would purchase e-books under the existing wholesale model and resell them, as other e-book retailers did, and as Apple itself did with music, movies, and television shows.[44]  But, during those meetings, Apple heard the same complaints from each publisher:  retail e-book prices were too low.[45]  For its part, Apple

---

[42] PX-0344, at SS00028729.

[43] Apple (Eddy Cue) CID Dep., at 124:10–18 ("Q.  And were the publishers aware that you were going from one publisher to the other negotiating the agreements?  A.  Yes.  I certainly let them know that I was in the process of negotiating."); *see also* PX-0314, at HC-DOJ-0198725 (Mr. Cue "has asked to speak to two CEOs tomorrow -- you and Markus [Dohle]"); PX-0073, at MAC0038797 ("Phone just rang.  Head dude of I tunes who reports directly to Jobs is coming to town next week to see a couple of CEOs.  I'm on for Monday.  Cool…"); PX-0112, at PEN013176; PX-0301, at HC-TXAG-0547605 ("They met five publishers in NY this week.  They're looking to do direct distribution deals with the top six and maybe source the rest through a distributor."); PX-0299, at HBG-YOUNG000103571 (Ms. Reidy requesting Mr. Cue's contact information from Mr. Young of Hachette after Simon & Schuster's initial meeting with Apple, noting that "we were last and he left here to go to the plane").

[44] Apple (Eddy Cue) CID Dep., at 44:3–13; Eddy Cue Dep., at 315:4–7, 427:7–10; Keith Moerer Dep., at 174:8–11.

[45] Apple (Eddy Cue) CID Dep., at 42:13–43:17.  As the meetings progressed, Mr. Cue informed the publishers what their competitors had been saying.  *See, e.g.*, PX-0359, at SS00027182 (Elinor Hirschhorn handwritten notes from meeting with Apple:  "other publishers want:  $13-$15 range, get by including extra material").

desperately wanted to avoid having to compete against Amazon's $9.99, often loss-leading, price.[46]   Therefore, Mr. Cue and his team took the suggestion of Hachette and HarperCollins during their initial meetings with Apple and began to consider selling e-books under an "agency model," whereby the publishers would set the prices of e-books sold and Apple would take a commission as the selling agent.[47]   Apple presented the agency idea to most of the remaining publishers in late December 2009, and, in early January 2010, presented it to them all in a formal term sheet.[48]

> A.   *Apple Structured the Agency Agreements Knowing That They Would Necessarily Change the Distribution Model Across the Industry.*

In the early January term sheets it sent to the publishers, Apple included the principle that "all resellers of new titles need to be in agency model."[49]   That is, Publisher Defendants were to take control of and raise retail prices not just on the iBookstore, but at all e-book retailers.   In the substantively identical draft agency agreements that it sent to the Big Six publishers a week later, on January 11, 2010, Apple animated this principle with an unusual retail price MFN.   This MFN was different from the MFN clauses Apple employs in its other content businesses, which require content providers to offer Apple their most attractive wholesale terms.   The proposed MFN required Publisher Defendants to match in Apple's iBookstore lower retail prices of new release e-books offered by any other retailer for those titles, *even if the other retailer had*

---

[46] *See, e.g.*, David Shanks Dep., at 211:13–21 ("Q.   And you took that to mean that -- you took that to mean that Apple didn't want to enter into the wholesale agreement because it would have to compete on price with Amazon, right?   A.   That they -- yes.   More or less, yes."); PX-0301, at HC-TXAG-0547605 (e-mail from Leslie Hulse to HarperCollins executives, recounting Apple meeting:   "Apple won't sell at a loss."); PX-0359, at SS00027180 (Elinor Hirschhorn handwritten notes from meeting with Apple:   "won't sell anything at a loss").

[47] Apple (Eddy Cue) CID Dep., at 44:14–45:21; Eddy Cue Dep., at 122:1–3, 163:4–7.

[48] *See supra* notes 4–11 and accompanying text.

[49] *See supra* notes 10–12 and accompanying text.

*remained on the wholesale model and set consumer prices independently.*[50]

Apple knew that, while Publisher Defendants already desired to wrest pricing control from their retailers (primarily Amazon), the retail price MFN would sharpen their incentives to follow through on raising prices across all retailers.[51]  If a retailer were allowed to remain on wholesale terms, and that retailer continued to price new release e-books at $9.99, the Publisher Defendant would be forced to lower the iBookstore price to match the $9.99 price, placing two sources of pressure on the publisher.  First, because Apple's commission would be 30 percent of the matched (lower) price, the Publisher Defendant's per-unit revenues net of that commission would decline.  Second, being forced to set e-book prices at $9.99 in the iBookstore to match another retailer's price would, as Simon & Schuster CEO Ms. Reidy put it, "undercut[] one of the reasons for making the deal."  Accordingly, Ms. Reidy concluded that Simon & Schuster would "need to change our eBook selling terms with our other eRetailers before" the iBookstore became publicly available.[52]

Apple also knew that, in order for its plan to "move the whole market" to be successful, it needed all Publisher Defendants to accept the MFN.  Thus, when HarperCollins expressed hesitance to agree to the MFN, Apple appears to have enlisted another Publisher Defendant to help close the deal.  On January 21 at 3:07 P.M., HarperCollins CEO Brian Murray sent an e-mail to Mr. Cue that included two alternative counterproposals, both of which excluded Apple's MFN.[53]  At 3:34 P.M., Mr. Murray and Mr. Cue spoke on the phone for approximately 11

---

[50] PX-0248, at APLEBOOK-00012749 (§ 5(b):  "If, for any particular New Release in hardcover format, the then-current Customer Price at any time is or becomes higher than a customer price offered by any other reseller ('Other Customer Price'), then Publisher shall designate a new, lower Customer Price to meet such lower Other Customer Price."); PX-0249, at APLEBOOK-00012765; PX-0285, at APLEBOOK-00012781; PX-0286, at APLEBOOK-00012813; PX-0322, at APLEBOOK-00012797.

[51] Apple (Eddy Cue) CID Dep., at 87:7–12; Eddy Cue Dep., at 300:25–302:14.

[52] PX-0341, at SS00031715; *see also* David Shanks Dep., at 250:11–251:8.

[53] PX-310, at HC-DOJ-0198805.

minutes.[54]  Two minutes after hanging up the phone, at 3:47 P.M., Mr. Cue called Macmillan

CEO John Sargent and the two spoke for three minutes.[55]  Approximately ten minutes after

speaking with Mr. Cue, at 4:01 P.M., Mr. Sargent called Mr. Murray and the two spoke for eight

minutes.[56]  HarperCollins, of course, ultimately agreed to the MFN and moved all of its other e-

book retailers to agency.

      Apple recognized that the MFNs in the Apple Agency Agreements would commit

Publisher Defendants to moving their other retailers to the agency model.  In a telling admission,

Apple executive Pete Alcorn observed how the MFN "forc[ed] people off the [A]mazon model

and onto ours" and that "any decent MFN forces the model."[57]  Although Apple's experts now

argue that the MFN could not have served as such a mechanism,[58] Mr. Jobs (like Publisher

Defendants' CEOs) recognized the MFN's efficacy:  "[W]e also asked for a guarantee that if

anybody else is selling the book cheaper than we are, then we can sell them at the lower price

too.  So [Publisher Defendants] went to Amazon and said, 'You're going to sign an agency

contract or we're not going to give you the books.'"[59]  Indeed, the fact that Mr. Jobs made this

statement on January 28, 2010—the same day that Macmillan CEO Sargent flew to Seattle to

become the first to give Amazon that exact ultimatum, and three days before he would disclose it

publically[60]—indicates Apple's foreknowledge that Publisher Defendants would demand agency

---

[54] PX-0788.

