# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— )
UNITED STATES OF AMERICA,                           )
                                                    )
                      Plaintiff,                    )
                                                    )
                v.                                  )        Civil Action No. 12-CV-2826 (DLC)
                                                    )
APPLE, INC., et al.,                                )
                                                    )
                      Defendants.                   )
—————————————————————————— )


—————————————————————————— )
THE STATE OF TEXAS;                                 )
THE STATE OF CONNECTICUT; et al.,                   )
                                                    )
                      Plaintiffs,                   )
                                                    )
                v.                                  )        Civil Action No. 12-cv-03394 (DLC)
                                                    )
PENGUIN GROUP (USA) INC. et al.,                    )
                                                    )
                      Defendants.                   )
—————————————————————————— )


## PLAINTIFFS' PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................ 1

II.  DEFENDANTS ................................................................................................ 4

   A.  Litigating Defendants ........................................................................... 4

   B.  Settled Defendants ............................................................................... 4

III.  BACKGROUND ............................................................................................. 5

   A.  The Publishing Industry ...................................................................... 5

   B.  Amazon Ushered in the Modern E-Book Era in 2007 with the Kindle Device and Low E-Book Prices ....................................................... 5

   C.  Apple Never Wanted to Price Compete Against Amazon .................................. 7

   D.  Publisher Defendants Hated Amazon's $9.99 Pricing .......................................... 8

   E.  E-Books Would Have Been Available on the iPad No Matter What ............. 10

IV.  PUBLISHER DEFENDANTS SOUGHT TO RAISE RETAIL E-BOOK PRICES ........ 11

   A.  The Publishing Industry Is Well-Suited to Coordinated Pricing and Interaction ................................................................................................. 11

   B.  Publisher Defendants Shared Competitively Sensitive Information with Each Other ................................................................................................ 12

   C.  Early Plans to Force Amazon to Raise Its Prices Were Abandoned for Lack of Industry Support ................................................................................ 13

   D.  Groups of Publisher Defendants Discussed Raising Retail E-Book Prices in the Context of Potential Joint Venture Conversations ............................................. 14

   E.  Publisher Defendants Used Coordinated Windowing as a Tool to Try to Force Amazon to Raise Its Retail E-Book Prices ........................................................ 16

     1.  Single-Title Windowing ..................................................... 16

     2.  Systematic Windowing ..................................................... 17

       3.      The Threat of Windowing, by Itself, Was Unlikely to Move Amazon's Prices Due to Insufficient Publisher Participation and Risks Inherent in the Strategy ........................................................... 20

V.     IN RECOGNITION OF THEIR SHARED GOALS, APPLE AND PUBLISHER DEFENDANTS AGREED TO INCREASE THE PRICE OF E-BOOKS TO CONSUMERS AND RESTRAIN RETAIL E-BOOK PRICE COMPETITION ........... 20

     A.     Apple Began Reaching Out to Publishers on December 8, 2009 ..................... 22

     B.     Some Publisher Defendants Considered Agency Prior to Initial Apple Meetings ................................................................................................... 23

     C.     Apple Held Initial Meetings with Big Six Publishers on December 15 and 16, 2009 ..................................................................................................... 24

     D.     Apple Embraced Agency and Higher E-Book Prices Following Its Initial Meetings with Publisher Defendants ................................................. 26

     E.     Publisher Defendants Communicated Directly with One Another During Apple Negotiations ...................................................................................... 27

VI.    EDDY CUE CONVEYED INDUSTRY-WIDE AGENCY MODEL PROPOSAL IN DECEMBER 21, 2009 CONVERSATIONS WITH THE CEOS OF SIMON & SCHUSTER, MACMILLAN, AND RANDOM HOUSE ................................................ 30

VII.   APPLE'S SUBSTANTIVELY IDENTICAL E-MAILS TO PUBLISHER DEFENDANTS ON JANUARY 4 AND 5, 2010 SET FORTH THE PRINCIPLES OF THE CONSPIRACY AMONG APPLE AND PUBLISHER DEFENDANTS .............. 32

VIII.  APPLE'S FOLLOW-UP COMMUNICATIONS WITH THE PUBLISHERS WERE DESIGNED TO FACILITATE COLLECTIVE PUBLISHER ACTION........................ 35

IX.    APPLE'S AGENCY AGREEMENTS FACILITATED AN ILLEGAL CONSPIRACY TO RAISE E-BOOK PRICES AND RESTRAIN PRICE COMPETITION BY ENSURING THAT PUBLISHER DEFENDANTS WOULD SWITCH THEIR OTHER E-BOOK RETAILERS TO THE AGENCY MODEL .................................................... 40

     A.     Apple's Initial Written Proposal Included a Most Favored Nation Clause as a Mechanism to Ensure that Each Publisher Defendant Would Move All of Its E-Book Retailers to Agency .............................................................................. 40

     B.     Apple's Initial Written Proposal Included "Price Caps" That Would Function as Fixed Prices for Publisher Defendants' E-books............................................... 45

C.      Apple Agreed to Higher Price Tiers ................................................. 46

D.      Apple Pushes Publisher Defendants Forward as Amazon Offers Better Deal to Authors ................................................................................. 48

E.      In Order to Secure a "Critical Mass" of Publishers for the Conspiracy, Apple Assured Publisher Defendants that Their Competitors Would Join the Agreement.......................................................................................... 51

F.      The Conspiracy Benefited Apple by Allowing Apple to Earn a 30% Commission Without Needing to Compete Against Amazon on Price............. 57

X.      APPLE'S ASSURANCES OF COMMON ACTION GAVE PUBLISHER DEFENDANTS THE NECESSARY CONFIDENCE THAT THEY WERE NOT ACTING ALONE .......................................................................................... 59

XI.     IN ACCORDANCE WITH THEIR CONSPIRACY WITH APPLE, ALL PUBLISHER DEFENDANTS PRESENTED AGENCY AGREEMENTS AS AN ULTIMATUM TO AMAZON ......................................................................................... 61

XII.    SIGNING AN APPLE AGENCY AGREEMENT WOULD HAVE BEEN CONTRARY TO EACH PUBLISHER DEFENDANT'S ECONOMIC INTERESTS ABSENT THE CONSPIRACY ...................................................................................... 68

XIII.   APPLE AND PUBLISHER DEFENDANTS PRESSURED RANDOM HOUSE TO JOIN THEM IN SIGNING AGENCY AGREEMENTS ................................................. 69

XIV.    THE CONSPIRACY AMONG APPLE AND PUBLISHER DEFENDANTS ACHIEVED ITS COLLECTIVE GOALS OF RAISING E-BOOK PRICES AND ENDING RETAIL PRICE COMPETITION.................................................... 72

A.      Prevailing Low E-book Prices Would Have Continued But For the Conspiracy .......................................................................................... 72

B.      Apple and Publisher Defendants Understood the Price Caps in the Apple Agency Agreements Would Become *de facto* E-book Prices ......................... 73

C.      Average Prices of E-books Increased Soon After Implementation of the Apple Agency Agreements.......................................................................... 75

D.      The Apple Agency Agreements Harmed Consumers by Preventing Promotional Competition Among Retailers. ....................................................... 82

E.      Higher Agency Prices Reduced E-book Sales ................................. 84

iv

F.      Reduced Royalty Payments Harmed Authors..................................................... 86

XV.    THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS ATTRIBUTABLE TO THE
        APPLE AGENCY AGREEMENTS .................................................................... 86

       A.      The Apple Agency Agreements Did Not Promote Competition for
                Complementary Products Such as E-readers and Tablets ............................... 87

               1.      Lower Device Prices Are Not Attributable to Agency ..................... 88

               2.      Improved Device Features Are Not Attributable to Agency............. 89

       B.      The Apple Agency Agreements Did Not Promote Competition for E-Reader
                Apps ............................................................................................................... 89

               1.      Features that Preceded the Apple Agency Agreements Cannot
                       Possibly Have Resulted from Those Agreements ............................ 90

               2.      Features that Appeared Long After the Apple Agency Agreements
                       Did Not Result from Those Agreements ........................................... 90

XVI.   THE RELEVANT PRODUCT MARKET IS TRADE E-BOOKS AND DEFENDANTS
        COLLECTIVELY POSSESS MARKET POWER ........................................... 91

       A.      E-books Are Different from Physical Books ..................................................... 92

       B.      Market Participants Observe Low Substitution from E-books to Physical Books
                ......................................................................................................................... 92

       C.      Individual Trade E-book Titles Are Not Separate Markets .............................. 94

       D.      The Relevant Geographic Market Is the United States...................................... 94

## I.   INTRODUCTION

1.      As set forth in the following Proposed Findings of Fact, and accompanying Conclusions of Law, Defendant Apple, Inc. unlawfully orchestrated and participated in a horizontal price-fixing agreement among five of the six largest publishers in the United States ("Publisher Defendants"), including Defendant Penguin Group (USA) Inc., in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      The price-fixing conspiracy at issue in this case has its roots in publisher antipathy for low prices set by retailer Amazon, Inc. for the sale of e-books.  Amazon was instrumental in creating consumer demand for e-books in the United States, both through the development of its Kindle e-reader and its practice of setting low retail prices for e-books generally and especially low prices for many of the most popular e-books.  For these and other reasons, the sales of e-books grew significantly in the U.S. over the last several years.

3.      As is described in further detail below, the evidence in this case establishes that Publisher Defendants worked individually and together in an effort to persuade Amazon to raise its prices to consumers, especially the $9.99 price it set for *New York Times* bestsellers and other newly released titles.  Those efforts were unsuccessful as of late 2009, when Publisher Defendants entered into discussions with Apple about Apple's possible entry into e-book retailing through the opening of its iBookstore.  Publisher Defendants and Apple quickly realized that they shared the objective of thwarting Amazon's ability to compete on price.  And their remaining goals were complementary:  Publisher Defendants wanted higher retail prices and Apple wanted 30% margins.  So Apple set out to impose a new distribution model on e-books, a so-called agency model, under which Publisher Defendants could set their higher consumer prices and then hand over the extra revenues to Apple.

4.     The crux of Apple's scheme was that Publisher Defendants would move together to strip retailers of pricing authority and thereafter set retail prices themselves.  Apple understood that Publisher Defendants would agree to this dramatic change in business practices only as a group and primarily to increase consumer prices.  Apple designed the agency model ultimately reflected in the Apple Agency Agreements; it repeatedly assured Publisher Defendants that other publishers were on board with its agency model; it acted as a conduit among the publishers to reassure them that there was a common plan in place; it made plain that not only would Apple be on the agency model but that the Apple Agency Agreements would allow the publishers to force other retailers to adopt an equivalent agency model as well (especially Amazon); it negotiated consistent "price caps" with Publisher Defendants so that retail prices of many categories of e-books would be not only higher but uniform; and it acted with complete disregard for consumer interests in low prices and in vigorous price competition.

5.     The conspiracy among Apple and Publisher Defendants was remarkably successful. Over a three-day period in January 2010, the five Publisher Defendants each agreed to all-but identical Apple Agency Agreements, abandoning the longstanding practice of wholesale distribution of e-books, and each then promptly took steps to force Amazon to an agency model as well.  Amazon caved to the combined pressures of the five Publisher Defendants, who threatened to cripple Amazon's e-book business by withholding their e-books.  The results were exactly what Apple and Publisher Defendants intended.  The $9.99 problem at Amazon was solved, retail prices went up, and Publisher Defendants began setting retail prices at levels remarkably consistent with the price tiers in the Apple Agency Agreements.  Millions of U.S. e-book readers suffered the consequences.

6.      The following chart demonstrates how e-book prices increased immediately after the first

Publisher Defendants moved Amazon to agency in April 2010 (with Penguin delayed until late

May):



Gilbert Direct Figure 3.

7.      The events of late 2009 and early 2010 that led to the seismic shift of the publishing

industry to an agency model for e-books, and the resulting dramatic impact on consumer prices,

were not the result of competitive forces and different firms acting independently of one another.

Rather, as the parties' documents, admissible deposition testimony, and expected trial testimony

overwhelmingly establish, Apple and Publisher Defendants entered into a "conscious

commitment to a common scheme" aimed at limiting retail price competition for e-books, with

Publisher Defendants achieving higher retail prices and Apple obtaining margins far in excess of

what e-book sellers previously earned.  As a result, and as is further set out in these Proposed

Findings of Fact and accompanying Conclusions of Law, Apple and its co-conspirators violated Section 1 of the Sherman Act.

## II.   DEFENDANTS

### A.  Litigating Defendants

8.     Apple, Inc. is a California corporation with its principal place of business at One Infinite Loop, Cupertino, CA.  Apple Inc. Annual Report (Form 10-K), Oct. 31, 2012, *available at* http://www.sec.gov/Archives/edgar/data/320193/000119312512444068/d411355d10k.htm.

9.     Penguin Group (USA) Inc. is a Delaware corporation with its principal place of business at 375 Hudson Street, New York, NY and is the U.S. affiliate of the Penguin Group, the incorporated division of parent Pearson PLC.  Penguin has settled with the U.S. Department of Justice but not with the Plaintiff States.

### B.  Settled Defendants

10.     Simon & Schuster, Inc. is a New York corporation with its principal place of business at 1230 Avenue of the Americas, New York, NY and is a subsidiary of CBS Corporation.

11.     Hachette Book Group is a Delaware corporation with its principal place of business at 237 Park Avenue, New York, NY and is a subsidiary of Hachette Livre.

12.     HarperCollins Publishers LLC is a Delaware corporation with its principal place of business at 10 East 53rd Street, New York, NY and is a subsidiary of News Corporation.

13.     Holtzbrinck Publishers, LLC d/b/a Macmillan and Macmillan Publishers, Inc. is a New York limited liability corporation with its principal place of business at 175 Fifth Avenue, New York, NY and is a subsidiary of Georg von Holtzbrinck GmbH & Co. KG.

### III.    BACKGROUND

#### A. The Publishing Industry

14.    The publishing industry is dominated by six large publishing houses, the five Publisher Defendants plus non-defendant Random House.  These six firms often are referred to together within the publishing industry as the "Big Six."[1]  Titles from the Big Six publishers accounted for over 90% of all U.S. *New York Times* bestselling book sales in 2010.

15.    Retailers purchase physical books directly from publishers, or through wholesale distributors, and resell them to consumers.  Retailers typically purchase physical books under the "wholesale model."  Under that model, retailers pay publishers a wholesale price that typically is approximately one-half of the list price of books, take ownership of the books, and then resell them to consumers at prices of the retailer's choice.  Grandinetti Direct ¶¶ 22, 25.  Publishers have sold physical books to retailers through the wholesale model for over 100 years and continue to do so today.

16.    E-books are books published in electronic formats.  Like physical books, e-books traditionally have been distributed under wholesale terms.  E-books reduce or eliminate a number of meaningful costs compared to physical books, including costs associated with manufacturing, freight, warehousing, and delivery to consumers.

#### B. Amazon Ushered in the Modern E-Book Era in 2007 with the Kindle Device and Low E-Book Prices

17.    Amazon's Kindle, launched in November 2007, was the first e-reader to gain widespread commercial acceptance.  *See, e.g.*, Grandinetti Direct ¶ 13; Porco Direct ¶ 8.  As John Sargent,

---

[1] *See, e.g.*, PX-0018; PX-0520 at 1.

Macmillan's CEO wrote, Amazon "built an e book market pretty much from scratch."

PX-0704.[2]

18.     Amazon priced most e-book versions of current *New York Times* bestsellers and some

other new releases at $9.99.  Grandinetti Direct ¶ 25.  When Amazon launched its Kindle

business, many publishers set a digital list price for e-books that was 20% lower than the

equivalent physical list price to reflect cost savings compared to physical books.  Grandinetti

Direct ¶¶ 22, 25; Porco Direct ¶¶ 9-11.  This 20% discount on the wholesale price of e-books

meant that in many cases Amazon's $9.99 price was essentially breakeven.  Grandinetti Direct

¶ 25; Naggar Direct ¶ 8.  By early 2009, Hachette, Simon & Schuster, Penguin, and

HarperCollins had raised their digital list prices so that they were the same or greater than

equivalent print list prices.  Porco Direct ¶ 9; Naggar Direct ¶ 9.  Hachette told Amazon that

"peer pressure" was a factor in its decision to raise the wholesale prices of e-books.  Porco Direct

¶ 10; PX-0477.

19.     In some cases, Amazon used the $9.99 titles as loss leaders, which is "quite common in

both bookselling and retailing generally."  Grandinetti Direct ¶ 25.  In fact, it is "common" that

Amazon will lose money on some print bestsellers, and has found the strategy to be "successful,

sustainable, and profitable."  *Id.*  Despite its higher wholesale costs of e-books, Amazon

determined that its pricing strategy was profitable and popular with consumers and thus saw no

reason to abandon the $9.99 price point.  Naggar Direct ¶¶ 11-12, 15; Grandinetti Direct ¶ 28.

---

[2] *See also, e.g.*, PX-0385 at 18 (MAC0038381); PX-0424 at 4 (RH-USDOJ-00049865); PX-0410 at 4 (HC-TXAG-0588779); Genevieve Shore Dep. 83:12-19.

20.     Amazon's $9.99 pricing was so popular with consumers that other e-book retailers often matched it.  PX-0179;[3] PX-0204 at 14 (SS00028507); PX-0185 at 1.

21.     From its very small base in 2007 at the time of Amazon's Kindle launch, e-books have exploded, registering triple-digit sales growth each year through 2011.  PX-0770 at 14, 16 (APLEBOOK-00408520, 022).  By 2011, e-books constituted approximately fifteen percent of general interest fiction and non-fiction books (commonly known as "trade" books[4]) sold in the United States.  *See id*. at 14 (APLEBOOK-00408520).

### C.  Apple Never Wanted to Price Compete Against Amazon

22.     Apple was aware that part of the reason for Amazon's e-books success was Amazon's low prices.  Eddy Cue Dep. 93:2-15; PX-0047.  Apple also was familiar with Amazon's aggressive price competition bent from Apple's experience selling digital music, movies, and applications, where Amazon was a competitor.  Mr. Cue testified that price is regularly a "benefit[] or feature[]" that Amazon "tr[ies] to communicate" to consumers.  Eddy Cue Dep. 22:7-12.

23.     Apple was different.  It competed primarily on the features of its hardware devices, and was not interested in price competition.  Phillip Schiller Dep. 56:5-57:8; Keith Moerer Dep. 199:24-200:16; Penguin (Timothy McCall) Dep. 145:23-146:94.

---

[3] Barnes & Noble believed that it could operate profitably at $9.99.  PX-0180 at 6 (BN0001895).

[4] Non-trade e-books, which include electronic versions of children's picture books and academic textbooks, reference materials, and other specialized texts that typically are published by separate imprints from trade books, often are sold through separate channels, and are not reasonably substitutable for trade e-books.

24.     When Mr. Cue was evaluating the e-books competitive landscape in February 2009, he recognized that the "book publishers would do almost anything for us to get into the ebook business." PX-0027. Instead, though, he suggested to Steve Jobs that he "could see a scenario where iTunes becomes an ebook reseller exclusive to Amazon and Amazon becomes an audio/video iTunes reseller exclusive to Apple." *Id.* In other words, Apple would stay out of e-books if Amazon would stop competing against Apple in music and video.

### D. Publisher Defendants Hated Amazon's $9.99 Pricing

25.     From the Kindle's launch in late 2007, Publisher Defendants were complaining regularly to Amazon executives about its e-book pricing. Grandinetti Direct ¶ 27; Porco Direct ¶ 9.[5] In particular, they complained about what one Publisher Defendant described as Amazon's "wretched" $9.99 pricing of hardcover bestsellers. PX-0274.[6]

26.     Publisher Defendants believed that Amazon's low prices would cause consumers to become accustomed to the $9.99 price point. As one CEO put it, Amazon's $9.99 pricing for e-books was "destroying the value perceived by consumers" and over time, would not provide enough money for publishers. Arnaud Nourry Dep. 21:22-24:8.[7]

27.     Publisher Defendants worried that low consumer prices eventually would harm their own economics because Amazon's leadership as an e-book retailer could enable it to demand that publishers lower their wholesale e-book prices—the so-called digital list price.[8]

---

[5] *See also* PX-0676 at 1, 6.

[6] *See also* PX-0154 at 2 (MAC0150967); PX-0343; PX-0438 at 2 (PEN013191); PX-0226.

[7] *See also* PX-0078 at 4-9 (MAC01460081-086).

[8] PX-0088 at 12 (MCMLN-LIT-00073699); PX-0229; PX-0778 at 3 (HBG00004309).

8

28.      Publisher Defendants also feared that consumers would begin to expect similar low retail pricing on hardcover books, which usually were priced significantly above $9.99.  Publisher Defendants believed that such "price deflation" would harm their businesses as physical wholesale prices were driven down, too.  PX-0674 at 13 (HBG00004059).[9]

29.      Finally, Publisher Defendants feared that Amazon would transition from being the publishers' business partner to becoming a competitor.[10]  PX-0133 at 2 (PEN-LIT-00008100); PX-0210 at 1.  Specifically, they worried that Amazon might begin contracting directly with authors to publish their works, cutting out traditional publishers entirely.[11]

30.      Accordingly, in March 2009, Macmillan CEO John Sargent met with Amazon and said he was concerned about $9.99 pricing and that all the "pubs" were talking about it.  PX-0240.

31.      As Hachette Livre CEO Arnaud Nourry put it in an August 2009 *Financial Times* article: "there are very recent books, bestsellers at $9.99, which means that all the rest will have to be sold at between zero and $9.99. . . . Amazon is not in the business of losing money. So, one day, they are going to come to the publishers and say: by the way, we are cutting the price we pay. If that happens, after paying the authors, there will be nothing left for the publishers."  PX-0817.  Mr. Nourry told others at Hachette that "[t]he purpose of this paper was indeed to 'invite' other voices to join!"  PX-0411 at 1.

---

[9] Plaintiffs anticipate that the testimony of Mr. Murray, Mr. Young, and Ms. Reidy will demonstrate further that this was a concern among the publishers.

