# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————————— )
UNITED STATES OF AMERICA,                )
                                         )
          Plaintiff,                     )
                                         )
                  v.                     )      Civil Action No. 12-cv-2826 (DLC)
                                         )
APPLE, INC., et al.,                     )
                                         )
          Defendants.                    )
—————————————————————————)


————————————————————————— )
THE STATE OF TEXAS;                      )
THE STATE OF CONNECTICUT; et al.,        )
                                         )
          Plaintiffs,                    )
                                         )
                  v.                     )      Civil Action No. 12-cv-03394 (DLC)
                                         )
PENGUIN GROUP (USA) INC. et al.,         )
                                         )
          Defendants.                    )
————————————————————————— )


## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.   APPLE'S CONSPIRACY WITH PUBLISHER DEFENDANTS IS *PER SE* ILLEGAL ..... 1

    A. The *Per Se* Rule ................................................................................................................ 2

    B. Plaintiffs Have Proved a *Per Se* Illegal Horizontal Price-Fixing Agreement with Apple at the Center ................................................................................................................ 3

II.  BOTH DIRECT EVIDENCE AND INFERENCES FROM CIRCUMSTANTIAL EVIDENCE PROVE A HORIZONTAL CONSPIRACY AMONG PUBLISHER DEFENDANTS ................................................................................................................ 5

    A. Direct Evidence Exists of an Agreement Among Publisher Defendants to Fix the Retail Price of E-books Above Amazon's $9.99 Prices ............................................................. 5

    B. An Overwhelming Amount of Circumstantial Evidence Proves a Horizontal Agreement Among Publisher Defendants ......................................................................................... 6

        1. The parallel conduct of Penguin and the other Publisher Defendants' conduct and the resulting anticompetitive effects corroborate the direct evidence of conspiracy .......... 7

        2. Publisher Defendants had a common motive to fix the price of e-books...................... 9

        3. Publisher Defendants actions were against their economic self-interest if they had been undertaken unilaterally ................................................................................................ 10

        4. Traditional conspiracy evidence supports an inference of horizontal agreement among Publisher Defendants................................................................................................... 12

        5. Publisher Defendants all abruptly changed longstanding business practices............... 14

III. BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE PROVE THAT APPLE KNOWINGLY PARTICIPATED IN AND FACILITATED PUBLISHER DEFENDANTS' HORIZONTAL AGREEMENT ................................................................................... 15

    A. Apple's Conduct Strongly Resembles Conduct Condemned in "Hub and Spoke" Conspiracy Cases ............................................................................................................ 15

    B. There is Extensive Direct Evidence of Apple's Knowing Participation and Facilitation of Publisher Defendants' Horizontal Agreement ................................................................ 16

    C. Circumstantial Evidence Also Supports Apple's Knowing Participation in a Price-Fixing Conspiracy with Publisher Defendants............................................................................ 17

    D. Apple is Not Immune from Antitrust Liability Because It May Have Been Acting in Its Own Interest................................................................................................................... 21

    E. Apple's Liability for Participation in the Conspiracy Does Not Depend on It Having Market Power.................................................................................................................. 23

IV.  DEFENDANTS' CONDUCT IS ILLEGAL UNDER THE RULE OF REASON............... 24

    A. A "Quick Look" Shows that Apple and Penguin Harmed Competition.......................... 25

B. Full Rule of Reason Analysis Shows that the Conspiracy Harmed Competition............. 26

    1. Defendants' conspiracy has had an adverse effect on competition............................ 27

        a.  Defendants' conspiracy had direct anticompetitive effects .................................... 27

        b.  Publisher Defendants collectively have market power and their conspiracy with Apple is inherently anticompetitive ........................................................................ 28

            *i.  Trade e-books is a relevant product market*.................................................... 29

            *ii.  The relevant geographic market is the United States* ..................................... 32

            *iii. Publisher Defendants have sufficient market share*......................................... 32

    2.      Apple and Penguin Cannot Justify the Harm they Caused...........................34

        a.  Targeting Amazon's below-cost pricing is not a valid justification for anticompetitive conduct ......................................................................................... 35

        b.  Defendants' arguments about e-reader competition are neither relevant nor factually supported ................................................................................................ 36

        c.  Apple's and Penguin's procompetitive justifications, even if believed, do not outweigh the harm they caused ............................................................................. 37

V.    THE COURT HAS BROAD REMEDIAL POWERS........................................................ 39

VI.    DEFENDANTS' CONDUCT VIOLATES STATE LAWS AS ALLEGED IN COUNT IV OF THE STATES' COMPLAINT........................................................................................ 42

TABLE OF AUTHORITIES

**Cases**

*Ambook Enters. v. Time Inc.*, 612 F.2d 604 (2d Cir. 1979) ...................................................... 9, 16

*Anderson News, LLC v. Am. Media, Inc.* 680 F.3d 162 (2d Cir. 2012) .................................... 5, 17

*Apex Oil Co. v. Dimauro*, 822 F.2d 246 (2d Cir. 1987)...................................................... 7, 9, 21

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982) ...................................................... 2

*Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir. 2010) ................... 38

*Bascom Food Prods. Corp. v. Reese Finer Foods*, 715 F. Supp. 616 (D.N.J. 1989) .................... 3

*Board of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918) ............................... 24

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) ...................... 3

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................. 29

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ......................................................................... 25

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537 (2d Cir. 1993) .. 26, 27, 38

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980).......................................................... 37

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548 (11th Cir. 1998) ............................... 8

*Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379 (S.D.N.Y. 2004)................................... 38

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) ...................................... 26, 38

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46 (3d Cir. 2007) ................................. 5

*Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217 (7th Cir. 1993)................................ 10

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451(1992) ........................................ 28, 29

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330 (S.D.N.Y. 2009).............................................................................................................. 29

*Fashion Originators Guild of Am. v. FTC*, 312 U.S. 457 (1941) .......................................... 34, 35

*Fineman v. Armstrong World Indus.*, 980 F.2d 171 (3d Cir. 1992)................................. 10, 17, 21

*Flash Elecs. v. Universal Music*, 312 F. Supp. 2d 379 (E.D.N.Y. 2004) .................................. 33

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986).............................................................. 27, 34

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990)............................................... 2

*FTC v. Whole Foods Mkt.*, 548 F.3d 1028 (D.C. Cir. 2008) ...................................................... 31

*Gen. Glass Co. v. Globe Glass & Trim Co.*, No. 71 C 921, 1980 WL 1890 (N.D. Ill. June 26, 1980) .................................................................................................................................... 4

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)........................... 27

*Georgia v. Pa. R.R. Co.*, 324 U.S. 439 (1945).............................................................................. 1

*Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005)......................................................... 25

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972)........................................................................ 1

*Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219 (2d Cir. 2007).................................... 32

*In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th Cir. 1997).... 15, 23

*In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351 (S.D.N.Y. 2011).......... 7, 13

*In re Currency Conversion Fee Antitrust Litigation*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003) 11, 21

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012) ............................... 4, 24

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009)....................................................................................................... 8, 13, 14

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)............................................... 7, 12

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ............... 6, 13, 16

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)......................................... 6, 29

*In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001)................................... 4

*In re Mid-Atlantic Toyota Antitrust Litig.*, 560 F. Supp. 760 (D. Md. 1983) ............................... 20

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012) ...................................... passim

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) .............................................. 8

*Int'l Salt Co. v. United States,* 332 U.S. 392 (1947)................................................................ 39

*Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939)................................................. passim

*Jefferson Parish Hosp. Dist. No. 9 v. Hyde,* 466 U.S. 2 (1984) ............................................... 2

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995)................ 24, 27, 28

*Laumann v. Nat'l Hockey League*, No. 12 Civ. 1817, 2012 WL 6043225 (S.D.N.Y. Dec. 5, 2012) ................................................................................................................................................. 15

*Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998)........................ 34, 36, 38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ...................................... 3

*Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008)................ 2

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ......................................... 1, 5

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents* ("*NCAA*"), 468 U.S. 85 (1984) ............... passim

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)........................................... 34

*New York v. Microsoft Corp.*, 209 F. Supp. 2d 132 (D.D.C. 2002)............................................. 41

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)............ 23

*Olstad v. Microsoft Corp.*, 700 N.W. 2d 139 (Wis. 2005)........................................................... 45

*Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) ................................................... 35

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ......................................................................... 2

*Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009).................... 30

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002)................................................... 4, 6

*Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993)..... 7, 8

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005)............................................. 25, 26

*Re/Max International, Inc., v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ............................ 11

*Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951 (10th Cir. 1990)................................... 33

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ................................................................ 25

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ......................................... 2, 10

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................ 31

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................................................... 6, 27, 29

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir 1998) ................................. 27, 28, 33

*Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000) ............................................................. passim

*United States v. All Star Indus.*, 962 F.2d 465 (5th Cir. 1992) ..................................................... 4

*United States v. Apple, Inc.*, 889 F. Supp. 2d 623 (S.D.N.Y. 2012)........................................... 36

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ...................................... 39

*United States v. Gen. Motors Corp.*, 384 U.S. 127 (1966) ................................................... 3, 22

*United States v. Giordano*, 261 F.3d 1134 (11th Cir. 2001)....................................................... 35

*United States v. Masonite Corp.*, 316 U.S. 265 (1942) ............................................................. 18

*United States v. Nat'l Lead Co.*, 63 F. Supp. 513 (S.D.N.Y. 1945) ............................................ 35

*United States v. Parke, Davis and Co.*, 362 U.S. 29 (1960) ............................................... 20, 39

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................................... 36

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)......................................... 10, 35

*United States v. Topco Assoc., Inc.*, 405 U.S. 596 (1972) .......................................................... 36

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950) .............................................................. 40

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001)................................... 31

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)............................................ passim

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953).............................................................. 39

*United States. v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ............................ 29, 30, 31

**Statutes**

§ 407.010.4, Mo.Rev.Stat. ........................................................................................................ 42

§ 407.020.1, Mo.Rev.Stat. ........................................................................................................ 43

15 U.S.C. § 1 (2004) ............................................................................................................... 1, 2

15 U.S.C. § 26 ............................................................................................................................. 1

28 U.S.C. § 1367 ....................................................................................................................... 41

M.G.L. c. 93A § 2 ..................................................................................................................... 43

Utah Code § 76-10-918(2) ........................................................................................................ 43

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW § 14.03b, at 14–
25 (4th ed. 2011) ................................................................................................................. 22

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1 (2010) .......29

VI Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶1415c (2d ed. 2003)........ 11, 34

XI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1914c (3d ed. 2011) ......... 33, 37

## I. APPLE'S CONSPIRACY WITH PUBLISHER DEFENDANTS IS *PER SE* ILLEGAL

1.      Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1 (2004).  Section 16 of the Clayton Act authorizes states to seek injunctive relief against every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.  15 U.S.C. § 26 (2004).  The unlawful restraint of trade in this case also gives rise to Plaintiff States having standing as *parens patriae* on behalf of their citizens and each states' general welfare and economies.  *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 259–61 (1972); *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945).

