UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

UNITED STATES OF AMERICA,         :

           Plaintiff,       :

                    :

     v.            :      12 Civ. 2826 (DLC)

                    :

APPLE INC., *et al.*,          :

           Defendants.     :

                    :

                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

THE STATE OF TEXAS,          :
THE STATE OF CONNECTICUT, *et al.*,  :

           Plaintiffs,     :

                    :

     v.            :      12 Civ. 03394 (DLC)

                    :

PENGUIN GROUP (USA) INC., *et al.*,  :

           Defendants.     :

                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## APPLE INC.'S PRE-TRIAL MEMORANDUM OF LAW

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 6

ARGUMENT ...................................................................................................................... 18

I.    Plaintiffs Cannot Prove The Existence Of A Conspiracy ....................................... 19

    A.    Apple Was Neither Involved In Nor Aware Of The Alleged Conspiracy
        Among The Publishers ................................................................................ 21

    B.    Plaintiffs' Evidence Does Not Tend To Exclude The Possibility Of
        Independent Action ..................................................................................... 22

        1.    The Procompetitive Nature Of Apple's Market Entry Requires Plaintiffs
            To Provide "Strong" Evidence Of A Conspiracy ............................................. 23

        2.    Apple's Conduct Was Driven By Its Independent Business Interests ............... 24

        3.    Plaintiffs' Evidence Fails The "Stringent Standards" In *Monsanto* ................. 27

            (a)   Price Tiers/Caps ........................................................................... 28

            (b)   Negotiation Approach ..................................................................... 28

            (c)   MFNs ............................................................................................ 29

            (d)   Communications ........................................................................... 30

        4.    Statements Attributed To Steve Jobs Do Not Support Plaintiffs' Theory ........ 31

        5.    Evidence Of Amazon's Voluntary Move To Agency Renders Plaintiffs'
            Theory A Chronological Fiction ...................................................................... 33

CONCLUSION .................................................................................................................. 40

APPENDIX A .................................................................................................................... 1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ...................................................................................... 23, 26

*Albrecht v. Herald Co.*,
  390 U.S. 145 (1968) ...................................................................................................... 20

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ........................................................................................ 22

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ......................................................................................... 29

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ....................................................................................................... 38

*Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*,
  769 F.2d 919 (2d Cir. 1985) ................................................................................. 6, 26, 27

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ...................................................................................................... 20

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ...................................................................................................... 37

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ..................................................................................... 20, 38

*Comfort Traine Air Conditioning Co. v. Trane Co.*,
  592 F.2d 1373 (5th Cir. 1979) ...................................................................................... 27

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) ........................................................................................................ 20

*Dr. Miles Med. Co. v. John D. Park & Sons, Co.*,
  220 U.S. 373 (1911) ...................................................................................................... 20

*Euromodas, Inc. v. Zanella, Ltd.*,
  368 F.3d 11 (1st Cir. 2004) ....................................................................................... 24, 33

*Fed. Broad. Sys., Inc. v. Am. Broad. Co.*,
  167 F.2d 349 (2d Cir. 1948) .......................................................................................... 31

*Gatt Commc'ns v. PMC Assocs., L.L.C.,*
    711 F.3d 68 (2d Cir. 2013) ............................................................... 38

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
    386 F.3d 485 (2d Cir. 2004) ............................................................. 21

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.,*
    879 F.2d 1005 (2d Cir. 1989) ........................................................... 24

*In re Baby Food Antitrust Litig.,*
    166 F.3d 112 (3d Cir. 1999) ............................................................. 22

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007) ............................................................... 29

*In re Flat Glass Antitrust Litig.,*
    385 F.3d 350 (3d Cir. 2004) ............................................................. 24

*In re Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010) ........................................................ 24, 31

*In re Publ'n Paper Antitrust Litig.,*
    690 F.3d 51 (2d Cir. 2012) ............................................................ 6, 23

*In re Sulfuric Acid Antitrust Litig.,*
    703 F.3d 1004 (7th Cir. 2012) ..................................................... 36, 37

*In re Travel Agent Comm'n Antitrust Litig.,*
    583 F.3d 896 (6th Cir. 2009) ........................................................... 23

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.,*
    812 F.2d 786 (2d Cir. 1987) ............................................................. 27

*Interstate Circuit v. United States,*
    306 U.S. 208 (1939) .................................................................... 21, 22

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,*
    61 F.3d 1250 (7th Cir. 1995) ........................................................... 40

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ............................................................................ 40

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.,*
    61 F.3d 123 (2d Cir. 1995) ............................................................... 38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ............................................. 6, 20, 22, 24, 36, 37, 39

*Lovett v. Gen. Motors Corp.*,
   998 F.2d 575 (8th Cir. 1993) ................................................................ 27

*Major League Baseball Props. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................... 36, 37, 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................. 6, 23, 24

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ................................................... 22, 24, 26

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ......................... 6, 20, 22, 23, 24, 26, 27, 30, 33

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ............................................................................... 36

*Texaco v. Dagher*,
   547 U.S. 1 (2006) ............................................................................... 37

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ........................................................ 27

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ............................................................ 22

*United Air Lines, Inc. v. Austin Travel Corp.*,
   867 F.2d 737 (2d Cir. 1989) ............................................................ 26

*United States v. Arnold, Schwinn & Co.*,
   388 U.S. 365 (1967) ........................................................................... 20

*United States v. Gen. Elec. Co.*,
   272 U.S. 476 (1926) ........................................................................... 20

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................................... 36

*Valuepest.com of Charlotte, Inc. v. Bayer Corp.*,
   561 F.3d 282 (4th Cir. 2009) ........................................................... 20

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001) ........................................................... 20

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011) ........................................................... 26

**Statutes**

15 U.S.C. § 1 ................................................................................................................... 19, 23

**Other Authorities**

P. Areeda & H. Hovenkamp, *Antitrust Law* (3d ed. 2010) ...................................................... 22, 24

Press Release, Amazon.com, Kindle Device Unit Sales Accelerate Each Month in Second
    Quarter; New $189 Price Results in Tipping Point for Growth (July 19, 2010) ...................... 40

U.S. Dep't of Justice, Statement by Assistant Attorney General R. Hewitt Pate Regarding the
    Closing of the Orbitz Investigation (July 31, 2003) ............................................................... 39

## PRELIMINARY STATEMENT

Apple did not conspire to fix e-book prices. The evidence proves that Apple acted independently, to further its own legitimate business goals, in negotiating agency agreements with the publishers to enter the e-book market. Plaintiffs can no longer rely on mere allegations, faulty assumptions, and unfounded conclusions. That time has passed. Plaintiffs must produce evidence at trial that Apple consciously conspired with the publishers. But plaintiffs fall well short of their burden; indeed, the evidence contradicts their key allegations against Apple.

1. Plaintiffs' complaints allege a longstanding conspiracy among five book publishers, dating back to 2008, to raise e-book prices. Plaintiffs have never alleged that Apple participated in or knew of any meetings or conversations that allegedly formed the basis of the purported conspiracy—indeed, Apple is not even named as a defendant in the States' first two conspiracy counts. Instead, plaintiffs allege that Apple "facilitated" some other conspiracy with the five publishers over a handful of weeks by negotiating agency agreements with them that allowed Apple to enter the e-book business. The evidence refutes this theory.

Plaintiffs alleged a narrative that has now proven false: that the five publishers, after public announcement of the Apple agency agreements in late January 2010, were required by a single term in the agency agreements to move together to "force" Amazon to adopt agency and raise its prices. First, the Apple agency agreements required no such thing. They set forth the terms of Apple's business relationship with each publisher; they placed no constraints on how a publisher should deal with other retailers, including Amazon. Second, the chronology advanced by plaintiffs is a fiction. The agency agreements that Apple signed with the publishers in late January 2010 followed several weeks of difficult business negotiations. Unbeknownst to Apple, Barnes & Noble, at the same time, was pursuing agency agreements with the very same

publishers and had been doing so for months.  And even Amazon, the alleged victim of the conspiracy, had been discussing a shift to agency after learning of Apple's negotiations, but before Apple and the publishers entered into a single agreement.

2.  Agency was a logical model for a new entrant to the e-books business in 2009.  The market was roiled by a public conflict between the publishers and Amazon.  Amazon at the time sold 9 out of every 10 e-books, and many publishers publicly disagreed with Amazon's uniform, below-cost pricing strategy for *New York Times* bestsellers.  In December 2009, before Apple had contacted a single publisher, some publishers publicly announced and implemented plans to delay the release of e-book new releases on Amazon (a strategy known as "windowing") to address Amazon's pricing strategy.  This tumult in the industry inspired the second largest e-retailer, Barnes & Noble, to push for agency agreements with the publishers.  And Amazon used an agency-like model for small publishers and self-published authors.  In other words, Apple did not introduce agency to the e-book industry; it was simply the first to reach an agency agreement with the industry's largest publishers.

3.  In their effort to brand Apple's legitimate agency agreements an illegal conspiracy, plaintiffs distort both the intent and effect of the retail-price "Most Favored Nation" clause ("MFN") in Apple's agency agreements.  Plaintiffs falsely characterize the MFN as "a key commitment mechanism" that Apple designed to compel the publishers to move Amazon to an agency model.  Plaintiffs' after-the-fact characterization of the MFN is simply wrong.

Apple's clear intent in creating the MFN was to advance its independent and procompetitive business objective: to enter the market and offer competitive prices.  The MFN gave Apple the contractual right to *lower* prices on the Apple bookstore to match lower prices offered by competing retailers for a limited set of new releases.  The agency agreements

contained no provision addressing the business model of Amazon or other retailers.  There is no evidence that Apple created the MFN to incentivize the publishers through some process to convince Amazon to change its business model.  The very point of the MFN was to enable Apple to be competitive with Amazon and other retailers *regardless* of their business model or strategy. Indeed, the evidence shows that Apple told the publishers that they were free to remain on a wholesale model with other retailers, even as the publishers sold e-books on Apple's bookstore under an agency arrangement.

4. The linchpin of plaintiffs' conspiracy claim against Apple is that the MFN actually forced publishers to band together to require Amazon to agree to an agency relationship. Plaintiffs claim that Amazon "had no choice but to accept the agency model" and "capitulated" in late January 2010 when confronted by a united front of publishers, supposedly led by Macmillan.  Compl. ¶ 84.  The evidence contradicts this narrative as well.

