UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

APPLE INC., *et al.*,

                Defendants.

12 Civ. 2826 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, *et al.*,

                Plaintiffs,

    v.

PENGUIN GROUP (USA) INC., *et al.*,

                Defendants.

12 Civ. 03394 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPLE INC.'S PROPOSED FINDINGS OF FACT

## I.     INTRODUCTION

1.      For centuries, people have captured information and imagination in the printed word.  Books became increasingly available to the modern mass public in the fifteenth century with the invention of movable type and printing technology.  [*See* DX-485.]

2.      The fundamental technology underlying the book has remained the same for hundreds of years: printed words on paper, bound with a cover and spine.  There have been innovations in the manufacture (*e.g.*, improved printing technology) and distribution (*e.g.*, Internet sales), but a book was a book.  That began to change in 2006 when Sony launched the first major e-reading device tailored to digitized books.  Amazon followed with the Kindle in 2007.  The Sony and Amazon e-readers were both single-purpose, black-and-white devices, operated with buttons, and with access to limited proprietary e-bookstores.  But for the first time, readers could download and store hundreds of e-books in a single device.

3.      Just three years later, in 2010, Apple launched the iPad, a personal "tablet" computer offering an e-reading platform with several new features, including vivid color and a touchscreen.  Unlike the single-purpose, black-and-white e-readers, Apple's iPad and iBooks software allowed interactivity with the written word in unprecedented ways and transformed the reading experience.  Apple's iBooks software created an unmatched aesthetic e-reading experience, with pages that "curl" when the reader "turns" them and customizable features like text size and paper color.  The software's interactive features allow a reader to look up words and concepts in dictionaries and online encyclopedias, accessible from the e-book itself with a simple tap of the screen.  [*See* PX-0365.]

## II.    APPLE'S BACKGROUND AND CONTENT BUSINESSES

4.    Apple is a technology company that manufactures and markets innovative hardware, including mobile communication and media devices (iPhone and iPad), personal computers (Mac), and portable digital music players (iPod).  It also sells state-of-the-art software (*e.g.*, the iOS X operating systems, iCloud, iPhoto, iAd, and Siri).   Innovation is part of the Apple brand.  [*See* Cue Decl. ¶ 5.]

5.    Apple was incorporated in California in 1977.  Today, Apple is a multinational company that employs more than 75,000 people around the world.  Apple sells its products and services in more than 150 countries and through more than 204,000 points of sale worldwide.

6.    Apple sells and delivers digital content (*e.g.*, music, television shows, movies, interactive games, e-books) to its consumers through its digital content stores, including the iTunes Store, App Store, and iBookstore.

7.    The development of Apple's other content businesses provide important context for Apple's conduct in pursuing its iBookstore, because Apple's approach to content is consistent across industries.

### iTunes Store

8.    Apple launched its iTunes Store in 2003, and helped transform the way consumers purchased music.  [*See* Cue Decl. ¶ 17.]

9.    Apple has always used a "wholesale" pricing model to purchase content from media providers for its iTunes store.  In this wholesale model, content providers sell Apple content—music, movies, television shows—for a specific, discount price, and Apple can then offer the content to consumers at whatever price it wishes.

10.     Apple negotiated with major record labels to obtain rights to the most popular music content before iTunes launched.  [Cue Decl. ¶ 17.]

11.     iTunes had several key features at launch, including (1) a simple, maximum pricing structure (all singles sold for $0.99); (2) digital prices that were generally lower than their physical counterparts—which, at the time, were usually CDs; (3) a simple royalty structure where Apple received roughly 30% of the retail price on each sale, which resulted in a single-digit margin for Apple; (4) a comprehensive catalogue that included content from the major record labels; and (5) similar terms across all content providers.  [Cue Decl. ¶ 17.]

12.     These features made iTunes an overnight sensation.  The legal digital music industry was in its infancy at the time Apple launched iTunes.  iTunes played a critical role in the transformation of the music industry from CDs to digital.  Consumers have purchased and downloaded more than 25 billion songs from iTunes.  And, today iTunes also sells movies and television shows.  [Cue Decl. ¶¶ 17-18.]

**<u>App Store</u>**

13.     Apple launched its App Store in 2008, essentially creating a new digital market. [Cue Decl. ¶ 16.]

14.     The App Store has always operated under an agency pricing model with app developers.  The app developer creates an "app"—a piece of software that allows consumers to, for example, play a game or make a restaurant reservation—and sets the consumer price (from zero to $999.99).  Apple collects a 30% agency commission on each sale.  [Cue Decl. ¶ 19.]

15.     Like iTunes, Apple launched its App Store with several key features: simplified pricing, with limited retail price points ending in $0.99, and standard, uniform contracts across developers.  [Cue Decl. ¶ 19.]

16.     The App Store has been a runaway commercial success.  Consumers downloaded

10 million apps in the week after the App Store opened, and the App Store has continued to

experience phenomenal growth since then.  Consumers have downloaded over 40 billion apps to

date, and the App Store has over 500 million active accounts.  [Cue Decl. ¶ 20.]

**Apple's Established Core Business Principles for Digital Content Stores**

17.     Apple has developed and maintains several core business principles and strategies

for selling digital content that it believes are essential to building a successful digital content

business.  [Cue Decl. ¶¶ 8-14.]

18.     **Broad content selection.**  Apple seeks to offer as broad a catalogue of content as

possible to ensure that Apple's consumers can find what they are looking for.  Apple seeks

content from all major content providers.  It is important to Apple to have the digital version at

the same time content providers release the physical version.  For example, Apple pushes for the

digital version of a CD to be available at the same time as the physical version.  Apple does not

want its customers to see any digital market as inferior, or offering less, than the physical market.

[Cue Decl. ¶¶ 10-11.]

19.     **Simple, competitive pricing.**  Apple believes that it cannot run a successful

digital content store unless it has competitive pricing in two respects.  First, Apple's content

prices must be competitive with the prices other digital content retailers offer.  Second, digital

content has to be priced significantly less than its physical counterpart.  [Cue Decl. ¶ 12.]

20.     Apple believes that lower prices for digital content are especially important in

new and emerging digital markets.  Consumers who are not familiar with the benefits of digital

content need incentives to convert to a digital format.  [Cue Decl. ¶ 12; Moerer Decl. ¶ 22.]

Apple has also found that consumers respond to simple prices and favors having only a few different pricing options for content.  [Cue Decl. ¶ 12.]

21. **Opportunity to make a profit.**  In its content businesses, Apple strives for sufficient gross margins—roughly around 30%—in order to make a single-digit profit margin. [Cue Decl. ¶ 13.]

22. **Same material terms and a level playing field.**  Apple offers all content providers (large or small) the same or similar business terms to allow them to compete and innovate on a level playing field.  Apple does not favor any content partner over another.  For example, it does not allow content providers to buy Apple's marketing or promotion, which would favor larger providers.  [Cue Decl. ¶ 14.]   Apple believes that healthy competition results from promoting quality and value across its content providers.  [*See* Cue Decl. ¶ 14.]

## III.    MODERN BOOK INDUSTRY BACKGROUND

23. Large online-only retailers began selling books on their websites to the mass public in the mid-1990s.  Jeff Bezos founded Amazon.com in 1994 as an online print book seller; it since has expanded into an e-commerce giant and the self-proclaimed "earth's largest bookstore," selling just about everything.  [*See* DX-483; DX-411.]  "Books are big business.  Around the world, people spent $108 billion (USD) on books in 2009."  [DX-402.]  Amazon has experienced explosive growth; garnered revenues grew from $150 million in 1997, to $3.9 billion in 2002, to $61 billion in 2012.  [DX-483.]

24. E-book online retailers are a recent phenomenon.  [DX-484.]  Sony launched the first major e-reading device tailored to digitized books in 2006.  Amazon followed with the Amazon Kindle in 2007, Barnes & Noble Nook released the NOOK in 2009, and Apple launched its iPad in 2010.  [DX-482.]

25.    In 2009, six large publishers accounted for over half of all physical and digital books:  Random House, Penguin, Simon & Schuster, HarperCollins, Macmillan, and Hachette.  [DX-079.]

- **Random House**, led by CEO Markus Dohle, is the biggest trade publisher in the world.  It sells more than 400 million books worldwide.  Random House has published more than 50 Nobel Prize laureates, over 100 Pulitzer Prize winners, and widely-read and beloved authors from John Updike to Julia Child.

- **Penguin**, led by CEO David Shanks, is one of the largest English-language trade book publishers in the world.  [DX-540.]  Penguin includes a portfolio of publishing brands, such as DK, Puffin, Ladybird, Putnam, Berkley, Viking, and Hamish Hamilton.  [DX-543.]  In 2012, Penguin (international) reported sales of $1,673 million.  [DX-540.]  Penguin titles include *Dutton's No Easy Day: The Firsthand Account of the Mission That Killed Osama bin Laden* by Mark Owen and Kevin Maurer, *Outliers* and *Blink* by Malcolm Gladwell, *Freakonomics* and *Superfreakonomics* by Stephen J. Dubner, *Too Big to* Fail by Andrew Ross Sorkin, and *Animal Farm* by George Orwell.  [DX-542; DX-540.]

- **Simon & Schuster**, led by CEO and President Carolyn Reidy, is a subsidiary of CBS Corporation ("CBS").  In 2012, it had 317 titles on the New York Times bestseller list, including thirty-five #1 bestsellers.  Simon & Schuster's titles include *Team of Rivals* by Doris Kearns Goodwin, *The Wind through the Keyhold* by Stephen King, *My Year in Meals* by Rachael Ray, and *The Perks of Being a Wallflower* by Stephen Chbosdy.  [Reidy Decl. ¶¶ 1, 3.]

- **HarperCollins**, led by CEO Brian Murray, is a subsidiary of News Corporation ("News Corp").  It was the first publishing house to digitize its content.  [Murray Decl. ¶¶ 2-3.]  J.R.R. Tolkien is among its authors.

- **Macmillan**, led by CEO John Sargent, consists of a group of publishing companies, which publish around 1,300 titles each year, including from renowned authors like Robert Frost, Norman Mailer, and Jonathan Franzen.  [Sargent Decl. ¶¶ 1, 6.]

- **Hachette**, led by CEO David Young, publishes over a thousand book titles each year, including *New York Times* bestsellers *The Casual Vacancy* by J.K. Rowling and *The Innocent* by David Baldacci.  [Young Decl. ¶¶ 1, 5.]

## IV.    APPLE CONSIDERS AN E-BOOKSTORE

### Apple's Initial Market Research

26.    Apple's e-book experience was significantly limited before 2010.  Apple did not have its own, dedicated e-bookstore.  There were two ways that consumers could read e-books

on Apple's devices, iPhones and iPods, through third party software: (1) some book publishers

sold apps for individual books, and (2) e-book retailers offered apps in Apple's App Store.  [Cue

Decl. ¶ 23; McDonald Decl. ¶ 15.]  Apple also operated a limited audio book business on iTunes.

[Cue Decl. ¶ 23.]  Apple's market share of U.S. e-book sales was 0%.  [DX-436.]

27.     Apple began to consider building and launching an e-bookstore in 2009.

[McDonald Decl. ¶¶ 12-13; *see* Cue Decl. ¶¶ 24-27; *see* DX-25.]  In early 2009, Eddy Cue's

team began to evaluate the e-books market.  [Moerer Decl. ¶ 6; McDonald Decl. ¶ 12.]   Eddy

Cue was Apple's then-vice president of Internet services and software.  Keith Moerer and Robert

McDonald researched information that would be helpful for Apple's management team to

evaluate the market opportunity for Apple.  McDonald evaluated, in broad strokes, what an

Apple e-bookstore would look like for the Apple devices on which consumers could read e-

books at that time—the iPhone and iPod touch.  The team did not forecast a detailed financial

picture of any potential Apple e-bookstore, such as return on investment, revenue projections, or

estimated costs.  [McDonald Decl. ¶ 12.]

28.     Mr. McDonald first presented his analyses of Apple's potential e-bookstore to

Eddy Cue, Keith Moerer, and Pat Fitzgerald (who reported to Mr. Cue) in the first quarter of

2009.  Mr. McDonald told Apple's managers that the then-new and relatively small digital book

business would likely continue to grow.  [McDonald Decl. ¶ 13.]

29.     Steve Jobs, Apple's CEO at the time, had some reservations about launching an e-

bookstore.  Mr. Jobs did not think that reading e-books on the Apple devices then-available—

iPod, iPod Touch, iPhone, or Mac—could provide consumers with the best possible e-reading

and e-book purchasing experience.  [Cue Decl. ¶ 24.]  He did not approve going forward, and

Apple shelved the project.

8

30.     Nevertheless, Eddy Cue continued to believe that there was real potential for an Apple e-bookstore.  His team continued to evaluate the e-books business throughout 2009. Apple's research revealed that e-books represented only $100 million in a $14 billion consumer trade books business. [Cue Decl. ¶ 25; McDonald Decl. ¶ 16; DX-025.]  E-book sales represented 4 to 5% of all book revenues in 2009, up from less than 1%. Apple, and specifically Rob McDonald, predicted that the e-books market could easily be a $1 billion market in 2010. [McDonald Decl. ¶ 16; DX-051.]

31.     Apple was secretly developing the iPad in 2009.  Apple believed that the iPad could be a transformative consumer device.  It would have a 10-inch, backlit and color screen that consumers could navigate through touch.  As an e-reader, it would be able to display not only e-book text, but also book illustrations and photographs.  [Cue Decl. ¶ 26.]

32.     Mr. Cue raised the possibility of launching an e-bookstore with Mr. Jobs again in November 2009.  Mr. Jobs agreed that the iPad combined with Apple's e-books software could provide a better e-reading experience than anything available to consumers at the time.  Mr. Jobs told Mr. Cue to pursue a dedicated Apple e-bookstore, but instructed him to negotiate deals with major book publishers that followed Apple's established content strategies: (1) a broad selection of content, (2) competitive prices—lower than physical book prices and competitive with other e-book retailers, (3) each sale must generate a single-digit profit net margin for Apple, and (4) an offer of the same basic terms to all e-book providers.  [Cue Decl. ¶ 28.]

**Apple's Decision to Pursue an E-Bookstore**

33.     Apple wanted to announce and demonstrate an e-bookstore when Mr. Jobs unveiled the iPad on January 27, 2010.   Because the iPad was unlike any consumer device in the market at the time, Apple anticipated a large, worldwide audience on that date.  Apple believed

that announcing an e-bookstore to this audience would ensure that it would have broad consumer exposure. [Cue Decl. ¶ 29.]

34. Mr. Cue and his team had approximately two months before the January 27th deadline to acquire content and create an e-bookstore. [Cue Decl. ¶¶ 29-30.] Because of these time constraints, Apple focused on obtaining trade e-books rather than textbooks or other specialty books. [Cue Decl. ¶ 30.]

35. With Mr. Jobs' blessing, Mr. Cue and his team set about further educating themselves on the e-books market, taking into account what they had learned as they had watched the market over the past year, keeping an eye on the press, and speaking to the book industry's major publishers.

36. Apple made its decision to pursue an e-bookstore independently.

## V.    E-BOOKS MARKET 2009: A NEW MARKET IN FLUX

### The E-Book and E-Reader Markets in General

37. The Department of Justice ("DOJ") defines the alleged relevant market as "trade e-books" (DOJ Compl. ¶ 99) or "general interest fiction and non-fiction" e-books (DOJ Compl. ¶ 27). The states define the alleged relevant market as "the market for the sale of e-books" in the United States. (States Compl. ¶¶ 113-114). Trade e-books include *New York Times* bestsellers—digital versions of books appearing on *New York Times* best seller lists for hardcover fiction, hardcover nonfiction, or advice—and "hardcover new releases"—e-books for which the corresponding hardcover print book has been newly released within the last year. [Burtis Decl. ¶ 11, Tab 2.]

38. The six largest book publishers distributed print and digital books through the "wholesale model" until April 2010. Publishers sold books to retailers at wholesale prices with a

suggested list price, which commonly was about half the book's hardcover list price, and retailers then set the book's price to consumers. [Sargent Decl. ¶ 8; *see, e.g.*, Murray ¶ 5; Young Decl. ¶ 6; Burtis Decl. Tab 2.]  Most hardcover books have a physical list price of $24 to $30. Retailers like Barnes & Noble and Amazon generally paid publishers wholesale prices of $12 to $15 for both these hardcovers and the corresponding e-books.

39.     Through 2009, Amazon dominated the e-books retail market, selling nearly 90% of all e-books.  [Burtis Decl. ¶ 52; DX-536.]  In October 2009, Barnes & Noble introduced the NOOK, offering some limited competition to Amazon.

