UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,                                                :
:
               Plaintiff,                                 :
:
   v.                                                                  :  12 Civ. 2826 (DLC)
:
APPLE INC., *et al.*,                                                    :
:
               Defendants.                                :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                       x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
THE STATE OF TEXAS,                                                      :
THE STATE OF CONNECTICUT, *et al.*,                                      :
:
               Plaintiffs,                                :
:
   v.                                                                  :  12 Civ. 03394 (DLC)
:
PENGUIN GROUP (USA) INC., *et al.*,                                      :
:
               Defendants.                                :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE
DR. MICHELLE BURTIS FROM OFFERING AT TRIAL ANY OPINION ON
COMPETITIVE EFFECTS**

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. OVERVIEW ....................................................................................................................... 1

    A. Plaintiffs' Allegations ................................................................................................ 1

    B. Dr. Burtis' Opinion .................................................................................................... 2

III. ARGUMENT ..................................................................................................................... 4

    A. Dr. Burtis' Testimony Is Relevant To Refute Plaintiffs' Express Allegations ............. 4

    B. Dr. Burtis' Testimony Is Relevant Under Governing Legal Standard ......................... 5

    C. Dr. Burtis' Work Meets The Reliability Standards Of Rule 702 ................................ 9

IV. CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bickerstaff v. Vassar Coll.*,
  196 F.3d 435 (2d Cir. 1999) .................................................................................................. 9

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .......................................................................................................... 1, 7

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) .................................................................................................. 6

*Chicago Bd. of Trade v. United States*,
  246 U.S. 231 (1918) .............................................................................................................. 5

*Claar v. Burlington N. R.R.*,
  29 F.3d 499 (9th Cir. 1994) ................................................................................................ 10

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) ................................................................................................................ 6

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004) .................................................................................................. 1

*In re Executive Telecard, Ltd. Sec. Litig.*,
  979 F. Supp. 1021 (S.D.N.Y. 1997) .................................................................................... 10

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) .............................................................................................. 8

*In re Wireless Tele. Serv. Antitrust Litig.*,
  385 F. Supp. 2d 403 (S.D.N.Y. 2005) .............................................................................. 9, 10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) .................................................................................................................. 6

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .............................................................................................................. 8

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................................... 9

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) .................................................................................................. 10

*U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers Local Union No. 3*,
    313 F. Supp. 213 (S.D.N.Y. 2004) ............................................................................................ 10

*U.S. v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) ..................................................................................................... 9

**Other Authorities**

Response of Plaintiff United States to Public Comments on the Proposed Final Judgment (July
    23, 2012) .................................................................................................................................... 5

U.S. Dep't of Justice, Statement by Assistant Attorney General R. Hewitt Pate Regarding the
    Closing of the Orbitz Investigation, at 2-4 (July 31, 2003) ....................................................... 7

**Rules**

Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments ......................................... 10

## I.  INTRODUCTION

Apple's and Penguin's expert Dr. Michelle Burtis has concluded that the economic evidence in this case "is inconsistent with Plaintiffs' allegations of anticompetitive harm in the alleged relevant market."  Burtis Decl. ¶ 3.  Prices have dropped in that market.  Output has exploded.  Selection has improved.  Product quality has never been better.  Innovation has moved at breathtaking speed.  Dr. Burtis' comparison of the pre-agency period with the post-agency period makes these points decisively.  Unable to rebut these facts, Plaintiffs now ask this Court to turn a blind eye to them and exclude Dr. Burtis' testimony along with the underlying economic evidence.  This motion should be summarily denied.  Plaintiffs do not contest Dr. Burtis' qualifications as an expert.  They do not dispute the comprehensiveness of her database or the accuracy of her calculations.  They accept that the relevant market is trade e-books (it is their definition, after all).  Their allegations about anticompetitive harm in the alleged relevant market are a matter of record.  The economic evidence in this case *is inconsistent with those allegations* and is *highly relevant*.  Facts are facts.  The "anticompetitive scheme" Plaintiffs have alleged must be "judged against the realities of the market."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993).

