

**U.S. Department of Justice**

Antitrust Division

---

*Lawrence E. Buterman*  
*Direct Dial: (202) 532-4575*  
*Fax: (202) 616-8544*  
*e-mail: lawrence.buterman@usdoj.gov*

*Liberty Square Building*  
*450 5th Street, NW*  
*Suite 4000*  
*Washington, DC 20530*

Dx F
6/4/13

May 31, 2013

BY E-MAIL

The Honorable Denise L. Cote  
United States District Judge, S.D.N.Y.  
Daniel P. Moynihan U.S. Courthouse  
New York, NY 10007-1312

      Re:    <u>United States v. Apple, Inc.</u>, No. 12-cv-2826 (DLC)  
             <u>State of Texas v. Penguin Group (USA), Inc.</u>, No. 12-cv-3394 (DLC)

Dear Judge Cote:

      We have reviewed the revised expert affidavits of Dr. Michelle Burtis and Dr. Kevin Murphy that Apple submitted to the Court last evening, and write to provide the Court with our objections to certain portions of those affidavits that do not comport with this Court's rulings on Plaintiffs' motions *in limine*.

**DR. BURTIS**

      Last week, this Court granted Plaintiffs' motion *in limine* to preclude Dr. Burtis from offering at trial any opinion on competitive effects, and specifically identified several statements in Dr. Burtis's trial affidavit as being insufficiently rooted in economic theory to be admissible. *See* Pretrial Conf. Tr. 31-32. In Dr. Burtis's revised affidavit, however, Apple has merely deleted the conclusions from the paragraphs identified by the Court and buried them at the end of the affidavit in a new paragraph 56. That is not complying with the Court's ruling. Indeed, Dr. Burtis's paragraph 56 specifically offers the opinion that the Court excluded: "competition in the alleged relevant market (trade eBooks) has not been reduced by Apple's entry or the adoption of the agency model." And, in further disregard of the Court's ruling, Dr. Burtis presents a new, albeit, bald statement that the decline she observed in average prices of eBooks "was not the result of any pre-existing downward trend in price." Plaintiffs respectfully submit that Dr. Burtis's failure to comply with the Court's ruling warrants the exclusion of the entirety of new paragraph 56.

The Honorable Denise L. Cote
May 31, 2013
Page 2

Additionally, despite the fact that the Court listed the first sentence of paragraph 20 (which is now paragraph 19 in Dr. Burtis's revised affidavit) as an example of a sentence that was not sufficiently rooted in economic theory to be admissible, *see* Pretrial Conf. Tr. 31-32, Apple has refused to delete that sentence. That sentence reads as follows: "If the analysis was performed based on the one-year time period that Professor Gilbert uses to measure the 'long run effect of the switch to agency on eBook retail prices' by Publisher Defendants, my conclusion would be unchanged." Again, we respectfully submit that this statement referencing Dr. Burtis's conclusion is not sufficiently rooted in economic theory and should be stricken.

## DR. MURPHY

Last week, this Court granted in part Plaintiffs' motion *in limine* to preclude Dr. Kevin Murphy from offering at trial testimony on the first three opinions set forth in his expert report. In particular, at the prior day's pretrial conference, the Court stated that "at the very least," Dr. Murphy's first opinion was "premised on a faulty legal assumption and is irrelevant in this case." Pretrial Conf. Tr. 34. In addition, the Court held that to "the extent that Dr. Murphy simply presents his own views regarding Apple's motives and intentions, that testimony is also inadmissible as an improper invasion of the factfinder's role." *Id.*

Consistent with the Court's observation that Dr. Murphy's trial declaration was "focused almost exclusively on Apple's conduct and motivations," *id.* at 33, Apple has excised or modified significant portions of Dr. Murphy's testimony. However, much of Dr. Murphy's testimony continues to read like a legal brief or summation, consisting of nothing more than a recasting of the record evidence, including Dr. Murphy's interpretations of Apple's and Publisher Defendants' intent, knowledge, and purpose. Several portions of Dr. Murphy's testimony are also still based on the same faulty legal assumptions that pervaded his initial testimony and analysis.

