**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
)
UNITED STATES OF AMERICA,       )
)
       Plaintiff,       )
)
       v.       )     Civil Action No. 12-cv-2826 (DLC)
)
APPLE, INC., et al.,       )
)
       Defendants.       )
_____)

_____
)
THE STATE OF TEXAS;       )
THE STATE OF CONNECTICUT; et al.,       )
)
       Plaintiffs,       )
)
       v.       )     Civil Action No. 12-cv-03394 (DLC)
)
PENGUIN GROUP (USA) INC. et al.,       )
)
       Defendants.       )
_____)

## <u>UNITED STATES' POST-TRIAL MEMORANDUM</u>



# *United States of America v. Apple, Inc.*
## Summation

June 20, 2013





PX-1105

"You can do all kinds of statistics, but really, all you need to do is look at the diagram . . . . Their prices went up and stayed up. So it's not rocket science. You just have to look at it."

Gilbert Testimony, TT 1653:9-13



| Degree to Which Prices Were at the Applicable Price Cap<br>Five Months Following Switch to Agency<br>(% of units sold at a price within 1% of the maximum price specified in the publisher's Apple Agency Agreement) | | | | |
|---|---|---|---|---|
| Retailer | Apple | | Amazon | |
| Publisher | New Releases | New York Times Bestsellers | New Releases | New York Times Bestsellers |
| Hachette | 96.3% | 99.7% | 89.9% | 100.0% |
| HarperCollins | 90.0% | 100.0% | 84.6% | 95.6% |
| Macmillan | 81.1% | 100.0% | 76.3% | 98.7% |
| Penguin | 98.4% | 100.0% | 92.2% | 99.3% |
| Simon & Schuster | 91.3% | 97.9% | 83.7% | 90.1% |
| Defendant publishers combined | 92.1% | 99.4% | 85.7% | 96.8% |
| Random House | N/A | N/A | 2.5% | 0.0% |

Over 90% of new releases sold by Defendant Publishers at Apple were set at the price caps.

Over 99% of New York Times bestsellers sold by Defendant Publishers at Apple were set at the price caps.

Over 85% of new releases and 96% of New York Times bestsellers sold at Amazon were set at the price caps.

PX-0866

3


To establish a conspiracy in violation of Section 1, the Plaintiffs must "present direct or circumstantial evidence that reasonably tends to prove that the [defendants] and others had a **conscious commitment** to a **common scheme**, designed to achieve an **unlawful objective**."

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted)



"Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, or to divide markets."

"Horizontal agreements among competitors to fix prices . . . have manifestly anticompetitive effects and lack any redeeming virtue."

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)


# 1. To Raise E-Book Prices

# 2. To Restrain Retail Price Competition

"Concerted action by dealers to protect themselves from price competition by discounters constitutes horizontal price-fixing."

*Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993)



# "A Conscious Commitment"



**December 2009**



### December 15, 2009

- Apple meets with first three publishers

  (PX-0050)

- Publishers request an Apple proposal on "new release pricing"

  (PX-0050)

### December 16, 2009

- Apple meets with second three publishers

  (PX-0262)

- HarperCollins interested in agency model to "fix Amazon pricing"

  (PX-0036)

8





"HarperCollins

Interested in agency model to fix Amazon pricing (we said no)."

"Q. And the reference here to fix Amazon pricing, was that HarperCollins wanted to get Amazon's prices higher, correct?

**A. That was my understanding, yes.**"

Saul Testimony, TT 182:9-11


"Q. So, sir, you were aware, were you not, by December 16, that at least one publisher was planning on using an agency model in order to fix industry pricing, correct?

**A. Yes. Again, to fix – they wanted an agency model with us. Let me be clear. I wasn't trying to negotiate for the industry. But they wanted an agency model with us so that they would be able to set the price to fix the 9.99 price, which is what this says."**

**Eddy Cue**

Cue Testimony, TT 1697:12-19; PX-0036





Date: Tue, 15 Dec 2009

"Clearly, the biggest issue is new release pricing and they want a proposal from us."

Eddy Cue



"Q. You left your meeting with Apple on December 16, 2009 understanding that Apple did not want Amazon's 9.95 price to continue in the industry, correct?

**A. Clearly."**

Reidy Testimony, TT 484:2-7



**December 2009**



### December 17-18, 2009
- Apple agrees to offer agency model

(Cue Testimony, TT 1699:15-1702:12)

### December 18, 2009
- Mr. Cue emails three publishers requesting a call to provide an update on "all my findings and thoughts."

(PX-0056, PX-0501, PX-0502)



# Apple & Publisher Conspiracy Commences

"I want to update you [on] all my findings and thoughts.
I have some things I want to run by you. I only need 30 minutes."

Markus Dohle — RANDOM HOUSE

John Sargent — MACMILLAN

Carolyn Reidy — SIMON & SCHUSTER

PX-0056

PX-0501

PX-0502

14


**December 2009**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**December 21, 2009**

- Apple proposes agency model with $12.99 price point and requirement that all resellers be moved to agency

  (PX-0540, Cue Testimony, TT 1713:22-1714:3)

- Apple tells publishers they can use threat of windowing to force Amazon to agency

  (PX-0336)

- Publishers understand "plus" of the Apple proposal: "solves Amazon issue"

  (PX-0043)



• "The government . . . is not required to prove a formal, express agreement with all the terms precisely set out and clearly understood by the conspirators.  It is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade."

    *United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990) (citations omitted)


• "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful conspiracy under the Sherman Act."

    *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939)



**From:** Eulau, Dennis <Dennis.Eulau@Simonandschuster.com>
**Sent:** Tuesday, December 22, 2009 8:44 AM
**To:** Reidy, Carolyn <Carolyn.Reidy@Simonandschuster.com>
**Subject:** Re: Apple – CONFIDENTIAL

I will play with this today...30% margin will be steep...30% to them ▢ to the author and ▢ to us – based on a $12.99 price...much less than we get now. I realize we can't keep what we have but this will be a real big change...more to come.

**From:** Reidy, Carolyn
**To:** Eulau, Dennis; Selleck, Michael; Rivlin, Elisa; Hirschhorn, Elinor H.
**Sent:** Mon Dec 21 12:03:33 2009
**Subject:** Apple -- CONFIDENTIAL

Eddy Cue phoned me this morning (rather than come in for a visit). He wanted to relay his conclusions, having met with all the major publishers and looked at the online retailing market once he got home. He had four points:

1. It is important to Apple make "at least some money" on the endeavor of selling eBooks, so a **30% margin**, like they have in the APP Store, is essential to them; they "need that".

2. It is important to Apple that there be "some level of reasonable pricing." They feel the only way to get this is for the industry to go to the agency model like with the APP store, so the publisher sets the prices to the consumer thus had

4. We would have to "get everyone else to go to the agency model." When I said, "but of course we can't talk to our competitors," he said he didn't mean other publishers, but our **accounts** – to which I replied, if we make these our terms, then they are our terms.

In conclusion he asked that after we've had time to digest and discuss this, we/I write him an email with our reactions and thoughts.

