UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,                               :
                                                        :
        Plaintiff,                                     :
                                                        :
   v.                                                  :       12 Civ. 2826 (DLC)
                                                        :
APPLE INC., *et al.*,                                   :
                                                        :
        Defendants.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
THE STATE OF TEXAS,                                     :
THE STATE OF CONNECTICUT, *et al.*,                     :
                                                        :
        Plaintiffs,                                    :
                                                        :
   v.                                                  :       12 Civ. 3394 (DLC)
                                                        :
PENGUIN GROUP (USA) INC., *et al.*,                     :
                                                        :
        Defendants.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPLE INC.'S POST-TRIAL MEMORANDUM**

**Part 4 of 8**

# More Reasonable Inference: Cue Is Not "Chief Ringleader"



81



# More Reasonable Inference: Cue Is Not "Chief Ringleader"



83

Apple exploring the possibility of opening eBookstore

No agreements reached with publishers

Apple chose agency model based on its core business principles

Apple's actual communications – and lack of communications – with publishers show no conspiracy






# January 4 & 5, 2010





Penguin

Macmillan

Hachette

HarperCollins

Random House

Simon & Schuster



# January 4 & 5, 2010

Subject: iTunes
Date: Mon, 04 Jan 2010 09:21:47 -0800
From: Eddy Cue <cue@apple.com>
To: David Young <david.young@hbgusa.com>
Message-ID: <953BE52E-855D-45E0-83E5-A40C6E07A6DE@apple.com>

Hi David,

I hope you had a great holiday!

After talking to all the other publishers and seeing the overall book environment, here is what I think is the best approach for ebooks.

Just like the App Store, we are proposing a principal-agency model with you, where you would be the principal and iTunes would sell your product as your agent for your account. In exchange for acting as

There are several things we have to accomplish in order to sell ebooks at realistic prices -
• books need to be cheaper to buy than physical
• you should make less per book since significant costs have been eliminated but still have a healthy, profitable sale
• **all resellers of new titles need to be in agency model**

We think these agency terms accomplishes all the goals we both have. I will try to schedule a call for us for tomorrow to catch up and determine the next steps.

--- Eddy

------ end message ------

PX-41

88

## Government's Opening Statement

> But as Mr. Cue will admit, Apple never had any further communications with the publisher defendants rescinding that demand.

50:18-20

89



# Testimony Of Eddy Cue

Q. And I think you testified that there came a time when you realized that that idea didn't work?

A. …But as we started thinking about this, I started thinking of several issues that were very concerning to me. Number one, ==how was I to be assured that the agency deal that I got was the same agency deal that they were going to give somebody else?== In other words, there was nothing in my agency deal that said all the terms had to be the same and so it had to be exactly the same as ours.

**CONTINUED**

1823:1-12

92



# Testimony Of Eddy Cue

Secondly, I was concerned that even if they gave us the same terms in the agreement, Amazon and Barnes & Noble were extremely powerful, huge resellers of books, because they were in the physical business along with digital. And so my concern was what power did they have over the publishers to negotiate deals that were combined between physical books and digital books.

CONTINUED

1824:2-8

93



# Testimony Of Eddy Cue

Thirdly, I'm concerned that I realize that even if I put in this requirement that says all the resellers need to go to an agency model, how can I enforce it? And so I look at Amazon, Barnes & Noble, they are the largest providers of money to these six major publishers. And I'm thinking, okay, let's say they're even willing to agree to this. Let's say I'm willing to ignore the first two issues that I just described. If at the end of the day they don't sign the deal, what's my – what do I do?

1824:14-22

94



# Testimony Of Eddy Cue

Q. And how if at all, sir – if you were to say it simply, what was your thinking behind the MFN? What was your overall thinking behind proposing an MFN?

A. It lets me compete on price so that I can set the best price for the consumer.

1836:19-23

96



# Testimony Of Brian Murray

Q. And how, if at all, did Apple explain to you its thinking behind [the] MFN, why it wanted it in its agency agreements?

A. They wanted the consumer offer in their bookstore to be competitive with the Kindle bookstore; so it was important to them to have a consumer offer that was competitive on price.

1046:10-14

97



# Testimony Of Russell Grandinetti

Q. What purpose, if any, is served by having both a price parity provision and a business model parity provision in Amazon's agency contracts?

A. The price parity provision allowed us, under an agency model, to know with comfort that our agency price would be no higher than the lowest price of another agent for that publisher, to the extent the publishers, at some future point, additionally change their terms or offered a new set of terms.

761:3-10

99



# Testimony Of Theresa Horner

Q. How important, if at all, were those MFNs to Barnes & Noble?

A. The pricing MFN?

Q. Yes.

A. Extremely important.

Q. Why?

A. As previously stated, if we didn't have a representation from the publisher that the price that we were getting from the publisher was the lowest available in the marketplace, we didn't have assurances that -- we didn't have an understanding without the ability to discount that we could compete unless we understood that we had the lowest price available.

2193:18-2194:4

100



# Testimony Of Thomas Turvey

Q. And Google determined that it needed [a price parity] provision because it was concerned about pricing discrepancies once you gave the principal pricing authority between the eBooks on Google's bookstore with those sold by Apple and Amazon under agency agreements on its bookstore, correct?

A. Yes. We wanted to make sure that we were not being discriminated against, yes.

Q. On price, correct?

A. Correct.

923:22-924:5

101