D659USA1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,

        v.                              12 Civ. 2826 (DLC)

APPLE, INC., *et al.*,

                Defendants.

------------------------------x

                                        June 52013
                                        9:30 a.m.
Before:

                HON. DENISE L. COTE,

                                        District Judge

D659USA1                          Trial

1                                APPEARANCES

2

UNITED STATES DEPARTMENT OF JUSTICE
3        Attorneys for Plaintiff
BY:  MARK W. RYAN
4        DANIEL McCUAIG
         LAWRENCE BUTERMAN
5        CARRIE SYME
         DANIEL McCUAIG
6

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
7        Attorneys for State of Texas and Liaison counsel
         for plaintiff States
8   BY:  ERIC LIPMAN
         GABRIEL R. GERVEY
9        DAVID M. ASHTON

10  OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT
         Attorneys for State of Connecticut and Liaison counsel
11       for plaintiff States
    BY:  W. JOSEPH NIELSEN
12       GARY M. BECKER

13  OFFICE OF THE ATTORNEY GENERAL OF OHIO
         Attorneys for State of Ohio
14  BY:  EDWARD J. OLSZEWSKI

15  GIBSON, DUNN & CRUTCHER
         Attorneys for Defendant Apple
16  BY:  ORIN SNYDER
         LISA RUBIN
17       DANIEL FLOYD
         DANIEL SWANSON
18       CYNTHIA RICHMAN
              -and-
19  O'MELVENEY & MYERS
    BY:  HOWARD HEISS
20

21

22

23

24

25

1                  (In open court)

2                  THE COURT:  Good morning, everyone.

3                  I doublechecked my math.  I was wrong when I did my

4      addition yesterday.  So let me give you the new numbers.

5      Yesterday the government spent 2 hours and 57 minutes not 2

6      hours and 45.  That means altogether so far they've spent 5

7      hours and 37 minutes.

8                  Yesterday the defendant spent 2 hours and 7 minutes.

9      That means altogether it has spent 4 hours and 48 minutes.

10                 The government may call its next witness.

11                 MR. BUTERMAN:  Your Honor, Lawrence Buterman for the

12     United States.  Before we begin we're pleased to inform the

13     Court that we have another stipulation for your Honor.  Apple

14     and the plaintiffs have worked out the 901 issue.  And so we

15     have a stipulation, if I could provide to the Court copies of

16     that, stipulating to the admissibility of all the 901

17     objected-to documents on the plaintiffs' witnesses.

18                 THE COURT:  Fine.  I've signed that stipulation.

19                 MR. BUTERMAN:  Your Honor, the United States has

20     withdrawn its objection to the document from yesterday that we

21     had a discussion about.

22                 We will provide the Court with the DX number at a

23     convenient time.

24                 THE COURT:  Anything else?

25                 MR. BUTERMAN:  That's it, your Honor.

D659USA1                              Trial

1            THE COURT:  By the way, with respect to a portion of

2    Mr. Shanks testimony yesterday, I think he adopted some

3    testimony in a deposition.  Do you have a transcript of that

4    deposition excerpt?  I'd like that also.

5            MR. RYAN:  We do.  Would you like it with a sticker on

6    it, your Honor, for identification purposes?

7            THE COURT:  That would be great.  Thank you.

8            Government may call its next witness.

9            MR. BUTERMAN:  Thank you, your Honor.

10           The government calls Carolyn Reidy.

11           THE DEPUTY CLERK:  Ms. Reidy if you would please come

12   forward and take the witness stand.

13     CAROLYN KROLL REIDY,

14        called as a witness by the Plaintiffs,

15        having been duly sworn, testified as follows:

16           THE COURT:  Ms. Reidy, you're about to be handed a

17   document, a declaration of yours, which is I believe a

18   defendant's exhibit.

19           Do we have the Defendant's Exhibit number?

20           MR. FLOYD:  I believe it to be 552, your Honor.

21           THE COURT:  Defendant's Exhibit 552.

22           And counsel do you have the declaration for Ms. Reidy

23   to look at?

24           MR. BUTERMAN:  Yes, your Honor.  We're getting a copy

25   of it.  I apologize, your Honor.

1              THE COURT:  Do the defendants, since it's their

2     declaration, do they have a copy for Ms. Reidy?

3              MR. FLOYD:  Yes, we do.

4              THE COURT:  Thank you.

5              MR. FLOYD:  It also includes the exhibits.

6              THE COURT:  So Ms. Reidy I've been given, really some

7     weeks ago, a 13-page declaration signed by you I believe on

8     April 26 of this year.

9              Do you see that document?

10             THE WITNESS:  Yes, I do.

11             THE COURT:  Did you read it carefully before you

12    signed it?

13             THE WITNESS:  Yes.

14             THE COURT:  Are the statements that you make in that

15    declaration true and accurate?

16             THE WITNESS:  Yes.

17             THE COURT:  Any objection to receipt of Defendant's

18    Exhibit 552 as constituting what would have been the direct

19    testimony of Ms. Reidy if she had been called first as an Apple

20    witness?

21             MR. BUTERMAN:  Lawrence Buterman, your Honor.

22             The plaintiffs have two objections.  The first is to

23    paragraph 8, the sentence, "Finally we're hearing from other

24    eBook retailers and especially Barnes & Noble that they could

25    not match Amazon's below-cost pricing without losing money and

D659USA1                          Trial

1    that as a result their businesses were suffering."

2               THE COURT:  I'm happy to take that statement not for

3    the truth but for the declarant's state of mind.

4               Any objection?

5               MR. FLOYD:  No, your Honor.  That would be our point.

6               MR. BUTERMAN:  Your Honor, the second paragraph that

7    we have an objection to is the concluding paragraph, paragraph

8    38 which we believe is objectionable under 602.

9               THE COURT:  Overruled.

10              MR. BUTERMAN:  May I proceed, your Honor?

11              Thank you.

12   DIRECT EXAMINATION

13   BY MR. BUTERMAN:

14   Q.  Good morning, Ms. Reidy.

15   A.  Good morning.

16   Q.  I don't know if you remember me.  My name is Lawrence

17   Buterman.  We've met once before.

18   A.  I remember.

19   Q.  Ms. Reidy, you've been the President and CEO of

20   Simon & Schuster since 2008; is that correct?

21   A.  Yes.

22   Q.  And you report directly to Leslie Moonves?

23   A.  Yes.

24   Q.  What is Mr. Moonves' title?

25   A.  He's the CEO of CBS Corporation.

D659USA1                          Reidy - direct

1   Q.  Do you generally keep Mr. Moonves appraised of major

2   business decisions that's Simon & Schuster is considering?

3   A.  Major, yes.

4   Q.  Now, Ms. Reidy, could you turn to, in the binder with the

5   blue tab, the document that says -- the tab that says PX788.

6   A.  Mm-hmm.  Yes.

7   Q.  And specifically if you could turn to page six of seven of

8   that document.

9           Do you have that, Ms. Reidy?

10  A.  Yes, I do.

11  Q.  Now, Ms. Reidy, I'd like to direct your attention to the

12  date of Monday, January 25, 2010.

13          Do you see that?

14  A.  Yes.

15  Q.  Do you see the first line with respect to Monday,

16  January 25, 2010 reflects that at 8:42 there was a phonecall

17  between Mr. Cue and Mr. Shanks for 20 minutes and 7 seconds.

18          Do you see that?

19  A.  Yes.

20  Q.  Do you see that directly under there, there is a phonecall

21  originating from Penguin's main phone number to yourself?

22  A.  Yes.

23  Q.  And do you see that under that at 9:46 a.m. there's a call

24  from Mr. Shanks to yourself for four minutes?

25  A.  Yes.

1  Q.  And you understand Mr. Shanks to be the CEO of Penguin,

2  correct?

3  A.  Yes.

4  Q.  Do you recall that conversation, Ms. Reidy?

5  A.  No, I do not.

6  Q.  Do you recall whether during that discussion Mr. Shanks

7  told you that he was not planning on doing a deal with Apple?

8  A.  No, I don't.  Because I don't recall the call.

9  Q.  Do you recall ever discussing with Mr. Shanks during this

10  time period in late January whether Penguin was considering

11  doing a deal with Apple?

12  A.  No, I do not.

13  Q.  Do you recall whether you ever had any conversations with

14  Mr. Shanks where you tried to convince him to do a deal with

15  Apple?

16  A.  No, I did not.

17  Q.  You did not or you do not recall?

18  A.  I -- well, number one, I don't recall.  But number two, I

19  believe I did not ever have such a call.

20  Q.  During the period from December of 2009 when Apple first

21  contacted Simon & Schuster to the date of the iPad launch which

22  you understand to be January 27, 2010, correct?

23  A.  Yes.

24  Q.  Did you ever, during that time period, talk with any of the

25  other publisher -- strike that.

1          During that time period did you ever talk with any

2     other of the CEOs of the Big Six publishers regarding their

3     plans to do an agency deal with Apple?

4     A.  No.

5          THE COURT:  How about anyone else at those Big Six

6     publishing companies other than CEOs?

7          THE WITNESS:  No.

8     Q.  Ms. Reidy, outside of Simon & Schuster and Apple, at any

9     point in time between early December 2009 and January 27, 2010

10    did you have a conversation regarding Simon & Schuster's plans

11    to move to an agency model with Apple?

12    A.  Not to my recollection, no.

13    Q.  Just so we're clear your recollection is that outside of

14    Simon & Schuster and Apple you never discussed

15    Simon & Schuster's plans to enter into an agency agreement

16    prior to actually entering into that agreement with Apple,

17    correct?

18    A.  Yes.  That's my memory.

19    Q.  I'd like to just briefly talk about some of the dinners

20    that you attended in 2008 to 2010.

21          Now, Ms. Reidy from 2008 to 2010 it's true that you

22    attended a number of dinners where the only other people in

23    attendance were one or more of the CEOs from competing

24    publishers?

25    A.  Yes.

1   Q.  And the first one of those took place in or about September

2   of 2008; is that correct?

3   A.  Yes.

4   Q.  And the purpose of that dinner was to welcome Random

5   House's new CEO at the time, Markus Dohle, to the industry; is

6   that correct?

7   A.  Yes.

8   Q.  And that dinner was set up by David Young; is that correct?

9   A.  Yes.

10  Q.  And Mr. Young is the CEO of Hachette Group?

11  A.  Yes.

12  Q.  And that dinner was attended by yourself, Mr. Dohle of

13  Random House, Mr. Young of Hachette, Mr. Makinson of Pearson,

14  Penguin's parent company, and Mr. Sargent of Macmillan,

15  correct?

16  A.  And Brian Murray of HarperCollins.

17  Q.  Thank you.

18          And that dinner was held at Picholine restaurant?

19  A.  Yes.

20  Q.  And it was held in the private dining room of Picholine?

21  A.  Yes.

22  Q.  Also referred to as the wine cellar?

23  A.  Yes.

24  Q.  There were no legal counsel present at that meeting, were

25  there?

1    A.  No.

2    Q.  Now there was another dinner with CEOs that took place on

3    January 28, 2009; is that correct?

4    A.  Yes.

5    Q.  And that dinner was hosted by Mr. Makinson, correct?

6    A.  Yes.

7    Q.  And it was attended by yourself, Mr. Makinson, Mr. Young,

8    Mr. Murray, Mr. Sargent, and Mr. Dohle, correct?

9    A.  I don't remember if -- I think that's correct.  I'm not

10   sure if John Sargent was at that dinner or not.

11   Q.  But that dinner was also held at Picholine?

12   A.  Yes.

13   Q.  Also in the private wine cellar?

14   A.  Yes.

15   Q.  Also without counsel present, correct?

16   A.  Yes.

17   Q.  And at that dinner there was a discussion about potential

18   joint ventures, was there not?

19   A.  Yes.

20   Q.  And the discussion was about the joint venture that

21   eventually became known as Bookish is that correct?

22   A.  Yes.

23   Q.  The next CEO dinner took place on June 16, 2009; is that

24   correct?

25   A.  Yes.

1    Q.  And that dinner was not attended by Mr. Sargent, correct?

2    A.  Correct.

3    Q.  But it was attended by the other five CEOs, correct?

4    A.  Five including me, yes.

5    Q.  And that dinner was hosted by yourself?

6    A.  Yes.

7    Q.  And again it was at Picholine?

8    A.  Yes.

9    Q.  And the joint venture was discussed at that point in time?

10   A.  Yes.

11   Q.  Now, during those dinners there was also conversation

12   amongst at least some of the CEOs regarding their unhappiness

13   with Amazon, correct?

14   A.  I wouldn't say discussions so much as comments.

15   Q.  Comments that they disliked the 9.99 price that Amazon was

16   charging, for example?

17   A.  I don't have specific recollection.  But, you know, it

18   would be a throwaway comment like that.

19   Q.  Now, there was another CEO dinner that took place on

20   September 10, 2009; is that correct?

21   A.  Yes.

22   Q.  And, again, the same five CEOs attended that dinner?

23   A.  Yes.

24   Q.  That dinner took place at Alto; is that correct?

25   A.  Yes.

1    Q.  Again, in a private dining room?

2    A.  Yes.

3    Q.  And that dinner was hosted by Mr. Murray, correct?

4    A.  Yes.

5    Q.  And Mr. Murray is the head of HarperCollins, correct?

6    A.  Yes.

7    Q.  And the joint venture again was discussed during that

8    meeting, correct?

9    A.  Yes.

10   Q.  Now during that meeting you also had a conversation with

11   Mr. Young regarding the release date for the eBook version of

12   Senator Kennedy's biography True Compass, correct?

13   A.  Yes.

14   Q.  And specifically you asked Mr. Young when Hachette planned

15   to release that eBook, correct?

16   A.  Yes.

17   Q.  And that was an eBook that Hachette ended up windowing,

18   correct?

19   A.  Yes.

20   Q.  Now, Ms. Reidy, in May of 2009 you sat next to John

21   Sargent, the CEO of Macmillan, at an Association of American

22   Publishers dinner, correct?

23   A.  Yep.

24   Q.  And during that dinner Mr. Sargent informed you that he was

25   going out to Seattle to meet with Amazon, correct?

1    A.  That's not a correct -- I wouldn't put it that way.

2           I made some crack about the personalities at Amazon.

3    And he said don't speak to me about Amazon because I am going

4    out there.

5           So he didn't choose to inform me.  It was in response

6    to something I said.

7    Q.  Thank you for the clarification.

8           So, in other words, during that dinner you were made

9    aware of the fact that Mr. Sargent was planning on going out to

10   Seattle to meet with Amazon, correct?

11   A.  Yes.

12   Q.  And you understood that one of the reasons that Mr. Sargent

13   was going out to Seattle to meet with Amazon was to discuss

14   eBook pricing, correct?

15   A.  Absolutely not.  I had no idea why he was going out.

16   Q.  No idea --

17   A.  I just knew he was going out and that therefore made him

18   nervous -- he didn't want to talk to anybody about Amazon

19   because of what he was going to do.  But he never characterized

20   what he was going out for or why.

21   Q.  And you -- is it your testimony that you had no

22   understanding as to why Mr. Sargent was going out to meet with

23   Amazon?

24   A.  Any understanding I had was just supposition on my part.

25   Q.  And part of the supposition on your part was, in fact, that

```
 1  Mr. Sargent was going out to discuss eBook pricing?

 2  A.  Actually, no.

 3          Part of the assumption on my part was he was going out

 4  to propose some kind of terms thing with them, who knows what,

 5  and, you know, that it was something that would be dramatic.

 6  Q.  Terms in the eBook market?

 7  A.  I don't know.

 8  Q.  Now, you did respond at the time, did you not, by telling

 9  Mr. Sargent that Simon & Schuster would consider any approach

10  that Macmillan ultimately took with Amazon, correct?

11  A.  Would consider, yes.

12  Q.  And, in fact, you followed up with an e-mail to Mr. Sargent

13  in which you reiterated the exact same point, correct?

14  A.  Yes.

15  Q.  But just so we're clear.  Your testimony here today is that

16  you did not have any idea why Mr. Sargent was going out to

17  Seattle to meet with Amazon but yet you still told him on two

18  occasions that you'd consider any approach that Macmillan took

19  with Amazon?

20  A.  We consider any approach anyone takes with any account that

21  we see that's public to see if it's good for us.  So that's

22  basically what I was saying, yes.

23  Q.  Now, Ms. Reidy, in the fall of 2009 you considered

24  implementing a form of retail price maintenance, correct?

25  A.  Yes.
```

1   Q.  And you presented that idea to Mr. Moonves, correct?

2   A.  Yes.

3   Q.  And the idea behind implementing this form of retail price

4   maintenance was to get Amazon to change its 9.99 pricing,

5   correct?

6   A.  It was to get them to -- no.  It was to gain control of the

7   intellectual property of our authors and the valuing of it.

8   9.99 is like a shortcut phrase for an awful lot of other

9   aspects of the pricing of eBooks.  It's like a shorthand.  But

10  it's not just the 9.99.

11  Q.  So the purpose of instituting the retail price

12  maintenance -- or you would say that it's not fair for me to

13  say --

14  A.  Right.  Because I would say it's --

15          THE COURT:  Excuse me.  Let him finish the question.

16  Q.  Ms. Reidy, you would say that it's not fair for me to say

17  that the purpose of instituting the retail price maintenance

18  was to get Amazon to change its pricing, correct?

19  A.  I would say it was to get -- I would say it is correct to

20  say it was to get them to change their pricing, but not just

21  9.99, which is what you said the first time.

22  Q.  Okay.  Thank you for the clarification.

23          Your chief concern was with Amazon's pricing of titles

24  at nine -- New York Times -- excuse me.

25          Your chief concern was with Amazon's pricing of New

1    York Times bestsellers at 9.99 when the wholesale price that

2    they were paying was more than 9.99, correct?

3    A.   Yes.

4    Q.   Ms. Reidy in your binder can you turn to PX343.

5              MR. BUTERMAN:  Your Honor, would your Honor like me to

6    indicate every document that is in?

7              THE COURT:  No.  Only those that are not covered by

8    the stipulations or for which there is otherwise objection in

9    some way.

10             MR. BUTERMAN:  Thank you, your Honor.

11             THE COURT:  I'm going to assume that adversary counsel

12   will help alert me if there's any document that's in dispute.

13   I'm assuming these two sets of stipulations have basically

14   taken the admissibility issues off the table.  If I'm wrong

15   about any document, please rise and tell me.

16             MR. FLOYD:  We will, your Honor.  It is considerable.

17   There will still be a few things, but not very many.

18             MR. BUTERMAN:  Your Honor, just to clarify or to

19   expound, we are working out amongst the parties a way to deal

20   with some of the remaining hearsay objections.  And we believe

21   that we have a -- we're well on our way to resolving those

22   issues.

23             THE COURT:  That was Mr. Floyd who just spoke?

24             MR. FLOYD:  Yes, your Honor.  I'll identify myself

25   each time I speak.  This is Dan Floyd.

```
 1   Q.  Now, Ms. Reidy, PX343 -- well could you tell me what PX343
 2   is.
 3   A.  These are notes to myself in preparation for my
 4   conversation with Leslie Moonves and Joe Ianniello at CBS Corp.
 5   about the minimum price maintenance plan we wanted to put into
 6   effect.
 7   Q.  And in the first line of your notes you say, "Memo.  I hope
 8   clearly explained basic problem:  How to get Amazon to change
 9   its pricing," correct?
10   A.  Correct.
11   Q.  And if you scroll down a little bit do you see about
12   halfway down the page, you say, "Have tried to do it by raising
13   prices.  Has not worked"?
14   A.  Yes.
15   Q.  What does that refer to?
16   A.  When we first entered the eBook market we discounted -- the
17   digital list price was 20 percent less than the physical price.
18   We at one point, I think in '09, decided to raise our prices so
19   the eBook price was equal to the physical book price in hopes
20   that that would make Amazon lose more -- so much money they had
21   to change some of their policies.
22   Q.  And that had not been successful, correct?
23   A.  No.
24        I mean correct, yes.
25   Q.  And so you say that -- and then in the next sentence you
```

1   say "Don't think that delaying eBook release will be

2   successful," correct?

3   A.   Correct.

4   Q.   By that you were referring to windowing?

5   A.   Correct.

6   Q.   And so windowing was an attempt to by publishers to get

7   Amazon to change its pricing, correct?

8   A.   I wouldn't presume to say why anybody else did it.  But

9   that is why Simon & Schuster did it.

10   Q.   Now in parentheses you then say, "B&N and other retailers

11   now asking for this because of price pressures," correct?

12   A.   Correct.

13   Q.   So Barnes & Noble and other retailers were asking

14   Simon & Schuster to window?

15   A.   Yes.

16   Q.   And the date of this is September 23, 2009, correct?

17   A.   Yes.

18   Q.   And then you say, "So only other option is minimum price,"

19   correct?

20   A.   That's a what I say.

21   Q.   And by that you refer to retail price maintenance?

22   A.   Yes.

23   Q.   After that you discuss some of the dangers.  And the

24   dangers that you're referring to there refer to retaliation by

25   Amazon, correct?

1    A.  Yes.

2    Q.  And there's some redacted language.

3           But then at the bottom you end your notes by saying,

4    "Do hope others would copy us if we move to do this," correct?

5    A.  Yes.

6    Q.  And by "others" you meant other publishers, correct?

7    A.  Yes.

8    Q.  Other Big Six publishers?

9    A.  Yes.

10   Q.  Now these were notes for a conversation that you had with

11   Mr. Moonves, correct?

12   A.  Yes.

13   Q.  And was it during that conversation that Mr. Moonves

14   decided that Simon & Schuster should not implement retail price

15   maintenance or was it at some point after?

16   A.  Mr. Moonves didn't make the decision.  He was very clear

17   the decision was ours to make.  But he advised against it.  And

18   it was in the conversation at the meeting at his office.  I

19   believe this memo of September 23 is like the day before it.

20   Q.  And then after -- and then you accepted Mr. Moonves's

21   recommendation, right?

22   A.  I think the conversation clarified in our mind that the

23   danger was too great.

24   Q.  After having this conversation with Mr. Moonves, you sent

25   Mr. Moonves an e-mail, correct?

D659USA1                      Reidy - direct

```
 1   A.  Yes.

 2   Q.  Could you turn to PX344.

 3   A.  Mm-hmm.  Yes.

 4   Q.  And Ms. Reidy, is PX344, the lower half, the e-mail that

 5   you sent to Mr. Moonves following your phonecall with him?

 6   A.  Yes.  It wasn't a phonecall.  It was a video conference.

 7   Q.  Thank you.

 8          And in this e-mail you do say that Mr. Moonves was

 9   absolutely correct in what you mentioned to you, correct?

10   A.  Yes.

11   Q.  And looking at the end of the first line, you say, "We've

12   always known that unless other publishers follow us there is no

13   chance of success in getting Amazon to change its pricing

14   practices," correct?

15   A.  Correct.

16   Q.  So you agree that as of September 2009 Simon & Schuster on

17   its own could not force Amazon to change its pricing, correct?

18   A.  That's what we believed at the time.

19   Q.  You go on to say, "Your excellent and direct questions made

20   me realize that I do need to have a better idea of how the rest

21   of the negotiations will go before we can begin it."

22          Did I read that correctly?

23   A.  You did.

24   Q.  And then you say, "And of course you were right that

25   without a critical mass behind us Amazon won't 'negotiate' so
```

1    we need to be more confident of how our fellow publishers will

2    react if we make a move like this."

3            I read that correctly?

4    A.  Yes.

5    Q.  And so what you are telling Mr. Moonves there is that if

6    Simon & Schuster is going to take any action to try to force

7    Amazon to raise its pricing it needs to be -- it needs to have

8    a critical mass.  And by "critical mass" you meant publishers,

9    correct?

10   A.  It wasn't if Simon & Schuster was going to single-handedly

11   force them to move it.  It was to change their business model,

12   which may turn out to be the same thing, but it is a

13   distinction.

14           But that's what I'm saying.

15   Q.  In other words --

16   A.  The comment was made they're not going to change their

17   business model for you.

18   Q.  They're going to -- if you're going to change the industry,

19   you need more of a critical mass, correct?

20   A.  Yeah, I guess that's correct.

21   Q.  And so you say that you need to be more confident of how

22   our fellow publishers will react if we make a move like this.

23           And then you go on to say, "While I'm fairly sure that

24   at least two of them would quickly follow us, our conversation

25   made me feel that I need to shore up that confidence."

1          First of all, Ms. Reidy, do you recall who the two

2    other publishers were that you were fairly confident would

3    quickly follow Simon & Schuster?

4    A.   Yes.

5    Q.   And who were those two publishers?

6    A.   Hachette and Harper.

7    Q.   And those were based on conversations that you had had with

8    Mr. Young and Mr. Murray over the previous several months,

9    correct?

10   A.   No, they were not.

11         They were based on their public comments in various

12   and sundry newspaper articles about the eBook pricing.

13   Q.   And so it's your testimony that it was not -- your

14   statement here was not informed by any private conversations

15   that you had with either Mr. Murray or Mr. Young?

16   A.   That's true.

17   Q.   And by "shore up that confidence," what did you mean?

18   A.   I don't know what I meant.  And I -- I don't know what I

19   meant then.  I don't know what it means now.  Because as far as

20   I was concerned when this memo was written the retail price

21   maintenance was dead and I never spoke to another competitor

22   about it, never talked about how we were even thinking of it,

23   and I never asked anybody to try to join us in doing it.

24   Q.   Now, you conclude your memo by saying -- excuse me, you

25   conclude your e-mail by saying, "We will keep thinking of how

1    to attack the problem (as we receive it)."

2    A.   Excuse me.

3              THE COURT:  "Perceive it."

4              MR. BUTERMAN:  "Perceive it."  I apologize.  "...of

5    current eBook pricing; as you realize, we think it's too

6    important to ignore.  But clearly we need to 'gather more

7    troops' and ammunition first;"

8              With the correction, did I read that correctly?

9              THE WITNESS:  Yes.  Except the last is an exclamation

10   point, not a semicolon.

11             MR. BUTERMAN:  Excuse me.  Publisher correcting me on

12   my grammar -- punctuation.

13   Q.  Ms. Reidy, when you say "we clearly need to gather more

14   troops," you are referring to other publishers, correct?

15   A.  I don't -- as I said earlier, these phrases are in here.

16   But, I not only -- that's what it appears to refer to, but I

17   frankly can't imagine that that's what it refers to.

18             THE COURT:  So let's imagine together what else it

19   could refer to.

20             THE WITNESS:  Yes.  No.  No.  I'm saying that's

21   clearly what it must refer to but I didn't do it and I wouldn't

22   do it.

23             THE COURT:  Well, Ms. Reidy, you're under oath.

24             THE WITNESS:  Yes.

25             THE COURT:  I appreciate you coming to this courtroom

1    and helping to inform me of what happened here historically.

2              THE WITNESS:  Mm-hmm.

3              THE COURT:  Thank you.

4    Q.  Now --

5    A.  The reason -- can I amplify a minute?

6              THE COURT:  No.  Thank you.

7    Q.  Now, Ms. Reidy, in October of 2009 -- I'm moving on to

8    something just slightly different but I'm trying to keep us in

9    a chronological trail here.

10             In October of 2009 Simon & Schuster announced the

11   windowing of Stephen King's novel Under the Dome, correct?

12   A.  Yes.

13   Q.  And the hardcover version of Under the Dome was released on

14   November 10, 2009; is that correct?

15   A.  I believe so.

16   Q.  And Simon & Schuster delayed the eBook version until

17   December 24, 2009; is that correct?

18   A.  Yes.

19   Q.  Now, did you share Simon & Schuster's plans to window Under

20   the Dome with any other publisher prior to announcing that

21   decision?

22   A.  Yes.

23   Q.  And, in fact, you told David Young of Hachette, did you

24   not, that you planned to window the book with Stephen King's

25   approval?

 1   A.  Yes.

 2   Q.  And then -- and you gave that information to Mr. Young on a

 3   confidential basis, correct?

 4   A.  Yes.

 5   Q.  And you told Mr. Young that in August of 2009, correct?

 6   A.  According to the memo that is here, yes.

 7   Q.  Now -- and you have no reason to doubt that, correct?

 8   A.  No, I don't.

 9   Q.  Now, on December 9 of 2009 do you recall that there was a

10   Wall Street Journal article which came out in which

11   Simon & Schuster's windowing policy was discussed?

12   A.  Yes, I do.

13   Q.  And after that article came out, you received

14   congratulatory calls from other publishers, correct?

15   A.  I remember congratulatory calls from retailers.  I don't

16   recall from publishers.  But it's possible.

17   Q.  Could you turn to PX349.

18   A.  Mm-hmm.  Yes.

19   Q.  Ms. Reidy, PX349 is an e-mail -- contains an e-mail from

20   yourself to Mr. Moonves dated December 9, 2009, correct?

21   A.  Yes.

22   Q.  And you write to Mr. Moonves and you say, "I assume you saw

23   the article in this morning -- I'm sorry.  I assume you saw the

24   article this morning in the WSJ on the timing of eBook

25   publication (Front page of B1 section) after hardcover

1    publication."

2              Do you see that?

3    A.  Yes.

4    Q.  That's referring to the article that you testified about a

5    moment ago?

6    A.  Yes.

7    Q.  And in the second sentence you say, "We have been receiving

8    kudos all day from retailers (Barnes & Noble, BGI, Levy --

9    A.  Levy.

10   Q.  -- Levy - major wholesaler); agents (at least five have

11   written); and other publishers."

12             Do you see that?

13   A.  Yes, I do.

14   Q.  So after that article came out in the Wall Street Journal

15   you received congratulatory calls from other publishers,

16   correct?

17   A.  Clearly.

18   Q.  Do you recall which publishers you received congratulatory

19   calls from?

20   A.  No, I do not.

21   Q.  Do you know a Mr. Rubin?

22   A.  Yes, I do.

23   Q.  Can you tell me who Mr. Rubin is?

24   A.  Mr. Rubin is currently the publisher of Holt.  He is a very

25   dear personal friend of mine.  And I believe -- although I'm

1     not positive -- no at this time he was already the publisher of

2     Holt.

3     Q.  And Holt is an imprint of Macmillan?

4     A.  Yes.

5     Q.  And did you talk to Mr. Rubin around this time and try

6     to -- excuse me.  Let me rephrase it.

7          Did you talk to Mr. Rubin at this time in an effort to

8     help convince Macmillan to window eBooks?

9     A.  No.  I spoke to him about a windowing.

10         THE COURT:  So that's a no.

11         THE WITNESS:  Yes.  That's a no.  Sorry.

12    Q.  Are you aware of an e-mail in which Mr. Rubin told

13    Mr. Sargent that you were interested in getting Macmillan to

14    window eBook?

15    A.  I'm aware in an e-mail in which he says to John Sargent

16    something like she said in the nicest possible way she wouldn't

17    mind if others followed her, which is not the same as trying to

18    convince somebody to do it.

19    Q.  Thank you for the clarification.

20         So, are you aware or isn't it true -- I should say --

21    that in December of 2009 you spoke with Mr. Rubin in an effort

22    to get Macmillan to follow Simon & Schuster --

23    A.  Absolutely not.

24         THE COURT:  Ms. Reidy, you must let the question be

25    completed before you answer.

1          Excuse me one second.

2          The question, Mr. Buterman:  So, are you aware or

3   isn't it true -- I should say -- that in December of 2009 you

4   spoke with Mr. Rubin in an effort to get Macmillan to follow

5   Simon & Schuster -- in windowing?

6          MR. BUTERMAN:  In windowing, your Honor.

7          THE COURT:  And your answer, Ms. Reidy.

8          THE WITNESS:  Absolutely not.  I was not trying to

9   persuade anybody to follow us.

10  Q.  What were you telling Mr. Rubin?

11  A.  I don't know that I was telling him anything.  He saw the

12  article like anyone else.  I'm assuming that created the

13  conversation.  That he asked me about it.

14  Q.  Let me move on to something else, Ms. Reidy.

15          On December 15, 2009 you received a telephone call

16  from Mr. Young of Hachette, correct?

17  A.  I have -- I assume you have a record of it.

18  Q.  Sure.

19          Ms. Reidy if you would like to turn to PX787 in your

20  binder.

21  A.  Yes.

22  Q.  And do you see under Tuesday, December 15, 2009?

23  A.  Yes.

24  Q.  There is a call that takes place at 10:12 a.m. from

25  Mr. Young to yourself that's a 1-minute-and-18-second

1   phonecall.

2           And then there's another call from Mr. Young to

3   yourself at 12:08 p.m. that's an 18-second phonecall.

4           And then there's another call, this time from you to

5   Mr. Young, at 3:17 p.m. for 3 minutes and 30 seconds.

6           Then there's another call from you to Mr. Young at

7   3:41 p.m. for 36 seconds.

8   A.  That's the next day.

9   Q.  I'm sorry.  That's the next day.  I apologize for that.

10          So you saw the calls on 12-15 between yourself and

11  Mr. Young?

12  A.  Yes.

13  Q.  Now, do you recall what was discussed during those

14  phonecalls?

15  A.  Just looking at this, no.

16  Q.  Do you recall whether you spoke with Mr. Young after he had

17  met with Apple?

