D6DPUSA1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                  Plaintiff,

          v.                              12 Civ. 2826 (DLC)

APPLE, INC., *et al.*,

                  Defendants.

------------------------------x

                                          June 13, 2013
                                          9:32 a.m.
Before:

                  HON. DENISE L. COTE,

                                          District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6DPUSA1                      Trial

1                              APPEARANCES

2

    UNITED STATES DEPARTMENT OF JUSTICE
3        Attorneys for Plaintiff
    BY:  MARK W. RYAN
4        LAWRENCE BUTERMAN
         CARRIE SYME
5        KATHARINE MITCHELL-TOMBRAS

6   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         Attorneys for State of Texas and Liaison counsel
7        for plaintiff States
    BY:  GABRIEL R. GERVEY
8
    OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT
9        Attorneys for State of Connecticut and Liaison counsel
         for plaintiff States
10  BY:  W. JOSEPH NIELSEN

11  OFFICE OF THE ATTORNEY GENERAL OF OHIO
         Attorneys for State of Ohio
12  BY:  EDWARD J. OLSZEWSKI

13  OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
         Attorneys for Commonwealth of Virginia
14  BY:  SARAH OXENHAM ALLEN

15  GIBSON, DUNN & CRUTCHER

16       Attorneys for Defendant Apple
    BY:  ORIN SNYDER
17       LISA H. RUBIN
         DANIEL S. FLOYD
18       DANIEL G. SWANSON
         CYNTHIA E. RICHMAN
19           -and-
    O'MELVENEY & MYERS
20  BY:  HOWARD E. HEISS

21

22

23

24

25

D6DPUSA1                          Trial

1              (In open court; trial resumed)

2              THE COURT:  Good morning, everyone.  Let me begin by

3      telling you that I confirmed the times that I gave you last

4      night and, therefore, the government has used so far 17 hours

5      and 43 minutes, and Apple has used 19 hours and 56 minutes.

6              I also used the time to look at Miss McIntosh's

7      declaration and reflect on the discussion that was raised with

8      me at the end of the trial day yesterday about the government's

9      decision not to cross-examine Ms. McIntosh, and I have a

10     question for the government, but before I get to that question,

11     let me just outline my understanding of the issues and some

12     observations about them.

13             Apple argues that I need to have Ms. McIntosh here in

14     the courtroom in order fairly to assess her credibility, and

15     last night they made two principal arguments about why it's so

16     important to have her in the courtroom for that purpose.  One,

17     to assess her credibility on the issue of whether Apple

18     acknowledged that Random House could be on a wholesale

19     arrangement with other retailers.  Of course, that's reflected

20     in a document, and it's described by Ms. McIntosh in paragraph

21     13 of her direct testimony.

22             The second, and as I understood less important, but

23     nonetheless important issue from Apple's point of view was with

24     respect to two conversations that Ms. McIntosh had with two

25     Amazon employees and these, again, are reflected in documents.

D6DPUSA1                        Trial

1    There is a conversation with Ms. Porco that's an e-mail

2    exchange in document DX278, and that's described in

3    Ms. McIntosh's direct testimony at paragraph 20.  And then

4    there is an e-mail exchange with Mr. Naggar in DX281, and

5    that's described in Ms. McIntosh's direct testimony at

6    Paragraph 21.

7            Neither Ms. Porco nor Mr. Naggar discuss these

8    conversations in their direct testimony, but they were the

9    subject of cross-examination by Apple.  So Apple chose to

10   question Miss Porco at length, I think we all remember that, I

11   certainly remember it clearly, on DX278, and there was

12   testimony elicited from Mr. Naggar about DX281.

13           So what does one conclude from this?  First, that each

14   of these topics was anticipated by Apple and elucidated through

15   this witness in her direct testimony.  Second, that each of

16   these topics is really premised principally on contemporaneous

17   documents.  That's why anyone's probably, at this point, able

18   to talk about these conversations in any detail because what

19   they're really doing is explaining what happened in connection

20   with an exchange of e-mails.

21           So I've looked at Ms. McIntosh's direct testimony and,

22   overnight, again.  So let me begin by asking the government.

23   In my view, the only unfairness to Apple here is if the

24   government plans to argue in summation that Miss McIntosh is

25   not a truth teller with respect to any statement in her

D6DPUSA1                         Trial

1    affidavit on these topics.  And the unfairness, I think, would

2    be that if they're going to make that argument in summation,

3    they should make it to her when she's on the stand, through

4    cross-examination, so that she has an opportunity to explain

5    herself.

6           So does the government plan to argue in summation that

7    she is not a truth teller with respect to any of the topics

8    outlined by Mr. Snyder last night?

9           MR. BUTERMAN:  Lawrence Buterman for the United

10   States, your Honor.  No, we do not.

11          THE COURT:  So I have looked at her affidavit, as

12   well, and don't feel that there are any questions I need to put

13   to her.  So if the government insists, Miss McIntosh would have

14   to come to court and swear to the truth of her affidavit.  I do

15   not understand that they are insisting on that and, therefore,

16   her affidavit will be received as an exhibit at trial and as

17   representing her direct testimony.

18          MR. HEISS:  Your Honor, just one point related to

19   that.  We, in connection with Ms. McIntosh's declaration, would

20   offer DX281 in evidence.  The government originally had a

21   hearsay objection to it, which I believe that they have now

22   withdrawn.  So we would offer that in evidence.

23          MR. BUTERMAN:  No objection, your Honor.

24          THE COURT:  It's received.

25          (Defendant's Exhibit 281 received in evidence)

D6DPUSA1                    Trial

1          THE COURT:  Thank you, so much, counsel, for your

2     assistance on this.  Okay.

3          MR. RYAN:  Your Honor, Mark Ryan.  We have the

4     unredacted version of those two pages from Professor Gilbert's

5     declaration that were accepted under seal.  I'd like to hand

6     those up.

7          THE COURT:  Thank you.  They will be sealed.

8          MR. SNYDER:  May I proceed, your Honor?

9          THE COURT:  Yes.  Dr. Gilbert?  Dr. Gilbert, please

10    take the witness stand and I want to remind you, you are still

11    under oath.

12          THE WITNESS:  Yes, your Honor.

13     RICHARD JOSEPH GILBERT,

14         called as a witness by the Plaintiffs,

15         having been previously duly sworn, testified as follows:

16    CROSS-EXAMINATION (Resumed)

17    BY MR. SNYDER:

18    Q.  Good morning, Dr. Gilbert.

19    A.  Good morning.

20    Q.  Sir, I want to direct your attention to paragraph 145 of

21    your direct testimony, which Andy will put up on the screen.

22    Am I correct, sir, that in your report, you offered the Court

23    an opinion about consumer harm resulting from, allegedly, the

24    agency agreements at issue in this case?

25    A.  If I might just take a moment to look at it.

D6DPUSA1                         Gilbert - cross

1    Q.  Well, without looking at the paragraph, sir, if you could

2    just tell the Court, is a component of your expert opinion, an

3    opinion that consumers were harmed as a result of the agency

4    agreements my client entered into with the five publishers in

5    January of 2010?

6    A.  Yes.

7    Q.  And am I correct that you base that conclusion in one --

8    paragraph 145, sir, by analyzing prices for the -- what you

9    call the defendant publishers' eBooks following agency; is that

10   correct?

11   A.  If I may just look at the paragraph just to be sure?

12   Q.  Well, let me just ask you, before you look at your report,

13   sir, do you know whether your consumer harm opinion is based on

14   just the prices for the publisher defendants' eBooks or for --

15   based on the price of eBooks throughout the relevant market in

16   the aftermath of my client's entry?

17   A.  I would say yes to both.

18   Q.  Didn't you acknowledge yesterday, sir, before we broke,

19   that you do not dispute Dr. Burtis' analysis that the average

20   price of eBooks in the relevant market across the market fell

21   following my client's entry into the eBook business?

22   A.  I do not dispute that.

23   Q.  So your consumer harm opinion is based on prices for the

24   defendant publishers' eBooks alone, correct?

25   A.  No.

D6DPUSA1                           Gilbert - cross

1   Q.  Well, let's look at 145 of your declaration.  Well, let me

2   ask you this question, sir.  Would you agree that price

3   increase by itself is not anticompetitive, as an economist

4   looking at markets?

5   A.  I would agree with that statement in its isolation.

6   Q.  Right.  And would you agree that even an infinite price

7   increase is not anticompetitive by itself?

8   A.  Not in isolation.

9   Q.  Now, did you offer an opinion yesterday, sir -- Let me

10  withdraw 145 and move on.

11         Did you offer an opinion yesterday, sir, -- well,

12  withdrawn.

13         Let me direct your attention briefly to the price caps

14  in the Apple agency agreements.  Your report discusses those,

15  correct?

16  A.  Yes.

17  Q.  And those are the price caps in Apple's agreements with the

18  five publishers, correct?

19  A.  Yes.

20  Q.  And you know that those price caps apply only to New York

21  Times best sellers and hardcover new release eBooks, correct?

22  A.  My understanding is the price caps have certain differences

23  among the contracts, some of them may apply to new releases in

24  any form, even a paperback.  Most of them apply to hardcover

25  new releases.

D6DPUSA1                    Gilbert – cross

1    Q.  And are you aware, sir, that the eBooks that are the focus

2    of this case, namely, hardcover new releases, including

3    New York Times best sellers, represent only ten percent of the

4    paid eBooks sold in your alleged relevant market; are you aware

5    of that?

6    A.  That depends on the moment of time that you're looking at.

7    Q.  Does that seem, though, to be a good approximation of the

8    percentage of paid eBooks represented by that category of

9    eBooks, that is, hardcover new releases, including the New York

10   Times best sellers that were subject to the price caps?

11   A.  I haven't done the calculation.  I would expect that in

12   recent times I wouldn't have reason to dispute that figure.

13   Q.  And having not done the calculations, you have no basis, do

14   you, to dispute Dr. Burtis' conclusion in paragraph 6 of her

15   declaration that the books we're talking about, that small

16   category represented only 10 percent of the paid eBooks in the

17   relevant market?

18   A.  I haven't verified the calculations; so I don't dispute it,

19   but I haven't verified it either.

20   Q.  And, therefore, you cannot dispute that 90 percent of all

21   eBooks sold in the relevant market alleged by the Department of

22   Justice were not subject to either the MFN or the price caps,

23   correct?

24   A.  For the same reason.

25   Q.  Right.  And you would agree, just on the subject of price

D6DPUSA1                          Gilbert - cross

1   caps, that the price caps in the agency agreements constrained

2   the publishers from setting higher prices for those books on

3   the Apple bookstore?

4   A.   I believe the publishers wanted higher prices; so -- and

5   according to my analysis, with the prices at or near the price

6   cap, I think that's a reasonable conclusion.

7   Q.   It's a reasonable conclusion that the price caps had the

8   effect of constraining the ability of the publishers to set

9   higher retail prices than they otherwise would, correct?

10  A.   For those books that were subject to the price cap.

11  Q.   Now, finally, sir, am I correct that you offered an opinion

12  in your report about what I call windowing, but you called

13  withholding of the eBooks?

14  A.   It depends upon which opinion.  I mean, windowing and

15  withholding are different concepts.  I've addressed both

16  concepts in the report.

17          MR. SNYDER:  Can we, Andrew, please, call the witness'

18  attention to yesterday's trial transcript, Page 1613, Lines 13

19  to 1614, Line 6.

20  Q.   Sir, do you recall before the break me asking you these

21  questions and you giving these answers:

22  "Q.   Apple's entry into the eBook business on -- with a

23  dedicated eBook store was a significant event in the nascent

24  eBook industry, correct?

25  "A.   I would agree it was perceived at the time --

D6DPUSA1                        Gilbert - cross

1   "Q.   Thank you.

2   "A.   -- as a significant event.

3   "Q.   And as things stood in late January, Apple was going to

4   have all new releases on a brand new tablet device, correct?

5   "A.   I'm sorry, say that again, please."

6          I repeated the question, and your answer was:

7   "A.   That was an understanding, yes, I believe.

8   "Q.   And if Amazon stayed in its existing business

9   relationships with the publishers, that is wholesale with

10  either actual or threat of windowing, that could pose to Amazon

11  a competitive risk, correct?

12  "A.   Only if that withholding were a credible threat, and I

13  felt it was -- I do not feel that it was not."

14  A.   I think I said --

15          MR. RYAN:   Objection, your Honor.

16  Q.   I think you meant, I do not feel that it was, is what

17  you're saying, a credible threat, correct?

18          MR. RYAN:   Objection.

19  A.   I think --

20          THE COURT:   Wait one minute.

21          MR. SNYDER:   I was flustered by the objection.

22          THE COURT:   Yes.

23          MR. SNYDER:   I withdraw the last question, and I'm

24  going to ask a new one.

25  Q.   Sir, can you read your answer and then tell the Court what

D6DPUSA1                         Gilbert - cross

1    your answer is so we can have clarity on the record?

2                   MR. RYAN:  Objection, your Honor.

3    Q.  Can you read your answer, please, out loud, sir?

4                   THE COURT:  Well, I think I'm going to try to capture

5    what Mr. Snyder wants to achieve here.  I'm going to place the

6    last question to you again.  If you could, answer that, please.

7                   And if Amazon stayed in its existing business

8    relationships with the publishers, that is wholesale with

9    either actual or threat of windowing, that could pose to Amazon

10   a competitive risk, correct?

11   A.  My answer is only if that withholding were a credible

12   threat, and I felt it was -- I do feel that it was not.

13   Q.  So it's your testimony that you did not feel that Amazon,

14   as an economic actor, believed that withholding was a credible

15   threat, yes or no?

16   A.  I don't know what Amazon believed.  Whether the threat was

17   credible depends upon whether the entity that is making the

18   threat is prepared to carry it out, and I addressed it in that

19   sense.

20   Q.  I'm just trying to understand your testimony.  Yes or no,

21   is it your testimony that you do not believe that windowing in

22   late January 2010 was a credible threat?

23                   MR. RYAN:  Objection.

24   A.  I believe it was not a credible threat.

25   Q.  Thank you.

D6DPUSA1                          Gilbert - cross

1              THE COURT:  Overruled.

2   Q.  And in coming to the conclusion that the threat of

3   windowing was not credible in January of 2010, did you review

4   documents in the case concerning Amazon's reaction to the

5   concept of withholding or windowing of books?

6   A.  I reviewed a number of documents.

7   Q.  Did you consider -- who's the CEO of Amazon?

8   A.  Mr. Bezos.

9   Q.  And did you consider whether Mr. Bezos, for example, as the

10  CEO, thought that windowing was a credible competitive threat

11  to Amazon's business?

12  A.  I don't recall.

13  Q.  Let me show you Plaintiff's Exhibit 146, which I'll offer

14  in evidence.

15              MR. SNYDER:  And I'll hand that up to the Court, and

16  distribute to counsel and the witness.

17              THE COURT:  Any objection?

18              MR. RYAN:  It's in, your Honor.

19              THE COURT:  Thank you.

20  Q.  Did you review this document, sir, before coming to your

21  expert conclusion that windowing was not a credible threat?

22  A.  I may have, but I don't recall.

23  Q.  And was it not relevant to your determination that,

24  according to Brian Murray's e-mail of January 31, 2009, Amazon

25  was warning nuclear war if publishers delay eBook publication

D6DPUSA1                          Gilbert -- cross

1    date?  Have you ever seen that before?

2    A.  I vaguely recall that, but I don't know if I saw it in this

3    document.

4    Q.  Thank you.  Let's go to the next exhibit, Defendant's

5    Exhibit 23.

6              THE COURT:  I'm sorry.  This document is from July of

7    '09?

8              MR. SNYDER:  Yes, your Honor.

9              THE COURT:  Okay.  PX146?

10             MR. SNYDER:  Yes, your Honor.  It is.

11             THE COURT:  Okay.

12   Q.  Have you seen Defendant's Exhibit 23, sir, which includes

13   an e-mail from April of 2009 from Jeff Bezos to Laura Porco and

14   others at Amazon regarding a Kindle meeting with Markus Dohle,

15   CEO of Random House?

16   A.  I don't recall it.  I may have seen it.  I don't recall it.

17   Q.  And so then you don't recall whether Mr. Bezos told Laura

18   Porco and others in April of 2009 that, on the subject of

19   delaying the eBook, "that would be an absolute declaration of

20   war, terrible customer experience, embarrassing to us in front

21   of customers; the simple fact is we couldn't tolerate it.  It

22   would be better off to just not carry their books"?  Do you see

23   that?

24   A.  I see it, yes.

25   Q.  Did you do any investigation of whether Amazon's views

D6DPUSA1                          Gilbert - cross

1    about windowing changed between the time Mr. Bezos said in

2    April 2009 that the delaying of an eBook would be an absolute

3    declaration of war, to late January of 2010?

4    A.   Are you -- just to clarify, are we talking windowing or

5    withholding?

6    Q.   Delaying the eBook for a period of time on the Kindle

7    platform, as several publishers were then doing, and four had

8    threatened by the end of January 2010, which we established

9    yesterday?

10             MR. RYAN:   Objection.

11             THE COURT:   Sustained.

12   Q.   Didn't we establish yesterday your understanding that four

13   of the six major publishers had, prior to Apple entering the

14   scene, already either started windowing or threatening

15   windowing; that is, delaying the eBook on the Kindle, the NOOK

16   and other platforms?

17   A.   It is my understanding that there were sporadic instances

18   of windowing.

19   Q.   Right.   And including some of the very top new releases of

20   some of the top publishing houses in the world, correct?

21   A.   Yes.   I understand, over this period, it's my understanding

22   there were 37 titles that were windowed.

23   Q.   And you understood, did you not, that under the contracts

24   that were negotiated between Amazon, on the one hand, and the

25   publishers, on the other, the publishers had the absolute

D6DPUSA1                    Gilbert - cross

1    contractual right to delay books on any platform if the

2    publishers saw fit, correct?

3    A.   That is my understanding.

4    Q.   All right.  So my question to you is, sir, in coming to

5    this Court and telling the Court that you thought windowing in

6    January of 2010 was not a credible threat, did you investigate

7    whether Mr. Bezos' view in November -- in April of 29 --

8    withdrawn.

9            In rendering your opinion that windowing was not a

10   credible threat in January of 2010, did you investigate whether

11   Amazon's view that delaying an eBook would be an absolute

12   declaration of war changed in any way between the spring of

13   2009, when it was expressed, and January of 2010?

14   A.   I certainly considered that.

15   Q.   And do you have evidence that you can point to the Court, a

16   document or testimony, where Amazon's view that the withholding

17   of books was an absolute declaration of war, was any different

18   in January of 2010 than it was in June of 2009?

19   A.   My view is that Amazon reacted strongly.  You know, whether

20   it's a formal declaration of war or not to withholding threats,

21   and that was something they reacted to over this time period,

22   that they didn't like it, they objected to it, it was

23   discussed.

24           How their thinking may have progressed over this time

25   period, I think, is really something that Mr. Bezos has to

D6DPUSA1                      Gilbert - cross

1  testify to, but my view is that they objected to windowing,

2  withholding over this time period.

3  Q.  Right.  And you have no evidence that you can point to this

4  Court -- withdrawn.

5          You reviewed extensive testimony in preparing your

6  hundreds of pages of reports in this case, correct?

7  A.  Yes.

8  Q.  And you had a staff working for you, correct?

9  A.  Yes.

10  Q.  How many people worked for you in reviewing reports and

11  documents leading up to the creation of your report?

12  A.  Several.  I don't know the exact number.

13  Q.  More than five?

14  A.  Probably about five.  I don't know if there were more or

15  less.

16  Q.  And for how long did you work with that team, how many

17  months, in preparing your report, reports?

18  A.  Oh, many months, probably eight months or so.

19  Q.  So you had a team of five people for as much as eight

20  months reviewing the evidence in this case, correct?

21  A.  Yes.

22  Q.  Can you point to a single document or a single piece of

23  testimony, sir, that demonstrates that Amazon's view in

24  April 2009, that delaying the eBook would be an absolute

25  declaration of war, changed in any way between April 2009 and

D6DPUSA1                    Gilbert - cross

1    January of 2010, yes or no?

2    A.  I could not point to a document.

3    Q.  Yes or no --

4    A.  I don't think it did; so that's -- I think that's what I

5    said.

6    Q.  Is the answer yes or no to my question, sir?

7    A.  No, I'm not aware of a document to that effect.

8              MR. SNYDER:  Thank you.  No further questions.

9    REDIRECT EXAMINATION

10   BY MR. RYAN:

11   Q.  Good morning, Dr. Gilbert.

12   A.  Good morning.

13   Q.  As a professional economist, are you familiar with the term

14   confounding factor?

15   A.  Yes.

16   Q.  What is a confounding factor?

17   A.  Usually it arises in statistical analysis where when you're

18   trying to determine whether one variable causes another

19   variable or is causally related to another variable, you have

20   to take into account all the other variables that might

21   confound that relationship, and that's what we call confounding

22   factors.

23   Q.  And do you recall you were asked questions yesterday about

24   Dr. Burtis' pricing analyses in this case?

25   A.  Yes.

D6DPUSA1                      Gilbert - redirect

1    Q.  Now, if at all, in your opinion, did Dr. Burtis account for

2    confounding factors in her analyses?

3    A.  I don't think she did any analysis whatsoever of

4    confounding factors.

5    Q.  And, in your opinion, what would a failure to account for

6    confounding factors have as to the -- on the reliability of her

7    work?

8    A.  Well, it can certainly lead an analyst to go astray in very

9    significant, really fatal ways because the issue is if you're

10   trying to understand how a particular event or conduct has

11   affected the marketplace, markets are affected by many events

12   and many types of conduct, and you're trying to unravel that

13   relationship and to not try to control for these confounding --

14   other confounding factors, it can lead you to a conclusion

15   that, for example, prices went down for eBooks for reasons that

16   have nothing whatsoever to do with the Apple agency agreements.

17   Q.  Now, would you turn to Page 51 of your declaration, please,

18   your written testimony, and take a look at figure 3.  Let me

19   know when you have it.  That was Page 51, figure 3?

20   A.  I have it.

21   Q.  Now, looking at figure 3, is that information depicted in

22   figure 3 important to your opinions in this case?

23   A.  Yes, indeed.

24   Q.  Could you tell us, briefly, why figure 3 is important to

25   the opinions that you've rendered in this case?

D6DPUSA1                    Gilbert - redirect

A.   Figure 3 shows very clearly that following the sale of the
iPad and the launch of the iBookstore on April 3rd or 4th -- it
depends, this identifies the week of April 4th, the launch was
April 3rd of 2010 -- the four publishers who went on agency
immediately, which were Hachette, HarperCollins, Macmillan and
Simon & Schuster, immediately raised their prices and those
prices had a durable increase from April 2010 through the time
period in this figure, which goes to January 2011.

          You can do all kinds of statistics, but really, all
you need to do is look at the diagram and then in, I believe it
was, May, the end of May when Penguin moved to agency, exactly
the same thing happened.  Their prices went up and stayed up.
So it's not rocket science.  You just have to look at it.

          MR. RYAN:  Thank you.

          THE COURT:  Mr. Snyder?

          MR. SNYDER:  Nothing further, your Honor.

          THE COURT:  Thank you.  If you could go to paragraph
55 of your direct testimony.  Well, I guess it's 54 where this
first comes up.  You indicate there that Apple wanted a
significant 30 percent gross margin on its sales of eBooks.  I
just want to make sure that I understand correctly that that's
nothing more than a statement that the agency agreements gave
Apple a 30 percent gross margin on the eBook sales rendered
through the iBookstore.

          THE WITNESS:  Yes, your Honor.  I inferred that from

D6DPUSA1                        Gilbert - redirect

1  the agency agreement.

2          THE COURT:  Okay.  And then in paragraph 55, you

3  continue to earn a 30 percent gross margin on a 9.99 eBook,

4  Apple would have to pay a wholesale price no greater than $7,

5  well below the prevailing wholesale prices for just-released

6  and best selling eBooks.  Of course, the agency agreements were

7  not actually the purchase of an eBook by Apple on a wholesale

8  basis?

9          THE WITNESS:  That's correct.

10         THE COURT:  So as an economist thinking about these

11 financial transactions, however, you are converting the amount

12 that Apple paid under an agency agreement for the role of

13 acting as a distributor into -- equating it for these purposes,

14 into a wholesale model?

15         THE WITNESS:  That's correct.  You're right.

16 Technically, it's not legally that.  It's what they give to the

17 publisher, which is like a wholesale price.

18         THE COURT:  Now, you made a distinction several times

19 in your testimony yesterday and today between withholding and

20 windowing.

21         THE WITNESS:  Yes, your Honor.

22         THE COURT:  So why don't you explain that distinction?

23         THE WITNESS:  Windowing refers to a decision not to

24 sell books of a certain category, a format.  For example,

25 publishers routinely window paperback books.  They'll come out

1    with a hardcover and then the paperback, and they do that

2    because some people want the book right away.  They're willing

3    to pay more for the hardcover, and so they charge a high price

4    at the beginning, and then a lower price in the end.  It's

5    called price discrimination, and it's just a way to make more

6    money.

7            Withholding refers to not allowing a particular

8    retailer to sell that book, and that was the threat that was at

9    issue here, was to withhold books from Amazon.  I found -- it

10   was my view that windowing of eBooks was not a profitable

11   conduct, if I might point that out, because unlike paperbacks

12   and hardback books, there was no reason not to sell an eBook.

13   They were making money on these eBooks.  By not selling them,

14   they would just lose the money.

15           There really wasn't much competition between eBooks

16   and printed books that I could see.  So the question is what is

17   the withholding threat?  And that was what I was addressing in

18   my analysis.  Was it profitable?  Was it credible for the

19   publishers to withhold books from Amazon?

20           THE COURT:  And why did you think -- Well, did it ever

21   become credible, in your view, for a publisher to threaten to

22   withhold eBooks from Amazon?

23           THE WITNESS:  My view is that withholding, by itself,

24   was not a credible threat and would not have been a credible

25   threat because even if the expectation was that Apple and

D6DPUSA1                    Gilbert - redirect

1    Barnes and Noble and other e-retailers would be a large

2    fraction of the market, withholding books from Amazon, who was

3    always going to be a large fraction of this market, would mean

4    inevitably a lot of your books wouldn't get sold and that's

5    costly, more costly, and that's why I thought it was a game of

6    chicken.  I didn't think that the publishers really wanted to

7    do this.

8            Now, it changed with the MFN because with the MFN, not

9    only -- if Amazon stays on wholesale and you have an MFN, and

10   if Apple and Barnes and Noble are agency, and you have at least

11   the expectation of a large share of the market, being

12   objective, by the pricing parity in the MFN, then if Amazon is

13   selling books at 9.99, and delivering to the publisher a much

14   larger wholesale price, often 12.50 for a 9.99 book, now you go

15   through the price parity provisions of the MFN.  You go to

16   Apple and Barnes and Noble.  You still need that book at the

17   retail price of 9.99, which the publisher didn't want at all,

18   and they're not getting 12.50 for that book, they're getting

19   $7 for that book.  And that is a important factor that, in my

20   view, greatly reinforced the decision to withhold books.

21           THE COURT:  To what extent is the -- and I'm going to

22   ask you to assume here there was an agreement for concerted

23   action by a group of publishers to make the same withholding

24   threat at the same time, change your analysis.

25           THE WITNESS:  Your Honor, I want to make sure I

D6DPUSA1                          Gilbert - redirect

1   understand your question.  So to what extent was there an

2   assumed agreement?  I just want to be sure.

3          THE COURT:  If you assume that five publishers -- Let

4   me change it.  Let's assume that four of the Big Six

5   publishers, at the same moment in time, threatened to withhold

6   books.  Does that change your analysis in any way?  Threaten to

7   withhold books from Amazon.

8          THE WITNESS:  It could in the sense that, as I say,

9   it's a game of chicken because the publishers -- without the

10  reinforcement of the MFN, the publishers really wanted their

11  books sold at Amazon and, of course, Amazon wanted the books to

12  be sold.  If four publishers got together and committed

13  themselves to withholding, it's an outcome that they wouldn't

14  like, but it might put so much pressure on Amazon that Amazon

15  would have to -- would have to cave to that.

16         That's a complicated dynamic, and it's one that I

17  think I would have to say let's look and see what the record

18  shows because it's a bargaining game in which neither side

19  wants that outcome.  So it's hard to say how credible it really

20  is.  I, as an economist, I prefer to analyze situations in

21  which people make credible threats, threats that they would

22  actually carry out on, as opposed to ganging up to make

23  incredible threats.

24         THE COURT:  So let me now tweak the hypothetical.

25  Assume that four publishers have agreed to withhold books from

D6DPUSA1                    Gilbert - redirect

1    Amazon, but they have an MFN clause in an agency agreement with

2    Apple.  Does that change your analysis of the effect of the

3    withholding threat?

4              THE WITNESS:  It definitely does for the reasons that

5    I explained because the MFN -- one way of thinking about it is

6    the MFN adds financial injury, namely getting $7 for this 9.99

7    book, to what the publishers consider to be the insult of

8    selling a book at 9.99.  So you take that and combine it with

9    the fact that this MFN now applies to a larger share of the

10   market with the expected entry of Apple, and it becomes a much

11   more important threat and more credible threat.

12             THE COURT:  I believe you testified that -- yesterday

13   that the publishers had incentives to move Amazon to an agency

14   relationship, and do I understand that correctly to be a

15   reference, your testimony yesterday, I don't think it was

16   developed at that portion of your testimony, that that

17   incentive came from the MFN?

18             THE WITNESS:  Yes, that's correct, to avoid the

19   circumstance that I just explained.

20             THE COURT:  Now, yesterday, I believe you testified

21   that the withholding threat had been mooted by the time that

22   Barnes and Noble executed agency agreements with publishers

23   that contained an MFN.  Did I understand that correctly?

24             THE WITNESS:  I think that's correct.  At that point,

25   at least my understanding of the chronology is that by that

D6DPUSA1                          Gilbert - redirect

1        point, Amazon had agreed to go to agency.  Certainly these

2        publishers, and by then Barnes and Noble, was going to go to

3        agency.  That was in their interest as well; so it was -- the

4        threat period was -- seemed to be over at that point.

5                THE COURT:  Okay.  Now, you were asked this morning

6        whether you disagreed or not with the calculation that the

7        average price of eBooks fell after Apple entered the eBook

8        market and opened the iBookstore.

9                THE WITNESS:  Yes.

10               THE COURT:  But you've also testified that it is your

11       belief that consumers were harmed after Apple entered the

12       market, the eBook market, from the perspective of either the

13       relevant market or a subset of the perspective of the eBook

14       prices from defendant publishers.  Do I understand that

15       correctly?

16               THE WITNESS:  Yes, your Honor.

17               THE COURT:  And would you explain why you believe

18       consumer harm existed from either of those perspectives, even

19       though you do not disagree that, as a matter of calculation,

20       the average eBook price fell after Apple entered the eBook

21       market?

22               THE WITNESS:  Yes, your Honor.  EBooks are an example

23       of what economists call differentiated products.  They're not

24       commodity products like gasoline or wheat or coal or something

25       like that.  When you have differentiated products, you expect

D6DPUSA1                    Gilbert - redirect

products to be sold at different prices, different qualities,
but they're all still in the market.  In fact, most markets are
differentiated products.

         And when you look at price impacts in a differentiated
product market, you have to pay attention to the mix of product
that are being sold.  Computers are sold in different price
categories and price points.  Handset cell phones are set at
different price points and different categories.  Cars, we
still have a car market.  We have a handset market.  We have a
personal computer market.  But there are different types of
products that are being sold in that market.

         Now, you can have conduct that effects some of those
products in the market, and it can raise the price of those
products and, yet, it's still very possible for the average
price to fall in those markets.  So, for example, suppose
people got together and suppose Ford and Chevrolet and General
Motors, Toyota agreed to raise the price of certain higher-end
automobiles, maybe the options on certain automobiles.

