D6j9usa1                        Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5              v.                              12 Civ. 2826 (DLC)

6    APPLE, INC., *et al.*,

7                    Defendants.

8    ------------------------------x

9
                                         June 19, 2013
10                                       9:30 a.m.
     Before:
11
                        HON. DENISE L. COTE,
12
                                         District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

D6j9usa1                              Trial

1                                    APPEARANCES

2

UNITED STATES DEPARTMENT OF JUSTICE
3          Attorneys for Plaintiff
     BY:  MARK W. RYAN
4          DANIEL McCUAIG
           LAWRENCE BUTERMAN
5          CARRIE SYME

6    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
           Attorneys for State of Texas and Liaison counsel
7          for plaintiff States
     BY:  ERIC LIPMAN
8          GABRIEL R. GERVEY

9    OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT
           Attorneys for State of Connecticut and Liaison counsel
10         for plaintiff States
     BY:  W. JOSEPH NIELSEN

11

12   GIBSON, DUNN & CRUTCHER
           Attorneys for Defendant Apple
13   BY:  ORIN SNYDER
           LISA RUBIN
14         DANIEL FLOYD
           DANIEL SWANSON
15         CYNTHIA RICHMAN
                -and-
16   O'MELVENEY & MYERS
     BY:  HOWARD HEISS

17

18

19

20

21

22

23

24

25

1               (In open court; trial resumed)

2               THE COURT:  Good morning, everyone.

3               Last night chambers gave the, I hope, good news to

4       everyone.  The government has an hour and 57 minutes left.  And

5       Apple has an hour and 49 minutes left.  So roughly the same

6       amount of time right down to the end here.

7               On the deposition issue, I looked at the final

8       pretrial conference transcript from May 23.  I think we had

9       agreement with respect to depositions.  I'm looking at pages 15

10      to 16.  And in any event, in the final pretrial order Apple

11      only identified two deponents, both of whom testified live

12      here.  So it's my understanding based on the material in the

13      final pretrial order and the final pretrial conference that

14      Apple is not offering any deposition evidence.

15              MR. FLOYD:  We are not, your Honor.  Thank you.

16              THE COURT:  With that, I think we're ready for

17      Dr. Burtis to resume the stand.

18        MICHELLE BURTIS, resumed.

19              THE COURT:  Dr. Burtis, I want to remind you, you are

20      still under oath.

21              THE WITNESS:  Okay.  Thanks.

22              MR. BUTERMAN:  Lawrence Buterman for the United

23      States.

24              (Continued on next page)

25

D6j9usa1                          Trial

1   CROSS-EXAMINATION

2   BY MR. BUTERMAN:

3   Q.  Good morning, Dr. Burtis.

4   A.  Good morning.

5   Q.  Could you turn to paragraph 42 of your declaration.

6           You see, Dr. Burtis, in paragraph 42 you talk about

7   the Kindle direct publishing program.  We discussed that

8   yesterday

9   A.  Yes.

10  Q.  And you say that, "The increase in self-publisher sales can

11  be attributed at least in part to Amazon's Kindle direct

12  publishing program and its adoption of an agency model as

13  employed by Apple."

14          Do you see that?

15  A.  Yes.

16  Q.  Now, it's your belief, is it not, that the Kindle direct

17  program announced by Amazon -- let me back up.

18          You agree that the Kindle direct program was announced

19  by Amazon on January 20, 2010?

20  A.  I don't remember exactly but that sounds like the right

21  date.

22  Q.  Can you quickly look at DX196, please.

23  A.  Yes.

24  Q.  So you agree that the Kindle direct program -- direct

25  purchasing program was announced by Amazon on January 20, 2010,

D6j9usa1                          Burtis - cross

1    correct?

2    A.  Yes.

3    Q.  And that was before the Apple agency agreements were signed

4    with any of the publishers, correct?

5    A.  I believe that's correct.

6    Q.  And it's your belief that the Kindle direct program,

7    publishing program, had provisions that were similar to the

8    Apple agency agreements, correct?

9    A.  Certain provisions were similar, yes.

10   Q.  And one of the provisions that you believe was similar was

11   the 70/30 split, correct?

12   A.  Correct.

13   Q.  Now you're referring to the fact that the Kindle direct

14   purchasing program raised the share of revenue that went to the

15   author and publisher from 35 percent to 70 percent, correct?

16   A.  That's correct.

17   Q.  But the 70/30 split in the Apple agency agreements had the

18   effect of lowering the amount paid to publishers and authors

19   per book, did it not, Doctor?

20   A.  Only certain publishers and certain titles.  That would be

21   true -- so it actually increased the amount from 50 to 70.  It

22   decreased the amount of revenue for the defendant publishers

23   because the DLPs actually fell under agency.  And, you know,

24   the 50 and the 70 were taken off the DLPs.  But for those

25   titles and for those publishers whose DLPs were the same or

1   close to the same, then actually Apple's agency agreement would

2   have increased the return to publishers.

3   Q.   Doctor, is it really your testimony under oath that

4   publishers and authors made more money per book under the Apple

5   agency agreements than they made under the wholesale deals that

6   existed with Amazon?

7   A.   Well I don't know about authors because I've never seen any

8   data for authors.   But it is my testimony that, you know,

9   the -- if the DLP remained the same or close to the same,

10   compared to -- you know in the wholesale versus the agency

11   world, then the increase in the amount a publisher would get --

12   or that amount would increase because it was 50 percent and it

13   went to 70 percent.

14   Q.   Doctor, you studied what happened to the publisher

15   defendants after they moved to agency, correct?

16   A.   Yes.

17   Q.   You would agree with me that the publisher defendants

18   received less money -- less revenue per book after they moved

19   to agency, correct?

20   A.   Yes.   They did --

21   Q.   Okay.

22   A.   Okay.

23   Q.   So, with respect to the Kindle direct purchasing program,

24   to the extent that it raised the amount of money that went to

25   authors and publishers, it was different than the effect that

1    the Apple agency agreements had on the publisher defendants'

2    books, correct?

3    A.  Just to be clear, the reason that --

4            THE COURT:  No.

5            THE WITNESS:  I'm sorry.

6            THE COURT:  Doctor.

7            THE WITNESS:  Sorry.

8            THE COURT:  We're going to try today to listen to the

9    question and answer the question that's asked.

10           THE WITNESS:  Okay.  Can you -- it's just not true of

11   all books.  That was my only.

12   Q.  Let me ask the question again, Doctor.

13           With respect to the Kindle direct purchasing program,

14   to the extent that it raised the amount of money that went to

15   authors and publishers, it was different than the effect that

16   the Apple agency agreements had on the publisher defendants'

17   book sales, correct?

18   A.  And I would say correct to certain books.

19   Q.  Thank you, Doctor.

20           MR. BUTERMAN:  No further questions, your Honor.

21   REDIRECT EXAMINATION

22   BY MR. SWANSON:

23   Q.  Good morning, Dr. Burtis.

24   A.  Good morning.

25           MR. SWANSON:  Your Honor, if I may, I would like to

1   attend to a few housekeeping issues before starting the

2   examination.

3           Tab 3 of Exhibit 721 which is Dr. Burtis' declaration

4   includes 17 charts or tables which have now been admitted.  But

5   we also gave them additional exhibit numbers under the theory

6   that that might help us in dealing with those documents.  Two

7   of them have raised issues that have -- have led us and I think

8   your Honor has already heard about this a few days ago -- to

9   agree with Amazon to have redacted public versions and then

10  sealed original versions.

11          So what I would like to do, your Honor, is to hand up

12  the sealed version of the two exhibits that fall under that

13  rubric that are in tab 3 of Exhibit 721, if I may.  Those are

14  documents which under tab 3 have the DX numbers 436 and 441.

15          THE COURT:  I think -- thank you.  I really appreciate

16  this.  I think we've already sealed and filed with the clerk of

17  court the unredacted copies.  We took them from the attachments

18  to the Amazon letter on this issue.  Then I think we're ready

19  to go.

20          MR. SWANSON:  Do we need -- Your Honor, do I need to

21  give you a list of the other fifteen exhibit numbers that are

22  associated with the charts and graphs in tab 3 so that we can

23  have those I guess admitted under those numbers as well.

24          THE COURT:  If you'd like to have them admitted and

25  they are not already, yes.

1              MR. SWANSON:  Not under these numbers at least.  Let

2     me read them out.  And they're just the documents that are

3     under tab 3 of Exhibit 721.  So here they are.  DX434, which is

4     already admitted.  DX435 which is already admitted.  DX436

5     which is one of the documents that is under seal.  DX437.

6     DX438.  DX439.  DX440.  DX441 is another sealed document.  The

7     public version is in the binder.  DX443.  DX445.  DX448.

8     DX449.  DX452.  DX453.  DX461.  DX463.  And DX465.

9              So we would offer those, your Honor, as counterparts

10    to the exhibits that are already in 721.

11             MR. BUTERMAN:  No objection, your Honor.

12             THE COURT:  They are received.

13             (Defendant's Exhibits  DX434, DX435, DX436, DX437,

14    DX438, DX439, DX440, DX441, DX443, DX445, DX448, DX449, DX452,

15    DX453, DX461, DX463 and DX465 received in evidence)

16    Q.  Dr. Burtis, in response to Mr. Buterman's last question you

17    had indicated that your answer was correct in part.  Could you

18    explain the part that it is correct and the part that it isn't.

19    A.  Sure.

20             What I was trying to get at is that even among the

21    defendant publishers' books, certainly the hardcover new

22    release books, the DLP fell.  And so even though they were

23    making 70 percent instead of 50 percent, the result of that was

24    that they made less.

25             And -- but there were other books that they had, in

1   particular backlist, where that was not necessarily true and

2   the DLPs did not fall.  And so even for that set of books, they

3   would have made more under the 70 model than the wholesale

4   model.

5           For them, as, overall for their set of books, it is

6   true, and I have an exhibit that shows this, that overall they

7   did make less under agency.

8   Q.  When you say they did make less, you're referring to major

9   publishers?

10  A.  The defendant publishers and I guess I should say what I

11  really mean is per book or, you know, per unit.  I don't mean

12  overall.

13  Q.  And on average do nonmajor publishers make more or less on

14  average per title under the 70/30 agency share split?

15           MR. BUTERMAN:  Objection.

16           THE COURT:  Sustained.

17  Q.  Let me ask you to turn to paragraph 13 of your report.

18           The first sentence of paragraph 13 reads, "My goal in

19  analyzing the data was to present the Court with a clear and

20  complete picture of the competitive conditions in the alleged

21  relevant market before and after the implementation of the

22  agency agreements."

23           What did you do to achieve that goal, Dr. Burtis?

24  A.  So, what I did -- well I tried to -- what I did is I

25  created or, you know, assembled a very large database of eBook

D6j9usa1                        Burtis - redirect

1   information.  And I also reviewed a lot of material to try to

2   put that data into some perspective.  I calculated various

3   statistics with that data to try to form a picture of what was

4   going on in the marketplace and to, you know, to see both

5   before and after Apple's entry what was happening in the

6   marketplace.

7   Q.  When you testified that you reviewed certain materials,

8   what kind of materials?

9   A.  I looked at a number of Amazon documents so that I could

10  understand their pricing strategy.  I looked at Barnes & Noble

11  documents.  I reviewed -- I tried to review everything I could

12  to understand how prices were being set.

13  Q.  Did you have a team of people who assisted you in this

14  task?

15  A.  Yes, I did.

16  Q.  And how much time did you and your team devote to this

17  review?

18  A.  Are you asking specifically about the documents or are you

19  asking about everything?

20  Q.  Well, why don't we start with everything.

21  A.  With everything.  Well, we, I think, started working on

22  this case in August.  And I would say worked extremely hard up

23  through December when I believe it was the end of December when

24  the first report was issued.

25           A lot of that work was related to the, you know,

1   assembling this database because it was basically we were

2   taking bits and pieces of information from a lot of different

3   databases and trying to, you know, make it all consistent.  And

4   it was actually very time consuming.

5   Q.  And how much time did you devote to studying documents and

6   materials?

7   A.  So, that was something that probably I did more of than

8   anybody else on my team.  And I did it continually throughout

9   this process as I, you know, learned more about the data and

10  more questions came up about, you know -- it was a very

11  iterative process, actually.

12          As we learned things about the marketplace, I would go

13  back to the documents and try to understand it and put it into

14  context.  So, I'm not sure that answers the question, but.

15  Q.  Did you say you studied documents from Amazon?

16  A.  Yes.

17  Q.  Did you study documents from Barnes & Noble?

18  A.  Yes, I did.

19  Q.  Sony?

20  A.  I don't actually recall that we had documents from Sony.

21  We had the data.  And I did -- we had public information about

22  Sony.  But I don't remember specifically whether there were

23  documents.

24          THE COURT:  Doctor, I'm just going to ask you to move

25  your chair up and take that mic and just move it under your

1   chin and keep that voice up.

2               THE WITNESS:  Is that better?

3               THE COURT:  That's better.  Thanks so much.

4   Q.  Now have you conducted your analysis within a relevant

5   market in this case?

6   A.  Yes.  I have adopted the relevant market that the

7   plaintiffs have claimed in this case.

8   Q.  Did you make any assumptions about the interchangeability

9   of products within that market?

10  A.  Only insofar as I have adopted it as a relevant market.

11              The idea of relevant market is that products within a

12  relevant market are reasonably interchangeable; that is, they

13  are reasonable substitutes for one another.

14  Q.  And was that an assumption you made?

15  A.  Yes, it was.

16  Q.  Now, did you look at the state of price competition in the

17  relevant market in late 2009?

18  A.  Yes, I did.

19  Q.  What did you determine about how many price setters there

20  were in the eBooks market, trade eBooks market at that point in

21  time?

22  A.  So there were three retailers who were in the market.

23  There was Amazon, Sony, and Barnes & Noble.

24              There were likely some very small other players but

25  those were the three that were evident in the marketplace.

D6j9usa1                    Burtis - redirect

1   Q.  And how much price competition was there in the relevant

2   market before Apple landed in New York in December of 2009?

3              MR. BUTERMAN:  Objection.

4              THE COURT:  Sustained.

5   Q.  Well what did you observe in your study about the nature of

6   price competition in the relevant market in late 2009 period?

7              MR. BUTERMAN:  Objection.

8              THE COURT:  Sustained.

9   Q.  Dr. Burtis, did you look at the state of price competition

10  in the relevant market in 2010 and afterwards?

11             MR. BUTERMAN:  Objection.

12             THE COURT:  Sustained.

13             MR. SWANSON:  Might I have and understanding as to --

14             THE COURT:  I don't think this is -- I don't think

15  that the government opened the door to this line of questioning

16  based on their cross-examination of the doctor.

17             MR. SWANSON:  Just to register an objection obviously

18  respectfully.  The great bulk of the examination was about the

19  nature of Dr. Burtis' work, what she controlled for, and the

20  like.  It seems to us that that opens the door wide open to

21  have her explain what it is she did and what she observed.

22             THE COURT:  Thank you.

23  Q.  Now, Dr. Burtis, you have in your report, you've marked it

24  with an additional number, that's an exhibit that we've seen a

25  lot of, DX434, then there's DX435 as well.  These are the

1   graphs.  434 is to the left.  435 is to the right.  You can see

2   those, I take it.

3   A.  Yes.

4   Q.  And you're familiar with those?

5   A.  Yes.

6   Q.  Now, I would like to hand up another document.

7          MR. SWANSON:  Your Honor, I have a confession to make,

8   somewhat embarrassing.  This is what we've marked as Exhibit

9   719 and it was previously incarnated as Exhibit 703 which was

10  used during the deposition, or I'm sorry, the testimony of

11  Dr. Ashenfelter.  We marked it for identification as 703.  And

12  then somehow another exhibit, I think Mr. Moerer's declaration,

13  was admitted as 703.  So this is perhaps a good time to let the

14  record reflect that the 703 that was used with Dr. Ashenfelter

15  is now DX719.

16  Q.  So, Dr. Burtis, do you recognize Exhibit 719?

17  A.  I do.

18  Q.  And can you tell us what it is?

19  A.  This is the -- these are the numbers that are essentially

20  behind or I don't remember which of the exhibits.  I think it's

21  434.  These are the numbers behind that exhibit.  It shows the

22  average prices in the relevant market by month as well as for

23  each of the defendant publishers.

24  Q.  Are these numbers the counterparts for lines that are in

25  those exhibits?

D6j9usa1                    Burtis - redirect

1  A.  Yes, that's correct.

2            MR. SWANSON:  Your Honor, I offer 719.

3            MR. BUTERMAN:  No objection, your Honor.

4            THE COURT:  Received.

5            (Defendant's Exhibit 719 received in evidence)

6  Q.  Now, turning back to the graphs, 434 and 435.  Do these

7  reflect the entirety of the work you've done when it comes to

8  evaluating competition in the relevant market?

9  A.  No.

10 Q.  And you've talked about a process and what types of

11 materials you've looked at.  What type of factors did you

12 examine beyond looking at these numbers?

13 A.  So, I tried to understand what was behind the trends in

14 prices that we see.  So, I looked at, for example, changes in

15 output, who was selling that output; shares of different types,

16 publishers in the market.  I tried to understand the growth in

17 products.  And I did try to understand what was going on with

18 the defendant publishers' prices as well.

19 Q.  Thank you, Doctor.  When Apple did enter into the

20 agreements with the five major publishers if you recall?

21 A.  I'm sorry.  I didn't hear the first part of your question.

22 When?

23 Q.  When.  In general terms?

24 A.  It was the beginning of April 2010.

25 Q.  And you recall when Mr. Buterman was asking you questions

D6j9usa1                        Burtis - redirect

1    about whether you controlled for factors in the relevant market

2    in undertaking your analysis?

3    A.   Yes.

4    Q.   You indicated in substance in response to those questions

5    in order to inform that you undertook you believe some control.

6    Is that --

7    A.   Yes.

8    Q.   Can you explain what type of control that you took account

9    of or implemented in your work?

10   A.   Yes.  So, what I try to do is understand the factors that

11   were leading to or contributing to the changes in price that I

12   saw in the data, those changes in price in the relevant market.

13   And so one of the things that I did was try to find the source

14   of that.

15          We can see from Exhibit 435 -- I can't tell if that's

16   a 5 or an 8 -- 5.  That the prices of the defendant publishers

17   are increasing.  The price of Random House increases when it

18   moves to agency.  But yet the average price in the relevant

19   market is falling.

20          And so I undertook to -- I undertook various analyses

21   to try to find out what was causing that.

22          So, I began by -- there's I believe another exhibit in

23   this pile somewhere that shows the average price of

24   publishers -- I think I called them independent publishers.

25   It's essentially the set of publishers besides the defendant

1   publishers and Random House.  And I found that, in fact, those

2   prices were falling during the time period that the average

3   price in the relevant market was falling.

4           So then once I did that, I tried to understand whether

5   or not that was independent or unrelated to Apple's entry or

6   whether or not Apple's entry and the terms of the agency

7   agreements could have contributed to those falling prices.

8   Q.  Let me ask you first.  Did you observe any change in the

9   relevant market in average price in January of 2010?

10  A.  Yes.  In January of 2010 there was a very sharp decline --

11  I mean relative to what you had seen before.  And that actually

12  continued into February of 2010.

13          In February of 2010, you can kind of see it here in

14  this graph, is the lowest price, the lowest average price in

15  the market over the period for which I had data.

16  Q.  Now in 2009 did you observe any -- the timing trend in

17  average prices in the relevant market?

18  A.  No.  Is there a very slight -- and it's very difficult to

19  see in this graph.  You'd have to actually look at the

20  underlying data.  But there is a very slight upward trend in

21  prices from 2008 to 2009.

22  Q.  Doctor, can you turn to paragraph 8 of your declaration.

23  I'd like to focus you on the first sentence of that paragraph

24  which reads, "The growth in eBook sales (and overall lower

25  eBook prices) are attributable in large part to the dynamic

1    nature of competition in the market, stimulated by the

2    expansion of platforms, sales models, and publishers vying for

3    consumer's attention."