[55] *Id.*

[56] *Id.*

[57] PX-0065, at APLEBOOK-00369168.

[58] PX-0829, at ¶¶ 15–26.

[59] PX-0514, at pp. 503–04.

[60] PX-0101, at APLEBOOK-03345032.

terms from Amazon and every other retailer that wanted to sell their e-books.[61]

Moreover, and despite Apple's protestations to the contrary, the evidence establishes that Apple continued throughout the negotiations to demand explicitly that Publisher Defendants move Amazon to agency. During the negotiations, when Mr. Cue updated Mr. Jobs on the higher pricing tiers he proposed offering to Publisher Defendants, Mr. Jobs's reaction was: "I can live with this, as long as they move Amazon to the agent model too for new releases for the first year. If they don't, I'm not sure we can be competitive."[62] Consistent with that, Mr. Cue kept Mr. Jobs apprised both when Publisher Defendants indicated to him that they were planning on moving to agency with Amazon,[63] and when they actually did so.[64]

In fact, in instances when a Publisher Defendant indicated a reluctance to go to agency with Amazon, it appears that Mr. Cue may have forced the issue. Macmillan CEO John Sargent told Amazon's Russell Grandinetti on January 20, 2010 that "he was working on an agency model but his plan was to offer both an agency and reseller model."[65] The next day, Mr. Sargent abruptly reversed course and told Mr. Grandinetti that he had "realized that the Apple contract

---

[61] PX-0514, at p. 503 ("The day after the iPad launch, Jobs described to me his thinking on books . . . ."). Publisher Defendants' executives have recognized, both in contemporaneous documents and in sworn testimony, that their steadfastness in making the agency demand resulted in large part from being bound by the Apple MFN. PX-0503, at HC-DOJ-0112604 (recognizing that HarperCollins "would have no flexibility on pricing and would have to exclude content from anyone who was not on the same agency model for up to a year (Amazon)"); PX-0106, at HBG00098079 (recognizing that the likely implication of the "price matching clause" in Hachette's Apple Agency Agreement was that Hachette would "withhold ebooks from Amazon and other retailers unless they play ball with us on price"); PX-0504, at PEN-LIT-00037261 ("[Amazon is] indicating we can only switch models at the end of our current contract term, which is November. Given the clauses about price matching in the Apple contract, this could mean that we have to suspend or delay certain sales of e-books to Amazon until the contract is renegotiated.").

[62] PX-0055, at APLEBOOK-03345509.

[63] PX-0026, at APLEBOOK-00012481 (noting to Mr. Jobs that Hachette and Penguin had indicated that they would go to agency "with everyone else").

[64] *See* PX-0058, at APLEBOOK-00002151 ("We have reviewed all the books on Amazon and they have switched to agency with the publishers.").

[65] PX-0482, at AMZN-MDL-0161086.

required him to only offer the agency model."[66]  In between, Mr. Sargent had dinner with

Mr. Cue, and when Mr. Sargent explained that "[t]he stumbling block is the single large issue

that we clearly had a misunderstanding about," Mr. Cue gave no ground in his response:  "I

understand.  I don't believe we are asking you to do anything, you haven't told us you are doing.

We are just trying to get a commitment."[67]

> B.    *During Negotiations, Apple Assured Publisher Defendants of their Common*
> *Commitment to Raising Retail E-book Prices via the Agency Model.*

Each Publisher Defendant realized that attempting to move alone to agency and higher

retail e-book prices would be against its economic self-interest.[68]  If a single Publisher Defendant

did so, most of its competitors' newly released and bestselling e-books would continue to be sold

at $9.99 under the wholesale model, and so would be expected to take market share from the

lone agency publisher.[69]  Worse, the publisher would earn less revenue (net of commission) on

many such e-books.[70]  And if a Publisher Defendant tried on its own to force Amazon to accept

the agency model, it knew Amazon could retaliate in ways that were damaging to that Publisher

Defendant's business.[71]  HarperCollins CEO Brian Murray stated the problem succinctly:

> In summary, the econ[o]m[i]cs for publisher and author are terrible compared to
> hardcover economic or current kindle economics.  All value accrues to apple and
> the consumer.  But the strategic value of an Apple bookstore is very high.  The
> risk of doing this deal is Amazon[']s reaction.  Since we are the fifth publisher[] it

---

[66] *Id.*

[67] PX-0037, at APLEBOOK-01274492.

[68] Richard Gilbert Direct Testimony, at ¶ 60.

[69] Richard Gilbert Direct Testimony, at ¶ 62.

[70] Richard Gilbert Direct Testimony, at ¶ 77; PX-0506, at HC-TXAG-0541238 (HarperCollins would suffer a "profit hit for switching to the agency model" of "about $3.5M in revenues on $20M or 17%"); PX-0719, at PEN015492 (analysis showing switch to agency would result in a negative "$4.5m net profit impact" on Penguin's 2010 budget).

[71] Apple (Eddy Cue) CID Dep., at 52:19–53:16 (testifying that Apple was aware that publishers were concerned about signing on to the agency model alone because it would open them up to "significant repercussions" from Amazon); Eddy Cue Dep., at 336:8–24 (testifying that Mr. Cue "want[ed] to get them over" the "fear of being singled out by Amazon in particular").  *See also* Jonathan Baker Direct Testimony, at ¶ 75.

should be muted but we won't know for a few weeks.[72]

Publisher Defendants, therefore, before they were willing to sign the Apple Agency Agreements,

needed assurances that they were not acting alone and would be joined by other publishers in

transitioning to the agency model.[73]

Apple provided the necessary assurances—both that Publisher Defendants would move

as a group and that Apple would support their collective goal of raising consumer e-book prices

(in exchange for Apple's guaranteed margin and protection from price competition).  Apple

initially assured Publisher Defendants that it would launch the iBookstore only if it signed each

of the Big Six publishers.[74]  After Apple later backed off of that pledge, it assured each Publisher

Defendant that it would not proceed without "critical mass."[75]  And when Penguin CEO Mr.

Shanks specifically demanded that Apple confirm Penguin would be "1 of 4 before signing,"

Mr. Cue called Mr. Shanks several times to provide that assurance.[76]  Mr. Jobs explained to

James Murdoch of HarperCollins parent News Corporation, while trying to persuade him to

direct HarperCollins to sign the Apple Agency Agreement, that "[a]ll the major publishers tell us

that Amazon's $9.99 price for new releases is eroding the value perception of their products in

---

[72] PX-0526, at HC-TXAG-0008901.

[73] Eddy Cue Dep., at 333:14–334:9 ("A.  In other words, they were fearful of being the only one.  So I want them to move.  So I want them to feel like they're not first.  Q.  And you do that by telling them we've completed our first deal?  A.  That's right.").

[74] Apple (Eddy Cue) CID Dep., at 52:9–18.

[75] Penguin (David Shanks) CID Dep., at 84:14–85:9; PX-0018, at PEN013117 (Eddy Cue to David Shanks:  "We completed our first deal and are very close with two other publishers."; Shanks reply:  "Do you have any more of the big six confirmed yet?  I have a call today and tomorrow with London and they are very anxious about this."); PX-0784, at APLEBOOK-00012513 (Eddy Cue to Steve Jobs, requesting that Mr. Jobs call James Murdoch and "tell him we have 3 signed so there is no leap of faith here"); PX-0507, at APLEBOOK-00011122 (Eddy Cue to Brian Murray:  "know that [Apple has] 4 publishers completed"); PX-0084, at MAC0043583; PX-0089, at MAC0043602.