[10] This phenomenon is known in the publishing industry as disintermediation, which Simon & Schuster defines as "being cut out of the market entirely as retailers contract directly with authors."  PX-0505 at 2 (DOJ-SS0043165).

[11] PX-0167; PX-0383; PX-0665 at 2 (HC-TXAG-0832406); PX-0273 at 4 (HC-TXAG-0837473); PX-0465 at 15 (RH-USDOJ-00001441).

### E.  E-Books Would Have Been Available on the iPad No Matter What

32.    Apple developed its iPad tablet with the vision that its "primary purposes" were to be "browsing the web, e-mail, watching video, and using third party apps."  Apple (Eddy Cue) CID Dep. 28:18-25.  It did not begin seriously working on its own e-reader app until November 2009, less than three months prior to the scheduled public unveiling of the device.  *Id.* at 33:1-20.

33.    Apple would have released the iPad regardless of whether it also began selling e-books. As Mr. Moerer admitted in his capacity as Apple's corporate representative, "I knew we were launching a hardware device, and that hardware device, the iPad, was going to be launched with or without a bookstore."  Apple (Keith Moerer) Dep. 36:17-24.

34.    The iPad would have functioned as an e-reader (just as the iPhone already did) regardless of whether Apple built its own e-reading app or began selling e-books itself.  In his negotiations with Publisher Defendants, Apple's Eddy Cue communicated that if they did not reach agreement with Apple, Apple would "let others build book store apps (like we already have from Amazon, Barnes & Noble, etc.)."[12]

35.    In July 2011, a few months after non-defendant Random House made its titles available in the iBookstore, Apple changed its practice of allowing third-party e-reader apps to include hyperlinks to their own e-book stores.  Scott Forstall Dep. 67:22-68:4.  When its competitors resisted Apple's decision, Apple removed their e-reader applications from its App Store.  Apple executive Phil Schiller explained:  "I want the message to these guys (mostly Google and B&N)

---

[12] PX-0513 at 1; PX-0512 at 1; PX-0120 at 1; PX-0511 at 1; PX-0059 at 1; *see also* Apple (Eddy Cue) CID Dep. 119:19-24; Naggar Direct ¶ 6; PX-0452.

to be:  we don't care if they put their apps back up or not, we are fine with or without them on our store."  PX-0256 at 1.

## IV.    PUBLISHER DEFENDANTS SOUGHT TO RAISE RETAIL E-BOOK PRICES

36.    Throughout 2009, Publisher Defendants engaged in a series of attempts to induce Amazon to raise its consumer prices for e-books.  These attempts, though not necessary to Publisher Defendants' ultimate conspiracy with Apple, are relevant as evidence of the willingness of Publisher Defendants to work together to effect market change, and specifically, to collude in order to raise consumer e-book prices.

### A.  The Publishing Industry Is Well-Suited to Coordinated Pricing and Interaction

37.    Publisher Defendants compete in the sale and marketing of books, as well as in the acquisition of rights to publish books.[13]  But publishers also tend to view each other as "partners" or "colleagues" in a "club."  PX-0416; PX-0466 at 1.[14]  Publisher Defendants' settlements with the United States in this action disrupted cozy communications among publishers that had been going on for at least thirty years.

38.    There are numerous opportunities for publishers to share competitively sensitive information with one another.  Publisher Defendants' CEOs and other senior executives meet with each other at various meetings or events, such as meetings of the Association of American

---

[13] *E.g.*, John Makinson Dep. 102:2-102:9; Penguin (Timothy McCall) Dep. 244:18-245:2.

[14] S*ee also* PX-0083 (Mr. Sargent's "greatest worry is that our colleagues will be very bad at pricing" once the agency model goes into effect); PX-0666 at 1; PX-0245 at 1-3; PX-0274.

Publishers.[15]  They communicate frequently with each other over the telephone and, in the past, have dined together to discuss matters of common industry concern.

39.     On at least three occasions, the CEOs of all or most of Publisher Defendants met for dinners in the private dining rooms of New York restaurants, without counsel present, to discuss business matters.[16]  The stated purpose of one of these dinners was to welcome Markus Dohle, the new CEO of Random House.  John Makinson Dep. 154:19-157:25.  As reported in the recap of the dinner in HarperCollins's "Executive Minutes," one topic of conversation at that dinner was educating Mr. Dohle "how decisions get made" in the publishing industry.  PX-0208 at 2 (HC-TXAG-0577400); *see also* PX-0390 at 1 (Ms. Reidy reported that she "learned much of interest at" the June 2009 "CEO dinner . . . . Harper, by the way, is also 'standard' with Amazon.").

**B. Publisher Defendants Shared Competitively Sensitive Information with Each Other**

40.     Publisher Defendants communicated with one another about their relationships with Amazon.  One example is Macmillan's Executive Board Member Rüdiger Salat seeking the opinion of HarperCollins' Mr. Murray on its activities with Amazon.  PX-0211 at 1.

41.     On another occasion, Tim McCall, Penguin's VP of Online Sales & Marketing, told his Penguin colleagues that he would speak to his friend at HarperCollins to learn what steps Amazon was taking in connection with how some e-books were priced.  PX-0327 at 1.  And

---

[15] PX-0672 at 2 (HBG-YOUNG000099490); PX-0377 at 1; PX-0098.

[16] PX-0810 at 8-9 (USDOJ-00039116-117); John Makinson Dep. 154:3-18.

Publisher Defendants generally knew that their counterparts also were unhappy with Amazon's $9.99 pricing.[17]

42.    In April 2009, Simon & Schuster CEO Carolyn Reidy spoke with Random House CEO Markus Dohle about their companies' digital businesses.  Ms. Reidy reported that Mr. Dohle agreed with her characterization that this was a "disruptive" time for the "industry," and there was a "need to change the model" under which e-books were sold.  PX-0347.

43.    In July 2009, Hachette Livre CEO Arnaud Nourry came to New York and met with the CEOs of Simon & Schuster, Macmillan, and HarperCollins.[18]  After those meetings, Mr. Nourry sent an e-mail to colleagues at Hachette expressing his discontent with Amazon's pricing, and fearing a future industry "that will consist in selling content at 7$ a piece.  Like it works in the music business."   Mr. Nourry ended his e-mail by questioning whether that was "what we want," and stating how he was "pleased to know that none of our competitors is of this opinion!"   PX-0404 at 3 (HBG00033436).

44.    In the fall of 2009, Publisher Defendant executives sought and shared information with each other about whether they would be participating in a Barnes & Noble feature associated with its e-reading device, the Nook, called "Lend Me."  PX-0328; PX-0356; PX-0368.

## C.  Early Plans to Force Amazon to Raise Its Prices Were Abandoned for Lack of Industry Support

45.    Simon & Schuster considered adopting a Minimum Advertised Price or "MAP" policy for e-books as a way to dull the effects of Amazon's $9.99 pricing.  Simon & Schuster did not

---

[17] Arnaud Nourry Dep. 46:5-46:11; Richard Heffernan Dep. 80:5-82:1.

[18] PX-0672 at 2 (HBG-YOUNG000099490); PX-0166 at 185 (DOJ-SS0078338).

ultimately institute a MAP policy, though, because it could not be assured that other publishers would follow its lead: "we've always known that unless other publishers follow us there's no chance of success in getting Amazon to change its pricing practices. . . . And of course you were right that without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react if we make a move like this." PX-0344. Accordingly, Simon & Schuster CEO Carolyn Reidy concluded that, with respect to the possibility of instituting a MAP policy: "clearly we need to 'gather more troops' and ammunition first!" *Id.*

46.     For its part, Penguin developed—but never instituted—an incentive plan whereby retailers would be given greater wholesale discounts in return for charging consumers higher prices.  Timothy McCall Dep. 47:22-58:6; PX-0329 at 2 (PEN675466).

### D.  Groups of Publisher Defendants Discussed Raising Retail E-Book Prices in the Context of Potential Joint Venture Conversations

47.     In 2009 and 2010, Publisher Defendant CEOs and other executives met frequently to discuss a number of joint venture possibilities relating to e-books.  Nothing substantive came of the conversations in the U.S. until a modest book recommendation site (www.bookish.com) was launched in February 2013 by Hachette, Penguin, and Simon & Schuster.  The meetings themselves, though, offered Publisher Defendants opportunities to discuss how they could work collectively in pursuit of higher retail e-book prices.  Indeed, establishing higher retail e-book prices was itself to be the primary purpose of the potential joint ventures discussed most intensively in 2009.

48.     For example, when Brian Napack, Macmillan's President, met with HarperCollins CEO Brian Murray in April 2009 to discuss the creation of "an industry consortium" to sell e-books,

Murray also relayed his company's e-book pricing strategy, his worries about Amazon, and his message that "we must stop" Amazon, "[p]artially by nurturing other channels, and partially by non-cooperation on ebooks."  PX-0182.

49.     By the summer of 2009, Publisher Defendants' joint venture discussions were focused almost exclusively on using collective action to overcome Amazon's $9.99 pricing and preserve the publishers' position in the value chain.  Hachette Livre CEO Arnaud Nourry explained in a July 29, 2009 e-mail to the CEO of Hachette Livre's parent corporation:  "In the USA and the UK, but also in Spain and France to a lesser degree, the 'top publishers' are in discussions to create an alternative platform to Amazon for e-books.  The goal is less to compete with Amazon than to force it to accept a price level higher than 9.99 . . . . I am in NY this week to promote these ideas and the movement is positive with MacMillan [sic], S&S, Harper and Penguin."  PX-0391; PX-0392 (certified English translation).

50.     Less than a week later, in an August 4, 2009 strategy memo for the board of directors of Penguin's ultimate parent company, Penguin Group CEO John Makinson conveyed the same message:

> Competition for the attention of readers will be most intense from digital companies whose objective may be to disintermediate traditional publishers altogether.  This is not a new threat but we do appear to be on a collision course with Amazon, and possibly Google as well.  It will not be possible for any individual publisher to mount an effective response, because of both the resources necessary and the risk of retribution, so the industry needs to develop a common strategy. This is the context for the development of the Project Z initiatives [joint ventures] in London and New York.

PX-0133 at 2 (PEN-LIT-00008100); *see also* PX-0136.

51.     By December of 2009, Publisher Defendant joint venture participants in the U.S. had narrowed to Hachette, Penguin, and Simon & Schuster.  As Simon & Schuster communicated in

a presentation developed for a meeting with Penguin and Hachette, one purpose of the potential joint venture was to "[d]efend against further price erosion."  PX-0358 at 6 (DOJ-SS0046224, at slide 5).

52.     Once the Apple Agency Agreements were in place, any urgency of these joint venture discussions evaporated.  *See, e.g.*, PX-0815.  Publisher Defendants, however, continued to use joint venture discussions to coordinate their agency negotiations with Amazon.  For example, at a joint venture meeting in March of 2010, Hachette executive Maja Thomas learned from Penguin that Penguin was far from agreement with Amazon.  PX-0741.

**E.  Publisher Defendants Used Coordinated Windowing as a Tool to Try to Force Amazon to Raise Its Retail E-Book Prices**

**1.  Single-Title Windowing**

53.     From the beginning of the modern e-book era, electronic versions of new titles were, to the extent feasible, typically released on the same day as their physical counterparts.  Grandinetti Direct ¶ 31.  In the summer and fall of 2009, some publishers experimented with delaying the electronic release of a title or two until some weeks or months after its physical release.  This phenomenon was known as "windowing" the e-book.  *Id.* at ¶ 32.

54.     Publisher Defendants communicated to one another their plans to window specific titles, which they believed would pressure Amazon to raise its retail e-book prices.  For example, in an August 14, 2009 e-mail to Hachette Livre CEO Arnaud Nourry, Hachette Book Group CEO David Young writes:  "Completely confidentially, [Simon & Schuster CEO] Carolyn [Reidy] has told me that they are delaying the new Stephen King, with his full support, but will not be announcing this until after Labor Day . . . ."  PX-0274.

16

55.     In the same e-mail, Mr. Young criticized Random House CEO Markus Dohle as an "appeaser" for his refusal to window Dan Brown's *The Lost Symbol*: "You should know that I have been told by a reliable source that the [internal Random House] publishers voted for the Dan Brown to be delayed but they were over-ruled by Markus who is apparently 'obsessed' by his desire to meet Jeff Bezos: why this should matter to him and what he thinks he would gain from such a meeting is beyond me.  He appears to be an appeaser which is not good with them being the market leader. . . ."  *Id*.  Mr. Young's "reliable source" was a senior Random House executive who subsequently joined Macmillan in the fall of 2009.

56.     Mr. Young concluded this e-mail containing confidential information about Hachette's competitors' business plans by advising Mr. Nourry that he should permanently destroy the message:  "I think it would be prudent for you to double delete this from your email files when you return to your office."  *Id.*

## 2.  Systematic Windowing

57.     In December of 2009, four Publisher Defendants—Hachette, Simon & Schuster, HarperCollins, and Macmillan—announced plans to begin windowing new releases on a systematic basis.  Grandinetti Direct ¶¶ 33-35.  These efforts were coordinated and were designed to pressure Amazon to increase its retail e-book prices.  *See, e.g.*, PX-0458 ("You may have seen the recent press attention to moves by publishers (including us) to 'window' release of eBooks . . . . This move is mostly in response to Amazon's low pricing of eBooks and is creating a lot of heated discussion.").  Publisher Defendants recognized that windowing their new releases was contrary to their unilateral economic interests, and ultimately did not window very many titles.

58.    On December 3, 2009, Hachette Livre CEO Arnaud Nourry met at breakfast with Amazon's Vice President of Kindle Content, David Naggar.  During that meeting, Mr. Nourry told Mr. Naggar that Amazon's $9.99 pricing posed a "big problem" for the industry.  Naggar Direct ¶ 18.  According to Mr. Nourry, raising e-book prices by even one or two dollars would "solve the problem."  Mr. Naggar, however, did not agree.  *Id.*; *see also* PX-0437.

59.    The following day, a Friday, Hachette and Simon & Schuster (along with Penguin) met at Hachette's offices, purportedly to discuss a joint venture.  John Makinson Dep. 302:17-23 Hachette informed Amazon later that day that it intended systematically to window several of its e-book titles.  Naggar Direct ¶ 19.

60.    The following Monday, December 7, Simon & Schuster informed Amazon that it too intended systematically to window several of its e-book titles.  Naggar Direct ¶ 21; PX-0781 at 4 (AMZN-MDL-0027585).

61.    The first public announcement of these publishers' new windowing policies did not come until a December 9 Wall Street Journal article.  Jeffrey A. Trachtenberg, *Two Major Publishers to Hold Back E-Books*, WALL ST. J., Dec. 9, 2009 (available online December 8, 2009), at B1 (PX-0617).

62.    HarperCollins soon followed with its own windowing announcement.  PX-0781 at 4 (AMZN-MDL-0027585); Naggar Direct ¶ 21.

63.    The following week, Macmillan joined the publishers that had announced windowing policies.  PX-0781 at 4 (AMZN-MDL-0027585); Naggar Direct ¶ 21.

64.    Even beyond this timeline, there is ample evidence that Publisher Defendants coordinated these new windowing policies.  For example, on December 9, Mr. Nourry reached out to Stefan von Holtzbrinck of Macmillan to offer his input on the windowing strategy.  PX-0447 at 1.  On

18

the same day, Mr. Nourry also instructed Hachette's UK CEO to "get in touch with Gail [Rebuck of Random House] and know her feeling about this."  PX-0446.

65.     On December 10, HarperCollins CEO Brian Murray wrote to others at HarperCollins: "We need to think about how we release the 5-10 delayed ebooks.  One idea I have been thinking about is that we set up a release schedule (maybe the first and third Monday of each month) where we make these ebooks available.  **Maybe then we get S&S and Hachette to do the same.**  This would only apply to those ebooks that are not published at the same time as the print edition."  PX-0313 (emphasis added).

66.     On December 11, 2009, a Macmillan executive passed along a message to Mr. Sargent from Ms. Reidy that she would "love for [Macmillan] to join" Hachette, HarperCollins and Simon & Schuster, in windowing.  "She feels if one more publisher comes aboard, everyone else will follow suit."  PX-0096 at 1.

67.     Mr. Nourry admitted that the "goal" of systematic windowing was to "force Amazon to return to acceptable sales prices."  PX-0393; PX-0394 (certified English translation).  As Mr. Sargent explained, windowing itself was "actually deeply flawed and will end up being a disaster if we keep doing it.  Right now it is all about tactics while we try to get hardcovers over the artificially low 9.99 price point."  PX-0070; *see also* PX-0290 (Hachette's Mr. Young was "not in favor of 'windowing' but felt it was the only way we could deal with Amazon selling off the family jewels."); PX-0450 (Mr. Sargent explains:  windowing "actually makes no damn sense at all really.  But we need to do something to budge Amazon from their current strategy, so as a tactic it might be worth pushing.").

### 3. The Threat of Windowing, by Itself, Was Unlikely to Move Amazon's Prices Due to Insufficient Publisher Participation and Risks Inherent in the Strategy

68.     Publisher Defendants recognized that the windowing strategy had no hope of achieving their pricing goal if the Big Six publishers did not present a united front on the matter.  As Hachette Livre's Mr. Nourry explained:  "To succeed our colleagues must know that we entered the fray and follow us."  PX-0393; PX-0394 (certified English translation).  Penguin executive Tim McCall concurred:  "If other publishers don't follow suit," Amazon's $9.99 pricing "will continue, and we'll lose."  PX-0427.

69.     Penguin and Random House, though, ultimately decided not to window, preferring instead "to take market share as a result."  PX-0276.  Hachette's Young found that stance "deeply divisive and disappointing."  *Id.*

70.     Ultimately, the four windowing Publisher Defendants delayed release of only 37 books, total.  Benjamin Klein Dep. 39:23-40:6.  With Publisher Defendants divided and inconsistent on the short-term "tactic," Amazon continued to price newly released and bestselling e-books at $9.99 and windowing was failing even before the Apple Agency Agreements went into effect. Grandinetti Direct ¶ 35.

## V.     IN RECOGNITION OF THEIR SHARED GOALS, APPLE AND PUBLISHER DEFENDANTS AGREED TO INCREASE THE PRICE OF E-BOOKS TO CONSUMERS AND RESTRAIN RETAIL E-BOOK PRICE COMPETITION

71.     Apple began reaching out to major trade publishers on December 8, 2009 to set up in-person meetings for the following week.  Over December 15 and 16, 2009, Eddy Cue, Keith Moerer, and Kevin Saul of Apple met in Manhattan with the CEOs and other executives from each of the Publisher Defendants plus Random House.  Apple walked into those meetings "knowing" that the publishers as a group "were unhappy with their biggest retailer."  Apple

(Eddy Cue) CID Dep. 42:13-43:6.  The source of that unhappiness was, as Eddy Cue reported to Steve Jobs on December 10, 2009, Amazon's "new release pricing."  PX-0050; PX-0025; PX-0371.  From the beginning of these meetings, Publisher Defendants made clear to Apple that they believed e-book prices were "too low."  Apple (Eddy Cue) CID Dep. 42:13-43:12; 47:5-48:5.

72.     Apple worked to facilitate the conspiracy in several different ways.  First, Apple assured Publisher Defendants that none of them would have to move alone; Apple would allow the conspiracy to move forward only if a critical mass of publishers agreed.  From their own perspective, Publisher Defendants feared that any one of them acting alone would be subject to retaliation from Amazon, and communicated that to Apple.  Eddy Cue Dep. 349:25-350:12.  Apple wanted to get them over the fear of being singled out by Amazon by providing them assurances that they would not be alone.  *Id.* at 336:8-24.

73.     Second, Apple assured Publisher Defendants that they all would get materially the same deal, including the same retail price tiers.  David Shanks Dep. 286:25-287:4, 288:17-23; Eddy Cue Dep. 300:3-13.  As Mr. Cue has admitted, Apple assured Publisher Defendants that the first e-books contract Apple signed would be materially the same as the last one it signed.  Eddy Cue Dep. 127:21-128:22.  Another Apple executive similarly testified that Apple guaranteed the publishers a "level playing field."[19]  Kevin Saul Dep. 171:24-172:23.

74.     Third, Apple kept each Publisher Defendant apprised of its negotiations status with others.

---

[19] *See also* Penguin (David Shanks) CID Dep. 72:15-73:19 (Apple made clear in its initial proposal that Apple was going to have "one contract that fit all" and "the same agreement for everybody.").

75.     Fourth, Apple insisted on including in each agency agreement a most-favored nation ("MFN") clause that sharpened each Publisher Defendant's incentive to force Amazon onto agency, and to do so at the same time—before the iBookstore launched in April 2010.

76.     In February of 2011, Penguin CEO David Shanks described Apple's role in facilitating the conspiracy in response to a suggestion that Penguin's Canadian subsidiary meet with the other major publishers and Indigo, the largest Canadian bookseller, to discuss how they all could work together to raise e-book prices in Canada: "We would never meet with Barnes and all our competitors.  The Government would be all over that. **We would meet separately with Indigo being the facilitator and go between.  That is how we worked with Apple and the government is still looking into that.**"  PX-0542 at 1 (emphasis added).

**A. Apple Began Reaching Out to Publishers on December 8, 2009**

77.     On December 8, 2009, Apple's Eddy Cue began reaching out by telephone to all of the "Big Six" publishers to schedule meetings in New York the next week.  PX-0314.   In making his initial outreach calls, Mr. Cue told some publishers that he also would be meeting with other members of the "Big Six."  *Id.*

78.     Mr. Cue first spoke to HarperCollins CEO Brian Murray and Random House CEO Markus Dohle.  On December 11, Mr. Cue called Macmillan CEO Mr. Sargent.   Mr. Cue told him that he would be meeting with a "couple of" other Publisher CEOs.  PX-0073.

79.     By December 11, Apple had made arrangements to meet with each of the "Big Six" on December 15 and 16.  PX-0362 at 1-2.

80.     Before its initial meeting with the publishers, Apple anticipated entering the e-books business under the existing wholesale distribution model.  Eddy Cue Dep. 107:17-21.