2.      To establish a conspiracy in violation of Section 1, the United States and Plaintiff States (collectively "Plaintiffs") must "present direct or circumstantial evidence that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme, designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted).

3.      A preponderance of the evidence shows that Apple, Inc. ("Apple") conspired and agreed with Hachette Book Group, Inc., a subsidiary of Hachette Livre ("Hachette"), HarperCollins Publishers L.L.C., a subsidiary of News Corporation ("HarperCollins"), Holtzbrinck Publishers, LLC d/b/a Macmillan, a subsidiary of Verlagsgruppe Georg von Holtzbrinck GmbH ("Macmillan"), The Penguin Group, a Division of Pearson plc and Penguin Group (USA), Inc. ("Penguin"), and Simon & Schuster, Inc., and a subsidiary of CBS Corporation ("Simon & Schuster") (collectively "Publisher Defendants") for the purpose and with the effect of raising consumer e-book prices and restraining retail price competition, in violation of Section 1 of the Sherman Act.  15 U.S.C. § 1.

1

4.      The conspiracy took root in publishers' disdain for $9.99 e-book prices and Apple's fear of having to compete with Amazon and other e-book retailers on price, and accomplished Defendants' goals of raising prices and limiting price competition.  These collective efforts to raise e-book prices and limit price competition violated Section 1 of the Sherman Act.

A.      The *Per Se* Rule

5.      Under the Sherman Act, there are two types of antitrust claims:  *per se* claims and rule of reason claims.  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 326 n.4 (2d Cir. 2010).  "Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable," and it therefore is illegal *per se*.  *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982).  "The *per se* rules also reflect a longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.'"  *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 443 (1990) (quoting *Jefferson Parish Hosp. Dist. No. 9 v. Hyde*, 466 U.S. 2, 16 (1984)).

6.      "A horizontal agreement to fix or raise prices is *per se*" illegal.  *Maricopa*, 457 U.S. at 347–48; *see also Starr*, 592 F.3d at 326 n.4.  Price-fixing agreements need not include "explicit agreement on prices to be charged or that one party have the right to be consulted about the other's prices."  *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 48–50 (1990).  Instead, any "agreement to eliminate price competition from the market" or that "has the purpose and effect of fixing, stabilizing, or raising prices may be a *per se* violation of the Sherman Act."  *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 335–37 (2d Cir. 2008).

7.      Outside the joint venture context inapplicable here, the Supreme Court has recognized that joint price setting by competitors can be judged under the rule of reason only where

2

"horizontal restraints on competition are essential if the product is to be available at all," *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents* ("*NCAA*"), 468 U.S. 85, 101 (1984), or where a "joint selling arrangement may be so efficient that it will increase sellers' aggregate output and thus be procompetitive," *id.* at 103 (citations omitted), as was true in the Supreme Court's decisions in *NCAA* and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) (finding that blanket licensing fees were not *per se* price-fixing because defendants "made a market" for copyrighted music that did not exist previously).  Neither of these circumstances applies to the present case.  *See, e.g.*, *Bascom Food Prods. Corp. v. Reese Finer Foods*, 715 F. Supp. 616, 631–32 (D.N.J. 1989) (distinguishing *NCAA* and *Broadcast Music* in applying *per se* rule to restraints that did not create a new product and were not essential to the product's existence).

### B.   Plaintiffs Have Proved a *Per Se* Illegal Horizontal Price-Fixing Agreement with Apple at the Center

8.      Apple helped to organize, and was thus a member of, a conspiracy with Penguin and the other Publisher Defendants.  Because this conspiracy is fundamentally the product of a horizontal agreement among Publisher Defendants to fix the retail price of e-books, it is illegal *per se*.  "A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007); *United States v. Gen. Motors Corp.*, 384 U.S. 127, 144–45 (1966) (finding group boycott agreement among competing car dealers and their supplier to be a horizontal restraint subjecting all parties to *per se* liability).

9.      Apple's vertical relationship with Penguin and other Publisher Defendants does not alter the fundamentally horizontal nature of the conspiracy.  Apple "help[ed] the suppliers to collude,

3

rather than to compete independently." *Toys "R" Us v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000).

A conspiracy does not "escape the per se rule" just because it depends on the participation of a

vertically related "middleman" such as Apple. *United States v. All Star Indus.*, 962 F.2d 465,

473 (5th Cir. 1992). "[T]he law is settled that where an upstream supplier participates in a

conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of

horizontal price-fixing." *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 362

(D.N.J. 2001); *see also In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 693 (S.D.N.Y.

2012) (a price-fixing agreement that is "fundamentally horizontal" is *per se* illegal); *Gen. Glass

Co. v. Globe Glass & Trim Co.*, No. 71 C 921, 1980 WL 1890, at *9 (N.D. Ill. June 26, 1980)

("[T]he fact that Allstate does not operate on the same level of competition with the glass shops

does not preclude a finding that it participated in horizontal price fixing.").

10.    Because of its place "in the center as the ringmaster" of a horizontal agreement among

Publisher Defendants to fix the retail prices of e-books, Apple is liable *per se* under Section 1 of

the Sherman Act. *Toys "R" Us*, 221 F.2d at 934.

11.    As discussed in greater detail below, the factors relied upon by the Court in *Toys "R" Us*

in finding that there was a horizontal agreement is instructive.  The court found a horizontal

agreement in *Toys "R" Us* where three key factors existed:  (1) direct evidence of

communication among the conspiring manufacturers; (2) an abrupt shift of the conspiring

manufacturers' business practices; and (3) evidence that the conspiring manufacturers made this

shift "only . . . on the condition that their competitors also agree to go along with it." *PepsiCo,

Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (citing *Toys "R" Us*, 221 F.3d at 932–

33, 935–36).  Each of those factors exists here.  And the evidence is equally clear that, just as in

*Toys "R" Us*, Apple knowingly participated in and facilitated Publisher Defendants' horizontal

agreement.  In short, there is ample evidence that Apple was acting to "disadvantage . . . its competitors," and did so by supervising a horizontal agreement among Publisher Defendants. *Toys "R" Us*, 221 F.3d at 936.

## II.   BOTH DIRECT EVIDENCE AND INFERENCES FROM CIRCUMSTANTIAL EVIDENCE PROVE A HORIZONTAL CONSPIRACY AMONG PUBLISHER DEFENDANTS

12.    Plaintiffs can prove the existence of a horizontal agreement among Publisher Defendants through either "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, LLC v. Am. Media, Inc.* 680 F.3d 162, 184 (2d Cir. 2012) (emphasis omitted) (quoting *Monsanto*, 465 U.S. at 764).  Both direct evidence of an agreement and circumstantial evidence, from which the Court can infer an agreement, exists in this case.

### A.   Direct Evidence Exists of an Agreement Among Publisher Defendants to Fix the Retail Price of E-books Above Amazon's $9.99 Prices

13.    Direct evidence of a horizontal agreement "evince[s] with clarity a concert of illegal action" among the conspiring parties. *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007) (detailing types of direct evidence).  "All evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion, though perhaps on average circumstantial evidence requires a longer chain of inferences." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (citation omitted).

14.    Here, there is persuasive *direct* evidence of a horizontal agreement among Publisher Defendants to raise e-book prices and eliminate price competition among e-book retailers.  For example, just as in *Toys "R" Us*, each publisher agreed to Apple's agency agreements on the

explicit condition that other publishers agree to do the same.[1]  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 332 (3d Cir. 2010) (describing this type of evidence as direct evidence of agreement); *see also PepsiCo*, 315 F.3d at 110 (describing this type of evidence as "strong evidence of a horizontal agreement").  There also is significant direct evidence that Publisher Defendants believed Amazon's pricing to be "wretched" and a big problem for the industry,[2] and that Publisher Defendants believed the only way to address the industry's Amazon problem was for the largest publishers to "develop a common strategy."  Statements by company officers referring to an "'understanding within the industry'" on price, and that "'our competitors are our friends,'" are evidence of an "explicit agreement to fix prices."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).  Penguin's CEO David Shanks even admitted that Publisher Defendants used Apple as a "facilitator" and as a "go between" to allow them to pursue their common strategy while avoiding antitrust liability.[3]  And within days after Publisher Defendants executed their agreements with Apple, each made identical demands on Amazon to move to the agency model or face losing e-books altogether.[4]

**B.  An Overwhelming Amount of Circumstantial Evidence Proves a Horizontal Agreement Among Publisher Defendants**

15.     Even without the array of direct evidence present here, "a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).  Plus factors include:  (1) the presence of a strong motive to enter into the alleged conspiracy, *see, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 773 F.

---

[1] Plaintiffs' Proposed Findings of Fact ("PF"), at ¶¶ 153-167.

[2] PF, at ¶¶ 25-28.

[3] PF, at ¶ 76.

[4] PF, at ¶¶ 179-189.

Supp. 2d 351, 366 (S.D.N.Y. 2011); (2) actions against independent economic self-interest, *see, e.g.*, *id.*; (3) "evidence implying a traditional conspiracy," including competitors seeking assurances of common action, *see, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (quoting *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993)); and (4) abrupt, unanimous changes in longstanding business practices, *see Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 223 (1939).

16.     An antitrust plaintiff asking a court to infer a horizontal agreement from circumstantial evidence and plus factors must prove that the evidence "might tend to exclude the possibility of independent parallel behavior." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987).[5]

17.     Where, as here, the "conspiracy is economically sensible for the alleged conspirators to undertake," the "tends to exclude standard" is "more easily satisfied." *See In re Publ'n Paper*, 690 F.3d at 63 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004)).  It made economic sense for Publisher Defendants to work together and with Apple to increase e-book prices.  Publisher Defendants despised Amazon's $9.99 pricing but knew that no one publisher could address the problem on its own.  Thus, Publisher Defendants could only achieve their goal by acting collusively to obtain their desired outcome.[6]

          **1.     The parallel conduct of Penguin and the other Publisher Defendants' conduct and the resulting anticompetitive effects corroborate the direct evidence of conspiracy**

18.     Consciously parallel conduct occurs when defendants act similarly, know of each other's actions, and take that knowledge into account when making decisions.  *See Petruzzi's*, 998 F.2d at 1242–44.  "Parallel behavior of a sort anomalous in a competitive market is [] a symptom of

---

[5] But this standard does "not apply at all" when, as is true here, a plaintiff has produced direct evidence of an agreement to fix prices. *In re Pub'n Paper Antitrust Litig.*, 690 F.3d at 63.  *See infra* ¶ 48.