Earlier in January, Amazon had started its own parallel discussions with the publishers about a shift to agency before Apple signed a single agency agreement.  Amazon learned that Apple was negotiating agency terms with major publishers to open an e-bookstore on its rumored new tablet device.  These agreements would give Apple access to all "new release" e-books, including those that the publishers were already starting to window on Amazon.  The potential entry of Apple, with its full access to new releases and its game-changing color e-reader (what would be the iPad), posed the first meaningful competition to Amazon's dominant e-book retail position.  Amazon faced a choice: continue to use wholesale arrangements and be windowed by the publishers, use its considerable economic power to retaliate, or move to agency.

Amazon quickly made the rational business decision to move to an agency model for the five publishers that signed deals with Apple, but Amazon staged a PR stunt to blame its decision

on Macmillan, the smallest publisher.  Agency would give Amazon access to all new releases,

enabling it to compete with Apple on those titles, and turn losses into a ▮▮▮ margin.  This model

was familiar to Amazon.  An email written by an Amazon executive on January 31, 2010,

reveals that Amazon discussed as early as 2009 the possibility of moving from a wholesale

model to one involving a ▮▮▮ revenue split similar to that proposed by Apple.  This same email

shows that Amazon was privately pleased with the result of its negotiations, even as it publicly

blamed Macmillan for its move to agency.  Amazon's decision to discuss agency deals was a

reaction to Apple's potential entry (a procompetitive event) and the publishers' windowing of e-

books.  It had nothing to do with the Apple MFN.  Amazon went on to negotiate aggressively to

obtain its own favorable agency terms from the publishers, including its own MFN.

    5. Plaintiffs and their experts critically do not dispute that Apple pursued the key

contract terms in its agency agreements (including the MFN and price caps) for its independent

business reasons.  For example, Apple insisted on price caps, over the strong objection of each

publisher, to ensure that digital books on Apple's bookstore cost less than their physical

counterparts.  The price caps *constrained* the ability of the publishers to raise prices, as plaintiffs

admit; they did not set a uniform price for all publishers.  Plaintiffs' own experts admit that these

contract terms made business sense for Apple, independent of any alleged conspiracy, as a new

entrant into an uncertain market.  Apple's terms reflected Apple's digital business principles it

had consistently implemented when successfully entering (or creating) other digital content

markets, including its revolutionary iTunes Store and App Store.  These core business principles,

and not a conspiracy with publishers, drove Apple's negotiating strategy and contract terms.

    6. The difficult negotiations between Apple and each publisher contradict plaintiffs'

conspiracy story as well.  The arms-length and individual negotiations show that the interests of

Apple and each publisher diverged sharply (and in different ways) on the very terms that are the basis of the claims against Apple. Each publisher fought to eliminate the MFN and price cap provisions that plaintiffs allege were the centerpieces of the alleged conspiracy.

7. The United States' Complaint alleges that Apple's entry "increase[ed] the retail prices of trade e-books." Compl. ¶ 102(a). That allegation is demonstrably false. Average prices for trade e-books have fallen, and output, whether measured in the number of sales, the number of titles, or the types and quality of e-books offered, has increased substantially. These facts are undisputed.

Apple also fundamentally transformed the e-reading experience, leaving rudimentary, black-and-white, and expensive single-purpose e-readers (e.g., the Kindle) in the dust. The e-book world changed dramatically when Apple launched its iBookstore on the iPad in April 2010. At the time, 400,000 e-book titles were available to the consuming public; today, readers can download more than 1.7 million e-books. Apple has also created or spurred a number of the most important e-reading hardware and software innovations, such as full-color, interactive, and vivid digital e-books.

It is not surprising that plaintiffs seek to run from the fact that every critical indicator of market health—lower price, higher output, more selection, higher quality, lower concentration— signals that the trade e-books market has been thriving since Apple's entry and consumers have been reaping the benefits.

\*   \*   \*

Plaintiffs have no case against Apple. Lacking direct evidence that Apple conspired, plaintiffs string together a chain of unreasonable inferences, drawn from a patchwork of ambiguous evidence.

The Supreme Court has held, however, that under the teaching of *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Plaintiffs are required to meet the "stringent standards in *Monsanto*." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 903 (2007). Specifically, plaintiffs must adduce "evidence that tends to exclude the possibility" that Apple acted independently. *Monsanto*, 465 U.S. at 768. And where the challenged conduct—here, Apple's entry into the e-books market—is *inherently procompetitive* and supported by "uncontradicted evidence" of an independent business justification, plaintiffs' case fails the *Monsanto* test. *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012).

A finding of liability against Apple under section 1 would represent an unprecedented expansion of the antitrust laws to condemn unilateral and procompetitive conduct. No case in the history of the antitrust laws has imposed liability on (1) a new entrant; (2) facing a dominant player with a 90% market share; (3) that entered into separate, vertical agreements; (4) motivated by legitimate and independent business objectives; (5) enabling entry into a market for an emerging technology; (6) where average prices fell and output continued to grow following entry. Ruling against Apple would create a dangerous precedent and risk deterring new entry into concentrated markets and punishing innovation. The antitrust laws should promote competition, not condemn it. Judgment should be entered in favor of Apple.

## STATEMENT OF FACTS[1]

Apple is a leading technology company that has globally revolutionized mobile

---

[1] A full and detailed statement of Apple's Proposed Findings of Fact ("Apple Fact" or "AF"), with citations to the evidentiary record, is submitted under separate cover.

communication and media devices, personal computers, and software.  AF ¶¶ 4–7.  Today, Apple

manufactures and markets the innovative iPhone, iPad, Mac, and iPod—the most innovative

products of this generation.  AF ¶ 4.  Apple also distributes digital content through its digital

content stores, including the iTunes Store, App Store, and iBookstore.  AF ¶ 6.  Apple's

innovative products and content stores have fundamentally transformed how consumers

purchase, discover, and enjoy media.  AF ¶¶ 3, 8, 13.

Apple entered the e-book business in April 2010 when it opened the iBookstore and

released the iPad.  AF ¶ 3.  Apple had sold some e-books as individual apps before that time, but

it did not believe that any of its devices—the iPod, iPhone, or Mac—were optimal e-readers.  AF

¶¶ 26, 29.  The iPad changed that.

Apple was not the first to market.  Sony had launched the first mass market e-reading

device in September 2006.  AF ¶ 2.  Amazon followed with the Kindle in November 2007;

Barnes & Noble released the NOOK in November 2009.  AF ¶¶ 2, 24.  Apple did not believe any

of these devices offered a superior consumer experience to physical books; they merely took the

printed word and digitalized it.  AF ¶¶ 2–3.  From Apple's perspective, there was still a very real

opportunity to do something different.  AF ¶¶ 30–31.

## I.      Apple Considers Creating A Bookstore

Apple's decision to launch the e-bookstore was made independent of any publisher.  AF

¶ 32.  Eddy Cue, an Apple senior executive, had pushed Apple's CEO, Steve Jobs, and others at

Apple to develop an e-bookstore throughout 2009.  AF ¶¶ 30, 32.  He believed there was a

significant opportunity for Apple in the e-book market given the size of the potential market and

the promise of the iPad as an e-reader.  AF ¶ 30.  Mr. Cue, and ultimately Mr. Jobs, believed that

an Apple e-bookstore and e-reading software, designed to take advantage of the extraordinary

capabilities of the new iPad, would provide a much better e-reading and purchasing experience than the basic devices then available to consumers.  AF ¶ 31.

Mr. Jobs authorized Mr. Cue to move forward with an effort to launch an e-bookstore in November 2009.  AF ¶¶ 32, 35.  But there was a catch.  Mr. Jobs gave Mr. Cue a deadline of January 27, 2010, the date of the iPad launch.  AF ¶ 33.  Mr. Cue had less than two months to secure a broad and attractive selection of digital books.  AF ¶ 34.  To make things even more challenging, Mr. Cue had no experience in the book business and no personal or business relationships with any of the publisher CEOs.  AF ¶ 73.

## II.     The E-Book Market In Turmoil

Apple walked into a market in turmoil in December 2009.  AF ¶¶ 43–49.  There was growing tension throughout 2009 between the major book publishers and Amazon, the leading retailer of books.  AF ¶¶ 39, 43–52.  Amazon dominated the e-book market; it accounted for 80–90% of all e-books sold.[2]  AF ¶ 39.  Amazon was selling many of the digital versions of *New York Times* bestsellers at $9.99—well below the prevailing wholesale prices; Amazon was purchasing books at wholesale for ██████ meaning it was losing ██████ per title.  AF ¶¶ 38, 43.

Amazon's dominance and pricing strategy caused significant concerns in the book publishing business.  AF ¶ 44.  These concerns were no secret.  AF ¶ 51.  *The New York Times*, the *Wall Street Journal*, and other media outlets reported that the publishers were concerned that Amazon's uniform, below-cost pricing of certain e-books:  (1) devalued books by treating them as homogeneous products; (2) undermined sales of more expensive hardcover editions; (3) threatened the variety and quality of literary works; (4) impeded growth, innovation, and

---

[2]  Plaintiffs define "trade e-books" as "general interest fiction and non-fiction" e-books, which include the e-book versions of *New York Times* best sellers and hardcover new releases.  AF ¶ 37.

competition; and (5) barred entry and free competition in a new and evolving market.  AF ¶ 44.

Publishers took a variety of different steps to address the problem posed by Amazon in 2009.  First, certain publishers eliminated digital wholesale discounts.  AF ¶ 58.  Second, Hachette, Macmillan, HarperCollins, and Simon & Schuster announced plans in the fall of 2009 to "window," or delay the release of e-books after hardcover releases.  AF ¶¶ 59–66.  Initially each announced plans to window a specific, hotly anticipated book.  AF ¶¶ 62–65.  Later each publicly announced plans in December 2009 to implement a broader windowing strategy.  AF ¶¶ 62–63, 65.  Third, leading publishers and retailers discussed agency as a model to sell e-books in the second half of 2009.  AF ¶ 67.  Barnes & Noble discussed the possibility of using agency with several publishers.  AF ¶ 68.  HarperCollins and Hachette independently weighed a shift to agency before Apple began any discussions with any publisher.  AF ¶¶ 69, 81.

## III.   Apple's Initial Discussions With The Six Largest Book Publishers

On December 9, 2009, Hachette, HarperCollins and Simon & Schuster announced plans to expand their windowing efforts of e-books, and the *New York Times* published a story on their unhappiness with Amazon.  It was against that backdrop that Mr. Cue had his first conversations with any publisher, on the very next day, about Apple's interest in entering the e-book market.  Mr. Cue talked separately to Mr. Dohle of Random House and Mr. Murray of HarperCollins.  Both publishing executives voiced concerns about the state of the market.  AF ¶ 70.