40.     The handful of e-readers in the market at the end of 2009 displayed only black-and-white text and were not multi-purpose—that is, they were used solely to read e-books. Amazon's Kindle had a 3.6-by-4.8-inch screen [Cue Decl. ¶ 26.], and readers turned a page by pressing a button.  Indeed, developers at this time sought to make these devices as close to a plain, print experience as possible.

41.     Apple offered a few individual e-book apps in its App Store in 2009.  But Apple thought that selling e-books as individual apps was not a scalable option for publishers because the app cost the publishers more to create than a single e-book.  In addition, the App Store's organization and display would make it difficult for consumers to find, purchase, and maintain book apps on their Apple devices.  [McDonald Decl. ¶ 15; *see* Murray Decl. ¶ 11.]  The App Store did not lend itself well to e-book browsing or discovery.  [McDonald Decl. ¶ 15.]

42.     Despite the few e-book apps in the App Store, Apple itself was not present or competing in the e-books market.  Apple had no "market power," as that term is understood in an economic sense, in the e-books market through 2009.  [Murphy Decl. ¶ 57.]

43.     Amazon sold e-book versions of *New York Times* bestsellers and new releases for
$9.99, absorbing a ███████████ per e-book.  [*See, e.g.*, Moerer Decl. ¶ 6; Sargent Decl. ¶ 9;
Burtis Decl. ¶ 10, 52; DX-003; DX-022; Grandinetti Dep. Tr. at 49:19-21 ("Q. There were titles
that were sold below cost with the 9.99 price?  A. Yes.").]  Amazon strategically priced these
books at a loss to grow its market share.  [*See* DX-002; Grandinetti Dep. Tr. at 78:15-22 ("A. We
had a policy at the time of pricing *New York Times* bestsellers and new releases at 9.99. . .  A.
[O]ur general approach . . . was to set prices . . . to grow the business, to generate profit."]  For
example, in August 2009, Amazon sold a new Pat Conroy title for $9.99 even though the
wholesale cost was ███████ that strategy resulted in a per-book loss for Amazon of █████, and a
total loss of $72,000 during a one-week period.  [*See* DX-033.]  Amazon's strategic pricing and
large e-book catalogue attracted customers to the Kindle ecosystem and gave Amazon a
"leading" market position.  [*See* Grandinetti Dep. Tr. at 139:23-25, 140:2-4, 140:7-8.]  But
Amazon's e-books business was ████████████████████████████████████████████████████
███████████████████████████████████████ [Burtis Decl. ¶ 53.]

44.     As Apple was aware from news reports, by 2009 major publishers and book
retailers were concerned that Amazon's below-cost pricing on certain visible e-books would
create an unworkable precedent that could inalterably damage the market at large and their
respective businesses.  [*See, e.g.*, Cue Decl. ¶ 32; Moerer Decl. ¶ 6; Sargent Decl. ¶¶ 11-15;
Reidy Decl. ¶¶ 7-10; Murray Decl. ¶¶ 6-7; Young Decl. ¶ 8; Horner Decl. ¶¶ 15-16; DX-02.]
Amazon understood that its strategies contributed significantly to the industry's unrest.  [DX-047
(noting the "largest publishers, agents, and authors consistently cite our $9.99 price point for
most new releases as the biggest issue they have with Kindle.  The fact that they know we are
pricing these books below cost today only exacerbates their concerns . . .").]  In the evolving

industry, Amazon recognized that "it is critical we work with publishers to manage through the transition."  [DX-047.]  The publishers' key concerns included the following:

45.    **Devaluation of Creative Content**.  Publishers believed that Amazon's uniform, below-cost pricing of certain e-books devalued some books by treating all as homogenous products.  Amazon's approach ███████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████           [*See, e.g.*, Sargent Decl. ¶ 14; Reidy Decl. ¶ 8; Young Decl. ¶¶ 8, 10-11; DX-047.]  Publishers worried that Amazon's $9.99 e-book price on their most popular e-books would become locked as *the* e-book price in the consumer's mind, and consumers would fiercely resist any subsequent price differentiation.  [*See, e.g.*, Sargent Decl. ¶ 14; Reidy ¶ 8; Young Decl. ¶ 11.]

46.    **Cannibalization of Hardcover Sales**.  Publishers and retailers were concerned that, if $9.99 took permanent hold, it would lead to reduced revenues by undermining sales of more expensive hardcover editions.  *See* Sargent Decl. ¶ 14; Reidy Decl.¶ 8; Young Decl. ¶¶ 10-11; DX-047.]  This would mean lower revenues overall for both retailers and publishers.

47.    **Lower Wholesale Prices**.  Book analysts predicted—and publishers feared—that publishers' increasing dependence on Amazon as the only meaningful e-book retailer, plus a cemented $9.99 e-book price in consumers' minds, would provide Amazon with leverage that would enable it to force publishers to accept unfavorable contract terms, such as lower wholesale prices.  [*See, e.g.*, Moerer ¶ 6; Sargent Decl. ¶ 13; Young Decl. ¶ 14; DX-007 ("[John Sargent] [w]ants to know if our plan is just to come back and ask for more money per book soon."); DX-047 (the publishers "believe that we will ask them to fund the $9.99 price point at some point").] This too would also translate into significantly lower revenues.

48.     **Decreased Competition**.  Publishers believed that Amazon's below-cost pricing impeded growth, innovation, and competition across the new e-books market.   Prospective competitors could not operate on a loss to match Amazon's subsidized below-cost prices.  The handful of other retailers in the market—B&N, Sony, and Kobo—did not provide meaningful competition.  [*See* Naggar Dep. Tr. at 60:12-16 ("Q. Well, who were the competitors that Amazon had in the e-books business [around April 2009]?  A. There was a -- Sony was in the business.  I don't remember precisely who else.  There were a lot of smaller companies in startup mode.")]  By late 2009, Sony (100,000) and B&N (40,000) *combined* had fewer than half the number of titles offered by Amazon (400,000).  [*See* DX-097.]  B&N lost money from the outset and even considered leaving the e-books business altogether.  [*See* Horner Decl. ¶ 15; Burtis Decl. ¶¶ 55-56 (describing how Barnes & Noble's e-books business was not profitable after it started matching Amazon's prices).]

49.     The result of all of these concerns was a fundamental business conflict between the publishers (and authors), as owners of content, and the dominant retailer, Amazon, who was selling the content.  Each publisher discussed these issues with Amazon on a regular basis.  The issues facing each publisher were common across publishers.

**Publisher and Retailer Reactions to the E-Books Market**

50.     Publishers made clear to Amazon that the traditional wholesale model—grafted on from the long-established physical book business—was not working in the developing e-books market.  A Macmillan executive, for example, told Amazon that the publisher believed there were ███████████████████████████████████████████████████████ ██████████████████████████████████████████████  [DX-046.]

51.     The publishers' and retailers' unhappiness with Amazon's pricing strategy was a matter of public record.  Tensions between Amazon and the major book publishers over Amazon's pricing of certain e-books were quickly escalating, and Apple believed that the e-books market was about to change.  [Moerer Decl. ¶¶ 8-10; *see* Cue Decl. ¶¶ 46-47, 49.]  Industry press reported on these events and recognized that the e-books business was on the brink of significant change.  [Moerer Decl. ¶¶ 6-7, 12; DX-043.]

52.     It also was clear to Amazon by December 2009 that ██████████████████ ████████████████████████████████████  [DX-107.]  In response to the instability, major publishers and retailers considered and encouraged various strategies to change—and thereby strengthen the sustainability of—the e-books market.

53.     Between April and June 2009, Barnes & Noble considered entering the e-books business on several possible alternative business models, including (i) "MAP" (minimum advertised price), and (ii) a "revenue sharing" arrangement with a commission for the retailer.  [Horner Decl. ¶ 9.]

54.     Barnes & Noble discussed these alternatives with several publishers, who were receptive to the idea of a new model.  [*See, e.g.,* DX-016 ("Carolyn [Reidy] is very intrigued by the possibility of mandating MAP pricing on eBooks . . . David Shanks [Penguin] was very receptive as well"); DX-014 (Random House "raised MAP as a concept and we said we are receptive to that . . .").]

55.     Barnes & Noble entered the business on the wholesale model in July 2009.  [Horner Decl. ¶ 12.]

56.     According to press reports that Mr. Moerer read, Google also was considering entering the market on terms with publishers that were quite different from Amazon's terms.

According to reports, Google would allow the publishers to charge consumers the same price for an e-book as the corresponding physical book unless the latter's price was "exorbitant." [Moerer Decl. ¶ 9; DX-027.]

57.    **Modification of Current Terms.**  Amazon's e-book executives also began to think about alternatives to the wholesale model.  Amazon proposed to publishers several alternative business structures, including:

- New discounting arrangements and combining digital and physical proposals—which HarperCollins's CEO Brian Murray recognized as Amazon "try[ing] to work something out that was creative." [DX-034.]

- ██████████            —a proposal Macmillan rejected because "there are too many unknowns and complications . . . at this time." [DX-046.]

- In 2009, Amazon also discussed internally a revenue sharing model, where Amazon would receive ████ and the publishers would receive ████ of revenues from the sale of e-books. [DX-278.]

58.    **Raising E-Book Wholesale Prices.**  Several publishers each independently decided to eliminate the existing discount on wholesale prices of e-books, to incentivize Amazon to raise retail e-book prices.  [*See* Reidy Decl. ¶ 12.]  For example, HarperCollins informed Amazon in August 2009 that it was "seriously considering changes to our discount structure and our digital list prices for all retailers." [DX-034.]  Apple knew that some publishers had raised the prices at which they sold e-books to Amazon by 20% in 2009.  [Cue Decl. ¶ 51.]

59.    **Windowing.**  In 2009, publishers began to window certain new release titles— *i.e.*, delay a title's e-book release until sometime (typically 3-6 months) after the title's hardcover book release.  [*See, e.g.*, Cue Decl. ¶ 33; Moerer Decl. ¶ 12; Sargent Decl. ¶¶ 17-19; Young Decl. ¶¶ 18-19.]  Publishers were ███████████████ under their wholesale contracts with Amazon.  [*See* Grandinetti Dep. Tr. at 118:21-23, 119: 2-7 ████████████████████

████████████████████████████████████████

███████████████████████████████████████ The

publishers windowed to discourage Amazon from its uniform, below-cost pricing on popular e-

books and avoid the cannibalization of hardcover sales.

60.     Windowing was not a new concept for books.  For decades, publishers have

windowed the release of paperback books after publishers release an initial hardcover.  [*See*

Young Decl. ¶ 18; Reidy Decl. ¶ 13; Murray ¶ 8.]

61.     Brick-and-mortar booksellers asked publishers to window e-books in 2009 to

address Amazon's below-cost pricing.   This would protect new release hardcover book sales by

delaying availability of the e-book, which could compete with the hardcover version, for several

months.  For example, Barnes & Noble encouraged publisher windowing efforts and threatened

adverse consequences for any publisher who did not window—including that Barnes & Noble

would cease to carry that publisher's physical books in its stores.  [*See, e.g.*, DX-057 (Amazon

learned "there was strong movement within Random House to block e-books because they are

worried about weathering the B&N storm"); *see also* DX-054 (reporting that Random House's

Madeline McIntosh believed that the "the fixation on widowing across all publishers is being

fueled by 'panic' from B&N and Borders.").]

62.     As early as March 2009, **Macmillan's** CEO John Sargent told Amazon that he

was concerned with Amazon's $9.99 pricing and that "if forced to choose between lowering his

digital list price so [Amazon] can make money at $9.99 or not selling a[n] ebook for [the] first 3-

6 months [after the physical book release] then we won't sell [Amazon] the ebook."  [DX-007.]

In December 2009, Macmillan announced that it would delay most of its e-books for about three

months after the release of the hardcover edition.  [Sargent Decl. ¶ 19.]  It would, however,

release "enhanced e-books"—or special edition e-books that would feature extra content, like

author interviews or access to primary documents or maps—simultaneously with the hardcover version.  Because of the added value, Macmillan set list prices for enhanced e-books higher than the list prices for standard e-books, and expected that retailers would sell them for more. [Sargent Decl. ¶ 19.]

63.     **Simon & Schuster** had discussed windowing as early as spring 2009.  [Reidy Decl. ¶ 13.]  It first began windowing e-book releases in the fall of 2009 when it windowed the digital version of Stephen King's *Under the Dome*.  [Reidy Decl. ¶¶ 13-14; *see also* DX-036; DX-039.]  In early December 2009, Simon & Schuster announced plans to delay the e-book versions of 35 new books scheduled for release in hardcover between January and April 2010. [Reidy Decl. ¶ 15.]

64.     In September 2009, **Hachette** began windowing with Senator Edward Kennedy's autobiography, *True Compass*.  [Young Decl. ¶ 19.]

65.     In December 2009, **HarperCollins** announced that beginning in 2010, it would window 5 to 10 e-books each month, with the digital release delayed one to six months after the physical book's release.  [*See* Murray Decl. ¶ 12; DX-536.]

66.     In response to reports in April 2009 that certain publishers were considering windowing, Amazon's CEO Jeff Bezos said in an internal email that windowing would be "an absolute declaration of war," which Amazon would not "tolerate."  [DX-023.]  Amazon emphasized to Random House that "the nuclear nature of windowing, even on a single title" would "force [Amazon] to a very negative response."  [DX-028.]  And Amazon told Simon & Schuster that Amazon's proposals to resolve the publisher's concerns were "only going to happen in the context of no windowing of hardcovers and that even a single one could send us to a very ugly situation."  [DX-029; DX-032.] ███████████████████████

████████████████████████████████████

████████. [DX-118.]

67.    **Agency Model.**  In the second half of 2009, publishers and retailers also considered pursuing an agency model to sell e-books where the publisher would set the price or a price range for each e-book and the retailer, acting as an agent, would receive a commission on each e-book sale.  Some publishers already used the model on a small scale, with the online library Scribd.  [*See*, *e.g.*, Reidy Decl. ¶¶ 16-17; DX-142; Young Decl. ¶¶ 16-17.]

68.    In November and December of 2009, Barnes & Noble approached several major publishers, including Simon & Schuster, HarperCollins, and Hachette, "socializing" an agency model in the hope of finding a way to improve its revenue from e-book sales in the face of Amazon's below-cost pricing.  [*See* Reidy Decl. ¶ 16; Horner Decl. ¶ 17; Young Decl. ¶¶ 16-17; DX-055.]  At this time, publishers were more receptive to Barnes & Noble's suggestions of alternate business models than they were earlier in 2009.  The agency model Barnes & Noble proposed provided that the publisher would set the price of e-books sold on its e-reader, the Nook and, in return for marketing and distribution, Barnes & Noble would receive a commission on each sale.  On December 3, 2009, Barnes & Noble reported that the publishers "don't want their books at 9.99 cannibalizing their profitable physical books business ultimately leading to lower margins for them as Amazon and us come back banging on their door saying we no longer are willing to accept losses."  And it concluded:  "*We need to enable this agency model through our content store and they will happily join.*"  [Horner Decl. ¶¶ 17-18; DX-055.]

69.    These discussions did not result in any immediate agreements to operate on an agency model with Barnes & Noble.  Some publishers, particularly HarperCollins and Hachette, began to seriously consider agency as a business model for selling e-books.  In particular,

HarperCollins envisioned using an agency model to sell enhanced e-books, or e-books that would provide extra value through video, audio, interactivity, and a better technological interface.  [*See* Murray Decl. ¶¶ 9, 11.]  HarperCollins already sold some e-book apps through Apple's App Store and liked the agency model Apple used there.  [*See* Murray Decl. ¶ 11.]  As for Hachette, after a number of internal discussions, it concluded that the agency model to sell e-books would be the best for its overall e-books business.  The agency model would allow Hachette to differentiate e-books based on price and better capture the value of its books.  Hachette also believed the agency model would offer new and existing retailers greater incentives to enter and invest in e-books, e-reading devices, and promotion.  [*See* Young Decl. ¶ 17.]

## VI.    APPLE'S FIRST STEPS IN ENTERING THE E-BOOKS MARKET

### Apple's Initial Discussions with the Six Largest Book Publishers

70.    On or about December 9, 2010, Eddy Cue spoke to two publisher CEOs, Brian Murray, HarperCollins's CEO, and Marcus Dohle, Random House's CEO.  Consistent with what Apple had read in the press, Mr. Murray and Mr. Dohle each told Mr. Cue that he was unhappy with the way Amazon was pricing certain of his most visible e-books.  [Cue Decl. ¶ 37.]

71.    Apple representatives met in New York with representatives from the six largest trade e-book publishers—Hachette, HarperCollins, Macmillan, Penguin, Simon & Schuster, and Random House—on December 15-17, 2009.  [Cue Decl. ¶¶ 38-45; *see* Moerer Decl. ¶¶ 17-22; Saul Decl. ¶ 4.]  Apple chose these publishers because, together, they published well over half of all trade e-books in the United States at the time.  [*See* Cue Decl. ¶ 39.]