## II.  OVERVIEW

### A.  Plaintiffs' Allegations

As Plaintiffs recognize, they bear the "initial burden to demonstrate that the defendants' challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market.'"  P. Br. 35 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004)).  Accordingly, in their complaints, Plaintiffs expressly and extensively alleged that retail prices were increased and competition was reduced *across the entire relevant*

1

*market*.  According to Plaintiffs, "[e]ach Publisher Defendant desired higher retail e-book prices across the industry," DOJ Compl. ¶ 3, and Apple was "perhaps the only company that could facilitate their goal of raising retail e- book prices across the industry," *id*. ¶ 60.  *See also* States' Second Amended Compl. ¶ 63 ("Apple was actively seeking to bring the Publishers into a collective agreement to use the Agency Model as a mechanism to raise e-book retail prices marketwide.").  Plaintiffs contend that this was achieved through the Apple Agency Agreements "that all Defendants knew would raise consumer prices market-wide."  P. Br. 31.  Plaintiffs assert that the Agreements allowed defendants "to raise, fix, and stabilize retail e-book prices" by "export[ing] the agency model and higher retail prices to the rest of the industry."  DOJ Compl. ¶ 91.  "Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on consumers in the trade e-books market by depriving consumers of the benefits of competition among e-book retailers as to both retail prices and retail innovations . . . such that it constitutes an unreasonable restraint on trade."  *Id.* ¶ 98.  Among the alleged anticompetitive effects that "Defendants' agreement and conspiracy has had and will continue to have" are "[i]ncreasing the retail prices of trade e-books,"[1] "[e]liminating competition on price among e-book retailers," and "[c]onstraining innovation among e-book retailers." *Id*. ¶ 102(a), (b) & (e).

**B.      Dr. Burtis' Opinion**

Dr. Burtis opines that the "economic evidence is inconsistent with Plaintiffs' allegations of anticompetitive harm in the alleged relevant market."  Burtis Decl. ¶ 3.  In reaching this opinion, Dr. Burtis analyzed sales data produced in this litigation and other evidence related to

---

[1]  This is a distinct allegation from the claim that defendants restrained "competition on retail price among the Publisher Defendants."  DOJ Compl. ¶ 102(c).

2

pricing, output, competitive conditions prior to Apple's entry, the pricing strategy and profitability of other e-book retailers prior to Apple's entry, and e-reader characteristics and prices post-agency in order to "present the Court with a clear and complete picture of the competitive conditions in the alleged relevant market before and after the implementation of the agency agreements." *Id.* ¶ 13.  Given Plaintiffs' claim that the alleged conspiracy caused harm in the alleged relevant market, *see supra* 1-2, Dr. Burtis sought to "examine indicia of competition across Plaintiffs' entire alleged relevant market," based on the "full range of transactional data produced."  Burtis Decl. ¶¶ 15-16.  Accordingly, her analysis measures "longer-term effects" in the alleged relevant market post-agency, as well as presents a complete picture of prices and output in the overall trade e-books market on a monthly basis over the course of the year leading up to and following implementation of the Apple agency agreements. *See* Burtis Decl. ¶ 17; DX-435; DX-436.

      Dr. Burtis calculated the average retail price of e-books in the alleged relevant market and found that average prices were lower during the post-agency period than the pre-agency period overall, with the average price having fallen lower by January 2011 than it was prior to implementation of the first agency agreements on April 1, 2010.  Burtis Decl. ¶¶ 19-20.  These results were verified by Plaintiffs' experts Professors Gilbert and Ashenfelter.  *Id.* ¶ 21.  Dr. Burtis also opines that "[t]he economic evidence indicates that absent the agency agreements, average prices of eBooks may have been higher than average prices prior to the agreements."  *Id.* ¶ 18.  As Dr. Burtis explains, Plaintiffs' experts Professors Gilbert and Ashenfelter present no analysis of prices in the alleged relevant market.  *Id.* ¶ 22.  Professor Baker, the sole expert in this litigation who claims that the average retail price of e-books in the alleged relevant market

3

increased following the agency agreements, conducted no data analysis in support of his claim.[2] *Id.* ¶ 23.  Dr. Burtis also concluded that "[e]book output in the alleged relevant market continued to increase substantially following implementation of the agency agreements"—another uncontested fact. *Id.* ¶ 7.