At times, Apple attempts to mask the true nature of Dr. Murphy's testimony by adding phrases like "[a]s an economic matter," *e.g.*, Murphy Aff ¶¶ 14, 26, 31, and "an economic incentive," *e.g.*, *id.* ¶¶ 11, 16, to his previous rote recitation of the "facts" that Apple would like this Court to find. At other times, Apple leaves Dr. Murphy's testimony about what it and the publishers expected or wanted to have happen unchanged. Neither approach complies with this Court's ruling on Plaintiffs' motion *in limine* or the Federal Rules of Evidence.

Thus, much of Dr. Murphy's revised testimony should be excluded because it usurps the proper role of the factfinder in applying the law to the facts before it, or because it applies a faulty legal standard and is therefore irrelevant. *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). In appendix A, Plaintiffs have identified those portions of Dr. Murphy's testimony they continue to find objectionable and the reasons for those objections. We respectfully ask the Court to exclude the identified testimony from Dr. Murphy's trial affidavit.

The Honorable Denise L. Cote
May 31, 2013
Page 3

                                  Respectfully Submitted,

                                  /s/ Lawrence E. Buterman
                                Lawrence E. Buterman

# Appendix A: Plaintiffs' Objections to Dr. Murphy's Revised Affidavit

| Paragraph Number | Statement | Objections |
|---|---|---|
| 8 | "Based on my analysis, I have concluded that, as a matter of economics, all the actions taken by Apple in connection with its entry into e-book retailing are consistent with it acting independently of any conspiracy with publishers." | Federal Rules of Evidence Rules 401/702. Dr. Murphy's testimony improperly states ultimate legal conclusions based on the expert's view of record evidence. |
| 9 | "Based on my economic analysis, I conclude that the contract provisions Apple negotiated and the way in which it negotiated those agreements were consistent with its independent economic interest absent any participation in or knowledge of a conspiracy." | 401/702. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. |
| 11 | "In order to perform such an economic analysis, an economist must examine whether Apple's conduct is consistent with its own independent business interests absent participation in a conspiracy. Accordingly, I have evaluated whether, based on standard principles of economics and considering Apple's economic incentives, the challenged conduct makes business sense for Apple given the economic environment it faced, if it were not conspiring with the publishers. Based on my economic analysis, I find that Apple independently would have selected a similar business approach in launching the iBookstore absent participation in a conspiracy." | 401/702. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. |
| 13 | "My second conclusion is that all the terms that Plaintiffs have challneged as evidence of conspiracy instead can be explained by Apple's economic self-interest absent participation in or knowledege of the alleged publisher conspiracy." | 401/702. Impermissible expert testimony stating ultimate legal conclusions based on expert's view of record evidence. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. |
| 13 | "As my economic analysis demonstrates, the challenged terms were in Apple's interest independent of whether those terms allowed the publishers to move Amazon to the agency model." | 401/702. Improper usurption of the role of the factfinder. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. |

| Paragraph Number | Statement | Objections |
|---|---|---|
| 14 | "Economic analysis demonstrates that each of the challenged terms in Apple's agency agreements with publishers—including the price tiers and the MFN—was in Apple's interest absent a conspiracy. Nor did the profitability of those terms to Apple depend on a reduction in competition or harm to consumers. Individually and collectively, the challenged terms were in Apple's interest absent any anticompetitive effect. Indeed, to the extent that the terms were necessary for Apple to launch the iBookstore, then as an economic matter, they had a strong procompetitive rationale." | 401/702. Impermissible expert testimony stating ultimate legal conclusions based on expert's view of record evidence. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. |
| 16 | "Apple had an economic incentive – independent of any increase in retail prices or harm to competition – to explore the agency model with each publisher because the agency model enabled Apple to achieve the objective of earning a sufficient margin to make the introduction of the iBookstore attractive. Other retailers of e-books also used agency. For example, Barnes & Noble used agency for newspapers [Lynch B&N Dep. at 80:11-21.]), and Amazon used an agency-like approach for its Digital Text Platform ("DTP"), which allowed small publishers and authors to publish with Kindle. Jeffrey Bezos explained in 2009 that DTP allowed "small publishers or even self-published authors [to] . . . "submit the book" and "set the price" and Amazon would "charge the customer" and "give [the author] 35 percent of the revenue" while keeping 65 percent. [Deborah Solomon, "Book Learning," New York Times December 6, 2009.]" | 401/702. Dr. Murphy's factual narrative is impermissible. |