CONFIDENTIAL                                    SS00028855

> "It is important to Apple that there be 'some level of reasonable pricing.' They feel the only way to get this is for the industry to go to the **agency model** . . . ."

> "Q. And [Apple] told you that they feel the only way to get this is for the industry to go to the agency model; do you see that?
>
> **A. Yes.**
>
> Q. And by the "industry," they meant other publishers, correct?
>
> **A. Yes.**
>
> Q. And they meant other retailers, correct?
>
> **A. Yes.**"
>
> Reidy Testimony, TT 499:25-500:24

PX-0540

17



# Apple Makes A Proposal







"He also thinks that book prices are becoming too low . . . . Therefore he suggests an 'agency model' . . . ."







**Eddy Cue**

"They saw both the plus (solves Amazon issue) and negative (little less than they would like)."

"[T]his refers to the fact that I was allowing them, because it was an agency model, to price books at higher than 9.99 which I knew they wanted to do. They referred to that as their Amazon problem."

Cue Testimony, TT 1703:20-24


There is a consciousness of commitment to a price-fixing scheme when "[c]ircumstances [] reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."

*Monsanto*, 465 U.S. at 764



## January 2010



| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

### January 4-5

- Mr. Cue expressly requires that "all resellers of new titles need to be in agency model"

(Cue Testimony, TT 1717:14-24)

### January 8

- Mr. Moerer tells Ms. Reidy she has "exactly" the same view as other publishers: "pricing was too low"

(PX-0537)

### January 9

- Mr. Moerer explains agency model as way to "move the whole market off $9.99"

(PX-0174)





"[A]ll resellers of new titles need to be in agency model…."

"…realistic pricing…."

"We think these agency terms accomplishes all the goals we both have."

PX-0021, PX-0473, PX-0476, PX-0041, PX-0040, PX-0306



## January 2010



**January 11**

- Draft contracts sent to each "Big Six" publisher

(DX-714 at ¶ 75)

**January 12**

- Penguin and Hachette tell Apple they will go agency with "everyone else"

(PX-0026)

**January 14**

- Mr. Jobs approves higher price points so long as publishers "move Amazon to the agent model too"

(PX-0055)

23







"Wed, 13 Jan 2010"

"The response from both Penguin and Hachette was very similar –

- willing to do an agency model
- go agency model for new releases with everyone else"





Plaintiff Exhibit
US v. Apple
11-cv-02293
PX-0055

From:       Steve Jobs <sjobs@apple.com>
To:         Eddy Cue <cue@apple.com>
Subject:    Re: Book Prices Thoughts
Received(Date):    Thu, 14 Jan 2010 18:23:09 -0800

I can live with this, as long as they move Amazon to the agent model too for new releases for the first year.  If they don't, I'm not sure we can be competitive...
Steve

if they are offering a $26 book to Amazon
On Jan 14, 2010, at 6:04 PM, Eddy Cue wrote:

Here is the pricing I think will push them to very edge and still have a credible offering in the market.
These are the highest individual iTunes prices as each publisher can choose a lower price if they want.

List Price Wholesale iTunes 70%  Diff
$20.01-22.50 $10.00-11.25 $9.99 $7.00 $3.00-4.25
$22.51-25.00 $11.25-12.50 $10.99 $7.70 $3.56-4.80
$25.01-27.50 $12.50-13.75 $12.99 $9.10 $3.40-4.65
$27.51-30.00 $13.76-15.00 $14.99 $10.50 $3.25-4.50
$30.01-35.00 $15.01-17.50 $16.99 $11.90 $3.10-5.60
$35.01-40.00 $17.51-20.00 $19.99 $14.00 $3.51-6.00

The other point I want to get is lowering the price while the book is on the NYT Bestseller List. This will
be hard to get because they will be losing an additional $1.40, but we should try.
When a book that list for $30 or less is in the NYT Bestseller List than the iTunes price will be no greater
than $12.99. Between $30.01-35 in the NYT Bestseller List, the price will be no greater than $

-- Eddy

Exhibit 30
Cue
03/12/13

K. Schroeder
csr. rpr. ccrr

Highly Confidential                                    APLEBOOK-03345509

"I can live with this, as long as they move Amazon to the agent model too for new releases for the first year. If they don't, I'm not sure we can be competitive…
Steve"

"Here is the pricing I think will push them to very edge and still have a credible offering in the market. . . .
--Eddy"



## January 2010



**January 16**

- Mr. Cue agrees to "significantly more tiers and higher prices"

(PX-0059, PX-0120, PX-0511, PX-0512, PX-0513)

**January 19**

- Macmillan and HarperCollins continue to understand Apple requires all retailers be moved to agency

(PX-0573, Murray Testimony, TT 994:9-16)



A defendant is liable for price-fixing upon a showing of "evidence sufficient to permit a preponderance finding that higher prices came about as a result of [the agreement], rather than through independent action of the defendants."

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (citation omitted, alteration in original)







**Eddy Cue**

"This gives you significantly more tiers and higher prices."

PX-0513





"They believe that this is the best chance for publishers to challenge the 9.99 price point."

PX-0521



"They decided they had to come up with a way that would move the whole market off 9.99 and they think an agency model is the only way to do it."

PX-0174





# "A Common Scheme"





PX-0742

"As a way to enter the market place, Apple proposed moving the entire industry to an agency model."

(PX-0742)

"Q. 'As a way to enter the marketplace, Apple proposed moving the entire industry to an agency model.' Do you see that?

**A. Yes.**

Q. That's what happened right?

**A. That's what happened.**"



**David Shanks**

Shanks Testimony, TT 368:24-369:4


"Q. I don't think we can legally force this. That's why – that's why, sir, Apple moved to an MFN instead of the explicit term, correct?

**A. That's correct.**

Q. And that's why Apple stopped talking about the move all resellers to an agency model, correct?

**A. That's correct. Again –"**

Cue Testimony, TT 1727:14-20

She repeated what Markus told you about RH basically being happy with industry ebook terms as

Subject: Re: Random House update
Date: Sun, 10 Jan 2010 19:24:21 +0000
From: "Eddy Cue" <cue@apple.com>
To: "Keith Moerer" <kmoerer@apple.com>
Message-ID: <E4373EAD-7C5B-498E-91BF-A502890B3AD1@apple.com>

On Jan 9, 2010, at 7:37 PM, Keith Moerer wrote:

Eddy--

RH's #2, Madeline McIntosh, called me this afternoon to say RH is currently "stuck" in considering an agency model and asked me a series of questions:

1) Are we willing to consider the agency model for new releases only? (I told her our preference would be an agency model for all titles, but we're willing to consider for new releases only.)

Yes as long as new releases are defined correctly (e.g. as long as hardback or 1 year - maybe 6 months) but this is really about others not us. We want all agency.

2) Are we willing to accept an agency model if other retailers continue a standard wholesale model for new releases without holdbacks? (No.)

We are (I don't think we can legally force this). What we care about is price us the contract will say we get it at 30% less whatever the lowest retail price out in the market (whether agency or wholesale).