18  A.  Yes, I did.

19  Q.  And could you please turn to PX162 in your binder.

20  A.  Yes.

21  Q.  And the bottom half of the document -- let me back up.

22          What is PX162?

23  A.  I had a booklet, which this is a page of, that I used to

24  take notes of phonecalls.

25  Q.  And these are your handwritten notes, correct?

1    A.  Yes, they are.

2    Q.  And if we look at the -- towards the middle of the page

3    there is a reference to David Young with a phone number.

4           Do you see that?

5    A.  Yes, I do.

6    Q.  And this reflects your notes of a phone conversation that

7    you had with Mr. Young, correct?

8    A.  Yes.

9    Q.  And these are the notes of the phone conversation that you

10   had with Mr. Young on December 15 after he had met with Apple,

11   correct?

12   A.  If that's the day, yes.

13   Q.  Let's make sure that we're on the same page here.

14          So could you turn to PX262 in your binder.

15   A.  Yes.

16   Q.  And do you see that PX262 is an itinerary of the set of

17   meetings with various publishers and it's an e-mail between

18   Mr. Saul and Mr. Moerer?

19   A.  Yes.

20   Q.  You can close that up.

21   A.  Yes.

22   Q.  Does that refresh your recollection?

23   A.  I know these notes are from when he met; so, if that's date

24   that he met, yes.

25   Q.  And he -- and the notes were made after -- during the

1    phonecall that took place after Mr. Young of Hachette had met

2    with Apple but before Simon & Schuster had met with Apple,

3    correct?

4    A.  Yes.

5    Q.  And in your phonecall with Mr. Young he told you that he

6    was much happier because of that meeting, correct?

7    A.  Yes.

8    Q.  But he told you that he was not going to spoil the fun for

9    you, correct?

10   A.  Correct.

11   Q.  And by that he meant that he wasn't going to tell you too

12   many specifics so as to not spoil the surprise for you,

13   correct?

14   A.  Correct.

15   Q.  Now if we look at the notes he does say that -- or your

16   notes reflect that you two will check in after, correct?

17   A.  Yes.

18   Q.  And the notes -- it then says dinner in January.  And that

19   refers to a dinner that you and Mr. Young were going to have in

20   January, correct?

21   A.  Correct.

22   Q.  Was that going to be a personal dinner or -- a one-on-one

23   dinner or a CEO group dinner?

24   A.  It was a one-on-one dinner.

25   Q.  And the next line says, "Top man:  Talk different

1  language."  And that refers to Mr. Eddy Cue?

2  A.  Yes.

3  Q.  And then at the bottom of the notes it says, "Not -- with

4  two underlines under it -- 9.95."  Do you see that?

5  A.  Yes.

6  Q.  And that's a reference to the fact that Apple did not want

7  to sell eBooks at 9.95, correct?

8  A.  Yes.

9  Q.  Now, Ms. Reidy, prior to this time did you know that

10 Mr. Young was meeting with Apple?

11 A.  I don't believe so but I don't recall.

12 Q.  Do you recall whether you knew whether any other publisher

13 was going to be meeting with Apple?

14 A.  Prior to my meeting with Apple I did not know it.

15 Q.  Did Mr. Young indicate to you how he knew that Apple would

16 be meeting with Simon & Schuster?

17 A.  No.  Not that I recall.

18 Q.  Now, Ms. Reidy, your initial meeting with Apple took place

19 in the afternoon of January 16, 2009, correct?

20 A.  Correct.

21 Q.  And, in fact, it took place at 2:00; is that correct?

22 A.  (No response).

23 Q.  2 p.m.?

24 A.  I assume.

25 Q.  If you need to, Ms. Reidy, to refresh your recollection you

1   can look back at PX262.

2              MR. FLOYD:  Your Honor, Dan Floyd.  I think you

3   misspoke.  You said January of 2009.  It should be December.

4              MR. BUTERMAN:  Apologize, your Honor.  December of

5   2009.

6              THE WITNESS:  This says we met on the 16th at 2:00

7   in the afternoon.

8              THE COURT:  Don't worry, Mr. Floyd.  You don't need to

9   introduce yourself every time you stand to make an objection

10  today.  I think this is the first time you're sitting in that

11  chair and I just wanted the record to be clear.

12             Thank you very much for your cooperation.

13  Q.  Now, Ms. Reidy, when you first met with Apple on January --

14  excuse me, on December 16, 2009, Mr. Cue told you that Apple

15  was not interested in a low price point for digital books,

16  correct?

17  A.  He told us they were not interested in losing money selling

18  books and that they thought the current pricing was too low.

19  Q.  Ms. Reidy, when you met with Mr. Cue and others from Apple

20  on December 16, 2009 Mr. Cue told you that Apple was not

21  interested in a low price point for digital books, correct?

22  A.  I'd have to look at my notes to see if he specifically said

23  that.

24  Q.  Could you turn to PX510 then.

25             Ms. Reidy, if you'd look at the second paragraph --

1    let me back up.  PX510 are the notes -- PX510 is an e-mail that

2    you sent to Mr. Moonves following your meeting with Apple,

3    correct?

4    A.  Correct.

5    Q.  And they accurately reflect what was said during your

6    meeting with Apple, correct?

7    A.  I assume so, yes.

8    Q.  If you look at the second paragraph, the second sentence

9    says, "They are not interested in a low price point for digital

10   books."

11            Do you see that?

12   A.  Yes, I do.

13   Q.  And that "they" refers to Apple, correct?

14   A.  Yes.

15   Q.  And then it goes on to say "(although they do want the

16   digital books to be priced below paper editions)."

17            Do you see that?

18   A.  Yes.

19   Q.  And was that your understanding as well?

20   A.  That that's what they wanted, yes.

21   Q.  And was that your understanding that Apple maintained

22   throughout its negotiations with Simon & Schuster?

23   A.  Yes.

24   Q.  Now, Ms. Reidy, if you go to the next sentence, it says,

25   "They also cannot tolerate a market where the product is sold

1   significantly more cheaply elsewhere (although they can accept

2   some price differentiation between themselves and a low price

3   competitor)."

4           Do you see that?

5   A.  Yes.

6   Q.  And, again, the "they" there is referring to Apple?

7   A.  Yes.

8   Q.  And then you say, "i.e., they don't want Amazon's 9.95 to

9   continue."

10          Did I read that correctly?

11  A.  Yes, you did.

12  Q.  So during your first meeting with Apple, Mr. Cue made clear

13  to you that Apple did not want Amazon's 9.95 price in the

14  market to continue, correct?

15  A.  I'm not certain that he said that.  You'd have to look at

16  my actual contemporaneous notes, which you also have.  That is

17  what I -- how I'm interpreting it to Leslie, to put it in

18  context for him.

19  Q.  Well get to your notes in a second, Ms. Reidy.

20  A.  I don't want to -- you know, this is writing to Leslie to

21  explain to him my feelings from the meeting.  My notes say what

22  was actually said in the meeting.

23          I'm not trying to be difficult but I don't necessarily

24  remember everything that was said.  And I'm not certain Apple

25  said we don't want 9.95 -- it should have been 9.99 -- to

1    continue.

2    Q.  We'll get to your notes in a second.  Let me just ask you

3    this caution then.

4            You left your meeting with Apple on December 16, 2009

5    understanding that Apple did not want Amazon's 9.95 price to

6    continue in the industry, correct?

7    A.  Clearly.

8    Q.  Based on that, Ms. Reidy, you understood as early as

9    December 16, 2009 that if Apple was going to enter the eBook

10   market it was going to lead to higher prices for New York Times

11   bestsellers, correct?

12   A.  I hoped it.

13   Q.  That's a yes?

14   A.  Well, I had one conversation with them so I can't -- they

15   hadn't proposed any business plan.  We didn't have a -- we

16   didn't know what any terms were going to be, to say that I

17   believed they would only enter the market if that didn't

18   continue is not completely accurate.

19   Q.  But you certainly hoped that Apple's entry would be leading

20   to higher prices for New York Times bestsellers?

21   A.  Yes.

22   Q.  And you made that clear to Apple, correct?

23   A.  Yes.

24   Q.  Now, Ms. Reidy you mentioned your notes from that meeting.

25   Could you turn to PX159 in your binder.

1   A.   Yes.

2   Q.   Do you have that, Ms. Reidy?

3   A.   Yes, I do.

4   Q.   And PX159 are your handwritten notes from that meeting,

5   correct?

6   A.   Yes, they are.

7   Q.   And you took those contemporaneously with the meeting,

8   correct?

9   A.   Yes.

10  Q.   Now, if you turn to the second page -- let me back up for

11  one second before we get to the second page, Ms. Reidy.

12       Could you tell me who attended that meeting?

13  A.   From Apple was Eddy Cue, Kevin Saul, and Keith Moerer.

14  From our side was myself; Dennis Eulau, who is our CFO; Michael

15  Selleck, who is our head of sales; and Ellie Hirschhorn, who is

16  our chief digital officer.

17  Q.   Now can you turn to the second page of the document?

18  A.   Yes.

19  Q.   And do you see six lines down you write, "12.99 and 14.99

20  okay with them"?

21  A.   Yes.

22  Q.   And that refers to the fact that Mr. Cue told you in that

23  meeting that Apple was okay with prices for New York Times

24  bestsellers and new releases of 12.99 and 14.99, correct?

25  A.   There is no reference to what category book he's talking

```
 1    about.  But he did say those prices were acceptable to Apple
 2    for eBook prices.
 3    Q.  And you understood him to be referring to books that at
 4    that time were being priced primarily at 9.99, correct?
 5    A.  I think so.
 6    Q.  During this meeting Apple also informed you that they had
 7    met with Macmillan, correct?
 8    A.  They told us they had met with all the other major
 9    publishers already.
10    Q.  And you understood that to mean Hachette, HarperCollins,
11    Random House, Macmillan, and Penguin?
12    A.  Yes.
13    Q.  And with respect to Macmillan, Apple specifically told you
14    during this meeting that Macmillan's plan was that it would not
15    be offering enhanced eBooks to Amazon, correct?
16    A.  Well, on the last page there's a note that says, "Macmillan
17    offering enhanced only to folks who have screen in color, not
18    Amazon," but I don't actually know necessarily who said it in
19    the meeting.
20    Q.  Do you believe that you said it, Ms. Reidy?
21    A.  No.  But it could have been somebody on my staff too who
22    heard this.
23    Q.  Do you have any reason to understand why your staff,
24    someone on your staff would have information about Macmillan's
25    future plans with respect to enhanced eBooks?
```

1    A.  No.

2    Q.  Do you believe that information likely came from Apple?

3    A.  It could have.

4    Q.  Now, Ms. Reidy, during this meeting isn't it true that

5    Apple also told you that other publishers had told them that

6    the publishers wanted a 13- to a 15-dollar price range for

7    eBooks?

8    A.  I remember discussion that other publishers had said they

9    wanted eBook prices raised, as we did.  I don't remember

10   specifically any numbers.  But that's just my memory, unless

11   it's written down here.

12   Q.  And you remember Apple telling you that during your first

13   meeting with them, correct?

14   A.  Yes.

15   Q.  Ms. Reidy, are you familiar with Ms. Hirschhorn's

16   handwriting?

17   A.  I think so.

18   Q.  Could you just take a look at PX359.  I want to see if this

19   will refresh your recollection.  So let's not put it on the

20   screen.

21            If you could, Ms. Reidy, could you just look at the

22   third page of the document.

23   A.  Yes.

24            (Continued on next page)

25

 1  BY MR. BUTERMAN:

 2  Q.  Right under the part that says "biz model"?

 3  A.  Yes.

 4  Q.  Okay.  Can you just close that up for us?

 5  A.  Oh, close.

 6  Q.  Does that refresh your recollection as to whether during

 7  your initial meeting with Apple, Apple informed you that other

 8  publishers wanted a 13 to $15 price range for eBooks?

 9  A.  It does not reflect -- It does not change my memory, sorry.

10          MR. BUTERMAN:  Actually, your Honor, this document was

11  objected to.  I believe that we have cleared up the 901 grounds

12  on this.  I'll give Mr. Floyd a chance to address the Court, if

13  I'm in correct?

14          MR. FLOYD:  No, you're not incorrect.  We have cleared

15  up this document.

16          MR. BUTERMAN:  So, your Honor, I'd like to move this

17  document into evidence.

18          THE COURT:  Yes.  And the number is?

19          MR. BUTERMAN:  This is PX359, your Honor.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 359 received in evidence)

22  BY MR. BUTERMAN:

23  Q.  So, Miss Reidy, looking at the third page of the document,

24  you do see that under the title that says business -- "biz

25  model," Miss Hirschhorn writes, "other publishers want 13 to

D65PUSA2                        Reidy - direct

1    $15 range;" do you see that?

2    A.  Yes, I do.  But it also says "get by including extra

3    material."

4    Q.  Yes.  Now --

5             THE COURT:  So I think the question was, who said

6    that; do you remember?

7             THE WITNESS:  No.  That's what I don't remember,

8    but --

9             THE COURT:  Oh, so you think -- Did you say it, that

10   other publishers wanted 13 to $15?

11            THE WITNESS:  I'm not saying I said it.

12            THE COURT:  Did someone on your staff say it?

13            THE WITNESS:  I doubt it.  These are her notes of what

14   Apple said.

15            THE COURT:  Thank you.

16            THE WITNESS:  I just personally have no memory of that

17   statement, that's all.

18   BY MR. BUTERMAN:

19   Q.  Ms. Reidy, if you look down on the page, there's a mention

20   of, it says, "min pricing" and then underneath, "set a floor;"

21   do you see that?

22   A.  Yes.

23   Q.  And do you recall a conversation with Apple during this

24   meeting regarding minimum pricing?

25   A.  I remember telling them that we had looked at it and

1   felt -- and rejected it as a way forward.  So I know there was

2   some discussion about minimum pricing there, but I can't make a

3   whole lot of sense out of this, what's written here, but I do

4   remember that the topic was brought up.

5   Q.  And it was brought up as a possibility for your business

6   model moving forward with Apple?

7   A.  Yes, I think Apple was -- at this point, they were talking

8   about wholesale or this or that or the other.  There was a lot

9   of general discussion going on.

10  Q.  And if we look at what it says here, it says, "If

11  Apple/retailer sells below amount they bought it from" -- does

12  that F/publisher mean from publisher, in your mind?

13  A.  I assume so.

14  Q.  Then it says "can't sell"?

15  A.  She may have been taking notes in this meeting of me

16  talking because she was not involved in all those other

17  discussions.

18  Q.  But you don't know for sure?

19  A.  I do not know for sure.  I don't remember Apple proposing

20  minimum pricing because later I -- actually, there's a memo in

21  which I say this may be -- that agency may be a way to get what

22  we were trying to get through the minimum pricing.  So Apple

23  did not make that connection for me.  I made it myself later;

24  so....

25  Q.  But there was a discussion that took place during this

1    meeting between Simon & Schuster and Apple about the

2    possibility of not -- of entering into an agreement whereby

3    retailers would not be able to sell a book below the cost at

4    which they purchased it from a publisher, correct?

5    A.   There was a discussion, I believe, because it says S and S

6    at the top of this part, that this may be us talking, but

7    again, that's an interpretation.

8    Q.   Okay.  Now, Miss Reidy, overall, isn't it true that you

9    believe that price wars do not make sense for Simon &

10   Schuster's business?

11   A.   Yes.

12   Q.   And in fact, you believe, Miss Reidy, that price wars end

13   up devaluing Simon & Schuster's product, correct?

14   A.   Yes.

15   Q.   And part of the appeal of what Mr. Cue was proposing to

16   Simon & Schuster was that there would be no price wars once

17   Apple entered the market, correct?

18   A.   It's not quite that simple because Apple can enter the

19   market and you can -- it's only if you could take control over

20   the pricing completely could you stop price wars.

21   Q.   But that's what --

22   A.   Apple itself is not the market.

23   Q.   But that's what Apple was intending to do, correct?

24   A.   No.

25   Q.   Miss Reidy, in your notes to Mr. Moonves, you said that

1   Apple could not tolerate a situation where books were priced

2   lower, significantly lower somewhere else than at Apple,

3   correct?

4   A.  Yes.

5   Q.  And doesn't that mean that Apple was going to be entering

6   only if it wouldn't have to engage in price wars?

7   A.  Well, except for the fact that, you know, they could have

8   said if someone else prices lower, we get to buy the product

9   lower, which is -- you know, which means they don't upset their

10  margins.  The characterization of what you're saying is not

11  what I -- is alien to my thinking.

12  Q.  Miss Reidy, you understood that Apple wanted to get rid of

13  the 9.95 price on Amazon, correct?  That's what you told

14  Mr. Moonves?

15  A.  That's what I told Mr. Moonves, but as I told you before,

16  that's code for not wanting pricing that was too low.  And they

17  said they would not tolerate losing money, they wouldn't enter

18  a business to lose money.

19  Q.  Did you understand that Apple wanted their prices to be the

20  same as Amazon's, their prices to consumers?

21  A.  Well, as it said in the same -- in one of the things we've

22  just looked at, they didn't mind if there was competition

23  from -- you know, some competition between units but they,

24  however, did not want a great disparity.

25  Q.  So you understood that the prices would be close to the

D65PUSA2                         Reidy - direct

1    same, correct?

2    A.   Yes.

3    Q.   And that meant that there wouldn't be vigorous price

4    competition, correct?

5    A.   On a single title there still could have been, but not

6    across the whole catalog.

7    Q.   Now, Miss Reidy, after your meeting on December 16th, 2009,

8    with Apple, you did check in with Mr. Young; did you not?

9    A.   Probably.  Although, I don't have memory of that call.

10   Q.   In fact, Miss Reidy, you picked up the phone and called

11   Mr. Young almost immediately after getting out of your meeting

12   with Apple, correct?

13   A.   According to the phone log, yes.

14   Q.   And if we look back at PX787 --

15   A.   Yes.

16   Q.   -- we see that there are three phone calls that take place

17   between you and Mr. Young, correct, that day?

18   A.   Yes.  The two of them look like no one answered the phone.

19   Q.   Right.  And it culminates at 5:15 p.m.  Well, one of them

20   is a two-minute phone call, correct?

21   A.   Yes.

22   Q.   Does that indicate to you that you may have left a voice

23   mail?

24   A.   Either left a voice mail or actually spoke to him.

25   Q.   And the two of you do speak at 5:15 for nine minutes and 42

1   seconds?

2   A.   Mmm, hmm; yes.

3   Q.   And during that phone conversation, you talked about your

4   meeting with Apple, correct?

5   A.   That's a presumption that I agree with, but I don't have

6   any memory of that call.

7   Q.   So some point after your meeting with Apple, you did follow

8   up with Mr. Young regarding that meeting with Apple, correct?

9   A.   Yes.

10  Q.   And, in fact, Miss Reidy, isn't it true that during one of

11  your four conversations that took place with Mr. -- or four

12  phone calls that took place between yourself and Mr. Young,

13  after the meeting on December 16th through 5:15 p.m. on

14  December 17th --

15  A.   Those are the 17th, the next two calls.

16  Q.   Yes.  But during one of those calls between yourself and

17  Mr. Young over that time period, you actually discussed with

18  Mr. Young the idea of sending a term sheet to Apple; did you

19  not?

20  A.   No, I -- No.  The e-mail that is in evidence, where I asked

21  him for Eddy Cue's phone number or e-mail address which I did

22  not have, says I'm going to take up your suggestion for asking

23  them for a term sheet; so I must have discussed that he didn't

24  leave any terms with them as he did with us.

25  Q.   So you do recall sending an e-mail to Mr. Young after your

1   meeting with Apple in which you discuss taking up his

2   suggestion to e-mail Apple about a term sheet, correct?

3   A.  I don't recollect it, except I've seen the document; so....

4   Q.  Well, let's look at PX299 in your binder.

5   A.  Yes.

6   Q.  And, Miss Reidy, this is a e-mail exchange between yourself

7   and Mr. Young from December 17th, 2009, correct?

8   A.  Correct.

9           MR. BUTERMAN:  Okay.  There is a hearsay objection to

10  this document, your Honor.

11          MR. FLOYD:  No objection.

12          THE COURT:  It's received.

13          (Plaintiff's Exhibit 299 received in evidence)

14  Q.  So looking at PX299, do you see that at 8:23 p.m. on

15  December 17th you wrote to Mr. Young asking him for Mr. Cue's

16  e-mail address?

17  A.  Yes.

18  Q.  And you say that Mr. Cue didn't have a card when he got to

19  you, correct?

20  A.  Correct.

21  Q.  And by "you," you mean Simon & Schuster, correct?

22  A.  Yes.

23  Q.  And you say in parentheses that you were the last of the

24  six publishers to meet them?

25  A.  That's what they told us.

1    Q.  Okay.  And then you say, "I want to take up your suggestion

2    to e-mail him about the 'term sheet'"; do you see that?

3    A.  Yes.

4    Q.  So after your meeting with Apple, but before this e-mail,

5    you did have a conversation with Mr. Young about your meeting

6    with Apple, correct?

7    A.  Clearly.

8    Q.  And during that conversation, you discussed the possibility

9    of e-mailing Mr. Cue about a term sheet, correct?

10   A.  No, that was -- the e-mail -- that was subsequent.

11   Q.  During your call with Mr. Young where you discussed your

12   meeting with Apple, you discussed the possibility of e-mailing

13   Apple regarding a term sheet; did you not?

14   A.  You know, I have no recollection actually of that call.

15   It's entirely possible I did, but I -- it appears that

16   Mr. Young suggested to me to e-mail him about a term sheet, but

17   I -- I honestly don't remember that call; so....

18   Q.  Miss Reidy, when we started this morning, I asked you if

19   you had had any conversations with any other publishers

20   regarding Simon & Schuster's plans with respect to signing an

21   agreement with Apple.

22   A.  Yes.

23   Q.  And do you recall that you said that you had not had any

24   conversations during the period between when Apple first

25   approached you in early December 2009 and January 27th, 2010,

1    when the agreements were signed, correct?

2    A.  Correct.

3    Q.  Is that still your testimony?

4    A.  Yes.  Can I elucidate, since you're --

5          THE COURT:  Miss Reidy, I'm going to explain how this

6    works.  When a question is asked, answer it, if you can fairly,

7    with a yes or no.  If you can't, you, of course, may give a

8    lengthier answer.  But after the government is done placing

9    questions to you Apple's lawyers are going to have some

10   questions.

11         THE WITNESS:  Okay.  Thank you.

12   Q.  Now, Miss Reidy, approximately two days after meeting with

13   Apple you received a e-mail from Mr. Cue, correct?

14   A.  Yes.

15   Q.  And in that e-mail Mr. Cue told you that he was back in

16   New York, correct?

17   A.  Yes.

18   Q.  And that he wanted to update you on all his findings and

19   thoughts, correct?

20   A.  Correct.

21   Q.  And that he needed 30 minutes of your time, correct?

22   A.  Correct.

23   Q.  Okay.  And you recall that on December 251st you did, in

24   fact, speak with Mr. Cue by telephone, correct?

25   A.  Yes.

1    Q.   And you wrote up your notes of that conversation as well;

2    did you not?

3    A.   Yes, I did.

4    Q.   And if we turn to PX540?

5    A.   540.  Yes.

6    Q.   PX540, accurately -- Are those -- excuse me.

7         Does PX540 contain an e-mail in which you relay your

8    conversations with Mr. Cue?

9    A.   Yes.

10   Q.   And these notes were written up contemporaneously?

11   A.   Yes.

12   Q.   And during your call with Mr. Cue on December 21st, Mr. Cue

13   told you that it would be important to Apple that there be some

14   level of reasonable pricing; do you see that?  I'm at the

15   second comment.

16   A.   Yes.

17   Q.   And then Mr. Cue told you -- What did you understand by

18   reasonable pricing?

19   A.   The phrase keeps being used about lowering prices or

20   raising prices, but it's not about whether the prices are too

21   low or too high.  It's the relation of the price to the

22   physical book.  So it is the relationship that is the crucial

23   question.

24        So to address the question of what reasonable pricing

25   meant, Apple had the opinion, which we agreed with actually,

1    that the eBooks should be less expensive than the physical book

2    because costs had been taken out of production and everything

3    else and that's what consumers would expect.

4            And then the question is what is the relationship of

5    that price to the physical price, whether it's a hardback or a

6    paperback or what have you.  And that relationship was what was

7    sticking in our craw with the way that the market had been

8    developing through Amazon.

9            So I assume what they meant by reasonable pricing was

10   that relationship.

11   Q.  Now --

12   A.  I found out later what they really meant by it.

13   Q.  Which was higher pricing, correct?

14   A.  No, that's not actually what it was.  What they said was --

15   well, yes, higher pricing that had been going on.

16   Q.  Thank you.

17   A.  But, you know, we run a business; so -- well, never mind.

18   Q.  Reasonable pricing meant higher pricing than existed

19   currently --

20   A.  Some.

21   Q.  -- in the market?

22   A.  For some books.

23   Q.  For the New York Times best sellers, correct?

24   A.  Correct.

25   Q.  And they told you that they feel the only way to get this

1   is for the industry to go to the agency model; do you see that?

2   A.  Yes.

3   Q.  And by the "industry," they meant other publishers,

4   correct?

5   A.  Yes.

6   Q.  And they meant other retailers, correct?

7   A.  Yes.

8   Q.  And Mr. Cue also told you that when Apple had thought it

9   through, Apple didn't think anything else would keep the market

10  from its current pricing craziness, correct?

11  A.  That's what he told me, yes.

12  Q.  Mr. Cue also told you specifically that you would have to

13  get all other retailers to move to an agency model, correct?

14  A.  I think he put that in one note he sent, but I don't know

15  if he said that at that phone call or not.

16  Q.  Miss Reidy, if you want to look down to the paragraph that

17  has the number four in front of it?

18  A.  Oh, yes, you're right.  Yes, here it is.

19  Q.  Okay.  So Mr. Cue did tell you that Simon & Schuster had to

20  get all other retailers to move to an agency model, correct?

21  A.  Correct.

22  Q.  And by other retailers, he meant, for example, Amazon,

23  correct?

24  A.  Yes.

25  Q.  Barnes and Noble, correct?

1    A.  Yes.

2    Q.  Sony?

3    A.  Yes.

4    Q.  And all other retailers?

5    A.  Yes.

6    Q.  And you believed, Miss Reidy, did you not, that Mr. Cue was

7    having similar conversations with other publishers at this

8    time?

9    A.  I assumed it.

10   Q.  And Mr. Cue had also made it clear to you, from the outset,

11   that the publishers would all be getting materially the same

12   deal, correct?

13   A.  I don't think that that came up from the outset

14   necessarily, but I assumed it, again.

15   Q.  Well, in fact, at various points in time throughout the

16   negotiation process, you asked for the addition of certain

17   terms, correct?

18   A.  Yes.

19   Q.  And at times, Mr. Cue responded by saying to you that he

20   couldn't do that because the other contracts that he was

21   signing with the other publishers didn't have that term,

22   correct?

23   A.  Yes.

24   Q.  Miss Reidy, on January 4th, 2010, you received a term sheet

25   from Mr. Cue, correct?

D65PUSA2                         Reidy - direct

1    A.  Yes.

2    Q.  And that term sheet accurately reflected or was consistent

3    with what you had discussed with Mr. Cue in December, correct?

4    A.  Yes.

5    Q.  Would you turn to PX21?

6    A.  Yes.

7    Q.  And is PX21 the term sheet that you received from Mr. Cue?

8    A.  Yes, it is.

9    Q.  And do you see that towards the bottom there are some

10   bullet points?

11   A.  Yes.

12   Q.  And the paragraph begins, "There are several things we have

13   to accomplish in order to sell eBooks at realistic prices."

14   The first bullet says, "Books need to be cheaper to buy than

15   physical"?

16   A.  Yes.

17   Q.  The second bullet says, "You should make less per book

18   since significant costs have been eliminated but still have a

19   healthy profitable sale;" do you see that?

20   A.  Yes.

21   Q.  And the third is, "All resellers of new titles need to be

22   in agency model," correct?

23   A.  Yes.

24   Q.  Now, Miss Reidy, the first bullet, books need to be cheaper

25   to buy than physical, we discussed that this morning, correct?

1   A.  Yes.

2   Q.  And that was a term that Apple maintained throughout its

3   negotiations with Simon & Schuster, correct?

4   A.  Well, we didn't disagree with them; so it wasn't -- they

5   didn't have to maintain it.

6   Q.  They never rescinded it?

7   A.  They never rescinded.  We never asked them to either.

8   Q.  Okay.  You should make less per book, that was something

9   that stayed throughout the negotiations as well, correct?

10  A.  I always like retailers telling us how much money we should

11  make, but anyhow.  Well, if you lower -- if you lower the

12  prices and you go to this model, you will make less per book;

13  so that's him arguing for the model.

14  Q.  Even if you had raised the books to the maximum price tier,

15  you still were going to be making less money on certain books

16  that were being --

17  A.  Yes.

18  Q.  Okay.  Thank you.  And then, the third bullet, all

19  resellers of new titles need to be in agency model, again,

20  that's a -- that was a term that Apple never rescinded,

21  correct?

22  A.  Yes, they did, because it's not in the contract.  The grids

23  took care of one and two, bullets one and two.  But the third

24  point is not in the contract, and we wouldn't have signed a

25  contract that said let Apple tell us what we had to do with

D65PUSA2                         Reidy - direct

1    other retailers.

2    Q.  Let's make sure that we're clear about this.  Is it your

3    testimony that there is an express provision in the contract

4    that says that books need to be cheaper to buy than physical,

5    eBooks need to be cheaper than physical?

6    A.  The price grids, yes, make --

7    Q.  The price grids?

8    A.  The price grids make it so that eBooks are less expensive

9    than physical books.

10   Q.  Okay.  And isn't it true that, from your perspective, the

11   MFN, as a practical business matter, made it so that Simon &

12   Schuster would be moving all of its other retailers to an

13   agency model?

14   A.  Unless we wanted to make even less money, yes.

15   Q.  So while neither the first bullet nor the third bullet were

16   expressly laid out in contractual terms in your ultimate

17   agreement, there were provisions, in your view, that

18   accomplished both of those goals, correct?

19   A.  Well, no, because I believe the grids are a contractual --

20   they're in the contract.  So, I'm sorry, the pricing of the E

21   to the physical is in the contract.

22   Q.  I'm sorry.  Is there a provision in your contract that says

23   that you cannot charge a higher digital price than the lowest

24   existing consumer physical price for the same title?

25   A.  It does not say that in those words, but it does say you

1    have to price $25 books at this amount, which is, in effect,

2    saying the -- it just does it in more detail.

3    Q.  Okay.  And from your perspective --

4    A.  From my perspective, it's in the contract.

5    Q.  Okay.  And from your perspective, the MFN in the contract

6    also meant that Simon & Schuster would be moving all of its

7    other retailers to an agency model, correct?

8    A.  Actually, I wouldn't put it that way because we had the

9    option of not doing that.  We wanted to do it.  It had nothing

10   to do with whether Apple made it a demand or not.  You know,

11   you could sell to one person so other people -- and, in fact,

12   we did, for a period of time, have a wholesale market -- and

13   have to have your prices with Apple go down.  As a practical

14   business matter, you are correct, you wouldn't want to do it.

15   Q.  So what --

16   A.  But it was not because Apple -- that never appeared again

17   in the discussions with Apple.

18   Q.  It was never rescinded, correct?

19   A.  It was never rescinded but --

20   Q.  And --

21   A.  But we said we would not put that in the contract with

22   them.

23   Q.  We'll get back to that in a second.  But the MFN, just so

24   we're clear, according to you, as a practical business matter,

25   the MFN meant that Simon & Schuster would have to move all of

1  its other retailers to agency, correct?

2          MR. FLOYD:  Objection, asked and answered.

3          THE COURT:  Overruled.

4  A.  As a practical business matter, the MFN made Simon &

5  Schuster want to put all of its other retailers.  Didn't force

6  us to do anything, sorry.

7  Q.  Okay.  Now, let's talk about those grids for a second.

8  A.  Yes.

9  Q.  Could you turn to PX532, please.  Excuse me, 523,

10  Miss Reidy.

11  A.  Oh, okay.

12  Q.  523?

13  A.  Yes.

14  Q.  Okay.  Now, Miss Reidy, PX523 is an e-mail that you

15  received from Mr. Keith Moerer on January 11th, 2010, correct?

16  A.  Correct.

17  Q.  And Mr. Moerer was providing you Apple's analysis of

18  New York Times best sellers for January 1st, correct?

19  A.  Correct.

20  Q.  And Mr. Moerer's analysis showed you how Simon & Schuster's

21  prices would look if Simon & Schuster did a deal with Apple,

22  correct?

23  A.  Under the terms they'd sent us, yes.

24  Q.  And from this list, Simon & Schuster could also figure out

25  what its competitors' prices would be with Apple, correct?

1   A.  If they had the same grids.

2   Q.  Which was your assumption, correct?

3   A.  That's my assumption, correct.

4   Q.  Now, it is true, Miss Reidy, is it not, that for Simon &

5   Schuster books, the iTunes eBook retail price that Mr. Moerer

6   was proposing was, in every instance, higher than the lowest

7   then-existing eBook price?