         Now, maybe because gas prices go up, people buy
smaller cars.  Smaller cars tend to be cheaper.  So over time,
the price of cars, if you look at the whole market, the average
price may go down, but that doesn't mean that there was not
conduct to raise the price of certain types of cars.  And in
evaluating that conduct, you'd want to focus on the particular
cars whose prices were raised and not simply say, well, because

D6DPUSA1                    Gilbert - redirect

1    other cars came into the market and they were cheaper cars,

2    that somehow offset it.

3          I mean, similarly, there's been many allegations of

4    unlawful conduct raising the price of disk drives.  Well, over

5    time technological progress has moved the price of computer

6    disk drives from $5,000 down to, you know, $100 or less for a

7    disk drive.  Phenomenal technological progress for disk drives,

8    but it's still the case that there were periods of time where

9    there was collusion, or at least alleged collusion, in the disk

10   drive market.  The fact that there were new products coming on

11   the market that were cheaper doesn't mean that that conduct

12   didn't harm consumers.

13         Here, you have clear evidence that certain titles went

14   up in price, the new release New York Times best sellers by the

15   defendant publishers.  The evidence is very clear.  It's also

16   clear that their backlist titles went up, too, often even more

17   than the frontlist titles.  The fact that a lot of independent

18   publishers came onto the market and were selling books at 2.99

19   is just another confounding factor.  It doesn't offset this

20   conduct because it would have happened without regard to this

21   conduct.  So you really have to unravel those different

22   incidental factors.

23         THE COURT:  Is another way of thinking about it that

24   if there hasn't been any control or analysis presented by

25   Dr. Burtis, of whether the average price would have fallen even

D6DPUSA1                    Gilbert - redirect

1    more without the alleged conspiratorial activity?

2              THE WITNESS:  Yes, your Honor, that's another way of

3    looking at it.  If all those other factors were controlled for,

4    and it's my understanding that that's what Professor

5    Ashenfelter was trying to do, then, yes, that the prices would

6    have fallen even more than they did.

7              THE COURT:  Now, you've talked about five people on a

8    team working for eight months.  That's a pretty extraordinary

9    effort.  Are you suggesting that they worked full time on this

10   project alone for eight months?

11             THE WITNESS:  No.  No, your Honor.

12             THE COURT:  And this sort of circles back to something

13   you've just been describing to me, but when you talk about

14   confounding factors and a lot of individually published books

15   at this lower price point, are you familiar with the term

16   disintermediation?

17             THE WITNESS:  Yes, your Honor.

18             THE COURT:  And what does that mean to you?

19             THE WITNESS:  It means when a -- I'd say generally

20   when a firm that is at a particular stage in a production

21   cycle, may move into another vertically related stage of the

22   production cycle.  So a retailer, for example, might move

23   upstream to get more into manufacturing, that would be referred

24   to as disintermediating the function of the manufacturer.  And

25   here I refer to it in the context of an e-retailer moving

D6DPUSA1                         Gilbert - redirect

1    upstream to publishing.

2            THE COURT:  And can it also be an author directly

3    publishing their books through the facility of technology made

4    available by either Apple or through arrangements that Amazon

5    made available, for instance, in December of 2009, or at least

6    announced then, so that the publisher was no longer essential

7    to the author in getting its books to market?

8            THE WITNESS:  Absolutely, your Honor.  I should

9    clarify.  Disintermediation can come about by moving upstream

10   or downstream.  So that would be an example of going from the

11   upstream activity to more downstream, as publishing.

12           THE COURT:  Okay.  Does the government have any

13   additional questions to place to Dr. Gilbert based on the

14   questions I've asked of him?

15           MR. RYAN:  Just a couple, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. RYAN:

18   Q.  Dr. Gilbert, you were asked about consumer harm and you

19   talked about prices.  In your professional opinion, if in one

20   of these differentiated product markets items at the high end

21   went up in price and, as a result, consumers purchased items at

22   the lower end rather than the higher end, is that a form of

23   consumer harm?

24   A.  Yes, indeed.

25   Q.  And did you identify such consumer harm in this case?

D6DPUSA1                          Gilbert - redirect

1    A.  Yes.  Consumers are going from their more preferred

2    products to a lesser preferred product, that's consumer harm.

3              MR. RYAN:  Thank you.

4              MR. SNYDER:  Yes, your Honor.

5    RECROSS EXAMINATION

6    BY MR. SNYDER:

7    Q.  Dr. Gilbert, I have a few questions to follow up on the

8    Court's questions.

9              The first question is you asked -- the Court asked you

10   about incentives stemming from the MFN on the publishers.  Do

11   you recall those questions?

12   A.  Yes.

13   Q.  Just to make sure, you did testify yesterday, did you not,

14   that the publishers had incentives to move Amazon to agency

15   before Apple first entered the scene?  Do you remember that

16   testimony you gave?

17   A.  Well, they certainly had an incentive to get a higher

18   price, and one way to do that was through an agency

19   relationship.

20   Q.  Okay.  So you acknowledged yesterday, did you not, that,

21   for example, Hachette had incentive to move its resellers to an

22   agency model before Apple entered the scene, correct?

23   A.  I don't recall the exact testimony, but I know there were

24   some discussion of that.  As I pointed out in my witness

25   statement, if you look at an individual publisher, individual

D6DPUSA1                         Gilbert - recross

1   publisher moving books, for example, from 9.99 to 12.99 would

2   not be profitable, and while they might have wanted to do that,

3   it probably would not have been profitable for them to do that

4   on a unilateral basis.

5   Q.  I understand that, but let's take an individual publisher

6   had an incentive before Apple entered the scene to move Amazon

7   to agency and Barnes and Noble to agency, whether they could

8   accomplish it on their own or not, correct?

9   A.  No, I think I would disagree.

10  Q.  And do you recall testifying to the contrary yesterday?

11  A.  I guess I'd have to look at my testimony to be sure.

12  Q.  So --

13  A.  Because it wouldn't be profitable.

14  Q.  And you agree, sir, do you not, that all trade eBooks are

15  more or less substitutable?

16  A.  More or less.  Some more than others.

17  Q.  As differentiated products, correct, one 6.99 book could

18  be --

19          THE COURT:  You're about to insult every reader in

20  America, Mr. Snyder.  No, I'm just kidding.  To say nothing of

21  authors.  But I'm sorry.

22  Q.  As an economic matter, you were talking about economics,

23  right, when you were answering the Court's question about

24  interchangeability and substitutability, correct?

25  A.  Well, I think the Court's question referred to

D6DPUSA1                          Gilbert - recross

differentiated products.  They are differentiated products,
more or less substitutable.
Q.  You know, I'm not asking about the quality of the book,
correct, but as an economic matter, whether all trade eBook
titles are reasonably substitutable for one another as an
economic matter?
A.  Differentiated products involve quality as well as price.
People perceive these -- you know, you have loyal Toyota
customers, you have people who want to buy Fords.  There's
still differentiated products.  Some people have more or less
attachments to one than the other.  Some people are going to be
more interested in certain authors and less in others.  That's
the way it works.
Q.  Before I ask you my final question, I just want to confirm.
You agree, do you not, that as differentiated products, all
trade eBooks are more or less substitutable?
A.  More or less, yes.
Q.  Finally, I'd like to show you your testimony yesterday at
Page 1614, Line 19 to 1615 Line 3.  This is in response to the
Court's questions about the MFN in the Apple agency agreements.
Do you remember me asking you this question and giving this
answer:
"Q.  And that's precisely why, sir, you, as the government's
economist, have not ruled out the possibility that other
factors, factors other than Apple's MFN, might have led Amazon

D6DPUSA1                          Gilbert - recross

1    to make the business decision to restructure its business

2    relationships with the publishers, correct?

3    "A.  I have not ruled out other possible explanations, other

4    than the explanations that I think are, in fact, the most

5    likely explanations.  You know, whether that description that

6    you gave me was precisely the reason, I'm not sure that's

7    correct, but I have not ruled out other explanations."

8             Do you recall that question?

9             MR. RYAN:  Objection.

10   A.  Yes.

11            THE COURT:  Overruled.

12   Q.  Am I correct, sir, that nothing that you said to Judge Cote

13   in response to her question changes your sworn testimony

14   yesterday, that you have not ruled out the possibility of other

15   explanations other than the MFN as you testified yesterday?

16   Does it change your testimony?

17   A.  It does not change my testimony.

18   Q.  Thank you.

19   A.  I would just like to clarify.

20            MR. SNYDER:  Your Honor?

21   A.  May I just clarify the response?

22            MR. SNYDER:  Your Honor?

23            THE COURT:  Excuse me.

24            MR. SNYDER:  Your Honor, every other witness has been

25   required to answer yes or no, just about, and this witness

D6DPUSA1                          Gilbert - recross

1    continues to not answer my questions yes or no.

2             MR. RYAN:  I --

3             THE COURT:  Actually, Mr. Snyder, I think this witness

4    has been very responsive, but I will let him and his answer at

5    this point.  The government may or may not ask further

6    questions.

7             MR. SNYDER:  Thank you, Judge.

8             THE COURT:  Anything further, Mr. Snyder?

9             MR. SNYDER:  Yes.

10   BY MR. SNYDER:

11   Q.  You talked about a bargaining game in discussing -- in

12   describing what was going on between Amazon, on the one hand,

13   and publishers, on the other.  Do you remember -- Do you

14   remember that discussion?

15   A.  There is -- There is a, certainly, I will say, an

16   interaction that one might characterize as a bargaining of some

17   type, yes.

18   Q.  You say one might characterize.  You told this Court that

19   it was, in fact, a bargaining game, correct?  That's how you

20   described it.  Those were your words, correct?

21            MR. RYAN:  Objection.

22   A.  I believe I've used something -- words to that effect.

23   Q.  And when you meant bargaining game, you meant a negotiation

24   between two parties, correct?

25   A.  Well, at least two parties.

D6DPUSA1                          Gilbert – recross

1    Q.  Right.  And as an economist, putting aside the Judge's

2    hypothetical about concerted action, as an economist, would you

3    agree that a bargaining game is not anticompetitive; that is

4    parties negotiating in a free market based on their economic

5    interests?

6    A.  Of course it depends on the context.

7              MR. SNYDER:  Nothing further.

8              THE COURT:  And, Mr. Snyder, I want to apologize for

9    interrupting your examination.

10             MR. SNYDER:  No apologies needed.  Thank you.

11             THE COURT:  I very much regret that I did.  Mr. Ryan?

12   REDIRECT EXAMINATION

13   BY MR. RYAN:

14   Q.  What was it you wanted to clarify?

15   A.  Just in that response, my response was a little confusing.

16   I didn't mean -- suggested in my response that Mr. Snyder asked

17   me, my response suggested that I was ruling out the most likely

18   explanations, and I just wanted to make it clear, of course, I

19   wasn't ruling out the most likely explanation.  I think my

20   response was a little garbled.

21             MR. RYAN:  Thank you, your Honor.

22             THE COURT:  You may step down, Dr. Gilbert.

23             THE WITNESS:  Okay.

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6d9usa2                         Cue - direct

1              MR. BUTERMAN:  Your Honor, plaintiffs called Eddy Cue.

2              THE COURT:  Mr. Cue, if you could come up here please

3      and take the witness stand and remain standing.

4        EDDY CUE,

5           called as a witness by the Plaintiffs,

6           having been duly sworn, testified as follows:

7              THE COURT:  How do you spell your first name, Mr. Cue.

8              THE WITNESS:  E-D-D-Y.

9              THE COURT:  Thank you.  You're about to be handed a

10     document which constitutes your direct testimony as submitted

11     by Apple in this case.  It's been given the designation DX --

12     does Apple have a number for it?

13             MR. SNYDER:  714 which was, isn't that the number of

14     home runs that Babe Ruth had?

15             THE COURT:  DX714 it is.

16             Mr. Cue, do you have your declaration in front of you?

17             THE WITNESS:  I do.

18             THE COURT:  On the 37th page, is that your signature?

19             THE WITNESS:  It is.

20             THE COURT:  And did you sign this document on

21     April 26?

22             THE WITNESS:  I did.

23             THE COURT:  Before signing it, did you read it

24     carefully?

25             THE WITNESS:  I did.

D6d9usa2                          Cue - direct

1                THE COURT:  Do you swear to the truth of its contents?

2                THE WITNESS:  I do.

3                THE COURT:  Does the government have any objections to

4       receipt of DX714?

5                MR. BUTERMAN:  Yes, your Honor.  We have a couple.

6                Your Honor, we object to paragraph 20, the sentence,

7       "The popularity of apps has let our major retailers like Amazon

8       and Google to open up their own app stores," both on 401 and

9       602 grounds.

10               THE COURT:  Is stricken.

11               MR. BUTERMAN:  We object to paragraph 44.  "Publishers

12      told us that they thought an Apple eBook store would be good

13      for three reasons," all of that on 802 grounds.

14               THE COURT:  I'm going to receive this not for the

15      truth but for the fact that it was said.  It's not stricken.

16               MR. SNYDER:  Do I have any opportunity to respond to

17      the government's objections?

18               THE COURT:  Yes.

19               MR. SNYDER:  I didn't have an opportunity to respond

20      to 20.  It happened so quickly.

21               THE COURT:  Yes, it did.  With respect to 44, let's

22      deal with 44 so that's where we are and then we'll circle back.

23               I'm granting the objection in terms of the hearsay

24      objection.  But Mr. Snyder, did you want this received for the

25      truth?

D6d9usa2                          Cue - direct

1          MR. SNYDER:  No, your Honor.  Effect on the listener,
2     then existing mental state.
3          THE COURT:  Great.  That's how I'm receiving it.
4     Next.  And then we'll circle back, Mr. Snyder.
5          MR. BUTERMAN:  The last one your Honor is paragraph
6     108.  "This model has encouraged many new and independent
7     publishers to partner with Apple and has also increased the
8     number of author self-publishing.  The major reason for this is
9     our click-through contract where a publisher can simply go
10    online and accept the terms by clicking a button."  We have a
11    401 and a 602 on that, your Honor.
12         THE COURT:  I'm going to -- I think this is
13    objectionable the way it is phrased but not objectionable if
14    phrased differently.  So, I'm going to assume that what this is
15    conveying is this witness's understanding and motive and not a
16    suggestion that he has looked inside the minds of many other
17    folks and discerned their motivation.
18         MR. BUTERMAN:  Finally, your Honor, we'd also note
19    that there are several paragraphs in the testimony that it is
20    simply unclear at this point whether they are based on
21    Mr. Cue's direct knowledge or not.  We're not challenging them
22    at this moment.  However, we would like to reserve the right if
23    it turns out during the testimony that the statements
24    reflecting, for example, what was said in the Wall Street
25    Journal articles or other publications is not actually personal

D6d9usa2                         Cue - direct

1   knowledge of Mr. Cue to strike that after his testimony is

2   completed.

3            THE COURT:  Yes.  You may reserve that right.

4            MR. BUTERMAN:  Thank you, your Honor.

5            THE COURT:  So let's circle back to the first issue.

6   And that's paragraph 20.  And Mr. Snyder wanted an opportunity

7   to argue that I should have kept that sentence in and not

8   granted the objection.

9            Mr. Snyder.

10           MR. SNYDER:  Yes, your Honor.

11           I'm not suggesting that this is the earth shattering

12  testimony in his declaration, but we do believe that it is

13  helpful and relevant industry background and context.  And

14  specifically certainly Mr. Cue has personal knowledge as -- in

15  his position at Apple and in the industry of this testimony.

16  But the relevance, your Honor, is that it's -- the evidence

17  indicates that one of the reasons the publishers were

18  interested in partnering with Apple was because of Apple's

19  innovation in new content markets.  And so we believe it is

20  relevant that Apple, when it invented essentially the app

21  market in 2008 on its iPhone, that led to other major players

22  following their lead.  So, too, when Apple was contemplating

23  opening its own bookstore, there was an industry belief, based

24  on Apple's successes in the app store and the iTunes store, for

25  that matter, that Apple would innovate as well in this market.

D6d9usa2                    Cue - direct

 1   And we believe that Apple's leadership position as an innovator

 2   in new content markets is critically important not only to

 3   understanding the background but also in addressing the

 4   government's claim that Apple's actions here were the product

 5   of some unlawful intent as opposed to part and parcel of its

 6   historic practice of entering and innovating new content

 7   markets.

 8           THE COURT:  Thank you.  I am going to strike the

 9   sentence since this witness purports to represent the

10   motivations of other major retailers including Amazon and

11   Google and he's not competent to do that.

12           With those rulings, DX714 is received.

13           (Defendant's Exhibit  714 received in evidence)

14           THE COURT:  Cross-examination.

15   DIRECT EXAMINATION

16   BY MR. BUTERMAN:

17   Q.  Good morning, Mr. Cue.  I don't know if you remember.  We

18   met once before.  My name is Lawrence Buterman.  I'm an

19   attorney with the United States.

20   A.  I do.  It's good to be here today.

21   Q.  Mr. Cue, the declaration that you provided here today, did

22   you actually sign that document on April 26 or did you provide

23   your signature in advance?

24   A.  No.  I signed it on April 26.

25   Q.  And when was the last time you reviewed the entire

D6d9usa2                          Cue - direct

 1   declaration prior to signing it?

 2   A.  I don't recall.

 3   Q.  Was it roughly around that time?

 4   A.  It would have been either that morning, that -- the night

 5   before, right before I signed it.

 6   Q.  And Mr. Cue, if you look in your declaration -- I can

 7   direct you to one example, paragraph 78, you have some

 8   references to DXs in your testimony.

 9          Do you see that?

10   A.  I do.

11   Q.  And do you know what the DXs refer to?

12   A.  I believe they're document numbers that I was referring to

13   so that I could look at them.

14   Q.  And did you review all the documents before you signed your

15   affidavit?

16   A.  I did.

17   Q.  And did they all have DX numbers on them?

18   A.  Well, I don't remember that.

19   Q.  Is it possible that the DX numbers were added to your

20   declaration after you signed it?

21   A.  No.

22   Q.  Mr. Cue, does Apple sell eBooks in all 50 states?

23   A.  Yes.

24   Q.  And all U.S. territories as well?

25   A.  I'm not sure because I don't know what everything is a U.S.

D6d9usa2                    Cue – direct

1    territory.

2    Q.  Now, I'd like to begin today by picking up on something

3    from your declaration.  So can you please turn to paragraph 98

4    of your declaration, sir.

5    A.  Yes.

6    Q.  Sir, do you see that in paragraph 98 you write, "After this

7    lawsuit was filed I learned for the first time about

8    allegations of publisher meetings, phonecalls and dinners.  We

9    had no information about any of those communications during our

10   iBookstore negotiations, and I do not know today whether any of

11   them occurred or not."

12           Did I read that correctly?

13   A.  Yes, you did.

14   Q.  And that is your sworn testimony, sir?

15   A.  It is.

16   Q.  When you say "we," who are you referring to in that

17   sentence?

18   A.  Apple.

19   Q.  And you're saying that nobody at Apple had any knowledge of

20   any kind that publisher communications or publisher meetings,

21   phonecalls, and dinners were going on?

22   A.  That's correct.

23   Q.  How did you have the knowledge that nobody at Apple knew

24   that?

25   A.  I work very closely with my team and if that was going on

D6d9usa2                          Cue - direct

1    they would have told me because it would have jeopardized my

2    negotiations.

3              MR. BUTERMAN:  Can you please put up PX857.

4    Q.  Sir -- let me give you some books.

5              Could you turn in your binder to the tab that's

6    labeled PX857, sir.

7    A.  I know you're not going to believe this but I have 56 and

8    58.

9    Q.  857.  I'm sorry.  And I would believe that.

10   A.  Yes.

11   Q.  Now, sir, PX857 was a slide that was used in the United

12   States's opening and I just want to explain to you that every

13   single line that you see in PX857 represents a telephone call

14   between one of the five CEOs of the publishers who signed

15   agency agreements with Apple in late January of 2010.

16             Do you understand?

17   A.  Yes.

18   Q.  And I'll represent to you that there's well over a hundred

19   calls that are reflected in this exhibit.  Okay?

20   A.  Okay.

21   Q.  Now, sir, can you turn to PX858.

22             Just so you understand this is another slide that was

23   used in the opening.  And PX858 is a graphical representation

24   of when those phonecalls occurred.

25             And do you see that the phonecalls tend to be

D6d9usa2                    Cue - direct

1   clustered around key events that took place during the

2   negotiations between Apple and the publishers?

3   A.  I see the clusters and how you've identified them.

4   Q.  And so, for example, you see that there's a cluster of

5   calls that correspond to when Apple first reached out to the

6   publishers to set up meetings in early December.  And I won't

7   go through them all, but you see that there's another cluster

8   that occurs right after January 4 and 5 when you send out

9   initial term sheets to all of the publishers.  And then you see

10  January 21 and 22 which were your initial drop dead dates for

11  doing deals and there's a big bump in calls.

12          Do you see all those, sir?

13  A.  Again, I see all the clusters, yes.

14  Q.  Now, sir, at this time you were in fairly consistent

15  communication with the CEOs, were you not?

16  A.  Sorry.  At which time?

17  Q.  I'm talking about the six week -- the six-week period

18  between the beginning of December and the end of January 2009

19  to 2010.  You were in fairly regular communication with the

20  CEOs of these companies, were you not?

21  A.  No, I was not.

22  Q.  You weren't calling them?

23  A.  Not throughout that period, no.

24  Q.  You weren't sending them e-mails?

25  A.  Again, yes.

D6d9usa2                         Cue - direct

1    Q.  You were meeting with them face-to-face as well?

2    A.  Yes.  I met with them face-to-face.

3    Q.  You had a fair number of calls with the CEOs of these

4    publishers during that six-week period, did you not?

5    A.  No, I did not.

6    Q.  Mr. Cue, I'm handing you a document which we're going to

7    mark as PX867.

8    A.  Thank you.

9            MR. SNYDER:  Your Honor, I'm going to object to this

10   document.  This is the first time we've seen it.  Foundation.

11           THE COURT:  Overruled.

12   Q.  So, Mr. Cue.

13   A.  Yes.

14   Q.  Just to let you know, we have some documents and they are

15   actually in your binder.  PX788 contains all phonecalls between

16   the publisher defendants and yourself -- amongst yourself, the

17   publisher, and the publisher defendants over the six-week time

18   period.  And the chart that you're looking at in PX867

19   represents the phonecalls that you had with the publishers over

20   that time period.

21           Looking at that chart, is it fair to say that you had

22   a fair number of phonecalls with the CEOs of those five

23   publishers during the six weeks between when Apple first

24   approached the publishers to discuss the possibility of

25   entering into an agreement to sell eBooks and late January when

D6d9usa2                    Cue - direct

1   you signed the five publishers?

2   A.  No.  I had lots of communications with them at very small

3   intervals of time, in particular at the end.  But I did not

4   have constant communication with them throughout that period of

5   time.

6   Q.  This reflects that you were speaking to these individuals

7   at various points in time over that six-week period, correct?

8   A.  I don't know what these calls represent, what timeframes

9   they are.

10  Q.  We can agree, sir, that you did speak to Ryan Murray, John

11  Sargent, David Young, David Shanks, and Carolyn Reidy multiple

12  times over that six-week period, correct?

13  A.  Yes.

14  Q.  You were negotiating a deal with them?

15  A.  Yes.

16  Q.  And when you negotiate deals you have to talk to the people

17  you're negotiating with, correct?

18  A.  Yes.

19  Q.  So, can you put the other spiderweb back on?

20          MR. SNYDER:  Objection.

21          THE COURT:  And.

22          MR. SNYDER:  Form.

23          THE COURT:  Overruled.

24          Mr. Cue, I'm going to ask you to move that mic.  It

25  moves.  Put it under your chin.  And keep your voice up.

D6d9usa2                          Cue – direct

1              THE WITNESS:  Thank you.

2              MR. SNYDER:  Can I just make a standing objection to

3       the reference to spiderwebs.  I don't want to stand up all the

4       time.

5              MR. BUTERMAN:  I apologize.

6              THE COURT:  I think we should refer to it by its PX

7       number.

8       Q.  So, looking back at this document, sir, which is PX857, is

9       it your testimony here that you had no idea whatsoever that the

10      publishers were talking with one another at any point in time

11      while you were negotiating your Apple agency agreements with

12      them?

13      A.  Yes.  That's correct.

14      Q.  Not one of those calls you were aware of, sir?

15      A.  That's correct.

16      Q.  And is it your testimony, sir, that nothing that any

17      publisher said at any point in time gave you any reason to

18      believe that those conversations were going on?

19      A.  Sorry.  Repeat -- I just want to make sure -- can you

20      repeat the question.

21      Q.  Sure.

22              Is it your testimony that nothing that any of those

23      publisher defendant CEOs said at any point in time ever gave

24      you a reason to believe that those conversations were going on?

25      A.  Yes.  That's correct.

D6d9usa2                    Cue - direct

1   Q.  Not one of them?

2   A.  Not one.

3   Q.  And in your paragraph 98 you say that after this lawsuit

4   was filed you learned for the first time about the allegations

5   of publisher meetings, phonecalls, and dinners.

6           Well now that you've learned about those allegations

7   and you see the sheer number of phonecalls that took place,

8   sir, do you have an opinion as to whether the publishers were

9   working together in December of 2009 and January of 2010?

10  A.  Yes, I do.

11  Q.  And what's your opinion, sir?

12  A.  I don't believe they were working together to do the deal

13  that I was working on because I did those deals and I struggled

14  and fought with them for many, many days to get them to sign.

15  And they argued different points.  So if they were talking to

16  each other, I would have assumed that I would have had a much

17  easier time getting those deals done.

18  Q.  Does it upset you to learn that your business partners were

19  talking to one another with this kind of frequency while you

20  were negotiating a deal with them?

21  A.  If they were talking about my deal, I would.

22  Q.  Turn to paragraph 108 of your declaration.

23          Do you have that, sir?

24  A.  Just one second, please.

25          Yes.

D6d9usa2                         Cue - direct

1  Q.  And I want to direct you to the last sentence of paragraph

2  108.

3         Just so we're clear, this paragraph is talking about

4  adding self-published authors to the iBookstore; is that

5  correct?

6  A.  Sorry.  Repeat the question.  I was reading it.

7  Q.  This paragraph refers to Apple adding self-published

8  authors to the iBookstore, correct, and the effects of that?

9  A.  It refers to both self-publishers and other publishers; not

10 just self-publishers.

11 Q.  Self-publishers and independent publishers; is that

12 correct?

13 A.  Yes.

14 Q.  And you believe that the self-publishers had provided Apple

15 with an extremely important source of new eBooks and price

16 innovation; is that correct?

17 A.  That's correct.

18 Q.  You believe that Apple's activities with respect to

19 self-published authors have been innovative?

20 A.  I do.

21 Q.  Sir, isn't it true that Apple's actions with respect to

22 even just allowing self-published authors to be on the

23 iBookstore was simply a mirroring of what Amazon was doing?

24 A.  No, it's not.

25 Q.  Sir, can you turn to PX870 in your binder.

D6d9usa2                    Cue - direct

1            Do you have the document, sir?

2    A.  Yes.

3    Q.  This is an e-mail from yourself -- or an e-mail chain

4    culminating at the top with an e-mail from Mr. Jobs to

5    yourself, correct?  And it's dated March 29, 2010?

6            Is that correct?

7    A.  You said to myself.  It looks like this is an e-mail from

8    Steve to a gentleman by the name of Mr. Humphreys.

9    Q.  Do you have 870, sir?

10   A.  Sorry.  Yes.

11   Q.  And that's on the top there's an e-mail from yourself to --

12   excuse me.  From Mr. Jobs to yourself dated March 29, 2010?

13   A.  I see it.

14   Q.  And that's before the iBookstore went live, correct?

15   A.  That's correct.

16           MR. BUTERMAN:  Your Honor, we'd like to offer PX870

17   into evidence.

18           MR. SNYDER:  No objection, your Honor.

19           THE COURT:  Received.

20           (Plaintiffs' Exhibit 870 received in evidence)

21   Q.  Do you see that on March 29, 2010 Mr. Jobs asks a question

22   to you and he says, "Are we going to let anyone self-publish?"

23   And then his next question is, "Does Amazon?"

24           Do you see that, sir?

25   A.  I do.

D6d9usa2                      Cue - direct

1   Q.  And your response is, "Yes and yes.  We believe half of

2   Amazon's book count is from self-publishing (200K).  My biggest

3   concern with self-publishing is we will need to review each

4   submission."

5          Do you see that sir?

6   A.  I do.

7   Q.  And then Mr. Jobs responds to you and says "Yep.  What does

8   Amazon do?"

9          Do you see that, sir?

10  A.  I do.

11  Q.  So is it still your testimony that in allowing

12  self-published authors on the iBookstore Apple wasn't merely

13  following what Amazon was doing?

14  A.  That's correct.

15  Q.  Mr. Jobs was the ultimate decision maker as to whether to

16  allow self-published authors on the iBookstore, correct?

17  A.  He's the ultimate decision maker of Apple.

18  Q.  And would it be fair to say that Mr. Jobs' key questions

19  here relate to what is Amazon doing?

20  A.  One question is.

21  Q.  And he's -- Mr. Jobs is, in fact, basing his decision, is

22  he not, on what you are informing him about what Amazon does,

23  correct?

24  A.  That's not correct.

25  Q.  Now, Mr. Cue, would you agree that with respect to most of

D6d9usa2                      Cue - direct

1    the content businesses that Apple has entered, though it wasn't

2    necessarily the first entrant, it ended up being a price

3    leader?

4    A.  I don't know about price leader.  We were certainly

5    competitive.  I always viewed every store that we entered we

6    were competitive.

7    Q.  Mr. Cue, do you recall being deposed in this matter on

8    March 12, 2013?

9    A.  I do.

10   Q.  And do you recall being asked the following question and

11   giving the following answer.  And I'm reading from lines 3815

12   from your deposition.

13   "Q.  Has Apple ever considered, with any media business that it

14   was a new entrant into, engaging in loss leading in order to

15   gain market share?

16   "A.  No.  Every entrant that we were, we were first, first at

17   being successful.  We weren't first at being in the markets.

18   And we were the price leader.  We were cheaper than everybody

19   across the product.  So we were the first to introduce 99 cents

20   across the board.  We were the first to introduce $1.99 for TV

21   shows.  We were the first to introduce $9.99 and $14.99 for

22   movies.  We were the first to introduce app stores at 99 cents.

23   So we were always the leader in price, at bringing the price

24   down in the stores that we entered."

25              Do you recall being asked that question and giving

D6d9usa2                    Cue - direct

1  that answer?

2  A.  I do.

3  Q.  And do you believe that's true?

4  A.  I do.

5  Q.  So, you would agree that with respect to most of the

6  content businesses that Apple has entered, though it wasn't the

7  first entrant, it ended up being a price leader, correct?

8  A.  As I said, in the document and -- yes.

9  Q.  Now, so it's clear, that Apple, in those businesses -- and

10  I think that that refers to music, TV, movies, and apps,

11  correct?

12  A.  I believe those are all.  There may be some others, but.

13  Q.  Apple was a leader in bringing down the prices in -- that

14  existed in the marketplace at that point in time, correct?

15  A.  Not across all of those.

16  Q.  But with respect to digital books, sir, Apple didn't bring

17  down prices, did it?

18  A.  We did for certain books.

19  Q.  Sir, isn't it a fact that Apple's entry rather than

20  bringing down prices actually caused prices to go up?

21  A.  For certain books.

22  Q.  And the reason that Apple's entry caused prices to go up

23  instead of down is because as opposed to the other markets that

24  you helped Apple enter into, there was already an established

25  player in this market that had brought prices down, correct?

D6d9usa2                    Cue - direct

1    A.  That's not correct.

2    Q.  Now, you mentioned a few moments ago that prices went up

3    for some books.  Is that accurate?

4    A.  That's correct.

5    Q.  You do understand that the average prices of the eBooks, of

6    the five major publishers that Apple signed deals with in late

7    January in -- excuse me in late January of 2010 went up and

8    stayed elevated at least through 2012, correct?