4              Do you see that?

5    A.  Yes.

6    Q.  What time period are you speaking of here?

7    A.  I am speaking of the period after April of 2010.

8    Q.  And which platforms are you referring to in this sentence?

9    A.  I am referring to the Apple platform and Barnes & Noble

10   primarily.

11   Q.  Which sales models?

12   A.  The wholesale model and the agency model.

13   Q.  And which publishers are you referring to in this sentence?

14   A.  I am referring to the publishers who began selling books on

15   the agency agreement and they're the ones that obtained the

16   ability to set their own prices on that model.

17   Q.  How many price setters were there in the relevant market

18   after Apple entered?

19   A.  I don't know the exact number.  There were thousands.

20   Because each of those publishers who signed an agency agreement

21   with Apple had the ability to set their own retail price.

22   Q.  Now, you talked about the five defendant publishers.  Did

23   that group of thousands of price setters include large

24   publishers?

25   A.  It did.  I mean it included, you know, some that were --

D6j9usa1                          Burtis - redirect

1    the six publishers that we talk about generally are very large.

2    But there are others that are, you know, not as large but still

3    larger than many others.

4    Q.  And did it include self-publishers?

5    A.  It did, yes.

6    Q.  Can you give an example of a large albeit nondefendant

7    publisher.

8    A.  Let's see.  There is Perseus, there is -- is it Workman.

9    There is Scholastic.  There's Disney.  Those are the ones that

10   I can think of.

11   Q.  And is it your testimony they became price setters in the

12   relevant market?

13   A.  Yes.

14   Q.  Looking again at paragraph 8 of your declaration.  What do

15   you mean by the term "dynamic nature of competition"?

16   A.  Well I just mean that the -- there were -- there were many

17   changes that were occurring in this market.  And in

18   particular -- well, I guess I'm really referring to the last

19   part of that sentence, you know, the new platforms that were

20   available, the sales models that existed as well as the entry

21   of the publishers as price setters.

22   Q.  You had mentioned that Barnes & Noble was one of the

23   platforms that you intended to refer to in paragraph 8.  What

24   was it about Barnes & Noble that stimulated competition?

25   A.  (No response).

D6j9usa1                    Burtis - redirect

1   Q.  As you refer to it in this sentence?

2   A.  Well, Barnes & Noble, after they went to the agency model,

3   was able to earn margins that provided the opportunity for it

4   to invest in its business that it did not have prior to that

5   time.  It didn't look like -- well, in the data that I looked

6   at, which I believe was November and December of 2009, that was

7   the time period when Barnes & Noble started meeting Amazon's

8   prices and they started losing money.

9   Q.  And I take it you were here yesterday to hear the testimony

10  of Ms. Horner?

11  A.  I was, yes.

12  Q.  Was that consistent or inconsistent with the understanding

13  you developed about Barnes & Noble's role in the relevant

14  market?

15  A.  That was very consistent with what I understood from the

16  data and their documents.

17  Q.  Let me ask you to turn to Exhibit DX473.

18  A.  Yes.

19  Q.  Do you recognize that?

20  A.  Yes.

21  Q.  Is that an exhibit you prepared?

22  A.  Yes.

23          MR. SWANSON:  Your Honor, we'd offer DX473.

24          MR. BUTERMAN:  No objection.

25          THE COURT:  Received.

1          (Defendant's Exhibit 473 received in evidence)

2    Q.   What does that depict, Dr. Burtis?

3    A.   This was the one that I was actually referring to earlier.

4    This exhibit shows the overall average price in the relevant

5    market; that's the green line.  The average of the defendant

6    publishers' prices; that's the red line.  The blue line is

7    Random House's average price.  And then that black line is the

8    average price of the publishers besides the defendant

9    publishers and Random House.

10   Q.   Would it be fair to refer to that line as the independent

11   publisher line?

12   A.   I think, yeah, that is how I describe it.

13   Q.   Does that include self-publishers as well?

14   A.   It does, yes.

15   Q.   Focusing on the red line for a moment, which -- I take it

16   that's same line that's in DX434 and 435; is that right?

17   A.   434 is -- I don't believe there's the average across the

18   defendant publishers.  There is each one of them.  But DX435 I

19   believe there is an average defendant publisher line.

20   Q.   Thank you for the correction.

21         Now, did you ever calculate the extent to which the

22   defendant publishers' prices went up on an average in the six

23   months after April 1, 2010 compared to the six months before?

24   A.   Yes.  It's about 17 percent.

25   Q.   Did all of the publisher defendants' titles increase in

D6j9usa1                    Burtis - redirect

1   price?

2   A.   No, they didn't.   Even among hardcover new release titles

3   there were many that either did not change or fell shortly

4   after the entry of Apple and the move to agency.

5   Q.   Could you give an example of new release that fell in price

6   after April 1.

7   A.   Yes.   So one of the things I did is I looked at the

8   hardcover new releases two weeks before and two weeks after.

9   And one of the titles that fell in price was True Compass

10  written by Senator Kennedy.   And I noticed this because the

11  government used it in the opening.

12          And it is true as they showed in Court the end of

13  January the price of that title was 9.99.   But in 2009 Amazon

14  had adopted a strategy where hardcover new release books after

15  90 days would -- it would no longer be 9.99 and they would

16  increase based on their digital list price.

17          So, in March of 2010 the price of that title at Amazon

18  increased to $19.25.   So in that particular case, the change

19  from wholesale to agency led to a decline in the price of that

20  title.

21  Q.   Do you recall what the price was under agency?

22  A.   It's 16.99.

23  Q.   And do you recall the list price of that book?

24  A.   $35.

25  Q.   And how did 16.99 relate to the price caps for a $35 list

D6j9usa1                         Burtis - redirect

1   price book?

2   A.  I believe that was consistent with those caps.

3   Q.  Dr. Burtis, was pricing at $9.99 common or uncommon after

4   Apple's entry in the relevant market?

5   A.  It remained -- I'll just say, it was about --

6   three-quarters of the books that were sold were either 9.99 or

7   lower.

8   Q.  And this is after Apple's entry?

9   A.  Yes.

10  Q.  Looking back at DX473 you said the blue line depicts Random

11  House?

12  A.  Yes.

13  Q.  Or Random House's average prices; is that correct?

14  A.  Yes.

15  Q.  What did you observe from this data about Random House's

16  prices?

17  A.  Well, a couple of things.  One is you can see after the

18  defendant publishers moved to agency, you can see the decline

19  in Random House's average price, which is consistent with the

20  testimony about the way that Amazon was promoting and

21  discounting those titles.

22         And you can also see that when Random House itself

23  moved to agency that its price increased.  And it increased a

24  little bit more than the average of the defendant publishers.

25  Q.  And what, if anything, is the significance of that fact to

D6j9usa1                    Burtis - redirect

1    your analysis?

2    A.   So the significance of that is that Random House had to

3    figure out what prices to set for its books.  And it did

4    that -- it had to do that within the context of the supply and

5    demand factors present in the marketplace.  And so its prices

6    represent market prices; that is, those are the prices that it

7    could set given the market conditions at the time.

8    Q.   Doctor, what happened to output after Apple entered the

9    relevant market?

10   A.   Output continued to increase.

11   Q.   Let me ask you to turn to DX463 which, your Honor, is in

12   evidence.

13          Tell us what -- first of all, did you prepare that?

14   A.   Yes.

15   Q.   Tell us what it is.

16   A.   These are -- this is the number of paid eBook titles in the

17   Kindle store.  And this is taken from Amazon's press releases

18   over time.

19   Q.   What do you conclude from DX463?

20   A.   That there was a continuing large number of new titles

21   available in the marketplace.  And, of course, that Amazon

22   continued to market this.  This was an important way that they

23   competed.  And you can see that that trend, if you will,

24   certainly -- there was almost an influxion point around the

25   time that Apple entered.

D6j9usa1                          Burtis - redirect

1    Q.  What do you mean by influxion point?

2    A.  I just mean that the trend shifts a little bit to be a

3    little bit steeper.

4    Q.  Now let me ask you to turn to Exhibit DX441 which is in

5    evidence.

6           MR. SWANSON:  There is a sealed version of this, your

7    Honor.  This is one of the exhibits we were speaking of a few

8    moments ago.

9    Q.  So we have the redacted version -- I'm not sure we have the

10   redacted version here -- yes?

11   A.  No.  Oh, yes, it is.  Sorry.

12   Q.  Dr. Burtis, is this an exhibit that you prepared?

13   A.  Yes.

14   Q.  Can you tell us what it depicts.

15   A.  This is showing the increase in the number of publishers

16   selling eBooks at Amazon and their increased share over time.

17   Q.  What did you conclude from this exhibit?

18   A.  Well this actually helped me understand why I saw prices

19   falling or I tried to understand what was going on with the

20   average price in the relevant market.

21          And it also indicated to me that the entry of these

22   publishers was certainly consistent with a very well

23   functioning marketplace that, you know, there was nothing wrong

24   with the competitive process, if you will.  The number of

25   publishers continued to increase.

1              MR. BUTERMAN:  Objection.  Move to strike the last

2    portion of that answer.

3              THE COURT:  Stricken.

4    Q.  Doctor, let me ask you to turn to Exhibit 462.

5              MR. SWANSON:  This, your Honor, is also a redacted

6    exhibit, the original of which is under seal.  It is not in

7    evidence.

8    Q.  Let me ask, Dr. Burtis, is this an exhibit you prepared?

9              THE WITNESS:  Yes.

10             MR. SWANSON:  Your Honor, we'd offer 462.

11             THE COURT:  I think it is received already.

12             MR. SWANSON:  Thank you.

13   Q.  Dr. Burtis, what does this exhibit depict?

14   A.  This shows the quantity sold of self-published books at

15   Amazon over time.

16             And I should mention the only way I could identify

17   self-published books in this data was to assume that a

18   self-published book was one where the author and the publisher

19   was the same in the data.  So that was the only way I could do

20   that.

21   Q.  What did you conclude from this exhibit?

22   A.  I concluded that there was a very substantial increase

23   after Amazon increased the royalty that was available on

24   self-published books from 35 to 70 percent.

25   Q.  Speaking of self-publishing programs, Mr. Buterman asked

 1  you yesterday whether you were saying that Amazon was mirroring

 2  Apple in regard to the 70/30 KDP split.  Do you recall that

 3  question?

 4  A.  Yes.

 5  Q.  Does it matter to your economic opinion whether Amazon was

 6  mirroring Apple's proposed agency terms or if Apple was

 7  mirroring Amazon in giving self-publishers a 70/30 split?

 8  A.  Not really.  I don't think it matters.  I think it is --

 9  certainly one or the other one, as they learned about their

10  competitor's program had the incentive to offer similar terms.

11  And once one -- you know, once they offer those similar terms,

12  it's very difficult for either one of them to change their mind

13  and give publishers less.  So it is very -- it's

14  self-reinforcing, if you will.

15  Q.  Doctor, I'd like you to assume for the moment that Amazon

16  retained control over self-publishers' prices under the KDP

17  program.  Do you have that assumption in mind?

18  A.  Yes.

19  Q.  Does that change any of your opinions about the effect or

20  impact of that program?

21          MR. BUTERMAN:  Objection.

22          THE COURT:  Sustained.

23  Q.  Doctor, let me ask you to turn to paragraph 33 of your

24  declaration.

25          In your first sentence of that paragraph you state

1   that, "Plaintiffs' theory of reduced eBook output or diminished

2   eBook output growth, in the alleged relevant market is

3   implausible and based on unsubstantiated assertions or flawed

4   and complete empirical analysis."

5          Please explain what you mean by this.

6          MR. BUTERMAN:  Objection.

7          THE COURT:  Sustained.

8          MR. SWANSON:  There were numerous questions about

9   output, whether Dr. Burtis was examining output.

10          MR. BUTERMAN:  Your Honor, this paragraph goes to a

11  critique of Professor Gilbert.  And there were no questions

12  about Dr. Burtis' critique of Professor Gilbert during my

13  examination.

14          THE COURT:  Sustained.

15          MR. SWANSON:  Let me ask to have placed up if you can,

16  Andrew, trial transcript from yesterday, page 2253, starting at

17  line 8 through 15.

18          Let me just read those questions so I can ask you

19  about them, Dr. Burtis.

20          Mr. Buterman asked.

21  "Q.  You agree that there are other factors that contributed to

22  the increase in eBook output you observed in the postagency

23  period, correct, Doctor?

24  "A.  Yes.  There are factors that contributed to growth.

25  "Q.  And you cannot quantify how much, if any, of the increase

1   in eBook output you observed is a result of the agency

2   agreements, can you?

3   "A.  That's correct, I cannot."

4          Do you see that?

5   A.  Yes.

6   Q.  And you recall that exchange.

7          Can you explain what you meant by your answer to the

8   second question?

9   A.  Well, what I was -- what I was thinking was that -- so

10  there is an increase in output that we observed in the data.

11  But, there is no evidence that the increase in output was any

12  different after agency than it was prior to agency.

13  Q.  Doctor, can you quantify any reduction in eBook output as a

14  result of the agency agreement?

15  A.  No.  As I said, the only evidence -- well the evidence that

16  I understand exists about this question is that there is no

17  statistical change in the trend of output in the agency period

18  compared to the prior period.

19  Q.  Let me ask you to look at DX461 which is in evidence.

20          Is this an exhibit that you prepared?

21  A.  Yes.

22  Q.  What does it depict?

23  A.  These are Apple's paid sales -- actually it's quantity of

24  eBooks sold by Apple over this period.  And those are just paid

25  sales.

D6j9usa1                          Burtis - redirect

1    Q.   What conclusions can you draw from this exhibit?

2    A.   This shows that, you know, Apple enters the market and is

3    quite successful in selling eBooks.

4    Q.   And do you have an understanding as to the model under

5    which all of these eBooks were sold?

6    A.   All of them were sold under the agency model.

7    Q.   Is it your opinion, Doctor, that the price in output trends

8    you've identified in 2010 and later years were unrelated to

9    Apple's entry in the agency model?

10             MR. BUTERMAN:   Objection.

11             THE COURT:   Sustained.

12   Q.   Dr. Burtis, do you have an opinion about whether average

13   market prices would have been different but for the entry of

14   Apple and the adoption of the agency model?

15   A.   Yes.  I have an opinion.

16   Q.   What is your opinion?

17   A.   So my opinion is that the economic data and information

18   that I reviewed indicate that there was entry by publishers and

19   additional competition from those publishers who were setting

20   prices in the marketplace and that Apple entered as a new

21   competitor.  And all of those factors intensified competition

22   and led prices to be lower than they otherwise would have been.