[76] PX-0788; PX-0028, at APLEBOOK00434218; PX-0018, at PEN013117; Eddy Cue Dep., at 352:4–8.  Indeed, Apple sequenced its actual signing of the agreements with other Publisher Defendants on January 25, 2010 so that it had three agreements already signed when it went to get Penguin's signature.

customer's minds, and they do not want this practice to continue for new releases."[77]   Apple also

consistently assured Publisher Defendants that the deals each would sign with Apple would be

materially the same, including the same agency structure, price tiers, and retail price MFN.[78]

Apple knew exactly what it was doing.  Apple assured Publisher Defendants that it

understood and would support their goal of raising retail e-book prices as part of Defendants'

grand agreement.  Eddy Cue communicated to Publisher Defendants from the outset that Apple

recognized their collective displeasure with Amazon's $9.99 pricing and would not seek to

emulate it.[79]   When Mr. Cue updated Mr. Jobs on his initial meetings with the publishers, he

confirmed that for the publishers, "the biggest issue is new release pricing."[80]   As part of his

negotiations with Publisher Defendants, Mr. Cue therefore agreed to price tiers higher than he

had initially proposed, [81] and even touted his plan as "the best chance for publishers to challenge

the 9.99 price point."[82]

Mr. Jobs recognized as well as Mr. Cue that the price tiers to which Apple was

committing would serve as *de facto* retail prices, not only in the iBookstore, but at all other retail

sites as well (because otherwise the retail price MFN would push the Apple prices back to

$9.99).[83]   When Mr. Jobs wrote to James Murdoch, he explained that HarperCollins could either

"[t]hrow in with Apple and see if we can **all** make a go of this to create a real mainstream ebooks

---

[77] PX-0032, at APLEBOOK-03345080.

[78] Eddy Cue Dep., at 300:3–13 (admitting that Mr. Cue told Mr. Murray "that we were going to treat them, you know, in a very similar thing -- very similar position around all the key points"); PX-0509, at HBG00078033 ("Apple have stated that none of our competitors joining after us will gain an advantage against the first movers.").

[79] PX-0510, at SS00028954 ("They [Apple] are not interested in a low price point for digital books . . . . They also cannot tolerate a market where the product is sold significantly more cheaply elsewhere . . . i.e., they don't want Amazon's $9.95 to continue."); PX-0336, at RH-USDOJ-00032366.

[80] PX-0050, at APLEBOOK00434143.

[81] PX-0059, at APLEBOOK-00012487; PX-0120, at APLEBOOK-00012492; PX-0511, at APLEBOOK-00003704; PX-0512, at APLEBOOK-00003706; PX-0513, at APLEBOOK-00003710.

[82] PX-0521, at HBG00013352.

[83] Richard Gilbert Direct Testimony, at ¶ 142 & tbl.4.

market at $12.99 and $14.99" or "[k]eep going with Amazon at $9.99."[84]

Publisher Defendants recognized and appreciated that they were collectively adopting Apple's agency model and *de facto* retail e-book prices, and that Apple was orchestrating and facilitating their efforts.  Macmillan CEO Mr. Sargent understood that he was just "one voice among many" during the negotiations,[85] and Simon & Schuster CEO Ms. Reidy told Mr. Cue, four days before Simon & Schuster signed the Apple Agency Agreement, that she "look[ed] forward to an update on [his] progress in herding us cats."[86]  And, of course, Penguin CEO Mr. Shanks bluntly described Apple's role as "the facilitator and go between."[87]

C.      *The Apple Agency Agreements Succeeded in Raising Retail Prices of E-books.*

Publisher Defendants signed their Apple Agency Agreements within a three-day period from January 24 to 26, 2010.  The following day, at a launch event in San Francisco, Apple publicly unveiled the iPad, which, among its functions, featured an iBookstore displaying content from all five Publisher Defendants.  At that event, Mr. Jobs stood on stage and ushered in a new era of higher e-book prices by purchasing for $14.99 Senator Edward Kennedy's autobiography, *True Compass*, which was selling at the time for $9.99 on Amazon.[88]  When asked later by reporter Walter Mossberg (on camera) why a consumer would purchase an e-book at $14.99 from Apple when other retailers charged $9.99, Mr. Jobs replied that "that won't be the case."  When asked whether that meant, "You won't be $14.99 or they won't be $9.99?," Mr.

---

[84] PX-0032, at APLEBOOK-03345078 (emphasis added).

[85] PX-0076, at MAC0038862.

[86] PX-0782, at APLEBOOK00414549.  Mr. Cue appears to have accommodated Ms. Reidy's request for information.  Two days later, Ms. Reidy e-mailed her boss to say "[i]t appears they have reached agreement with four of the five major publishers in time for the announcement next Wednesday—from what I can gather, Random House and HarperCollins will not be part of the announcement . . . ."  PX-0351, at SS00028952.

[87] PX-0542, at PEN-LIT-00199145.

[88] PX-0365, at 53:56.

Jobs smiled and responded, "the prices will be the same."[89]

The Apple Agency Agreements (and, with few exceptions, the agency agreements Publisher Defendants subsequently signed with other e-book retailers) took effect when the iBookstore became publicly accessible on April 3, 2010. Almost overnight, the prices of the vast majority of newly released and bestselling e-books jumped from $9.99 to $12.99 or $14.99, depending on their respective price tiers.[90]

> D.    With Apple's Support, Publisher Defendants Moved Together to Export the Agency Model to All Other E-book Retailers.

Publisher Defendants moved swiftly after the January 27 iPad announcement to export the agency model to their other e-book retailers so that there would be higher retail prices industry-wide as soon as the iPad shipped. Some retailers, such as Barnes & Noble, readily accepted agency terms, as the new model meant they would no longer have to face aggressive price competition from Amazon.[91]

Amazon, however, desired to remain on the traditional wholesale model, until Publisher Defendants' common, simultaneous demands forced it to accept the agency model. Publisher Defendants reinforced their demands that Amazon change to the agency model with the threat Apple suggested to (at least) Random House: to withhold their newly released e-books if Amazon did not comply.[92] The day after the iPad's public unveiling, Macmillan CEO Mr. Sargent flew to Seattle to meet with Amazon executives and offer them the choice of adopting

---

[89] PX-0615, at 1:57. In a later interview with Mr. Mossberg in June 2010, Mr. Jobs responded to Mr. Mossberg's observation that e-book prices had risen from $9.99 to $14.99 by stating that "it's complicated," and acknowledging that "the structure of how the publishers are approaching this has changed dramatically." *See* PX-0348, at 42:08.

[90] As Professor Gilbert explains, Publisher Defendants' use of agency agreements at all their e-book retailers also resulted in the increased average price of older, or "backlist," e-books. Richard Gilbert Direct Testimony, at ¶ 145. *See also* Jonathan Baker Direct Testimony, at ¶ 115; Orley Ashenfelter Direct Testimony, at ¶ 47 (price increases across entire catalogue).

[91] PX-0515, at BN00062768.

[92] PX-0336, at RH-USDOJ-00032366.

the agency model or losing the ability to sell any e-book that could trigger Apple's MFN with Macmillan—new hardcover titles for the first seven months of their release (while Apple sold all Macmillan e-books).[93]  Mr. Sargent has conceded that, because he knew the four other Publisher Defendants had signed functionally identical Apple Agency Agreements to Macmillan's, "[t]he optics make it look like I stood alone, but in the end I had no doubt that the others would eventually follow."[94]  Indeed, on January 31, Hachette's Mr. Nourry promised Mr. Sargent as much:  "I can ensure you that you are not going to find your company alone in the battle."[95]

Mr. Sargent initially kept Mr. Cue apprised of his dealings with Amazon to "make sure [he was] in the loop,"[96] and later sought Mr. Cue's help in hammering out Macmillan's e-book terms with Amazon.  On January 31, Mr. Sargent sent Mr. Cue an e-mail (subject line: "**URGENT!!**") seeking Mr. Cue's counsel:  "**Hi Eddy.  I am gonna need to figure out our final agency terms of sale tonight.  Can you call me please?**"  Mr. Cue replied, "**I just tried.  Call me on my cell . . . .**"[97]

Amazon initially resisted Macmillan's ultimatum and even fought back by temporarily ceasing to sell Macmillan's print books and e-books.  But Amazon capitulated once it understood that all five Publisher Defendants had committed themselves to the agency model across all their retailers.[98]  As former Amazon executive Laura Porco explains, representatives from Hachette,

---

[93] Russell Grandinetti Direct Testimony, at ¶ 45.