**B.  Some Publisher Defendants Considered Agency Prior to Initial Apple Meetings**

81.     In the Fall of 2009, Barnes & Noble had encouraged the publishers to move to agency as a means to free itself from having to compete against Amazon on price, but was unable to convince any publisher to try.  *See* PX-0434; PX-0682.  Barnes & Noble was not able (and perhaps did not even try) to assure the publishers that they would be moving as a group, with no risk that any one could find itself isolated as the lone agency-mover—risking higher retail prices, lower per unit revenues, and Amazon's displeasure all by itself.  Apple, though, which had not already sunk costs into e-book distribution and was not dependent on selling physical books, could credibly assure each Publisher Defendant that it would not be the only one to move to agency.   As Mr. Nourry wrote in December 2009, "preventing" Amazon "from selling at 9.99" would require "the help of Apple or Google."  PX-0108 at 1.  And as Mr. Murray elaborated in January 2010, "only google and apple can compete with Amazon and Apple looks more promising that [sic] Google right now."  PX-0307 at 3 (HC-DOJ-0149470); *see also* PX-0320 at 3 (MCMLN-LIT-00041316).

82.     On December 10, Maja Thomas, Hachette's Senior Vice President Digital, spoke to Betty Woodmancy, then HarperCollins's Vice President of Retail Business Development (Symtio Division), and told Ms. Woodmancy that Hachette was considering a "different business model" for distributing its digital content.  Ms. Woodmancy recounted in an e-mail that Ms. Thomas "just wanted to run it by us to get our feedback."  PX-0456 at 1.  Ms. Woodmancy's e-mail quickly made its way to HarperCollins CEO Brian Murray:  "Essentially, it is the iTunes model. Hachette is the 'seller' to the customer—they set the selling price and retailers are not allowed to discount off that price.  They would pay their 'agents' a 30% commission on each sale."  *Id.*

**C.  Apple Held Initial Meetings with Big Six Publishers on December 15 and 16, 2009**

83.    On December 15 and 16, 2009, Apple met separately in New York with the CEOs of

each of the six largest publishers.  Apple (Eddy Cue) CID Dep. 35:3-16; PX-0262 at 1-3.  In

these initial meetings, Apple told the publishers that it expected to proceed under a wholesale

relationship.[20]  Indeed, Apple could have begun reselling e-books, with little or no negotiation

required, simply by taking advantage of the publishers' then-existing, publicly available terms of

sale.  *See Porco Direct* ¶ 6.

84.    Apple, by now well aware of publisher hostility to Amazon's $9.99 price point, played to

these concerns in its meetings with the publishers.  Arnaud Nourry Dep. 140:5-14.

85.    Apple informed the publishers that it would not be pursuing a low price strategy.

PX-0359 at 3 (SS00027182).  Ms. Reidy recounted her meeting with Mr. Cue to her boss as

follows:  "[Apple is] not interested in a low price point for digital books . . . . They also cannot

tolerate a market where the product is sold significantly more cheaply elsewhere . . . i.e., they

don't want Amazon's $9.95 to continue."  PX-0510.  The publishers felt that "[i]t was

comforting . . . that Apple said that it isn't interested in pursuing a low cost provider strategy."

PX-0360.  As a result, Apple was perceived as the publishers' best partner "because they don't

like deep discounting."  PX-0148 at 3 (HC-DOJ-0087651).  Mr. Cue also expressly assured the

publishers that consumers would be willing to pay a higher price for e-books.  Penguin (David

Shanks) CID Dep. 69:7-71:24; Timothy McCall Dep. 68:4-68:23, 186:7-186:23; PX-0338

---

[20] PX-0359 at 3 (SS00027182); PX-0301 at 1; Timothy McCall Dep. 65:19-67:20, 113:22-
114:11; Apple (Eddy Cue) CID Dep. 44:3-13.

(Random House executive reporting to Mr. Dohle that Rupert Murdoch "had been briefed by Apple that they were launching their ereader in 90 days and will be selling books at 15 dollars").

86.     Apple made very clear in its conversations with each publisher that it was talking with their competitors as well.  Penguin (David Shanks) CID Dep. 71:23-72:2.

87.     Apple also passed along information from one publisher to the next as the initial meetings progressed.  For example, at their December 16 meeting, Apple and Simon & Schuster discussed what other publishers wanted in terms of pricing of e-books—"other publishers want $13-$15 range"—and that the price was achievable "by including extra material."  PX-0359 at 3 (SS00027182).

88.     For their part, the publishers' response to Apple in these initial meetings was primarily focused on their displeasure with Amazon's low $9.99 pricing.  Eddy Cue Dep. 120:17-25; Apple (Eddy Cue) CID Dep. 42:13-43:17, 47:5-24; PX-0036 at 3 (APLEBOOK-01601745).

89.     After conferring with one another, Hachette and HarperCollins raised the agency model in their preliminary discussions with Apple.  Eddy Cue Dep. 125:10-14; PX-0306 at 3 (APLEBOOK-01601745).  HarperCollins told Apple that it was interested in using the agency model as a way "to fix Amazon pricing."  PX-0036 at 3 (APLEBOOK-01601745).[21]  Hachette supported an agency model in part because the "logic of agency agreement is that everyone has to be under the same terms."  Arnaud Nourry Dep. 153:24-155:4.  However, Apple initially told

---

[21] Similarly, a Hachette executive is expected to testify that the agency model would meet the goal of publishers setting the *retail* price of e-books and would address some of its concerns with $9.99 pricing.

HarperCollins and Hachette that it would not agree to an agency model.  PX-0036 at 3 (APLEBOOK-01601745); PX-0281 at 1.

90.     Mr. Cue e-mailed to Mr. Jobs a report of his three publisher meetings on December 15. Mr. Cue wrote that "[c]learly, the biggest issue is new release pricing" and that each publisher disliked the "$9.99 price point."  PX-0050 at 1-2.  Nonetheless—and while contemplating a wholesale regime with other e-book retailers selling some titles below cost—Mr. Cue's headline analysis to Mr. Jobs was:  "Nothing scared me or made me feel like we can't get these deals done right away."

### D.  Apple Embraced Agency and Higher E-Book Prices Following Its Initial Meetings with Publisher Defendants

91.     After his first set of meetings with the publishers in Manhattan, Mr. Cue returned to California.  Eddy Cue Dep. 176:2-7.  There, he discussed the publisher meetings with Apple's Steve Jobs.  *Id*. at. 176:8-14.  On December 18, 2009, a little more than 24 hours after completing his initial meetings, Apple had decided that it could do better than entering a very competitive space on wholesale terms and had embraced the Hachette/HarperCollins-proposed agency model.  PX-0043.

92.     The way to avoid having to compete against Amazon on price, Apple realized, was to use an "a[i]kido move" to move all retailers to agency.  PX-0514 at 11 (p. 504).  Steve Jobs succinctly described the move to his biographer:  "we told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and *yes, the customer pays a little more, but that's what you want anyway.*'"  *Id.* at 10 (p. 503) (emphasis added).

93.     The success of Apple's "aikido move" would depend on having a significant number of major publishers agree to move to agency together.  Apple (Eddy Cue) CID Dep. 51:5-53:22.

94.     Publisher Defendants embraced Apple's vision of "level[ing] the playing field" by stopping consumers from being able to choose to buy e-books from different retailers based on the e-book's price.  PX-0307 at 2 (HC-DOJ-0149469).  Indeed, in 2010, when Penguin moved Amazon to an agency model, *see infra*, Mr. Shanks wrote to Mr. Cue, "I imagine our new books will be up soon.  The playing field is now level."  PX-0284.

### E.  Publisher Defendants Communicated Directly with One Another During Apple Negotiations

95.     As would be true throughout the negotiations in December and January, the publishers engaged in a flurry of communications following their initial conversations with Apple.  The timing and frequency of these calls strongly supports an inference that the publishers were discussing how they could best use Apple's sudden appearance to achieve their elusive, industry-wide objectives.

96.     For example, just after Mr. Cue's initial outreach calls, on December 10, 2009, at 9:07 A.M., Hachette CEO David Young called from his cell phone to Simon & Schuster CEO Carolyn Reidy's cell phone, and the two spoke for approximately four and a half minutes. PX-0787 at 1; PX-0789 at 1.  At 10:10 A.M., Ms. Reidy called from work to Mr. Young's office number, and the two spoke for over two minutes.  At 10:54 A.M., HarperCollins CEO Brian Murray placed a brief call to Mr. Young's office.  At 11:01 A.M., Mr. Young called from his office to Mr. Murray, and the two spoke for over five minutes.  On December 11, 2009, at 9:07 A.M., Mr. Young placed a brief call to Ms. Reidy.  Ms. Reidy returned his call at 9:21 A.M., and the two talked for nearly five minutes.  Ms. Reidy then called Mr. Murray at 1:58 P.M., and the two talked for over five and a half minutes.  PX-0787 at 1; PX-0789 at 1-2.

97.      In total, there were upwards of 100 telephone calls between Publisher Defendant CEOs

between December 8—when Mr. Cue began to reach out to the publishers—and January 26

when Publisher Defendants had all signed their Apple Agency Agreements.  In contrast, there

was exactly one phone call between publisher CEOs from December 1 through December 7 and

not a single phone call between January 27 and January 31.  PX-0787.  On January 16, Mr. Cue

informed the publishers that he needed their commitment by January 21.  *See* PX-0707 at 3

(HBG00071037) (January 19, 2010 e-mail from Maja Thomas to others at Hachette noting that

Apple "need[s] the agreement signed by Thursday"); Eddy Cue Dep. 313:1-10.  It is, therefore,

unsurprising that Publisher Defendants' CEOs made upwards of twenty-five calls on January 21,

the most calls on any single day in December or January.  PX-0787.

98.      On December 10, 2009, having spoken with Mr. Cue, HarperCollins began work on a

proposal for Apple.  Aware that Apple also was going to speak to Random House, PX-0314,

HarperCollins CEO Brian Murray wrote in an internal e-mail that HarperCollins's proposal to

Apple should "bring RH in if possible."  PX-0304.  Five minutes later, Mr. Murray e-mailed

Random House CEO Markus Dohle and requested that the two meet the next day.  PX-0448.

Mr. Murray and Mr. Dohle did not meet the next day, but they did speak by phone for

approximately 17 minutes.  PX-0788 at 1 (Mr. Murray's phone records identify the call as

coming from Random House's main number).

99.      During the time of Apple's initial meetings with Publisher Defendants, there was another

flurry of inter-publisher communications between Ms. Reidy and Mr. Young.  *See* PX-0787.

Most notably, Mr. Young and Ms. Reidy once again called and e-mailed each other repeatedly.

Ms. Reidy called Mr. Young on December 16 just minutes after her meeting with Mr. Cue

finished.  PX-0362 at 2 (APLEBOOK-00424586); PX-0787 at 1.  After three additional calls on

December 17, including one where Mr. Young called Ms. Reidy from his office and the two

spoke for 9 minutes and 42 seconds, Ms. Reidy e-mailed Mr. Young at 8:23 P.M. to get Mr.

Cue's contact information.  PX-0787 at 1; PX-0789 at 2.  Ms. Reidy said she wanted to "take up"

Mr. Young's suggestion about getting in touch with Apple regarding the "term sheet."  PX-0299.

Ms. Reidy e-mailed Mr. Cue later than night, and then told Mr. Young the next day that she had

done so.  PX-0602.[22]

100.     Hachette Livre CEO Arnaud Nourry and Penguin Group CEO John Makinson also met

on December 16, one day after both Penguin and Hachette met with Apple, ostensibly to discuss

a proposed joint venture.  PX-0138 at 1; PX-0468.  In a follow-up e-mail within Hachette,

Mr. Nourry described certain joint venture-related topics that had been discussed, but reserved

the other portions of the meeting to be "shared with you on the phone."  PX-0468.  An e-mail

from Mr. Makinson to his colleagues, however, reveals at least some of the topics that Mr.

Nourry would not put into an e-mail:  during the meeting, Mr. Nourry brought up Hachette's

Apple meeting of the day before, in addition to "pressur[ing]" Mr. Makinson to "join the

windowing movement in the US."  PX-0541 at 1; PX-0332; John Makinson Dep. 310:18-313:13,

314:2-18, 315:4-316:5, 325:4-327:10.

101.     Similarly, on December 17, a Random House executive reported to Mr. Dohle that she

had just spoken to Rupert Murdoch, the CEO of HarperCollins's parent company, News Corp.

---

[22] Ms. Reidy and Mr. Young also had called one another repeatedly on December 10, 11, and 15,
including a call each day over three minutes.  PX-0787.  On December 15, Ms. Reidy and Mr.
Young spoke on the phone fewer than twenty minutes prior to Mr. Young's meeting with Mr.
Cue.  PX-0362 at 1; PX-0787.

The executive reported that Mr. Murdoch "had been briefed by Apple that they were launching their ereader in 90 days and will be selling books at 15 dollars."  PX-0338.

102.    Penguin USA CEO David Shanks admitted that he met with Ms. Reidy and Mr. Young during the Apple negotiations, ostensibly to get the Muse joint venture off the ground.  Shanks Dep. 223:12-22.  Ms. Reidy will testify that at the end of one such meeting, Mr. Young volunteered that he was intrigued with the agency model.

## VI.    EDDY CUE CONVEYED INDUSTRY-WIDE AGENCY MODEL PROPOSAL IN DECEMBER 21, 2009 CONVERSATIONS WITH THE CEOS OF SIMON & SCHUSTER, MACMILLAN, AND RANDOM HOUSE

103.    On Friday, December 18, 2009, Mr. Cue sent identical e-mails to the CEOs of Simon & Schuster and Macmillan: "I am back in NY for a vacation. Do you have anytime Mon or Tue to get together? I want to update you all my findings and thoughts. I have some things I want to run by you. I only need 30 minutes."  PX-0502; PX-0501.  Mr. Cue also sent a nearly identical e-mail to the CEO of Random House.  PX-0056.  Mr. Cue spoke with all three CEOs by telephone on Monday, December 21.  PX-0788 at 2.

104.    The substance of those conversations is clear from the e-mails that followed from Simon & Schuster CEO Carolyn Reidy, Macmillan CEO John Sargent, Random House CEO Markus Dohle, and Mr. Cue himself.  Apple had given more thought to the agency proposal made in the first round meetings by Hachette and HarperCollins "to fix Amazon pricing," PX-0036 at 3 (APLEBOOK-01601745), and had decided to adopt it.  In essence, Apple offered the publishers a deal where they could set customer prices at $12.99 instead of $9.99 and demanded in return a 30% commission and a guarantee that the publishers would move all of their other e-book retailers to agency, too.

30

105.    Ms. Reidy sent a summary of her call with Mr. Cue to the rest of Simon & Schuster's e-books team just after noon on December 21.  PX-0540.  She noted that Mr. Cue "relay[ed] his conclusions" based on "having met with all the major publishers."  *Id.* at 1.  Mr. Cue told Ms. Reidy that it was "important to Apple that there be 'some level of reasonable pricing'" and that Apple believed "the only way to get this is for the industry to go to the **agency model**."  *Id.* (emphasis in original).  Ms. Reidy also reported that Apple believed "that **new release eBooks should be priced at $12.99.**"  *Id.* (emphasis in original).  Finally, she reported that Apple would require Simon & Schuster to "get everyone else to go to the agency model," which Mr. Cue clarified to mean Simon & Schuster's "accounts"—that is, the other e-book retailers it used.  *Id.*

106.    Mr. Sargent's December 21 e-mail to Mr. Cue following up on their phone call indicates that Mr. Cue delivered substantively the same message to Mr. Sargent.  PX-0099.  For instance, Mr. Sargent responded to Apple's demand that the publishers move all other e-book retailers to agency by explaining that "[o]ne of the problems we face is that most companies have contracts under the discount [i.e., wholesale] model."  *Id.* at 1.  Mr. Sargent also pushed for higher consumer prices than Apple had proposed:  "Price points: The concept would be that we would price books at around half of the price of the hardcover. That would put the majority of new releases at the 14.95 or 12.95 price points."  *Id.*  As with Ms. Reidy's e-mail, Mr. Sargent's e-mail makes clear that Mr. Cue and the publisher CEOs discussed actual retail prices, not just price caps.

107.    Mr. Dohle sent a summary of his call with Mr. Cue to the rest of Random House's e-books team.  Mr. Dohle began by noting:  "I had a good conversation with Eddy Cue today. He said he had meetings with all major houses to discuss their positions last week."  PX-0336 at 1.  Mr. Dohle reported that Mr. Cue "thinks that book prices are becoming too low—he is worried

about the consumer perception. Therefore he suggests an 'agency model.'" *Id.* Mr. Dohle also relayed Mr. Cue's explanation of why Apple would rather have all retailers on agency relationships than have lower e-book wholesale prices—Apple did not want to compete with Amazon on price: "He assumes that if we did find a new TOS [i.e., terms of sale, or wholesale] model which would provide APL with an acceptable margin, Amazon would lower the prices again . . . ." *Id.* Mr. Dohle also reported that Mr. Cue advised Random House to withhold e-books from Amazon if Amazon balked at moving to an agency relationship: "I also indicated that Amazon would not accept a distributor [i.e., agency] model. He answered that windowing could be used to establish a distributor model . . . ." *Id.*

108.   Finally, Mr. Cue sent his own summary of his December 21 conversations with the publisher CEOs to Mr. Jobs: "I had good meetings with 3 publishers.  All the talks went well and everyone understood our position and thought it was reasonable." PX-0043.  Most important, Mr. Cue explained that the publishers correctly recognized that "the plus" of the deal Apple was offering had nothing at all to do with Apple's entry or otherwise expanding e-book output, but rather was that Apple's industry-wide agency proposal "solves Amazon issue." *Id.* That is, just as HarperCollins had explained when it first suggested agency to Apple, the purpose of adopting Apple's agency model was "to fix Amazon pricing." PX-0036 at 3 (APLEBOOK-01601745).

## VII.   APPLE'S SUBSTANTIVELY IDENTICAL E-MAILS TO PUBLISHER DEFENDANTS ON JANUARY 4 AND 5, 2010 SET FORTH THE PRINCIPLES OF THE CONSPIRACY AMONG APPLE AND PUBLISHER DEFENDANTS

109.   On January 4 and 5, 2010, Apple's Eddy Cue sent substantively identical term sheet e-mails to each of the "Big Six" publisher CEOs.  He framed the e-mails differently, though, depending on whether he had already informed the CEO in question that Apple's proposal was

meant to satisfy the collective goals of all six publishers.  Mr. Cue wrote to the three CEOs with

whom he had <u>not</u> spoken since Apple's initial round of publisher meetings:  "*After talking to all

the other publishers* and seeing the overall book environment, here is what I think is the best

approach for ebooks."[23]  To the three other CEOs—with whom he <u>had</u> discussed the contours of

Apple's agency proposal on December 21, 2009—Mr. Cue wrote instead:  "As we discussed,

here is what I think is the best approach for e-books."[24]  Plainly, one piece that Mr. Cue

considered important in his discussions with Mr. Dohle, Mr. Sargent, and Ms. Reidy on

December 21 was that Apple was making its agency proposal "[a]fter talking to all the other

publishers and seeing the overall book environment."

110.    The substance of the term sheets reflected both Apple's goal to be protected from price

competition by other e-book retailers and the publisher goal of forcing consumer e-book prices

higher than the then-prevailing $9.99 for new releases and bestsellers.  Apple was unwilling to

be the only e-book retailer on an agency model because it would be exposed to price competition

from retailers that were still on the wholesale model and thus would retain control over their own

retail prices.  To satisfy Apple's interest, Mr. Cue explicitly demanded that not just Apple but all

e-book retailers be stripped of price-setting authority:  "**all resellers of new titles need to be in**

---

[23] PX-0041(Hachette) (emphasis added); PX-0306 (HarperCollins) (emphasis added); PX-0040 (Penguin) (emphasis added).

[24] PX-0473 (Random House); PX-0476 (Macmillan); PX-0021(Simon & Schuster).  Mr. Cue ultimately sent Macmillan CEO John Sargent *both* versions of the e-mail.  PX-0476 (Jan. 4, "As we discussed"); PX-0076 (Jan. 6, "After talking to all the other publishers and seeing the overall book environment").

**agency model**."  In exchange, Apple included the fixed prices of $12.99, $14.99, and higher, depending on the hardcover price of the book.[25]

111.    As Mr. Cue knew from his December meetings with the publishers, moving Amazon to agency fit perfectly with their desire to eliminate Amazon's $9.99 pricing and to move industry retail prices higher.  Accordingly, after laying out his price tiers and all-resellers-to-agency proposals, Mr. Cue concluded the term sheet e-mails by stating:  "We think these agency terms accomplish[] all the goals we both have."[26]  Thus, moving all Publisher Defendants' resellers to agency became a critical part of the common scheme pursued by Apple and Publisher Defendants.

112.    Publisher Defendants understood that the price caps in Apple's proposal would allow them to raise the consumer prices for the e-book versions of their key titles above Amazon's $9.99.  For example, Ms. Reidy wrote on a copy of Mr. Cue's January 4 e-mail, that Apple's proposal would raise e-book prices and reduce sales:  "Higher price slows Ebks/casual purchaser/keeps retailers/stops authors leaving."  PX-0164 at 2 (SS00029038).  To achieve the higher prices, however, meant accepting Mr. Cue's demand that the publishers move all of their e-book retailers to the agency model.  As Ms. Reidy e-mailed three other Simon & Schuster executives the same day she received Mr. Cue's proposal, Simon & Schuster was in "total

---

[25] PX-0041 (emphasis added) (Hachette); PX-0306 (emphasis added) (HarperCollins); PX-0040 (emphasis added) (Penguin); PX-0473 (emphasis added) (Random House); PX-0476  (emphasis added) (Macmillan); PX-0021 (emphasis added) (Simon & Schuster).

[26] PX-0041 (Hachette); PX-0306 (HarperCollins); PX-0040 (Penguin); PX-0473 (Random House); PX-0476 at 1 (Macmillan); PX-0021 (Simon & Schuster).

agreement" that the "agency model should hold for all retailers; these would become our terms." PX-0355 at 1.