[6] PF, at ¶¶ 25, 45, 49-50.

price fixing, though standing alone it is not proof of it." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). Consciously parallel behavior may exist, for example, when prices move in a parallel fashion and the alleged conspirators are aware of the movement of each other's prices. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572 (11th Cir. 1998). Similar treatment of suppliers or customers—and awareness that similar treatment is occurring—can also demonstrate conscious parallelism. *See Petruzzi's*, 998 F.2d at 1243 (recognizing as parallel behavior buyers' similar actions in refraining from competing for each other's accounts).

19.     Publisher Defendants' parallel conduct corroborates the direct evidence that they engaged in a horizontal price-fixing agreement. Publisher Defendants all increased the prices of e-book versions of their hardcover new releases and *New York Times* bestsellers nearly simultaneously, at the first opportunity after securing control of retail pricing from their retailers.[7] For most of their new releases and bestsellers, Publisher Defendants all raised e-book prices to the maximum levels allowable under their Apple Agency Agreements.[8] These similar price movements alone are enough to show parallel conduct. *See City of Tuscaloosa*, 158 F.3d at 572; *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009) (finding defendants' six lockstep price increases satisfy parallel conduct requirement).

20.     Publisher Defendants also acted in parallel when they simultaneously abandoned the prevailing wholesale model for distribution of e-books and entered the Apple Agency Agreements.[9] Their parallel conduct continued when they each proceeded to impose agency

---

[7] PF, at ¶¶ 217-224.

[8] PF, at ¶ 217.

[9] PF, at ¶ 175.

terms on Amazon, with threats to withhold e-books from Amazon if it did not accede, and then did the same with all other retailers through which they sold e-books.[10]  Each Publisher Defendant completely transformed the way it sold e-books, beginning with the signing of the Apple Agency Agreements in January 2010.[11]

21.    The actual effect flowing from the conspiracy, as detailed below, was that e-book prices for new releases and *New York Times* bestsellers increased in the weeks following the move to agency.[12]  These anticompetitive effects strengthen the inference of conspiracy arising from parallel conduct.   For example, the Second Circuit has found the existence of a conspiracy to be plausible based on the ability of some defendant conspirators to sell oil at above-market prices. *Apex Oil*, 822 F.3d at 253.

### 2.    Publisher Defendants had a common motive to fix the price of e-books

22.    One "plus factor" to be considered in determining if an agreement can be inferred from parallel conduct is "whether agreement benefited the alleged conspirators as the practice in *Interstate Circuit* clearly had."  *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 616 (2d Cir. 1979). Publisher Defendants certainly benefited here.  Publisher Defendants despised Amazon's $9.99 pricing and had demonstrated that they were willing to act collusively in order to obtain their desired outcome.[13]  Their conspiracy with Apple allowed them to address these concerns, which none could have done on its own.[14]

---

[10] PF, at ¶¶ 180-189, 194-95.

[11] PF, at ¶¶ 217-224, 231-250.

[12] PF, at ¶¶ 25, 217-224.

[13] PF, at ¶¶ 25, 49-50, 54-67.

[14] PF, at ¶¶ 179, 185.

23.     Common motives of conspirators can manifest themselves when the benefits of the conspiracy depend on "substantially uniform" acceptance of the practices at issue by the conspirators. *Id.* at 616. Here, each Publisher Defendant adopted substantively identical agency terms with Apple and then exported those terms to all other e-book retailers.[15]

24.     The Second Circuit has found allegations of an agreement to be credible based on content providers' shared interests in preventing the devaluation of their content. *Starr*, 592 F.3d at 323–24 (citation omitted). Moreover, it is well-established that "concerted action" by firms "to protect themselves from price competition by discounters constitutes horizontal price-fixing." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220–21 (7th Cir. 1993); *see also Toys "R" Us*, 221 F.3d at 937 ("Taking steps to prevent a price collapse through coordination of action among competitors has been illegal at least since [*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).]."). The factual record in this case contains many uncontroverted statements by executives of Publisher Defendants demonstrating that preventing the devaluation of books by $9.99 consumer e-book prices for new releases and *New York Times* bestsellers was motivation to collude.[16]

### 3.    Publisher Defendants actions were against their economic self-interest if they had been undertaken unilaterally

25.     An act against economic self-interest is one in which "there is risk of substantial loss" unless conspirators perform it in a "substantially unanimous" way. *Interstate Circuit*, 306 U.S. at 222. Penguin and the other Publisher Defendants[17] would have risked substantial losses to

---

[15] PF, at ¶¶ 73, 175, 194-195.

[16] PF, at ¶¶ 25-28, 215.

[17] This plus factor applies only to the inference of a horizontal agreement among the publishers. It does not bear on the question of Apple's participation in the conspiracy. *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 n.32 (3d Cir. 1992) (distinguishing horizontal case

competitors, and therefore acted against their economic self-interests, if any of them had *unilaterally* raised e-book prices or attempted to impose the agency model on Amazon.[18]  "Some acts, or failure to act, cannot be profitably continued unless rivals behave in parallel.  For example, one cannot profitably increase its price above that charged by rivals unless they follow the price-raiser's lead."  VI Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶1415c (2d ed. 2003).  Publisher Defendants each recognized that signing the Apple Agency Agreements independent of their competitors would have run counter to their self-interest.  As Mr. Shanks testified:  "[W]e were very afraid of punitive action being taken by Amazon and at this point we felt that there had to be enough of Amazon's publisher customers going that way or Amazon would make a serious example of anyone who strayed away from the way they wanted to do business."[19]

26.     In *Re/Max International, Inc., v. Realty One, Inc.*, 173 F.3d 995, 1010 (6th Cir. 1999), the court examined an alleged agreement among two large real estate brokers designed to disadvantage a competitor, the plaintiff.  In finding a conspiracy, the court observed that it would not have made economic sense for only one of defendants to adopt the challenged practice, because Re/Max could have increased its business with the other defendant.  *Id.*  The logic of *Re/Max* applies to this case because a Publisher Defendant that independently raised its e-book prices above its competitors' prices also risked losing one of its best customers – Amazon – as an outlet for its e-books.  *See also In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 418–19 (S.D.N.Y. 2003) (finding that banks' imposition of currency exchange fee was

---

where finding of action contrary to self-interest helps rule out parallel behavior with case where one firm is in vertical relationship with co-conspirators).

[18] PF, at ¶¶ 176-178, 189, 196-197, 253.

[19] Penguin (David Shanks) CID Dep., at 85:10-86:6; *see also* PF, at ¶ 176.

against self-interest, absent collusion, because "they would stand to lose some of their best customers").

### 4. Traditional conspiracy evidence supports an inference of horizontal agreement among Publisher Defendants

27.     "The most important evidence will generally be non-economic evidence that there was an actual, manifest agreement not to compete." *In re Flat Glass*, 385 F.3d at 361.  That evidence often involves "customary indications of traditional conspiracy" or "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan." *Id.* In *Flat Glass*, the Third Circuit emphasized the importance of information exchanges between conspirators that affected the conspirators' decisions *after* information was exchanged. *Id.* at 369.  In that case, information exchanges between competitors took place several weeks before the collusive action on one occasion and nearly a month before collusive action on another occasion. *Id.* at 364, 367.  The *Flat Glass* court concluded "a finder of fact could reasonably infer that the flat glass producers used the information to implement collusive price increases; that is, 'the exchanges of information had an impact on pricing decisions.'" *Id.* at 369 (citation omitted).  In the present case, the information exchanges between Publisher Defendants were plentiful and directly tied to their decisions to join with each other in moving to higher prices under the agency model with Apple.[20]  In some instances, executives of Publisher Defendants "exchanged assurances of common action" about signing the Apple Agency Agreements,[21] the types of assurances courts have found to be evidence of traditional conspiracy. *See, e.g.*, *In re Flat Glass*, 385 F.3d at 361.

---

[20] PF, at ¶¶ 95-102.

[21] PF, at ¶ 166.

28.     Publisher Defendants' pattern of communicating with Apple, then shortly afterwards communicating with each other, supports an inference that these information exchanges "impacted their decisions."  *See In re Currency Conversion Fee*, 773 F. Supp. 2d at 369 (finding that "nature and timing" of communications can support inference of conspiracy where a series of communications and of parallel actions took place concurrently over half of the year).

29.     Further, friendly relationships between executives of competing firms can offer evidence of traditional conspiracy.  *See In re EPDM*, 681 F. Supp. 2d at 173 (outlining personal relationships, including years of friendship, between executives of competing firms).  The uncontroverted record shows intertwined personal and professional relationships between executives of Publisher Defendants.[22]  These close relationships constitute traditional evidence of conspiracy.  *See In re High Fructose Corn Syrup*, 295 F.3d at 662 (listing examples of executives expressing friendship towards competitors and disregard for customers as proof of horizontal agreement:  "[O]ur competitors are our friends.  Our customers are the enemy" and "competitors['] happiness is at least as important as customers['] happiness.").

30.     Further, the numerous and frequent communications between executives of Penguin and the other Publisher Defendants, especially in December 2009 and January 2010, are also traditional evidence of conspiracy.  *In re EPDM*, 681 F. Supp. 2d at 173–74.  For example, there were upwards of 100 calls between Publisher Defendant CEOs during the time that the Apple Agency Agreements were being negotiated, clustered around dates when Apple was meeting with Publisher Defendants, presenting them with potential contract terms, and obtaining final signatures from them.[23]  These inter-firm communications take on added significance because of the high rank of the executives who made them.  *In re Publ'n Paper*, 690 F.3d at 67 (recognizing

---

[22] PF, at ¶ 37.

[23] PF, at ¶¶ 95-102.

13

increased weight of communications between conspirators' executives who possess decision-making authority).  Publisher Defendants' CEOs and other leading decision makers regularly communicated with each other regarding their concerns about the e-books market.[24]

31.     As in *In re EPDM*, 681 F. Supp. 2d at 174–76, the frequency, volume, and friendly nature of communications over several years among executives of Publisher Defendants supports inferring an illicit agreement.  The inter-publisher communications were part of "a plethora of emails, memoranda, and other inter-firm communications," about competitive matters, ranging from the very specific, such as decisions to delay releases of particular e-books and assurances about negotiations with Apple, to the general, such as concerns about the future of the e-books market.  *Id*. at 174.[25]

### 5.     Publisher Defendants all abruptly changed longstanding business practices

32.     A group of competitors' abrupt, near simultaneous, and far-reaching changes in methods of doing business can be suggestive of conspiracy.  The *Interstate Circuit* Court explained the role such moves can serve in inferring a conspiracy:  "It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join . . . ."  *Id*. at 223; *see also Toys "R" Us*, 221 F.3d at 935 ("the manufacturers' decision to stop dealing with the warehouse clubs [was] an abrupt shift from the past").