The next week, Mr. Cue and his colleagues traveled to New York City to meet separately with the CEOs of the six largest trade e-book publishers—Hachette, HarperCollins, Macmillan, Penguin, Simon & Schuster, and Random House—to explore the idea of an Apple e-bookstore.  AF ¶ 71.  Mr. Cue emphasized to each publisher that Apple could be a transforming new entrant into e-book retailing, with a highly innovative reader, a proven track record of success, and an

enormous customer base.  AF ¶¶ 78–79.  Mr. Cue also made clear that Apple would not accept

windowing, would not operate an e-bookstore at a loss, would need lower wholesale prices, and

would need a broad selection of e-books.  AF ¶ 78.  The initial response was enthusiastic; rumors

that Apple would launch an exciting multi-purpose tablet device were rampant.  AF ¶ 79.  And

the publishers believed that Apple—given its history of hardware innovation and digital content

success—was uniquely situated to enter the market.  AF ¶ 79.

There was no discussion of specific contract terms by either side at this first set of

meetings with the publishers.  AF ¶ 74.  Apple believed it would ultimately negotiate wholesale

agreements with the publishers, but quickly realized that it would be unable to do so without

sustaining heavy losses in order to be competitive.  AF ¶ 86.

Hachette and HarperCollins mentioned agency as a possible model for Apple in their first

meetings with Apple in December 2009.  AF ¶ 81.  Apple was no stranger to the agency model—

it operated its App Store on agency.  AF ¶ 14.  And after some discussion, Apple decided agency

would also be a good model for e-books.  AF ¶ 87.

Apple told each publisher that it was Apple's policy to give all content providers the

same basic terms within a content store.  AF ¶¶ 148.  Apple also explained that it would not

launch an e-bookstore without a sufficient number of the major publishers signed, because it

needed a large enough e-book selection to attract consumers.  AF ¶ 147.  And any agency

agreements needed to be in place by late January so Mr. Jobs could announce the new e-

bookstore as part of the iPad launch.  AF ¶¶ 33.

On January 4 and 6, 2010, Mr. Cue wrote to each of the six book publisher CEOs he had

met with in December 2009.  AF ¶ 95.  He outlined his thinking about the terms of a potential

agency deal for the sale of e-books through Apple's platform:  a 70/30 agency commission split,

10

price tiers and caps, a prohibition on windowing, the requirement that e-book prices would be lower than print book prices, and Mr. Cue's idea, at that time, that Apple would only sign a deal with a publisher that sold all of its e-books under an agency model.  AF ¶¶ 89–95.

After further thought and discussion, Mr. Cue realized that obligating a publisher to have all of its e-book retailers on the agency model was impractical and would not address Apple's underlying concern that Apple's pricing on new release titles be fully competitive with other retailers.  AF ¶ 97.  Agency required Apple to give up the right to set prices, and powerful retailers like Amazon and Barnes & Noble could negotiate with publishers for more stringent price caps, rebates, or coupons to lower their prices below what Apple offered.  AF ¶ 97. Therefore, Apple abandoned the idea of only signing with publishers whose retailers were on agency.  No such term was included in the initial draft agreement sent to the publishers for negotiation or in any subsequent draft.  AF ¶¶ 100–01.

## IV.    Apple's Initial Draft Agency Agreements

Apple began drafting a proposed agency agreement in January 2010.  AF ¶ 96.  In the days after the initial set of meetings with the publishers, Apple's counsel had developed a retail price MFN provision.  AF ¶ 98.  The purpose of that MFN was to ensure that Apple would offer competitive prices in its e-bookstore.   AF ¶¶ 98–99.   The MFN gave Apple the limited contractual right to lower the price of new release e-books on its bookstore to match the lowest available price in the market.  AF ¶ 99.  It was not designed to incentivize the publishers to change Amazon's business model.  AF ¶ 104.  The very point of the MFN was to enable Apple to offer competitive prices regardless of the model used by other retailers.  AF ¶¶ 98–99.

Apple separately e-mailed its draft agency agreement to each of the six major publishers' CEOs on January 11, 2010.  AF ¶ 96.  The draft agreement contained Apple's core terms:  (1)

agency with a 30% commission to Apple; (2) a requirement that all books be made available for sale at the same time as their hardcover new release; (3) price tiers and caps setting maximum e-book prices; and (4) a new-release retail MFN.  AF ¶ 96.  The agency agreements contained no provisions that address, much less dictate, how individual publishers should structure their business relationships with other retailers.  AF ¶ 100.

Apple was ultimately indifferent as to whether publishers' agreements with other retailers used agency, wholesale, or any other model.  AF ¶ 101.  Apple made clear during negotiations in mid-January that a publisher was free to remain on a wholesale model with other retailers and sell e-books in Apple's bookstore through an agency arrangement.  AF ¶¶ 99–104.

## V.    The Agency Agreement Negotiations

Apple and each of the six publishers engaged in arms-length, individual negotiations over the terms of Apple's proposed contracts.  AF ¶¶ 108, 154.  These negotiations were often contentious.  AF ¶ 108.  For different reasons and to different degrees, the publishers fought against:  the MFN (AF ¶¶ 110, 119, 123, 127, 138); price tiers (AF ¶¶ 110, 118, 121, 125, 128); the anti-windowing provision (AF ¶¶ 110, 117); and Apple's 30% commission, AF ¶¶ 110, 122, 126, 130, 137.

By January 25, 2010—two days before the iPad and e-bookstore launch—Apple had signed agency agreements with four major publishers:  Hachette, Macmillan, Penguin, and Simon & Schuster.  AF ¶ 132.  Random House decided not to sign.  AF ¶ 134.  HarperCollins did not sign until January 26, 2010, and only did so after it, in consultation with its parent company News Corp, decided that signing an agency agreement with Apple was important to News Corp's overall content-based relationship with Apple and was in News Corp's best interests overall.  AF ¶ 143.  In January 2010, immediately after signing its first five agency

agreements for the iBookstore, Apple began negotiating and signing agency deals with smaller and independent publishers, including Hyperion, Perseus, and Workman containing the same core terms as the original contracts with the first five publishers.  AF ¶ 166.  None of these smaller publishers ever signed agency deals with Amazon.  AF ¶ 168.

## VI.    Amazon's Decision To Move To Agency

Amazon was no stranger to agency in January 2010.  It had used an agency-like revenue-sharing model for its Kindle Direct Publishing platform since late 2007.  AF ¶ 175.  Amazon also discussed the possibility of a ▮▮▮ revenue e-book model for larger publishers in spring 2009. AF ¶ 202.

Unbeknownst to Apple, Madeline McIntosh, Random House's COO and a former Amazon employee, had dinner with Laura Porco, an Amazon executive and old colleague, on January 18, 2010.  AF ¶ 174.  Ms. McIntosh told Ms. Porco that Apple was proposing an agency model for e-books.  AF ¶ 174.  She also shared her belief that at least some publishers would continue to window e-books sold under a wholesale model.  AF ¶ 174.  Also unbeknownst to Apple, Barnes & Noble, the second largest e-retailer to Amazon, was involved in parallel discussions with the publishers about moving to an agency arrangement for selling books on the Barnes & Noble platform.  AF ¶ 225.

On January 20, two days after Ms. Porco's dinner, Amazon announced changes to the Kindle Direct Publishing platform in a widely reported event in New York City.  AF ¶ 175.  This platform had long allowed small publishers and independent authors to sell their books directly to consumers on the Kindle, setting the price at a 35/65 split in favor of Amazon.  Amazon changed their terms to ones strikingly similar to Apple's agency proposal: price tiers and caps, a retail price MFN, and a 30% commission for Amazon.  AF ¶ 175.

13

Around the same time in mid-January, Amazon met with representatives of each of the five publisher defendants and raised the subject of agency at several of these meetings, signaling that it might be open to it.  AF ¶ 176.  At that point, Apple was still negotiating with each publisher over the terms of the agency agreement, including the MFN, and no publisher had agreed in principle to, let alone signed, any agreement with Apple.  AF ¶¶ 119, 121, 127, 129, 132.  Apple was not informed of these Amazon meetings.

By January 22, Simon & Schuster and HarperCollins proposed an agency relationship with Amazon for e-book sales.  AF ¶¶ 177, 179.  Amazon indicated to Simon & Schuster that it would consider using agency for the first 90 days after an e-book's release if Simon & Schuster would go back to wholesale thereafter.  AF ¶ 177.  HarperCollins proposed that Amazon either stay on a wholesale model with all new e-books windowed for the first six months or move to agency.  HarperCollins indicated that it would prefer to do an exclusive agency deal with Amazon, and not do a deal with a new content partner, meaning Apple.  AF ¶ 179.  Amazon told HarperCollins that it was undertaking an analysis of the agency model and that it would respond in a couple of weeks.  AF ¶ 179.

Amazon knew that the e-book market was on the cusp of some dramatic changes.  Apple's device promised to transform the digital reading experience.  Apple was also negotiating agreements that would ensure that it would have immediate access to all new-release e-books.  AF ¶¶ 89, 117.  Amazon would potentially have neither.  AF ¶ 199.  Amazon thus confronted a choice between a wholesale model that was increasingly subject to windowing and an agency model that would ensure immediate access to all titles.  AF ¶¶ 196, 199.

Days after the launch of the iPad and the demonstration of Apple's new e-book platform, Macmillan executives met with Amazon in Seattle.  AF ¶ 188.  Macmillan proposed that

Amazon stay on wholesale with windowing or agree to an agency model.  When the Macmillan executives left, they learned that Amazon had removed all the "buy buttons" for Macmillan books on its site.  After heavy publicity on both sides about the dispute, on or before January 31, Amazon announced a business decision to go to agency with Macmillan.  AF ¶ 191.

Amazon publicly claimed it had no choice but to "capitulate" to the agency terms forced on them by Macmillan (AF ¶ 223), but it privately told a very different story.  In a January 31, 2010 e-mail exchange, Ms. McIntosh reminded Ms. Porco of their discussions nine months earlier (when they worked together at Amazon) about proposing a ▆▆▆ profit-share model to the major publishers.  At the time, they did not believe Amazon could convince the publishers to "go for it unless the share was like ▆▆▆▆"  AF ¶¶ 191, 202.  Ms. Porco found the situation "hysterical" and joked that Amazon had used "Jedi Mind Tricks" to get the publishers to do what was in Amazon's best interests while publicly playing the victim.  AF ¶ 192.  Another Amazon executive led Ms. McIntosh to believe that Amazon created the controversy for publicity.  AF ¶ 224.