72.    Apple approached the six largest publishers to discuss a possible Apple e-bookstore because it wanted to secure the broadest selection of the most popular books.

73.     This was the first time Mr. Cue had met most of these publishers and individuals from these publishers.  Apple had very little experience with book publishing prior to December 2009.  Mr. Cue did not have relationships with the executives of the six major publishing houses, Random House, Simon & Schuster, Penguin, HarperCollins, Hachette, and MacMillan.  [Cue Decl. ¶ 39.]

74.     Apple had not decided to launch an e-bookstore at the time; these meetings were strictly exploratory and educational for Apple.  [Cue Decl. ¶ 38; *see* Reidy ¶ 19; Sargent ¶ 22.]

75.     Mr. Cue told each publisher during these initial meetings that Apple would not accept windowing.   Apple thought that windowing would hurt the e-books market.  [Cue Decl. ¶ 40; *see* Moerer Decl.¶ 21.]  To successfully convert physical book readers to e-book readers, Apple believed that it needed the most visible and popular e-books in its e-bookstore at the time it opened.  [*See* Moerer Decl. ¶ 22; Cue Decl. ¶ 35.]

76.     Apple was at a competitive disadvantage in negotiating compared to retailers who sold both physical and digital books, like Amazon and Barnes & Noble.  [*See* Cue Decl. ¶ 35]

77.     Three publishers, Hachette, HarperCollins, and Simon & Schuster, told Apple that they thought windowing was necessary to protect their e-books businesses.  [Cue Decl. ¶ 40; *see* Moerer Decl. ¶ 22.]  Macmillan was also windowing e-books.  Hachette and Macmillan each confided that they did not think that windowing was a good long-term strategy for e-books.  [Cue Decl. ¶ 40; *see also* Moerer Decl. 22.]  Random House commented that it did not think windowing was a good idea, and it had no plans to window.  Penguin also was not windowing. [Cue Decl. ¶ 40.]

78.     Mr. Cue told each publisher that Apple would not operate any e-bookstore at a loss.  [Cue Decl. ¶ 41; *see* Moerer Decl. ¶ 23; McIntosh Decl. ¶ 10.]  He explained that if Apple

and the publishers contracted on the then-prevalent wholesale model, Apple would need the publishers to lower their wholesale prices to Apple so that Apple had an opportunity to profitably compete with Amazon's retail pricing on popular e-books. [*See* Cue Decl. ¶ 41.]

79.    The publishers also generally told Apple that they thought an Apple e-bookstore would bring innovation to e-books and attract a new audience to the format. [Cue Decl. ¶ 44; *cf.* Reidy Decl. ¶ 23; Sargent Decl. ¶ 24; Murray Decl. ¶ 14; Young Decl. ¶ 22.] The publishers also thought that Apple could provide better sales reporting than Amazon was then willing to provide. This would help the publishers better develop marketing and e-book promotion programs. [Cue Decl. ¶ 43; *see, e.g.*, Reidy Decl. ¶¶ 18, 23.]

80.    Each of the six publishers informed Apple that the e-books market was in conflict and that it believed that Amazon's practice of selling new release e-books and *New York Times Bestsellers* below its cost was hurting its digital business. [Cue Decl. ¶¶ 42, 45; *see, e.g.*, Young Decl. ¶¶ 8, 11; Reidy Decl. ¶¶ 7-11; Murray Decl. ¶¶ 6-8.]

81.    When Apple met with each of Hachette and HarperCollins, both individually brought up an agency model for selling e-books, where the publishers would set e-book prices and pay Apple a percentage commission on each sale for operating the e-bookstore, marketing, and handling consumer transactions. [Cue Decl. ¶ 43; Moerer Decl. ¶ 25; Murray Decl. ¶ 16; Young Decl. ¶ 23.]

### VII.    APPLE FORMULATES ITS E-BOOK TERMS ACCORDING TO ITS DIGITAL CONTENT BUSINESS PRINCIPLES

82.    After meeting with major publishers in December 2009, Apple internally discussed how it could enter the e-books market. [Cue Decl. ¶ 46; *see* Moerer Decl. ¶ 23.] Apple believed the e-book prices and availability were uncertain. There was also very limited retail competition in the market at the time. [Cue Decl. ¶ 47; *see* Sargent Decl. ¶ 10; Young

Decl. ¶ 7; Murray Decl. ¶ 10.]  And Apple believed that it would be disadvantaged in the e-books market because it did not have any experience with pricing e-books, and it did not have a physical book business.  [Cue Decl. ¶ 48.]

83.     Apple also, however, saw its entry and the current market conditions as an opportunity.  Apple saw the market at a crossroads, where, absent entry by a new retail competitor to Amazon, major publishers had similar fundamental concerns about the viability of their e-books businesses.  Each publisher was choosing between windowing or ceding long-term control of the market to Amazon.  [*See* Cue Decl. ¶ 49; Sargent Decl. ¶¶ 13, 18; Reidy Decl. ¶ 13; Young Decl. ¶ 19.]

84.     Apple believed that it could be a major new competitor with a proven record of success in emerging digital content markets.  It also believed it could take advantage of the publisher's concerns to negotiate terms that would favor Apple.  [Cue Decl. ¶ 49-63.]

85.     Apple was in a good position to negotiate business terms that would permit Apple to enter the e-books market without having to incur e-book losses.  Apple did not feel that an e-bookstore was essential to the iPad's success.  The iPad was a new multi-purpose tablet and an important product for Apple.  Apple would launch the iPad without an e-bookstore.  [Cue Decl. ¶ 49.]

**Apple's Original Proposal: January 4-6, 2010**

86.     **Agency Model with 30% Commission.**  Apple initially planned to propose distributing e-books on a wholesale model.   Apple considered asking publishers to sell e-books to Apple at wholesale prices 20 to 25% below their physical book wholesale prices.  [*See* Moerer Decl. ¶ 23; *see* Cue Decl. ¶¶ 36, 41, 51.]  Mr. Cue believed that publishers would not be willing

to lower their digital list prices by 20 to 25%.  Apple also thought that it was a strong possibility that publishers may continue to window e-books.  [Cue Decl. ¶ 52; *see* Moerer Decl. ¶ 23.]

87.     Apple thought that agency could be a good alternate model for its potential e-bookstore.  Agency had helped Apple launch and grow its App Store a few years before, and Apple thought that agency could also help it grow the e-books business while still making a small profit.  [Cue Decl. ¶ 54.]  Because agency set a fixed percentage sales commission for Apple, Apple would receive a small net margin on each e-book sale, no matter where e-book prices settled after Apple's entry.  [Cue Decl. ¶ 54.]

88.     Apple chose a 70/30% agency commission split, where Apple would get a 30% commission on each e-book sale.  This tracked the gross margins across all of its digital content businesses.  [Cue Decl. ¶ 54; Moerer Decl. ¶ 28.]  Based on its digital content experience, Apple believed that it would not lose money and could make a single-digit net profit margin with a 30% commission.  Even if prices were very low, Apple believed that it could make a profit on the resulting high volume as long as it received a 30% commission.  [Cue Decl. ¶ 54; Moerer Decl. ¶ 25; DX-147.]

89.     **Broader Selection: "Day and Date."**  Because Apple was strongly against windowing, it formulated "day and date" language to explicitly prohibit windowing on any Apple e-bookstore.   This would require publishers to give Apple e-books on the same date they released physical books.  [Cue Decl. ¶ 56; *see* Moerer Decl. ¶ 25.]

90.     **Competitive Pricing.**  Under an agency model, publishers would set prices on an Apple e-bookstore.  From Apple's initial meetings with the publishers and from reports in the press, Apple believed that its pricing goals and the major publishers' pricing goals were different.  Apple understood that the major publishers were uneasy with Amazon's below-cost

pricing on their popular e-books because these publishers believed that Amazon's prices did not reflect the value of their e-books.  Apple understood some publishers to believe that e-book prices should equal physical book prices.  The publishers also wanted to protect physical book sales.  [Cue Decl. ¶¶ 57-58; *see* Murray Decl. ¶ 7.]

91.     As a digital retailer only, Apple did not care about physical book pricing.  In line with its digital content principles, Apple only wanted to ensure that (1) e-book prices were lower than physical book prices and (2) Apple's customers received competitive prices on e-books available in the market on Apple's e-bookstore.  [Cue Decl. ¶ 58; *see* Moerer ¶ 40.]  Apple also did not believe that many prices in the 2009 e-books market were the product of price competition.  Instead, they reflected a strategic price set by a dominant retailer.  Apple had no experience with e-books and did now know where prices would move with more competition in the future, but it did not share the publishers' view that $9.99 was a "bad" e-book price.  [Cue Decl. ¶ 58; Moerer Decl. ¶ 41.]

92.     **Price Tiers/Caps.**  To simplify pricing and keep e-book prices generally lower than physical book prices, Apple developed price tiers with caps tied to the wholesale price of a physical book.  [Cue Decl. ¶ 59; Moerer Decl. ¶ 39.]  Specifically, Apple developed different price tiers, starting at $0.99.  Apple's price caps would correspond to a physical book's wholesale price, which was about half of a physical book's retail price to consumers.  [Moerer Decl. ¶ 39.]  Apple would cap the highest price tier for hardcover books with a physical list price under $35 at $12.99.  Apple would cap hardcover books with a physical list price of $35 at $14.99, and the cap would increase in $5 increments for higher list prices.  Publishers would be able to price e-books at any price according to Apple's tiers, but not above the corresponding, maximum price cap.  [Cue Decl. ¶¶ 59-60.]

93.     Apple thought that publishers would find that they could increase revenues by selling more e-books below each maximum price cap.  During later negotiations, and also after opening its e-bookstore, Apple encouraged publishers to price e-books below the caps and experiment with e-book prices.  [Cue Decl. ¶ 60; *see* Moerer Decl. ¶ 41.]

94.     **Initial "All-Agency" Idea.**  Apple wanted to have e-book prices on its e-bookstore be competitive with (as low as) prices in other e-book retailers' stores.  Steve Jobs and Eddy Cue initially believed that this could be accomplished by the publishers' moving all of their other e-book retailers to an agency model.  Mr. Jobs and Mr. Cue thought that publishers would treat Apple the same as their other retailers with regard to at least the most visible e-book prices, new releases and *New York Times* bestsellers.  [Cue Decl. ¶ 61; *see* Moerer Decl. ¶ 26.]

95.     From January 4-6, 2010, Eddy Cue emailed each of the six major publishers' CEOs an outline of Apple's initial proposed agency terms:  An agency model with a 30% commission, price tiers and caps, and Mr. Cue's idea that all of the publishers' other e-book retailers would move to an agency model for new releases.  [Cue Decl. ¶ 63; DX-121; *see* Moerer Decl. ¶ 26.]

**Apple's Initial Draft Agency Agreements: January 11, 2010**

96.     Apple began drafting agency agreements in early January 2010.  On January 11, 2010, Kevin Saul emailed Apple's draft agency agreement to each of the six major publishers' CEOs.  This agreement was the first document that contained all of the business and legal issues necessary to negotiate agency agreements in detail.  [Saul Decl. ¶ 10.]  It contained Apple's core terms that were consistent with its basic digital business principles: (1) agency with a 30% Apple commission; (2) language prohibiting windowing; (3) price tiers and caps setting maximum e-book prices; and (4) Apple's new, new-release "Most Favored Nation" ("MFN") clause, detailed

below.  [Cue Decl. ¶ 75; Moerer Decl. ¶ 37; Saul Decl. ¶ 8; DX-149; DX-150; DX-151; DX-152; DX-153; DX-534.]  The draft agreement became the basis for Apple's detailed negotiations with the six major publishers.  Consistent with Apple's usual digital content business strategy, Apple sent the same draft to all six publishers.  [Saul Decl. ¶ 8; Cue Decl. ¶ 75.]

97.     **Competitive Prices: "Most Favored Nation" Clause.**  After Eddy Cue sent his initial proposal to the major publisher CEOs on January 4-5, 2010, he realized that having the publishers move all of their e-book retailers to an agency model would not in fact address Apple's business need for competitive prices.  Apple thought that Amazon, even if on an agency model, may be able to negotiate for lower e-book prices in an agency model given its dominant presence in the e-books market and as one of the publishers' primary physical book accounts. [Cue Decl. ¶¶ 64-65.]

98.     Kevin Saul, Apple's in-house counsel, was responsible for drafting the terms of Apple's proposed agreements.  In December 2009, he had developed a retail price-lowering MFN as a way to protect Apple's ability to compete on prices.  [Saul Decl. ¶¶ 3, 7.]  The MFN would require a publisher to lower its retail price on Apple's e-bookstore on new releases to match any lower price offered on another retailer's e-bookstore.  [Cue Decl. ¶ 65; Saul Decl. ¶ 3.]  In this way, the MFN would enable Apple to compete with Amazon and other retailers regardless of whether they sold e-books on an agency model, a wholesale model, or under any other pricing arrangement.  [Cue Decl. ¶ 65.]  If other retailers like Amazon had lower prices on particular e-books, Apple would get to lower its price to match on Apple's potential e-bookstore. [Cue Decl. ¶ 65; Saul ¶ 3.]

99.     Apple's intent in creating the MFN was to advance its own, independent and legitimate business goal: offering competitive prices on its e-bookstore for the most visible titles,

where it did not set prices, to its customers.  [Cue Decl. ¶ 65; Saul Decl. ¶¶ 3, 7.]  Offering

uncompetitive prices would likely cost Apple both a potential individual e-book sale and a

customer—a consumer may choose to shop elsewhere if faced with uncompetitive prices when

he or she first visits Apple's e-bookstore.  [Cue Decl. ¶ 35.]  The MFN accomplished this

objective by giving Apple the limited contractual right to lower the price of new release e-books

in the Apple bookstore to match lower prices offered elsewhere.   The MFN would guarantee

that Apple would have the lowest prices for new releases available on its e-bookstore.  [Cue

Decl. ¶ 65; Saul ¶ 3.]   It made Apple indifferent to whether publishers used an agency,

wholesale, or other pricing model with their other retailers.  [Cue Decl. ¶¶ 65-66.]

100.    Apple's January 11, 2010 draft agreements contained the new-release MFN.  The

draft agency agreements contained no provisions addressing other retailers' business models, and

did not dictate how individual publishers should structure their business relationships with them.

[Cue Decl. ¶ 65; Saul Decl. ¶ 9.]

101.    Apple made clear during later negotiations with publishers that it was indifferent

to the pricing models or terms each publisher had with other e-book retailers.  Publishers were

free to remain on a wholesale model with other retailers and sell e-books on Apple's bookstore

through an agency arrangement so long as Apple had a satisfactory MFN.  [Cue Decl. ¶¶ 67-71;

Moerer Decl. ¶¶ 30-31; see Saul Decl. ¶¶ 9, 13.]

102.    Keith Moerer spoke with Madeline McIntosh, an executive at Random House,

before Apple sent a draft agreement.  Ms. McIntosh asked Mr. Moerer about a number of

business plans Random House was considering, one of which was to do business with Apple on

an agency model and keep other retailers like Amazon on a wholesale model without

windowing.  Mr. Moerer emailed the question to Eddy Cue.   Mr. Cue responded that Apple did

not care which model a publisher used with other retailers.  Apple's only concern was with

Apple's e-bookstore prices.  Mr. Moerer then conveyed that message back to Random House.

As a result, if Random House signed an agency deal with Apple—and Amazon continued its

retail pricing strategy—Random House new releases would sell for $9.99 on Apple's e-

bookstore.  [*See* Cue Decl. ¶ 68; Moerer Decl. ¶ 33; McIntosh Decl. ¶¶ 12-13; DX-140; DX-

169.]

103.    Apple also explained its MFN to Macmillan on January 20, 2010.  Apple

explained to Macmillan that Apple's MFN required Macmillan to match the lowest new release

e-book price on another retailer, regardless of the pricing model or business terms Macmillan

had with that other retailer.   [Cue Decl. ¶ 69; Saul Decl. ¶ 13; Sargent Decl. ¶ 30; DX-205.]  In

addition, HarperCollins conveyed to Apple on January 11 that it potentially anticipated using an

agency and wholesale model with different retailers.  [Cue Decl. ¶ 70; DX-154.]

104.    Apple's statements to Random House and Macmillan show that Apple ultimately

did not care whether the publishers remained on the wholesale model with other retailers,

including Amazon, even if they signed agency agreements with Apple.  These statements,

therefore, establish that Apple did not intend the MFN to be a "commitment mechanism" to force

Amazon to move to agency.

105.    Apple eventually tailored the MFN to expressly allow exceptions for limited-time

price promotions.  Apple wanted the publishers to be free to experiment with price discounting,

even if a publisher did not chose to use a particular promotion on Apple's e-bookstore.  Apple

felt that this would lead to more effective price discounting.  [Cue Decl. ¶ 72.]