### III.  ARGUMENT

#### A.  Dr. Burtis' Testimony Is Relevant To Refute Plaintiffs' Express Allegations

Dr. Burtis' testimony—that the economic evidence in this case "is inconsistent with Plaintiffs' allegations of anticompetitive harm in the alleged relevant market"—is not just relevant, it is *demonstrably true*.  While Plaintiffs appear to regret it, they did indeed allege that defendants used "the Agency Model as a mechanism to raise e-book retail prices marketwide," "exported the agency model and higher retail prices to the rest of the industry," and imposed "demonstrable anticompetitive effects on consumers in the trade e-books market by depriving consumers of the benefits of competition."  *See* IIA, *supra*.  Now, faced with the incontrovertible *proof* that market prices dropped after agency, output expanded, innovation continued and concentration diminished, Plaintiffs' solution is to demand that the Court ignore those facts.  But inconvenient facts cannot be dealt with like insubordinate soldiers by having them taken out and shot.

Plaintiffs now pretend that they always knew market prices were falling after agency and argue that this fact is somehow irrelevant rather than damning.  But, as noted above, Plaintiffs clearly alleged that defendants conspired "to *raise, fix, and stabilize* retail e-book prices."  DOJ Compl. ¶ 91 (emphasis added).  Indeed, in the course of Tunney Act proceedings in this case,

---

[2]  Plaintiffs do not seek to preclude Dr. Burtis from offering criticisms of Plaintiffs' experts. Mot. 9 n.6.

when Barnes & Noble observed "that 'average' retail … prices for e-books have declined under [agency]," the DOJ dismissed the comment derisively: "[U]nlike the United States, B&N does not have access to sales data from competing retailers, so its results only address one retailer's slice of the market." *See* Response of Plaintiff United States to Public Comments on the Proposed Final Judgment (July 23, 2012), at 29-30. Relying on this superior access to information, the DOJ endorsed the view that "even with these uncertainties, B&N's own data suggests that the collusive agreement played a role in *stabilizing retail e-book prices*" and that "just as the collusive agency agreements were taking effect in the spring of 2010, *a trend of falling e-book pricing was arrested.*" *Id*. at 30 (emphasis added). As Dr. Burtis will testify, this is simply not a correct picture of the relevant market.

**B.     Dr. Burtis' Testimony Is Relevant Under Governing Legal Standard**

Dr. Burtis' testimony is acutely relevant in this case even without regard to Plaintiffs' affirmative allegations of marketwide harm. Under the rule of reason, the fact-finder *must* consider "the facts peculiar to the business to which the [alleged] restraint is applied [and] its condition before and after the restraint was imposed." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). Dr. Burtis has undertaken this exact "before and after" analysis of the relevant market, calculating and evaluating the key indicators of market health. Plaintiffs' contention that this analysis must be excluded is flatly wrong.

Plaintiffs' fundamental problem with Dr. Burtis' testimony is that it is not limited in focus to the portion of the market accounted for by the defendant publishers' new releases and bestsellers. But these titles account for *only 10%* of the paid e-books sold in the alleged relevant market. Burtis Decl. ¶ 6. Plaintiffs bear the burden under the rule of reason of "showing that the challenged action has had an actual adverse effect on *competition as a whole in the relevant*

5

market." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis added); *see also* P. Br. 35. Dr. Burtis' testimony—showing the healthy state of competition as a whole over the post-agency period—demonstrates that Plaintiffs' partial evidence gives a wholly unrepresentative picture of reality at the market level. This testimony is highly probative of their failure to show that competition in the relevant market overall was restrained. *See, e.g.*, *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 45 (1977) ("Applying the rule of reason to the restrictions that were not imposed in conjunction with the sale of bicycles, the Court had little difficulty finding them all reasonable in light of the competitive situation in 'the product market as a whole.'"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29-30 & n.48 (1984) (rule of reason claim unsubstantiated when empirical evidence lacking of effect of challenged arrangement on price or quality in the relevant market).