2

| Paragraph Number | Statement | Objections |
|---|---|---|
| 17 | "Apple adopted for the iBookstore the same 30 percent commission rate it used in its App Store. This rate is less than half the 65 percent commission rate that Amazon was charging small publishers that utilized Amazon's DTP when Apple was considering whether to launch the iBookstore. Apple's 30 percent commission rate applied to all publishers, large and small. Most of those publishers had and continued to have wholesale agreements with Amazon and thus clearly did not sign agency agreements with Apple to raise retail e-book prices by forcing Amazon to agency. That other publishers find Apple's 30 percent commission rate commercially attractive demonstrates that the rate is competitive." | 401/702. Dr. Murphy's factual narrative, including testimony about publisher intent and belief is impermissible. |
| 18 | "The price caps thus lowered retail prices and expanded e-book sales relative to what Apple expected if publishers had unconstrained retail pricing flexibility (as evidence by the fact that several publishers wanted higher price caps)." | 401/702. Dr. Murphy's factual narrative, including testimony about Apple's expectations, is impermissible. |
| 20 | "publishers wanted higher prices than what Amazon was charging, and Apple was concerned that the publishers would price e-books too high if left unconstrained." | 401/702. Dr. Murphy's factual narrative, including testimony about Apple's concerns and publisher intent, is impermissible. |
| 21 | "But even if this were true, it indicates that those price caps likely lowered prices compared to the prices that at least some publishers wanted to charge." | 401/702. Dr. Murphy's factual narrative, including testimony about publisher intent, is impermissible. |
| 23 | "Indeed, Amazon continued to have wholesale agreements with publishers other than the Publisher Defendants and Random House (until March 2011), while those other publishers had agency contracts with Apple." | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 24 | "Amazon and Barnes & Noble also required the publishers to provide retail-price MFNs, presumably motivated by the same concern as Apple had that otherwise they could be competitively disadvantaged once publishers had control of retail pricing under the agency model." | 401/702. Dr. Murphy's factual narrative, including testimony about the motivations of Amazon and Barnes & Noble, is impermissible. |

| Paragraph Number | Statement | Objections |
|---|---|---|
| 25 | "The MFN protected Apple whether New York Times best sellers and other new releases sold elsewhere for $9.99, at the price caps or somewhere in between." | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 25 | "A publisher might prefer that Amazon be on agency for other reasons, but the MFN did not "compel" the publisher to move Amazon to agency." | 401/702. Dr. Murphy's factual narrative, including testimony about the preferences and decision-making of publishers is impermissible. |
| 26 | "Apple and the publishers testified that the publishers resisted Apple's unilateral demand for an MFN" | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 26 | "the agency model combined with the price MFN allowed Apple to achieve its business goals whether prices were the same, higher or lower than their historical level." | 401/702. Dr. Murphy's factual narrative regarding Apple's business goals is impermissible. |
| 26 | "It also was in Apple's interest to negotiate an MFN with each individual publisher regardless of whether other publishers agreed to the MFN." | 401. Dr. Murphy's conclusions about Apple's interests regardless of whether other publishers agreed to the MFN is irrelevant because Apple insisted on the inclusion of the MFN with each publisher. |
| 27 | "The fact that the publishers resisted the MFN is at odds with the Plaintiffs' claims that the MFN was the key provision required by the publishers to enforce the publishers' conspiracy." | 401/702. Dr. Murphy's factual narrative about the publisher reaction to the MFN is impermissible. |
| 28 | "MFNs are used by the U.S. Government and by firms in the private sector." | 401. Only Apple's MFNs are at issue in this case. Therefore Dr. Murphy's testimony is irrelevant. |
| 29 | "The MFN at issue here had the potential to be output expanding by creating conditions that I assume were necessary for Apple to be willing to enter." | 401/702. Dr. Murphy's testimony and does not assist the trier of fact because it only speaks to the "potential" of the MFN. |
| 31 | "As an economic matter, by communicating limited information to certain publishers about the progress of its negotiations with other publishers, Apple made it more likely that it would launch the iBookstore in an expeditious and efficient manner." | 401/702. Dr. Murphy's factual narrative is impermissible and is not saved by inserting the words "as an economic matter." |
| 32 | "Apple's negotiations with five of the publishers were successful and Apple launched the iBookstore. After it had negotiated agreements with the largest publishers, Apple then made the same type of terms available to all other publishers." | 401/702. Dr. Murphy's factual narrative is impermissible. |