3) Are we willing to consider a wholesale model for titles not currently available in ebook form because lack of color, no ability for multi-media add-ons, or multiple-device pagination problems that other ebook retailers isn't resolved? (I told her we're not interested in harder-to-execute opportunities such as [...] Stewart cookbooks and Dr. Seuss picture books if we're forced to sell current ebook [...] such as Dan Brown and Andre Agassi as loss leaders or not at all.)

Yes on [...] would just prefer an agency model with us, otherwise it gets com[...]

[...]g to consider an agency model with more tiers or different tiers than currently [...]old her we're willing to listen to and consider a counter-proposal. I also told her that [...]our analysis of NYT bestsellers comparing physical prices and current ebook prices, [...]ed us arrive at a $12.99 price point for most new-release titles, once I got your OK.)

[...] want a proposal. This is our offer. I am willing to add $14.99 for above $30. We need [...]eing very firm on price.

APLEBOOK00434921

PX-0487

# "(I don't think we can legally force this.)"

32







> "I feel like it's a giant win to keep pushing the MFN and forcing people off the amazon model and onto ours."

> "The interesting insight in the meeting was Eddy's explanation that it doesn't have to be that broad – any decent MFN forces the model."


amazon    Dominates sales, wants to build market share

80% eBook sales in US          46% eBook sales in UK

Harper

"The Apple agency model deal means that we will have to **shift to an agency model with Amazon which with [sic] strengthen our control over pricing.**"

(PX-0529)

Harper [...]
Tuesday 16 Feb [...]

Amazon accounts for 19% of our physical book sales, second only to Waterstones. (IN us 19% of physical sales)

Dominates sales of ebooks in US (launched 2007) accounting for approx. 50% of sales, and approx. 46% of sales in the UK (launched end 2009)

Strategy of building and maintaining market share by locking in consumers with proprietary DRM and predatory pricing (e.g. $9.99 for ebooks).

**HARPERCOLLINS and AMAZON:** When the Kindle launched in the UK, HC had more ebooks on the site than an other UK publishers.

Apple agency model protects the value of content and as a result has given us the opportunity to renegotiate terms with Amazon.

The Apple agency model deal means that we will have to **shift to an agency model with Amazon which with strengthen our control over pricing.**

Apple deals is stopping Amazon becoming a monopoly – they become one of multiple retailers in a healthy market.



"Q. All right. So isn't it true that as of January 19th, 2010, you understood that doing a deal with Apple would force Amazon to move to an agency model?

**"A: Yeah, as the Apple deal, as it was presented at that time, yes."**



Murray Testimony, TT 987:22-988:1


- "Shortcomings from apple deal as presented . . . expected retaliation from amazon because **deal forces a move to an agency model**."

  -- Brian Murray, Jan. 19, 2010, PX-0307

- "We would have no flexibility on pricing and **would have to exclude content from anyone who was not on the same agency model for up to a year (Amazon)**."

  -- Charlie Redmayne, Jan. 22, 2010, PX-0308

- "**Implications: If Amazon, B&N, and Sony want our books as new releases, they must adopt our agency model and terms**."

  -- Brian Murray, Jan. 27, 2010, PX-0637

- "**The Apple agency model deal means that we will have to shift to an agency model with Amazon** which with [sic] strengthen our control over pricing."

  -- HarperCollins Agents Catch-Up Presentation, Feb. 16, 2010, PX-0529





**David Shanks**

"**The fact that there was a parity clause in the contract more or less made it a given that we would have to be at agency . . . with everybody.**"

Shanks Testimony, TT 352:12-353:12



**Arnaud Nourry**

"**Apple's contract... that we commit to maintaining the same price for the same titles across the platforms. And I'm not a lawyer, but I can't see that happening unless everyone is under agency agreement . . . .**"

PX-0884 at 148:13-25



**Carolyn Reidy**

"Q. Okay. And isn't it true that, from your perspective, the MFN, as a practical business matter, made it so that Simon & Schuster would be moving all of its other retailers to an agency model?

**A. Unless we wanted to make even less money, yes.**"

Reidy Testimony, TT 504:10-14



**January 20, 2010**

John Sargent
MACMILLAN

Meeting

Russ Grandinetti

PX-0482

"Jan 20th: Russ met with John Sargent in NY. John indicated that he was working on an agency model but his plan was to offer both an agency and reseller model."

PX-0482



January 20,



**John Sargent** — MACMILLAN

"I am willing to give up on many…points…. The stumbling block is the single large issue that we clearly had a misunderstanding about."

**Eddy Cue** — Apple

"I understand. I don't believe we are asking you to do anything, you haven't told us you are doing. We are just trying to get a commitment."

Russ Grandinetti

PX-0482

PX-0037



January 20                                                January 21, 2010

John Sargent
MACMILLAN

Meeting

Russ Grandinetti

"Jan 21st: John and Russ by phone. John realized that the Apple contract required him to only offer the agency model only and wanted to talk through options with Russ."

John Sargent
MACMILLAN

Phone Call

Russ Grandinetti

PX-0482

PX-0482

PX-0482

40



"Q. And during that deposition you said that you didn't recall what this stumbling block issue was but that it might relate—your best guess was that it related to pricing tiers, correct?

**A. That's correct.**

Q. And now you're saying, sir, that it actually relates to one-off promotions relating to the MFN?

**A. That's correct."**

Cue Testimony, TT 1750:12-18; PX-0037





"The first time Apple had definitive knowledge that a publisher was negotiating with another retailer was through press reports and an e-mail from John Sargent, Macmillan's CEO, on January 31, 2010, after we had signed our agreement."

DX-714, ¶ 100

Jan. 24, 2010: "As for Friday, I hope to be in, but suspect I will be in Seattle or traveling back."

PX-0881

PX-0881

42

9  Q.  By the time you met with the publishers in December, Apple
10   understood that they believed the 9.99 pricing posed an acute
11    threat to their overall business?
12  A.  No, that's not correct.

Moerer Testimony, TT 1251: 9-12

2  Q.  And my question is, by the time Apple approached the
3   publishers in December, it was Apple's knowledge that the
4   publishers had each decided that 9.99 pricing posed an acute
5    threat to their overall businesses, correct?
6  A.  That is correct.

Moerer Testimony, TT 1252: 2-6



"Q. The publishers who gained control of eBook retail pricing did, in fact, price the great majority of their new release and bestselling eBooks at the maximum allowed price, correct?

**A. I do not know that to be the case.**

Q. That was what you expected them to do, wasn't it?

**A. I did not know how they would price their books. These were price caps. I did not know."**



**Keith Moerer**

Moerer Testimony, TT 1294:23-1295:4

"Q. And the reason it didn't surprise you that the publishers were pricing at the caps was for the very same reason, because you know they wanted higher prices, correct?

**A. That's correct.**

Q. In fact, this wasn't something that only you were aware of? This was something that Mr. Jobs was aware of as well, correct?

**A. Yes. They had expressed they wanted higher prices from us.**

Q. And that was consistent throughout the negotiations, correct?

**A. Yes, it was."**



**Eddy Cue**

Cue Testimony, TT 1691:7-16



• "[W]e hadn't come up with the pricing MFN idea" by January 4.