8   A.  Yes.

9   Q.  And if you look at the list of Simon & Schuster books, am I

10  correct that for none of those books Simon & Schuster's eBooks

11  as of January 1st, 2010, sold at prices above the corresponding

12  physical book price?

13  A.  I'm sorry, could you repeat that question?  I was --

14  Q.  Sure.  As of January 1st, 2010, none of Simon & Schuster's

15  eBooks sold at prices above the corresponding physical book

16  price, correct?

17  A.  I'm checking.  Are you talking about our retail, physical

18  retail price or the Amazon one that's listed here?

19  Q.  I'm looking at the lowest -- excuse me.  I'm looking at the

20  eBook retail price versus the hardcover retail price.

21  A.  Oh, yes, correct.

22  Q.  Okay.  So as of January 1st, 2010, none of Simon &

23  Schuster's eBooks sold at prices above the corresponding

24  physical book price, correct?  That's what you just answered?

25  A.  Well, now, I have to correct that.  On Amazon, they did

D65PUSA2                          Reidy - direct

1   not.

2   Q.  But under Mr. Moerer's proposal, that wasn't going to be

3   the case, correct?  Maybe if I give you an example?  Why don't

4   you look at Glenn Beck's The Christmas Sweater?

5   A.  Yes.

6              THE COURT:  What page?

7              MR. BUTERMAN:  That is, your Honor, on the first page

8   of the document.  It's about --

9              THE COURT:  Got it.

10             MR. BUTERMAN:  -- eight down.

11  Q.  So as of January 1st, that book sold -- the eBook sold for

12  9.99 on Amazon, and the hardcover retail price was $11.97; do

13  you see that?

14  A.  Yes, I do.

15  Q.  Now, under Mr. Moerer's proposal, though, the iTunes eBook

16  price would be higher than the Amazon hardcover price, correct?

17  A.  That's what it says in the memo, but in fact, according to

18  their grids, that's not true because it was only a

19  $20 hardcover.

20  Q.  Okay.

21  A.  And the $20 hardcovers were not in the 12.99 grid.

22  Q.  Miss Reidy, could you look at Pursuant of Honor?

23  A.  Yes.

24  Q.  Which is --

25             THE COURT:  I've got it.

```
 1              MR. BUTERMAN:  Thank you, your Honor.
 2   Q.  -- Vince Flynn.
 3   A.  Yes.
 4   Q.  So that was selling as an eBook on Amazon for $8 and as an
 5   Amazon hardcover at 12.47, correct?
 6   A.  Correct.
 7   Q.  Okay.  And that book, under iTunes, would have sold for
 8   12.99 as an electronic book, right?
 9   A.  Your prior question to me was whether any eBook was selling
10   higher than the retail price, which is what we set, not what
11   Amazon does.  Amazon can be discounting something on a specific
12   day any amount they want.  So you're saying now Amazon is
13   setting the hardcover prices is basically what you're saying.
14   Q.  Miss Reidy, is it --
15   A.  And the grids, as well as the practice with the Apple, had
16   to do with our set retail prices, not with what Amazon decided
17   to discount for those prices for the physical sale.
18   Q.  Miss Reidy?
19   A.  Yes.
20   Q.  Is it your testimony that Apple wasn't concerned about
21   whether eBooks were more expensive to consumers than physical
22   books?
23   A.  No, that's not my testimony.  But what I'm saying to you
24   here is, they created this chart and they said these are the
25   prices by our grids, and they are approximately half, in most
```

1   cases, the physical price.  And in some cases, Amazon would be

2   pricing the hardcover price less, but they didn't say,

3   therefore, those have to be lower.  So this is just their

4   reference point, looking at Amazon as their main competitor.

5   Q.  Let me just make sure we're clear here.  We agree that

6   prior to Apple's entry into the marketplace for New York Times

7   best sellers, eBooks were selling to consumers for less than

8   physical books, correct?

9   A.  Amazon was selling eBooks to consumers for less than

10  physical books.

11  Q.  Okay.  And after Apple's entry, it became possible, in

12  fact, if Simon & Schuster priced eBooks at their caps, that

13  eBooks would be more expensive than physical books, correct,

14  for certain books?

15  A.  All depending on what the retailer discounted the physical

16  books.  I don't control the retailers' pricing of the physical

17  books.

18  Q.  And is it your testimony that when Apple told you on

19  January 4th that books need to be cheaper to buy than physical,

20  they weren't referring to the consumer price?

21  A.  They couldn't have been because they don't control that

22  consumer price either.  I do believe that, in their own minds,

23  they looked at how Amazon was pricing, and Amazon was generally

24  discounting 40 percent for hardcovers.  And, I believe, but

25  this is my supposition, that that's how they came up with

 1   50 percent is what the eBook price should be.

 2           But as you see here, in some cases Amazon discounts

 3   more than 50 percent on a book.

 4   Q.  Now, Miss Reidy, you met with Mr. Moerer after receiving

 5   this January 11th, e-mail, correct?

 6   A.  I assume so.  We met with them a lot, and I don't remember

 7   exactly who, when.

 8   Q.  Okay.  And Mr. Moerer told you that he was meeting with all

 9   the other publishers, correct?

10   A.  I don't have recollection of that specific conversation,

11   but he could have.

12   Q.  Okay.  Why don't you take a look at PX537?

13   A.  Yes.

14   Q.  Okay.  And PX537 are your e-mail notes -- sorry, that's an

15   e-mail from yourself to Mr. Moonves, correct?

16   A.  Yes.

17   Q.  And it's dated January 18th, 2010?

18   A.  Yes.

19   Q.  Okay.  And you say, "Just to give you an update, a

20   representative of Apple (not the head guy; but one of his

21   minions) came to New York at the end of the week"?

22           THE COURT:  Sorry, Mr. Moerer.

23           THE WITNESS:  Yes, my apologies.  That's just what I

24   was thinking, your Honor.

25           THE COURT:  We're all minions from some perspective,

1    even me.  Okay.

2    BY MR. BUTERMAN:

3    Q.  So "came to New York at the end of the week before last to

4    meet with all the major publishers;" do you see that?

5    A.  Mmm, hmm; yes.

6    Q.  And then you say, "We were the last to meet with him (we

7    planned the meeting for after our meeting with you) and he told

8    us that what we said to him was exactly what all the other

9    publishers had said."

10           So during that conversation, Mr. Moerer informed you

11   of what the other publishers were saying with respect to the

12   Apple contract, correct?

13   A.  Yes.

14   Q.  Okay.  And you go on in the e-mail to tell Mr. Moonves that

15   you received an e-mail from Mr. Moerer -- or excuse me, strike

16   that.

17           You say in the second paragraph, "Last night I

18   received an e-mail I assume went to everyone;" do you see that?

19   A.  Yes.

20   Q.  Okay.  And the reason that you assumed it, you assumed it

21   went to everyone, you meant you assumed it went to the other

22   Big Six publishers, correct?

23   A.  Yes.

24   Q.  And you assumed that based on what Apple had told you

25   throughout the negotiations, correct?

1    A.   Partially.

2    Q.   Now, Miss Reidy, if you would turn to PX608.

3    A.   Yes.

4    Q.   I just want to make sure that we're on the same page.  Is

5    this the e-mail that you were referring to in your e-mail to

6    Mr. Moonves that you received from Apple?

7    A.   I'm sorry, what's the time?  I don't know what day I sent

8    the e-mail.

9    Q.   The e-mail to Mr. Moonves was sent on January 18th, and

10   this e-mail from Mr. Cue is dated January 16th.

11   A.   Then I assume so.

12   Q.   And there's some handwriting on --

13   A.   Yes.

14   Q.   -- this?  Is this your handwriting at the top?

15   A.   Yes.

16   Q.   Okay.  But the handwriting at the bottom is not your

17   handwriting, correct?

18   A.   Correct.

19   Q.   And that's Mr. Cue's handwriting?

20   A.   Yes.

21   Q.   And these are notes that Mr. Cue made to you during a

22   dinner that the two of you had where you discussed the

23   agreement, correct?

24   A.   Correct.

25   Q.   At the top you wrote, "Need three competitors to agree,"

1   and is that a dash after that, okay?

2   A.  It's an equals sign.

3   Q.  Equals, okay, with a question mark, correct?

4   A.  Yes.

5   Q.  Now, Miss Reidy, isn't it true that within Simon &

6   Schuster, people on your team were discussing the idea that you

7   could float an idea to Apple knowing that it could get into

8   their terms with all the publishers?

9   A.  Repeat that question?

10  Q.  Sure.  Isn't it true that internally in Simon & Schuster,

11  that Simon & Schuster people on your team had discussions about

12  the fact that you could float an idea to Apple knowing that, by

13  doing so, you could get it into terms with all the other

14  publishers?

15  A.  I have absolutely no recollection of any conversations like

16  that.

17  Q.  Could you turn to PX698, please?

18  A.  Mmm, hmm; yes.

19  Q.  And, Miss Reidy, I'll direct your attention to Mr. Eulau's

20  e-mail to yourself?

21  A.  Yes.

22  Q.  And this is Mr. Eulau commenting on the e-mail that you

23  received from Mr. Cue on January 16th, correct?

24  A.  Yes.

25  Q.  And he writes, "The only thing that changed is that they

1   now are offering a 14.99/16.99 and 19.99 on titles for over

2   $27.51..if we can get them to move the price tiers by little

3   ...26.99 and higher being at 14.99?"  Do you see that?

4   A.  Yes.

5   Q.  Okay.  And then he says, "They are still concerned about

6   the physical."  That's preferring to Apple, correct?

7   A.  They're concerned about the price differential between the

8   two, yes, and Apple's deep discounting of physicals.

9          THE COURT:  And Apple's deep discounting?

10          THE WITNESS:  No, sorry.  And Amazon's deep

11   discounting of the physicals.

12   Q.  So Apple's concerned about the retail price that Amazon is

13   setting for physical books, correct?

14   A.  Correct.

15   Q.  As opposed to what the eBook price would be for those

16   books?

17   A.  Because it's all about the delta between them.

18   Q.  And the delta to the consumer, right?

19   A.  Yes.

20   Q.  So then he writes, "I wonder if it is time to talk to MAP

21   on physical?"  MAP refers to minimum advertised pricing,

22   correct?

23   A.  Yes.  We don't use it properly, but it goes back to our

24   minimum retail pricing.

25   Q.  It's a form of retail price minimum?

D65PUSA2                          Reidy - direct

1    A.  Yes.

2    Q.  And so Mr. Eulau is saying -- is asking to you whether it's

3    time to talk to Apple about retail price maintenance on

4    physical, correct?

5    A.  It makes no sense since they don't sell physical; so I

6    don't --

7    Q.  Miss Reidy, is Mr. Eulau in this e-mail saying to you that

8    he wonders whether it's time to talk to Apple about retail

9    price maintenance on physical books?

10   A.  I'm not certain he's referring to talking to Apple about it

11   because it makes no sense.  They don't sell physical.

12        So just as I said to you, we would not accept in a

13   contract something from them that said what we could put in

14   other contracts with other people, we wouldn't have anything in

15   our Apple contract anything that had to do with physical;

16   so....

17   Q.  Let's read the rest of the sentence and see if we can clear

18   this up, because it goes on to say, "on know that might be

19   trying to change the world in two seconds;" do you see that?

20   A.  Yes.

21   Q.  "But if we float that to them - would they/could they put

22   in their terms for all?"

23        Now, Ms. Reidy, after reading the entire sentence, do

24   you have any doubt that Mr. Eulau was proposing to you the

25   possibility of reaching out to Apple and telling them to put

1    some form of retail price maintenance for physical books into

2    their contracts with you in an effort that they would do so for

3    the entire industry?

4              MR. FLOYD:  Objection, foundation.

5              THE COURT:  Overruled.

6    A.  The only reason I have doubt is because it doesn't make

7    sense, I'm sorry.

8    Q.  But that's what it says, correct?

9    A.  I suppose.

10   Q.  And that would change the world in two seconds, correct?

11   That's what he says?

12   A.  Yeah, that's what he says.  It wouldn't do that either;

13   so....

14   Q.  Now, Miss Reidy, I just want to make sure.  Is it still

15   your testimony that prior to signing a deal with Apple, that

16   you did not have any conversations with anyone else in the book

17   industry about your plans to move Simon & Schuster to an agency

18   model?

19   A.  Yes.

20   Q.  Okay.

21   A.  Oh, no, that's not true.  I called Amazon before we signed.

22   Q.  Anyone else before Amazon?

23   A.  To my recollection, no.

24   Q.  Ms. Reidy, who is Simon Lipskar?

25   A.  An agent.

1    Q.  And could you tell me what the AAR is?

2    A.  Association of American -- of Author Representatives.

3            MR. BUTERMAN:  Let's not put this on the screen.

4    Q.  Could you turn to PX697?

5    A.  697.

6    Q.  And, Miss Reidy, I'd like you to follow along with me as I

7    read, okay?

8    A.  Oh, okay.

9    Q.  And this is an e-mail from Simon Lipskar to Brian Murray,

10   HarperCollins, dated January 16th, 2010; do you see that?

11   A.  Yes.

12   Q.  "Subject:  My call.  Brian, prefer to do this via phone,

13   but two things this week: One, Carolyn came to a joint AAR

14   board and digital committee meeting and talked about S and S's

15   strategies, RE moving to an agency model;" do you see that?

16   A.  Yes.

17   Q.  Miss Reidy, is it still your testimony that you did not

18   have any conversations with anyone in the book industry during

19   that six-week period prior to signing your agreement with Apple

20   in which you discussed Simon & Schuster's plans regarding

21   agency?

22   A.  We actually had not, as of this date, made the final

23   decision to do it.  What the AAR asked me to do was come and

24   explain how the agency model worked versus how the other one

25   worked, and we gave them a -- you know, like a -- what do you

1    call it -- a piece of paper that showed the -- how much the

2    author -- it was mostly focused on the author.  What the

3    difference was in the two ways of selling for the author.

4    Q.  Miss Reidy, is it your testimony that you did not talk

5    about Simon & Schuster's strategy regarding moving to an agency

6    model at an AAR board and digital committee meeting on or about

7    January 16th, 2010?

8    A.  I did not say that Simon & Schuster was doing it.

9    Q.  Did you discuss Simon & Schuster's strategy regarding

10   moving to an agency model?

11   A.  I discussed what the difference was between the two.

12   Q.  Miss Reidy, you mentioned earlier in your testimony that,

13   at points during your negotiations with Mr. Cue, when you would

14   make proposals to Mr. Cue, Mr. Cue would reject your proposals

15   by telling you that he wasn't doing that with other publishers.

16   Do you remember that testimony?

17   A.  Yes, but his phraseology was, we're not doing that.  It

18   wasn't -- he didn't say with other publishers.  He said Apple's

19   not doing that.

20   Q.  Miss Reidy, can you turn to PX604 in your binder?

21   A.  Sorry.  I'm having trouble finding that one.  Okay.  Yup.

22   Q.  Okay.  And, Miss Reidy, this is an e-mail from Mr. Cue to

23   yourself dated January 23rd; do you see that?

24   A.  Yes.  Yes.

25   Q.  Okay.  And this involves a discussion that you were having,

1    a negotiation that you were having with Mr. Cue regarding the

2    term of your agency agreement, correct?

3    A.  Correct.

4    Q.  And Mr. Cue says to you in the e-mail in which he's

5    explaining why he's not going to change the term for you, that

6    "all of our deals will be for a year for the same reason;" do

7    you see that?

8    A.  Yes.

9    Q.  Now, Miss Reidy, you testified earlier that had Mr. Cue

10   told you that, as part of doing a deal with Apple Simon &

11   Schuster needed to move all resellers to an agency model, that

12   you would have rejected the deal outright, correct?

13   A.  Correct.

14   Q.  And that would have been because it would have been Apple

15   telling Simon & Schuster how to run its business, correct?

16   A.  Correct.

17   Q.  But, Miss Reidy, on December 21st, Mr. Cue told you

18   precisely that; did he not?

19   A.  He said it in that letter, yes.

20   Q.  And your response to him wasn't, I'm sorry, we're not going

21   to be doing a deal with Apple, correct?

22   A.  Correct.

23   Q.  In fact, your response to him was if we make these our

24   terms, then they are our terms, correct?

25   A.  Correct.

1   Q.  And then Mr. Cue made the same demand in the January 4th

2   term sheet, correct?

3   A.  Yes.

4   Q.  And then you sent an e-mail to your colleagues Mr. Eulau

5   and Mr. Selleck following receiving that initial term sheet;

6   did you not?

7   A.  Yes.

8   Q.  And could you look at PX355?

9   A.  Yes.

10  Q.  And this is the e-mail that you sent to your colleagues

11  following receiving Mr. Cue's initial term sheet, correct?

12  A.  Yes.

13  Q.  And that's a term sheet that had the line in it, all

14  resellers of new titles need to be in agency model --

15  A.  Mmm, hmm.

16  Q.  -- correct?

17  A.  Yes.

18  Q.  And you write for No. 3 in your e-mail to Mr. Eulau and

19  Mr. Selleck, "We are in total agreement that" and then you say,

20  "A, eBooks should be significantly cheaper than physical

21  books," and then, "B, agency model should hold for all

22  retailers, these would become our terms," correct?

23  A.  Correct.

24  Q.  Now, Miss Reidy, on January 23rd, 2010, you wrote to

25  Mr. Moonves to tell him that it appears that Apple had reached

1   agreement with four of the six major publishers, correct?

2   A.  I assume it's here, yes.

3   Q.  And specifically, you told Mr. Moonves that you believed

4   that Simon & Schuster, Hachette, Macmillan and Penguin would be

5   in the deal, but Random House and HarperCollins would not be

6   part of the announcement, correct?

7   A.  Yes.

8   Q.  And the reason you knew that information was because of

9   information that Mr. Cue had provided to you over the course of

10  the negotiations, correct?

11  A.  I knew he had four publishers.  It was my presumption who

12  the two that had not signed were, based on comments that had

13  been made, but he did not name them.

14  Q.  So Mr. Cue didn't name the publishers to you, but he

15  provided you with information from which you were able to

16  surmise who, at that point, was in and who was out, correct?

17  A.  I guess, yes.

18  Q.  And, in fact, you had conversations with Mr. Cue, did you

19  not, concerning his progress?

20  A.  Yes.

21  Q.  In fact, at one point, you sent an e-mail to Mr. Cue in

22  which you told him that you would look forward to an update on

23  your progress in herding us cats, correct?

24  A.  Correct.

25  Q.  And that's PX782, if you'd like to look at it.

1   A.  I must have the wrong one.  Wait a minute.

2   Q.  Do you have that, Miss Reidy?

3   A.  No, I don't.  This doesn't have it.  This isn't the right

4   one.  It's not 782.

5   Q.  782, there's an e-mail that, at the top, says, "Yes, I will

6   commit to review pricing;" do you see that?

7   A.  Yes.

8   Q.  Do you see halfway down there's an e-mail, it's an e-mail

9   from yourself to Mr. Cue?

10  A.  Mmm, hmm.

11  Q.  And it says -- Right there in the middle?

12  A.  Yes.  Sorry, I didn't see it.

13  Q.  "I will also look forward to an update on your progress in

14  herding us cats;" do you see that?

15  A.  Yes.

16  Q.  And by the "progress in herding us cats" you were saying to

17  Mr. Cue that you were looking forward to hearing how Mr. Cue

18  was doing in getting all of the publishers to move to similar

19  agency agreements with Apple, correct?

20  A.  He said they needed four publishers in order -- three --

21  four publishers in order to open the bookstore.  I wanted to

22  know was it going to open; so, therefore, how was he doing.

23  Q.  Ms. Reidy?

24  A.  It's not the same thing as saying were you able to get the

25  exact -- I don't know what agreements he was doing with anybody

1   else.

2   Q.  But you assume that he's going to be doing the same

3   agreements?

4   A.  I assume it, but I don't know it.

5   Q.  You assume it, and you assume it based on what Mr. Cue has

6   told you throughout the negotiations, correct?

7   A.  Yeah.  Yes.

8   Q.  And, in fact, Miss Reidy, you have a series of phone

9   conversations with Mr. Cue after you sent him this e-mail

10  regarding your desire for an update on his progress in herding

11  the cats, correct?

12  A.  I assume so.  We hadn't signed yet, right?  We were still

13  negotiating.

14  Q.  Miss Reidy, why don't you look again at 788, okay?

15  A.  Mmm, hmm.

16  Q.  And, Miss Reidy, I'm looking at Page 4 of 7.

17  A.  Yes.

18  Q.  So your e-mail to Mr. Cue was sent at 9:10 a.m.; do you see

19  that?

20  A.  I'm not there anymore, but I assume, yes.

21  Q.  Okay.  Do you see that, ma'am?  I'm sorry?

22  A.  If you're reading from the -- I'll accept that that's

23  right.

24  Q.  And then you have phone calls with Mr. Cue at 12:24 p.m.

25  for ten minutes and 45 seconds; do you see that?

1   A.   Yes.

2   Q.   Then you have an 11-minute phone conversation with Mr. Cue?

3   A.   Yes.

4   Q.   And then the following day you have a

5   five-minute-and-48-second call with Mr. Cue, and that's on

6   Page 5 of 7; do you see that?

7   A.   Yes.

8   Q.   Okay.  And then later that day you have a

9   six-minute-and-two-second phone call with Mr. Cue; do you see

10  that?

11  A.   Yes.

12  Q.   And then the following day, on 1-23, at 11:51 a.m. on

13  Saturday, you have a 13-minute-and-44-second phone call with

14  Mr. Cue; do you see that?

15  A.   No, I don't see that one.  I see a one minute and 1:11, I

16  see a 3:41.

17  Q.   On 1-23, Miss Reidy, it's seven or eight from the bottom?

18  A.   Oh, he called me, 13:44.

19  Q.   Yes.

20  A.   Yes.

21  Q.   Miss Reidy, is it your testimony that during those phone

22  calls, after you had asked Mr. Cue for an update on his

23  progress in herding the cats, that Mr. Cue did not provide you

24  with information regarding the ongoing status of Apple's

25  negotiations with other publishers?

```
 1   A.  My memory is even to -- you told me I have two, I have
 2   three, whatever the number was he had, but he didn't talk to me
 3   about the negotiations.  Absolutely not.  We were still
 4   negotiating here.  We hadn't signed yet.
 5   Q.  So is that a no, Miss Reidy?
 6   A.  That's -- It's the way you worded it.  It's the status of
 7   his negotiations.  He told me if he had people in or if he
 8   didn't, not who, but -- you know, as the count was going up.
 9   But he did not discuss his negotiations with anyone else.
10   Q.  And, Miss Reidy, you believe that doing a deal with Apple
11   was going to change the industry, correct?
12   A.  Yes.
13   Q.  And you told that to Mr. Cue?
14   A.  Yes.
15   Q.  And Mr. Cue referred to you as a leader in the industry,
16   correct?
17   A.  Yes.
18   Q.  How did Mr. Cue know that you were a leader in the
19   industry?
20   A.  I have no idea.
21   Q.  Miss Reidy, did you assist Mr. Cue in getting other
22   publishers to sign agency agreements with Apple?
23   A.  No.
24   Q.  Now, Miss Reidy, do you recall an e-mail exchange with your
25   then general counsel Miss Rivlin following the iPad launch
```

1    event?

2    A.   Yes.

3    Q.   And do you recall that Miss Rivlin forwarded you an article

4    regarding the statement that Mr. Jobs had made after the event

5    to a Wall Street Journal reporter, Mr. Mossberg?

6    A.   Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D659usa3                        Reidy - direct

1    Q.  Could you turn to PX607, please.

2    A.  Yes.

3    Q.  Is this the e-mail exchange between you and Ms. Rivlin

4    regarding Mr. Mossberg interview with Mr. Jobs?

5    A.  Yes.

6           MR. BUTERMAN:  Your Honor, there's an 802 objection

7    here.  I would note that the underlying video has not been

8    objected to.  So I'm not sure whether Apple is maintaining

9    that.

10          MR. FLOYD:  We'll be withdrawing that objection.

11          THE COURT:  PX607 is received.

12          (Plaintiffs' Exhibit 607 received in evidence)

13   Q.  So, Ms. Reidy, the article that Ms. Rivlin forwards to you

14   is entitled "Steve Jobs makes it quite clear how this will

15   work," correct?

16   A.  Yes.

17   Q.  And it says, "Further to our own reports on how publishers

18   hope/expect to deploy the agency model of selling terms broadly

19   across their eBook accounts to retake some measure of control

20   over the pricing of new releases, Apple's Steve Jobs

21   essentially confirmed the plan to the WSJ's Walt Mossberg in a

22   brief video interview."

23          Did I read that correctly?

24   A.  Yes.

25   Q.  Then it goes on to say, "Mossberg wondered why someone

1    'should buy a book for 14.99 when you can buy one from Amazon

2    for 9.99 on the Kindle or Barnes & Noble?'"

3              Did I read that correctly?

4    A.  Yes.

5    Q.  Then it goes on to say, "A confident Jobs replied, 'that

6    won't be the case.... the prices will be the same.'  How in the

7    world will prices be the same?  Because if you want to carry

8    brand new eBook releases, you will carry on the publisher's new

9    selling terms."

10             Did I read that correctly?

11   A.  Yes.

12   Q.  "Or, as Steve put it, publishers will actually withhold

13   their eBooks from Amazon... because they are not happy with the

14   price."

15             Correct?

16   A.  That's what it says.

17   Q.  And that was an accurate statement, was it not?

18             MR. FLOYD:  Objection, your Honor.

19             THE WITNESS:  I don't know.  That's an assumption by

20   Steve Jobs.

21   Q.  Well let me ask a different question.

22             THE COURT:  Overruled.

23   Q.  From your perspective that was how things were going to

24   work, correct?

25   A.  It depends what part of this you're talking about.  I'm

1   sorry.  Because the statement, "publishers will withhold their

2   books from Amazon because they're not happy with the price," we

3   hadn't gone down that road at all.  So that's the part of it

4   that I don't -- but the fact that prices will be the same, they

5   will be the prices because even if you had to match a lower

6   price now you had an MFN in the Apple contract.

7   Q.  Now you hadn't gone down that road, but the publishers were

8   planning on going down that road, correct?

9   A.  We made no plans to take our books off Amazon.

10  Q.  Ms. Reidy, publishers did threaten to take their books off

11  Amazon if Amazon didn't agree to the agency terms, correct?

12  A.  I don't know what other people did.  We did not threaten

13  Amazon at all.

14  Q.  Are you aware of any publisher telling Amazon that they

15  would not be selling books on Amazon unless they accepted their

16  agency terms?

17  A.  In that kind of language, no.

18          But I don't know what anybody else said to Amazon.

19  Q.  You're not aware of, for example, Mr. Sargent's dispute

20  with Amazon?

21  A.  Amazon took his books down.  He didn't threaten to take his

22  books down from them.  As far as I know.

23          All I know is what I saw publicly.  He went on to say

24  I want to change my business model.  They took his business

25  down.

1    Q.  So is it your testimony that you never had a conversation

2    with any publisher regarding their negotiations with Amazon?

3    A.  At that time, no.  Certainly not to my recollection.

4    Q.  Let me ask this.  At any time, Ms. Reidy, prior to a

5    publisher signing a deal with Amazon, did you have a

6    conversation with that publisher regarding their negotiations

7    with Amazon?

8    A.  Not to my memory, no.

9    Q.  Now, Ms. Rivlin writes that Mr. Jobs' statement is

10   incredibly stupid, correct?

11   A.  Yes, she does.  She did.

12   Q.  She did.

13          And she wrote -- actually what she wrote is "I cannot

14   believe that Jobs made the statement below.  Incredibly

15   stupid."

16          Correct?

17   A.  Correct.

18   Q.  And you agreed that it was incredibly stupid for Mr. Jobs

19   to make that statement, correct?

20   A.  Actually, no.  I had to have her explain to me why it was

21   stupid.

22   Q.  Ms. Reidy, do you recall during your deposition testifying

23   that you agreed that the statement was incredibly stupid?

24   A.  Well after she explained to me, yes.

25   Q.  And you respond by saying, "Yes, he did say it."

1   A.  No.  That is from Adam Rothberg.

2   Q.  I'm sorry.  Adam Rothberg responds in an e-mail that you're

3   on by saying that he did say it.  And he provides the video of

4   the statement?

5   A.  Correct.

6           MR. BUTERMAN:  With your Honor's permission I'd just

7   like to show the video.  It's very brief.

8           The video itself, there is no objection by Apple.

9           Your Honor, I'm just showing -- your Honor, the entire

10  video is a lengthy video.  I'm just showing the portion that

11  relates to the statement that's referenced in this document.

12          (Videotape played)

13  Q.  That's the video you were referring to or that was being

14  referred to?

15  A.  Yes.

16  Q.  I'm sorry.  I'll finish my question.  That is the video

17  that was being referred to in the e-mail exchange, correct?

18  A.  Yes.

19  Q.  Now, Ms. Reidy --

20          THE COURT:  How much longer, counsel?

21          MR. BUTERMAN:  I need to look over my notes, your

22  Honor.  Probably another fifteen or twenty.

23          THE COURT:  We'll just take our midmorning recess.

24          (Recess)

25          MR. BUTERMAN:  May I continue, your Honor?

D659usa3                         Reidy - direct

1              THE COURT:  Yes.

2              MR. BUTERMAN:  Your Honor for the record the video was

3    PX615.

4    Q.  Ms. Reidy?

5    A.  Yes.

6    Q.  Simon & Schuster understood that once it reached its agency

7    deal with Apple that if it didn't move Amazon to an agency

8    model they would have to sell new release eBooks in the

9    iBookstore at 9.99, correct?

10   A.  That was our assumption.

11   Q.  That was because of the MFN in the Apple agreement,

12   correct?

13   A.  Correct.

14   Q.  And you believed, did you not, that pricing your new

15   release eBooks at 9.99 would, in fact, undercut one of the

16   reasons for doing the deal, correct?

17   A.  One of the reasons.

18   Q.  And, therefore, you felt that Simon & Schuster needed to

19   change Amazon to an agency model before the iBookstore went

20   live, correct?

21   A.  Correct.

22   Q.  So in other words, Ms. Reidy, the effect of the Apple MFN,

23   from your perspective, was to force Simon & Schuster to change

24   your terms of sale with Amazon, correct?

25   A.  It's not put correctly.

1        We embraced the Apple way of selling because it

2   enabled us to change the way we sold to other retailers.  So it

3   didn't force us.  We wouldn't have signed -- you know.  It's

4   the wrong conclusion.

5   Q.  Ms. Reidy could you turn to PX341, please.

6   A.  Yes.

7   Q.  And PX341 contains an e-mail that you wrote to Mr. Moonves

8   dated February 11, 2010, correct?

9   A.  Correct.

10  Q.  And you're writing to Mr. Moonves to update him regarding

11  the status of your eBook negotiations with accounts, correct?

12  A.  Correct.  Although I believe it's mostly -- it's all about

13  Amazon.

14  Q.  And you say in the second paragraph, "As you know, we

15  signed a one-year contract with Apple designating them as an

16  agent to sell eBooks for us at a 30 percent fee.  This enables

17  us to set the price to the consumer on our eBooks, with certain

18  agreed ceiling prices on some new releases and bestsellers."

19        Do you see that?

20  A.  Yes.

21  Q.  And then you say the Apple iTunes eBook store will go live

22  around the end of March (Exact date not yet determined)."

23        Do you see that?

24  A.  Yes.

25  Q.  And then you say, "In order to not be in a situation

1  whereby we must price our adult new release eBooks sold through

2  Apple at 9.99, undercutting one of the reasons for making the

3  deal, we need to change our eBook selling terms with our other

4  e-retailers before that date."

5          Do you see that?

6  A.  Correct.

7  Q.  So, Ms. Reidy, isn't it true that signing an agency

8  agreement with Apple meant that Simon & Schuster needed to

9  change its eBook terms of sale with Amazon?

10  A.  Yes.  That's not the same as forcing.

11  Q.  Now, Ms. Reidy, once you determined that you were likely to

12  do a deal with Apple but before you signed with Apple, you told

13  Amazon that were you going to be moving to an agency model,

14  correct?

15  A.  Correct.

16  Q.  And Amazon was not pleased by the fact that

17  Simon & Schuster wanted to move to an agency model, correct?

18  A.  Correct.

19  Q.  In fact, Amazon made clear to you that they wanted to stay

20  on wholesale, correct?

21  A.  Yes.

22  Q.  Now, Ms. Reidy, you were aware that other publishers who

23  signed deals with Apple had sent revised agency terms to

24  Amazon, correct?

25  A.  I'm not certain I was aware at that date.  I don't know

1   when you're talking about.

2          Well, the date of this memo clearly Macmillan had done

3   it because the whole thing had blown up.

4   Q.  Ms. Reidy, could you turn -- actually never mind.  I'm

5   sorry.

6          Were you at any point aware prior to the iBookstore

7   going live that other publishers had sent revised agency terms

8   to Amazon?

9   A.  Yes.

10  Q.  And you were aware of that, Ms. Reidy, because publishers

11  had told you that, correct?

12  A.  In at least one case, yes.

13  Q.  And because that became clear through your conversations

14  with Apple as well, correct?