9    A.  Again, depends on which books you're looking for.  So if

10   you could be more specific for me.

11   Q.  I'm talking about the average prices of all the eBooks.  Of

12   the publishers that you did deals with.

13   A.  Yes.

14   Q.  You said some books went up and some books went down?

15   A.  And some became available for the first time.

16   Q.  And what I want to know, sir, is whether you were aware

17   that the average price of the eBooks of the five major

18   publishers that you signed deals with went up and stayed

19   elevated through at least 2012?

20   A.  It's not something I recall looking at.

21          MR. BUTERMAN:  Put DX842 on the screen.

22   Q.  You can look at DX842 in your book, Mr. Cue.

23          Now, Mr. Cue, you understand that Apple entered into

24   agency agreements with Hachette, HarperCollins, Macmillan,

25   Penguin, and Simon & Schuster in late January of 2010, correct,

D6d9usa2                    Cue - direct

1   sir?

2   A.  That's correct.

3   Q.  And do you see -- let's leave out Penguin for a moment

4   because we'll get to that later -- but for the other four, do

5   you see that on April 1, 2010 -- which you would agree roughly

6   corresponds to the date that the iBookstore went live?

7   A.  That's correct.

8   Q.  This shows that the average price of those publishers'

9   books, all of their books, the average price overall, went up

10  drastically.

11           Do you see that?

12  A.  I do.

13  Q.  Is that consistent with what you understood Apple's entry

14  caused in the marketplace?

15  A.  Again, I disagreed before and I'll disagree again.

16  Q.  You disagree with the numbers on this chart?

17  A.  I don't know -- I don't disagree with the numbers.  I'm

18  sure you calculated them right.  These numbers don't include

19  other books that you've left out here.

20  Q.  Actually, sir, this is a chart that you prepared, your team

21  prepared.  This is Apple's chart, not the government's.

22  A.  Okay.  It doesn't include the books that were not in the

23  marketplace that we brought to the marketplace for the first

24  time.

25  Q.  Mr. Cue, on April 1, 2010 you recognized that the prices

D6d9usa2                     Cue - direct

1    for New York Times bestsellers and new releases went up,

2    correct?

3    A.  That's correct.

4    Q.  And that wasn't a surprise to you, was it?

5    A.  It was not.

6    Q.  And the reason it wasn't a surprise to you was because all

7    of the publishers had told you during the course of your

8    negotiations that they had a problem with Amazon's pricing of

9    New York Times bestsellers and new releases, correct?

10   A.  That's correct.

11   Q.  And in fact, each of the publishers asked you for price

12   tiers which were higher than the ones you initially proposed in

13   order to give them more flexibility to price books above the

14   level that you had proposed, correct?

15   A.  That's correct.

16   Q.  And you did give them price tiers that allowed them to

17   price -- to raise their prices above the 9.99 price point that

18   prevailed in the market for New York Times bestsellers and new

19   releases at that time; is that correct, sir?

20   A.  That's correct.

21   Q.  Now, sir, when the iBookstore went live, you noticed that

22   the publishers were pricing those New York Times bestsellers

23   and new releases typically at 12.99 and 14.99, correct?

24   A.  I did.

25   Q.  And those were the top of the caps of the pricing tiers

D6d9usa2                         Cue - direct

1    that you had provided to them in your negotiation, correct,

2    sir?

3    A.  That's correct.

4    Q.  And it didn't surprise you either that the publishers were

5    pricing at the caps, did it?

6    A.  No, it did not.

7    Q.  And the reason it didn't surprise you that the publishers

8    were pricing at the caps was for the very same reason, because

9    you know they wanted higher prices, correct?

10   A.  That's correct.

11   Q.  In fact, this wasn't something that only you were aware of?

12   This was something that Mr. Jobs was aware of as well, correct?

13   A.  Yes.  They had expressed they wanted higher prices from us.

14   Q.  And that was consistent throughout the negotiations,

15   correct?

16   A.  Yes, it was.

17   Q.  So, let's pull up PX869.  It's in your book, sir.

18           I asked you a moment ago, sir, whether Mr. Jobs was

19   also aware that the publishers wanted to raise prices and you

20   answered yes.

21           And PX869 is an e-mail chain between Mr. Jobs and the

22   Sethh Humphrey who I believe is a college student.

23           Do you see that?

24   A.  I do.

25   Q.  And do you see that --

D6d9usa2                         Cue - direct

1            MR. BUTERMAN:  Your Honor, we'd like to offer PX869.

2            MR. SNYDER:  No objection.

3            THE COURT:  Received.

4            (Plaintiffs' Exhibit 869 received in evidence)

5    Q.  So do you see in the bottom e-mail, Mr. Cue, that

6    Mr. Humphrey writes on February 9, 2010, which is after you've

7    made the announcement that you're launching the iBookstore but

8    before it actually went live, correct, sir?

9    A.  That's correct.

10   Q.  And he writes, "Hello, Mr. Jobs.  I don't really expect a

11   reply from this, but here goes.  I am a Mac and Kindle owner.

12   And with Apple strongarming Amazon into raising eBook prices,

13   this is detrimental to my reading as a college student.  You

14   have so much.  Wouldn't it be okay for us little guys to have

15   something?  If you read this, thanks for your time.  Peace."

16           Did I read that correctly sir?

17   A.  Yes, you did.

18   Q.  And Mr. Jobs actually replied to the e-mail, did he not?

19   A.  It appears he did, yes.

20   Q.  And Mr. Jobs wrote, "It's the publishers that are raising

21   prices not Apple."  Correct?

22   A.  That's correct.

23   Q.  And at this point in time how did Mr. Jobs know -- strike

24   that.

25           At this point in time Mr. Jobs knew that the

1   publishers were going to be raising prices, correct?

2   A.  That's correct.

3   Q.  And Sethh Humphrey responds, "Yes, but the change in prices

4   only comes after your company has let major publishers set

5   their own prices.  These publishers must realize that they have

6   almost one hundred percent profit coming in from these eBooks

7   because no paper is used.  There are other fees and such but

8   still, greed does not beget most, even those at the top."

9           Did I read that correctly?

10  A.  Yes, you did.

11  Q.  And then Mr. Jobs responds again, sir, does he not?

12  A.  Yes, he does.

13  Q.  And his question is, "How do we stop the publishers from

14  setting their own prices and terms?"

15          Correct?

16  A.  That's correct.

17  Q.  Now, sir, prior to Apple's entry into the market, the

18  publishers were not setting their own prices and terms,

19  correct?

20  A.  That's correct.

21  Q.  Apple gave the publishers the ability to set their own

22  prices and terms, correct?

23  A.  We negotiated that.

24  Q.  Now, sir, look back at your declaration.

25          Do you see on page 3 that you discuss Apple's core

D6d9usa2                          Cue - direct

1   business principles and strategies for its digital content

2   stores?

3   A.   I do.

4   Q.   And I believe as your declaration goes on, you laid out in

5   bold various core principles.  Is that fair?

6   A.   That's fair.

7   Q.   Broad selection of available content, simple competitive

8   pricing, opportunity to make a profit, same material terms, and

9   a level playing field for all content providers.

10          Were those the ones that you've identified?

11  A.   Yes, they are.

12  Q.   And you believe that those are core principles?

13  A.   I do.

14  Q.   Now, sir, when you went to meet with the publishers in

15  December you knew that the publishers -- excuse me.  You knew

16  that many New York Times bestsellers and new releases were

17  actually being sold at a loss, correct?

18  A.   I did.

19  Q.   No doubt about it?

20  A.   I didn't have the contracts in front of me but that's what

21  I was led to believe.

22  Q.   And you also knew that windowing was going on or threats of

23  windowing had been made, correct?

24  A.   Both.  That's correct.

25  Q.   No doubt about that either?

D6d9usa2                        Cue - direct

1   A.  That's correct.

2   Q.  And so, sir, you go out to meet the publishers.  And they

3   tell you that the marketplace is one which violates two of your

4   core principles, correct?  Digital products aren't available at

5   the same time as physical products?  You can't make a profit

6   that you want?

7   A.  That's correct.

8   Q.  Is that fair?

9   A.  That's correct.

10  Q.  So essentially two deal breakers for Apple, would you

11  agree?

12  A.  That's correct.

13  Q.  But, sir, your response when you learned of this

14  information wasn't to say, you know what, this is a marketplace

15  that doesn't jive with our core principles, correct?

16  A.  I don't understand your question.  I'm sorry.

17  Q.  Let me make it -- I'm sorry.  Let me try to make it a

18  little bit clearer.

19          Isn't it true that your response, after learning this

20  information which violates your core principles according to

21  this document, your response was, "Nothing scared me or made me

22  feel like we can't get these deals done right away."

23          That's what you told Mr. Jobs after meeting with the

24  publishers and learning of this information, correct, sir?

25  A.  That's correct.

D6d9usa2                        Cue – direct

1   Q.  And that was done when you and Mr. Jobs had an

2   understanding that you would be entering the eBook market if

3   you were going to enter under a wholesale model, correct?

4   A.  That's correct.

5   Q.  Now, if we look at PX36.  Do you recall PX36, sir?

6   A.  Sorry.  Let me get to it.

7   Q.  Sure, please.

8   A.  I do.

9   Q.  PX36 contained a series of notes both from Mr. Saul and

10  Mr. Moerer which are forwarded to you, correct?

11  A.  That's correct.

12  Q.  And these notes were made during the second day of meetings

13  that you had with three of the six publishers that you met with

14  on December 15 and December 16, correct, sir?

15  A.  I'm not sure when the notes were made but that's when the

16  e-mail was sent.

17  Q.  Well, you recall, sir, that on December 15 you, Mr. Moerer,

18  and Mr. Saul met with Hachette, Random House, and Penguin?

19  A.  I do.

20  Q.  And then on December 16 you, Mr. Saul, and Mr. Moerer met

21  with Macmillan, Simon & Schuster, and HarperCollins, correct?

22  A.  I do.

23  Q.  Now, if you turn to the third page of the document.  And

24  you understand over here we're looking at the notes of

25  Mr. Saul, correct?

D6d9usa2                        Cue - direct

1    A.  That's correct.

2    Q.  And the purpose of this document, as you say if we look at

3    the last page, is to provide Mr. Jobs with an update of what

4    took place during this meeting, correct?

5    A.  That's correct.

6    Q.  With respect to HarperCollins, if you look in the middle of

7    the third page, do you see the first line after the word

8    HarperCollins it says "Interested in agency model to fix Amazon

9    pricing.  (We said no)."

10                Did I read that correctly?

11   A.  You did.

12   Q.  So, sir, you were aware, were you not, by December 16 that

13   at least one publisher was planning on using an agency model in

14   order to fix industry pricing, correct?

15   A.  Yes.  Again, to fix -- they wanted an agency model with us.

16   Let me be clear.  I wasn't trying to negotiate for the

17   industry.  But they wanted an agency model with us so that they

18   would be able to set the price to fix the 9.99 price, which is

19   what this says.

20   Q.  So, in other words -- and thank you for the clarification.

21                You were negotiating a deal just for Apple?

22   A.  That's correct.

23   Q.  With HarperCollins -- well eventually with all these

24   publishers, you were just negotiating deals with them for

25   content for Apple, correct?

D6d9usa2                    Cue - direct

1   A.   That's correct.

2   Q.   But you were aware, as of December 16, that the publishers

3   had much larger goals in mind, correct?

4   A.   Again, that's -- I knew that they were having issues with

5   other publishers and Amazon in particular.  But how they were

6   going to resolve them and what they were going to do, other

7   than windowing, which I was aware of, this was another proposal

8   that they made to us saying hey we might want to go to an

9   agency model.  At this point all I'm doing is listening.  I'm

10   in there for the first time meeting those folks and I'm just

11   taking -- taking it in, letting me know what they want to do.

12   Q.   So, sir, during this meeting you were informed by

13   HarperCollins that they want to do an agency model, not for any

14   reason with respect to Apple, but because they're interested in

15   fixing Amazon's pricing, correct?  That's what they told you?

16   A.   That's not correct.

17   Q.   Isn't that what they told you?

18   A.   No.

19   Q.   Isn't that what this document says, sir?

20   A.   No, it does not.

21   Q.   "Interested in agency model to fix Amazon pricing."  That's

22   not what this says?

23   A.   I'd be happy to clarify if --

24   Q.   Can you answer my question, sir?  Does this document say

25   that HarperCollins was "interested in an agency model to fix

1  Amazon pricing.  We said no."

2  A.  That's correct.  That's what it says.

3  Q.  Now, you talk about, in your declaration, the fact that at

4  some point thereafter you and Mr. Jobs decided to pursue an

5  agency model, correct?

6  A.  That's correct.

7  Q.  In fact, the timeframe was pretty tight, was it not?

8  A.  That's correct.

9  Q.  You finished up your meeting with the publishers on

10  December 16, correct?

11  A.  That's correct.

12  Q.  You left Carolyn Reidy and you went straight to the

13  airport; is that correct?

14  A.  I believe so but honestly I don't recall the exact.

15  Q.  Is it fair to say, sir, that you came back to the office --

16  you came back to Cupertino on December 17?

17  A.  Yes.

18  Q.  And isn't it true, sir, that on December 18 you reached out

19  to Carolyn Reidy, John Sargent, and Markus Dohle, the CEOs of

20  Simon & Schuster, Macmillan, and Random House, and told them

21  that you were already back in New York, correct?

22  A.  Sorry, that I was back in New York?

23  Q.  Yes.

24  A.  You said I called them to tell them I was back in New York?

25  Q.  You e-mailed to tell them that you were back in New York?

D6d9usa2                      Cue - direct

1   A.   Sorry.  I don't remember the dates from that standpoint.

2   So if you'd like to clear it up with me that would be great.

3   Q.   Let's see if we can get the dates worked out here.

4        You agree that December 16 in the afternoon you have

5   your last meeting with one of the publishers, correct?

6   A.   That's correct.

7   Q.   And then you fly back to Cupertino?

8   A.   That's correct.

9   Q.   And you go into the office on the 17th?

10  A.   That's correct.

11  Q.   And you have a meeting with Mr. Jobs where you discuss what

12  took place?

13  A.   I had discussed what took place with Mr. Jobs all along the

14  path, so yes.

15  Q.   And by December 18, sir, the next day, you're actually no

16  longer in Cupertino, you're back in New York, correct?

17  A.   I don't recall that.

18  Q.   Can you turn to PX56 in your binder.

19  A.   Yes.

20  Q.   Do you see, sir, that PX56 is an e-mail from yourself to

21  Markus Dohle dated December 18, 2009?

22  A.   I do.

23  Q.   And do you see that you tell Mr. Dohle in this e-mail that

24  you're back in New York for a vacation?

25  A.   I do.

D6d9usa2                        Cue - direct

1    Q.  And even though you're back in New York for a vacation, you

2    still request some time with him on Monday or Tuesday to get

3    together, correct?

4    A.  I do.

5    Q.  And the purpose of getting together is to update him on all

6    your findings and thoughts, correct?

7    A.  I'm sure it's to get another update from him based on what

8    I've thought, so, yes, I wanted an update.

9    Q.  You write, "I want to update you"?

10   A.  Right.

11   Q.  "All my findings and thoughts," right?

12   A.  Correct.

13   Q.  And you say, "I have some things I want to run by you.  I

14   only need 30 minutes.  If not, can I call you?"

15          Do you see that?

16   A.  I do.

17   Q.  And if you look at tabs PX501 and 502, sir, you'll see,

18   will you not, that you sent similar e-mails to Mr. Sargent and

19   Ms. Reidy?

20   A.  I do.

21   Q.  So, sir, within 48 hours, roughly, of telling HarperCollins

22   no to their request or to their statement that they were

23   interested in an agency model in order to fix Amazon pricing,

24   you're back in New York and you want to talk to these three

25   publishers, correct?

D6d9usa2                          Cue - direct

1    A.  I'm on vacation in New York and I requested meetings with

2    them, yes.

3    Q.  And the meetings, sir, were in order to pitch to them the

4    very agency model that HarperCollins told you it was interested

5    in in order to fix Amazon's pricing, correct?

6    A.  That's not correct.

7    Q.  Is it your testimony here that you did not pitch the agency

8    model to Ms. Reidy, Mr. Dohle, and Mr. Sargent during this

9    visit to New York?

10   A.  That's -- that's not what I said, so.

11   Q.  No, no.  I'm asking you.  Did you?

12   A.  Yes, I did.

13   Q.  Now, you did understand at this point that HarperCollins

14   had expressed that it was interested in an agency model in

15   order to fix Amazon's pricing, correct?

16   A.  With us, that's correct.

17   Q.  And, in fact, sir when you spoke to Ms. Reidy, Mr. Dohle,

18   and Mr. Sargent, your pitch as to why they should adopt the

19   agency model was, in fact, that it solved their Amazon issues,

20   correct?

21   A.  Not correct.

22   Q.  Isn't it true, sir, that on December 21, 2009 after you had

23   spoken to Ms. Reidy, Mr. Dohle, and Mr. Sargent, you e-mailed

24   Mr. Jobs and you told him about your meetings with those three

25   CEOs?

D6d9usa2                      Cue - direct

1    A.  That's correct.

2    Q.  And isn't it true that in that recounting of what took

3    place you told Mr. Jobs that they, referring to the three CEOs,

4    saw both the plus and the negative of the deal that you were

5    proposing?

6    A.  That's correct.

7    Q.  And the plus -- and maybe we can put this up if you want to

8    look.  It's PX43 in your binder.

9            Do you see, sir, the plus that you tell Mr. Jobs that

10   these CEOs saw from the deal that you proposed "solves Amazon

11   issue."

12           Did I read that correctly?

13   A.  You did.

14   Q.  And is it your testimony here under oath, sir, that you did

15   not pitch the deal to those three publishers in terms of "doing

16   an agency deal with us will allow you to solve your Amazon

17   problem"?

18   A.  That's not the way I pitched it.  That's correct.

19   Q.  But that's the way they understood it, correct?

20   A.  They -- this refers to the fact that I was allowing them,

21   because it was an agency model, to price books at higher than

22   9.99 which I knew they wanted to do.  They referred to that as

23   their Amazon problem.  So I -- in our agreement, they would be

24   allowed to price books higher than 9.99.

25   Q.  But, sir, if they were only allowed to price books at Apple

D6d9usa2                        Cue – direct

1    above 9.99, that wouldn't be solving their Amazon problem,

2    correct?

3    A.  It would with us.

4    Q.  It wouldn't be solving their Amazon problem though overall,

5    would it?

6    A.  Again, it solves it for us.  It doesn't solve it for

7    anybody else.

8    Q.  Now you say that it solves the Amazon issue.  You don't say

9    that they saw the plus as it solves the Amazon issue with

10   respect to us, did you?

11   A.  That's what I wrote.

12   Q.  And are you confident, sir, that the publishers understood

13   it the same way that you're presenting it?

14   A.  Yes.

15   Q.  Mr. Cue, you spoke with Markus Dohle, the CEO of Random

16   House, on December 21, 2009, correct?

17   A.  That's correct.

18   Q.  And during that conversation you told Mr. Dohle, did you

19   not, that you thought book prices were becoming too low?

20   A.  That's not correct.

21   Q.  And you told Mr. Dohle that because you thought book prices

22   were becoming too low that you were suggesting an agency model,

23   correct?

24   A.  Those are not my words.

25   Q.  Do they represent what you told Mr. Dohle?

D6d9usa2                        Cue - direct

1   A.  No.

2   Q.  Could you turn to PX336 in your binder, sir.

3          Do you have that, sir?

4   A.  I do.

5   Q.  Do you see the e-mail from Mr. Dohle to other people at

6   Random House dated December 22?

7   A.  I do.

8   Q.  And do you see that in the second paragraph he writes, "As

9   you know, he is against windowing.  He also thinks that book

10  prices are becoming too low – he is worried about the consumer

11  perception.  Therefore, he suggests an agency model."

12         Is it your testimony, sir, that Mr. Dohle was writing

13  something incorrect?

14  A.  No, it is not.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D6DPUSA3                          Cue - direct

1   BY MR. BUTERMAN:

2   Q.  Now, that's not the only thing that you told Mr. Dohle

3   during your meeting -- during your phone conversation with him,

4   correct?

5   A.  No, it's not.

6   Q.  In fact, the other thing that you told Mr. Dohle was

7   that -- In fact, well, let me back up.

8           You also had a discussion with Mr. Dohle about whether

9   Amazon would be willing to move to an agency model as well,

10  correct?

11  A.  Not correct.  He shared that information with me.

12  Q.  Do you see in the bottom, in the last paragraph, Mr. Dohle

13  writes, "I told him" -- and you understand the "him" here

14  referring to be you?

15  A.  I do.

16  Q.  "I told him that I have doubts that Amazon would lower the

17  prices again once we would establish a sustainable eBook

18  business model for the market.  I also indicated that Amazon

19  would not accept a distributor model."

20          You understand the distributor model to be the agency

21  model, correct?

22  A.  I do.

23  Q.  And then he writes, "he answered," referring to you,

24  correct?  He's referring to you?

25  A.  Yes.

D6DPUSA3                          Cue - direct

1    Q.  "He answered that windowing could be used to establish a

2    distributor model on print pub date for eBooks (coming back to

3    simultaneous publication)."

4           And now, sir, is it your testimony that you did not

5    tell Mr. Dohle on December 21st, 2009, that Random House could

6    use a threat of windowing in order to move Amazon to an agency

7    model?

8    A.  That's correct, I did not.

9    Q.  He just made this up?

10   A.  That's not what I said.

11   Q.  I'm asking.

12   A.  I responded -- Would you like me to respond to the

13   communication I had with him?

14   Q.  I would like to know, sir, whether it's your testimony that

15   you did not say this?

16   A.  These are not my words, no.

17          MR. BUTERMAN:  Your Honor, would this be an

18   appropriate time for our break?

19          THE COURT:  Yes.  We'll have a ten-minute recess.

20          (Recess)

21   BY MR. BUTERMAN:

22   Q.  Mr. Cue, before we broke, we were discussing PX336, which

23   is a writeup of a conversation that you had with Mr. Dohle.

24   The writeup being Mr. Dohle's, correct?

25   A.  That's correct.

D6DPUSA3                    Cue - direct

1    Q.  And I was asking you about the fourth paragraph in the

2    document.  Do you see the third paragraph, the one that says

3    "He said"?  "He said he would provide us with some data

4    regarding his idea/model."  Do you see that?

5    A.  I do.

6    Q.  And do you see that in the next sentence you say -- he --

7    I'm sorry.  Mr. Dohle writes, "He also said that he would call

8    some publishing peers to discuss;" do you see that?

9    A.  I do.

10   Q.  Isn't it true that during your meeting with Mr. Dohle, you

11   also made clear to him that you planned to discuss the agency

12   model that you were proposing to Mr. Dohle with other

13   publishers?

14   A.  Yes, it is.

15   Q.  Now, I was asking you about this fourth paragraph, the one

16   that talks about windowing, how windowing -- that windowing

17   could be used to establish a distributor model on print pub

18   date for eBooks coming back to simultaneous publishing?

19             THE COURT:  Fifth paragraph?

20             MR. BUTERMAN:  I'm sorry, your Honor.  The fifth

21   paragraph.

22   Q.  Do you see that, sir?

23   A.  I do.

24   Q.  Now, sir, you recall that in late January, after you had

25   signed an agency agreement with Macmillan, you became aware

D6DPUSA3                        Cue - direct

1   that Macmillan had gone out to Seattle and presented the exact

2   same threat to Amazon, correct?

3   A.  I don't know about the exact same threat.  I read articles

4   about Amazon and Penguin getting into a disagreement based on

5   an agency model.

6           THE COURT:  Amazon and Penguin?

7           THE WITNESS:  Sorry.  Thank you.

8           THE COURT:  Amazon and?

9           THE WITNESS:  And Macmillan, sorry.  Thank you for

10  correcting me, your Honor.

11  Q.  So just so we're clear, and we'll get to this a little bit

12  later, you learned that Macmillan was going out to talk to

13  Amazon -- or you learned that Macmillan had gone out to talk to

14  Amazon when you read about it in the papers, correct?

15  A.  Yeah, I don't know who went to whom or whatever.  I know

16  that Amazon and Macmillan had talked and had some kind of

17  disagreement.

18  Q.  Okay.  Now, when you saw that Macmillan had told Amazon

19  that if it wanted its new release books, eBooks, without a long

20  period of windowing, it needed to be on an agency model, was

21  that at all surprising?

22  A.  No, it did not.

23  Q.  And the reason that that didn't surprise you, sir, is

24  because you knew all along that following Macmillan's signing a

25  deal with Apple, it was going to fly out to Seattle and make

D6DPUSA3                    Cue - direct

1    that exact offer to Amazon, correct?

2    A.  No, that is not correct.

3    Q.  But, yet, you weren't surprised when you saw that they had

4    made that offer?

5    A.  That's correct.

6    Q.  And is it your testimony here, sir, just so we're clear,

7    that that's not based on information that Mr. Sargent provided

8    you?

9    A.  That's correct, he did not provide me any information.

10   Q.  Now, I want to go back to -- I'm sorry.  We got a little

11   sidetracked.  Let me take you back to December 21st.  You also

12   spoke with Miss Reidy that day, correct?

13   A.  That's correct.

14   Q.  And do you recall telling Miss Reidy that you believed that

15   it was important for Apple that there be some level of

16   reasonable pricing in the eBooks market?

17   A.  Yes, I do.

18   Q.  And did you also tell her, sir, that you felt that the only

19   way to get this was for the industry to go to an agency model?

20   A.  With us, that's correct.

21   Q.  So you were telling Miss Reidy -- Just so we're clear, you

22   were telling Miss Reidy on December 21st that you needed the

23   entire industry --

24   A.  All of the publishers.

25   Q.  -- all of the publishers to go to an agency model with you,

D6DPUSA3                    Cue - direct

1    with Apple, correct?

2    A.   That's correct.

3    Q.   That's your testimony under oath, sir?

4    A.   Yes, it is.

5    Q.   No doubt about it?

6    A.   Yes.

7    Q.   Do you also recall telling Miss Reidy that you believed

8    that new release eBooks should be priced at $12.99?

9    A.   I told her we were willing to accept a maximum price point

10   of 12.99, yes.

11   Q.   So could you turn to PX540 in your binder, sir?  Now,

12   Mr. Cue, do you see that PX540 is Miss Reidy's writeup of her

13   conversation with you on December 21st?

14   A.   I do.

15   Q.   And she starts off by saying, "Eddy Cue phoned me this

16   morning (rather than come in for a visit);" do you see that?

17   A.   I do.

18   Q.   And she goes on to say, "He wanted to relay his

19   conclusions, having met with all the major publishers and

20   looked at the online retailing market once he got home."  Do

21   you see that?

22   A.   I do.

23   Q.   And I think that this is laid out in your declaration, but

24   so we're clear, you did make it clear to the publishers, to

25   each publisher, who the other publishers were that you were

D6DPUSA3                          Cue - direct

1   negotiating with, correct?

2   A.  That's not correct.

3   Q.  You told Miss Reidy -- Did you, or did you not, tell

4   Miss Reidy that you had met with all the other major

5   publishers?

6   A.  I did.

7   Q.  And did you have any doubt that Miss Reidy would know who

8   that refers to?

9   A.  No.

10  Q.  Now, do you see that in the second paragraph, the one that

11  has the No. 2 before it, Miss Reidy writes, and she's relaying

12  four points that came out -- that she's writing came out of the

13  conversation, correct?

14  A.  That's correct.

15  Q.  And she says, "It's important to Apple that there be some

16  level of reasonable pricing.  They feel the only way to get

17  this is for the industry to go to the agency model, like with

18  the App Store.  So the publisher sets the price to the

19  consumer.  They feel it's a better way to do it, unlike our

20  usual terms of sale."

21          Does that accurately reflect what you told Miss Reidy

22  on December 21st, 2009?

23  A.  It does.

24  Q.  And just so we're clear, your testimony is that when you

25  said that the industry needed to go to an agency model, what

D6DPUSA3                         Cue - direct

1    you were referring to were all the publishers, correct?

2    A.   At this particular point, that's correct.

3    Q.   And do you see in the third bullet, with the paragraph with

4    the No. 3, it says in the middle, "Therefore, they feel that

5    new release eBooks should be priced at 12.99;" do you see that?

6    A.   I do.

7    Q.   And is it your testimony that you told this to Miss Reidy,

8    or not?

9    A.   I did not.

10   Q.   Now, you testified quite clearly that when you used the

11   word "industry," you were referring to all of the publishers?

12   A.   In bullet point No. 2, that's correct.

13   Q.   Do you see bullet point 4?

14   A.   Yes, I do.

15   Q.   And do you see that Miss Reidy writes, "We would have to

16   'get everyone else to go to the agency model.'  When I said,

17   'but, of course, we can't talk to our competitors,' he said he

18   didn't mean other publishers, but our accounts.  To which I

19   replied, 'if we make these our terms, then they are our

20   terms.'"  Do you see that?

21   A.   I do.

22   Q.   And so it's clear that you told Miss Reidy not only that

23   all publishers needed to move to an agency model, but also that

24   all retailers of those publishers needed to move to an agency

25   model, correct?

1    A.   That's correct.

2    Q.   And that included Amazon?

3    A.   That's correct.

4    Q.   Isn't it true, sir, that throughout your negotiations with

5    the publishers, you constantly pitched the deal that you were

6    proposing as a way for them to change the entire eBooks market?

7    A.   No, that is not true.

8    Q.   Do you recall speaking with Maja Thomas of Hachette on or

9    about January 19th, 2010?

10   A.   Roughly, yes.

11   Q.   Do you recall telling Miss Thomas that Apple believes that

12   the deal that it was proposing is the best chance for the

13   publishers to challenge the 9.99 price point; otherwise, they

14   will continue to supply to consumer through third parties, in

15   effect, cementing consumer expectation of 9.99 as a top price?

16   Do you recall telling that to Miss Thomas?

17   A.   I do.

18   Q.   And, sir, when you tell Miss Thomas that doing a deal with

19   Apple is the best chance to challenge the 9.99 price point,

20   you're not talking about the 9.99 price point with respect to

21   Apple, correct?  You're talking about the 9.99 price point in

22   the industry?

23   A.   I'm talking about the existing 9.99 price in the industry

24   but as it relates to Apple.

25   Q.   Right.  In other words, do a deal with Apple is your best

D6DPUSA3                          Cue - direct

1   chance to change the industry, correct?

2   A.  No, that's not correct.

3   Q.  Mr. Moerer was working at your direction in this matter,

4   correct?

5   A.  That's correct.

6   Q.  And do you know that Mr. Moerer had a conversation with

7   Miss McIntosh on January 9th, 2010?

8   A.  I do.

9   Q.  And are you aware that during that conversation, according

10  to Miss McIntosh, Mr. Moerer told her that you felt that the

11  agency model was the only way to get all publishers committed

12  to simultaneous digital print release?  Is that fair?

13  A.  Yes, I'm aware of that.

14  Q.  Okay.  And do you recall that you also told -- according to

15  Miss McIntosh, you also said that Apple had come up with a way

16  that would move the whole market off 9.99 and that Apple thinks

17  an agency model is the only way to do it?

18  A.  Again, I don't recall that, in those words.  Those aren't

19  my words.

20  Q.  Is it consistent with what you were telling the publishers

21  during the course of your negotiations with them?

22  A.  Not at that particular time, no.

23  Q.  When you say not at that particular time, is it something

24  that you did tell them during the course of your negotiations

25  at some point in time?

D6DPUSA3                      Cue - direct

1   A.  Tell them which thing?

2   Q.  That the agency model that you were proposing would move

3   the whole market off of 9.99?

4   A.  Again, we believed, with Apple, they would have the

5   opportunity to move the market from 9.99 to the higher price

6   points that they wanted, yes.

7   Q.  The whole market?

8   A.  Apple.

9   Q.  Sir, this says the whole market, though, doesn't it?

10  A.  You asked me what my words are.

11  Q.  Okay.  So it's your testimony here that during the course

12  of your negotiations with the publishers, you never spoke in

13  terms of moving the whole market or moving the entire industry,

14  meaning the entire industry and not just Apple?