23             MR. BUTERMAN:   Move to strike.

24             THE COURT:   Stricken.

25             MR. SWANSON:   Your Honor, is this a scope objection?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  Yes.  Among other things.  The scope of
 2     her original testimony -- counsel, this expert was invaluable
 3     in this case and the work she did.  But, she did not present a
 4     causation analysis except with respect to the defendant
 5     publishers potentially.  And that's fine.
 6              I don't want to discount the importance of this very
 7     important work to my understanding.  But we're not going to try
 8     to convert now through redirect examination an expert who was
 9     tendered for one purpose into a completely different causation
10     expert.
11              MR. SWANSON:  We understand your ruling, your Honor.
12     I just wanted to clarify the record.  We do object to, your
13     Honor, I hope is not offended by it.
14              THE COURT:  Never offended by an objection.  That's
15     the role of counsel.  And my role to rule.
16              MR. SWANSON:  I've always wanted to say I'm not a
17     potted plant.  But no, no, maybe I am.
18     Q.  Doctor Burtis, you referred yesterday in response to a
19     question by Mr. Buterman about regressions by other experts in
20     the case to a regression by Professor Ashenfelter that you said
21     he described as a baby step.
22              Do you recall that response?
23     A.  Yes.
24     Q.  What regression were you referring to?
25     A.  Professor Ashenfelter attempted to control for the entry of
```

D6j9usa1                    Burtis - redirect

1   new publishers and take account of that as it would affect the

2   average prices in the market.

3   Q.  In your opinion have Professor Ashenfelter's regression

4   analyses shown that market prices would have fallen more but

5   for the entry of Apple and the adoption of the agency model?

6   A.  No, it doesn't.

7   Q.  Now let me ask you to turn to DX446.  This is not in

8   evidence.

9            Is this an exhibit you prepared?

10  A.  It is.

11           MR. SWANSON:  Your Honor we would offer 446.

12           MR. BUTERMAN:  No objection.

13           THE COURT:  Received.

14           (Defendant's Exhibit 446 received in evidence)

15  Q.  Just in the interest of time let me just move through a

16  number of these.  Can you turn to DX450.  That should be in

17  your --

18  A.  Yes.

19  Q.  And is that an exhibit you prepared?

20  A.  Yes.

21           MR. SWANSON:  We'd offer 450, your Honor.

22           MR. BUTERMAN:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit 450 received in evidence)

25  Q.  Can you turn, Dr. Burtis, to DX451.

D6j9usa1                    Burtis - redirect

1    A.  Yes.

2    Q.  Is this an exhibit you prepared?

3    A.  Yes.

4            MR. SWANSON:  We would offer 451.

5            MR. BUTERMAN:  Your Honor, I'm sorry.  I apologize.

6    DX450 and 451 are, as far as I understand, exhibits that were

7    initially attached to Dr. Burtis' first report regarding an

8    opinion relating to innovation which Dr. Burtis removed from

9    her rebuttal report and is not testifying about at trial.  And

10   there's nothing in her direct testimony that relates in any way

11   to DX450 or 451, I believe.

12           THE COURT:  So you're now objecting to both?

13           MR. BUTERMAN:  I am.

14           THE COURT:  Or just 451?

15           MR. BUTERMAN:  450 hand 451.  And I apologize, your

16   Honor.

17           MR. SWANSON:  Your Honor, may I lay a foundation?

18           THE COURT:  Certainly.  By pointing me to the portion

19   of her direct testimony that this relates to.

20           MR. SWANSON:  Yes.  These exhibits are referenced in

21   Dr. Burtis' direct testimony as exhibits that she prepared.

22   Q.  Let me ask Dr. Burtis, if I may, without getting into the

23   substance of DX451, can you -- does this relate to your direct

24   testimony in this case?

25   A.  It does.  All this is, is showing the, by retailer and by

D6j9usa1                    Burtis - redirect

1    defendant publisher, their sales in the various categories of

2    books.

3            THE COURT:  I'm looking at the direct testimony.  Can

4    you point me to, Mr. Swanson, the paragraph.  I see paragraph

5    28 we skip to 452 and 453.

6            MR. SWANSON:  Well your Honor the reference to the --

7    all of the exhibits that were attached to the -- Dr. Burtis'

8    reports, this one was attached to her initial report as an

9    exhibit for, are cited in the declaration, referenced as

10   exhibits that she prepared.  In terms of specific discussion,

11   it's not specifically discussed in her report, but it

12   illustrates the data that is discussed in her report and her

13   quantification.  I didn't think it was terribly controversial.

14           THE COURT:  So happy to look at a particular sentence

15   in the report.

16   BY MR. SWANSON:

17   Q.  Dr. Burtis is there a particular sentence in the report

18   that you would refer to as connecting to this exhibit?

19           THE COURT:  To 450 and 451, DX450 and DX451.

20           MR. SWANSON:  I think we're just focused on 451 right

21   now.

22           THE COURT:  Okay.

23           MR. SWANSON:  At least I --

24           THE COURT:  The objection is to both.

25           MR. SWANSON:  Yes.  I just wanted to take them one at

D6j9usa1                         Burtis - redirect

1    a time.

2              THE COURT:  Good.  DX451.

3              THE WITNESS:  It kind of relates --

4              THE COURT:  Which paragraph?

5              THE WITNESS:  Fifteen.  If you look at -- this is --

6              THE COURT:  Excuse me.  Just let me look.

7              THE WITNESS:  Sorry.

8              THE COURT:  I don't see this as support for --

9    paragraph 15 leads up to paragraph 16, not surprisingly.  And

10   so I don't find this would have put the plaintiff on notice

11   that all of a sudden in the direct testimony we're talking

12   about Exhibit DX451.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. SWANSON:  Your Honor, Page 19.

2            THE COURT:  Page 19, I don't have.  The signature is

3       on Page 18.

4            MR. SWANSON:  No, I'm sorry.  Well, let me move on to

5       another, your Honor.

6            THE COURT:  Okay.  So DX450 is stricken, and DX451 is

7       not received.

8       BY MR. SWANSON:

9       Q.  Let me ask you to turn to DX469 --

10      A.  Yes.

11      Q.  -- Dr. Burtis.  Okay.  Now, was this an exhibit in your

12      rebuttal report?

13      A.  I believe that's correct.

14      Q.  And what -- If you could help me out.  Your paragraph on

15      Barnes and Noble?

16      A.  Let's see, we were just looking at it.  54?  I'm sorry, 53

17      and 54.

18      Q.  53 and 54.  Does DX469 relate to your testimony in

19      paragraph 53 and 54?

20            MR. BUTERMAN:  Objection.

21            THE COURT:  Let me look.  So paragraph 53 relates to

22      DX465.  So turning to paragraph 54, it talks about Barnes and

23      Noble's negative gross margins in December of '09 and January

24      of 2010.  So why isn't, Mr. Buterman, DX469 related to that?

25            MR. BUTERMAN:  Your Honor, I'm not suggesting that

1    it's not.  I'm suggesting that I didn't ask any questions about

2    this topic during my examination, and that's the basis for my

3    objection.

4              THE COURT:  Sustained.

5              MR. SWANSON:  I believe, your Honor, we've had

6    testimony today about Barnes and Noble that came up in reaction

7    to a question that wasn't within the scope, and that's the

8    basis on which we offered it.

9              THE COURT:  Today, I think the only examination by the

10   government was on self publishing, KDP from program at Amazon

11   and related topics.  So I think the objection is sustained.

12             MR. SWANSON:  I have no further questions.  Thank you.

13   RECROSS EXAMINATION

14   BY MR. BUTERMAN:

15   Q.  Dr. Burtis, could you just look at the DX719?  That's the

16   big chart here.

17   A.  Yes.

18   Q.  And, Doctor, counsel asked you about what was happening in

19   January 2010 and you testified about a downward spike, correct?

20   A.  Correct.

21   Q.  Doctor, do you see that prices actually started to decline

22   in December of 2009?

23   A.  Yes, they did a little.

24   Q.  And, Doctor, do you know what happened in December of 2009?

25   Or let me -- actually, let me just say it.  Isn't that when

1  Barnes and Noble entered the market with its NOOK device?

2  A.  Yes.

3          MR. BUTERMAN:  Thank you.

4  REDIRECT EXAMINATION

5  BY MR. SWANSON:

6  Q.  Dr. Burtis, did anything else happen in December of 2009 in

7  the relevant market?

8  A.  There was the press associated with Apple's entry.

9          MR. SWANSON:  And, your Honor, I would offer DX469 on

10  Barnes and Noble's gross margins in November, December of 2009.

11          THE COURT:  Is there an objection or not?

12          MR. BUTERMAN:  No objection -- I'm sorry, which

13  document?

14          THE COURT:  469, it's the -- it's 469.

15          MR. BUTERMAN:  I apologize, your Honor.  We have the

16  same objection.

17          THE COURT:  Yes, sustained.

18          Doctor, again, I want to thank you and your team for

19  their invaluable work in amassing an enormous quantity of data

20  and displaying it in a way that makes it intelligible and

21  helpful certainly to me but also, obviously, to the parties.

22          So you have a category called independent publishers;

23  am I right?

24          THE WITNESS:  Yes.

25          THE COURT:  And, again, is that everyone except the

1   publisher defendants?

2           THE WITNESS:  I believe so.  If you could -- Are you

3   looking at something in particular?

4           THE COURT:  No.  I just want to ask you a question.

5           THE WITNESS:  I usually use that term to be everybody

6   except the defendant publishers and Random House.

7           THE COURT:  Thank you.  And that group then includes

8   the self publishers, authors who do not use a publishing

9   company to go to market; is that right?

10          THE WITNESS:  That's true.

11          THE COURT:  Okay.  So there's this subcategory of

12  publishing companies that are independent publishers; am I

13  right?

14          THE WITNESS:  Yes.

15          THE COURT:  How many of those had an agency agreement

16  with Amazon?

17          THE WITNESS:  With Amazon?  As far as I know, but I'm

18  not sure that I actually know the answer to that question --

19  maybe I should just say I really don't know the answer to that

20  question.

21          THE COURT:  If they didn't have an agency agreement

22  with Amazon and were selling through Amazon on a wholesale

23  basis, who was setting the price for their books?

24          THE WITNESS:  Amazon.

25          THE COURT:  And if they had an agency agreement with

D6JPUSA2                    Burtis - redirect

1  Apple in order to be on the iBookstore, that agency agreement

2  had an MFN, I take it?

3           THE WITNESS:  As far as I know, yes.

4           THE COURT:  And so the price on their Apple platform

5  in the iBookstore would, if the price in the Amazon bookstore

6  were lower, would have to match that lower price; is that

7  right?

8           THE WITNESS:  Absolutely, yes.

9           THE COURT:  You said you defined a self publisher as

10 someone where the name was the same for the author and the

11 publisher; am I right?

12          THE WITNESS:  That's correct.

13          THE COURT:  What if the publisher line was blank?

14          THE WITNESS:  I don't think we counted it.

15          THE COURT:  As a self publisher?

16          THE WITNESS:  As a self publisher.

17          THE COURT:  And what if the publisher line was filled,

18 but it was like John Smith, Inc.?

19          THE WITNESS:  Right.

20          THE COURT:  The author's name but an incorporation.

21          THE WITNESS:  Oh, hmm.  We tried to do some cleaning

22 of names, but there were many, many, many, and so I can't tell

23 you that everyone like that got caught, but there was certainly

24 an attempt to catch those kinds of things.

25          THE COURT:  Thank you.  Counsel, does the government

 1  have any additional questions based on the questions I've

 2  placed?

 3          MR. BUTERMAN:  Just one, your Honor.

 4  RECROSS EXAMINATION

 5  BY MR. BUTERMAN:

 6  Q.  Dr. Burtis, do you know if Apple consistently enforced the

 7  MFN?

 8  A.  I do not.

 9          MR. BUTERMAN:  Okay.  Thank you.

10  REDIRECT EXAMINATION

11  BY MR. SWANSON:

12  Q.  Dr. Burtis, with respect to independent publishers who are

13  under agency with Apple and wholesale with Amazon, if the

14  Amazon wholesale agreement has an MFN, will the price set by

15  the agent on Apple control the Amazon price with the MFN?

16          MR. BUTERMAN:  Objection, I'm sorry.

17          THE COURT:  Do you understand that question?

18          THE WITNESS:  Can you repeat it?  Sorry.  I don't

19  think I heard the first part.

20  Q.  Okay.  With respect to independent publishers, I believe

21  the subject of the Court's questioning, who are on agency with

22  Apple --

23  A.  Mmm, hmm.

24  Q.  -- and wholesale with Amazon, and there was a question

25  about the Apple MFN --

D6JPUSA2                    Burtis - redirect

1   A.   Mmm, hmm.

2   Q.   -- I'm asking you a question about an Amazon MFN in the

3   wholesale agreement.  How would that effect pricing with

4   respect to that particular independent publisher?

5            MR. BUTERMAN:  Objection.

6            THE COURT:  Sustained.

7            MR. SWANSON:  Thank you.

8            THE COURT:  I mean, I want to make sure here.  I'm

9   unaware of any record evidence that when you have a wholesale

10  relationship, that there is an MFN clause.  So if I'm missing

11  something here, please, that's the basis for my cutting this

12  off because I don't know that that captures anything I've heard

13  about in the real world.

14           MR. SWANSON:  I just need to check the Amazon

15  testimony.  I was under the impression that their adherence to

16  MFN was in the post-Apple world, was quite comprehensive.

17           THE COURT:  On a wholesale model?

18           MR. SWANSON:  In all models.

19           THE COURT:  Okay.  Thank you.  Doctor, you may step

20  down.  Thanks so much.

21           (Witness excused)

22           MR. FLOYD:  Your Honor, we have a couple of, I guess,

23  almost housekeeping matters.  This is Dan Floyd.  One is we

24  want to offer the direct testimony of Madeline McIntosh, which

25  is DX713.

D6JPUSA2                    Burtis - redirect

1          THE COURT:  Received.

2          (Defendant's Exhibit 713 received in evidence)

3          MR. FLOYD:  And the Exhibit DX726, which are the

4   slides that were used in the opening, we'd like to put those

5   into evidence.

6          THE COURT:  Well, I wanted copies of them, and thank

7   you.

8          MR. FLOYD:  Yes.  Let me hand them up.

9          THE COURT:  Okay.  I don't --

10         MS. RUBIN:  Your Honor, you've already been provided

11  with an electronic copy of Apple's slides.  They just haven't

12  been marked as an exhibit.

13         MR. FLOYD:  I can provide you with a hard copy now, if

14  that would be helpful.

15         THE COURT:  Great.  And I did want copies.  I do have

16  copies.  Thank you.  I don't think they're evidence unless

17  they're demonstratives, unless they summarize or display.  For

18  instance, a lot of them, as I remember, were legal arguments

19  and capturing legal concepts.

20         MR. FLOYD:  That's fine, your Honor.  We have them

21  admitted on that basis, for demonstrative.  However your Honor

22  intended to use them, we just wanted to mark them as exhibits

23  and have them in the record for the purpose that you were going

24  to use them.

25         THE COURT:  Fine.  We'll have them received then just

D6JPUSA2                    Burtis - redirect

1    so we have, not as an evidentiary basis when they shouldn't be,

2    but just so we have this record captured of slides used with

3    the opening.

4              MR. FLOYD:  Thank you.  And then --

5              THE COURT:  And their number is?

6              MR. FLOYD:  726.

7              THE COURT:  Thank you.

8              (Defendant's Exhibit 726 received in evidence)

9              MR. FLOYD:  And then there were a series of exhibits

10   that we shared with the government this morning, kind of a

11   cleanup.  I have a list.  In the interest of time, if it would

12   be possible to provide the list and have that incorporated into

13   the record.  I have a copy of it.  I'll show it to

14   Mr. Buterman, but we provided the copies, went through all of

15   them.

16             THE COURT:  Great.

17             MR. FLOYD:  And there were no objections.

18             THE COURT:  Good.  And so if you give me the original

19   of that, I'll treat it as a stipulation then and give it

20   today's date; so there will be a record of actually what's

21   happened here.

22             MR. FLOYD:  Very much appreciate it.  Thank you.

23             THE COURT:  Yes.

24             MR. FLOYD:  All right.

25             THE COURT:  And this is a document that the heading is

1    "DX Exhibits to be Admitted 6-19-13," and I'm signing it now.

2         Next?

3         MS. RUBIN:  Your Honor, Apple calls Robert McDonald to

4    the stand as its next witness.

5         THE COURT:  Sir, if you could step up to the witness

6    stand and remain standing.

7    ROBERT BRUCE McDONALD,