[94] PX-0094, at MAC0039617.

[95] PX-0091, at MAC0039105.  Two days later, Penguin Group CEO John Makinson e-mailed Mr. Sargent to say that he was "full of admiration for [Sargent's] articulation of Macmillan's position on this."  PX-0075, at MAC 044175.

[96] PX-0101, at APLEBOOK-03345032.

[97] PX-0053, at APLEBOOK-00012609 (emphasis added).

[98] Russell Grandinetti Direct Testimony, at ¶¶ 45–47 (by January 28, 2010, "it had been made clear to us by Simon, HarperCollins, Macmillan, Hachette and Penguin that they were all going to require us to move to agency . . . . [m]uch as we disagreed with the publishers' decision . . . we could not have new titles from five of our biggest publishers unavailable to our customers, so we really had no choice but to negotiate" agency terms).

HarperCollins, Simon & Schuster and Penguin "all made it clear to us that reseller terms in any form were non-negotiable because agency terms were the only way Apple wanted to do business."[99]

After Amazon gave in and reached agency agreements with Publisher Defendants, Random House was the last remaining Big Six publisher that continued to distribute e-books on wholesale terms. Apple pressured Random House to switch to agency by, *inter alia*, threatening to block Random House e-books that were sold as standalone apps from appearing in its App Store,[100] and Penguin tried to enlist non-defendant Barnes & Noble to punish Random House for not joining Defendants' conspiracy.[101] Random House eventually gave in, switching exclusively to agency distribution of e-books as of March 1, 2011.[102] Thus, through concerted action, Apple and Publisher Defendants succeeded in achieving their common goals.

## ARGUMENT

Agreements by which competitors coordinate prices are illegal "contract[s], combination[s] . . . or conspirac[ies], in restraint of trade," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. To prove Defendants violated Section 1, Plaintiffs must show "a combination or some form of concerted action between at least two legally distinct economic entities that constituted an unreasonable restraint of trade either per se or under the rule of reason." *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir. 2000) (quotations omitted). Plaintiffs must show by a preponderance of the evidence, *United States v.*

---

[99] Laura Porco Direct Testimony, at ¶ 16.

[100] PX-0518, at RH-USDOJ-00018790; *see also* PX-0516, at RH-USDOJ-00011099 ("They are emphatic about not varying their deal . . . . No interest whatsoever in wholesale terms, even if our prices were lower."). Additionally, Mr. Jobs threatened that Random House might not receive full support from Apple personnel if it eventually put its e-books into the iBookstore at a later date. *See* PX-0517, at RH-USDOJ-00016510; PX-0518, at RH-USDOJ-00018790; PX-0519, at APLEBOOK-03345736.

[101] Penguin's David Shanks e-mailed Barnes & Noble's Steve Riggio to express his "hope that B&N would be equally brutal to Publishers who have thrown in with your competition with obvious disdain for your welfare. . . . I hope you make Random House hurt like Amazon is doing to people who are looking out for the overall welfare of the publishing industry." PX-0116, at PEN012999; PX-0520, at RH-USDOJ-00018644.

[102] PX-0006, RH-USDOJ-00025408.

*Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 331 (S.D.N.Y. 2001), that Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotation omitted).

Apple's legal defenses have shifted over time. Apple initially claimed that its entry into the e-books market was procompetitive because it led to innovations such as color e-books and "enhanced e-books" that contain pictures, sound and video. But Apple essentially dropped those claims once depositions established that most of those claimed "innovations" predated Apple's entry. Apple then argued that its entry was procompetitive because it diminished Amazon's purported monopoly retail position. Apple pivoted from that argument after the Court ruled that even if Amazon's actions had been anticompetitive, the "familiar mantra regarding 'two wrongs' would seem to offer guidance."[103] Apple next moved on to suggest that its entry caused a decline in the average price of e-reading devices and an increase in device innovation.[104] This defense lacked factual or legal[105] foundation when it was first made, and the argument has not improved over time. Indeed, in its expert reports, Apple has all but abandoned this argument too. Most recently, Apple has engaged in arithmetic gymnastics in an effort to show that average price of all e-books is lower today than it was prior to Apple's entry[106]—even though both fact and theory show that relevant prices are higher than they would have been but for the

---

[103] Order Granting United States' Mot. for Entry of Proposed Final J., at 40, Sept. 5, 2012 (Docket No. 113). It is hornbook law that competitors do not have a legal self-help right to collude. *See, e.g.*, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 465 (1986) ("That a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it."); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 (1951).

[104] Tr. of Telephone Conference 17:20–25, Oct. 26, 2012 (argument of Apple's counsel) ("Our position is that the increased competition in the market from Apple, both on the device side and on the e-book side, that the e-book prices as well as the device prices resulted in increased competition, lower prices, lower overall prices to consumers because you need a device to read the e-book.").

[105] Claimed benefits outside the relevant product market are not cognizable. *See, e.g.*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (rejecting argument that "anticompetitive effects in one market could be justified by procompetitive consequences in another").

[106] PX-0831, at ¶¶ 23–26 & graphs 1, 2.

conspiracy.[107]   Apple's only consistent position has been that Publisher Defendants never agreed among themselves to raise prices or suppress competition, and that Apple never conspired with Publisher Defendants to achieve any of those goals.  All of Apple's defenses fail.

I.      **Apple Conspired with Publisher Defendants to Raise Retail E-book Prices and Restrain Retail Price Competition.**

For Apple to be found liable *per se* under Section 1 of the Sherman Act, this Court must find that "there was a horizontal agreement among the" publishers that has Apple "in the center as the ringmaster" to fix the retail prices of e-books.  *Toys "R" Us v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000).

A.      *Both Direct and Circumstantial Evidence Prove a Horizontal Price-Fixing Agreement Among the Publishers.*

The United States can prove a horizontal price-fixing agreement among the publishers through either "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quotation omitted).  Publisher Defendants' agreement in this case is amply supported by both types of evidence.

Here, there is persuasive direct evidence of a horizontal agreement among the publishers to raise e-book prices and blunt retail competition.  For example, just as in *Toys "R" Us*, there are statements from the publishers that each publisher agreed to Apple's agency agreements on the explicit condition that other publishers agree to do the same.[108]  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 332 (3d Cir. 2010) (describing this type of evidence as direct evidence of agreement); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir.

---

[107] Richard Gilbert Direct Testimony, at ¶¶ 169–80.  *See also* Jonathan Baker Direct Testimony, at ¶ 115; Orley Ashenfelter Direct Testimony, at ¶ 47.

[108] *See, e.g.*, *supra* notes 74–76 and accompanying text.