## VIII.   APPLE'S FOLLOW-UP COMMUNICATIONS WITH THE PUBLISHERS WERE DESIGNED TO FACILITATE COLLECTIVE PUBLISHER ACTION

113.    In its follow-up telephone calls to the publishers, Apple assured them of their fellow publishers' lock-step reaction to Apple's term sheet.  For example, Ms. Reidy reported to her parent corporation's CEO Mr. Moonves that Apple's Keith Moerer informed her in a January 8, 2010 conversation that "what we said to him **was exactly what all the other publishers had said: the pricing was too low**."  PX-0537 at 1 (emphasis added).

114.    Likewise, in his January 9, 2010 conversation with Madeline McIntosh of Random House, Mr. Moerer informed her both that "[o]thers have advocated for higher price tiers" and that Random House was "the least receptive to [Apple's] proposal."  PX-0174 at 1.

115.    Mr. Moerer's call with Ms. McIntosh provides further evidence of Apple's conscious commitment to its common scheme with the publishers.  As documented in Ms. McIntosh's detailed summary of their conversation—which she sent to her boss, Mr. Dohle, as well as several other Random House executives—Mr. Moerer explicitly told Ms. McIntosh that Apple had "decided they had to come up with a way that would move the whole market off 9.99 and they think an agency model is the only way to do it."  Mr. Moerer also explained Apple's expectation that none of the publishers "will try to manage their business with Apple on agency and other retailers on [wholesale] terms."  *Id.*

116.    On January 11, 2010, Apple's Keith Moerer sent identical e-mails to the CEOs of Penguin, Simon & Schuster, and Hachette.  Each e-mail contained a pricing analysis that set forth, for each of the publishers' titles that were listed on the *New York Times* hardcover fiction

bestseller list as of January 1:  hardcover list prices; Amazon hardcover retail prices; and e-book

retail prices at Amazon and Barnes & Noble.  Additionally, each e-mail contained a column

showing how the recipient publisher's bestselling e-books would be priced when sold through

the iBookstore.[27]  Even though the e-mails showed the iBookstore price only for the recipient

publisher's books and not for the others, the fact that Apple otherwise sent the full grid,

conveying all the other information relating to all the publishers' books on the bestseller list,

suggested to each recipient, almost like a "cc" line in a letter, that Apple intended to send an

equivalent grid to the other publishers—keeping them all on the same pricing page.[28]  The e-mail

Mr. Moerer sent to David Shanks of Penguin (PX-0522) is reproduced here:

---

[27] PX-0522 at 1-3 (Penguin); PX-0523 at 1-3 (Simon & Schuster); PX-0524 at 1-3 (Hachette).

[28] Although Defendants did not produce similar e-mails that Apple sent to HarperCollins and
Macmillan, Mr. Moerer testified that he recalled sending similar grids to all five Publisher
Defendants.  Keith Moerer Dep. 122:22-123:4.

Plaintiffs' Exhibit
US v Apple
12-cv-02826
**PX-0522**

Subject: our meeting tomorrow
Date: Mon, 11 Jan 2010 14:34:29 -0800
From: Keith Moerer <kmoerer@apple.com>
To: <david.shanks@us.penguingroup.com>
Cc: Eddy Cue <cue@apple.com>
Message-ID: <75004564-BE31-48CE-A0EC-EC9ECC98D588@apple.com>

---

David--

I look forward to meeting with you and Genevieve tomorrow morning.

Kevin Saul has sent a draft agreement in separate email. Eddy has also asked me to send you our pricing analysis of Jan. 1 NYT bestsellers, which will help explain the price tiers we've proposed for hardcover new releases.

Best, Keith

| NYT Bestsellers-Hardcover Fiction Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|
| The Lost Symbol | Dan Brown | Random House | $29.95 | $12.00 | $9.60 | $9.60 | |
| I, Alex Cross | James Patterson | Hachette | $27.99 | $16.79 | $9.99 | $9.99 | |
| Under the Dome | Stephen King | Simon & Schuster | $35.00 | $21.00 | $9.99 | $9.99 | |
| The Help | Kathryn Stockett | Penguin | $24.95 | $9.50 | $8.55 | $8.55 | $12.99 |
| Pirate Latitudes | Michael Crichton | HarperCollins | $27.99 | $14.00 | $9.99 | $9.99 | |
| Ford County | John Grisham | Random House | $24.00 | $11.00 | NA | NA | |
| U is for Undertow | Sue Grafton | Penguin | $27.95 | $14.96 | $9.99 | $9.99 | $12.99 |
| The Last Song | Nicholas Sparks | Hachette | $24.99 | $12.96 | $8.80 | $8.80 | |
| The Christmas Sweater | Glenn Beck | Simon & Schuster | $19.99 | $11.97 | $9.99 | $9.99 | |
| Breathless | Dean Koontz | Random House | $28.00 | $14.00 | $9.99 | $9.99 | |
| The Lacuna | Barbara Kingsolver | HarperCollins | $26.99 | $13.00 | $9.99 | $9.99 | |
| True Blue | David Baldacci | Hachette | $27.99 | $13.97 | $9.99 | $9.99 | |
| Wolf Hall | Hilary Mantel | Macmillan | $27.00 | $11.00 | $8.80 | $8.80 | |
| The Gathering Storm | Robert Jordan | Macmillan | $29.99 | $17.54 | NA | NA | |
| Half Broke Horses | Jeannette Walls | Simon & Schuster | $26.00 | $14.46 | $9.99 | $9.99 | |
| Pursuit of Honor | Vince Flynn | Simon & Schuster | $27.99 | $12.47 | $8.00 | $8.00 | |
| The Scarpetta Factor | Patricia Cornwell | Penguin | $27.95 | $14.97 | $9.99 | $9.99 | $12.99 |
| The Girl Who Played with Fire | Stieg Larsson | Random House | $25.95 | $13.00 | $7.99 | $7.99 | |
| The Wrecker | Clive Cussler | Penguin | $27.95 | $15.97 | $9.99 | $9.99 | $12.99 |
| South of Broad | Pat Conroy | Random House | $29.95 | $16.97 | $9.99 | $9.99 | |
| Last Night in Twisted River | John Irving | Random House | $28.00 | $15.97 | $9.99 | $9.99 | |
| Too Much Happiness | Alice Munro | Random House | $25.95 | $15.17 | $9.99 | $9.99 | |
| Nanny Returns | Emma McLaughlin | Simon & Schuster | $25.00 | $14.39 | $9.99 | $9.99 | |
| Too Much Money | Dominick Dunne | Random House | $26.00 | $15.21 | $9.99 | $9.99 | |
| Her Fearful Symmetry | Audrey Niffenegger | Simon & Schuster | $26.99 | $13.49 | $5.79 | $5.79 | |
| Heat Wave | Richard Castle | HarperCollins | $19.99 | $11.69 | $9.99 | $9.99 | |
| Divine Misdemeanors | Laurell K. Ballantine | Random House | $26.00 | $14.97 | $9.99 | $9.99 | |
| Angel Time | Anne Rice | Random House | $25.95 | $12.98 | $9.99 | $9.99 | |

| Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|
| Anger Time | Anne Rice | House | $25.95 | $12.98 | $9.99 | $9.99 | |
| The Host | Stephenie Meyer | Hachette | $25.99 | $14.97 | $9.99 | $9.99 | |
| New York | Edward Rutherford | Random House | $30.00 | $17.55 | $9.99 | $9.99 | |
| Darth Bane | Drew Karpyshyn | LucasBooks | $27.00 | $17.82 | NA | NA | |
| Southern Lights | Danielle Steele | Random House | $28.00 | $15.97 | $9.99 | $9.99 | |
| The Paris Vendetta | Steve Berry | Random House | $26.00 | $14.97 | $9.99 | $9.99 | |
| Dead and Gone | Charlaine Harris | Penguin | $25.95 | $14.97 | $9.99 | $9.99 | $12.99 |
| An Echo in the Bone | Diana Gabaldon | Random House | $30.00 | $17.55 | $9.99 | $9.99 | |

| NYT Bestsellers-Hardcover Nonfiction | Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|---|
| | Going Rogue | Sarah Palin | HarperCollins | $28.99 | $14.50 | $9.99 | $9.99 | |
| | Have a Little Faith | Mitch Albom | HarperCollins | $23.99 | $10.99 | $9.90 | $9.90 | |
| | Arguing with Idiots | Glenn Beck | Simon & Schuster | $29.99 | $16.96 | $9.99 | NA | |
| | True Compass | Edward M. Kennedy | Hachette | $35.00 | $21.00 | $9.99 | $9.99 | |
| | Open | Andre Agassi | Random House | $28.95 | $16.46 | $9.99 | $9.99 | |
| | Superfreakonomics | Steven D. Levitt | HarperCollins | $29.99 | $12.00 | $9.99 | $9.99 | |
| | What the Dog Saw | Malcolm Gladwell | Hachette | $27.99 | $11.25 | $9.00 | $9.00 | |
| | Stones into Schools | Greg Mortenson | Penguin | $26.95 | $13.00 | $9.99 | $9.99 | $12.99 |
| | Outliers | Malcolm Gladwell | Hachette | $27.99 | $11.75 | $9.40 | $9.40 | |
| | The Imperial Cruise | James Bradley | Hachette | $29.99 | $16.97 | $9.99 | NA | |
| | A Bold Fresh Piece of Humanity | Bill O'Reilly | Random House | $26.00 | $14.97 | $9.60 | $9.60 | |
| | When the Game Was Ours | Larry Bird, Magic | Houghton Mifflin | $26.00 | $14.96 | $9.99 | $9.99 | |
| | The Book of Basketball | Bill Simmons | ESPN | $30.00 | $17.55 | $9.99 | $9.99 | |
| | Last Words | George Carlin | Simon & Schuster | $26.99 | $14.97 | $9.99 | $9.99 | |
| | Too Big to Fail | Andrew Ross Sorkin | Penguin | $32.95 | $13.00 | $9.99 | $9.99 | $12.99 |
| | Where Men Win Glory | Jon Krakauer | Random House | $27.95 | $14.97 | $9.99 | $9.99 | |
| | A Simple Christmas | Mike Huckabee | Penguin | $19.95 | $11.47 | $9.97 | $9.97 | $12.99 |
| | Liberty and Tyranny | Mark Levin | Simon & Schuster | $25.00 | $12.96 | $9.90 | $9.90 | |
| | Born to Run | Christopher McDougall | Random House | $24.95 | $14.47 | $9.99 | $9.99 | |
| | Half the Sky | Sheryl WuDunn | Random House | $27.95 | $13.99 | $9.99 | $9.99 | |
| | The National Parks | Ken Burns | Random House | $50.00 | $31.50 | NA | NA | |
| | Inside of a Dog | Alexander Horowitz | Simon & Schuster | $27.99 | $13.21 | $9.99 | $9.99 | |
| | Our Front Pages | Onion Staff | Simon & Schuster | $28.00 | $18.48 | NA | NA | |
| | Here's the Deal | Howie Mandel | Random House | $25.00 | $16.50 | $9.99 | NA | |
| | Comeback 2.0 | Lance Armstrong | Simon & Schuster | $27.99 | $18.47 | NA | NA | |
| | Highest Duty | Chesley B. Sullenberger | HarperCollins | $25.99 | $15.20 | $9.99 | $9.99 | |
| | The Time of My Life | Patrick Swayze | Simon & Schuster | $26.00 | $14.47 | $9.99 | $9.99 | |
| | You Better Not Cry | Augusten Burroughs | Macmillan | $21.99 | $10.98 | $9.99 | $9.99 | |
| | Are You There, Vodka? It's Me, Chelsea | Chelsea Handler | Simon & Schuster | $24.95 | $16.47 | $8.42 | $8.42 | |
| | Hard Work | Roy Williams | Algonquin Houghton | $24.95 | $16.47 | $9.99 | $9.99 | |

| The Big Burn | Timothy Egan | Houghton Mifflin | $27.00 | $17.82 | $9.99 | $9.99 | |
| Churchill | Paul Johnson | Penguin | $24.95 | $14.58 | $9.99 | $9.99 | $12.99 |
| The Red Book | C. G. Jung | W. W. Norton | $195.00 | $122.85 | NA | NA | |
| The Football Book, Expanded Ed. | SI Editors | Time/SI | $29.95 | $19.77 | NA | NA | |
| Official Book Club Selection | Kathy Griffin | Random House | $25.00 | $16.50 | $9.99 | $9.99 | |

------ end message ------

Confidential

IX.    **APPLE'S AGENCY AGREEMENTS FACILITATED AN ILLEGAL CONSPIRACY TO RAISE E-BOOK PRICES AND RESTRAIN PRICE COMPETITION BY ENSURING THAT PUBLISHER DEFENDANTS WOULD SWITCH THEIR OTHER E-BOOK RETAILERS TO THE AGENCY MODEL**

117.    On January 11, 2010, Apple sent to each Publisher Defendant's CEO identical draft E-book Agency Distribution Agreements.  The agreements required publishers to set "customer prices" for new release hardcover titles at one of several price tiers.  Specifically, for the e-book versions of new release hardcover titles with list prices of $30 or less, publishers could designate any price ending in "$-.99" up to a maximum of $12.99, and could designate a $14.99 price for list prices greater than $30, with incremental $5 increases in customer prices for every $5 increase in list price.[29]

118.    On January 12, Apple met with executives from Penguin, Hachette, and HarperCollins. Mr. Cue summarized the results of those meetings the next day to Mr. Jobs:  "The response from both Penguin and Hachette was very similar—willing to do an agency model[,] go agency model for new releases with everyone else[,] agree that digital books should be cheaper than physical but[,] need a higher tier(s)."  PX-0026.  This was precisely in keeping with Apple's goal of moving other retailers to agency.

A.    **Apple's Initial Written Proposal Included a Most Favored Nation Clause as a Mechanism to Ensure that Each Publisher Defendant Would Move All of Its E-Book Retailers to Agency**

119.    Apple was aware that it could not "legally force" the publishers to move all other retailers to agency.  PX-0487 at 1-2.  Instead, Apple came up with an alternative way to accomplish that

---

[29] PX-0248 at 14 (APLEBOOK-00012758); PX-0249 at 14 (APLEBOOK-00012774); PX-0285 at 14 (APLEBOOK-00012790); PX-0322 at 14 (APLEBOOK-00012806); PX-0286 at 14 (APLEBOOK-00012822).

goal:  a Most Favored Nation clause ("MFN").  Apple (Eddy Cue) CID Dep. 77:4-14.  These

MFN clauses, identical in each of the January 11 draft E-book Agency Distribution Agreements,

obligated the publishers to lower the iBookstore customer price of a particular new release

e-book to match a lower price on that e-book offered by any other e-book retailer.[30]  Apple's

Kevin Saul testified that the MFN was an "elegant way of enabling us to compete," Kevin Saul

Dep. 155:20-156:4, that provided an "elegant solution" to its problem of having to compete on

price against retailers like Amazon, *id.* at 163:7-16.

120.    Apple understood that the MFN clause "was a way to protect" itself from price

competition with Amazon by forcing the publishers to move all other retailers to agency.  *See*

Peter Alcorn Dep. 122:22-124:20; PX-0065 at 1.

121.    The publishers initially resisted the MFN clause, Genevieve Shore Dep. 325:19-327:4;

PX-0107 at 1; PX-0310 at 1, with at least two publishers—Macmillan and HarperCollins—

basing their objections on legal concerns.  Eddy Cue Dep. 301:23-302:7, 310:20-311:22, 342:3-

343:7; PX-0563 at 1.  A Macmillan executive internally identified the antitrust risk of signing the

agency agreement with the MFN as being "huge."  PX-0320 at 3 (MCMLN-LIT-00041316).

122.    In resisting the MFN, publishers sought to assure Apple that, even without it, all retailers

would be moved to agency.  Apple (Eddy Cue) CID Dep. 87:7-12.  But Apple, perhaps not

entirely trusting Publisher Defendants, insisted on including the MFN.  Eddy Cue Dep. 300:25-

302:14.

---

[30] PX-0249 at 5 (APLEBOOK-00012765); PX-0285 at 5 (APLEBOOK-00012781); PX-0322 at
5 (APLEBOOK-00012797); PX-0286 at 5 (APLEBOOK-00012813); PX-0248 at 5
(APLEBOOK-00012749).

123.     The MFNs in the Apple Agency Agreements effectively locked the publishers into their

commitment to impose agency terms on Amazon and other retailers.  *See, e.g.*, PX-0529 at 12

(HC-TXAG-0816834).  This was because a Publisher Defendant that had signed an agency

agreement with Apple would be vulnerable to pricing decisions by another, wholesale-model

retailer, namely Amazon.  Gilbert Direct ¶ 96; *see also* Baker Direct ¶ 78 (… "[t]he MFN

sharpened a publisher's incentive to convert Amazon because it effectively penalized a publisher

for not doing so").  The MFN required each Publisher Defendant to match at the iBookstore a

lower price for a title sold at any other retailer even if the publisher did not set that lower price

(i.e., the book was sold on the wholesale model).

124.     HarperCollins executives acknowledged that the implication of the MFN clause would be

to change Amazon's model and raise the price of e-books.  PX-0529 at 12 (HC-TXAG-

0816834).  The CEO of Penguin's parent company wrote to her board in January 2010 that "we

don't think" the agency and wholesale models "can coexist very long, and so we're going to be

telling all our re-selling middlemen (Amazon, Barnes & Noble, e.g.) that we're going to deal

with them for eBooks on the agency basis in the future, too."  PX-0530 at 2 (PEN831800).

Another Penguin executive testified that Penguin had to move Amazon and its other retailers to

the agency model because the Apple Agency Agreement's MFN clause would require Penguin to

match on the iBookstore any lower price that was set on Amazon under wholesale, resulting in

Penguin making less money per unit.  Timothy McCall Dep. 126:24-127:20.

125.     The other publishers reached an identical conclusion.  Mr. Nourry testified that the

presence of the MFN clause meant that "everyone" would have to be "under agency agreement."

Arnaud Nourry Dep. 148:13-149:2.  And Ms. Reidy wrote to Mr. Moonves that "[t]he Apple

ITunes eBook store will go live around the end of March (exact date not yet determined).  In

order not to be in a situation whereby we must price our adult new release eBooks sold through Apple at $9.99, undercutting one of the reasons for making the deal, we need to change our eBook selling terms with our other eRetailers before that date."  PX-0341 at 1.

126.    In turn, moving Amazon and other retailers to agency meant that the publishers would be able to take control of pricing decisions and would be able to raise e-book prices and restrain retail e-book price competition.  As Penguin's Mr. McCall wrote:  "Agency is anti-pricewar territory.  We don't need to compete with other publishers on the price of our books."  PX-0317. A Macmillan analysis concluded that the agency model will "drive up prices on branded, differentiated" e-books.  PX-0320 at 1.  In contrast, if the publishers did not move Amazon and other retailers to agency, and Amazon continued its low prices, "Apple would be entitled to match that price and if Apple matched that price" the publishers "wouldn't have been able to afford the loss of margin."  Penguin (Timothy McCall) Dep. 125:13-126:24.

127.    The MFN clause was the fundamental mechanism by which Apple ensured that Publisher Defendants followed through on their agreed-upon goal of raising prices by eliminating Amazon's retail pricing authority.  It did so in two ways, which the analyses of Professors Gilbert and Baker illuminate.  First, the MFN cemented each publisher's belief that the other Publisher Defendants would move uniformly to convert all other retailers to an agency model. Accordingly, Professor Gilbert finds that as an economic matter, the MFN allowed each publisher credibly to commit to this goal of shifting the industry to agency.  Gilbert Direct ¶¶ 95, 98 ("[I]t would have been obvious to each defendant publisher that the MFNs created symmetric incentives for other defendant publishers to export agency to all other e-retailers as well."); *see also* Baker Direct ¶ 74 ("Apple's iBookstore launch offered each publisher a vehicle for understanding that each of the other defendant publishers had the same financial incentive to

adopt an agency distribution model agreement with Amazon and, consequently, for reaching a common understanding that all the publishers would do so.").  Second, the MFN served as a punishment mechanism for any publisher that would deviate unilaterally from this goal and keep Amazon on a wholesale model.  Baker Direct ¶¶ 72, 89-93 ("Because the publisher's profits are higher in the first of these settings—in which Amazon is on the wholesale model absent the Apple MFN—than in the second—in which Amazon is on the wholesale model and the Apple distribution agreement contains an MFN—the MFN penalized a publisher for keeping Amazon on the wholesale model.  For that reason, the Apple MFN strengthened publisher incentives to follow through on a common understanding to convert Amazon to the agency model.").  Such a publisher would incur a profit loss on all sales at Apple because the MFN requires that prices be as low as at any other retailer, such as would prevail at Amazon on a wholesale model.  Gilbert Direct ¶¶ 96, 97; *see also* Baker Direct ¶ 78 ("[T]he MFN sharpened a publisher's incentive to convert Amazon because it effectively penalized a publisher for not doing so.").

128.    Apple has suggested that the MFN simply was designed to allow Apple to offer lower prices in the iBookstore if Amazon or others continued their low pricing.  But that argument ignores the reality—which Publisher Defendants had made clear to Apple—that the last thing Publisher Defendants wanted was to see Amazon's $9.99 pricing not only continue, but extend to Apple.  As Mr. Nourry testified, his "entire vision was to prevent" $9.99 pricing "by putting either agency agreements or wholesale on windowed titles.  So yes, in theory that would have been possible, but my intention was to make sure that this would not happen."  Arnaud Nourry Dep. 233:11-20.  Indeed, Publisher Defendants concede that the Apple MFN "heavily incentivized" the publishers to "attempt to move to the agency model with Amazon and other

retailers."  Mem. of Law in Supp. of Publisher Defs.' Mot.  Dismiss Consolidated Am. Class

Action Compl., at 27, Mar. 2, 2012 (Case No. 1:11-md-02293-DLC, Docket No. 89).[31]

129.    It is utterly implausible that Apple was unaware of the consequences of what it was

proposing.  As Mr. Nourry testified, one need not be "a lawyer" to understand that the publishers

could not comply with the Apple MFN clause "unless everyone is under agency agreement."