33.     Publisher Defendants' actions are like those that "taxe[d] credulity" in *Interstate Circuit*.  The agency model was a *radical departure* from the longstanding business practice of the publishing industry to sell all books under a wholesale model.  Nonetheless, five of the six

---

[24] PF, at ¶¶ 40-43, 48.

[25] PF, at ¶¶ 43, 54, 166.

largest publishers all agreed simultaneously to change their long-standing business model – for one that was less profitable in the short-run – in the span of about a month.[26]

34.     In sum, there is ample direct and circumstantial evidence to prove a horizontal price-fixing agreement among Publisher Defendants to raise the retail price of e-books.

## III.   BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE PROVE THAT APPLE KNOWINGLY PARTICIPATED IN AND FACILITATED PUBLISHER DEFENDANTS' HORIZONTAL AGREEMENT

35.     "It is *well established*" that a distributor's "coordination of horizontal agreements in restraint of trade at the next distribution level by entering into a series of identical vertical agreements with multiple parties may subject *all* participants to antitrust liability." *Laumann v. Nat'l Hockey League*, No. 12 Civ. 1817, 2012 WL 6043225, at *9 (S.D.N.Y. Dec. 5, 2012) (emphasis added) (citing *Interstate Circuit*, 306 U.S. at 226); *see also Toys "R" Us*, 221 F.3d at 930.  The idea that a customer may help enforce a conspiracy among manufacturers, and be held liable for doing so, "is nothing new."  *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997).

### A.     Apple's Conduct Strongly Resembles Conduct Condemned in "Hub and Spoke" Conspiracy Cases

36.     Apple's conspiracy with Publisher Defendants mirrors the schemes that violated Section 1 in *Interstate Circuit* and *Toys "R" Us*.  In both cases, manufacturers conspired with distributors in order to blunt competition from rival discounters.  In *Interstate Circuit*, two retailers (movie theater chains) violated Section 1 by requiring movie distributors to agree to sell subsequent-run films to discount theatres only if the distributors agreed to charge a minimum admissions price.  "The obvious result of such a joint action by the [movie distributors] was to weaken the ability of the [competing discount theatres] to draw audiences away from Interstate

---

[26] PF, at ¶¶ 141, 153-70.

and Consolidated by offering *substantially lower prices* . . . ."  *Ambook*, 612 F.2d at 613–14

(emphasis added).  In *Toys "R" Us*, "a modern equivalent" of *Interstate Circuit*, the retailer

unlawfully conspired with its toy manufacturer-suppliers to reduce the price competition it faced

from discount toy sellers.  221 F.3d at 935.  Here, Apple's conspiracy with Publisher Defendants

weakened Amazon's ability to win customers with lower prices.

### B.   There is Extensive Direct Evidence of Apple's Knowing Participation and Facilitation of Publisher Defendants' Horizontal Agreement

37.     As was true with Publisher Defendants, Apple executives' own statements and

admissions are direct evidence of its role in the conspiracy.  *In re High Fructose Corn Syrup*,

295 F.3d at 662 (stating that "evidence tantamount to an acknowledgement of guilt" constitutes

direct evidence of participation in conspiracy).  For example, Apple's former CEO Steve Jobs

admitted to his biographer that Apple "told the publishers 'We'll go to the agency model, where

you set the price, and we get our 30%, and yes, the customer pays a little more, but that is what

you want anyway.  But we also asked for a guarantee that if anybody else is selling the books

cheaper than we are, then we can sell them at the lower price too.'"[27]  Similarly, Apple's

conspiracy with Publisher Defendants allowed Mr. Jobs to presciently predict, when asked at the

iPad's launch about why customers would pay higher prices for e-book titles when Amazon

offered the same titles for less, that Apple would not have to compete with Amazon's low prices:

"the prices will be the same."[28]  The direct evidence also includes Apple's Mr. Saul's meeting

notes that HarperCollins proposed agency to Apple "to fix Amazon pricing,"[29] and Mr. Cue's

summary of his calls relaying that proposal to the CEOs of Macmillan, Simon & Schuster, and

---

[27] PF, at ¶ 92.

[28] PF, at ¶ 171.

[29] PF, at ¶ 89.

non-defendant Random House, in which he explained that they "saw . . . the plus" of the Apple proposal to be that it "solves Amazon issue."[30]  Additionally, when Mr. Jobs e-mailed James Murdoch, he took pains to suggest that HarperCollins "[t]hrow in with Apple and see if we can **all** make a go of this to create a real mainstream e-books market at $12.99 and $14.99."[31]  Clearly, then, Apple was not only aware of Publisher Defendants' horizontal agreement, it joined the conspiracy with the intent of furthering that agreement's success.

###   C.   Circumstantial Evidence Also Supports Apple's Knowing Participation in a Price-Fixing Conspiracy with Publisher Defendants

38.   Because Apple is in a vertical relationship with Publisher Defendants, there is no need to conduct analysis of parallel conduct or plus factors to infer agreement.  Instead, the Court must simply examine the circumstantial evidence to determine whether Apple shared a "commitment to a common scheme" with Publisher Defendants.  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212–15 (3d Cir. 1992).

39.   Substantial circumstantial evidence further proves Apple's participation through "inferences that may fairly be drawn from the behavior of the alleged conspirators."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quotation omitted).  First, in its initial round of meetings with Publisher Defendants and Random House on December 15-16, Apple told each of them that it was holding similar meetings with its direct competitors.[32]  Similarly, Apple invited Publisher Defendants to take part in concerted action that would raise prices and end retail price competition, including telling Publisher Defendants and Random House that they needed to move *all* retailers to the agency model if Apple was going to agree to

---

[30] PF, at ¶ 108.

[31] PF, at ¶ 168 (emphasis added).

[32] PF, at ¶¶ 71, 86.

an agency contract, and telling Publisher Defendants that Apple was not interested in being a low-cost provider. *Interstate Circuit*, 306 U.S. at 222.[33]  For example, Mr. Cue told Ms. Reidy of Simon & Schuster that "new release e-books should be priced at $12.99" and that "the only way" to get "some level of reasonable pricing" "is for the industry to go to the agency model."[34]

40.     Second, as Apple negotiated the Agency Agreements, it repeatedly assured Publisher Defendants that they would be joined by, and receive materially the same deals as, their competitors.[35]  *See United States v. Masonite Corp.*, 316 U.S. 265, 269–70 (1942) (finding illegal "agency" agreements between a patent holder and a group of competing distributors of the patent holders' products where "[e]ach 'agent' knew . . . that [the patent holder] proposed to make substantially identical agreements with the others").  For example, as Mr. Cue conveyed to Mr. Jobs three days before Penguin signed its Apple Agency Agreement, Mr. Shanks "wants an assurance that he is 1 of 4 before signing (not in the contract)."[36]  Mr. Shanks testified that Mr. Cue assured him that three other publishers were going to participate in the iBookstore launch,[37] and indeed, telephone records show that before Penguin signed, Mr. Cue made four calls to Mr. Shanks's cell phone over January 22, 24, and 25.[38]  Similarly, in response to Simon & Schuster CEO Carolyn Reidy's contemporaneous request for "an update on your progress in herding us cats,"[39] Mr. Cue appears to have provided her with the number and names of publishers with whom Apple had agreed in principle.  Mr. Cue admitted he told Publisher Defendants "from very

---

[33] PF, at ¶¶ 85, 105.

[34] PF, at ¶ 110.

[35] PF, at ¶ 73.

[36] PF, at ¶ 160.

[37] Penguin (David Shanks) CID Dep., at 86:7–24, 88:18–22.

[38] PF, at ¶¶ 161-62.

[39] PF, at ¶ 147.

early on" that they would be receiving the "exact same deal" as their competitors, and that, "in order to cut some of the deals," he told Publisher Defendants "that they weren't going to be the only ones."[40]  On January 4-6, 2010, Mr. Cue e-mailed each of the Big Six publishers' CEOs substantively identical term sheets that provided the initial outline of Apple's agency proposal. The only variation in the term sheets was arrived at "[a]fter talking to all the other publishers and seeing the overall book environment" for those three Publishers to whom he had not previously relayed that Apple was willing to adopt an agency model.[41]  Apple also indicated that all Publisher Defendants would be getting the same deal in subsequent communications between its executives and executives of Publisher Defendants.[42]

41.      Apple's pattern of behavior mirrored, in the above respects, the orchestrator of the conspiracy in *Interstate Circuit*.  306 U.S. at 222–27.  In *Interstate Circuit*, the orchestrator sent its proposed terms in a letter addressed to eight competitor distributors.  "[F]rom the beginning each of the distributors knew that the proposals were under consideration by the others." *Id.* at 222.  As in *Interstate Circuit*, Mr. Cue admitted that he "certainly let [Publisher Defendants] know that" he was negotiating with their competitors.[43]  Thus, because each Publisher Defendant knew the proposals "were under consideration by the others," Mr. Cue's communication also acted as an invitation to concerted action.  *Id.* at 222, 226.  When Publisher Defendants accepted Apple's invitation and established substantively identical Apple Agency Agreements, Publisher Defendants and Apple formed a conspiracy that violated Section 1.  *See id.* at 227.  "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the

---

[40] PF, at ¶¶ 141, 154.

[41] PF, at ¶ 109.

[42] PF, at ¶ 73.

[43] Apple (Eddy Cue) CID Dep. 124:10-18.

necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *Id.* (citations omitted).  Publisher Defendants and Apple knew that the consequences of their actions would be higher consumer e-book prices.[44]

42.     There are other factual similarities between *Interstate Circuit* and this case.  For example, after the theatres "present[ed] their demands to all [distributors]," 306 U.S. at 222, "[c]onferences followed" between the theaters and "the representatives of the various distributors." *Id.* at 218.  In this case, Apple followed its delivery of terms sheets with a series of meetings with Publisher Defendants.[45]  Courts have found that "shuttle diplomacy," as practiced by Mr. Cue and other Apple executives when performed as a go-between among horizontal competitors, contributed to evidence of a conspiracy sufficient to defeat summary judgment. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 560 F. Supp. 760, 775 (D. Md. 1983).