Amazon signed an agency agreement with Macmillan on February 5, 2010.  AF ¶ 204.  Amazon then engaged in simultaneous negotiations with Hachette, HarperCollins, MacMillan, and Simon & Schuster.  AF ¶ 204.  It felt it had the upper hand in the negotiations and could dictate what it characterized as "onerous" terms on the publishers.  AF ¶ 200.  Amazon eventually signed agreements with all of the other publisher defendants by late May 2010.  AF ¶ 204.  Those agreements feature many of the core terms of Apple's agency agreements—a ▆▆▆ agency commission, ▆▆▆▆▆▆▆, and a prohibition against windowing—and in some respects, they go even further.  AF ¶¶ 205–15.  Several of Amazon's ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆  AF ¶ 210.  Internal Amazon documents reflect that Amazon

sought an MFN for the same reason that Apple did: to ensure that its customers would have access to the lowest possible prices for e-books and to "level the playing field."  AF ¶ 207.

## VII.    The Trade E-Books Market After Apple's Entry

*Pricing.*  As demonstrated in Appendix A-5, the average price in the relevant market alleged by Plaintiffs (trade e-books) has dropped since agency.  AF ¶ 268.  Before agency, the average retail price for an e-book was $7.97; after agency (from April 2010 to March 2012, the latest date for which market-wide data were available) the average price for an e-book was $7.34.  AF ¶ 269.  The great bulk of e-books continue to be priced post-agency at or below $9.99.  AF ¶ 271.

*Output.*  Output has exploded.  In Q2 2010, consumers purchased approximately 18 million e-books from Amazon, Apple, Barnes & Noble, Books-A-Million, Google, Kobo, and Sony.  AF ¶ 279.  Less than two years later in Q1 2012, consumers purchased approximately 100 million e-books, an increase of over 447% from Q2 2010.  AF ¶ 279.  The increase is 615% if free e-books are included.  AF ¶ 279.  Consumers have downloaded 230 million e-books from Apple's iBookstore, including 70 million paid e-books.  AF ¶ 279.  The charts attached at Appendix A-6 and A-7 hereto demonstrate these facts.

*Innovation.*  Apple's entry dynamically and fundamentally transformed the e-reading experience by innovating e-reading software, enabling self-publishing, and growing the breadth and reach of the e-books market.  AF ¶¶ 252–57.  In combination, the iPad, the iBookstore, and the iBooks App made e-reading a richer, diversified, and more interactive experience.  AF ¶¶ 252–56.  For example, the e-reading experience is no longer limited to plain black-and-white text.  AF ¶¶ 253–55.  Instead, iPad and iBooks introduced color, audio, video, and other dynamic features and functionality that allow users to interact with the content, not just consume it.  AF

¶¶ 253–55.

Apple has also transformed self-publishing: iBooks Author, Apple's authoring and publishing software tool launched in January 2012, allows a layperson to create e-books by designing templates and layouts; adding text, graphics, photographs, audio or movies; and inserting interactive elements, such as 3D graphics.  AF ¶¶ 171, 257.  The iPad has also spurred the introduction of cost-effective, multipurpose e-reader devices into the market; together, these devices have encouraged less-frequent readers to purchase e-books and have also enhanced the user experience considerably.  AF ¶ 259.

Apple's entry into the market has expanded the breadth and reach of e-books.  AF ¶¶ 259–60.  When the iBookstore was first launched in April 2010, the initial catalog consisted of 60,000 titles; today, it features 1.5 million titles and many new e-book categories.  AF ¶ 260.

## VIII.   The Admissions Of Plaintiffs' Experts

Plaintiffs' case rests on their contentions that Apple forced Amazon's move to the agency model, that this alleged coercion resulted from a conspiracy with the publishers, and that consumers were harmed as a result.  But plaintiffs' experts have made admissions that strike at the foundations of plaintiffs' case.

*Apple's Independent Business Justification.*  Professors Gilbert and Baker, experts for the DOJ and States respectively, have both testified to the independent business justifications that exist for Apple's conduct.  Both acknowledge the independent interest that Apple had in seeking agency, negotiating simultaneously and pursuing a critical mass of publishers, imposing price caps, requiring MFNs, and obtaining a 30% commission.  AF ¶ 291.

*Amazon's Adoption of Agency.*  Professor Gilbert admits that there could have been factors *other than the Apple MFN* that led Amazon to adopt agency (AF ¶ 292), and that he

simply does not "have enough facts to say what actually could have happened." AF ¶ 292. He also acknowledges that with or without an MFN in Apple's agency agreements, it would have been rational for Amazon to be concerned about a scenario in which Apple could sell all new-release e-books under an agency model while faced with publishers' publicly announced plans to window books from retailers remaining on an agency model. AF ¶ 292. Professor Gilbert admits further that he has no basis to contradict Apple's testimony that it was indifferent to whether Amazon stayed on a wholesale model or moved to agency. AF ¶ 292.

*Market Entry.* Professor Gilbert admits that actual entry by a new firm often changes the structure of markets and can upset traditional patterns of market conditions. AF ¶ 293. He also acknowledges it is not "reasonable for a firm to enter an industry with the expectation of losing money." AF ¶ 293. Professors Baker and Gilbert do not contest Apple's testimony that it would not have entered the market absent the agency agreements. AF ¶¶ 292, 293.

*Prices and Output.* Professors Gilbert and Ashenfelter (another expert for the States) admit they cannot dispute that average prices for all trade e-books—plaintiffs' alleged relevant market—*fell* since Apple's entry. AF ¶ 294. They also admit they have no basis to refute the evidence e-book sales continued to increase substantially after Apple's entry.

## ARGUMENT

The foundational element of any section 1 claim is a finding of an agreement to restrain trade. There is simply no evidence to support a finding that Apple reached an agreement with two or more publishers to increase prices or otherwise restrain trade in the e-book market. There is also no evidence to support plaintiffs' allegation that Apple participated in an illegal conspiracy. At all times, Apple acted in its independent and legitimate business interest when it negotiated to enter the e-book business. This is why plaintiffs focus so much of their attention

on the relationship among the five defendant-publishers, and attempt to shoehorn Apple into the alleged conspiracy based upon impermissible inferences drawn from Apple's lawful conduct.

The foundation for plaintiffs' alleged conspiracy is a series of meetings among five book publishers dating back to 2008 in which Apple had *no* involvement—and plaintiffs do not contend otherwise. Apple is not alleged to have participated in any meeting between two or more publishers—indeed, the States do not even name Apple as a defendant in two of their three conspiracy counts, in which they name *only* the publishers. *See* States' Second Amended Compl. Counts 1 & 2. Instead, their theory is that Apple nonetheless facilitated some other conspiracy when it negotiated agency agreements with the publishers in January 2010. The key to plaintiffs' case against Apple is a single term in those agreements—a retail MFN.

Plaintiffs contend that the retail MFN forced Amazon to abandon the wholesale model for e-books and ultimately raise its prices. Although the MFN is a well-known contract term for keeping prices *down* by requiring price competition (Compl. ¶¶ 66, 78), plaintiffs nevertheless allege that Apple repurposed the MFN as a "key commitment mechanism" (Compl. ¶ 78) to force the publishers to collectively demand agency from Amazon, in order to *raise* prices. This claim is contradicted by the evidence. It is founded upon a lengthy string of implausible and legally impermissible inferences. Apple's agency agreements do not support an inference of conspiracy. Plaintiffs cannot meet their burden.

## I.    Plaintiffs Cannot Prove The Existence Of A Conspiracy

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade ... is declared to be illegal."[3] 15 U.S.C. § 1.

---

[3]    Plaintiffs also bring claims under state law. States' Second Amended Compl. ¶¶ 129–98. These claims parallel the section 1 claim in this case as state courts "overwhelmingly look to federal antitrust decisions to construe their own antitrust statutes." *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d

"Thus, according to the statute," plaintiffs "*must first establish* a combination or some form of concerted action." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (emphasis added). If plaintiffs cannot prove that Apple participated in a conspiracy, then their section 1 claims "must fail." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001).

Plaintiffs do not argue that Apple's individual agreements with the publishers violate the Sherman Act—nor could they.[4]   Rather, they allege that Apple participated in a separate, horizontal conspiracy[5] among all of the publishers.

To prevail on their claims, plaintiffs must introduce "direct or circumstantial evidence that reasonably tends to prove that [Apple] had a *conscious commitment to a common scheme*" with the publishers "designed to achieve [the] unlawful objective" of raising prices throughout the e-book market. *Monsanto*, 465 U.S. at 764 (quotation marks omitted) (emphasis added).

---

435, 447–50 & nn. 19–21 (S.D.N.Y. 2008) (collecting authorities), *rev'd on other grounds by Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010).

   [4]   The Supreme Court has held that "genuine contracts of agency" are not "violations of the Anti-Trust Act" (per se or otherwise) as a "matter of principle." *United States v. Gen. Elec. Co.*, 272 U.S. 476, 488 (1926); *see also Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 294 (4th Cir. 2009) (upholding lawfulness of genuine agency agreements).

   [5]   Plaintiffs have good reason not to challenge Apple's distribution relationship with the publishers: The Supreme Court is increasingly hostile to section 1 claims based on vertical relationships. The Court has recognized that vertically related firms have "legitimate reasons to exchange information" on pricing (*Monsanto*, 465 U.S. at 762), and that vertical business relationships are likely to have procompetitive benefits that promote the purpose of the antitrust laws, *see, e.g.*, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988) (vertical nonprice restraints "ha[ve] real potential to stimulate interbrand competition, the primary concern of antitrust law") (quotation marks omitted). The Court has "rejected the approach of reliance on rules governing horizontal restraints when defining rules applicable to vertical ones," and no longer treats "vertical agreements a manufacturer makes with its distributors as analogous to a horizontal combination among competing distributors." *Leegin*, 551 U.S. at 888. And the Court has even overruled its own precedents three times to reduce scrutiny on vertical relationships. *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977) (holding that vertical non-price restrictions are subject to the rule of reason, overruling *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967)); *State Oil Co. v. Kahn*, 522 U.S. 3, 7 (1997) (holding that vertical agreements setting maximum prices are subject to the rule of reason, overruling *Albrecht v. Herald Co.*, 390 U.S. 145 (1968)); *Leegin*, 551 U.S. at 907 (holding that all "[v]ertical price restraints are to be judged according to the rule of reason," overruling *Dr. Miles Med. Co. v. John D. Park & Sons, Co.*, 220 U.S. 373 (1911)).