106.    **Competitive Prices: Price Tiers and Caps.**  Apple also reevaluated its price tiers

and caps in early January.  Individual publishers pushed back on the maximum caps for some of

the new release tiers.  For example, Penguin's CEO, David Shanks, emailed Mr. Cue on January 6th explaining that Penguin would not be able to sustain the way it did business with its authors under Apple's proposed caps.  Mr. Shanks said that Penguin would have difficulty releasing e-books at the same time as hardcover books under Apple's proposed maximums.  [Cue Decl. ¶ 73; DX-129.]

107.    Apple believed its original tiers were reasonable and provided important ceilings to keep e-book prices lower than their physical counterparts.  In response to the significant resistance from publishers, however, Apple decided to offer modest higher tiers and caps for "new release hardcover books"—defined at the time as books released within the previous twelve months.  Apple needed to get a deal done.  Apple kept a $12.99 cap for new release hardcovers with a physical wholesale list price under $30.  Apple also kept a $14.99 cap for new release hardcovers with a list price over $30, with incremental tiers for every $5 increase in physical wholesale list price.  Apple included all other hardcovers in a lower-tier proposal: Apple would cap trade paperbacks, mass market titles, out-of-print titles, and all hardcovers that were not new releases at $9.99 or less.  These new tiers and caps would still ensure that e-books would generally cost less than physical books.  [Cue Decl. ¶ 74; *see* Moerer Decl. ¶ 39.]

## VIII.   APPLE'S INDIVIDUAL CONTRACT NEGOTIATIONS WITH PUBLISHERS

108.    Apple engaged in individual, one-on-one, and at times contentious negotiations over the draft contracts with each publisher throughout January 2010.  Apple had just over two weeks until Mr. Jobs publically unveiled the iPad on January 27th to complete its initial content deals.  [Cue Decl. ¶ 76-91.]

109.    Apple urged each publisher to look beyond the specific terms and focus on the long-term, overall opportunity: (1) Apple was interested in working with them to improve the e-

book reading experience, promoting e-books, and marketing to Apple's huge customer base; (2)

Apple had a track record of success in its content businesses—iTunes and the App Store; and (3)

Apple's entry would expand the universe of potential e-book readers dramatically and introduce

e-books to a younger audience.   Apple noted that its proposed agreement was only for one year,

and that it would be open to changes after that to best promote its prospective e-bookstore and e-

books generally.  [Cue Decl. ¶ 77.]

110.    The MFN, the price caps, the "day and date" provision prohibiting windowing,

and Apple's demand for a 30% commission were the subject of significant resistance and

negotiation.  Early—and constant—points of negotiation and contention were over Apple's price

caps and 30% commission.  After Apple sent draft agency agreements to each publisher CEO on

January 11, each immediately opposed Apple's price tiers and caps.  [Saul Decl. ¶¶ 8, 11.]  The

publishers said that they could not make a large enough per-book revenue under Apple's terms.

[*See* Cue Decl. ¶ 78; DX-154.]  Each publisher also negotiated Apple's retail MFN in different

practical ways. [*See* Saul Decl. ¶ 11.]

111.    Mr. Moerer met individually with HarperCollins, Penguin, and Hachette on

January 12th in New York.  At those meetings, each publisher advocated different

counterproposals to Apple's commission percentage and price tiers/caps.  [*See* Moerer Decl.

¶ 36; DX-161.]

112.    In order to move negotiations along and sign the publishers in time for the iPad

launch, Apple determined that it could make a further modification to its price tiers and caps

while offering e-book prices that were lower than physical book prices.  Apple simplified the

price tiers.  Apple lowered slightly the list prices subject to its original, highest cap at $14.99 for

new releases.  Apple capped new release hardcovers with a list price between $27.51 and $30.00

at $14.99.  Mr. Cue emailed the revised pricing proposal to each publisher CEO on January 16, 2010.  [Cue Decl. ¶¶ 80-81; DX-174.]

113.    After Mr. Cue's January 16th email, Apple continued its negotiations with each publisher.  Except for small (and what Apple felt were non-material) exceptions, Apple did not further change its pricing tiers.  Apple made some small practical concessions to publishers on its new release MFN.  Apple also modified its MFN to expressly allow exceptions for limited-time price promotions or other retailers.  [*See* Cue Decl. ¶ 72.]  Apple, however, did not agree to change its 30% commission at all.

114.    Eddy Cue, Keith Moerer, and Kevin Saul were in New York the week before the iPad launch—to negotiate in-person with each publisher.  Apple originally planned to leave on the 21st, but stayed until January 26th—the day before the iPad launch—because the negotiations proved more time-consuming than Apple had expected.  [Cue Decl. ¶ 82.]

115.    During the negotiations, each publisher negotiated against the core terms of Apple's proposed agency agreement, including the MFN.

116.    The contentious negotiation points between Apple and individual publishers on the key terms alleged to be the foundation of the conspiracy is inconsistent with a conspiracy between Apple and the publishers.

## Hachette

117.    **Windowing.**  Hachette resisted Apple's across-the-board prohibition on widowing.  Hachette believed that it was important to retain all of Hachette's available tools to respond to the changing market conditions, including the ability to window.  [Young Decl. ¶ 29.]  Hachette specifically wanted the right to window enhanced e-books and insisted through the

negotiations that it be able to window.  [*See* Cue Decl. ¶ 84; DX-172; DX-204; Moerer Decl. ¶ 36.]

118.    **Price Tiers and Caps.**  Hachette also opposed Apple's proposed price tiers. Hachette believed that consumers would be willing to pay more than Apple's maximum prices. [*See* Young Decl. ¶ 33.]  During its first meeting with Apple after receiving Apple's draft agency agreement, Hachette insisted on higher price tiers (though it did not make a specific counterproposal).  Hachette also indicated that it was otherwise committed to continue windowing some e-books.  [Cue Decl. ¶ 84; Moerer Decl. ¶ 36, DX-162.]  Throughout the negotiations, Hachette opposed any limitation on its ability to determine its own e-book pricing because Hachette believed that it could set appropriate prices.  Hachette also opposed Apple's price tiers because, with Apple's caps, Hachette would make less money under agency than wholesale for some titles.

119.    **MFN.**  Hachette tried to eliminate Apple's new release MFN.  Hachette felt that it should generally have complete freedom to set prices within the agency model.  [*See* Young Decl. ¶ 30.]  Hachette made clear that did not like the "wording" of Apple's MFN.  [DX-204.] On January 21st, just days before Hachette signed its final agency agreement with Apple, Hachette struck Apple's MFN in its redline of the Apple draft agreement.  Hachette asked Apple to sign the agreement without the MFN.  Apple wrote in response, "THIS IS A MUST" when Hachette redlined the MFN provision.  [DX-213 at APLEBOOK-0043005; *see also* Young Decl. ¶ 30; Cue Decl. ¶ 84.]

120.    **"New Release" Definition.**  Hachette also negotiated the definition of "New Release," which would determine the term of the applicability for the price caps and the MFN.

Hachette's final contract limited new releases to seven months, down from Apple's original twelve months.  [DX-235.]

**Macmillan**

121.   **Price Tiers and Caps.**  Macmillan opposed Apple's proposed price tiers and caps.  Macmillan believed that it understood how to price books competitively, and it felt that Apple's maximum price caps were too low.  [Sargent Decl. ¶¶ 32-34.]  Macmillan sent Apple a counteroffer on January 19th, proposing price caps only for the first 90 days of an e-book's sale, higher caps for e-books with a corresponding hardcover book priced at $30, and the option to price up to 3% or up to 20 titles outside of Apple's proposed price tiers.  [DX-187; Cue Decl. ¶ 83; Sargent Decl. ¶ 33.]  Apple rejected Macmillan's counteroffer and instead offered Macmillan a provision allowing limited exceptions based on good faith and mutual agreement.  Macmillan decided to accept that compromise because Apple's limited exceptions gave Macmillan some e-book pricing flexibility.  [*See* Sargent Decl. ¶ 34.]

122.   **Apple's 30% Commission.**  Macmillan also contested Apple's 30% commission, attempting to lower it to 15% on *New York Times* bestsellers.  [DX-187; Sargent Decl. ¶ 35.]  Macmillan's final agency agreement with Apple, however, contained a 30% commission.  [DX-245.]

123.   **MFN.**  Macmillan also initially rejected Apple's proposed MFN, saying it "c[ould] not agree to match other resellers prices" for new releases.  [DX-187.] Macmillan believed that it may continue to sell e-books to other retailers under the wholesale model, where the retailer set the prices.  Macmillan did not want to be obligated to match lower prices set by someone other than Macmillan.  [Sargent Decl. ¶ 29.]  Apple explained in an email that Apple's price-lowering MFN would simply require Macmillan to set a customer price in the Apple e-

bookstore matching any lower retail price at any other online retailer regardless of the model

Macmillan used with that retailer.  Apple's MFN would not have any other implications on

Macmillan's business.  [Saul Decl. ¶ 13; *see* Sargent Decl. ¶ 30; DX-205.]  Macmillan agreed to

Apple's MFN after it negotiated certain modest practical modifications:

- Macmillan could set a price in Apple's e-bookstore that was higher, but within $1.00, of a lower-available price.  [*See* DX-245 at ¶ 5(b).]

- Macmillan had limited exceptions for pre-order prices and prices charged by unauthorized retailer.

124.   **"New Release" Definition.**  Another difficult term for Macmillan was the

definition of a "new release."  This definition determined the length of time for the application of

the price caps and the MFN.  Days before Macmillan and Apple signed an agency contract, they

had not reached agreement over the definition.  Apple wanted to define a new release as an e-

book in its first twelve months after release.  Macmillan wanted to only include the first seven

months.  Macmillan's final contract with Apple limited new releases to seven months.  [Sargent

Decl. ¶ 36; *see* DX-245 at ¶ 1(h).]

**Simon & Schuster**

125.   **Price Tiers and Caps.**  Early in the negotiations, Simon & Schuster strongly

objected to Apple's price tiers and caps.  Simon & Schuster suggested that it had no choice but to

continue windowing new release e-books given the maximum price caps. [Cue Decl. ¶ 85; DX-

180.]  Simon & Schuster believed that the maximum prices Apple had set were too low given

Simon & Schuster's costs and the value of its books, especially serious works from famous

authors. [Reidy Decl. ¶ 29.]  Apple ultimately made small concessions to its proposal, allowing

Simon & Schuster either higher tiers or exemptions for limited categories of e-books, such as

enhanced e-books, works published only in e-book form, and backlist hardcovers. [Reidy Decl.¶, 29; DX-231.]

126.    **Apple's 30% Commission.**    Simon & Schuster believed that Apple's 30% commission was too high.    In order to determine whether there was any room to negotiate down, Simon & Schuster's CEO Carolyn Reidy investigated Apple's other content businesses.    [Reidy Decl. ¶ 28.]    She reached out to contacts at Paramount (another CBS affiliate), CBS Television, and in the music industry, who all confirmed that Apple effectively took a 30% net margin across-the-board on every type of digital content. [Reidy Decl. ¶ 28; DX-125; DX-183.]

127.    **MFN.**    Simon & Schuster sought significant revisions to Apple's proposed MFN provision as late as January 23, 2010.    Simon & Schuster did not know how Apple's entry would affect Amazon's pricing strategy if Simon & Schuster stayed on a wholesale model with Amazon.    [Reidy Decl. ¶ 30.]    Simon & Schuster obtained several practical carve-outs:

- Language protecting Simon & Schuster from matching a lower retail price in breach of Simon & Schuster's contracts with other retailers.

- An exception for promotional activity.    Simon & Schuster would not lower new release prices to match another retailer's lower price if that price were a temporary promotion or unavailable on an "a la carte" basis (*i.e.*, only available as a bundled offer to a book club).

- Simon & Schuster would lower its price on Apple's e-bookstore to match another retailer's price for as long as the other retailer offered that price.

- A carve-out that allowed Simon & Schuster's authors to delay an e-book's release on Apple's e-bookstore or refrain from selling an e-book on Apple's e-bookstore at all.    [Reidy Decl. ¶ 31.]

**Penguin**

128.    **Price Tiers and Caps.**    Penguin opposed Apple's price tiers and caps for several reasons.    Penguin first opposed Apple's maximum price caps because Penguin could lose a significant amount of money if other retailers matched Apple's lower pricing.    This was in part because a majority of Penguin's e-books were not *New York Times* bestsellers and therefore

priced above $9.99 on Amazon and other retailers.  Penguin requested higher and more price

tiers, noting internally that, if Apple did not revise its price caps, this could be a "dealbreaker."

[DX-173.]

129.    In addition to general objections that Penguin's CEO voiced to Apple about the

price tiers and caps, Penguin's biggest concern was with Apple's trade paperback price tiers and

caps.  Penguin has a large paperback book business, and it wanted higher price caps for these

books.  [Moerer Decl. ¶ 36.]  On January 25, 2010, Penguin's CEO, David Shanks, wrote to

Eddy Cue:  "The paperback price is a problem. . . . This does not work."  [DX-251; *see also* DX-

250.]

130.    **30% Commission.**  Penguin thought that Apple's 30% commission was too high,

and  negotiated unsuccessfully for a lower commission on *New York Times* bestsellers.  [DX-

161.]

## Four Major Publishers Sign with Apple by January 25, 2010

131.    By January 22nd, four major publishers—Hachette, Macmillan, Penguin, and

Simon & Schuster—had separately agreed to Apple's terms.

132.    By January 25, 2010, two days before Apple's iPad and e-bookstore

announcement, Apple had signed agency agreements with these four publishers.  This was

enough, in Apple's view, to open an e-bookstore with enough content to attract consumers.

Hachette signed its agreement with Apple on January 24th, and Simon & Schuster, Penguin, and

Macmillan signed with Apple on January 25th.  [Cue Decl. ¶ 90.]

## Not All Major Publishers Signed Apple's Agency Agreement, or Wanted To

133.    Apple's negotiations with two publishers—Random House and HarperCollins—

were particularly challenging.

**Random House**

134.    Random House disliked Apple's proposed agency model from the beginning. Apple and Random House had the most limited negotiations.  [Cue Decl. ¶ 87.]  Marcus Dohle, Random House's CEO, sent Apple an email on January 21st, rejecting Apple's terms.  [Cue Decl. ¶ 87.]  Apple had no further meaningful negotiations with Random House before the iPad launch.  Random House joined Apple's e-bookstore one year later, in February 2011.  [Cue Decl. ¶ 87.]

**HarperCollins**

135.    HarperCollins did not want to sign an agency agreement with Apple that included Apple's proposed terms.

136.    **Price Tiers and Caps.**  HarperCollins objected to Apple's proposed price tiers and caps because HarperCollins would make less money on average per e-book than it was then making on a wholesale model with Amazon.  [Murray Decl. ¶ 19.]  HarperCollins repeatedly proposed alternative, higher pricing tiers to Apple.  [Moerer Decl. ¶ 36; Cue Decl. ¶ 88; DX-154; DX-223.]  For example, in advance of a meeting with Keith Moerer, HarperCollins on January 11th emailed Apple proposing tiers with higher price caps on a large section of e-books.  [DX-154.]

137.    **30% Commission.**  HarperCollins also objected to Apple's 30% agency commission, believing it too high. [Murray Decl. ¶ 19.]  HarperCollins made a series of different proposals, trying to get Apple to lower its across-the-board 30% commission.  [DX-154; DX-223; Cue Decl. ¶ 88.]  For example, before a January 11th meeting with Apple, HarperCollins proposed a 5% agency commission for the first three months of an e-book's release.  [DX-154.]  As late as January 21st, HarperCollins requested a 10% commission on new releases.  [DX-209.]

138.   **MFN.**  HarperCollins had concerns about Apple's MFN.  If Amazon continued below-cost pricing on HarperCollins's most visible e-books under a wholesale model, the MFN would require HarperCollins to match these prices for new releases on Apple's e-bookstore.  HarperCollins also wanted more flexibility.  [Murray Decl. ¶ 20.]  HarperCollins requested a carve-out for any situation in which Apple and HarperCollins disagreed on the appropriate price for an e-book.  [Murray Decl. ¶ 20; DX-223.]  Apple rejected this proposal, but made a limited concession to HarperCollins known as an "author out," which gave HarperCollins authors the right to opt out of selling their e-books on Apple's e-bookstore. [Murray Decl. ¶¶ 28-29.]

139.   **"New Release" Definition.**  HarperCollins negotiated the definition of "New Release" to limit the application of the price caps and the MFN.  HarperCollins negotiated the term of "New Release" from Apple's original proposed 12 months down to 7 months. (*See* DX-257 at ¶ 1(g).]