The complaint that Dr. Burtis' testimony is "unhelpful, and at worst, misleading" because of a supposed failure to "isolate" the effect of the agency model on the relevant market is highly ironic given the extent to which Plaintiffs' own experts have insulated their own opinions from market realities. Further, Plaintiffs' experts by their own admission have *not* calculated "but-for" market prices or "but-for" market output. *See* Apple's Mot. in Limine to Exclude Testimony of Profs. Ashenfelter and Baker at 8-13; Apple's Mot. in Limine to Exclude Testimony of Prof. Gilbert at 7-10; AF ¶ 270. In any event, there is no legal merit to the suggestion that *accurate market price and output data* are irrelevant to the question of market effects unless pruned, pared, manipulated, abridged, or adjusted. Mot. 7 ("failing to control for outside variables (either via a regression or a short window) renders an opinion unreliable"). To the contrary, the Supreme Court (for example) has found unadjusted market price and output data (over long, not short, windows of time) to be highly relevant in evaluating claims of

6

anticompetitive pricing and output restriction. *See Brooke Grp.*, 509 U.S. at 233-37.  Consulting *actual market outcomes* is little more than common sense.  It is routine in antitrust analysis.  In another case, for example, the DOJ deemed unadjusted market price data showing an "overall [price] decrease" over an extended period to be a relevant and reliable basis for concluding that an MFN did not raise prices in a market, even while acknowledging that "many factors could have influenced this [market price] decrease."  DX-001 (U.S. Dep't of Justice, Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of the Orbitz Investigation, at 2-4 (July 31, 2003)).

Plaintiffs opine that "Dr. Burtis could have chosen a short window for analyzing the effects of the Apple Agency Agreement," but ignore her explanation for why doing so would be erroneous.  Mot. 8.  As Dr. Burtis has explained:

> "[T]he shift from the wholesale model to the agency model represented a significant change in the business model for selling eBooks.  Some of the effects of this change in business model, including any procompetitive benefits, would not be immediately apparent in the transactional data.  Analysis by Plaintiffs' experts, who for the most part evaluate indicia of competition over shorter durations of time, is incapable of measuring any longer-term effects of the competition and innovation in the alleged relevant market post-agency." Burtis Decl. ¶ 17.

Plaintiffs also criticize Dr. Burtis for supposedly failing to control "for the most obvious factors affecting e-book prices, such as the continuing growth of low-priced, self-published e-books and the changing mix of titles that are offered in digital formats as traditional publishers continue converting their print backlists to digital."  Mot. 3.  Not so.  Dr. Burtis' testimony will allow the Court to assess whether "other factors" independent of entry by Apple and the advent and success of the agency model caused prices to fall.  For example, Dr. Burtis has calculated average prices of all relevant groupings of publishers for every point in time over the entire 2008-2012 time period for which market data were available.  Burtis Decl. ¶¶ 11-13, 19; DX-434; DX-435.  The Court can examine this information and determine whether the DOJ was

7

correct to advance the view (in the Tunney Act proceedings) that "just as the collusive agency agreements were taking effect in the spring of 2010, a trend of falling e-book pricing was arrested."  *See* Response of Plaintiff United States to Public Comments on the Proposed Final Judgment (July 23, 2012), at 30.  (In fact, average market price was largely flat over the 2008-2009 period; in the 2010-2012 period, the trend was downward.  *See* DX-434; DX-435.)

Dr. Burtis' calculations show plainly how Apple's entry stimulated Amazon to compete.  "For example, since the entry of Apple, the growth in Amazon's catalog has accelerated. . . . [I]n the five months prior to agency and Apple's entry, Amazon reported a 29% increase in the number of titles available, while over the five months after agency, the increase was 46%."  Burtis Decl. ¶ 33; DX-463.  Plaintiffs simply overlook the decisive fact that a durable effect of Apple's entry via the agency model was and is the *stimulation of interbrand competition*.[3]  As another example of this, just days after learning of Apple's looming entry into the e-book market on the agency model, *see* Grandinetti Decl. ¶¶ 36-38; Naggar Decl. ¶¶ 23-26, Amazon announced on January 20, 2010 that it would reduce its commission on self-publisher sales from 65% to 30%, exactly mimicking Apple's agency model (in this regard as in others).  *See* DX-196 (Amazon Press Release, "Amazon Announces New 70 Percent Royalty Option for Kindle Digital Text Platform" (Jan. 20, 2010)); Burtis Decl. ¶ 43 (Amazon program involved terms much like those in the Apple agency model).  Dr. Burtis has studied carefully how this 70-30 split in revenue (embraced by both Amazon and Apple) promoted entry and growth by

---

[3] *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 895 (2007) (the "antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result"); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1012 (7th Cir. 2012) ("The plaintiffs' claim that the price would have been even lower without the [challenged price-raising] agreements is doubtful, as we have said, because without the agreements the [defendants] might not have entered the U.S. market").

independent and self-publishers. Burtis Decl. ¶¶ 40-43; DX-441. Plaintiffs thus have no warrant to complain of the inclusion of these sales in Dr. Burtis' study of the relevant market. *See* Mot. 4 ("makes no sense" to include Amazon self-publisher sales in evaluating agency). On the contrary, to exclude them would be a distortion of market reality.