4

| Paragraph Number | Statement | Objections |
|---|---|---|
| 41 | "Random House's eventual decision to join the iBookstore does not suggest a conspiracy." | 401/702. Dr. Murphy's testimony amounts to an impermissible statement of a legal conclusion. |
| 41 | "The fact that many smaller publishers signed onto the iBookstore platform also implies that participation in the platform is in the unilateral interest of those publishers and does not suggest conspiracy." | 401/702. Dr. Murphy's factual narrative is impermissible. His testimony also amounts to an impermissible statement of a legal conclusion. |
| 44 | "indeed, Amazon was closely identified at the time, at least in the United States, with both eReader hardware and e-books content. Apple had learned through public sources and its discussions with publishers about Amazon's practice of selling many e-book titles below wholesale cost." | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 44 | "Thus, it was in Apple's independent self-interest, irrespective of whether the publishers were acting independently or collectively, to require agreements with publishers that allowed Apple to expect a positive economic return on its investment in the iBookstore." | 401/702. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. Dr. Murphy's conclusions about Apple's expectations also do not assist the trier of fact and are irrelevant. |
| 46 | "Apple's expected profit from selling e-books differed from that of major book retailers such as Amazon." | 401/702. Dr. Murphy's testimony about Apple's expectations do not assist the trier of fact and are irrelevant. |
| 46 | "The iBookstore was not critical to the success of the iPad platform, because reading books was only one of the many activities that iPad users could perform on the tablet (while Amazon likely considered the Kindle store essential to success of the Kindle). | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 48 | "As explained by several publishers (including Macmillan, Hachette, HarperCollins and Simon & Schuster) and recalled by Mr. Cue, publishers expected Apple to introduce enhanced e-books and e-reading experience that would expand e-book readership given Apple's history of innovation and its demonstrated success in introducing new platforms such as the iTunes and its App store." | 401/702. Dr. Murphy's factual narrative, including his testimony about publishers' expectations, is impermissible. |

| Paragraph Number | Statement | Objections |
|---|---|---|
| 48 | "I understand that publishers anticipated that the iPad would be extremely popular and could expand the customer base for e-books to consumers who might not buy a dedicated e-Reader or otherwise read e-books on the iPhone, iPod Touch or other available hardware." | 401/702. Dr. Murphy's factual narrative, including his testimony about publishers' anticipation, is impermissible. |
| 48 | "It was also rational for publishers to expect that Apple's entry with the iBookstore would improve the publisher's position in bargaining with Amazon for more attractive terms." | 401/702. Dr. Murphy's factual narrative, including his testimony about publishers' expectations, is impermissible. |
| 53 | "In keeping with these predictions, it announced in early February 2010 that it had purchased Touchco, a company working to develop touch screens, and was merging it into Lab126, the research division responsible for the Kindle eReader. There were public reports about this time that Amazon wanted to improve its Kindle to compete with the iPad, and that Amazon had recently announced plans for a Kindle applications store in order to attract developers to create apps for Kindle like they had created apps for the iPhone and would create for iPad. There also was published commentary observing that Amazon had been on a "hiring binge" for Lab 126." | 401/702. Dr. Murphy's factual narrative is impermissible. |
| 58 | "Apple decided to enter the e-book retailing business based on what it knew in early 2010." | 401/702. Dr. Murphy's factual narrative, including his testimony about Apple's expectations, is impermissible. |
| 58 | "The challenged terms in Apple's agency agreements, whether viewed indvidually or collectively, were in Apple's interest absent conspiracy and independent of any harm to competition. It was in Apple's interest to negotiate these terms with each of the publishers individually regardless of what would happen to prices or whether the publishers would change the terms of their dealings with Amazon. | 401/702. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. Dr. Murphy's testimony also amounts to an impermissible statement of a legal conclusion. |

6

| Paragraph Number | Statement | Objections |
|---|---|---|
| 60 | "I conclude that the terms of Apple's agreements and how Apple negotiated those agreements are fully consistent with Apple's independent interest." | 401/702. Dr. Murphy's testimony is based on an erroneous legal standard and therefore fails to assist the factfinder. Dr. Murphy's testimony also amounts to an impermissible statement of a legal conclusion. |
| 60 | "This is the type of conduct that generally enhances competition and benefits consumers. From that perspective, Apple's conduct was consistent with how I expect firms to behave in a competitive marketplace." | 401/702. Dr. Murphy's testimony is an impermissible statement of a legal conclusion. |