**-Eddy Cue January 25, 2011**

• Kevin Saul had developed an idea for a price-matching "Most Favored Nation" ("MFN") clause, "[a] few weeks before" January 4.

**-Eddy Cue April 26, 2013**

• Kevin Saul was in the process of "developing" MFN on January 4 but it wasn't "completed."

**-Eddy Cue June 13, 2013**

> "Q. … Mr. Cue, could you please tell me which of these three statements is the correct one?
> **A.  All of them.**"
>
> Cue Testimony, TT 1981:5-15, 21-23


"Amazon quickly made the rational business decision to move to an agency model for the five publishers that signed deals with Apple . . . ."

Apple Inc.'s Pre-Trial Memorandum of Law at 3

# Amazon Resisted Move to Agency



"[W]e disagreed with the publishers' decision to move to agency and wanted to forestall it."

PX-0835 at ¶ 47



"We strongly resisted moving to agency and would not have done so but for these publishers insisting on it simultaneously."

PX-0837 at ¶ 35



An agency agreement with the publishers was "not what we would have ever wanted."

Porco Testimony, TT 827:21-25



"Q. Would you say that Amazon welcomed your proposal to move to agency?

**A. No.**

Q. How would you describe their reaction?

**A. They yelled and screamed and threatened. It was a very unpleasant meeting. . . .**

Q. And do you recall testifying that Amazon told you they would do anything to stop you from moving to agency?

**A. I probably said that."**



David Shanks

Shanks Testimony, TT 362:25-363:11

"Q. And Amazon was not pleased by the fact that Simon & Schuster wanted to move to an agency model, correct?

**A. Correct.**

Q. In fact, Amazon made clear to you that they wanted to stay on wholesale, correct?



Carolyn Reidy

**A. Yes."**

Reidy Testimony, TT 535:16-535:21



"[S]ubstantial *direct* evidence of agreements to maintain prices . . . . testimony from a Monsanto district manager . . . that Monsanto on at least two occasions . . . approached price-cutting distributors and advised that if they did not maintain the suggested resale price, they would not receive adequate supplies of Monsanto's new corn herbicide."

*Monsanto*, 465 U.S. at 765



**Eddy Cue**

**"[W]e believe that withholding books is a disaster for a bookstore."**

Cue Testimony, TT 1871:15-16



**Keith Moerer**

**"[W]indowing was completely unacceptable to Apple . . . ."**

Moerer Testimony, TT 1236:23-24


"We cannot agree to your language. There are possible unilateral ways you can comply with our provision, such as get others on an agency model, or withhold content."

(PX-0738)



Kevin Saul

"I also indicated that Amazon would not accept a distributor model. [Eddy Cue] answered that windowing could be used to establish a distributor model on print pub date for ebooks (coming back to simultaneous publication)."

(PX-0336)



Markus Dohle


Before Apple, Publisher Defendants windowed only *37 titles*.

Klein Testimony, TT 2066:11-14



After conspiring with Apple, the publishers were able to present Amazon with an entirely different choice: accept agency or don't sell *any* of the *thousands* of new e-books we publish each year.

PX-0837 at ¶¶ 28, 30



**Russ Grandinetti**

"Q. What deadlines, if any, did the publishers give Amazon to complete those agency deals?

**A. I don't remember each specific case, but my recollection is they all told us we had to be on new terms by roughly the end of March."**

Grandinetti Testimony, TT 760:12-16



**Carolyn Reidy** — SIMON & SCHUSTER

**Eddy Cue**

Eddy: we are deep into negotiations with others and are curious if the start date remains on or about March 25th. Any update?

Carolyn

------ end message ------

DX-313



**Carolyn Reidy** — SIMON & SCHUSTER

"Q. And, therefore, you felt that Simon & Schuster needed to change Amazon to an agency model before the iBookstore went live, correct?

**A. Correct."**

Reidy Testimony, TT 533:18-21

53





Subject: Book Pricing update
Date: Sat, 03 Apr 2010 03:13:41 -0700
From: Eddy Cue <cue@apple.com>
To: Steve Jobs <sjobs@apple.com>
Message-ID: <7BB78A4B-013A-47CF-A66F-EA71C5EDB312@apple.com>

We have reviewed all the books on Amazon and they have switched to agency with the publishers.
Here is what they look like on Amazon. Note the disclaimer on each product detail page below
("This price was set by the publisher").

We are changing a bunch of Penguin titles to $9.99 as I write this to because they didn't get their
Amazon deal done.

Overall, our NYT bestsellers and new releases are the same as Amazon.

— Eddy

------- end message -------



Eddy Cue

"We have reviewed all the books on Amazon and they have switched to agency with the publishers."



Subject: Re: Amazon
Date: Wed, 26 May 2010 09:51:44 -0700



**David Shanks**

"I wanted to tell you before you read it on line that we have finally reached an agreement with Amazon on our new terms of sale….The playing field is now level."

\* \* \*

"Please keep this to yourself until the announcement."



**Eddy Cue**

"Great news and congratulations!!!"

Confidential
PX-0284 / 1          PX-0284          APLEBOOK-00016074



# "An Unlawful Objective":
# Raise E-Book Prices



"Under the Sherman Act a combination formed for the purpose and with the effect of raising . . . fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* . . . . The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."

*Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 346-51 (1982)



EXHIBIT A

Definitions

"List Price, or Lists" means the Publishers suggested retail price for the corresponding physical book.

| List Price | Maximum Customer Price | 70% |
|---|---|---|
| $20.01-22.00 | $9.99 | $7.00 |
| $22.01-24.00 | $10.99 | $7.70 |
| $24.01-25.00 | $11.99 | $8.40 |
| $25.01-27.50 | $12.99 | $9.10 |
| $27.51-30.00 | $14.99 | $10.50 |
| $30.01-35.00 | $16.99 | $11.90 |
| $35.01-40.00 | $19.99 | $14.00 |

List Price of such New Release is between $30.01 - $35.00, the Customer Price will be no greater than $14.99.

4.   For the avoidance of doubt, (i) *enhanced eBooks* where there is a corresponding basic version made available hereunder; (ii) *all other eBooks not identified above* (including, without limitation, any eBook with a corresponding hardcover which is not a New Release; any eBook with a corresponding Adult Paperback which has been in print for more than 12 months and does not appear on any paperback NYT Bestseller List; any eBook with a corresponding paperback which is not an Adult Paperback; any eBook where there is no corresponding print book, and any eBook with a corresponding print title with a list price over $40.00) and (iii) any *Other Sales Content* may be priced at any Customer Price set by Publisher, provided that Apple does not have to make such eBooks or Other Sales Content available if Apple determines the price is unrealistic or not efficient and under those circumstances Publisher shall be free to make such eBook or Other Sales Content available elsewhere without regard to this Agreement.

5.   All Customer Prices shall end in "--.99".

16 of 18

Confidential

APLEBOOK00384770

# Price Caps Functioned as Fixed E-Book Prices





**Charlie Redmayne**
HarperCollins

"[P]rice would be standard across the industry."