15  A.  I'm sorry.  Correct -- I don't understand that question.

16  Q.  During your conversations with Apple, you became aware of

17  the fact that other publishers had gone and sent revised terms

18  to Amazon, correct?

19  A.  No.  In fact, when I called Amazon on whatever date, the

20  date before we -- the weekend -- the end of the week before we

21  signed the Apple agreement, I thought when I was calling him --

22  I didn't know he had had any other calls.  And then in the call

23  Russ Grandinetti told me I'm not surprised to hear this.  But

24  that was the first I ever heard that anybody else had contacted

25  him.

1   Q.  But you testified a moment ago that at least in one

2   instance you had heard from another publisher that they had

3   sent revised terms --

4   A.  You said before the iPad released, which goes significantly

5   later.

6   Q.  I'm sorry.

7   A.  I'm sorry.  We've got to get the timing straight here, so.

8   Q.  Absolutely.

9           Earlier in the day I asked you at any time prior to

10  the iBookstore going live whether you had had a conversation

11  with any other publisher regarding their negotiations with

12  Amazon, correct?

13          Do you recall that?

14  A.  Correct.  Yes.

15  Q.  And your testimony was that you did not recall any such --

16  A.  Correct.

17  Q.  That's not your testimony anymore, is it?

18  A.  Yes, it is.  Because there are two different things.  One

19  is whether someone sent a contract to Amazon and another is

20  about their negotiations.  Sorry.  But I see those as two very

21  different things.

22  Q.  So just so we're clear here.  You had at least one

23  conversation with another publisher in which a publisher told

24  you that they -- that publisher was sending revised contract

25  terms to Amazon, but that you had no other discussion regarding

1   the ongoing negotiations that that publisher was having with

2   Amazon?

3   A.   That publisher told me they had sent a contract to Amazon

4   and had been waiting weeks to get a response.  And that is the

5   total sum of what the discussion was about.

6   Q.   And if there had been anything more than that, would you

7   consider that then to have been having a conversation with

8   someone regarding their negotiations with Amazon?

9   A.   Well, if they talked actually about negotiations or about

10  how they were going, or what have you.

11  Q.   Ms. Reidy, was the individual who you had those

12  conversations or at least that conversation with regarding

13  revised terms being sent to Amazon Brian Murray of

14  HarperCollins?

15  A.   Yes.

16  Q.   And could you turn to PX153.

17  A.   Yes.

18  Q.   And, again, Ms. Reidy PX153 are your handwritten notes,

19  correct?

20  A.   Yes.

21  Q.   Do you see towards the bottom there's a -- you wrote down

22  the name Brian Murray?

23  A.   Yes.

24  Q.   And this reflects a phone conversation that you had with

25  Brian Murray, correct?

1   A.   Yes.

2   Q.   And am I right that your notes here reflect that Mr. Murray

3   told you that Amazon was not engaging with HarperCollins on

4   renegotiating or negotiating an agency contract?

5   A.   Yes.

6   Q.   And specifically Mr. Murray informed you that he had sent

7   proposed terms before he signed with Apple.  And then I believe

8   it says four or five days before.

9        Do you see that?

10  A.   Yes.

11  Q.   And does this reflect that Mr. Murray told you that Amazon

12  said that it would take two weeks to decide?

13  A.   Yes.

14  Q.   But your testimony is this is not a conversation between

15  you and Mr. Murray regarding whether -- regarding --

16  A.   Negotiations.

17  Q.   -- HarperCollins' negotiations with Amazon?

18  A.   Negotiations.

19  Q.   Okay.  But clearly you were made aware, from Mr. Murray,

20  that HarperCollins was seeking to move Amazon to an agency

21  model, correct?

22  A.   Yes.

23        MR. BUTERMAN:  Your Honor, one other document that I'd

24  like to show the witness.  Unfortunately, it's not in the book,

25  so if I could just.

 1    Q.  Ms. Reidy for the record what I've handed you is PX160.

 2    These are your handwritten notes, are they not?

 3    A.  Yes.

 4    Q.  And these reflect another phone conversation that you had

 5    with Brian Murray, right?

 6    A.  Correct.

 7    Q.  If we look at the bottom there is a note that you wrote,

 8    "Close to Amazon."

 9           Do you see that?

10    A.  Yes.

11    Q.  "Last few weeks..."  Does that say "that"?

12    A.  "Thought."

13    Q.  And then it says, "two issues left," correct?

14    A.  Yes.

15    Q.  Ms. Reidy, is it still your testimony here today that you

16    did not have conversations with another publisher regarding

17    their negotiations with Amazon before the agreement was signed?

18    A.  I guess when I'm referring to negotiations I'm actually

19    talking about what you're talking about, not the fact that

20    you're having them.  That's all.  So we're using the term

21    differently.

22    Q.  Now Ms. Reidy when it came time for Simon & Schuster to

23    negotiate a new deal with Amazon, Simon & Schuster, in fact,

24    tried to delay that process, correct?

25    A.  Yes.

1   Q.  And the reason that Simon & Schuster wanted to delay that

2   process is because doing so would make it more likely that

3   Amazon would have to deal with all of the publishers that

4   signed deals with Apple at the same time, correct?

5   A.  I don't know.  That may have been the thought at one point

6   but it was more -- there's a, in my experience, they'll take as

7   much time as there is.

8   Q.  Well, Ms. Reidy, could you turn back to PX341, please.  And

9   specifically to the second page of the document.

10  A.  Yes.

11  Q.  I direct your attention to the second paragraph there.

12          Do you see that?

13  A.  Yes.

14  Q.  You say -- again these are your -- this is an e-mail from

15  you to Mr. Moonves, correct?

16  A.  Yes.

17  Q.  And you say, "We are also trying to delay, making it

18  imperative due to timing that the other publishers with whom

19  Apple has announced deals push for resolution on their term

20  changes (Thus not leaving us out there alone) and making it

21  less likely that we will have a lengthy effect on our sales

22  with Amazon."

23          Do you see that?

24  A.  Yes.

25  Q.  So, Ms. Reidy, isn't it true that the reason that

1   Simon & Schuster wanted to delay its negotiations with Amazon

2   was because doing so made it more likely that Amazon would have

3   to deal with all of the publishers who had signed deals with

4   Apple at the same time?

5   A.  We actually wanted the big guys to go first, bigger.

6   Q.  Ms. Reidy, isn't it true that what you wrote here

7   indicates --

8   A.  No, no.  It's not about all at the same time.

9           What it says is other people would go, be pushing

10  already for the terms.  And then we would come in a little bit

11  after them when a lot of stuff got resolved.  So it's not

12  really about all at once.

13  Q.  Ms. Reidy did you or did you not say to Mr. Moonves on

14  February 11, 2010 --

15  A.  Right.

16  Q.  -- that your concern was that you not be left out there

17  alone?

18  A.  Oh, yes.

19  Q.  And the reason that you didn't want to be left out there

20  alone was because you believed that if Amazon had to deal with

21  all of the publishers at once, that made it less likely that

22  Simon & Schuster would be singled out for retribution, correct?

23  A.  Correct.

24          MR. BUTERMAN:  Your Honor, I have no further questions

25  at this time.

1          MR. FLOYD:  I can proceed, your Honor?

2     CROSS-EXAMINATION

3     BY MR. FLOYD:

4     Q.  Time to say good afternoon, Ms. Reidy.  I'm Dan Floyd and

5     I'm representing Apple.

6          I want to, in my cross-examination focus -- I mean

7     redirect examination, excuse me, want to focus on Apple.  But

8     first there's a -- I want to ask you a few questions that you

9     were asked a number of questions about dinners that you may

10    have had with other publisher CEOs and other communications

11    prior to December 2009.

12         Do you recall that?

13    A.  Yes.

14    Q.  Was Apple involved in any of those dinners or

15    communications?

16    A.  Not in the least.

17    Q.  Did you inform Apple of any information that might have

18    been discussed at any dinner or meeting with another publisher?

19    A.  Not to my recollection.

20    Q.  You had -- if we could look at Exhibit 344.  It's in the

21    government binder, PX344.

22         In your testimony you had -- if you look at the -- I

23    think it's the last line, it's the line that references the

24    troops.

25    A.  Yes.

D659usa3                    Reidy - cross

1   Q.  You had asked -- requested an opportunity to explain a bit

2   more of your answer.  So since I'm up here I figured I would

3   give you an opportunity to explain a bit more of your answer.

4   A.  When we had the meeting to discuss the possibility of doing

5   retail price maintenance, we -- the point that Leslie made was

6   that if you try to get Amazon to change its business practice

7   for you alone they won't do it.  They're more powerful than you

8   are.  And unless you're -- you know, you're sure that your

9   competitors would follow you, it's too dangerous to do.

10          And we, of course, said well there is no way to know

11  for sure that our competitors would also follow us.  So that's

12  why we made the decision then not to do it.

13          So the "gather your troops" was in quotes because it

14  was just part of the conversation.  And frankly, the way it's

15  written here could also refer to getting more authors like

16  Stephen King to also help participate in trying to do

17  windowing.

18          Anyway, that was the explanation.

19  Q.  In that September 2009 e-mail the information that was

20  conveyed to Mr. Moonves was not something that you communicated

21  to Apple; is that right?

22  A.  No.

23  Q.  Let's start with your dealings with Apple.  Now you had a

24  meeting with Apple on December 16; is that correct?

25  A.  Yes.

 1    Q.  And I think if we could look at PX159.  Raised in your

 2    cross-examination.

 3             So, look at the first page.  You list the

 4    participants.  You write Eddy Cue.  I notice you used a Q there

 5    at that point?

 6    A.  Yes.

 7    Q.  Is it fair to say that you hadn't met Mr. Cue before?

 8    A.  No, I had not.

 9    Q.  And was Apple's team led by Mr. Cue?

10    A.  Yes, it was.

11    Q.  We saw a reference to, later in a meeting that you're

12    referencing to minions.

13             Was your belief then that Mr. Cue was the key decision

14    maker that you were dealing with at Apple?

15    A.  Absolute.

16    Q.  And from his perspective, were you the key decision making

17    person at Simon & Schuster?

18    A.  I assume so.

19    Q.  And --

20    A.  But.

21    Q.  All right.  And so I'm going to talk to you a bit about

22    some of the conversations in meeting with him and we can use

23    your notes as a platform for that.

24             But based on what you learned at the meeting did you

25    understand whether or not Mr. Cue had any experience in the

D659usa3                         Reidy - cross

1   book business?

2   A.  I believed that none of the Apple people understood the

3   book business or they were just learning about it.

4   Q.  When they came to you did they come to you with the -- did

5   they express a desire to learn more about the business from

6   you?

7   A.  Yes.

8   Q.  And in this first meeting, did Mr. Cue commit for Apple to

9   open an eBook store?

10  A.  No.

11  Q.  And in this meeting did Mr. Cue describe for you what he

12  considered to be some of the key business considerations for

13  Apple in evaluating whether it wanted to open an eBook store?

14  A.  Yes.

15  Q.  So let's -- if we can look on the second page of the notes.

16  There is a portion that starts with pricing.  I think some of

17  this you went over.  I'd like to go over it a bit more here.

18          From your understanding, what were basically the key

19  competitive or business considerations for Apple that they were

20  evaluating in this fact finding mission with you?

21  A.  They would not -- number one, they had to make some money.

22  Because they only make 25 percent margin on their machines.

23  But they only make digits in the stores.  So clearly it had to

24  be something advantageous to them to support the store.

25          They were okay with prices for major books being 12.99

D659usa3                          Reidy - cross

1    to 14.99.  Digital books should definitely be less.

2              They wanted a competitive landscape so that they could

3    match anybody's prices.

4              And they didn't like windowing.

5    Q.  In there it says, "Need new releases.  Windowing upsets

6    customers.  Piracy."

7    A.  Those were the reasons against windowing.  It upsets

8    customers, and increased piracy.

9              THE COURT:  Excuse me.  Could you just hold on one

10   second.

11             MR. FLOYD:  Of course, your Honor.

12             THE COURT:  Thank you.

13             (Pause)

14             THE COURT:  I realize that Ms. Reidy was speaking

15   quickly and making a lot of different points in a very concise

16   way.  But the way the answer comes across is I think confusing,

17   and I just want to make sure.

18             MR. FLOYD:  Your Honor, I was actually planning to go

19   back and break out the points because I understand your Honor's

20   concern.  So why don't I try that and if unsuccessful we can

21   deal with that.

22   Q.  So let's talk about windowing first.  It's the last point

23   you made; that Apple communicated to you that it did not want

24   windowing to occur, right?

25   A.  Correct.

D659usa3                        Reidy - cross

1    Q.  And at that point were there any prohibitions in the

2    contracts that you had with other retailers on windowing?

3    A.  We didn't actually have contracts with other -- oh, yes, we

4    did.  Sorry.  Nevermind.  Correct that.

5           No, there were not.

6    Q.  So at that point it -- Simon & Schuster had the authority,

7    if it chose, for any reason it wanted, maybe an author or

8    business reason, to withhold a title that was available

9    physically, withhold it from a digital marketplace?

10   A.  Yes.

11   Q.  Did you understand that Apple was going to be a digital

12   only seller of books?

13   A.  Yes.

14   Q.  And was there any -- did you reach any conclusions or have

15   any thoughts as to the consequences to a digital only player if

16   the major books were unavailable at the time of initial

17   release?

18   A.  Yes.  Of course, it occurred to us that they wouldn't like

19   it if they were the secondary market.

20   Q.  So let's talk -- let's go back over some of these things

21   that you talked about.

22           It says here in your notes that Apple, and you

23   underlined that, would never sell at a loss?

24   A.  Correct.

25   Q.  And then there's a reference to single digit store.

1          Did Apple explain to you that they were looking at the

2     end of the day to have a net profit margin in the single digits

3     at the -- whatever, the iBookstore, whatever became the eBook

4     store for Apple?

5     A.  Yes.

6     Q.  And at that time -- well let me back up.

7          During this conversation was the conversation focused

8     on a potential wholesale arrangement from Apple?

9     A.  Um --

10    Q.  With Apple?

11    A.  The conversation was free-ranging.  So we explained how we

12    do sell, which it was wholesale at the time.  And as is clear

13    in the notes, we discuss somehow -- or Ellie's notes, other

14    ideas came forward.

15         But my understanding leaving that meeting was that

16    Apple was looking at a wholesale model.

17    Q.  Do you recall whether or not there were any discussions

18    about an agency model at that meeting?

19    A.  The word agency wasn't used because I -- but there was talk

20    about how you basically -- the publisher has control of the

21    prices.  So the concept of it was brought up.

22    Q.  But the term agency was not used?

23    A.  Correct.

24    Q.  And you were talking in terms of a potential arrangement of

25    a wholesale arrangement?

D659usa3                          Reidy - cross

```
 1    A.  Yes.

 2            My memory actually is that Apple said they weren't

 3    sure how they were going to do it at that time.

 4    Q.  So, in here there's a reference to, you say "12.99 and

 5    14.99.  Okay with them."

 6            Correct?

 7    A.  Correct.

 8    Q.  Now, you're not -- you don't suggest here that a lower

 9    price is not also okay with Apple, right?

10    A.  Correct.

11    Q.  Now let's take a look at 540 for a moment.  PX540.

12            If we look a lot PX540 and the paragraph that says, "I

13    asked if that meant Apple thought all eBooks should be priced

14    the same."

15    A.  Yes.

16    Q.  And it says there, "He said no.  He thought pricing could

17    vary from 99 cents to 12.99."

18            Do you see that?

19    A.  Yes.

20    Q.  From your initial meetings forward, did you understand that

21    Apple was conceiving of a marketplace on an eBook store that

22    would have prices starting at 99 cents and moving all the way

23    up to, in this case, 12.99?

24    A.  Yes.

25            MR. BUTERMAN:  Objection.  Leading.
```

D659usa3                        Reidy - cross

1           THE COURT:  Sustained.  Stricken.

2     Q.  Did you have any understanding at the original meeting

3     whether or not Apple was suggesting that it had a problem with

4     prices below 12.99?

5     A.  No.

6     Q.  Was there any discussion about any types of pricing tiers

7     or grids that might be ultimately proposed?

8     A.  I believe in the first meeting there was no discussion

9     about grids.

10    Q.  And eventually Apple proposed an MFN, right?

11    A.  Yes.

12    Q.  What would be the result of that MFN if say for a New York

13    Times bestseller there was a book offered elsewhere at 9.99, a

14    New York Times bestseller?

15    A.  The way our contract reads, if that person was in breach --

16    was an agency seller for us and was in breach of that contract,

17    we would have three days to cure it.  Otherwise, Apple would be

18    able to say -- otherwise, then we had to lower the price to

19    that.  If we had dual selling -- so one had agency and one had

20    wholesale -- if one of the wholesale retailers lowered the

21    price to 9.99, we would have to do so for the -- in the

22    iBookstore.

23    Q.  Now there's a reference here that Apple said it would never

24    sell at a loss?

25    A.  Correct.

1   Q.  At that point for New York Times bestsellers what was the

2   range of prices, wholesale prices that Simon & Schuster was

3   charging retailers?

4   A.  Well, we sell physical books and eBooks -- we sold eBooks

5   at that time 48 percent off.  So, to make it easy we can say

6   50 percent.

7          Most New York Times bestsellers -- not all as you saw

8   from the list we looked at earlier but most -- were 25 to $28.

9   So 50 percent of that is 12.50 to let's say $14.

10         So that's the price at which the retailer purchased

11  the books from us.

12  Q.  Right.

13         So at that point if Apple was selling books -- if it

14  decided to engage in that model, selling books at 9.99, what

15  would be the effect of having to pay 12.50 for the book?

16  A.  They basically would be $12.51 negative or loss on the sale

17  of that book.

18  Q.  And was that something that Apple discussed as a reason why

19  it didn't like the 9.99 price?

20  A.  Yes.  They were not interested in entering a business in

21  which they had to lose money.

22  Q.  And did you think that was a reasonable position for Apple

23  to take?

24  A.  Yes, I did.

25  Q.  Why is that?

1    A.  They're a business and they're a public company and why

2    would you invest to build a store and to basically do all the

3    advertising and everything else you need to do, to set up a

4    model where you lost money every time you sold something.

5    Makes no sense.

6    Q.  In connection with this meeting did you and the -- Simon &

7    Schuster believe that you might have to effectively lower the

8    price -- wholesale price, the price of a book to a retailer?

9            MR. BUTERMAN:  Objection.

10           THE COURT:  Sustained.

11   Q.  Was there any discussion in that meeting about

12   Simon & Schuster, whether or not Simon & Schuster would be

13   willing to charge less for eBooks for Apple?

14   A.  No.  I was more intrigued to find out how they felt we

15   would be able to get control of pricing.

16   Q.  You said -- you testified that you were -- were you

17   interested in pursuing a deal with Apple after the initial

18   December meeting?

19   A.  Yes, I was.

20   Q.  And I think you testified at -- right before I got up

21   here -- that there was a discussion about how the MFN that

22   Apple ultimately put in its deal undercut one of the reasons

23   for entering a deal with Apple.

24           Do you recall that?

25   A.  You mean where -- the question whether the MFN forced us to

1    change our terms elsewhere?

2    Q.  Right.  And the sentence around that was whether or not --

3    you had said something to the effect that the MFN undercut one

4    of the reasons for doing a deal with Apple, right?

5    A.  Yes.

6    Q.  So could you explain then what were the other reasons you

7    wanted to do a deal with Apple that -- at that time?

8    A.  Well, number one, they already had in hand 120 e-mail

9    addresses.

10           They're a fantastic device company and so the idea

11   that they would sell a new device that had book reading as part

12   of it and get it in front of those 120 consumers just

13   automatically is exciting because it increases the market

14   dramatically for us.

15           The fact that they were also going to be making it

16   possible to do picture books and enhanced eBooks and other

17   things because of the functionality of whatever mysterious

18   machine, which they wouldn't tell us, they were creating.  But

19   they clearly had that.

20           They right away at the very first meeting talked about

21   different market things and the ability to link back to us, the

22   ability to link to authors' other books.  So they right way

23   were talking about how the functionality of their machine could

24   help us market.

25           So, you know -- and it's a huge major company.  And,

1   therefore, as far as we're concerned, to have a major company

2   wanting to get involved in the book business is only a plus.

3   Q.  And from a financial point of view all of the things that

4   you packaged there, what would that mean to Simon & Schuster?

5   A.  Well it's also another place for us to obviously sell our

6   authors' books and make more money.

7        But we also -- by the way, and I would also say one of

8   the real reasons for signing it too was it seemed to give us

9   what we had been searching for when we were trying to go down

10  the path of trying to do minimum retail pricing; in other

11  words, getting control of our intellectual property back.

12  Q.  And this was ultimately when an agency deal was propose,

13  right?

14  A.  Yes.  That was later.

15  Q.  So we're still focusing on this initial meeting.

16       Did Mr. Cue make any proposals during that initial

17  meeting?

18  A.  I do not recall any specific proposals until he sent the

19  letter.

20  Q.  I take it without -- well did you reach any agreements at

21  that meeting?

22  A.  No.  Except to give him a technical contact so they could

23  already -- and show him sample files so they can already start

24  doing the back end work on it.

25  Q.  At the initial meeting with Apple, did you explain to Apple

1    your perspective of the competitive conditions in the eBooks

2    business?

3    A.  Yes.

4    Q.  And what did you describe to Mr. Cue and the other people

5    that attended with him, Mr. Saul and Mr. Moerer?

6    A.  I expressed dissatisfaction with Amazon's pricing and the

7    fact that it was, in fact, inhibiting the development of the

8    eBook world.  And that was pretty much it.  Because we were --

9    we were always very much an enthusiast of the digital book

10   world, so.

11   Q.  What were Simon & Schuster's issues with the Amazon pricing

12   strategy for eBooks in December of 2009?

13   A.  Well there was quite a bunch of them.  But you know to

14   begin with, it devalued the intellectual property.  Because we

15   live in -- we've always lived, in publishing, in a variable

16   pricing world.  So we charge more for books because the author

17   is famous and, therefore, we can; because the author has spent

18   years writing a book; because it's a complicated subject;

19   because it's a small market.  There are all kinds of reasons

20   for books to be -- because the book is really long.  There's

21   alls kinds of reasons -- because you have to spend more

22   marketing on it.  There's all kinds of reasons for books to be

23   more expensive or less expensive.  That's physical books.

24           In pricing of eBooks or is what eBook pricing should

25   be, we at Simon & Schuster always acknowledged you take out the

printing cost, you take out the warehousing costs, you take out

the shipping costs.  But all the other costs to originate that

book still exist.

        We felt that Amazon particularly was low pricing in

order to increase the sales of their machine.  And they were,

therefore, using the intellectual property of authors to sell

their machine rather than what we felt was proper, which was

the other way around.  You don't even have a machine if you

don't have the work of these authors.

        By lowering the prices, we never believed that forever

Amazon would say, fine, we'll give you 48 percent of whatever

price you give us.  We absolutely believed that one day they'd

come and say it's 9.99, that's the right price, so we're only

going to pay you 48 percent of 9.99.

        Once you do that, there's not enough money for

everybody.  There's not enough money for us, for the author.

It increases disintermediation because the author can go

directly to the digital people and say we want a big ship and

take the whole share from them instead of having us in the

middle helping to make it better.

        They were hurting the market because other retailers

also said they didn't want to lose money and therefore they

couldn't put a lot of money into it, into eBook selling which

clearly consumers wanted, because they would have to do it at a

loss and particularly for people who are book stores only.

D659usa3                        Reidy - cross

1   That's a very -- that's an impossibility because book stores

2   don't have a high enough margin to be able to support a money

3   losing digital operation.

4           And I could go on if you want to but there's --

5   Q.  I appreciate that.  I think I will try to move us along.  I

6   appreciate it.

7   A.  There were a lot of reasons.  Let me just put it that way.

8           But the one I want to make, because I keep talking

9   about the proportion, is you have a lot of consumers who still

10  want to buy the physical book.  And by low pricing the

11  digital -- not as a marketing ploy.  It also takes away price

12  as a marketing ploy.  But by lowering that price so much, in

13  effect you're forcing -- you're forcing people to have to turn

14  over in their own economic interest instead of saying this --

15  the physical costs more for all these reasons that people can

16  accept.  So that relationship is the thing that's the most

17  important.

18  Q.  And you have some testimony, and I'll cover it a little bit

19  more later, about the price tiers that were ultimately agreed

20  to with Apple.

21          Do you remember that?

22  A.  Yes.

23  Q.  How did those price tiers fit into this concept of

24  proportionality that you were talking about between physical

25  and digital?

D659usa3                         Reidy - cross

1    A.  Well, we thought they were too low, all the way to the end.

2    We wished they were higher.  We wished that what Apple proposed

3    at 12.99 allowed us to go up to 14.99 in that bridge.

4            But, I finally realized -- and part of it was the

5    e-mail which we looked at from Keith with the best sellers on

6    it -- that Apple was focusing on Amazon's pricing and,

7    therefore, wanting to make sure that the eBook was priced

8    properly in relation to Amazon's practice, which is 40 percent

9    off on New York Times bestsellers.  So they proposed 50 percent

10   by and large.

11           So, once we realized that, then we realized we were

12   fighting a losing battle in terms of trying to get the prices

13   up even more.

14   Q.  Did 50 percent of the physical list price, did that have

15   significance?  Is that something that was utilized in selling

16   books wholesale?

17   A.  Well we sell books -- we sell, in the wholesale model,

18   accounts.  Even the accounts that have the best terms buy them

19   at 50 off.  So, you know, half price was kind of a, you know,

20   was a term in wholesale selling.

21           But in terms of the eBooks, Amazon had such dominance

22   in the market that there was just what Amazon was doing

23   basically, so.

24   Q.  So, just to be clear.  After the December 16 meeting you

25   said that there were no proposals made and no agreements

1    reached?

2    A.  Correct.

3    Q.  So, then was the next call that you had -- or the next

4    communication you had a call with Eddy Cue on December 21?

5    A.  Yes.

6    Q.  Let's take a look at Exhibit 788.  Take a look at the

7    record of that call.  Which is on the 18th.

8    A.  It's on page two.

9    Q.  Make sure I have the right one.

10            I'm sorry.  It's 12-21.  That was my fault.  So the

11   next call you had was on 12-21?

12   A.  Yes.

13   Q.  So let's take a look at that.  That call lasted just ten

14   minutes and 45 seconds?

15   A.  Correct.

16   Q.  And so between the 16th and the 21st had you had any

17   communications with Mr. Cue?

18   A.  Not to my recollection.

19   Q.  And was --

20   A.  Well he sent me.

21   Q.  An e-mail?

22   A.  An e-mail.

23   Q.  But you hadn't had any conversations with him?

24   A.  No.  Not that I recall.

25   Q.  Would you characterize that as a brief call?

1    A.   A what?

2    Q.   A brief call, short call?

3    A.   Ten minutes?  No.  That's pretty long.

4    Q.   Did you -- do you recall anything specifically about the

5    call?

6    A.   Well, there's the memo in here.  That's the record of it,

7    so.

8    Q.   How would you characterize the discussion?  Was it a high

9    level discussion?

10   A.   Yes.

11   Q.   And did you have any exchange of pleasantries?

12   A.   I'm sure we did.

13   Q.   So in that 10-minute-45-second call you exchanged

14   pleasantries, had a conversation, and hung up; is that correct?

15   A.   Correct.

16   Q.   So by the end of December you had had the preliminary

17   meeting and a 10-minute-45-second phonecall with Eddy Cue?

18   A.   Correct.

19   Q.   Was that the total amount of communication you had had with

20   him in your life?

21   A.   At that point, yes.

22   Q.   So in that 10-minute-45-second call with Mr. Cue, did you

23   reach any agreements?

24   A.   No.

25   Q.   Did you make my commitments to Mr. Cue?

1    A.  No.

2    Q.  Did he make any commitments to you?

3    A.  No.

4    Q.  So, if we -- then the next communication.  In looking at

5    that, after that call with Mr. Cue -- if you look at 788.

6              First, do you recall having conversations with anybody

7    else, phone conversations with any other publisher regarding

8    that meeting, that phone conversation?

9    A.  I don't believe so because I left that night for Europe.

10   Q.  So after your call with Eddy Cue you didn't speak with

11   anybody else?

12   A.  I quickly wrote the memo.

13   Q.  And then?

14   A.  Got out of the office.

15   Q.  And then if you look there, there are no calls -- well the

16   next communication was the January 4, 2010 e-mail from Mr. Cue.

17   Do you remember that?

18   A.  Yes.

19   Q.  And you received that.  Was there any reference of any

20   calls that you made to any publishers at that time?

21   A.  Well there's a --

22   Q.  On the fourth or fifth.

23   A.  No.  There are not.

24   Q.  You had an internal meeting on the fourth to discuss a

25   proposal?

D659usa3                        Reidy - cross

1    A.  Yes.

2    Q.  And at that point -- so, the first time -- let me back up

3    for a minute.

4         So on the December 21 phonecall with Mr. Cue that was

5    the first time that he specifically raised a potential agency

6    relationship?

7    A.  Yes.

8    Q.  And then on January 4 you received an e-mail that described

9    an agency relationship?

10   A.  Yes.

11   Q.  So in between the time that -- that was the first you heard

12   of it, you didn't speak with any other publisher.  And in the

13   end of -- the first couple days after you had looked at it, had

14   you spoken to any other publisher?  About Mr. Cue's?

15   A.  About that, no.  I was out of the country for all that

16   time, too.

17   Q.  So the e-mail showed that there was an internal discussion

18   at Simon & Schuster about the January 4 e-mail from Mr. Cue?

19   A.  Yes.

20   Q.  And if I recall correctly the exhibit referenced a

21   potential call with Mr. Cue.

22        Do you know of that?

23   A.  I think the next thing that -- well, I'm not sure.  I don't

24   know the time.  I don't recall.  I just don't recall.

25        The record must show it.  But I did have -- I don't

D659usa3                              Reidy - cross

1   remember when the dinner was with him.

2   Q.  I'll get to that.  At least you see no phonecall there?

3   A.  I see none on the log, yes.

4   Q.  So if there was a reference to a -- a particular phonecall

5   and a meeting --

6   A.  It should be here.

7   Q.  It should be here.  You don't remember it?

8   A.  Right.

9   Q.  And it's not in the records?

10  A.  Correct.

11           MR. BUTERMAN:  Objection.

12           THE COURT:  Overruled.

13  Q.  So then you do recall then there was some testimony about

14  that you had dinner with Mr. Cue on January 16?

15  A.  Correct.

16  Q.  And if we -- we have the phone records up there again.  If

17  we can go to just confirm that you had no conversations with

18  Mr. Cue or anybody at Apple between January 4 and January 16?

19  A.  Correct.

20  Q.  Certainly phone conversations -- why don't we first go

21  between January 4 and January 11; is that right?

22  A.  Correct.

23  Q.  And then you recall you had dinner with Mr. Cue on

24  January 16, 2010?

25  A.  Correct.

D659usa3                          Reidy – cross

1    Q.  On January 11, 2010 you had received a contract proposal

2    from Mr. Saul, Apple's in-house lawyer; is that right?

3    A.  Correct.

4            MR. FLOYD:  Let's put that up, Exhibit DX534.

5            THE WITNESS:  Is that in your book?  You gave me one

6    this morning.

7            MR. FLOYD:  There is a second book.

8    Q.  I think we're now properly situated.

9            So do you recognize DX534 which is an e-mail from

10   Kevin Saul to you attaching a proposed agreement?

11   A.  I don't recognize it.  But I assume it is what it is.

12   Q.  So this was the initial proposed contract from Apple to

13   Simon & Schuster?

14   A.  Correct.

15   Q.  And so between the time that Simon & Schuster received

16   Mr. Cue's January 4 e-mail and received a proposed contract, no

17   one at Simon & Schuster had any communications with anyone at

18   Apple?

19   A.  I said I do believe the technical people were talking

20   during this whole period.

21   Q.  I'm sorry.  Let me just make clear.  Mr. Cue, for example,

22   you had said that Mr. Cue was the person you looked to as the

23   person who was negotiating the substantive terms of the

24   agreement.  Is that fair?

25   A.  Yes.

1    Q.  So, based on what we have put up here, there was no

2    communications between you and Mr. Cue between January 4 and

3    January 11; is that right?

4    A.  Yes.  Not to my recollection.

5    Q.  So then when you had a first meeting in this case, a dinner

6    meeting with Mr. Cue, you had received the proposed draft

7    contract?

8    A.  Yes.

9    Q.  At that point then -- were the discussions that you had

10   going forward about the proposed draft contract or about the

11   original e-mail?

12   A.  I think they were largely about the original e-mail and the

13   basic business deal.

14   Q.  Well, weren't you negotiating the contract then with Apple?

15   A.  Yes.

16           MR. BUTERMAN:  Objection.

17           THE COURT:  Sustained.  Stricken.

18   Q.  What was it that kicked off the negotiations for a

19   contract?

20   A.  I guess I would say that from the beginning we were excited

21   about Apple's potential entry into the market.  And so once

22   they came to us and said this is the model under which we want

23   to enter the market, and it was clear from their wanting us to

24   have the technical people, starting to talk to them right away,

25   that they wanted to send the contract and get us talking about

D659usa3                        Reidy - cross

1    that right away even before we come to any final agreement on

2    any terms.