15  A.  To what?  Sorry.

16  Q.  To higher prices?

17  A.  No.  We talked about moving them to an agency model.

18  Q.  Which you knew would lead to higher prices for New York

19  Times best sellers and new releases, correct?

20  A.  For some books, we I believed it would.

21  Q.  I'm sorry, I --

22  A.  I'm sorry.  I said, for some books, I believed it would.

23  Q.  For the New York Times best sellers and new releases, I

24  think you testified earlier that you believed it would?

25  A.  For the ones they made available, that's correct.

D6DPUSA3                      Cue - direct

1    Q.  Could you turn to paragraph 61 of your declaration?

2    A.  Oh, declaration.

3    Q.  And, sir, there is in italics above paragraph 61 it reads,

4    "Competitive prices:  My all-agency idea;" do you see that?

5    A.  That's correct.

6    Q.  And when I read paragraph 61, it seems -- and please

7    correct me if I'm wrong -- that what you're describing is the

8    idea that both you and Mr. Jobs agreed with; is that fair?

9    A.  Yes, it is.

10   Q.  And that was the idea that you placed in the initial term

11   sheet that you sent to the publishers on January 4th and 5th,

12   correct?

13   A.  That's correct.

14   Q.  And so, sir, if you turn to PX21 in your binder, that's an

15   example of the January term sheet, correct?

16   A.  That's correct.

17   Q.  And in that term sheet, you state quite clearly to the

18   publishers that one of the things that you need to have in

19   order to sell books at realistic prices is that all resellers

20   of new titles need to be in agency model, correct?

21   A.  That's correct.

22   Q.  And when you say, "All resellers of new titles need to be

23   in agency model," you're not just talking about Apple, correct?

24   A.  That's correct.

25   Q.  You're talking about Barnes and Noble, Sony, Amazon and

D6DPUSA3                    Cue - direct

1    other eBook retailers, correct?

2    A.  That's correct.

3    Q.  In other words, you were telling the publishers that they

4    had two options if they wanted to do a deal with Apple.  Option

5    one was they can move all their other retailers to an agency

6    model, correct?  That was one option?

7    A.  I prefer if you'd finish, yes, that -- I don't view my

8    agreement as an option.

9    Q.  That's fine.  Your statement here gave the publishers two

10   options.  No. 1, they could move other retailers to an agency

11   model; or alternatively, they could not give those retailers

12   new release eBooks.  That's what you say here, correct?

13   A.  Yes, that's correct.  I want to be -- one second.

14   Q.  Sir --

15   A.  One second.  I when I say that's correct, I want to be

16   clear.  I'm saying for new titles if the publishers wanted a

17   deal, they needed to be in agency model, period.

18   Q.  Thank you.  Now, sir, is it fair to say that you personally

19   had never had an interest in competing against Amazon when it

20   comes to price?

21   A.  We compete with Amazon all the time.

22   Q.  But you don't want to have to compete with Amazon on price,

23   do you, sir?

24   A.  I would say we don't want to compete with anybody on price.

25   As I said, we want to be competitive pricing with everybody in

D6DPUSA3                         Cue - direct

1   the market.

2   Q.  By competitive, you mean the same?

3   A.  Or feels the same to the consumer.

4   Q.  So isn't it true, sir, that one of your very first

5   communications to Mr. Jobs regarding the possibility of

6   entering an eBook -- into the eBook space actually contemplated

7   that, instead of competing with Amazon in eBooks, you would

8   simply enter into a market allocation with Amazon, whereby you

9   would allow Amazon to have books and you would take -- "you"

10  meaning Apple -- would take music?

11  A.  I apologize.  That's a long question.  You said a lot of

12  words.  So can you repeat that, please?

13  Q.  Sure.  Isn't it true, sir, that one of your very first

14  communications to Mr. Jobs regarding the possibility of

15  entering into the eBook space actually contemplated that

16  instead of competing with Amazon in eBooks, Apple would simply

17  enter into a market allocation with Amazon whereby Apple would

18  allow Amazon to have books and Apple would take music?

19  A.  Yes, that's correct.

20  Q.  And can you turn to PX27 in your binder, sir?

21  A.  Yes.

22  Q.  And is PX27 the document that refers to the market

23  allocation that you proposed to Mr. Jobs?

24  A.  Among other things that are here, yes.

25            MR. BUTERMAN:  Your Honor, we'd like to offer PX27.

D6DPUSA3                      Cue - direct

1            MR. SNYDER:  No objection.

2            THE COURT:  Received.

3            (Plaintiff's Exhibit 27 received in evidence)

4   Q.  Isn't it a fact, sir, that Apple realized that comparisons

5   to Amazon, when it came to prices, were not good for Apple?

6   A.  No, that's not correct.

7   Q.  Sir, can you turn to paragraph 65 of your declaration.  Do

8   you have that, sir?

9   A.  I do.

10  Q.  And that's the first paragraph under italics that says

11  "Competitive prices: Limited 'most favored nation' clause;" do

12  you see that, sir?

13  A.  I do.

14  Q.  Now, you say there, "A few weeks before I sent my initial

15  proposal to the publishers, my in-house lawyer, Kevin Saul, had

16  developed an idea for price matching, most favored nation,

17  clause that would protect Apple's ability to compete on

18  prices."  Do you see that?

19  A.  That's correct.

20  Q.  And what you're referring to there when you say "a few

21  weeks before I sent my initial proposal to the publishers," you

22  meant a few weeks before you sent the January 4th term sheet,

23  correct?

24  A.  That's correct.

25  Q.  And so your best understanding is that Kevin Saul developed

1     the idea for a price matching MFN sometime in, would it be

2     mid-December?

3     A.   I don't know when he developed it himself.  I can tell you

4     when we looked at it, when I looked at it and reviewed it, and

5     decided that was the way to go.  He was working on it

6     throughout the holidays.  I wasn't working with him on it.

7     Q.   But you say here, sir, "a few weeks before I sent my

8     initial proposals to the publishers, my in-house lawyer, Kevin

9     Saul, had developed an idea for a price-matching, most favorite

10    nation, clause."  So a few weeks before January 4th --

11    A.   That's correct.

12    Q.   -- puts you into December 20, around there?

13    A.   Around there.

14    Q.   And you knew, at that point in time, that Mr. Saul had

15    developed this price-matching MFN, correct?

16    A.   I knew he was working on it, yes.

17    Q.   Well, you say developed?

18    A.   Yes, he's developing it.

19    Q.   Okay.  I'm sorry.  You say developing here, but your

20    testimony isn't developing.  It's developed, past tense?

21    A.   Sorry.  I meant it exactly the same way.  It means the same

22    to me, but...

23    Q.   Now, just so we're clear, this price-matching MFN was

24    clearly developed well in advance of January 4th, correct?

25    A.   Again, it wasn't completed.  A development is something

1    that takes a path, and so we start developing something and we

2    iterate back and forth.  And so it wasn't completed fully

3    formulated to my satisfaction until post-January 4th.

4    Q.  And is it your testimony, sir, that the reason that you did

5    not put the MFN into the January 4th and 5th term sheets is

6    because it wasn't fully developed by that point in time?

7    A.  That's correct.

8    Q.  And your testimony is that once it was developed, you could

9    then swap out the bullet point that we looked at earlier

10   regarding all retailers need to be on an agency model, correct?

11   A.  It wouldn't require that.  It was a different requirement;

12   so, yes, I would remove the all agency.

13   Q.  Now, Apple has never had a retail price MFN in any of its

14   other content businesses; is that correct?

15   A.  That's correct.

16   Q.  So, sir, am I correct that once Apple had this MFN, you

17   believed that Apple was indifferent as to what any publisher

18   did with respect to moving Amazon or any other retailer to a

19   different model?

20   A.  That's correct.

21   Q.  And if we look at paragraph 58 of your declaration, is the

22   reason why Apple, once it had the MFN, was indifferent because,

23   as you say here, "When it came to prices, Apple cared about two

24   things, one, making our eBook prices generally lower than

25   physical book prices; and, two, making sure that our customers

D6DPUSA3                        Cue - direct

1    got the lowest eBook price available in the market."

2            Is that why once you had the MFN, you no longer cared

3    what model other publishers moved or what model other

4    publishers used with other retailers?

5    A.  That's correct.

6    Q.  So with the MFN, Apple was assured that its consumer prices

7    would be the lowest in the market, correct?

8    A.  Equal to the lowest in the market.

9    Q.  Assuming that Apple actually enforced the MFN, which we

10   know that Apple didn't do consistently, correct?

11           MR. SNYDER:  Objection to form.

12           THE COURT:  Sustained.

13   Q.  Sir, you do realize that, depending on whether Amazon was

14   on an agency model with publishers that you had entered into

15   agreements with, that that would determine whether your

16   consumers, Apple's consumers, would be paying $9.99 for

17   New York Times best sellers and new releases or the higher

18   prices that you knew the publishers were planning on charging?

19   A.  Yes, that's correct.

20   Q.  So in other words, sir, when you say that you were

21   indifferent to whether the publishers moved Amazon to a

22   wholesale model, what you're really saying is that you, Apple,

23   are indifferent to the actual prices that Apple's consumers

24   were paying, correct?

25   A.  That's not correct.

D6DPUSA3                          Cue - direct

1    Q.  You were indifferent as to whether your consumers paid

2    $9.99 for New York Times best sellers and new releases as

3    opposed to $14.99, correct?

4    A.  For the books that -- In the deal that I cut, that's

5    correct.

6    Q.  All you cared about was that they couldn't be available

7    anywhere else cheaper?

8    A.  Also not correct.

9    Q.  Isn't it true that you believed -- strike that.

10            Isn't it true, sir, that Apple had made the

11   determination that it was fine with its consumers paying

12   $14.99 for books that had previously been available for $9.99,

13   as long as no consumer in the United States could find that

14   book for less than 14.99?

15   A.  You can -- It's an accurate statement.  It's not the way

16   that I would have said it, but it's an accurate statement.

17   Q.  So just to back up, sir.  If I understand correctly, early

18   January, January 4th and 5th, Apple wanted all resellers to be

19   on an agency model, correct?

20   A.  That's correct.

21   Q.  But at some point after that, Apple decided that as long as

22   it had an MFN, it didn't care what others did vis-a-vis Amazon,

23   correct, the other publishers did?

24   A.  Sorry, I --

25   Q.  You know what, it was too broad.

D6DPUSA3                    Cue - direct

1    A.   It was too broad.

2    Q.   Let me do it again.  At some point after Apple sent out its

3    January 4th and January 5th term sheets, Apple decided that as

4    long as it had the retail price MFN, it didn't care what model

5    the other publishers maintained or had with Amazon or any other

6    retailer, correct?

7    A.   That's correct.

8    Q.   Sir, isn't it true that, actually, Apple at all times cared

9    what model the other retailers were on?

10   A.   No, that's not true.

11   Q.   Isn't it true, sir, that what actually happened was that

12   Apple realized that the condition that it had put in the

13   January 4th and 5th term sheets, that all resellers need to

14   move to an agency model, was a term that it couldn't legally

15   enforce and, therefore, it replaced it with the MFN?

16   A.   No, that is not true.

17   Q.   Sir, do you recall receiving an e-mail from Mr. Moerer on

18   or about January 10th -- January 9th, excuse me, 2010, asking

19   you a series of questions regarding what the deal that you were

20   proposing would require?

21   A.   From whom?

22   Q.   Let me look at PX487 and, hopefully, that will refresh your

23   recollection.

24   A.   I'm sorry, what was the number again?

25   Q.   PX487.

D6DPUSA3                        Cue - direct

1   A.  Thank you.  Yes, I do.

2   Q.  And, sir, do you recall having this exchange with

3   Mr. Moerer?

4   A.  I do.

5   Q.  Just bear with me one second, sir.

6           And you testified about this exchange in paragraph 68

7   of your declaration, correct, sir?

8   A.  One second.  Yes, I did.

9   Q.  And what you say in paragraph 68 is that, "On January 10th,

10  2010, Keith Moerer sent me an e-mail relaying Random House's

11  questions on this topic - specifically, whether Random House

12  could move to agency with Apple and remain on wholesale with

13  Amazon.  I told Keith to let Random House know that we did not

14  care whether Random House stayed on a wholesale model with

15  Amazon or other retailers.  Apple's only concern, as I

16  explained, was on Apple's price to the consumer.  Specifically,

17  Random House asked (as Keith repeated it to me) 'Are we willing

18  to accept an agency model if other retailers continue a

19  standard wholesale model for new releases without holdbacks?'

20  I responded, 'We are ... what we care about is price.'  So the

21  contract will say we get it at 30 percent, less whatever the

22  lowest retail price out in the market is (whether agency or

23  wholesale)."  Did I read that correctly, sir?

24  A.  You did.

25  Q.  Now, sir, you have PX487, which is the same, I'll represent

D6DPUSA3                          Cue – direct

1    to you, the same e-mail as what's here, DX140.

2    A.  I agree.

3    Q.  You agree, good.  The quote referring to your statement

4    that's in paragraph 68 of your declaration is not accurate, is

5    it, sir?

6    A.  It's accurate.  I believe it is.

7    Q.  Sir, your quote in paragraph 68 reads, "I responded, 'We

8    are ... what we care about is price," and then you go on; is

9    that correct?

10   A.  That's correct.

11   Q.  And what did you actually tell Mr. Moerer on January 10th

12   when you responded to him?

13   A.  "I don't think we can legally force this."

14   Q.  I don't think we can legally force this.  That's why --

15   that's why, sir, Apple moved to an MFN instead of the explicit

16   term, correct?

17   A.  That's correct.

18   Q.  And that's why Apple stopped talking about the move all

19   resellers to an agency model, correct?

20   A.  That's correct.  Again --

21   Q.  So --

22   A.  We --

23   Q.  Sir?

24            MR. SNYDER:  Your Honor, the witness was in the middle

25   of an answer.

D6DPUSA3                          Cue - direct

1              THE COURT:  Let me ask you, Mr. Cue.  Could you fairly
2    answer with a yes or no the question that was placed to you?
3              THE WITNESS:  If it's the words, if those words are
4    the words that are written and he's asking me the question if
5    those are the words that are written, yes.
6              If he's asking me what those mean and what the
7    representation of that is, based on his previous question which
8    he alluded to, then, you know, I need to explain what those
9    words are.  That's my only...
10             THE COURT:  Okay.  So --
11             THE WITNESS:  He asked me earlier on --
12             THE COURT:  Let me just try to capture the question
13   here.  There were a chain of questions.
14             THE WITNESS:  Right.
15             THE COURT:  And then we lead up to, And that's why
16   Apple stopped talking about the move all resellers to an agency
17   model, correct?
18             THE WITNESS:  My answer wasn't the previous
19   question -- sorry.  I apologize, your Honor.  It wasn't to the
20   legal question that he asked me earlier, whether I had stopped
21   this because it wasn't -- it was illegal to do it.
22             My issue here was when I was doing the deal for an
23   all-agency model, I had a position now where I was requiring
24   all of the publishers to move to an all-agency model, and I
25   came to the conclusion of what happens if that doesn't happen?

D6DPUSA3                        Cue - direct

1   What happens if they don't get that?

2           Because you -- because I put it in an agreement, it

3   doesn't force them to do it.  And so if they're not successful

4   in doing it, I've got an agreement that doesn't work anymore.

5   And so what I'm saying here is I don't think we can legally

6   force this because even if I have it in the agreement, I can't

7   force them to sign that agreement with somebody else.

8           And so, yes, I didn't think that we could legally

9   force someone or someone else to sign an agreement.

10  BY MR. BUTERMAN:

11  Q.  Sir, even after you sent out your January 11th, 2010,

12  contract, initial contract that had the MFN provision in it,

13  you continued to keep track of which publishers were willing to

14  go to an agency model, not only with Apple, but with all other

15  retailers, correct?

16  A.  I didn't keep track.  Some of them shared that information

17  with me.

18  Q.  And you found that information so important that you shared

19  it with Mr. Jobs, correct?

20  A.  That's correct, because they didn't want to sign the MFN.

21          MR. BUTERMAN:  Move to strike.

22          THE COURT:  It is stricken.

23  Q.  Sir --

24  A.  Sorry.

25  Q.  -- you shared that information with Mr. Jobs, did you not,

1  because you knew that Mr. Jobs was very keen on making sure

2  that all of the publishers moved to an agency model with

3  Amazon, correct?

4  A.  That is not correct.

5  Q.  Let me ask you something, sir.  It's your testimony that

6  once you put the MFN in the contract, Apple was indifferent as

7  to what model it ended up with -- excuse me, what model the

8  publishers dealt with -- strike that.

9        After Apple put the MFN in its agreement, it no longer

10  cared what model the publishers operated on with their other

11  retailers, correct?

12  A.  That's correct.

13  Q.  Apple was indifferent at that point, correct?

14  A.  That's correct.

15  Q.  You were talking to the publishers, were you not, sir?

16  A.  Sorry, at which time?

17  Q.  During this six-week period?

18  A.  Yes.

19  Q.  You were negotiating with them?

20  A.  That's correct.

21  Q.  They explained to you the economics of their industry,

22  correct?

23  A.  That's correct.

24  Q.  They explained to you the economics of the MFN that you

25  were proposing, correct?

D6DPUSA3                          Cue - direct

1   A.  We explained it mostly to them; so I -- it was our MFN; so

2   we were explaining how the MFN worked to them.

3   Q.  Did you believe -- I know that you -- Let me back up.

4        I know that you believe that Apple was indifferent.

5   Did you believe the publishers were indifferent to what model

6   they ended up on as a result of your MFN?

7   A.  Some of them said that they were looking at doing an agency

8   model and doing a wholesale model.

9   Q.  My question was, did you believe that the publishers were

10  indifferent to what model they used with Amazon?

11  A.  I didn't think about it.  I didn't -- It's not something I

12  cared about.

13  Q.  Now, we established that what model they were on with

14  Amazon would impact the prices that would be charged at your

15  bookstore, correct?

16  A.  Possibly, that's correct.

17  Q.  And still your testimony is, you didn't care?

18  A.  No, I don't care.

19  Q.  Do your consumers care, sir?

20  A.  Our consumers were protected by my price points and what I

21  had agreed to; so, yes, my consumers cared, and I cared about

22  the prices that I could set books at.

23  Q.  Did you care about the fact that if your consumers wanted

24  to buy a Macmillan book and Macmillan had moved to an agency

25  model with Amazon, that that book, New York Times best seller,

D6DPUSA3                         Cue - direct

1   might be 14.99, but if Macmillan stayed on wholesale model with

2   Amazon, that book, because of your MFN, would be 9.99?  Did you

3   care about that, sir?

4   A.   Sorry, I'm not sure what you're asking me I care about.

5   Can you repeat it?

6   Q.   Do you care about the fact that Apple consumers paid 12.99

7   and 14.99 for New York Times best sellers and new releases that

8   they otherwise, if not for Apple, could have had for 9.99?

9   A.   That's a lot of speculation of what may or may not have

10  happened based on the agreement; so I don't know.  I was

11  worried about what our consumers were paying in the deal that I

12  struck with the publishers, and I thought we were going to

13  treat our consumers very, very fairly, and I had an MFN that

14  protected me in case I was wrong.

15  Q.   Who protected them, sir?

16  A.   I did.

17  Q.   By charging them higher prices?

18  A.   No, by charging them great prices at a great book selection

19  on books that weren't available elsewhere, in a better

20  bookstore.  We gave them a great offer.

21  Q.   You saw an example earlier of somebody who didn't

22  necessarily agree with you, who wrote an e-mail to Mr. Jobs

23  complaining about the book prices and the fact that the book

24  prices were going up; do you remember that?

25  A.   I do.

D6DPUSA3                        Cue - direct

1   Q.  Do you recall similar complaints by customers?

2           MR. SNYDER:  Objection.

3           THE COURT:  Overruled.

4   A.  I don't recall very many, but I'm sure there could be more.

5   Q.  Do you recall customers coming up to you and saying, thank

6   you for raising eBook prices?

7   A.  I remember customers calling me, thank you for creating an

8   iBookstore, yes.

9   Q.  Do you recall customers saying thank you for raising my

10  eBook prices?

11  A.  They wouldn't have to.  They say it as thank you for

12  creating the bookstore.  It's all part of it.

13  Q.  I think we offered this earlier, sir --

14  A.  One last --

15  Q.  Just --

16  A.  Sorry, one last thing.  I didn't raise prices.

17  Q.  No, you just gave them the opportunity to raise prices?

18  A.  The publishers decide the price, and I did give them the

19  opportunity, if they wanted to raise prices, to raise them.

20  Q.  In fact, sir, not only did you give them the opportunity

21  with your initial price caps, but then you subsequently even

22  raised them higher, correct, in order to get your deal done?

23  A.  Slightly, yes, that's correct.

24  Q.  And the reason why you gave them higher price caps was

25  specifically so that you, Apple, could ensure that you would

D6DPUSA3                          Cue - direct

1   get your 30 percent margin -- excuse me, your 30 percent

2   commission that you wanted on the deal, correct?

3   A.  No, that is not correct.

4   Q.  Isn't it true, sir, that in order to make sure that you got

5   the 70/30 split that you wanted on eBooks, which the

6   publishers -- let me back up.

7           The publishers fought you very hard on the 70/30

8   split, correct?

9   A.  Among many things, yes.

10  Q.  They wanted a lower split; they wanted something that gave

11  them a greater percentage and a lower percentage for Apple,

12  correct?

13  A.  That's correct.

14  Q.  And they fought vehemently on that, did they not?

15  A.  Among many things, as I said, yes, that's correct.

16  Q.  In some cases they wanted a 10 percent commission for

17  Apple, and others they wanted a 15 percent, others wanted a 20,

18  correct?

19  A.  That's correct.

20  Q.  And in order to not have to give them a lower commission,

21  you gave them higher price tiers, correct?

22  A.  That's not correct.

23  Q.  Because what happened was the publishers told you, did they

24  not, that the economics of the deal were so poor for them, that

25  they needed one of two things from Apple; they either needed to

1   be making more money per book in terms of a bigger slice of

2   that pie or, alternatively, they needed the ability to price

3   books higher; is that fair, sir?

4   A.   That's one of the many arguments they tried to use.

5   Q.   And in order to make sure that you didn't have to vary from

6   the 30 percent commission that Apple wanted, you, in fact, gave

7   them higher price tiers, correct?

8   A.   Again, that's not correct.

9   Q.   Mr. Cue, I'm going to hand you a copy of your deposition

10  from March of 2013.

11  A.   Thank you.

12  Q.   And do you recognize that as your deposition transcript,

13  sir?

14  A.   I believe so, yes.

15  Q.   Of day one of your deposition transcripts?

16  A.   Yes, that's correct.

17  Q.   And I want to see if I can refresh your recollection first,

18  here; so if you would do me the favor of turning to Page 74 and

19  75.  It's a long question, which is why I want to see if we can

20  cut through this.  The question actually begins on Page 73.

21  A.   Yes.

22  Q.   So, sir, you can close that up.  Does that refresh your

23  recollection as to whether one of the issues that you were

24  willing to negotiate with the publishers on, in exchange for

25  maintaining the 30 percent commission, were higher price tiers?

D6DPUSA3                          Cue - direct

1           MR. SNYDER:  Objection.

2           THE COURT:  Overruled.

3  A.  No, it doesn't.

4  Q.  Okay.  Now, sir, if we look at PX34 --

5  A.  Are we done with this one?  Sorry.  So I can move it?

6  Q.  Yes.  You can just leave that off the side.  You may have

7  to come back to it.

8  A.  Okay.  Sorry, the number again?

9  Q.  PX34.  And, sir, you understand PX34 to be an e-mail from

10  yourself to Mr. Jobs dated January 14th, 2010, correct?

11  A.  I do.

12  Q.  And in this e-mail, you were asking Mr. Jobs for permission

13  to offer the publishers higher price tiers than you had

14  initially offered both in your term sheet and in your draft

15  contract in order to get the deal done, correct?

16  A.  That's correct.

17           MR. BUTERMAN:  We'd like to offer PX34 into evidence,

18  your Honor.

19           MR. SNYDER:  No objection.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 34 received in evidence)

22  Q.  Now, Mr. Jobs approved your request for higher price tiers,

23  correct?

24  A.  After a discussion with me, that's correct.

25  Q.  Right.  And we touched upon this during your deposition; so

D6DPUSA3                         Cue - direct

1   I want to make sure that we accurately do this now.  Could you

2   turn to PX55 in your binder?

3   A.  Yes.

4   Q.  And am I correct, sir, that you do not know whether or not

5   you ever received PX55?

6   A.  No, you are not correct.

7   Q.  Okay.  Do you recall receiving PX55?

8   A.  No, I do not.

9   Q.  What is PX55?

10  A.  Well, I've seen this for the first time yesterday; so I can

11  describe it's an e-mail from Steve that was a draft of some

12  kind because I never received it.  I saw the e-mail in the

13  package yesterday.

14  Q.  I'm sorry, sir.  How do you know that you never received

15  it?

16  A.  I would have remembered if I had received this e-mail, and

17  I would have called Steve.  Steve and I interacted very closely

18  together; so if I had received this e-mail, I would have

19  responded to him because it was incorrect.

20  Q.  Do you recall testifying about this document during your

21  deposition?

22  A.  I don't recall, but I may have.

23  Q.  You were, in fact, shown this document during your

24  deposition; were you not, sir?

25  A.  Again, I don't recall, but I may have.  I was shown many

D6DPUSA3                    Cue – direct

1    documents.

2    Q.  And do you recall testifying that you weren't sure whether

3    you had seen it or not?

4    A.  Again, I don't recall.  I didn't receive this.

5    Q.  This document accurately reflects what Mr. Jobs thought, as

6    far as you knew, on January 14th, 2010, correct?

7    A.  I don't know what Mr. Jobs thought at this moment in time;

8    so...

9    Q.  In the document, Mr. Jobs writes to you, "I can live with

10   this, as long as they move Amazon to the agent model too for

11   new releases for the first year.  If they don't, I'm not sure

12   we can be competitive."  Do you see that?

13   A.  I do.

14   Q.  Do you recall ever having a conversation with Mr. Jobs on

15   or around this time regarding this topic?

16   A.  About being competitive, yes, we discussed the MFN.

17   Q.  Did you ever discuss with Mr. Jobs the fact that you didn't

18   believe that Apple needed to move Amazon to an agency model?

19   A.  I did.

20   Q.  You clarified for Mr. Jobs something that was confusing to

21   him?

22   A.  Not confusing.  Once I explained it to him, I don't think

23   he was confused.

24   Q.  And when did you explain this to him, sir?

25   A.  Several times.  I did it the first time before I sent the

D6DPUSA3                      Cue - direct

1   contract agreement out, which was -- I can't remember the exact

2   date.  I'm sure you have it, but somewhere in mid-January when

3   I sent the -- When I sent the contract, I had discussions with

4   him before I sent that contract.

5           And as we were modifying the agreement, he was very

6   concerned about whether, if we entered into an agency model

7   with the publishers, we were going to be able to compete.  And

8   I explained to him again how the MFN model worked that would

9   allow us to compete on pricing.

10  Q.  So you had to explain to Mr. Jobs on multiple occasions why

11  it was that what he wrote in PX55 was not important?

12  A.  Well, I didn't explain it based on what he wrote.  I

13  explained it based on the discussion we were having.  As I

14  said, I never saw this; so it wasn't based on this e-mail.

15  Q.  So let me ask you a question.  After you explained to

16  Mr. Jobs the way the MFN was going to work, did Mr. Jobs become

17  indifferent as to whether publishers moved Amazon to an agency

18  model or not?

19  A.  He did.

20  Q.  And to your best knowledge, when did that occur?

21  A.  Sorry?

22  Q.  To your best knowledge, when did that occur?

23  A.  Again, I explained it to him before I sent the agreement,

24  and we had several conversations about it afterwards, and so

25  probably within -- probably discussed it over a two-week period

D6DPUSA3                          Cue - direct

1   several times.

2   Q.  Is it fair to say, sir, that by the time the agreement was

3   signed, Mr. Jobs understood how it was going to work?

4   A.  Sure.

5   Q.  Is it fair to say that by the time negotiations really --

6   is it fair to say that by January 21st, Mr. Jobs had a good

7   understanding of how the agreement was going to work with

8   respect to the MFN?

9   A.  I believe so.

10  Q.  Now, you recall that Mr. Jobs had some communications with

11  James Murdoch in late January, correct?

12  A.  I do.

13  Q.  And Mr. Jobs was trying to help convince HarperCollins to

14  do a deal with Apple, correct?

15  A.  That's correct.

16  Q.  And could you turn to PX32?

17  A.  Yes.

18  Q.  Okay.  So this e-mail was from January 24th.  I'm looking

19  at the e-mail from Mr. Jobs to Mr. Murdoch, January 24th, 2010.

20  Okay?  Do you see that?

21  A.  Yes.

22  Q.  And by this point in time, sir, it's your testimony that

23  Mr. Jobs understands how the MFN is going to work, correct?

24  A.  That's correct.

25  Q.  Now, Mr. Jobs, in this e-mail, tells HarperCollins, tells

D6DPUSA3                    Cue - direct

1    Mr. Murdoch that he believes that HarperCollins has the

2    following choices.  The first choice is to "throw in with Apple

3    and see if we can all make a go of this to create a real

4    mainstream eBooks market at 12.99 and 14.99;" do you see that?

5    A.  I do.

6    Q.  The second option is "to keep going with Amazon at 9.99;"

7    do you see that, sir?

8    A.  I do.

9    Q.  Okay.  So if Mr. Jobs understood the MFN like you testified

10   that he did, Mr. Jobs would know that there's no possible way

11   that HarperCollins and Apple could create a mainstream eBook

12   market at 12.99 and 14.99 unless they moved Amazon to an agency

13   model too, correct, sir?

14   A.  That's not correct.

15   Q.  Sir, if Amazon stayed on an wholesale model and Apple and

16   HarperCollins signed a deal, then no matter what kind of market

17   Mr. Jobs and Mr. Murdoch wanted to set for eBook prices, your

18   MFN that Mr. Saul drafted, would bring the prices back down to

19   whatever Amazon's prices were, correct?

20   A.  You're not correct.

21   Q.  That's not the way that the MFN worked?

22   A.  No, but it is -- there's pieces of it.  So HarperCollins

23   was withholding books from Amazon, and so those books would

24   have been available in our store at 12.99 and 14.99, at our

25   prices, and they would not have been available at Amazon at

D6DPUSA3                         Cue – direct

1    all.

2           And so we would have established a price point of

3    12.99 and 14.99 and Amazon could have continued using a

4    wholesale model at prices of 9.99 for those books and, yes, for

5    those books we would have a 9.99, but we would have established

6    a marketplace of 12.99 and 14.99; so Mr. Jobs is correct.

7    Q.  So in other words, Mr. Jobs is correct because the deal

8    that you proposed gave HarperCollins two options with respect

9    to Amazon, either move them to the agency model or they were

10   not going to get the new releases that Apple was going to get,

11   correct?

12   A.  It wasn't our deal.  That was the deal that the publishers

13   had.  They were the ones withholding.  They started doing that

14   before we ever arrived; so...

15   Q.  And on January 24th, 2010, before the deal is ever signed,

16   Mr. Jobs knew exactly how that was going to play out, didn't

17   he?

18   A.  I believe so.  Sure.  He's a smart guy.

19          THE COURT:  So this is quarter to 1:00.  We're going

20   to break.  You may step down, Mr. Cue.

21          THE WITNESS:  Thank you, your Honor.

22          (Witness excused temporarily)

23          THE COURT:  We'll resume at 2:00.  And, counsel, I'm

24   afraid I have a couple of matters during our break.  You don't

25   have to clear the tables, but you should be aware that other

D6DPUSA3                         Cue - direct

1    people will be in the courtroom at the tables.  Thanks so much.