8         called as a witness by the Defendants,

9         having been duly sworn, testified as follows:

10        THE COURT:  State your full name and spell your last

11   name for the record.

12        THE WITNESS:  Robert Bruce McDonald.  Last name,

13   M-c-D-o-n-a-l-d.

14        THE COURT:  So, Mr. McDonald, you're being handed a

15   declaration, which has the number DX723, and I want to ask you,

16   is that your signature on the 24th page?

17        THE WITNESS:  Yes, it is.

18        THE COURT:  And it's dated April 25th.  Is that the

19   date you signed this?

20        THE WITNESS:  Yes.

21        THE COURT:  Now, before signing this document, did you

22   read it carefully?

23        THE WITNESS:  I did.

24        THE COURT:  And do you swear to the truth of its

25   contents?

 1              THE WITNESS:  I do.

 2              THE COURT:  Any objection to receipt of DX723?

 3              MR. BUTERMAN:  Your Honor, the United States -- there

 4     are a number of paragraphs in Mr. McDonald's declaration that,

 5     as long as the understanding is that they represent

 6     Mr. McDonald's opinions, as opposed to some statements of

 7     facts, which we do not necessarily believe that Mr. McDonald

 8     has the ability to render, we don't have objections.

 9              For example, paragraph 20, we believe that there's a

10     hearsay problem, but if that paragraph is not coming in for the

11     truth of the matter being asserted, but rather, a

12     representation of Mr. McDonald's opinion, we have no problem

13     with the sentence.

14              THE COURT:  For instance, publishers were optimistic

15     about something?

16              MR. BUTERMAN:  Yes.

17              THE COURT:  Publishers were hopeful?

18              MR. BUTERMAN:  Yes.

19              MS. RUBIN:  Your Honor, may I be heard?

20              THE COURT:  Yes.

21              MS. RUBIN:  Your Honor, it's my understanding that the

22     government's objections on hearsay grounds are solely as to

23     paragraph -- a sentence in paragraph 20, the one to which your

24     Honor was just referring, as well as to a sentence in paragraph

25     31.  Mr. Buterman, is that correct?

1           MR. BUTERMAN:  I -- As I just said, your Honor, as

2     long as these aren't being introduced for the truth of the

3     matter being asserted, we don't have a problem.

4           MS. RUBIN:  Sure.  We just wanted some clarification

5     if we could that those are the only paragraphs to which the

6     government was asserting.

7           MR. BUTERMAN:  I was planning on going through my

8     objections, your Honor, but those are the only two.

9           THE COURT:  So I take it there's agreement among the

10    parties that I am to receive those sections that would

11    otherwise draw a hearsay objection, not for the truth?

12          MS. RUBIN:  Yes, your Honor.  Thank you.

13          THE COURT:  And on that understanding, DX723 is

14    received.

15          MR. BUTERMAN:  Oh.

16          THE COURT:  Oh, is there --

17          MR. BUTERMAN:  Yes, there are other issues, your

18    Honor, I apologize.

19          THE COURT:  Mr. Buterman.

20          MR. BUTERMAN:  There are several paragraphs, as I

21    mentioned, where Mr. McDonald makes statements.  For example,

22    in paragraph 31 -- and I have an overarching issue with 31,

23    which I'll raise in a moment -- but Mr. McDonald says, "these

24    innovations have fundamentally transformed the digital reading

25    experience."

1          As long as these are understood these are

2     Mr. McDonald's opinions, the United States does not have a

3     problem with their admission.

4          THE COURT:  Any problem from Apple receiving it on

5     that basis?

6          MS. RUBIN:  No, your Honor.  And thank you.

7          MR. BUTERMAN:  And I can list the rest of the

8     paragraphs, but it really pervades the entire document.  We

9     don't -- we are not trying to strike Mr. McDonald's personal

10    beliefs here.  We just want to make sure that it's understood

11    it's just that.

12         THE COURT:  Well, he's a lay witness, not an expert,

13    and I'm not -- and I don't understand that Apple is contending

14    he should be converted into an expert witness.  So with that

15    understanding DX7 -- Oh, there's more?

16         MR. BUTERMAN:  One more, your Honor.

17         THE COURT:  Thank you.  More.

18         MR. BUTERMAN:  I apologize.  This is the last one.

19         Paragraph 31 of Mr. McDonald's declaration largely --

20    and I want to use the qualification "largely" -- refers to a

21    comparison between the iBookstore and iBooks versus physical

22    devices, reading books, physical books.  We do not believe

23    that's a relevant issue in this case.

24         THE COURT:  I'm not going to strike it.

25         MR. BUTERMAN:  Okay.  I'll inquire into it.

1              THE COURT:  Okay.  Good.

2              MR. BUTERMAN:  Thank you.

3              THE COURT:  DX723 is received with those modifications

4     or observations.

5              (Defendant's Exhibit 723 received in evidence).

6     CROSS-EXAMINATION

7     BY MR. BUTERMAN:

8     Q.  Good morning, Mr. McDonald.

9     A.  Good morning.

10    Q.  I don't know if you remember me.  We did meet at your

11    deposition several months ago.  I am Lawrence Buterman, and I'm

12    an attorney with the United States.

13             Mr. McDonald, before we get into the substance too

14    deep, I do want to address one point.  Could you turn to

15    paragraph 17 of your declaration?  Do you have that, sir?

16    A.  Yes.

17    Q.  And do you see that you write in there, I believe it's the

18    third sentence, that, "Next week Mr. Moerer asked me to arrange

19    in-person meetings with each CEO for Mr. Moerer, Mr. Cue and

20    Kevin Saul, counsel for Apple, to meet individually at the

21    offices of each publisher in New York the following week, on

22    December 16 and 17."  Do you that, sir?

23    A.  I do.

24    Q.  Sir, are you aware that the meetings with the publishers

25    took place on December 15th and 16th, and not 16th and 17th?

D6JPUSA2                    McDonald - cross

1   A.  I don't recall specifically.

2   Q.  Before you wrote this sentence, did you check to see

3   whether -- what date those meetings took place?

4   A.  I did.

5          THE COURT:  You did or didn't?

6          THE WITNESS:  I did.

7          THE COURT:  You did.  Thank you.

8   Q.  Okay.  You do understand that that sentence is incorrect?

9   A.  At the time I wrote this, that's the date I found.

10  Q.  Now, Mr. McDonald, could you turn to Paragraph 22 of your

11  declaration, and I'm looking on Page 11, the sentence that

12  begins with the words "While it is difficult;" do you see that?

13  A.  I do.

14  Q.  And you testified, "While it is difficult to obtain

15  definitive information on market share, our best estimate that

16  the iBookstore comprises roughly 17 to 20 percent of the U.S.

17  eBook business."  Do you see that, sir?

18  A.  I do.

19  Q.  And do you stand by that sentence, sir?

20  A.  I do.

21  Q.  Are you aware that Mr. Cue testified at trial last week and

22  earlier this week, and during his testimony, he said that

23  Apple's market share was 25 percent?

24  A.  I am.

25  Q.  And you disagree with Mr. Cue?

D6JPUSA2                         McDonald - cross

1   A.  I do.  In this context, yes.

2   Q.  Sir, you are currently the manager of the US iBookstore at

3   Apple?

4   A.  Yes.

5   Q.  And you have been part of the iBookstore management team

6   since it launched; is that correct?

7   A.  Correct.

8   Q.  You currently have primary responsibility for the

9   day-to-day operations of the iBookstore; is that correct?

10  A.  Yes.

11  Q.  And included in that responsibility is managing the

12  promotions and sales of eBooks --

13  A.  Yes.

14  Q.  -- correct?  You've worked at Apple for eight years?

15  A.  Yes.

16  Q.  And you report directly to Keith Moerer?

17  A.  Yes.

18  Q.  And Mr. Moerer is the director of iTunes, correct?

19  A.  Correct.

20  Q.  Could you turn to paragraph 8 of your declaration, sir?  Do

21  you see that in the second sentence you write, "When we opened

22  our iBookstore in April 2010, 60,000 eBook titles were

23  available to the consuming public"?

24  A.  Yes.

25  Q.  "Today, readers can download more than 1.5 million eBooks;"

1   do you see that, sir?

2   A.  I do.

3   Q.  And that follows a sentence that you write, which you say

4   based on your personal experience, "Apple's decision to launch

5   an iBookstore has fundamentally transferred the eBook market,"

6   correct, sir?

7   A.  Correct.

8   Q.  Now, sir, the growth in number of titles that you're

9   referring to, from 60,000 to 1.5 million, that's the growth

10  that took place on Apple's iBookstore, correct?

11  A.  Correct.

12  Q.  So, in other words, 60,000 eBook titles were -- There were

13  more than 60,000 eBook titles available to the consuming public

14  in April of 2010, correct?

15  A.  That's correct.

16  Q.  And just so we're clear, the growth that you're talking

17  about is just the growth that took place on the iBookstore,

18  correct?

19  A.  The growth in catalog, correct.

20  Q.  Now, could you turn to paragraph 10 of your declaration,

21  sir?  And you testify in paragraph 10 of your declaration that

22  the eBooks business was a growth industry before Apple entered

23  it, correct?

24  A.  Which sentence are you referring to?

25  Q.  I think you can read through the entire paragraph and tell

1   me whether you believe that the eBooks business was a growth

2   industry before Apple entered?

3   A.   Okay.

4   Q.   And you see there's a sentence in there that says that,

5   "The industry reports I saw showed that the sales of eBooks

6   were increasing"?

7   A.   Yes.

8   Q.   And as early as 2008, it was your view that the growth of

9   eBooks was only likely to accelerate, correct?

10  A.   Correct.

11  Q.   Now, if you look at paragraph 16 of your declaration, in

12  paragraph 16 of your declaration you discuss the fact that the

13  growth in eBooks went from one percent to four -- to five

14  percent of large publisher revenue in just one year.  Do you

15  see that, sir?

16  A.   Yes.

17  Q.   And so given this tremendous -- this trend of tremendous

18  growth, you're not suggesting that all new eBook titles since

19  April of 2010, are the result of Apple's entry, correct?

20           MS. RUBIN:   Objection.

21           THE COURT:   Overruled.

22  A.   Can you repeat the question, please?

23  Q.   Given this growth that you note in paragraph 16, you're not

24  suggesting that all new eBook titles since April of 2010 are

25  the result of Apple's entry, correct?

D6JPUSA2                         McDonald - cross

1   A.  No.

2   Q.  In fact, you don't know how many eBook title may or may not

3   have been available, may or may not have become available as a

4   result of Apple's entry, correct?

5   A.  Can you rephrase the question, please?

6   Q.  Sure.  You can't tell us how many eBook titles came onto

7   the market specifically because of Apple's entry in 2010,

8   correct?

9   A.  I can't at this time.

10   Q.  You cannot?

11   A.  I cannot at this time, no.

12   Q.  Now, looking at paragraph 14 of your declaration, sir, I

13   just want to make sure I understand your testimony correctly.

14   Is it your testimony that you believe that the iPod touch and

15   the iPhone provide a better reading experience than existing

16   e-readers in 2009?

17   A.  I do believe that, yes.

18   Q.  And that included the Amazon Kindle?

19   A.  I do.

20   Q.  And the Barnes and Noble NOOK?

21   A.  I believe so, yes.

22   Q.  Now, sir, isn't it true that in 2009, prior to Apple's

23   entry, there were a variety of e-reader apps that were already

24   available to consumers on Apple's devices, including the iPhone

25   and the iPod touch?

1   A.  That's correct.

2   Q.  Amazon's Kindle reader was one of those apps, correct?

3   A.  Yes.

4   Q.  Barnes and Noble's NOOK e-reader app was one of those,

5   correct?

6   A.  Yes.

7   Q.  Kobo's e-reader app also existed prior to Apple's entry,

8   correct?

9   A.  I believe so.

10  Q.  And there were also other e-reader apps, were there not,

11  including Stanza in Fictionwise that were available prior to

12  Apple's entry?

13  A.  Yes.

14  Q.  And, in fact, the Stanza e-reader app had been downloaded

15  approximately 500,000 times as of December 2008, correct?

16  A.  I don't recall.

17  Q.  Does that number sound out of whack to you?

18  A.  It does not.

19  Q.  And those e-reading apps from Amazon, Barnes and Noble,

20  Sony and others, they continue to be available on Apple's

21  devices today, including the iPad, correct?

22  A.  Yes.

23  Q.  And to your knowledge, at no point in time during Apple's

24  consideration of whether to enter the eBooks market, did Apple

25  intend to forbid other providers of e-reader apps from making

1    their products available to consumers on the iPad, correct?

2    A.  Not that I'm aware of.

3    Q.  In other words, regardless of whether Apple launched the

4    iBookstore, e-reader apps would have still been available on

5    the Apple App Store and available to iPad users, correct?

6    A.  That's correct.

7    Q.  And the iPad, to your knowledge, would have launched

8    regardless of whether Apple launched its own e-reader app,

9    correct?

10   A.  I assume so.

11   Q.  Now, you testified in paragraph 40 of your declaration that

12   Apple developed software innovations that arose from Apple's

13   launching of the iBookstore; is that correct?

14   A.  Where in that paragraph are you referring?

15   Q.  "Apple's technical innovations all arising from Apple's

16   launching of the app bookstore have expanded the various ways

17   that various retailers now compete in the eBooks industry"?

18   A.  Correct.

19   Q.  And, for example, if you look at paragraph 26 of your

20   declaration, you testified that Apple has added eBooks not

21   available in physical form, like eBooks enhanced with audio and

22   video, correct, sir?

23   A.  Correct.

24   Q.  But, sir, in 2009, prior to Apple's entry, there were

25   eBooks with audio and video capability; were there not?

1   A.  I'm not sure.

2   Q.  Well, there were certainly eBooks in Apple's App Store that

3   had audio and video capability, correct, sir?

4   A.  I think that's probably correct.

5   Q.  And, in fact, even after Apple launched its iPad, isn't it

6   true, sir, that Amazon offered eBooks with embedded audio and

7   video before Apple did?

8   A.  That's correct.

9   Q.  And isn't it the case that the first version of iBooks that

10  went to consumers did not expressly support books with embedded

11  audio and video?

12  A.  That's correct.

13  Q.  And wouldn't you agree with me, sir, that enhanced --

14  eBooks enhanced with audio and video represent only a small

15  percentage of eBooks sold on the iBookstore?

16  A.  Can you define small?

17  Q.  Do you believe it's a large percentage, sir?

18  A.  I do not believe it's a large percentage.

19  Q.  Now, if you look at paragraph 30 of your declaration, you

20  testified that Apple's iBookstore transformed eBooks from

21  rudimentary black and white text; isn't that right, sir?

22          THE COURT:  Page 13, the bottom.

23          THE WITNESS:  Thank you.

24  A.  And which sentence are you referring to?

25          THE COURT:  The first sentence.

D6JPUSA2                         McDonald - cross

1              THE WITNESS:  Okay.

2   A.  Correct.

3   Q.  But in 2009, prior to Apple's entry, eBooks with color

4   capabilities did exist, correct?

5   A.  I'm not sure.

6   Q.  Well, for example, eBook apps with color capabilities

7   existed or eBooks with color capabilities existed in Apple's

8   App Store, correct?

9   A.  I'm not sure.

10  Q.  You have no reason to doubt that they did, though, correct?

11  A.  No.

12  Q.  And, in fact, sir, isn't it true that on the day that the

13  iPad launched, consumers could read eBooks in color through the

14  Kindle app, the same way that they could read them through the

15  iBooks app?

16  A.  That's correct.

17  Q.  And, sir, prior to Apple's entry, Amazon introduced its

18  Kindle app for the PC, correct?

19  A.  I don't recall.

20  Q.  Let me hand you an exhibit.  This is PX904.  And, sir, do

21  you see PX904 is a press release entitled "Introducing Kindle

22  for PX"?

23              MS. RUBIN:  I'm sorry, counsel.  I don't believe we

24  received a copy.

25              MR. BUTERMAN:  Oh, I thought you had.

1          MS. RUBIN:  Thank you very much.  I'm sorry, your

2    Honor.

3    Q.  Do you see PX904 is a press release entitled, "Introducing

4    Kindle for PC, a free application for reading Kindle books with

5    PC"?

6    A.  Yes.

7    Q.  And it's dated October 22nd, 2009?

8    A.  Correct.

9          MR. BUTERMAN:  Your Honor, we'd like to move PX904

10   into evidence.

11         MS. RUBIN:  No objection, your Honor.

12         THE COURT:  Received.

13         (Plaintiff's Exhibit 904 received in evidence)

14   Q.  So prior to Apple's entry, Amazon introduced its Kindle app

15   for the PC, correct?

16   A.  Correct.

17   Q.  And once Amazon introduced its Kindle app for the PC,

18   consumers could read eBooks on the PC with color capabilities,

19   correct?

20   A.  Correct.

21   Q.  And prior to Apple's launch of the iBookstore in April of

22   2010, Amazon also launched its Kindle for Mac application,

23   correct?

24   A.  I don't recall the dates.

25   Q.  Okay.  Sir, can you turn to PX621 in the binder that I just