2002) (describing this type of evidence as "strong evidence of a horizontal agreement").  There is also significant direct evidence that the publishers believed Amazon's pricing to be "wretched" and a "big problem for the industry."[109]  Further, there is significant direct evidence that the publishers believed that the only way to address the industry's Amazon problem was to "develop a common strategy" among the largest publishers.[110]  And, of course, Penguin's CEO has admitted that Publisher Defendants used Apple as a "facilitator" and as a "go between" in an attempt to coordinate while avoiding antitrust liability.[111]

There also is substantial circumstantial evidence to support a horizontal agreement among the publishers.  To infer a horizontal agreement when faced with evidence of parallel conduct, a court may draw inferences from "plus factors" to rule out purely interdependent decision making by rivals.  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).  Plus factors commonly considered by courts include customary indications of a traditional conspiracy (meetings, phone calls, and the like), a common motive to conspire, acts contrary to economic self-interest, and the use of facilitating practices such as information sharing.  VI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1434 (3d ed. 2010).  An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants also strengthen the inference.  *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222 (1939).  In this case, there is overwhelming evidence of each plus factor supporting an agreement among Publisher Defendants to raise e-book prices.[112]

---

[109] *See, e.g.*, *supra* notes 28, 37 and accompanying text.

[110] *See, e.g.*, *supra* notes 31–42 and accompanying text.

[111] *See supra* note 2 and accompanying text.

[112] To list just a few such pieces of evidence:  **There were approximately 100 calls between Publisher Defendant CEOs during the time the Apple Agency Agreements were being negotiated**, clustered around dates when Apple was meeting with Publisher Defendants, presenting them with potential contract terms, and obtaining final signatures from them.  *See* PX-0788.  Publisher Defendants each recognized that signing the Apple Agency Agreements alone would have run counter to their self-interest.  *See, e.g.*, Penguin (David Shanks) CID Dep., at

B.    *Both Direct and Circumstantial Evidence Prove that Apple Knowingly Participated in and Facilitated Publisher Defendants' Horizontal Agreement*

The direct evidence of Apple's participation in the publishers' agreement includes, but is not limited to, Penguin CEO Mr. Shanks's admission of Apple's facilitating role as the "go between" for Publisher Defendants to ensure that they would move together to raise retail e-book prices.[113] It also includes Mr. Saul's meeting notes that HarperCollins proposed agency to Apple "to fix Amazon pricing,"[114] and Mr. Cue's summary of his calls relaying that proposal to the CEOs of Macmillan, Simon & Schuster, and non-defendant Random House, in which he explained that the publishers "saw . . . the plus" of the Apple proposal to be that it "solves Amazon issue."[115] Additionally, when Mr. Jobs e-mailed James Murdoch, he took pains to suggest that HarperCollins "[t]hrow in with Apple and see if we can **all** make a go of this to create a real mainstream e-books market at $12.99 and $14.99."[116] And, as Mr. Jobs reported to his biographer, Apple realized that, as a result of Publisher Defendants collectively entering the Apple Agency Agreements, the "customer pays a little more, but that's what [Publisher Defendants] want anyway."[117]

Substantial circumstantial evidence further proves Apple's participation through "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quotation omitted). Because

---

85:10–86:6 ("[W]e were very afraid of punitive action being taken by Amazon and at this point we felt that there had to be enough of Amazon's publisher customers going that way or Amazon would make a serious example of anyone who strayed away from the way they wanted to do business."). And, of course, in the space of three days, Publisher Defendants abandoned the business model that had stood in the publishing industry for decades to adopt an entirely new business model at the behest of a retailer that had not yet entered the market.

[113] PX-0542, at PEN-LIT-00199145.

[114] PX-0036, at APLEBOOK-01601745.

[115] PX-0043, at APLEBOOK-00013734.

[116] PX-0032, at APLEBOOK-03345078 (emphasis added).

[117] PX-0514, at p. 503.

Apple is in a vertical relationship with the publishers, there is no need to analyze parallel conduct or plus factors to infer agreement.  Instead, the Court may simply examine the circumstantial evidence to determine whether Apple shared a "commitment to a common scheme" with the publishers.  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212–15 (3d Cir. 1992).

As a vertically-related firm that signed equivalent contracts with each Publisher Defendant, Apple's participation in Defendants' unlawful agreement is evidenced through the actions it took to ensure Publisher Defendants they would not be acting alone and would not be materially disadvantaged vis-à-vis their competitors' contractual terms.  The facilitating acts of the vertically-related conspirator in *Interstate Circuit*, in which the Supreme Court upheld the finding of an agreement based on inferences, 306 U.S. at 232, are instructive here.  An exhibitor of first-run films, Interstate Circuit, sent identical letters to eight film distributors, listing all of their addresses on the letters, proposing they agree to terms that would limit the ability of Interstate Circuit's low-price competitors to compete in exchange for the distributors' continued rights to show their films in its cinemas.  The eight distributors agreed to the proposal in ostensibly bilateral communications.  The trial court inferred an agreement among the distributors to act on Interstate Circuit's demands, concluding that the nature of the exhibitor's proposals and the manner in which they were made, together with the near-unanimity of action by the distributors, supported a conclusion of conspiracy.  *Id.* at 221.  The Supreme Court affirmed, reasoning that each distributor knew from the letter that its competitors were likely to accede to Interstate Circuit's demands.  *Id.* at 222.  The Court held that no direct evidence of agreement was necessary to its finding:  "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."  *Id.* at 226.

Likewise, in *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), toy retailer Toys "R" Us induced several toy manufacturers to agree not to sell toys to discounting big-box stores. Toys "R" Us orchestrated the manufacturers' horizontal boycott by, among other actions, relaying the message "I'll stop if they stop" from manufacturer to manufacturer, thereby overcoming the manufacturers' fears that their boycott would forgo a fast-growing, profitable distribution channel. *Id.* at 932. Because "the only condition on which" each manufacturer would agree to Toys "R" Us's demands was "if it could be sure its competitors were doing the same thing," Toys "R" Us provided those assurances of common action, even though it was against the manufacturers' unilateral interests to boycott potential sources of incremental sales. "That is a horizontal agreement." *Id.* at 936.

Apple provided Publisher Defendants with similar assurances, in a similar manner, to those that helped prove agreements in *Interstate Circuit* and *Toys "R" Us*. At its December 15–16 meetings with the Big Six publishers, Apple told the publishers it was holding similar meetings with their direct competitors.[118] A few days later, after Apple communicated its agency proposal to Random House, Simon & Schuster, and Macmillan, Eddy Cue wrote Mr. Jobs that the three publishers "saw both the plus (solves Amazon issue) and negative (little less than they would l[i]ke)" of the proposal.[119]

Then, on January 4–6, 2010, Mr. Cue e-mailed each of the Big Six publishers' CEOs substantively identical term sheets that provided the initial outline of Apple's agency proposal. The only variation in the term sheets was Mr. Cue's inclusion of the message that Apple's proposal was arrived at "[a]fter talking to all the other publishers and seeing the overall book environment" for those three Publishers to whom he had not previously relayed that fact.

---

[118] *See supra* note 43.

[119] PX-0043, at APLEBOOK-00013734.

Less than a week later, on January 11, Apple executive Keith Moerer sent e-mails to each of the CEOs of the Big Six publishers, enclosing a pricing analysis conducted by Apple.[120]  The analysis set forth, for each of the Big Six publishers' titles that were listed on the *New York Times* hardcover fiction or nonfiction bestseller lists as of January 1, the hardcover list price, Amazon's hardcover retail price, and e-book retail prices at both Amazon and Barnes & Noble. Additionally, each analysis contained a column showing how the recipient publisher's bestselling e-books would be priced when sold through the iBookstore.  While the e-mails showed the iBookstore price only for the recipient publisher's books and not for the others, the fact that Apple otherwise sent the full grid, conveying all the other information relating to all the publishers' books on the bestseller list, suggested to each recipient not only that the other publishers would be signing with Apple, but that their retail prices would be the same.