Arnaud Nourry Dep. 148:13-149:2.

### B.  Apple's Initial Written Proposal Included "Price Caps" That Would Function as Fixed Prices for Publisher Defendants' E-books

130.    The price caps were, in reality, an agreement among Publisher Defendants and Apple to

fix the retail prices of e-books at higher prices than Amazon was charging.  The publishers

recognized that Apple's price caps meant that "price would be standard across the industry."

PX-0308 at 1.  In economic terms, the price caps were "focal (natural and obvious)" and

provided "a basis by which the publishers reached a common understanding as to price levels."

Baker Direct ¶ 104.  Mr. Zaffiris of HarperCollins identified as a benefit of moving to agency

that it would mean "uniform prices" for e-books and a "once-in-a-lifetime chance to flip the

model."  PX-0307 at 2 (HC-DOJ-0149469).   Indeed, the whole concept of the caps, when

coupled with the move to agency, was that "people all have the same prices."  Arnaud Nourry

Dep. 164:3-17.

131.    Because the move to agency meant that the publishers would make less on each e-book,

Genevieve Shore Dep. 299:18-300:20, both Apple and the publishers knew that the publishers

would price the vast majority of e-books at the maximum agreed-upon price—a price that the

---

[31] *See also* PX-0341 at 1-2; PX-0106 at 1; Penguin (Timothy McCall) Dep. 125:13-126:24.

publishers all knew was the same for each of them.  *See, e.g.*, PX-0030; PX-0023 at 1-3;

PX-0612 at 3 (SS00032649); PX-0156 at 1.  Moreover, because Publisher Defendants and Apple

expected the price caps would be binding, they understood the MFN would have its desired

effect of getting the publishers to move as a united front in converting Amazon to agency.

132.    Mr. Cue was not only aware that the publishers wanted to raise e-book prices, but he

specifically touted the Apple Agency Agreements to the publishers as the "best chance for

publishers to challenge the 9.99 price point."  Arnaud Nourry Dep. 140:5-14.  Mr.

Hely-Hutchison testified that agency was intended precisely so that prices of bestsellers would

rise to the price cap.   Timothy Hely-Hutchinson Dep. 167:21-168:9; *see also* Penguin (David

Shanks) Dep. 123:17-124:14.

### C.  Apple Agreed to Higher Price Tiers

133.    Consistent with their collective commitment to raise retail e-book prices, each Publisher

Defendant conveyed to Apple that the price caps should be higher than Apple had proposed.[32]

When Apple ultimately agreed to higher price tiers as sought by Publisher Defendants, it knew

that Publisher Defendants would price at the "caps" and thus that it was agreeing to increase

retail prices.  *See* Eddy Cue Dep. 278:5-279:2.

134.    Acting as an information conduit in such a manner as to increase the likelihood that each

Publisher Defendant ultimately would set its prices at (rather than below) the caps negotiated,

Apple told Publisher Defendants that each publisher shared the same reaction to Apple's initial

proposal for price caps.  Simon & Schuster CEO Ms. Reidy reported to her parent corporation's

---

[32] PX-0049 at 1; PX-0484 at 1; PX-0076; PX-0026; PX-0174 at 1.

CEO that Apple's Keith Moerer told her on January 8 that "what we said to him was exactly what all the other publishers had said:  the pricing was too low."  PX-0537; *see also* Timothy McCall Dep. 76:24-77:4.

135.    On January 13, 2010, Apple planned to meet with executives from Simon & Schuster, Random House, and Macmillan.  PX-0026.  That morning, executives from Simon & Schuster, Penguin, and Hachette met to discuss an e-book joint venture, but likely also to discuss how best to engage with Apple.  PX-0103; David Shanks Dep. 228:21-233:2.

136.    Apple relented in meetings later that day and agreed it would increase the price caps. From her January 13 meeting with Apple, Ms. Reidy came away believing "that there will be some movement on . . . the question[] of pricing . . . ."  PX-0656.  And in a January 15, 2010 call, Apple's Mr. Moerer told Madeline McIntosh and Amanda Close of Random House that Apple was "examining and refining the model to allow more flexibility and high price tiers now."  PX-0192 at 1.

137.    On Saturday January 16, 2010, Apple's Mr. Cue sent a series of nearly identical e-mails to his publisher contacts.  In those e-mails, Mr. Cue formally agreed to Publisher Defendants' request for higher price caps:  "This gives you significantly more tiers and higher prices."[33] Mr. Cue also used language to make clear both that Apple was negotiating a single deal with the group of publishers and that each Publisher Defendant would receive the January 16 e-mail: "one question we have been asked is whether we would take less than a 30% commission."  *See supra* note 33.  Indeed, leading off her description of the e-mail, Simon & Schuster's Ms. Reidy noted:  "Last night I received an email I assume went to everyone."  PX-0537.

---

[33] PX-0059 at 1; PX-0511 at 1; PX-0512 at 1; PX-0120 at 1; PX-0513 at 1.

138.    Before offering Publisher Defendants these "higher prices," Mr. Cue sought permission

from Mr. Jobs, explaining:  "Here is the pricing I think will push them to the very edge and still

have a credible offering in the market."  PX-0055.  After composing many drafts of an e-mail

response, Mr. Jobs settled on:  "I can live with this, as long as they move Amazon to the agent

model too for new releases for the first year.  If they don't, I'm not sure we can be competitive."

*Id.*  In some earlier drafts of his e-mail, Mr. Jobs included an MFN condition instead of the

"move Amazon to the agent model" condition, demonstrating the equivalence in his mind of the

two.[34]

### D.  Apple Pushes Publisher Defendants Forward as Amazon Offers Better Deal to Authors

139.    On January 18, 2010, Laura Porco, Amazon's Director of Kindle Books, met with her

friend and former colleague, Madeline McIntosh of Random House.  In the meeting,

Ms. McIntosh told Ms. Porco that she was under pressure from other "Big Six" publishers for

Random House to move to the agency model because Apple had made it clear that they wanted

maximum participation before it would open its iBookstore.  Porco Direct ¶¶ 12-13.

140.    On January 20, 2010, Amazon unveiled a new option in its self-publishing program under

which copyright holders could take their e-books directly to Amazon—cutting out the publishers

entirely—and receive royalties of up to 70 percent, far in excess of what the publishers offered.

PX-0706.  Penguin CEO David Shanks summed up the publisher reaction:  "On Apple I am now

more convinced that we need a viable alternative to Amazon or this nonsense will continue and

get much worse."  PX-0713.  Rupert Murdoch, the CEO of HarperCollins's parent company, was

---

[34] *See* PX-0195; PX-0686; PX-0687; PX-0688.

described by Mr. Murray as reacting to the news by becoming "pissed at Amazon" and wanting to "screw Amazon."  PX-0714 at 1.

141.    Apple knew that the publishers were trying to formulate a joint response to Amazon and that Apple could help them do so.  As Mr. Cue commented to Mr. Jobs on January 21 when discussing Publisher Defendants' willingness to agree to agency:  "In the end, they want us and see the opportunity we give them but they're scared to commit!  It [has] less to do with the terms and more about the dramatic business change for them. . . . They just have to get some balls." PX-0042 at 1.  Mr. Cue understood that one of Publisher Defendants' greatest fears was having to face Amazon alone, so he assured each of the Publisher Defendants that "they weren't going to be alone, so that I would take the fear away of the Amazon retribution that they were all afraid of."  Eddy Cue Dep. 129:25-130:11.

### 1.  Apple's Eddy Cue Tells Macmillan CEO John Sargent over Dinner on January 20, 2010 that Macmillan Must Move Amazon to Agency

142.    On January 20, 2010, Macmillan CEO Mr. Sargent met with Mr. Grandinetti of Amazon. At that meeting, Mr. Sargent "indicated that he was working on an agency model but his plan was to offer both an agency and reseller model."  PX-0482 at 3 (AMZN-MDL-0161086).

143.    That same evening, on January 20, Mr. Sargent had dinner with Mr. Cue.  PX-0037. Before that dinner, Mr. Cue told Mr. Sargent that, while he was "very reasonable to try new things," they would have to work for the whole group:  "we need to establish a starting point for everyone."  PX-0712.

144.    The morning after their dinner, Mr. Sargent wrote to Mr. Cue about Macmillan's position with respect to Apple's agency offer.  PX-0037 at 1.  Mr. Sargent explained that Macmillan was "willing to give up on many . . . points," but that "[t]he stumbling block is the single large issue

that we clearly had a misunderstanding about." *Id.*  Mr. Cue did not budge in his response: "I understand.  I don't believe we are asking you to do anything, you haven't told us you are doing. We are just trying to get a commitment."  *Id.*

145.    Later on January 21, Mr. Sargent telephoned Mr. Grandinetti to explain that he had realized that the "Apple contract required him to only offer the agency model."  PX-0482 at 3 (AMZN-MDL-0161086).

146.    The plain inference from this sequence of events and Mr. Sargent's abrupt reversal of his statement that he would offer Amazon both an agency and a reseller model is that Mr. Cue reaffirmed to Mr. Sargent over dinner that Amazon had to be moved to agency.  In doing so, Mr. Cue was acting consistent with his January 4 and 5 emails in which Apple insisted that "all resellers of new titles need to be in agency model."  PX-0476 at 1.

## 2.  Apple Herds the Cats

147.    The morning of January 21, Simon & Schuster CEO Carolyn Reidy e-mailed Mr. Cue promising to call him and requesting information regarding Apple's negotiations with the other Publisher Defendants:  "I will also look forward to an update on your progress in herding us cats."  PX-0782 at 1.  Ms. Reidy called Mr. Cue at 12:24 P.M. and spoke to him for approximately eleven minutes.  PX-0788 at 4.

148.    Later on January 21, Mr. Cue sent e-mails to both Penguin CEO David Shanks and Macmillan CEO John Sargent stating:  "We completed our first deal and are very close with two other publishers."  PX-0018; PX-0084.

149.    The same day, there were upwards of 25 calls to one another placed between Publisher Defendants' CEOs.  PX-0787 at 2-3.  The logical inference is that each of the CEOs was confirming Cue's assurances about Publisher Defendant participation in the conspiracy.

150.    On January 22, Ms. Reidy called Amazon's Mr. Grandinetti to tell him that Simon &

Schuster intended to move to agency terms with all e-book retailers.  Grandinetti Direct ¶ 42;

PX-0351 at 1; PX-0482 at 3 (AMZN-MDL-0161086).

151.    On January 23, Ms. Reidy reported to the CEO of Simon & Schuster's parent

corporation:  "It appears they [Apple] have reached agreement with four of the five major

publishers in time for the announcement next Wednesday—from what I can gather, Random

House and HarperCollins will not be part of the announcement, but Penguin, Hachette, and

Macmillan will be, along with us."  PX-0351 at 1.

152.    On January 26, before the iBookstore was officially announced, Ms. Reidy e-mailed

Mr. Cue and noted—in terms that clearly reflect a conscious commitment to a common scheme

by Apple and Publisher Defendants—her hope that the iPad launch event "will sustain us as we

move through the next steps in this process of changing the industry."  PX-0613.

### E.  In Order to Secure a "Critical Mass" of Publishers for the Conspiracy, Apple Assured Publisher Defendants that Their Competitors Would Join the Agreement

153.    As described below, the only condition on which any one of Publisher Defendants would

agree to Apple's terms was if it could be sure its competitors were also going to agree.  "In

particular," the publishers told Apple that they feared being "singled out by Amazon."  Eddy Cue

Dep. 336:8-24.

154.    Apple allayed the publishers' fears by deliberately using the acquiescence of some

publishers to secure the agreement of others.  Eddy Cue Dep. 333:8-334:9, 336:8-24.

Specifically, Apple continued to tell the publishers that it would only open the iBookstore if

there were an agreement among the publishers to join on Apple's proposed terms.  Apple (Eddy

Cue) CID Dep. 52:12-53:22.  Doing so also worked to Apple's advantage.  One publishing

executive observed that as Apple's self-imposed deadline for opening the iBookstore grew nearer, Apple put "pressure" on the publishers by "letting [us] know they want 5 out the [sic] 6 . . . ." PX-0707 at 1.  Another publishing executive described Apple as "demanding that all publishers be in the program . . . ." PX-0303 at 2-3 (STATE-DOJ-00001281-282).  Apple also was careful to assure each publisher that its agreement would be same as that of the other major publishers.  Apple (Eddy Cue) Dep. (Mar. 13, 2013), 300:3-13; Apple (Eddy Cue) Dep. (Mar. 12, 2013), 127:21-128:22; Kevin Saul Dep. (Feb. 22, 2013), 172:3-173:2; PX-0509.

155.    Each Publisher Defendant responded to Apple's pressure by seeking additional information about where Apple stood in its discussions with other publishers.  This was information Publisher Defendants needed to know to be certain that they could successfully apply sufficient pressure on Amazon to change to an agency model.  Apple willingly obliged by sharing this information with Publisher Defendants.  Arnaud Nourry Dep. 151:3-152:5.  On January 21, 2010, Mr. Cue e-mailed Mr. Sargent to inform him that Apple had already agreed to agency terms with one publisher and was "very close with two other publishers."  PX-0084.  Two minutes later, Mr. Cue sent a substantively identical e-mail to Penguin's Mr. Shanks.  PX-0018.

156.    On January 22, 2010, Macmillan agreed in principle to the agency deal with Apple.  Apple then told Macmillan that it was the "third to say yes" and that Apple had "decided they can go forward with the i[book]store at this level of support."  PX-0089.  Mr. Cue had sent a similar message to Mr. Young earlier that afternoon, PX-0563, which had its desired effect.  When Mr. Young forwarded that email to Mr. Nourry, it clearly piqued the latter's attention and Mr. Nourry responded:  "We really need to know about the others!"  PX-0563.

157.    Hachette's willingness to agree to agency was based expressly on where Apple's negotiations stood with Hachette's competitors.  On January 21, Mr. Young reported to Mr. Nourry on what he had learned from Eddy Cue as to the status of the agency negotiations. PX-0562 at 1.  Mr. Cue apparently reported that "one major publisher (clearly RH) was out and that ne [sic] need the five majors in but maybe four."  Because Random House had just informed Apple that same day that it would not sign an agency agreement with Apple,[35] PX-0042 at 2 (APLEBOOK-00016370), Mr. Young had to have spoken to Mr. Cue on January 21.

158.    Mr. Nourry responded that Mr. Young should see if he could find out something from his "great PR fan."  PX-0562 at 1.  An e-mail from the previous day establishes that Mr. Nourry's "fan" was Simon & Schuster's CEO Ms. Reidy.  PX-0711 at 1.  Specifically, Mr. Nourry wanted information on Simon & Schuster's plans because Mr. Nourry was "reluctant to fixing best seller prices at 12$90 because it may be our last chance to bring it back up to say 14$99."  PX-0562 at 1.  Mr. Young replied to Mr. Nourry that he was off to a meeting of the Association of American Publishers where he would "try and discover what is going on."  PX-0715.  Mr. Young will testify that he wanted this information in part to determine whether the information he was receiving from Eddy Cue about other publishers was accurate.  Mr. Sargent is likely to testify that he spoke to Mr. Young and Mr. Murray at the AAP meeting, and that they acknowledged they were having a "tough week" with Apple.

159.    Hachette was the first publisher to actually sign an Apple Agency Agreement on January 24. PX-0001.  Mr. Young will likely testify that it was a great comfort to know that Hachette

---

[35] Random House executives will testify that moving to agency would have been too dramatic of a shift in the company's business model to make that quickly.

would not be alone in signing up with Apple, as Mr. Young knew that Macmillan had already

verbally agreed to Apple's terms.  PX-0539.  As Mr. Nourry of Hachette wrote that same day,

once he was assured that other publishers would be participating in the conspiracy, "moving to

the agency model will put an end to price deflation and help several players to remain in the

game.  We do not like the 12,90 price point, but it is much better than 9,99 and moving back to

say 14,90 would help Amazon in their communication to customers."  PX-0106 at 1; Arnaud

Nourry Dep. 179:11-180:4.

160.    Penguin's agreement to Apple's terms was conditioned expressly on the agreement of its

competitors to Apple's terms.  PX-0018.  As Mr. Cue testified:  "Penguin, and David in

particular of all the publishers, was the most concerned about sort of not being alone or being

one of two."  Eddy Cue Dep. 344:5-345:4.  Indeed, Penguin's Mr. Shanks told Mr. Cue that he

would not agree to agency unless at least three of the other publishers did so as well.  Penguin

(David Shanks) CID Dep. 86:15-24; PX-0029.  On the evening of Friday, January 22, 2010, Mr.

Cue e-mailed his boss, Mr. Jobs, and noted that Mr. Shanks "wants an assurance that he is 1 of 4

before signing."  PX-0028 at 1.

161.    On January 22, 2010, Mr. Shanks asked Mr. Cue if he had "any more of the big six

confirmed yet."  PX-0018.  Five minutes later Mr. Cue called Mr. Shanks.  PX-0788 at 5.  Later

that day, Mr. Shanks told Mr. Cue that, on "orders from London," Apple had to "have the fourth

major or we can't be in the announcement."  Mr. Cue responded, "Hopefully this is not an issue

but if it is I will call you at 4pm.  It would be a huge mistake to miss this if we have 3."

PX-0029.

162.    On January 24 and 25, 2010, Mr. Shanks had repeated calls with Mr. Cue:  a nearly two-

minute call on Sunday, January 24, 2010, and three calls of twenty, five and a half, and one and a

half minutes on the morning of January 25, 2010.  Eddy Cue Dep. 352:9-17; PX-0788 at 6.  On

the morning of January 25, 2010, Mr. Shanks had a four-minute telephone conversation with Ms.

Reidy.[36]  PX-0787 at 4.  Through Mr. Shanks' repeated calls with Mr. Cue and his call with Ms.

Reidy, Mr. Shanks must have received the assurances he needed, as Penguin signed the Apple

Agency Agreement on January 25, 2010.  PX-0002.

163.     In total, three other publishers—Simon & Schuster, Macmillan, and Penguin—signed

Apple Agency Agreements on January 25.[37]

164.     At this point, HarperCollins remained a holdout, largely because, as Mr. Murray will

testify, HarperCollins believed the retail prices of e-books in Apple's proposal remained too low

and would deliver long-term damage to HarperCollins's business.  HarperCollins's executives

recognized, though, that the effect of the publishers moving to agency would be that Apple

would monitor and enforce the price-fixing agreement.  PX-0308 at 1-2 (stating that under the

agency agreements "Apple would control price and that price would be standard across the

industry" and observing that Apple would become the "gatekeeper" on e-book prices for the

industry).

165.     Once he had secured the verbal agreement of Simon & Schuster, Hachette, Macmillan,

and Penguin, Mr. Cue wrote Mr. Murray to inform him that four publishers had agreed to

Apple's agency agreements.  PX-0507.

---

[36] Mr. Shanks was unable to recall the substance of that conversation.  David Shanks Dep.
241:13-242:3.

[37] PX-0004 (Simon & Schuster /Apple Agency Agreement); PX-0002 (Penguin/Apple Agency
Agreement); PX-0003 (Macmillan/Apple Agency Agreement).

166.    Before making a final decision on signing with Apple, Mr. Murray made a round of phone calls to his fellow publisher CEOs.  Mr. Murray first called Mr. Sargent at Macmillan to tell him that HarperCollins would not sign the Apple contracts.  Mr. Sargent will testify that this communication by Mr. Murray, a competitor of Mr. Sargent's, was "inappropriate."  As Mr. Murray will testify, however, Mr. Sargent nonetheless confirmed for Mr. Murray that Macmillan would participate in the iBookstore launch.  Two minutes before calling Mr. Sargent, Mr. Murray had called Mr. Young.  While it does not appear that Mr. Murray was able to reach him, PX-0787 at 3, Mr. Murray will testify that he did confirm with Hachette that it would participate in the iBookstore launch.  A little more than an hour after Mr. Murray called Mr. Sargent, Mr. Sargent called both Ms. Reidy and Mr. Young.  *Id.*

167.    At the request of Mr. Cue, Mr. Jobs went over Mr. Murray's head to HarperCollins's parent, News Corp., to secure HarperCollins's participation in the conspiracy.  Specifically, Mr. Cue requested that Mr. Jobs call James Murdoch and "tell him we have 3 signed so there is no leap of faith here."  PX-0030.

168.    In convincing News Corp., Mr. Jobs demonstrated that Apple knew it was conspiring with the Publisher Defendants to restrain retail price competition, thereby fixing higher e-book prices.  Mr. Jobs acceded to Mr. Cue's request and wrote to James Murdoch on January 24, 2010, urging HarperCollins to "[t]hrow in with Apple and see if we can all make a go of this to create a real mainstream ebooks market at $12.99 and $14.99," rather than at $9.99 with Amazon.  PX-0032 at 1.  That is to say, Mr. Jobs told Mr. Murdoch that the price for e-books in the iBookstore would be fixed at the price caps in the substantively identical Apple Agency Agreements.

169.    Mr. Jobs did not stop there.  He told Mr. Murdoch:  "All the major publishers tell us that Amazon's $9.99 price for new releases is eroding the value perception of their products in customer's [sic] minds, and they do not want this practice to continue for new releases."  PX-0032 at 3 (APLEBOOK-03345080).  Mr. Jobs also made clear to Mr. Murdoch that the price caps would be the actual prices charged in the iBookstore:  He referred in his e-mail to the publishers' revenue per book sold being "around $9 per new release," a figure that Mr. Jobs could state with certainty only because he knew that the publishers would be pricing at the caps.  PX-0032 at 5 (APLEBOOK-03345082).  Thus, whatever else Apple may contend about its level of interest in raising e-book prices, it certainly knew that prices would increase as a result of its conspiracy with the publishers.

170.    Mr. Jobs's message proved persuasive.  On January 26, 2010, Apple and HarperCollins signed an agreement for Apple to distribute HarperCollins's e-books through an agency model.  PX-0005.