43.     In *United States v. Parke, Davis and Co.*, the Supreme Court condemned a drug manufacturer's passing of assurances between retailers that each would cease advertising the manufacturer's products at below-cost prices, if others did so as well.  362 U.S. 29, 46 (1960).  The manufacturer received one retailer's "apparent willingness to cooperate" as "the lever to gain [the] acquiescence" of other retailers in subsequent meetings.  Mr. Cue, in his rounds of meetings with Publisher Defendants, similarly used the acquiescence of some Publisher Defendants to secure agreement from others.[46]

---

[44] PF, at ¶¶ 85, 106, 112, 131, 168-69.

[45] PF, at ¶¶ 113, 118.

[46] PF, at ¶¶ 154-165.  Plaintiffs neither argue nor mean to suggest that, standing alone, Mr. Cue's shuttling between negotiating partners and attempting to lure them in accepting his deal violates the Sherman Act.  Like all the evidence in this case, this must be viewed in context of the entire record.

### D.   Apple is Not Immune from Antitrust Liability Because It May Have Been Acting in Its Own Interest

44.    In the face of the overwhelming evidence proving its participation in the conspiracy, Apple has sought refuge in asserting Plaintiffs must show that there is no possibility that it acted in its independent business interests.[47]   This is not the legal standard applicable to Apple's liability in this case.

45.    Where a plaintiff asserts that a horizontal actor is liable based primarily on parallel conduct, the fact that the horizontal competitors were acting in a matter that would be against their economic self-interest (if undertaken unilaterally) may indicate that the conduct was the result of conspiratorial, as opposed to independent, conduct.  *See, e.g.*, *Apex Oil Co. v. Dimauro*, 822 F.2d 246, 254 (2d Cir. 1987); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d at 419.  And that is, in fact, one of the bases to infer a horizontal agreement among Publisher Defendants here.[48]

46.    However, when an accused conspirator is in a vertical relationship with its co-conspirators, a query into the vertical conspirator's independent economic self-interest carries no weight because the allegation of conspiracy is necessarily not based on parallel conduct.  There is no allegation here that Apple, the sole distributor in the conspiracy, engaged in parallel conduct with any of its co-conspirators, Publisher Defendants.  Thus, there is no inference from parallel conduct to make or to undermine.  *See Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 n.32 (3d Cir. 1992) (distinguishing horizontal case where finding of action contrary to self-interest helps rule out parallel behavior with case where one firm is in vertical relationship with co-conspirators).

---

[47] Tr. of Telephone Conference, Mar. 13, 2013, at 11:11–14.

[48] *See supra* ¶¶ 24-25.

47.     Accordingly, the Supreme Court has held that it "is of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act" whether a vertical conspirator "acted in its own lawful interest.  Nor is it of consequence for this purpose whether the [challenged conduct was] economically desirable."  *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142 (1966).  Notably, the Seventh Circuit in *Toys "R" Us* applied the independent self-interest test to evaluate only whether the toy manufacturers conspired, not whether Toys "R" Us also participated in the conspiracy.  221 F.3d at 936.

48.     Moreover, Apple's proposed standard conflicts with reason and common sense.  One is hard-pressed to imagine when a vertical conspirator would join a conspiracy where it was not in its economic self-interest to do so.  *Interstate Circuit* and *Toys "R" Us* illustrate the point.  Both Toys "R" Us and the theatres in *Interstate Circuit* advanced their independent business interests in facilitating their respective conspiracies—they both blunted price competition from discounters.  Apple's participation in its conspiracy with Publisher Defendants similarly allowed it to avoid price competition with Amazon.

49.     Yet even if the legal standard Apple has articulated made sense in the context of analyzing its liability here, Apple's argument to the Court—that Plaintiffs must prove "there is *no possibility* that Apple acted in further[ance] of its own independent, rational and legitimate business interests"—has been explicitly rejected by this Circuit.  In *In re Publication Paper Antitrust Litigation*, the court noted that "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff."  690 F.3d at 63.  In support of its statement, the Court quoted the leading antitrust treatise:

> [i]t is important not to be misled by *Matsushita*'s statement ... that the plaintiff's evidence, if it is to prevail, must "tend ... to exclude the possibility that the alleged conspirators acted independently."  The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants'

> conduct.  Not only did the court use the word "tend," but the context made clear that the Court was simply requiring sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.

*See id.* (citing Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW § 14.03b, at 14–25 (4th ed. 2011) (footnotes omitted) (emphasis added)).  Judge Posner also characterized as "absurd[ ]" the suggestion that an antitrust plaintiff must "exclude all possibility" that the defendants conduct was unilateral rather than collusive, because "[t]hat would imply that the plaintiff . . . must prove a violation . . . not by a preponderance of the evidence, not even by proof beyond a reasonable doubt . . . , but to a 100 percent certainty."  *In re Brand Name Prescription Drugs*, 186 F.3d at 787.  In any event, "the standards established in *Matsushita* do not apply at all" when, as is true here, a plaintiff has produced direct evidence of an agreement to fix prices.  *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.

### E.    Apple's Liability for Participation in the Conspiracy Does Not Depend on It Having Market Power

50.    As a threshold matter, if the Court finds that the price-fixing conspiracy at the heart of this case is illegal *per se*, there is no market power requirement.  *Toys "R" Us*, 221 F.3d at 936; *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).

51.    Moreover, because of the existing dynamics of the publishing industry, Apple's facilitation of Publisher Defendants' horizontal agreement did not require Apple to have market power.  Apple was in a unique position because of its popular physical and electronic platforms, such as the iPhone device and the iTunes store.[49]  Highlighting Apple's uniqueness in an email to Madeline Mcintosh considering Apple's proposed agency deal, Matt Shatz of Random House

---

[49] PF, at ¶ 270.

characterized Apple as "probably the only retailer in the world that offers us a last chance to shift the anchor away from $9.99 for any foreseeable future."[50]  Mr. Jobs similarly told James Murdoch of HarperCollins's parent News Corp.: "Apple's iTunes Store and App Store have over 120 million customers with credit cards on file and have downloaded over 12 billion products. This is the type of online asset[] that will be required to scale the ebook business into something that matters to the publishers."  This convinced the publishers that only Apple was capable of assisting the publishers in achieving their goal of moving Amazon off of its $9.99 pricing."[51]

52.     In any event, courts examining the liability of actors at a different level of the market do not require that the party accused of facilitating horizontal conspiracies possess market power. *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 690–91 (collecting cases).

## IV.   DEFENDANTS' CONDUCT IS ILLEGAL UNDER THE RULE OF REASON

53.     Even if the conspiracy between Apple and Publisher Defendants is not subject to *per se* condemnation, Apple's conduct should still be found to have violated section 1 under the "rule of reason," because Apple knowingly entered into a series of agreements with Publisher Defendants that limited Apple's rivals' ability to compete on price and in so doing, harmed consumers by increasing e-book prices.  *NCAA*, 468 U.S. at 118.  A rule of reason analysis, described originally in *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918), and reiterated by the Supreme Court numerous times since, requires the factfinder to "weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited."  *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (citation omitted).

---

[50] *Id.*

[51] *Id.*

### A.    A "Quick Look" Shows that Apple and Penguin Harmed Competition

54.    But the rule of reason need not entail a detailed inquiry into market conditions and the reasons giving rise to a restraint.  "[D]epending upon the concerted activity in question, the rule of reason . . .  can sometimes be applied in the twinkling of an eye." *NCAA* at 109 & n.39.  These are cases in which "the great likelihood of anticompetitive effects can easily be ascertained." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  Here, even a quick review of the evidence demonstrates that the effects of Defendants' agreement to raise consumer e-book prices outweigh the speculative and attenuated procompetitive benefits Apple claims also resulted from the agreement.

55.    Quick-look analysis is an intermediate standard that is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *Cal. Dental Ass'n*, 526 U.S. at 770.  Under a quick-look review, the court need not conduct "a detailed market analysis."  *Id.*; *see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 209–10 (3d Cir. 2005) (explaining that quick-look analysis applies when "no elaborate industry analysis is required to demonstrate the anticompetitive character" of an alleged restraint).

56.    In this case, both the conduct in question, and the effect of that conduct—raising consumer e-book prices and eliminating price competition among e-book retailers—resembles past price-fixing schemes and is an obvious and core concern of antitrust law.  *See Standard Oil Co. v. United States*, 221 U.S. 1, 57 (1911) ("dread of enhancement of prices").  "Quick-Look" analysis is therefore appropriate.  *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 37 (D.C. Cir. 2005) (applying quick-look to conduct in light of a "close family resemblance between the

suspect practice and another practice that already stands convicted in the court of consumer welfare").

57.     Under a "quick-look" analysis, Apple and Penguin cannot prevail.  In light of the substantial familiarity courts have with price-fixing conspiracies like the one at issue here, there is a strong presumption of adverse competitive impact.  "[R]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *Polygram*, 416 F.3d at 37 (quoting *NCAA*, 468 U.S. at 107–08).  Therefore, Apple and Penguin must present "some competitive justification" for the restraint, "even in the absence of detailed market analysis." *NCAA,* 468 U.S. at 110.  If they offer no legitimate justifications, the presumption of adverse competitive impact prevails, and the court should condemn the practice. *Id.*  For the reasons detailed below,[52] Defendants have no creditable procompetitive justifications, and accordingly their conduct violates Section 1 under a "quick-look" analysis.

### B.     Full Rule of Reason Analysis Shows that the Conspiracy Harmed Competition

58.     Under a full rule of reason analysis, the conspiracy in this case also violates Section 1. "Ultimately, the goal is to determine whether restrictions in an agreement among competitors potentially harm consumers." *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997).

59.     Establishing a violation of the rule of reason involves three steps.  Plaintiffs bear "the initial burden of demonstrating that the defendants' conduct . . . has had a substantially harmful effect on competition." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993).  If the plaintiff succeeds, "the burden shifts to the defendant to establish any procompetitive justifications for the conduct in question." *Id.*  Should Defendants carry this

---

[52] *See infra* ¶¶ 73–84.

burden, plaintiffs must then show that the same procompetitive effect could be achieved through an alternative means that is less restrictive of competition.  *Id*.

### 1.     Defendants' conspiracy has had an adverse effect on competition

60.     There are "two independent means by which to satisfy the adverse-effect requirement." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir 1998).  First, the plaintiff may offer "proof of actual detrimental effects."  *Capital Imaging*, 996 F.2d at 546 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)) (detailed market analysis and inquiry into market power not required if actual effects shown); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) (citing *Capital Imaging*, 996 F.2d at 560–61) (same). Alternatively, "where the plaintiff is unable to demonstrate [] actual effects" it "must at least establish that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide."  *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (quoting *Capital Imaging*, 996 F.2d at 546).