Plaintiffs also bear the burden of proving that Apple had a culpable intent, as the "lack of intent by one party ... precludes a conspiracy to [restrain trade]." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).

### A. Apple Was Neither Involved In Nor Aware Of The Alleged Conspiracy Among The Publishers

Plaintiffs do not allege, nor could they, that Apple had any involvement in the alleged conspiracy dating back to 2008 or the summer of 2009, in which the publishers supposedly conspired to force Amazon to raise its e-book prices so that the publishers could charge more for their hardcover books. Apple did not attend the alleged meetings, and plaintiffs do not allege that Apple, or the possibility of Apple entering the e-book market, was ever discussed in the meetings among the publishers. AF ¶ 150.

Apple's only interactions with the publishers occurred over a few weeks in which Apple individually approached the publishers, developed terms, presented proposed agreements, and negotiated against each publisher for the very terms that plaintiffs allege form the basis of Apple's role in the conspiracy. AF ¶¶ 70–132. The idea of an e-bookstore was not even seriously discussed at Apple before November 2009. AF ¶ 32. Apple began communicating with the publishers on December 9 and 10, 2009, and sent them an initial informal proposal between January 4 and 6, 2010. From January 11 until January 25, when the agreements with the four major publishers were finalized, Apple and the publishers engaged in difficult and contentious negotiations with the publishers. AF ¶¶ 70–132. And the largest publisher did not agree to the terms. AF ¶ 134.

This case bears no resemblance to the traditional "hub and spoke" case in which an antitrust defendant is alleged to have organized or joined a conspiracy. In both *Interstate Circuit v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir.

2000), the "hub" of the conspiracy was the party that allegedly implemented and enforced the plan.  There was no doubt in either case that the "hub" defendant was aware of the purported scheme—the only question was whether the horizontal defendants agreed to it.  *See Interstate Circuit*, 306 U.S. at 222 (noting that the defendant organized and implemented the plan); *Toys "R" Us*, 221 F.3d at 933 (noting that the defendant communicated messages from manufacturer to competing manufacturer and "served as the central clearinghouse for complaints about breaches in the agreement").  Plaintiffs do not allege that Apple participated in or knew of a single one of the meetings or conversations that allegedly formed the basis of the purported conspiracy.  The paucity of evidence supporting plaintiffs' theory makes clear that it bears no resemblance to the conspiracies in cases like *Interstate Circuit* and *Toys "R" Us*.  *Accord* 14B P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1426d & n.47 (3d ed. 2010) (cautioning against application of *Interstate Circuit* and *Toys "R" Us* "to an altogether different set of facts").

## B. Plaintiffs' Evidence Does Not Tend To Exclude The Possibility Of Independent Action

"Direct evidence is extremely rare in antitrust cases."  *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004).  Direct evidence in a section 1 conspiracy must be evidence that "is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).  For example, direct evidence might consist of "a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Plaintiffs have no such evidence against Apple.

Plaintiffs must therefore present circumstantial evidence given the lack of a "smoking gun."  *Citigroup*, 709 F.3d at 136.  To establish a conspiracy by circumstantial evidence, however, plaintiffs must meet the "stringent standards in *Monsanto*."  *Leegin*, 551 U.S. at 903.

In *Monsanto*, the Supreme Court held that antitrust law "limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588.

Under this standard, conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588; *accord AD/SAT v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 909 (6th Cir. 2009) (conspiracy cannot be based on evidence "which is as consistent with permissible competition as with illegal conspiracy").  Rather, a section 1 plaintiff "must present evidence that '*tends to exclude* the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764) (emphasis added).  Just last year, the Second Circuit confirmed the continuing force of *Monsanto*'s "tends to exclude" standard, holding that *Monsanto* requires "strong" evidence where plaintiffs' theory is implausible and the challenged conduct can reasonably be perceived as procompetitive.  *Publ'n Paper*, 690 F.3d at 63.

      1.      The Procompetitive Nature Of Apple's Market Entry Requires Plaintiffs To Provide "Strong" Evidence Of A Conspiracy

Strong evidence is required because Apple's conduct—entering a new and concentrated market—is quintessentially procompetitive.  The challenged activities present an exhaustive array of actions that limit the inferences that can be drawn by the Court in a section 1 case:  (1) a new entrant; (2) facing a dominant market player with 90% market share (AF ¶ 39); (3) who entered into separate, vertical agreements (AF ¶¶ 132, 143); (4) motivated by legitimate and independent business objectives (AF ¶ 145); (5) enabling entry into a market for an emerging technology (AF ¶¶ 31, 33); and (6) where average prices fell and output continued to grow, AF ¶¶ 268–70, 279–80.

New entrants are the competitive force that drives the economy, which makes "market

entry for new firms and brands" a special category of conduct that requires circumspect treatment under the antitrust laws. *Leegin*, 551 U.S. at 891; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1110–12 (7th Cir. 2012). Restricted inferences in antitrust cases avoid "deter[ring] or penaliz[ing] perfectly legitimate conduct" and creating "irrational dislocation in the market." *Monsanto*, 465 U.S. at 763–64; *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (a "higher threshold is imposed in antitrust cases to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition").

## 2.   Apple's Conduct Was Driven By Its Independent Business Interests

When "[t]he most natural inference from the evidence" is that the defendant had a "legitimate, independent reason" for its actions, no inference of conspiracy is possible under the Supreme Court's case law. *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 20 (1st Cir. 2004) (citing *Matsushita*, 475 U.S. at 588); *see also* 14A Areeda, *supra*, ¶ 1413a ("no conspiracy can be inferred from parallel behavior when" an alleged conspirator "had an 'independent' or 'good business reason' for the challenged act"). "Motivation to enter a conspiracy is never enough to establish a traditional conspiracy." 14A Areeda, *supra*, ¶ 1411; *see Citigroup*, 709 F.3d at 139; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010).

The evidence overwhelmingly shows that Apple acted independently in pursuit of its own business interests, which precludes any inference of a conspiracy.

*First*, Apple was motivated by its independent desire to enter and successfully compete in the e-books market. AF ¶¶ 82–85; *see H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1014 (2d Cir. 1989); *see also Burlington*, 769 F.2d at 924.

Apple was confronted by an uncertain and unsettled market when it sought to enter. AF ¶¶ 82–83. The dominant retailer, Amazon, was using its position aggressively. AF ¶¶ 39, 43, 80. The content owners (the publishers) were deeply unhappy with the state of the market. AF

¶¶ 44, 50–51.  Some were taking steps to address Amazon's power by seeking to window e-books and taking other actions.  AF ¶¶ 58–66.  Apple thus had sound business reasons to eschew the wholesale model:  (1) it would not enter the market if it had to suffer indefinite losses to compete (AF ¶ 78); (2) it wanted to be able offer consumers e-books on the same day and date as physical books (AF ¶ 75); (3) the publishers were moving toward long-term windowing of e-books under the wholesale model (AF ¶¶ 77); and (4) windowing would fundamentally damage the e-book market, AF ¶ 75.

Apple decided to use the agency model to enter the e-book market.  AF ¶ 87.  The agency model, coupled with price caps and an MFN, seemed a logical fit.  The model satisfied Apple's independent business goals: (1) a substantial amount of content available to customers, (2) at a lower price than its physical counterpart (via the price caps), and (3) competitive with the lowest price offered for the same e-book anywhere else in the market (via the MFN).  AF ¶¶ 87–93.

No witness disputes, and plaintiffs do not challenge, Apple's legitimate business motivations.  Plaintiffs' experts do not contest that Apple's challenged conduct was justified by Apple's business interests even if no conspiracy existed.  AF ¶ 291.  For example, plaintiffs' expert, Professor Gilbert, admitted that he could not point to a single act that was plausibly against Apple's self-interest in the absence of a conspiracy.  AF ¶ 291.  His only testimony was that Apple's conduct was *also* plausibly consistent with a conspiracy.

Thus, on the single most important question in a section 1 case—"What motivated the defendant's actions?"—plaintiffs concede the truth of Apple's testimony.

So far as Apple is aware, no defendant has ever been found to have participated in a conspiracy where plaintiffs' expert did not dispute that the defendant acted at all times in its independent economic interest.  When antitrust plaintiffs' experts fail to contest critical facts,

plaintiffs *lose*.  *See*, *e.g. White v. R.M. Packer Co.*, 635 F.3d 571, 581, 585–86 (1st Cir. 2011) (plaintiff's "antitrust claims fail" where "[p]laintiff's own expert stated that 'no unambiguous conclusion can be gleaned from defendants' pattern of parallel pricing'" and results of analysis were "mixed"); *see also United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 739 (2d Cir. 1989) (summary judgment appropriate where "expert conceded that there was no reasonable or realistic possibility that [counterclaimant] could achieve a monopoly").

Plaintiffs expect Apple to prove the negative, but that is not the law.  Plaintiffs believe they can establish a conspiracy simply by showing that Apple's sound business decisions may also be plausibly consistent with a conspiracy.  That theory has been soundly rejected by the Second Circuit in *Citigroup*, *AD/SAT*, and a host of other cases.[6]

*Second*, the MFN—the alleged contractual "mechanism" of the purported conspiracy— was independently and fiercely resisted by the publishers.  The publishers' negotiations with Apple were often contentious because Apple's e-book pricing interests sharply diverged with each of the publishers' interests for different reasons and to different degrees.  AF ¶¶ 108, 115– 40.  Significantly, the publishers opposed the MFN, price tiers, the anti-windowing provision, and Apple's 30% commission.  AF ¶ 110.

*Third*, Amazon and Barnes & Noble insisted on the same core contract terms when they adopted agency.  AF ¶¶ 204–16, 225–36.  The MFN made independent business sense for any

---

[6]   *See*, *e.g.*, *Citigroup*, 709 F.3d at 138 (dismissing conspiracy allegations where defendants' conduct "made perfect business sense" and was "not just *a* rational business decision, but the *only* rational business decision"); *AD/SAT*, 181 F.3d at 235 (concluding summary judgment was warranted because each defendant's conduct was "as consistent with the defendant's legitimate, independent business interest as with an illegal combination in restraint of trade"); *H.L. Hayden*, 879 F.2d at 1014 (affirming grant of summary judgment where the defendant presented evidence that it terminated business relations with plaintiff for "independent business reasons"); *Burlington*, 769 F.2d at 924 (affirming grant of summary judgment and concluding that plaintiff failed to meet *Monsanto*'s test where "uncontradicted evidence" showed defendant had an independent business justification).  Similar decisions from this Court and other courts are listed in Appendix A.

retailer operating under agency.