140.   On January 22nd, HarperCollins sent Apple a proposal that included no price caps, no MFN, a 10% commission on new releases, and a six month contract term.  [DX-223.]  After Apple rejected that proposal, HarperCollins sent a similar proposal two days later with no price caps, a 10% commission for new releases, and the right to terminate at any time on thirty-days' notice (though they left our MFN in that version).  [DX-255.]  At this point, Apple's negotiations with HarperCollins had essentially broken down.  [Murray Decl. ¶ 24; Cue Decl. ¶ 88.]

141.   By January 25th, Apple was operating under the assumption that HarperCollins would not participate in Apple's e-bookstore launch on January 27th.  [Cue Decl. ¶ 88.]  Brian Murray, the CEO of HarperCollins, did not want to sign the deal with Apple because he believed that the economics of the deal were not good for HarperCollins. [Murray Decl. ¶¶ 26-27.]

142.     Steve Jobs appealed to the broader Apple-NewsCorp relationship, discussing the matter with James Murdoch, an executive at NewsCorp, HarperCollins's parent company.  [Cue Decl. ¶¶ 88, 91; Murray Decl. ¶¶ 25-27; DX-234.]  Apple and other divisions of NewsCorp had been discussing other partnerships for the sale and distribution of digital content, such as movies and television shows.  [Murray Decl; ¶ 25.]

143.     HarperCollins at the urging of its corporate parent made the decision to sign an agency agreement with Apple for e-book sales.  It was seen as an important part of NewsCorp's overall relationship with Apple and in the best interests of NewsCorp overall. [Murray Decl. ¶¶ 25-27.]  HarperCollins signed the agency agreement on January 26th—the day before the iPad launch.  [Cue Decl. ¶ 91; DX-257.]

144.     Apple's negotiations with the publishers described above were conducted consistently with its independent, legitimate business purposes in simultaneously signing up multiple publishers to provide e-books necessary for Apple to open an e-bookstore.

**Apple's Negotiation Approach**

145.     Apple held preliminary discussions with publishers about a potential agreement starting on December 15, 2009.  After Apple sent a draft agency agreement on January 11, 2010, its negotiations with publishers began in earnest.  Apple signed agreements with five publishers on January 24th, 25th, and 26th.  In all, Apple negotiated the terms of its agreements for 13 to 15 days.

146.     Apple made clear that its deadline to have agency agreements in place was January 27, 2010—the day that Steve Jobs would announce a new device, the iPad, and, if it came together, the e-bookstore.  [Cue Decl. ¶¶ 29, 76; Moerer Decl. ¶ 34; *see also* Sargent Decl.

¶ 27.]  Apple used this tight timeline, inclusion in the iPad announcement, and the associated publicity as leverage in the negotiations. [*See* Cue Decl. ¶ 76.]

147.     Apple told each publisher that it would not launch an e-bookstore without a sufficient number of the major publishers signed, because it needed a large enough catalogue to attract consumers.  [Cue Decl. ¶ 95; *see also* Reidy Decl. ¶ 21; Murray Decl. ¶ 15; Young Decl. ¶ 36; Sargent Decl. ¶ 23.]   Apple wanted to sign agreements with a majority of the major trade publishers before the January 27th announcement of the iPad. [Cue Decl. ¶ 29, 76.]

148.     Apple explained to each publisher how Apple generally conducted business in its digital content stores.  [Cue Decl. ¶¶  37-45;  *see also* Moerer Decl. ¶¶  18-19, 22; *see also* Young Decl. ¶ 34]  For example, Apple told each publisher that it was Apple's approach to give all content providers the same basic economic terms within a content store. [*See* Moerer Decl. ¶ 16; Cue Decl. ¶ 94; *see, e.g.,* Murray Decl. ¶ 15.]  This principle applied to Apple's potential e-bookstore meant that if one publisher negotiated a materially better term with Apple, Apple would offer that term to all other publishers.  [*See* Cue Decl. ¶ 94.]  Apple hoped the tight timeline for getting deals done and its standard terms would discourage publishers from holding out for "better" terms by being the last to sign.  [Cue Decl. ¶ 94.]

149.     Apple never spoke to more than one publisher at the same time during Apple's agency negotiations with each major publisher.  [*See* Cue Decl. ¶ 92; Young Decl. ¶ 28.]

150.     Apple had no knowledge of any intra-publisher communications during the time Apple was negotiating its agency agreements.  [Cue Decl. ¶ 98.]  After this lawsuit was filed, Apple learned for the first time about allegations relating to various publisher meetings, phone calls, and dinners.  Apple had no information about any such communications during its iBookstore negotiations.  [Cue Decl. ¶ 98.]

151.    Apple updated some of the major publishers with general information about how many publishers had signed deals or how close other publishers were to signing with Apple. [Cue Decl. ¶ 96; *see, e.g.,* Young Decl. ¶ 36; Sargent Decl. ¶ 23.]  The number of publishers signed was important to the negotiations, because Apple had informed publishers that it needed a minimum number of publishers to launch an e-bookstore. [Cue Decl. ¶ 95; Reidy Decl. ¶ 21; Murray Decl. ¶ 15; Young Decl. ¶ 36; Sargent Decl. ¶ 23.]  Publishers also sought reassurance that they would not be alone in signing an agency agreement with Apple, because they feared Amazon's retribution in their broader business relationship.  [Cue Decl. ¶¶ 95-96; *see, e.g.,* Sargent Decl. ¶ 45; Reidy Decl. ¶ 32.]

152.    Apple's communications described above were normal business negotiation tactics and not intended or designed to—and did not—facilitate a conspiracy.

**The Five Publishers' Final Agency Agreements with Apple**

153.    Apple's final agency agreements with each publisher set forth the terms on which Apple and each publisher would do business to sell e-books in Apple's new e-bookstore.  [*See* DX-235; DX-244; DX-245; DX-246; DX-257.]

154.    The agreements Apple signed with publishers each contained the same core agency terms.  They each differed in ways that reflect the arms-length, nuanced negotiations Apple had with each publisher.  Individual publishers negotiated specific exceptions or carve-outs to Apple's core terms, such as Simon & Schuster's exceptions to the MFN or HarperCollins's "author out" provision.

155.    Importantly, each MFN provision differed from the others as a result of the negotiation process.  These differences ranged from minor modifications of language to exceptions viewed as significant by each publisher.  [*See* Saul Decl. ¶ 14; DX-235; DX-244;

DX-245; DX-246; DX-257.] These adjustments to the MFN, however, did not undermine Apple's fundamental purpose in including the MFN: to guarantee that Apple would have the lowest prices for new releases available on its e-bookstore.

156.    The MFN contained in Apple's agreement with **Simon & Schuster** contained numerous exceptions:

> "If Apple notifies Publisher that an eBook of a hardcover New Release is available in the United States for a customer price that is lower than the then-current Customer Price then Publisher, subject to being made aware of such lower price, hereby automatically sets a new, lower Customer Price to meet such lower customer price <u>for so long as such lower price is in effect, provided that this provision shall not apply (i) if such availability is in contractual breach of Publisher's rights and does not continue for 72 hours after such notification; (ii) if such price represents a one-off limited- time promotional offering; (iii) if such price is not available on an a la carte basis (i.e., individual eBooks are not available at separate prices); (iv) if such price is available through a book club requiring non-cancellable (except for penalty) prospective purchase commitments, or (v) if such price is the result of a Promotional Discount of the type that would be permitted to Apple under the terms of [the agreement].</u>"

> (DX- 246 at ¶ 5(b) (2010.01.25)).

157.    **Macmillan** negotiated an acceptable price range, as well as some exceptions:

> "If, for any particular New Release whose first publication is on or after the Launch Date, the then-current Customer Price at any time while it is still a New Release is or becomes higher than a customer price then offered by any other provider of that New Release in e-book form ("Other Customer Price"), then <u>Publisher shall designate a Customer Price for the New Release that ends in a "--.99" and is less than $1.00 above such lower other Customer Price.  The foregoing Publisher matching obligation shall not apply in the event that (i) the Other Customer Price is a pre-order price such that the New Release will be but is not yet available, or (ii) the Other Customer Price is offered by a provider that has not been directly or indirectly authorized by Publisher to make the New Release available in eBook form.</u>"

> (DX- 245 at ¶ 5(b) (2010.01.25))

158.    **Hachette** also negotiated some exceptions:

"If another eBook distributor offers the sale of a New Release after the launch of the Online Store in eBook format in the United States at a new customer price that is lower than the Customer Price, then Publisher shall set a lower Customer Price to meet such other then-existing lower price, <u>except that if such lower price is in violation of its agreement with the Publisher, then such price matching provision shall not be effective for 3 business days following the Publisher's notice of such lower price, provided that such lower price is not chronic behavior by same distributor</u>."

(DX-235 at ¶ 5(b) (2010.01.24)).

159.    As discussed above, **HarperCollins** considered the "author-out" in paragraph 3(c) to be an exception to the MFN; the MFN itself contained modifications of language and limited the provision to "standard" digital versions (excepting enhanced digital versions):

"If, for any particular eBook that is a New Release and also available in hardcover format, the then-current Customer Price is or becomes higher than a customer price offered by any other reseller for such Publisher Content in a <u>standard digital version</u> ("Other Customer Price"), then Publisher shall designate a new, lower Customer Price to meet such lower Other Customer Price."

(DX-257 at ¶ 5(b) (2010.01.25)).

160.    **Penguin's** MFN contained some alterations to the language regarding the effective date:

"<u>Commencing March 15, 2010, or date on which Apple begins marketing and soliciting orders for eBooks in the Online Store, whichever occurs later</u>, if, for any particular New Release in hardcover format, the then-current Customer Price at any time is or becomes higher than a customer price offered by any other reseller ("Other Customer Price"), then Publisher shall designate a new, lower Customer Price to meet such lower Other Customer Price."

(DX-244 at ¶ 5(b) (2010.01.25)).

IX.    **APPLE'S AGENCY AGREEMENTS POST-JANUARY 2010: RANDOM HOUSE AND INDEPENDENT PUBLISHERS**

161.    On January 27, 2010, Steve Jobs announced the iPad and demonstrated the use of the iBooks software.  [*See* PX-0635.]

162.    After the iPad announcement on January 27, 2010, Apple continued to negotiate a deal with Random House, the largest trade book publisher.  [Cue Decl. ¶ 104.]  Apple and Random House continued conversations periodically during 2010.  [Cue Decl. ¶ 104.]  Apple made clear to Random House that they could join Apple's bookstore and use any business model with Amazon or any other retailer (wholesale, agency, or other).  [Cue Decl. ¶ 104; Moerer Decl. ¶¶ 32-33; McIntosh Decl. ¶¶ 12-13.]

163.    In fall 2010, Random House submitted individual e-book apps for Apple's App Store.  Mr. Cue told Random House that Apple was only interested in an overall deal with Random House to offer all of their e-books in Apple's iBookstore.  [Cue Decl. ¶ 105.]

164.    In late December 2010, Random House reached out to Apple to express its interest in joining the Apple iBookstore.  [Cue Decl. ¶ 105.]  Random House made this decision based on its assessment of the impact of its wholesale e-books contract with Amazon on its overall book business, and Random House initiated discussions with each of its e-book retailers around this same time.  [McIntosh Decl. ¶ 14.]  In February 2011, Apple and Random House signed an agency agreement that was materially the same as Apple's agreements with the other major publishers.  [Cue Decl. ¶ 105; *see* DX-235; DX-245; DX-246; DX-258.]

165.    Apple began negotiating and signing agency deals with smaller and independent publishers, including Hyperion, Perseus, and Workman in January 2010.  [Cue Decl. ¶¶ 106-108.]  Apple wanted to open the store with as many titles as possible.  [Cue Decl. ¶ 8; Moerer Decl. ¶ 45; Murray Decl. ¶ 15.]

166.    Apple contracted with small and independent publishers using the same material agency terms it had used with the larger publishers.  [Cue Decl. ¶ 108; Moerer Decl. ¶ 45.]  The smaller publishers' opposition to Apple's core terms was similar to that of the larger publishers. [Cue Decl. ¶ 107.]  For example, one of Hyperion's key points of negotiation was around Apple's new-release MFN.

167.    Apple's willingness to remit 70% of e-books sales prices was a very attractive option for smaller publishers.  [Moerer Decl. ¶ 45.]  Apple's contracts with trade publishers included Apple's core terms:  an agency model with 30% commission, no windowing, a limited MFN, and price caps/tiers.  [Cue Decl. ¶ 107.]

168.    Many of these publishers had and continued to have wholesale agreements with Amazon.  Apple has continued to add small and independent publishers using the same material terms from its January 2010 contracts through to the present day.  [Cue Decl. ¶ 108; Moerer Decl. ¶ 45.]  Apple also helped pay for many smaller publishers to convert their books to the e-book format so they could participate in the iBookstore and Apple consumers would have the benefit of their content.  [McDonald Decl. ¶ 25.]

169.    Apple's agency model, its "click through" contract, and the fact that it offered a level playing field encouraged many new and independent publishers of all sizes to partner with Apple.  [Cue Decl. ¶ 108; Moerer Decl. ¶ 45.]  The "click through" contract enabled publishers simply to go online and accept terms by clicking a button.  [Cue Decl. ¶ 108.]

170.    Today, over seventy thousand publishers and self-publishers have "signed" click-through agency agreements with Apple's iBookstore, providing Apple, its consumers, and the market with an extremely important source of new e-books and price innovation.  [Cue Decl. ¶ 108; Moerer Decl. ¶ 45.]

171.    In January 2012, Apple introduced its free iBooks Author software, which allows anyone to easily create a professional-quality e-book.  [Moerer Decl. ¶ 46.]   Apple significantly increased the number of authors self-publishing through the iBookstore.  [Cue Decl. ¶ 108; Moerer Decl. ¶ 46.]

## X.    OTHER E-BOOK RETAILERS (AMAZON AND BARNES & NOBLE) MOVE TO AGENCY WITH THE MAJOR PUBLISHERS

### Amazon

**Amazon Discusses Agency Terms with Publishers in January 2010, before Apple Signs Any Agency Agreements**

172.    On January 9, 2010, before Apple sent its first draft agency agreement to any publisher, Random House's Madeline McIntosh, a former Amazon employee, emailed Amazon's David Naggar, stating, "It would be a good time to share Amazon thoughts on the pros/cons of an agency model.  In this case what I mean by that is vendor sets price, Amazon charges a commission per sale."  [DX-532.]

173.    Two days later, on January 11, 2010, Ms. McIntosh discussed Amazon's thoughts on an agency model for e-books with Mr. Naggar.  [*See* DX-264.]

174.    One week later, on January 18, 2010, Amazon discussed internally a *Wall Street Journal* article about Apple's agency talks with major publishers.  [*See* DX-184.]  That same evening, Ms. McIntosh had dinner with Amazon's Laura Porco, and explained her belief that several major publishers were negotiating agency e-book distribution agreements with Apple.  [*See* DX-184.]  Ms. McIntosh also speculated about what other publishers may do, based on their previous windowing practices under a wholesale model.  [McIntosh Decl. ¶ 19.]

175.    Amazon announced changes to its Kindle Digital Text Platform ("DTP") on January 20, 2010. [*See* DX-189.]  The changes resemble the agency model that Apple proposed for e-books:

- The royalty that the self-publisher could earn increased from 35% to 70%.

- Under the revised terms, Amazon took a reduced commission of 30% (instead of 65%) on each sale.

- There were price caps; the author/publisher's list price was required to be between $2.99 and $9.99.

- The ebooks must be priced at least 20% below the lowest physical list price for the physical book.

- There was a price parity provision that required ebooks published through DTP be offered at or below competitors' prices.

[DX-189.]

176.    That same day, Amazon began a series of meetings with five major publishers to discuss the agency model, as a result of publicity concerning Apple's negotiation of agency agreements.  At this time, Apple was in active negotiations with individual publishers, and did not have a single agency agreement signed.

177.    **Simon & Schuster.**  On January 20, 2010, Ms. Porco met with Simon & Schuster's Michael Selleck to discuss ███████████████ and the agency model.  When Mr. Selleck asked Ms. Porco if big publishers like Simon & Schuster ████████████████ ████████████████████████████████████████████████████ ████████████████  [DX-197.]  Regarding agency terms, Mr. Selleck said that Simon & Schuster was "constantly discussing potential new terms for ebooks" but that nothing was imminent.  [*See* DX-266; DX-197.]  Two days later, on January 22, 2010, Simon & Schuster CEO Carolyn Reidy told Mr. Grandinetti that Simon & Schuster "was likely moving to agency terms for [its] entire business" using a 70%/30% revenue split.  [DX-266.]  Grandinetti asked

whether Simon & Schuster would consider "applying agency terms during a 90-day window on new releases and keeping the rest of the list available under [whole]sale." [DX-266.] Ms. Reidy said she would consider the proposal. [DX-266.]