C.     **Dr. Burtis' Work Meets The Reliability Standards Of Rule 702**

In seeking to exclude her testimony, Plaintiffs cite a number of cases in which, they say, expert testimony has been excluded due to failure to account for alternative explanations of the alleged outcome. *See* Mot. 6-7. These cases are not on point, however, and certainly do not uphold the exclusion of an expert's opinion that real world, undisputed data on price, output, and innovation are inconsistent with alleged anticompetitive effects. This is not a case of Dr. Burtis basing her conclusions on a "regression[] so incomplete as to be inadmissible as irrelevant." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999); *see also In re Wireless Tele. Serv. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) ("Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 667-78 (S.D.N.Y. 2007) (holding that expert opinion based on a single factor regression analysis was not reliable). Dr. Burtis does not conduct a regression analysis and, despite Plaintiffs' suggestion otherwise, a "regression analysis is not a mandatory feature in all applications of economics or statistics." *U.S. v. Valencia*, 600 F.3d 389, 427 (5th Cir. 2010) (upholding admission of expert testimony based on calculation of weighted-average prices and observation of trends).

As discussed above, Dr. Burtis' testimony presents a full picture of market data that will allow the Court to assess whether "other factors" independent of entry by Apple and the advent and success of the agency model caused prices to fall. *See U.S. Info. Sys. v. Int'l Bhd. of Elec.*

9

*Workers Local Union No. 3*, 313 F. Supp. 213, 238-239 (S.D.N.Y. 2004) ("In order for [expert's] testimony to be admissible, he need only demonstrate that he has 'adequately accounted' for alternative explanations") (quoting Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments); *cf. In re Wireless*, 385 F. Supp. 2d at 427 (excluding testimony where expert "failed to consider or test for any alternative explanations"). The cases cited by Plaintiffs in which courts excluded expert testimony where such testimony failed to meet a *plaintiff's* burden of proof on damages or otherwise are inapposite.[4] Dr. Burtis' testimony is reliable and highly relevant to the core issues in this case. It cannot be excluded.

### IV.   CONCLUSION

Apple respectfully requests that this Court deny Plaintiffs' motion to preclude Dr. Burtis from offering at trial any opinion on competitive effects.

---

[4] *See Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (discrimination claim required a "showing of causation between the challenged practice and alleged disparities" and statistical analysis that did not provide reliable evidence of causation failed "to make it more or less likely that [defendant] engaged in age discrimination"); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (upholding exclusion of expert's opinion where "[h]e offered no scientific basis for concluding that chemical exposure played any part at all in [plaintiff's] condition."); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding expert opinion where damages in securities fraud case "require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong" and expert failed to do so).

Dated: May 3, 2013  
       New York, New York

Respectfully submitted,

By: _____  
Orin Snyder  
Lisa H. Rubin  
Gibson, Dunn & Crutcher, LLP  
200 Park Avenue, 47th Floor  
New York, NY 10166  
(212) 351-4000  
osnyder@gibsondunn.com

Daniel S. Floyd (*Pro Hac Vice*)  
Daniel G. Swanson (*Pro Hac Vice*)  
Gibson, Dunn & Crutcher, LLP  
333 South Grand Avenue  
Los Angeles, CA 90071  
(213) 229-7000  
dfloyd@gibsondunn.com

Cynthia Richman  
Gibson, Dunn & Crutcher, LLP  
1050 Connecticut Avenue, N.W.  
Washington, DC 20036  
(202) 955-8500  
crichman@gibsondunn.com

Howard E. Heiss  
Edward N. Moss  
O'Melveny & Myers LLP  
Times Square Tower  
7 Times Square  
New York, NY 10036  
(212) 326-2000  
hheiss@omm.com

*On behalf of Defendant Apple Inc.*