PX-0308



**Arnaud Nourry**
hachette LIVRE

"…the concept of agency agreement is that people all have the same prices…"

PX-0884 at 164:3-17



**Tim McCall**
Penguin

"Agency is anti-price war territory. We don't need to compete with other publishers on the price of our books."

PX-0317



**Robert McDonald**

"Q. And so in other words, sir, after Apple signed its agency agreements with its MFN and its iBookstore went live, with respect to the publisher defendants' titles, isn't it true that the prices were the same?
**A. Yes."**

McDonald Testimony, TT 2361:17-21

59



# Apple and Publishers Agreed on Retail Prices for Industry



Further to our own reports on how publishers hope/expect to the deploy the agency model of selling terms broadly across their ebook accounts to retake some measure of control over the pricing of new releases, Apple's Steve Jobs essentially confirmed the plan to the WSJ's Walt Mossberg in a brief video interview.

Mossberg wondered why someone "should buy a [b]book for $14.99 when you can buy one from Amazon for $9.99 on the Kindle or Barnes & Noble?" A confident Jobs replies, "That won't be the case.... The prices will be the same." How in the world will prices be the same? Because if you want to carry brand-new ebook release, you will carry on the publishers' new selling terms. Or as Steve puts it, "publishers will actually withhold their [e]books from Amazon...because they are not happy with the price."

CONFIDENTIALITY NOTICE:

"Mossberg wondered why someone 'should buy a [b]book for $14.99 when you can buy one from Amazon for $9.99 on the Kindle or Barnes & Noble?' A confident Jobs replies, 'That won't be the case.... The prices will be the same.'"

"I cannot believe that Jobs made the statement below. Incredibly stupid."





PX-0607

60





**Russ Grandinetti**

"So I left each of those conversations with the clear impression and assumption that that's the price we could expect…I believe in all cases publishers introduced price points like 12.99 or 14.99."

Grandinetti Testimony, TT 767:12-768:19



**Laura Porco**

"Q. Had they told you what they planned to do with pricing?

A. Well, during the negotiations, it was pretty clear with the pricing tiers that they intended to raise prices, yes."

Porco Testimony, TT 844:19-25


"Q. And you did give them price tiers that allowed them to price -- to raise their prices above the 9.99 price point that prevailed in the market for New York Times bestsellers and new releases at that time; is that correct, sir?

**A. That's correct.**

                             *              *             *

Q. And it didn't surprise you either that the publishers were pricing at the caps, did it?

**A. No, it did not.**

Q. And the reason it didn't surprise you that the publishers were pricing at the caps was for the very same reason, because you know they wanted higher prices, correct?

**A. That's correct.**

Q. In fact, this wasn't something that only you were aware of? This was something that Mr. Jobs was aware of as well, correct?

**A. Yes. They had expressed they wanted higher prices from us."**



**Eddy Cue**

Cue Testimony, TT 1690:16-20, 1691:4-13



# Apple Knew That Retail Prices Would Increase Under Agency

"Q. Mr. Cue, on April 1, 2010 you recognized that the prices for New York Times bestsellers and new releases went up, correct?

**A. That's correct.**

Q. And that wasn't a surprise to you, was it?

**A. It was not.**

Q. And the reason it wasn't a surprise to you was because all of the publishers had told you during the course of your negotiations that they had a problem with Amazon's pricing of New York Times bestsellers and new releases, correct?

**A. That's correct."**



Cue Testimony, TT
1689:25-1690:10





-----Original Message-----
From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Tue 2/9/2010 11:32 PM
To: Sethh Humphrey
Subject: Re:

It's the publishers that are raising prices, not Apple.

Sent from my iPhone

> Hello Mr. Jobs. I don't really expect a reply from this, but here
> goes. I am a mac and kindle owner. And with Apple strong arming
> Amazon into raising e-book prices, this is detrimental to my reading
> as a college student. You have so much. Wouldn't it be okay for us
> little guys to have something? If you read this, thanks for your
> time. Peace.
>
> Sethh T. Humphrey

"Q. At this point in time Mr. Jobs knew that the publishers were going to be raising prices, correct?
**A. That's correct.**"

Cue Testimony, TT 1692:25-1693:2



"Q. You were indifferent as to whether your consumers paid $9.99 for New York Times best sellers and new releases as opposed to $14.99, correct?

**A. For the books that – In the deal that I cut, that's correct."**

"Q. Isn't it true, sir, that Apple had made the determination that it was fine with its consumers paying $14.99 for books that had previously been available for $9.99, as long as no consumer in the United States could find that book for less than $14.99?

**A. You can – it's an accurate statement. It's not the way that I would have said it, but it's an accurate statement."**

Cue Testimony, TT 1724:1-5, 9-16



**Eddy Cue**



"It is important to Apple that there be 'some level of **reasonable pricing**.' They feel the only way to get this is for the industry to go to the agency model…."

(Dec. 21, 2009; PX-0540)

"There are several things we have to accomplish in order to sell ebooks at **realistic prices**…"

(Eddy Cue, Jan. 4, 2010; PX-0021)

"Our top objective is to build a book store that sells books not displays them. We think our customers will pay a **reasonable price** (not more than physical or 50-100+% more than existing ebooks) if given the elegant and easy solutions we are known for."

(Eddy Cue, Jan. 24, 2010; PX-0569)

**Eddy Cue**





**Carolyn Reidy**

"Our eBook prices will be rising – we are planning, for instance, to sell NY Times bestsellers for $12.99 at all outlets."

(PX-0726)



**Brian Murray**

"If we just do what Apple suggests – our ebook prices will go to $14.99 for most books and consumers could scream if they are no longer available from Amazon and B&N at $9.99."

(PX-0307)



**David Young**

"Q. You also knew that the prices of some of Hachette's books would be going up if Hachette signed the agency agreement, correct?
**A. That's right."**

Young Testimony, TT 1422:2-1425:5



# "An Unlawful Objective":
# Restrain Retail Price Competition





From: Redmayne, Charlie
Sent: Friday, January 22, 2010 12:07 PM
To: Murray, Brian (HarperCollins US)
Subject: FW:

From: Redmayne, Charlie
Sent: 22 January 2010 16:34
To: Miller, Jonathan ( Newscorp )
Subject:

"The upshot is that Apple would control price and that price would be standard across the industry meaning that they would be clear to compete in the areas that they are strong: Hardware, Reach, Experience etc."

I have pasted below Brian's ema

Am available at 2.00 EST for the

Best

Charlie

From: Murray, Brian (HarperCollins US)
Sent: Friday, January 22, 2010 11:14 AM
To: Carey, Chase ( Newscorp )
Subject: Apple

Chase,

I met with Eddy this morning.  We did not come to terms with them today because I don't believe the terms work for us in the long term.

The major issue for us is that Apple's contract caps the consumer price that we **can** set for them but more importantly for ALL OTHER PARTNERS.  If an author, HarperCollins and B&N think we can charge $1 more than Apple believes is the



IGHLY CONFIDENTIAL                                    HC-TXAG-0008492



"The critical question here is whether . . . there was a horizontal agreement among the toy manufacturers, with TRU in the center as the ringmaster, to boycott the wholesale clubs."