3            So, I don't know.  It seemed to me that Eddy's e-mail

4    of the -- was it the fourth -- I'm going to get my dates wrong.

5    The first e-mail really was the beginning of negotiating a

6    contract unless we rejected it right then.  So I'd say from

7    that moment on we were negotiating.

8    Q.  From January 4 to January 11 you didn't have any

9    communications with Mr. Cue?

10   A.  No.  Because we were looking at all the implications for

11   this for our business.

12   Q.  And then you received the January 11 contract, right?

13   A.  Correct.

14   Q.  What did you do with the January 11 contract?

15   A.  When did I get the second letter from him?  Was that the

16   11th also?

17   Q.  The letter from Mr. Saul was on the 11th with the draft

18   agreement.

19   A.  Right.

20   Q.  So what happened?  What did you do at Simon & Schuster in

21   light of that?

22   A.  Then this contract went to the lawyers, the sales -- the

23   people who had been in the Apple meeting, but in addition the

24   lawyers as well as a man named Doug Stambaugh who had been

25   negotiating all of our eBook agreements.

1           MR. FLOYD:  Can we put up DX163, please.

2      Q.  So can you take a look then at Exhibit 163.

3      A.  Mm-hmm.

4      Q.  So this is an e-mail exchange on January 12?

5      A.  Yes.

6      Q.  And it starts off, if you go at the very beginning it has

7      Mr. Saul's e-mail?

8      A.  Yes.

9      Q.  And then you see here you are receiving the contract?

10     A.  Yes.

11     Q.  And you describe many problems with it, the pricing being

12     the main one?

13     A.  Yes.

14     Q.  This is -- does this refresh your recollection as to

15     whether you were -- what agreement you were negotiating off of

16     after January 11?

17     A.  No.  Oh, I mean yes.  This is what we were doing after

18     January 11.

19     Q.  Meaning?

20          "This is what we were doing," meaning what?

21     A.  Negotiating.

22     Q.  Negotiating based on --

23     A.  Based on this agreement, yes.

24     Q.  Because you had described that there were certain things in

25     your cross-examination that there were certain provisions in

```
 1   the January 4 letter that weren't contained in this draft.  Do
 2   you recall that?
 3   A.  Correct.
 4   Q.  And you met -- what did you mean by that?
 5   A.  Well the one --
 6   Q.  In terms of for negotiation purposes.
 7   A.  It said that we had to make other retailers go under agency
 8   also.
 9   Q.  What were the implications for you having received this
10   contract and not having that provision in there on your
11   negotiations?
12            MR. BUTERMAN:  Objection.  Leading.
13            THE COURT:  Overruled.
14            THE WITNESS:  Could you repeat it.  I got distracted.
15   Q.  Meaning that did you notice in the January 11 draft
16   contract that there was no provision relating to your dealings
17   with other retailers?
18   A.  I can't recall.
19   Q.  You now know, having looked at it, you know that it doesn't
20   have that; is that correct?
21   A.  Yes.
22   Q.  What did that means in terms of negotiating forward?  Did
23   you have to negotiate that issue then?
24   A.  No.  We did not have to negotiate it.  In other words, it
25   never appeared in it so we didn't have to object to it.
```

1          Because as I said, we wouldn't sign an agreement that

2     demanded that we treat other retailers in some way.

3     Q.  And so what you're describing here in your e-mail, what are

4     you describe -- in terms of your review of the draft contract

5     of January 11?

6     A.  Of what I think the problems are?

7     Q.  Yes.

8     A.  Well, from the beginning the main problem, as far as we

9     were concerned, was the 30 percent agency fee.  And the pricing

10    bans.  As far as I'm concerned, those were the major concerns I

11    had.

12    Q.  And I think -- who is Mr. Stambaugh.  He writes an e-mail

13    to you describing a number of concerns he has with the

14    agreement.

15    A.  Yes.  Doug Stambaugh has been one of the main negotiators

16    of all of our eBook agreements.  And he is in business

17    development in our digital department.

18    Q.  Had you done any agreements with Apple before -- "you"

19    being Simon & Schuster -- if you recall?

20    A.  The digital department had done a couple app agreements, I

21    mean -- I don't know if they are -- I don't even know if they

22    are actual printed agreements.  But we had arranged to sell

23    several apps on the Apple store, in the Apple store.  And I

24    believe that's -- there's a contract involved in that.

25    Q.  Well from your perspective was there any kind of course of

D659usa3                          Reidy - cross

1   dealing between Apple and Simon & Schuster that you were

2   relying upon going forward?

3   A.   No.

4           THE COURT:  So, counsel, I'm afraid this is the time

5   for our lunch break.  I hope we're choosing an appropriate

6   point.

7           MR. FLOYD:  That's fine, your Honor.  Thank you.

8           THE COURT:  Thank you.

9           So, Ms. Reidy, you may step down.

10          And we start again at 2:00.

11          And counsel, again, you don't have to move your things

12   from the tables but I do have -- not today.  Tables are yours

13   during lunch.

14          MR. SNYDER:  I don't need to clean up today?

15          THE WITNESS:  And I leave these here?

16          THE COURT:  Yes, you may.

17          (Luncheon recess)

18

19

20

21

22

23

24

25

1               A F T E R N O O N   S E S S I O N

2                            2:06 P.M.

3          MR. FLOYD:  May I proceed, your Honor?

4    BY MR. FLOYD:

5    Q.  All right.  Ms. Reidy, I wanted to make sure we're very

6    clear on one particular issue, so if we could put up PX510 for

7    just a moment, take a quick look at it, and we can focus in on

8    the second paragraph, the next-to-last sentence.  And you were

9    asked about this by counsel, where -- this sentence about --

10   I'll just read it -- they also cannot tolerate a market where

11   the product is sold significantly more cheaply elsewhere,

12   although they can accept some price differentiation between

13   themselves and a low-price competitor, i.e. they don't want

14   Amazon's 9.95 to continue.  Do you remember talking about that?

15   A.  Yes.

16   Q.  I think you testified that your notes would be the best

17   place to find out whether or not something like that was

18   actually said, correct?

19   A.  Yes.

20   Q.  All right.  So if you could then -- we could look at PX159,

21   and if we looked at on Page 2 with pricing, that dealt with

22   this issue.  Do you see any reference to the --

23   A.  Wait one second.

24   Q.  Yes.  Take your time.

25   A.  Okay.  Okay.  I'm there.

1   Q.  Right.  And so there -- do you see, is there any statement

2   in those -- in your notes there that Apple does not want the

3   9.95 price to continue?

4   A.  Can you give me a minute?

5   Q.  Yes.

6   A.  No.

7   Q.  I'd like to talk about the context of those discussions

8   that occurred on 12-16.  So did you have discussions on

9   December 16th with Apple about pricing that existed on the

10  wholesale model for eBooks?

11  A.  Yes, I believe we did.

12  Q.  All right.  Did you explain the wholesale prices that Simon

13  & Schuster was charging at the time?

14  A.  Yes.

15  Q.  All right.  So if we can make those clear for the record.

16  For New York Times best sellers, what would be the range of

17  dollar pricing that a retailer would be receiving for New York

18  Times best sellers?

19  A.  Well, our digital list prices were equal to the physical

20  book price in every case, and we sold them at a 48 percent

21  discount.

22  Q.  So what -- I'm sorry.

23  A.  So New York Times best sellers covers a wide range of

24  pricing; so....

25  Q.  Can you identify what would be a typical range?  For

1    example, I think the 12.50 came out in your testimony?

2    A.  Yes.  The general -- most New York Times best sellers, with

3    exceptions, were priced at that time between 25, 28 or $30.

4    Q.  So if we do the math there, you would get roughly --

5    A.  They would be charged somewhere between 12.80, something

6    like that; 12.50, if you do it at 50 percent, or two percent

7    more than that.  And a $30 book would be $15.

8    Q.  Did you then discuss the prevailing retail prices at the

9    time?

10   A.  Yes, we did.

11   Q.  All right.  And that would be the -- Would that be the 9.99

12   price?

13   A.  Yes.

14   Q.  All right.  So then in that context, the wholesale price is

15   larger -- is higher than the retail price?

16   A.  Yes.

17   Q.  All right.  And the numbers would be, what, per book?  I

18   don't mean to make you do math, but --

19   A.  In general, retail pricing at that time, the eBook prices

20   were a good 20 percent, 30 percent lower than the wholesale

21   price that the retailer was being charged and in some cases

22   even more.

23   Q.  So that that would be a 20 to 30 percent negative gross

24   margin?

25   A.  Yes.

1  Q.  So was it in this context that Apple expressed any issues

2  with the 9.99 price?

3  A.  Yes, and that's the phrase, never sell at a loss.

4  Q.  And so this was not some broad or fundamental disagreement

5  expressed by Apple?

6  A.  No.

7  Q.  Did you ever speak to Mr. Jobs in connection with any of

8  the negotiations?

9  A.  No.  The only time I ever spoke to Mr. Jobs was at the

10  launch of the iPad when -- I don't know if it was Eddy Cue or

11  Keith Moerer took me up to just introduce me to him.  It was

12  about a ten-second conversation.

13  Q.  And just, in general, did you discuss any windowing plans

14  that you had at all at any time with Apple?

15  A.  No.

16  Q.  All right.  What I'd like to do now is I'd like to focus on

17  the negotiations that Simon & Schuster had with Apple for the

18  agreement that ultimately launched the iBookstore.  So those

19  negotiations took place between -- you received the draft

20  contract on January 11th; is that correct?

21  A.  Yes.

22  Q.  And then do you recall roughly when you signed the -- you,

23  Simon & Schuster, signed the agreement with Apple?

24  A.  It was January -- it was basically two weeks later, I

25  believe.  I think it was on the 25th, but I'd have to look to

D65PUSA4                         Reidy - cross

1   confirm that.  But basically, two weeks.  We negotiated for two

2   weeks.

3   Q.  I think I will have the contract up in a moment; so that

4   will -- we'll be able to nail that down for sure, but thank

5   you.

6         So there were -- How would you characterize -- well,

7   let me back up.  Sorry.

8         Had you negotiated contracts or been involved in the

9   negotiation of contracts with Simon & Schuster?

10  A.  With other retailers?

11  Q.  Yes.

12  A.  Yes, I have.

13  Q.  And in general?

14  A.  Yes.

15  Q.  If you had to provide even a rough estimate, how many

16  contracts do you think you'd been involved in negotiating?

17  A.  Are you talking about retailer contracts?  Because there's

18  author contracts, there's a lot of contracts.  Anyway, I'd say

19  I've been involved in major -- negotiations on contracts, not

20  just a clause but contracts, with probably, I don't know, up to

21  ten retailers.

22  Q.  Now, did you -- these negotiations with Apple, did you find

23  these to be consistent in the way they were conducted back and

24  forth with the other contract negotiations you've been involved

25  in?

1    A.   Yes.

2    Q.   In what manner?  Were you negotiating particular provisions

3    with Apple?

4    A.   Well, basically, No. 1, they gave us the contract.  We

5    outlined the clauses we had trouble with.  We sent them back a

6    redline, and then I was only involved in negotiating certain of

7    the clauses specifically, which were the biggest big terms,

8    which is what I was involved in.

9    Q.   And could you identify which ones those were?

10   A.   No. 1 was the 30 percent agency charge.  No. 2 were the

11   pricing bans, and then some of the other crucial things like

12   the MFN.  So when you say involved in the negotiations, I went

13   through that redline internally many, many times with counsel,

14   but counsel did a lot of the conversation with Mr. Saul --

15   Q.   All right.

16   A.   -- other than these major business issues.

17   Q.   And these major business issues, how were they handled in

18   terms of negotiating?

19   A.   Those conversations went on also between the lawyers, but

20   also, I had a lot of conversations with Eddy Cue.  And as you

21   saw from the memo, we already looked at tweaking the term of

22   something I got involved in trying to negotiate.

23   Q.   And you were looking for a shorter term than one year?

24   A.   Yes, because we wanted to see how -- you know, see what the

25   true implications were of the new business model.

1    Q.  All right.  So let's -- You referenced a number of

2    different terms.  Let's see if we can walk through those at

3    least briefly.

4    A.  Okay.

5    Q.  So you mentioned the commission?

6    A.  Yes.

7    Q.  The commission was 30 percent?

8    A.  Yes.

9    Q.  What was Simon & Schuster's position on that?

10   A.  Our position was, why do you need 30 percent?  Once you get

11   the website set up, you don't have very many costs; so, you

12   know, we'd like more of it.

13   Q.  And do you recall what Apple's response was at the time?

14   A.  Their response was, that's the percent we do for all of our

15   businesses and that only gives us a one percent profit in the

16   store, and we can't go less than that.

17   Q.  All right.  And did you do any type of diligence to

18   determine whether or not you thought that position on the part

19   of Apple was reasonable?

20   A.  Absolutely.  I called -- I had someone on my staff speak to

21   music companies, and I spoke to Paramount Pictures.

22   Q.  All right.  And what conclusion did you reach after that in

23   terms of the -- how did that manifest itself in terms of

24   your --

25   A.  The conclusion was that, in fact, what they were telling us

D65PUSA4                        Reidy - cross

1     was true, and 30 percent was their standard fee for putting

2     goods on the book -- on the iTunes store.

3     Q.   And so that -- was that the reason why then you agreed to

4     that term?

5     A.   Yes.

6     Q.   Okay.  So let's talk about the price caps.  Why don't we

7     put up Exhibit 246.  If you could look at 246, which is the --

8     this will tell us the final date, I believe.

9     A.   PX?

10    Q.   I'm sorry, it's DX.

11    A.   Oh.

12    Q.   And if we go to the signature page, it looks like your

13    testimony is correct, it was January 25th.

14              So what I wanted to do was see that -- if we go to

15    Exhibit A?

16    A.   Yes.

17    Q.   And these are the final price caps that were agreed to; is

18    that --

19    A.   Correct.

20    Q.   -- correct?  All right.  What was your -- What was Simon &

21    Schuster's position about the price caps?

22    A.   What we basically wanted was that the price cap would never

23    be -- let me make sure I get this right -- would never be

24    greater than 50 percent of the retail price of a hardcover.  So

25    if it's $25, the cap would be 12.50, and in some of these

D65PUSA4                         Reidy - cross

1    cases, the caps are lower than that.

2    Q.  And initially did you have concerns with the caps at all or

3    at least initial caps that were proposed?

4    A.  Well, oh, the initial caps were worse than this.  I mean

5    there were fewer -- there was fewer gradations, and they

6    stopped at, I believe, the 14.99, and we already had a lot of

7    books that we were publishing that were higher than that.

8         So the initial price caps that were given to us, there

9    were a smaller number of them, there were fewer breaks between

10   the pricing, and they also, originally -- when they were first

11   given to us, I don't think it talked only about new releases,

12   and we wanted to get backlist and a lot of other things

13   exempted out of it.

14   Q.  So I take it that Apple and Simon & Schuster had different

15   positions on the price caps?

16   A.  At the beginning, yes.  All the way probably until the end.

17   Q.  Right.  At the end, you accepted this deal.  Was it one

18   that you were fully satisfied with on the price caps?

19   A.  No.

20   Q.  And why not?

21   A.  Because I would like to have had the option to price

22   higher.

23   Q.  But in this context, Apple insisted upon the price caps

24   that are in this agreement?

25   A.  Yes.

1   Q.  Was there negotiation back and forth?  Did you obtain some

2   concessions?

3   A.  Yes, there was definitely negotiation back and forth.

4   There were an additional, you know, gradations put in.  There

5   was more put in for the top.  There was completely no moving

6   over $40.  There was the backlist was not included, and we were

7   able to get basically, you know, print on demand, a whole

8   portion of our business where this did not make sense as a

9   business practicality, which are mostly small either print on

10  demand or very small printings of books that we didn't have to

11  follow the grids.

12          THE COURT:  Excuse me just one second.  Ms. Reidy, I

13  want you to make sure you wait until the question is completed

14  before you answer so the court reporter is just taking down one

15  person at a time.

16          THE WITNESS:  Okay.  Thank you.  Sorry.  Apologies.

17  Q.  Did you understand -- What was your understanding about

18  Simon & Schuster's ability to price below the price caps?

19  A.  We had complete freedom to price below the price caps any

20  way we wanted, any time we wanted.

21  Q.  What were -- If you can give an example of a circumstance

22  where you'd want to price below a price cap?

23  A.  You could have an author that you're introducing into the

24  market, and if you think that if you low price the eBook, you

25  could help to build an audience for it.  People might not want

1    to pay 12.99 to try a new author.

2            You could have an author where you publish three book,

3    and they've just never quite taken hold, and so you're trying

4    to give their sales a boost.

5    Q.   That would be an example?

6    A.   Yes.

7    Q.   But you've described your understanding, then, of how the

8    price tiers and price caps were?

9    A.   Yes, and we immediately started doing it that way.

10   Q.   Fine.  You also mentioned -- And so each of these things

11   that I've talked about so far, the commission split and the

12   price caps were items that you specifically were involved in

13   and would have had discussions with people at Apple directly?

14   A.   Yes.

15   Q.   So another thing you mentioned was the MFN?

16   A.   Yes.

17   Q.   Right?  And you've testified about the MFN.  Did you work

18   to obtain modifications of the MFN?

19   A.   Yes, I did.

20   Q.   Did you ever just push back entirely on the MFN?

21   A.   Yes.

22   Q.   And why did you do that?

23   A.   Because as a business -- as a company sort of policy, we

24   don't like to sign MFNs of any sort.

25   Q.   And what were the -- Why don't you like to sign MFNs?

1   A.  Because we don't like any entity we deal with or that's

2   partnered with us basically constricting what we're allowed to

3   do.

4   Q.  Is that similar to what you said before on the issue of

5   what kind of relationships you might have with other retailers?

6   A.  Yes.

7   Q.  Is the rationale the same?

8   A.  Yes, the rationale is the same.

9   Q.  And is that a principle that you adhere to across your

10  company in general?

11  A.  Yes.

12          MR. BUTERMAN:  Objection.

13          THE COURT:  Overruled.

14  Q.  In this case, you agreed to an MFN, right?

15  A.  Yes.

16  Q.  And did you negotiate any exceptions?

17  A.  Yes.

18  Q.  All right.  Let's take a look at Exhibit 246 and let's go

19  to --

20  A.  What are we looking at, I'm sorry?

21  Q.  It would be DX246.

22  A.  Yes.

23  Q.  And if you could turn to, in the document, it looks like

24  it's Page 5 of 18, and it is paragraph 5(b).

25  A.  Yes.

D65PUSA4                          Reidy - cross

1    Q.  Is paragraph 5(b) the MFN?

2    A.  Yes.

3    Q.  And so the first part references that -- it says, "If Apple

4    notifies publisher that an eBook of a hardcover new release is

5    available in the United States for a customer price that is

6    lower than the then-current customer price, then publisher,

7    subject to being made aware of such lower price, hereby

8    automatically sets a new lower customer price to meet such

9    lower customer price for so long as such lower price is in

10   effect;" do you see that?

11   A.  Correct; mmm, hmm.

12   Q.  And you read that at the time?

13   A.  Yes.

14   Q.  And what was your understanding of that provision --

15   A.  The understand --

16   Q.  -- of that part?

17   A.  Right.  My understanding of that provision is if we have a

18   customer, for instance, who's not on agency, so we're not

19   controlling the price, and they price it lower, Apple is -- we

20   have to match that price to keep Apple on an even playing field

21   for commercial reasons.

22   Q.  Is the matching always -- is it in one direction, meaning

23   down?

24   A.  Well, though it does say lower, but I guess we never

25   assumed it's probably higher, but there are all of these

D65PUSA4                          Reidy - cross

1    exceptions to it too.

2    Q.  Right.  So let's look at the exceptions.  You negotiated

3    exceptions.  What was your purpose in attempting to negotiate

4    exceptions?

5    A.  I understood the basic business reason Apple wanted the

6    MFN, which is you couldn't -- they were going to enter a market

7    and all of a sudden you could have it so that since we

8    controlled their price.  In the wholesale world, we don't

9    control the retail price.  So they couldn't enter an agreement

10   whereby we could disadvantage them in every single book they

11   sold.

12            So after working it through, because we didn't like it

13   originally.  We understood why they wanted it, but then there

14   are all these reasons, these other things where we did not feel

15   that we should have to be -- that the general MFN, where we

16   control the price, should necessarily hold sway.

17   Q.  All right.  So if we can walk through them, I don't want to

18   go into great detail, but there's the first one references if

19   such availability, I assume of a lower price is in contractual

20   breach of publisher's rights?

21   A.  Right.  So if that's the case if we do have another person

22   we're working with on the price and someone under prices it

23   against our will and our control, we have 72 hours to cure it

24   so that we don't have constant price changing because someone

25   made a mistake.

D65PUSA4                          Reidy - cross

1   Q.  There's then a reference to, if such price represents a

2   one-time limited -- limited-time promotional offering, could

3   you explain that?

4   A.  That gives us the ability to do a promotion with Apple or

5   with another account and to have a one-time promotion, a

6   marketing -- ability to market a book on somebody's site and

7   not have to match it with Apple.

8   Q.  Does that -- Would that allow you to do special promotions

9   without having to offer it to everybody?

10  A.  Yes.

11  Q.  All right.  Then it says, if such price is not available on

12  an ala cart basis?

13  A.  That was with the concept that there could be something

14  like a book club or a subscription, none of which we currently

15  had done or do, but left us open the option of doing that.

16  Q.  All right.  Then it looks like there's another one that

17  references a book club, and then finally, if such price is a

18  result of a promotional discount that would be permitted to

19  Apple under (f).  So that was another --

20  A.  Yes, that's iTunes.

21  Q.  And so you described the process where you figured out and

22  tried to understand what the MFN was about and then negotiate

23  the exceptions.  Were there any exceptions that you requested

24  that Apple didn't do?

25  A.  Not that I recall.

D65PUSA4                          Reidy – cross

1    Q.  Was a part of the reason why you negotiated this exception

2    is that you believed the MFN would be operated?

3              MR. BUTERMAN:  Objection.

4              THE COURT:  Sustained.

5              THE WITNESS:  Does that mean I don't answer?

6              THE COURT:  That's right.

7              THE WITNESS:  Okay.  Sorry.

8    Q.  I must rephrase the question in order for you to answer.

9              What was your purpose then in negotiating these

10   exceptions going forward?

11   A.  The purpose in negotiating these was to give us flexibility

12   in dealing with other retailers and other accounts, but as I

13   said, also to protect us for if we -- if other accounts made a

14   mistake -- were under agency also and made mistakes in their

15   pricing or tried to just underprice against our will; so....

16   Q.  Okay.  Thank you.  During the time, I think shortly before,

17   you can clarify this, you signed the Apple contract, did you

18   contact Amazon?

19   A.  Yes, I did.

20   Q.  And why did you contact Amazon?

21   A.  Because I wanted to contact them as soon as we had actually

22   made the decision to sign the Apple agreement.  I felt that

23   since they were our largest digital account, that we should

24   notify them that we were going to be wanting to change the

25   business terms under which we operated with them.

1    Q.  All right.  Did you tell Apple that you were contacting

2    Amazon?

3    A.  Not to my recollection, no.

4    Q.  Do you recall providing any information to Apple regarding

5    your communications with Amazon?

6    A.  No.

7    Q.  Did Apple ever provide you any information regarding any

8    other publishers' dealings with Amazon?

9    A.  No.

10   Q.  So you spoke to Amazon then shortly before you signed the

11   Apple contract?

12   A.  Correct.

13   Q.  And what was the response from Amazon?

14   A.  It was Russ Grandinetti I spoke to, and his first response

15   was, I'm not entirely surprised to hear this; second was, would

16   you consider having agency for, you know, a period of time and

17   then go back to wholesale?  In other words, a hybrid model of

18   some sort.

19        I believe I said, well, we'll look at it, but I can't

20   really see how that would work, and he might have asked me

21   another question then.  There was a memo but, anyway, then he

22   hung up.  Then he called me back two times after.  The second

23   time he asked more questions about how it would work, and then

24   the third time he called up and threatened our business.

25   Q.  And you said you wrote a memo about that.  We could put

1    DX233 up.  Is that the memo?

2    A.  Yes, that is the memo.

3    Q.  And so I just wanted to, you know, put it up here.  I don't

4    think we need to go through it in any detail, but you said that

5    your business was threatened, and in what manner?

6    A.  He said, well, if you're going to do this, we're going to

7    have to look at our whole business.  If we can't sell you

8    digital books the way we want, maybe we shouldn't be selling

9    any of your books.  We'll just have to look at everything.

10   Q.  Now, then --

11              THE COURT:  Excuse me just one second.

12              MR. FLOYD:  Sure.

13              THE COURT:  Yes, thank you.

14   Q.  We can take a quick look at the document.  Does the first

15   sentence on the -- the last sentence on the first page under 2

16   reflect what was said by Mr -- it was Mr. Grandinetti?

17   A.  Yes.  Yes, it does.

18   Q.  He said Amazon had to ask itself if it could not buy

19   digital books on standard terms, why would it buy any books;

20   maybe it should just become a used book seller?

21   A.  Yes, that is what he said.

22   Q.  So then just to make sure I understand, then.  You called

23   Mr. Grandinetti and then he called you back, you said, twice?

24   A.  Yes.

25   Q.  All right.  Then what was the next communication that you

D65PUSA4                    Reidy - cross

1   had with Amazon, if you can recall, on this issue of --

2   A.   Right.   What I recall is him calling me, him calling me and

3   saying that they were sending us a contract, and he wanted just

4   to be clear that if we were going to go this way, what he

5   wanted was we were going to have to devote ourselves to

6   negotiating seriously and quickly.

7           And he meant, he said, with John Sargent we negotiated

8   over the weekend, Sundays, late at night, early in the morning,

9   it didn't matter.   You have to make yourself available.   I said

10  I would, and he said, we care about parity, we care about day

11  and date, and we care about that the Amazon customer is never

12  disadvantaged, and there were possibly about two other points

13  like that.

14  Q.   By Amazon customer never disadvantaged, is that an MFN?

15  A.   Yes, it was, and not just on pricing.

16  Q.   Meaning what?

17  A.   Promotions, everything.

18  Q.   So between the last conversation you had with

19  Mr. Grandinetti, you described that was I think referenced in

20  Exhibit 233, and the next communication that you had at all

21  with Mr. Grandinetti was with this proposal?

22  A.   Yes.

23  Q.   In the --

24  A.   To my memory.   To my memory.

25           THE COURT:   And I'm going to ask you, Miss Reidy, to

1    wait until the question is finished.

2              THE WITNESS:  I'm sorry.

3              MR. FLOYD:  I'll back up and try that one again.

4    Q.  So you described the conversations you had with

5    Mr. Grandinetti at or around the January 23rd time frame and

6    then the next conversation was initiated by Mr. Grandinetti

7    with a proposed agency contract coming?

8    A.  Yes, I believe, to the best of my recollection.

9    Q.  And then you described in general your recollection of what

10   the specifics of what he said to you at that time?

11   A.  Yes.

12   Q.  All right.  So then what happened after that, vis-a-vis

13   Amazon?

14   A.  We then began intense negotiations with Amazon over their

15   agency agreement contract.

16   Q.  Did you inform Apple that you were engaging in intense

17   negotiations with Amazon over an agency agreement?

18   A.  Not to my recollection, no.

19   Q.  Did you report to Apple after you completed the agency

20   negotiations?

21   A.  Not to my recollection, no.

22   Q.  Before we broke for lunch, I asked you for some of the

23   reasons why you wanted to do business with Apple other than to

24   regain pricing control over your intellectual property; do you

25   remember that?

1    A.  Yes.

2    Q.  I think it went a little fast in terms of the testimony; so

3    I'd like to walk through it a little bit more slowly, if that's

4    all right?

5    A.  Okay.

6    Q.  Now, so you first you mentioned the number of potential

7    customers at iTunes?

8    A.  Yes.

9    Q.  And I think you said 120.  I'm not sure that you meant 120.

10   A.  I said 120 million.  I meant, that's what I meant.

11   Q.  Great.  And so that was part of it.  Now, did you reference

12   anything or picture books or enhanced eBooks?

13   A.  Yes.

14   Q.  Could you explain that?

15   A.  Well, from what they had said about the new machine, that

16   they would not describe in any detail because, of course, it

17   was top secret, they just said, we've never done a machine that

18   didn't have color functionality and didn't have touch

19   capability and didn't have, you know, the things that were

20   already on the iPhone.  Or they didn't say that.  They

21   described them, and that became clear that, therefore, the

22   whatever machine was coming, which didn't have a name or

23   anything at that point, would likely have the very same things.

24           And we asked, does that mean it will be able to, you

25   know, show color and, therefore, children's books and other

1   things, which the current e-readers on the market could not do.

2   Q.  Why was that something that was of interest or value to

3   Simon & Schuster?

4   A.  Well, we have a large children's business.  We believed

5   that, again, this makes for -- it broadens the market for the

6   product we have by making it accessible also to people who

7   don't have to go buy -- go into a bookstore and buy a book.

8           In fact, several members of our staff, who have

9   children, said if this is what they're talking about, you know,

10  I can just see myself handing it to my kid in the back seat and

11  saying, here, entertain yourself.  So it seemed like a market

12  opportunity to us.

13  Q.  A market opportunity that was not then currently available?

14  A.  Right, because the e-readers were just black and white and

15  not very good quality screens.

16  Q.  So in that area, at least, would these be sales that you

17  were not able to capture at all in a digital market?

18          MR. BUTERMAN:  Objection.

19  A.  Yes.

20          THE COURT:  Sustained.

21  Q.  Well, let's go back up, then.  You describe that the

22  existing e-readers, the black and white e-readers, were not

23  able to display the children's books in the way you described?

24  A.  We had put some children's books into E form to look, and

25  they looked so terrible, we stopped doing it and we took them

D65PUSA4                         Reidy - cross

1    down.  So there was, at that time, no market for illustrated

2    children's books in e-readers.

3    Q.  So what was your expectation, then, at this time, of what

4    the -- being able to launch books on the Apple iPad, the

5    software that Apple put up?

6    A.  Well, our frame of reference were the phones, and so we

7    assumed that you would get that kind of great color resolution

8    and be able to see the books on the new machine at that quality

9    level.

10   Q.  And if things subsequently panned out as you hoped in terms

11   of the functionality of the iPad and iBooks software?

12   A.  Yes, indeed.  In fact, they've made improvements, in fact,

13   all along the way.

14   Q.  I think you mentioned something about marketing links to

15   authors' other books?

16   A.  Yes.

17   Q.  Is that -- and could you explain that?

18   A.  Even in the very first meeting, as my notes reveal, they

19   talked about the ability to link from the iTunes store to, for

20   instance, our store, where we have videos and other things of

21   authors available for consumers that want to see further.

22       In addition, they talked about linking to the authors'

23   other books within the store and also within the books.  So

24   that if you read a Vince Flynn novel and you get to the end and

25   you liked it, you could literally push a button and order the

1    next one.  So anything that makes for ease of ordering, as far

2    as we're concerned, is a plus.

3    Q.  And you said another place to sell books?

4    A.  Yes.

5    Q.  And was that -- Well, maybe you can describe, in terms of

6    Apple's, specifically why having the Apple iPad and what would

7    be the bookstore, what would be the value -- sorry, I led you

8    astray as I almost -- I paused there.  Let me just start over.

9           What was there in particular about the opportunity

10   that Apple was providing as another place to sell books that

11   was of appeal to you?

12   A.  Well, the first meeting Eddy Cue said that Apple was going

13   to launch this machine with a $10 million advertising campaign,

14   that they hoped publishers would share with them, meaning

15   split, to which I said, you know -- or, no, he thought

16   publishers should give $10 million towards the marketing

17   campaign.

18          If you've seen all the other publishers, has no one

19   told you that's not going to happen?  We don't have that kind

20   of money.  So the part of it was they would be advertising this

21   machine with hundreds of millions of dollars probably, books

22   would be featured, at least in it in some way, and all of that

23   is like urging people to read books, which is merely a huge

24   plus to our market.

25          In addition, we saw the popularity of online book

D65PUSA4                    Reidy - cross

stores through Barnes and Noble and Amazon, and to have another

strong contender out there also offering books for sale, it

just gets us in front of more consumers and, therefore, there's

an opportunity for more sales.

Q.  All right.  And those are at least the things I have notes

on.  Are there anything else now, sitting here, that you

would -- at the time, that you thought were reasons why you

wanted to enter into a deal with Apple other than the pricing

issues?

            THE COURT:  Other than the?

            MR. FLOYD:  Pricing issues that she had described.

A.  I think that's enough.  I can't remember any others.

            MR. FLOYD:  Take a brief moment.

Q.  If we can go back for a moment to Exhibit 233, DX233,

there's a reference on the second page of the e-mail memo where

it says, "Amazon always wants the most complete consumer

experience."  Did you understand -- What did you understand

that to mean?

A.  Amazon is a very customer-centric company.  They talk --

they say that all the time, and their behavior shows it.  So

they always want -- what he meant by that was, you know, we

will fight to make sure we give the consumer the best --

because this is when he was being aggressive and negative to

me, to give them the best possible -- by experience, in this

case, he was also talking about price.