2    See you at 2:00.

3                  (Luncheon recess)

4                  (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D6D9USA4

```
 1                         AFTERNOON SESSION

 2                              2:00 p.m.

 3            EDDY CUE, resumed.

 4            MS. OXENHAM ALLEN:  Your Honor, I'm Sarah

 5   Oxenham Allen for the plaintiff states and I just wanted to

 6   bring up one quick matter before we resume with Mr. Cue, if

 7   that's all right.

 8            THE COURT:  I'm sorry.  Mr. Buterman, are you done

 9   with your examination?

10            MR. BUTERMAN:  No, I'm not, your Honor.

11            THE COURT:  Okay.  No.  Make your application I was

12   just trying to understand what's happening.

13            You had an application independent of the examination

14   of Mr. Cue?

15            MS. OXENHAM ALLEN:  Yes, ma'am.  I just wanted to

16   inform you of something --

17            THE COURT:  Can you spell your name for the record

18   please.

19            MS. OXENHAM ALLEN:  My name?

20            THE COURT:  Yes.

21            MS. OXENHAM ALLEN:  SARAH OXENHAM ALLEN.

22            Your Honor, we are -- the plaintiffs are very

23   cognizant of the limited time remaining in the trial for both

24   sides to present their cases and we are confident that we have

25   everything in the record we need from Doctors Ashenfelter and
```

D6D9USA4

1    Gilbert.  So because there is significant overlap between

2    Dr. Baker's testimony and Dr. Gilbert's testimony, the

3    plaintiffs intend to forego offering Dr. Baker's testimony at

4    this time and rely on Doctors Gilbert and Ashenfelter unless

5    your Honor feels like she needs to hear from Dr. Baker.

6            THE COURT:  No, I don't.  Thank you very much for

7    putting that on the record.

8    DIRECT EXAMINATION CONTINUED

9    BY MR. BUTERMAN:

10   Q.  Good afternoon, Mr. Cue.

11   A.  Good afternoon, sir.

12   Q.  Mr. Cue, were any of the ultimately executed Apple agency

13   agreements with the five publishers in January of 2010

14   materially different from one another?

15   A.  Not from Apple's perspective.

16   Q.  Now, Mr. Cue, do you recall a dinner that took place on

17   January 20 that you attended with others from Apple and from

18   Macmillan?

19   A.  I do.

20   Q.  And who attended that dinner?

21   A.  I believe Kevin Saul from my team, Keith Moerer from my

22   team, John Sargent from Macmillan, and the name doesn't ring a

23   bell but I'm sure you can remind me of the other person from

24   Macmillan and I can validate it.

25   Q.  That's all right.

D6D9USA4                          Cue - direct

1              Do you recall that during that dinner the topic came

2    up -- the topic of the Apple deal came up?

3    A.  We were negotiating the deal so the reason we were having

4    the dinner was the whole deal.

5    Q.  And do you recall that during that dinner one of the

6    matters that was discussed was how Macmillan would be operating

7    with its other retailers after it did the deal with Apple?

8    A.  I don't recall that as being an issue in the agreement at

9    all -- in the dinner at all.

10   Q.  Do you recall that Mr. Sargent explained to you at the

11   dinner that Macmillan planned to offer both a wholesale and an

12   agency model?

13   A.  Yes.

14   Q.  And do you recall that you explained to Mr. Sargent during

15   that dinner that the Apple deal that you were going to sign

16   with Macmillan would not allow him to both have a wholesale

17   model with Amazon and an agency model with Apple?

18   A.  That's not correct.

19   Q.  Could you turn to PX37 in your binder, sir.

20              You have PX37, sir?

21   A.  I do.

22   Q.  You recall PX37 as an e-mail exchange between yourself and

23   Mr. Sargent on the morning following your dinner on January 20?

24   A.  It started on an e-mail from the -- from myself sending it

25   to him that night.

D6D9USA4                         Cue - direct

1    Q.  Thank you for the clarification.

2             You see that in the e-mail that Mr. Sargent writes to

3    you at 6:55 a.m. he writes, "The stumbling block is the single

4    large issue that we clearly had a misunderstanding about.  I

5    was clear in my head with what your position was.  Brian was

6    clear as well after his discussion with Keith.  Somehow, it

7    seems we misread you.  Please understand that it is significant

8    enough for us that we may, in fact, give you a no later today.

9    And only in working through the contract will we be sure we

10   actually understand every aspect of your proposal.  More a bit

11   later."

12            Did I read that correctly, sir?

13   A.  You did.

14   Q.  Can you tell me what the stumbling block was that

15   Mr. Sargent was referring to in this e-mail?

16   A.  I can.

17            He was referring to the fact that he wanted to be able

18   to do one-offs and marketing campaigns that -- where the MFN

19   would not apply.  So he was very confused on whether the MFN,

20   the way we had written it, would allow him to do anything with

21   any other retailer where the MFN wouldn't apply.  And I had

22   told him that we were okay if they wanted to do one-time

23   promotions or, you know, special offers, things that I didn't

24   view as the normal practice of selling the book.

25   Q.  Sir, do you recall being asked this specific question

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6D9USA4                         Cue - direct

1  during your deposition?  About this document?

2  A.  I don't.

3  Q.  Do you recall not being able to recall what this e-mail was

4  about at the time?

5  A.  I don't.

6         MR. BUTERMAN:  Could you please play clip 38, with the

7  Court's permission.

8         The pages are 307, line 12 through 309, line 25.

9  "Q.  Now I want to move forward to Mr. Sargent's response to

10  you on January 21st.  And the second paragraph, he says, 'I

11  will get our lawyers working today with Kevin.  I know the

12  clock is ticking.  I'm willing to give up on many of the points

13  I think we were being absolutely reasonable to ask for.

14  Remarkable that you guys say no to everything and still appear

15  somehow to be reasonable.'

16         "He says in the next sentence, 'The stumbling block is

17  the single large issue that we clearly had a misunderstanding

18  about.  I was clear in my head with what your position was.

19  Brian was clear as well after his discussion with Keith.

20  Somehow it seems we misread you.  Please understand that it is

21  significant enough for us that we may, in fact, give you a no

22  later today, and only in working through the contract will we

23  be sure we actually understand every aspect of your proposal.

24  More a bit later.'

25         "Did I read that correctly?

D6D9USA4                         Cue - direct

1   "A.  You did.

2   "Q.  Can you explain to me what the 'single large issue' is

3   that Mr. Sargent is referring to in that e-mail?

4   "A.  I don't recall, but I recall what John -- again, the big

5   issues that we ended up fighting for were the tiers and the

6   MFN.  And so I don't recall which -- during this particular

7   cycle, or this particular issue, what he referred to.

8           "Because as we went back and sat down with them on the

9   agreement and were negotiating back and forth, those remained

10  issues through the 11th hour.  As a matter of fact, he wanted

11  exceptions to the tiers that he wanted to create for certain

12  types of books.  And so -- but I don't recall exactly what

13  his -- in this particular, what was -- what was the thing that

14  he misunderstood, you know, from the agreement.

15  "Q.  So if you look at your response to Mr. Sargent, you say,

16  'I understand.  I don't believe we're asking you to do anything

17  you haven't told us you were doing already.  We're just trying

18  to get a commitment '

19          "Does that help refresh your recollection as to what

20  the topic was that you were discussing with Mr. Sargent?

21  "A.  It -- you know, it makes me feel like it's pricing tiers,

22  but I don't know that for a fact.  I don't recall.  And the

23  only reason I say pricing tiers is only because I would view

24  that they already priced their books at different prices based

25  on the tiers, but I don't -- again, don't recall.

D6D9USA4                          Cue - direct

1    "Q.  Is it possible that Mr. Sargent here is referring to

2    moving to an agency agreement with Amazon?

3           "Mr. Snyder:  Objection to form.

4    "A.  I -- I -- there is no way it's about that.

5    "Q.  No way?

6    "A.  No way."

7    BY MR. BUTERMAN:

8    Q.  That was your testimony during your deposition, sir?

9    A.  That's correct.

10   Q.  That deposition took place only a couple months ago?

11   A.  That's correct.

12   Q.  And during that deposition you said that you didn't recall

13   what this stumbling block issue was but that it might relate --

14   your best guess was that it related to pricing tiers, correct?

15   A.  That's correct.

16   Q.  And now you're saying, sir, that it actually relates to

17   one-off promotions relating to the MFN?

18   A.  That's correct.

19   Q.  What happened between your deposition and now that has

20   caused you to change your opinion?

21   A.  As I was reading and going over all of the documents, one

22   document that you didn't show me was -- I had asked Kevin that

23   night, after the dinner when I sent him the thank you, I asked

24   Kevin, Can you please send a document to his attorney or Brian

25   and John to clarify the point.  And so as I read that document

D6D9USA4                          Cue - direct

1    at the same time that this was going on, it recollected my

2    position of what this was about as I had told Kevin to do it

3    and Kevin responds to Brian in agreement about this.

4    Q.  So, in other words, in meeting with your lawyers in

5    preparation for your testimony you changed your answer from

6    your deposition, correct, sir?

7              MR. SNYDER:  Objection to form.

8              THE COURT:  Sustained.

9              THE WITNESS:  That's not correct.

10             THE COURT:  You didn't have to answer.  The question

11   was stricken.

12             THE WITNESS:  I'm sorry.  I apologize.

13             THE COURT:  No problem.

14   Q.  Now you say in the e-mail, "I don't believe we're asking

15   you to do anything you haven't told us you are doing.  We are

16   just trying to get a commitment."

17             Is it your testimony that allowing Macmillan to do a

18   one-off promotions somehow relates to getting a commitment from

19   them?

20   A.  Absolutely.  I wanted a commitment from the number of books

21   that he could do one-off promotions from.

22   Q.  Now, are you aware, sir, that on January 20 John Sargent,

23   before he had dinner with you, met with Russ Grandinetti of

24   Amazon?

25   A.  No, I was not.

D6D9USA4                         Cue - direct

1    Q.  And are you aware, sir, that on January 20 in a meeting

2    with Russ Grandinetti John Sargent indicated that he was

3    working on an agency model but his plan was to offer both an

4    agency model and a wholesale model.  Were you aware of that

5    sir?

6    A.  I wasn't aware that he was talking to Amazon.  He had made

7    me aware that he wanted to offer both models.

8    Q.  And sir, could you turn to PX482 in your binder.

9            I just want to make sure that we have the timeline

10   correct here.  So, on January 20 there is a meeting between

11   Mr. Grandinetti and Mr. Sargent.

12           Do you see that?  If you look at the third page of the

13   document.

14   A.  Sorry.  Can you refer to me -- what was the number again?

15   Q.  It's PX482 and it's the third page of the document.

16   A.  Okay.

17   Q.  Under the heading Macmillan.  Do you see that, sir?

18   A.  I do.

19   Q.  And so on January 20 you see that there's a meeting between

20   Mr. Grandinetti and Mr. Sargent?

21   A.  (No response).

22   Q.  "Russ met with John Sargent in New York."

23           Do you see that sir?

24   A.  I do.

25   Q.  And do you see there that John -- it says "John indicated

D6D9USA4                         Cue - direct

1    that he was working on an agency model but his plan was to

2    offer both an agency and a reseller model".

3              Do you see that, sir?

4    A.  I do.

5    Q.  And then that night was the night that you had dinner with

6    Mr. Sargent, correct?

7    A.  I believe that's correct, yes.

8    Q.  And the following -- well that evening, starting that

9    evening you sent an e-mail to Mr. Sergeant, which results in

10   Mr. Sargent sending you an e-mail the morning of January 21

11   talking about a very large stumbling block in the deal,

12   potentially, correct?

13   A.  That's correct.

14   Q.  And you tell Mr. Sargent in response, "I understand.  I

15   don't believe we're asking you to do anything you haven't told

16   us you are doing.  We are just trying to get a commitment."

17             You saw that?

18   A.  I did.

19   Q.  Now if you look at PX482 do you see that there's a heading

20   under January 21 in the Macmillan -- under Macmillan?

21   A.  I do.

22   Q.  Do you see that it says, "January 21.  John and Russ by

23   phone.  John realized that the Apple contract required him to

24   only offer the agency model only and wanted to talk through

25   options with Russ."

D6D9USA4                     Cue - direct

1        Do you see that?

2   A.  I do.

3   Q.  Now, sir, is it still your testimony that during the dinner

4   that you had with Mr. Sargent and others on January 20 you did

5   not inform them that if Macmillan did a deal, an agency deal

6   with Apple, it had to move Amazon to an agency model?

7   A.  That's correct.  I did not.

8   Q.  Just so we're clear.  Your belief is that the large

9   stumbling block in this e-mail back and forth between you and

10  Mr. Sargent is about doing one-off promotions?

11  A.  And the number of commitments.  Yes.  That's correct.

12  Q.  Sir, could you turn to PX42, please.

13        PX42, sir, is your update of your negotiations that

14  you wrote to Mr. Jobs, correct?

15  A.  That's correct.

16  Q.  And it's dated January 21, 2010, correct?

17  A.  That's correct.

18  Q.  So it's the day after you have your dinner with Mr. Sargent

19  where you talked about the one-off promotions, correct?

20  A.  Correct.

21  Q.  Which was a big stumbling block that almost cratered your

22  deal, correct?

23  A.  It's one of the stumbling blocks.  That's correct.

24  Q.  If you look at the Macmillan section of this document it

25  reads as follows, "After a long afternoon with their general

D6D9USA4                    Cue - direct

 1    counsel, we are in agreement with -- agreement on the terms but

 2    the CEO and GC have legal concerns over the price matching.  He

 3    is going to his outside counsel tomorrow morning.  We need him

 4    to sign off because he was one I was counting on.  I am meeting

 5    with him at 10:30 a.m. to make a final go/no-go decision."

 6              Did I read that correctly, sir?

 7    A.  You did.

 8    Q.  Now, if you look at the top of your e-mail to Mr. Jobs,

 9    you're informing Mr. Jobs that you're confident that they --

10    that you have two even though they have not yet signed; is that

11    correct?

12    A.  That's correct.

13    Q.  And you say that "They keep chickening out so I have to

14    give them a real drop dead time or they won't make up their

15    minds."

16              Do you see that?

17    A.  (No response).

18    Q.  Sir?

19    A.  Yes, I do.

20    Q.  And you say, "In the end they want us and see the

21    opportunity we give them but they're scared to commit."

22              Do you see that?

23    A.  I do.

24    Q.  "It's less to do with the terms and more about the dramatic

25    business change for them."

D6D9USA4                          Cue - direct

1            Do you see that?

2    A.  I do.

3    Q.  And was that really the issue that was going on here, sir?

4    A.  That's what I believed it was.

5    Q.  That you were imposing on the publishers a dramatic

6    business change to their industry?

7    A.  No.  Not to their industry but to the Apple agreement that

8    I was negotiating with them.

9    Q.  Now, Mr. Cue, could you turn to paragraph 96 of your

10   declaration.

11   A.  Yes.

12   Q.  And in paragraph 96 of your declaration you write,

13   "Finally, as I have done when negotiating music, movie, and TV

14   deals for iTunes, we gave some publishers very general

15   information about how close other publishers were to signing,

16   and then how many had signed.  We wanted each publisher to know

17   that we were close to meeting the minimum number for us to

18   launch to encourage them to accept."

19            Do you see that, sir?

20   A.  I do.

21   Q.  And is it your testimony, sir, that the reason that you

22   from time to time throughout the negotiations gave the

23   publishers information to let them know that you were close to

24   meeting the minimum number for Apple to launch was to encourage

25   them to accept the deal?

D6D9USA4                    Cue - direct

1   A.  Yes.  That's correct.

2   Q.  And Mr. Cue, isn't it true, though, that the real reason

3   that you consistently gave publishers information about who had

4   signed and who was planning on signing was because the

5   publishers were afraid of retaliation from Amazon and you

6   wanted to make sure they understood they were not going to be

7   alone in fighting Amazon?

8   A.  Long question.  So I hope I can answer.  But I didn't give

9   the publishers any information about who had signed

10  specifically.  I gave them general comments about the number

11  that had signed and the fact that I was talking to them.

12          So, no to your question if you're asking me did I give

13  them any specifics about which publisher had signed or any of

14  that.

15  Q.  That wasn't my question, sir.

16  A.  Sorry.

17  Q.  My question was:  Isn't it true that the real reason that

18  you were telling publishers that other publishers were close to

19  signing or had signed or had agreed to the deal had nothing to

20  do with a hey, guys, you know, the train is leaving, but rather

21  because you wanted to make them aware of the fact that they

22  would not have to face retaliation from Amazon because they

23  would all be moving together?

24  A.  No.  That's not correct.

25          MR. BUTERMAN:  Can you please play clip 13.

D6D9USA4                        Cue - direct

1            This is 129, 25 through 130, 11.

2   "Q.   And then for the third point, did Apple launch the

3   iBookstore in part by following a business strategy that

4   involved telling publishers the number of publishers that had

5   already signed?

6   "A.   No.   Again, did I tell them that some had signed from that

7   standpoint, or I might have said, you know, hey we've got two

8   publishers signed, but at no point in time did we get to the

9   point of giving them the specifics or -- I just wanted to

10  assure them that they weren't going to be alone, so that I

11  would take the fear aware of the Amazon retribution that they

12  were all afraid of."

13  BY MR. BUTERMAN:

14  Q.   Was that testimony true and accurate when you gave it, sir?

15  A.   It is.

16  Q.   Would you like to change your answer now?

17  A.   No.   You asked me if it was the only thing.   It wasn't the

18  only reason.   It was one of many reasons I gave them.

19  Q.   Now, Mr. Cue, isn't it true that the reason that publishers

20  were afraid of retaliation from Amazon is because they were

21  going to move Amazon to an agency model?

22  A.   I don't know that.   You'd have to ask them.

23  Q.   I'm sorry.   I interrupted.

24  A.   Sorry.   You would have to ask them.

25  Q.   Well, you knew that the publishers were afraid of

D6D9USA4                      Cue - direct

1  retaliation from Amazon, correct?

2  A.  That's correct.

3  Q.  And you understood that Amazon would be retaliating for

4  some reason, correct?

5  A.  I do.

6  Q.  And before Apple entered into the marketplace, there were

7  other retailers who entered into the marketplace, correct?

8  A.  That's correct.

9  Q.  For example, Amazon was in the marketplace and then Barnes

10  & Noble entered, correct?

11  A.  That's correct.

12  Q.  But there was no retaliation against Barnes & Noble --

13  excuse me, against the publishers for signing deals with Barnes

14  & Noble, correct?

15  A.  That's correct.

16  Q.  The reason why there was a fear of retaliation that you

17  were aware of and that the publishers were aware of is because

18  you all knew that the deal that you were imposing was going to

19  change the industry from the wholesale model to the agency

20  model, correct, sir?

21  A.  That's not correct.

22  Q.  Now, you said a moment ago, sir, that you gave information

23  to the publishers about numbers of publishers who were close to

24  signing and things of that sort, correct?

25  A.  That's correct.

D6D9USA4                              Cue - direct

1    Q.  But if I understand your testimony you never gave specific

2    names of publishers, correct?

3    A.  I don't recall ever giving a specific name, no.

4    Q.  But you did give the publishers at various points in time

5    pretty specific information, did you not?

6    A.  Could you be more specific?

7    Q.  Sure.  Penguin.  Penguin wanted some very specific

8    information from you before they would sign the contract,

9    correct?

10   A.  That's correct.

11   Q.  And that specific information was that they wanted an

12   assurance that they would be one of four, correct?

13   A.  That's correct.

14   Q.  And they didn't ask for that term to be in the contract,

15   correct?

16   A.  That's correct.

17   Q.  But they still wanted you to provide that information to

18   them?

19   A.  That's correct.

20   Q.  And, in fact, sir, you didn't tell Penguin, "I'm sorry

21   you're dealing with me one-on-one here," correct?

22   A.  Sorry?  Tell them that when?

23   Q.  You didn't tell Penguin, "No, deal with me and sign my

24   deal"?

25   A.  I tried.

D6D9USA4                         Cue - direct

1    Q.  But they wouldn't do it?

2    A.  That's correct.

3    Q.  And so you actually did what they wanted, correct?

4    A.  Well I was doing what -- I was trying to sign all six

5    publishers.  So, with Penguin I looked at it and said they

6    wanted to be one of four.  Clearly they weren't going to be the

7    first, the second, or the third, but I was pretty optimistic if

8    I got three that they would be the fourth, and so I didn't

9    think it was a big deal.

10   Q.  So you didn't think it was a big deal to wait until you had

11   three signed up and then tell Penguin, "Okay, I got the other

12   three that you wanted and now you can sign"?

13   A.  That's correct.

14   Q.  Did that strike you a little bit like a:  I'm only doing

15   this deal if my competitors do it?

16   A.  Given my experience, having done this with music, having

17   done it last week with publishers for radio, it's not unusual.

18   Nobody likes being the first to sign.  Everybody thinks that

19   you get a better deal by signing last.  And so I didn't find

20   Penguin's request unusual.  It's something I've heard from all

21   of the media industries over time.

22   Q.  Mr. Cue, I'd like to now direct you to something that we

23   started talking about earlier in the morning.

24           Could you turn to paragraph 100 of your declaration.

25   A.  Yes.

D6D9USA4                           Cue - direct

1    Q.  I want to direct your attention to the part of paragraph

2    100 where you write, "The first time Apple had definitive

3    knowledge that a publisher was negotiating with another

4    retailer was through press reports and an e-mail from John

5    Sargent, Macmillan's CEO, on January 31, 2010 after we had

6    signed our agreements."

7            Did I read that correctly, sir?

8    A.  You did.

9    Q.  Now I notice in that sentence that you use a qualifier.  So

10   I just want to make sure that we're on the same page.

11           When you say this was the first time that Apple had

12   definitive knowledge, what did you mean by that?

13   A.  Well some of the publishers had told us that they wanted to

14   go agency.  And so I didn't know whether it was a negotiation

15   tactic with us to get our deal signed or not.  But this was the

16   first time I knew they had actually -- one of them had actually

17   done something about it.

18   Q.  And by "done something" you mean gone out to Seattle,

19   correct?

20   A.  Again, if they went to Seattle -- I mean negotiate with

21   Amazon.

22   Q.  So, just so we're clear, the first time that you believe

23   Apple had definitive knowledge that a publisher was negotiating

24   with another retailer was through press reports and an e-mail

25   from John Sargent on January 31, 2010?  Correct?

D6D9USA4                          Cue - direct

1    A.  That's correct.

2    Q.  And you stand by that statement one hundred percent?

3    A.  I do.

4    Q.  Sir, could you turn to PX514 in your binder.

5            Sir, you have PX514?

6    A.  I do.

7    Q.  And you recognize PX514 to be a part of Mr. Jobs'

8    biography?

9    A.  I do.

10   Q.  And can you turn to page 503 of the document, sir.

11   A.  Yes.

12   Q.  And you see that on page 503 Mr. Isaacson reports on a

13   conversation that he had with Mr. Jobs the day after the iPad

14   launch, correct?

15   A.  I do.

16   Q.  And the iPad launch event was on January 27, 2010, correct?

17   A.  That's correct.

18   Q.  Which means that this conversation between Mr. Jobs and

19   Mr. Isaacson took place on January 28, 2010, correct?

20   A.  That's correct.

21   Q.  And in this conversation -- I'll just read the entire thing

22   just so, for completeness sake.

23   A.  Thank you.

24   Q.  Mr. Jobs writes or, excuse me, Mr. Jobs says to

25   Mr. Isaacson, "Amazon screwed it up.  It paid the wholesale

1   price for some books but started selling them below cost at

2   9.99.  The publishers hated that -- they thought it would trash

3   their ability to sell hardcover books at $28.  So before Apple

4   even got on the scene, some book sellers were starting to

5   withhold books from Amazon.  So we told the publishers, 'We'll

6   go to the agency model, where you set the price, and we get our

7   30 percent, and yes, the customer pays a little more, but

8   that's what you want anyway,' but we also asked for a guarantee

9   that if anybody else is selling books cheaper than we are, then

10  we can sell them at the lower price too.  So they went to

11  Amazon and said, 'You're going to sign an agency contract or

12  we're not going to give you the books.'"

13          Did I read that correctly, sir?

14  A.  You did.

15  Q.  So isn't it true that as of January 28, 2010, which is days

16  before you say, in paragraph 100 of your declaration, that

17  Apple became aware of the fact that any other publisher was

18  negotiating with another retailer, Mr. Jobs was aware that

19  publishers went to Amazon and said, "You're going to sign an

20  agency contract or we're not going to give you the books"?

21  A.  That's not correct.

22  Q.  That's not correct, sir?

23  A.  No, it is not.

24  Q.  What part of it is not correct, sir?

25  A.  Mr. Jobs didn't know whether any publisher had gone to

D6D9USA4                        Cue - direct

1    Amazon.

2    Q.  So are you saying that Mr. Jobs was not speaking accurately

3    to his biographer when he wrote, "So they went to Amazon and

4    said, 'You're going to sign an agency contract or we're not

5    going to give you the books'"?

6    A.  I think he was speaking a hundred percent accurately, yes.

7           But he didn't know that publishers had gone to Amazon.

8    Mr. Jobs is a pretty smart guy.  The publishers are upset.

9    Some of them had said they wanted to go to an agency model.  He

10   expected them to go to Amazon.  And so he said that.  I would

11   have said the same thing.

12   Q.  But, sir, he didn't say they are going to go to Amazon.  He

13   said, "They went to Amazon and said, 'You're going to sign an

14   agency contract or we're not going to give you the books,'"

15   correct?

16   A.  He did.

17   Q.  And it's your testimony that Mr. Jobs did not know prior to

18   January 31 that the publishers had started to reach out to

19   negotiate with other retailers?

20   A.  That's correct.

21   Q.  So you know what Mr. Jobs knew?

22   A.  In the book business I'm pretty sure since I was his main

23   source.  There was nobody else working with the publishers.  So

24   I couldn't imagine where else he would get that kind of

25   information.

D6D9USA4                        Cue - direct

1    Q.  So the information could only come from you, correct?

2    A.  I believe so.

3    Q.  And your information could only come from the publishers,

4    correct?

5    A.  My information about whether they were negotiating with

6    Amazon?

7    Q.  Correct.  If you had information about whether a publisher

8    was negotiating with Amazon, that would have come from the

9    publishers, correct?

10   A.  If I had it, that would be correct, yes.

11   Q.  And you still believe that paragraph 100 of your

12   declaration is accurate?

13   A.  I do.

14   Q.  Now, sir, a few moments ago, and actually earlier this

15   morning as well, you testified that you learned about the

16   Macmillan Amazon dispute from press reports and an e-mail; is

17   that correct?

18   A.  That's correct.

19   Q.  That's in paragraph 100 of your declaration, is it not?

20   A.  That's correct.

21   Q.  So let's look at the documents and see if we can isolate

22   the documents that you're referring to there.  Could you turn

23   to PX46 in your binder, sir.

24          Is PX46, sir, is that the e-mail that you received

25   from Mr. Sargent?

D6D9USA4                         Cue - direct

1    A.  Yes, it is.

2    Q.  And Mr. Sargent writes to you on January 31 and he says,

3    "Morning Eddy.  Sometimes it is not good to be CEO and VP

4    corporate communications.  Just to make sure you are in the

5    loop.  Lots of noise this morning."

6            Do you see that?

7    A.  I do.

8    Q.  Then you see that underneath there's a letter from John

9    Sargent to all Macmillan authors, illustrators and the literary

10   agent community.

11           Do you see that?

12   A.  I do.

13   Q.  And he says, "This past Thursday I immediate with Amazon in

14   Seattle," correct?

15   A.  I do.

16   Q.  And that's where you learned that Mr. Sargent had met with

17   Amazon in Seattle, correct?

18   A.  I don't remember if it was this or the articles in the

19   paper but from one of the two.

20   Q.  So let's look at the article in the paper so just make sure

21   that we're all on the same page.

22           I'm sorry.  Let me just, before we move on.

23           You forward this e-mail to Mr. Jobs, correct?

24   A.  I do.

25   Q.  And Mr. Jobs responds by saying, "We have definitely helped

D6D9USA4                        Cue - direct

1    stir things up in the publishing world," correct?

2    A.  He does.

3             MR. BUTERMAN:  Your Honor, we'd like to move PX46 into

4    evidence.

5             MR. SNYDER:  No objection.

6             THE COURT:  Received.

7             (Plaintiffs' Exhibit 46 received in evidence)

8    Q.  Now could you turn to PX871, please.

9             Do you have that, sir?

10   A.  I do.

11   Q.  And PX871 is a January 30, 2010 e-mail from you to

12   Mr. Jobs, to which Mr. Jobs responds to, correct?

13   A.  That's correct.

14   Q.  And it contains an article from Publishers Deluxe Lunch

15   Blog regarding the Amazon versus Macmillan dispute, correct?

16   A.  That's correct.

17   Q.  And Mr. Jobs responds to your forward by saying, "Wow, we

18   have really lit the fuse on a powder keg," correct?

19   A.  That's correct.

20   Q.  Fair to say that Mr. Jobs was proud of what you and he had

21   done in the eBooks world?

22   A.  We were proud of launching the iBookstore if that's what

23   you're asking me.

24   Q.  You were proud of lighting a fuse on a powder keg in a

25   dispute with Amazon and other publishers?

D6D9USA4                          Cue - direct

1    A.  No, we were not.

2    Q.  Would you agree with me that it's either from this article

3    on January 30, 2010 or from the e-mail from January 31, 2010

4    that you were referring to in your paragraph 100 of your

5    declaration?

6    A.  I cannot.  I mean there were many, many articles that were

7    written.  So I don't know which one I read first.  So it could

8    be this one.  It could be others.  I mean it was front headline

9    news as I recall.

10   Q.  And it was news on January 30 and 31, correct?

11   A.  I believe so.  But I don't know if something leaked a

12   little earlier or not.

13   Q.  Well, you say in your declaration -- make sure that we have

14   the language correct -- you say in your declaration, "The first

15   time Apple had definitive knowledge that a publisher was

16   negotiating with another retailer was through press reports and

17   an e-mail from John Sargent, Macmillan's CEO, on January 31,

18   2010 after we had signed our agreements"?

19   A.  I did.

20   Q.  Now, sir, isn't it true that you and Mr. Sargent actually

21   discussed his plans to go out to Seattle and make the proposal

22   to move Amazon to an agency model one week earlier than

23   January 31?

24   A.  No.  That is not true.

25   Q.  You said it a couple times here but I want to just make

D6D9USA4                         Cue - direct

1   sure we're clear.

2             Prior to seeing these articles and receiving this

3   e-mail you did not know that John Sargent went out to Seattle,

4   correct?

5   A.  That's correct.

6   Q.  Sir, I've handed you what's been market as PX877.  This is

7   an e-mail between you and Mr. Sargent, an e-mail exchange,

8   January 27 and 28.

9             Do you see that, sir?

10  A.  I do.

11  Q.  And do you see that Mr. Sargent in his January 27 e-mail --

12  and January 27 was the day of the iPad launch event, correct?

13  A.  Correct.

14  Q.  And do you recall that during that event Mr. Jobs made a

15  statement to Mr. Mossberg where he talked about the prices of

16  books being the same?

17  A.  I do.

18  Q.  And isn't that what Mr. Sargent is responding to when he

19  writes, "I've spoken to the Times and the Journal.  They picked

20  up on 14.95 for the Kennedy book.  It is at 9.99 on Kindle.  I

21  have answered questions on the price caps, tied to ink on

22  paper, and the availability of all titles.  Hope the spin will

23  be all positive.  Brian, please forward to the press contact at

24  Apple.

25            "Damn, that device rocks."

D6D9USA4                          Cue - direct

1            Did I read that correctly sir?

2   A.  You did.

3   Q.  That's January 27.

4            And what do you write in response, sir?  You write to

5   Mr. Sargent, "If you get back to New York Friday, I can stop

6   by," correct?