```
 1    handed to you?  And, sir, do you see that PX621 is a press

 2    release entitled, "Introducing Kindle for Mac, the free

 3    application for reading Kindle books on the Mack now available

 4    in 100 countries"?

 5    A.  Yes.

 6    Q.  And the date of that is March 18th, 2010, correct, sir?

 7    A.  Correct.

 8    Q.  And that is before Apple's bookstore launch, correct?

 9    A.  Yes.

10    Q.  And --

11            THE COURT:  Is this in evidence, counsel?

12            MR. BUTERMAN:  Yes, it is, your Honor.

13    Q.  If you'd look at the document, do you see -- if you scroll

14    down to the sentence that begins with "Kindle for Mac readers

15    can take advantage of the following features," and then there

16    are a bunch of dots?

17    A.  Yes.

18    Q.  And you see that the third dot says, "Choose from 10

19    different font sizes and adjust words per line"?  Do you see

20    that, sir?

21    A.  I do.

22    Q.  And do you see the fifth dot says, "View notes and

23    highlights marked on Kindle, Kindle DX and Kindle for iPhone"?

24    A.  Yes.

25    Q.  And do you see the last one says, "Read books in full
```

1  color, including children's books, cookbooks, travel books and

2  textbooks"?

3  A.  Yes.

4  Q.  So, sir, it's fair to say that the ability to read eBooks

5  in color is not a technical innovation arising out of Apple's

6  launching of the iBookstore, correct?

7  A.  We were not the first to introduce color.

8  Q.  By the way, sir, this is a -- introducing a Kindle for Mac

9  application, can you read books from the iBookstore on a Mac?

10  A.  Not yet.

11  Q.  And you can't read books from the iBookstore on a PC

12  either, correct, sir?

13  A.  That's correct.

14  Q.  So can we now look at paragraph 31 of your declaration?

15  And you say in paragraph 31, "At Apple, we believe that paying

16  close attention to the details of the individual reader

17  experience is critical to win the competition with physical

18  books for the loyalty of a reader."

19          To that end, Apple has introduced or improved the

20  following features and functionality through the iBooks app for

21  eBooks when utilized on an Apple device."  Do you see that,

22  sir?

23  A.  I do.

24  Q.  So is it fair to say -- And you can take a look at the rest

25  of paragraph 31, which goes on for a little bit.  Is it fair to

1    say that what follows after that introductory sentence is your

2    discussion of a number of features and functionality that you

3    believe Apple either introduced or improved through its

4    e-reading software?

5    A.   Correct.

6    Q.   And you certainly aren't claiming that Apple created all of

7    these?

8    A.   Not all of these, correct.

9    Q.   And looking at -- And you are doing a comparison here of

10   the reading experience on the -- using the iBooks app versus

11   reading a physical book, correct, sir?

12            MS. RUBIN:   Objection.

13            THE COURT:   Overruled.

14   Q.   Isn't that what you say in the first sentence, sir?

15   A.   Correct.

16   Q.   And sitting here today, sir, and looking at paragraph 31,

17   can you tell me which, if any, of the features that you

18   mentioned in paragraph 31 would not be available to the public

19   if Apple had not -- had launched its iPad but not its

20   iBookstore?

21   A.   Can you repeat the question, please?

22   Q.   Sure.  Sitting here today, and looking at paragraph 31, can

23   you tell me which, if any, of the features that you list here

24   would be unavailable to the public if Apple had launched the

25   iPad but not an iBookstore?

D6JPUSA2                    McDonald - cross

1   A.   Sure.   And I need to work -- to read through this, and

2   you're just asking whether it was available and not improved,

3   correct?

4   Q.   I'm just wondering, if we lived in a world where there was

5   no iBookstore but there was an iPad, whether you can tell me

6   definitively that we wouldn't have some of these bulleted

7   features and functionalities that you discuss in paragraph 31?

8            MS. RUBIN:   Objection.

9            THE COURT:   Overruled.

10  A.   I'm going to take my time reading through this.

11  Q.   Well, you know what, sir, because -- let me see if I can

12  move us along.   Okay?

13  A.   Sure.

14  Q.   So let me just ask some specific questions.

15  A.   Okay.

16  Q.   And at the end, if you want to come back to answering this

17  question, we can come back to it.   So in paragraph 31, one of

18  the things you testify about is that Apple software allows

19  readers to select from a large variety of fonts and customize

20  font size, correct, sir?

21  A.   Correct.

22  Q.   And as we just saw a few moments ago, Amazon's Kindle app

23  for the Mac allowed that, sir; did it not?

24  A.   It did.

25  Q.   And, in fact, Amazon's Kindle app for the iPad, the first

D6JPUSA2                    McDonald - cross

1   Kindle app for the iPad that came out the day that the iPad

2   launched, the day that the iPad actually went to market,

3   allowed for choice in customizations of fonts; did it not?

4   A.  Correct.

5   Q.  Now, you also testified that Apple's software allows

6   readers to change the background color of the book pages from

7   white to sepia, correct, sir?

8   A.  Correct.

9   Q.  But, again, Amazon's first Kindle app for the iPad also

10  allowed readers to change the background color of the -- of

11  book pages, correct, sir?

12  A.  Correct.

13  Q.  And, indeed, Mr. McDonald, Apple was quite envious of the

14  Kindle app's sepia look because Amazon did it first; isn't that

15  true?

16  A.  I can't say.

17  Q.  I'm going to hand you what we've marked as PX902.  And,

18  sir, do you see PX902 as a e-mail, as an Apple e-mail?

19  A.  Yes.

20  Q.  And it's an e-mail entitled, "SJ iBooks review notes,

21  April 5th, 2010"?

22  A.  Correct.

23  Q.  That's a couple of days after the iBookstore's launch,

24  correct, sir?

25  A.  Yes.

1    Q.  And the SJ, you understand to be Steve Jobs?

2    A.  I assume so.

3    Q.  And you see that the e-mail was written from a Bill

4    Bachman.  Do you know who Mr. Bachman is?

5    A.  I do.

6    Q.  And who is he?

7    A.  I believe he was in charge of some of the design elements

8    of iBooks -- of the iBooks, the app.

9    Q.  And Mr. Bachman is writing to several high-level people at

10   Apple, correct?

11   A.  Correct.

12   Q.  Including Mr. Cue and Mr. Forstall; is that correct?

13   A.  Correct.

14          MR. BUTERMAN:  Your Honor, we'd like to offer PX902

15   into evidence.

16          MS. RUBIN:  No objection, your Honor.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 902 received in evidence)

19   Q.  And do you see that Mr. Bachman writes, "Here are my notes

20   of Monday's SJ review of iBooks"?

21   A.  Yes.

22   Q.  And it goes on to say that Mr. Jobs spent the first part of

23   the meeting comparing two different books on two different

24   iPads, one with the iBooks and one with the Kindle app.  Do you

25   see that, sir?

1    A.  Yes.

2    Q.  And then it goes on to say, "Overall, he thinks Amazon did

3    a good job with the app and felt it was worthy having us study

4    it."  Do you see that, sir?

5    A.  I do.

6    Q.  And then there's some more details on that, are there not?

7    A.  Yes.

8    Q.  For example, the first bullet after that says, "For

9    appearance settings, he likes the look of their default page

10   with text at 75 percent black."  Did I read that correctly,

11   sir?

12   A.  Yes.

13   Q.  "He likes the font Georgia and is interested in having us

14   add it."  Do you see that, sir?

15   A.  I do.

16   Q.  And "He doesn't like their white text on black page, but he

17   does like the look of their sepia, and he is interested in us

18   looking into adding sepia."  Do you see that, sir?

19   A.  I do.

20   Q.  So isn't it a fact, sir, that Apple's sepia feature in

21   iBooks wasn't an innovation at all?

22   A.  We didn't come out with it first, correct.

23   Q.  In fact, Apple just copied it from Amazon, correct?

24   A.  I can't speak to the nature of how we implemented it.

25   Q.  But that's what the document indicates, sir; does it not?

1   A.   That's what this document indicates, correct.

2   Q.   And so would you agree with me, sir, that at the very

3   least, the part of your declaration that talks about changing

4   the color of book pages from white to sepia as being an

5   innovation of the iBooks app isn't entirely accurate?

6   A.   Yes.

7   Q.   Now, you also mentioned in paragraph 31 of your

8   declaration, the optional page curl feature that simulates the

9   physical book experience and let's the reader turn the page,

10  correct, sir?

11  A.   Yes.

12  Q.   But Amazon's first Kindle app for the iPad also included an

13  optional page turn animation; did it not?

14  A.   I'm not sure.

15  Q.   Sir, I'm going to hand you what's been marked as PX899.

16  And, sir, do you see PX899 as a Amazon.com announcement of the

17  Kindle app for the iPad?

18  A.   Yes.

19  Q.   And it is dated April 2nd, 2010, sir?

20  A.   Yes.

21          MR. BUTERMAN:  We'd like to offer PX899, your Honor.

22          MS. RUBIN:  No objection.  I'm sorry, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 899 received in evidence)

25  Q.   And, sir, April 2nd, 2010, is that the day before the iPad

1    became available?

2    A.   That's the day before the iBookstore was launched.

3    Q.   And do you see that, if you look at the bullets, the

4    features of the Kindle app for the iPad, that if you look down,

5    the fourth one talks of page-turn animation?  Do you see that,

6    sir?

7    A.   I do.

8    Q.   So Kindle app for iPad offers an interactive experience

9    with page-turn animation designed to replicate the look of a

10   book -- of a page turning in a book, and then it goes on to say

11   that customers who prefer a simple, unadorned reading

12   experience can choose the basic reading mode option and turn

13   off the animation.  Did I read that correctly, sir?

14   A.   Yes.

15   Q.   And, in fact, Mr. McDonald, isn't it true that page-turn

16   animation was something that Apple was aware of as early as

17   February of 2009, as a feature that publishers were putting

18   into iBooks that they were selling on the App Store?

19   A.   I don't know.

20   Q.   Bear with me for one second, sir.  Sir, I'm handing you

21   what's been marked as PX901?

22              MS. RUBIN:  And again, counsel, can we have a copy?

23              MR. BUTERMAN:  I'm getting it.

24              MS. RUBIN:  Thanks so much.

25   Q.   And, sir, do you see that PX901 is entitled "Penguin U.S.

D6JPUSA2                          McDonald - cross

1   iPhone app"?

2   A.  Yes.

3   Q.  And, sir, do you see that if you turn to Page 3 of the

4   document, it says under 1.1 features, the 1.1 version of

5   Penguin's U.S. app was submitted in April -- excuse me, was

6   submitted to Apple in mid-February 2009?  Do you see that?

7   A.  I do.

8   Q.  And then it says the version of the Apple contained the

9   following additional features; do you see that, sir?

10  A.  I do.

11  Q.  And then if you go, look at the last of the bullets, it

12  says, "Excerpt reader functionality has been expanded to

13  include portrait or landscape reading, automatic text reflow,

14  five different font sizes, page-turning animation;" do you see

15  that, sir?

16  A.  I do.

17          MR. BUTERMAN:  Your Honor, we'd like to offer PX901

18  into evidence.

19          MS. RUBIN:  No objection, your Honor.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 901 received in evidence)

22  Q.  Now, sir, you had also -- Well, so, sir, let me ask you

23  again.  When you list in your declaration the page-curl feature

24  among the innovations that resulted from the iBooks app, that

25  too is not entirely accurate, correct, sir?

D6JPUSA2                        McDonald - cross

1  A.  Well, I qualify that as either introduced or improved.

2  Q.  Sitting here today, you can't explain how Apple's page

3  turn, page curl improved upon either the page curl that Penguin

4  sent to Apple in February of 2009 or that Amazon had on its

5  Kindle app for the iPad in April of 2010, correct, sir?

6  A.  That's correct.

7  Q.  And when you list in your declaration a large variety of

8  fonts and customizable font sizes among the innovations that

9  result from the iBooks app, that too is not entirely accurate,

10  correct, sir?

11  A.  Again, it did not introduce the font selection, but we

12  improved upon the display fonts.

13  Q.  And one of the ways that you improved upon fonts, as we saw

14  in one of the previous documents, was taking the fonts from

15  sources like Amazon that you believed looked nice, correct,

16  sir?

17  A.  That was a font that we added, correct.

18  Q.  And when you list in your declaration that the integrity of

19  the layout is preserved when a device is rotated, and you list

20  that as one of the innovations that resulted from the iBooks

21  app, that too is not entirely accurate, correct, sir?

22  A.  No, I disagree.

23  Q.  Well, the Penguin app that we just talked about showed

24  being able to look at documents in either portrait or landscape

25  mode, correct, sir?

1   A.  Correct.

2   Q.  And you understood that to be, since it was talking about

3   an iPhone app, reading with your iPhone either held vertically

4   or horizontally, correct, sir?

5   A.  Correct.

6   Q.  Now, you also talk in paragraph 31 about the ability to dim

7   or increase the backlighting for easy reading at night; do you

8   not, sir?

9   A.  Yes.

10  Q.  And Amazon's first Kindle app for the iPad also had the

11  capability of adjusting the screen's brightness from within the

12  app; did it not, sir?

13  A.  Yes.

14  Q.  Now, sir, can we look briefly at paragraph 28 of your

15  declaration, and I just want to make sure that we're on the

16  same page here.  Just to be clear, you're not claiming that

17  Apple created concepts of marketing campaigns, such as editor's

18  picks, best of the month or best of the year, correct, sir?

19  A.  That's correct.

20  Q.  And you're also not suggesting that these kinds of

21  marketing campaigns were unavailable at any of your

22  competitor's eBooks stores prior to April of 2010, correct,

23  sir?

24  A.  That's correct.

25  Q.  And similarly, if we look at paragraph 29 of your

1   declaration, you're not claiming that Apple created the concept

2   of marketing campaigns such as breakout authors or breakout

3   books, correct, sir?

4   A.  That's correct.

5   Q.  And you're not claiming that these kinds of marketing

6   campaigns were unavailable at any of your competitors' eBooks

7   store prior to Apple's launch, correct, sir?

8   A.  Yes.

9   Q.  Yes, you're not claiming that?

10  A.  That's correct.

11          MR. BUTERMAN:  Now, your Honor, would this be an

12  appropriate time for our break?

13          THE COURT:  Sure.  Why don't you step down, sir.

14          (Witness excused temporarily)

15          THE COURT:  So this is the very unpleasant part of the

16  trial, with the declining moments.  So I'm going to give you --

17  I'm going to check and confirm during our break where we stand

18  because, you know, I'm doing this a little on the fly, and I

19  think that the government has an hour and five minutes left and

20  Apple has 44 minutes left, something like that.

21          I'm going to confirm it.  Okay?  I think that should

22  be sufficient, that it's the rules of the game we've all lived

23  with for three weeks.  That's life.

24          We know a second thing.  We're having summations

25  tomorrow; so the evidentiary record will close today.  I'm not

D6JPUSA2                          McDonald - cross

1   doing anything else this afternoon.  I don't want to -- I don't

2   think you need more time, but if there was a joint application

3   and only a joint application, because everybody's lived with

4   the same understanding and the same rules, if there was a joint

5   application and you wanted to, you know, extend the time a

6   little bit today, fine with me.  Okay?  Thanks.

7            (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.

2          So, is Mr. McDonald around?  We'll start when he

3     returns.

4          Mr. McDonald, you can retake the stand.

5     ROBERT BRUCE McDONALD, resumed.

6          So, my law clerk informed counsel during the break

7     that my math was wrong and the government has an hour and 14

8     minutes left and Apple has, as I stated earlier, 44 minutes

9     left.

10          Counsel -- wait one minute.

11          You may begin.

12          MR. BUTERMAN:  Thank you, your Honor.

13     CROSS-EXAMINATION CONTINUED

14     BY MR. BUTERMAN:

15     Q.  Mr. McDonald, can you return to paragraph 36 of your

16     declaration.

17          Do you see, sir, that in paragraph 36 you testify that

18     "Shortly after Apple launched its iBookstore, Apple began to

19     create a groundbreaking authoring and publishing software tool

20     called iBooks Author that would allow virtually anyone to

21     create compelling books of all types."

22          Do you see that, sir?

23     A.  Yes.

24     Q.  To be clear, sir, the iBooks Author software was not

25     available to the public until January 2012, correct, sir?

1   A.  That's correct.

2   Q.  And that was two years, approximately, after Apple launched

3   it iBookstore, correct, sir?

4   A.  Approximately.

5   Q.  And you testified that iBooks Author lowered technical

6   barriers to entry to create an eBook, correct, sir?

7   A.  Yes.

8   Q.  But there are other self-publishing tools such as Lulu and

9   Smashwords that existed prior to iBooks Author, correct, sir?

10  A.  I don't think you can compare the self-publishing tools --

11  I disagree.

12  Q.  Sir, my question was there were other self-publishing tools

13  such as Lulu and Smashwords that already existed prior to

14  iBooks Author coming onto the market, correct, sir?

15  A.  I'm not familiar with the tools that you're referring to.

16  Q.  So you don't know whether they existed before --

17  A.  I know the organizations existed.  I don't know about the

18  tools you're referring to.

19  Q.  So, you would agree with me, though, sir, it's not the case

20  that the existence of eBook self-publishing tools was a

21  technical innovation arising out of the launch of the

22  iBookstore, correct, sir?

23  A.  No.  I disagree.

24  Q.  You're saying that the existence of eBook self-publishing

25  tools as a technical innovation across the world arose out of

1   the launch of the iBookstore?  Is that your testimony, sir,

2   under oath?

3   A.  Can you repeat that sentence that you're referring to,

4   please.

5   Q.  Is it your testimony here today, sir, that the existence of

6   eBook self-publishing tools was a technical innovation that

7   arose throughout the world out of the launch of the iBookstore?

8   A.  IBookstore or iBooks Author?

9   Q.  No.  IBookstore, sir.

10  A.  I need to read this, please.  Where are you referring to?

11  Q.  You talk about iBooks Author in paragraphs 37 -- well, 36

12  but I'm looking at paragraphs 37 and 38.

13  A.  Okay.  Please.

14  Q.  Is it your testimony here, sir, that the existence of eBook

15  self-publishing tools was a technical innovation that arose

16  throughout the world as a result of the launch of the

17  iBookstore?

18  A.  Yes.

19  Q.  So there may have been self-publishing tools that existed

20  before iBook -- the iBookstore, correct, sir?

21  A.  Correct.

22  Q.  And yet your testimony is still that the existence of eBook

23  self-publishing tools only came about through the iBookstore?

24  A.  No.  That's incorrect.

25  Q.  Okay.  So I just want to make sure that we're on the same

D6j9usa3                      McDonald - cross

1    page here.

2              It is not your testimony that eBook self-publishing

3    tools was a technical innovation that arose from the launch of

4    the iBookstore, correct, sir?

5    A.  Can you -- are you asking a question?  Or are you referring

6    to something in this document that I can look at?

7    Q.  No.  I'm asking you a question, sir.

8    A.  Okay.  Can you repeat the question, please.

9    Q.  Sure.

10             It is not your testimony that eBook self-publishing

11   tools was a technical innovation that arose from the launch of

12   the iBookstore, correct, sir?

13   A.  I think that's correct.  I think it's correct that --

14   Q.  Thank you.

15   A.  Yeah.

16   Q.  Now, sir, you testified that iBooks Author has transformed

17   the book industry, correct?

18   A.  Yes.

19   Q.  That's your view?

20   A.  Yes.

21   Q.  And there are 1.5 million eBooks available for consumers to

22   download just on the iBookstore today, correct, sir?

23   A.  The number is 1.8 million now.

24   Q.  1.8 million.

25             Sir, isn't it true that only 18,000 titles have been

D6j9usa3                       McDonald - cross

1  created using the iBooks Author?

2  A.  Now 21,000.  Yes.

3  Q.  Your declaration at paragraph 38 refers to 18,000, correct,

4  sir?

5  A.  Yes.

6  Q.  And so now it's at 21,000 out of 1.8 million; is that

7  correct, sir?

8  A.  Correct.

9  Q.  And your testimony is that iBooks Author has transformed

10 the book industry?

11 A.  Do I use those exact words, "transformed the book

12 industry"?

13 Q.  I believe you do, sir.

14        Would you agree with me that that's a slight

15 exaggeration?

16 A.  No.  I don't agree.

17 Q.  Well, sir, you talk about the book industry.  When an

18 author creates a book using iBooks Author, that book can only

19 be distributed through the iBookstore, correct?

20 A.  That's correct.

21 Q.  So, in other words, by using the iBooks Author software, a

22 consumer -- excuse me.  By using -- yes.  By using the iBooks

23 Author software, the user has no choice but to sell the content

24 on the iBookstore, correct, sir?

25 A.  That's correct.

1   Q.  The iBookstore, as you testified -- or let me back that up.

2          You testified earlier that Apple has only between 17

3   and 20 percent of the eBooks market, correct, sir?

4   A.  (No response).

5   Q.  That was your testimony earlier?

6   A.  Yes.

7   Q.  Okay.  And so you're telling me -- you're testimony this

8   Court that a product developed two years after the iBookstore

9   launch, you're telling me that a product that accounts for

10  21,000 of 1.8 million titles on a store, that only sells

11  20 percent of the total books that are sold, eBooks that are

12  sold in the country, transformed the book industry, sir?

13  A.  I agree with that, yes.

14  Q.  By the way, isn't it the case that Apple's iBook Author was

15  originally launched to support textbooks, not trade eBooks?

16  A.  That was launched with a dozen textbooks.  And we also

17  introduced about four trade titles at that time.

18  Q.  It was originally designed -- it was originally launched to

19  support textbooks primarily, correct, sir?

20  A.  I don't think we intended to solely support textbooks at

21  that time.  I think we knew that there would be uses for the

22  trade part of the business as well.

23  Q.  Now, you testified that in -- and you can look at paragraph

24  33 of your declaration -- that as a direct result of launching

25  the iBookstore, Apple developed the fixed layout ePub format,

D6j9usa3                    McDonald - cross

1   also called fixed layout, correct, sir?

2   A.  Yes.

3   Q.  And isn't it the case that when iBooks first launched,

4   iBooks 1.0 it did not support fixed layout?

5   A.  That's correct.

6   Q.  It was only a later version of iBooks that supported fixed

7   layout, correct, sir?

8   A.  That's correct.

9   Q.  Now, sir, I want to move on to something slightly

10  different.

11          You were informed around January 4 that Apple intended

12  to propose an agency model to the publishers, correct?

13  A.  I don't recall the exact date but I believe it was in

14  January.

15  Q.  And you were informed by Mr. Moerer over the phone that

16  agency was how Apple was going to proceed, correct, sir?

17  A.  At some point, yes.

18  Q.  And prior to that occasion you did not know that Apple

19  intended to propose an agency model, correct, sir?

20  A.  That's correct.

21  Q.  And isn't it true, sir, that at no time in 2009, and

22  leading up to the signing of the Apple agency agreements, did

23  any senior executive tell you that Apple would not enter the

24  eBook market absent agency being the form of business model?

25          MS. RUBIN:  Objection, your Honor.  It's beyond the

D6j9usa3                              McDonald - cross

1   scope.

2           MR. BUTERMAN:  Your Honor, in paragraph 3 Mr. McDonald

3   discusses -- sorry.  Starting in paragraph 2 he discusses his

4   responsibilities.  He specifically discusses the negotiations

5   when he talks about in paragraph 16 and 17 the early -- in

6   paragraph 17, the meetings that he had in December of 2009 with

7   the publishers.  And this is all leading to another

8   conversation regarding MFNs which is the topic that

9   Mr. McDonald testifies about in his declaration.

10          THE COURT:  Overruled.

11  Q.  So, Mr. McDonald, my question was isn't it true that at no

12  time in 2009 and leading up to the signing of the Apple agency

13  agreements did any senior executive tell you that Apple would

14  not enter the eBooks market absent agency being the form of the