As Apple negotiated the Agency Agreements, it repeatedly assured Publisher Defendants that they would be joined by, and receive materially the same deals as, their competitors.  For example, as Mr. Cue conveyed to Mr. Jobs three days before Penguin signed its Apple Agency Agreement, Mr. Shanks "wants an assurance that he is 1 of 4 before signing (not in the contract)."[121]  Mr. Shanks testified that Mr. Cue assured him that three other publishers were going to participate in the iBookstore launch,[122] and indeed, telephone records show that before Penguin signed, Mr. Cue made four calls to Mr. Shanks's cell phone over January 22, 24, and 25.[123]  Similarly, in response to Simon & Schuster CEO Carolyn Reidy's contemporaneous

---

[120] *See, e.g.*, PX-0522, at APLEBOOK-00012826; PX-0523, at APLEBOOK-00000362; PX-0524, at APLEBOOK-00000366; Keith Moerer Dep., at 122:22–123:4.

[121] PX-0028, at APLEBOOK00434218.

[122] Penguin (David Shanks) CID Dep., at 86:7–24, 88:18–22.

[123] PX-0788.

request for "an update on your progress in herding us cats,"[124] Mr. Cue appears to have provided

her with the number and names of publishers with whom Apple had agreed in principle.[125] Mr.

Cue admitted he told the publishers "from very early on" that they would be receiving the "exact

same deal" as their competitors,[126] and that, "in order to cut some of the deals," he told the

publishers "that they weren't going to be the only ones."[127]

Just as in *Interstate Circuit*, Apple knew throughout the negotiations that it was bringing

about a radical shift in the industry.  Mr. Cue updated Mr. Jobs that Publisher Defendants "want

us and see the opportunity we give them but they're scared to commit" because of the "dramatic

business change" the agency model represented.[128]  Apple provided Publisher Defendants the

requested assurances that they would not face the consequences of signing an Apple Agency

Agreement, including Amazon's reaction, alone.[129]

Apple does not dispute the many ways in which it operated as an information conduit, nor

that it—and not Publisher Defendants—insisted on including the MFN and price tiers that made

the success of Defendants' agreement more likely.[130]  Apple admits that, in its negotiations with

Publisher Defendants, it knew that each wanted Amazon to charge e-book prices higher than

---

[124] PX-0782, at APLEBOOK00414549.

[125] PX-0351, at SS00028952 ("It appears they have reached agreement with four of the five major publishers in time for the announcement next Wednesday—from what I can gather, Random House and HarperCollins will not be part of the announcement, but Penguin, Hachette, and Macmillan will be, along with us.")  At 3:01 P.M. that afternoon, Reidy and Cue held a four minute conversation on their cell phones. *See* PX-0788.

[126] Apple (Eddy Cue) CID Dep., at 94:19–95:3.

[127] Eddy Cue Dep., at 129:2–24.

[128] PX-0042, at APLEBOOK-00016369.

[129] *See, e.g.*, PX-0526, at HC-TXAG-0008901; Apple (Eddy Cue) CID Dep., 52:12–53:22 (Apple assured Publisher Defendants it "would only [launch the iBookstore] if we got them all").

[130] Apple (Eddy Cue) CID Dep., at 78:13–79:4 (Apple included MFN because it "wanted to make sure that [the publishers] were setting a price that was competitive in the marketplace"), 88:3–89:3 (describing Apple's concern "that, given complete free will of pricing books at whatever, that they could take certain books or all books and price them at equal to or higher than a physical book").

$9.99, but were afraid to act alone in trying to change the status quo.[131]  In response, Apple specifically assured Publisher Defendants that they would move as a group.

As a result of Apple's organization, in the space of three days, Publisher Defendants abandoned the business model that had long prevailed in the industry and signed the Apple Agency Agreements that all Defendants knew would raise consumer prices market-wide.

>   C.     *Apple is Not Immune from Antitrust Liability Because it May Have Been Acting in its Own Interest.*

In the face of the overwhelming evidence proving its participation in the conspiracy, Apple has sought refuge in asserting Plaintiffs must show there is no possibility it acted in its independent business interests.[132]  Where a plaintiff asserts that a horizontal actor is liable based primarily on parallel conduct, the fact that the horizontal competitors were acting in a manner that would be against their economic self-interest (if undertaken unilaterally) may indicate that the conduct was the result of conspiratorial, as opposed to independent, conduct.  *See, e.g.*, *Apex Oil Co. v. Dimauro*, 822 F.2d 246, 254 (2d Cir. 1987); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 419 (S.D.N.Y. 2003).  And that is, in fact, one of the bases to infer a horizontal agreement among the publishers here.

However, when an accused conspirator is in a vertical relationship to its co-conspirators, a query into the vertical conspirator's economic self-interest carries no weight, as the allegation of agreement is necessarily not based on parallel conduct.  There is no allegation here that Apple, the sole distributor in the conspiracy, did or could engage in parallel conduct with any of its co-conspirators, Publisher Defendants.  Thus, there is no inference from parallel conduct to make or

---

[131] Eddy Cue Dep., at 129:25–130:11 ("I just wanted to assure [the publishers] that they weren't going to be alone, so that I would take the fear away of the Amazon retribution that they were all afraid of.").  Indeed, Mr. Cue testified that he knew Publisher Defendants were "telling [him] that 9.99 is a problem," but said "[t]hat's not my concern.  I don't care."  Eddy Cue Dep., at 157:9–16.

[132] Tr. of Telephone Conference, Mar. 13, 2013, at 11:11–15 (argument of Apple's counsel).

to undermine.  *See Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 n.32 (3d Cir. 1992)

(distinguishing horizontal case where finding of action contrary to self-interest helps rule out

parallel behavior with case where one firm is in vertical relationship with co-conspirators).

Indeed, one is hard-pressed to imagine when a vertical conspirator would join a conspiracy

where it was *not* in its economic self-interest to do so.  Accordingly, the Supreme Court has held

that it "is of no consequence, for purposes of determining whether there has been a combination

or conspiracy under § 1 of the Sherman Act" whether a vertical conspirator "acted in its own

lawful interest.  Nor is it of consequence for this purpose whether the [challenged conduct was]

economically desirable."  *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142 (1966).

Yet even if the legal standard Apple has articulated made sense in the context of

analyzing its liability here, Apple's argument that it articulated to the Court—that Plaintiffs must

prove "there is *no possibility* that Apple acted in further[ance] of its own independent, rational

and legitimate business interests"—has been explicitly rejected by this Circuit.  In *In re*

*Publication Paper Antitrust Litigation*, the court noted that "[r]equiring a plaintiff to 'exclude' or

'dispel' the possibility of independent action places too heavy a burden on the plaintiff."  690

F.3d at 63.  In support of its statement, the Court referenced the articulation by Professors

Areeda and Hovenkamp that

> [i]t is important not to be misled by *Matsushita*'s statement ... that the plaintiff's
> evidence, if it is to prevail, must "tend ... to exclude the possibility that the alleged
> conspirators acted independently."  The Court surely did not mean that the
> plaintiff must disprove all nonconspiratorial explanations for the defendants'
> conduct.  Not only did the court use the word "tend," but the context made clear
> that the Court was simply requiring sufficient evidence to allow a reasonable fact
> finder to infer that the conspiratorial explanation is more likely than not.

*See id.* (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* §

14.03(b), at 14–25 (4th ed. 2011)).  And, in any event, "the standards established in *Matsushita*

32

do not apply at all" when, as is the case here, Plaintiffs have produced direct evidence of an agreement to fix prices.  *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.