### F.  The Conspiracy Benefited Apple by Allowing Apple to Earn a 30% Commission Without Needing to Compete Against Amazon on Price

171.    Having thus reached agreement, at the iPad's launch on January 27, Mr. Jobs was able confidently to respond to *Wall Street Journal* reporter Walt Mossberg's question about why customers would pay higher prices for e-books sold in the iBookstore when they could get the same titles from Amazon for less:  "The prices will be the same."[38]  PX-0615.  Mr. Jobs's

---

[38] In a nearly identical communication two days later, Simon & Schuster executives demonstrated that they also understood the terms of the Apple Agency Agreement would mean it would have to prevent Amazon from selling its bestseller e-books at $9.99.   In response to an e-mail asking, "If I can still buy an ebook from amazon at 9.99 and read on the ipad, how does

prediction was prescient because he knew that Apple had successfully orchestrated a horizontal agreement among the publishers to move other e-retailers to agency, with the MFN clause serving as the enforcement mechanism. *See* Kevin Saul Dep. 152:9-16 (Apple's counsel's understanding was that the existence of the MFN clause explains why Mr. Jobs was able to assert that Apple's e-book prices would be the same as Amazon's).

172.    Indeed, the prices that appeared behind Mr. Jobs at the January 27 press conference—the same prices he had quoted in his emails to James Murdoch of HarperCollins—and the prices that would be "the same" as Amazon's prices, were $12.99 and $14.99. *See* PX-0365 at 52:40-56. Those prices could only have been the same as Amazon's prices if Mr. Jobs knew that the publishers would gain control of *all* retail pricing, especially at Amazon. This was the "aikido move" to unify Publisher Defendants that Mr. Jobs described to his biographer the next day.

173.    Elisa Rivlin, then the general counsel of Simon & Schuster, observed that Mr. Jobs's comment to Mr. Mossberg was "incredibly stupid." PX-0607 at 1. Mr. Jobs's candor would make it harder for Defendants to use the pretext of individual vertical agreements to mask the horizontal agreement among Publisher Defendants and thereby avoid antitrust scrutiny.

174.    On January 27, the very day the Apple iPad launch took place, Mr. Makinson of Penguin called Mr. Grandinetti of Amazon to tell him that Penguin had moved to agency with their "first customer." Grandinetti Direct ¶ 43. Mr. Murray of HarperCollins was even more blunt, writing to Mr. Grandinetti, "[i]n the interest of 'no surprises,'" that HarperCollins had decided to move

that impact our terms with apple," a Simon & Schuster executive stated, "You will bo [sic] longer get 999." PX-0361.

all of their new release e-books to the agency model and that they had already reached an

agreement with Apple.  PX-0728.

## X.  APPLE'S ASSURANCES OF COMMON ACTION GAVE PUBLISHER DEFENDANTS THE NECESSARY CONFIDENCE THAT THEY WERE NOT ACTING ALONE

175.    Publisher Defendants all signed Apple's agency contracts within three days of one

another.  The terms of the Apple Agency Agreements were materially identical for each

Publisher Defendant, a fact that Apple made sure to convey to the publishers.  For example, Mr.

Cue told Mr. Murray "that we were going to treat them, you know, in a very similar thing -- very

similar position around all the key points."  Eddy Cue Dep. 300:3-13.

176.    Publisher Defendants were also well aware that moving to agency with Apple was

against their short-term individual economic interest.  Any publisher that moved to agency alone

would sell newly-released and bestselling e-books at higher prices than its competitors, thus

losing market share.[39]  Worse, the publisher would earn less revenue (net of commission) on

every e-book sold.[40]  But more importantly, and as Apple recognized, any single publisher that

tried to force Amazon to accept the agency model would have credibly faced retaliation from

Amazon.  Apple (Eddy Cue) CID Dep. 52:19-53:22 (testifying that Apple was aware that

publishers were concerned about signing on to the agency model alone because it would open

them up to "significant repercussions" from Amazon); Eddy Cue Dep. 336:8-21 (Mr. Cue

---

[39] Gilbert Direct ¶ 61.

[40] Gilbert Direct ¶ 76; PX-0506 (Jan. 20, 2010 e-mail from Robert Zaffiris to Charlie Redmayne, citing a "profit hit for switching to the agency model" of "about $3.5M in revenues on $20M or 17%"); PX-0719 (Jan. 23, 2010 email from Coram Williams to John Makinson forwarding analysis showing a switch to agency would result in a negative "$4.5 m net profit impact" on Penguin's fiscal 2010 budget).

"want[ed] to get them over" the "fear of being singled out by Amazon in particular").  Indeed, as

Ms. Reidy will testify, Simon & Schuster had not taken unilateral action against Amazon in the

past because of the risk of Amazon retaliation.  Mr. Murray put it succinctly when he wrote to

Mr. Murdoch to tell him HarperCollins had reached agreement with Apple:

> In summary, the econimcs [sic] for publisher and author are terrible
> compared to hardcover economic or current kindle economics.  All value
> accrues to apple and the consumer.  But the strategic value of an Apple
> bookstore is very high.  The risk of doing this deal is Amazons reaction.
> Since we are the fifth publishers it should be muted but we won't know for
> a few weeks.[41]

177.    Because Publisher Defendants had acted in concert through their agreements with Apple,

they could be sure that the risk that Amazon might "punish" a publisher was unlikely, since

"most of industry will be going to these terms at suggestion of Apple."  PX-0156 at 1.

178.    Moving to agency with Apple as a group not only assured Publisher Defendants of

common action, but also helped them achieve their goal of raising e-book prices.  The agency

model enabled Publisher Defendants to "gain[] control over consumer price" and ensure that

price would be "increased [] from 9.99 to 12.99 or 14.99 for most books."  PX-0303 at 3

(STATE-DOJ-00001282).  As Mr. Young put it when he learned from Mr. Cue that five

publishers had signed the Apple Agency Agreement, "[i]t is really good news that all but the

rudderless company appear to have seen the potential that this opportunity presents in a similar

manner."  PX-0725.  The "rudderless company" referred to Random House.  PX-0042 at 2

(APLEBOOK-00016370).  The "opportunity" was clearly higher e-book retail prices through

collective movement to the agency model.

---

[41] PX-0526.

## XI.  IN ACCORDANCE WITH THEIR CONSPIRACY WITH APPLE, ALL PUBLISHER DEFENDANTS PRESENTED AGENCY AGREEMENTS AS AN ULTIMATUM TO AMAZON

179.    After entering into the Apple Agency Agreements, Apple and Publisher Defendants succeeded in implementing the aims of their conspiracy.  Together, they stopped Amazon's $9.99 pricing and raised the price of e-books to consumers.  Publisher Defendants got the higher prices they wanted, and Apple would not have to worry about competing on price with Amazon. In short, Mr. Jobs's "aikido move" worked.

180.    Publisher Defendants all understood that an unspoken provision of their conspiracy with Apple was threatening any retailer who insisted on remaining on the wholesale model with an extended period of windowing, or even receiving no e-books whatsoever.  PX-0637 at 1; PX-0503.  Mr. Cue had suggested to at least one large publisher, Random House, that it use the threat of windowing as a tool for getting Amazon to make the change to agency.  PX-0336 at 1. In March 2010, Apple's counsel, Kevin Saul, suggested to a smaller publisher that to comply with the Apple MFN, the publisher could "get others on an agency model, or withhold content. Others have agreed to this and we cannot make any changes."  PX-0738 at 1.

181.    Thus, Publisher Defendants all gave Amazon a choice:  move to an agency model for e-books, which would give Publisher Defendants the ability to raise e-book prices and end price competition, or accept the windowing of their e-books.  Grandinetti Direct ¶ 46; Naggar Direct ¶ 28; PX-0309 at 1.  There was little doubt among Publisher Defendants that their collective threats would force Amazon off its $9.99 pricing and the wholesale model.  For example, one publishing executive described the publishers as "imposing" agency on Amazon.  PX-0727. Macmillan executives will testify at trial that they expected Amazon to dislike both choices, but would find windowing unacceptable.

182.    Publisher Defendants also knew that the choice they were offering Amazon wasn't much of a choice at all.  After signing the Apple Agency Agreement, Mr. Nourry explained that "I knew I would be able to impose agency contract on Amazon."  Arnaud Nourry Dep. 231:17-232:7.  Mr. Nourry viewed Amazon's chances of accepting the wholesale model with withholding as "not very realistic."  *Id.* at 232:9-14.  Mr. Sargent wrote to the CEO of his parent corporation that giving Amazon a choice of a loss of e-books or a move to agency would "force Amazon's hand" and cause it to agree to be moved to agency.  PX-0095.

183.    The day after the iPad launch event, Macmillan became the first publisher formally to implement the next phase of the conspiracy—threatening Amazon with a choice between agency or losing e-books—when, on January 28, 2010, its CEO, Mr. Sargent, traveled to Seattle to meet with Amazon executives.  Naggar Direct ¶¶ 27-28.  Macmillan, the smallest of the five Publisher Defendants, would not have threatened Amazon unless it had agreed with other publishers to coerce adoption of the agency model and remove price competition at the retail level.  Indeed, the other four Publisher Defendants would subsequently deliver the same threat.  Naggar Direct ¶ 28.

184.    Mr. Sargent described the outcome of his January 28 meeting with Amazon, and Amazon's subsequent response, in a January 30 e-mail addressed to Macmillan authors and the "literary agent community":

> This past Thursday I met with Amazon in Seattle.  I gave them our proposal for new terms of sale for e books under the agency model which will become effective in early March.  In addition, I told them they could stay with their old terms of sale, but that this would involve extensive and deep windowing of titles. By the time I arrived back in New York late yesterday afternoon they informed me that they were taking all our books off the Kindle site, and off Amazon.

PX-0101 at 1; *see also* Grandinetti Direct ¶ 45.  Mr. Sargent continued by expressing the

publishers' view of the future of the publishing industry using the classic language of cartels:

expressing a hope for pricing that was "stable and rational" and stating that Macmillan was

willing to "make less money" in the short term to achieve that goal.  PX-0101 at 2

(APLEBOOK-03345033).  Mr. Sargent used nearly identical language in a February 4 blog post,

writing:

> Over the last few years we have been deeply concerned about the pricing of
> electronic books.  That pricing, combined with the traditional business model we
> were using, was creating a market that we believe was fundamentally unbalanced.
> In the last three weeks, from a standing start, we have moved to a new business
> model.  We will make less money on the sale of ebooks, but we will have a stable
> and rational market.

PX-0470 at 1.  Mr. Sargent also forwarded Mr. Cue his letter regarding the Amazon dispute

"[j]ust to make sure you are in the loop."  Mr. Cue then forwarded Mr. Sargent's letter to Mr.

Jobs, who responded, "Good email."  PX-0101 at 1.  That same day, Mr. Sargent sent Mr. Cue

an e-mail (subject line:  "URGENT!!") seeking Mr. Cue's counsel:  "Hi Eddy.  I am gonna need

to figure out our final agency terms of sale tonight.  Can you call me please?"  Mr. Cue replied,

"I just tried. Call me on my cell . . . ."  PX-0053.

185.    As CEO of the smallest of the publishers, Mr. Sargent will testify that he knew

Macmillan would have been unable to force Amazon's hand alone.[42]  Mr. Sargent could only

have made the threats to Amazon if he knew that other publishers were prepared to make the

same threat.  Mr. Sargent was able to go forward with his threats to Amazon because, as he will

---

[42] Penguin similarly knew it could not move Amazon to the agency model alone.  *See* Penguin
(Timothy McCall) Dep. 233:2-16 (testifying that if Penguin had attempted to move Amazon to
an agency model by itself, Amazon would not have agreed).

testify, he had no doubt that the other Publisher Defendants would deliver a similar message to Amazon.  Mr. Sargent admitted precisely that:  "[T]he deal that 5 of us did with Apple meant someone was gonna have to do it.  Just luck of the draw that it was me. . . . The optics make it look like I stood alone, but in the end I had no doubt that the others would eventually follow." PX-0094 at 1.

186.    On Sunday, January 31, 2010, Mr. Nourry of Hachette Livre e-mailed Mr. Sargent that "I can ensure you that you are not going to find your company alone in the battle."  PX-0091.  Mr. Nourry testified that the purpose of his e-mail to Mr. Sargent was that "those who had signed" with Apple and were "now having to face other retailers to sign the agency agreement . . . would have to follow the same difficult path of negotiating with Amazon."  Arnaud Nourry Dep. 200:18-201:17.  Jennifer Walsh of the William Morris literary agency then e-mailed Mr. Nourry, writing that Macmillan had "punch[ed] the bully in the nose in front of the whole school yard. Now you can *bring in the cavalry* and make new alliances that will preserve our business." PX-0191 (emphasis added).

187.    Other Publisher Defendants also expressed their support to Macmillan in its battle with Amazon.  For example, Mr. Makinson of Penguin wrote Mr. Sargent on February 2, 2010:  "Just to say that I'm full of admiration for your articulation of Macmillan's position on this.  Bravo." PX-0075.

188.    Mr. Nourry had written to Mr. Young on January 31 that he wanted to "enter in the battle as soon as possible" and that he was "thrilled to know how A will react against 3 or 4 of the big guys."  PX-0730 at 1.  Mr. Nourry testified that he wanted to join the battle to bolster Macmillan and force Amazon to "negotiate in a much weaker position than they like to be in."  Arnaud Nourry Dep. 206:5-207:6.  After Hachette actually delivered its ultimatum to Amazon, Hachette

64

executives celebrated the message's effect, noting that on February 1, 2010, "Amazon's stock is down 9%!"  PX-0187.  The subject line of the email was "Now it must really hurt…"  *Id.*

189.    Over the next few weeks, the other Publisher Defendants also told Amazon that it could either switch to the agency model or lose new release e-books for a significant period.  Naggar Direct ¶¶ 27-28; Porco Direct ¶ 16.  It is implausible that the five Publisher Defendants all could have independently reached a decision to make essentially the same threat to Amazon.  Tellingly, Publisher Defendants' internal analyses show that moving to agency was not unilaterally profitable and thus only made sense in the context of collective action.  PX-0506 (Jan. 20, 2010 e-mail from Robert Zaffiris to Charlie Redmayne, citing a "profit hit for switching to the agency model" of "about $3.5M in revenues on $20M or 17%"); PX-0719 at 1 (Jan. 23, 2010 email from Coram Williams to John Makinson forwarding analysis showing a switch to agency would result in a negative "$4.5 m net profit impact" on Penguin's fiscal 2010 budget).  It is reasonable to infer, therefore, that Publisher Defendants knew that most of their closest competitors would increase prices, rather than try to undercut the price increases and capture diverted sales.  And it is certainly reasonable to believe that Apple knew the same.

190.    As Ms. Reidy will admit at trial, without an agreement among the publishers, facilitated by Apple, Amazon would have ignored any one publisher's request to go to agency, and that publisher would then have been forced to lower prices in the iBookstore because of the Apple price MFN.  This was unacceptable to Publisher Defendants.  Thus, they made certain that Amazon understood that all five Publisher Defendants were united in seeking agency agreements.

191.    Amazon heard Publisher Defendants' message loud and clear.  As Mr. Grandinetti testified:  "it was highly likely that we would lose ebooks from those publishers unless we

65

moved to agency with all of them.  If it had been only Macmillan demanding agency, we would

not have negotiated an agency contract with them." Grandinetti Direct ¶ 46.  Mr. Naggar

similarly testified that the only reason Amazon agreed to move to agency with Macmillan was

because "it had become clear by then that all five of the publishers were making this move at the

same time and there was no way we could fight them all together."  Naggar Direct ¶ 30.

Amazon simply could not succeed with a digital bookstore without new titles from five of its

biggest publishers.  Grandinetti Direct ¶ 47; Naggar Direct ¶ 28.  Another Amazon executive,

Ms. Porco, testified that Publisher Defendants' stated reason for moving Amazon to agency was

the requirements in their Apple contracts.  Porco Direct ¶ 16.

192.    Unsurprisingly, and consistent with their common scheme, Publisher Defendants also

continued to communicate with one another about their individual negotiations with Amazon.

*See* PX-0131; John Makinson Dep. 402:24-407:17 (agreeing that it was a "fair reading" of

PX-0131 that Mr. Makinson was reaching out to Hachette to discuss Amazon).  Using the

opportunity of a joint venture meeting in late March 2010, Hachette executive Maja Thomas

learned from Penguin that Penguin was far from agreement with Amazon.  PX-0741.  That

Publisher Defendants were communicating with one another about their discussions with

Amazon was clear to Amazon too:  Amazon "would make a concession on an important deal

point and have it come back to us from another publisher asking for the same thing or proposing

similar language."  Naggar Direct ¶ 34.  In one instance, Mr. McCall left a voicemail with Mr.

Naggar in late March stating that he was "hearing through the grapevine" that Amazon was

giving some publishers a certain term that Penguin also hoped to obtain.  *Id.*

193.    Amazon understood that Publisher Defendants needed to move quickly because

otherwise they would have to match Amazon's pricing on their bestsellers in the iBookstore.

PX-0605 at 1. It also was clear to Amazon that Publisher Defendants were going to raise prices to consumers. Grandinetti Direct ¶¶ 39, 48.

194. In the span of two months, four of the five Publisher Defendants moved Amazon to agency. Naggar Direct ¶¶ 31-33.[43] Penguin was the final Publisher Defendant to move Amazon to agency pricing in May of 2010 because of certain terms in its existing agreement with Amazon. Penguin (David Shanks) CID Dep. 114:11-117:21. Even then, Penguin was able to force Amazon to move to agency earlier than planned by stopping the addition of new e-books to the Kindle store beginning on April 1, 2010. The effect of this measure was to make every new Penguin release available in all other digital bookstores except Amazon's. Grandinetti Direct ¶ 50; Naggar Direct ¶ 33.

195. Publisher Defendants quickly transitioned to substantially similar agency agreements with their other e-retailers as well, eliminating any retail price competition on e-books.[44] For example, Google, which had been prepared to and preferred to sell e-books on a wholesale model, accepted Publisher Defendants' collective agency demand given the percentage of popular e-books those publishers controlled. Turvey Direct ¶¶ 3-5. In conversations with Google, Publisher Defendants conveyed that it was their agreements with Apple that made them unwilling to enter into a non-agency agreement with Google. Turvey Direct ¶ 3.

---

[43] *See also* PX-0016 (Feb. 5, 2010 Amazon/Macmillan agency agreement); PX-0017 (Mar. 23, 2010 Amazon/HarperCollins agency agreement); PX-0014 (Mar. 23, 2010 Amazon/Simon & Schuster agency agreement); PX-0013 (Mar. 31, 2010 Amazon/Hachette agency agreement); PX-0015 (June 3, 2010 Amazon/Penguin agency agreement).

[44] With Barnes & Noble, *see* PX-0007; PX-0008; PX-0009; PX-0010; PX-0011. With Sony, *see, e.g.*, PX-0494; PX-495; PX-0497; PX-0498. With Kobo, *see, e.g.*, PX-0493; PX-0496.

**XII.   SIGNING AN APPLE AGENCY AGREEMENT WOULD HAVE BEEN
CONTRARY TO EACH PUBLISHER DEFENDANT'S ECONOMIC INTERESTS
ABSENT THE CONSPIRACY**

196.    As Professor Gilbert testified, each Publisher Defendant's decision to enter into an Apple

Agency Agreement cannot be understood as a rational decision independent of the moves of

other publishers.  Gilbert Direct ¶¶ 24, 47, 60-64.  Almost certainly, a publisher acting alone

would not have been able to move Amazon to abandon the wholesale model.  Gilbert Direct

¶ 64; *see also* Baker Direct ¶ 77 ("It is unlikely that any of the defendant publishers would have

sought to negotiate an agency model distribution agreement with Amazon, and thereby take

[pricing] authority . . . away from Amazon, had the defendant publishers not [nearly

simultaneously] reached distribution agreements with Apple.").  Indeed, Penguin admitted that

"if we were the only publisher that had [asked for agency from] Amazon, I assume they would

have said, 'Forget it, we're not selling your books,' which is exactly what happened to

Macmillan."  Penguin (Timothy McCall) Dep. 233:2-16.  We expect Ms. Reidy to offer similar

testimony at trial.

197.    Any publisher acting alone in adopting Apple's agency model would have had no choice

but to lose substantial revenues, either by selling e-books at Apple's iBookstore for $9.99, while

giving Apple a 30% margin, or by withholding e-book titles from Amazon and losing those

sales.

198.    Moreover, even if a lone publisher had done the unlikely and managed to move Amazon

to agency, its small share of the market would have been insufficient to dislodge the $9.99 price

from consumers' minds and ward off the attendant threats posed by Amazon to the publishers'

future revenue streams.  Gilbert Direct ¶¶ 62-63; *see also* Baker Direct ¶ 77 ("Had any individual

publisher succeeded in preventing Amazon from discounting its ebooks, while Amazon

68

continued to discount the trade ebooks sold by other publishers, that outcome would have done little to address its concerns, or the shared concerns of the defendant publishers as a group."). Without any assurance that other publishers would move similarly, no rational publisher could be expected to accept Apple's retail price MFN, which effectively committed Publisher Defendants to their plan to convert Amazon and all other e-book retailers to the agency model. Once Apple had assured Publisher Defendants of coordinated movement, however, their resistance to the MFN largely faded away.

## XIII.   APPLE AND PUBLISHER DEFENDANTS PRESSURED RANDOM HOUSE TO JOIN THEM IN SIGNING AGENCY AGREEMENTS

199.    Random House greatly benefitted from its refusal to join Publisher Defendants in their conspiracy with Apple. This fact further proves that Publisher Defendants were engaging in behavior that, had they been acting independently, would have been against their economic self-interest. As it did with other publishers that remained on wholesale terms, Amazon continued to price Random House's newly-released and bestselling e-books at $9.99, Naggar Direct ¶ 39, which increased Random House's sales volume and market share. PX-0765 at 14 (RH-MDL-00026705).

200.    Apple was not content to stop with only five of the six biggest publishers. Bringing in the last remaining large publisher not on agency was key to consolidating the conspiracy's achievements because, as Mr. Cue wrote Tim Cook, "when we get Random House, it will be over for everyone." PX-0627 at 1.