### a.     Defendants' conspiracy had direct anticompetitive effects

61.     "The use of anticompetitive effects to demonstrate market power . . . is not limited to 'quick look' . . . cases."  *Todd*, 275 F.3d at 207 (collecting cases).  Proof of actual or likely detrimental effects "obviate[s] the need for an inquiry into market power, which is but a surrogate for detrimental effects."  *Ind. Fed'n of Dentists*, 476 U.S. at 460–61 (quotation omitted); *see also Todd*, 275 F.3d at 206–07.  Anticompetitive effects may be demonstrated through likely increased prices, reduced output, or decreased quality.  *See Capital Imaging*, 966 F.2d at 546; *see also United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir 2003) (affirming district court's finding that defendants' conduct "harm[ed] competition by reducing

overall card output and available card features as well as by decreasing network services output and stunting price competition") (citation omitted).

62.     Plaintiffs have proved significant adverse effects.  The factual record in this case shows that there were significant increases in the prices of trade e-books as a result of the conspiracy between Apple and Publisher Defendants.[53]  These price increases are actual anticompetitive effects.  Higher prices are "facially anticompetitive and exactly the harm that antitrust laws aim to prevent."  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 478 (1992).  To the extent that Penguin claims that output in the relevant market increased as a result of Defendants' activities (a contention that the States' experts will testify is flawed), it cannot show that any such increase was the result of the switch to the agency model itself as opposed to other factors.

> **b.     Publisher Defendants collectively have market power and their conspiracy with Apple is inherently anticompetitive**

63.     Alternatively, a plaintiff may use market power as a proxy for a showing of adverse effects.  Under this particular framework, a plaintiff "must show market power, plus some other ground for believing that the challenged behaviors could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market."  *Tops Markets*, 142 F.3d at 97.  Market power means the power to affect price or exclude competition.  *K.M.B. Warehouse Distribs*, 61 F.3d at 129.

64.     "A traditional way to demonstrate market power is by defining the relevant product market [and geographic market] and showing defendants' percentage share of that market."

---

[53] PF, at ¶¶ 209-212, 217-224.

*Todd*, 275 F.3d at 199.[54]  "[M]arket power may be presumed if the defendant controls a large

enough share of the relevant market."  *Visa*, 344 F.3d at 239.

65.     In this case, the relevant inquiry focuses on "the collective market power" of Publisher

Defendants in the market for trade e-books.  This is because it was Publisher Defendants, and not

Apple, that actually agreed with their competitors, and it was *this leverage* that Publisher

Defendants possessed when colluding that Apple exploited to force Amazon and other retailers

onto agency.[55]  *See, e.g.*, *In re Ins. Brokerage*, 618 F.3d at 332–33 (explaining that the

facilitators in *Interstate Circuit* and *Toys "R" Us* sought to "exploit the collective market power"

of the horizontal competitors whose conspiracies they helped facilitate).

> i.        *Trade e-books is a relevant product market*

66.     "A relevant product market is a term of art in antitrust analysis."  *United States. v. H&R*

*Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011).  As set forth by the Supreme Court, "the outer

boundaries of a product market are determined by the reasonable interchangeability of use [by

consumers] or the cross-elasticity of demand between the product itself and substitutes for it."

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  "A broad, overall market may

contain smaller markets which themselves 'constitute product markets for antitrust purposes.'"

*H&R Block*, 833 F. Supp. 2d at 51 (quoting *Brown Shoe*, 370 U.S. at 325).

67.     An analytical method often used by courts to define a relevant market "is to ask

hypothetically whether it would be profitable to have a monopoly over a given set of substitute

products."  *H&R Block*, 833 F. Supp. 2d at 51; *see also Emigra Group, LLC v. Fragomen, Del*

*Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 352 & nn.85–89 (S.D.N.Y. 2009).  This

---

[54] Market share is one, but by no means the only, way, of establishing market power.  *Kodak*,
504 U.S. at 467-68.

[55] PF, at ¶ 283.

approach is endorsed by the Horizontal Merger Guidelines issued by the DOJ and Federal Trade Commission. U.S. Dep't of Justice & Fed. Trade Comm'n, HORIZONTAL MERGER GUIDELINES § 4.1.1 (2010); *cf. Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 327–28 (S.D.N.Y. 2009) ("The Merger Guidelines have been recognized by this Court in antitrust cases as a tool used to define a relevant market.").

68.     Plaintiffs contend that the relevant product market is trade e-books.[56] While Apple does not agree that trade e-books is a relevant market, it does agree that "the relevant market is no narrower than the sale of trade e-books."[57] However, despite offering testimony from three economists, Apple never states what *it believes* is an appropriate relevant market.   Penguin denies that trade e-books is a relevant market, suggesting that the relevant market might "include at least physical books and all e-books."[58] Penguin's expert, Dr. Rubinfeld, goes further, suggesting that the market could plausibly include e-reading devices and even "alternative forms of leisure entertainment (TV, movies, music)."[59] The economic analysis conducted by Plaintiffs' experts, Drs. Gilbert, Baker, and Ashenfelter, along with various documents[60] from Defendants and nonparty retailers shows that e-books are relatively inelastic and that there is low substitution from e-books to print books or other products even in the event of a price increase.[61] Therefore, a hypothetical monopolist of trade e-books could profitably impose a small but significant and nontransitory increase in price, making trade e-books a relevant product market.

---

[56] PF, at ¶¶ 272-282.

[57] PX-0803, at 6.

[58] PX-0799, at 4.

[59] Rubinfeld Report (PX-0833) ¶¶ 133–38.

[60] "When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."  *H&R Block*, 833 F. Supp. 2d at 52.

[61] PF, at ¶¶ 274-77.

69.     In defining the market, neither the plaintiff nor the court need spell out the precise "metes

and bounds" of the market.  *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611

(1953).  This is especially true here, where Apple's expert, Dr. Murphy, testified that "the

experts have pretty much agreed that what the exact contours of the market are aren't critical to

the economic analysis."[62]

70.     Defendants' references to possible substitutes for e-books do not compel a different

conclusion.  When defining a relevant product market, the Supreme Court has cautioned that it

need not include every possible substitute:  "For every product, substitutes exist.  But a relevant

market cannot meaningfully encompass that infinite range.  The circle must be drawn narrowly

to exclude any other product to which, within reasonable variations in price, only a limited

number of buyers will turn . . . ."  *Times-Picayune Publ'g Co*, 345 U.S. at 612.  Nor is it harmful

to plaintiffs' proposed relevant product market that e-books may compete to some degree with

print books, or even other forms of entertainment.  *H&R Block*, 833 F.Supp. 2d at 54 (noting

that, though two products "may compete at some level, this does not necessarily require that they

be included in the relevant product market for antitrust purposes"); *United States v. Visa U.S.A.,

Inc.*, 163 F. Supp. 2d 322, 338 (S.D.N.Y. 2001) (excluding cash and checks from general

purpose credit card market even though the different methods of payment are often functional

substitutes).  An e-book is a distinctive product, with distinctive pricing, and with many features

that differentiate it from traditional print books or other forms of entertainment.  *See FTC v.

Whole Foods Mkt.*, 548 F.3d 1028, 1037–38 (D.C. Cir. 2008) (opinion of Brown, J.) (noting that

a "product's peculiar characteristics and uses" and "distinct prices" may distinguish a relevant

market).

---

[62] Kevin Murphy Dep. 178:6–9.

ii.    *The relevant geographic market is the United States*

71.    Apple does not dispute that the relevant geographic market is the United States.[63] Penguin acknowledges that the geographic market is "no narrower than the United States," and asserts that there may be "some form of a more global market" for e-books.[64]  It bases its arguments on the fact that certain free e-books (as opposed to those sold pursuant to agency agreements) are available worldwide, and on reports of isolated instances of U.S. consumers purchasing e-books from foreign retailers.  Plaintiff States' expert, Dr. Baker, as well as the documents and testimony elicited from the publishers and retailers, however, demonstrate that Publisher Defendants have taken great pains to ensure that no such end-runs around territorial restrictions can be accomplished by any but the relatively few technologically sophisticated consumers capable of "beating the system."  There is no reason to deviate in this case from the Second Circuit's observation that the "relevant geographic market for goods sold nationwide is often the entire United States."  *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 228 (2d Cir. 2007).

iii.    *Publisher Defendants have sufficient market share*

72.    Prior to entering the Apple Agency Agreements, Publisher Defendants had a collective market share of approximately half of trade e-books sales.[65]  Publisher Defendants' collective share exceeds that on which courts have found market power in other cases.  *See, e.g.*, *Visa*, 344 F.3d at 239–40 (defendants each had market power with 47% and 26% of the market, respectively); *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 969 (10th Cir. 1990) (Defendant had market power with market share between 45%–62%).

---

[63]  *See* PX-0803, at 6.

[64]  PX-0799, at 2-3.

[65]  PF, at ¶ 283.

73.     Furthermore, there are other grounds for belieiving that the challenged behaviors could harm competition in the market.  First, the structure of the trade e-books market is such that Publisher Defendants collectively can, and have, asserted market power resulting in anticompetitive effects.  *See Tops Mkts.*, 142 F.3d at 97.  E-book retailing is a "content business" and retailers would lose business if they did not carry Publisher Defendants' titles.  *See Flash Elecs. v. Universal Music*, 312 F. Supp. 2d 379, 395 (E.D.N.Y. 2004) (finding that market-wide anticompetitive effects are possible where "a wholesale distributor will lose a substantial amount of its customers" if it is "[w]ithout access to the supply of product from a major studio, such as [defendant]").  For example, Amazon stated that it would not have given in to Macmillan's ultimatum that it go to the agency model if Macmillan had been acting alone.  Losing e-books from all five Publisher Defendants, however, was simply not an option because Amazon could not do without titles from five of the largest publishers."[66]  As a result, Publisher Defendants could collectively credibly threaten to withhold books from retailers such as Amazon and force them to move to the Apple Agency model.[67]  Moreover, the challenged restraint in this case has an "inherent[ly] anticompetitive nature."  *Tops Mkts.*, 142 F.3d at 97.  The common plan forged between Apple and Publisher Defendants to wrest pricing authority from Amazon had a clear anticompetitive purpose, and an almost certain anticompetitive effect—raising retail prices of e-books.  Accordingly, apart from the substantial direct evidence of adverse effects, there is sufficient evidence to infer that the Apple Agency Agreements had an adverse effect on competition.