Amazon had been exploring the agency model even before Apple initiated its first contact with the publishers.   AF ¶ 202.   For example, Amazon used an agency-like model for self-published e-book sales in its "Kindle Digital Text Platform."   AF ¶ 175.   It is implausible for plaintiffs to claim—as they must in order to prove a conspiracy—that no reasonable firm would have acted as Apple did when in fact the two biggest players in the market (Amazon and Barnes & Noble) took exactly the same actions in pursuit of their own independent economic interests.

Plaintiffs' evidence of Apple's conduct "cannot stand against overwhelming evidence that the challenged action was taken unilaterally for sound business reasons."   *Comfort Traine Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1384 (5th Cir. 1979); *see also Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 579, 581 (8th Cir. 1993) (overturning a jury verdict where the defendant acted independently to meet its "legitimate business goals"); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 794 (2d Cir. 1987) (same).

3.   Plaintiffs' Evidence Fails The "Stringent Standards" In *Monsanto*

Apple's "substantial evidence supporting [a] plausible and legitimate explanation of [its] conduct"—an explanation that plaintiffs do not contest—places a heavy burden on plaintiffs. *Burlington*, 769 F.2d at 923.   They "may not rest on conclusory assertions of conspiracy" and instead must come forward with strong additional evidence of the defendant's conspiratorial activities.   *H.L. Hayden*, 879 F.2d at 1014 (citing *Burlington*, 769 F.2d at 923); *see also Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("when the defendant puts forth a plausible, procompetitive justification for his actions, … the plaintiff must produce more probative evidence that the law has been violated").

Plaintiffs cannot satisfy this requirement.   They hang their circumstantial case on five pegs, none of which tends to exclude the possibility that Apple acted independently.

(a)  Price Tiers/Caps

Plaintiffs cite the fact that Apple's agency agreements included tiers of e-books, with maximum prices for categories of books.  Compl. ¶¶ 7, 68.  But the price caps do not prove a conspiracy; indeed, they prove the opposite.  As Apple's witnesses explain, and as plaintiffs admitted in a Request for Admission, the caps were fiercely resisted by the publishers because they kept prices *down* by limiting the publishers' discretion to set prices.  AF ¶¶ 92–93, 106–07; DX-415.  The caps functioned just as Apple described, not as some sort of implicit signaling device.  Plaintiffs have never argued that they would have preferred an agency agreement that gave the publishers unfettered control over e-book prices.

Apple wanted the caps because it believed that some publishers' pricing expectations for e-books were high.  AF ¶ 90.  In fact, plaintiffs' experts agree that Apple implemented the price tiers to keep e-book prices low.  AF ¶ 291.  And Amazon itself imposed price caps in its own agency agreements with the publishers.  AF ¶¶ 212–13.

(b)  Negotiation Approach

All five publishers negotiated and signed similar agency agreements with Apple within a relatively short period.  Compl. ¶ 74.  Plaintiffs emphasize the publishers' sudden shift from a wholesale model to agency, and Apple's core set of terms, as a cause for suspicion.  Compl. ¶ 38. Yet courts have recognized that a change in market conditions can make it necessary for a firm to change its business model.  *See Citigroup*, 709 F.3d at 138 (defendants' en masse exit from market in reaction to market conditions was "not just *a* rational business decision, but the *only* rational business decision"); *Travel Agent Comm'n*, 583 F.3d at 898, 908 (conduct was based on defendants' "reasonable, independent economic interest" where the market had "changed fundamentally since 1983 due to technological advances").

Apple made it very clear at the outset that it had a very small window in which to

complete agreements.  It drafted a standard agreement that could be used as a model, not only for these six major publishers but for every publisher and even independent authors.  That is an approach Apple has taken in the content businesses it has entered over the last decade.  The evidence that Apple acted in a similar way with each of its publisher partners proves nothing, because "[s]imilar contract terms can reflect similar bargaining power and commercial goals." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).  The Third Circuit has rejected a section 1 case based on precisely the same type of strained inference.  *In re Ins. Brokerage*, 618 F.3d at 327 ("one cannot plausibly infer" a hub-and-spoke conspiracy from the mere fact that several insurers entered similar commission agreements with an insurance broker).

(c)    MFNs

Apple insisted on an MFN for new releases in its agency agreements.  Compl. ¶¶ 65–66. Apple did not intend or design the MFN to compel the publishers to force Amazon to move to agency.  AF ¶ 104.  Instead, the MFN ensured that Apple would be able to offer competitive prices even if it did not have control over those prices.  AF ¶¶ 97–99, 103, 237.  Courts have recognized that the use of MFNs to bargain for low prices "is the sort of conduct that the antitrust laws seek to encourage." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995); *see also id.* ("'Most favored nations' clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers.... It is not price-fixing.").

Plaintiffs suggest that Apple *incentivized* the publishers to seek the agency model from Amazon.  That theory is flawed for two reasons.  First, the plaintiffs ignore the incentives of Amazon to embrace agency as a model after Apple's entry.  Indeed, the plaintiffs own experts acknowledge that there were a number of other factors that ultimately led Amazon to decide to negotiate agency agreements with the five major publishers in early 2010.  Second, plaintiffs'

29

keystone allegation—that Apple's MFN provided an irresistible incentive to the publishers to jointly force Amazon onto agency—is false.  Professor Klein established that, as a matter of economics, the impact of the MFN on the publishers' existing incentives was insignificant.  AF ¶ 292.  Plaintiffs' experts did not even bother to try to measure the effect of the MFN on the publishers' incentives.  Their experts studiously avoid this readily verifiable economic conclusion:  Professor Baker chose not to quantify the incentives created by the MFN (AF ¶ 292), and Professor Gilbert did quantify it, but not in his expert opinion, AF ¶ 292.

It would have been commercial suicide for Apple to enter the e-books market without a MFN.  AF ¶¶ 97–99.  Professor Baker testified that without an MFN, the publishers had a strong incentive to charge higher prices on Apple's e-bookstore than existed on Amazon's e-bookstore.  AF ¶ 293.  Again, this is why the top two e-retailers, Amazon and Barnes & Noble, insisted on similar MFN provisions when they negotiated their agency agreements with the publishers.

(d)    Communications

Apple's communications with the publishers during contract negotiations do not support an inference of a conspiracy.  *See*, *e.g.*, Compl. ¶¶ 59, 61, 64.  The Supreme Court recognizes that "the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions.  A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market."  *Monsanto*, 465 U.S. at 762.  The Court's statement applies precisely to this case:  Apple was a new player in the emerging e-books market in 2010.  That Apple was talking to all of the major publishers at the same times was hardly a cause for suspicion.  Indeed, it was to be expected.

The publishers confirmed that Apple never spoke to more than one publisher at a time, never shared any other publisher's position on terms, and required each publisher to sign a

30

confidentiality agreement.  AF ¶ 149.

Plaintiffs nevertheless point out that Apple negotiated with each publisher at the same time.  Compl. ¶ 83.  Of course it did: Apple faced a tight deadline to launch the iBookstore in time for the announcement of the release of the iPad.  But no conspiracy can be inferred from parallel commercial conduct where "time [is] of the essence."  *Fed. Broad. Sys., Inc. v. Am. Broad. Co.*, 167 F.2d 349, 352 (2d Cir. 1948).

Apple told each publisher that it was offering the same basic terms to every other publisher, and that it would open the iBookstore only if it could reach agreements with several of the publishers.  AF ¶ 147.  This is a standard negotiation tactic that incentivized each publisher to come on board with Apple.  *See Ins. Brokerage*, 618 F.3d at 329–30 (such sharing "could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner").  The evidence shows that far from being willing co-conspirators, the publishers fought Apple's proposed terms tooth-and-nail.  AF ¶¶ 108–44.

4.  <u>Statements Attributed To Steve Jobs Do Not Support Plaintiffs' Theory</u>

Plaintiffs fare no better with Steve Jobs's remarks, which further establish that Apple acted to protect its independent interests and did not conspire to force Amazon to raise its prices.

*First*, the e-mail correspondence with James Murdoch (Compl. ¶ 71) reflects two executives wrestling with the realities of the e-books business and alternative strategies for dealing with an obvious problem facing the publishers.  Mr. Jobs and Mr. Murdoch confirmed the obvious: that Apple's $12.99 and $14.99 prices were indeed caps—not actual prices—and that HarperCollins was free to price at a tier anywhere below the caps.  AF ¶ 244.  Mr. Jobs never once said anything about how Amazon can, should, or will price its books in the future.  Indeed, he recognized the uncertainties of the market in flux when he said that Amazon is "selling these books at $9.99, *and who knows, maybe they are right*."  AF ¶ 245 (emphasis

added).  This is no smoking gun.  Instead, this e-mail shows a new entrant with no market power proposing an alternative business model to HarperCollins, and candidly recognizing that Apple has no power to predict or influence other retailers.

*Second*, the Isaacson biography (Compl. ¶¶ 6, 56) describes the condition of the e-book business before Apple entered the scene—disgruntled publishers windowing their e-books in protest against Amazon's pricing strategies.  AF ¶¶ 246–47.  The biography correctly explained that Apple proposed an agency model that gave the publishers the ability to set the price of certain e-books above $9.99 if they chose.  AF ¶ 247.  The statement attributed to Mr. Jobs in the biography makes clear that Apple was not a part of any conspiracy to force Amazon to adopt an agency model or higher prices:  It states that Apple insisted on an MFN so that if "anybody else is selling the books cheaper than we are," then "Apple has the right to sell them at the lower price too."  AF ¶ 247.  This shows that Mr. Jobs understood that Amazon may well have decided to stay on a wholesale model with $9.99 prices, and it protected Apple against just such an event.

*Third*, the clip of Mr. Jobs's comments to Mr. Mossberg (Compl. ¶ 77), is incomplete and edited.  But Mr. Jobs's telling Mr. Mossberg that prices of e-books on the iBookstore would be the same as Apple's competitors simply confirms the evidence that the MFN was intended to ensure that e-books on the Apple platform were available at the lowest price that the consumer could find them on any other platform.  When Mr. Jobs told Mr. Mossberg that the price would be the same, he could not say what the price would actually be, but he knew that because of the MFN, Apple's price would be the same as the lowest price offered on Amazon or anywhere else.