178. **Hachette.** On January 20, 2010, Ms. Porco met with Hachette's Maja Thomas. Ms. Porco raised the topic of agency but did not say "anything for or against the agency terms." [DX-217.]

179. **HarperCollins.** On January 20, 2010, Messrs. Grandinetti and Naggar met with HarperCollins CEO Brian Murray. Mr. Murray "outlined [HarperCollins'] desire to go to an agency model" and the Amazon executives responded that they "were trying not to be closed minded . . . ." [*See* DX-266.] Two days later, on January 22, 2010, Mr. Murray emailed Messrs. Grandinetti and Naggar, thanked them "for coming in to see us this week on short notice[,]" and proposed specific agency terms "so that when you have your discussions in Seattle you have some specifics." [DX-220.] Mr. Murray suggested that, if Amazon were amenable to agency terms, he might do a deal with Amazon only and not with Apple. [DX-220.] In response, Amazon told Mr. Murray that it was going to dive into and evaluate the pros and cons of an agency model at an offsite meeting but that it could not get back to Mr. Murray at least two weeks. [DX-252.]

180. **Macmillan.** On January 20, 2010, Mr. Grandinetti met with Macmillan CEO John Sargent, who indicated that Macmillan was working on an agency model but that Macmillan's plan was to offer both an agency and a reseller model. [DX-266.]

181. **Random House.** On January 20, 2010, Mr. Grandinetti and Random House CEO Markus Dohle met and "talked a lot about [the] agency model." Mr. Grandinetti "was very diplomatic" and said Amazon "would be open" to evaluating the model. [*See* DX-199.]

182.   Each of these meetings and communications occurred before Apple entered into any agency agreements for the iBookstore with any publisher.  Amazon did not mention any of the January 20, 2010 meetings and communications about agency in the White Paper it sent to the DOJ on February 1, 2010.  In fact, it removed references to these meetings that it had included in the initial drafts of the white paper.  [*Compare* DX-266 *with* DX-282.]

183.   On Sunday, January 24, 2010 Amazon senior executives met at Mr. Bezos's boathouse to discuss Amazon's agency strategy.

184.   The very next day, on January 25, 2010, Amazon circulated in an internal email the possible deal terms that Amazon would require in any agency contract with publishers. These included a ███ commission, a prohibition on windowing, and a requirement that ███████ ████████████████████████████  [*See* DX-260.]

185.   Throughout the week of January 25, 2010, Amazon continued to discuss agency with several publishers:

186.   **Simon & Schuster.**  On January 26, 2010, Mr. Naggar told Mr. Selleck that "we [are] trying to look at [the agency model] with an open mind."  The two discussed Mr. Grandinetti's earlier proposal to Ms. Reidy that Simon & Schuster consider limiting agency to a 90-day window.  [DX-269; DX-259.]

187.   **HarperCollins.**  On January 25, 2010, HarperCollins CEO Brian Murray spoke with Mr. Naggar and informed him that "[n]o final decisions have been made yet about the agency model . . ."  [DX-248.]  On January 27, 2010, Mr. Murray informed Amazon that HarperCollins had decided to move to the agency model for e-book new releases and that HarperCollins would "be ready to discuss this with you as soon as you are ready."  [DX-267.]

188.    **Macmillan.**  On January 28, 2010, Macmillan CEO John Sargent met with Amazon executives to discuss the agency model.  [DX-269.]

189.    **Penguin.**  On January 27, 2010, Penguin CEO John Makinson called Mr. Grandinetti and said he hoped to be able to discuss agency with Amazon during meetings scheduled for February in Seattle.  [DX-269.]

190.    Amazon had been discussing favorably the possibility of a revenue sharing model as early as the spring of 2009, as revealed by a January 2010 email exchange following Apple's iBookstore announcement and Amazon's agency discussions with publishers.

191.    On January 31, Random House's Madeline McIntosh emailed her former Amazon colleague, Laura Porco, in response to Amazon's announcement suggesting that it was forced to agency with Macmillan "because Macmillan has a monopoly over their own titles."  [DX-277.] In her email, Ms. McIntosh reminded Ms. Porco that, approximately nine months before, the two had discussed a similar model, but at the time they did not believe the publishers would ever agree to Amazon's preferred ████ split.  [DX-278.]  Ms. McIntosh wrote, in her email with the subject line "so remember when":

> We were in discussions 9 months or so ago regarding how we would ever be able to implement a profit share model, and you pointed out that publishers would never go for it unless the share was like ████, since otherwise, the terms would be worse than existing ones? And Amazon would never accept unless the share was ████. And so it would just never happen? I guess what we never figured in was the idea that five publishers would band together and insist on receiving worse terms. ***And then Amzn would be "cornered" into accepting them***.

[DX-278.]

192.    Ms. Porco responded, "Hysterical isn't it.  ***Jedi Mind Tricks here in Seattle***."

[DX-278 (emphasis added).]

193.    In light of Amazon's decision to move to agency with Macmillan, Ms. McIntosh and Ms. Porco were joking that Amazon was able to (i) get publishers to do what it had wanted all along without being the one to initiate agency, while (ii) Amazon played the victim and portrayed publicly that it was "cornered" into accepting agency by the publishers.  [DX-278; McIntosh Decl. ¶ 20.]

194.    Ms. McIntosh's email is consistent with ███████████████████████████
████████████████████████████████████  [DX-286.]

195.    Based on the forgoing, Amazon's decision to adopt an agency model was not the result of the MFN in the Apple agency agreements or Apple's role in any alleged conspiracy. Rather, Amazon's adoption of agency was the result of market forces and business considerations.

**Amazon's Agency Agreements.**

196.    Throughout Amazon's January 2010 agency discussions with publishers, several publishers made clear to Amazon that it had a choice:  move to agency or remain on the wholesale model with windowing.  [*See* Grandinetti Dep. Tr. at 150:21-25, 151:2-5.]

197.    Mr. Murray explained that HarperCollins would delay all e-books for six months for retailers that chose to remain on "standard 'reseller' terms," but "would make all ebooks available simultaneously with the hardcover to any partner who is willing to be an agent."  [DX-220.]

198.    Mr. Sargent informed Amazon that it could either move to agency with Macmillan or remain on wholesale terms with windowing for seven months.  [*See* Naggar Dep. Tr. at 137:15-22 ("A. Well, he said, 'You have a choice.  You can either go to the agency model or you cannot see new releases for seven months.' . . . Q. So it was sign up with the agency model or windowing; am I right?  A. Yes.").]

199.    Amazon understood the market reality that if it did not move to agency, its customers would cease to have access to the most popular e-books, but Apple's customers would—such a situation would be untenable to Amazon because, as Amazon itself recognized, it "would hurt the attractiveness of Kindle to the consumers." [*See* Grandinetti Dep. Tr. at 153:4-8). According to Mr. Grandinetti, "[I]f we didn't have the titles that people wanted, and competitors were offering them, certainly we thought it would be more likely that customers would choose other platforms."; *id.* at 154:7-10.]

200.    Amazon made the business decision to switch to agency to remain competitive in the scope of its e-book offerings. Amazon explained that it moved to agency with several large publishers "because they consistently publish *NYT* bestsellers from authors[,] which customers will expect to buy on Kindle." [*See* DX-317.] Amazon believed it was in a strong negotiating position to obtain the contract terms it wanted. [*See* DX-317]. Amazon explained in negotiations with an independent publisher that it, not the major publishers, had the stronger bargaining position and could extract onerous terms from those publishers. [*See* DX-317.]

201.    Apple's agency contracts do not require any publisher to move to any particular business model with any particular retailer. [DX-235 (Hachette); DX-244 (Penguin); DX-245 (Macmillan); DX-246 (Simon & Schuster); DX-257 (HarperCollins).] And no publisher told Amazon during the agency negotiations that its contract with Apple required the publisher to switch to agency with Amazon. [*See* Grandinetti Dep. Tr. at 203:11-16; 203:22-25; 204:2-3 ("Q. Can you point to any publisher that said that, that what we're doing now is being driven by our Apple content? Anybody say that to you? Any of the publishers say that to you? A. I don't remember specifically them saying that.").]

202.    Amazon's move to a ██████ agency split was consistent with its previous
discussions and agreements:

- *Amazon had discussed moving from* 
  In approximately April 2009, Amazon executives Laura Porco and
  Madeline McIntosh had discussed a revenue share model but concluded that "publishers
  would never go for it unless the share was like ██████ since otherwise the terms would be
  worse than existing ones . . . [a]nd Amazon would never accept unless the share was
  ██████ [DX-278; *see also* McIntosh Decl. ¶ 20.]

- 
  [DX-137.]

- *Amazon announced an agency DTP model for its direct publishing business at the same
  time it was discussing agency with the publishers in January 2010*, the terms of which
  included a 70/30 revenue split and MFN, and resemble the agency model that Amazon
  ultimately adopted for e-books.  [DX-196.]

- 

- *Amazon understood that a* ██████

**Some Publishers Moved to Agency with Apple But Remained on Wholesale With
Amazon**

203.    Penguin was unable to reach an agency agreement with Amazon by the time it
launched the agency model with other retailers on April 1, 2010.  [Cue Decl. ¶ 102.]  Amazon
proceeded on a wholesale-with-windowing model for Penguin titles; Amazon explained that "for
now, we operate under old terms and set our own prices but don't get any of their new books[]."

54

[DX-350.]  That situation was untenable for Amazon, who continued to negotiate and ultimately

reached an agency agreement with Penguin in May.  [DX-379.]

### Amazon Requires the Same Key Agency Terms As Apple

204.    After entering into an agency agreement with Macmillan on February 5, 2010,

[*see* DX-288], Amazon entered into agency agreements with four other major publishers in the

spring of 2010.  [*See* DX-333 (Simon & Schuster); DX-334 (HarperCollins); DX-345

(Hachette); DX-369 (Penguin).]  Amazon entered into an agency agreement with Random House

one year later.  [DX-310; McIntosh Decl. ¶ 29.]

205.    

 (i) MFNs, (ii) ████, and (iii) a ██ commission.

206.    **MFNs**.  MFNs were Amazon's primary concern.  As Amazon explained to

Hachette, "Our primary concern, above everything else, is that in an agency model there be

assurances that Amazon never find itself in a situation where an e-book be available anywhere

else that is not available on Amazon (Selection Parity) and that said e-books be available at the

same price anywhere that a consumer may see them (price parity)."  [DX-274; DX-305.]

207.    Amazon believed that MFNs would provide protection in an evolving market and

would ensure "a level playing field."  [DX-302; *see, e.g.*, Grandinetti Dep. Tr. at 223:25, 224:2-3

("[O]ne of the things that was paramount in our minds was making sure that our terms put us on

a level playing field with other e-book sellers."); *see also* DX-274 (HarperCollins "understands

[Amazon's] need for assurance" on parity terms).]

208.    Amazon wanted to be sure that Kindle customers would not be disadvantaged on

price, so Amazon refused to "sign[] any agreement where there was any loophole allowing for

any book to be available anywhere at any price that isn't available on Amazon at the same price." [DX-295.]

209. Amazon also wanted to ensure that it could offer Kindle customers the same selection that publishers made available to other retailers. [DX-285 (demanding "parity" terms for price, selection, ██████████████████████████ *see also*, Naggar Dep. Tr. at 224:4-5 ("No book should be available anywhere else that isn't available at Amazon.").]

210. Several of Amazon's MFNs were ████████████████████████ ███████████████████████████████████████████████. [*See, e.g.*, DX-333; DX-334; DX-345.] And Amazon's contracts defined "new releases" █████████ ████████████████████████████████████████████ ████████████████████████████████████████████ whereas Apple's was the lesser of 12 months or the period during which the physical version is available only in hardcover).]

211. MFNs were not new for Amazon. █████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ██████████████████████████ [DX-119 ("Selection that is available from publisher's own websites must be available from Amazon").] As for Kindle DTP, Amazon conditioned participation in the program on an author's setting a digital list price for Amazon that was at or below the digital list price the author set for any other distributor. [DX-189 ("Under this royalty option, books must be offered at or below price parity with competition, including physical book prices.").]

212. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

213. In some cases, Amazon's agency agreements provided for ███████████

████ For example, Apple's agreements allowed for a range of maximum prices from $9.99

to $12.99 where the hardcover list price is below $27.50, while ██████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

214. ███ **Commission.** Amazon demanded a ███ commission. [DX-260 ███

█████████████████ DX-278 (Ms. McIntosh and Ms. Porco

discussing the agency model in the spring of 2009 and noting that "Amazon would never accept

unless the share was ████"); Naggar Dep. Tr. at 148:4-11 █████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████

215. Amazon sought ████████ terms in each of its agency agreements. [*See, e.g.*,

DX-274 ██████████████████████████████████ Several

publishers resisted to ██████████████████████████████

██████████████████. [*See* DX-333 (Simon & Schuster, 3/23/10, section 13(a)

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

216.     Based on the foregoing, Amazon sought and obtained the same core terms in its

agency agreements as did Apple.  The fact that Amazon sought and obtained these terms in

furtherance of its own independent and legitimate business reasons provides additional evidence

that Apple pursued its agency agreement terms for its independent and legitimate business

reasons.

**Amazon's Negotiation Approach**

217.     Amazon's practice was to ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ .

218.     On January 22, 2010, when Amazon was discussing a new wholesale agreement

with Penguin, Mr. Naggar sent Penguin a "meeting competition" letter at Penguin's request.  Mr.

Naggar wrote:  "Penguin has requested confirmation that Amazon receives terms from other

publishers which are equivalent to certain terms requested by Amazon.  This letter confirms that

Amazon receives a discount of at least ███ and ██████ payment terms from other publishers

with which Penguin competes for our business, including Hachette Book Group USA."  [DX-

228; *see also* Naggar Dep. Tr. at 258:24-25, 259:2-15 ("Q. . . .  Did you refer to this as a meeting

competition letter?  A. Yes, that's what it is.  Q. Okay.  What is a meeting competition letter?  A.

It is a letter providing a partner with assurance that we have the same terms from other

publishers and that they can meet that competition.  Q. And Penguin had asked you to send them

a letter to this effect?  A. Yes.  Q. Yeah.  In fact, they wrote you that their legal department

requires at least one of Penguin's major trade competitors to be listed in the meet comp letter? A. Right.").]

219.     On February 23, 2010, in the context of agency negotiations with Hachette, Amazon wrote to Hachette's CEO David Young:  "First, let me assure you, there is nothing in the document [Amazon's] Laura [Porco] sent to [Hachette's] Maja [Thomas] that is different from agency agreements we've sent to others."  [DX-303.]

**The Macmillan Buy-Button Dispute**

220.     The first time Apple had notice that one of the five publishers was negotiating with another retailer was through press reports and an email from John Sargent, Macmillan's CEO, around January 31, 2010, regarding a dispute between Macmillan and Amazon.  [Cue Decl. ¶ 100.]  At the end of January 2010, brewing disagreements between Amazon and publishers over pricing culminated in a public dispute between Amazon and Macmillan.  [Cue Decl. ¶ 100; Sargent Decl. ¶¶ 45-50.]

221.     One week before Amazon signed its first agency agreement—with Macmillan, the smallest of the major publishers—Amazon stopped sales of Macmillan physical and e-books through Amazon.  Faced with the two choices that Macmillan provided—agency or wholesale with windowing of new titles for seven months—Amazon pulled Macmillan's "buy buttons." This meant that although customers could view Macmillan's physical and e-books on the Amazon website, they could not purchase them.  [*See* Grandinetti Dep. Tr. at 195:11-16; Cue Decl. ¶ 100; Sargent Decl. ¶¶ 45-50.]

222.     In fact, even a number of Macmillan titles displayed on Amazon's own bestseller list could no longer be accessed or purchased.  [Cue Decl. ¶¶ 100-01; Sargent Decl. ¶¶ 45-50.] Consumers who clicked on Macmillan titles on Amazon were directed to an online page that

read: "We're sorry.  The Web address you entered is not a functioning page on our site."  [DX-270; DX-276.]

223.     Amazon received customer complaints, and it announced within days that it would "capitulate and accept" Macmillan's agency terms.  [DX-277.]  And just four days after "capitulating," on February 5, 2010, Amazon signed a formal agency agreement with Macmillan. [DX-288.]

224.     Around the time of the Macmillan buy-button dispute, Random House's Madeleine McIntosh spoke to Amazon's David Naggar.  Something Naggar said during the course of their conversation made McIntosh believe that the buy-button dispute played out in the press exactly as Amazon had planned.  [McIntosh Decl. ¶ 21.]