*Toys "R" Us v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000)


The critical question here is whether there was a horizontal agreement among the publishers, with Apple in the center as the ringmaster, to raise e-book prices.



# A Horizontal Agreement Among the Publishers


"Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, or to divide markets."

Horizontal agreements among competitors to fix prices "have manifestly anticompetitive effects and lack any redeeming virtue."

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).



1. <u>Evidence of communication between competitors</u>;

2. <u>Abrupt shift in business practices</u>;

3. <u>Condition that horizontal competitors also agree to go along with agreement</u>.

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (citing *Toys "R" Us*, 221 F.3d at 932-33, 936-37)





**Carolyn Reidy** — SIMON & SCHUSTER

"Q. And in your phone call with Mr. Young he told you that he was much happier because of that meeting, correct?

**A. Yes . . . .**

Q. And by that he meant that he wasn't going to tell you too many specifics so as to not spoil the surprise for you, correct?

**A. Correct.**"

Reidy Testimony, TT 479:25-480:8



**David Shanks** — Penguin

**"I think the only thing that I remember was saying to [Ms. Reidy] that we're probably out. We're not going to go in."**

Shanks Testimony, TT 380:14-22



**Carolyn Reidy** — SIMON & SCHUSTER

"Q. Ms. Reidy, was the individual who you had . . . that conversation with regarding revised terms being sent to Amazon Brian Murray of HarperCollins?

**A. Yes.**"

Reidy Testimony, TT 538:11-15

75





**Brian Murray**

Mr. Murray called Mr. Sargent and Mr. Young to find out if they had signed agency deals.

Murray Testimony, TT 1006:9-19



**John Sargent**

"Q. And Mr. Murray said, these words or words to this effect, HarperCollins is out, right?
**A. That's correct.**"

Sargent Testimony, TT 1165:3-13



**David Young**

"I certainly had a conversation, I remember, with Brian Murray when I told him that we had signed the agreement, but that was the only conversation I recall having with Brian about that."

Young Testimony, TT 1433:21-1434:2





**Dec. 8, 2009**
Apple begins reaching out to publishers
(PX-0314)

**Dec. 15, 2009**
Apple holds initial meeting with Big Six publishers
(PX-0262)

**Jan. 4-5, 2010**
Apple sends identical e-mails to publishers proposing key terms
(PX-0021; PX-0473, PX-0476, PX-0041; PX-0040; PX-0306)

**Jan. 11, 2010**
Apple sends draft contracts to each publisher
(PX-0248; PX-0249; PX-0285; PX-0322; PX-0286)

**Jan. 21-22, 2010**
Apple's deadlines for publishers to commit to the deal
(PX-0707; PX-0042)

**Jan. 26, 2010**
All five publisher defendants have signed the agreement
(PX-0005)

Number of Calls

December 2009 | January 2010

PX-0858


Statements by company officers referring to an "understanding within the industry" on price, and that "'our competitors are our friends,'" are evidence of an "explicit agreement to fix prices."

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002)



"You are probably asking why we have objected to the $9.99 price if we are not losing money on the sales, and that's because we feel it will ultimately be destructive to our industry."



Carolyn Reidy
SIMON & SCHUSTER

(PX-0726)





**John Sargent**

"In the last three weeks, from a standing start we have moved to a new business model. We will make less money on the sale of e books, but we will have a stable and rational market."

February 4, 2010, PX-0470



**Rupert Murdoch**

"Yeah we don't like the Amazon model . . . . I think it really devalues books and it hurts all the retailers of the hard cover books. . . . [A]pple in its agreement with us . . . does allow for a variety of slight of higher prices. There will be, prices very much less than the printed copy of books. But still it will not be fixed in a way that Amazon has been doing it."

February 2, 2010, PX-0491



**Carolyn Reidy**

"Q. And, Miss Reidy, you believe that doing a deal with Apple was going to change the industry, correct?
**A. Yes."**

Reidy Testimony, TT 526:10-12





**John Sargent**

"Q. …Changing the business model for the industry, is something you were very proud of at the time, correct, sir?
**A. Yes.**
Q. And you're proud of it today?
**A. Yes.**"

Sargent Testimony, TT 1141:4-9



**David Young**

"Q. And Mr. Nourry strongly believed that Amazon's pricing policy was a threat not just to Hachette but to the entire U.S. publishing industry, correct?
**A. The entire U.S. publishing and book selling industry, yes.**"

Young Testimony, TT 1399:4-7



**David Shanks**

"Q. But you [held back new releases], in part, because you wanted to see the publishing industry move to agency and you wanted to support that move, correct?
**A. It was one of the reasons that we did that.**"

Shanks Testimony, TT 365:12-14


"The new policies represented a radical shift from the industry's prior business practices, and the Court rejected as beyond the range of probability that such unanimity of action was explainable only by chance."

*Toys "R" US,* 221 F.3d at 935

"Q. And would you agree with me that the move from wholesale to agency was a very dramatic change for the eBook publishing in the United States?

**A. Yes."**


**David Shanks**

Shanks Testimony, TT 361:7-16



# The Move to Agency Was a Dramatic Business Change



"They keep chickening out . . . . In the end, they want us and see the opportunity we give them but they're scared to commit! It [sic] less to do with the terms and more about the dramatic business change for them."



**Eddy Cue**



**Apple in the Center as the Ringmaster**


- "[A]n admission by an employee of one of the conspirators."

    *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010)



"So we told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.'"

"So they went to Amazon and said, 'You're going to sign an agency contract or we're not going to give you the books'"

504    WALTER ISAACSON

cheaper than we are, then we can sell them at the lower price too. So they went to Amazon and said, "You're going to sign an agency contract or we're not going to give you the books."

Jobs acknowledged that he was trying to have it both ways when it came to music and books. He had refused to offer the music companies the agency model and allow them to set their own prices. Why? Because he didn't have to. But with books he did. "We were not the first people in the books business," he said. "Given the situation that existed, what was best for us was to do this akido move and end up with the agency model. And we pulled it off."

Right after the iPad launch event, Jobs traveled to New York in February 2010 to meet with executives in the journalism business. In two days he... Rupert Murdoch, his son James, and the management of their ...rnal; Arthur Sulzberger Jr. and the top executives at the ...s and executives at Time, Fortune, and other Time In... ...ld love to help quality journalism," he later said. "... ...loggers for our news. We need real reporting ...re than ever. So I'd love to find a way to help

because of its privacy policy, Apple would not share this information unless a customer gave explicit permission to do so.

Jobs was particularly interested in striking a deal with the New York Times, which he felt was a great newspaper in danger of declining because it had not figured out how to charge for digital content. "One of

same." He was...