1   Q.  All right.  When you negotiated with Amazon, did you

2   disclose any of the terms of your agreement with Apple?

3   A.  No.

4   Q.  You testified about an e-mail that your -- a lawyer for

5   Simon & Schuster had written in connection with viewing the

6   Mossberg -- with the clip that we saw?

7   A.  Yes.

8   Q.  Right.  And you testified -- Well, let's first -- let me

9   back up.

10          And in that, there was Mr. Jobs saying in response to

11  a question, that prices will be the same?

12  A.  Yes.

13  Q.  Do you remember that?  Now, you testified that your

14  understanding of the statement, right, this morning, and what

15  did it relate -- did it relate to the MFN?

16  A.  I believe that's what he was referring to.

17  Q.  Why did you think that?

18  A.  Because I knew that was in the contract.  So that if Amazon

19  was still on wholesale and priced it lower, we had to match

20  that price.  So the prices would be the same.

21  Q.  So well, how would that work if -- so if there was a book

22  that was on Apple that was at 12.99 or 14.99 and at 9.99 on

23  Amazon, what would happen then, based on the MFN?

24  A.  Well, provided that Amazon was still in the wholesale model

25  and was not mispricing our book, what would happen is we would

1    have to feed to Apple the 9.99 price for that book.

2    Q.  All right.  And then on, on that date, which was the date

3    of the launch of the iPad, Simon & Schuster was on wholesale

4    with Amazon, right?

5    A.  We were still on wholesale with Amazon but the live date of

6    the iBookstore was our goal date for going agency with Amazon.

7    Q.  Right.  And you had not described any -- you had not

8    informed Apple of any communications that you had with Amazon?

9    A.  Not to my recollection.

10         MR. FLOYD:  Thank you, Miss Reidy.  I have no more

11   questions.

12   REDIRECT EXAMINATION

13   BY MR. BUTERMAN:

14   Q.  Good afternoon, Miss Reidy.

15   A.  Good afternoon.

16   Q.  I just have a few questions for you.  Miss Reidy, you

17   mentioned a few moments ago that Mr. Cue had made a request of

18   Simon & Schuster to pay money towards a marketing campaign in

19   connection with the launch of the iPad; is that correct?

20   A.  Well, he talked about in general.  This was in the very

21   first meeting.

22   Q.  And your response was, what did the other publishers say?

23   That was your testimony, correct?

24   A.  No.  My question was, didn't any other publisher tell you

25   that's not going to happen.

D65PUSA4                          Reidy - redirect

1   Q.  You were asking him what the other publishers had told you?

2   A.  It was a rhetorical question.

3   Q.  Okay.  Now, turning back to -- you mentioned earlier in

4   your testimony with Mr. Floyd that doing a deal with Apple

5   would make Simon & Schuster more money; do you recall that

6   testimony?

7   A.  I don't recall what it was in response to.

8   Q.  Do you recall saying that doing a deal --

9   A.  I assume it -- I must have meant -- I'm not supposed to

10  assume.

11  Q.  Let's --

12  A.  I would have you have to tell me the context, sorry.

13  Q.  I just had written down what you had said.

14  A.  Sorry.

15  Q.  Let's make sure that we're on the same page.  In fact, by

16  doing a deal with Apple, you were making less money per book,

17  correct?

18  A.  Yes.

19  Q.  And, in fact, you were taking a hit at Amazon which was, at

20  the time, the retailer responsible for the most significant

21  portion of your eBook sales, correct?

22  A.  Correct.

23  Q.  Okay.  So you weren't making more money with Apple,

24  correct?

25  A.  We were making more money if the market got bigger.

D65PUSA4                          Reidy - redirect

1   Q.  It would have to get pretty big in order for you to make up

2   all the money that you were losing off Amazon, correct?

3              MR. FLOYD:  Object to the form.

4              THE COURT:  Overruled.

5              THE WITNESS:  That means I do answer?

6              THE COURT:  Yes.

7              THE WITNESS:  I'm sorry.

8   A.  Yes.

9   Q.  And you were making less money per book even though the

10  prices of the books were going up to consumers, correct?

11  A.  Correct.

12  Q.  You also mentioned that Amazon's pricing was inhibiting the

13  development of the eBook world.  Do you recall that testimony?

14  A.  Yes.

15  Q.  Miss Reidy, isn't it true that one of the reasons why Simon

16  & Schuster wanted higher eBook prices was because it was

17  interested in slowing eBook growth -- and let me finish the

18  question -- and thereby protecting its much more valuable

19  physical business?

20  A.  Although it's entirely possible there's some piece of paper

21  where I say something like that, that was not in any way our

22  motivating -- anything that motivated us.  It was more --

23  again, it was the differential between the two.  We didn't want

24  to chase consumers to one or the other because, in fact, the

25  physical business is not necessarily more profitable.

1  Q.  Isn't it true, Miss Reidy, that one of the reasons why you

2  liked the Apple deal is because the Apple deal would cause

3  eBook prices to go up, which would slow eBook growth?

4  A.  No, I don't believe so.

5  Q.  Miss Reidy, I've handed you what's been marked as PX164.

6  A.  Yes.

7  Q.  And PX164 contains your handwriting, correct?

8  A.  Yes.

9        MR. BUTERMAN:  Your Honor, there was a foundation

10  objection based on the handwriting.

11        MR. FLOYD:  Withdrawn.

12        THE COURT:  PX164 is received.

13        (Plaintiff's Exhibit 164 received in evidence)

14  Q.  And, Miss Reidy, this handwriting, these notes were taken

15  on the part of the January 4th term sheet that Mr. Cue had

16  provided to you, correct?

17  A.  Correct.

18  Q.  And you see right under Mr. Cue's name --

19  A.  Yes.

20  Q.  -- it says -- am I right that it says, "All say these

21  prices too low;" do you see that?

22  A.  No, it says "all say must be less hardcover."

23  Q.  And then what does it say underneath?

24  A.  "These prices too low."

25  Q.  Now, Miss Reidy, you said a moment ago that you weren't

D65PUSA4                    Reidy - redirect

1    interested in or -- sorry.  Let me take that back.

2              You testified a moment ago that one of the reasons

3    that you wanted to do the deal with Apple was not because it

4    would lead to higher prices, which would slow eBook growth,

5    correct?

6    A.  Correct.

7    Q.  Okay.  Can you flip to the back of the page, and can you

8    blow that up, please.  Miss Reidy, did you write on the back of

9    this document "higher prices slow eBooks"?

10   A.  Yes.

11   Q.  And also "keeps retailers, stops authors leaving"?

12   A.  Yes.

13   Q.  These were benefits that you saw from doing a deal with

14   Apple, correct?

15   A.  I have no idea.

16   Q.  These are your handwritten notes?

17   A.  It is my handwriting.

18   Q.  Now, Miss Reidy, you mentioned in response to a question by

19   Mr. Floyd that on December 21st, when you spoke with Mr. Cue,

20   you gave him no commitments with respect to what Apple --

21   excuse me, with respect to what Simon & Schuster was going to

22   do, correct?

23   A.  Other than continue the conversations, yes.

24   Q.  But isn't it true that Mr. Cue told you that you needed to

25   move all your other retailers to an agency model during that

D65PUSA4                        Reidy - redirect

1   conversation?

2   A.  It was in the e-mail, yes.  I don't know about the -- I

3   don't remember about the conversation, I'm sorry, but it's in

4   the e-mail.

5   Q.  Do you want to go back to your notes, your writeup of that

6   12-21 conversation?  Would that help you?

7   A.  Yes, it might.

8   Q.  Okay.  So let's see if we can find that real quickly.  I

9   believe it's PX540.  Do you have PX540, Miss Reidy?

10  A.  Yes.  Oh, yes, he did.

11  Q.  And am I correct, Mr. Cue told you that you'd have to get

12  everyone else to the agency model?

13  A.  Yes.

14  Q.  And your response was, if we make these our terms, then

15  they are our terms?

16  A.  Right, it says --

17  Q.  Did it --

18  A.  But it says "if."

19  Q.  So that's not a commitment, in your view?

20  A.  In my view, it is not.

21  Q.  Is it a commitment that if you do a deal with Apple, that

22  you're going to give them this?

23  A.  That's what it implies.

24  Q.  Okay.  Could you turn --

25            THE COURT:  Excuse me one second.

1          MR. BUTERMAN:  Sorry.

2          THE COURT:  Thank you.

3   Q.  Miss Reidy, could you turn to PX159?

4   A.  Yes.

5   Q.  And Mr. Floyd was asking you about Page 2 that begins with

6   pricing; do you see that?

7   A.  Yes.

8   Q.  And do you see that you wrote down there, "So there's the

9   line that says 12.99 and 14.99 okay with them," which we

10  established was okay with Apple, correct?

11  A.  Yes.

12  Q.  And then two lines down it says, "can't be less elsewhere,"

13  correct?

14  A.  Correct.

15  Q.  Okay.  Could you look at in the binder that Mr. Floyd gave

16  you, DX233?

17  A.  Yes.

18  Q.  And Mr. Floyd read you the sentence that begins at the end

19  of the first page regarding maybe Amazon should just become a

20  used book seller; do you recall that?

21  A.  Yes.

22  Q.  Okay.  And the next sentence reads, "Amazon finds the

23  agency model very difficult to contemplate;" do you see that?

24  A.  Yes.

25  Q.  And so isn't it true that Amazon found the price increases

1    that would be resulting from the move to agency so difficult to

2    contemplate that Amazon was even considering, rather than

3    giving in to an agency model, getting out of the new release

4    eBook business?

5    A.  I don't know what Amazon was thinking.

6    Q.  But that's what they told you?

7    A.  I considered this more a threat to us than that they were

8    considering getting out of the business.

9    Q.  But it is what they told you?

10   A.  What -- It's a question.  It's not a....

11            THE COURT:  I'm sorry?

12            THE WITNESS:  He said, as a question, if we can't get

13   digital books the way we want, maybe we should become a used

14   book seller only, you know.  To me, that's like a question.

15   That's what we had to think about, which is what he said.

16   Q.  Now, Miss Reidy --

17   A.  Mmm, hmm.

18   Q.  -- could you look back at DX246, which is your contract?

19   A.  Yes.

20   Q.  And I'd like you to go back and look at Exhibit A, which is

21   Page 16 of 18.

22   A.  Yes.

23   Q.  I believe you testified that the price tiers that exist in

24   this contract are not the initial price tiers that Apple

25   proposed to you; is that correct?

D65PUSA4                          Reidy - redirect

1    A.   Yes.

2    Q.   And, in fact, some of these price tiers are higher than the

3    price tiers Apple initially proposed to you, correct?

4    A.   Yes.

5    Q.   And so as part of the negotiation process, Apple gave you

6    higher prices, the ability to charge higher prices than you

7    initially -- they had initially offered to you, correct?

8    A.   They gave us some higher price caps, yes.

9    Q.   And in exchange, during the course of the negotiation, you

10   gave Apple, as a quid pro quo, certain things that you

11   initially did not want to give to Apple, correct?

12   A.   Well, I'm not sure it was a quid pro quo for the changes in

13   the grids.  I mean, as a negotiation, you're talking about all

14   the things at once.

15   Q.   So in the negotiation there were things that you wanted and

16   there were things that Apple wanted, correct?

17   A.   Correct.

18   Q.   You wanted higher price tiers, correct?

19   A.   Right.

20   Q.   Apple wanted an MFN, correct?

21   A.   Yes.

22   Q.   And so you gave Apple an MFN, and they gave you higher

23   price tiers, correct?

24   A.   Yes, but they were not necessarily connected.

25   Q.   You didn't want to give Apple an MFN, correct?

1    A.  If I had my choice, I wouldn't have price tiers either.

2    I'd have minimum price maintenance.

3              MR. BUTERMAN:  No further questions, your Honor.

4              MR. FLOYD:  Your Honor?  Okay.  Thank you.

5    RECROSS EXAMINATION

6    BY MR. FLOYD:

7    Q.  If you could look at what was just put in front of you,

8    which was PX164, and on --

9    A.  Yes.

10   Q.  And on the --

11             THE COURT:  I'm sorry.

12   A.  Which one?

13   Q.  PX164.

14   A.  Oh, the extra sheet?

15   Q.  Right.  It was just put in front of you in the re,

16   re-direct or recross, excuse me.  And there's on the left-hand

17   side, near the bottom, there's a "Jobs."  Could you read that?

18   A.  It says "Jobs" and then it says, "makes 9.99 the right

19   price?"

20   Q.  Do you recall what you were referring to there?

21   A.  These notes are a combination of things I wanted to say and

22   things -- and things that Eddy Cue said in his conversation

23   with me.  So there's a mixture here.

24             And I believe when we were going through the whole

25   pricing conversation, he said, and in looking at things, you

D65PUSA4                          Reidy - recross

1    know, that Steve Jobs even said, at one point, well, maybe 9.99

2    is the right price.  I believe that's what it means.

3              MR. FLOYD:  Thank you.

4    REDIRECT EXAMINATION

5    BY MR. BUTERMAN:

6    Q.  Miss Reidy, despite the fact that Mr. Cue told you that

7    Mr. Jobs might believe that 9.99 was the right price, Mr. Cue

8    gave you the ability to price much higher than that, correct?

9    A.  Correct.

10             MR. BUTERMAN:  Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D659usa5                              Reidy

1           THE COURT:  Are we done?

2           MR. FLOYD:  We are done, your Honor.

3           THE COURT:  Okay.  Ms. Reidy, give me a moment,

4      please.

5           THE WITNESS:  Yes.

6           (Pause)

7           THE COURT:  Can I ask, Ms. Reidy to look as PX159.

8           THE WITNESS:  Yes.

9           THE COURT:  And the second page.  You've been asked a

10     lot of questions about these comments concerning pricing.  And

11     there's a line there that says, "12.99 and 14.99.  Okay with

12     them."

13          The "them," I believe you have testified, refers to

14     Apple.

15          THE WITNESS:  Yes.

16          THE COURT:  Who mentioned these numbers?  Are these

17     numbers that you're mentioning to Apple in that meeting?  And,

18     again, this is your first meeting with Apple, the meeting with

19     Mr. Cue and others on December 16.  Or did Apple first mention

20     those specific prices to you?

21          THE WITNESS:  Unfortunately, I don't recall.

22          THE COURT:  I wonder if the government could put up

23     two demonstratives that you used in your opening statement and

24     I believe you're going to be offering at some point if you

25     haven't already at this trial.  The first is the bar chart with

 1    the telephone conversations in mid-December.

 2              MR. RYAN:  Excuse me, your Honor.

 3              THE COURT:  And the second would be what I refer to as

 4    the spiderweb.

 5              MR. RYAN:  We don't have it in the computer but we

 6    have paper we can put up on the ELMO.

 7              MR. FLOYD:  We can put it up for you if you'd like.

 8              THE COURT:  Thank you.

 9              So this was a chart that the government prepared, as I

10    understand it, from one of the documents that you saw during

11    your examination today that reflected a lot of phonecalls among

12    publishers during a critical period of time here between

13    December 1 and January 31.  So that's December of '09 and

14    January of 2010.  And it shows the volume of calls among

15    publishers.  These are five of the six who signed agency

16    agreements with Apple.  And as you can see from the

17    demonstrative here, the number of calls spikes on certain days

18    and the little boxes that describe key events that were

19    occurring.  I just want to make sure you have a chance to look

20    at that.

21              THE WITNESS:  Yes.

22              THE COURT:  And then if we could switch to the

23    spiderweb.  And you'll see you're pretty prominently featured

24    there.  This is another demonstrative taking those same

25    phonecalls.  And each line is a single call during this same

D659usa5                          Reidy

1    period of time.

2            So the first chart shows the volume of calls grouped

3    around certain days as they occurred.  And the second one shows

4    graphically who the calls were between during these two months.

5            As you can see you and Mr. Young had frequent

6    communication.  And you had, looks like the second highest

7    number of phonecalls were -- that you were involved in were

8    between you and Mr. Shanks.  And then you had fewer calls with

9    Mr. Sargent and Mr. Murray.

10           THE WITNESS:  Correct.

11           Can I comment on that?

12           THE COURT:  And then I'd like you to look at DX233.

13           THE WITNESS:  Yes.

14           THE COURT:  And in the first full paragraph it says

15   "We are final licensing the Apple contract this weekend and

16   expect to sign it on Monday.  It appears they have reached

17   agreement with four of the five major publishers in time for

18   the announcement next Wednesday -- from what I can gather,

19   Random House and HarperCollins will not be part of the

20   announcement, but Penguin, Hachette, and Macmillan will be,

21   along with us."

22           And this is a January 23 memorandum that you're

23   writing or I should say I guess it's an e-mail from you to

24   Mr. Moonves the person to whom you reported.

25           THE WITNESS:  Yes.

D659usa5                         Reidy

1          THE COURT:  You had not yet signed your agreement,

2    agency agreement with Apple.  That happened two days later on

3    January 25.

4          THE WITNESS:  Correct.

5          THE COURT:  So, what was your basis for saying that

6    Penguin would also be entering into an agency agreement with

7    Apple?

8          THE WITNESS:  I actually came at it the other way.

9    Eddy had told me he had three others, or it looked like he was

10   going to have three others.  And my assumption was of the two

11   who were not going to be in.  If you understand what I mean.

12   So then I assumed that Penguin, Hachette, and Macmillan would

13   be.

14         THE COURT:  And so who told you Random House would not

15   be?

16         THE WITNESS:  No one gave me the names.  Eddy at one

17   point had said something like he was having difficulty with the

18   bigger or biggest.  And since Random House is the biggest

19   publisher.

20         And also because their head of digital matters was

21   someone who had recently come from Amazon, I made the

22   assumption that Random House was one that was not going in.

23         THE COURT:  And how about HarperCollins?

24         THE WITNESS:  That came out of a fact that in talking

25   about the price caps, and my frustration about them with Eddy.

D659usa5                          Reidy

He said well you've got -- some of your competitors want to go

crazy with pricing.  And from things that I had heard at

various and sundry times, I assumed that was Brian Murray.  And

so I assumed that Harper was the second that wasn't going to do

it because they thought the price caps were too low.

THE COURT:  And what had you heard about Mr. Murray's

position on price caps that led you to believe that

HarperCollins was not going to sign the agency agreement.

THE WITNESS:  I didn't hear about it on price caps.  I

just knew he was the most -- in any time I ever heard anybody

talking about what the pricing of eBooks should be, he was the

most aggressive.

THE COURT:  In terms of wanting the highest prices?

THE WITNESS:  Yes.

THE COURT:  So no one told you, either at Apple or

HarperCollins or any of the other publishers, that

HarperCollins was not going to sign the agency agreement?

THE WITNESS:  Correct.

THE COURT:  Penguin.  Did anyone tell you before the

iPad launch that Penguin was going to sign the agency

agreement?

THE WITNESS:  Not to my recollection.

THE COURT:  How about Hachette?

THE WITNESS:  Not to my recollection.

THE COURT:  How about Macmillan?

D659usa5                          Reidy

1              THE WITNESS:  Not to my recollection.

2              THE COURT:  Did any of the publishers, Penguin -- well

3    let me put a different question to you.

4              Did anyone from Penguin ever give you, during this

5    period of negotiations in December and January, their current

6    position on whether they were going to sign or not?

7              THE WITNESS:  Not to my recollection.

8              THE COURT:  How about at Hachette?

9              THE WITNESS:  Not to my recollection.

10             THE COURT:  How about at Macmillan?

11             THE WITNESS:  Not to my recollection.

12             THE COURT:  So yesterday Mr. Shanks was here.

13             THE WITNESS:  Mm-hmm.

14             THE COURT:  And he testified -- and I'm at page 380 of

15   the transcript, counsel.  That he told Ms. Reidy at one point

16   about last minute problems that Penguin was having with the

17   agency agreement and that they were probably not going to be

18   able to sign the agreement because of those last minute

19   problems.

20             Do you remember having such a conversation with

21   Mr. Shanks?

22             THE WITNESS:  No.

23             THE COURT:  Counsel, do you have any questions for

24   this witness based on the questions that I have put to her?

25             MR. BUTERMAN:  Plaintiffs have no questions, your

D659usa5                              Reidy

 1    Honor.

 2              MR. FLOYD:  No, your Honor.

 3              THE COURT:  Ms. Reidy, you may step down.

 4              (Witness excused)

 5              THE COURT:  Next witness.

 6              MR. McCUAIG:  Dan McCuaig for the Department of

 7    Justice.  The Department of Justice and the Plaintiff States

 8    call Russell Grandinetti.

 9              THE COURT:  Mr. Grandinetti, if you would come up here

10    please.

11     RUSSELL CHRISTOPHER GRANDINETTI,

12          called as a witness by the Plaintiffs,

13          having been duly sworn, testified as follows:

14              MR. McCUAIG:  Your Honor, we have a copy of

15    Mr. Grandinetti's declaration marked with the exhibit sticker.

16    PX0835.

17              Apple does have objection to this declaration.  We've

18    worked with Apple and have narrowed the scope of Apple's

19    objections.  In some cases we've agreed to strike material and

20    in other cases Apple has dropped some of its objections.

21              I understand there are still objections remaining.

22              What I propose to do is give Mr. Grandinetti a copy of

23    the PX835, which is the declaration that he originally signed

24    that shows no strike-throughs.

25              We've been having these conversations during the

D659usa5                        Reidy

1    course of the day today.

2            I also have a copy of Mr. Grandinetti's declaration

3    that is color-coded that shows where -- where we have agreed to

4    strike-throughs; also shows where Apple, at least as of this

5    morning, had remaining objections.

6            And I propose to offer that to the Court.

7            Apple already has this as well.  As a means to

8    understand where the remaining objections still exist, if that

9    would be helpful.

10           THE COURT:  Great.

11           MR. McCUAIG:  Your Honor, in the color-coded version,

12   the green highlights represent places where the Department of

13   Justice and the Plaintiff States have agreed to strike

14   material.  The yellow highlights represent outstanding

15   objections at least as of this morning, although Mr. Heiss can

16   speak for himself.

17           MR. HEISS:  Your Honor, if it would be helpful I think

18   I can take you through our remaining objections.

19           THE COURT:  Are you still objecting to all of the

20   material in yellow?

21           MR. HEISS:  No.  Not all of it.

22           THE COURT:  Okay.

23           MR. HEISS:  Our objections are to paragraphs 8 through

24   11 and 15 through 18 on 401 and 403 grounds.

25           THE COURT:  Hold on one second.  Eight through eleven.

D659usa5                          Reidy

1    Just let me read those.

2              (Pause)

3              What is the basis of your objection?

4              MR. HEISS:  Your Honor those paragraphs contain a lot

5    of background material that we don't think is relevant under

6    401 or probative under 403.

7              It also will invite cross-examination in areas where I

8    think it would be a waste of time, in areas where I don't

9    think, in light of your Honor's ruling that profitability, for

10   example, is irrelevant and Amazon's justifications for its own

11   business practices, I don't think are relevant.

12             The fact of the matter is that Amazon had certain

13   business practices that the publishers respond to.  The

14   rationale, the internal rationale for those practices I don't

15   think is probative but will invite cross-examination into those

16   areas where I don't think we need to go.

17             That would apply to paragraph 25 as well.

18             THE COURT:  No.  I'm sorry.  All I've read is eight to

19   eleven.

20             MR. McCUAIG:  Your Honor, may I respond?

21             THE COURT:  Excuse me.  I'm focusing on eight to

22   eleven.  I understand there is a relevance argument and a 403

23   argument.  And the -- Apple is arguing it's going to open the

24   door to material that the government is going to want to

25   exclude ultimately as, I guess, additional 401 and 403 grounds.

1           MR. McCUAIG:  I understand.

2           Paragraphs 809 go to market definition.

3           In this case Apple has conceded that the relevant

4    market is no narrower than trade eBooks but they have

5    specifically not conceded that it may not be broader, that it

6    may not include physical books.

7           Paragraphs eight and nine provide evidence on the

8    distinctions between physical books and electronic books.

9           THE COURT:  So understanding the risks that Mr. Heiss

10   is pointing out here, you want paragraphs eight and eleven to

11   remain?

12          MR. McCUAIG:  I'm sorry.  I was speaking to paragraphs

13   eight and nine.

14          THE COURT:  Okay.

15          MR. McCUAIG:  Yes.  I think it's important, your

16   Honor.

17          Similarly paragraphs ten and eleven go to questions of

18   innovation.  In particular -- and frankly are counter to

19   testimony that Apple has put forward in this matter.

20          Paragraph eleven, if I could just call out the inline

21   dictionary that was in existence from the very first Kindle is

22   something that in Mr. Moerer's declaration he claims is an

23   innovation of the iBook's app.

24          Paragraph ten likewise goes to the innovations that

25   Amazon brought to the table when it became involved in the

1    eBooks market.

2            And in particular the last couple of sentences of

3    paragraph eleven, you know, give testimony on the ease of

4    ordering new books, new material, which is testimony that Apple

5    just elicited from Ms. Reidy with respect to the iPad.

6            THE COURT:  Okay.  Well, as we've had occasion to

7    discuss, perhaps not frequently enough but in paper

8    submissions, the issue of whether device innovations are

9    relevant here is an important issue for us to address.  The

10   antitrust case, as I understand it, is focused not on the

11   introduction at all or in any way to the iPad.  And Apple has

12   taken the position here, and I think it's undisputed, that the

13   iPad was going to be launched whether there was an iBookstore

14   or not.  There is no dispute about that.  The iPad was going to

15   be launched with all the features that it did or didn't have in

16   terms of functionality, whether there was an iBookstore.  It

17   was going to be -- have touch features and color capability and

18   interactivity and the -- I'm sure I'm not using the right terms

19   here -- but wireless enabled.  And this has nothing to do, as I

20   understand it, with the antitrust case here.

21           So, I think we have enough on our plate without

22   opening the door to those issues.  So that's a distinction I'm

23   going to try to keep making here.  Because I think it's a

24   distinction that all the parties agree is relevant.

25           Apple is not suggesting in this case that the

1    negotiations for an iBookstore that happened in the two months

2    before the launch of the iPad were going to effect the features

3    on the iPad other than the presence or absence of an iBookstore

4    or the functionality of the iPad.

5         Mr. Snyder.

6         MR. SNYDER:  I just want to clarify one thing.  You're

7    correct.  We're not saying that the introduction of the iPad is

8    itself an innovation that is relevant in this case.  But of

9    course the iPad's functionality enabled aspects of the iBook

10   software, which without the technology of the iPad, in

11   combination, could express itself fully.

12        So while we are focused certainly on the functionality

13   of the iBookstore software and the innovations that that

14   introduced, it is only because it was on the iPad that it was

15   able to be manifest in the full way that it was.

16        So it is the functionality of the iPad that is the

17   engine for, or vehicle by which iBooks is accessed.  So we

18   wouldn't say that there is no relevance to the iPad, of course,

19   because the iBookstore exists on the iPad.

20        THE COURT:  Absolutely.

21        And I understand that was a selling feature to the

22   publishing community that the iPad would present an e-reader

23   that was, from Apple's point of view, a far superior e-reader

24   because of the various features that already existed on the

25   iPad.

D659usa5                              Reidy

1          MR. SNYDER:  Yes.

2          And the reason that's relevant to our case, of course,

3     is at least twofold.

4          One, it's our position obviously that it was the iPad

5     released with its parity with the e-reader that put pressure on

6     other retailers to look at their business models.

7          And, of course, it's also our position that it was the

8     iPad, as your Honor said, that made, as Ms. Reidy testified,

9     access to our customers one of the main selling points for

10    doing a deal with us.

11         So, thank you, your Honor.

12         THE COURT:  Perhaps I'm responding more to some of the

13    comments of Mr. Heiss.

14         I'm happy to receive eight through eleven.  I think

15    it's important background material for this witness and

16    understanding the context in which Amazon enters as a player

17    into this case.

18         The government's aware that by offering this material

19    Apple may be arguing at various points that it's open the door

20    on other issues.  We'll just have to take that one step at a

21    time.  It has or hasn't opened the door.  I don't know where

22    Apple is going precisely with this.  But if the government's

23    willing to take the risk understanding that you can't project

24    how I'm going to rule on each of these issues, we have to see

25    how they play out, that's fine with me.

D659usa5                           Reidy

1          MR. HEISS:  Very well, your Honor.

2          THE COURT:  And I take it that's the government's

3    position.  It wants to offer eight through eleven?

4          MR. RYAN:  May I have a moment to confer with my

5    colleague, your Honor, for just a moment?

6          THE COURT:  Yes.

7          You know what, we're going to take our afternoon

8    recess.  And we're going to make it ten minutes.  Thank you.

9          MR. SNYDER:  Your Honor, that five-minute one

10   yesterday was harsh.

11         THE COURT:  It was a problem.

12         (Recess)

13         THE COURT:  Please be seated.

14         It's Mr. McCuaig.

15         MR. McCUAIG:  Correct, your Honor.  Dan McCuaig with

16   the Department of Justice.

17         We will agree to strike paragraphs eight, nine, and

18   ten.  We will keep paragraph eleven.

19         THE COURT:  And I'm sorry.  I can't hear you.

20         MR. McCUAIG:  I'm sorry.  We will agree to strike

21   paragraphs eight, nine and ten.  But not paragraph eleven.

22   Paragraph eleven we believe should remain in the declaration.

23         THE COURT:  Fine.  Objection overruled.

24         Next.

25         Do you have agreements with respect to 15 through 18?

D659usa5                         Reidy

1              MR. McCUAIG:  No, your Honor.

2              MR. HEISS:  Your Honor, it's the same objection,

3    although I think in light of your ruling with respect to these

4    other paragraphs you'll probably overrule it, but it's the same

5    basis.  It's 401, 403.  And 25 is --

6              THE COURT:  Excuse me.  Let me just read 15 through

7    17.

8              I actually don't think this runs the same risks.  Your

9    objection is overruled.

10             Let's look at 18.  Hold on.

11             I understand a sentence in 18 that is in green is

12   being stricken.  But the first and last sentences may remain.

13             I think the next material in dispute is at paragraph

14   21.  Hold on one second.

15             MR. HEISS:  25.

16             THE COURT:  Okay.  Are you sure 21 doesn't have an

17   issue?

18             MR. HEISS:  No longer, your Honor.

19             THE COURT:  Going to 25 then.  Let me read it.

20             Material on 25 has in essence already come in through

21   a variety of sources and many documents.  It's in this case

22   already.

23             I take it your objection was 401, 403 again?

24             MR. HEISS:  It was, yes.

25             THE COURT:  28.  Is that still an objection?

D659usa5                         Reidy

1          MR. HEISS:  To that one phrase at the end of the first

2     sentence.

3          THE COURT:  Overruled.

4          MR. HEISS:  The next would be one sentence in

5     paragraph 46.

6          THE COURT:  So 37 is no longer a problem?

7          MR. HEISS:  Correct.

8          THE COURT:  43 is no longer a problem?

9          MR. HEISS:  That's correct, your Honor.

10          THE COURT:  46.  Overruled.

11          MR. HEISS:  There's one sentence in 48, the second

12     sentence.

13          THE COURT:  Overruled.

14          MR. HEISS:  And then paragraph 53.

15          THE COURT:  And what's the basis of the objection to

16     53?

17          MR. HEISS:  It's 401, 403, and hearsay.

18          THE COURT:  Well, it could have been written to convey

19     the same information and avoid a hearsay problem because I

20     don't think it's hearsay to describe the fact that there were

21     negative customer reviews.  But trying to understand what was

22     in the consumer's mind or the customer's mind when they gave

23     the negative review and attributing it to them being upset

24     about higher price books or giving a book one star because of

25     the price -- and these are inferences which it may be fair to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D659usa5                          Reidy

1   draw but I think they do subject it to a hearsay finding,

2   hearsay objection.  Unless they were -- (pause) even if we

3   could rewrite this and I gave the government an opportunity to

4   elicit information which would convey some of this information

5   but in a nonhearsay capacity, the question is:  What is its

6   relevance?  The fact that customers on Amazon sites were

7   posting negative customer reviews and giving books one star.

8            So assuming we linked this more explicitly than it now

9   is, that these negative reviews and one-star ratings were

10  associated with books that customers of the -- of the kind that

11  customers had once been seeing priced at 9.99 and were now

12  priced because of the agency system above 9.99, I'm not sure

13  what the relevance is.

14           MR. McCUAIG:  It's a demonstration of anticompetitive

15  effect, your Honor.  But we'll drop the paragraph.

16           THE COURT:  Okay.  So I think PX835 -- and,

17  Mr. Grandinetti, do you have a pen?

18           THE WITNESS:  I do not.

19           THE COURT:  May I give you one?

20           THE WITNESS:  Yes.  Thank you.

21           THE COURT:  So we're going to strike paragraphs seven

22  through ten, if you could just put a line through those.

23           I want you to know what's in and what's not.

24           THE WITNESS:  Seven through ten.

25           THE COURT:  And on paragraph 18, the second full

D659usa5                        Reidy

1    sentence that begins, "This is like."

2            THE WITNESS:  Ending with "website"?

3            THE COURT:  I'm sorry?

4            THE WITNESS:  Ending with "website," your Honor, that

5    one sentence?