7   A.  That's correct.

8   Q.  Sir, is it still your testimony under oath here that you

9   did not know that on January 28, the day after the iPad launch

10  event, Mr. Sargent flew to Seattle to meet with Amazon?

11           MR. SNYDER:  Objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  That's correct.

14  Q.  You seem to have some knowledge of Mr. Sargent's travel

15  plans, correct?

16  A.  I do.

17  Q.  Why is that, sir?

18  A.  I invited him to the event.  I wanted him to come out to

19  the event to see the launch of the I -- of the iPad and our

20  iBooks.  We were very excited about it.  We thought he would

21  love to be there at the event.

22           And he shared with me that he was not -- I don't

23  remember the comment or whatever, but he was going to be out of

24  town and not going to be available.  And so, that's why I wrote

25  back to him:  If you're back in New York on Friday, I wanted to

D6D9USA4                         Cue – direct

1   stop by on Friday because, believe it or not, all of the

2   publishers signed the deal with us without ever seeing what an

3   iPad looked like or what an iBooks looked like.  And so I

4   wanted to be the first to go to New York and show the

5   publishers what an iPad and what an iBook application looked

6   like.  And so I was letting him know that.

7   Q.  So, Mr. Sargent had told you that he's going to be out of

8   town, he might be back on Friday, you wanted to show him the

9   iPad, correct?

10  A.  IPad and iBooks, yes.

11  Q.  The iPad and iBooks.

12          I'm going to show you what's been marked as PX881.

13  A.  Thank you.

14  Q.  Sir, PX881 is an e-mail dated January 24, 2010.  It's an

15  e-mail exchange between you and Mr. Sargent; is it not, sir?

16  A.  It is.

17  Q.  And as you said in your previous answer, Mr. Sargent -- or

18  it begins with, I'm sorry, you, on the bottom telling

19  Mr. Sargent, "As I recall you are not going to the event on

20  Wednesday, right?  Question.  Also I hope to stop by on Friday

21  to show you the device."

22          That's correct, sir, right?

23  A.  That's correct.

24  Q.  And Mr. Sargent responds to you by saying, "I can't make

25  the event but I'm hoping you can hook me up to watch it

D6D9USA4                          Cue - direct

1  somehow.  As for Friday, I hope to be in but suspect I will be

2  in Seattle or traveling back."

3           Mr. Cue, despite what you've said repeatedly today,

4  you knew that Mr. Sargent was going out to Seattle to meet with

5  Amazon, correct?

6  A.  That is not correct.

7  Q.  And Mr. Cue, you knew that Mr. Sargent was going out to

8  Seattle to tell Amazon that they could either move to an agency

9  agreement or they would not get his books for several months?

10 A.  That is not correct.

11 Q.  That is something that you and Mr. Sargent discussed days

12 before he ever went out to Seattle?

13 A.  (No response).

14 Q.  Correct?

15 A.  That is not correct.

16 Q.  You are aware that you've testified at least four times

17 this morning that you were not aware that Mr. Sargent was going

18 out to Seattle prior to January 30 or 31, correct?

19           MR. SNYDER:  Objection to form.

20           THE COURT:  Overruled.

21           THE WITNESS:  I am.  And I will keep answering it the

22 same way.

23           MR. BUTERMAN:  One moment, your Honor.

24           (Pause)

25           No further questions at this time, your Honor.

D6D9USA4                           Cue - direct

1          Your Honor, may I just request to move in PXs 877 and

2     881 into evidence.

3               THE COURT:  Any objection?

4               MR. SNYDER:  No, your Honor.

5               THE COURT:  Received.

6               (Plaintiffs' Exhibits  877 and 881 received in

7     evidence)

8     CROSS-EXAMINATION

9     BY MR. SNYDER:

10    Q.  Good afternoon, Mr. Cue.

11    A.  Hello.  Thank you.

12    Q.  Mr. Cue, do you recall -- withdrawn.

13         What I'm going to do just to -- for the Court's

14    benefit, your benefit, is I'm going to work through all the

15    documents that the government showed you in the same order and

16    then I may go back to some other topics.  That's the way I'm

17    going to proceed.

18         The first documents that the government showed you

19    first was Plaintiffs' Exhibit 857.  I think people have

20    referred to this as the spiderweb.

21         Before court today had you seen this chart before,

22    sir?

23    A.  I don't believe so.

24    Q.  And I think counsel said this, these were phonecalls among

25    and between publishers at times at issue in this case?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6D9USA4                              Cue - cross

1    A.   That's correct.

2    Q.   And just to be clear, at any time during your negotiations

3    with the individual publishers in January of 2010 were you

4    aware that any of these calls among and between different

5    publishers were occurring?

6    A.   No, I was not aware of any calls or any other form of

7    communication actually.

8    Q.   And have you throughout your career, sir -- withdrawn.  How

9    long have you worked at Apple?

10   A.   Just over 24 years.

11   Q.   And what was your role in negotiating the iTunes deals?

12   A.   I was the primary business person in charge of getting the

13   deals done with the -- at the time I believe there were five

14   major labels.  And so I negotiated each of those deals before

15   we went live.

16   Q.   And did you play a role in the development of the app

17   store?

18   A.   I did.

19   Q.   What was your role?

20   A.   I was also responsible for the app store as the lead

21   business person and responsible for both the development, the

22   running of it, and all the day-to-day operations.

23   Q.   And when you negotiated content deals for the app store,

24   did you start -- let's go to game business, the Angry Birds and

25   games like that, did you approach the biggest gaming companies

D6D9USA4                    Cue – cross

1   first to try to strike app deals with them?

2   A.  What we did with the app store is we created, based on our

3   experience of creating agreements in the past with music,

4   movies, and TV shows, we've always treated everybody the same,

5   roughly the same, right.  So whether you're a large music label

6   or a small music label, you get the same deals that we do.

7             So when we wanted to do the app store, we wanted to

8   take exactly the same way and treat a large developer or a

9   small developer exactly the same and so we created a template

10  agreement for the app store that we thought met the needs of

11  all of the different parties.  And we created that.  And

12  actually went live with that agreement.  And gave it out to all

13  of the major publishers and the smaller ones too at the same

14  time.

15  Q.  And I believe you testified a few moments ago that very,

16  very recently you negotiated deals for what is known as the

17  iRadio; is that correct?

18  A.  ITunes Radio.

19  Q.  ITunes Radio?

20  A.  And yes, I just completed those negotiations last week here

21  in New York.

22  Q.  And with which companies did you negotiate and what size

23  companies?

24  A.  With Universal Music, Sony Music, Warner Music,

25  Warner/Chappell, Sony ATV Publishing, so the large -- the large

D6D9USA4                      Cue - cross

1    major labels and publishers of music.

2    Q.  By the way, during the course of those negotiations,

3    jumping ahead to a subject but it sparked my memory, did you at

4    any time tell any one music publisher that one is in, two is

5    in, three is in, that kind of same negotiating tactic that you

6    used with Penguin that was discussed earlier?

7    A.  I did.  I kept them all aware, both from the music side and

8    the publishing side.

9    Q.  Now returning to the phonecalls which prompted that slight

10   digression, based on your years of negotiating with content

11   companies for content deals for your content stores, if you had

12   become aware, sir, in this instance that the publishers were in

13   frequent communication with one another, how if at all would

14   that have impacted your desire to continue negotiations?

15   A.  Well I would have stopped the negotiations because I

16   wouldn't have been able to -- I would have felt like I wouldn't

17   have been able to get to an agreement that was good for Apple

18   and consumers.

19   Q.  And why is that?

20   A.  Well, typically what happens as I -- with my experience is

21   I have an idea of how we want to structure the deal and each of

22   the companies has slightly different ideas.  And they're not

23   all the same.  And some have a particular issue on one topic.

24   Some have an issue on another topic and not the same one as the

25   other.

D6D9USA4                    Cue - cross

1              If they're talking to each other and sharing that

2      information, then sort of they will all stand up and, my belief

3      is they would all stand up and basically ask for all the same

4      terms that are not good for Apple and good for what I think are

5      consumers.  So I think the deal wouldn't get done with them.

6      Q.  And did that happen here, sir?

7      A.  No, it did not.

8      Q.  Now, Mr. -- counsel also showed you another exhibit which

9      is Plaintiffs' 867.  Had you ever seen this exhibit before this

10     morning?

11     A.  (No response).

12     Q.  You can look at it on the screen if it's easier, Mr. Cue.

13     A.  Thank you.  No, I had not.

14     Q.  Counsel said that, page ten of the rough transcript,

15     "Looking at this chart, is it fair to say that you've had a

16     fair number of phonecalls with the CEOs of those five

17     publishers during the six weeks between when Apple first

18     approached the publishers to discuss the possibility of

19     entering into agreement to sell eBooks and late January when

20     you signed the five publishers?"

21             And you said -- answered, "No, I had lots of

22     communications with them at very small intervals of time, in

23     particular at the end, but I did not have constant

24     communications with them throughout that period of time."

25             Do you recall that question and your answer?

D6D9USA4                        Cue – cross

1     A.  I do.

2     Q.  First question is just to ask the obvious.  Anything

3     unusual with talking on the telephone to potential contractual

4     partners as you're negotiating a deal?

5     A.  No.  I do that all the time.

6     Q.  And when you're working in California and your contractual

7     counterparties or potential contractual counterparties are in

8     New York, how do you communicate with them?

9     A.  By phone and e-mail.

10    Q.  Thank you.  Now let's actually look at the evidence, sir.

11    And I want to show you Plaintiffs' Exhibit 788.

12              MR. BUTERMAN:  Objection, your Honor.

13              THE COURT:  Sustained.  Stricken.

14    Q.  Now I want to direct your attention to the government's

15    exhibit, Plaintiffs' 788.

16              MR. SNYDER:  And could we put side-by-side on the

17    screen, Andrew, a calendar which I have marked and we'll offer

18    in evidence as Defendant's Exhibit 718.

19              Would the Court mind, your Honor, if I use a light

20    bearing instrument to point to dates where appropriate?

21              THE COURT:  Not at all.

22              MR. SNYDER:  Thank you.

23              Now, if you can, Andrew, put the calendar, blank

24    calendar on the screen, side-by-side, with Plaintiffs' Exhibit

25    788.

D6D9USA4                    Cue - cross

1    Q.   Now am I correct, sir, that you had your initial meetings

2    on December 15 and 16, 2009 with the publishers?

3    A.   Those were the first time I met them in person.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D6DPUSA5                      Cue - cross

1    BY MR. SNYDER:

2    Q.  And at those meetings, did Apple and any publisher reach

3    any agreement of any kind on any topic relating to the sale of

4    eBooks?

5    A.  Those were discovery meetings.  Those were the first times

6    I got to meet with them, and so I was there to learn.  I wanted

7    to understand the book marketplace and what they wanted to see,

8    what was going well, what wasn't going well, the technical

9    requirements of running a bookstore, lots of information that I

10   was gathering at the time.

11   Q.  Now, you testified that sometime between the 15th and 16th,

12   your initial meetings, and the 21st, where there are the phone

13   calls that counsel took you through with three publishers, you

14   made a determination to begin consideration of an agency model;

15   is that correct?

16   A.  That's correct.

17   Q.  Now, let's look at the call entries for 12-21, and do you

18   see there are several calls under two minutes with --

19   withdrawn.

20          Do you see that there are two calls, at least, placed

21   under two minutes involving Mr. Young, David Young, there and

22   there?

23   A.  I do.

24   Q.  One's 18 seconds and one is 23 seconds?

25   A.  That's correct.

D6DPUSA5                     Cue - cross

1   Q.  Are you aware that there's no -- You've reviewed the

2   e-mails from Mr. Dohle, Ms. Reidy and Mr. Sargent summarizing

3   the phone calls they had with you on the 21st?

4   A.  That's correct.

5   Q.  Are you aware of Mr. Young having any e-mail summarizing an

6   18-second or 23-second call with you at 11:45 a.m. and then

7   11:46 a.m. on the 21st of December?

8   A.  No, I didn't talk to him; so that wouldn't be the case.

9   Q.  And on that topic, can we please go back to government's

10  857?  Looking at this chart, sir, that counsel showed you, do

11  you have any way to determine whether -- I'm sorry.  I meant to

12  do the one that was involving you.   867.

13          Do you have any way of knowing whether the 18-second

14  and 23-second telephonic communication from one number to

15  another listed on Plaintiff's 788 is captured in any of those

16  so-called spiderwebs that I'm pointing to between Apple and

17  Hachette?

18          MR. BUTERMAN:  Objection.

19          THE COURT:  Overruled.

20  Q.  Sir?

21  A.  No, I don't know what -- I don't know what is counted or

22  isn't counted there.

23  Q.  Now, let's go back to 788.  You had a

24  ten-minute-and-45-second call with Carolyn Reidy at 10:33 a.m.;

25  do you see that?

1   A.  I do.

2   Q.  You had a 17-minute-and-37 second call with Markus Dohle at

3   12:17 p.m., correct?

4   A.  I do.

5   Q.  Markus Dohle was the head of Random House, correct?

6   A.  That's correct.

7   Q.  Did Apple enter into an agency agreement with Random House?

8   A.  We did not.

9            THE COURT:  At that time?

10  Q.  At any time?

11           THE WITNESS:  Sorry.  I apologize.

12           THE COURT:  Yes.  I assumed you meant at that time.

13           THE WITNESS:  Sorry, your Honor.

14           MR. SNYDER:  Yes.

15           THE COURT:  Right?

16  Q.  And not in January either, correct?

17  A.  We tried very hard to enter into an agreement with Markus

18  Dohle throughout the process, but I was unable to get him to

19  sign an agreement.

20  Q.  And then finally you had an 11-minute call at 12:48 p.m.

21  with Mr. John Sargent, correct?

22  A.  That's correct.

23  Q.  Sir, between the 15th and 16th of December -- and if we can

24  go to January, please -- and the 4th, 5th of January when you

25  sent out your initial proposals to the five, six publishers,

D6DPUSA5                          Cue - cross

1    did you have a single telephone conversation, sir, with Penguin

2    on any topic, according to the government's phone records?

3    A.  No, I did not.

4    Q.  No meetings?

5    A.  No, I did not.

6    Q.  To your knowledge, did Steve Jobs have any communications

7    with anyone at Penguin during the period between the initial

8    introductory meetings in December and the time you sent out

9    your e-mail proposal?

10   A.  He couldn't have because he would have asked me who to

11   call, and he never did.

12   Q.  Any calls at all after the introductory meeting with

13   Mr. Young and his colleagues at Hachette between the time of

14   that initial meeting and when you sent Hachette your initial

15   e-mail proposal in early January?

16   A.  Not that I can recall.

17   Q.  Well, if you look at the phone records, 788, can you

18   confirm whether between December 22 and January 5, first of

19   all, whether there were any phone calls between any publisher

20   and you?  And look at that chart.

21   A.  Between the 23rd and the --

22   Q.  21st when you had --

23   A.  Yes.

24   Q.  -- the calls with the three publishers?

25   A.  No, there's not.

D6DPUSA5                          Cue - cross

1    Q.  And now, I want to ask you about HarperCollins.  We'll get

2    to HarperCollins later and your negotiation with HarperCollins,

3    and I believe you touched on it earlier; am I correct?

4    A.  That's correct.

5    Q.  And you were asked questions about Mr. Steve Jobs calling

6    Mr. James Murdoch, e-mailing Mr. James Murdoch to persuade

7    HarperCollins to do the deal?

8    A.  That's correct.

9    Q.  Do you know the date -- Andrew, calendar, please -- do you

10   know the date on which you met with HarperCollins, whether it

11   was the 15th or 16th?  Can you recall?  Within the first three

12   or the second three, I can't remember.

13   A.  An e-mail would tell us, but I honestly don't remember.

14   Q.  Between the 15th and the 16th of December and the 4th or

15   5th of January, when you sent out your initial e-mail proposal,

16   did you have a single telephone conversation with anyone at

17   HarperCollins?

18   A.  No, I did not.

19   Q.  In fact, sir, if you look at your calls with John Sargent

20   on Government Exhibit 788, after your initial call with

21   Mr. Sargent for 11 minutes at 12:48 p.m. on December 22nd, when

22   was the next call you had with Mr. John Sargent following your

23   January -- your December 21 call?  If you can scroll down, and

24   take your time.

25   A.  I believe it is on the 21st at 3:47 p.m.

D6DPUSA5                         Cue - cross

1   Q.   Which month?

2   A.   January.

3   Q.   What was January 21st?  What did it signify in connection

4   with this negotiation?

5   A.   Well, we were getting near the end, and I needed to get the

6   deals done, and so I was negotiating with the publishers here

7   basically on a 24-by-7 basis; so I was willing to call or see

8   or e-mail anybody at any time.  So I had -- I felt tremendous

9   pressure to get deals done at this point because we were

10  getting near the iPad launch date.

11  Q.   Why did you feel pressure, sir?

12  A.   So I've worked at Apple for 24 years.  I've worked for

13  Steve for 16, 17 years.  I was very close to him.  Steve was

14  near the end of his life when we were launching the iPad, and

15  he was really proud of it.  He was working hard on it.

16       I believed that the bookstore was going -- and iBooks

17  was going to be a tremendous feature of the product.  People

18  were going to love it, customers and our consumers were just

19  going to go wild about iPad and iBooks, and I wanted to be able

20  to get that done in time for that because it was really

21  important to him.

22       And so I felt that pressure tremendously now.  I

23  normally would have felt it anyway.  I like getting my work

24  done.  I pride myself on being successful, but this had extra

25  meaning to me.

D6DPUSA5                          Cue - cross

1    Q.  And, sir, were you in New York on January 21st?

2    A.  I was.

3    Q.  And you said 24/7 -- Do you have an ability, based on your

4    present recollection, to actually accurately estimate how many

5    hours a day you were negotiating agency agreements with the

6    five publishers -- if we can get the calendar, please -- during

7    the week of 21st, 22nd, 23rd, 24, 25 and 26?

8    A.  If I was awake, I was negotiating, other than talking to my

9    wife and kids at home.

10   Q.  Did you stay in New York over that weekend?

11   A.  I did.

12   Q.  And if you look at the chart, Government's Exhibit 788, can

13   you tell the Court where the majority of the calls involving

14   you can be found on the so-called spiderweb involving you, on

15   the one hand, and the individual publishers, on the other?

16   A.  The majority of the calls are during that week, from the

17   21st, all the way through the 26th.

18   Q.  Now, let me take you to the next exhibit, which is

19   Plaintiff's Exhibit 870.  Do you remember being shown this

20   document by counsel this morning?

21   A.  Yes.

22   Q.  And do you remember being asked this question and giving

23   this answer?  Apple's entry rather than -- withdrawn.

24          Do you remember being asked whether the average price

25   of eBooks of the five major publishers went up and stayed

D6DPUSA5                        Cue - cross

1   elevated?  Do you remember a question to that effect?

2   A.  Sorry, repeat --

3   Q.  Do you remember being asked whether --

4   A.  I was looking at this document, sorry.

5   Q.  Do you remember being asked whether after Apple entered the

6   market, whether the price of eBooks of the five major

7   publishers went up and stayed elevated?

8   A.  I do.

9   Q.  And you testified "That's not the way I looked at it"?

10  A.  That's correct.

11  Q.  Why was that not the way you looked at it?

12  A.  Well, so when we met those publishers, as I stated, they

13  weren't happy with Amazon.  They were windowing books.  So one

14  of the things that I was not willing to accept was not having

15  those books in the store.

16          And so when I look at it, we launched a product that

17  had books that were not going to be available on Amazon or any

18  other place that was windowed, No. 1.  I expected them to price

19  some of the books at 12.99 or 14.99 based on that capability.

20  I didn't know how many they would price, but I certainly

21  expected them to price some, at least to start with.

22          I also had put some tiers in place to make sure that

23  other books were cheaper.  I had put a maximum price tier of

24  9.99 for some other books, and trying to do that, in my

25  discussions with them, they let us know that one of the reasons

D6DPUSA5                    Cue - cross

1    they wanted to have control of pricing is they wanted more

2    flexibility to take books that weren't selling well and lower

3    the price, and take books that were older and do different

4    things with pricing and moving the pricing from that

5    standpoint.

6           And so my view was, going into the market, I knew that

7    some books would definitely go up, but other books would be

8    available for the first time.  And I expected them -- that

9    others, they would play around with the pricing and compete

10   with each other.

11   Q.  Let me ask some follow-up questions.  When you talk about

12   prices, prices on what bookstore are you discussing right now?

13   A.  I'm talking about the Apple bookstore.  That's all I could

14   focus on because it's the only thing I had control of.  And I

15   only had control of it by my tiers that I set in place because

16   it's an agency model; so the publishers decided what the price

17   was.  The tiers gave me a way to make sure that, at worse case,

18   those were the maximum price points that they would use.

19   Q.  Now, you talk about the fact that Kindle was being windowed

20   by publishers for some new releases; is that correct?

21   A.  That's correct.

22   Q.  Was that the condition of the market as Apple found it when

23   it first, as we've been saying, came to town?

24   A.  That is correct.

25   Q.  And for the consumer, looking for an eBook on Kindle, based

D6DPUSA5                         Cue - cross

1    on your understanding of the book business as you acquired it

2    during the negotiations, what's the impact on the consumer who

3    wants to buy an eBook, let's say the Palin or Kennedy book,

4    poplar at that time, and finding it not available at all on

5    Amazon or NOOK?

6    A.  Well, I mean, there are two options for the consumer.  One,

7    they don't get to read it at all and, obviously, it's

8    disappointing because you can't get it; or, two, they have to

9    go buy it in a physical way, and the physical price is

10   generally higher than the physical -- than the digital price,

11   and so they would have to pay more.

12   Q.  Has Apple, as a content distributor, either on the iTunes

13   store, the App Store or now the iBookstore, ever permitted

14   windowing of important new release content?

15   A.  We don't permit windowing at all.  We think it's a -- if

16   you're going to run a store, you cannot have content that's

17   windowed.

18   Q.  Why not?

19   A.  Because you're trying to get customers to come to your

20   store, and if they can't find it, they won't come back, they'll

21   go somewhere else and -- so number one.  Number two, as I said,

22   they can't find it, we know that digital is a better price for

23   consumers; so at that point, we're telling consumers they have

24   to buy it somewhere else at a higher price.  And so we've been

25   unwilling to do that.

1    Q.  Now, you also talked about giving pricing over to the

2    content provider as part of agency.  Do you remember that being

3    an element of your answer?

4    A.  I do.

5    Q.  And what year did Apple open up its App Store?

6    A.  I don't recall, but I'm sure if you give me the date, I'll

7    remember.  It's -- I believe it was in 2010, but I don't

8    recall.

9    Q.  Were you intimately involved in its creation and launch?

10   A.  I was.

11   Q.  On what model does Apple sell apps?

12   A.  On the agency model.

13   Q.  And do you know approximately how many apps have been

14   downloaded since the App Store was developed?

15   A.  Well over 50 billion.

16   Q.  And how are those 50 billion apps priced on the App Store,

17   by whom?

18   A.  They're priced by the developer of the app.  We give them a

19   set of tiers in which to price the apps, and the developer, we

20   give them a system, just like we gave the publishers, where

21   they can come in and set the price points and modify the price

22   points at any time across the tiers of pricing that we have.

23   Q.  Since the launch of the App Store -- withdrawn.

24        From the time of the launch of the App Store until the

25   launch of the iBookstore, did Apple have an opportunity, that

D6DPUSA5                          Cue - cross

1    is you and your colleagues, to evaluate how the agency model

2    has worked for the App Store?

3    A.  We did.  It was the first time we had ever done an agency

4    model and so we knew how it worked at that point.  We knew how

5    it operated.  We knew how it worked for consumers, for us, for

6    the developers, and so we had a very good understanding of it.

7    Q.  How did it work for consumers?

8    A.  For consumers, it was -- they don't really see the

9    difference.  They come in and see a price point that is set by

10   the developer, and so they buy it.  And so from a consumer

11   point of view, it's worked effectively because developers

12   compete with each other, and so they set the price.  And the

13   competitive nature of the developers keeps it -- keeps the

14   pricing, you know, aggressive across all of the developers.

15   Q.  And how did it work for Apple?

16   A.  For Apple, we collect the fees, we process the transaction,

17   and then we give the customer the actual application.  We keep

18   30 percent, as an agency fee for running the service, and we

19   give 70 percent of it to the developers.

20   Q.  Is that a -- that 30 percent, is that a gross or net number

21   to Apple?

22   A.  It's a gross number.

23   Q.  Now, how, if at all, did Apple's experience with the App

24   Store influence the decision by Apple to pursue an agency model

25   in December 2009 for books?

D6DPUSA5                        Cue - cross

A.   Well, as we kind of -- as I mentioned, when I went to
New York, it was a learning experience.  Right?  I spent
several hours, hour to two hours, with each of the publishers,
got a lot of information and kind of thought a lot about it and
came to the conclusion two of the publishers had told us that
they wanted to go to an agency model.

          My first reaction when I had gone there, we wanted to
do a wholesale deal, and so I wasn't really receptive to it.
But as I got back, I realized sort of the constraints and
issues that the publishers were trying to do, which is price
books at sort of $15, holdback, windows.  I didn't believe that
I could get a wholesale deal, and I thought, wow, you know,
we've done this with an agency model where we let the
developers set the price.  It's worked very effectively for us.
Could we do this for books?

          And so I said, yeah, that's a great idea, but I
thought more about it.  One of the issues that came about was
how do I know for sure that if I let them price completely for
free at any price points that they want, what would they do?
And I had just met these individuals.  I didn't know them very
well.  And so I said, you know, I really want to set some caps
here and tiers so that they don't go above them.  And we had
done the same thing in the App Store.  We had set a price tier
of $999 at the App Store as the maximum price; so I set the
same thing for books.

D6DPUSA5                    Cue - cross

1    Q.  999?

2    A.  For the App Store.

3    Q.  What sells for 999 at the App Stores?

4    A.  They're enterprise apps.  Obviously, not consumer apps.

5    Q.  Now, you said that with respect to the wholesale model,

6    there were constraints and issues, and you refer to a wholesale

7    price and the ongoing windowing; is that correct?

8    A.  That's correct.

9    Q.  Can you explain to the Court, sir, why having gone into

10   New York in a wholesale state of mind, you came out thinking

11   that wholesale was not going to work for Apple?

12            MR. BUTERMAN:  Objection.

13            THE COURT:  Overruled.

14   A.  Yes.  As I sat down, one of the things that I asked them

15   certainly is, in a wholesale model, one of the questions that

16   you have is, what are you selling the books at to us?  And so

17   as I asked them, they stated the fact that they were selling --

18   and I focused a lot on new release hardbacks, to start with.

19   To ask that question, I asked about others, but focused on new

20   release hardbacks.

21   Q.  Let me stop you there.  A, why did you ask about new

22   release hardbacks; and, B, how did you know enough about the

23   book industry to ask that?

24   A.  Well, I had already read the news reports that they were

25   holding back new release hardbacks.  I knew what a new release

D6DPUSA5                        Cue - cross

1    hardback was because I was a book reader, and so I bought new

2    releases, certainly.

3           And in my conversations, my initial conversations with

4    the three publishers that I had earlier, they had, you know,

5    said that they were unhappy with 9.99 as a price point.  I knew

6    that was a contentious issue going in; so I really wanted to

7    understand, well, what was the contention.

8           One of the first questions you ask is, what are you

9    selling those books to me at?  And their price points were that

10   they were selling those books at anywhere from 12 to $14 or

11   anything to that ballpark, typically, and that as a matter of

12   fact, they were going to be raising those prices.  And they had

13   just raised them once and they were going to raise them again.

14          And then, secondarily, is that they wanted -- they

15   were going to have the ability of saying which books they would

16   make available at the time that the book came out physically.

17   And so they wanted to be able to -- the windowing, holdback

18   language that we've all talked about today, which is they

19   wanted the ability the decide on a book-by-book basis which

20   ones they would give us, when they would give it to us, and at

21   what prices they would give it to us.

22   Q.  Did you have a conversation with Steve Jobs --

23          MR. SNYDER:  If I could have the calendar, please,

24   Andrew.

25   Q.  When you got back to New York, I think you told counsel

D6DPUSA5                       Cue - cross

1   that you were back in New York by the 17th or 18th; is that

2   correct?

3   A.   I believe I flew back right after the meeting; so I was

4   probably back that night and in the office on the 17th.

5   Q.   And do you recall the e-mails you saw from the 22nd from

6   Markus Dohle and others recounting of the conversations you had

7   on the 21st?

8   A.   I do.

9   Q.   And do you believe that the conversations you had with

10  Steve Jobs about how to proceed occurred sometime between the

11  17th of December and the 21st of December?

12  A.   They started on the way to the airport because I was trying

13  to get him up to speed as quickly as I was getting up to speed.

14  As I said, neither of us was very knowledgeable about the book

15  market, and so I immediately started relaying and kind of

16  talking about what I saw as the issues of getting a deal done,

17  that was, with them.

18  Q.   And do you recall having a conversation with Mr. Jobs

19  during this time period in which you discussed whether you

20  should pursue agency agreements?

21  A.   I did.  We -- As I thought about this and looked at this, I

22  thought that an agency model would address the issues that we

23  had, which is to have a competitive bookstore with all of the

24  releases available at the time that they're new, and that even

25  though the price of some books would be going up from 9.99 to

D6DPUSA5                           Cue - cross

1    12.99, I would put -- I had come up with the idea of putting

2    caps to make sure they could only go up that high.  I would

3    require those books that were held back to come into the

4    market.

5    Q.  Let me interrupt you because I'm not asking about what your

6    state of mind was then, but whether you recall speaking to

7    Steve Jobs on the subject?

8    A.  Oh, I did.  You know, once I had sort of formulated a game

9    plan of what I thought would be a set of terms, then I went to

10   Steve and kind of expressed, here's what I'm thinking.  And,

11   you know, I don't recall exactly all of the points and who

12   came, but we trade back and forth ideas and came to a

13   conclusion of, yes, this is a good idea.

14   Q.  Let me just pause, hit the pause button there, and ask you

15   approximately how many content deals have you negotiated for

16   Apple during your career?

17   A.  That are signed?  It's got to be in the many tens of

18   thousands.

19   Q.  And have you worked -- Was Steve Jobs your boss for most of

20   that time?

21   A.  He was my boss for all of the time.

22   Q.  And can you tell the Court how you worked with Steve Jobs

23   as a negotiator on content deals?  What was the -- was there --

24   Let me ask you first.

25              Was there a pattern and practice about how involved he

D6DPUSA5                        Cue - cross

1    was, what role he played when you were the lead negotiator on

2    the ground?

3    A.    Yeah, it's been pretty much the same on all of the deals

4    that I've ever done.  I, as the lead negotiator, you know, I

5    consider sort of as the person charged by Steve, I knew what we

6    needed from a bookstore perspective.  I had a lot of experience

7    before and certainly in all the deals; so him and I would talk

8    about it before we would launch.

9            Before I would go out and negotiate, we'd sit down and

10   kind of talk, do we want to enter this market?  Right?  Do we

11   want to go into the music business?  If we were going to do it,

12   how would we do it?  We do a little brainstorming together, and

13   then I go off and say, okay, I'm going to go educate myself by

14   talking to all of the key players, whether it's the music

15   labels, the publishers, the movie companies.  So I start

16   understanding what the market is like.

17           So I start shaping what I think the deals and

18   negotiations that can happen, and then I run them by Steve.

19   And so I run those by Steve and say, here's what I think.  I

20   think this is the way we should do this and here.  And

21   sometimes, you know, he'll say that's fine, that's great, or

22   sometimes he'll say, I don't like this, or have you thought of

23   this?  And I do that only in the times that they're material.

24           So I spend the majority of my time doing these

25   negotiations back and forth, and I know what Apple needs from

D6DPUSA5                        Cue - cross

1   these deals and what Steve wants from those deals.  So I don't

2   communicate with him on a point-by-point in a contract or term

3   sheets that we send out.  I do it at a high level.  I know what

4   we want, and then when something isn't going the right way or I

5   think I need to change something, then I'll bring it up with

6   him.