15  business model?

16  A.  I don't recall anyone saying that to me.

17  Q.  Do you recall being deposed in this matter, sir?

18  A.  I do.

19  Q.  Mr. McDonald, I'm handing you a copy of your deposition

20  transcript, okay.  I'm going to direct you to a line and a page

21  and I'm going to ask you just to look at what I direct you to?

22          MR. BUTERMAN:  Would your Honor like copies of the

23  transcript?

24  Q.  So, sir, it's in the -- it's on the bottom stack.  I want

25  to direct your attention to page 241, line 21 through 242, line

1   2.  I want you to find that, sir, and I just want you to read

2   it to yourself.

3   A.  From which line to which line?

4   Q.  From 241, line 21 through 242, line 2.  I just want you to

5   read it to yourself.  Not out loud, sir.

6              Now can you put that aside, sir.

7              Now, sir, did reading that passage refresh your

8   recollection as to whether at any point in time in 2009 and

9   leading up to the signing of the Apple agency agreements,

10  whether any senior executive told you that Apple would not

11  enter the eBook market absent agency being the form of business

12  model?

13  A.  Yes.

14  Q.  Can you tell me what the answer to the question is.

15  A.  No.

16  Q.  Now, once the iBookstore opened, you were the person

17  initially responsible for managing the five largest publisher

18  accounts; that is, HarperCollins, Penguin, Macmillan,

19  Simon & Schuster, and Hachette; is that correct, sir?

20  A.  That's correct.

21  Q.  And as part of your responsibility managing these accounts

22  you understood that the Apple agency agreements, including the

23  application of the pricing MFN clause -- I'm sorry.  Let me

24  start that again.

25              As part of your responsibility managing these

1   accounts, you understood the Apple agency agreements, including

2   the application of the pricing MFN clause contained in the

3   agreements, correct, sir?

4   A.  That's correct.

5   Q.  And Mr. McDonald, you testified in your direct -- and I

6   believe it's at paragraph 41 -- that from the early days of the

7   iBookstore, with Apple's encouragement, publishers have

8   experimented with pricing.

9           Is that accurate, sir?

10  A.  That is.

11  Q.  But, sir, when you were deposed in this matter you had a

12  different understanding with respect to eBook titles subject to

13  the Apple agency agreements, did you not, sir?

14  A.  I'm not sure what you're referring to specifically.

15  Q.  Well, sir, at the time of your deposition isn't it true

16  that in your understanding that as a result of the agency

17  agreements, the price for a particular title, subject to the

18  agency agreement, would be the same across eBook retailers?

19  A.  Can you ask the question again, please.

20  Q.  Sure.  At the time of your deposition it was your

21  understanding that as a result of the agency agreements the

22  price for a particular eBook title that was subject to the

23  agreements would be the same across eBook retailers, correct?

24  A.  I don't recall what I said in my deposition.

25  Q.  Okay.  Well, if you could pull up the deposition I want you

D6j9usa3                    McDonald - cross

1    just to look again at -- to yourself at paragraph -- at page

2    250, lines 2 through 14.

3              Could you close that, sir.

4              Now, does looking at that refresh your recollection as

5    to what your understanding was regarding the agency agreements

6    and how they impacted the price of particular eBook titles

7    subject to the agreements?

8    A.  I'm not sure I follow your question.

9    Q.  Okay, sir.

10             As a result of the Apple agency agreements with the

11   pricing MFNs, is Apple able to compete on price with Amazon for

12   their titles?

13   A.  Today?

14   Q.  No.  After signing the agreements.

15   A.  If a publisher has the same price, if it was agency in our

16   store and agency elsewhere, those prices were the same.

17   Q.  And so in other words, sir, after Apple signed its agency

18   agreements with its MFN and its iBookstore went live, with

19   respect to the publisher defendants' titles, isn't it true that

20   the prices were the same?

21   A.  Yes.

22   Q.  And as a result of the prices being the same, you

23   understood that there could be no price competition, correct,

24   sir?

25             MS. RUBIN:  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you define price competition and

3   between whom.

4   Q.  Sir, now you can pull open your deposition and I'm going to

5   read to you the following question and answer.  And I want you

6   to look at page 251 -- actually, we'll start with 250, 2

7   through 14.  Okay, sir.  Do you have that?

8   A.  Yes.

9   "Q.  Fair enough.  It was tough to follow.

10          "Do you believe that Apple competes on price with

11   Amazon for the same titles by the same publisher under an

12   agency contract?

13          "Mr. Floyd:  Objection.  Vague and ambiguous.

14          "Mr. Miller:  Calls for opinion and conclusion.

15          "The witness:  Publisher who has the same price?  So

16   it's agency on our store as well as agency on Amazon.

17          I may be missing the question, but I'm not sure how

18   you compete price if the price is the same in that case."

19          Did you give that -- excuse me.  Did I read that

20   question and answer correctly?

21   A.  You did.  Yes.

22   Q.  Do you recall giving that testimony?

23   A.  I do.

24   Q.  And that testimony is true and accurate, correct, sir?

25   A.  Yes.

D6j9usa3                    McDonald - cross

1   Q.  And I'd like to you also look at 251, lines 2 through 9.

2   I'm going to read those also.

3   "Q.  I'm not talking about the settling pubs.  I'm talking

4   about the litigating publishers.  Are you able to compete on

5   price with Amazon for their titles?

6           "Mr. Miller:  It's vague.

7           "The witness:  The price is the same so I may be

8   missing the question.  But I'm not sure you can compete on

9   price if the price is the same."

10          Did I read that correctly, sir?

11  A.  You did.

12  Q.  And did you give that testimony during your deposition?

13  A.  I did.

14  Q.  And was it true and accurate?

15  A.  Yes.

16  Q.  Now, sir, you can turn -- if you could turn to paragraph --

17  you can put that aside.  Thank you.

18          Mr. McDonald, if you could turn to paragraph 21 of

19  your declaration.  Do you have that, sir?

20  A.  I do.

21  Q.  And isn't it true, sir, that after the Apple agency

22  agreements went into effect and the iBookstore was launched,

23  your team was responsible for enforcing the retail price MFN?

24  A.  Initially the first few weeks, I believe, that was handled

25  by the operations team.  But after a few weeks, yes, my team

D6j9usa3                          McDonald – cross

1   was focused on this, yes.

2   Q.  And pursuant to that responsibility your team initially

3   evaluated for a limited set of titles how the prices at another

4   retailer, typically Amazon, compared with the prices on the

5   iBookstore; is that correct?

6   A.  That's correct.

7   Q.  You say in that sentence, in paragraph 21, "usually."  Why

8   do you use the qualifier usually?

9   A.  Well sometimes it was more.

10          The audit that we did of titles happened formally on a

11  weekly basis, but we were looking at titles on a daily basis.

12  Q.  And you weren't looking at all titles, were you, sir?

13  A.  No.

14  Q.  In fact, you were looking at a limited set of titles,

15  correct, sir?

16  A.  That's correct.

17  Q.  And those were a limited set that you chose to look at,

18  correct, sir?

19  A.  Yes.

20  Q.  But after your assessment of initial compliance, a decision

21  was made that employee resources were better spent building the

22  store rather than enforcing compliance with the MFN; isn't that

23  so?

24  A.  That's right.

25  Q.  And as a result, Apple generally does not enforce any of

1  the price matching MFNs in the Apple agency contracts, correct,

2  sir.

3  A.  That's incorrect.

4  Q.  Does Apple enforce its price matching MFNs today, sir?

5  A.  We talk to publishers where their prices are out of whack.

6  Q.  That's something that you continue to do today?

7  A.  Yes.

8  Q.  Sir, could you turn to page 215 of your deposition.

9         Your deposition was dated -- took place in December of

10  2012, correct, sir?

11  A.  Yes.

12  Q.  And could you turn -- so you're on page 215?

13  A.  Yes.

14  Q.  I'm going to read to you from your deposition starting at

15  line 15 on 215.  Okay.  I'd like you to follow with me.

16         "Do you still enforce any of your price matching

17  MFNs?"  That was --

18  "Q.  Do you still enforce any of your price matching MFNs?

19  "A.  It's not something we've done, to my knowledge, in a

20  while.

21  "Q.  How long is a while?

22  "A.  I'd say most of the year.

23  "Q.  And that's because you found it was just too costly to

24  devote the resources?

25  "A.  I think it's mainly that.  And whether or not it was

D6j9usa3                          McDonald - cross

1    conscious, I believe it now.  And I think the marker is a more

2    effective way to track that.  And if a publisher, you know,

3    decides to price their books at full list and they don't see

4    sales, and they're seeing sales elsewhere, they have the

5    ability to change their own prices.  So they may decide to do

6    so."

7                 And then I'd like you to look at page 2 -- let me

8    stop, sir.

9                 Do you recall being asked those questions and giving

10   those answers?

11   A.  I do.

12   Q.  And is that testimony truthful?

13   A.  Yes.

14   Q.  Now I'd like you to look at page 214, lines 4 through 22 of

15   your deposition.

16                 Do you have that, sir?

17   A.  I do.

18   Q.  I'm going to read again.

19   "Q.  How does Apple -- sorry, you're done with that document.

20   How does Apple go about enforcing its price MFN in its eBook

21   contracts?

22   "A.  For the most part we don't.  I think initially we

23   looked -- we looked at -- on a weekly basis, we would look at a

24   set, a limited set of titles to see how those -- how that

25   content was being priced on our store versus elsewhere.  We

1    haven't done that as much of late.

2              "Why not?

3    "A.  Ultimately did not have the bandwidth or the automation or

4    the technology to do this in any scalable way.

5    "Q.  If you could automate it, would you do it?

6              "Mr. Floyd:  Objection.  Calls for speculation.

7              "The witness:  Yeah.  It's hard to say.  I'm not

8    sure."

9              Did you give that testimony during your deposition,

10   sir?

11   A.  I did.

12   Q.  And was it truthful?

13   A.  Yes.

14   Q.  And in that testimony, sir -- and I'm specifically

15   referring to the testimony that you gave in page 215 of your

16   deposition, you say that the market is ultimately a more

17   effective way to track prices rather than through an MFN; is

18   that correct, sir?

19   A.  Correct.

20   Q.  Sir, if the market were a more effective way to track

21   prices than the MFN, there would have been no need for an MFN

22   in the Apple agency agreements in the first place, correct,

23   sir?

24   A.  I can't say.

25   Q.  Isn't it actually the case that after the pricing MFN

1   accomplished its purpose of moving the industry to an agency

2   model Apple wasn't concerned about actually enforcing its low

3   price guarantee?

4   A.  No.  That's not correct.

5          MR. BUTERMAN:  I have no further questions at this

6   time.

7   REDIRECT EXAMINATION

8   BY MS. RUBIN:

9   Q.  Good afternoon, Mr. McDonald.

10  A.  Good afternoon.

11  Q.  Mr. Buterman just directed your attention to page -- I'm

12  sorry, paragraph 21 of your declaration with respect to the MFN

13  enforcement.

14         Do you recall that?

15  A.  Yes.

16  Q.  And in your direct testimony you say that to enforce the

17  MFN your team "initially evaluated, usually on a weekly basis,

18  a limited set of titles to compare prices in the iBookstore

19  with prices for the same title at other eBook retailers,

20  typically Amazon, by far the largest competitor.

21         Is that still your testimony, sir?

22  A.  Yes.

23  Q.  You go on to say, "We've learned through those efforts over

24  time that publisher compliance with the MFN was generally

25  good."

1    A.   Yes.

2    Q.   Can you describe for the Court how you understood that

3    publisher compliance with the MFN was generally good, as you

4    say here in paragraph 21?

5    A.   Sure.  Well we would audit a set of titles, usually about

6    300 a week.   Initially we found maybe a dozen prices were not

7    competitive.   That number of titles reduced over time.

8    Q.   When you say initially you found a dozen that were not

9    competitive, where you found titles where publishers were not

10   in compliance with the MFN, what did you and your team do?

11   A.   We would call or e-mail the publisher and let them know

12   that they are in violation of the MFN.

13   Q.   Mr. McDonald, under the Apple agency agreements as you

14   understood them, who bore the responsibility for MFN

15   enforcement?

16   A.   Both myself and -- myself.

17   Q.   And let me clarify my question.  Who was responsible for

18   lowering the prices where a publisher was out of compliance

19   with the MFN?

20           MR. BUTERMAN:  Objection.

21           THE COURT:  Do you understand the question?

22           THE WITNESS:  I do.

23           THE COURT:  You may answer.

24           THE WITNESS:  Well, publishers are ultimately

25   responsible for lowering their own -- for changing their

1  prices, lowering it.  We also felt like it was our

2  responsibility to make sure they are doing so.

3  Q.  But it was generally your expectation that publishers would

4  comply with the MFN because under the contracts the

5  responsibility was theirs to lower prices, correct?

6  A.  That's correct.

7            MR. BUTERMAN:  Objection.

8            THE COURT:  Sustained.  Stricken.

9  Q.  Mr. McDonald, did you understand that publishers would

10 generally abide by the MFN by lowering prices where there was a

11 lower available customer price?

12           MR. BUTERMAN:  Objection.

13           THE COURT:  Sustained.

14 Q.  Mr. McDonald, you say in paragraph 21 of your declaration

15 that eventually your weekly efforts lessened.

16           Mr. Buterman asked you some questions about this and

17 you said -- he asked you whether your resources were better

18 spent building the store and you agreed with him, that they

19 were.

20           Why were your resources better spent building the

21 store as opposed to monitoring the MFN?

22           MR. BUTERMAN:  Objection.

23           THE COURT:  Yes.  I think actually if I remember

24 correctly that was read from the deposition testimony.  It

25 wasn't Mr. Buterman who said it.  It was the witness.  So if

1   you want to ask -- rephrase the question.

2           MS. RUBIN:  I'd be happy to, your Honor.

3   Q.  Mr. McDonald at your deposition and again today you have

4   confirmed that there came a point in time where Apple's

5   resources were better spent building the bookstore.  Do I

6   understand your testimony correctly?

7   A.  Yes.

8   Q.  Why was that?

9   A.  Well because publishers were complying and they were

10  lowering the prices.  And the instances of us finding examples

11  were so, so few that it no longer required weekly monitoring.

12  Q.  Mr. McDonald, when we looked at -- Mr. Buterman showed you

13  some passages from your deposition about the MFN.

14          Did you understand Apple's MFNs to cover all eBooks?

15  A.  No.

16  Q.  Which eBooks did you understand to be covered by Apple's

17  MFN in these agency agreements?

18  A.  New releases.

19  Q.  So would that be one reason when -- I'm sorry.  Withdrawn.

20          Would that be one reason why Apple would not enforce

21  an MFN with respect to a disparity between titles?

22          MR. BUTERMAN:  Objection.

23          THE COURT:  Sustained.  Form.

24  Q.  Mr. McDonald, to the extent that you found a price

25  disparity between titles that were not covered by the MFN, did

1    you and your team ask a publisher to adjust the prices?

2              MR. BUTERMAN:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes, we did.

5    Q.  And why would you do that?

6    A.  Because we wanted to be price competitive.

7    Q.  So, is it your testimony here today, sir, that even where

8    the MFN was not in effect, there were occasions where you asked

9    publishers to lower their prices?

10   A.  Yes.

11   Q.  And, again, sir could you describe to the Court the

12   circumstances that would lead to you requesting that a

13   publisher do that.

14   A.  Sure.  Sometimes we see that a publisher's sales are not

15   tracking with other publishers, other peer publishers or the

16   iBookstore itself.  And when that happens one thing we will do

17   is look at pricing.  And, you know, if we see that a set of

18   their titles is not being priced competitively, we'll let that

19   publisher know and we'll talk about it and see if, you know --

20   we'll talk about whether pricing is the reason.

21   Q.  And how do publishers typically react to those

22   conversations?

23   A.  You know, I think they've been receptive overall.  I think

24   it's important to show data.  And the sorts of data that we

25   typically show is, you know, you're making more money by

1    offering this title or these sets of titles with some kind of a

2    discount than not.

3    Q.  Mr. McDonald in your capacity as manager of the U.S.

4    iBookstore do you have occasions to talk to publishers during

5    your average work week?

6    A.  I do.

7    Q.  On average, how many times per week do you talk to

8    publishers?

9    A.  Me personally, anywhere from five to ten conversations.

10   Q.  And what about your team, sir?

11   A.  I would say dozens.  They all have weekly calls with key

12   accounts.  They're on the phone almost the entire -- entire

13   week.

14   Q.  And the types of conversations that you were just

15   describing to me, are those conversations that you and your

16   team still have with publishers to this day?

17   A.  They are.

18   Q.  When was the last time you recall personally having a

19   conversation with a publisher to bring to their attention

20   pricing disparities for higher prices on the iBookstore that

21   you believe inhibited that publisher from being competitive on

22   your store?

23           MR. BUTERMAN:  Objection.

24           THE COURT:  Overruled.

25           THE WITNESS:  Just last week.

1   Q.  Tell the Court about that conversation, sir.

2   A.  Sure.  Similar to the example I just gave where their sales

3   were not doing well and I don't think they were paying very

4   close attention to their -- the pricing on their titles.  And I

5   thought we gave a very compelling case that showed that by, you

6   know, offering some kind of discount, by being competitive --

7   by offering a competitive price on our platform they would

8   benefit.

9   Q.  Why would they benefit from offering a competitive price on

10  your platform?

11  A.  Well they would sell more books.

12  Q.  And is it your position generally that where a publisher

13  lowers its prices they'll sell more books on the iBookstore?

14  A.  Generally.

15  Q.  Are there exceptions to that, sir?

16  A.  Sure.  You know, there's a range of -- customers are --

17  price is one factor in what drives sales.  We do typically see

18  sales volume increase when prices are lowered.  But that's not

19  always the case.

20  Q.  Mr. McDonald, I want to move on to a different topic.

21  Earlier today during cross-examination by counsel, counsel

22  pointed your attention to two exhibits, PX621 and PX904.  One

23  is a press release from Amazon covering Kindle for a Mac.  The

24  other is a press release covering Kindle for a PC.  And in

25  particular Mr. Buterman drew your attention to certain of the

1    bullet points in each of these press releases.

2                Do you recall that?

3    A.  Yes.

4    Q.  Mr. McDonald, you say in your direct testimony that you

5    were a person at Apple responsible for exploration of -- I'm

6    sorry -- investigation of the eBooks industry as Apple was

7    exploring entering it; is that correct, sir?

8    A.  Yes.

9    Q.  And as part of that, did you look at e-reader applications

10   for the PC?

11   A.  Not typically.

12   Q.  Why not?

13   A.  They weren't gaining much traction.  Not a lot of people

14   were buying books from those places.

15   Q.  Is it fair to say that e-reader applications for the PC and

16   for the Mac were, in your view, a negligible part of the eBooks

17   industry at that point in time?

18               MR. BUTERMAN:  Objection.

19               THE COURT:  Sustained.

20   Q.  Did you have a view as to what portion of the eBooks

21   industry applications for PCs or Macs constituted at that point

22   in time?

23   A.  Very small.

24   Q.  I want to draw your attention back to paragraph 31 of your

25   declaration, Mr. McDonald, if we could, where you describe a

D6j9usa3                      McDonald - redirect

1   number of features and functionality that in your testimony

2   were introduced or improved through the iBooks app for eBooks

3   when utilized on an Apple device?

4   A.  Yes.

5          MS. RUBIN:  Your Honor, for illustrative purposes we'd

6   like to bring to Mr. McDonald for his use Defendant's Exhibit

7   530 and Defendant's Exhibit 529.  These are the first

8   generation iPad launched on April 3, 2010 and the new iPad.

9   These have been provided to the government and the Court in

10  connection with Apple's pretrial submissions on April 26.

11         MR. BUTERMAN:  Objection.

12         MS. RUBIN:  Your Honor, we seek to offer these --

13         THE COURT:  Overruled.

14         MS. RUBIN:  One moment, your Honor.

15         Your Honor, may I stop the clock to have a

16  conversation with counsel about the time allocation that your

17  Honor described before the break?

18         Your Honor, we asked counsel if they would stipulate

19  to an extension of 30 minutes on both sides.  I just want to

20  represent for the record that counsel's representation was a

21  no.

22  Q.  Mr. McDonald, if I could, could I ask you to turn on the

23  first generation iPad that's Exhibit DX529.

24  A.  Yes.

25  Q.  You'll see -- could I ask you to go to the iBooks

1   application.  You'll see that this has been preloaded with a

2   series of books?

3   A.  Yes.

4   Q.  Do you recognize some of these books, Mr. McDonald?

5   A.  I do.

6   Q.  Mr. McDonald, in paragraph 31, you describe a host of

7   features and functionalities that were improved or enhanced

8   through the introduction of the iPad.

9         Can you describe for me, looking at the books in the

10  iPad, some of these features?

11        MR. BUTERMAN:  Objection to form.

12        THE COURT:  Overruled.

13  Q.  Well let's start with the page curl function.

14  A.  Sure.

15  Q.  Mr. Buterman asked you some questions about page curl or

16  page turning animation functions that were available on the

17  Penguin for iPhone app as well as available on the Kindle app

18  that was launched on April 2, 2010.

19        First, do you remember the launch of the iPad in

20  January of 2010?

21  A.  I do.

22  Q.  And were you at that event?

23  A.  I wasn't at it in person but I watched it.

24  Q.  But you've seen a video of that event, correct?

25  A.  Yes, I have.

D6j9usa3                        McDonald - redirect

Q.  And do you recall Mr. Jobs demonstrating the page curl

feature as part of his demonstration of the iBookstore at that

event?

A.  I do.

Q.  Could you take me through the page curl feature that was

available on iBooks on April 3, 2010 and demonstrate for the

Court how it worked and whether or not that was an innovation

over other e-reader apps available at the time?

        MR. BUTERMAN:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  Sure.  Well when we launched the book we

chose, our initial launch, to maintain the book metaphor where

you see pages on the side.  And you --

        THE COURT:  This may be a little easier if I

disclose -- I don't think this will be a shock to anyone -- I

have an iPad.  I love my iPad.  I think, you know so if this --

I have seen this feature, just so you know.  How

technologically challenged the court is, is or isn't relevant

here.

        THE WITNESS:  Quite simply then.  I think we

endeavored to recreate the book experience.

Q.  Sure.  Why don't we do something then.  Mr. McDonald, can I

ask you to put down the iPad 1 and pick up the second

generation iPad for me, if you could.

A.  Yes.

1    Q.  In your second generation iPad, the iBooks app is loaded

2    with the book Olivia by Ian Falconer.  I'd also like to submit

3    to the Court and have Mr. McDonald look at a hard copy of

4    DX510.

5              MR. BUTERMAN:  Your Honor.

6              THE COURT:  Yes.

7              MR. BUTERMAN:  We do have a relevance objection to the

8    iPad 2.  It came out much later and we don't understand the

9    relevance of showing something on that device.

10             THE COURT:  Ms. Rubin.

11             MS. RUBIN:  Your Honor, we're using the iPad 2 for