## II.     Defendants' Agreement to Raise Retail E-book Prices is *Per Se* Unlawful.

Horizontal price restraints are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality" or the "reasonableness of the particular prices agreed upon."  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 326 n.4 (2d Cir. 2010) (citation omitted).  In particular, price-fixing agreements involving competitors are virtually always unlawful, without the need for inquiry into any resulting procompetitive benefits.  *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).  Indeed, any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se," even if the defendants do not agree on actual prices.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

The agreement between Apple and Publisher Defendants constitutes a horizontal price restraint.  "A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).  Apple's position at a different level of the market than Publisher Defendants does not undermine the horizontality of the agreement—a party can participate in a horizontal price-fixing conspiracy even if it has only a vertical relationship with the other conspirators.  *United States v. All Star Indus.*, 962 F.2d 465, 473 (5th Cir. 1992); *see also Laumann v. Nat'l Hockey League*, ___ F. Supp. 2d ___, 2012 WL 6043225, at *9 (S.D.N.Y. Dec. 5, 2012) ("It is well established . . . that a distributor's coordination of horizontal agreements in restraint of trade at the next distribution level by entering into a series of identical vertical agreements with multiple parties may subject

all participants to antitrust liability."). [133]   In this case, Apple orchestrated the joint action,

providing the assurances that were necessary for Publisher Defendants to act together and

otherwise disseminating information among Publisher Defendants.  *See Toys "R" Us*, 221 F.3d

at 936 (citing evidence that "the only condition on which each toy manufacturer would agree to

TRU's demands was if it could be sure its competitors were doing the same thing").

       Courts routinely treat as *per se* unlawful conspiracies that are facilitated by a firm at a

different level of distribution.  *See, e.g.*, *Toys "R" Us*, 221 F.3d at 933 (affirming Federal Trade

Commission conclusion that "the [Toys "R" Us]-led manufacturer boycott of the warehouse

clubs was illegal per se").  *Cf. Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir. 1998)

("[A] conspiracy is horizontal in nature when a number of competitor firms agree with each

other and at least one of their common suppliers or manufacturers to eliminate their price-cutting

competition . . . ."); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 362 (D.N.J.

2001) ("[T]he law is settled that where an upstream supplier participates in a conspiracy

involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal

price-fixing.").  Here, too, Apple's conduct should be condemned as *per se* unlawful.

## III.    Under a Rule of Reason Analysis, the Harmful Effects to Consumers of Defendants' Agreement Outweigh any Procompetitive Benefits.

       Should rule of reason analysis be necessary, even a quick review of the evidence

establishes that the effects of Defendants' agreement to raise consumer e-book prices outweigh

the speculative and attenuated procompetitive benefits Apple claims resulted from the

agreements.

---

[133] The fact that Apple is a retailer, rather than a direct competitor, of Publisher Defendants is no impediment to its liability:  "a noncompetitor can join a Sherman Act [price-fixing] conspiracy among competitors."  *United States v. MMR Corp.*, 907 F.2d 489, 498 (5th Cir. 1990).  Indeed, as in this case, the "noncompetitor" may play an important role in furthering the conspiracy.  *Cf. In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) ("There is nothing new about the idea that a cartel might 'hire' a customer to help police the cartel.").

A rule of reason analysis, described originally in *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918), and reiterated by the Supreme Court numerous times since, requires the factfinder to "'weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited.'" *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). Depending upon the activity in question, the rule of reason may not require a detailed analysis, but "can sometimes be applied in the twinkling of an eye." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.39 (1984) (quotation omitted). So-called "quick look" analysis is an intermediate standard appropriate where "'no elaborate industry analysis is required to demonstrate the anticompetitive character'" of an agreement. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Only when an agreement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition" does the court perform a more fulsome inquiry. *Id.* at 771.

Under a "full-blown" analysis, establishing a violation of the rule of reason involves three steps. The plaintiff bears an initial burden to demonstrate that the defendants' challenged behavior "had an actual adverse effect on competition as a whole in the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) (quotation omitted). Once the plaintiff satisfies its initial burden, the burden shifts to the defendants to establish "the pro-competitive effects of their agreement." *Id.* Should the defendants carry this burden, the plaintiff must then show that the same procompetitive effect could be achieved through an alternative means that is less restrictive of competition, or that those objectives may be achieved in a manner less restrictive of competition. *Ark. Carpenters Health & Welfare Fund*

*v. Bayer AG*, 604 F.3d 98, 104 (2d Cir. 2010).

Under either standard, Defendants have violated Section 1. Here, the anticompetitive effect of the conspiracy—that Defendants' agreement raised e-book prices to consumers, in some cases by thirty to fifty percent—is not seriously disputed.[134, 135] While the effects of Defendants' price hike were most visible for *New York Times* bestsellers and new releases, average prices for Publisher Defendants' e-books outside of those categories also increased substantially—Defendants' mantra of "some went up, some went down" simply does not square with the sales data.[136] Professor Gilbert's analysis further establishes that the rise in prices was durable—ten months after the agency contracts took effect, Publisher Defendants' e-book titles sold on Amazon were, on average, 23.9% higher than their pre-agency prices.[137] Professor Ashenfelter's regression analysis similarly finds a 24.6% increase in Publisher Defendants' e-book prices over the same period.[138]

Defendants' agreement also resulted in reduced output, or sales, of e-books. After the Apple Agency Agreements took effect, Publisher Defendants' average unit sales of trade e-books

---

[134] Richard Gilbert Direct Testimony, at ¶ 145 ("[T]he retail prices for e-books that were set by each defendant publisher following its assumption of price-setting authority were, on average, significantly higher than the retail e-book prices set by the retailers under the wholesale model."); PX-0831, at ¶ 25 ("[A]verage prices for Publisher Defendants' eBooks increased—in varying amounts—in the period after the Apple agency agreements."); Orley Ashenfelter Direct Testimony, at ¶ 47 & tbl.1 (showing that Publisher Defendants' average e-book prices rose 16.8% from the pre- to post-agency period).

[135] Despite her concession that average e-book prices rose following the initial implementation of the Apple Agency Agreements, PX-0831, at ¶ 25, Defendants' expert, Dr. Burtis, purports to show that the average retail price of all e-books in early 2012 was lower than the average price of all e-books just prior to the switch to agency. *Id.* at ¶¶ 23, 26. As Professor Gilbert explains, Dr. Burtis contorts the data by (1) including the average price of all e-books (regardless of whether they were set pursuant to the conspiracy alleged), and (2) choosing inappropriately-long time windows over which to evaluate the effects of the collective move to agency pricing—essentially allowing the wave to be lowered by the tide. Richard Gilbert Direct Testimony, at ¶¶ 172–76. Additionally, Dr. Burtis fails to control for changes in publisher composition. Professor Ashenfelter demonstrates that controlling for this factor reverses Dr. Burtis's conclusions. Orley Ashenfelter Direct Testimony, at ¶ 63 & fig.11.

[136] Richard Gilbert Direct Testimony, at ¶ 145; *see also* Orley Ashenfelter Direct Testimony, at ¶ 47.

[137] Richard Gilbert Direct Testimony, at ¶ 153.

[138] Orley Ashenfelter Direct Testimony, at ¶ 53.

in the United States declined by about 15% from trend for at least six months,[139] whereas the sales of publishers who remained on the wholesale model did not decline.[140]  In fact, Amazon e-book sales for non-agency publisher Random House increased 10%, while Publisher Defendants' sales declined 20% overall, during the first week of agency pricing.[141]  Consumers also suffered harm to the extent the price increase caused them not to purchase e-books that they otherwise would have.[142]

Against this clear and substantial harm to consumers, Apple has offered a shifting array of speculative and attenuated benefits.  Apple generally has argued that its actions were procompetitive because its entry improved the e-reading experience.  In Apple's telling, enhancements in e-reader innovations and the lowering of their consumer cost resulted directly from the collective move to the agency model in spring 2010.  As Professor Gilbert's testimony makes clear, however, the quality-adjusted price of e-readers has declined and their performance improved in a trajectory typical of other consumer devices.[143]  Apple's defense is susceptible to the classic *post hoc ergo propter hoc* fallacy, and Apple has never pointed the Court to the factual link between the collective adoption of the agency model and lower e-reader prices.  Nor have Apple's experts performed any analysis purporting to show how the Apple Agency Agreements led to any specific innovations.