201.    Despite Random House offering Apple lower wholesale prices, Apple refused to allow Random House's e-books in the iBookstore unless Random House adopted the agency model. PX-0516; PX-0528.

202.    In July 2010, Mr. Jobs threatened Random House with the loss of support from Apple if

it delayed entering an agency agreement any further, even if Random House ultimately accepted

Apple's terms.  PX-0517.  Mr. Dohle described this conversation with Mr. Jobs:  "Tough call

with SJ. . . .  Motto:  his book people are really 'pissed off' that we hold back our books from the

store.  And if we didn't come on board soon, we would feel it in terms of their missing support

. . ."  *Id.*  Random House refused to cave to the pressure from Mr. Jobs at that time, though.

203.    Later in July, Mr. Cue—frustrated with that refusal and with Mr. Dohle's inability to

"make a decision if his life depended on it"—outlined for Mr. Cook how Apple would "go on the

offensive by talking to his authors and agents."  PX-0057 at 1.  By September 2010, Apple also

had threatened to block Random House e-book applications from appearing in Apple's App

Store because Random House still had not moved to the agency model.  PX-0518 at 1.  These

threats put Random House's app business in jeopardy.

204.    Publisher Defendants also recognized that Random House's holdout status was hurting

their economic interests.  As Ms. Reidy of Simon & Schuster wrote to Mr. Young of Hachette,

Random House's refusal to participate in the conspiracy was "sad for *our industry*."  PX-0489

(emphasis added).  Indeed, pressure on Random House had started even *before* the Apple

Agency Agreements were signed.  During a January 18, 2010 dinner, Ms. McIntosh of Random

House told Ms. Porco of Amazon that "she was under pressure from other publishers for

Random House to move to this agency model" and "[s]he was concerned because she believed

that other publishers were talking with one another and were making plans to move to the agency

model."  Porco Direct ¶13.

205.    Publisher Defendants' pressure on Random House increased once the agency agreements

were signed.  In February or March of 2010, Penguin CEO David Shanks had lunch with

Random House's Ms. McIntosh for the purpose of informing her that Random House, as the

largest publisher, had a responsibility to the industry to try to save the brick and mortar stores.

Penguin (David Shanks) CID Dep. at 132:2-135:9.  In late 2010, Mr. Shanks met with Random

House CEO Mr. Dohle and, again, stressed that Random House was failing in its obligations to

the industry.  *Id.*  It was obvious to Mr. Shanks that Ms. McIntosh and Mr. Dohle knew that Mr.

Shanks was suggesting that Random House move to agency terms.  *Id.* at 134:13-20.

206.    Publisher Defendants also sought Barnes & Noble's assistance in pressuring Random

House.  Penguin again led the charge.  Mr. Shanks wrote to Barnes & Noble's Vice Chairman

Steve Riggio expressing his "hope that B&N would be equally brutal to Publishers who have

thrown in with your competition with obvious disdain for your welfare. . . . I hope you make

Random House hurt like Amazon is doing to people who are looking out for the overall welfare

of the publishing industry."  PX-0116.

207.    On January 18, 2011, Random House entered into an Apple Agency Agreement.

PX-0006.  In an e-mail to Mr. Jobs, Mr.Cue attributed Random House's capitulation, in part, to

"the fact that I prevented an app from Random House from going live in the app store . . . ."

PX-0519.  Subsequently, Random House moved all its other retailers to the agency model.

208.    Apple also monitored whether Publisher Defendants were living up to their end of the

conspiratorial bargain, that is, moving Amazon to agency.  In an April 3, 2010 e-mail to Mr.

Jobs, Mr. Cue wrote that "[w]e have reviewed all the books on Amazon and they have switched

to agency with the publishers. . . . Overall, our NYT bestsellers and new releases are the same as

Amazon."  PX-0058.

### XIV.   THE CONSPIRACY AMONG APPLE AND PUBLISHER DEFENDANTS ACHIEVED ITS COLLECTIVE GOALS OF RAISING E-BOOK PRICES AND ENDING RETAIL PRICE COMPETITION

209.    Almost immediately, the conspiracy had its intended effects.  The evidence is overwhelming that Publisher Defendants' e-book prices rose after their move to an agency pricing model.  As Mr. Grandinetti testified, "[a]fter agency, consumers saw an immediate double-digit percentage price increase on ebooks pretty much across the board.  The higher prices appeared not only on best-selling e-books, but even on backlist titles."  Grandinetti Direct ¶ 51.  Even Defendants' experts admit that prices rose, although they try their best to explain away the data.

#### A.   Prevailing Low E-book Prices Would Have Continued But For the Conspiracy

210.    From the launch of its Kindle business until it was forced to adopt agency pricing terms as a result of Defendants' conspiracy, Amazon sold most new-release e-books and *New York Times* bestsellers to consumers for $9.99.  Grandinetti Direct ¶¶ 25, 27.  Amazon's approach to pricing e-books was similar to the one it had long used in the sale of physical books:  attractive low pricing for the most popular titles, including the use of "loss leaders" where certain titles were sold below cost, in order to stimulate purchases of other more profitable titles, thereby maintaining a profitable e-books business overall.  Grandinetti Direct ¶¶ 21, 25, 29-30; Naggar Direct ¶¶ 11-12.  Amazon's Mr. Naggar "explained to the publishers that Amazon's pricing strategy was highly sustainable."  Naggar Direct ¶ 11.  Mr. Grandinetti likewise testified that loss-leading "is quite common in both book-selling and retailing generally" and "it's common that we might lose money on some print bestsellers and this has proven a very successful, sustainable, and profitable approach."  Amazon applied this approach to its e-book business

where it achieved its goals of maximizing long term cash flow and running a profitable business. Grandinetti Direct ¶ 25.

211.    Even when publishers raised the wholesale price of e-books in an attempt to force Amazon to raise its e-book prices, Amazon maintained its $9.99 pricing commitment to its customers and continued to believe it could run its Kindle business profitably.  Grandinetti Direct ¶¶ 28-29; Naggar Direct ¶ 15; Porco Direct ¶ 10.  Accordingly, it is reasonable to conclude that Amazon would have continued selling e-books at low prices for the foreseeable future had it stayed on a wholesale model and retained the ability to set retail e-book prices.

212.    Apple's expert, Professor Klein, speculates, however, that Amazon might have been moved onto an agency model absent the conspiracy by Publisher Defendants' threats to withhold new releases.  PX-0830 at ¶¶ 19-20.  Professor Klein ignores that the threat of withholding e-books would not have been credible absent the conspiracy.  Gilbert Direct ¶¶ 114-124; *see also* Baker Direct ¶¶ 95-96 ("In this way, the publishers succeeded after augmenting whatever bargaining leverage their windowing option provided with the additional leverage they obtained through their roughly coincident requests that Amazon switch to the agency model."); Grandinetti Direct ¶¶ 27-35; Naggar Direct ¶¶ 14-22; Porco Direct ¶ 11.

**B. Apple and Publisher Defendants Understood the Price Caps in the Apple Agency Agreements Would Become *de facto* E-book Prices**

213.    Economic evidence confirms that Publisher Defendants raised e-book prices above what they would have been absent the conspiracy.  As embodied in the Apple Agency Agreements, and shown in Table 3 below, Apple and Publisher Defendants agreed to e-book price caps that were (with one *de minimis* exception) identical and were almost all above the $9.99 Amazon was charging for the most popular e-books.

**Table 3:  The price caps in the Apple Agency Agreements**

| Hardcover list price | Maximum price to customer | |
|---|---|---|
| | New releases | NY Times Bestsellers override caps |
| $20.01–$22.00 | $9.99 | |
| $22.01–$24.00 | $10.99 | |
| $24.01–$25.00 | $11.99 | |
| $25.01–$27.50 | $12.99 | |
| $27.51–$30.00 | $14.99 | $12.99 |
| $30.01–$35.00 | $16.99 | $14.99 |
| $35.01–$40.00 | $19.99 | |

Gilbert Direct Table 3.

214.    Apple and Publisher Defendants expected that as soon as their agency agreements went into effect, the prices of their e-books would rise significantly as a result of setting prices at the caps.  *See* PX-0514 at 10 (p. 503) (Mr. Jobs told his biographer that Apple "told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.'"); Apple (Eddy Cue) CID Dep. 42:7-43:17, 47:5-16 ("And so when we walked in and had the meeting, they certainly expressed to us that they were not happy with books being sold at what they viewed as too low prices, below the cost that they were doing it, and that they were not particularly interested in empowering us to become just the same thing."); Kevin Murphy Dep. 262:1-264:5; PX-0508 at 1.

215.    Rupert Murdoch, CEO of HarperCollins's parent company, News Corp., confirmed that he knew retail prices would increase, stating on February 2, 2010:

Yeah we don't like the Amazon model of selling everything at 9.99 they don't pay us that.  They pay us the whole wholesale price of $14 or whatever we charge but we [sic] I think it really devalues books and it hurts all the retailers of the hard cover books.... Amazon, sorry, *apple in its agreement with us,* which is [sic] not been disclosed in detail, *does allow for* a variety of slight of [sic] *higher prices.* There will be, prices very much less than the printed copy of books. But still it will not be fixed in a way that Amazon has been doing it. **And it appears that Amazon is now ready to sit down with us again and re-negotiate pricing.**

PX-0491 (italics added) (bold in original).

216.    Retailers that were forced onto agency models likewise predicted agency would lead to price increases.  One of Amazon's primary objections to agency pricing was the understanding that it was intended to raise prices to Amazon customers.  Grandinetti Direct ¶¶ 38-39; Naggar Direct ¶ 35.  And Kobo warned its readers:  "Bestseller prices are going to rise from many major publishers and we can expect more to follow.  In the US, a lot of $9.99's are going to become $12.99's and some will be more."  PX-0147 at 1 (forwarding Mar. 29, 2010 Kobo Blog Post, "*Countdown to Agency (and Party Like its $9.99!)*").

### C. Average Prices of E-books Increased Soon After Implementation of the Apple Agency Agreements

217.    The effects of Publisher Defendants' concerted move to agency were immediate.  As soon as they gained control over retail pricing, Publisher Defendants successfully implemented their plan to raise e-book prices to the agreed-upon price caps in the Apple Agency Agreements. Immediately following the implementation of the Apple Agency Agreements, Publisher Defendants set the price of e-books at the price cap for 92.1% of new releases and 99.4% of *New York Times* bestsellers at Apple's iBookstore, and 85.7% of new releases and 96.8% of *New York Times* bestsellers at Amazon.  Gilbert Direct Table 4; *see also* Baker Direct ¶ 107 ("[A]cross the entire period July 2010 through March 2012, the titles of the five defendant publishers, on a collective basis, were priced at the caps more than 93% of the time, measured in terms of

quantities sold."). Even the analysis of Defendants' expert, Dr. Burtis, confirmed that Publisher Defendants set the prices of the vast majority of their titles at the agreed-upon maximums. PX-0831 at Graph 7; *see also* PX-0833 at Exhibit 17. Exactly as Publisher Defendants and Apple had agreed, the price caps became the actual prices for e-books.

218.    Even Mr. Cue admitted that the prices of *New York Times* bestsellers in e-book form tended to be "a few bucks higher" post-agency. Apple (Eddy Cue) CID Dep. 38:7-16.

219.    Publisher Defendants also observed that they had "successfully" increased e-book prices. PX-0367 at 2 (MCMLN-LIT-00071915) ("Second, by successfully setting the price on the e-book versions of first release hardcovers above $9.99, we have been able to prove that the consumer does in fact place a value higher than $9.99 on first release electronic books."). Hachette Livre CEO Arnaud Nourry likewise testified: "the vast majority of the *New York Times* bestsellers were priced up" after Hachette moved to agency. Arnaud Nourry Dep. 172:23-173:11.

220.    To measure the change in price attributable to the shift to agency, Professor Gilbert calculated the weighted average price of all Publisher Defendants' titles in a one-week period shortly before, and another one-week period shortly after, the effective date of the Apple Agency Agreements. Gilbert Direct ¶ 149 & n.105. Measuring the difference between the two periods, he found that prices increased by 18.6% at Amazon and by 19.9% at Barnes & Noble in the weeks following the move to agency. Gilbert Direct Table 5. Fuller detail of his results is provided in Table 5 and in Figure 3 from his direct testimony, which are reproduced below:

**Table 5: Summary of E-book Price Increases at Amazon and Barnes & Noble by Defendant Publishers from Shortly Before to Shortly After Agency**

Amazon Weighted Average Price Increases

| Publisher | All eBooks | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 33.0% | 14.1% | 37.9% | 37.5% |
| HarperCollins | 13.6% | 12.5% | 44.0% | 15.2% |
| Macmillan | 11.6% | 14.0% | - | 11.2% |
| Penguin | 18.3% | 19.5% | 43.6% | 17.6% |
| Simon & Schuster | 18.0% | 15.1% | 28.7% | 19.8% |
| Defendant Publishers | 18.6% | 14.2% | 42.7% | 19.6% |
| Random House | 0.01% | 1.9% | 0.2% | 0.3% |
| Non-Majors | -0.2% | -0.9% | 1.1% | 0.1% |

Barnes & Noble Weighted Average Price Increases

| Publisher | All eBooks | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 36.0% | 16.5% | 38.2% | 34.4% |
| HarperCollins | 23.6% | 42.5% | 43.4% | 18.2% |
| Macmillan | 11.3% | 7.2% | - | 13.6% |
| Penguin | 14.4% | 9.7% | 9.3% | 15.4% |
| Simon & Schuster | 20.0% | 17.1% | 30.0% | 22.4% |
| Defendant Publishers | 19.9% | 19.0% | 15.8% | 19.5% |
| Random House | -0.2% | 0.5% | 0.0% | 1.2% |
| Non-Majors | 2.3% | -3.1% | 1.1% | 3.7% |

Gilbert Direct at Table 5.



**Figure 3: The average per unit e-book prices at Amazon of each First Wave Agency Publisher increased significantly when it switched to agency**

Gilbert Direct Figure 3.

221.    As Professor Gilbert's graph reproduced above illustrates, the first four Publisher Defendants to move to agency with Amazon increased their prices in April 2010 when those agreements went into effect.  Penguin, which did not begin its agency relationship with Amazon until late May, increased its prices substantially at that time, just as the others had done in the prior month.

222.    Professor Ashenfelter performed a regression analysis of Publisher Defendants' trade e-book retail prices during the six months before and after the agency transition.  After controlling for a wide variety of possible influences using a control group and fixed effects, he found that these prices increased by 16.8%.  Ashenfelter Direct ¶ 10.

223.     These effects were confirmed by Defendants' expert, Dr. Burtis, who concluded "average prices for Publisher Defendants' eBooks increased—in varying amounts—in the period after" the Apple Agency Agreements went into effect.  PX-0831 at ¶ 25; PX-0832 at ¶ 35 ("The prices of certain hardcover new releases and NYT bestsellers that are the focus of Plaintiffs' price-fixing allegations increased . . . ."); *see also* PX-0833 at ¶ 16 (Professor Rubinfeld recognizes that "the initial effect of the move to an agency model was an initial increase in prices of best-selling e-books.").

224.     Retailers who had been moved to agency observed these significant retail price increases immediately after agency went into effect.  As a Barnes & Noble presentation concluded, the "[a]verage price rose as expected with agency pricing."  PX-0548 at 16 (BN00093265).  Amazon calculated that the average selling price of agency publishers' e-books sold by Amazon increased by $2, from $8.18 on March 31, 2010, when Amazon set the retail prices, to $10.18 on April 7, 2010, when Publisher Defendants set the retail prices.  PX-0549 at 1-2.  In the same period, the average selling price of non-agency e-books increased by only 6 cents.  *Id.*  One executive at Sony proposed the following language appear on the home page of its e-book store:  "We apologize for the increase in price on certain eBooks at the Reader Store.  Unfortunately, changes have recently occurred in the publishing industry affecting many eBook retailers which require that we no longer provide discounts on the prices set by the publishers."  PX-0170.  The price increases also led Amazon to change its website page for each agency-price e-book with a description, "This price was set by the publisher," to inform customers that Amazon was not responsible for raising prices.  Grandinetti Direct ¶ 51.

225.     Even though Defendants' expert, Dr. Burtis, acknowledges these price increases immediately following the move to agency, her analysis obfuscates these results.  PX-0831 at

¶¶ 25-26.  Dr. Burtis's primary price analysis, which focuses on price changes occurring long after agency, is not credible for two reasons.

226.    First, Dr. Burtis uses the average price of *all publishers*' e-books as her measurement of harm.  Her analysis *includes* publishers that did not adopt agency pricing and were not part of Defendants' conspiracy.  Gilbert Direct ¶ 172.  Averaging prices over all publishers' titles, rather than averaging only over the titles of Publisher Defendants, has the effect of diluting the increases in the prices of Publisher Defendants' titles.  Gilbert Direct ¶ 173; Baker Direct ¶¶ 123-24 ("Dr. Burtis' finding that ebook prices declined misleads because it is based on a comparison that does not account for changes in the mix of products sold. . . . Professor Ashenfelter demonstrates that Dr. Burtis' claim to have found that ebook prices fell is unconvincing because of changes in the mix of ebooks sold.  In particular, Professor Ashenfelter revised Dr. Burtis' analysis to account for one way in which the mix changed:  the changing composition of unit sales across publishers.  After controlling for this aspect of product mix, the average price for the books included in Dr. Burtis' data rose over the time period that she studied" (citing Ashenfelter Direct ¶¶ 17, 64 & Figure 11)); Ashenfelter Direct ¶ 63 ("Dr. Burtis's decline in mean prices may reflect a decrease in the relative sales of the higher-priced books sold by the big six publishers rather than a general decrease in the prices of particular books.  That is, Dr. Burtis is not showing what happened to the prices of the same books or even of books from the same publishers."); *see also* Grandinetti Direct ¶ 50.

227.    Second, Dr. Burtis compared e-book prices and sales over a two year period before adoption of the Apple Agency Agreements to prices and sales for two years after adoption of the agreements.  PX-0831 ¶ 26; Gilbert Direct ¶ 174.  These long periods obscure the effects of the Apple Agency Agreements because they capture underlying trends in the prices and sales of e-

books that have nothing to do with the adoption of the agreements. *Id*. at ¶¶ 175-76. As a result, Dr. Burtis's comparison provides no useful information about harm to consumers. *Id*. at ¶ 178. In contrast to Dr. Burtis's methodology, Professor Gilbert minimized the risk that factors other than the conspiracy would affect the measurement by examining the two week-long windows close to the event that he was studying—the widespread switch to selling e-books under an agency model. Gilbert Direct ¶¶ 149 n.105, 177. Professor Ashenfelter used six-month pre- and post-agency windows, and controlled for "differences by factors specific to the retailer, factors specific to each title, factors specific to each month, whether the observation was affected by the 'buy button' incident  and whether the title was on the backlist. (Note that adjusting both for differences in factors specific to the title and differences in factors specific to the month, implicitly adjusts for differences in the length of time since a title was first published.) The model also allows for the possibility that the 'buy button' incident, factors specific to the month and whether the title was on the frontlist might have different effects at different retailers." Ashenfelter Direct ¶ 8. Additionally, Professor Ashenfelter used titles published by Random House as a control for "changes in e-book pricing that would have affected the prices or quantities sold of e-books from the conspiring publishers, had they not conspired." *Id*. at ¶ 30.

228.    Professor Rubinfeld also used an unreliable methodology to calculate price effects, and as a result he failed to measure price effects attributable to the conspiracy. Professor Rubinfeld did not compare post-agency prices to the prices actually prevailing prior to the advent of agency pricing. PX-0833 at ¶ 190. By its own reports, Amazon's $9.99 pricing was part of an overall profitable business strategy, and Amazon had no plans to increase its retail prices in the foreseeable future. Grandinetti Direct ¶¶ 25, 29. Professor Rubinfeld nonetheless took an overly narrow view of profitability, claimed "in the long-run, prices can be expected to exceed costs"

for any individual title, and "assume[d]" for purposes of his calculations "that all of Amazon's below-cost sales in the pre-agency period occurred at cost." PX-0833 at ¶ 190. This approach is designed to understate actual consumer price increases and ignores the possibility that a loss on one title could be made up by other incremental revenues. Naggar Direct ¶ 12. Professor Rubinfeld also failed to explain why Amazon's low pricing of e-books would not have continued or why a multi-product firm such as Amazon must price every title above wholesale cost. Gilbert Direct ¶ 166 n.123.

229.   Publisher Defendants' higher e-book prices were durable. Professor Gilbert found that Publisher Defendants' price increases lasted for at least a year. In fact, Publisher Defendants' prices increased in the year starting February 2010 and ending February 2011 by 23.9% at Amazon and by 19.3% at Barnes & Noble. Gilbert Direct ¶ 153 & Table 6. Defendants' own expert, Dr. Burtis, confirmed that the elevations in average prices of Publisher Defendants' e-books lasted for nearly two years following their move to agency. PX-0831 at Graph 1; *see also* Ashenfelter Direct ¶ 53 (regression model yields a 24.6% price increase from February 2010 through February 2011).

230.   Consistent with the evidence that the conspiracy caused material e-book price increases, e-books began to be sold at a substantial discount once Publisher Defendants who reached a settlement with the United States in this antitrust lawsuit negotiated new e-book agreements with retailers pursuant to their consent decrees. *See* PX-0388; Turvey Direct ¶ 8.

### D. The Apple Agency Agreements Harmed Consumers by Preventing Promotional Competition Among Retailers.

231.   For all the reasons described above, Publisher Defendants stripped e-book retailers not only of the ability to compete directly on price, but also of the ability to offer discounts, rebates,

bundles, rewards programs, or other promotions that could have the effect of softening the effects on consumers of the higher agency prices. *See, e.g.*, PX-0013 at 6 (HBG-HC-000006); PX-0016 at 7 (MAC 0005598); PX-0014 at 13 (SS00027594); PX-0533 at 9-10 (GOGBKS-TT-0015423-424); PX-0497 at 7 (SEL-CORP-0000074); Porco Direct ¶ 17; Turvey Direct ¶¶ 6-7.