---

[66] PF, at ¶ 191.

[67] PF, at ¶¶ 181-82.

## 2. Apple and Penguin Cannot Justify the Harm they Caused

74.     Because the evidence shows that the challenged conspiracy had an actual adverse effect on competition (under either of the methods of proving actual adverse effects), the burden shifts to Defendants "who must provide a procompetitive justification for the challenged restraint." *Visa*, 344 F.3d at 238.  Where, as here, the evidence of anticompetitive effects is substantial, Defendants' burden to justify their anticompetitive conduct is a "heavy" one.  *NCAA*, 468 U.S. at 113.  Specifically, Apple and Penguin are required to establish "an affirmative defense which completely justifies this apparent deviation from the operations of a free market."  *Id.*  Apple and Penguin cannot carry that burden.

75.     The Sherman Act "reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).  Accordingly, Apple's and Penguin's justifications can be credited "only to the extent that they tend to show that, on balance, the challenged restraint enhances competition."  *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1021 (10th Cir. 1998) (quoting *NCAA*, 468 U.S. at 104).  Thus, Apple and Penguin must show that— contrary to Plaintiffs' evidence—the effect of the conspiracy "is to increase output (or decrease price)."  XI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1914c (3d ed. 2011).

76.     Justifications not based on competition are irrelevant.  *See Ind. Fed'n of Dentists*, 476 U.S. at 462–64; *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692–94.  In particular, claims that an otherwise anticompetitive restraint has generalized "social benefits," or in some other way benefits the conspirators themselves, are out of bounds.  *See id.* at 693–94 (rejecting affirmative defense that "restraint on price competition ultimately inures to the public benefit by preventing the production of inferior work and by insuring ethical behavior"); *see also Fashion Originators*

34

*Guild of Am. v. FTC*, 312 U.S. 457, 467–68 (1941) (upholding decision of lower court to refuse

to hear evidence that group boycott by fashion designers was justified by desire to protect against

"devastating evils growing" from piracy of original designs); *Oreck Corp. v. Whirlpool Corp.*,

579 F.2d 126, 138 (2d Cir. 1978) (finding illegal conspiracy not "saved by reference to the need

for preserving the collaborators' profit margins").

### a.    Targeting Amazon's below-cost pricing is not a valid justification for anticompetitive conduct

77.    Defendants' claim that that they were merely putting a stop to below-cost—or even

predatory—pricing by Amazon is not a valid defense to a Sherman Act violation.  While

"[r]uinous competition, financial disaster, evils of price cutting and the like appear throughout

our history as ostensible justifications for price-fixing," the Supreme Court has cautioned that

"[t]he elimination of so-called competitive evils is no legal justification for [defendants'

anticompetitive conduct]."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–22

(1940).  "[S]ociety prefers that coerced parties seek the protection of public authorities rather

than help create a cartel."  *See* VI Areeda & Hovenkamp ¶ 1408c (2d ed. 2003).  As such, "[t]he

Rule of Reason does not support a defense based on the assumption that competition itself is

unreasonable."  *NCAA*, 468 U.S. at 117.  It is up to Congress to determine whether firms may

deviate from the normal antitrust laws that govern their conduct.  *United States v. Nat'l Lead

Co.*, 63 F. Supp. 513, 525–26 (S.D.N.Y. 1945).  Defendants do not, because they cannot, point to

circumstances here that merit taking that role upon themselves.

78.    Moreover, courts have repeatedly rejected economic vigilantism as an excuse for

unlawful conspiracies.  *See, e.g.*, *Fashion Originators Guild of Am.*, 312 U.S. at 467–68 (finding

a desire to protect against "devastating evils growing" from piracy of original designs not a valid

justification  for defendants' group boycott); *United States v. Giordano*, 261 F.3d 1134, 1142–43

(11th Cir. 2001) (rejecting defense that price-fixing agreement was procompetitive because it was meant to terminate a ruinous price war); *Law v. Nat'l Collegiate Athletic Ass'n*, 902 F. Supp. 1394, 1405–06 (D. Kan. 1995) (finding "skyrocketing costs" not a justification for an agreement fixing the maximum salaries of certain basketball coaches), *aff'd*, 134 F.3d 1010 (10th Cir. 1998); *United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 635–36, 642 (S.D.N.Y. 2012) ("Amazon's alleged free-riding in no way justifies subsidizing brick-and-mortar bookstores by virtue of an e-books price-fixing conspiracy."  "[E]ven if Amazon *was* engaged in predatory pricing, this is no excuse for unlawful price-fixing . . . .  The familiar mantra regarding 'two wrongs' would seem to offer guidance in these circumstances.").

### b.     Defendants' arguments about e-reader competition are neither relevant nor factually supported

79.     Defendants repeatedly attempt to justify their conduct in the trade e-book market by pointing to increased competition in the wholly separate e-reader market.[68]  Apart from the utter lack of evidence that agency and higher e-book prices caused increased device competition, this argument fails as a matter of law.

80.     Procompetitive justifications for anticompetitive conduct must apply to the same market in which the restraint is found, not to some other market.  *See United States v. Topco Assoc., Inc.*, 405 U.S. 596, 610 (1972) (noting competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy"); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (finding that anticompetitive effects in one market cannot be justified by procompetitive consequences in another); *Law v. Nat'l Collegiate Athletic Ass'n*, 902 F. Supp. 1394, 1406 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998).  Apple

---

[68] *See, e.g.*, PX-0374; Penguin Response to States' Interrogatory No. 3.

admits that devices are not substitutes for e-books and, thus, they are not in the same relevant market.[69] Therefore, the only procompetitive benefits the Court should consider are those that may arise in the market for the sale of trade e-books.

81.     Moreover, Defendants' argument is essentially that higher prices of e-books made entry and innovation in the e-reader market more attractive.  This serves only as an admission of anticompetitive intent and effect.  The same is true of Penguin's argument that the ability to charge higher prices for e-books contributed to the "survival" of brick-and-mortar bookstores.  High prices, and presumably supracompetitive profits, generally increase the willingness of other firms to enter the market; however, if this were a justification for price-fixing and other naked restraints, the Sherman Act would be gravely compromised.  As the Supreme Court explained in *Catalano, Inc. v. Target Sales, Inc.*,

> "[I]n any case in which competitors are able to increase the price level or to curtail production by agreement, it could be argued that the agreement has the effect of making the market more attractive to potential new entrants.  If that potential justifies horizontal agreements among competitors imposing one kind of voluntary restraint or another on their competitive freedom, it would seem to follow that the more successful an agreement is in raising the price level, the safer it is from antitrust attack.  Nothing could be more inconsistent with our cases."

446 U.S. 643, 649 (1980); *see also NCAA*, 468 U.S. at 115–17 (rejecting argument that restraint on number of television broadcasts of football games could be justified by a desire to protect live attendance receipts).

### c.     Apple's and Penguin's procompetitive justifications, even if believed, do not outweigh the harm they caused

82.     If Apple and Penguin come forward with significant, creditable procompetitive justifications, Plaintiffs may then demonstrate that those procompetitive effects could have been achieved by less restrictive means, *i.e.*, that the restraint is not reasonably necessary to achieve

---

[69] PF, at ¶ 0805.

Defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of competition.  *See, e.g., Ark. Carpenters Health & Welfare Fund v. Bayer AG,* 604 F.3d 98, 104 (2d Cir. 2010); *Visa,* 344 F.3d at 238.  This inquiry is only necessary if Apple and Penguin come forward with evidence of sufficient, creditable procompetitive justifications.  *See, e.g.*, *Law*, 134 F.3d at 1024 n.16; *Clarett v. Nat'l Football League,* 306 F. Supp. 2d 379, 409 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004).

83.     Less restrictive alternatives are those that "would be less prejudicial to competition as a whole" than the conspiracy between Apple, Penguin, and the other Publisher Defendants. *Capital Imaging*, 996 F.2d at 543 (citations omitted).  Plaintiffs are not required to show the least restrictive alternative.  Instead, any less restrictive means is a sufficient showing.  *See Clorox*, 117 F.3d at 59–60.

84.     If a suitable less restrictive alternative can be found, the ordinary remedy is a finding that the challenged conspiracy is unreasonable and a violation of Section 1 of the Sherman Act.  *See, e.g.,* XI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1913 (3d ed. 2011); *Clarett*, 306 F. Supp. 2d at 410 ("[E]ven if a procompetitive justification for the [restraint] existed, summary judgment for [plaintiff] would be appropriate because an alternative to the [restraint] exists that is less prejudicial to competition.") (citing *Capital Imaging*, 996 F.2d at 543).

85.     Essentially all of Defendants' procompetitive justifications are tied to Apple's entry into the e-book market.  For the reasons stated above, those are not creditable.  But even if the Court were to credit Apple's claimed efficiencies, they could have been achieved simply by Apple's entry on the wholesale terms that already existed in the industry—in particular, terms with lowered wholesale prices, which the evidence shows at least one publisher (Random House) was

willing to offer Apple.[70]  To the extent Apple determined that it was not sufficiently profitable to enter without changing terms for all other retailers in the market, this suggests that Apple's entry was inefficient.  It could instead have remained out of the market and focused on developing other aspects of its business—leaving it to Amazon and other retailers to innovate and improve the e-reading experience on Apple's devices—as they had been doing for years.

## V.  THE COURT HAS BROAD REMEDIAL POWERS

86.  Once a violation of the antitrust laws has been established, "the courts have an obligation to protect the public from a continuation of the harmful and unlawful activities."  *United States v. Parke, Davis Co.*, 362 U.S. 29, 48 (1960); *see also, e.g.*, *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) ("In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices.  A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.").  Even where the prohibited activity has been discontinued, the future protection of the public may warrant injunctive relief.  *Cf. United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct.").  Antitrust judgments operate prospectively to prohibit unlawful conduct in the future and to restore effective competition.  *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).  "[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."  *Id*.

87.  "[District courts] are invested with large discretion to model their judgments to fit the exigencies of the particular case."  *See, e.g.*, *Int'l Salt*, 332 U.S. at 400–01; *Parke, Davis Co.*, 362 U.S. at 48.  The Supreme Court has emphasized that courts have "the duty to compel action

---

[70] PF, at ¶ 201.

by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.  Such action is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal."  *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88–89 (1950).  As part of such a remedy, "[a]cts entirely proper when viewed alone may be prohibited."  *Id*.