It is striking to compare Mr. Jobs's statements with the way Amazon's internal documents described the MFN contained in its own agency agreements.  For example, Mr. Jobs said that the prices would all be the same for the Ted Kennedy biography.  AF ¶ 249.  Similarly,

Amazon's executives stated that, through its MFN, Amazon could be assured that its "e-books [would] be available at the same price anywhere that a consumer may see them."  AF ¶ 206. Steve Jobs and Amazon both understood that once the publishers were given pricing authority under an agency model, price caps and an MFN were necessary in order for the retailers to remain competitive.

> 5.    Evidence Of Amazon's Voluntary Move To Agency Renders Plaintiffs'
>        Theory A Chronological Fiction

Apple bears *no burden* to disprove plaintiffs' speculative theory.  *See Euromodas*, 368 F.3d at 18.  As discussed above, plaintiffs' evidence does not "tend[] to exclude the possibility that [the defendants] were acting independently," and plaintiffs' claims against Apple therefore fail.  *Monsanto*, 465 U.S. at 764.  Nevertheless, Apple submits separate evidence disproving plaintiffs' false assumptions and unproven allegations.

The evidence proves that plaintiffs' theory is a chronological fiction.  Plaintiffs' story is that Apple "facilitated" an ongoing, long-term conspiracy when it negotiated its agency agreements with the publishers.  Plaintiffs contend that Apple's MFN forced the publishers to confront Amazon en masse and demand it adopt the agency model.  According to plaintiffs, Amazon "capitulated" and "had no choice but to accept the agency model."  Compl. ¶ 84.  The evidence does not support this story.

*First*, Amazon engaged in parallel discussions with the publishers regarding agency in January 2010 while contentious publisher negotiations were ongoing.  AF ¶ 176–89.  Before completion of the first Apple agreement, Amazon learned that Apple was negotiating its agency terms with the major publishers to open a competing e-bookstore on its rumored and hotly anticipated new tablet.  AF ¶ 174.  Immediately, Amazon independently and voluntarily entered into its own private discussions with the publishers.  AF ¶ 176.  Agency was familiar to Amazon;

on January 20, 2010, Amazon announced a revision to its self-publication program which provided agency-like terms, a 30 percent commission, a price cap, and a retail-price MFN—terms strikingly similar to those challenged by plaintiffs in this case.  AF ¶ 175.

There was no Apple MFN in place at the time Amazon commenced discussions with the publishers.  AF ¶¶ 176–89.  Nor was there any reason to know that there would be.  It was hardly a foregone conclusion that Apple would reach an agreement with the publishers at that point, much less one with an MFN.  Apple's negotiations with the publishers were difficult and at times contentious, with publishers strongly resisting Apple's proposed MFN.  AF ¶¶ 119, 123, 127, 138.  Nor can the negotiations be labeled a confrontation en masse when, for example, HarperCollins tried to strike an exclusive deal with Amazon in these negotiations.  AF ¶ 179.

Amazon understood—from its own, independent and parallel discussions with publishers, no less—that it had to contend with Apple entering the e-books market with an eagerly anticipated tablet device (the iPad) that would have first-to-market, ready access to all new releases.  AF ¶ 199.  At the same time, Amazon would be operating under a wholesale model that was increasingly subject to windowing.  AF ¶ 199.  Amazon's response was to make the rational decision to adopt agency, and use its considerable bargaining power to negotiate favorable terms, including ███████████████████████████—hardly an act of a party being forced into an unfavorable agreement.  AF ¶ 200.  Agency would (and did) permit Amazon to compete with Apple by giving it access to all new releases and a ████ commission— a term it had already contemplated the year before.  AF ¶ 202.  The only "coercive" force in play was the prospect of increased competition, which the antitrust laws were designed to foster.

*Second*, Amazon hardly "capitulated" to the collective will of the publishers.  Instead, it insisted on terms that were more favorable than those contained in the Apple agency agreements.

Amazon demanded and received not only a ███ agency commission, ████████████ and a prohibition against windowing, but also a retail-price MFN that ████████████ ████████████████ AF ¶¶ 204–16.  Plaintiffs do not—and  cannot—explain how Amazon, a party that was allegedly "forced" to agency, nevertheless obtained terms equal to or *better* than those of Apple, the alleged co-conspirator.

*Finally*, Amazon itself does not support plaintiffs' theory.  Amazon's contemporaneous documents reveal that Amazon's move to agency had absolutely nothing to do with Apple's MFN.  AF ¶¶ 190–95.  Amazon was aware that the market was changing and that agency could very well emerge as the model preferred by publishers over the traditional wholesale model, which had prevailed for physical books.  Ultimately, Amazon recognized that it faced a choice between wholesale with windowing and agency.  AF ¶ 199–200.  And given that choice, it had been able to "Jedi Mind Trick" the publishers (AF ¶¶ 192–93) into agency terms that were acceptable to it.  Amazon explained in negotiations with an independent publisher that it, not the major publishers, had the stronger bargaining position and could extract onerous terms from those publishers, such as its own MFN.  AF ¶¶ 200, 210.  Amazon itself did not believe it "capitulated" or was forced to do anything; there is no reason why this Court should disagree.

## II.   Plaintiffs Cannot Demonstrate An Unreasonable Restraint Of Trade

In no circumstance can plaintiffs show an unreasonable restraint of trade.

### A.   The Rule Of Reason, Not The Per Se Rule, Applies Here

Plaintiffs' insistence that this is a straightforward "price-fixing" case subject to the *per se* rule is simply incorrect.  Apple did not agree with any competitor to "fix" prices or require any publisher to charge a particular price.  To the contrary, Apple has placed a ceiling on new release

e-book prices, a category of conduct that is subject to the rule of reason.[7] *State Oil Co. v. Khan*, 522 U.S. 3, 22 (1997).[8] The Supreme Court has stated that "a departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than upon formalistic line drawing." *Leegin*, 551 U.S. at 887 (quotation marks and ellipsis omitted). The *per se* rule is reserved for practices that have "manifestly anticompetitive" effects and that "lack ... any redeeming virtue." *Id.* at 886 (quotation marks and ellipsis omitted).

It is not "immediately obvious" (*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008)), that entry into a market via the agency model, MFNs, and price caps is manifestly anticompetitive. Agency is perfectly lawful, while price caps and MFNs are subject to the rule of reason.[9] Put succinctly, "[i]t is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context ...) to per se treatment under antitrust law." *In re Sulfuric Acid*, 703 F.3d at 1011; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 93 (D.C. Cir. 2001) (*per se* rule inapplicable in dynamic markets as trade restraints "in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the *per se* rule as originally conceived").

Nor can it seriously be contended that Apple's entry with the iBookstore lacked any redeeming virtue. Entry has brought competition to a market previously dominated by a single (Amazon Kindle) brand. AF ¶ 287. Entry has brought millions of consumers into the market. AF ¶ 279. Entry has brought innovations and improvements in the quality of the e-reading experience. AF ¶¶ 253–55. Entry has brought the market higher output, with hundreds of

---

[7]   The price caps are imposed within a principal-agent relationship that is not a "contract, combination, or conspiracy" under section 1, however. *See* footnote 3, *supra*.

[8]   When price caps are allegedly used to effectuate *per se* unlawful arrangements, the rule of reason must still be employed. *Khan*, 522 U.S. at 17.

[9]   *See Khan*, 522 U.S. at 22; *Blue Cross*, 65 F.3d at 1415 (MFNs are "not price fixing").

millions of e-books bought (or downloaded for free) from the iBookstore alone.  AF ¶ 279.
These (and more) benefits stem from entry, which is a consequence of the challenged agency
contract provisions.  Plaintiffs have not shown—and their experts have not disputed—that Apple
would not have entered absent agency.  Prof. Baker, for example, assumed that Apple would not
have entered the market without agency when he constructed his but-for world.  AF ¶ 293.  To
wield the *per se* rule and automatically condemn entry—an act that is "essential to a dynamic
economy" (*Leegin*, 551 U.S. at 891)—would be little short of perverse.  *See In re Sulfuric Acid*,
703 F.3d at 1010–11.  This Court must therefore reject a *per se* analysis in this case.[10]

### B.    Under The Rule Of Reason, Plaintiffs Cannot Establish A Section 1 Violation

Plaintiffs cannot show that Apple, a company concededly lacking any market power in
the relevant market (AF ¶ 294), unreasonably restrained trade.  *Gatt Commc'ns v. PMC Assocs.,
L.L.C.*, 711 F.3d 68, 73 n.8 (2d Cir. 2013) (generally describing rule of reason, including
importance of market power factor).  "In its design and function the rule distinguishes between
restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating
competition that are in the consumer's best interest."  *Leegin*, 551 U.S. at 886.

In this case, the agency model undeniably stimulated competition.  The "antitrust laws
are designed primarily to protect interbrand competition, from which lower prices can later
result."  *Leegin*, 551 U.S. at 895. Vigorous interbrand competition spurred by Apple's entry on
agency led Amazon, which continued to use the wholesale model to sell Random House and
independent publisher titles (adding up to more than half the market), to lose considerable

---

[10]    Nor is "quick look" analysis appropriate, which the Supreme Court has "applied … to business
activities that are so plainly anticompetitive that courts need undertake only a cursory examination before
imposing antitrust liability."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.3 (2006).  But "[i]f an arrangement
'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on
competition,' more than a 'quick look' is required."  *Major League Baseball*, 542 F.3d at 318 (quoting
*Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999)).  Thus, "for the same reasons that *per se* liability is
unwarranted here," Apple cannot be held liable under the quick look doctrine.  *Texaco*, 547 U.S. at 7 n.3.

market share in favor of agency distributors, as consumers voted with their wallets.  AF ¶ 287.

Consumers benefitted from this competition as Amazon vied for independent publishers on the

wholesale model while Apple signed them up under agency terms, and while both enlisted an

army of new self-publishers in the market on attractive agency terms (in Amazon's case, under

the Kindle Digital program).  AF ¶¶ 175, 257.  All this and more stimulated continued explosive

growth in titles, catalogues, and sales.  AF ¶¶ 279–80.