**Barnes & Noble**

### Barnes & Noble Negotiates the Same Key Agency Terms As Apple

225.     In January 2010, at the same time several major publishers were discussing an agency model for e-books with both Apple and Amazon, those publishers began discussing an agency model with Barnes & Noble.  On January 15, 2010, Barnes & Noble CEO William Lynch had lunch with Macmillan President Brian Napak and discussed an agency model.  Mr. Lynch planned to have an agreement to Macmillan outlining an agency relationship within two weeks.  [DX-170; DX-218 (reporting that HarperCollins and Penguin were "'fed up' with Amazon and want to move to an agency model for eBooks").]

226.     As discussed above, Barnes & Noble had raised the possibility of an agency model to several publishers in 2009, and it supported a move to agency.  [*See* Horner Decl. ¶¶ 17, 20.]

227.     Between January 24 and February 1, 2010, Barnes & Noble sent the same draft

term sheet, in separate communications, to Macmillan, HarperCollins, Penguin, Simon &

Schuster, and Hachette for their consideration.  [*See* DX-243 (Macmillan); DX-256

(HarperCollins); DX-026 (Penguin); DX-283 (Simon & Schuster).]

228.     Barnes & Noble proposed the same terms to each publisher.  [*See* Horner Decl.

¶ 22.]

229.     Barnes & Noble proposed to each publisher MFN provisions, which would ensure

that Barnes & Noble would receive the same terms as any other retailer, including (i) selection,

(ii) price, and (iii) commission.  Barnes & Noble also proposed a provision that would require

each publisher to do business with all other retailers only under an agency model.  [*See, e.g.*,

DX-336.]

230.     Barnes & Noble wanted the selection MFN to ensure that it offered customers the

same books that were available on other retailers' websites.  Barnes & Noble would not control

retail prices under agency and it therefore felt it needed the pricing MFN to ensure that a

publisher did not set a lower price on a competitor's website.  The selection and price MFNs thus

were critical to Barnes & Noble's business interests.  [*See* Horner Decl. ¶ 24-26.]  Barnes &

Noble also wanted to ensure that Barnes & Noble received the same commission as its

competitors.

231.     These MFN protections were critically important to Barnes & Noble.  [*See* Horner

Decl. ¶ 26.]

232.     Between January and April 2010, Barnes & Noble negotiated and entered into

agency contracts with five of the major publishers (all but Random House).  [*See* DX-346

(Hachette); DX-353 (Macmillan); DX-354 (Penguin); DX-358 (Simon & Schuster); DX-359

(HarperCollins).]

233.     Barnes & Noble achieved its objective of having selection and price MFNs in its

agency agreements.  [*See, e.g.*, DX-346 ¶¶ 4-6, 9 (Hachette); DX-353 ¶ 2(c) (Macmillan); DX-

354 ¶¶ 2(c), 5(a) (Penguin); DX-358 ¶¶ 3(g), 4(b) (Simon & Schuster); DX-359 ¶ 6.3 (Harper

Collins).]

234.     Barnes & Noble also secured a 30% commission in each agreement.  [*See, e.g.*,

DX-346 ¶ 9 (Hachette); DX-353 ¶ 2(b) (Macmillan); DX-354 ¶ 5(a) (Penguin); DX-358 ¶ 3(a)

(Simon & Schuster); DX-359 ¶ 6.1 (Harper Collins).]  But Barnes & Noble was unable to

achieve with any publisher the provision that would require the publisher to use an agency model

with all other retailers.

235.     The agency agreements that Barnes & Noble entered into were similar but not

identical.  [*See* DX-346 (Hachette); DX-353 (Macmillan); DX-354 (Penguin); DX-358 (Simon &

Schuster); DX-359 (HarperCollins).]  The differences reflected the fact that each negotiation was

different, and each contract was the product of give-and-take on both sides.  [*See* Horner Decl.

¶ 29.]

236.     No publisher told Barnes & Noble during the agency negotiations that its contract

with Apple required the publisher to switch to agency with Barnes & Noble.  [*See* Horner Decl.

¶ 31.]

## XI.    APPLE'S MFN ENFORCEMENT

237.     Apple intended that its new release MFN advance its own independent and

legitimate business goal:  offering competitive prices on its e-bookstore, where it did not set

prices, to its customers.  Apple intended the MFN to guarantee that its e-bookstore would have the lowest new release prices.  [Saul Decl. ¶ 3; Cue Decl. ¶¶ 65-66.]

238.    Apple enforced the MFN with the same spirit and good faith with which it was written: to ensure Apple offered the most competitive prices available, and that its prices were generally as low as its competitors.  Apple therefore made attempts to confirm across retailers that publishers were giving Apple customers the lowest price available.

239.    Apple has never had an automated process to enforce compliance with Apple's new release MFN.  Instead, Apple conducted ad hoc comparisons of the prices of key new releases subject to the MFN in both the iBookstore and on Amazon.  That is, on a per-title basis, someone from Apple would visit the Amazon site, identify a particular title, ensure that that title was a comparable product to one offered in the iBookstore, and then compare that price to the iBookstore price.  [Gray Decl. ¶ 10.]

240.    If the price on another retailer's e-bookstore for a title subject to Apple's MFN were lower, Apple would contact the publisher of that title, typically by e-mail.  Apple would inform the publisher that, pursuant to the MFN, Apple would lower the price on that title on the iBookstore to match the price of the title offered at the other retailer, typically Amazon.  Apple would then decide whether to enforce the MFN for that title.  When Apple decided to enforce the MFN, Apple would lower the price on the iBookstore.  [Gray Decl. ¶ 10.]

241.    Because of the time and effort associated with generally enforcing the MFN manually, Apple at first randomly checked certain titles.  Apple, however, enforced rigorously the requirements that the top 15 *New York Times* best sellers be priced at $12.99.  Apple's initial reviews of e-book prices demonstrated that Apple was generally effective in offering competitive pricing on the titles subject to the MFN.  [Gray Decl. ¶ 10.]

242.     Apple concluded—after months of attempting to enforce the MFN manually, and after internal discussions regarding its compliance measures—that the time, effort, and resources needed to rigorously enforce compliance with the MFN outweighed any benefits that would result from such measures.  Apple consequently discontinued any systematic efforts to enforce compliance with the MFN and established the policy it has today.  Apple's current policy is to enforce the MFN at an individual title level based on occasional, ad hoc observations of online prices.  [Gray Decl. ¶ 11.]

## XII.   THE STATEMENTS OF APPLE'S FORMER CEO, STEVE JOBS

243.     Steve Jobs' statements are consistent with the facts in this case.  In an e-mail on January 24, 2010, Steve Jobs discussed Apple's agency proposal with James Murdoch, CEO of News Corp, the parent company of HarperCollins, during the course of negotiating the e-book deal.  Mr. Jobs described Apple's price caps as part of Apple's pricing structure as "$\leq$ or = 14.99."  He made clear that $12.99 and $14.99 were price caps, explaining, "Our proposal does set the upper limit for ebook retail pricing based on the hardcover price of each book." [DX-234 (emphasis added).]  Mr. Jobs proposes prices only on Apple within the price tiers and speculates that the market may or may not follow.

244.     Steve Jobs' January 24, 2010 email correspondence with James Murdoch, an executive at HarperCollins's parent company NewsCorp, reflects two executives discussing alternative business strategies for addressing a conflicted e-books market.

245.     In his last email to Mr. Murdoch, Mr. Jobs recognized the uncertainties of the market in flux.  He said that Amazon is "selling these books at $9.99, and who knows, maybe they are right."  [DX-234.]  Mr. Jobs did not discuss how other retailers should or would price e-books in the future.  Instead, Mr. Jobs proposed an alternative business model to HarperCollins,

and he candidly recognized that Apple had no power to predict or influence other retailers' e-book prices.  [*See* DX-234.]

246.    In addition, Steve Jobs' subsequent comments on Apple's agency agreements with the five major publishers in his 2011 biography confirm the way Apple saw the e-book in early 2010—specifically, Amazon's place within the market.  [Compl. ¶¶ 6, 56.]

247.    Apple had no information about other e-book retailers' plans in 2010 or their views about Apple's entry into the e-books market.  The situation in the e-books market in early 2010 was clear, however.  Steve Jobs was an experienced businessman.  He understood the realities facing Apple and Amazon.  Before Apple entered the market, major publishers were unhappy and windowing their books in response to Amazon's below-cost pricing on new releases and New York Times bestsellers.  [Cue Decl. ¶¶ 33-34; *see also* DX-61.]  Apple was a new competitor with a new device and a new e-bookstore.  [Cue Decl. ¶¶ 23, 27.]  Apple's price tiers gave the publishers the ability to set the price for certain e-books above $9.99 if they chose to do so (without windowing).  [Cue Decl. ¶¶ 59-60.]  And Apple had an MFN:  If "other retailers . . . were able to get better deals or lower prices than Apple," then Apple's MFN gave Apple the right to lower those e-book prices on Apple's e-bookstore as well.  [Cue Decl. ¶ 65.]  As Mr. Jobs put it, the MFN meant that if "anybody else is selling the books cheaper than we are," then "Apple has the right to sell them at the lower price too."  [PX-514.]  If Amazon stayed on a wholesale model, major publishers would continue to window books on their e-bookstores.  [Cue Decl. ¶¶ 65-66.]  In Mr. Jobs' view, Amazon's choice was clear:  Sign agency contracts as the publishers asked Amazon, or lose money using a wholesale model with windowing.

248.     This was Apple's "aikido move," as Steve Jobs described it in his
biography.  Aikido is an individual sport.  An "aikido move" is using the strength and power of
your competitor against him—without involvement by anyone else.  Amazon's strategic pricing
pushed the market too far, and, as a result, publishers were going to window their e-books on
Amazon's e-bookstore.  With his reference to aikido, Mr. Jobs explained that Amazon moved to
agency to avoid windowing and ensure that it could keep offering a broad selection of e-books.

249.     Finally, Steve Jobs demonstrated his understanding of Apple's new release MFN
in an interview with Walter Mossberg, a technology reporter, at the iPad launch on January 27,
2010.  Mr. Jobs explained that Apple's new release MFN would ensure that Apple's e-book
prices would generally match the lowest price available regardless of what that lower price
actually was—the price for the e-book on Apple's e-bookstore "w[ould] be the same" as, for
example, a $9.99 new release e-book on Amazon's or Barnes & Noble's e-bookstores.  [Compl.
¶ 77.]

250.     Based on the foregoing, Steve Jobs' statements cited in the complaints do not
support an inference that Apple participated in a conspiracy.

## XIII.   INNOVATION

**Apple's Entry Increased Innovation in E-Books**

**Pre-Apple**

251.     Before Apple, consumers were largely limited to single-purpose, black-and-white
e-readers.  [*See* Cue Decl. ¶¶ 26, 44, 111; Moerer Decl. ¶¶ 14, 43; *see also* DX-085.]  By 2009,
publishers were ready to offer enhanced e-books with audio, video, and color.  [Sargent Decl.
¶ 24; *see also* DX-040.]  They were already experimenting with e-book apps in the App Store.

Because e-readers read only text, however, consumers had access to limited genres and titles of e-books at that time.

**Apple's Technological Innovation**

252.     Apple's iBooks software as experienced through the iPad, and Apple's subsequent innovations, described below, enhanced the e-reading experience, making it richer and increasing e-book availability and variety.  [McDonald Decl. ¶ 31; Young Decl. ¶¶ 40-41; Reidy Decl. ¶ 38.]  These efforts were the result of Apple's decision to enter the e-books business on the terms of Apple's agency agreements.  Apple's iPad and iBooks App was the first e-reading platform to offer major new features such as color, a touch screen, and "multi-functionality"—it was not only for e-reading, but also for numerous other uses, such as listening to music, watching television shows and movies, surfing the Internet, checking email, playing games, and much more.

253.     **Enhanced Reading Experience**. Apple's iBooks software introduced or improved features and functionality that make e-reading easier, more comfortable, more customizable, and more aesthetically pleasing.  A reader can, for example: (1) select from a large variety of fonts and adjust the font size; (2) change the e-book page color from white to sepia; (3) dim the screen's back light to read more easily at night; (4) double-tap an image to zoom in; (5) swipe across the screen to turn a page—an optional page curl feature simulates a page "turning;" (6) read e-books in a full screen mode with more words on a single page; (7) use an optional format that allows the reader to scroll vertically seamlessly though the e-book; and (8) use an optional double-page format that displays two pages on a single screen with a simulated "spine" down the middle (which looks like a physical book).  [McDonald Decl. ¶ 31.]

254.     iBooks also automatically hyphenates words to display more words on each page.  When a reader rotates the iPad (*i.e.*, turns it horizontally or vertically), iBooks

automatically re-orients the page so the text is always upright.  [McDonald Decl. ¶ 31.]  And iBooks has a virtual bookshelf, where consumers can organize e-books.  The bookshelf displays color e-book covers and consumers can sort their e-books by title, author, category, or genre in their personal iBookstore collections.  [McDonald Decl. ¶ 31.]

255.   **Interactive Reading Experience**.  Apple's iBooks software also introduced or improved features and functionality that allow readers to interact with, learn from, and experience e-books, including a built-in search feature to find a word, character, or phrase anywhere in the e-book text and a navigator tool at the bottom of each page that allows a reader to navigate an e-book.  Readers can also (1) highlight passages by swiping their finger across words; (2) add notes or bookmark pages; (3) look up definitions to words in English, Spanish, French, Japanese, and Simplified Chinese without leaving the e-book; (4) search Wikipedia directly from the e-book; and (5) share quotes or thoughts about books with connections on Facebook, Twitter, iMessage or e-mail.  iBooks also has a read-aloud feature, where a real narrator reads the e-book and the reader can follow along with highlighted text.  [McDonald Decl. ¶ 31.]

256.   **New Software Development.**  Apple developed an entirely new format for e-books, now called "Fixed Format" or "Fixed Layout."  Fixed Format has become widely-used in the e-book industry as part of the industry-standard, preexisting EPUB e-book format.  [McDonald Decl. ¶ 34.]  Apple's Fixed Format improved an e-book's layout, "fixing" e-book text and pictures in specific locations on a page.  Fixed Format allowed publishers and authors to publish new categories of e-books, such as cookbooks, children's books, and travel books.  [McDonald Decl. ¶¶ 32-33.]

257.   **Innovation in Self-Publishing.** Apple developed and launched iBooks Author, Apple's authoring and publishing software tool.  iBooks Author allows someone with relatively little technical knowledge or expertise to create e-books by designing templates and layouts; adding text, graphics, photographs, audio or movies; and inserting interactive elements, such as pop-over widgets or 3D graphics.  The creator can keep the e-book for personal use, distribute it to family or friends to read on iPad, or publish the e-book by offering it for sale on the iBookstore.  [McDonald Decl. ¶¶ 36-38.]

258.   Since Apple's entry, other e-book retailers have adopted similar innovations.  [McDonald Decl. ¶ 31.]  In response to Apple's entry, Amazon increased its innovation efforts.  [Murphy Decl. ¶¶ 52-54, 56.]  Indeed, there were public reports that Amazon wanted to improve its Kindle to compete with the iPad.  [Murphy Decl. ¶¶ 52-54, 56.]  With Apple's development of the Fixed Format EPUB 3 standard layout, Amazon has offered advancements in e-book display and layout on its Kindle e-reader.  [McDonald Decl. ¶¶ 34-35.]

**Apple's Innovation Extends Beyond E-Reading Technology and Software**

259.   **Non-Dedicated E-Reader Devices and New Readers**.  The iPad has led to the introduction of non-dedicated e-reader devices.  These devices have encouraged less frequent readers to purchase e-books and also enhanced the user experience considerably.  [Young Decl. ¶¶ 40-41; Reidy Decl. ¶ 38.]  Apple's 120 million-strong customer base has allowed publishers to reach new readers.  [Young Decl. ¶¶ 40-41; Reidy Decl. ¶ 38.]

260.   **Availability of Titles and Expansion into New Categories**.  When Apple first launched the iBookstore in April 2010, Apple offered 60,000 e-book titles.  Today, the iBookstore has 1.5 million titles.  This growth is on par with the growth of Amazon's e-book catalog in that same time period.  [McDonald Decl. ¶ 24.]  Apple's Fixed Format also made new

e-books—such as cookbooks or other illustrated works—available to consumers.  [Young Decl.
¶ 41; Reidy Decl. ¶ 38; McDonald Decl. ¶¶ 32-33.]

261.   **Consumer-Centered Promotion**.  The iBookstore also has consumer-centered
editorial and promotion policies that increase consumers' choice and access to e-books.   Apple
does not accept co-op payments from any publisher in exchange for preferential treatment of that
publisher's titles or authors.  Apple's editorial team reads e-books and promotes or features
certain e-books based on their quality and merit, not sales potential or publisher size.  To help
Apple customers find compelling content, Apple has also developed new merchandising
campaigns, such as "Editor's Pick," "Best of the Month," and "Best of the Year," "Essentials,"
"Book Club Picks," and "Free Book of the Week," to name a few.  [McDonald Decl. ¶ 28.]