The day after... ...described to me his thinking on books:

Amazon screwed it up. It pai... ...sale price for some books, but started selling them below cost a... ...The publishers hated that— they thought it would trash their abili... ...to sell hardcover books at $28. So before Apple even got on the scene, some booksellers were starting to withhold books from Amazon. So we told the publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway." But we also asked for a guarantee that if anybody else is selling the books


"[T]he only condition on which each toy manufacturer would agree to TRU's demands was if it could be sure its competitors were doing the same thing. That is a horizontal agreement."

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000)





**Keith Moerer**

"We did communicate to publishers that the MFN was important to the agreement that we were negotiating with that individual publisher, but also that every materially significant term would be similar. So things like the 30 percent commission, the MFN, the price caps."

*Moerer Testimony, TT 1308:24-1309:3*



**Brian Murray**
**HarperCollins**

"Q. And just so we're clear, all of the assurances that you mentioned or that we talked about here, regarding the type of deal, the MFN, the price cap, and the commission, all of the assurances came from Apple, correct?
**A. That's my recollection.**"

*Murray Testimony, TT 1005:4-8*



**Carolyn Reidy**
**SIMON & SCHUSTER**

"Q. And then you say, 'We were the last to meet with him (we planned the meeting for after our meeting with you) and he told us that what we said to him was exactly what all the other publishers had said.' So during that conversation, Mr. Moerer informed you of what the other publishers were saying with respect to the Apple contract, correct?
**A. Yes.**"

*Reidy Testimony, TT 512:6-13*



"In both [*Interstate Circuit* and *Toys "R" Us*] the evidence clearly indicated that the defendants would not have undertaken their common action without reasonable assurances that all would act in concert."

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 332 (3d Cir. 2010)



> "I just wanted to assure them that they weren't going to be alone, so that I would take the fear away of the Amazon retribution that they were all afraid of."



Cue Testimony, TT 1758:6-12







John Sargent

"Hey, do you have any more in, or still at 3?"



Eddy Cue

"give me a call on my cell ▮▮▮▮▮."









**David Shanks**

"My orders from London. You must have the fourth major or we can't be in the announcement."



**Eddy Cue**

"Hopefully this is not an issue but if it is I will call you at 4pm. It would be a huge mistake to miss this if we have 3."



**PX-0718**

Subject: Book Publisher Update
Date: Sat, 23 Jan 2010 16:22:27 -0800
From: Eddy Cue <cue@apple.com>
To: Steve Jobs <sjobs@apple.com>
Message-ID: <88CADBD3-EB70-4DC6-86F9-9D1C3FC884E6@apple.com>

None were signed today though all publishers worked on them. At this point, there are no material issues with the agreements but that can obviously change until they get signed. The process is very slow because they have never done an agreement like this and given all the issues they have had with their existing partners, they want to make sure they don't make a huge mistake. In addition, all these guys use external lawyers to review what their internal ones do so it makes everything slower. I know we are way past where we should be with them getting signed, but I am pushing them really hard (even to the point of killing the deal). I hope we can get signed tomorrow because all of them at this point are really close. In my mind, I have an absolute drop-dead of Mon!

**¾ Simon & Schuster**
We have gone through two red lines today. We expect their final version late tonight. I have also talked to the CEO, Carolyn, several times today and there are no issues.

**¾ Penguin**
No change here, he is waiting for the others to sign. We have executables ready to sign but he wants an assurance that he is 1 of 4 before signing (not in the contract).

**¾ MacMillan**
We just got a redline from them so we are about to go through it. I also talked to the CEO, John, several times today and there are no issues.

**¾ Hachette**
Got the redline at noon and just finished a face to face meeting. Both sides believe we are done so we are sending a clean version by late tonight to the CEO. He will have a call with France in the morning.

**X Harper Collins**
I reached out to him and told him we had 4 done and he should really re consider. Here was his response -

Congratulations. You've accomplished a lot in a week or two.
I will discuss with my team tomorrow. I can't promise that anything will change.
Is four out of six enough for you to launch the store? I'd assume so.
---
I am not going to answer him since they are not signed yet, but maybe he will change his mind with the news and Murdoch pushing.

**X Random House**
No conversations are occurring but will try one more time when i have 4 signatures in hand.

--- Eddy

Confidential                                        APEEBOOK-00012832

> "**Penguin**
> No change here, he is waiting for the others to sign. We have executables ready to sign but he wants an assurance that he is 1 of 4 before signing (not in the contract)."



"A co-conspirator who used his power to guide or direct other conspirators qualifies as an organizer even though his control was not absolute. The need to negotiate some details of the conspiracy with the cartel members also does not strip a defendant of the organizer role . . . ."

*United States v. Andreas*, 216 F.3d 645, 679-80 (7th Cir. 2000)



- Amazon's large market share

  (Cue Testimony, TT 1827:8-23)

- Apple didn't want to lose money on new releases and best-sellers

  (Moerer Testimony, TT 1331:25-1332:18)

- Eliminate price competition with Amazon

  (PX-0540)





**John Sargent**
MACMILLAN

"Q. Right. And when you and four of the other large Big Six publishers entered into Apple agency agreements, that was the point in time when you were able to force Amazon's hand, correct?
**A. That was the point in time, correct.**"

Sargent Testimony, TT 1106:2-14



**David Shanks**
Penguin

"THE COURT: And were you concerned at all about retaliation from Amazon if you signed an agreement with Apple and were the only one to do it?
**THE WITNESS: Yes. I was concerned.**"

Shanks Testimony, TT 436:5-8



**Carolyn Reidy**
SIMON & SCHUSTER

"Q. And the reason that you didn't want to be left out there alone was because you believed that if Amazon had to deal with all of the publishers at once, that made it less likely that Simon & Schuster would be singled out for retribution, correct?
**A. Correct.**"

Reidy Testimony, TT 542:19-23



# Concerted Action Required to Move Amazon to Agency



**Russ Grandinetti**

"[I]t was highly likely that we would lose ebooks from those publishers unless we moved to agency with all of them. If it had only been Macmillan demanding agency, we would not have negotiated an agency contract with them."

PX-0835 at ¶ 46



**David Naggar**

"[I]t had become clear by then that all five of the publishers were making this move at the same time and there was no way we could fight them all together."

PX-0837 at ¶ 30



**Apple Is Liable Under the Rule of Reason**



Quick-look analysis is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."

*Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999)





"You can do all kinds of statistics, but really, all you need to do is look at the diagram . . . . Their prices went up and stayed up. So it's not rocket science. You just have to look at it."

Gilbert Testimony, TT 1653:9-13



# Apple Is Liable Under the Rule of Reason

 Apple's conduct has had a "substantially harmful effect on competition."

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993)

 Apple lacks creditable procompetitive justifications.

*United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963)

 Any procompetitive benefits could have been achieved through alternative means.

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003)



"The use of anticompetitive effects to demonstrate market power . . . is not limited to 'quick look' . . . cases."

*Todd v. Exxon Corp.,* 275 F.3d 191, 207 (2d Cir. 2001)

Proof of actual detrimental effects "can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."

*FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 460-61 (1986)


• Professor Ashenfelter ran his primary analysis regression on data from six months before and six months after the implementation of agency. (PX-1097 at ¶ 7)

• He controlled for many factors, including retailer, title, month, backlist status, and the Macmillan "buy button" incident. (PX-1097 at ¶ 8)

• Relative to Random House, Publisher Defendants':

> • Prices increased 16.8%
> • Unit sales decreased 14.5%



| E-book Price Increases for Agency Publishers, by Retailer February 2010 to February 2011 | | |
|---|---|---|
| **Book Category** | **Amazon** | **Barnes & Noble** |
| NYT Bestsellers | 40.4% | 48.6% |
| New releases | 24.2% | 18.1% |
| Backlist | 27.5% | 19.2% |
| **Overall** | **23.9%** | **19.3%** |
| | | PX-1105, Table 6 |



Price Changes of Titles Covered by Tiers Versus Those Not Covered by Tiers Demonstrate That Tiers Constrained Prices

|  | Amazon | Barnes & Noble | Sony |
|---|---|---|---|
| **Backlist** | | | |
| Before Agency | $7.16 | $6.84 | $8.07 |
| After Agency | $8.78 | $8.20 | $8.43 |
| Percent Change | 23% | 20% | 4% |
| **Hardcover New Release and NYT Bestsellers** | | | |
| Before Agency | $10.37 | $9.99 | $11.31 |
| After Agency | $12.28 | $11.60 | $11.97 |
| Percent Change | 18% | 16% | 6% |

Source: Amazon Transactions Data, Barnes & Noble Transactions Data, Sony Transactions Data

DX-449



- Publisher Defendants accounted for approximately half of the trade e-book market in the first quarter of 2010.  (PX-1105, Table 1)

- Publisher Defendants' prices increased over 18% for all e-books.  (PX-1105, Table 5)

- Random House's prices were flat.  (PX-1105, Table 5)

- Non-agency publishers' prices barely moved.  (PX-1105, Table 5)

- Half of 18% is 9%.

> There was a 9% price increase in the overall trade e-book market.



"[T]he fact that sales on the spot markets were still governed by some competition is of no consequence. For it is indisputable that that competition was restricted through the removal by respondents of a part of the supply which but for the buying programs would have been a factor in determining the going prices on those markets. . . . Any combination which tampers with price structures is engaged in an unlawful activity."

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220-2 (1940)



# The Apple Agency Agreements Did <u>Not</u> Increase Output



Non-agency publishers' share increased.

Agency publishers' share declined.

**Figure 10: Output shares of defendant publishers, Random House, and non-major publishers**

Source: Gilbert Direct, p. 89.

PX-1105

"[I]f the Apple agency agreements were stimulating growth, then I would expect to see some indication of that in the share of the publishers who were operating under those agreements. And, in fact, I see the opposite."

Gilbert Testimony, TT 1565:3-7


"Q. You can't tell us how many eBook titles came on to the market specifically because of Apple's entry in 2010, correct?

**A. I can't at this time."**

"Q. And in fact, even after Apple launched its iPad, isn't it true, sir, that Amazon offered eBooks with embedded audio and video before Apple did?

**A. That's correct"**

"Q. And, in fact, Amazon's Kindle app for the iPad, the first Kindle app for the iPad that came out the day that the iPad launched, the day that the iPad actually went to market, allowed for choice in customization of fonts; did it not?

**A. Correct."**

McDonald Testimony, TT 2331:6-9, 2334:5-8, 2340:25-2341:4



"Q. So isn't it a fact, sir, that Apple's sepia feature in iBooks wasn't an innovation at all?

**A. We didn't come out with it first, correct.**

Q. In fact, Apple just copied it from Amazon, correct?

**A. I can't speak to the nature of how we implemented it.**

Q. But that's what the document indicates, sir; does it not?

**A. That's what this document indicates, correct.**

Q. And so would you agree with me, sir, that at the very least, the part of your declaration that talks about changing the color of book pages from white to sepia I can't as being an innovation of the iBooks app isn't entirely accurate?

**A. Yes."**

McDonald Testimony, TT 2343:20-2344:6





"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

**BEFORE**

**$9.99**

**AFTER**

**$12.99 – $14.99**

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23





"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

**BEFORE**

$9.99

**AFTER**

$12.99 – $14.99

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23





"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

**BEFORE**

**$9.99**

**AFTER**

**$12.99 – $14.99**

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23





"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

**BEFORE**

$9.99

**AFTER**

$12.99 – $14.99

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23



# From Apple's Opening



"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

BEFORE

$9.99

AFTER

$12.99 – $14.99

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23



"The publishers sign Apple's agency agreements with an MFN and price caps"

"Demand for agency convinces a company, Amazon, of the futility of continued resistance to agency"

"The publishers raise prices to the price caps by agreement"

**BEFORE**

**$9.99**

**AFTER**

**$12.99 – $14.99**

"The MFN sharpens the publishers' incentives to demand agency from Amazon"

"Amazon adopts agency in circumstances where absent the Apple MFN it would not have adopted agency"

**"All of these links in the chain are required for the government to meet its burden of proving that Apple participated in a price fixing scheme."**

Apple's Opening Statement, TT 136:11-23



# Purposes of Remedy

- End Apple's illegal conduct

  *United States v. Parke, Davis Co.*, 362 U.S. 29, 48 (1960)

- Restore competition to the marketplace

  *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)

- Deprive Apple of the benefits of its conspiracy

  *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 171 (1948)

- Prevent reoccurrence

  *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950)

**The Court has broad remedial powers to accomplish these purposes**.

*Int'l Salt*, 332 U.S. at 400-01


Prohibited:

- Agency prohibited for two years

- Retail price MFNs prohibited for five years

- Apple prohibited from further antitrust law violations

- Apple prohibited from retaliation or discrimination

Required:

- Antitrust compliance program

- Antitrust training for executives

- Independent monitoring trustee

- Allow third-party booksellers to reinstate hyperlinks to their stores

*See* Plaintiffs' Proposed Conclusions of Law (April 26, 2013) at ¶ 88



- Fearing for the future of their "industry," publishers conspired to raise retail e-book prices; however, their efforts had proved largely unsuccessful.

- Apple wanted to enter the e-book market, but feared that price competition with Amazon, the market leader, would involve either Apple accepting a lower margin, or no one buying Apple's books.

- The publishers sought a plan from Apple that would solve their "Amazon issue."

- Rather than risk competition on the merits with Amazon, Apple accepted the publishers' invitation to fix industry pricing.

- To effectuate their common goals, Apple orchestrated a horizontal conspiracy among the publishers to move the industry to an agency model, which would let the publishers set higher retail prices that they had agreed upon with Apple.

- Each of the publishers, assured of the participation of four other publishers in the conspiracy, threatened Amazon with the choice of either adopting the agreed-upon terms, or face losing all new release e-books for seven months.

- The conspiracy was effective: Amazon was forced to accept an agency model, e-book prices rose overnight and significantly, and consumers paid higher prices for e-books.

- Rather than accept responsibility for their actions, high-level Apple executives have consistently denied, under oath, what their normal course business documents make clear: they conspired with the publishers to raise e-book prices and restrain retail price competition, harming consumers.