6            THE COURT:  The next sentence that begins, "Of course

7    that means."

8            The next sentence that begins "Ultimately they

9    return."  Those three sentences are stricken.

10           So paragraph 18 has its first and last sentence.

11           Paragraph 20 is stricken.

12           Paragraph 21 in the first full sentence, the word

13   "profitable" is stricken.  That's the third line.

14           Page -- I'm sorry.  Paragraph 24.  The last phrase,

15   beginning "and we've comfortably operated our company" through

16   to the end of the sentence.

17           Paragraph 25.  Striking the sentence in the middle of

18   the paragraph that begins, "Even today it's common."  Striking

19   that sentence.

20           Striking the next sentence.  "There was no reason to

21   think."

22           Striking the last -- I'm sorry.  The penultimate

23   sentence, "At Amazon we tend."

24           And striking the last sentence, "Our approach has

25   always been."

1          Paragraph 28.  Striking the third sentence, "Even with
2     this irrational increase."
3          Paragraph 30.  The penultimate sentence, "But better
4     terms certainly."  Strike that sentence.
5          Paragraph 33.  Strike everything that follows the name
6     David Naggar.
7          Paragraph 40.  Strike the last sentence, "Also on
8     January 20."
9          Paragraph 51.  Strike the third sentence, "As a
10    result."
11         Paragraph 56.  Third line.  Strike the phrase,
12    "Consumers definitely suffered."
13         With those changes, PX --
14         MR. McCUAIG:  Your Honor, we also agreed to strike
15    paragraph 53.
16         THE COURT:  Thank you very much.  Paragraph 53 is
17    stricken.
18         With those changes, PX835 is received.
19         (Plaintiffs' Exhibit PX835 received in evidence)
20         MR. HEISS:  There is one other agreed deletion by the
21    government.  It's a document at the end of paragraph 48 that is
22    no longer offered through the witness.  Highlighted in green.
23         MR. McCUAIG:  That's correct, your Honor.
24         THE COURT:  Do you see paragraph 46?
25         THE WITNESS:  I do.

D659usa5                          Reidy

1          THE COURT:  At the very end of that paragraph there's

2   a document number.

3          THE WITNESS:  Strike the document number?

4          THE COURT:  Yes.

5          Okay.  Now, Mr. Grandinetti, obviously you're not

6   reading this again right now, this moment, with all the changes

7   incorporated.  But at the time you originally signed this

8   declaration understanding that it would constitute your direct

9   testimony at this trial, was it a truthful statement and

10  accurate statement as far as you were concerned?

11         THE WITNESS:  Yes, your Honor.

12         THE COURT:  Do you swear to the truth of its contents?

13         THE WITNESS:  I do.

14         THE COURT:  Okay.  The witness is tendered.

15         MR. HEISS:  Thank you, your Honor.

16  CROSS-EXAMINATION

17  BY MR. HEISS:

18  Q.  Mr. Grandinetti, on January 28, 2010 you met at Amazon

19  offices in Seattle with John Sargent and Brian Napack of

20  Macmillan, correct?

21  A.  I believe that's the date, yes.

22  Q.  Excuse me?

23  A.  I believe that's the date, yes.

24  Q.  Well it's in your declaration, isn't it?

25  A.  I can go look, yes, sir.

```
 1          THE COURT:  And Mr. Grandinetti, if you could just
 2   pull your chair up and feel free to move the mic under your
 3   chin.  It moves.  Great.  Thanks so much.
 4          THE WITNESS:  Yes.  That's correct.
 5   Q.  That's paragraph 45 of your declaration, right?
 6   A.  Yes, sir.  I see that.
 7   Q.  And Mr. Sargent offered Amazon an option between either the
 8   agency model or a wholesale model with windowing of new
 9   releases for seven months, correct?
10   A.  That's correct.
11   Q.  And that offer was consistent with your discussions with
12   Mr. Sargent on January 20 when you were in New York, right?
13   A.  No.
14   Q.  No?
15   A.  No.
16   Q.  Take a look at paragraph -- the numbers have changed so
17   bear with me.
18          THE COURT:  I don't think we've changed the numbers.
19          MR. HEISS:  There are a few changes, your Honor.  I
20   think at the end.  Maybe not.
21          THE COURT:  I think we should go with the original
22   PX835.
23          MR. HEISS:  No.  I'm sorry.  The paragraph numbers in
24   the redacted version may have shifted around a bit.  I'll
25   navigate through it in any event.
```

1          THE COURT:  I don't think so.  I just want to make

2     sure we're all dealing with the same document.  We didn't

3     change any paragraph numbers.  Some of the paragraphs have been

4     stricken from this declaration.  So, for instance, paragraph 53

5     no longer exists as part of this record.  So the paragraphs

6     jump from 52 to 54 but we're not renumbering them.

7          MR. HEISS:  Thank you, your Honor.

8          THE COURT:  Good.

9     Q.  So I asked you, Mr. Grandinetti, whether Mr. Sargent

10    offered Amazon an option between agency and wholesale with

11    windowing of new releases for seven months, right?  And he did

12    that in the meeting on January 28 in Seattle?

13    A.  Yes, sir.

14    Q.  And the offer that he made then was the same offer that he

15    made to you on January 20 when you were in New York, right?

16    A.  No, sir.

17    Q.  Let me direct your attention to paragraph 40 of your

18    declaration.

19          You say at the bottom of the page, "I also met with

20    John Sargent of Macmillan on January 20.  John told me he was

21    working on an agency model but planned to offer both an agency

22    and a reseller model."

23          Do you see that?

24    A.  I do see that.  Yes, sir.

25    Q.  So on the 20th he offered you -- he told you that he was

1    thinking about an agency model or a reseller model, but when he

2    spoke to you on the 20th he didn't mention the reseller model

3    was accompanied by windowing?

4    A.  If I understood your question correctly, on the 28th he

5    offered us a reseller model with a seven-month window on new

6    releases.

7    Q.  What is that -- I'm sorry. Go ahead.

8    A.  That's distinctly different from saying we may have to move

9    to an agency model with some customers; we may be able to offer

10   both an agency model and a reselling model, which on the 20th

11   I thought might well include us retaining us retaining the

12   reseller terms we had before.

13   Q.  So you thought it might be the same reseller terms that you

14   were on then?

15   A.  I didn't know because I don't think we got to that level of

16   specificity.  But the specificity of a seven-month window on

17   new titles is quite a different thing than saying we may offer

18   more than one model to our customers, one of which is agency

19   and one of which is reseller in general form.

20   Q.  Then you received a call from Mr. Sargent while you were

21   still in New York on January 21, 2010, in which he told you

22   that he wasn't sure whether he'd be able to offer wholesale

23   terms because he was about to sign a contract that required him

24   to offer only the agency model; is that right?

25   A.  Yes, sir.

1    Q.  And you concluded that Mr. Sargent was referring to a

2    contract that he was about to sign with Apple, right?

3    A.  Yes.

4    Q.  Now, when you met with Mr. Sargent on January 28, back in

5    Seattle, Sargent once again offered Amazon a choice, right?

6    A.  A different choice; but yes, he offered us a choice.

7    Q.  He offered you a choice between the agency model or a

8    wholesale model with windowing, correct?

9    A.  That's correct.

10   Q.  No question in your mind about that, right?

11   A.  I don't have a question in my mind about that.

12   Q.  Mr. Naggar and Ms. Porco were at the meeting on January 28

13   in Seattle with Sargent and Napack, right?

14   A.  I believe so, yes, sir.

15   Q.  And were they present when Mr. Sargent presented that

16   option?

17   A.  On which date are you referring to?

18   Q.  The 28th?

19   A.  On the 28th, yes, they were.

20   Q.  They were.

21        Were they paying attention to what he was saying?

22   A.  I believe so.

23   Q.  As far as you know they heard what he was saying?

24   A.  I think so, yes, sir.

25   Q.  Now, by January 28 when Mr. Sargent presented that choice

1  to Amazon, you understood, did you not, that Macmillan had

2  already signed an agency contract with Apple?

3  A.  I believe that to be true, yes.

4  Q.  Now, at the meeting on January 28 you rejected

5  Mr. Sargent's proposal, correct?

6  A.  I actually don't remember if we rejected in the meeting or

7  not.  I think we expressed quite strongly how unpalatable the

8  choice that we were presented with was.  But whether or not we

9  rejected either one, I don't recall.

10 Q.  Well when you say you objected to the proposal, would you

11 agree with me that the discussion with Mr. Sargent and

12 Mr. Napack was a heated discussion?

13 A.  I don't recall voices being raised.  I think us very

14 gravely expressing our concern over the choice with which we

15 were being presented.

16 Q.  Did you express your grave concern with strong language?

17 A.  I don't recall that specifically although I recall the

18 meeting was very tense.

19 Q.  So it was a tense meeting?

20 A.  Yeah.  I think that's true.

21 Q.  Did the meeting end with you throwing the Macmillan

22 representatives out of the offices and escorting them out?

23 A.  I walked with them out to the security -- I think we had to

24 go down an elevator and then saw them out of the building.

25 Q.  And the next day, Friday, January 29, Amazon removed the

D659usa5                    Grandinetti - cross

1    Macmillan buy buttons from its site, right?

2    A.  Yes.

3    Q.  And that was in direct response to this tense meeting?  Do

4    you agree with me?

5    A.  I do agree with you.

6    Q.  And that meant that consumers couldn't buy Macmillan books

7    on the Amazon site, the removal of the buy buttons?

8    A.  That's correct.

9    Q.  And that meant both eBooks and physical books, correct?

10   A.  Technically it meant new physical books.  We actually

11   maintained third party use sales of Macmillan books during that

12   term.

13   Q.  But all other -- all other Macmillan titles couldn't be

14   bought and sold?

15   A.  New books sold by Amazon and eBooks sold by Amazon for

16   Macmillan were no longer purchasable.

17   Q.  Would you agree with me, Mr. Grandinetti, that at the time

18   you, Amazon, turned off the buy buttons, Macmillan was the

19   smallest of the Big Six publishers measured by revenue?

20   A.  That sounds right.

21   Q.  And Amazon's removal of the buy buttons generated a

22   considerable amount of publicity, right?

23   A.  Yes.

24   Q.  There were articles in Publishers Lunch, that's a trade

25   publication, correct?

1    A.  Publishers Lunch is a trade publication.

2    Q.  And there was an article in Publishers Lunch about the

3    dispute that Amazon was having with Macmillan, correct?

4    A.  If I remember correctly, that appeared on Saturday.

5    Q.  There were articles in the mainstream press too, right, the

6    New York Times and elsewhere, about their dispute?

7    A.  I believe so, yes.

8    Q.  Now in response to Amazon's move, turning off the buy

9    buttons, on Saturday, January 30, 2010, Mr. Sargent issued a

10   public statement on behalf of Macmillan to the author and

11   literary community through a paid advertisement in Publishers

12   Lunch.  You were aware of that, right?

13   A.  Yes.

14   Q.  And in the statement Mr. Sargent offered Macmillan's point

15   of view on the dispute with your company, right?

16   A.  Could you just repeat the question, please.

17   Q.  In the statement that Mr. Sargent issued on behalf of

18   Macmillan, he offered Macmillan's view about -- Macmillan's

19   point of view about the dispute with Amazon?

20   A.  That's my recollection.

21   Q.  And more generally about the state -- more generally about

22   the state of the eBook market?

23   A.  (No response).

24   Q.  Do you remember that?

25   A.  I remember the letter.  It's a while ago so I can't

D659usa5                    Grandinetti - cross

1   remember the contents.

2   Q.  Do you remember him describing why he thought the agency

3   model he thought was better in his view, his personal view?

4   A.  Yeah.  I think so.

5   Q.  Now, Amazon encountered some negative feedback, didn't it,

6   from the media and customers as a result of its dispute with

7   Macmillan?

8   A.  Well as you pointed out, there is a wide variety of

9   discussion in the media.  And I would say it ran the gamut from

10  positive to negative.

11  Q.  But I asked you whether or not Macmillan -- I'm sorry

12  whether or not Amazon received some negative feedback.  Did it

13  receive some negative feedback?

14  A.  Yes, sir.

15  Q.  And on Sunday, January 31, Amazon announced that it would

16  have to capitulate to Macmillan and accept Macmillan's terms.

17          Do you recall that?

18  A.  I do.

19  Q.  And let me show you DX277.  And ask you whether or not you

20  recognize that.

21  A.  Just give me one moment to finish reading, sir.

22  Q.  Sure.

23  A.  Could you repeat the question, please.

24  Q.  Do you recognize it?

25  A.  I do recognize it, yes.

D659usa5                        Grandinetti - cross

1   Q.  That is the Amazon announcement on a message board that it

2   was going to capitulate to Macmillan's demands, correct?

3   A.  Yes.

4           MR. HEISS:  We offer it, your Honor.

5           MR. McCUAIG:  No objection.

6           THE COURT:  Received.

7           (Defendant's Exhibit 277 received in evidence)

8   Q.  And in it you say, in the second paragraph, second

9   sentence, "We want you to know that ultimately, however, we

10  will have to capitulate and accept Macmillan's terms because

11  Macmillan has a monopoly over their own titles."

12          Do you see that?

13  A.  I do.

14  Q.  And the terms that Amazon was referring to were the agency

15  terms that Macmillan had offered as an option to Amazon at the

16  tense meeting on January 28 in Seattle, correct?

17  A.  Correct.

18  Q.  Now, later that same day -- so we're on Sunday, January 31,

19  you called John Sargent, who is the CEO of Macmillan, correct?

20  A.  Yes, he is.

21  Q.  You called him on Sunday?

22  A.  I don't recall.

23  Q.  Do you recall calling him and telling him that Amazon would

24  agree to accept agency terms?

25  A.  At some point after we posted this message, whether it was

D659usa5                        Grandinetti - cross

1    Sunday or Monday, I'm sure I did.

2    Q.   In fact, you told him that you actually liked his letter to

3    authors and agents, right?  You thought it was useful?

4    A.   I may have said something complimentary about his

5    communication style which I think is often very

6    straightforward.

7    Q.   And Amazon had a good relationship with Macmillan, at least

8    up until this point?

9    A.   Well I both like John personally and I think we've had a

10   successful relationship with Macmillan for many years.

11   Q.   Easy to deal with, Mr. Sargent?

12   A.   In light of the events of this case it's hard to answer

13   that.

14            But definitive, yes.

15   Q.   At the time you said you liked him, right?

16   A.   I did and I do.

17   Q.   Thought he would be easy to deal with in a negotiation?

18   A.   Again, when I think about this negotiation there weren't

19   many easy things about it.  But is it -- is it good to work

20   with John?  Do I like him?  Yes.

21   Q.   You think -- did you prefer him to negotiate an agency

22   agreement with at least first than some of the folks you were

23   dealing with at the other publishers?

24   A.   I think if I had to have a hard conversation John is among

25   the better leaders of publishers with whom I'd like to have

1  that conversation.

2  Q.  Now, that same day you outlined for yourself agency terms

3  that Amazon intended to negotiate with Macmillan.

4          Do you recall doing that?

5  A.  I recall in that time period beginning to formulate the

6  important terms of an agency agreement were we to successfully

7  negotiate one with Macmillan.

8  Q.  And you actually started negotiating with Macmillan that

9  night, right, Sunday night?

10 A.  Whether it was Sunday night or the next day, I don't

11 remember exactly.  I remember getting into work extremely early

12 and starting the next day.  So it was very soon.

13 Q.  Let me show you what's been marked as DX274.

14 A.  Thank you.

15 Q.  And this appears to be an e-mail that you sent to yourself

16 on Sunday, January 31 at 9:08 p.m.; is that correct?

17 A.  It looks like it, sir, yes.

18 Q.  And it contains a list of -- the subject line is terms and

19 then below that are a list of items that appear to be terms

20 that might be negotiated for an agency agreement; is that

21 correct?

22 A.  Yes, sir.

23          MR. HEISS:  We offer it, your Honor.

24          MR. McCUAIG:  No objection.

25          THE COURT:  Received.

1              (Defendant's Exhibit 274 received in evidence)

2    Q.  So, one of the terms that you had in mind when you wrote

3    this the evening of January 31 was no windowing, correct,

4    that's all books, day and date?

5    A.  Thank you.  I see that.  Yes.

6    Q.  And that was an important item for Amazon, correct?

7    A.  Yes.

8    Q.  Books priced lower than the physical books.  That was also

9    an important item for Amazon at the time?

10   A.  It was, yes.

11   Q.  And at the bottom of 274 there are a number of items under

12   MFN which is most favored nations; is that right?

13   A.  Yes.

14   Q.  And those are basically parity provisions, correct?

15   A.  Correct.

16   Q.  The first one is commission.  That meant that you wanted to

17   have parity with other agents with respect to the amount of the

18   commission that Amazon would be receiving as an agent, correct?

19   A.  Yes.  That's correct.

20   Q.  Selection is another parity provision and you wanted access

21   to the same selection that other agents would have access to,

22   correct?

23   A.  That's correct.

24   Q.  And the last one is price parity.

25              Do you see that at the bottom?

1   A.  I do.

2   Q.  And that was fair to say that that was an important term

3   for Amazon in these negotiations with Macmillan and ultimately

4   the other publishers?

5   A.  Yes.

6   Q.  And that meant that you wanted to be competitive in terms

7   of price so that there couldn't be an eBook sold by one agent

8   at a price that you weren't able to match?

9   A.  That's correct.

10  Q.  And I take it that these were among the key terms which you

11  planned to negotiate for in the contract negotiations with

12  Macmillan and the contract negotiations which then ensued with

13  the other four publishers, correct?

14  A.  Yes.

15  Q.  Now, after the events of the weekend of January 30, Amazon

16  negotiated an agency agreement with Macmillan, right?

17  A.  Yes.

18  Q.  And you and Mr. Naggar, David Naggar, your colleague,

19  negotiated the agreement with Macmillan?

20  A.  Yes.

21  Q.  You took the lead, did you not?

22  A.  Yeah.  We worked as a team, of course.  But I was the most

23  senior person working on it.

24              (Continued on next page)

25

D65PUSA6                    Grandinetti - cross

1   BY MR. HEISS:

2   Q.  And those negotiations didn't take very long to conclude,

3   did they?

4   A.  That's a matter of perspective.  They concluded later that

5   week.  We really -- we got in at 5:30, 6:00 in the morning

6   almost every day and worked until late at night.  Draw your own

7   conclusions about how long or short that is.

8   Q.  Those are long days, but in terms of number of days it took

9   to negotiate, you were done at the end of the week, right,

10  because you signed it on February 5th?

11  A.  I can't say I recall the specific signing date, but my

12  recollection is we finished by the end of the week.

13  Q.  Let me show you Exhibit 288.  Do you recognize that as the

14  contract you signed, the agency contract you signed with

15  Macmillan on February 5th, 2010?

16  A.  Well, looking at this first page, it does look like that's

17  what it is.

18         MR. HEISS:  And just for the record, your Honor, this

19  has been redacted pursuant to agreements.  If you or the

20  witness needs the entirety of the agreement, we have that as

21  well.

22         THE COURT:  Thank you.

23  Q.  And one of the -- One of the points that you included in

24  your e-mail to yourself on January 31st, that's DX274, was a

25  three-year term; do you see that on DX274, that one page?

1   A.  Yes, I do.

2   Q.  And that's a term that you were successful in negotiating

3   with Macmillan, correct?

4   A.  I believe our contract was for three years, yes.

5   Q.  That's the only contract that ended up being three years,

6   right?  It's the only agency contract with one of the major

7   publishers for three years was with Macmillan, right?

8   A.  I think that's correct.  Although, I can't remember all the

9   exact terms right now with certainty.

10   Q.  In any event, this was the first agency agreement that --

11   with one of the big publishers that Amazon signed?

12   A.  Yes.

13   Q.  And you agreed to this deal, Mr. Grandinetti, because you

14   wanted to avoid windowing by Macmillan; is that right?

15   A.  We wanted to avoid losing most or all of their titles from

16   our store, yes.

17   Q.  So that's a yes?

18   A.  Yes.

19   Q.  Now, is it fair to say that many of the core terms that you

20   negotiated with Macmillan found their way into the contracts

21   with the other publishers as well?

22   A.  I think many of them, yes.

23   Q.  The parity provisions, right?

24   A.  Certainly.

25   Q.  No windowing, right?

1    A.  I believe so.

2    Q.  30 percent commission, correct?

3    A.  I also believe that's true.

4    Q.  Commission MFN?

5    A.  I'm not sure if that was always true.

6    Q.  And once you agreed to move to agency with Macmillan,

7    Amazon began negotiations with Hachette, HarperCollins, Penguin

8    and Simon & Schuster, right?

9    A.  Yes.

10   Q.  All at around the same time?

11   A.  Even those, I believe, that we staggered to the extent

12   possible.

13   Q.  But there was overlap, wasn't there, Mr. Grandinetti?

14   A.  Yes, there was some overlap.

15   Q.  There was a lot of overlap, wasn't there?

16   A.  I don't know how to characterize a lot or not.  I recall,

17   you know, there were days where we might be having

18   conversations with two and sometimes three publishers.  As I

19   said, we did our best to try and separate them as much as we

20   could, given the short time frame we were presented by these

21   publishers.

22   Q.  Well, the short time frame was the result of Amazon wanted

23   to conclude agency deals so it didn't face windowing of eBooks,

24   correct?

25   A.  Is the premise of the question, which I don't totally

```
 1    agree, we did not want agency deals?  We were presented with
 2    ultimatums from the publishers about when we would lose their
 3    titles if we didn't move to an agency agreement, and that was
 4    concerning enough to us that we wanted to get them all
 5    completed in the time frames we were given.
 6    Q.  And that was the time pressure, correct?
 7    A.  Yes.
 8    Q.  Now, Amazon actually broke off negotiations with Penguin in
 9    early March 2010; do you recall that?
10    A.  I do.
11    Q.  And Amazon broke off those negotiations because Penguin
12    wouldn't agree to the three-year term, right?
13    A.  That's not my recollection.
14    Q.  It wouldn't agree to the parity provisions either, would
15    it?
16    A.  That's not my recollection either.
17    Q.  Did Penguin end up agreeing to a three-year term?
18    A.  I don't remember the term of the Penguin agreement offhand.
19    Q.  And during your negotiations with the other publishers, in
20    fact, all of them, in various ways and combinations, opposed
21    some or all of the parity provisions, correct?
22    A.  Could you just repeat the question one more time, please?
23    Q.  In your negotiations with all of those publishers, the
24    other four, each one of those publishers opposed some of the
25    parity provisions, correct?
```

1    A.   I believe that's true.

2    Q.   And each one of the publishers opposed the three-year term

3    that Amazon was insisting on, right, each one?

4    A.   I don't -- it's not clear to me that we were insisting on a

5    three-year term in all those deals.

6    Q.   And you and Naggar were the principal negotiators in each

7    of those agreements?

8    A.   Yes.

9    Q.   And by the end of March 2010, Amazon had entered into

10   agency agreements with four of the Big Six publishers; is that

11   right, by the end of 2010?

12           THE COURT:   March you said.

13   Q.   By the end of March -- Yes, by the end of March 2010, you

14   had agency agreements with Macmillan, right?

15   A.   Yes.

16   Q.   HarperCollins?

17   A.   Yup.

18   Q.   Simon & Schuster?

19   A.   Yup.

20   Q.   And Hachette?

21   A.   Yes, sir.

22   Q.   And Penguin followed later, that was at the end of May,

23   right?

24   A.   Yes.

25   Q.   Okay.   We've already offered the Macmillan contract, that's

1    288.  Do you have 334 in front of you?

2    A.  I do.

3    Q.  And that's the HarperCollins contract, correct?

4    A.  Yes, it appears so.

5    Q.  And that was finalized on March 23rd, right?

6    A.  That's what it says here.

7    Q.  Okay.  And then do you have DX333?

8    A.  I do.

9    Q.  That's a Simon & Schuster contract, correct?

10   A.  Correct.

11   Q.  And that was also executed on March 23rd?

12   A.  I don't know the date.  I can't see anything here.

13   Q.  Is it blocked out?  Look at 24 of 27.

14   A.  Is that a page number?

15   Q.  Yes, at the bottom.

16   A.  I see the dates hear say March 23rd, 2010.

17   Q.  So that was executed March 23rd, correct?

18   A.  That's what it says here.

19   Q.  And DX345, which I think I -- Let me hand you 345, unless

20   you --

21   A.  I think I have it.

22   Q.  You have 345?

23   A.  Yes.

24   Q.  Let me hand you 382.

25   A.  Okay.

1    Q.  So 345 is the agreement with Hachette, correct?

2    A.  It looks like it, yes.

3    Q.  And that was executed on March 31st, 2010?

4    A.  That's what it says.

5    Q.  And then, finally, the agreement with Penguin is DX382, and

6    that was executed on May 25th, by Amazon, Page 18?

7    A.  Thank you.  It says May 25th.

8              MR. HEISS:  Your Honor, we offer DX334, 333, 345 and

9    382.

10             THE COURT:  Received.

11             (Defendant's Exhibits DX334, 333, 345 and 382 received

12   in evidence)

13   Q.  Now, fair to say at no time in your negotiations with any

14   of the publishers do you recall any of them mentioning the

15   terms of the contracts with Apple, correct?

16   A.  Could I ask for a clarification of your question?  Are you

17   asking me did they mention that these are the terms we have

18   with Apple?

19   Q.  My question is whether or not in your negotiations with any

20   of the publishers, whether you recall any of them mentioning

21   the terms of their contracts with Apple?

22   A.  During our negotiations, I don't recall publishers saying

23   this is a term we have with Apple.

24   Q.  Now, in each of the agreements, in each of the contracts,

25   Amazon insisted on a no-windowing guarantee, correct?

1   A.  Yes.

2   Q.  That was something that Amazon didn't have previously in

3   its wholesale agreements with the publishers, right?

4   A.  I don't believe so.

5   Q.  And Amazon wanted to continue to be sure that it had a

6   broad selection of content for the Kindle store, right?

7   A.  Absolutely.

8   Q.  And in each of these agreements, you achieved a

9   no-windowing guarantee?

10  A.  I believe that's true.

11  Q.  Now, each of these agreements includes price tiers, you're

12  aware of that; are you not?

13  A.  Included price?

14  Q.  Price tiers?

15  A.  I definitely recall price tiers in most of the agreements,

16  and I'm assuming all of them, but I can't say I know that with

17  certainty.

18  Q.  That's something else that Amazon insisted on during the

19  negotiations, correct?

20  A.  I don't remember clearly who introduced the pricing tiers

21  first in the conversation.  It was of very high importance to

22  us, to the extent that we were going to have to enter into

23  these agency models, we maintained the lowest consumer prices

24  we could manage.

25  Q.  So the price tiers, I take it, were designed to do two

1   things.  They were designed, first, to ensure that publishers
2   priced eBooks below hardcover prices, right?
3   A.  Well, I can't say that's true because, first of all, it
4   didn't achieve that effect.  There were many agency books
5   priced above print prices; so I think the answer is probably
6   no.
7   Q.  Well, was it the case that there -- that you wanted there
8   to be some separation between what the publisher charged for a
9   hardcover book as opposed to what the publisher charged for an
10  eBook to reflect the cost savings associated with the
11  distribution, production and distribution of an eBook?
12  A.  Maybe you could repeat the question for me.  I'll do my
13  best to answer.  I'm sorry.
14  Q.  Well, do you think there should be some difference between
15  a physical book price and a digital book price to reflect the
16  cost savings?
17  A.  Definitely.
18  Q.  Okay.  And then the other -- The other reason you wanted
19  to -- the reason, primary reason Amazon wanted the price tiers
20  was to set limits on how high the publishers could price their
21  eBooks, correct?
22  A.  Yes.
23  Q.  And I take it that you considered the price tiers in the
24  Amazon agency contracts to be in Amazon's independent business
25  interests?

1   A.  I don't think the price tiers in our agreements were the

2   price tiers that we would choose.  So was it of interest to

3   have any kind of cap on price?  Yes.

4   Q.  Yes.

5   A.  Were the schedules that are in these agreements in our best

6   interests?  Would we have preferred lower prices?  The answer

7   is also yes.  Yet, we would prefer lower prices and I don't --

8   we, during these negotiations, pushed to actually have lower

9   caps in many or all of these agreements.

10  Q.  Understood.  But having some price caps, you concluded, was

11  in your interests?

12  A.  Yes.

13  Q.  And the reason it was in your independent business

14  interests is that it would constrain, put limits, on the amount

15  of money the publishers, which now had pricing authority, could

16  charge for eBooks, right?

17  A.  Yes.

18  Q.  Now, you didn't agree to those tiers with any intention

19  that the publishers would price their books at the top of the

20  tier, right?  You wanted lower prices?

21  A.  We did want lower prices.

22  Q.  So is that a yes, your intention --

23  A.  Yes, sir.

24          THE COURT:  Well, you have a compound question.

25          MR. HEISS:  Sorry, let me break it down.

1   Q.  You wanted lower prices, you said, Mr. Grandinetti,

2   correct?

3   A.  Yes.

4   Q.  So I take it, then, that it wasn't your intention, in

5   agreeing to these price tiers, that the publishers would price

6   the books at the top of the tier?

7   A.  We weren't setting prices.  Our intention was irrelevant.

8   Q.  Well, did you agree to those price tiers with the

9   expectation that the publishers would price at the top of the

10  tier?

11  A.  Yes.

12  Q.  Did you agree to those prices with the intention --

13  A.  Could I actually clarify my last answer?  Because I don't

14  think I answered it as clearly as I should have.

15  Q.  Yes.

16  A.  We expected that in many, many cases, particularly for

17  front list books, New York Time best selling books, the top of

18  the tiers were what the prices the publishers were going to

19  set.  We didn't know across the back list and so many other

20  titles in the business, that that would be true and we hoped it

21  would be different than it turned out.  It just wasn't.

22  Q.  And that wasn't your purpose in agreeing to the tiers.  In

23  other words, your purpose in agreeing to the tiers was not

24  that, to encourage the publishers to price at the top of the

25  tier, right?

D65PUSA6                      Grandinetti - cross

1    A.  Our purpose was to prevent prices being higher than they

2    were already going to be.

3    Q.  And you wanted lower prices than the tiers themselves?

4    A.  Yes, we wanted lower prices.

5    Q.  Are you aware, by the way, that some of the price tiers in

6    Amazon's agency agreement were higher than the price tiers in

7    Apple's agreements?

8    A.  I'm not.

9    Q.  Amazon's price tiers applied not only to new releases and

10   New York Times best sellers, but to other eBooks as well,

11   correct?

12   A.  I think there was some provisions that applied beyond

13   those, yes.

14   Q.  Now, from the outset of the agency negotiations, Amazon

15   insisted on MFNs on price, right?

16   A.  Yes.

17   Q.  Commission?

18   A.  Yes.

19   Q.  Selection?

20   A.  Again, with respect to commission, I can't say I'm

21   confident we achieved it in every agreement.  What was the next

22   one you asked about?

23   Q.  Selection?

24   A.  Yes.

25   Q.  And content?

1    A.   Could you say it more specifically what you mean by

2    content?

3    Q.   Enhanced content?

4    A.   That's a more complex one, and I would just -- I don't

5    think I can answer it in a binary, definitive way.  We wanted

6    to make sure that, to the extent we had selection parity, that

7    the selection of books we were given would be similar to what

8    existed elsewhere.

9    Q.   And is it fair to say that Amazon, in particular, was

10   adamant about parity provisions for both price and selection?

11   A.   Yes.

12   Q.   And Amazon sought the parity provisions to ensure a level

13   playing field; is that correct?

14   A.   Yes, with other agents.

15   Q.   You didn't want to be disadvantaged competitively with

16   respect to other agents, right?

17   A.   That's correct.

18   Q.   And, in fact, you emphasized to some of the publishers the

19   importance of maintaining a level playing field, didn't you, in

20   terms of negotiating the parity provisions with the publishers?

21   A.   We did.

22   Q.   In fact, you told HarperCollins that the publishers had

23   created a level playing field through agency, right?  Do you

24   recall saying that?

25   A.   I do not recall saying that.

1    Q.  Do you recall saying that that level playing field should

2    be maintained through the various parity provisions demanded by

3    Amazon?

4    A.  If I'm remembering the conversation you're referring to

5    correctly, the context was pretty specific.  On at least one

6    occasion I had a conversation with folks at HarperCollins where

7    I laid out the importance of parity against other agents on

8    some of these terms because it was our belief the reason we

9    were in this position is that some of the publishers wanted to

10   slow down the success of Kindle.

11           And so one of the most important goals of that

12   agreement was to make sure that if the effect they were seeking

13   didn't take hold the way they hoped, that the next set of

14   agreements could further disadvantage our business because that

15   was our belief.  At least giving ourselves a contract where we

16   knew we would not be further disadvantaged was of high

17   importance to us.

18   Q.  And so you told Brian Murray of HarperCollins that you --

19   that Amazon wouldn't sign an agreement without parity

20   provisions on price and selection; is that right?