7   Q.  What role, if any, did Steve Jobs play in actual

8   negotiations during the course of your career negotiating

9   deals, that is, when you would involve him at any time in the

10  actual negotiations?

11          MR. BUTERMAN:  Objection.

12          THE COURT:  Sustained, but you can bring it back to

13  books.

14          MR. SNYDER:  Getting tired; so I'm leading.  I'm

15  sorry.

16          THE COURT:  But, no, leading isn't the problem.

17          MR. SNYDER:  Foundation?

18          THE COURT:  Let's bring it back to books.

19  Q.  Okay.  Bringing it back to books, was the question of

20  whether to pursue an agency model a high-level enough issue

21  that, in your pattern and practice, that you would raise that

22  with Steve Jobs?

23  A.  Absolutely.

24  Q.  And at that time, what were Apple's options with respect to

25  eBooks?  Let me ask it this way.  Withdrawn.

D6DPUSA5                        Cue - cross

1              Had Apple made a determination by the 21st of December

2       as to whether it would enter -- attempt to enter into wholesale

3       agreements with the book companies?

4       A.  By the --

5       Q.  21st of December?

6       A.  By the 21st of December we had already decided that we

7       wanted to go to an agency model.

8       Q.  And was Apple prepared to enter into a wholesale deal with

9       the publishers as of December 21st, paying 15 or $16 a book in

10      the current market conditions?

11      A.  No.  I thought that was crazy, and so it's not a real

12      viable option.

13      Q.  I have to ask this question just for the record, sir.

14      Apple is a rich and powerful company.  Why did it enter the

15      eBook business, losing money on new releases, if it wanted to

16      open up a bookstore and that was the price of entry on a

17      wholesale model?

18              MR. BUTERMAN:  Objection.

19              THE COURT:  Sustained.

20      Q.  Is Apple a wealthy company?

21      A.  I think by most people's definition.

22      Q.  Right.  And it was in 2009, correct?

23      A.  Yes, it was.

24      Q.  All right.  Why wasn't Apple prepared to lose money on a

25      wholesale model in order to enter the eBook business?

D6DPUSA5                         Cue - cross

1   A.  Well, we're not willing to lose money under any model, and

2   the reason is, if you're starting a new business, like eBooks,

3   and we're losing money, am I really going to put my best people

4   on it?  Am I going to market it?  Am I going to invest in it?

5   Am I going to try to move it forward in a business that doesn't

6   make any money and that's losing money?

7            History, for me, as a person who's run a lot of

8   businesses, shows me that people that do businesses that lose

9   money quickly, give them up over time or change them to make

10  money.

11  Q.  Let me ask you this question, sir, if Apple is not prepared

12  to enter on a wholesale model and did not enter on an agency

13  model, what was its third option, if any?

14  A.  Well, we had an option of not entering the market at all,

15  which I guess is an option, but not one that I really wanted.

16  Q.  Are you aware that the government in this case has

17  contended that instead of entering on an agency agreement, if

18  Apple didn't want to enter on a wholesale model, it should not

19  have entered at all and left it up to Amazon and Barnes and

20  Noble to compete?

21            MR. BUTERMAN:  Objection.

22            THE COURT:  Sustained.  Shall we take our

23  mid-afternoon break at this time, Mr. Snyder, or did you want

24  to go a bit further?

25            MR. SNYDER:  I mean, I hate to take a break on a

1    sustained objection, but, yes, your Honor.

2              (Recess)

3    BY MR. SNYDER:

4    Q.  Mr. Cue, I want to direct your attention, please, to

5    Plaintiff's Exhibit 842.  Do you recall being shown this, these

6    squiggly lines?

7    A.  I do.

8    Q.  And have you seen these squiggly lines before this morning?

9    A.  I had not.

10   Q.  Now, do you remember being asked whether you were surprised

11   that as of April 1st, prices of New York Times best sellers and

12   new releases for the publishers who had signed agency deals,

13   went up on the Apple bookstore?

14   A.  I do.

15   Q.  And do you remember saying you were not surprised?

16   A.  That's correct.

17   Q.  Let me ask you this question, sir.  Was it Apple's intent

18   in providing price tiers for 99 cents to 12.99 or 14.99, that

19   the publishers would price all their New York Times best

20   sellers and new releases at the top of the tier?

21             MR. BUTERMAN:  Objection.

22             THE COURT:  Overruled.

23   A.  No, I was not.

24   Q.  Can you describe to the Court, please, what your thinking

25   was -- withdrawn.

D6DPUSA5                    Cue - cross

1            Who came up with the idea of the price tiers?

2    A.   I did.

3    Q.   Who came up with the idea of the price caps?

4    A.   I did.

5    Q.   What was your thinking behind the price caps and the price

6    tiers as you were putting together the materials for an agency

7    deal?

8    A.   In an agency deal, the publisher would get to set the price

9    at whatever they wanted.  My concern was if there were no sort

10   of tiers, what prevented publishers from setting price points

11   that were equal to or as very high compared to the physical

12   book?

13           I had heard some of that from HarperCollins, as an

14   example, and so I wanted to make sure that the book pricing was

15   going to be competitive, and I felt if I gave a price -- if I

16   gave them tiers and caps, I would force them, at least at a

17   maximum price point, to live within those.  And then, as they

18   competed with each other and they established different books,

19   I wanted them to have the flexibility, obviously, to change

20   pricing.

21           Now, we like magic price points at Apple.  If you are

22   familiar with our music stores and our App Stores, in general,

23   we end things in 99 cents.  And so I had suggested that we

24   price those tiers from 99 cents all the way to 12.99 or 14.99,

25   depending on which type of book.

D6DPUSA5                    Cue - cross

1   Q.  And did Apple have any -- withdrawn.

2          Do you remember questions being asked of you about

3   whether Apple cared about the consumer?

4   A.  I do.

5   Q.  Did Apple have any preferred price for new releases and

6   New York Times best sellers within the tier of 99 cents to

7   12.99 or 14.99?

8   A.  We didn't have a preferred price.  We were -- you know,

9   we've sold things all the way from 99 cents on; so we didn't

10  care at what price the publishers priced it at.  We were

11  even -- I think we even expressed to them and the publishers,

12  when I was there, that, you know, 9.99 might be the right price

13  for some of the best New York Times best sellers.  But we

14  didn't really know the market that well to be able to tell what

15  the right price points were.

16  Q.  Now, there was a question about your 30 percent commission

17  in connection with the price caps; do you remember that

18  question?

19  A.  I do.

20  Q.  And do you remember a suggestion being made that, through

21  the question, that Apple intended to -- withdrawn.

22          Do you remember a suggestion, through a question, that

23  Apple raised the price cap deal term from 12.99 to 14.99 so

24  that it would get a bigger commission?

25          MR. BUTERMAN:  Objection.

D6DPUSA5                    Cue - cross

1           THE COURT:  Sustained.

2   Q.  Do you recall being asked whether your agreement to raise

3   the cap from 12.99 to 14.99 for certain books was an exchange

4   for you keeping your 30 percent commission?

5   A.  I do.

6   Q.  And you said no, correct?

7   A.  That's correct.

8   Q.  Why did you say no?

9   A.  Well, so when I was -- as I said, we're learning about

10  books.  So as I learned about books, I went into the

11  marketplace thinking, like, most hardback new releases sort of

12  retail for $25 or $30.  In talking to the publishers, I learned

13  that they had a lot of different pricing, physical book

14  pricings for books; so books could be $26.99, 27.99 and even

15  28.64, for that matter, and $31.

16          And so they had expressed, as I had come up with my

17  price tiers, I had not really taken that into account and that

18  some of the books that they had at those different price points

19  kind of didn't make sense with my tiers.  And so that's why I

20  went back and I realized that they were right.

21          Yeah, they wanted a little more in those pricings, but

22  it made sense to me as to why they wanted it because those

23  prices of books were different.  So I expanded the tiers to

24  allow for that.

25  Q.  Now, in terms of Apple's 30 percent commission, what drives

D6DPUSA5                    Cue - cross

1    Apple's profits at 30 percent, the price or volume?

2    A.  Oh, volume.

3    Q.  And what has been Apple's experience selling content at

4    9.99, 6.99, 1.99 or 99 with a 30 percent profit?

5    A.  With a 30 percent margin.

6    Q.  Margin.

7    A.  I wish it was profit, but it's not.  We make in the high

8    single-digit profitability from running those services at those

9    price points, and so as I said, we make it up in volume.  When

10   we sell a 99-cent song or we sell a 9.99 album, it's effective

11   for us because we sell a lot of songs.

12   Q.  Let me show you Defendant's Exhibit 714.  Oh, no, that's

13   the wrong -- yes.  And counsel pointed you to paragraph 3 of

14   your direct testimony, where you said after the initial

15   meetings in New York, I don't know which paragraph it was,

16   nothing scared me or made me feel we can't get these deals

17   right away.  Was that in the declaration, I believe?

18   A.  That's correct.

19   Q.  And you said that that was correct, and can you explain

20   why?

21   A.  Yes.

22   Q.  Having concluded that the wholesale model was not workable?

23   A.  I mean, in my experience, I've never walked into a

24   negotiation or my initial meeting and walked out with an

25   agreement, and so I didn't expect to go to New York and spend

D6DPUSA5                      Cue - cross

1    two days there and come back with agreements.  That's not

2    reasonable or feasible, and so there was nothing in there that

3    I learned at the time that scared me.

4         I wasn't sure what the agreement was going to be at

5    that time, but I didn't walk into a meeting where they said,

6    you know, thanks for coming, but we're not interested in doing

7    business with you, or thanks for coming, you know, we have --

8    come back in a few months, we don't see what your offering.

9         You know, they were excited to see Apple because they

10   thought that we could do something compelling, I felt, and so

11   they were excited to see a new entrant into the marketplace.

12   Though, I didn't show them the device, I communicated to them

13   that our device was going to be something that no eBook reader

14   had ever seen before by having things like color, having things

15   like touch.  And so I felt that we could do books that had

16   never been done before.

17        And so, in general, as I talked to them, yeah, there

18   were some significant issues there, but I was confident in my

19   abilities that, over time, I would be able to negotiate a deal

20   with them.

21   Q.  Had you used a demo of the iPad at that time?

22   A.  I had.

23   Q.  Had the iBookstore been built by December 15th?

24   A.  It had not.  We were -- we didn't start at that time.  We

25   were, you --

D6DPUSA5                    Cue - cross

1    Q.   And so -- I'm sorry.

2    A.   Sorry.  We hadn't had it completed at that time.

3    Q.   So how on the 15th of December and 16th of December, in

4    your initial meetings, did you know that e-reading software

5    that was not yet created would be, I forgot what you used,

6    would be --

7    A.   Superior to, it would be better than anything in the

8    marketplace.

9    Q.   How did you know that at the time?

10   A.   Well, so I was -- the engineering team that was going to

11   build it worked for me.  I had used an iPad for the first time

12   and -- awhile back and had used one thereafter, and I knew a

13   lot about the touch interface that it had, the screen

14   resolution, the fact that it was color, that it could play back

15   video.

16        And so as I had talked to my engineering team, we had

17   a lot of thoughts already about the type of eBook reader and

18   eBook store that we would build, and so I was pretty excited

19   about it.  I thought we could build something that was

20   spectacular, that consumers were going to go, that's the best

21   eBook store and eBook reader that they've ever seen.

22   Q.   Do you know when your engineers began working on, for

23   example, the foot page and other interactive functionality of

24   the e-reading software that became the iBook software?

25   A.   It was in December.  Again, some of the functionality we

D6DPUSA5                    Cue - cross

were able to leverage off of other applications, but like sort

of the page flip that we did was an idea that we came up with

as we were developing.  And we thought it was a great way for a

customer, even though they were holding a physical device, to

kind of get the experience of a physical book.

Q.  When you began your investigations in late November and

December of 2009, was Steve Jobs immediately on board with the

idea of pursuing a bookstore?

A.  No, he wasn't interested.

Q.  And could you tell the Court, did he become interested at

some point?

A.  Yes.  What happened was, even before the iPad, I had

thought when we did the iPhone, that given the experience and

knowledge that we had running stores, that we should go build a

bookstore.  And so prior to even the iPad, I had talked to

Steve about that.

        Steve never felt that the Mac, at the time, or the

iPhone were ideal reading devices.  In the case of the phone,

the screen was smaller, and in the case of the Mac, you had

this keyboard and device, and it didn't feel like a book.  And

so, you know, that had kind of got away.

        What happened was when I got my first chance to touch

the iPad and was using it as it was being developed, I became

completely convinced that this was a huge opportunity for us to

build the best e-reader that the market had ever seen.  And so

D6DPUSA5                         Cue - cross

1    I went to Steve, and we had a meeting about it, and I kind

2    of -- I believe I even sent him an e-mail kind of dictating all

3    of the principles of why I thought it was going to be a great

4    device.

5              And him and I sat together and talked about it, and

6    after some discussions back and forth and some thoughts on him,

7    he came back and said, you know, I think you're right.  I think

8    this is great, and then he started coming up with ideas himself

9    about what he wanted to do with it and how it could be even

10   better as a reader and store.  And so that led us to say, okay,

11   go ahead and see if you can get the deals.

12             Now, that was the good part.  The bad part was that

13   this was in November, and as you all are aware of, we were

14   launching the product in January.  And so Steve said, you know,

15   it's fine, you can go do this, but you've got to get it done by

16   January.  So you have to get the deals done, and I want to be

17   able to demo it on stage.  And so that was the sort of

18   challenge presented to me.

19   Q.  And if you had not done sufficient number of deals to

20   populate a bookstore with a sufficient amount of digital

21   content, would the iPad have launched without a bookstore?

22   A.  Yeah, we would have launched it without a bookstore.

23   Q.  Let me show you Plaintiff's Exhibit 36, which are notes

24   that you were shown written by Mr. Moerer and Mr. Saul from the

25   December 15 and 16 meeting, and I'll direct your attention to a

D6DPUSA5                    Cue - cross

1   paragraph that you were asked to look at.

2              Page 3, under HarperCollins, and there's a reference,

3   sir, to interested in agency model to fix Amazon pricing, we

4   said no.  Do you recall being asked about that question?

5   A.  I do.

6   Q.  Do you recall being asked to clarify -- do you recall --

7   withdrawn.

8              Do you recall asking counsel, would you like me to

9   clarify, after you gave a yes or no answer to that question?

10  A.  I did.

11  Q.  Can you please clarify now why you were not interested in

12  an agency model, according to your testimony, to fix the

13  publishers' Amazon problem industry-wide?

14  A.  Well, at this time, when they presented the idea of an

15  agency model, their idea was to fix Amazon pricing, which

16  again, when I use the word "Amazon pricing" here, it's the 9.99

17  price for these books that were being sold at 12 to $15, was to

18  fix it with us.

19             And so they were interested in moving us to an agency

20  model so that they were able to then price the books at

21  whatever price they wanted, and at that point, I wasn't even

22  thinking agency model.  I was thinking wholesale, and so I said

23  no to them, and kind of moved on.  As I said, this wasn't a

24  negotiation by any means.  This was them presenting their ideas

25  to us.

D6DPUSA5                          Cue - cross

1    Q.  Were you aware in these introductory meetings on

2    December 15th and 16th, that the publishers had, from time to

3    time, that is the senior executives of the publishers, had

4    private dinners in different restaurants and locations?

5    A.  No, I am -- I was not aware of that.

6    Q.  Before November of 2009, were you aware of the names of the

7    CEOs of the major book publishers?

8    A.  No, I was -- I didn't know them.

9    Q.  And you were asked questions -- if you can look at the

10   calendar, Andrew -- about, apparently, you flew home and then

11   you flew back to New York, was that your testimony, for a

12   vacation?

13   A.  That's correct.

14   Q.  And were you with your family?

15   A.  I believe I was with my wife.

16   Q.  Now, counsel asked a couple of questions about within 48

17   hours after HarperCollins said they were interested in the

18   agency model, you reached out to certain publishers; do you

19   recall that question?

20   A.  That's correct.

21   Q.  Do you recall questions about you were doing this on your

22   vacation?

23   A.  Yes.

24   Q.  Why, when you were in New York to spend a weekend with your

25   wife, were you calling publishers and trying to meet with

D6DPUSA5                          Cue - cross

1    publishers during what was probably the beginning of the

2    holiday vacation?

3    A.   Again, I had planned to go to New York as a vacation prior

4    to ever -- before even knowing that I was doing anything with

5    books, and so I came to New York, and having had the meetings

6    with them and given the time frame that I had to get things

7    done by January, I felt like there was no time to lose.

8             And so I wanted to initiate conversations as quickly

9    as possible.  Unfortunately, they didn't want to meet on

10   weekends at this particular time, and so I wasn't able to do

11   that while I was here, and so I was not able to meet with them

12   in person.

13   Q.   Am I correct that you didn't -- did you even attempt to

14   meet with Penguin or HarperCollins during the holiday season?

15   A.   I did not.

16   Q.   Now, counsel asked you a number of times whether in these

17   phone conversations you discussed fixing Amazon's pricing, and

18   you answered several times, with "us," using that pronoun us.

19   Do you remember that?

20             MR. BUTERMAN:  Objection.

21             THE COURT:  Overruled.

22   A.   I do.

23   Q.   What did you mean by "us"?

24   A.   Well, again, they didn't want us to have the ability -- us,

25   meaning Apple -- in the agreement to be able to price books

D6DPUSA5                          Cue – cross

1    that they were selling to us at 12 to $15 at 9.99, and so they

2    were concerned and wanted to make sure that the deal that they

3    struck with us didn't give us those abilities.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D6d9usa6                        Cue - cross

1    Q.  Let me take you now, please, to Plaintiffs' Exhibit 336,

2    which is a e-mail from Markus Dohle, I think you and counsel

3    agreed, summarized your December 21 call with Mr. Dohle which

4    you had on the 21st at 12:17 p.m. for 17 minutes and 37

5    seconds.

6            Do you remember looking at this e-mail?

7    A.  I do.

8    Q.  And there was a question about whether what Mr. Dohle was

9    writing was correct or incorrect.

10           Do you remember that?

11   A.  I do.

12   Q.  And there were a lot of negative -- double negatives.  I

13   think your answer was no, it's not incorrect.  And do you

14   recall that back and forth?

15   A.  I do.

16   Q.  Can you -- let me direct your attention to the part of the

17   e-mail where it says he also thinks that book prices are

18   becoming too low.  He is worried about the consumer perception.

19   Do you remember being asked about that attribution to you?

20   A.  I do.

21   Q.  And did you tell Mr. Dohle -- do you recall, whether you

22   told Mr. Dohle during your 17-minute conversation that or in

23   substance what is highlighted?

24   A.  No.  I would never have said "the price is too low."

25           I would have told him that -- him, and like I told the

D6d9usa6                            Cue - cross

1    other publishers, that I was certainly willing to consider

2    prices that were higher than 9.99 for certain types of books.

3            In addition to that, I told him that I was certainly

4    concerned about what those price points would be.

5            So I certainly was looking at it from the consumer

6    point of view of what price points we may come up with.

7    Q.  Did Apple have any interest in December of 2009 or January

8    of 2010 in preserving the ability of the major book publishers

9    to sell hardcover books at a high price?

10   A.  No.  Why -- there is no reason why we would ever want to do

11   that.  Why would we want that?  We're happy, as I said, selling

12   things from 99 cents all the way on up.  The model works for

13   us.  We have a lot -- we've sold billions of dollars that way.

14   Q.  How does Apple at all compare to Barnes & Noble as a book

15   retailer in terms of the inventory, book inventory that's

16   offered?

17   A.  At this time?

18   Q.  Yes.

19   A.  In general it's fairly comparable as far as all the major

20   publishers and independents from that standpoint, as far as

21   content is concerned.

22   Q.  Does Apple sell physical books on its bookstore?

23   A.  We do not.

24   Q.  Does Barnes & Noble sell physical books on its bookstore?

25   A.  We do -- sorry.  They -- Barnes & Noble does not sell

1    physical books and -- sorry.  Barnes & Noble sells physical

2    books.  We do not.

3    Q.  Right.  And does Amazon sell physical books as well?

4    A.  They do.

5    Q.  And in the past let's say in music by creating a

6    comprehensive music store, what impact, if any, has that

7    actually had on the physical side of the recorded music

8    business?

9              MR. BUTERMAN:  Objection.

10             THE COURT:  Sustained.

11   Q.  All right.  Let's go to the next exhibit which is 336.

12   We're on that.  Sorry.  That's the one we're on.

13             I want to point your attention to the last part of the

14   e-mail that counsel focused on which is, he answered that

15   windowing could be used -- last sentence -- "to establish a

16   distributor model on print pub date for eBooks (coming back to

17   simultaneous publication)."

18             Do you see that?

19   A.  I do.

20   Q.  Did you tell Mr. Dohle that or in substance that?

21   A.  Well what happened in the conversation was -- Mr. Dohle

22   told me -- when I told him that I was interested in moving to

23   agency, he said he was interested in having a parallel path; in

24   other words, he wanted to be able to have wholesale deals and

25   agency deals with everybody at, you know, his discretion and

D6d9usa6                          Cue - cross

1    that standpoint.

2            What I said was, well that presents a problem for us

3    because if you're in an agency deal with me and you get to set

4    the price points and the other competitor or anybody else is

5    not in an agency deal, and they get to set the price points,

6    then how will I compete?

7            And so when he -- we were talking about that, I said

8    to him:  What the other publishers have done is they've been

9    holding back books in order to do that.

10           And so that's what I was expressing to him, which is

11   it looked to me like the industry was using that as a way to

12   make sure that books, that they didn't want to sell at that

13   time, they were holding back.  And I told Mr. Dohle that.

14   Q.  Was that something that was reported in the national media

15   at the time?

16   A.  It was reported in the national media and all of the

17   publishers -- four of the six publishers, to be exact, had told

18   me that.

19   Q.  Counsel asked you whether you were giving advice to

20   Mr. Dohle there to threaten windowing.  Do you recall that

21   question?

22   A.  I do.

23   Q.  And did you ever advise any publisher that they should use

24   the threat of windowing to change their business relationships

25   with any other e-retailer?

1    A.   No.

2    Q.   Counsel also asked a question "during your meeting with

3    Mr. Dohle," that was embedded in the question.  Do you recall

4    that?

5    A.   Yes.

6    Q.   Did you actually meet in person with Mr. Dohle?

7    A.   I did not.  It was a phonecall.

8    Q.   Counsel asked you whether you were surprised that on

9    January 28, 2010 Macmillan went to Amazon and used windowing as

10   a negotiating position in its discussions with Amazon.  And you

11   said, "It did not surprise me."

12            Do you recall that?

13   A.   I do.

14   Q.   Why did it not surprise you that Macmillan would go to

15   Amazon after signing an agency agreement with Apple and

16   negotiate in that fashion?

17   A.   Several reasons.  One, as we've discussed, the press

18   reports were out there that the publishers were holding back

19   books.

20            Two, Macmillan, when we had talked about different

21   models, had said if we wanted to do a wholesale deal they

22   wanted the ability to holdback books.  And so it certainly

23   didn't surprise me.  It sort of -- it's been happening for

24   months in the marketplace.  And so I didn't see that as

25   anything, you know, as a brand new idea or in any way something

D6d9usa6                         Cue - cross

1    new.

2    Q.  Now, let's go to Plaintiffs' Exhibit 540.

3          Number four is the last bullet.  And I think you and

4    counsel established that this was a reflection of your

5    conversation with Ms. Reidy concerning your idea of all

6    resellers being on agency, correct?

7    A.  That's correct.

8    Q.  Can you tell the Court, first -- look at the calendar,

9    Andrew -- when you believe you came up with the idea -- first,

10   who came up with the idea of in order to remain competitive and

11   on agency model, all resellers being on the same model?

12   A.  I don't recall.  I think it's a combination between Steve

13   and myself and even my own team that had met with the team.  As

14   I was going back and looking at the data and decided that an

15   agency model is a good idea, one of my concerns in a model

16   where they get to set the price is how do I remain competitive.

17         And so between the 17th when I got back and that

18   weekend of the 20th where we sort of -- I sort of formulated

19   kind of the key deal points of how I could structure this, I

20   decided an agency model is a good idea.  One of the issues that

21   came about is well how do I stay competitive.  And my first

22   reaction was:  Well the publishers are really interested in an

23   agency model, then let's ask them to move everyone to an agency

24   model as part of my deal, to make sure that I'm getting as good

25   a deal as anybody else is going to get.

D6d9usa6                    Cue - cross

1   Q.  And did you discuss that concept with Mr. Jobs?

2   A.  I did.

3   Q.  Did you discuss that concept on the 21st with

4   Mr. Sargent, Ms. Reidy, and Mr. Dohle?

5   A.  Yes.  I presented it to all three.

6   Q.  And counsel asked you a question in connection with this

7   idea that throughout negotiations with the publishers you were

8   asked:  You constantly pitched the deal to them as a way to

9   change the entire industry.

10          Do you remember that question?

11  A.  I do.

12  Q.  Your answer was not true.

13          Do you recall that?

14  A.  I do.

15  Q.  Why was it not true that you pitched the publishers that

16  your agency deal was a way to change the entire industry?

17  A.  I was -- my focus is thinking about this from an Apple

18  point of view.  I'm not interested in their business or how

19  they do business with the -- with anybody else.  So I'm looking

20  at this from an Apple point of view I'm going to go into this

21  marketplace.  I'm negotiating deals with them for the first

22  time.  And so I'm thinking about what are all the parameters

23  that I need in order to enter this market and provide the

24  products in the way that we want all of them available,

25  competitive pricing, etc.  So that's my thought pattern and

D6d9usa6                          Cue - cross

1    what I'm thinking about.

2    Q.  And in thinking about that thought pattern am I correct

3    that at some point you codified that in an e-mail proposal?

4    A.  Yes.  On -- I believe it was January 4, I sent an e-mail

5    proposal to the publishers.

6    Q.  Was that the first day back from the holiday break?

7    A.  It was.

8    Q.  Let's look at Plaintiffs' Exhibit 521.

9           Let's withdraw that for a moment and look at

10   Plaintiffs' Exhibit 21.

11          Is this a copy of the e-mail proposal that you sent to

12   each publisher during the first few days after the holiday

13   break in January?

14   A.  It is with the exception of sort of some -- at the top of

15   the header I personalized it.

16   Q.  And attention was focused during cross-examination on the

17   all resellers of new titles need to be in the agency model.  Do

18   you recall that?

19   A.  I do.

20   Q.  Was that the idea that you describe that you came up with

21   in the end of January?

22   A.  Sorry.  End of December.

23   Q.  End of December?

24   A.  I came up with the idea by -- in the weekend of

25   December 17, 18, and 19, yes.

D6d9usa6                        Cue - cross

1   Q.  And I think you testified that there came a time when you

2   realized that that idea didn't work?

3   A.  There was.  We were -- our initial thought on this was,

4   again, they move everyone to agency, then we have competitive

5   prices and the deal that we have is the same as with others.

6          But as we started thinking about this, I started

7   thinking of several issues that were very concerning to me.

8   Number one, how was I to be assured that the agency deal that I

9   got was the same agency deal that they were going to give

10  somebody else?  In other words, there was nothing in my agency

11  deal that said all the terms had to be the same and so it had

12  to be exactly the same as ours.  And so they could turn around

13  and do an agency deal with somebody else that gave that other

14  party better terms.

15         THE COURT:  Excuse me, Mr. Cue.  I don't want to

16  interrupt but I am interrupting because I was distracted.

17         THE WITNESS:  Yes.

18         THE COURT:  Give me a second to catch up with you

19  here.

20         THE WITNESS:  No problem, your Honor.  Thank you.

21         THE COURT:  Thank you.

22         MR. SNYDER:  May I proceed, your Honor?

23         THE COURT:  Yes.

24         THE WITNESS:  As I was stating.  So, first of all I

25  was concerned about whether we would be getting the same terms

D6d9usa6                    Cue - cross

1   and our agreement, as I was proposing it, didn't do that.

2              Secondly, I was concerned that even if they gave us

3   the same terms in the agreement, Amazon and Barnes & Noble were

4   extremely powerful, huge resellers of books, because they were

5   in the physical business along with digital.  And so my concern

6   was what power did they have over the publishers to negotiate

7   deals that were combined between physical books and digital

8   books.  So that's a second issue now.  So maybe I'm getting the

9   same terms on the digital side but the way that they get around

10  by doing that is to give sort of my competitors better deals on

11  the physical side.  And I'm thinking okay, well I don't know

12  how to address that because I'm not in the physical book

13  market.  So I'm very concerned about that.

14             Thirdly, I'm concerned that I realize that even if I

15  put in this requirement that says all the resellers need to go

16  to an agency model, how can I enforce it?  And so I look at

17  Amazon, Barnes & Noble, they are the largest providers of money

18  to these six major publishers.  And I'm thinking, okay, let's

19  say they're even willing to agree to this.  Let's say I'm

20  willing to ignore the first two issues that I just described.

21  If at the end of the day they don't sign the deal, what's my --

22  what do I do?

23  Q.  Sign what deal.

24  A.  Sign a deal that moves them to agency.  Sorry.

25             So if the other providers don't sign deals that moves

D6d9usa6                    Cue - cross

1   them to agency, then what do I do?  At that point they were not

2   able to do that.  I've got a deal that says they're supposed

3   to.  And I said, in a legal agreement, I can't force Barnes &

4   Noble and Amazon to sign into an agency deal.

5          And so, as I'm talking about this and thinking about

6   this, this doesn't make sense.  And so I'm starting to look at

7   this and saying wait a second I think I was pretty smart here

8   in that if I move all the resellers to agency I'm going to be

9   competing on equal footing, but I realize I'm not that smart,

10  I've made a mistake, and I need to kind of shift and think of

11  something else.

12         And so I have to come up with another idea other than

13  this because this isn't going to, you know, create the effect

14  that I need.

15  Q.  Another idea for what and what was the effect that you

16  needed?

17  A.  The effect that I wanted is to be able to compete on price.

18  Because that's the thing that I didn't control.

19         In the agreement I was going to force them to give me

20  all their books.  I wasn't going to sign an agreement that

21  didn't force them to give me all their books.  So that I knew I

22  would be able to accomplish.

23         I knew that I could, you know, I was going to put

24  price tiers that prevented them from going to very high prices

25  and gave them flexibility as they said they wanted to be able

D6d9usa6                    Cue - cross

1   to go to lower prices.  But, if they put all my books at 12.99

2   or 9.99 or 7.99 for that matter and those other competitors,

3   Barnes & Noble and Amazon, were able to price books much

4   cheaper than that, for whatever deals they had -- and as I said

5   I viewed that there were lots of possibilities for that -- how

6   would I be able to do that?

7             And I wouldn't be able to do it.  Because in an agency

8   model I don't get to set the price.  So I have to come up with

9   a way that allows them to set the price but yet gives me the

10  ability of changing that price if I need to compete.  And so

11  that's kind of the -- what's going through my mind at this

12  point of trying to figure this out.

13  Q.  Was that your goal to ensure that you don't get undercut on

14  price on the market -- in the marketplace in coming up with the

15  all resellers to agency idea?

16  A.  It was.

17  Q.  Now let me -- you gave three reasons why you concluded that

18  that idea didn't work.  Do you remember that?

19  A.  I do.

20  Q.  You first said that the agency deal might not -- even if

21  they entered into agency deals with Barnes & Noble and Amazon

22  they might not get the same deal that you got.  What did you

23  mean by that?

24  A.  Well, so my deal had a 30 percent.  It had the -- you know,

25  I was thinking of whatever price caps I put in place.  And so

D6d9usa6                    Cue - cross

1   my concern was, well what if they give them 40 percent?  What

2   if their deal gives them, you know, some type of special

3   content that I hadn't thought of, of some kind.

4           So I was worried about what type of deal they could do

5   that would be better than mine that would give customers a

6   better price or a better product than I could offer given the

7   constraints of my deal.

8   Q.  And what would be -- if your goal was competitive prices to

9   consumers, how would other -- different kinds of agency deals

10  in this all-resellers concept undermine that?