12   demonstrative purposes.  The fixed format layout, about which

13   I'm about to ask Mr. McDonald was developed in December 2010.

14             It's Apple's position that were it not for the eBook

15   store, Apple would not have had an incentive to develop this

16   feature.

17             It could not be loaded with the original iBook

18   software on the iPad 1.  That's why it's being demonstrated on

19   the iPad 2.

20             MR. BUTERMAN:  Your Honor that's exactly why we

21   believe it's not relevant.

22             THE COURT:  Sustained.

23   Q.  Mr. McDonald why don't you pick up the hard copy then of

24   DX510.

25             Mr. McDonald let's take a different course.  Why don't

1    we put DX510 aside, if we could, as charming as Olivia is.

2              Mr. Buterman asked you about a series of innovations

3    before the break including fonts, night reading, and others.

4    Can you describe for the Court in your words how those

5    innovations were improved upon by Apple upon the introduction

6    of iBooks or future generations of iBooks?

7    A.  Sure.

8    Q.  Let's start with fonts if we could.

9    A.  Sure.  So you know we -- well we've had a lot of experience

10   at Apple with fonts over the years.  But making them work for

11   e-reading devices was a particularly rigorous endeavor.  For

12   months, and months, and months we test each font at discrete

13   sizes on different devices and different levels of brightness.

14   We do this while taking into account letting and kerning, that

15   is the space between characters, the line height, that sort of

16   thing.  And the overall effect, whether you're a layman or not,

17   I think is an aesthetically pleasing result and a more readable

18   one.

19   Q.  Let's talk about fixed layout if we could for a second?

20   A.  Sure.

21   Q.  You understand what I mean by fixed layout or fixed format?

22   A.  I do.

23   Q.  Can you describe to the Court how fixed format was an

24   innovation that Apple made to the market in December 2010?

25             MR. BUTERMAN:  Objection.

1            THE COURT:  December of 2010.

2            MS. RUBIN:  Yes.  That's when it was introduced, your

3   Honor.

4            THE COURT:  Mr. Buterman.

5            MR. BUTERMAN:  Your Honor, the same objection to the

6   iPad.  That's several months after the iPad was introduced and

7   when the iBookstore went live.

8            MS. RUBIN:  Your Honor, may I be heard?

9            It's Apple's position that were it not for the

10  introduction of the iBookstore Apple would not have invested

11  the considerable time and resources to make fixed format

12  available.

13           Mr. McDonald's testimony also is that fixed format was

14  something under development I believe at the time that the

15  iBookstore was introduced.

16           THE COURT:  Overruled.

17           THE WITNESS:  Fixed layout or fixed format was our

18  solution to support highly illustrated or complex layouts,

19  books that were full spread.

20           MS. RUBIN:  Why don't we put Olivia back up on the

21  screen so Mr. McDonald can explain how fixed layout works.

22  Q.  Go ahead, Mr. McDonald.

23  A.  Actually let's talk about this page prior to the fixed

24  layout being launched.  Well, first, it wasn't possible.

25  Because what happens when you change the font size or the

1    orientation is that images -- well the -- what may have

2    happened in this particular screen shot we're looking at is

3    that the text alone may have shown up all by itself on a single

4    page.  Then you may have seen just the art on the next page.

5    Then you may have seen Olivia's mom on the third page.  And

6    that's obviously not how the author/illustrator, Ian Falconer,

7    intended it.

8    Q.  Mr. McDonald, may I just interrupt you for a second.  At

9    the time that fixed layout was introduced by Apple, could

10   Olivia be seen like this in any other e-reader app that you're

11   familiar with?

12   A.  No.  This book did not exist.  Because the

13   author/illustrator/publisher/editor rightly did not think that

14   there was a content or a platform that supported it and

15   retained the integrity of the product.

16   Q.  And in your experience as the manager of the U.S.

17   iBookstore was that also true for other children's books and

18   similar books with text married to graphics like travel guides,

19   cookbooks, and other similar books?

20   A.  Absolutely.

21        MS. RUBIN:  No further questions, your Honor.

22   RECROSS EXAMINATION

23   BY MR. BUTERMAN:

24   Q.  Mr. McDonald, are children's books considered trade books?

25   A.  Yes.

D6j9usa3                        McDonald - recross

1   Q.  They are.  Are you sure about that?

2   A.  I am.

3   Q.  And what about travel books?

4   A.  Yes.

5   Q.  Cookbooks?

6   A.  Cookbooks.  Yes.

7           MR. BUTERMAN:  Thank you.

8           THE COURT:  Any additional questions?

9           MS. RUBIN:  No, your Honor.

10          THE COURT:  You may step down.  Thank you,

11  Mr. McDonald.

12          THE WITNESS:  Thank you.

13          (Witness excused)

14          THE COURT:  Next witness.

15          MS. RICHMAN:  Your Honor, Cynthia Richman for Apple.

16  Apple calls Dr. Kevin Murphy.

17          THE COURT:  Dr. Murphy, if you could come up here.

18  I'm going to ask counsel if they could help clear the witness

19  stand for poor Dr. Murphy who has, I'm sure, going to have his

20  own set of exhibits.

21    KEVIN M. MURPHY,

22      called as a witness by the Defendant,

23      having been duly sworn, testified as follows:

24          THE COURT:  Dr. Murphy, you have been handed a

25  declaration which is marked as DX724.  And I believe your

 1    signature is on the 23rd page.

 2         Do you see that?

 3         THE WITNESS:  Yes, I do.

 4         THE COURT:  Did you sign that on May 29?

 5         THE WITNESS:  I believe so, yes.

 6         THE COURT:  Before signing that document, did you read

 7    it carefully?

 8         THE WITNESS:  Yes.  I think there's been some changes

 9    because it looks like there's some redacted portions relative

10    to when I signed it, but yes.

11         THE COURT:  And do you swear to the truth of its

12    contents?

13         THE WITNESS:  Yes, I do.

14         THE COURT:  Any objections to receipt of DX724?

15         MR. RYAN:  Yes, your Honor.  And an inquiry as well,

16    your Honor.  So there have been extended discussions about

17    Dr. Murphy's revised declaration and I believe there was a

18    Court ruling on certain aspects of it.  And I'm referring in

19    particular, your Honor, to those portions of his declaration

20    that refer to acts that are consistent with individual

21    interests or not consistent with conspiracy.  I just want to

22    preserve for the record those objections because -- and not

23    walk him or the Court through all of those objections again

24    because there are several such references in his declaration.

25    But my understanding it's been fully briefed.  It's been ruled

D6j9usa3                         McDonald - recross

1   on by the Court.  So if that's acceptable to the Court, that's

2   the way we'll proceed.

3           THE COURT:  Yes.  I'm not sure what I'm accepting,

4   actually.  So I want to be sure before I agree with you.

5           MR. RYAN:  I could give you --

6           THE COURT:  You're preserving your objections to the

7   extent I've rejected them?

8           MR. RYAN:  That's correct.

9           THE COURT:  Fine.

10          MR. RYAN:  We have some other objections, your Honor.

11  Paragraph 24 of his declaration.

12          The sentence that begins "similarly."  Just that

13  sentence, your Honor.

14          THE COURT:  You move to strike the whole sentence?

15          MR. RYAN:  Yes, your Honor.

16          THE COURT:  Well, to the extent -- I mean in this

17  sentence Dr. Murphy indicates something about Amazon and Barnes

18  & Noble that he's presuming.  And then he has a citation to the

19  testimony of a witness from Amazon.  So, I'm not using this for

20  fact finding.  To the extent that it underlies an opinion he's

21  giving, it can be tested.

22          MR. RYAN:  Paragraph 25, your Honor.

23          THE COURT:  Your objection is.

24          MR. RYAN:  The sentence that begins, "In addition as

25  explained by Professor Klein."  So this is just repeating

D6j9usa3                        McDonald - recross

1    Professor Klein's opinion in his report, "his" being Professor

2    Murphy.

3              THE COURT:  Overruled.

4              MR. RYAN:  And paragraph 53, your Honor.  The

5    objection here is "Economics predicts how Amazon would react to

6    the introduction of the iPad in bookstore."  And there is no

7    factual basis in the record for this.  This is just

8    Dr. Murphy's speculation.

9              THE COURT:  Overruled.

10             MR. RYAN:  Thank you.  That's it, your Honor.

11             THE COURT:  With these rulings, DX724 is received.

12             (Defendant's Exhibit 724 received in evidence)

13   CROSS-EXAMINATION

14   BY MR. RYAN:

15   Q.  Dr. Murphy, good afternoon.

16   A.  Good afternoon.

17   Q.  Could you turn to paragraph 19 of your declaration, please.

18             Are you there?

19   A.  Yes.

20   Q.  And in this paragraph in the second sentence you identify

21   increased physical book sales as a benefit to publishers

22   resulting from higher retail prices, correct?

23   A.  Yes.  That would be one potential benefit to publishers.

24   Q.  And am I correct, sir, that nowhere in your declaration do

25   you quantify that benefit to publishers?

1  A.  No.  I did not.  That was other people analyzed the output

2  data.

3  Q.  But there is no where in your declaration, is there,

4  quantitative analysis of the increased physical book sales as a

5  benefit to the publishers, correct?

6  A.  No, there is not.

7  Q.  And you also say that higher retail prices for eBooks

8  reduced the substitution of eBooks for physical books, correct?

9  A.  Yes.

10  Q.  And I take it nowhere in your declaration do you quantify

11  the degree of that substitution in any way, correct?

12  A.  No.  I was speaking as a matter of economics.

13  Q.  Right.  But you did not undertake to quantify in this case

14  the extent to which that substitution occurred, correct?

15  A.  No, I did not.

16  Q.  And then you go on to say that higher retail prices for

17  eBooks protected the brick and mortar bookstore infrastructure,

18  correct?

19  A.  Yes.

20  Q.  And did you -- you don't say in your declaration the degree

21  to which that occurred, correct, how much protection there was?

22  A.  I did not, no.

23  Q.  And you didn't inquire into that either, did you?

24  A.  No.  As I said, I wasn't the person who analyzed the data

25  in this case.

D6j9usa3                          Murphy - cross

1   Q.  So, here you're talking simply about economic theory,

2   correct?

3   A.  I think it's more than theory.  I think it's the things

4   we've applied in economics generally.  We have a host of

5   empirical evidence that consumers and other individuals do

6   respond.

7           So it's not just theory.  It's based on a broad base

8   of empirical evidence.

9   Q.  But in this case you did not analyze any empirical evidence

10  for purposes of your opinion, did you, sir?

11  A.  Not specific.  But I'm just saying it's not specifically

12  theory.  You mentioned it was based on theory.  And the idea

13  that consumers substitute and respond to prices is not a

14  theoretical proposition.  It's been long established in

15  economics.

16  Q.  And we'll talk about that in a second.  But I just want to

17  establish nowhere in your declaration, sir, is there any

18  empirical analysis that you did in connection with this case,

19  correct?

20  A.  I did not.  As I said, that was not -- I was not asked to

21  do that.  That was not my responsibility in this case.

22  Q.  And it's also the case that in your declaration you do not

23  cite or refer to economic works, publications, treatises,

24  articles of the sort, correct?

25  A.  Not generally.  I think I refer to the economics, sort of

1   body of knowledge that we have as economists.

2   Q.  Right.  But you don't make any specific reference to say a

3   particular treatise, a particular writing, a particular paper,

4   anywhere in your report, do you?

5   A.  Nor do I generally in my academic work.

6   Q.  But just not with respect to generally, sir.  But this

7   report in this case, do you do that?

8   A.  No.  It would not be standard practice for me to do that,

9   particularly for things like people respond to prices.

10  Q.  So, no empirical work and no reference to outside economic

11  sources anywhere in your declaration, correct?

12  A.  I wouldn't say that's true.  I'd have to go back -- maybe

13  in my declaration.  I think my reports would have had some

14  references to those things.

15  Q.  Are you sure about that?

16  A.  I don't know.  I'd have to go back and look.  It's all

17  based on knowledge.  You and I went through it at my

18  deposition.

19  Q.  Staying with paragraph 19, you say, "For publishers, higher

20  retail prices increased eBook sales and profits."

21          Do you see that?

22  A.  Where are you looking at?

23  Q.  Paragraph 19, page 6 of your declaration.  The second

24  sentence.

25  A.  Yes.

D6j9usa3                          Murphy - cross

1   Q.  And you say -- did you see what I just read, "For

2   publishers, higher retail prices increased eBook sales and

3   profits"?

4   A.  Oh.  That would be a -- I don't think we would say it

5   increased eBook sales.  I think we should say profits.

6   Q.  Let me just stay with you.  So you were just talking about

7   I think a body of economic learning that says prices go up,

8   sales go down, right?

9   A.  Yes.

10  Q.  And here you're suggesting prices go up and sales go up,

11  correct?

12  A.  No.  That would have been -- that's a mistake that I wrote.

13  Q.  Okay.

14  A.  That was -- I wasn't trying to say eBook sales went up.  I

15  meant profits.

16  Q.  Right.  And, in fact, sir, you'd agree with me, all things

17  being equal, if eBook prices went up, output would go down,

18  correct?

19  A.  If you don't take account of other changes, yes.  If we're

20  just being looking at changes in prices, that's what economics

21  tells us.

22  Q.  Because eBooks are what you call a normal good, correct?

23  A.  Actually it's true even for most goods that aren't normal.

24  Normal is a sufficient condition, not necessary to have to have

25  it.

D6j9usa3                          Murphy - cross

1   Q.  So we can agree.  EBook prices go up.  Hold everything

2   equal.  EBook output goes down?

3   A.  That would be generally the case.  Like you said, all else

4   equal is an important qualifier there.

5   Q.  Could you turn to paragraph 44 of your declaration, please.

6   That's on page 16, sir.

7   A.  Okay.

8   Q.  And the first sentence of this paragraph reads, "A firm

9   will enter a competitive market only if it can develop a

10  business plan it expects to be profitable," correct?

11  A.  That's correct.

12  Q.  And then you go on to talk about Apple's entry into the

13  marketplace, correct?

14  A.  I believe that's correct, yes.

15  Q.  And you -- do I read your declaration correctly, sir, that

16  you believed at the time Apple entered the eBook market it was

17  a competitive market?

18  A.  There was competition in some ways.

19  Q.  I'm sorry.  Go ahead.

20  A.  No.  I'm saying that the beginning sentence is true.  I

21  think you have to be profitable regardless of whether it's

22  competitive or not.

23  Q.  Right.  But you were making the point here, you went on to

24  describe the market Apple was coming into.  And you were

25  conveying the message that the eBook market was a competitive

1  market, right?

2  A.   That wasn't the intent of the sentence.  The intent of the

3  sentence was that Apple would have to compete with the other

4  sellers in the market.  That's what I was referring to.

5  Q.   Then you go on to say that "Apple had learned from public

6  sources and its discussions with publishers about Amazon's

7  practice of selling many eBook titles below wholesale cost."

8            Do you see that?

9  A.   Yes.

10  Q.   So, Apple enters a market where a major seller is pricing

11  below cost, correct?

12  A.   That was the situation at the time at which they entered.

13  Q.   And that's one of the reasons, that is to say there was low

14  pricing in the market, that you believed the market was a

15  competitive market, right?

16  A.   I don't know if that was the particular thing.  I mean we

17  usually don't see pricing below cost in a competitive market.

18            It's not inconsistent.  That wouldn't be one of the

19  reasons I would qualify it as competitive, no.

20  Q.   And you say Apple had to compete with several other

21  established book sellers, correct?

22  A.   Yes.

23  Q.   One was Barnes & Noble, correct?

24  A.   Yes.

25  Q.   And one was Amazon?

1    A.   Yeah.  I would say Amazon was the more established of the

2    two.

3    Q.   And Sony was in the market?

4    A.   Yes.  Sony was in the market.  Wasn't doing as well.

5    Q.   And Kobo was in the market, correct?

6    A.   Yeah.  I would say Amazon was the 800-pound gorilla in that

7    case.

8    Q.   And Barnes & Noble had recently entered the eBook market,

9    correct?

10   A.   Well, yeah.

11            I mean they kind of done it in pieces.  They had come

12   in in the eBook market without a reader earlier the year before

13   and then they had just come out with their reader.  So they

14   were kind of still on their way in, in some sense.

15            THE COURT:  Excuse me, counsel.  I'm afraid we're

16   going to have to break at this point.

17            So I'll see everyone at 2:00.  The government has 34

18   minutes left.  And Apple has 22.

19            Thank you all.

20            (Luncheon recess)

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                              2:04 P.M.

3    CROSS-EXAMINATION (Resumed)

4    BY MR. RYAN:

5    Q.  Good afternoon, Dr. Murphy.

6    A.  Good afternoon, Mr. Ryan.

7    Q.  Do you have your declaration up there?

8    A.  Yes, I do.

9    Q.  Could you turn to paragraph 20, please?

10   A.  Sure.  Okay.

11   Q.  And do you see the paragraph begins, "Plaintiffs' experts

12   provide no economic evidence that Apple wanted higher prices."

13   Do you see that?

14   A.  That's correct.

15   Q.  And I would like to ask you a question about Apple's view

16   on prices, two different periods of time.  When Apple was

17   looking at the market, before it executed its agency agreement,

18   so back in December of 2009, did Apple have a view on whether

19   prices should be higher in the marketplace?

20   A.  I can't speak directly to Apple's view.  I think I can

21   speak to the economics because I'm an economist.  I can't get

22   into their mind, and I think they're the best people to testify

23   about what their actual view was.  I can tell you what was a

24   rational economic act in Apple's place was.

25   Q.  But they --

1    A.  They would be focused on whether the books would be

2    profitable for them.  That's what they would be focused on, and

3    whether the prices were higher, lower or the same, they would

4    care about what their profits would be on those books.

5            MR. RYAN:  Move to strike, your Honor.

6            THE COURT:  Overruled.

7    Q.  So did you -- You didn't undertake any investigation to see

8    if pre-agency Apple thought market prices were too low; is that

9    a fair statement?

10   A.  I didn't think to myself that that was my job.  My job was

11   to provide an economic analysis, and the conclusion of that was

12   just what I said.

13   Q.  Now, you agree prices went up once agency took effect,

14   right?

15   A.  I think there was a mix of prices.  Prices for some books

16   went up, others went down; so I don't really say across the

17   board they went up, no.

18   Q.  New York Times best seller prices went up, right?

19   A.  I don't know if that was true for everyone.  I think on

20   average that would be true for the defendant publishers.

21   Q.  Was that consistent with what Apple wanted, in your view?

22   A.  I don't think that was Apple's desire, per se.  I think

23   Apple's desire in this case would have been -- this is speaking

24   as an economist, not getting in Apple's mind -- what they would

25   care about is can books be profitable for them to sell.  And

1   that would be their logical, rational focus as an eBook seller,

2   and that would be consistent as far as whether books go up or

3   down.

4   Q.  So if you could turn to paragraph 15 on Page 5 of your

5   declaration, and there you say, the second sentence, "Even if

6   all six publishers had long-term contracts that bound them to

7   offer Amazon wholesale terms, Apple still would have benefited

8   from an agency contract with all the challenged terms."  Do you

9   see that?

10  A.  That's correct.

11  Q.  Now, with respect to the publishers, did you undertake to

12  determine whether if a publisher had a long-term contract with

13  Amazon, wholesale terms, it still would have been in the

14  publisher's interest to enter into an Apple agency agreement?

15  A.  I did not -- I did not undertake to valuate the publishers.

16  I can't say here one way or the other.  My focus was on Apple's

17  conduct and whether that conduct would be in their best

18  interest, absent participation in conspiracy and absent any

19  anticompetitive effect.

20  Q.  Now, one more question on publishers.

21  A.  Sure.

22  Q.  With respect to any one or more publishers, did you

23  undertake to determine whether any publisher acted contrary to

24  its unilateral self-interest in entering into an Apple agency

25  agreement?

D6JPUSA4                        Murphy - cross

1   A.  I did not.  I did not undertake that specifically.  I can't

2   say one way --

3             THE COURT:  Thank you.

4   A.  -- or the other.

5             MR. RYAN:  Thank you.

6   REDIRECT EXAMINATION

7   BY MS. RICHMAN:

8   Q.  Good afternoon, Professor Murphy.

9   A.  Good afternoon, Miss Richman.

10  Q.  Do you remember when Mr. Ryan asked you about the basis for

11  your economic conclusions?

12  A.  Yes, I do.

13  Q.  And he asked you whether you performed any empirical

14  analysis in connection with rendering your economic opinions in

15  this case?

16  A.  Yes, I do.

17  Q.  Can an economist render an economic opinion without

18  performing any number crunching?

19  A.  Yeah, I think -- and I think it's good you that asked that

20  because, you know, the --

21            THE COURT:  I think your answer is yes, then.

22  Q.  Can you please explain?

23  A.  Yeah, I was just -- I was just going to say because

24  economics, as an empirical science, doesn't just depend on

25  numbers crunching.  A lot of it is analyzing the situation you

D6JPUSA4                        Murphy - redirect

1   see, and fitting it into a standard economic framework.

2   Q.  And Mr. Ryan also asked you whether you had cited any

3   treatises or economic literature in your opinion; do you recall

4   that?

5   A.  Yes, I do.

6   Q.  And can you explain -- I think you started to explain your

7   general policy for citing economic literature.  Can you expand

8   on that?

9   A.  Yes.  The theory of the firm, which is what we're applying

10  here, what we would expect a profit-maximizing, economic entity

11  to do is generally accepted in economics.  It's not something

12  for which one would generally cite a treatise.  The type of

13  theory we apply here is probably one of the most broadly

14  accepted theories in economics, one of the most widely

15  accepted, and regularly taught, something I teach on an annual

16  basis to students on a variety of levels; so it wouldn't be --

17  Q.  And can you --

18  A.  -- something outside that.

19  Q.  And can you please explain for the Court a little bit about

20  your background in economics?

21  A.  Yeah.  I'm a professor of economics in graduate school of

22  business and in department of economics at the University of

23  Chicago.  I teach a Ph.D. course in economics, which is the

24  type of economics I talk about here today, that all our Ph.D.

25  students take.  I also teach a course in business school on

1    advanced microeconomics for MBA students who want a more

2    challenging exposure to that material.

3           I also teach a summer camp for students from Ph.D.

4    programs around the country who come to Chicago in June, which

5    is what I'm going to do next weak, to teach them some of the

6    tools that we use in economics.

7    Q.  And I don't want to embarrass you, Professor Murphy, but

8    have you won any awards in the field of economics?

9    A.  Yeah.  I was awarded the John Bates Clark medal, which at

10   the time was awarded every other year to an outstanding

11   American economist under the age of 40.  I've won a MacArthur

12   Fellowship for my work in economics.  I've also won several

13   other awards for my papers.  So I've done okay.

14   Q.  Now, Professor Murphy, do you still have your declaration

15   in front of you?

16   A.  Yes, I do.

17   Q.  Can you please turn to paragraph 34?

18   A.  Yes.

19   Q.  And in that paragraph, I believe you refer to platform