Moreover, Apple's argument conflates the distinction between the advent of the iBookstore (the introduction of which, Apple asserts, depended upon Apple selling e-books through the agency model, complete with price tiers and MFNs) and of the iPad (which assuredly

---

[139] *Id.* at ¶ 47.

[140] *Id.*

[141] PX-0527, at RH-USDOJ-00013521.

[142] Jonathan Baker Direct Testimony, at ¶ 116.

[143] Richard Gilbert Direct Testimony, at ¶ 248.  *See also* Jonathan Baker Direct Testimony, at ¶ 139.

did not).[144]  Apple admits that it would have launched the iPad even if it had been unable

simultaneously to launch the iBookstore.[145]  And, in any event, Apple's defense claims an

improvement in the innovation and prices of *e-reading devices*, a relevant market separate from

that which the United States pleaded and the evidence shows:  trade e-books sold in the U.S.

Procompetitive benefits claimed outside the appropriate relevant market typically are not

cognizable.  *See, e.g.*, *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)

(competition "cannot be foreclosed with respect to one sector of the economy because certain

private citizens or groups believe that such foreclosure might promote greater competition in a

more important sector of the economy"); *Phila. Nat'l Bank*, 374 U.S. at 370 (holding that

anticompetitive effects in one market cannot be justified by procompetitive consequences in

another).  Despite Dr. Burtis's charts, Apple does not attempt to claim that its participation in

Defendants' agreement reduced the average retail prices of e-books sold to consumers.

Apple has recently added new dimensions to its argument.  First, Apple expert Dr.

Benjamin Klein now argues that but for the Apple Agency Agreements, consumers would have

been worse off because Publisher Defendants would have simply withheld e-book versions of all

of their new releases as a means to maintain pressure on Amazon to raise prices.[146]  Apple's

defense posits an alternative universe that never existed and would not have been in any

Publisher Defendant's unilateral interest.[147]  Macmillan CEO Mr. Sargent, for instance,

---

[144] Apple (Eddy Cue) CID Dep., at 28:18–25 ("Q.  So the iPad was intended, among other things, as a device to read e-books, correct?  A.  Not when it was originally being developed.  That was not one of its intents.  I think as -- as we developed it and started using it, we discovered that it could make for a great e-book reader, but its primary purposes were browsing the web, e-mail, watching video, and using third party apps.").

[145] Apple (Keith Moerer) Dep., at 36:17–24.

[146] PX-0829, at ¶¶ 33–39.

[147] Even Dr. Klein concedes that Publisher Defendants, in the aggregate, windowed only 37 titles, ever.  Benjamin Klein Dep., 39:23–40:6.  And he has pointed to no example of any title being windowed for as long a period of time as he posits for *all* titles in his speculative but-for world.  PX-0830, at ¶ 18 (positing a "six or seven month[]" window in which Amazon would not have had access to "any of the new release e-book titles").

recognized that windowing was "entirely stupid" and explained that the "only reason to do it is for the short term impact."[148]  Even Mr. Cue conceded that "windowing is not a sustainable model."[149]  The only scenario in which windowing made sense for Publisher Defendants was if they did it collectively, pursuant to an agreement—an agreement whose existence Apple otherwise fights tooth-and-nail to deny.  Furthermore, it is highly ironic for Apple to argue that offering the agency model was necessary to stave off Publisher Defendants' intentions to window e-books, since Apple suggested, to non-defendant Random House and perhaps others, that it withhold e-books to force Amazon to accept the agency model.[150]

Second, Apple expert Dr. Kevin Murphy now argues that Amazon and other e-book purveyors were spurred on by the iBooks app to improve their own apps and even their own devices.[151]  Dr. Murphy points to no evidence that Amazon, Barnes & Noble, Sony, Google, Kobo, or any other e-book retailers were incrementally incentivized to improve their e-book apps in order to compete against the iBooks app beyond what they already were doing in order to compete against each other's.[152]  There *is* evidence to support the flip side of Dr. Murphy's claims, though:  Once Apple added Random House to its iBookstore, and thus could provide its iPad and iPhone customers a fairly complete selection of e-books on its own, it set about degrading competitive e-book apps (including those offered by Amazon, Barnes & Noble, Google, and Kobo) by forcing them to remove in-app links to their own e-book stores.[153]

---

[148] PX-0087, at MAC0038800.

[149] PX-0521, at HBG00013352.

[150] PX-0336, at RH-USDOJ-00032366.

[151] PX-0827, at ¶¶ 82–86.

[152] *Id.* at ¶¶ 82–83.  Dr. Murphy then tries to bootstrap his speculative marginal app competition theory into innovations in the *e-reader* market.  *Id.* at ¶¶ 84–86.  Needless to say, he offers no evidence to support this even further attenuated hypothesis.  *Id.  See also* Jonathan Baker Direct Testimony, at ¶ 136.

[153] PX-0258, at APLEBOOK-03478244; PX-0256, at APLEBOOK-03478282; PX-0259, at APLEBOOK-03478277; Scott Forstall Dep., at 67:22–68:4.

Finally, as described above, Apple has shown no causal connection between its entry on the agency model and improvements in e-reader device prices and innovations. But even if the Court were to credit Apple's claimed efficiencies, they could have been achieved simply by Apple's entry on the wholesale terms that already existed in the industry—in particular, terms with lowered wholesale prices, which the evidence shows at least one publisher was willing to offer Apple.[154] To the extent Apple determined it was not sufficiently profitable to enter without changing terms for all other retailers in the market, this suggests that Apple's entry was inefficient. It could instead have remained out of the market and focused on developing other aspects of its business—leaving it to Amazon and other retailers to innovate and improve the e-reading experience on Apple's devices—as they had been doing for years. Given Apple's clear knowledge that it was assisting Publisher Defendants in their shared quest to raise consumer prices, this would have been the wiser choice from a legal, as well as a business, perspective.

Even on their own terms, Apple's proffered justifications for its facilitation of Defendants' agreement are thin at best, and in no way justify the harm suffered by consumers. The Court should reject them.

## CONCLUSION

For the foregoing reasons, the Court should declare that Apple has violated the Sherman Act, 15 U.S.C. § 1, and order all equitable relief necessary to undo the effects of Defendants' agreement and prevent Apple from similarly violating the antitrust laws in the future.

---

[154] PX-0528, at RH-USDOJ-00014325 ("We would consider lower prices if that brought [Apple] onboard with our terms.").

Dated:  April 26, 2013

                                   Respectfully submitted,

                                   _____

                                   Mark W. Ryan
                                   Lawrence E. Buterman
                                   Daniel McCuaig
                                   Stephen T. Fairchild
                                   United States Department of Justice
                                   Antitrust Division
                                   450 Fifth Street, NW, Suite 4000
                                   Washington, DC 20530
                                   (202) 532-4753
                                   Mark.W.Ryan@usdoj.gov
                                   *Attorneys for the United States*

                                   _____

                                   Gabriel Gervey
                                   Eric Lipman
                                   David Ashton
                                   Assistant Attorneys General
                                   Office of the Attorney General of Texas
                                   P.O. Box 12548
                                   Austin, TX 78711
                                   (512) 463-1262
                                   Gabriel.Gervey@texasattorneygeneral.gov

                                   _____

                                   W. Joseph Nielsen
                                   Gary M. Becker
                                   Assistant Attorneys General
                                   Office of the Attorney General of Connecticut
                                   55 Elm Street
                                   Hartford, CT 06106
                                   (860) 808-5040
                                   Joseph.Nielsen@ct.gov
                                   *On Behalf of the Plaintiff States*