232.    That financial promotions would disappear at the same time higher agency prices arrived was not lost on e-book retailers. For example, just days before the agency agreements went into effect, Kobo offered its e-book customers "some great last minute promotions before they go away," including an extra $2 off every e-book. PX-0147 at 1 (forwarding Mar. 29, 2010 Kobo Blog Post, "*Countdown to Agency (and Party Like its $9.99!)*").

233.    The promotional restrictions were part of the price-fixing conspiracy. As Macmillan CEO John Sargent explained to Amazon's Russell Grandinetti just a week after the iPad launch event: "We can not budge on the final price that the consumers pay for our books. Not what is listed, but what they actually pay. That is the very heart of the agency model, and it is why we are doing this." PX-0063.

234.    Macmillan's Fritz Foy similarly explained to Barnes & Noble's Theresa Horner that a promotion she had proposed would not be permitted because "[w]e worked hard to push the price of our new Ebooks up just a few dollars – and this would immediately signal not an increase in value – but a decrease in value." PX-0315 at 1.

235.    HarperCollins's Leslie Hulse likewise conveyed to Kobo's Michael Tamblyn: "A gift card can NOT be used as a means to convey loyalty rewards" for e-book purchases. PX-0125 at 1 (emphasis in original). And Simon & Schuster quashed Kobo's request to reward high volume e-book buyers with "something non-book but lovely." PX-0143 at 1-2.

236.    When Google proposed to Macmillan a promotion where a customer would "buy[] a book at a normal price," and Google would buy a second copy of the e-book to give to a friend of the customer's, Macmillan's Mr. Foy responded that "answer as you suspected is NO." PX-0150 at 1 (emphasis in original).

237.    These restrictions by Publisher Defendants had the effect of restraining competition by e-book retailers not just to sell Publisher Defendants' titles, but to promote digital reading generally.  As Kobo explained on its blog shortly before agency prices went into effect, "[w]e lose most of our ability to issue coupons, promotions, special discounts, kickbacks, buy-X-get-one-free.  We could still do it for non-agency titles, but then we end up in a weird situation of 'Get $1 off, but only on these books, and definitely not on these other ones.'  That's not fun.  And worse, it's confusing to consumers.  We're sad about that, obviously."  PX-0147 at 2 (SS0035587).

238.    Amazon likewise found its innovative Kindle Owners' Lending Library, which allows Amazon Prime members to borrow one e-book per month free of charge, hobbled by its inability to include any of Publisher Defendants' e-books.  Grandinetti Direct ¶ 56.

### E.  Higher Agency Prices Reduced E-book Sales

239.    The Apple Agency Agreements suppressed e-book sales in two different ways.  First, some Publisher Defendants withheld e-books from retailers that had not signed agency agreements prior to the shift to agency terms with Apple.  PX-0449; *see also* PX-0163 at 1; David Shanks Dep. 248:22-251:8.  Second, consistent with fundamental expectations of consumer behavior, the higher e-book prices that resulted from the conspiracy translated into lower unit sales for Publisher Defendants.  Gilbert Direct ¶ 71.

240.    Consumers reacted in three different ways to the higher agency prices:  (1) some consumers paid the new prices; (2) others simply did not buy e-books that they would have purchased at pre-agency prices; and (3) still others switched to less-preferred titles of other publishers.  Gilbert Direct ¶¶ 289-91; Baker Direct ¶ 116; *see also* Grandinetti Direct ¶¶ 51, 53.  All three categories of consumers were harmed by the higher agency prices.  Gilbert Direct ¶¶ 289-91; Baker Direct ¶ 116.

241.    Publisher Defendants who shifted their retailers to agency in early April 2010 sold 12.9% fewer units at major retailers in a two-week period following the implementation of agency prices than they had in a two-week period preceding it, for books that were available in both periods.  Gilbert Direct ¶ 70.

242.    Publisher Defendants' units sold decreased by 14.5% relative to a control group consisting of Random House.  Ashenfelter Direct ¶¶ 8-10.

243.    Publisher Defendants' sales were 4.4%-14.5% lower than they would have been but for the conspiracy.  Baker Direct ¶ 117.

244.    E-book retailers recognized these effects in real time.  Amazon executives even shared data with each Publisher Defendant to show them that their sales growth significantly diminished compared to non-agency publishers in the hope that Publisher Defendants would lower e-book prices.  Naggar Direct ¶¶ 37-39; Porco Direct ¶18; PX-0756; PX-0757.

245.    Although sales eventually increased again, this increase was simply a continuation of the pre-agency trend of growing sales of e-books.  Gilbert Direct ¶¶ 227-33.

246.    Following the agency transition, the general growth rate in total e-book unit sales was seven percent below the average rate of increase for the pre- and post-periods taken together.  Ashenfelter Direct ¶ 18.

247.    The growth rate of free e-books did not increase following the transition to agency. Gilbert Direct ¶¶ 239-41 & Figure 11; *see also* Baker Direct ¶ 141 n.216.

### F.    Reduced Royalty Payments Harmed Authors

248.    As Macmillan recognized, "relative to non-agency & price matching publishers," Publisher Defendants were "at a disadvantage" not just "with consumers," but with authors as well.  PX-0762 at 2 (MCMLN-LIT-00030229) ("eBooks – Impact of the Agency Model").  The "disadvantage" with respect to consumers came because "[o]ur prices are higher."  *Id.*  At the same time, "[o]ur [p]ayments to authors are lower."  *Id.*

249.    Because Apple's 30% commission forced Publisher Defendant revenues lower even as consumer prices rose, author royalties suffered.  Macmillan concluded, for example, that the royalty payment for each sale of an e-book with the corresponding hardcover list price of $26.99 fell from $4.04 under wholesale to $2.28 under agency.  PX-0762 at 2 (MCMLN-LIT-00030229).  For a $14.99 trade paperback, the decline was from $2.25 to $1.75.  *Id.*

250.    This decline in per-unit royalties paid to Publisher Defendants' authors only exacerbated the harm they suffered from the suppressed unit sales described above.

## XV.    THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS ATTRIBUTABLE TO THE APPLE AGENCY AGREEMENTS

251.    Apple's defenses have no force if the Court finds a *per se* violation of the antitrust laws. Even in a rule of reason setting, Defendants point to no legitimate procompetitive justification for their otherwise anticompetitive conduct.  Despite over a year of discovery, it is still not clear precisely how Defendants believe consumers have benefited from the higher prices their conduct has caused.  What is clear is that Apple and Publisher Defendants may not defend their conspiracy on the grounds that Amazon was offering consumers low prices.  Nor is it valid to

point to consumer benefits that are not even tangentially related to the conspiracy, including the introduction of the iPad or a drop in e-reader or other device prices.

252.   Apple's purported procompetitive justifications may have validity only "if they succeed in increasing output, lowering price, or increasing quality."  Gilbert Direct ¶ 130; *see also* Baker Direct ¶ 132.  But e-book prices increased, output was lower than it would have been, and there has been no demonstration of increases in quality of e-books tied to the Apple Agency Agreements that would offset the significant price increases.  *See* Gilbert Direct ¶¶ 130-31.

253.   If the agency pricing model truly increased output by promoting e-book retailer efforts and inter-brand competition, Publisher Defendants would have had unilateral incentives to move independently to adopt agency pricing.  Yet the evidence indicates that Publisher Defendants did not find it in their unilateral interest to move to agency pricing without the participation of their rivals.  Gilbert Direct ¶ 131.

### A.  The Apple Agency Agreements Did Not Promote Competition for Complementary Products Such as E-readers and Tablets

254.    None of Defendants' experts argues that the entry of the Apple iBookstore as an e-book retailer generated consumer benefits from intensified inter-retailer price competition.  Gilbert Direct ¶ 276.  By contrast, inter-retailer price competition before the Apple Agency Agreements provided consumers with significantly lower e-book prices.  *Id.*

255.   The prices of consumer electronics tend to decrease with time, while their quality and performance tend to increase with time.  Gilbert Direct ¶¶ 247-48.  There is no evidence that e-reader devices have not simply followed this familiar path, much less that any deviation is the result of the Apple Agency Agreements rather than *device* competition.  *See* PX-0680; Baker Direct ¶ 139 ("[N]one of defendants' experts establish a causal connection between the

introduction of the iBookstore and the competition among device manufacturers observed in the period beginning in April 2010.").

### 1. Lower Device Prices Are Not Attributable to Agency

256.    Device competition may well have intensified as a result of Apple's release of the iPad, but that device "was going to be launched with or without a bookstore."  Apple (Keith Moerer) Dep. 36:17-24.  And some of the benefits Defendants would claim are not even attributable to the iPad, much less to the iBookstore or the Apple Agency Agreements.

257.    For example, Barnes & Noble's "price reduction for nook was planned long before iPad. It was not a reaction at all to the iPad's success."  PX-0451; *see also* PX-0442 at 1 (February 15, 2010 email to others at Barnes & Noble regarding "Nook pricing," explaining that "[t]he five year plan assumed a reduction in the retail price as of the beginning of the fiscal year—May 1").

258.    Accordingly, Dr. Burtis's observation that "since the agency agreements went into effect, eBook retailers have introduced many new and innovative eReader devices and tablets at lower prices," PX-0831 at ¶ 32, is simply irrelevant.  As with her observations on price and output, Dr. Burtis has not attempted to isolate which, if any, innovations were caused by the Apple Agency Agreements rather than the numerous other trends and events occurring concurrently in the e-book industry and related industries.  In particular, because she made no attempt to distinguish the much more direct effect of the iPad's entry from the effect of the iBookstore's entry (which, Apple's *post hoc* protestations notwithstanding, may well have happened even if Publisher Defendants had refused to deviate from their traditional wholesale sales model for e-books), her speculation does not demonstrate that any device prices were reduced as a result of the Apple Agency Agreements.

### 2.   Improved Device Features Are Not Attributable to Agency

259.   Apple has conceded that many innovations to devices used for reading e-books, including dedicated e-readers as well as multi-use tablets, preceded the Apple Agency Agreements.  Apple (Keith Moerer) Dep. 68:15-18.  Such innovations may have been driven in part by Apple's development of the iPhone (not the iPad), Philip Schiller Dep. 116:18-117:21, but they cannot have had any connection to the Apple Agency Agreements.

260.   Likewise, new features of e-readers and tablets that were planned prior to the Apple Agency Agreements cannot possibly be attributed to those agreements.  For example, Barnes & Noble began developing a version of its Nook e-reader to be a "full color touch screen" no later than May 2009—eleven months before agency pricing went into effect.  PX-0386 at 30, 45 (BN00019767, 782); *see also* PX-0071 at 1 (November 20, 2009 e-mail from William Lynch to Steve Riggio:  "We'll move to color backlit display technology, no question.").  Sony also was planning a color e-reader prior to the launch of the iPad.  PX-0471; PX-0469 at 14 (SEL 00110711).

### B.   The Apple Agency Agreements Did Not Promote Competition for E-Reader Apps

261.   Professor Murphy's speculations that "Apple's introduction of the iBookstore [impacted] the incentives of Amazon and others to compete," PX-0827 at ¶ 81, are not illuminating.  He suggests that Amazon would not have invested in developing e-reader apps for the iPad had Apple not released its iBooks app.  *Id.* at ¶¶ 81-82; PX-0828 at ¶¶ 17-18. He likewise suggests that Amazon's incentives to improve its Kindle *device* would have been dulled but for Apple's iBooks *app.*  PX-0827 at ¶ 83; PX-0828 at ¶ 18.

262.   Professor Murphy made no attempt to test these hypotheses, though, and he admitted in his deposition he made no attempt to weigh the alleged procompetitive benefits against the

distinct anticompetitive harm caused by the agency agreements.  Kevin Murphy Dep. 9:22-10:11; 15:12-17; 296:19-25.

263.   Professor Murphy's hypotheses also are belied by Amazon's actions.  Grandinetti Direct ¶¶ 16-18; Naggar Direct ¶¶ 5-6.

> ### 1.  Features that Preceded the Apple Agency Agreements Cannot Possibly Have Resulted from Those Agreements

264.   While Defendants would like to claim that the Apple Agency Agreements caused the advent of enhanced e-books, including e-books with audio and video features, Apple has admitted that such e-books already were available in app form prior to the launch of the iBookstore.  Apple (Keith Moerer) Dep. 52:1-6; *see also* Penguin (Timothy McCall) Dep. 168:22-169:21.

265.   Likewise, Apple has admitted that there were e-book apps that used color even "before the launch of the Kindle," Apple (Keith Moerer) Dep. 52:12-15, which itself predated the Apple Agency Agreements by years.

266.   Such preexisting features cannot have resulted from the Apple Agency Agreements.

> ### 2.  Features that Appeared Long After the Apple Agency Agreements Did Not Result from Those Agreements

267.   Nor are innovations that occurred after the introduction of the iBookstore attributable to the Apple Agency Agreements simply because of chronology.  Defendants have identified two such features they would claim as procompetitive benefits of the Apple Agency Agreements, fixed layout and iBooks Author.  Tellingly, though, Apple's experts have undertaken no empirical analysis to test for any causal link between the Apple Agency Agreements and those features.

268.    Fixed layout, which exploits EPUB (a free and open e-book standard), allows text to remain in place on a page of images.  Apple (Keith Moerer) Dep. 48:21-49:24.  It was not available through Apple when the iBookstore launched.  Indeed, that feature did not appear in Apple e-books before late 2010.  *Id.* at 88:19-90:11 (testifying about PX-0060).  The delay between the Apple Agency Agreements and the introduction of fixed layout casts serious doubt on the causal connection between them.  In any event, Amazon may already have offered e-books in fixed layout at the time Apple introduced its version of the technology.  *Id.* at 90:12-14.

269.    iBooks Author, an Apple app for creating e-books, did not come out until 2012.  Apple (Keith Moerer) Dep. 220:14-17.  Such a delay makes any causal connection between the Apple Agency Agreements and iBooks Author unlikely at best.

270.    Casting further doubt on the causal connection Apple baldly claims, the main features of iBooks Author are geared toward books such as textbooks that are outside the relevant market alleged.  *Id.* at 46:9-48:5.

271.    Any benefits from this innovation have been relatively small:  There have only been about 10,000 books published with iBooks Author.  Eric Gray Dep. 64:23-65:4.

## XVI.   THE RELEVANT PRODUCT MARKET IS TRADE E-BOOKS AND DEFENDANTS COLLECTIVELY POSSESS MARKET POWER

272.    The Court need not address the questions of market definition and market power because of the substantial amount of direct evidence of anticompetitive effects, namely higher prices.  *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); Kevin Murphy Dep. 177:16-178:9 (testifying that "the experts have pretty much agreed that what the exact contours of the market are aren't critical to the economic analysis.").  Should it choose to do so, however, there is ample evidence that that the relevant product market is trade e-books, that the relevant

geographic market is the United States, and that Apple and Publisher Defendants collectively possess substantial market power in the relevant market.

### A.  E-books Are Different from Physical Books

273.    E-books have several features that differentiate them substantially from traditional physical books.  An e-book is a digital copy of a title, and as such, reading one requires an electronic device such as an e-reader, smartphone, tablet, or laptop or desktop computer.  In addition, although an e-reader is a physical object with size and weight, an e-book has no size or weight.  A large number of e-books can be loaded onto an e-reader with no incremental weight or size.  A consumer can travel with a large number of e-books, and the size and weight of those books (including the device to read them) can be smaller and lighter than the aggregation of the physical versions of the same titles.  Grandinetti Direct ¶ 10; Gilbert Direct ¶ 200.  These differences, among others, may lead consumers of e-books to prefer the e-book format, so they may be willing to accept a significant price increase without switching to the print book format. Gilbert Direct ¶ 201.

### B.  Market Participants Observe Low Substitution from E-books to Physical Books

274.    The demand for e-books is inelastic.  In the weeks following the implementation of the Apple Agency Agreements, average prices of the titles available from the first four Publisher Defendants rose by 21.1%, while consumers purchased only 7.7% fewer of those publishers' e-books.  *See* Gilbert Direct ¶ 189.  Because consumers reduced their purchases of Publisher Defendants' e-books by less (on a percentage basis) than the amount by which prices increased, the price increase on Publisher Defendants' e-books was profitable, which shows that the

92

demand for e-books is inelastic. *Id.* at ¶¶ 188-191 & n.37. That Publisher Defendants handed to retailers like Apple all of these excess profits plus more does not bear on the elasticity analysis.

275.   Professor Ashenfelter's primary regression analysis of Publisher Defendants' and Random House's e-books yielded an implied elasticity of -1.01, a figure that is just barely elastic. Ashenfelter Direct ¶ 10. (Professor Ashenfelter's regressions over shorter windows resulted in elasticity estimates in the inelastic range for these titles. *See* Ashenfelter Direct Tables 2-3.) The percentage reduction in the quantity of trade e-books sold by Publisher Defendants in response to a given percentage increase in the price of those e-books is likely to exceed the percentage reduction in the quantity of all trade e-books in response to the same percentage increase in the price of all trade e-books because consumers in the first case can substitute to titles sold by non-defendant publishers that have not increased in price. Accordingly, the demand for trade e-books sold in the U.S. is likely more inelastic than would be indicated by the empirical results that Professor Ashenfelter reports for trade e-books sold by Publisher Defendants. Baker Direct ¶ 43 n.29.

276.   These findings suggest that relatively few e-book customers are switching to other products, including physical books, in response to price increases. Amazon presented evidence to Publisher Defendants before the move to agency that sales of physical books were unaffected by the introduction of e-books. Naggar Direct ¶ 17. An Amazon study in May 2010 similarly found "that there is no shift to [physical] []books," PX-0181 at 3 (AMZN-DOJ-000490), after prices for e-books increased due to the agency conspiracy. *See also* Gilbert Direct ¶¶ 202-204.

277.   Another indication that there is low substitution between physical books and e-books is that physical book sales of the four Publisher Defendants who first went to agency at Amazon (Hachette, HarperCollins, Macmillan, and Simon & Schuster) did not increase when the prices of

93

their e-books increased.  Gilbert Direct ¶¶ 205-08 & Figure 7.  Instead, physical book sales were steady until the following Christmas season, when sales traditionally rise.  Gilbert Direct at Figure 7.

### C.   Individual Trade E-book Titles Are Not Separate Markets

278.    No party claims that each e-book title is its own market.  Apple admits that the product market is no smaller than trade e-books.  PX-0803 at 6.  Penguin denies that trade e-books is a relevant market, but suggests only that the market might be broader, "includ[ing] at least physical books and all e-books."  PX-0799 at 4.

279.    No Defendant expert has offered analysis to support a product market broader than trade e-books.

### D.  The Relevant Geographic Market Is the United States

280.    Apple admits that the relevant geographic market is the United States.  PX-0803 at 6.  Penguin acknowledges that the geographic market is "no narrower than the United States," and asserts that there may be "some form of a more global market" for e-books.  PX-0799 at 2-3.

281.    The United States is a relevant geographic market because trade e-books sold in the United States "would form a valuable monopoly."  Baker Direct ¶ 41.  A U.S.-only geographic market is consistent with the fact that e-book distribution rights are region-specific, making it difficult for a U.S.-based consumer to substitute to e-books sold at retail outlets abroad.  For example, Amazon customers in the U.S. cannot purchase Kindle books from Amazon's UK site to read on their Kindles in the U.S.  *Id.* & n.25.

282.    That is, the United States is a relevant geographic market because when a hypothetical monopolist of the relevant product, trade e-books, could discriminate on the basis of customer

94

location, it is appropriate to define the relevant geographic market based on the locations of targeted customers.  Gilbert Direct ¶ 221.

### E.  Defendants Have Market Power

283.    Publisher Defendants and Apple collectively have substantial ability to affect prices and to diminish competition in the U.S. retail market for trade e-books.  Publisher Defendants sold over 48% of all e-books in the United States in the first quarter of 2010.  Gilbert Direct ¶¶ 35-36 & Table 1.  With such a high share of the market, Publisher Defendants as a group possessed considerable ability to affect competitive conditions.  *See* Apple (Eddy Cue) CID Dep. 47:17-48:5 (Big Six publishers represented "more than half of the book business.  And certainly when you looked at *New York Times* bestsellers, it was a very, very high percentage"); Porco Direct ¶ 5; Grandinetti Direct ¶ 47; Naggar Direct ¶ 30.

284.    Apple, moreover, was in a unique position because of its popular physical and electronic platforms, such as the iPhone device and the iTunes store.  PX-0833 at ¶ 157. Highlighting Apple's power, Matt Shatz of Random House noted a colleague's point that Apple was "probably the only retailer in the world that offers us a last chance to shift the anchor away from $9.99 for any foreseeable future."  PX-0816 at 1.

285.    Mr. Jobs similarly told James Murdoch of HarperCollins's parent, News Corp.:  "Apple's iTunes Store and App Store have over 120 million customers with credit cards on file and have downloaded over 12 billion products.  This is the type of online assets that will be required to scale the ebook business into something that matters to the publishers."  PX-0508 at 3 (APLEBOOK-03345091).  Publisher Defendants believed that Apple would be able to gain e-books market share quickly, which gave Apple bargaining power with Publisher Defendants.

Gilbert Direct ¶ 52-53.  Therefore, even before it entered the trade e-books market, Apple had a considerable amount of market influence.

286.     Defendants exercised their market power when they collectively increased the average price of trade e-books.  Average prices of trade e-books sold by Publisher Defendants increased by 18.6% at Amazon and by 19.9% at Barnes & Noble through the transition to agency.  Gilbert Direct ¶¶ 149-50 & Table 5; *see also* Baker Direct ¶ 115 n.170.

Dated:  April 26, 2013

Respectfully submitted,

_____
Mark W. Ryan
Lawrence E. Buterman
Daniel McCuaig
Mary Beth McGee
Nina B. Hale
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
(202) 532-4753
Mark.W.Ryan@usdoj.gov

*On Behalf of the United States of America*

_____
Gabriel Gervey
Eric Lipman
David Ashton
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711
(512) 463-1262
Gabriel.Gervey@texasattorneygeneral.gov

W. Joseph Nielsen
Gary M. Becker
Assistant Attorneys General
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

*On Behalf of the Plaintiff States*