88.     Consequently, if Plaintiffs prevail at trial, the Court may enjoin Apple from (a) entering into any contracts that have the purpose or effect of prohibiting it or any other e-books retailer from discounting or promoting e-books to consumers; (b) having a price most favored nation ("MFN") clause and price tiers in any agency contracts that Apple may choose to negotiate; and (c) providing to a publisher either confidential data derived from the sale of any other publishers' e-books or any other non-public information Apple learned from another publisher.  The Court also has the power to ensure that Apple does not operate its other businesses such as the App Store in a manner that allows Apple to evade the purposes of the decree and limit e-book competition.  Therefore, the Court may forbid Apple from punishing or retaliating against any Publisher Defendant for staying on a wholesale model with any other retailer by, for example, tying Publisher Defendant's (or Publisher Defendant's parent's) participation in any of Apple's other businesses on Publisher Defendant's agreement to behave in a certain manner pertaining to e-books.  Additionally, the Court may require that Apple (a) permit all e-book reader apps currently in the App Store to remain in the App Store on the same terms and conditions as are generally available to other apps; (b) accept any new e-book reader app or any update to an e-book reader app unless Apple can demonstrate that the new e-book reader app raises greater security issues or creates greater stability issues than other apps sold in the App Store; and (c)

permit other e-book retailers to sell e-books through their apps to Apple devices without having to pay an in-app commission. To limit disputes and to facilitate enforcement of this and other provisions, the Court may require Apple to pay for a monitor to determine its compliance with the provisions of any order. Additionally, as a prophylactic set of measures, the Court can require that Apple (a) log all conversations with any other e-book retailers, such as Barnes & Noble, Google, Amazon, or Sony, that relate to e-books, e-reader devices, or apps that sell e-books; (b) log all conversations that include more than one publisher; (c) notify the Department of Justice every quarter of any complaints it receives accusing it of an antitrust violation; and (d) provide its executives with antitrust compliance training.

89.     Penguin has agreed to certain injunctive relief as part of a consent judgment in the case brought by the United States.[71] If Penguin is found liable on the States' claims, the States request that the Court enter an injunction against Penguin coterminous with that embodied in the consent judgment and incorporating any additional injunctive relief the Court deems appropriate. *See New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 154–55 (D.D.C. 2002) (court may grant additional injunctive relief in *parens patriae* action after United States' enforcement action resolved by consent).

---

[71] Proposed Final Judgment in United States Case, ECF No. 162-1.

**VI.    DEFENDANTS' CONDUCT VIOLATES STATE LAWS AS ALLEGED IN COUNT IV OF THE STATES' COMPLAINT**

90.    The facts establishing that Apple and Penguin conspired and agreed for the purpose of and with the effect of raising consumer e-book prices in violation of Section 1 of the Sherman Act are sufficient to meet the analogous elements of causes of action arising under the laws of each Plaintiff State alleged in Count IV of the Plaintiff States' Second Amended Complaint.[72]

91.    This Court has the authority to assume pendent jurisdiction over the Plaintiff States' state law claims as set forth in in Count IV of the Plaintiff States' Second Amended Complaint, and exercise its discretion to assume jurisdiction over these state law claims as they arise out of the same facts as the federal law claims set forth in their Second Amended Complaint.  28 U.S.C. § 1367.

---

[72]*See* Ala. Code § 8-10-1; Alaska Restraint of Trade Act, Alaska Stat. § 45.50.562, and the common law of Alaska; Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1402; Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-309, and the common law of Arkansas; Colorado Antitrust Act of 1992, Col. Rev. Stat. § 6-4-104, and the common law of Colorado; Connecticut Antitrust Act, Conn. Gen. Stat. Ann. §§ 35-26, 35-28, 35-29  and Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110b; Delaware Antitrust Act, Del. Code Ann. tit. 6, § 2103; District of Columbia Antitrust Act, D.C. Code § 28-4502; Idaho Competition Act, Idaho Code Ann. § 48-104; Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3; Ind. Code Ann. §§ 24-1-1-1, 24-1-2-1; Iowa Competition Law, Iowa Code Ann. § 553.4; Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101; La. Rev. Stat. Ann. §§ 51:122, 51:1405; Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-204; Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A, § 2; Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.772, 445.772; Mo. Rev. Stat. § 416.031, Mo. Rev. Stat. § 407.020, et seq.,  as further interpreted by 15C.S.R. 60-8.010 et seq. and 60-9.010 et seq.; Neb. Rev. Stat. §§ 59-801, 59-1603–59-1609, §§84-211 and 84-212, Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302, and the common law of Nebraska; N.M. Stat. Ann. §§ 57-1-1, 57-12-1–3; N.Y. Gen. Bus. Law §§ 340, 369-a; Uniform State Antitrust Act, N.D. Cent. Code Ann. § 51-08.1-02; Ohio Rev. Code Ann. Ohio Rev. Code Ann. §§ 1331.01, 1331.02, 1331.04, and the common law of Ohio; the common law of Pennsylvania; 10 L.P.R.A. §§ 257, 258 and 32 L.P.R.A. § 3341; S.D. Codified Laws § 37-1-3.1; Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, and the common law of Tennessee; Tex. Bus. & Com. Code Ann. §§ 15.05(a), 15.21, 15.40; Utah Antitrust Act, Utah Code Ann. § 76-10-914(1), and the common law of Utah; Vt. Stat. Ann. tit. 9, § 2453; Virginia Antitrust Act, Va. Code Ann. § 59.1-9.5; West Virginia Antitrust Act, W. Va. Code Ann. §§ 47-18-3; Wis. Stat. Ann. § 133.03.

92.     Pursuant to the laws of the Plaintiff States, their respective Attorneys General may bring actions for injunctive relief and civil penalties in the name of the State for violations of their state law counterparts to Section 1 of the Sherman Act and other related statutes.[73]

93.     The activities of Penguin and Apple, including the production, sale and distribution of e-books, were in the regular, continuous, and substantial flow of interstate trade and commerce, and have had and continue to have a substantial effect upon interstate commerce. Penguin's and Apple's activities also have had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States, including the restraint of such trade and commerce.[74]

94.     No later than July 29, 2009, Penguin and the other conspiring publishers entered into an illegal agreement to act collectively to raise the price of frontlist trade e-books.  This illegal

---

[73] *See* Ala. Code § 8-10-1; Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.578(b)(2); Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1407; Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-212; Colorado Antitrust Act of 1992, Col. Rev. Stat. § 6-4-112; Connecticut Antitrust Act, Conn. Gen. Stat. Ann. § 35-38 and Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. §§ 42-110o, 42-110m; Delaware Antitrust Act, Del. Code Ann. tit. 6, § 2107; District of Columbia Antitrust Act, D.C. Code § 28-4507; Idaho Competition Act, Idaho Code Ann. § 48-108; Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/7(4); Ind. Code Ann. §§ 24-1-1-5.2, 24-1-2-7; Iowa Competition Law, Iowa Code Ann. § 553.13; Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-160; La. Rev. Stat. Ann. §§ 51:122; Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-209(a)(4); Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A; Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.777; Missouri Antitrust Act, Mo. Rev. Stat. § 416.011 et seq., and Missouri Merchandising Practices Act, Mo. Rev. Stat.§ 407.010 et seq.; Neb. Rev. Stat. § 59-821, Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-303.11; N.M. Stat. Ann. §§ 57-1-7, 57-12-11; N.Y. Gen. Bus. Law §§ 340–342-b, 369-a; Uniform State Antitrust Act, N.D. Cent. Code Ann. § 51-08-1-08; Ohio Rev. Code Ann. § 1331.03, 1331.08; 10 L.P.R.A. §§ 259(i), 266, 268; S.D. Codified Laws §§ 37-1-14.2; Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-103, 47-25-106, Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-122; Tex. Bus. & Com. Code Ann. § 15.20(a); Utah Antitrust Act, Utah Code Ann. § 76-10-918; Vt. Stat. Ann. tit. 9, §§ 2458 and 2465; Virginia Antitrust Act, Va. Code Ann. §§ 59.1-9.11, 59.1-9.15; West Virginia Antitrust Act, W. Va. Code Ann. § 47-18-8; Wis. Stat. Ann. §§ 133.03.

[74] PX-0793; PX-0792.

agreement continued until at least December 18, 2012, when Penguin entered into a settlement with the United States.

95.    No later than January 25, 2010, Apple, Penguin, and the other Publisher Defendants, entered into a conspiracy for the purpose and with the effect of raising e-books prices.[75]  This illegal agreement continued until at least December 18, 2012, when Penguin entered into a settlement with the United States.

96.    Penguin's and Apple's violation of Section 1 of the Sherman Act and analogous state laws was willful and flagrant and no fine or penalty has been imposed for the violation pursuant to federal law.

97.    E-books constitute merchandise pursuant to § 407.010.4, Mo.Rev.Stat., which defines merchandise to include "any objects, wares, goods, commodities, intangibles, real estate or services".

98.    The acts and practices of Penguin and Apple described above were in connection with their sale or advertisement of e-Books and constituted deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact, and were, thus, unlawful practices in violation of § 407.020.1, Mo.Rev.Stat.

99.    Penguin and Apple have not shown by a preponderance of the evidence that violations of § 407.020.1, Mo.Rev.Stat. resulted from bona fide errors notwithstanding their maintenance of procedures reasonably adopted to avoid the errors.

100.    Each sale of an e-book at an increased price as a result of the conspiracy is a separate violation of the Utah Antitrust Act for purposes of Utah Code § 76-10-918(2).

---

[75] PF, at ¶ 163.

101.    Each sale of an e-book by Publisher Defendants at an increased price as the result of the conspiracy is a separate unfair method of competition, or unfair or deceptive act or practice, in violation of M.G.L. c. 93A § 2.

102.    Penguin and Apple knew or should have known that each and all such sales of e-books at an increased price as the result of the conspiracy violated M.G.L. c. 93A, § 2.

103.    Penguin's and Apple's conduct substantially affected the people of Wisconsin and had impacts within the State of Wisconsin. *See Olstad v. Microsoft Corp.*, 700 N.W. 2d 139, 158 (Wis. 2005).

104.    The Plaintiff States are entitled to civil penalties for violations of state law claims alleged in Count IV of the Plaintiff States' Second Amended Complaint pursuant to their Prayer for Relief.

Dated:  April 26, 2013

Respectfully submitted,

Mark W. Ryan
Lawrence E. Buterman
William H. Jones II
David Z. Gringer
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
(202) 532-4753
Mark.W.Ryan@usdoj.gov

*On Behalf of the United States of America*

Gabriel Gervey
Eric Lipman
David Ashton
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711
(512) 463-1262
Gabriel.Gervey@texasattorneygeneral.gov

W. Joseph Nielsen
Gary M. Becker
Assistant Attorneys General
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

*On Behalf of the Plaintiff States*

46