Plaintiffs thus necessarily fail to carry their *initial* burden under the rule of reason, which

entails "showing that the challenged action has had an actual adverse effect on *competition as a*

*whole in the relevant market*."  *Capital Imaging*, 996 F.2d at 543 (emphasis added); *see also*

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (same);

*Major League Baseball*, 542 F.3d at 317 (same); *Gatt Commc'ns*, 711 F.3d at 73 n.5 (under rule

of reason, freedom of consumers to buy other brands could alone be fatal to claim alleging bid-

rigging of single brand absent restraint of competition in relevant market generally).  Here,

plaintiffs *ignore* competition as a whole in the relevant market, which, on their own definition,

includes *all* publishers, not just the defendant publishers, and *all* trade e-book titles, not just the

defendants' *New York Times* bestsellers and hardcover new releases.  The latter titles are just

10% of the defendant publishers' sales in the relevant market.  AF ¶ 270.

Apple's entry and the adoption of the agency model affected every corner of the market,

not just this small fraction.  For example, new publishers and especially self-publishers flooded

into the market, attracted by agency terms.  AF ¶ 285.  Plaintiffs' experts have *failed* to prove

that growth slowed here.  AF ¶¶ 281–82; *see Brooke Grp. Ltd. v. Brown & Williamson Tobacco*

*Corp.*, 509 U.S. 209, 233 (1993) (that output allegedly "expanded at a slower rate than it

[otherwise] would have" is a "counter factual proposition" that "is difficult to prove in the best of

circumstances"). Market growth continued at a torrential flow. AF ¶¶ 279–80, 285–90.

Given this vast expansion of output, it is not surprising that *price dropped in the relevant market after agency*. AF ¶ 268. Six out of seven of the witnesses designated as experts in this case affirm that average market prices were lower after agency than before (the seventh offers nothing more than self-serving speculation). AF ¶¶ 268–72, 295. Plaintiffs' core allegation in this case—that "Defendants' agreement and conspiracy has had and will continue to have" the effect of "[i]ncreasing the retail prices of trade e-books" (Compl. ¶102a)—is simply *untrue*. If plaintiffs' new plan is to concede this fact while claiming that prices would have fallen even more but-for agency, they are equally out of luck. Despite having the most comprehensive database of e-book market statistics ever assembled, they (and their experts) have no shred of admissible empirical evidence that even remotely substantiates such speculation.[11] AF ¶ 295; *In re Sulfuric Acid*, 703 F.3d at 1012 ("The plaintiffs' claim that the price would have been even lower without the [challenged price-raising] agreements is doubtful, as we have said, because without the agreements the [defendants] might not have entered the U.S. market").

Plaintiffs argue that the average prices of the defendant publishers' new release titles rose after agency, but "prices can be increased in the course of promoting procompetitive effects." *Leegin*, 551 U.S. at 895–96. And as noted above, these titles were only a fraction of the relevant market, as confirmed by the overall fall in market prices. At all times, consumers had access to ample and ever-increasing numbers of substitute products in the relevant market at prices of $9.99 or less. AF ¶ 271. Just months after the introduction of agency, Amazon announced that "over 510,000 of [its 630,000] books are $9.99 or less, including 75 *New York Times* Best

---

[11]   The DOJ has not hesitated in the past to conclude that an "overall decrease" in market prices is "inconsistent" with an "MFN causing significantly higher" prices, even while acknowledging that "many factors could have influenced this [market price] decrease." U.S. Dep't of Justice, Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of the Orbitz Investigation 2–3 (July 31, 2003), *available at*  http://www.justice.gov/atr/public/press_releases/2003/201208.pdf.

Sellers."[12]  Apple too offered over 75% of its catalog at the same prices.  AF ¶ 271.

Unsurprisingly, Plaintiffs seek to flee from the reality that every critical indicator of market health—lower price, higher output, more selection, higher quality, lower concentration—signals that the trade e-books market has been thriving since agency and consumers have been reaping the benefits.  AF ¶ 290.  But when contracts are challenged under the rule of reason and there is "no showing that the market as a whole has been affected at all by the contract[s]," section 1 has not been violated.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984).

*          *          *

 "It is an abuse of the antitrust laws to invoke them to stifle nascent competition."  *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1256 (7th Cir. 1995).  A finding that Apple's conduct violates the rule of reason, despite Apple's expansion of retail competition and the explosion in market growth that it brought about, would permit plaintiffs to do just that.  This court should avoid such a perverse and erroneous result.

## CONCLUSION

The Court should order judgment for Apple.

---

[12]   Press Release, Amazon.com, Kindle Device Unit Sales Accelerate Each Month in Second Quarter; New $189 Price Results in Tipping Point for Growth (July 19, 2010), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1449176&highlight=.

Dated: April 26, 2013

Respectfully submitted,

By:

Orin Snyder
Lisa H. Rubin
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166
(212) 351-4000
osnyder@gibsondunn.com
lrubin@gibsondunn.com

Daniel S. Floyd (*Pro Hac Vice*)
Daniel G. Swanson (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
dfloyd@gibsondunn.com
dswanson@gibsondunn.com

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple Inc.*

41

# APPENDIX A

Cases holding that evidence of the defendant's independent business interest precludes a finding of conspiracy:

## Court of Appeals Cases

*Am. Chiropractic Ass'n Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 226–27 (4th Cir. 2004)
- Finding no conspiracy where evidence in record showed actions were "appropriate and reasonable" and independent;

*Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 981–82 (9th Cir. 1988)
- Affirming summary judgment where defendants "presented evidence of facially valid institutional and business reasons for its decision";

*Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1232–33 (3d Cir. 1988)
- Affirming summary judgment where defendants' actions were in their own economic interests;

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.2d 896, 908 (6th Cir. 2009)
- Dismissing conspiracy allegations where "each defendant had a reasonable, independent economic interest" in its actions;

*Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488 (D.C. Cir. 1984)
- Holding that if a defendant "offer[s] an innocent explanation of the questioned conduct" and it "is plausible and more logical than a theory of concerted action, then a conspiracy may not be found";

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *15 (4th Cir. 1999) (per curiam)
- Affirming grant of summary judgment where evidence was equally consistent with decisions that "were independent or were made for legitimate business reasons";

*Miles Distribs. Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 450 (7th Cir. 2007)
- Affirming grant of summary judgment where defendants' actions were "as consistent with permissible competition as with a conspiracy";

*Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1457–58 (11th Cir. 1991)
- Affirming summary judgment where "record amply supports the procompetitive reasons" defendant offered for its actions;

*Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169–70 (6th Cir. 1995)
- Affirming grant of summary judgment where defendants' conduct was based on

"legitimate interest" and where "[p]laintiff's expert evidence [was] equally consistent with independent action as it [was] with conspiracy";

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1306–07 (11th Cir. 2003)
- Affirming grant of summary judgment where defendants' conduct was "readily explained as economically rational, self-interested responses" and where plaintiffs conceded that defendants' conduct "was an exceptionally competitive move".

<u>S.D.N.Y. Cases</u>

*Alpha Lyracom Space Commc'ns, Inc. v. Comsat Corp.*, 968 F. Supp. 876, 894 (S.D.N.Y. 1996)
- Finding no conspiracy despite parallel refusals and evidence that a joint venture met on numerous occasions where defendant presented "ample evidence" of independent business reasons;

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995)
- Finding no conspiracy where challenged actions "could equally have been prompted by lawful, independent goals";

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 U.S. Dist. LEXIS 504, at *36 (S.D.N.Y. Jan. 9, 2007)
- Finding no conspiracy where evidence showed defendants exercised "their independent business judgment";

*Reborn Enters. Inc. v. Fine Child, Inc.*, 590 F. Supp. 1423, 1442 (S.D.N.Y. 1984)
- "[I]f the decision ... was solely based on legitimate business reasons ... then plaintiff's claim must be dismissed" (quotation marks and brackets omitted);

*Sample, Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 501–03 (S.D.N.Y. 1989)
- Finding no conspiracy where defendant's actions were consistent with "legitimate business concerns";

*U.S. Info Sys. v. IBEW Local Union No. 3*, 2007 U.S. Dist. LEXIS 56229, at *49–50 (S.D.N.Y. Aug. 3, 2007)
- Finding no conspiracy where defendants' conduct was equally consistent with own self-interest.

Other District Court Cases

*Balaklaw v. Lovell*, 822 F. Supp. 892, 902 (N.D.N.Y. 1993)
- Finding no conspiracy where defendants "had a legitimate, business reason" for its conduct;

*Breakdown Servs., Ltd. v. Now Casting, Inc.*, 550 F. Supp. 2d 1123, 1137 (C.D. Cal. 2007)
- Finding no conspiracy where defendant "set forth a plausible and justifiable reason for its conduct that is consistent with proper business practice";

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 2009 WL 7266571, at *1, *10–14 (E.D.N.Y. Oct. 19, 2009) (Report and Recommendation), *adopted in full*, 2010 WL 5390176 (E.D.N.Y. Dec. 22, 2010)
- Finding no conspiracy where defendants had "legitimate business reasons" for its conduct;

*Friedman v. Del. Cnty. Mem'l Hosp.*, 672 F. Supp. 171, 188 (E.D. Pa. 1987)
- Finding no conspiracy where defendant "had legitimate business justifications" for its conduct;

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007)
- Dismissing antitrust conspiracy allegations where defendants "ha[d] its own independent reasons" for its actions;

*LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 152 (E.D.N.Y. 2010)
- Dismissing antitrust conspiracy allegations where change in market conditions plausibly "instigated independent decisions by defendants" to perform challenged action;

*Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*, 1994 WL 514024, at *2 (N.D. Cal. Sept. 7, 1994), *rev'd in part on other grounds*, 79 F.3d 1153 (9th Cir. 1996) (unpublished)
- Finding no conspiracy where defendants "had sound, legitimate business reasons" for its conduct;

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*, 598 F. Supp. 694, 708 (N.D. Cal. 1984)
- Finding no conspiracy where defendants "submitted overwhelming evidence that their ... practices were undertaken in the exercise of their independent and sound business judgment";

*Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154, at *7 (E.D.N.Y. Sept. 25, 2007)
- Dismissing antitrust conspiracy allegations where plaintiff alleged defendants acted "for business reasons" and to "protect their own profits" (internal brackets omitted);

*Tominaga v. Shepherd*, 682 F. Supp. 1489, 1496 (C.D. Cal. 1988)

- Finding no conspiracy where defendant "raised [a] plausible business justification" for its conduct;

*Wright v. S. Mono Hosp. Dist.*, 631 F. Supp. 1294, 1321 (E.D. Cal. 1986)
- Finding no conspiracy where defendants "c[a]me forth with more than sufficient evidence to establish that their acts benefitted their self interests while at the same time advancing legitimate business decisions".

101494504.41