**Amazon Innovates to Remain Competitive with Apple**

262.   Apple's entry into the e-books business spurred Amazon to improve the Kindle
reading experience.  One of Amazon's priorities was to ensure "competitive parity with Apple
and others on image quality."  [*See* DX-372.]  In particular, Amazon was concerned that it could
not match Apple's iBooks experience for graphic intensive books, like children's books.  [*See*
Naggar Dep. Tr. at 171:16-19, 171:21-25, 172:2-5 ("Q. Do you recall any proposal or suggestion
or project within Amazon to enhance the Amazon's e-reader that was directly attributable to
matching something that Apple was doing? . . . A. It was clear—yes.  It was clear that on
illustrated books, of which there were very few available in the marketplace . . . we wanted to
make sure that our Kindle app for iPad and others was going to be able to render children's
books.").]

263.   Amazon recognized ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████

264.    The *New York Times* reported that just days after Apple announced the iPad launch, Amazon acquired Touchco, a touchscreen start-up company, which was "a sign that Amazon wants to upgrade its Kindle e-reader to compete head-on with the Apple iPad." (DX-544.] And just days later, the *Times* ran a follow-up story that Amazon was hiring individuals with experience in color screens and Wi-Fi—another clear indication that "Amazon is not going to back down from a fight with Apple and its iPad." [DX-545.]

265.    Later that year, in June 2010, Amazon introduced its second generation Kindle DX with wireless internet and electronic (e-ink) display.  Then in July 2010, Amazon released a third generation Kindle 3G for only $189, featuring a smaller body and lighter weight.  [DX-394.]

266.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████  [DX-394.]

267.    In September 2011, Amazon released (i) the Kindle Touch, its first touchscreen device, and (ii) the Kindle Fire, the first Kindle that—like the iPad—had a full web browser, Wi-Fi, a touchscreen, color, and video support.  [*See* Naggar Dep. Tr. at 178:3-6, 178:10-13, 178:18-21, 178:24-25, 179:2-19 (describing the release of the Kindle Touch and Kindle Fire).]  The

Kindle Fire competed with the iPad's ability to support graphic intensive and color books, such as cookbooks and children's books.  [*See* Naggar Dep. Tr. at 179:24-25, 180:2-8.]

## XIV.   E-BOOK PRICES POST-APPLE'S AGREEMENTS (IN ALLEGED TRADE E-BOOKS MARKET) HAVE DECLINED

**Average E-Book Prices in the Alleged Relevant Market Declined Post-Agency**

268.    The average retail price of e-books in the alleged relevant market, trade e-books, has decreased since the implementation of Apple's first agency agreements on April 1, 2010. [Burtis Decl. ¶ 19.]  (Of note, when it gained the ability under the agency model to set its own prices in early 2011, Random House, a conceded non-conspirator, raised its prices (on average) higher than Publisher Defendants' prices (on average).  [Burtis Decl. ¶ 28.])

269.    The weighted-average retail price for an e-book fell from $7.97 in the "pre-agency" period (between February 2008 and March 2010) to $7.34 in the "post-agency" period (between April 2010 and March 2012).  [Burtis Decl. ¶ 19.]

270.    Plaintiffs' experts Professors Gilbert and Ashenfelter admit that they cannot dispute that the average retail price for trade e-books fell after Apple's entry.  [Burtis Decl. ¶ 21.] Plaintiffs' experts have not demonstrated that the average retail in the alleged relevant market would have been lower but-for the agency agreements.  Professor Ashenfelter has constructed a regression model to determine "adjusted" average market prices.  These "adjusted" prices are not calculations of actual prices, and Professor Ashenfelter does not consider them to be average prices "but-for" the adoption of agency.  [Snyder Decl., Ex. B at 140:18-141:12.]  Publisher defendants' e-book sales accounted for less than half of the market in April 2010 (and only about 25 percent in March 2012).  [Burtis Decl. ¶ 15.]  In fact, the e-books on which the Plaintiffs focus—the publisher defendants' new releases and bestselling titles that Apple, Amazon, Barnes

& Noble, and other retailers sell—account for only 10% or less of e-book sales in the alleged

relevant market and less than one-third of those publishers' e-book sales.  [Burtis Decl. ¶ 27.]

271.    Post-agency, consumers continued to have the ability to purchase e-books in the

alleged relevant market at $9.99 or less.  [Burtis Decl. ¶ 44.]  For example, in July 2010, Amazon

announced that it was offering 510,000 of its catalog of 630,000 e-books at prices of $9.99 or

below, including 75 *New York Times* bestsellers.  [DX-388.]  Professor Gilbert does not dispute

that over 75% of titles sold through the iBookstore were priced at or below $9.99.  [Burtis Decl.

¶ 44.]

272.    Wholesale prices have also declined since implementation of the agency

agreements.  Specifically, Hachette's average revenue per trade e-book—*i.e.*, the effective

average publisher-set wholesale price—declined post-agency.  [Burtis Decl. ¶ 25.]  Thus, post

agency, the major publishers earned less revenue per e-book sold than they had earned under the

wholesale model.  [Burtis Decl. ¶ 25.]

**Price Tiers Have Kept E-Book Prices Lower Than Print Book Prices**

273.    Apple's price tiers set maximum prices that constrained publishers' ability to

increase e-book prices.  [Burtis Decl. ¶ 45.]

274.    Of the e-books subject to the price tiers in Apple's agency agreements: (1) 74%

were required to be priced lower than the wholesale cost of the corresponding hardcover book;

and (2) 26% were required to be priced lower than the retail price of the corresponding hardcover

book, even if the retail price was as much as 40% off the print list price.  [Burtis Decl. ¶ 47.]

275.    Publishers' pricing strategies varied, and each priced certain e-books subject to

the pricing tiers below the prescribed maximums.  [Burtis Decl. ¶ 49.]

276.     E-book titles not covered by the pricing tiers are priced closer to the print list price than titles that are covered by the tiers.  [Burtis Decl. ¶ 50.]

277.     Certain maximum prices negotiated by Apple were lower than the maximum prices negotiated by Amazon.  [Burtis Decl. ¶ 48.]  Because Amazon had an MFN, the Apple-negotiated price caps in the Apple agency agreements resulted in Amazon's selling e-books at lower prices than the maximums it negotiated in its agency agreements.  [Burtis Decl. ¶ 48.]

### XV.     E-BOOK OUTPUT POST-APPLE'S AGREEMENTS (IN ALLEGED TRADE E-BOOKS MARKET) HAS INCREASED

278.     The publisher defendants' output in the alleged relevant market continued to increase substantially following implementation of Apple's agency agreements.  [Burtis Decl. ¶ 7.]

279.     From the second quarter of 2010 (when the first agency agreements were implemented) to the first quarter of 2012, the number of paid e-books purchased from Amazon, Apple, Barnes & Noble, Books-A-Million, Google, Kobo, and Sony rose from approximately 18 million to approximately 100 million (an increase of 447%).  [Burtis Decl. ¶ 31.]  If free e-book units are included, the number of e-books increased from approximately 31 million units to 222 million units (an increase of 615%).  [Burtis Decl. ¶ 31.]  Consumers downloaded 122 million e-books (including nearly 30 million paid e-books) from the iBookstore alone between April 2010 and April 2012.  [Burtis Decl. ¶ 32.]  To date, consumers have purchased 70 million e-books and have downloaded 160 million free titles from the iBookstore.  [McDonald Decl. ¶ 22.]  The iBooks App has been downloaded more than 140 million times worldwide, including over 50 million downloads in the United States.  [McDonald Decl. ¶ 22.]

280.     The number of available e-book titles also has increased.  [Burtis Decl. ¶ 33.]  For example, since Apple's entry, the growth in Amazon's e-book catalog of e-book titles has

accelerated.  [Burtis Decl. ¶ 33; DX-463.]  In the five months before Apple's entry through agency, Amazon reported a 29% increase in the number of titles available; in the five months after agency, the increase was 46%.  [Burtis Decl. ¶ 33.]

281.    There is no reliable evidence that e-book output declined after (or because of) the implementation of Apple's agency agreements.  [Burtis Decl. ¶¶ 34-35, 38.]  Professor Gilbert's conclusion that output declined is based on an analysis of two arbitrary two-week periods, and he acknowledged that his conclusion could change to show an increase in output depending on the weeks he chose to analyze.  [Burtis Decl. ¶¶ 34-35.]  Professor Ashenfelter has not ruled out the possibility that relative output of publisher defendants' titles increased post-agency, because, rather than buying fewer books, consumers could simply have purchased a "different mix" of titles.  [Burtis Decl. ¶ 38.]

282.    Professors Gilbert's and Ashenfelter's conclusion that e-book growth has slowed since agency is flawed.  [Burtis Decl. ¶¶ 36, 37.]  Both concede that the dramatic pre-agency growth rate was based on a starting point of relatively few e-book sales.  [Burtis Decl. ¶ 36.]  And it is undisputed that the pre-agency rate of growth was unsustainable over the long term. [Burtis Decl. ¶ 36.]

## XVI.   APPLE'S ENTRY AND THE AGENCY MODEL INCREASED COMPETITION IN THE ALLEGED RELEVANT MARKET

283.    The growth in e-book sales and overall lower e-book prices after the implementation of the Apple agency agreements are attributable in large part to the dynamic nature of competition in the e-books market, stimulated by the expansion of platforms, sales models, and publishers vying for the consumer's attention.  [Burtis Decl. ¶ 8.]

284.    The alleged relevant market includes the full range of trade e-books, meaning that titles offered by the major publishers compete with titles offered by independent publishers and

self-publishers.  [Burtis Decl. ¶ 8.]  In this market, bestsellers compete with backlist; $9.99 titles compete with $4.99 and $14.99 titles; titles sold on the agency model compete with titles sold on the wholesale model.  [Burtis Decl. ¶ 8.]  And self-publishers' sales increased dramatically following Defendants' agency agreements.  The increase in self-publisher sales can be attributed at least in part to Amazon's Kindle Direct Publishing (KDP) program and its adoption of an agency model as employed by Apple. The Amazon program involved terms much like those in the Apple agency model, including authors'/publishers' ability to set prices, price caps, price parity terms, and an increase in the amount the self-publisher could earn from 35% to 70%.  [Burtis Decl. ¶ 43.]

285.    Since the implementation of the Apple agency agreements, the number of inexpensive e-books published by independent publishers, including self-published authors, has increased substantially.  [Burtis Decl. ¶ 8.]  At the time Apple signed agency agreements with the first five major publishers, their sales comprised less than half of sales in the e-books market, and their share had been declining.  [Burtis Decl. ¶¶ 15, 41; DX-437.]  But after, and through March 2012, the sales of independent publishers and self-published authors grew, while the major publishers' sales continued to decline.  [Burtis Decl. ¶ 41; DX-437.]  Many of these independent and self-publishers offered low-priced alternatives to e-books published by the major publishers.  [Burtis Decl. ¶ 40.]

286.    The growth in competition among publishers is illustrated by (1) the growth in the total number of publishers, and (2) the increasing market share of small publishers.  In the six-month period before agency, approximately █████ publishers sold their e-books through Amazon.  In the six-month post-agency period between October 2010 and March 2011, that number totaled over █████ —an increase of ████████████ from the same period a

year earlier.  [Burtis Decl. ¶ 42; DX-441.]  Small independent publishers have also accounted for

a growing share of Amazon's total sales.  From October 2009 through March 2010, publishers

ranking outside the top 50 in e-book sales generated approximately ███ of Amazon's total e-

book sales; such publishers generated ███ of Amazon's e-book sales during that time period for

2010 to 2011, and ███ of Amazon's sales for that period in 2011 to 2012.  [DX-441.]

287.    Since the implementation of Apple's agency agreements, retailer competition also

has increased.  The number of retailers selling e-books has increased, and Amazon's share has

declined.  [Burtis Decl. ¶ 32.]  Before the implementation of the agency agreements, Amazon

accounted for almost ███ of e-book sales.  [Burtis Decl. ¶ 52.]  From April through December

2010, Amazon generated ███ of e-book sales, and Barnes & Noble and Apple respectively

accounted for 21% and 9%.  [DX-436.]  According to Plaintiffs' expert Professor Baker, as of

February 2013, Amazon's share of the trade e-books market was ███; Barnes & Noble's share

was 22%; and Apple's share was 12-15%.

288.    Since the agency agreements went into effect, e-book retailers have introduced

many new and innovative e-reader devices and tablets at lower prices.  [DX-450.]

289.    Apple promotes competition among e-book retailers by hosting Apple's

competitors' e-reader apps on Apple's iPad.  [Cue Decl. ¶ 109.]

290.    Every critical indicator of market health—lower price, higher output, more

selection, higher quality, lower concentration—signals that the trade e-books market has been

thriving since agency and consumers have been reaping the benefits.

## XVII.  **PLAINTIFFS' OWN EXPERTS DISPROVE PLAINTIFF'S CASE**

291.    ***Apple's Independent Business Justification.***  Apple had independent business

justifications for negotiating and signing the agency agreements with publishers.  The DOJ's

expert, Professor Gilbert, does not dispute that Apple had a "valid business justification" for wanting agreements with similar terms in place with the major publishers before opening its new bookstore.  Professor Gilbert also admits that, absent a conspiracy, "it could be consistent" with Apple's "independent interest" to have proposed an agency agreement with price caps, an MFN, no windowing, and a single digit profit margin.  He acknowledges that the MFN gave valuable "price protections to Apple."  Professor Baker, expert for the states, also admits that he cannot dispute Apple's evidence that the features of the agency agreements were in Apple's unilateral economic interests.  Professor Baker agreed that the MFN would benefit Apple, and Apple's e-book share would be higher if its prices were no higher than those of its competitors.

292.  ***Amazon's Adoption of Agency.***  Despite Plaintiffs' contentions that the Apple MFN was a commitment mechanism that economically forced the publishers to move Amazon to agency, Plaintiffs' experts have not rebutted Professor Klein's empirical analyses demonstrating that the Apple MFN had an extremely small incremental economic effect on publisher incentives for Amazon's to move to agency.  [*See* Klein Decl. ¶ 5.]  Professor Baker does not attempt to measure the effect of the MFN on Amazon's move to agency.  [Klein Decl. ¶ 7.]  Professor Gilbert claims that he prepared an empirical model to quantify the incentives created by the MFN, but did not include that analysis in his reports.  [Klein Decl. ¶ 7.]  In fact, Professor Gilbert admits that there could have been factors other than the Apple MFN that led Amazon to adopt agency, and he does not "have enough facts to say what actually could have happened." Professor Gilbert acknowledges that with or without an MFN in Apple's agency agreements, it would have been rational for Amazon to be concerned about a scenario in which Apple could sell all new release e-books under an agency model while faced with publishers' publicly announced plans to window or withhold books from retailers remaining on an agency model.  Professor

Gilbert also admits that he has no basis to contradict Apple's testimony that it was indifferent to whether Amazon stayed on a wholesale model or moved to agency.

293.     ***Market Entry.***  Professor Gilbert admits that actual entry by a new firm often changes the structure of markets and can upset traditional patterns of market conditions.  He also acknowledges that it is not "reasonable for a firm to enter an industry with the expectation of losing money."  Professor Baker assumes, consistent with Apple's testimony, that it would not have entered into the market without the agency agreements.   DOJ's expert, Professor Gilbert, testified that he made the working assumption "that but for the agency agreements, there may not be an iBookstore."  Apple's entry has brought millions of consumers into the alleged relevant market.

294.     ***Market Power***.  Plaintiff's expert Professor Ashenfelter admits that Apple did not have market power before entering the e-books market and that he does not "have any basis" for an opinion that Apple had market power once it entered in 2010.  Professor Baker agrees that Apple "did not have market power in the [alleged] relevant market before it entered."  [Murphy Decl. ¶ 57.]

295.     ***Prices and Output.***  Professors Gilbert and Ashenfelter admit that they cannot dispute that average prices for all trade e-books—plaintiffs' alleged relevant market—have fallen since Apple's entry.  [Burtis Decl. ¶ 21.]  No party disputes the rapid growth of output (e-book sales) in the alleged relevant market before and after agency.  [Burtis Decl. ¶ 7.]

## XVIII. <u>CONCLUSION</u>

296.     Apple did not enter into or facilitate a conspiracy to eliminate price competition or raise prices in the e-book industry.

Dated:  April 26, 2013
        New York, New York

Respectfully submitted,

By:

Orin Snyder
Lisa H. Rubin
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY  10166
(212) 351-4000
osnyder@gibsondunn.com

Daniel S. Floyd (*Pro Hac Vice*)
Daniel G. Swanson (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000
dfloyd@gibsondunn.com

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
Edward N. Moss
O'Melveny & Meyers LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple Inc.*