21   A.  That sounds right.

22   Q.  Let me show you what's been marked as DX306.

23   A.  Thank you.

24   Q.  And I'd ask you to take a look at that.  That's an e-mail

25   that you received from Mr. Murray of HarperCollins on

D65PUSA6                         Grandinetti - cross

1    Wednesday, February 24th, correct?

2    A.  That's what it looks like, yes.

3    Q.  And if -- Let me direct your attention to --

4            MR. HEISS:  Actually, we offer DX306.

5            MR. McQUAIG:  No objection.

6            THE COURT:  Received.

7            (Defendant's Exhibit 306 received in evidence)

8    Q.  So let me direct your attention to the second page of the

9    e-mail, at the bottom, where you say, "We're not going to sign

10   an agreement that doesn't give us a level playing field with

11   any other retailer of eBooks on either selection or price, and

12   we will quickly re-evaluate our entire relationship with you if

13   that's the choice we're given."

14           Do you recall saying that to Mr. Murray in this

15   e-mail?

16   A.  I can't say I recall this e-mail very clearly, but reading

17   it now, I see that I sent him that e-mail.

18   Q.  And you told him that if he -- if HarperCollins would not

19   agree to selection or price parity, you'd have to re-evaluate

20   your entire business relationship with HarperCollins, correct?

21   A.  That's what it says.

22   Q.  And that was a suggestion that if you didn't agree to those

23   provisions, Amazon would stop doing business with

24   HarperCollins, for example?

25   A.  I don't think we got so far as saying what we would do.

1    I'm not even sure even internally we got so far as what we

2    would do, but we were not prepared to sign a contract for

3    whatever length of time this was going to be, where we weren't

4    confident we could not be further discriminated against by

5    these publishers.

6    Q.  Now, if you look above in that same e-mail, you told

7    Mr. Murray that there was a lot of concern that the

8    conversation is moving too slowly.  That was the reference to

9    the pace of the negotiations; is that right?

10   A.  Yes.

11   Q.  And that the selection and price parity concepts are pretty

12   straightforward concepts that wouldn't be difficult to

13   negotiate, correct?

14   A.  That's what it says.

15   Q.  And you go on to say, "If we can't agree on those in short

16   order, the read here," meaning the understanding at Amazon,

17   correct?

18   A.  Yup.

19   Q.  "Will be that you guys aren't willing to keep the playing

20   field level.  That's what led to our last big dislocation with

21   a partner.  I think we'd both like to avoid that, but in the

22   interest of emphasizing the importance of these concepts, I

23   refer you to the last paragraph here," and then you include a

24   link --

25   A.  Mmm, hmm.

1    Q.   -- to a New York Times site, correct?

2    A.   Mmm, hmm.

3    Q.   Do you recall doing that?

4    A.   Yes.

5    Q.   Let me show you what's been marked as DX306A.  Do you

6    recall that as being the article that -- the link that takes

7    you to this article, the one that you included in your e-mail,

8    correct?

9    A.   I can't say I recall this clearly, but this seems correct.

10   Q.   And it's a reference to the Macmillan buy button dispute,

11   right?

12   A.   It is.  The New York Times piece is a general -- it appears

13   to be a reference to the Macmillan and Amazon dispute.

14   Q.   And sort of a general reminder to HarperCollins that if

15   they didn't agree to the selection and parity terms, that you

16   would do -- Amazon would do the same thing to it as Amazon had

17   done to Macmillan?

18   A.   Well, I think it was not my intent, and I think I tried to

19   word this, as I read it here, to make it clear we took these

20   terms very seriously.  Where we would end up, I think was still

21   to be determined, but it was not going to be possible for us to

22   sign a contract where other agents would have lower prices than

23   us or other agents would have books we didn't have.

24           And when I say -- when it says here that "you guys are

25   not willing to keep the playing field level," what we mean by

1   that is it seems -- under the agency model, it seems a very

2   simple request to a publisher to say, if you're going to make

3   me an agent, just tell me, as an agent, I'll have the same

4   prices as other people and tell me I'll have the same books.

5           So it seemed very insulting to me that they were not

6   willing to at least just say, we'll give you the same prices

7   and the same books as other people.  And if they weren't

8   willing to say that, we did have to re-evaluate our

9   relationship.  And what that means, I don't know.

10  Q.  And the reason you felt that way is that price parity and

11  selection parity, from an agent's standpoint, are perfectly

12  sensible business terms, correct?

13  A.  Within the agency model, absolutely.

14  Q.  And you wouldn't enter an agency agreement without having

15  that kind of protection, right?

16  A.  Given the sequence of events that led us here, we felt that

17  was sensible.

18  Q.  Well, you know, Mr. Grandinetti, that's the second time you

19  said that, the sequence of events that led you here.  You also

20  mention that in paragraph 48 and 49 of your declaration.  Let

21  me direct your attention to those paragraphs.

22  A.  Okay.

23  Q.  Because the way I read this is that Amazon was concerned

24  about retaliation from these publishers, right?

25  A.  I think you're going to have to give me some more context

1   for your question.  Do you want me to read this, or do you want

2   to add to the question?

3   Q.  Let me direct your attention first to paragraph 48 of your

4   declaration.  Do you have it?

5   A.  I have 48, but it may -- it starts out in a certain

6   context, if you give me one second, please.

7   Q.  Take your time.

8   A.  I've read it.  Thank you.

9   Q.  And did you read the first sentence of paragraph 49?

10  A.  Yes.

11  Q.  Now, the suggestion you're making here, Mr. Grandinetti, is

12  that if it weren't for Amazon's concerns about retaliation from

13  these publishers, you wouldn't have sought to negotiate these

14  parity provisions.  Isn't that what you're telling the Court?

15  A.  Could you repeat the question one more time?  I'm trying to

16  listen and answer as best I can.

17  Q.  Let me rephrase it.

18  A.  Okay.

19  Q.  In 48 you describe your concerns --

20  A.  Yes.

21  Q.  -- about retaliation from the publishers and discriminatory

22  treatment, correct?

23  A.  That's correct.

24  Q.  And then in paragraph 49, the first sentence says "To avoid

25  these problems, that is the risk of retaliation, the risk of

1   discriminatory treatment, we negotiated to include certain

2   parity provisions in the agency contracts," right?

3   A.  Yes.

4   Q.  That's not the reason you negotiated those provisions, is

5   it?

6   A.  Which reason?  I'm sorry, I'm just trying to follow you the

7   best I can.

8   Q.  The risk of retaliation wasn't the reason that you

9   negotiated those parity provisions, correct?

10  A.  Well, it's certainly a big factor.

11  Q.  Let me hypothesize something.  Let's say you had the best

12  business relationship in the world with a company, with a

13  publisher, completely harmonious, and you were entering into an

14  agency agreement with that publisher.  You would still insist

15  on price parity, correct?

16  A.  I think it's possible.

17  Q.  It's possible?  Mr. Grandinetti, if you were negotiating an

18  agreement with a publisher that you had a strong business

19  relationship, a harmonious business relationship --

20  A.  Yup.

21  Q.  -- as a business matter, you would still negotiate a price

22  parity provision if you were in a position of being an agent

23  because you would want to be protected, correct?

24  A.  Not necessarily, and let me offer you some context.  One of

25  the provisions we had in some of these agreements, for example,

1   included things like a must carry, where we were required

2   during the term of the contract to sell all the publisher's

3   books.

4          You know, we didn't have that provision under a

5   wholesale model.  We could actually choose to halt business.

6   And so I'm just giving you an example of the kind of context we

7   were in for some of the other terms in this contract.

8          So I -- if we didn't have these series of events,

9   would I ask for a price parity provision?  Probably.  Would it

10  have been as contentious and central and important?  Would I

11  have expressed it in the terms that I expressed to Brian?  I

12  can't say that's true.

13  Q.  I'm not asking you whether it would have been expressed in

14  those terms.  I'm asking you, as a common sense business

15  proposition, if you were negotiating an agency agreement with

16  anybody, good relationship, bad relationship or otherwise, you

17  at Amazon would want a price parity provision so that you would

18  not be disadvantaged relative to other agents, correct?

19  A.  Under those conditions, if we thought of that, we certainly

20  would have asked for it and I hoped we would have achieved it.

21  Q.  Same thing for selection parity, right, because you wanted

22  content?

23  A.  Agree.  I don't know that we would -- again, like must

24  carry is an example of the context, but I think you're right.

25  Q.  Did you have a good business relationship with Random

1   House, the largest publisher?

2   A.   Yes.

3   Q.   It was pretty harmonious, wasn't it?

4   A.   Not always.

5   Q.   Not always, but reasonably?

6   A.   We had a good, reasonable business relationship with them.

7   Q.   And when you got around to negotiating an agency agreement

8   with Random House in March of 2011, you insisted on price

9   parity provision, correct?

10  A.   That's correct.

11  Q.   And you insisted on a selection parity, correct?

12  A.   That's correct.

13  Q.   And you insisted on a business model parity, right?

14  A.   That's correct.

15  Q.   And a commission parity?

16  A.   I don't remember that specifically with Random House, but

17  I --

18  Q.   And a promotional parity?

19  A.   It wouldn't surprise me that those terms were in the Random

20  House agreement.

21  Q.   You don't need to be surprised.  That's the Random House

22  agreement, right?

23  A.   It looks like it.

24  Q.   And it's dated -- misdated, I believe, at the top as

25  March 1st, 2010.  But you didn't negotiate this -- you didn't

1   enter into this until 2011; isn't that right?

2   A.  That's correct.

3   Q.  Okay.  And the commission parity is at 9.2 of the

4   agreement; is it not?

5           THE COURT:  Mr. Heiss, is this in evidence?

6           MR. HEISS:  Oh, your Honor, I'm sorry.  I offer it.

7           MR. McQUAIG:  No objection.

8           THE COURT:  Received.

9           (Defendant's Exhibit Random House agreement received

10  in evidence)

11  A.  Yes, that looks --

12  Q.  You said you weren't sure whether there was a parity for

13  commission, that's 9.2, correct?

14  A.  I see the paragraph here, yes, sir.

15  Q.  And promotional parity is 5.5?

16  A.  That looks like it.

17  Q.  Price parity, 5.1?

18  A.  I'm doing my best to read this, and it looks like that's

19  true.  I would concede that, although, not being a lawyer and

20  this paragraph not being titled very clearly, I can't say that

21  with confidence.

22  Q.  But you know, as a matter of fact, you have a price parity

23  in the Random House?

24  A.  I think I said before that we have a price parity provision

25  with Random House.

D65PUSA6                    Grandinetti - cross

1   Q.  Thank you.  And you have a business model parity in here

2   too, 7.4?

3   A.  I believe so.

4   Q.  Sensible things to negotiate with any publisher, friendly

5   or not, right?

6   A.  Yes.

7   Q.  Now, let me ask you a few questions about the business

8   model of parity provision that found its way into each of these

9   agreements.  Now, that provision means that if a publisher

10  offered a reseller relationship with another retailer, they

11  would have to go back to reseller with Amazon, correct?

12  A.  I think it means they would have to offer it to us, and

13  certainly we would like to return to that.

14  Q.  Okay.  I was just quoting from your declaration, but it

15  would give you the option of going back?

16  A.  Yes.

17  Q.  That would be your choice?

18  A.  Yes.

19  Q.  But they would have to give you that choice?

20  A.  Yes.

21  Q.  So under that provision, if a publisher wanted Amazon to be

22  on agency, then the publisher was required -- also required to

23  be on agency terms with all other retailers, right?

24  A.  No.

25  Q.  If a publisher wanted to be on agency terms with you, if

1    that's what its preference was, it would have to be on agency

2    terms with everyone else to preserve that relationship because,

3    otherwise, it would have to give the option to Amazon to move

4    to another model, correct?

5    A.  No, and let me just expand.  I don't mean to be

6    argumentative.  Theoretically, they might have moved to some

7    other model C.  We might have thought the terms of that new

8    model were poor, we would have rejected it, and stayed on

9    agency.

10        We wanted to be given the option.  I think, certainly,

11   if they returned -- if somebody offered reseller, it was highly

12   likely we would have taken them up on that offer and get that

13   option.  But reseller wasn't the only theoretical possibility

14   that a publisher might have offered to another customer.

15   Q.  Understood.  But it was clear at the time -- What was clear

16   at the time is that Amazon didn't want to be on agency, right?

17   A.  That's correct.

18   Q.  And Amazon preferred reseller, no question about that, at

19   the time?

20   A.  If those are the only two choices, in general, that's true.

21   Q.  So under that scenario, if a -- under your business model

22   provision, which is something Amazon insisted on in these

23   contracts, right?

24   A.  That's right.

25   Q.  Under that provision, if a publisher agreed to the reseller

D65PUSA6                    Grandinetti - cross

1    model, the wholesale model with another agent, it would have

2    to --

3    A.  Well, there wouldn't be an agent anymore.

4    Q.  I'm sorry?

5    A.  A book seller.

6    Q.  With another retailer?

7    A.  Mmm, hmm.

8    Q.  Thank you.  It would have to offer Amazon that option,

9    correct?

10   A.  That's correct.

11   Q.  And there was no question that Amazon would have accepted

12   that option and gone to resale?

13   A.  Not necessarily.  So, again, just to think through some of

14   the possible scenarios.  Let's say a publisher said, okay, good

15   news, we're offering another set of reseller terms, or we're

16   going back to reseller or making reseller as an option but

17   every wholesale book has a cost of $100 each, that would have

18   been a very difficult thing for us to consider and to accept.

19          And so one of the reasons we asked for options here is

20   so that we would be presented with options and could make the

21   choice that was the best choice for our business.

22   Q.  But at the time, you understood that the publishers

23   wanted -- the big publishers to be -- the publishers wanted the

24   retailers to be on an agency model, that's what they pushed for

25   at the time, correct?

1    A.  Yes.

2    Q.  And so would you agree with me that the business model

3    provision that Amazon insisted on, sort of sharpened the

4    incentives of publishers to keep everyone on agency and not

5    move other retailers to wholesale?

6    A.  Well, you'd have to ask publishers.  But from my point of

7    view, if given the option to return to wholesale at any time,

8    at the same old terms where in many cases they were making more

9    money per unit, I could see any number of publishers actually

10   thinking through that scenario and choosing it.

11   Q.  Now, I think we've talked about the selection content MFNs,

12   but I take it that Amazon in these agreements insisted on a

13   selection parity provision and got it in each of the

14   agreements?

15   A.  That's correct.

16   Q.  And we talked briefly about a commission MFN, meaning that

17   Amazon would get the highest commission that the publisher was

18   paying any other agent.  And you recall that that was in at

19   least some of these agreements, right?

20   A.  Yes.

21   Q.  And the amount of the commission in each of these

22   agreements is 30 percent, correct?

23   A.  That's my recollection.

24   Q.  That was another priority for Amazon?

25   A.  Well, we would have liked more commission, but achieving at

1   least the same commission as our other customers was important

2   to us.

3   Q.  So you didn't think there was anything unreasonable about a

4   30 percent commission, right?

5   A.  It's a difficult question to answer because we had never

6   done business that way.  We were making it up very quickly.  We

7   were largely presented with many of these terms, and so not

8   knowing what a great term was, we at least asked to say we have

9   a commission that's as good as any of your other customers, at

10  least on a relative basis, knowing that it gave us a certain

11  level of comfort.

12         But having no experience operating an agency model in

13  the book business, what's reasonable and what's not, I think,

14  is an open question

15  Q.  You said in answer to my earlier question that Amazon would

16  have gladly accepted more, right?

17  A.  There were a lot of things we could ask for that we'd like,

18  yes.  Yes is the answer.

19  Q.  Yes.  So just getting back to my question.  A 30 percent

20  commission would be reasonable in your view, correct?

21  A.  I think I answered your question just a moment ago.  Not

22  having done business under the agency model before, we were

23  largely presented with these terms, including 30 percent, not

24  knowing what they'd agreed to with other agents, at least gave

25  us a certain degree of comfort that we were no worse than other

1   customers.

2   Q.  Now, Amazon also sought a three-year term for each of its

3   agency agreements, correct?

4           MR. McQUAIG:  Objection, asked and answered.

5           THE COURT:  Overruled.  I think he's returning

6   transition-wise to a topic to go into it in more detail.

7   A.  I don't recall, and I'm not sure that we asked for three

8   years for every deal.

9   Q.  Well, you asked for a three-year term with Macmillan and

10  you got it, right?

11  A.  Yes.

12  Q.  Fair to say you were pretty consistent across the

13  publishers in terms of what you were asking for at the time?

14  A.  Particularly as it relates to terms, the answer is no.

15  Q.  And you have no recollection that each of the publishers

16  resisted -- other than Macmillan, resisted entering into a

17  three-year agency term with Amazon, no recall of that?

18  A.  I recall that in at least some of the negotiations, how

19  long the term went for was certainly a matter of negotiation.

20  Q.  And you heard from at least some of the publishers, didn't

21  you, that they wanted to be able to -- they wanted a shorter

22  term because they wanted to be able to renegotiate if there

23  were issues associated with agency that, for example,

24  demonstrated it might not be the right model?

25  A.  I can't speak to their motivation.  I can tell you that

1    publishers, in any number of the cases, wanted shorter terms

2    than what we ultimately agreed to.

3    Q.  I'm not asking you about their motivation.  I'm asking

4    about what they told you during negotiations.  Didn't you hear

5    from publishers in the negotiations that we want a shorter term

6    because this is a new model.  We don't know exactly how it's

7    going to work out, and we want to be able to rethink this after

8    a year or so?

9    A.  I don't recall that specifically, but that doesn't sound

10   inconsistent with what they might have said.

11   Q.  Sir, I think we talked about Macmillan, that was a

12   three-year term.  Do you recall that the Simon & Schuster term

13   was around 21 months?

14   A.  I don't remember specifically.

15   Q.  Do you recall that the HarperCollins deal effectively was

16   for 22 months?

17   A.  Again, the actual durations, sometimes we talked about them

18   in terms of when they terminated as opposed to the duration.

19   So I'm just not as familiar with those terms by publisher off

20   the top of my head.

21   Q.  Do you recall that they were all longer than a year?

22   A.  I think so, yes.

23   Q.  Fair to say that Amazon's agency contracts were similar

24   with respect to the material terms across the publishers?

25   A.  Can you be more specific about what you mean by the

1    material terms?

2    Q.  Sure.  Well, let's talk about the terms we've discussed

3    today.  Each of the contracts had a no windowing guarantee,

4    correct?

5    A.  In some form.

6    Q.  In some form.  Price tiers in some form?

7    A.  Yes.

8    Q.  30 percent commission?

9    A.  I believe so.

10   Q.  And parity provisions for price, correct?

11   A.  Against other agents, yes.

12   Q.  Selection?

13   A.  Yes.

14   Q.  Business model?

15   A.  I believe so.

16   Q.  And at least some commission MFNs?

17   A.  Again, commission is just the one, for whatever reason, my

18   memory is less hazy on being in all the contracts.

19   Q.  Understood.  It was in one or more of them?

20   A.  It was in some.  We saw that in Random House, yes.

21   Q.  Now, let me ask you a few questions about the negotiations

22   themselves.  When you negotiated the agency contract with the

23   publishers, there were times when you shared with one publisher

24   information about your negotiations with another publisher,

25   correct?  Do you recall that?

D65PUSA6                      Grandinetti - cross

1   A.  I don't have a vivid memory of that.

2   Q.  Well, let's see if I can refresh it.

3            MR. HEISS:  This is DX312, which we offer.

4            MR. McQUAIG:  No objection.

5            THE COURT:  Received.

6            (Defendant's Exhibit 312 received in evidence)

7   Q.  Let me know when you've had an opportunity to review it,

8   Mr. Grandinetti.

9   A.  How far would you like me to read, sir?

10  Q.  Well, read the first page.  Well, actually, I think you're

11  going to have to read the first two pages.

12  A.  Okay.

13  Q.  Thank you.

14  A.  I read the first two pages.  Do you need me to read --

15  Q.  No, that's fine.  And this is an e-mail chain between a

16  variety of folks from Hachette and Amazon, right?

17  A.  It appears to be, yes.

18  Q.  Okay.  And in it you assure Hachette that your agreements

19  with competitors would be materially similar with respect to

20  parity on price and selection, right?

21  A.  It says, to be clear, parity and price and selection is

22  what we are agreeing to with others.

23  Q.  Right.  That's why I asked.  You agreed -- You assured him

24  that those terms would be materially similar because those were

25  the terms that you're agreeing to with others, right?

D65PUSA6                    Grandinetti - cross

1   A.  We were very clear with all the publishers that we would

2   not sign any agency agreements without parity on price and

3   selection.

4   Q.  And you told Hachette that that's precisely what you were

5   agreeing to with others.  By "others" you mean publishers with

6   which you were negotiating with at this very time, correct?

7   A.  Yes.

8            MR. McQUAIG:  Objection, compound.

9            THE COURT:  Overruled.

10  Q.  At the bottom of the first page you say -- this is an

11  e-mail from you to David Young, right?  "Hi, David."  And you

12  say, "We are making good progress with everyone else, and we'd

13  love to do the same with Hachette."

14           And what you were referring to by "good progress with

15  everyone else" was the progress, the positive progress that

16  Amazon was making in its negotiation with the other publishers

17  with which you were negotiating at the same time, right,

18  Mr. Grandinetti?

19  A.  Yes.

20  Q.  And Mr. Young responds --

21           THE COURT:  Excuse me.

22  Q.  -- by saying glad this is -- Oh, sorry.

23           THE COURT:  One more question, Mr. Heiss.

24           MR. HEISS:  Pardon?

25           THE COURT:  One more question.

1            MR. HEISS:  Thank you, your Honor.

2    Q.  And Mr. Young responds, "Glad to hear this.  Perhaps they

3    will do some of the heavy lifting."  Do you see that?

4    A.  I see that.

5    Q.  And you understood that to mean that Young at Hachette was

6    hoping that the other publishers might be able to resolve some

7    of the same terms that he was concerned about that you were

8    negotiating with him at the same time; isn't that how you

9    understood that?

10   A.  It's a very general comment.

11   Q.  Isn't that how you understood it?

12   A.  It's not clear to me.

13   Q.  You didn't have any idea what he meant?

14   A.  I could guess what he meant, but I wouldn't speculate.

15   Q.  I don't want you to guess or speculate.  I want you to tell

16   us --

17   A.  I don't know.

18   Q.  -- what your understanding of that is.

19   A.  I didn't write it.

20   Q.  I understand that.  But what did you understand it to mean?

21   You read it.  What did you understand it to mean?

22   A.  Well, when I read that, when I read this now, what it makes

23   me think of is we had any number of contentious terms for them,

24   and they thought other publishers might push us back on them.

25   That would be my guess at his intent.  Again, I didn't write

D65PUSA6                         Grandinetti - cross

1       it, and so I can't say what he thought.

2                   THE COURT:  And on that, we will end for the day.  You

3       can be seated.  And, Mr. Grandinetti, we'll see you tomorrow

4       morning at 9:30.

5                   THE WITNESS:  Thank you, your Honor.

6                   (Witness temporarily excused)

7                   THE COURT:  Mr. Heiss, I'm not sure that you offered

8       DX288, Amazon's contract with Macmillan.

9                   MR. HEISS:  If I didn't, I do now.

10                  THE COURT:  It's received.

11                  (Defendant's Exhibit 288 received in evidence)

12                  MR. HEISS:  Thank you.  Again, subject to checking all

13      of this, roughly, I think the government spent two hours and 55

14      minutes today, and Apple, two hours and 45 minutes.  But I'll

15      check this and tell you if that's different in the morning.

16                  So are there any issues we need -- Oh, we're going to

17      address third-party issues today and hopefully get those behind

18      us.

19                  MR. BUTERMAN:  Your Honor, for the government,

20      Miss Fleming will be addressing the issues.

21                  THE COURT:  Thank you.

22                  MS. FLEMING:  Good afternoon, your Honor.

23                  THE COURT:  Good afternoon, Ms. Fleming.

24                  MS. FLEMING:  Your Honor, the government has resolved

25      all issues with all third parties with the exception of Penguin

```
 1    for which two documents have issues that I believe they wish to

 2    bring to the attention of the Court.  Mr. McInnis is here to do

 3    that this afternoon.

 4              THE COURT:  Thank you, Mr. McInnis.  And Ms. Rubins'

 5    point of view?

 6              MS. RUBIN:  We've resolved all issues with all third

 7    parties, your Honor.

 8              THE COURT:  Thank you so much.  So the two documents,

 9    do I have copies of those, Mr. McInnis?

10              MR. McINNIS:  They are PX544 and 578.

11              MS. FLEMING:  Your Honor, I do have extra copies, if

12    you would like to take a look at them.

13              THE COURT:  I have them as part of the earlier

14    submission to me.  So I think what we should do, I think the

15    most efficient way for us to do this is to do this in the

16    robing room.  And I will make a decision after I hear the

17    parties whether or not the transcript will remain sealed or

18    not.  But this will permit Mr. McInnis to speak frankly about

19    his concerns in a way that we can't do here in open court.

20              And I'll inform everyone in the morning whether the

21    transcript is sealed in whole or in part and briefly describe

22    the subject, in any event, of our conversation.

23              Anything else that we need to do before adjourning

24    this evening?

25              MR. SNYDER:  Not from Apple, your Honor.  Thank you.
```

1            MR. RYAN:  Not from the government, your Honor.

2            THE COURT:  Great.  Thank you all.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D65PUSA7                         Trial

1            (In the robing room)

2            THE COURT:  So we'll go on the record and take

3    appearances for Penguin.

4            MR. McINNIS:  Daniel F. McGinnis.

5            THE COURT:  And for the government?

6            MR. RYAN:  Mark Ryan and Stephanie Fleming.

7            THE COURT:  And for Apple?

8            MS. RUBIN:  Lisa Rubin, your Honor.  But I think we

9    may have missed Mr. Lipman.

10            MR. LIPMAN:  For the states, your Honor.

11            THE COURT:  Thank you.  I very much apologize.

12            So the first document that is at issue, I think, is

13    PX544; is that right, Miss Fleming?

14            MS. FLEMING:  That's correct.  The two documents

15    actually are related, though.

16            THE COURT:  Why don't you describe their importance

17    from the government's point of view.

18            MS. FLEMING:  From our point of view, your Honor,

19    these two documents reflect the results of a study that Penguin

20    had arranged for in 2011 examining pricing and sales data from

21    eBooks between the period of March 1st, 2010, and June 30th,

22    2010, which also was the period when they had withheld new

23    releases from Amazon.

24            They examined the question of whether the withholding

25    of those new releases resulted in a significant increase in the

1    sales of print books and concluded, I believe, that it was

2    not -- was not a successful -- it did not successfully shift

3    those sales to print books.

4            And so PX544 is an e-mail discussing the results of

5    that study and confirming that they actually are consistent

6    with what they have found in practice.  And PX578 is, I

7    believe, the summary, the ash paper that resulted from that

8    study.

9            THE COURT:  And the relevance, from the government's

10   point of view, at this trial?

11           MS. FLEMING:  Well, your Honor, the counsel for Apple

12   has made the argument that windowing was part of the but-for

13   world in the absence of a shift to agency pricing for the

14   industry.  They have questioned several witnesses, including

15   this afternoon, regarding what incentives windowing created for

16   people to move to the agency model.

17           And, in fact, yesterday Mr. Shanks also testified

18   about a similar subject.  He discussed the fact that Penguin

19   had looked internally at whether it was worthwhile to window.

20   He discussed the experiments Penguin had done with Catherine

21   Coulter's novel and that influenced the incentives Penguin had

22   to windowing in the future.

23           So the but-for world includes windowing.  Forgive me,

24   if the but-for world is one in which publishers did not have an

25   incentive to window long term, then it would effect how likely

Apple is to succeed in their argument that there was -- that
there was an incentive for retailers to go to agency to avoid
windowing.

          MR. McINNIS:  To be clear, what Penguin did with
Amazon as part of its negotiations was not windowing because
these books were available to consumers.  So they were
available at Apple, Sony, Barnes and Noble.  So if this
argument is simply about windowing, this study and these
documents have nothing to do with windowing, as just described
by the government.

          More generally, why would we care, right?  Penguin,
when it became -- the principal took over the responsibility of
competing on prices to consumers, and Penguin is a highly
analytical company, they had the responsibility and recognized
the importance of investing heavily in researching how to price
effectively, efficiently in defined market prices.

          So they went out, they hired outside experts, they
hired people inside the company, including econometricians, and
spent significant sums in studying the marketplace.  And it's
this proprietary research that we're really talking about, and
there's a lot of it which the government has largely agreed is
confidential, and we have.

          It's not going to be part of the public record, and
it's really down to these just two small pieces that we contend
are not relevant to the case and are important, expensive

1    pieces of the research that the company has done to find out

2    how to best compete.  And here we are, in open court and with

3    our competitors in the room, our competitors reading the

4    transcript and, therefore, we have made a decision, and we made

5    a careful decision because we understand that most everything

6    is going to become public, these -- this type of analysis and

7    these specific sets of analyses have so limited relevance to

8    the case and are part of that overall proprietary work that the

9    company has done on how to compete, that we believe, we contend

10   that we have met the standard to keep this confidential.

11          MS. RUBIN:  Your Honor, may I be heard?  Your Honor,

12   Apple has no stake in the fight or the dispute rather, that the

13   government is having with Penguin over these two documents.  We

14   don't intend to rely on either of the documents.  I do want to

15   respond, however, to Ms. Fleming's characterization of the

16   relevance of the document as it relates to the arguments that

17   Apple is making in this trial.

18          Apple's position about windowing was clear.  We

19   dislike windowing in part because we believe that it led to

20   piracy.  That was based on our experience in innovating in

21   other contact markets.  The reason we believed that windowing

22   was relevant was because it was a part of the market conditions

23   at the time that Apple was exploring its entry into eBook

24   sales.

25          Whether windowing was or was not effective as a matter

 1   of practice is not relevant to Apple.  What Apple cares about

 2   is what the publishers were planning on doing, what their

 3   public announcements were, and what the world looked like as

 4   Apple was considering entering this market, and how it shaped

 5   its incentives and, therefore, its intent.

 6           THE COURT:  Let me just read the documents.

 7           MR. SNYDER:  Sure.  Of course.

 8           THE COURT:  Well, this is the same thing I just read,

 9   sorry.  So without tieing my hands, I have some preliminary

10   reactions and then some questions.  It seems to me that the

11   entirety of PX544 should probably come in.

12           With respect to PX578, it's made up of two documents.

13   There's a cover e-mail, which is also part of the previous

14   exhibit, and then there is the attachment, which is the study.

15   And the study goes on for several pages, and I think it would

16   be important to have the material through Page 2 up to Section

17   3 on that page.  So it would have the executive summary and the

18   research design, which includes the dates, including the delay

19   period that was studied.  But I'm not sure there would be any

20   need, from the government's point of view, for the rest of the

21   material, starting with Section 3 and the underlying data.

22           MS. FLEMING:  No, your Honor, correct.  We do not have

23   any need for the remainder of the document, and would be happy

24   to redact it.

25           THE COURT:  Okay.  So now we're talking about two

D65PUSA7                         Trial

 1  e-mails and a page and a half of the report, which doesn't

 2  actually include any sales figures.  Mr. McInnis?

 3          MR. McINNIS:  In the spirit of blissfully getting all

 4  of this confidentiality issue behind us, we would be fine with

 5  that resolution, your Honor.

 6          THE COURT:  Okay.  And I don't think any of this needs

 7  to be sealed.  We haven't disclosed any confidential

 8  information on the record.  Is there anyone who has a different

 9  opinion?

10          MR. McINNIS:  No objection, your Honor.

11          THE COURT:  Okay.  So we won't seal this transcript.

12  It will be available to everyone in the morning.  And thank you

13  so much.

14          McINNIS:  Thank you, your Honor.

15          MS. FLEMING:  Thank you.

16          MR. RYAN:  Thank you have a good night.

17          (Adjourned to June 6, 2013, at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    CAROLYN KROLL REIDY

 4   Direct By Mr. Buterman . . . . . . . . . . . 453

 5   Cross By Mr. Floyd . . . . . . . . . . . . . 543

 6   Redirect By Mr. Buterman . . . . . . . . . . 598

 7   Recross By Mr. Floyd . . . . . . . . . . . . 607

 8   Redirect By Mr. Buterman . . . . . . . . . . 608

 9   RUSSELL CHRISTOPHER GRANDINETTI

10   Cross By Mr. Heiss . . . . . . . . . . . . . 628

11                          PLAINTIFF EXHIBITS
     Exhibit No.                             Received
12    359   . . . . . . . . . . . . . . . . . . . 488

13    299   . . . . . . . . . . . . . . . . . . . 495

14    607   . . . . . . . . . . . . . . . . . . . 528

15    164   . . . . . . . . . . . . . . . . . . . 601

16    PX835   . . . . . . . . . . . . . . . . . . 627

17                          DEFENDANT EXHIBITS
     Exhibit No.                             Received
18    277   . . . . . . . . . . . . . . . . . . . 637

19    274   . . . . . . . . . . . . . . . . . . . 640

20    DX334, 333, 345 and 382   . . . . . . . . . 648

21    306   . . . . . . . . . . . . . . . . . . . 656

22    Random House agreement   . . . . . . . . . 664

23    312   . . . . . . . . . . . . . . . . . . . 673

24    288   . . . . . . . . . . . . . . . . . . . 676

25
```