11  A.  Well they could have come up with different price tiers,

12  for example.  And I, you know as I thought about it more and

13  more.  If you have Amazon at 90 percent market share in the

14  digital space, Amazon huge in the physical book space -- I

15  don't know what percentage they have but they have a huge

16  percentage, I'm thinking well when these guys -- I just met

17  these folks and I'm trying to negotiate.

18          When Amazon comes in and negotiates, they're

19  negotiating from a position of leverage.  What's leverage?

20  Well, leverage is I sell all of your digital books basically

21  today and I sell, you know, most or many of your physical books

22  today.  I have a lot of leverage over you to negotiate the best

23  deal possible.

24          And as an example they might have asked for quantity

25  discounts even in that standpoint or just say, you know, look,

D6d9usa6                    Cue - cross

1    if you want to sell your books in my store given the number of

2    books that you sell, I want the price cap to be 9.99 or 7.99 or

3    whatever else it was.

4    Q.  The second reason you gave was that even if let's take a

5    hypothetical, Random House, signed a reseller to new terms, to

6    the same agency terms, and Amazon and Barnes & Noble was huge

7    reseller of books and -- was that the same point you just made?

8    A.  No.  It's slightly, it's a little bit different in that

9    respect.  Because let's say for example that they came up with

10   the exact price tiers that we had and they had a 70/30 split.

11   You'd say well the deals are alike.  I've got the same deal

12   that they do.

13         But at that point now I'm also worried about:  Are

14   they getting a better deal, for example, because they give them

15   a larger percentage on the physical books?  Because they have

16   that relationship with them.

17         So they could have tied the two agreements together

18   and said okay well we're going to make this agreement sort of

19   look like ours on the terms but it actually has more because it

20   has businesses that we're not in.

21         So I was worried about any kind of physical tie to the

22   agreement that we don't have anything in our physical agreement

23   and so you could say that the agency deal was the same and what

24   were the effects of that.

25   Q.  What were you concerned the effects could be in that

D6d9usa6                    Cue - cross

1    scenario in terms of Apple's goal of offering competitive

2    prices to consumers on its bookstore?

3    A.  Again, it goes to if the agreement sort of looks at the

4    highest level the same, but they're able to use that book piece

5    of it as leverage to either get content that was unique to them

6    or different from that standpoint or features that were unique

7    to them or different, for example, audio, added to that, then I

8    wasn't competing.  The product could change on me and I

9    wouldn't be able to compete with that.

10   Q.  Finally, your third point was even if I put in that

11   requirement that all resellers go to agency, how can I enforce

12   it.  What did you mean by that?

13   A.  Well, so my view in a legal agreement is I could put in a

14   legal agreement that says you have to, you know, the deal that

15   you do with others -- this was my thinking at the time -- the

16   deals that you do with other resellers needs to be an agency

17   deal, thinking it would be the same as us.

18          But, in an agreement I can't force the other party to

19   sign that deal.  And so what would happen in that case is that

20   if the deal wasn't signed by the other party you could say well

21   the agreement is in breach or in violation.  But what's my --

22   what can I do about it?

23          So at this point now let's say that they weren't

24   successful at getting the other parties to sign into an agency

25   model, forgetting about my other two issues, and they didn't

D6d9usa6                         Cue - cross

1   get them to sign, and I've got a legal agreement that says that

2   they have to get them to sign.  So I can sue them.  I can do

3   what?

4          And so at this point now I'm not competing on price

5   and I have no ability to do anything based on the agreement

6   that I have.

7   Q.  And what, if anything, did those concerns, as you've

8   described them -- withdrawn.

9          How, if at all, did those concerns impact the

10  all-resellers-to-agency idea that you put in your January 4

11  proposal?

12  A.  Well at that point we decided well this doesn't accomplish

13  our goal.  Our goal of competitive pricing is not -- isn't

14  going to be accomplished by this.  And so we forgot about it.

15  We said this -- this -- it's irrelevant.  It doesn't help.

16         Secondly, as I said, there were -- and it sort of

17  helped the whole situation.  There were publishers that had

18  said we'd prefer to have a dual model and so we knew that it

19  was going to be problematic anyway.

20         But the primary reason is, as I said, was that.  So

21  now we start thinking, okay, given I want competitive pricing,

22  how can I accomplish that in an agreement?  And that's where

23  the MFN language comes in.

24         So we decided, okay.  Well if what I care about is

25  competitive pricing and what I want to do is I want to say:  I

D6d9usa6                    Cue - cross

don't care at all what deals are cut, whether they're agency

models, wholesale models or physical and digital together, any

combination, or any new deal I hadn't even thought of at that

point, what I care about what's the end consumer paying?

Because that's the thing I don't control on an agency model.

On an agency model, the publisher controls that.

         Kevin was very instrumental in helping.  This is a

discussion that we're having and trying to figure out solutions

for this.

Q.  I'm just going to ask you, you're referring to Kevin Saul?

A.  Yes.  Kevin Saul is my counsel and somebody I've worked

closely with across all of the deals.

Q.  I'm just going to counsel you just not to reveal private

lawyer-client conversations that you might have had but you can

continue.

A.  And so we're trying to come up with a concept.  And so the

idea was great.  So if I care about the end-user price, then

why don't I get an MFN in the agreement that says you, the

publisher, can set the price up to the tiers that I've set but

if there are others in the market that are able to price lower,

for whatever reasons, whether they have a better agency deal

than I do or whether they have a better wholesale deal than I

do, then I get that price in my deal.

         And so I felt great about that.  I thought that was a

really smart idea on our part because it let us compete in a

D6d9usa6                        Cue – cross

1   model where I didn't have the say on price.

2   Q.  Now, I want to direct your attention to paragraph 65 of

3   your declaration which counsel showed, and direct your

4   attention to your direct testimony where you testified "A few

5   weeks before I sent my proposal to the publishers, my in-house

6   lawyer, Kevin Saul, had developed an idea for a price matching

7   Most Favored Nation clause that would protect Apple's ability

8   to compete on prices."

9           Is that your testimony?

10  A.  It is.

11  Q.  And there was some discussion about the word "developed"?

12  A.  Yes.

13  Q.  What, if anything, do you recall about when -- and I'm

14  asking about the development, not the writing of the

15  language -- when Mr. Saul developed the concept for a retail

16  price facing MFN in connection with a potential agency deal?

17  A.  I think, as you can see from the first term that I sent

18  them, we were always worried about how we can compete.  We came

19  up with this idea of saying move them all to a reseller model.

20  But it was a discussion that I was already having trying to

21  figure out a way.

22          At that point we're having discussions.  And sort of

23  those things lead to the issues that I just started describing.

24          Kevin, at that time same time, is thinking about those

25  and coming up with a different idea, which was the MFN.  And so

D6d9usa6                         Cue - cross

1    he started on it at that time and had those ideas and it was

2    during the holiday break.  We sort of talked about it very

3    infrequently.  If he was working on it, I didn't know what it

4    was yet.  We weren't working on a day-to-day basis during the

5    holiday break.

6              And then when we came back on the week of June 4 --

7    Q.  January 4?

8    A.  January 4.  We really sat down and kind of filled it all in

9    and were able to come to a very concrete and specific proposal.

10   Q.  Now, there was a question about whether Apple ever had a

11   retail price facing MFN in other content deals and I think you

12   said to your knowledge no, correct?

13   A.  That's correct.

14   Q.  And why is that, sir?  Why in the iTunes store, in the app

15   store, do you not have retail price facing MFNs?

16   A.  Well, when we entered those markets there was no competitor

17   who was dominant.  And so we entered into a market where we

18   were -- there weren't very many music publishers or -- sorry

19   music stores.  There were no TV stores or movie stores.  The

20   app store, there were no app stores at that time.  And so we

21   were the -- we were entering markets where there was no other

22   competitor.  So I wasn't worried about that because I thought I

23   could lead the market.

24             In this particular case, I was dealing with a party

25   who, to me, seemed to control and have a huge piece of the

D6d9usa6                      Cue - cross

market.  And so I was very worried that I would be able to

compete with them.

Q.  Now, counsel showed you paragraph 58 of your declaration as

well where you testified on direct examination that Apple cared

about two things.

         And counsel then asked whether you cared what model

other publishers were on with other retailers once you had the

MFN, and you said you didn't.

         Why did Apple, once it settled on the MFN, not have an

interest in what the business relationship was between a

publisher and any of its other retailers?

A.  Because we structured the MFN on purpose to have nothing to

do with any type of agreement, wholesale, agency, combined, as

I said, anything else that I can think of.  We structured it

completely on what the end-user price was.

         And so I didn't care at all what type of deals the

publishers got or didn't get from Amazon or Barnes & Noble or

anybody else.  I knew that if Barnes & Noble or Amazon were

able to negotiate a better deal than I had from a consumer

price point, I would get it as part of that MFN.

Q.  Now you were asked the following question -- I think I

wrote it down right -- and gave the following answer on

cross-examination.  You were asked:  Isn't it true, sir, that

what actually happened was that Apple realized that it

couldn't -- I'll withdraw the question because I can't read

D6d9usa6                          Cue - cross

1    that one word.

2              You were asked whether, in fact, what really happened

3    was that Apple realized that moving all resellers to agency was

4    illegal and just then swapped out the MFN for that idea to

5    achieve the same purpose.

6              Do you recall a question to that effect?

7              MR. BUTERMAN:  Objection.

8              THE COURT:  Well, I would have sustained it except "to

9    that effect."  In sum or substance were you asked something

10   along those lines?  Do you remember that?

11             THE WITNESS:  I do, your Honor.

12   Q.  And I know what your answer was -- even though I can't read

13   one word in my notes -- it was:  No, that's not true.  Do you

14   recall that?

15   A.  I do.

16   Q.  And can you tell the Court why it's not true that the MFN

17   was designed to accomplish moving all resellers to agency?

18   A.  Well as I said before, we did the MFN for the purposes of

19   being able to compete on price.  And so when it didn't

20   accomplish that, I did substitute it for -- sorry.  We created

21   the -- let me go back because I think I said the words wrong.

22             We created the move to all agency as a way to compete

23   on price.  When I felt that that didn't get accomplished, I

24   substituted that and said well that doesn't get me what I want

25   so get rid of it.  And I put something in place that I thought

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6d9usa6                         Cue - cross

1    got me what I want.

2    Q.   Right.  And why wasn't that put on the table in

3    negotiations to achieve the same purpose of moving all

4    resellers to agency?

5    A.   Sorry.

6    Q.   Was the MFN simply another way for Apple to achieve the

7    purpose of moving Amazon, Barnes & Noble, and other retailers

8    to an agency model?

9    A.   No.  It's not.

10          Again, the MFN has nothing to do with whether you're

11   on an agency model or any other model.  That wasn't the goal.

12   It wasn't -- it's not something we contemplated from that

13   viewpoint as this is going to, you know, guarantee us that it's

14   going to force it.  It didn't matter to us.  That's not what

15   I'm thinking.

16          What I'm thinking is does the MFN give me competitive

17   pricing irrespective of whatever models Amazon, Barnes & Noble,

18   or anybody else is in.

19   Q.   And how if at all, sir -- if you were to say it simply,

20   what was your thinking behind the MFN?  What was your overall

21   thinking behind proposing an MFN?

22   A.   It lets me complete on price so that I can set the best

23   price for the consumer.

24   Q.   And when you say set the best price, have you heard the MFN

25   referred to as a price parity provision?

D6d9usa6                        Cue - cross

1    A.  I have.

2    Q.  Or a price lowering mechanism?

3    A.  I have.

4    Q.  And how, if at all, is the MFN a price lowering mechanism

5    as you understood it in January of 2010?

6    A.  Well if I was selling a book, for example, at 12.99 and I

7    found another reseller that was selling books at those -- those

8    same books that I was selling at 12.99 or 9.99 or 7.99 for that

9    matter and they were selling them at a lower price than what

10   our store was selling them at, then I would get the opportunity

11   of changing the price automatically to that lower price that

12   the other reseller was selling it at.

13           So it allowed me to take the price of the book and

14   lower it to a new price without requiring the publisher to do

15   it.  The MFN did that for me.

16   Q.  I want to direct your attention to -- one moment, your

17   Honor -- to Defendant's Exhibit 140.

18           Do you recall --

19   A.  One second.  Sorry.

20           I'm sorry.  I don't have a 140.  Did you say 1-4-0?

21           MR. SNYDER:  Yes.  I'll hand that one up as we're

22   getting the books.  Thank you.  Apologies.

23           THE WITNESS:  Thank you.

24   Q.  Do you recall, sir, being shown this document and comparing

25   it to your declaration, your direct testimony?

D6d9usa6                           Cue - cross

1    A.  I do.

2    Q.  And can you tell the court what this document is.

3    A.  Yes.  Keith Moerer, who works for me and was helping me on

4    the deal, had received a call from Madeline McIntosh who was

5    kind of the number two person under Markus Dohle.  And she had

6    talked to him and had a bunch of questions.  And he was giving

7    me an update on the questions and what he answered.

8    Q.  At the time of all of the six major publishers which one,

9    if any, was there one that was most important to you in terms

10   of a potential partner?

11   A.  Random House was the most important because they were the

12   largest.

13            MR. SNYDER:  If we can go to the calendar, please.

14   Q.  So, this e-mail is dated January 10, correct?

15   A.  That's correct.

16   Q.  And you sent your initial all-resellers-to-agency proposal

17   idea on the 4th and 5th to the different publishers; is that

18   correct?

19   A.  That's correct.

20   Q.  By the way, sir, do you recall that on or around the same

21   date that you sent to Penguin an agency proposal including the

22   all-resellers-to-agency idea, Penguin was sending to Apple a

23   draft wholesale agreement?

24   A.  I don't recall.

25   Q.  Are you certain, sir, that you never met with Penguin

D6d9usa6                         Cue - cross

1   during the holiday season?

2   A.   I definitely didn't meet with Penguin during the holiday

3   season.

4   Q.   Now, counsel directed your attention -- so my question

5   was -- so this e-mail is on the 10th.  Can you tell the Court

6   when between the 4th and the 10th you made the decision that

7   you've described in some detail to abandon the

8   all-resellers-to-agency idea in favor of a retail price facing

9   MFN?

10  A.   Yeah.  On the 4th when I sent the e-mail out to the

11  publishers, I sent them sort of the key terms.  And I asked

12  that I wanted to set up a meeting to call them and have a

13  conversation so I could walk through the terms and get an idea

14  of some feedback from them.

15          At this point, we were struggling, as I mentioned,

16  with the concept.  And I'm talking to Kevin and trying to come

17  up with a way to address my concerns.  And so we come up with

18  the idea of this MFN and realize that even on the 4th, after

19  I've sent it and I want to schedule the calls, I decide not to

20  go ahead and schedule them because I find that I really don't

21  know exactly what I'm going to ask for yet.

22  Q.   So let me just ask you.  You come back from vacation and

23  it's the 4th and what -- if we can look again at the

24  all-resellers e-mail to see what time you sent it out.

25  A.   It was at 9:16 in the morning.  I have it in front of me.

```
 1   Q.  What time do you generally get into the office?
 2   A.  About 9:00.
 3   Q.  Is it fair to say that one of the first things you did when
 4   you got back from vacation was send this proposal out?
 5   A.  It is.
 6   Q.  And did you testify that initially you -- because time was
 7   urgent, you had hoped to meet in New York that week with the
 8   publishers?
 9   A.  I wanted at least to have a phonecall with them if I
10   couldn't meet with them in person.  But as soon as I sent the
11   proposal I wanted to get some feedback.  I wanted to understand
12   where we were.
```

Q.  And why didn't you, after the 4th, 5th, 6th, 7th,

8th, 9th, 10th, why didn't you have the same series of

```
15   calls with the publishers that you had in December?
16   A.  Because I realized that I didn't want to ask them for the
17   all resellers going to agency and I needed to do something
18   else.  And so here's where we're formulating this MFN.  And so
19   I decided why am I going to have a call with them if I don't
20   really know what I'm asking for yet.
21   Q.  And when -- I'm sorry.  Were you finished?
22   A.  So I decided not to make the phonecalls to them.
23   Q.  And when was the next time that you or your team met with
24   the publishers in the month of January, do you know?
25   A.  Well, after we had come up with the MFN idea, I decided
```

D6d9usa6                     Cue - cross

1    that in the interests of time, that time point now I'm feeling

2    pretty good.  I think we've got price tiers.  I think we've got

3    this MFN language.  We've got the agency model for us.  So I

4    think I've got what feels to me like a deal that I want to get

5    done.

6          And so I decided to get a draft agreement to the

7    publishers so that they would have that, so instead of sending

8    a term sheet and wasting the time of going through that, they

9    could get the whole agreement.

10         So on -- I told Kevin, working with Kevin to get me an

11   agreement by that weekend so that I could send it out on the

12   11th.

13         And so I sent them an agreement.  And I believe it was

14   the 11th.  But I don't -- I don't remember the exact date.

15   But it's early that week I sent them the agreement.

16   Q.  And I think counsel will agree that the agreement was sent

17   out on the 11th, but just assume hypothetically it was sent

18   out on the 11th, how many days did Apple have to consummate;

19   that is, get executed agreements in order to include a

20   bookstore on the iPad?

21   A.  Well in my mind I had set a date of the 21st, in my mind

22   that we had to get the deal signed.  Because if you're familiar

23   with one of our events for launching a product, we send out

24   invitations.  It's a major event at a location.  Steve gets up

25   on stage.  He presents it.  He gives it a demo.  And so it

D6d9usa6                    Cue - cross

1    takes a lot of preparation to get to that event.

2            And so I decided that if we didn't have it on the

3    21st, in talking to Steve, he would have to pull it out of

4    his slides.  And pull the demo out.  And so I needed to give

5    him some time to be able to do that if I wasn't going to

6    succeed.

7    Q.  And in terms of Mr. Jobs' preparation for his launch

8    announcements, can you give the Court some sense of why if the

9    announcement was on the 27th you set a deadline of the

10   21st?

11   A.  Well so Mr. Jobs is working on a slide presentation.  His

12   slide presentations at an event run in the many, many hundreds

13   of slides.  He gives live demos.  They are generally well over

14   an hour long.  They are really important.  It's the first time

15   we make -- we show the product.

16           And so Steve works on that for weeks ahead of time.

17   And so at this point in time on the 11th he's already working

18   on his slides.  He's already thinking about what he wants to

19   demo.  We're providing him, you know, screen shots of what the

20   bookstore is going to look like.  We're providing him screen

21   shots of what they reader is going to look like.  So sort of

22   the train has left the station.

23           So if I got to sort of stop the train, I felt like if

24   I didn't do this by the 21st, then it was going to put Steve

25   in a very difficult position because he was going to be left

D6d9usa6                     Cue - cross

1   with slides in there that he was rehearsing, practicing in his

2   mind getting ready for that may or may not happen.

3   Q.  Now, let's go back, please, to Defendant's Exhibit 140,

4   which is an e-mail -- and if we have the calendar side by

5   side -- that Mr. Moerer wrote to you on a Saturday; is that

6   correct?

7   A.  That's correct -- it's correct.

8   Q.  And then you respond on Sunday; is that correct?

9   A.  That's correct.

10  Q.  And if we can direct your attention to number 2 where

11  Mr. Moerer writes, "Are we willing to accept an agency model if

12  other retailers continue a standard wholesale model for new

13  releases without holdbacks?"

14          And Mr. Moerer answers, "No."

15          You then write, "We are (I don't think we can legally

16  force this).  What we care about is price.  So the contract

17  will say we get it at 30 percent less whatever the lowest

18  retail price out in the market is, whether agency or

19  wholesale."

20          Did I read that correctly?

21  A.  You did.

22  Q.  I want to take you through your response, sir, carefully.

23          You wrote, "We are."  What did you mean by we are?

24  A.  Apple, Steve, myself.

25  Q.  You are what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6d9usa6                        Cue - cross

1    A.  We are okay with accepting an agency model for us if other

2    retailers continue in a standard wholesale model for new

3    releases without holdbacks.

4    Q.  You then wrote in parenthetical "I don't think we can

5    legally force this."

6          Do you see that?

7    A.  I do.

8    Q.  What did you mean by that?

9    A.  Again, as I said, I could put it in the agreement but I

10   couldn't legally force the other retailers to sign that

11   agreement.

12   Q.  To sign which agreement?

13   A.  Sorry.  I could put it in our agreement that they -- book

14   publishers had to sign the other retailers to an agency model

15   but my agreement can't force them to do that.  And so I was

16   basically making this doesn't work.

17   Q.  Now, just for the record doesn't work to accomplish what?

18   A.  It doesn't work to maintain the price competitive nature

19   that I wanted for our store.

20   Q.  You then write "What we care about is price."

21          What did you mean by that?

22   A.  What I care about is the consumer price.

23   Q.  And when you wrote "What we care about is price," what, if

24   anything, were you inferring you don't care about?

25          MR. BUTERMAN:  Objection.

1          MR. SNYDER:  Withdrawn.

2     Q.  You see the use of the words "what we care about"?

3     A.  I do.

4     Q.  In the use of those words, did you intend to convey that

5     you cared about one thing but not another thing?

6     A.  I was saying what I care about is the price.  I don't care

7     about whether the retailers continue in a standard wholesale

8     model for new releases which is the question that Keith -- or

9     that Madeline was asking Keith.

10    Q.  You go on to write, "So the contract will say we get it at

11    30 percent less whatever the lowest retail price out in the

12    market is."

13         Do you see that?

14    A.  I do.

15    Q.  What contract are you referring to?

16    A.  The contract that Kevin and I were working on that we

17    hadn't sent yet, that we sent out on the 11th.

18    Q.  Then you wrote "Lowest retail price out in the market."

19         What market were you referring to?

20    A.  The eBook market, anybody who had a store that was selling

21    eBooks.

22    Q.  Then you wrote in parenthetical, "Whether agency or

23    wholesale."

24         What did you mean by that?

25    A.  Again, if that retailer was on an agency model or a

D6d9usa6                          Cue - cross

1   wholesale model with the publishers it was irrelevant.  I

2   didn't care whether -- it didn't apply.

3   Q.  Do you know whether at any point in time -- withdrawn.

4           Do you know why Keith wrote "no" when you wrote "we

5   are"?

6   A.  I do.

7           I didn't expect -- since I sent the term sheets to the

8   publishers and I said I would call them, I was working with

9   Kevin.  Now at this point I had decided that I didn't want to

10   talk to the publishers because I didn't know what I really

11   wanted from them yet.

12           I didn't communicate with Keith at this point because

13   Kevin and I are working on the agreement itself.  And so Keith

14   wasn't aware that I had already moved on from this agency

15   model.  And Random House and Madeline called him, unbeknownst

16   to me.  And so at this point he wasn't aware of it.  And so I

17   was just trying to make him aware in this e-mail of the change

18   that Kevin and I had already done in the agreement.

19   Q.  Let me show you Defendant's Exhibit 169.  This is a --

20   A.  Thank you.

21   Q.  This is an e-mail, sir, internal from Random House that's

22   in evidence in this case from Amanda Close to Madeline McIntosh

23   and others.

24   A.  I'm sorry.  Which number was it?

25   Q.  I'm sorry.  Defendant's Exhibit 140 -- 169.

D6d9usa6                         Cue - cross

1    A.  One second, sorry.  The binder just opened on me here.

2    Q.  I'll direct your attention to the third numbered paragraph

3    Ms. Close writes to Madeline McIntosh, Markus Dohle and others,

4    "Is Apple willing to consider an agency model for Random House

5    even if no other retailers also convert to agency?  Yes, but

6    they expect to be treated the same way that retailers are

7    treated."  And then in handwriting, "(Consumer price?)"

8              Do you see that?

9    A.  I do.

10   Q.  To your knowledge did -- is this consistent with your

11   recollection that at some point Mr. Moerer informed Random

12   House that Apple was okay with Random House staying on

13   wholesale with other retailers and going to agency with Apple?

14   A.  Yes.  That's why I responded to Keith, since he had those

15   questions, I wanted to make sure that he had the answers so

16   that when he went back to Madeline he could communicate that.

17   Q.  Now let's go back to the calendar, please.  And -- that was

18   Sunday the 10th, correct?

19   A.  Correct.

20   Q.  And what happened in connection with the negotiations the

21   week of the 10th?  Do you recall?

22   A.  Again, I sent the agreements to the publishers on the

23   11th.  My first thought was to get on a plane and go -- start

24   the negotiations.  But I figured an agreement that was being

25   sent was going to be either the general counsel, the other

1   business folks in these publishers would want to kind of look

2   through it, try to understand it.  And so I decided that the

3   best course of action was to send Keith during the first few

4   days so that he would be able to talk to the publishers, not

5   generally the CEOs because I didn't expect them, but all of the

6   business folks, to answer any questions that they had on the

7   agreement, so that by the time I got there I would be prepared

8   with what, if any, issues they had.  And I would be able to

9   address those quicker by knowing what they were.

10  Q.  Let's look at Defendant's Exhibit -- Plaintiffs' Exhibit

11  for a minute, side by side, please.  788.

12          Again, I want you to take your time, sir, and tell the

13  Court whether the week of the 10th you had a -- any calls

14  with any of --

15  A.  Sorry.  Which number again?

16  Q.  I'm sorry?

17  A.  Which number again?

18  Q.  788.  It's in the plaintiff -- the government's binder?

19  A.  Yes.

20  Q.  You know the five publishers that signed agency agreements

21  by name, of course, sir?

22  A.  I do.

23  Q.  And did you have conversations the week of the 10th with

24  a single publisher with which Apple ultimately signed agency

25  agreements?

D6d9usa6                              Cue - cross

1    A.  I did not.

2    Q.  Did you have a two-minute conversation with Markus Dohle

3    that week?

4    A.  I did.

5    Q.  Now, the week of January 11th, in preparation for your

6    testimony today did you have an opportunity to review e-mails

7    and other materials to refresh your recollection about what you

8    did that week?

9    A.  I did.

10   Q.  And can you tell the Court what you did on

11   January 14th in connection with eBooks.

12   A.  I had set up a meeting a few weeks back with Mr. James

13   Murdoch from Fox.  Mr. John Miller from Fox.  Mr. Peter

14   Levinsohn from Fox.  And I should say -- I apologize.  Let me

15   get their companies right.  James Murdoch and John Miller were

16   at News Corp.  Peter Levinsohn was at Fox, which is a

17   subsidiary of News Corp.  With Mr. Jobs and myself.

18           Mr. Murdoch wanted to meet us.  We had never talked to

19   him.  He was running Europe at the time.  And he wanted to come

20   in and talk about how we could do more business together and

21   how our businesses were going together.

22   Q.  Where did that meeting take place?

23   A.  It took place in Apple in Cupertino in the boardroom of

24   Steve's building.

25   Q.  Do you have a picture of that meeting?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D6d9usa6                    Cue - cross

1    A.  I'm sorry?

2    Q.  Do you have a mental picture of that meeting?

3    A.  Yes, I do.

4    Q.  Do you have a photograph of it too?

5    A.  No pictures in the boardroom.  Kind of like the courtroom.

6    Q.  Did -- what was the general purpose of that meeting?

7    A.  Again, Mr. Murdoch kind of wanted to talk to us about the

8    businesses that he saw News Corp. as a company going forward

9    with, and how Apple could help, how we could partner and do

10   more things together.

11          And in addition to that, we took advantage of that and

12   wanted to talk about books because HarperCollins was a

13   subsidiary owned by News Corp.

14   Q.  And at the time, to your knowledge, did Steve Jobs have a

15   prior relationship with James Murdoch of any kind?

16   A.  No.  He had never met him.  And I knew that because I

17   had -- I had arranged a meeting and Steve had told me that he

18   had not met him.

19   Q.  All right.  Now, just very briefly can you describe for the

20   Court the other business relationships in general terms between

21   News Corp. on the one hand and Apple on the other as of

22   January 14, 2010.

23   A.  We sold their movies and rented their movies from Fox.  We

24   also sold their TV shows.  They were -- we were a large

25   advertiser in their TV networks.  They were interested in

D6d9usa6                    Cue - cross

1    bringing their news products as they had apps.  And so they

2    were interested in becoming a news supplier to the IOS

3    platform.

4           A lot of different relationships between us.  They

5    used a lot of our equipment.  They used Macs.  They used

6    iPhones.

7    Q.  Did you have an understanding, sir, as of January of 2010

8    that the relationship between News Corp. and Apple was

9    important to News Corp.?

10   A.  I would hope it was.  I thought it was.

11          MR. SNYDER:  Your Honor, I'm about to go to a series

12   of four documents but I think if I do that you will be unhappy.

13          THE COURT:  I'd be thrilled, but it is 5:00.

14          MR. SNYDER:  Thank you, Judge.

15          THE COURT:  Good.  Thank you.

16          We'll see you Monday morning, 9:30.

17          THE WITNESS:  Thank you, your Honor.

18          THE COURT:  Yes.  And you can step down, Mr. Cue.

19          THE WITNESS:  Okay.  Sorry.

20          THE COURT:  Thank you.  No problem.

21          (Witness excused)

22          Yes.  Mr. Buterman.

23          MR. BUTERMAN:  Your Honor, a few moments ago

24   Mr. Snyder elicited testimony from the witness indicating that

25   in preparation for his testimony Mr. Cue reviewed e-mails and

D6d9usa6                        Cue - cross

 1    other materials to refresh his recollection.  We believe under

 2    Rule 612 we're entitled to all of those materials.

 3                MR. SNYDER:  May I be heard, your Honor?  I think I

 4    can clear it up pretty quickly.

 5                THE COURT:  You know what I'm going to do.

 6                MR. SNYDER:  We will talk about it and solve the

 7    problem.

 8                THE COURT:  Yes.  Well, you will talk about it.  I

 9    will hope you will solve it.

10                MR. SNYDER:  We do better on the weekends than we do

11    during the weekdays.

12                THE COURT:  I want to let you talk about it today and

13    if you don't solve it today then I'm around tomorrow.  Because

14    I think if there is material to be shared it should be shared

15    over this weekend.

16                MR. SNYDER:  Yes, your Honor.  We agree.

17                THE COURT:  Okay.  Good.  Thanks so much.

18                So counsel I think the government used 3 hours today

19    or close to it.  And Apple used 2 hours and 35 minutes.  So I

20    think we're still on schedule as we expected to be.

21                Are there any other issues we need to address before

22    breaking for the weekend?

23                MR. RYAN:  No, your Honor.

24                MR. SNYDER:  No, your Honor.  Thank you.

25                THE COURT:  Thank you.  Have a good weekend everyone.

D6d9usa6                         Cue – cross

1              (Adjourned to June 17, 2013 at 9:30 a.m.)

2                       INDEX OF EXAMINATION

3      Examination of:                          Page

4      RICHARD JOSEPH GILBERT

5      Cross By Mr. Snyder . . . . . . . . . . . .1639

6      Redirect By Mr. Ryan . . . . . . . . . . . .1651

7      Redirect By Mr. Ryan . . . . . . . . . . . .1663

8      Recross By Mr. Snyder . . . . . . . . . .1664

9      Redirect By Mr. Ryan . . . . . . . . . . . .1669

10      EDDY CUE

11     Direct By Mr. Buterman . . . . . . . . . .1674

12     Cross By Mr. Snyder . . . . . . . . . . . .1774

13                     PLAINTIFF EXHIBITS

14     Exhibit No.                          Received

15      870    . . . . . . . . . . . . . . . . . . .1684

16      869    . . . . . . . . . . . . . . . . . . .1692

17      27     . . . . . . . . . . . . . . . . . . .1720

18      34     . . . . . . . . . . . . . . . . . . .1736

19      46     . . . . . . . . . . . . . . . . . . .1768

20       877 and 881 . . . . . . . . . . . . . . .1774

21         DEFENDANT EXHIBITS

22     Exhibit No.                          Received

23      281    . . . . . . . . . . . . . . . . . . .1638

24       714   . . . . . . . . . . . . . . . . . . .1674

25