20   economics; is that correct?

21   A.  Yes, I do.

22   Q.  And can you explain whether that is a body of economic

23   learning that informs your economic opinions in this case?

24   A.  Yes.

25           MR. RYAN:  Objection.

1          THE COURT:  Excuse me one second.  Overruled.

2     A.  Yes, it is.

3     Q.  And can you please explain how it informs your opinions in

4     this case?

5     A.  Well, you know, one of the things that we think about in

6     economics is a physical platform.  Most commonly, platforms are

7     products and groups of products that provide a functionality

8     and often requires participation by individuals on what we kind

9     of call both sides of the market.

10         So an e-reading platform and iBookstore is a specific

11    part of that.  It's important to be able to get a large number

12    of books or book sellers on one side, and a large number of

13    customers on the other side to make it successful.  Basic idea

14    being, book buyers want to go to a store that has more

15    selection of books, and book sellers want to go to a place that

16    has lots of buyers, and you need to get that started.  And one

17    of the ways you get that started is by having a critical mass

18    of eBook sellers there to attract the buyers, which will

19    attract additional sellers.

20    Q.  Thank you.  Can you -- We'll come back to that in a minute,

21    but can you turn to paragraph 44 of your declaration, another

22    one that Mr. Ryan asked you about.  The first sentence states,

23    "A firm will enter a competitive market only if they can

24    develop a business plan it expects to be profitable."  Did I

25    read that correctly?

1    A.  Yes, you did.

2    Q.  And can you please explain what you meant in that

3    testimony?

4    A.  Yeah.  Well, I mean, it's certainly -- that's kind of even

5    more broad than that because a firm will enter a business if it

6    expects it to be profitable, and that doesn't depend whether

7    the market is competitive or not.  So it's certainly true of a

8    competitive market.  It can be true of a market that wasn't

9    competitive.  You're going to go into a business, under

10   economic theory, if you can make it profitable.  If you can't

11   make it profitable, you don't have the incentive to enter it.

12   It's like the definition of profit maximization.

13   Q.  And did you evaluate, in connection with your work in this

14   case, whether Apple developed a business plan that it expected

15   to be profitable in charting out its strategy for entering the

16   eBook business?

17   A.  Yeah, I guess that what I would say is I applied economics

18   to look at their actions.  And as a matter of economics, the

19   things that I would expect to see somebody doing in the process

20   of launching a book reading platform, iBookstore in particular,

21   would be, one, you'd want to find a way to have lots of books;

22   No. 2, you'd want to be price competitive with the other --

23   with the other alternatives out there, and you want to be able

24   to earn a profit, the most basic principle in economics.

25           Those three principles would be what I would look for

1   and try to do terms and methods of negotiation to be consistent

2   with those.

3   Q.  And what specifically did Apple do to achieve those goals?

4   A.  I would say the two things that I examined.  They probably

5   did lots of things.  There's lots of technological things and

6   other things they needed to do, but from an economic

7   standpoint, two of the key ones were, find a set of contract

8   terms that were consistent with those goals and negotiate a

9   contract in a way that will allow them to achieve that critical

10  mass that they needed to launch the business.

11  Q.  So did -- And did you study the particular provisions of

12  the agreements that Apple entered into that allowed them to

13  achieve that goal?

14  A.  Yes, I did.

15  Q.  And can you describe what those were?

16  A.  Okay.  I examined a number of things.  For example, the

17  most favored nation clause, that's been a discussion, a lot of

18  discussion at this trial.  I evaluated that from an economic

19  standpoint, and asked whether that would be in Apple's interest

20  independent of participation --

21          MR. BUTERMAN:  Objection, your Honor.  It's beyond the

22  scope.

23          THE COURT:  Please don't interrupt the --

24          MR. RYAN:  Sorry.

25          THE COURT:  -- witness' answer.

1              You may complete your answer.

2              If you have a motion to strike at the end, you may

3     make it.

4     A.  I'm sorry, I was in the middle.  So let me -- so they would

5     have -- I was valuing whether they would have an incentive to

6     do that, absent participation in a conspiracy and in the

7     absence of any alleged anticompetitive effect.

8              A simple way to think about that is the hypothetical

9     that I think was brought up in cross-examination, which was if

10    Amazon had a long-term contract to remain on agency, in a world

11    which you couldn't possibly.  In my deposition I talked about

12    the law preventing them, it's the same effect.  If you can't

13    move Amazon to agency, the simple economics of it is it would

14    still would have been in Apple's interest to have the MFN cause

15    because what it accomplished was allowed them to be

16    competitive, allowed them to be competitive in a marketplace

17    whether Amazon remained on wholesale or Amazon moved to agency.

18    So that certainly was in their interest either way.

19             MR. RYAN:  Move to strike, your Honor.

20             THE COURT:  Granted.

21    Q.  Professor Murphy, Mr. Ryan asked you about paragraph 19 of

22    your declaration.  Can you turn to that, please?  The second

23    sentence, starting, "For publishers, higher retail prices

24    increased eBook sales and profits, reduced the substitution of

25    eBooks for physical books, increased physical book sales and

1    thereby protected the brick-and-mortar bookstore

2    infrastructure."  Did I read that correctly?

3    A.  Yes.

4    Q.  And did you have a correction to that sentence?

5    A.  Yeah.  Mr. Ryan did point out the typo there, where I

6    had -- you know, we had said here that increased eBook sales.

7    That would not have been part of it.  It would have presumably

8    increased the profits on eBooks.  That's a typo, I'm sorry

9    about that.

10   Q.  Okay.  And can you explain what you meant in that sentence?

11   A.  Yeah, the key part of it was really the latter part because

12   there were benefits that would have accrued to the publishers

13   that wouldn't have accrued to Apple.  That is, the publishers

14   would have benefited from higher eBook prices in ways that

15   Apple didn't, which made it natural that there would be a

16   disagreement between the parties, with Apple wanting lower

17   prices and the publishers wanting higher prices.

18   Q.  And is that what you're saying in the next sentence, if you

19   continue on?

20   A.  Absolutely.

21   Q.  Okay.  And that says, "Apple, on the other hand, obtained

22   no benefit from the higher physical book sales (and lower eBook

23   sales) resulting from higher eBook prices"?

24   A.  Yeah.  Actually, I got it right that second time.

25   Q.  Okay.  And can you just explain what you men there?

A.   Yeah, I mean, to the extent that the publishers benefited
in other ways from the higher prices, they wouldn't have
accrued to Apple, while Apple would have suffered the lower
sales associated with higher eBook prices.  So Apple, you know,
sort of suffered the consequences without the compensating
benefits.

Q.   Thank you.  Going on to the next paragraph that Mr. Ryan
asked you about, paragraph 20, "Plaintiffs' experts."  It
starts off stating, "Plaintiffs' experts provide no economic
evidence that Apple wanted higher prices."  Did you do any kind
of economic analysis of whether Apple wanted higher prices?

A.   Yes.  Two things.  One, they wanted -- the evidence that
they did want lower prices is provided by the fact they
negotiated for price caps to actually restrain the publishers'
ability to charge higher prices.  That's what economics would
predict and that's what we see.

     And under the agency model, particularly, Apple has a
strong incentive to push for lower prices because the
publishers are absorbing 70 percent of any reduction in price,
which is much more favorable from Apple's point of view for
reducing prices than it would have ever been under the
wholesale model.

Q.   Did you evaluate whether it would have been in Apple's
independent business interest to sell eBooks on the iBookstore
at a price point of 9.99?

1    A.  My assessment would be, yes, it would.  They would still be

2    able to earn a 30 percent margin.  They would capture the

3    additional sales provided by the reduction in price while only

4    bearing 30 percent of that price reduction.  That would be very

5    attractive from their point of view.  So you can't make a

6    presumption that they would like higher prices.

7    Q.  And tieing that to paragraph 15 of your declaration, that

8    Mr. Ryan asked you about, I believe there's a hypothetical in

9    that paragraph.

10   A.  Yes.

11   Q.  And can you read thank into the record, please?

12   A.  Yes, it says, "Even if all six publishers had long-term

13   contracts that bound them to offer Amazon wholesale terms,

14   Apple still would have benefited from an agency contract with

15   all the challenged terms."

16   Q.  And how does that conclusion relate, if at all, to your

17   opinion that there's no economic evidence that Apple wanted

18   higher prices?

19   A.  Well, I think it gets back to -- and, again, it probably

20   centers on the MFN, which is one of the things that was

21   generated by the MFN, was that Apple would be able to sell

22   books profitably whether the price points were higher or lower

23   than they had been previously because they would be able to

24   earn 30 percent on sales.  And while they would earn less per

25   book, they would sell more books if prices were lower.

1          MR. RYAN:  Your Honor, I move to strike on the MFN

2     part of the answer.

3          THE COURT:  It's stricken with respect to the MFN.

4     Q.  So focusing on the price points, did you evaluate what

5     steps Apple took to -- to ensure that prices on the iBookstore

6     would be set at -- withdrawn.

7          Did you evaluate, in connection with this analysis,

8     the price caps in the agency agreements?

9     A.  Yes, I did.

10    Q.  And what did you conclude about whether those price caps

11    were in Apple's independent business interests?

12    A.  I think they were definitely in their independent

13    interests.  They flowed out of that divergence of incentives

14    between the publishers and Apple that I spoke of earlier, where

15    the publishers would have wanted higher prices and Apple would

16    have preferred lower prices.  And so I think what you learn

17    from that is you learn something about Apple's actions and how

18    they're supported by the underlying economics.

19         MS. RICHMAN:  Just a second, your Honor.

20         THE COURT:  That's okay.  I just want to give Apple

21    notice that it has five minutes left, roughly, in terms of its

22    entire time.

23    Q.  Professor Murphy, turning again to paragraph 15 and your

24    hypothetical, was it in Apple's independent business interest

25    to set the prices on the iBookstore at 9.99 in the

1    hypothetical -- in the context of the hypothetical you outline

2    in paragraph 15?

3              MR. RYAN:  Objection, your Honor.

4    A.  I would have believed it would have been in Apple's

5    interest.  I'm not sure --

6              THE COURT:  Excuse me, one minute, Doctor.  There was

7    an objection that I didn't rule on fast enough.  Overruled.

8              So let me read that question to you again, which I

9    interrupted.  Professor Murphy, turning again to paragraph 15

10   and your hypothetical, was it in Apple's independent business

11   interest to set the prices on the iBookstore at 9.99 in the

12   hypothetical -- in the context of the hypothetical you outline

13   in paragraph 15?

14   A.  Yes, I believe it was because they would have still been

15   earning 30 percent under the agency terms, and that would have

16   allowed them to sell substantial number of books on that basis.

17   So their goals of having a large number of books and those

18   sales being profitable, which were the primary goals I would

19   have expected as an economist that they would have, would be

20   met.

21             MS. RICHMAN:  Thank you, Professor Murphy.  No further

22   questions, your Honor.

23   RECROSS EXAMINATION

24   BY MR. RYAN:

25   Q.  Just a couple of questions, Professor Murphy.  Paragraph 44

1    in your report that you were asked about, in the first sentence

2    it says, "A firm will enter a competitive market only if it can

3    develop a business plan it expects to be profitable."  Would

4    that principle apply to, as you say later in your -- that

5    paragraph, to Barnes and Noble when it introduced its NOOK

6    e-reader?  That is to say, it would not have done that unless

7    it thought it could be profitable, correct?

8    A.  I think that's what economics says, yes.

9            MR. RYAN:  Thank you.

10           THE COURT:  Any further examination?

11           MR. SNYDER:  May we have one minute?  I think we have

12   four left.  Mr. Heiss counts two more.

13           THE COURT:  Uh, oh.

14           MR. SNYDER:  And we know Mr. Heiss is very precise.

15           THE COURT:  I try to be too.

16           MR. SNYDER:  Yes, your Honor.

17   REDIRECT EXAMINATION

18   BY MS. RICHMAN:

19   Q.  Just one more question, Professor Murphy, or maybe two.

20   Professor Murphy, are you aware that Barnes and Noble

21   entered -- or entered into agency agreements?

22   A.  Yes, I am.

23   Q.  And do you have an opinion on whether they entered -- they

24   entered into agency agreements -- or excuse me.  Withdrawn.

25           Do you have -- Let me just gather my thoughts, sorry.

1   And did you study whether Barnes and Noble evaluated whether to

2   enter into an agency agreement because it expected that that

3   would allow it to be profitable?

4   A.  I can't speak -- I can't get in their head, but I can tell

5   you, as an economist, that is what I would have expected.  And

6   they faced many of the same incentives, from an economic

7   standpoint, as Apple.  So I wouldn't be surprised that that's

8   the decision that they made.  It's very consistent with

9   economics.

10  Q.  Why is that consistent with economics?

11  A.  For the same reasons.  They, again, wanted to have a wide

12  selection of books, have those sales of those books be

13  profitable and be price competitive, and those objectives would

14  be met by the kind of agreement that the publishers and Apple

15  signed.

16          MS. RICHMAN:  Thank you.

17          THE COURT:  Thank you very much, Dr. Murphy, for your

18  testimony today.  Much appreciated.  You may step down.

19          (Witness excused)

20          THE COURT:  Apple may call its next witness.

21          MR. SNYDER:  Your Honor, at this time, Apple rests its

22  case.

23          THE COURT:  Just before you rest, do you have all your

24  exhibits in?  Just to double-check.

25          MR. SNYDER:  The answer is, I have no idea, but

1    Mr. Floyd does.

2            MR. FLOYD:  We provided your Honor with the

3    stipulation with the additional exhibits; so I believe -- what

4    the one other issue, I guess, was possibly, not specifically,

5    dealt with is that Mr. McDonald's declaration has a number of

6    pictures attached to it as exhibits, as illustrations.  They

7    are exhibits.  We're not seeking to have them admitted as

8    evidence.  They were objected to, but we wanted them to be able

9    to at least be considered by your Honor as illustrations of

10   some of the statements within the declaration.

11           THE COURT:  Hmm, not in evidence but considered by me.

12           MR. FLOYD:  Well, as demonstratives.  As if he were

13   testifying on the stand, we might put up an illustration so you

14   could look at, as you would read it, you could see what he was

15   talking about without -- without necessarily the need for it to

16   be in evidence.

17           THE COURT:  Okay.  So I have the declaration DX723.

18   It doesn't have attachments.

19           MR. FLOYD:  When we submitted it, I believe we

20   submitted it in a notebook.

21           THE COURT:  Oh, originally?

22           MR. FLOYD:  Originally.

23           THE COURT:  Not with the pretrial order?

24           MR. FLOYD:  With the pretrial order.  So it would be

25   possible then to make sure that your Honor has that.  We can

1   otherwise make it available.

2              THE COURT:  Oh, I have it.

3              MR. FLOYD:  Or we'd be happy to have them in evidence

4   for the limited purpose.  The purpose we had is simply as

5   Mr. McDonald described certain things, there's references in

6   the declaration, and those are screen shots that were created

7   or pulled off of the Apple servers to provide illustrations to

8   the points he was making.

9              THE COURT:  Just so the record is clear, these begin

10  at DX526, but then they have other numbers that aren't in

11  sequence, 518, 522 -- I'm sorry, well, 526, 518, 519, 500, 521,

12  522, 511, 510, 489, 495, 496, 494, 493, 486, 503, 504, 517,

13  516, 515, 505 through 509, and 497 and 498, all of them as DX

14  numbers.  I have no idea if these are duplicative numbers or

15  not.

16             What is the government's position?

17             MR. BUTERMAN:  Your Honor, the government opposes the

18  introduction of these documents.  We lodged authenticity

19  objections to all of the screen shots, and the position that we

20  relayed to Apple was quite clear, which is, we needed to

21  understand where these shots come from -- came from because we

22  just received them in paper form.  We never received that

23  information.

24             Last evening, with respect to two screen shots that

25  Miss Rubin had planned to use with the witness, Miss Rubin was

D6JPUSA4                    Murphy - redirect

1   kind enough to actually provide us with the information, which

2   alleviated any concerns that we have.

3           We have no idea where those screen shots come from,

4   what they reflect, whether we can replicate them on our own,

5   and therefore, we do not believe that they should come into

6   evidence.

7           MR. FLOYD:  Your Honor, I believe all the screen shots

8   were obtained in the same manner, the same witness, and

9   attached to his declaration.  So we have them for the limited

10  purpose to illustrate what they were saying.  We have a couple

11  that are in evidence, which may be sufficient for your Honor to

12  understand the scope.  So we'll leave it to your discretion at

13  this point, of course.

14          THE COURT:  Thank you very much.  So with that record,

15  I'm not going to receive these in evidence.  If I choose to

16  look at them, I'll give notice to the parties that I've relied

17  on them in rendering my opinion; so you will know what your

18  position is with respect to my use of them, and whether you are

19  unhappy or happy with that decision.

20          Okay.  So giving everyone one last chance before I

21  close the record.  Good.  Everyone, no one is seeking to add

22  one additional exhibit or document or -- Right, okay, fine.

23  The record is closed.

24          So I just have a few comments.  One, it's been a

25  privilege to preside over this trial.  I worked hard to be

1   prepared for this trial and thought I'd learned a lot by

2   reading so many documents and affidavits.  Whatever, I thought

3   I'd read a lot and worked hard to be prepared.  You have helped

4   me understand so much more through the presentation of evidence

5   in these last three weeks, and I'm deeply grateful.

6           And your parties could not be more proud of the

7   representation, should not consider themselves in any way other

8   than very proud of the work that's been done in this courtroom,

9   both on behalf of the governments, who are represented here,

10  and on behalf of Apple.

11          I also want to say my staff and I deeply appreciated

12  the courtesies that you've shown us.  When I was ruling -- Oh,

13  we never did McCall.  You see?

14          MR. FLOYD:  I thought we had --

15          THE COURT:  It's gone?

16          MR. RYAN:  We did.  Yes, it's gone.

17          THE COURT:  Because I was about to say --

18          MR. FLOYD:  We were not offering any depositions, your

19  Honor.

20          THE COURT:  I was going to say one of the examples I

21  have of how thoughtful you were about your presentation of

22  evidence to me was how you presented the objections to

23  depositions.  You so clearly marked who had offered what and

24  what you were objecting to.  It was very easy for me to go

25  through and give you my rulings, and that's a trivial example,

1   really, of the many, many ways in which you made an effort to

2   think about how could we help the judge learn what we want her

3   to understand, and I really want to thank you.

4           I want to thank you also for your cooperation with

5   each other.  You've had your disputes, but you've tried to, I

6   think, work cooperatively when you could and present me with

7   those things which you felt were important for me to resolve,

8   and I deeply appreciate that.

9           Another thing is all the lawyers who you gave an

10  opportunity to present evidence in this courtroom.  It would

11  have been easy for lead counsel to just take all the witnesses

12  because the issues are so important to the parties.  And, yet,

13  no doubt with some conversations with your clients, made sure

14  that lots of lawyers had opportunities to work with witnesses

15  and present evidence in the courtroom, and I was very impressed

16  with that.  And everyone did an excellent, excellent job.

17          So we're left with minutes on the clock.  I know Apple

18  had only wanted 27 hours, but it was bumping right up against

19  29, and the government had asked for 30, and only got 29, and

20  it left some minutes on the table.  So I guess we did it just

21  about right.

22          So tomorrow we start at 9:30.  I look forward to

23  summations.  I think -- my expectation, maybe I'm wrong, but,

24  to me, the issues have somewhat shifted during the course of

25  the trial, and that's as it should be, I guess, even though,

D6JPUSA4                    Murphy - redirect

1    you know, you had a year or so of discovery and a chance to

2    think hard about the issues and full opportunity to look at

3    each other's evidence and think about each other's arguments.

4           As you see it play out in the courtroom, things change

5    a little bit and people have to stay nimble.  So I'm very much

6    looking forward to understanding precisely where we are now,

7    you know, when I listen to you tomorrow, what things are in

8    dispute and what things aren't in dispute.  I think things have

9    shifted, at least it's my perception it has.

10          Thank you so much.  See you at 9:30.

11          (Adjourned to June 20, 2013, at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    MICHELLE BURTIS

 4   Cross By Mr. Buterman . . . . . . . . . . .2280

 5   Redirect By Mr. Swanson . . . . . . . . . .2283

 6   Recross . . . . . . . . . . . . . . . . . .2314

 7   Redirect By Mr. Swanson . . . . . . . . 2315 by

 8   Recross By Mr. Buterman . . . . . . . . . .2318

 9   Redirect By Mr. Swanson . . . . . . . . . .2318

10   ROBERT BRUCE McDONALD

11   Cross By Mr. Buterman . . . . . . . . . . .2326

12   Redirect By Ms. Rubin . . . . . . . . . . .2368

13   Recross By Mr. Buterman . . . . . . . . . .2382

14    KEVIN M. MURPHY

15   Cross By Mr. Ryan . . . . . . . . . . . . .2386

16   Redirect By Ms. Richman . . . . . . . . . .2397

17   Recross By Mr. Ryan . . . . . . . . . . . .2408

18   Redirect By Ms. Richman . . . . . . . . . .2409

19                      DEFENDANT EXHIBITS

20   Exhibit No.                            Received

21     DX434, DX435, DX436, DX437, DX438, . . . . .2285

22            DX439, DX440, DX441, DX443,

23            DX445, DX448, DX449, DX452,

24            DX453, DX461, DX463 and DX465

25    719  . . . . . . . . . . . . . . . . . . .2292
```

```
 1                  DEFENDANT EXHIBITS (Continued)

 2     Exhibit No.                                Received

 3      473    . . . . . . . . . . . . . . . . . .2298

 4      446    . . . . . . . . . . . . . . . . . .2309

 5      450    . . . . . . . . . . . . . . . . . .2309

 6      713    . . . . . . . . . . . . . . . . . .2320

 7      726    . . . . . . . . . . . . . . . . . .2321

 8      723    . . . . . . . . . . . . . . . . . .2326

 9      724    . . . . . . . . . . . . . . . . . .2386

10                      PLAINTIFF EXHIBITS

11     Exhibit No.                                Received

12      904    . . . . . . . . . . . . . . . . . .2336

13      902    . . . . . . . . . . . . . . . . . .2342

14      899    . . . . . . . . . . . . . . . . . .2344

15      901    . . . . . . . . . . . . . . . . . .2346

16

17

18

19

20

21

22

23

24

25
```