UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                         Plaintiff,     :     12 Civ. 2826 (DLC)
              -v-                       :
                                        :
APPLE INC., et al.,                     :
                                        :
                         Defendants.    :
                                        :     OPINION & ORDER
----------------------------------------X
                                        :
THE STATE OF TEXAS, et al.,             :
                                        :
                         Plaintiffs,    :
              -v-                       :     12 Civ. 3394 (DLC)
                                        :
PENQUIN GROUP (USA) INC., et al.,       :
                                        :
                         Defendants.    :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiff the United States:

Mark W. Ryan
Lawrence E. Buterman
Daniel McCuaig
Stephen T. Fairchild
Nathan P. Sutton
Carrie Syme
Bill Jones
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530

<u>For plaintiff States</u>:

For State of Texas, <u>Liaison Counsel for Plaintiff States</u>

Gabriel Gervey
Eric Lipman
David Ashton
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711

For State of Connecticut, <u>Liaison Counsel for Plaintiff States</u>

W. Joseph Nielsen
Gary M. Becker
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

<u>For defendant Apple Inc.</u>:

Orin Snyder
Lisa H. Rubin
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166

Daniel S. Floyd, <u>Pro hac vice</u>
Daniel G. Swanson, <u>Pro hac vice</u>
Gibson, Dunn & Crutcher, LLP
333 South Grand Ave.
Los Angeles, CA 90071

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Howard E. Heiss
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Table of Contents

PROCEDURAL HISTORY..........................................5
SUMMARY OF FINDINGS.........................................9
BACKGROUND................................................13
   A.   Development of the E-book Market ...................14
   B.   Publishers' Discontent with the $9.99 Price Point ...15
   C.   January 2009-December 2009: Publisher Defendants
   Pursue Strategies to Combat Amazon Pricing..............16
   D.   Apple's Development of iBooks ......................26
   E.   December 15 to 16, 2009:  Apple's First New York
   Meetings with Publishers................................30
   F.   Apple Switches Gears and Presents An Agency Model
   with 30% Commission.....................................37
   G.   Apple's Term Sheet: All E-tailers to Agency and
   Pricing Caps............................................45
   H.   Creation of the MFN Clause ........................47
   I.   January 11: Apple Distributes Draft Agency Agreements50
     1.  MFN Negotiations..................................52
     2.  30 Percent Commission Negotiations................58
     3.  Price Tier Negotiations...........................59
   J.   January 18-27: Publishers Initiate Agency
   Negotiations with Amazon................................66
   K.   January 21-26:  Execution of Agreements ...........73
   L.   January 27:  The Launch of the iPad and iBookstore ..85
   M.   January 28 to 31:  The Publisher Defendants Force
   Amazon to Adopt the Agency Distribution Model...........86
   N.   The Five Amazon Agency Agreements .................90
   O.   Prices after Agency ...............................94
   P.   Random House Adopts an Agency Model ...............99
   Q.   The Publisher Defendants Require Google to Adopt an
   Agency Model...........................................101
   R.   Concluding Observations ..........................102
DISCUSSION...............................................104
   A.   Legal Standard ...................................104
   B.   Analysis of the Evidence .........................113
APPLE'S ARGUMENTS........................................122
   A. The Monsanto Decision and Apple's Independent Business
   Interests..............................................125
   B.   Apple's Intent ...................................135
   C.   Windowing ........................................140
   D.   Characterization of the Evidence .................142
     1.  Initial Meetings with the Publishers..............144
     2.  Conspiracy by Telepathy..........................146
     3.  Steve Jobs's Statements..........................149
     4.  The Publishers Raised Prices, Not Apple..........150

      E.   Per Se Liability ...................................152
      F.   Avoiding a Dangerous Precedent .....................155
      CONCLUSION..............................................159

DENISE COTE, District Judge:

       This Opinion explains how and why the prices for many

electronic books, or "e-books," rose significantly in the United

States in April 2010.  Plaintiffs the United States of America

("DOJ") and thirty-three states and U.S. territories (the

"States") (collectively, "Plaintiffs"), filed these antitrust

suits on April 11, 2012, alleging that defendant Apple Inc.

("Apple") and five book publishing companies conspired to raise,

fix, and stabilize the retail price for newly released and

bestselling trade e-books in violation of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1 ("Sherman Act"), and

various state laws.  These cases represent two of four related

actions brought before this Court alleging the same e-books

price-fixing conspiracy between Apple and the publishers.[1]  The

publishers are Hachette Book Group, Inc. ("Hachette"),

HarperCollins Publishers LLC ("HarperCollins"), Holtzbrinck

---

[1] The other two cases are State of Texas, et al. v. Hachette Book
Group, Inc., et al., 12 Civ. 6625 (DLC), in which forty-nine
states, the District of Columbia, and the U.S. Territories and
Possessions the Virgin Islands, Puerto Rico, the Northern
Mariana Islands, Guam, and American Samoa, bringing claims as
parens patriae, have settled their claims against Hachette,
HarperCollins, and Simon & Schuster ("Settlement Action"); and
In re: Electronic Books Antitrust Litigation, 11 MD 2296 (DLC),
in which class action plaintiffs bring claims for damages
("Class Action").

4

Publishers LLC d/b/a Macmillan ("Macmillan"), Penguin Group (USA), Inc. ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster" or "S&S") (collectively, "Publisher Defendants").

Only Apple proceeded to trial; the Publisher Defendants have settled their claims with both the DOJ and the States. This Opinion presents the Court's findings of fact and conclusions of law following the bench trial that was held from June 3 to 20, 2013 to resolve the issue of Apple's liability and the scope of any injunctive relief.  As described below, the Plaintiffs have shown that Apple conspired to raise the retail price of e-books and that they are entitled to injunctive relief.  A trial on damages will follow.


PROCEDURAL HISTORY

Fact and expert discovery in these actions concluded on March 22, 2013.  The parties' Joint Pretrial Order, proposed findings of fact and conclusions of law, and pretrial memoranda were submitted on April 26 and, following rulings on redactions, were filed on May 14.

At the time the trial was scheduled, the parties agreed that a bench trial would resolve claims for liability and injunctive relief.  With the parties' consent, the trial was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony

from witnesses under a party's control through affidavits submitted with the pretrial order.  The parties also served with the Joint Pretrial Order copies of all exhibits and deposition testimony that they intended to offer as evidence in chief at trial.[2]

At trial, the Plaintiffs called twelve fact witnesses and two expert economists.  The Plaintiffs' fact witnesses included three Apple employees: Eddy Cue ("Cue"), Senior Vice President of Internet Software and Services at Apple; Keith Moerer ("Moerer"), a Director of iTunes at Apple; and Kevin Saul ("Saul"), Associate General Counsel at Apple, and the lead business lawyer supporting Apple's Internet and Software Services division.  The Plaintiffs also called senior executives from each of the five Publisher Defendants: David Shanks ("Shanks"), CEO of Penguin; Carolyn Reidy ("Reidy"), President

---

[2] The Court's procedures for non-jury proceedings were discussed in detail at conferences held on June 22 and October 26, 2012, and May 8, 2013.  As the parties were informed, the Court prepared a draft opinion in advance of the bench trial based on the witness affidavits and other documents submitted with the pretrial order and the arguments of counsel in their trial memoranda.  At trial, the affiants swore to the truth of the contents of their affidavits and were tendered for cross and redirect examination, and the other trial evidence was formally received.  The parties understood that the Court's final findings of fact and conclusions of law would incorporate all of this evidence.  Consistent with these procedures, and with the expectation that the Court had already prepared a draft opinion, the parties jointly asked the Court for its preliminary views on the merits at the final pretrial conference held on May 23, 2013.

and CEO of Simon & Schuster; Brian Murray ("Murray"), CEO of HarperCollins; John Sargent ("Sargent"), CEO of Macmillan; and David Young ("Young"), Chairman and CEO of Hachette from 2006 through March 2013, who currently serves as Chairman of the Board of Directors of Hachette.  The Plaintiffs called four additional fact witnesses: Russell Grandinetti ("Grandinetti"), Vice President -- Kindle at non-party Amazon.com ("Amazon"); David Naggar ("Naggar"), Vice President of Kindle Content at Amazon; Laura Porco ("Porco"), Amazon's Director of Kindle Books from 2006 to 2011; and Thomas Turvey ("Turvey"), Director of Strategic Partnerships at non-party Google Inc. ("Google").  The Plaintiffs' expert witnesses were Dr. Richard Gilbert ("Gilbert"), Emeritus Professor of Economics and Professor of the Graduate School at the University of California, Berkeley, and a Senior Consultant (Affiliate) at Compass Lexecon, an economic consulting firm; and Dr. Orley Ashenfelter ("Ashenfelter"), the Joseph Douglas Green 1895 Professor of Economics at Princeton University.

Affidavits submitted by the Plaintiffs constituted the direct testimony of four of their fact witnesses -- Grandinetti, Naggar, Porco, and Turvey -- and both of their expert witnesses. Apple had intended to call seven of Plaintiffs' witnesses in its own case -- Cue, Moerer, Murray, Reidy, Sargent, Saul, and Young.  Thus, these witnesses' affidavits were also received

during the Plaintiffs' case in chief.  The Plaintiffs subpoenaed Shanks to testify at trial.[3]  Each of these witnesses appeared at trial and was cross-examined.

The Plaintiffs also offered excerpts from the depositions of John Makinson ("Makinson"), Chairman and CEO of the Penguin Group, the parent company of Penguin; Arnaud Nourry ("Nourry"), Chairman and CEO of Hachette Livre, the parent company of Hachette; and Maja Thomas ("Thomas"), Senior Vice-President at Hachette.  Apple offered counter-designations as to Nourry and Thomas.

During the presentation of its defense, Apple presented affidavits constituting the direct testimony of three fact witnesses and three expert economists.  Apple's fact witnesses were Robert McDonald ("McDonald"), the manager of Apple's U.S. iBookstore; Theresa Horner ("Horner"), Vice President of Digital Content for Barnesandnoble.com, a subsidiary of non-party Barnes & Noble, Inc. ("Barnes & Noble"); and Madeline McIntosh ("McIntosh"), Chief Operating Officer of non-party Random House, Inc. ("Random House").  Apple's expert witnesses were Dr. Benjamin Klein ("Klein"), Professor Emeritus of Economics at the University of California, Los Angeles, Senior Consultant at

---

[3] Penguin settled these actions on the eve of trial and therefore the affidavit constituting the direct testimony of Shanks, which had been submitted with the Joint Pretrial Order, was not offered at trial.

Compass Lexecon, and President of EAC Associates, Inc.; Dr.
Michelle Burtis ("Burtis"), Ph.D., Senior Advisor at Cornerstone
Research, Inc., an economic and financial consulting firm; and
Dr. Kevin Murphy ("Murphy"), George J. Stigler Distinguished
Service Professor of Economics at the University of Chicago, and
Faculty Research Associate at the National Bureau of Economic
Research.  Each of these witnesses, except McIntosh, appeared at
trial and was cross-examined.  The Plaintiffs did not seek to
cross-examine McIntosh.

As noted, the bench trial was held from June 3 to June 20,
2013, and this Opinion presents the Court's findings of fact and
conclusions of law.  The findings of fact appear principally in
the following Background section, but also appear in the
remaining sections of the Opinion.


SUMMARY OF FINDINGS

The Plaintiffs have shown that the Publisher Defendants
conspired with each other to eliminate retail price competition
in order to raise e-book prices, and that Apple played a central
role in facilitating and executing that conspiracy.  Without
Apple's orchestration of this conspiracy, it would not have
succeeded as it did in the Spring of 2010.

There is, at the end of the day, very little dispute about
many of the most material facts in this case.  Before Apple even

9

met with the first Publisher Defendant in mid-December 2009, it knew that the "Big Six" of United States publishing -- the Publisher Defendants and Random House (collectively, the "Publishers") -- wanted to raise e-book prices, in particular above the $9.99 prevailing price charged by Amazon for many e-book versions of New York Times bestselling books ("NYT Bestsellers") and other newly released hardcover books ("New Releases").  Apple also knew that Publisher Defendants were already acting collectively to place pressure on Amazon to abandon its pricing strategy.

At their very first meetings in mid-December 2009, the Publishers conveyed to Apple their abhorrence of Amazon's pricing, and Apple assured the Publishers it was willing to work with them to raise those prices, suggesting prices such as $12.99 and $14.99.  Over the course of their negotiations in December 2009 and January 2010, Apple and the Publisher Defendants educated one another about their other priorities. Apple strongly hoped to announce its new iBookstore when it launched the iPad on January 27, 2010, but would only do so if it had agreements in place with a core group of Publishers by that date, could assure itself it would make a profit in the iBookstore, and could offer e-book titles simultaneously with their hardcover releases.  For their part, if the Publisher Defendants were going to take control of e-book pricing and move

the price point above $9.99, they needed to act collectively;
any other course would leave an individual Publisher vulnerable
to retaliation from Amazon.

Apple and the Publisher Defendants shared one overarching
interest -- that there be no price competition at the retail
level.  Apple did not want to compete with Amazon (or any other
e-book retailer) on price; and the Publisher Defendants wanted
to end Amazon's $9.99 pricing and increase significantly the
prevailing price point for e-books.  With a full appreciation of
each other's interests, Apple and the Publisher Defendants
agreed to work together to eliminate retail price competition in
the e-book market and raise the price of e-books above $9.99.

Apple seized the moment and brilliantly played its hand.
Taking advantage of the Publisher Defendants' fear of and
frustration over Amazon's pricing, as well as the tight window
of opportunity created by the impending launch of the iPad on
January 27 (the "Launch"), Apple garnered the signatures it
needed to introduce the iBookstore at the Launch.  It provided
the Publisher Defendants with the vision, the format, the
timetable, and the coordination that they needed to raise e-book
prices.  Apple decided to offer the Publisher Defendants the
opportunity to move from a wholesale model -- where a publisher
receives its designated wholesale price for each e-book and the
retailer sets the retail price -- to an agency model, where a

publisher sets the retail price and the retailer sells the e-book as its agent.

The agency agreements that Apple and the Publisher Defendants executed on the eve of the Launch divided New Release e-books among price tiers. The top of each tier, or cap, was essentially the new price for New Release e-books. The caps included $12.99 and $14.99 for many books then being sold at $9.99 by Amazon.

The agreements also included a price parity provision, or Most-Favored-Nation clause ("MFN"), which not only protected Apple by guaranteeing it could match the lowest retail price listed on any competitor's e-bookstore, but also imposed a severe financial penalty upon the Publisher Defendants if they did not force Amazon and other retailers similarly to change their business models and cede control over e-book pricing to the Publishers. As Apple made clear to the Publishers, "There is no one outside of us that can do this for you. If we miss this opportunity, it will likely never come again."

Through the vehicle of the Apple agency agreements, the prices in the nascent e-book industry shifted upward, in some cases 50% or more for an individual title. Virtually overnight, Apple got an attractive, additional feature for its iPad and a guaranteed new revenue stream, and the Publisher Defendants removed Amazon's ability to price their e-books at $9.99. A

detailed explanation of how Apple facilitated this conspiracy and changed the face of the e-book industry follows.

BACKGROUND

Defendant Apple engages in a number of businesses, but as relevant here it sells the iPad tablet device and distributes e-books through its iBookstore.  E-books are books that are sold to consumers in electronic form, and that can and must be read on a dedicated electronic device such as the iPad, the Barnes & Noble Nook, or Amazon's Kindle.  The Publisher Defendants publish both e-books and print books.  The five Publisher Defendants and Random House represent the six largest publishers of "trade" books in the United States.[4]  These six firms are often referred to within the publishing industry as the "Big Six."[5]  The Publisher Defendants sold over 48% of all e-books in the United States in the first quarter of 2010.

---

[4] Trade books consist of general interest fiction and non-fiction books.  They are to be distinguished from "non-trade" books such as academic textbooks, reference materials, and other texts.

[5] Titles from the Bix Six publishers accounted for over 90% of all U.S. NYT Bestseller book sales in 2010.  Random House is the largest of the Big Six, followed, in descending order of size, by Penguin, Simon & Schuster, HarperCollins, Hachette, and Macmillan.  When it comes to e-books, the largest of the Big Six in early 2010 was Penguin, followed in descending order by Random House, HarperCollins, Hachette, S&S, and Macmillan.

A. Development of the E-book Market

Amazon's Kindle was the first e-reader to gain widespread commercial acceptance.  When the Kindle was launched in 2007, Amazon quickly became the market leader in the sale of e-books and e-book readers.[6]  Through 2009, Amazon dominated the e-book retail market, selling nearly 90% of all e-books.[7]

Amazon utilized a discount pricing strategy through which it charged $9.99 for certain New Release and bestselling e-books.  Amazon was staunchly committed to its $9.99 price point and believed it would have long-term benefits for its consumers.  In order to compete with Amazon, other e-book retailers also adopted a $9.99 or lower retail price for many e-book titles.

Prior to April 2010, the Publishers distributed print and digital books through a wholesale pricing model, in which a content provider sets a list price (also known as a suggested retail price) and then sells books and e-books to a retailer -- such as Amazon -- for a wholesale price, which is often a percentage of the list price.  The retailer then offers the book and e-book to consumers at whatever price it chooses.  Prior to

---

[6] The Nook was released two years later, in November of 2009, offering some competition to Amazon.  The iPad was released in April 2010.

[7] At present, the largest U.S. retailers of trade e-books include Apple, and non-parties Amazon, Barnes & Noble, Google, Kobo Inc., and Sony Corporation.

2009, many publishers set a wholesale price for e-books at a 20% discount from the equivalent physical book wholesale price to reflect the many cost savings associated with the distribution and sale of e-books.  For instance, there is no cost for the printing, storage, packaging, shipping, or return of e-books. With a digital book discount, Amazon's $9.99 price point roughly matched the wholesale price of many of its e-books.

B. Publishers' Discontent with the $9.99 Price Point

The Publishers were unhappy with Amazon's $9.99 price point and feared that it would have a number of pernicious effects on their profits, both in the short run and long-term.  In the short-term, the Publishers believed the low price point was eating into sales of their more profitable hardcover books, which were often priced at thirty dollars or more, and threatening the viability of the brick-and-mortar stores in which hardcover books were displayed and sold.  Over the long-term, they feared that consumers would grow accustomed to e-books priced at $9.99 and that the $9.99 price point would erode prices for all books, thereby threatening the business model for the publishing industry.  They believed that this low price failed to reflect the true value of many books and also failed to distinguish among books in terms of the effort entailed to create and produce them and in terms of their quality, however one might measure quality.

15

The Publishers also feared Amazon's growing power in the book distribution business.  They were concerned that, should Amazon continue to dominate the sale of e-books to consumers, it would start to demand even lower wholesale prices for e-books and might begin to compete directly with publishers by negotiating directly with authors and literary agents for rights -- a process referred to as disintermediation.[8]

As a result, the Publisher Defendants determined that they needed to force Amazon to abandon its discount pricing model. As Hachette's Young bluntly put it, they had to "defea[t] [Amazon's] $9.99 pricing policy," and prevent the "wretched $9.99 price point becoming a de facto standard."

C. January 2009-December 2009: Publisher Defendants Pursue Strategies to Combat Amazon Pricing

Beginning in at least early 2009, the Publisher Defendants began testing different ways to address what Macmillan termed "book devaluation to $9.99," and to confront what S&S's Reidy described as the "basic problem: how to get Amazon to change its pricing" and move off its $9.99 price point.  They frequently coordinated their efforts to increase the pressure on Amazon and decrease the likelihood that Amazon would retaliate -- an outcome each Publisher Defendant feared if it acted alone.

---

[8] In fact, as described below, Amazon announced a new initiative in January 2010 that would assist authors in self-publishing through Amazon on the Kindle Digital Platform.

One of the strategies that they employed was the elimination of the existing discount on wholesale prices of e-books.  This meant that the wholesale price for e-books would equal the wholesale price for physical books, and as a result, the wholesale price that Amazon paid for an e-book would be set at several dollars above Amazon's $9.99 price point.  This tactic, however, failed to convince Amazon to change its pricing policies and it continued to sell many NYT Bestsellers as loss leaders at $9.99.[9]

The Publishers were not shy about expressing their displeasure to Amazon about its $9.99 pricing.  In February 2009, Penguin told Amazon that "their 9.99 model" was "not a good sustainable one."  HarperCollins similarly warned Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers."  In March 2009, Macmillan's Sargent met with Amazon to express his own concern with the $9.99 price point, and indicated that "all the pubs" were talking about it.  In June 2009, S&S's Reidy bluntly told Amazon that the $9.99 price point was "a mistake" and that she would "continue to be vocal because she thinks it's terrible for the business."  In early December 2009, Hachette's

---

[9] Among other strategies that two or more of the Publishers discussed with each other were retail price maintenance, mandatory minimum advertised pricing, and a joint venture to sell e-books.

Nourry met with Amazon's Naggar, and told him that Amazon's
$9.99 pricing posed a "big problem" for the industry.  According
to Nourry, if Amazon raised e-book prices by even one or two
dollars it would "solve the problem."

     The Publisher Defendants did not believe, however, that any
one of them acting alone could convince Amazon to change its
pricing policy.  They also feared that if they did not act as a
group, Amazon would use its ever-growing power in the book
distribution business to retaliate against them.  As a result,
the Publisher Defendants conferred about their need to act
collectively if they were to have any impact on Amazon's
pricing.  As a Penguin executive reported to the Penguin Group
Board of Directors under the heading "competition and
collaboration," it "will not be possible for any individual
publisher to mount an effective response" to Amazon "because of
both the resources necessary and the risk of retribution, so the
industry needs to develop a common strategy."

     Thus, as early as December 2008, Stefan von Holtzbrinck of
Macmillan and Hachette's Nourry agreed "to exchange information
and cooperate very tightly on all issues around e-books and the
Kindle."  Nourry explained that "at the heart of our strategy"
are discussions among "top publishers" in the United States "to
create an alternative platform to Amazon for ebooks."  He
observed, however, that the goal of these ventures is "less to

compete with Amazon than to force it to accept a price level
higher than 9.99." During the Summer of 2009, Nourry came to
New York and met with the CEOs of Hachette's competitors on June
29 and 30. Nourry reported after his first day of meetings that
"the movement is positive" with respect to Macmillan, S&S,
HarperCollins, and Penguin. While he expressed his continued
fear that Amazon's pricing would lead to "selling content at 7$
. . . [l]ike it works in the music business," he was reassured
to know that "none of our competitors" wanted this to happen
either.

On a fairly regular basis, roughly once a quarter, the CEOs
of the Publishers held dinners in the private dining rooms of
New York restaurants, without counsel or assistants present, in
order to discuss the common challenges they faced, including
most prominently Amazon's pricing policies. Before one such
dinner, Hachette's Young promised Nourry that he would raise
with his competitors their options to confront the "potentially
dominant role played by . . . Amazon" in e-books, "in order to
control their strategy and pricing." As Young put it, "I hate
[Amazon's] bullying behavior and will be happy to support a
strategy that restricts their plans for world domination."

As the Publisher Defendants' CEOs testified, the Publishers
did not compete with each other on price; while they were
serious competitors, their preferred fields of competition were

over authors and agents.  Thus, they felt no hesitation in freely discussing Amazon's prices with each other and their joint strategies for raising those prices.

In the Fall of 2009, Reidy explained to her superior at Simon & Schuster's parent company CBS Corporation, Leslie Moonves ("Moonves"), that S&S was considering several different options to "get Amazon to change its pricing."  As Reidy explained,

> we've always known that unless other publishers follow us, there's no chance of success in getting Amazon to change its pricing practices. . . .  And of course you were right that without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react if we make a move."

Reidy assured Moonves, however, that she was "fairly sure that at least two of them would quickly follow us" and would "keep thinking of how to attack the problem (as we perceive it) of current eBook pricing; as you realize, we think it's too important to ignore."  Reidy acknowledged to Moonves that "we need to 'gather more troops' and ammunition first!"

In addition to raising the wholesale price of e-books, another strategy that Publisher Defendants adopted in 2009 to combat Amazon's $9.99 pricing was the delayed release or "withholding" of the e-book versions of New Releases, a practice

that was also called "windowing."[10]  By the end of 2009, four of
the Publisher Defendants -- Macmillan, Simon & Schuster,
Hachette, and HarperCollins -- had announced or implemented a
policy of windowing some of their most popular e-book titles on
Amazon.  By making the more expensive hardcover version
available to the public before the lower priced e-book, the
Publisher Defendants hoped to protect the sales of New Release
hardcover books and to pressure Amazon to raise its e-book
prices.  Sargent explained his support for withholding e-books
from Amazon in the following terms, "Right now it is all about
tactics while we try to get hardcovers over the artificially low
9.99 price point," and "we need to do something to budge Amazon
from their current strategy."  Hachette's Young similarly
believed that "windowing . . . was the only way we could deal
with Amazon selling off the family jewels."

    In order for the tactic of windowing to succeed, the
Publishers knew they needed to act together.  That several
Publishers synchronized the adoption and announcement of their
windowing strategies was thus no mere coincidence.  For example,

---

[10] Publishers had traditionally delayed the release of paperback
versions of hardcover books.  This practice is known as
windowing.  While the delayed release of some e-book titles,
particularly those of popular New Releases, is more technically
known as withholding, many in the publishing industry also
called it windowing, and that term will also be used in this
Opinion to refer to the delayed release of e-books as a strategy
employed by the Publisher Defendants to pressure Amazon to lift
its e-book prices.

Hachette's Young told Nourry in late Fall 2009, "[c]ompletely
confidentially, Carolyn [Reidy] has told me that they [S&S] are
delaying the new Stephen King, with his full support, but will
not be announcing this until after Labor Day."  Understanding
the impropriety of this exchange of confidential information
with a competitor, Young advised Nourry that "it would be
prudent for you to double delete this from your email files when
you return to your office."  When HarperCollins soon followed
with its own windowing announcement, delaying the digital
release of Sarah Palin's Going Rogue, Hachette's Nourry
congratulated Murray on his decision:  "Well done for the Palin
book," Nourry wrote, "and welcome to the Club!"

     The Publisher Defendants' synchronized windowing strategy
was publicly reported and tied to their discontent with Amazon's
pricing.  A Wall Street Journal article of December 9, entitled
"Two Major Publishers to Hold Back E-Books," reported that S&S
was windowing in order to "tak[e] a dramatic stand against the
cut-rate $9.99 pricing of e-book best sellers," and that
Hachette would follow suit in an effort to "preserve our
industry" from authors' work being "sold off at bargain-basement
prices."  The article's author noted that "publishers have come
to fear that the bargain prices will lead consumers to conclude
that books are worth only $10, or less, upsetting the pricing
model that has survived for decades."  The article reported that

22

S&S was intentionally focusing its windowing efforts on its most popular titles; as an S&S executive explained, she was concerned that e-book sales were "cannibalizing new best-selling hardcovers, which are the mainstay of the publishing business."

A New York Times article of the same day entitled "Publishers Delay E-book Releases," described an even broader effort among the Publisher Defendants to delay the digital release of certain popular titles. It reported that "[p]ublishers have been debating the timing of e-books in part as a way to protest the low prices -- typically $9.99 -- that online retailers like Amazon and Sony are offering on ebook versions of new releases and best sellers." It stated that at least four Publishers -- S&S, Hachette, HarperCollins, and Macmillan -- already had begun or announced an intention to window e-books in the coming year. The article described the economics of windowing and tied the strategy to the protection of Publishers' physical book business, stating that

> Although publishers currently receive the same wholesale price for an e-book that they receive for a print book (meaning the retailer takes a loss on the sale of the most popular e-books), publishing houses worry that eventually, Amazon and other e-book retailers will pressure publishers to take a smaller cut on e-books. In addition, since 95 percent of the business still comes from print booksellers, the publishers want to prevent those retailers from reducing orders.

The next day, the Wall Street Journal similarly announced that others had joined the windowing movement, reporting that

23

"HarperCollins Joins Ranks of Those Delaying E-Books," as "the
debate over the timing and pricing of e-books heats up."  The
article stated that, beginning in early 2010, HarperCollins will
delay the release of "five to ten hardcover titles each month."
It quoted Murray saying, "We have to believe that delaying the
e-book edition helped hardcover sales."  The article also
reported that Penguin was "watching the current situation with
interest."

    The three Publisher Defendants who had announced their
adoption of a windowing policy hoped that Macmillan, Penguin,
and Random House would join their campaign.  As Nourry expressed
on December 6, in order "[t]o succeed our colleagues must . . .
follow us."  Five days later, S&S's Reidy advised Macmillan that
it would "love" for Macmillan "to join" Hachette, HarperCollins,
and S&S in windowing, and "fel[t] if one more publisher comes
aboard, everyone else will follow suit."  On December 15,
Macmillan announced that, starting in January, it would delay
release of most of its e-books for 90 days.[11]  It was reported in
the Wall Street Journal on December 16.

    This left only two of the Big Six not yet committed to
windowing.  Penguin's Makinson reported in December that
Hachette had started to "put a lot of pressure" on Penguin "to
join the windowing movement," but Penguin refused to do so.

----

[11] As it turned out, Macmillan never implemented this policy.

Penguin's McCall was well aware that "[i]f other publishers don't follow suit" with windowing, Amazon's $9.99 "predatory pricing will continue, and we'll lose."  When Penguin and Random House chose not to join their competitors and delay the release of e-books, Hachette's Young found their refusal "deeply divisive and disappointing."

Even though by the Winter of 2009, four of the Publisher Defendants had delayed the release of some e-books or announced an intention to so, they knew that windowing was not a long-term solution to Amazon's $9.99 pricing model.  Among other things, windowing carried serious risks.  As Sargent recognized, windowing was "really bad" because it encouraged piracy.  Reidy noted that windowing "did not seem the wisest course" since "it doesn't seem smart to penalize the eBook reader: we in fact want to encourage eBook purchases, so long as we can maintain our margins and income."  She feared that windowing could "alienate an entire portion (and a growing one) of our audience."  As Sargent admitted to an author on December 14, while windowing could be used as a short-term tactic, "[w]indowing is entirely stupid," and "actually makes no damn sense at all really."  As a Penguin study showed, when a Publisher delayed the release of e-books, its sales never recovered.  The lost customers neither bought the print book at a higher price nor returned to purchase those e-books when they finally became available.

Sargent, for one, hoped that over time Publishers would be able to move to a system of simultaneous release of e-books with their physical counterparts, but at a higher price point of between $12.95 and $14.95.  In order to do so, the Publishers would need to find a way to gain long-term control over pricing, including on Amazon.  "The questions is," Sargent wondered, "how to get there?"  Other Publisher Defendants envisioned even higher price points for e-books, but pondered the same fundamental dilemma.  It was in this context that Apple arrived on the scene and provided the Publisher Defendants with the means to achieve their shared goal.

D. Apple's Development of iBooks

Apple is one of America's most admired, dynamic, and successful technology companies.  Its innovative devices are immensely popular not only in this country but around the world.  But, as of 2009, Apple had no e-bookstore.  Consumers could read e-books on Apple's devices through third party software, such as apps, but Apple did not yet have its own e-reading software or e-bookstore with a collection of books available for purchase.

Apple did not have an e-bookstore in 2009 because it did not yet have a device that its founder Steve Jobs ("Jobs") believed would be a great e-reader.  He demanded no less before he would invest his company's energies in e-books.  That was about to change.

26

In 2009, Apple was close to unveiling the iPad. With this revolutionary tablet, Apple was able to contemplate the arrival of its first great device for reading e-books. Therefore, under the direction of Apple's Cue, Moerer and others began studying the e-book industry. As of 2009, Cue had worked at Apple for twenty years and had played a major role in creating Apple's content stores, beginning with Apple's Online Store in 1998, the iTunes Store in 2003, and the App Store in 2008. Since 2004, Cue had been responsible for running all of Apple's digital content stores and had led Apple's negotiations in its deals with major content providers.

By June, Cue's team had assembled data that showed that the book market in North America was larger than the music market. The book industry was estimated to be roughly $35 to $42 billion in size, with trade books comprising $12.5 billion of that figure. While trade e-books accounted for just $100 million or so of those numbers, that market was growing at an exponential rate. Apple's McDonald predicted that the e-book market could reach nearly $1 billion in 2010.

Apple, of course, knew that Amazon was the dominant e-retailer ("e-tailer") of books. While part of Amazon's success could be attributed to its Kindle, Apple understood that another reason for Amazon's success in the e-book market was its low prices. As of that time, Apple had little experience with

competing on price when selling content; indeed, it considered itself a price "leader" in selling music, apps, and other content.

It was also clear to Cue that "all the content owners hate Amazon."[12]   As early as February 2009, Cue recognized that "[t]he book publishers would do almost anything for us to get into the ebook business."   Apple had also discovered analyst reports in June 2009 that indicated that a price of $12.99 could be a more profitable price point for e-books than Amazon's $9.99.

By November 2009, Apple had compiled a "Business Outlook" for audio book and e-book opportunities.   It concluded that selling e-books as individual apps was "flawed."   It was at that relatively late date that Jobs authorized Cue to pursue the development of a dedicated Apple e-bookstore (the "iBookstore") for the iPad.   Apple planned to demonstrate the iPad to the public at the Launch on January 27, 2010, and planned to ship the devices to stores in early April 2010.

Apple believed that the iPad would be a transformational e-reader.   In contrast to the black-and-white e-reader devices on the market at the time, the iPad would have the capacity to display not only e-book text but also e-book illustrations and photographs in color on a backlit screen.   The iPad would also

---

[12] Cue attributed the Publishers' hatred of Amazon to Amazon "leveraging [its] force in physical [books] to force [the Publishers] into bad deals" in e-books.

28

have audio and video capabilities and a touch screen, which
Apple believed would be seen by readers as a particularly
attractive feature.

Even though the iPad Launch would happen with or without an
iBookstore, Apple did hope to announce its new iBookstore at the
Launch.  This would ensure maximum consumer exposure and provide
a dramatic component of the Launch.  But, this left Cue with
less than two months for Apple to acquire enough content to
create a viable Apple e-bookstore, and that period included the
Christmas and New Year holidays.[13]  As a result, Apple
streamlined its efforts and concentrated on executing agreements
with the Big Six Publishers for trade e-books.  It would broaden
its campaign to add more publishers and to include other kinds
of e-books, including textbooks and every other kind of e-book,
after the Launch.

Cue also had his own reasons for working hard to make the
iBookstore a reality in time for the Launch.  He was, of course,
an able and experienced negotiator.  He took pride in all he had
achieved for Apple and wanted to succeed in adding an
e-bookstore to its other content domains.  Cue believed that
with the introduction of the iPad the iBookstore held the

---

[13] The record does not reveal when Apple began to develop the
software for the iBookstore, but it is clear that Apple was
intensely engaged in that development throughout this two month
window.

potential to be another rousing success for his company.  But,
beyond professional pride, Cue had more personal reasons for
making the iBookstore a reality in record-breaking time.  Cue
knew that Jobs was seriously ill and that this would be one of
his last opportunities to bring to life one of Jobs's visions
and to demonstrate his devotion to the man who had given him the
opportunity to help transform American culture.

  E. December 15 to 16, 2009:  Apple's First New York Meetings
    with Publishers

  Beginning on December 8, 2009, Cue's team contacted the
Publishers to set up meetings the following week to discuss an
"extremely confidential" subject.  Apple made it clear in these
calls that it would be trying to meet with each of the Big Six
CEOs on its whirlwind trip to New York City.

  Apple's requests for meetings in New York was an exciting
turn of events for the Publishers and prompted a flurry of
telephone calls among them.  They speculated about how they
might turn Apple's entry into the e-book business to their
advantage in their battle with Amazon.  They were well aware of
the press reports that Apple would be announcing the arrival of
another revolutionary device.  Reidy, Murray, and Young
exchanged at least five telephone calls on December 10 and 11
alone.  These calls among the Publisher Defendants' CEOs would
continue and intensify at critical moments during the course of

the Publishers' ensuing negotiations with Apple.[14]  See
Appendix A.

Even before it met with any of the Publishers on December
15, Apple already knew several things that are important to the
events that would unfold in the coming weeks.  As previously
described, Apple understood that the Publishers wanted to
pressure Amazon to raise the $9.99 price point for e-books, that
the Publishers were searching for ways to do that, and that they
were willing to coordinate their efforts to achieve that goal.
By December 15, the Wall Street Journal and New York Times
articles of December 9 and 10 had described the windowing
commitment made by three of the Big Six.  Cue viewed the e-book
market at the time to be dysfunctional and ripe for Apple's
arrival.

For its part, Apple had decided that it would not open the
iBookstore if it could not make money on the store and compete
effectively with Amazon.[15]  Apple knew that it needed access to a

---

[14] The telephone calls among the Publisher Defendants during the
period of their negotiations with Apple represented a departure
from the ordinary pattern of calls among them.  By contrast,
there was only one telephone call made between these CEOs during
the week prior to Apple's first contact with the Publishers on
December 8.

[15] Some months earlier, Apple had considered proposing to Amazon
that they simply divide the e-market for books and music, with
iTunes acting as "an ebook reseller exclusive to Amazon and
Amazon becom[ing] an audio/video iTunes reseller exclusive to
Apple."

large number of titles.  It was unwilling to allow e-books to be
windowed at any Apple store.  Apple also preferred to sell
e-books at prices below their physical counterparts, although
that object largely fell by the wayside in the coming weeks.
Prior to meeting with the Publishers, Apple assumed that it
would purchase e-books from them under the wholesale model and
resell them, in line with the arrangement Apple used to obtain
movies and TV shows for resale through its iTunes store.

    As a master negotiator, Cue came well prepared for his
meetings.  He knew how to convey Apple's conditions for entry
and at the same time give the Publishers an incentive for
entering, almost overnight, into a partnership with Apple.  He
decided to entice the Publishers by conveying an unambiguous
message that Apple was willing to sell e-books at prices up to
$14.99, that is, at a price point $5 above Amazon's price for
many New Releases and NYT Bestsellers.

    Cue, Moerer, and their in-house attorney Saul met
separately with Hachette, Penguin, and Random House on December
15, and with HarperCollins, Macmillan, and S&S on December 16.
If there was one Publisher that Apple most desired to have in
its iBookstore, it was Random House, the largest Publisher.  As
events unfolded, however, that would be the only Publisher who
declined to join the iBookstore before the Launch.

32

Following a script, Apple conveyed in each of these meetings that it hoped to be able to begin selling e-books through an e-bookstore within the next 90 days as a feature on a new web-enabled machine.  Apple expected that its entry into the market with an iBookstore on this device would help make books "cool" for the iTunes generation and quickly make Apple the vehicle through which a significant percentage of e-books were sold.

Cue emphasized that Apple would only launch an e-bookstore if it got all of the major Publishers to sign on.  As Cue intended, each of the Publishers understood that this was a reference to the Big Six.

The parties exchanged thoughts about a workable business model in these meetings.  Apple learned that current wholesale prices for e-books typically fell in the range of $13 to $15, and some were even sold at prices as high as $17.50.  Cue told Publishers that they would need to lower their wholesale prices for Apple if Apple were to enter the business.  In order for Apple to compete with Amazon it needed to be able to price e-books as cheaply as Amazon did, and it was not willing to pursue a strategy of loss leaders.  As Reidy recorded, Apple expressed that it "cannot tolerate a market where the product is sold significantly more cheaply elsewhere."

Well aware of the Publishers' experimentation with windowing, Apple also told Publishers that it opposed windowing; it believed that withholding e-books alienated customers and led to piracy.  Random House and Macmillan agreed, telling Apple that they believed windowing was "a terrible, self-destructive idea," even though Macmillan admitted that it might be considering "holdbacks" on some NYT Bestsellers.

Hachette and later HarperCollins surprised Apple with their suggestion that, instead of a wholesale model, Apple adopt an agency model for the distribution of e-books.  Hachette told Apple that it had already discussed switching to an agency model with Barnes & Noble and had concluded that it was an attractive business model for selling e-books.[16]  During these meetings, Cue rejected the idea.  Within days, however, he would reconsider their suggestion.

Mainly, however, the Publishers told Apple how unhappy they were with Amazon's $9.99 price point.  Every Publisher with whom Apple met lamented Amazon's pricing New Releases and NYT Bestsellers at $9.99.  Several of them made clear that they were actively searching for a way to gain more control over pricing and were implementing tactics they did not enjoy, like

---

[16] Hachette's Thomas had spoken to a HarperCollins executive on December 10, in advance of their meetings with Apple, regarding exploring agency as an alternative business model.

34

windowing, in an attempt to effect the change that was of utmost importance to them.

For example, Penguin in its meeting with Apple shared its view that a $9.99 e-book was not a "sustainable model."  The next day, S&S frankly admitted "hating" Amazon pricing, and HarperCollins revealed that it was interested in the agency model in order "to fix Amazon pricing."  HarperCollins advocated that e-book prices be set in the range of $18 to $20, which Cue viewed as utterly unrealistic.  Listening to the Publishers, Cue understood that they were afraid that Amazon's pricing strategy threatened their overall business.

Apple, in turn, assured the Publishers that it was not interested in entering the e-book market by pursuing a low-price strategy.  Apple opined that $9.99 was not yet "engrained" in the consumer mind, and suggested in each meeting pricing e-books at between $11.99 and $14.99.  The Publishers were thrilled. Macmillan agreed immediately with Apple's suggested $14.99 retail price for New Releases.

As Cue promptly reported to Jobs on December 15, after he had completed the first three of his six meetings, "[c]learly, the biggest issue is new release pricing and they want a proposal from us."  Cue was confident that he would be able to build the iBookstore in time for the Launch.  As he told Jobs, "[n]othing scared me or made me feel like we can't get these

35

deals done right away."  In his view, the Publishers had been
"ecstatic" about what Apple's arrival could mean for "their
industry."

On the heels of their initial meetings with Apple, the
Publisher Defendants enthusiastically shared the good news that
Apple was willing to enter the e-book market with a
significantly higher price point for newly-released e-books.  On
December 17, Reidy reported the "[t]errific news!" to Moonves
that Apple was entering the e-book market and "was not
interested in a low price point for digital books."  Reidy
understood that "they [Apple] don't want Amazon's $9.95 to
continue."  Hachette's Nourry similarly told Cue after their
initial meeting that he was glad it appeared "our business
interests are very much aligned."  HarperCollins later reflected
that Apple was the Publishers' "best partner" because it
"do[es]n't like deep discounting."

Several of the Publishers hashed over their meetings with
Apple with one another.  After Young had met with Apple but
before S&S had its meeting, Young could not resist calling Reidy
to share the wonderful news that the "Top Man" at Apple opposed
$9.99 pricing.  He hesitated to say more because S&S would be
meeting with Apple the following day, and he did not want to
"spoil [the] fun."  Young and Reidy promised to "check in" with
each other after S&S had its meeting with Apple, and did so in

36

several calls over the course of the next two days.[17]  At a breakfast meeting, Penguin's Makinson discussed the Apple meetings with Hachette's Nourry.  On December 17, Rupert Murdoch, Chairman and CEO of HarperCollins' parent company News Corp, relayed to Random House that Apple would soon be launching an e-reader and would be "selling books at 15 dollars."  Charlie Redmayne, a HarperCollins' digital officer, bluntly suggested to Murray immediately after their meeting with Apple on December 16 that they coordinate a response to Apple with the other Publishers.  As Redmayne wrote, in light of their "[g]reat meeting . . . I wou[]ld talk to the other CEO's early and look to present in early Jan."

F. Apple Switches Gears and Presents An Agency Model with 30% Commission

Having received an enthusiastic reception from the Publishers, the Apple team returned to Apple's headquarters in Cupertino, California and quickly absorbed what it had heard. One idea that it considered proposing to the Publishers, but rejected, was an across-the-board 25% discount for e-books off the wholesale price for physical books.  With many NYT Bestsellers having a $12 wholesale price for the hardcover book, this would allow a $9 digital wholesale price, which Apple's

---

[17] On December 15, Hachette's Young spoke to S&S's Reidy by telephone prior to his meeting with Cue.  On December 16, Reidy called Young just minutes after her meeting with Cue had ended. The next day, the two exchanged three calls.

Moerer thought should be "acceptable" to the Publishers for all
of their e-books with the possible exception of a few
blockbusters.

Cue quickly decided, however, to go a different route.
Unless the Publishers agreed to lower wholesale prices for
e-books, Apple would run the risk of losing money if it tried or
was forced to match Amazon's pricing to remain competitive.  The
wholesale model also allowed the Publishers to try to control
digital book prices by windowing e-books.  As Apple had
expressed to the Publishers, it strongly believed that
withholding content would interfere with the growth of the
digital market and was inconsistent with its business goals and
practices.  Apple thus embraced the model that Hachette and
HarperCollins had proposed -- the agency model.  Apple was
already familiar with this model since it used the agency model
to sell apps through its App Store.

Apple realized that the recent turmoil in the digital book
business strengthened its hand in proposing this new business
model to the Publishers.  Apple did not have to open an e-
bookstore when it launched the iPad; it could add the iBookstore
later.  On the other hand, the Publishers were searching for an
alternative to Amazon's pricing policies and excited about
Apple's entry into the e-book industry and the prospect that
that entry would give them leverage in their negotiations with

Amazon.  Apple appreciated that, in the words of Macmillan's
Sargent, the Publishers viewed Apple as "offer[ing] the single
best opportunity [they] would ever have to correct the imbalance
in our e-book market."

Apple settled on an agency model with a 30% commission, the
same commission it was using in its App Store.  Agency would
give the Publishers the control over e-book pricing that they
desired, and ensured that Apple would make a profit from every
e-book sale in its iBookstore without having to compete on
price.  Apple realized, however, that in handing over pricing
decisions to the Publishers, it needed to restrain their desire
to raise e-book prices sky high.  It decided to require retail
prices to be restrained by pricing tiers with caps.  While Apple
was willing to raise e-book prices by as much as 50% over
Amazon's $9.99, it did not want to be embarrassed by what it
considered unrealistically high prices.

The agency model presented one significant problem.  Apple
wanted its iBookstore to be a rousing success.  For that to
happen, Apple needed not only content but also customers.  Apple
realized that if it moved to an agency model with the
Publishers, Apple would be at a competitive disadvantage so long
as Amazon remained on the wholesale model and could price New
Releases and NYT Bestsellers at $9.99, or even lower to compete
with Apple.  Since it was inevitable that the Publishers would

raise e-book prices when given the opportunity -- indeed, Apple expected the Publishers to raise the prices to the tier caps -- e-books priced at $9.99 by Amazon would doom the iBookstore. Why would a consumer buy an e-book in the iBookstore for $14.99 when it could download it from Amazon for $9.99?

To ensure that the iBookstore would be competitive at higher prices, Apple concluded that it needed to eliminate all retail price competition.  Thus, the final component of its agency model required the Publishers to move all of their e-tailers to agency.  Apple expected that this proposal would appeal to the Publishers.  After all, it would allow them to "fix" their "problem" with Amazon's pricing.

Apple's first meetings with the Publishers in New York had occurred on a Tuesday and Wednesday.  Just three days later, on Saturday, Cue was ready to test drive his agency model and hear preliminary reactions from the Publishers.  On December 19, Cue emailed three of the six Publishers' CEOs to set up thirty minute meetings for the following Monday or Tuesday to "update you [on] all my findings and thoughts."  Cue already knew from the meetings earlier in the week that Hachette and HarperCollins were enamored of the agency model and did not contact them again at this stage.  He had pegged Penguin's CEO as a "follower," and chose to hold off on contacting him.  After all, Penguin and Random House were the only Publishers that had not publicly

announced any plans to withhold e-books from Amazon.  Cue decided instead to test his proposal with S&S, Macmillan, and Random House.

Cue chose these three Publishers carefully.  He considered Reidy a real "leader" among her fellow CEOs.  He was not wrong. As described below, she was instrumental in convincing both Penguin and Macmillan to sign up with Apple when they were wavering.  She was in frequent contact with Young, Shanks and Sargent at every critical juncture in the weeks before the Launch.

Cue reached out to Macmillan's Sargent for a different reason.  He had been impressed with Sargent's personal history, in particular his family's storied connection with the publishing industry.[18]  Cue believed that a partnership with Macmillan would add caché.  But, most importantly, Cue wanted the largest Publisher, Random House, to come on board.

Cue succeeded in speaking with key executives from each of these three Publishers early the following week.  He explained that he had met with all of the Big Six the preceding week, and had come to the conclusion that the way forward would involve four components.  First, the e-book "industry" needed to move to the agency model, which would allow the Publishers to set the

---

[18] Sargent's father, John Turner Sargent, Sr., was the President and CEO of the Doubleday & Company publishing house from 1963 to 1978, and led the company's expansion into an industry giant.

prices and introduce what Cue euphemistically termed "some level of reasonable pricing." Second, Apple would need a 30% margin on e-books sold through Apple. Third, he proposed setting prices for New Release e-books at $12.99, that is, $3 over Amazon's $9.99 price. Finally, to remove all retail price competition, the Publishers would have to adopt the agency model for all of their e-tailers.

Reidy described her conversation with Cue in a detailed email to colleagues at S&S that day. According to Reidy, Cue "didn't think anything [other than the agency model] would keep the market from its current pricing 'craziness.'" Reidy did not hesitate over the suggestion that the industry as a whole be moved to an agency model; Reidy had replied to Cue, "if we make these our terms, then they are our terms." Overall, Reidy was intrigued, but worried that the 30% commission for Apple would be too "steep."

Markus Dohle ("Dohle"), Chairman and CEO of Random House at the time, similarly described his conversation with Cue to colleagues at Random House. Dohle reported that Cue "thinks that book prices are becoming too low -- he is worried about the consumer perception. Therefore he suggests an 'agency model.'" Eliminating price competition with Amazon was essential to Cue since "[h]e assumes that if we find a new TOS [terms of sale, wholesale] model which would provide A[pple] with an acceptable

margin, Amazon would lower the prices again following . . .
their loss leader[] strategy."  As Dohle reported, when he
expressed concern about Amazon's willingness to accept an agency
model, Cue suggested that "windowing could be used to establish
a distributor [agent] model" if Amazon balked.

Shortly after his conversation with Cue, Sargent wrote to
Cue to suggest a pricing strategy that would allow Publishers to
price some e-books at $19.95, but that "put the majority of new
releases at the 14.95 or 12.95 price points."  Introducing the
concept of a dual model, an idea that would continue to have
appeal for Sargent in the following weeks, Sargent also
suggested that Apple offer two alternative terms of sale -- a
"30% agency model with no windowing," and "[a] [d]iscount model
that includes windowing" -- allowing each Publisher to "decid[e]
which model to buy under."  Sargent later reflected to another
Macmillan executive that he believed this dual approach "[w]ould
force Amazon's hand."

On December 21, Cue advised Jobs that his talks with the
Publishers had gone "well and everyone understood our position
and thought it was reasonable."  Cue observed that the
Publishers recognized "the plus" of moving to an agency model,
namely it "solves Amazon issue."[19]  On the "negative" side, they

_____

[19] Cue asserted at trial that "solves Amazon issue" referred to
pricing e-books in the iBookstore above $9.99, and was not a

were troubled by a commission for Apple that was as high as 30%.
That gave the Publishers a "little less" than they would like.
As of that point, Cue believed that the Publishers were willing
to pursue a strategy of moving all of their e-tailers to the
agency model, and in fact several Publishers had told him so.
The Publishers believed, however, that a $12.99 price for an
e-book would be too low if the physical book sold for more than
$35.  Cue reported that he had urged them to focus "on the other
99% and we can figure out how to solve the exceptions" later.

---

reference to raising prices across the industry or eliminating
Amazon's ability to set prices.  Indeed, Cue protested at trial
that, throughout its negotiations with the Publisher Defendants,
Apple was concerned only with the pricing that would prevail in
the iBookstore and sought only to "fix" Amazon's pricing or
"solve the Amazon issue" in its own e-bookstore.  In this and
several other aspects of Cue's testimony, regrettably, he was
not credible.  The documentary record and the commercial context
of the negotiations leave room for no other conclusion.  Apple's
pitch to the Publishers was -- from beginning to end -- a vision
for a new industry-wide price schedule.  Any other course would
have left the Publishers vulnerable to Amazon's pricing
strategies and would have forced Apple to compete on price.
Accordingly, Cue's repeated assertion at trial that his sole
"focus" was on thinking about the agency deals and their effects
"from an Apple point of view," cannot be taken at face value.
As a savvy negotiator he knew how to place himself in the
Publishers' shoes, understand their interests, and appeal to
their concerns, as he eventually admitted toward the end of his
testimony.  Cue recognized that the Publishers were consumed
first and foremost by a desire to eliminate Amazon's $9.99 price
for e-books across the market.  His colleagues, including Saul,
acknowledged that they understood at the time that Apple could
not solve the Publisher's problem with $9.99 if the Publishers
left Amazon on wholesale.  Thus, Cue and his team found a way to
solve the "Amazon problem" for the Publishers; not just "as to
Apple," but industry-wide.

Buoyed by the reactions of the three Publishers to Apple's proposal that the entire e-book industry be converted to an agency model -- with higher prices for e-books, a 30% commission for Apple and no retail price competition -- Cue's team turned their energies toward fleshing out a structure for this arrangement. They entered the Christmas break with every hope that an iBookstore could be announced at the Launch.

G. Apple's Term Sheet: All E-tailers to Agency and Pricing Caps

Shortly after the Christmas holidays, Cue wrote to each of the Publishers to present Apple's term sheet. On January 4 and 5, the first Monday and Tuesday in the new year, Cue wrote six essentially identical emails.[20] Only the introduction varied. For the three Publishers with whom he had talked in late December, Cue began his emails with, "As we discussed." For the other three, he began with the following comment: "After talking to all the other publishers and seeing the overall book environment, here is what I think is the best approach for ebooks."[21]

In these emails, Cue recapped the key components of Apple's proposed agency model. It included the elimination of retail

---

[20] Cue sent emails to Macmillan, S&S, Random House, and Hachette on January 4. Cue's emails to Penguin and HarperCollins were sent on January 5.

[21] For reasons unknown, Cue sent two emails to Macmillan, one with each greeting.

price competition and raising many e-book prices by at least $3.
Cue wrote, "Just like the App Store, we are proposing a
principal-agency model with you, where you would be the
principal and iTunes would sell your product as your agent for
your account.   In exchange for acting as your agent iTunes would
get a 30% commission for each transaction."   For "hardback
books" that retail for less than $35, the Publisher would set a
price for an e-book at any price up to $12.99; for trade or
mass-market paperback books, the price would be capped at $9.99;
and for any book that retailed above $35, the e-book price would
be capped at $14.99 and increments of $5 above that.   Cue added
that a "realistic" price for an e-book would be less than 50% of
the retail price for the hardcover book.   He emphasized that "to
sell e-books at realistic prices . . . all resellers of new
titles need to be in agency model."   In closing, Cue reiterated
that Apple "think[s] these agency terms accomplish[] all the
goals we both have."

It was as apparent to the Publishers as it was to Apple
that Apple's proposal would only allow the Publishers to raise
the consumer prices for e-book versions of their key titles
above Amazon's $9.99 price point to the proposed price caps if
they moved Amazon and their other e-tailers to agency.   Reidy
immediately advised her S&S colleagues that she was "in total
agreement" that the "[a]gency model should hold for all

46

retailers; these would become our terms." Reidy's notes on her copy of Cue's e-mail captured the benefits she saw accruing from Apple's proposal. The ability to raise e-book prices and protect the physical book business was front and center. Her notes read: "Higher price slows Ebks/casual purchaser/keeps retailers/stops authors leaving."

In the conversations that followed the dissemination of the term sheet, Publishers told Apple that the proposed price caps were too low. Apple reiterated that it would not tolerate windowing, it did not want to lose money, and it did not want any price competition. It advocated for an industry-wide adoption of the agency model as "the only way" to "move the whole market off 9.99."

H. Creation of the MFN Clause

One week after it distributed the term sheet, Apple distributed a draft contract. During the intervening week, however, Cue's thinking about how to achieve an industry-wide shift to the agency model changed. His in-house counsel had been working on an alternative way to reach that goal that was even more effective in protecting Apple's interests. Saul proposed using an MFN clause for retail prices. The MFN guaranteed that the e-books in Apple's e-bookstore would be sold for the lowest retail price available in the marketplace.

Apple had used an MFN in one of its music agreements, but the music had been purchased under a wholesale model.  Apple's use of an MFN for a retail price was a unique feature of its e-book agency agreements.

By combining the MFN with the pricing tiers, the pricing discretion Apple gave to the Publishers with one hand, it took away with the other.  While Publishers could theoretically raise e-book prices in the iBookstore above the $9.99 price point to the top of the Apple pricing tiers, unless the Publishers moved all of their e-tailers to an agency model and raised e-book prices in all of those e-bookstores, Apple would be selling its e-books at its competitors' lower prices.  Using Saul's characterization, the "elegant" solution presented by the MFN accomplished all of Apple's objectives.  It eliminated any risk that Apple would ever have to compete on price when selling e-books, while as a practical matter forcing the Publishers to adopt the agency model across the board.  As Cue admitted to colleagues in Britain in the Spring, "any decent MFN forces the model."[22]

Cue had an opportunity to explain the concept of the MFN to Moerer on January 10.  Moerer had been speaking with Random House, which was increasingly skeptical of Apple's proposals,

---

[22] Cue's words are captured in a colleague's memorandum.  At trial, Cue denied that he had actually spoken in those terms.

and he wanted Cue's advice on how to respond to several of its questions.  One question was, "Are we willing to accept an agency model if other retailers continue a standard wholesale model for new releases without holdbacks?"  Cue responded, "We are (I don't think we can legally force this).[23]  What we care about is price so the contract will say we get it at 30% less whatever the lowest retail price out in the market is (whether agency or wholesale)."

With the adoption of the MFN, Apple dropped from the agency contract it was drafting the explicit requirement that had appeared in its term sheet that all e-tailers be placed on an agency model.  But, Apple did not change its thinking.  It believed that the Publishers should still move their e-tailers to agency, and in the weeks that followed, it made sure that happened.  Cue was able to report to Jobs on January 13, three days after his e-mail exchange with Moerer, that at least two of the Publishers had agreed to "go [to the] agency model for new releases with everyone else."  Thus, despite the fact that it would tell Random House during its increasingly difficult negotiations that it could accept a hybrid model where Random

---

[23] Apple takes the position that Cue's explanation that it couldn't "legally force" the Publishers to place all of their e-tailers on an agency contract is not a reference to the lawfulness of such a requirement, but is instead a reference to Apple's skepticism that it could legally enforce the clause against any Publisher who reneged on its commitment.  It is unnecessary to resolve this ambiguity.

House moves to agency with Apple but stays on wholesale with some retailers, there is no evidence that Apple ever communicated to any of the Publisher Defendants that they were free to leave their other retailers of e-books on a wholesale model or that Apple ever rescinded its demand that each of them move to an agency arrangement with all resellers.[24]

As described above, Apple, quite simply, did not want to compete with Amazon on price.  Apple was confident that the iPad would be a revolutionary and wildly popular device.  It was happy to compete with Amazon on that playing field, where it believed its strength resided.  It would match its device -- the iPad -- against the Kindle.  As HarperCollins executive Robert Zaffiris observed on January 20, "Apple is cutting a blanket agency deal to level the playing field and ultimately compete in two areas they feel good about -- technology and iTunes."

I. January 11: Apple Distributes Draft Agency Agreements

On Monday, January 11, Apple sent its proposed eBook Agency Distribution Agreement ("Draft Agreement") to each of the

---

[24] A great deal of time was spent at trial trying to understand a series of five emails drafted by Jobs on January 14.  Cue wanted Jobs's approval for higher price caps, and Jobs's emails show that he was quite concerned about the profitability of the iBookstore.  Jobs's final email in the chain indicates that the Publishers need to "move Amazon to the agent model too for new releases for the first year.  If they don't, I'm not sure we can be competitive."  The e-mails were addressed to Cue and he denies ever receiving any of them, including the last in the series.

Publishers.  With the iPad launch just sixteen days away, Cue
told Jobs that his "goal" was to "get at least 2 of them to sign
this week."

The Draft Agreement contained all of the essential elements
of the contracts that the Publisher Defendants would accept two
weeks later, including a "day and date" commitment to prohibit
windowing on the Apple iBookstore,[25] price tiers, the 30%
commission, and the MFN.  Although the Publisher Defendants were
able to negotiate around the edges, none of the material terms
of the contract changed.  Apple insisted that its agency
contract be uniform.  It assured the Publisher Defendants that
they would all be getting the same terms, as would every other
publisher who decided to sell e-books through the iBookstore.

In the end, each of the Publisher Defendants simply had to
decide whether they wanted to take this opportunity to raise the
price of e-books or not.  The risks of acting and of failing to
act were similarly large.  As explained below, if a Publisher
accepted Apple's terms it was bound to lose some of the revenue
it would otherwise make from selling e-books, and could be
assured that it would incur the wrath of Amazon.  If the
Publisher declined to join Apple it would lose this particular
opportunity, backed by Apple, to confront Amazon as one of an

---

[25] The day and date commitment required Publishers to give Apple
e-books on the same date they released physical books.

organized group of Publishers united in an effort to eradicate the $9.99 price point.

In the two intervening weeks before the Launch, Apple and the Publishers engaged in intensive negotiations. Apple's Cue, Moerer, and Saul stayed in New York for the nine days immediately preceding the Launch to conclude the negotiations. Up until the very end, it was not clear precisely how many of the five Publisher Defendants would agree to execute the agency contract with Apple.

By all accounts, the negotiations were tough, particularly because Apple made few concessions. The Apple team reminded the Publishers though that this was a rare opportunity for them to achieve control over pricing. As Cue put it bluntly to Hachette, the agency model proposed by Apple was "the best chance for publishers to challenge the 9.99 price point." Some of the discussions regarding three contract terms -- the MFN, the 30% commission, and the pricing tiers -- are described here.

1. <u>MFN Negotiations</u>

The MFN clause required publishers to match in Apple's iBookstore any lower retail price of a New Release offered by any other retailer. The proposed MFN read: "If, for any particular New Release in hardcover format, the then-current Customer Price at any time is or becomes higher than a customer price offered by any other reseller ("Other Customer Price"),

then Publisher shall designate a new, lower Customer Price to meet such lower Other Customer Price." Customer Price was defined as "the price displayed to the [customer] on the [Apple] Online Store, as designated by [the] Publisher for each eBook by selecting from the prices set forth" in an exhibit to the contract.

As already described, the MFN effectively forced the Publisher Defendants to change their entire e-book distribution business to an agency model if they wanted to take control of retail pricing. Any other course would be a race to the bottom in e-book prices and would give the Publisher Defendants a fixed share of a far too small revenue stream.

Under the then-existing wholesale model for selling e-books, the Publisher Defendants received a designated wholesale price for each e-book. This wholesale model was more profitable for a Publisher's e-book business than the agency model proposed by Apple. Under a wholesale arrangement a Publisher received roughly 50% of the hardcover list price from the retailer, whereas under Apple's agency arrangement a Publisher received only 70% of the retail price. For example, as shown on this table, a Publisher might receive $13 on a wholesale basis for an e-book sold by Amazon for $9.99, but (because of the MFN) only $7 from Apple so long as Amazon was still selling that e-book for $9.99. Even if Apple and Amazon

were on the same agency arrangement with a Publisher, and that
Publisher were able to move the retail price of the e-book to
the top of the Apple price tier and sell it for $12.99, the
Publisher would still receive less revenue under the agency
model: $9.10 instead of the $13.00 in revenue under the
wholesale model.

**Publisher Per Unit Earnings**
**for New Release and NYT Bestseller Titles**
**Wholesale vs. Agency Model**

|  | Amazon on Wholesale prior to Apple's entry | Apple on Agency with MFN; Amazon on Wholesale | Apple and Amazon on Agency with MFN and Apple price tiers |
|---|---|---|---|
| Hardcover list price | $26.00 | $26.00 | $26.00 |
| E-book wholesale price (assuming 50%) | $13.00 | $13.00 | -- |
| Amazon retail price | $9.99 | $9.99 | $12.99 |
| Apple iBookstore retail price | -- | $9.99 | $12.99 |
| Publisher revenue received from Amazon | $13.00 | **$13.00** | **$9.10** |
| Publisher revenue received from Apple | -- | **$7.00** | **$9.10** |

Because the revenue each Publisher Defendant would receive
per e-book sold through the Apple store was substantially less
than what it was currently receiving under its wholesale
arrangements, there was no financial incentive for a Publisher
to sign an agency agreement with Apple unless those agreements
suited its long-term interests.  And as Apple well understood,

that long-term interest was compelling.  The Publisher
Defendants wanted to shift their industry to higher e-book
prices to protect the prices of their physical books and the
brick and mortar stores that sold those physical books.  While
no one Publisher could effect an industry-wide shift in prices
or change the public's perception of a book's value, if they
moved together they could.

To change the price of e-books across the industry,
however, the Publishers would have to raise Amazon's prices.
This is where the MFN became such a critical term in Apple's
contracts with the Publisher Defendants.  It literally stiffened
the spines of the Publisher Defendants to ensure that they would
demand new terms from Amazon.  Thus, the MFN protected Apple
from retail price competition as it punished a Publisher if it
failed to impose agency terms on other e-tailers.

Many of the documents received into evidence at trial as
well as trial testimony reflect this understanding.  After
signing the Agreement, HarperCollins acknowledged that "[t]he
Apple agency model deal means that we will have to shift to an
agency model with Amazon" to "strengthen our control over
pricing."

Penguin's CFO acknowledged on February 15, 2010, "[g]iven
the clauses about price matching in the Apple contract, this
could mean that we have to suspend or delay certain sales of

e-books to Amazon until the contract is renegotiated" to move Amazon to the agency model.  Recognizing the compulsive nature of the MFN, Shanks testified that in evaluating the Apple deal he came to understand that "the only way we could do [agency]" was if Penguin moved to agency with other e-book retailers as well.

Reidy testified that the MFN meant, as a practical business matter, that S&S would be moving all its other e-book retailers to agency "unless we wanted to make even less money."  As Reidy had written to Moonves, remaining on a wholesale model with Amazon "would just enshrine the $9.99 price point at a later date and would require us to lower our own pricing to those who accept the agency model to that price point."  Reidy knew that once S&S signed its Agreement with Apple, "we need to change our ebook selling terms with our other eRetailers before" the iBookstore opened, or risk "a situation whereby we must price our adult new release eBooks sold through Apple at $9.99, undercutting one of the reasons for making the deal."

Young also understood that the MFN required Hachette to move all of its e-book retailers to an agency relationship, and "ensure," in his words, "a competitive, level playing field for

e-book sellers."[26]  Fully recognizing the benefits and risks from
the Apple offer, Nourry told Young that he was "not against
[the] MFN as long as it is legal" because "[w]e need to find
higher pricing points."[27]

Cue explained that the Publisher Defendants generally did
not fight him on the MFN.[28]  He was even told that it was an
unnecessary feature of the contract since the Publishers were
going to move to an agency relationship with all e-book
retailers anyway.

The final agency agreements with the Publisher Defendants
(the "Agreements") included an MFN in paragraph 5(b).  Although
there were variations among the five paragraphs, the core
principle of the MFN remained intact.  The MFN assured that
Apple would face no retail price competition and that the
Publisher Defendants had no choice but to demand that Amazon,
and every other e-book retailer, adopt the agency model.  As
Saul insisted in an e-mail to an independent publisher who was

---

[26] The word "competitive" in this and many other contexts at the
trial means the opposite of competition.  It means the
eradication of retail price competition.

[27] Macmillan also identified that the antitrust risk of signing
the agency agreement with the MFN could be "huge."

[28] Although Cue attempted to deny this fact at trial, at his
deposition Cue admitted that the Publisher Defendants generally
"accepted" the MFN, and although the term was negotiated, Cue
never felt it was discussed "in [the] completely material way of
saying, no, we're not doing that."  Instead, the conversations
were focused mainly on "trying to create loopholes or exceptions
to it."

frustrated that the MFN removed the publisher's control over
pricing, "There are possible unilateral ways you can comply with
our [MFN] provision, such as get others on an agency model, or
withhold content.  Others have agreed to this and we cannot make
any changes."

### 2. 30 Percent Commission Negotiations

The 30% commission on which Apple insisted in its agency
agreements meant that any increase in retail prices, even up to
the caps of the pricing tiers, would not compensate for the
revenue loss the Publisher Defendants would experience from the
sale of e-books under the agency model.  Some of the Publisher
Defendants predicted that the loss would be roughly 17% of their
e-book gross revenue and amount to millions of dollars.

HarperCollins' Murray immediately recognized that "[t]he
combination of Apple's proposed pricing tiers and the 30%
commission meant that HarperCollins would make less money per
book than it was then making on a wholesale model."  To address
this problem, HarperCollins suggested that Apple take a
commission of just 20%.

Apple refused to budge.  This was the same commission it
charged in the App Store.  It would give Apple only a single
digit positive margin and, in Apple's view, was necessary to
generate the revenue Apple needed to build a great iBookstore.

The 30% commission was ultimately adopted across all of Apple's final Agreements.

### 3. Price Tier Negotiations

The Publisher Defendants fought hardest over the price caps.  They and Apple knew that these negotiations were really about setting the new industry prices for e-books.

These negotiations were intense even though the Draft Agreement included more generous price tiers than the term sheet had proposed.[29]  The Draft Agreement capped e-book prices at $12.99 for New Release titles with hardcover list prices of $30 or under, and set a $14.99 price tier cap for New Release titles with hardcover list prices above $30, with incremental price tier increases for every $5 increase in the hardcover list price above $30.  For books other than New Releases, the price cap was set at $9.99.

To dramatize the immediate increase in the price of e-books that the Publishers could achieve under the Apple agency agreement, and to assure each Publisher Defendant that it was being treated no differently than its competitors, Moerer sent a table of proposed book prices to them in identical e-mails on

---

[29] The January 4 term sheet had set a price cap at $14.99 for any book with a hardcover list price above $35, and $12.99 for any hardcover book listed below $35.  The Draft Agreement, by contrast, set the demarcation between $12.99 and $14.99 at $30, allowing for higher e-book prices in relation to a title's hardcover list price.

the same day Apple sent out the Draft Agreements.  The table
showed fiction NYT Bestsellers from every member of the Big Six.
It listed the book's title, author, and publisher.  It showed
each title's hardcover list price, followed by its retail prices
when sold as an Amazon hardcover book; Amazon e-book; Barnes &
Noble e-book; and finally, as a proposed iTunes e-book.[30]  The
proposed prices under the iTunes column were always either
$12.99 or $14.99, and were always several dollars higher than
the then-existing e-book price at Amazon and Barnes & Noble.  In
some cases, the iTunes e-book price was even higher than the
Amazon hardcover price.[31]  While the final column would only
display Apple's e-book prices for titles published by the
particular Publisher receiving that version of the table, the
layout made it easy for the Publishers to see that they were all
being treated identically.  The first page of one of these
tables is set out below.

---

[30] Sensitive to the fact that the table looked like an Apple
retail price list, Moerer clarified in a follow-up email to
Shanks that the prices in the table's final column designating
the "iTunes eBook Retail Price" are the "top price tier we've
proposed" and that "[i]n the agency model, Penguin would set
retail prices at its sole discretion, at this price or any lower
price, with Apple acting as your agent."

[31] The Amazon price for e-books, by contrast, was always lower
than its retail price for a title's corresponding physical book.

Subject: our meeting tomorrow
Date: Mon, 11 Jan 2010 14:34:29 -0800
From: Keith Moerer <kmoerer@apple.com>
To: <david.shanks@us.penguingroup.com>
Cc: Eddy Cue <cue@apple.com>
Message-ID: <75004564-BE31-48CE-A0EC-EC9ECC98D588@apple.com>

David--

I look forward to meeting with you and Genevieve tomorrow morning.

Kevin Saul has sent a draft agreement in separate email. Eddy has also asked me to send you our
pricing analysis of Jan. 1 NYT bestsellers, which will help explain the price tiers we've proposed
for hardcover new releases.

Best, Keith

| NYT Bestsellers-Hardcover Fiction Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|
| The Lost Symbol | Dan Brown | Random House | $29.95 | $12.00 | $9.60 | $9.60 | |
| I, Alex Cross | James Patterson | Hachette | $27.99 | $16.79 | $9.99 | $9.99 | |
| Under the Dome | Stephen King | Simon & Schuster | $35.00 | $21.00 | $9.99 | $9.99 | |
| The Help | Kathryn Stockett | Penguin | $24.95 | $9.50 | $8.55 | $8.55 | $12.99 |
| Pirate Latitudes | Michael Crichton | HarperCollins | $27.99 | $14.00 | $9.99 | $9.99 | |
| Ford County | John Grisham | Random House | $24.00 | $11.00 | NA | NA | |
| U is for Undertow | Sue Grafton | Penguin | $27.95 | $14.96 | $9.99 | $9.99 | $12.99 |
| The Last Song | Nicholas Sparks | Hachette | $24.99 | $12.96 | $8.80 | $8.80 | |
| The Christmas Sweater | Glenn Beck | Simon & Schuster | $19.99 | $11.97 | $9.99 | $9.99 | |
| Breathless | Dean Koontz | Random House | $28.00 | $14.00 | $9.99 | $9.99 | |
| The Lacuna | Barbara Kingsolver | HarperCollins | $26.99 | $13.00 | $9.99 | $9.99 | |
| True Blue | David Baldacci | Hachette | $27.99 | $13.97 | $9.99 | $9.99 | |
| Wolf Hall | Hilary Mantel | Macmillan | $27.00 | $11.00 | $8.80 | $8.80 | |
| The Gathering Storm | Robert Jordan | Macmillan | $29.99 | $17.54 | NA | NA | |
| Half Broke Horses | Jeannette Walls | Simon & Schuster | $26.00 | $14.46 | $9.99 | $9.99 | |
| Pursuit of Honor | Vince Flynn | Simon & Schuster | $27.99 | $12.47 | $8.00 | $8.00 | |
| The Scarpetta Factor | Patricia Cornwell | Penguin | $27.95 | $14.97 | $9.99 | $9.99 | $12.99 |
| The Girl Who Played with Fire | Stieg Larsson | Random House | $25.95 | $13.00 | $7.99 | $7.99 | |
| The Wrecker | Clive Cussler | Penguin | $27.95 | $15.97 | $9.99 | $9.99 | $12.99 |
| South of Broad | Pat Conroy | Random House | $29.95 | $16.97 | $9.99 | $9.99 | |
| Last Night in Twisted River | John Irving | Random House | $28.00 | $15.97 | $9.99 | $9.99 | |
| Too Much Happiness | Alice Munro | Random House | $25.95 | $15.17 | $9.99 | $9.99 | |
| Nanny Returns | Emma McLaughlin | Simon & Schuster | $25.00 | $14.39 | $9.99 | $9.99 | |
| Too Much Money | Dominick Dunne | Random House | $26.00 | $15.21 | $9.99 | $9.99 | |
| Her Fearful Symmetry | Audrey Niffenegger | Simon & Schuster | $26.99 | $13.49 | $5.79 | $5.79 | |
| Heat Wave | Richard Castle | HarperCollins | $19.99 | $11.69 | $9.99 | $9.99 | |
| Divine Misdemeanors | Laurell K. Ballantine | Random House | $26.00 | $14.97 | $9.99 | $9.99 | |

Penguin, HarperCollins, Hachette, and S&S quickly told

Apple that they were willing to do an agency model for New

Releases, and that they would "go with" the agency model with "everyone else," but that they needed higher price caps.  The debate over the caps essentially ended on Saturday, January 16. This was five days after the Draft Agreements had been distributed.  Despite their efforts, the Publisher Defendants achieved only modest adjustments to the price caps.

On January 16, Cue sent nearly identical e-mails to each of the Publisher Defendants with a revised pricing proposal.  Under this new regime, Cue decreased the hardcover list price triggers for the $12.99 and $14.99 e-book caps a second time, but carved out NYT Bestellers for special treatment.  When a NYT Bestseller was listed for $30 or less, the iTunes price would be capped at $12.99; when it was listed above $30 and up to $35, the iTunes price would be no greater than $14.99.[32]  For all other New Releases, the caps in the Draft Agreement would be applied to physical books with slightly lower list prices.  For example, the $12.99 cap now applied to titles with list prices between $25.01 and $27.50 instead of those at $30 or less; the $14.99 cap applied to books with list prices between $27.51 and $30 instead of over $30.  Cue also added two additional price caps at $16.99 and $19.99 for books listed between $30.01-$35 and $35.01-$40, respectively.

---

[32] Cue's January 16 offer kept the price caps for NYT Bestsellers at the caps listed for all New Releases in the Draft Agreement.

In his e-mails to the Publisher Defendants, Cue outlined the advantages he perceived they would gain from Apple's entry into the market, defended the pricing tiers of $12.99 and $14.99 for NYT Bestsellers, explaining that "it is critical that we appear at least reasonable" in relation "to the heavy discounting that is happening for NYT bestsellers." Cue added that, "This gives you significantly more tiers and higher prices." Except for small exceptions which were immaterial to Apple, this pricing proposal was the one finally adopted in the Agreements.

Cue had described these tiers to Jobs as prices that would "push [the Publisher Defendants] to the very edge," but still create a "credible offering in the market." Cue warned Jobs that "[t]his will be hard to get because they [the Publishers] will be losing an additional $1.40, but we should try."

Further confirming that Apple well understood that the negotiations over the price "caps" were actually negotiations over ultimate e-book prices, Cue's calculation of the $1.40 loss arose from his proposal that the prices of the NYT Bestsellers be capped at prices lower than other New Releases at similar hardcover list prices, and lower than the Publisher Defendants had been expecting. If a New Release with a list price of $30 or less was a NYT Bestseller, the cap moved from $14.99 to

$12.99, meaning that the Publisher would receive 70% of $12.99 instead of 70% of $14.99, or $1.40 less.

Cue was right to expect pushback from the Publishers over the carve-out for NYT Bestsellers. Hachette's Thomas identified the ceilings of $14.99 and $12.99 for NYT Bestsellers as a drawback when writing to her colleagues on January 19. Thomas warned that these prices would represent a "significant" loss to Hachette's profit margin.

The Publisher Defendants recognized that Apple's pricing regime would be a game-changer for the e-book industry. Because these caps would become the new standard industry-wide prices, they continued to push for higher ceilings. As Hachette's Nourry testified, the whole concept of price "caps," when coupled with the Publishers' move to an agency model of distribution, was that "people all have the same prices." Nourry was thus particularly "reluctant to fixing best seller prices at 12$90" with Apple "because it may be our last chance to bring it back up to say 14$99."

HarperCollins similarly understood that the "upshot" of the Apple agreement "is that Apple would control price and that price would be standard across the industry." Indeed, it believed that the benefit of moving to an agency model with Apple's price cap structure was the creation of "uniform prices"

for e-books and an "increase" in price "from 9.99 to 12.99 or 14.99 for most books."[33]

Ultimately, the Publisher Defendants all capitulated to Cue's revised pricing regime.  Even though Penguin's McCall still wanted to see all NYT Bestsellers capped at $14.99, he recognized on January 19 that Apple's proposal of $12.99 was "probably the middle ground where compromise is going to have to happen."  The reference to "middle ground" was a reference to the spread between Amazon's $9.99 price for the e-book version of NYT Bestsellers and the Barnes & Noble price for the physical book version.  He observed as well that "[i]f we migrate all accounts to agency selling, the price spread shouldn't matter, since we'll have a level playing field."

Macmillan was also unhappy with the price caps proposed by Apple.  It opposed the concept of price caps in general, but, as Sargent recognized, Apple wanted the price caps "as protection against excessively high prices that could either alienate [its] customers or subject [it] to ridicule."  S&S accepted the price caps proposed on January 16 on the condition that Apple would agree to "review pricing" after one year on the new model.  Cue readily agreed.

---

[33] Through a process known as translation, the prices for digital books are automatically set according to a predetermined relationship to the prices of their physical counterparts.

The January 16 pricing tiers were incorporated into Apple's final Agreements and were identical for each Publisher Defendant.  Through Apple's adoption of price caps in its Agreements, it took on the role of setting the prices for the Publisher Defendants' e-books and eventually for much of the e-book industry.  As described below, the Publisher Defendants largely moved the prices of their e-books to the caps, raising them consistently higher than they had been albeit below the prices that they would have preferred.

As of January 16, the Launch was just eleven days away and Cue did not have a single Agreement executed.  At that point, he had set a deadline of Thursday, January 21, as the final date by which the Publishers had to sign agency agreements with Apple.[34] As noted above, Cue and his team came to New York for this final push.  They arrived on Monday, January 18, and stayed until January 26, the day before the Launch.  By January 26, Apple had executed its fifth Agreement.

J. January 18-27: Publishers Initiate Agency Negotiations with Amazon

As already recounted, this entire endeavor was shaped by the Publishers' desire to raise the price of e-books being sold through Amazon.  With nearly a 90% market share for e-books in

---

[34] Cue wanted to be sure he had the Agreements in place early enough so that Jobs could finalize his presentation introducing the iBookstore during the Launch.

2009, Amazon was the single most important seller of e-books in America, and also a dominant seller of physical books.  Because of this power, the Publishers feared retaliation from Amazon unless they acted in unison.  The confrontation with Amazon began the week of January 18, before any of the Publisher Defendants had actually signed an Apple Agreement.

Press reports on January 18 and 19 alerted the publishing world and Amazon to the Publishers' negotiations with Apple.  A Wall Street Journal article titled "Publisher in Talks with Apple Over Tablet" reported on January 18 that HarperCollins and Apple were in discussions over an agency relationship and that this shift might mean higher prices for e-books.  The article explained that "HarperCollins is expected to set the prices of the e-books . . . with Apple taking a percentage of sales," and noted that "[o]ther publishers have also met with Apple."  The article reported that "enhanced" e-book new releases could be priced as high as $14.99 or $19.99.[35]  A detailed article on January 19 in the trade publication Publishers Lunch also reported that the Big Six were negotiating terms with Apple that would give them an opportunity to impose an agency model on the entire industry and to raise prices.

---

[35] While Murray chose to describe the price increases as related to e-books "enhanced" with special features, in fact the price increases implemented through the Apple Agreements applied to all e-books.

On the night of January 18, Amazon received confirmation
from a former colleague who was now working at Random House that
most of the Publishers were likely to enter agency agreements
with Apple.  Random House's McIntosh confirmed to Amazon's Porco
that several of the Publisher Defendants were negotiating e-book
agency distribution agreements with Apple and that Random House
"was under pressure from other publishers" to join them.  Porco
was concerned that Random House would be the only Publisher who
decided to keep the "current model" that allowed retailers like
Amazon make pricing decisions.

Amazon was adamantly opposed to adoption of the agency
model and did not want to cede pricing authority to the
Publishers.[36]  On January 20, Amazon disclosed how it would
respond.  It would appeal directly to authors and encourage
something the Publishers feared: disintermediation.

---

[36] Apple has suggested that Amazon was less opposed to the agency
model than the evidence shows.  It points to a single
brainstorming session between two Amazon employees in early
2009, in which they tried to come up with ideas to mollify the
Publishers.  The two employees pondered whether the Publishers
would agree to accept a flat percentage of the retail price for
e-books and quickly dismissed the idea since it would mean a
significant loss of revenue for the Publishers.  This was not a
discussion of the agency model; there was no discussion about
Amazon ceding control over the retail price.  There is simply no
credible evidence that Amazon moved willingly to the agency
model in 2010.  On January 31, 2010, after the Publisher
Defendants executed the Agreements, these two individuals
expressed astonishment that Publishers had agreed to a deal that
resulted in a significant loss of revenue for them.

68

That day, Amazon announced that authors and publishers of Kindle e-books could choose a "new 70 percent royalty option" for e-books with a list price "between $2.99 and $9.99."  Under this option, the author would receive 70% of the list price, net of delivery costs.  Using as an example an e-book being sold for $8.99, the author would make just $3.15 under the standard option, but $6.25 with the "new 70 percent option."

This was not happy news for the Publishers.  With an author receiving $6.25 of $8.99, and Amazon keeping the rest, this amounted to a naked play to eliminate the Publishers as a middle-man between authors and Amazon.  Shanks observed, "On Apple I am now more convinced that we need a viable alternative to Amazon or this nonsense will continue and get much worse." HarperCollins' parent News Corp also reacted with anger.  News Corp's Rupert Murdoch called HarperCollins to complain and in no uncertain terms expressed a desire to take revenge on Amazon.

During this week, Amazon had a long-scheduled set of meetings in New York with the Publishers.  In separate conversations on January 20 and over the next few days, the Publisher Defendants all told Amazon that they wanted to change to an agency distribution model with Amazon.  HarperCollins had a particularly contentious meeting with Amazon on January 20,

when it told Amazon that it "had to" move to agency.[37]  Amazon
made clear that it preferred to continue to do business on the
wholesale model.

On January 22, alluding to its negotiations with Apple and
the deadline associated with the impending Launch, HarperCollins
outlined its terms in writing to Amazon.  The message referred
to the "tremendous change" occurring in the e-book industry
"this week and next week."  It warned that Amazon had to act
quickly since

> [d]eliberations are moving fast.  If I could get your
> support to this kind of agency model in principle, I have
> less need to support other partners who wish to enter the
> ebook business.  As I mentioned we haven't made any
> decisions yet about how we will sell ebooks to consumers
> yet, but decision time is approaching.

Attempting to leverage its Apple negotiations to get a better
deal with Amazon, HarperCollins included a proposed retail price
for the majority of titles at either $12.99 or $14.99, but a
commission of just 5% for Amazon.  HarperCollins then leveled
its threat to Amazon.  If Amazon declined its offer,
HarperCollins would delay for six months the release of any
e-book sold on a wholesale basis.

On January 20, Amazon also met with Macmillan.  At a lunch
between Macmillan's Sargent and Amazon's Grandinetti, Sargent

---

[37] In internal emails that morning, HarperCollins executives
explained that a "big win of the Agency model is that by us
setting price we can protect the value of our hard covers."

announced that Macmillan was planning to offer Amazon the option
to choose either an agency and reseller model.  But, Sargent was
mistaken.  Neither Apple nor his fellow Publisher Defendants
would allow Amazon the option of remaining on a wholesale model.
At a dinner that night, Cue explained to Sargent that Macmillan
had no choice but to move Amazon to an agency model if it wanted
to sign an agency agreement with Apple.  The next morning, on
January 21, Sargent wrote to Cue and in a carefully crafted
message admitted that he had "misread" Cue in their previous
discussions, and warned that "[t]he stumbling block is the
single large issue we clearly had a misunderstanding about."
That stumbling block was "significant enough for us that we may
in fact give you a no later today."  Referring to the commitment
to move all resellers of e-books to an agency model, Cue
responded that afternoon that he "d[id]n't believe we are asking
you to do anything, you haven't told us you are doing.  We are
just trying to get a commitment."  He requested that they all
"sit down . . . and talk through it."[38]

---

[38] Neither Sargent nor Cue was credible during the trial when
they denied that Cue had explained at dinner that Macmillan was
required to put Amazon on the agency model.  Sargent protested
that he could not remember the conversation, even though his
email on the following day referred to "the single large issue"
that might lead Macmillan to abandon its negotiations with
Apple.  Cue explained in his deposition that the biggest issues
during his negotiations with Macmillan were the MFN and price
tiers, and that he thought the discussion at dinner had been
about pricing tiers; then at trial explained that he now

Cue also enlisted Sargent's competitors to intercede with him:  Cue spoke with Reidy, the CEO he considered a leader in the industry, for over twenty minutes after receiving Sargent's email on January 21.  Cue also called Murray immediately after hanging up with Reidy, and they talked for ten minutes later that day.  At that point, Cue called Sargent and urged him to speak with Murray and Reidy.  Sargent spoke to both Murray and Reidy by telephone for eight and fifteen minutes, respectively.

The straight talk from Reidy, Murray, and Cue worked.[39] Sargent called Grandinetti immediately after hanging up with Reidy, and told him that the Apple contract "required" Macmillan to offer Amazon the agency model only.

Amazon received a virtually identical message from a third Publisher Defendant on January 20.  Hachette told Amazon that day that it was looking at the agency model, and believed that it could offer only one pricing model to retailers, either the agency or reseller model, but not both.

---

remembered that they had discussed one-off promotions.  Cue's contemporaneous notes, however, indicate that the core issue in dispute with Macmillan was, in fact, the MFN and its implications.  In an email to Jobs on the evening of January 21, just hours after sending his email to Sargent, Cue reported that "[a]fter a long afternoon with their general counsel, we are in agreement on the terms" with Macmillan, "but the CEO and GC have legal concerns over the price matching."

[39] While Murray was fully supportive of the requirement that all e-tailers be moved to an agency model, as described below, he remained unhappy over the size of Apple's commission and the existence of price caps.

On Friday, January 22, S&S's Reidy advised Amazon that it was likely to move its entire business to the agency model. Amazon asked if it could continue to sell under the wholesale model after a window of ninety days.  Reidy said she would look at the idea, but did not actually consider it to be a realistic option since it "would just enshrine the $9.99 price point at a later date."  Amazon's Grandinetti expressed appreciation for the call, but said he was not sure "what this would mean in terms of our overall relationship."  Reidy explained her expectations about pricing going forward, and underscored that she did not intend to go as low as $9.99.

Thus, by the end of that week, four of the five Publisher Defendants had put Amazon on notice that they were joining forces with Apple and would be altering their relationship with Amazon in order to take control of the retail price of e-books.[40] It was clear to Amazon that it was facing a united front.

K. January 21-26:  Execution of Agreements

Even though Apple had told the Big Six in December that it needed all of them to sign on in order to open its e-bookstore, on January 21 it learned that Random House, the largest Publisher, would not sign an agency agreement.  Apple decided to

---

[40] Amazon had reached out to Penguin during that period, but Penguin had not responded.

proceed without Random House.  It let the Publisher Defendants know about Random House's decision and of its own decision to proceed with an iBookstore so long as four of them agreed to its terms before the Launch.  In the days that followed, Apple kept the Publisher Defendants apprised about who was in and how many were on board.

The Publisher Defendants kept each other informed as well. The CEOs of the Publisher Defendants made over 100 telephone calls to one another in the short period of time between December 8, when Cue first contacted them, and January 26, when the Agreements were signed.  In the critical negotiation period, over the three days between January 19 and 21, Murray, Reidy, Shanks, Young, and Sargent called one another 34 times, with 27 calls exchanged on January 21 alone.[41]

On Thursday, January 21, Cue briefed Jobs on the status of his negotiations with the Publishers.[42]  Cue was confident that S&S and Penguin would sign.  Penguin did not want to be alone, but Cue predicted that if he had secured as few as two other

---

[41] While many of these calls were simply efforts to reach the other person, those efforts and the conversations that occurred during some of them reflect the intensity of the communications in this period.

[42] At this stage, it was Cue's judgment that Random House would wait until after the Launch to make a decision whether to convert to the agency model.  Cue relayed Random House's email describing its "excitement" about Apple entering the market and "building a bookstore", but expressing several reservations about Apple's terms.

Publishers, Penguin would sign on.  Cue reported that Hachette and Macmillan had legal concerns over the "price matching," that is, the MFN.  HarperCollins was still trying to get Apple to accept a 10% commission on New Releases and to shorten the definition of a New Release to a title that had been in the market two months.[43]  Cue believed that the Publishers' hesitation to make a commitment to Apple was due to their fear over how difficult it was going to be to force Amazon to convert to an agency relationship.  As Cue explained, "[i]n the end, they want us and see the opportunity we give them but they're scared to commit!  It [has] less to do with the terms and more about the dramatic business change for them. . . .  They just have to get some balls."

By Friday evening, January 22, Cue was able to report progress.  He informed Jobs that he had commitments from Hachette, S&S, Macmillan, and Penguin that they would sign.  At this point, Penguin required assurance that three other Publishers were also signing Agreements.  As Cue admits, in these final days the Publishers needed reassurance that they would not be alone in signing an agency agreement with Apple because they feared Amazon's reaction, reassurance that Cue readily provided.

---

[43] The "new release" period would be set in the final Agreements at seven months.

The first Publisher to agree to Apple's terms was S&S.   S&S signed its Agreement on Monday, January 25.   Reidy advised Moonves that at the Launch Apple would announce that NYT Bestsellers would be priced at $12.99.

Hachette's Young had agreed to sign by January 22, but needed approval from France.   Hachette executed its Agreement on January 24.   As Nourry explained, Hachette signed the Agreement because the agency model "will put an end to price deflation . . . .   We do not like the 12,90 price point, but it is much better than 9,99."   Hachette also committed to Apple that it would move all of its relationships with distributors to an agency relationship.

On January 21, Cue sent substantively identical e-mails to Macmillan and Penguin stating that Apple had completed its first agency agreement and was "very close" on two more.   By the next day, January 22, Macmillan had agreed to the deal.   As Cue told Sargent, Macmillan was the third Publisher to agree to Apple's terms.   Macmillan executed the Agreement on January 25. Macmillan's Sargent testified that he decided to sign the Agreement even though he was "not completely happy with some of Apple's terms," because it was a "much better business strategy than simply continuing the status quo with Amazon."

On January 22, Penguin's Shanks had asked Cue whether Apple had "any more of the [B]ig [S]ix confirmed yet?"   Even though

76

three other Publishers had joined with Apple by the morning of
January 25, a Monday, Penguin was still hesitant.  Shanks wanted
assurance that he could price e-book versions of paperbacks,
particularly trade paperbacks, above $9.99.  Once again, S&S's
Reidy played a pivotal role.  Cue called Shanks, and the two
spoke for twenty minutes that morning.  Less than an hour after
getting off the telephone with Cue, Shanks called Reidy to
discuss Penguin's status in its negotiations with Apple.  By
that afternoon, Penguin had executed its Agreement.  Penguin
advised Apple that it would be moving to an agency arrangement
with all of its e-tailers.

     That same day, Penguin reported to its board that when
Apple announces "its long-awaited entry into the e-reader
market" on Wednesday, "you may also see in the media that
Penguin, along with a few other major trade publishers, has made
a partnership with Apple for the sale of US eBooks in the iTunes
store."  The report explained the agency model it had agreed to
adopt with Apple, and stated that "we don't think [the agency
model and the discount model we currently use with Amazon] for
eBooks can coexist very long, and so we're going to be telling
all our re-selling middlemen (Amazon, Barnes & Noble, e.g.) that
we're going to deal with them for eBooks on the agency basis in
the future, too."  At its next "Road Show" Penguin credited
Apple with its own decision to begin the "monumental effort" of

moving its other e-tailers to agency.  It reported that, in light of the "pending release of the iPad," and "[a]s a way to enter the market place, Apple proposed moving the entire industry to an agency model."

HarperCollins was the last of the five Publisher Defendants to agree to execute an Agreement.  As late as Friday, January 22, Murray wrote to Cue to thank him for his visit that morning, but to underscore HarperCollins' demands.  HarperCollins wanted "flexibility" on price outside the tiers; it wanted to sell through other "agents" at a higher price than the retail prices in the iBookstore; it wanted to limit the commission to 10%; and it wanted a shorter "new release window."  Reflecting his understanding that his company would be trying to get all of its distributors to adopt an agency relationship, Murray explained, "We need to have flexibility on the agency window.  We believe this window should be 6 months rather than 12 months in the event that one or more large retailers do not move to an agency model."

Cue was concerned that HarperCollins wanted to "drive ebook prices sky high."  So, Cue suggested that Jobs call James Murdoch of News Corp, HarperCollins' parent company, and "tell him we have 3 signed so there is no leap of faith here."[44]

---

[44] Jobs and Cue had met James Murdoch for the first time on January 14, when representatives from News Corp had visited

Jobs called Murdoch on January 22 about HarperCollins'
intransigence.  While Murdoch wanted to do business with Apple,
he remained concerned about the economics of the deal, as he
described in some detail in an email he sent to Jobs.  Jobs's
lengthy response on Saturday, January 23, included the
following:

> 1. The current business model of companies like Amazon
> distributing ebooks below cost or without making a
> reasonable profit isn't sustainable for long.  As ebooks
> become a larger business, distributors will need to make at
> least a small profit, and you will want this too so that
> they invest in the future of the business with
> infrastructure, marketing, etc.
>
> 2.  All the major publishers tell us that Amazon's
> $9.99 price for new releases is eroding the value
> perception of their products in customer's minds, and they
> do not want this practice to continue for new releases.
>
> 3.  Apple is proposing to give the cost benefits of a
> book without raw materials, distribution, remaindering,
> cost of capital, bad debt, etc., to the customer, not
> Apple.  This is why a new release would be priced at
> $12.99, say, instead of $16.99 or even higher.  Apple
> doesn't want to make more than the slim profit margin it
> makes distributing music, movies, etc.
>
> 4.  $9 per new release should represent a gross margin
> neutral business model for the publishers.  We are not
> asking them to make any less money.  As for the artists,
> giving them the same amount of royalty as they make today,
> leaving the publisher with the same profits, is as easy as
> sending them all a letter telling them that you are paying
> them a higher percentage for ebooks.  They won't be sad.
>
> 5. Analysts estimate that Amazon has sold slightly
> more than one million Kindles in 18+ months (Amazon has
> never said).  We will sell more of our new devices than all

Apple's Cupertino headquarters to discuss a broad range of
mutual business interests.

of the Kindles ever sold during the first few weeks they
are on sale.  If you stick with just Amazon, B&N, Sony,
etc., you will likely be sitting on the sidelines of the
mainstream ebook revolution.

    6. Customers will demand an end-to-end solution,
meaning an online bookstore that carries the books, handles
the transactions with their credit cards, and delivers the
books seamlessly to their device.  So far, there are only
two companies who have demonstrated online stores with
significant transaction volume -- Apple and Amazon.
Apple's iTunes Store and App Store have over 120 million
customers with credit cards on file and have downloaded
over 12 billion products.  This is the type of online
assets that will be required to scale the ebook business
into something that matters to the publishers.

    So, yes, getting around $9 per new release[45] is less
than the $12.50 or so that Amazon is currently paying.  But
the current situation is not sustainable and not a strong
foundation upon which to build an ebook business.  And the
amount we will pay should be gross margin neutral.  Apple
is the only other company currently capable of making a
serious impact, and we have 4 of the 6 big publishers
signed up already.  Once we open things up for the second
tier of publishers, we will have plenty of books to offer.
We'd love to have HC among them.

Murdoch still demurred, particularly with respect to

Apple's proposed price points, so Jobs wrote again on the

morning of January 24.

    Our proposal does set the upper limit for ebook retail
pricing based on the hardcover price of each book.  The
reason we are doing this is that, with our experience
selling a lot of content online, we simply don't think the
ebook market can be successful with pricing higher than
$12.99 or $14.99.  Heck, Amazon is selling these books at
$9.99, and who knows, maybe they are right and we will fail
even at $12.99.  But we're willing to try at the prices

---

[45] Jobs's reference to $9 in revenue is a reference to the 70% of
a $12.99 e-book price that a Publisher would receive under
Apple's agency Agreement.

we've proposed.  We are not willing to try at higher prices because we are pretty sure we'll all fail.

    As I see it, HC has the following choices:

    1.   Throw in with apple and see if we can all make a go of this to create a real mainstream ebooks market at $12.99 and $14.99.

    2.   Keep going with Amazon at $9.99.  You will make a bit more money in the short term, but in the medium term Amazon will tell you they will be paying you 70% of $9.99. They have shareholders too.

    3.   Hold back your books from Amazon.  Without a way for customers to buy your ebooks, they will steal them. This will be the start of piracy and once started there will be no stopping it.  Trust me, I've seen this happen with my own eyes.

    Maybe I'm missing something, but I don't see any other alternatives.  Do you?

On January 23, Cue had sent his own message to Murray.  "I wanted to let you know that we have 4 publishers completed so it is real shame" to not have an agreement with HarperCollins.  The next day, Cue also wrote to an executive at News Corp.  He expressed that Apple "think[s] our customers will pay a reasonable price (. . . 50-100% more than existing e-books)" and candidly laid out Apple's "basic deal points," including that Apple is offering "new release hardback pricing maximums which are way higher than $9.99 -> &12.99 or $14.99 for most."

Murray had a round of telephone calls with other Publisher Defendants prior to signing.  In the end, HarperCollins concluded that the deal Apple was offering was the best it could

get at that time.  It considered the economics of the deal to be
"terrible" for it and its authors but "the strategic value" of
creating an Apple e-bookstore to be "very high."  It principally
feared "Amazon[']s reaction," but as the fifth Publisher to
adopt an agency agreement with Apple, it hoped the reaction
would be "muted."  Ultimately, HarperCollins understood this was
a "once-in-a-lifetime chance to flip the model."  On January 26,
the day before the Launch, HarperCollins became the fifth
Publisher Defendant to accept the Agreement.

The only Publisher to decline to sign the Agreement was
Random House.  As noted, it had informed Apple of its decision
on January 21.  Apple had been as inflexible in its bargaining
with Random House as it had been with the Publisher Defendants.
Random House declined to adopt the Agreement for several
reasons.  It believed it "would be better off economically
sticking with the wholesale model."  It also realized that it
was not well equipped at that time to set efficient retail
prices, and that it would be necessary to make a "complete
switch to agency" if it entered into an agency agreement with
Apple, which it was not prepared to do.

Thus, in less than two months, Apple had signed agency
contracts with five of the six Publishers, and those Publisher
Defendants had agreed with each other and Apple to solve the
"Amazon issue" and eliminate retail price competition for

e-books.  The Publisher Defendants would move as one, first to force Amazon to relinquish control of pricing, and then, when the iBookstore went live, to raise the retail prices for e-book versions of New Releases and NYT Bestsellers to the caps set by Apple.

Each of the Publisher Defendants realized that its negotiations with Amazon would be difficult, but in their view they had embarked upon a mission that was necessary to protect the publishing business.  They took comfort in their knowledge that the five of them stood together, and in Apple's presence in the market.  As Reidy wrote to Cue on the day before the iBookstore was officially announced, it was her hope that the iPad Launch "will sustain us as we move through the next steps in this process of changing the industry."

This would not have happened without Apple's ingenuity and persistence.  Apple's task had not been easy, but it had succeeded.  As Reidy acknowledged in an email to Cue on January 21, working with the Publishers had been like "herding . . . cats."  For his part, Cue appreciated all that Reidy had done to convince her peers to join forces with Apple at several critical junctures.  He thanked Reidy for being a "real leader."

The Publisher Defendants took those "next steps" to "chang[e] the industry" immediately; the coordinated pressure on Amazon began at once.  On the day of the Launch, January 27,

HarperCollins advised Amazon in writing that it had reached its first agency agreement with Apple. "In the interest of 'no surprises,'" HarperCollins advised Amazon that it had decided to move all of their New Release e-books to the agency model, and had "reached an agreement with our first agent, Apple" last night. Penguin also called Amazon on January 27, right after the Launch, to explain that it had moved to agency with its "first customer," referring to Apple.[46] Macmillan's Sargent did not attend the Launch, because as he had told Cue on January 24, "I expect I will be in Seattle or traveling back," from delivering the news in person to Amazon.[47]

---

[46] Grandinetti responded that he did not understand why Penguin was "working so hard to have [Amazon send it] less money on each sale while at the same time, reducing total sales and frustrating us."

[47] Cue admitted at trial that Apple "expected" each of the Publisher Defendants to demand that Amazon move to an agency model, but denied actually "knowing" that they would. This testimony was not credible, for many reasons. Cue's denial of prior knowledge of Sargent's trip to Amazon was particularly brazen given the January 24 email in which Sargent explained his inability to attend the Launch because he would be traveling to Seattle, Jobs's comment to his biographer on January 28 -- the day of Sargent's meeting with Amazon -- that the Publisher Defendants "went to Amazon and said, 'You're going to sign an agency contract or we're not going to give you the books,'" a January 30 email exchange between Saul and Cue monitoring news about Amazon's decision to remove Macmillan's buy buttons and wondering whether Cue had "talk[ed] with [J]on" Sargent and a January 31 email in which Sargent reported to Cue on the trip.

L. January 27:  The Launch of the iPad and iBookstore

On January 27, Jobs launched the iPad.  As part of a beautifully orchestrated presentation, he also introduced the iPad's e-reader capability and the iBookstore.  He proudly displayed the names and logos of each Publisher Defendant whose books would populate the iBookstore.  To show the ease with which an iTunes customer could buy a book, standing in front of a giant screen displaying his own iPad's screen, Jobs browsed through his iBooks "bookshelf," clicked on the "store" button in the upper corner of his e-book shelf display, watched the shelf seamlessly flip to the iBookstore,[48] and purchased one of Hachette's NYT Bestsellers, Edward M. Kennedy's memoir, True Compass, for $14.99.  With one tap, the e-book was downloaded, and its cover appeared on Jobs's bookshelf, ready to be opened and read.

When asked by a reporter later that day why people would pay $14.99 in the iBookstore to purchase an e-book that was selling at Amazon for $9.99, Jobs told a reporter, "Well, that won't be the case."  When the reporter sought to clarify, "You mean you won't be 14.99 or they won't be 9.99?"  Jobs paused, and with a knowing nod responded, "The price will be the same," and explained that "Publishers are actually withholding their

---

[48] To the public's delight, Jobs described this transition as "like a secret passageway."

books from Amazon because they are not happy."  With that
statement, Jobs acknowledged his understanding that the
Publisher Defendants would now wrest control of pricing from
Amazon and raise e-book prices, and that Apple would not have to
face any competition from Amazon on price.

The import of Jobs's statement was obvious.  On January 29,
the General Counsel of S&S wrote to Reidy that she "cannot
believe that Jobs made the statement" and considered it
"[i]ncredibly stupid."

> M. January 28 to 31:  The Publisher Defendants Force Amazon
>    to Adopt the Agency Distribution Model

As previously discussed, the Publishers recognized that any
one of them acting alone would not be able to compel Amazon to
move to agency.  Five of them had now agreed to join forces, but
none of them was eager to be the first to meet with Amazon.  As
Sargent explained, however, he knew the Apple Agreement gave the
Publishers "a point in time when we could actually address our
. . . issues with Amazon"; it "gave us the chance to change the
entire business model for digital books."  So Sargent made the
first move.

Skipping the Launch to which he had been invited, Sargent
flew instead to Seattle, accompanied by Napack.  Thus,
Macmillan, the smallest of the five Publishers, did the
honorable thing and delivered its message in person.  Sargent

86

did not expect the meeting to go well.  As he put it, he was "on [his] way to Seattle to get [his] ass kicked by Amazon."  He was right.

At their meeting, Sargent advised Amazon on January 28 that it had just two options: either (1) move to an agency arrangement or (2) not receive Macmillan's Kindle versions of New Releases for seven months.  Seven months was no random period -- it was the number of months for which titles were designated New Release titles under the Apple Agreement and restrained by the Apple price caps and MFN.  The meeting lasted roughly twenty minutes.  Amazon let Macmillan know in blunt terms that it was unhappy.

Macmillan had anticipated that Amazon might retaliate against it by removing the "buy buttons" on the Amazon site that allow customers to purchase books from Amazon's online store or from the Kindle, or by eliminating Macmillan's products from its sites altogether.  That night, Macmillan learned which option Amazon had chosen.  Amazon removed the buy buttons for both print and Kindle versions of Macmillan titles.  Customers could view the Macmillan books on the Amazon website but could not purchase them.

On January 30, Sargent took out an ad in an industry publication to communicate quickly with the industry.  Written in the form of a letter to "Macmillan authors/illustrators and

87

the literary agent community," Sargent described the terms he
offered to Amazon during their Thursday meeting, including the
"deep windowing of titles" if Amazon did not switch to the
agency model.  He explained that Macmillan would price most
titles at first release under the agency model between $12.99
and $14.99.  Sargent expressed his regret at Amazon's reaction
to his ultimatum, and explained the reasons he had for acting as
he did.

> In the ink-on-paper world we sell books to retailers far
> and wide on a business model that provides a level playing
> field, and allows all retailers the possibility of selling
> books profitably.  Looking to the future and to a growing
> digital business, we need to establish the same sort of
> business model, one that encourages new devices and new
> stores.  One that encourages healthy competition.  One that
> is stable and rational.  It also needs to insure that
> intellectual property can be widely available digitally at
> a price that is both fair to the consumer and allows those
> who create it and publish it to be fairly compensated.

Macmillan knew it would not stand alone.  Sargent wrote to
a friend several days later that "the deal that 5 of us did with
Apple meant someone was gonna have to do it [first]. . . .  The
optics make it look like I stood alone, but in the end I had no
doubt that the others would eventually follow."[49]  Hachette's
Nourry had written to Sargent the day after the publication of
Sargent's letter to the industry stating, "I can ensure you that

---

[49] Conscious that he should not admit the truth, Sargent
disingenuously added: "Interesting in that we did the Apple deal
with no contact with other publishers, yet when Jobs announced
he had 5 on the agency plan things were clear."

you are not going to find your company alone in the battle" with
Amazon.[50]  The next day, Penguin's Makinson similarly wrote,
"[j]ust to say that I'm full of admiration for your articulation
of Macmillan's position on this.  Bravo."  Internally,
Hachette's Nourry told Young that he wanted to "enter in the
battle as soon as possible," and in an allusion to Macmillan's
small size, that he was "thrilled to know how A will react
against 3 or 4 of the big guys."

Over the weekend, it became obvious to Amazon that its
strategy had failed.  The feedback was mixed, but included
intense criticism of Amazon by customers and publishers.  Nourry
celebrated on Monday, February 1, by observing that "Amazon's
stock is down 9%!"[51]

Amazon knew that its battle was not just with Macmillan but
with five of the Big Six.  As Grandinetti testified, "[i]f it
had been only Macmillan demanding agency, we would not have
negotiated an agency contract with them.  But having heard the
same demand for agency terms coming from all the publishers in
such close proximity . . . we really had no choice but to
negotiate the best agency contracts we could with these five

---

[50] The next day, Nourry wrote a similar email to Sargent's
superior, Stefan von Holtzbrinck, assuring him that he "very
much appreciate[s] what MacMillan is doing" and he can "[b]e
sure others will enter the battle field!"

[51] The subject line of the email was "Now it must really
hurt . . .".

publishers." Unless it moved to an agency distribution model for e-books, Amazon customers would cease to have access to many of the most popular e-books, which would hurt Kindle customers and the attractiveness of the Kindle.

Amazon announced on its website on Sunday, January 31, that it would "capitulate and accept" Macmillan's agency terms "because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books." Shortly thereafter, Amazon sent a letter to the Federal Trade Commission complaining about the simultaneous nature of the demands for agency from the Publishers who had signed with Apple.

N. The Five Amazon Agency Agreements

On Sunday, January 31, Amazon signaled to Macmillan that it was willing to negotiate. That night, Sargent sent an e-mail marked "URGENT!!" to Cue. Sargent explained that he was "gonna need to figure out our final agency terms of sale tonight. Can you call me please?" Cue and Sargent spoke that night.[52] With help from Apple, Macmillan negotiated an agency agreement with Amazon, which was signed that Friday, February 5.

---

[52] While Cue denied at trial that their conversation was about the Macmillan negotiations with Amazon, his denial was not credible. Macmillan had executed its Agreement with Apple a week earlier; the only final agency terms still under discussion were with Amazon.

Macmillan made no secret of its intention to raise prices.
Sargent wrote to Grandinetti on February 2, that "[w]e can not
budge on the final price that the consumers pay for our books. .
. . That is the very heart of the agency model, and it is why
we are doing this. . . . [W]e can not give up control of price.
If we do we are much worse off than we were before." But,
referring to Macmillan's across-the-board shift to agency,
Sargent assured Amazon that it "will never be disadvantaged on
[the] pricing" for Macmillan's e-books.

In light of their overlapping threats to remove content
from Amazon's platform if it did not move to agency in early
April, when the iPad became available, Amazon moved quickly to
execute agency agreements with the remaining Publisher
Defendants. But, to avoid being vulnerable in the future to
collective pressure during contract negotiations, Amazon
insisted that each of the five agency agreements have a
different termination date. The final five contracts ranged in
length from terms of eighteen months to three years, or ended on
different dates, from January 31, 2012 to June 30, 2012.

Amazon did not want to give up control over pricing or
raise its prices, and like Apple, assumed that under an agency
model each of the Publisher Defendants would set retail prices
at the price caps. During the negotiations, therefore, it
shared data with the Publisher Defendants illustrating how the

91

wholesale model was more profitable for the Publishers.  Amazon also included a "model parity" clause in any agreement.  This gave Amazon the option to return to a wholesale model of distribution in the event any Publisher agreed to a wholesale distribution arrangement with any other e-tailer.

During their negotiations with Amazon, the Publisher Defendants shared their progress with one another.  As Naggar testified, whenever Amazon "would make a concession on an important deal point," it would "come back to us from another publisher asking for the same thing or proposing similar language."  For example, when Amazon agreed with one Publisher Defendant to forego any promotional activity in exchange for assurance that it would never be disadvantaged on price, it received a call the next day from another saying, "so I understand . . . you're willing to forego promotions."  Similarly, with respect to the length of the agreements, Penguin's McCall left a voicemail for Naggar indicating that Penguin had been "hearing through the grapevine that you guys are maybe coming to some agreements that are less than three years . . . maybe you're moving off of that," and suggesting they chat.

By the end of March 2010, Amazon had completed agency agreements with Macmillan, HarperCollins, Hachette, and S&S.  Because of circumstances that were unique to Penguin and its

reseller contract, its agency agreement with Amazon was the last
to be executed.  Penguin signed its agency contract with Amazon
on June 2, 2010, but before that date, Penguin had refused to
allow Amazon to sell any of Penguin's new e-books.

Apple closely monitored the progress of the Publisher
Defendants in their negotiations with Amazon.[53]  The Publisher
Defendants told Apple when their agency agreements with Amazon
had been signed, and Apple watched as they swiftly moved their
prices for New Release e-books on Amazon to the top of Apple's
tiers.  On April 3, 2010, Cue emailed Jobs to report that "[w]e
have reviewed all the books on Amazon and they have switched to
agency with the publishers. . . .  Overall, our NYT bestsellers
and new releases are the same as Amazon."  At that point,
Penguin was the only Publisher Defendant who had not yet signed
an agency agreement with Amazon.  As such, Cue told Jobs that
Apple was "changing a bunch of Penguin titles to $9.99 . . .
because they didn't get their Amazon deal done."  When Penguin's
Shanks wrote to Cue to share the news it had "finally" reached
an agreement with Amazon "on our new terms of sale," he added

---

[53] At trial, Moerer at first denied that he had watched the
prices of the Publisher Defendants' e-books on Amazon or had
noticed that they had increased to the price caps.  As a
director of iTunes for Apple, this was not credible, and Apple
witnesses, included Moerer, eventually came to admit that they
did track these price increases as they were occurring.

that "The playing field is now level."  Cue responded, "Great news and congratulations!!!"

O. Prices after Agency

Just as Apple expected, after the iBookstore opened in April 2010, the price caps in the Agreements became the new retail prices for the Publisher Defendants' e-books.  In the five months that followed, the Publisher Defendants collectively priced 85.7% of their New Release titles sold through Amazon and 92.1% of their New Release titles sold through Apple within 1% of the price caps.  This was also true for 99.4% of the NYT Bestseller titles on Apple's iBookstore, and 96.8% of NYT Bestsellers sold through Amazon.  The increases at Amazon within roughly two weeks of moving to agency amounted to an average per unit e-book retail price increase of 14.2% for their New Releases, 42.7% for their NYT Bestsellers, and 18.6% across all of the Publisher Defendants' e-books.

The following chart, prepared by one of Apple's experts, illustrates this sudden and uniform price increase.  While the average prices for Random House's e-books hovered steadily around $8, for four of the Publisher Defendants, the price increases occurred at the opening of the iBookstore; Penguin's price increases awaited the execution of its agency agreement with Amazon and followed within a few weeks.  The bottom flat line represents the average prices of non-major publishers.



The Publisher Defendants raised more than the prices of just New Release e-books.  The prices of some of their New Release <u>hardcover</u> books were also raised in order to move the e-book version into a correspondingly higher price tier.[54]  And, all of the Publisher Defendants raised the prices of their backlist e-books, which were not governed by the Agreements'

---

[54] The relationship between the price of e-books and their hardcover counterpart is a complex topic that was only tangentially explored at trial.  Apple conceded, however, that it had not been Amazon's policy to price e-books above their hardcover version, but that the Publishers who adopted an agency model for distribution of their e-books did not always follow that practice.  There is evidence that, with the adoption of the agency model, as many as 20% of trade e-books became more expensive for consumers than their physical counterpart.

price tier regimen.  As Cue had anticipated, the Publisher Defendants did this in order to make up for some of the revenue lost from their sales of New Release e-books.

The following two charts, one prepared by the Plaintiffs' expert and another from an expert for Apple, respectively, compare the price increases for the Publisher Defendants' New Releases with the price increases for their backlist books. Despite drawing from different time periods, their conclusions are very similar.  The Publisher Defendants used the change to an agency method for distributing their e-books as an opportunity to raise the prices for their e-books across the board.

E-Book Average Price Increases at Amazon by Publisher
Defendants Following the Move to Agency

Amazon Weighted Average Price Increases

| Publisher | All eBooks | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 33.0% | 14.1% | 37.9% | 37.5% |
| HarperCollins | 13.6% | 12.5% | 44.0% | 15.2% |
| Macmillan | 11.6% | 14.0% | - | 11.2% |
| Penguin | 18.3% | 19.5% | 43.6% | 17.6% |
| Simon & Schuster | 18.0% | 15.1% | 28.7% | 19.8% |
| Defendant Publishers | 18.6% | 14.2% | 42.7% | 19.6% |
| Random House | 0.01% | 1.9% | 0.2% | 0.3% |
| Non-Majors | -0.2% | -0.9% | 1.1% | 0.1% |

Average E-book Prices of Backlist and New Release Titles
in the Periods Before and After Agency

|  | Amazon | Barnes & Noble | Sony |
|---|---|---|---|
| **Backlist** | | | |
| Before Agency | $7.16 | $6.84 | $8.07 |
| After Agency | $8.78 | $8.20 | $8.43 |
| Percent Change | 23% | 20% | 4% |
| | | | |
| **Hardcover New Release and NYT Bestsellers** | | | |
| Before Agency | $10.37 | $9.99 | $11.31 |
| After Agency | $12.28 | $11.60 | $11.97 |
| Percent Change | 18% | 16% | 6% |

Not surprisingly, the laws of supply and demand were not suspended for e-books.  When the Publisher Defendants increased the prices of their e-books, they sold fewer books.

There were various measurements offered at trial to quantify the lost sales.  One study found that the Publisher Defendants who shifted their e-tailers to agency in early April 2010 sold 12.9% fewer units at major retailers in a two-week period following the implementation of agency prices than they had in a two-week period preceding it, at least for books that were available in both periods.[55]  Another expert opined that the Publisher Defendants' sales decreased by 14.5% relative to a control group consisting of Random House.[56]

---

[55] By contrast, in this study non-party publishers' sales increased 5.4% in the same period.

[56] Apple argued at trial that the decline in sales of the Publisher Defendants' e-books compared to those sold by Random House was attributable to Amazon's promotion of Random House

Amazon prepared charts for the Publisher Defendants illustrating the impact of their pricing decisions on their sales.  Amazon concluded that "[c]ompared to the 3 agency publishers -- Harper, Hachette and Penguin, who had overall kindle book units decline in Q2 compared to Q1, Random House had an increase of 41%."  It is unnecessary to quantify the precise decline in the sales for the Publisher Defendants that can be properly attributed to their decisions to raise their e-book prices.  It is abundantly clear, and not surprising, that each of the Publisher Defendants lost sales of e-books due to the price increases.

Thus, consumers suffered in a variety of ways from this scheme to eliminate retail price competition and to raise e-book prices.  Some consumers had to pay more for e-books; others bought a cheaper e-book rather than the one they preferred to purchase; and it can be assumed that still others deferred a purchase altogether rather than pay the higher price.  Now that the Publisher Defendants were in control of pricing, they were also less willing to authorize retailers to give consumers the benefit of promotions.  As Macmillan explained to Barnes &

books during the time Random House remained on a wholesale model of distribution.  Apple did not offer persuasive evidence, however, that the loss in sales was substantially due to anything other than the fact that Amazon continued to price many Random House New Releases at $9.99 while the Publisher Defendants raised the prices of their e-books substantially higher.

Noble, it would not agree to a proposed promotion because "[w]e worked hard to push the price of our new Ebooks up just a few dollars -- and this would immediately signal not an increase in value, but a decrease in value."

While conceding that the prices for the Publisher Defendants' e-books went up after Apple opened the iBookstore, Apple argued at trial that the opening of the iBookstore actually led to an overall decline in trade e-book prices during the two-year period that followed that event.  Its evidence was not persuasive.  Apple's experts did not present any analysis that attempted to control for the many changes that the e-book market was experiencing during these early years of its growth, including the phenomenon of disintermediation and the extent to which other publishers decided to remain on the wholesale model. The analysis presented by the Plaintiffs' experts as well as common sense lead invariably to a finding that the actions taken by Apple and the Publisher Defendants led to an increase in the price of e-books.  After all, the Publisher Defendants accounted for roughly 50% of the trade e-book market in April 2010, and it is undisputed that they raised the prices for not only their New Release but also their backlist e-books substantially.

P. Random House Adopts an Agency Model

If there were any doubt about the impact of the Apple agency Agreement on e-book prices, at least in so far as the

market for trade e-books is concerned, the experience of Random House confirms each of the observations just made about the prices and sales of the five Publisher Defendants.  Random House adopted the agency model in early 2011, and promptly raised the prices of its e-books and experienced a concomitant decline in e-book sales.[57]

Random House had resisted Apple's overtures to adopt the agency model and therefore its e-books were not available in 2010 in the iBookstore.  It was Cue's assessment that the iBookstore was not as successful as Apple had hoped because e-books from Random House, the largest of the Big Six, were not being sold there.  Cue believes that consumers expect all the books they may want to buy to be available in a bookstore and when they cannot find what they want, they go elsewhere and may never return.

While the Publisher Defendants were pricing their e-books at or close to the $12.99 and $14.99 price caps, Amazon continued to price many Random House New Releases and NYT Bestseller e-books at $9.99, as it did with other publishers that remained on its wholesale terms.  This increased Random House's sales and market share during that period.

---

[57] Dr. Ashenfelter calculated an increase in Random House's prices for e-books of 18.3% on average, and a decrease in its unit sales of e-books of 16.7%.

Apple decided to pressure Random House to join the iBookstore.  As Cue wrote to Apple CEO Tim Cook, "when we get Random House, it will be over for everyone."  Apple had its opportunity in the Fall of 2010, when Random House submitted some e-book apps to Apple's App Store.  Cue advised Random House that Apple was only interested in doing "an overall deal" with Random House.  By December, they had begun negotiations, and Random House executed an agency agreement with Apple in mid-January 2011.  In an email to Jobs, Cue attributed Random House's capitulation in part to "the fact that I prevented an app from Random House from going live in the app store this week."

Q. The Publisher Defendants Require Google to Adopt an
   Agency Model

The decision by the Publisher Defendants and later by Random House to adopt the agency model of distribution and raise e-book prices effected a change across the entire industry. Once the Publisher Defendants agreed with Apple to move to an agency relationship for the sale of their e-books, they not only demanded that Amazon change their relationship to an agency model, they negotiated agency agreements with their other e-book distributors to eliminate all retail price competition.

One of the companies that was planning to become an e-book distributor was Google, and the Publisher Defendants demanded

that Google as well adopt an agency agreement in January 2010. Google had begun to plan its entry into the e-book business as early as 2007. Before January 2010, Google understood from its discussions with the Publisher Defendants that the parties would use the wholesale model to sell digital books. But, in January 2010, each of the Publisher Defendants did an about-face and suddenly advised Google that they were switching to an agency model and would no longer be offering books under wholesale terms. Google, like Amazon, would have preferred to use the wholesale model and set the retail prices for its e-books, but the Publisher Defendants refused to allow it that option. The Publisher Defendants conveyed to Google that their Agreements with Apple made them "unwilling to enter into non-agency agreements with Google."

R. Concluding Observations

While many of the trial's fact witnesses who are employed by Apple and the Publisher Defendants were less than forthcoming, the contemporaneous documentary record was replete with admissions about their scheme. The preceding findings have therefore come not only from the testimony presented at trial, where the witnesses were cross-examined and questioned again through re-direct examination, but has also been derived liberally from the documentary record.

Based on these documents, it is difficult for either Apple or the Publisher Defendants to deny that they worked together to achieve the twin aims of eliminating retail price competition and raising the prices for trade e-books.  As Macmillan frankly acknowledged in writing to the trade in the Spring of 2010, one of its goals in moving to the agency model was to "[i]ncrease[e] prices" of e-books.  As Penguin's McCall wrote, "Agency is anti-pricewar territory.  We don't need to compete with other publishers on the price of our books."  Penguin executives told authors after signing the Apple Agreement that they had "fought to protect high prices; . . . fought against $9.99 pricing" to demand higher, "better" prices.  It continued, "who knows, it is $14.99 this year, but in a few years it may be $16.99 or $19.99."  HarperCollins recognized that, with the Apple Agreements, Apple had become the "gatekeeper" on e-book pricing "for the industry."  As Cue admitted at trial, raising e-book prices was simply "all part of" the bargain in creating the iBookstore.

Jobs himself was frank in explaining how this scheme worked when he spoke to biographer Walter Isaacson the day after the Launch.  Jobs described it as an "a[i]kido move" to move all retailers to agency and eliminate price competition with Amazon. In Jobs's own words:

Amazon screwed it up.  It paid the wholesale price for some
books, but started selling them below cost at $9.99.  The
publishers hated that -- they thought it would trash their
ability to sell hardcover books at $28.  So before Apple
even got on the scene, some booksellers were starting to
withhold books from Amazon.  So we told the publishers,
"We'll go to the agency model, where you set the price, and
we get our 30%, and yes, the customer pays a little more,
but that's what you want anyway."  But we also asked for a
guarantee that if anybody else is selling the books cheaper
than we are, then we can sell them at the lower price too.
So they went to Amazon and said, "You're going to sign an
agency contract or we're not going to give you the books."


DISCUSSION

     The United States of America has brought a single claim

against Apple for violation of Section 1 of the Sherman Act.

The States have brought claims against Apple based on violations

of the state statutes "to the extent those laws are congruent

with Section 1 of the Sherman Act."  Following a description of

the legal standard for a Section 1 claim, this Opinion will

apply that law to the facts presented at trial.  After finding

that the Plaintiffs' have carried their burden of showing that

Apple violated Section 1, the Opinion will address the six

principal arguments that Apple has presented in its defense.

     A. Legal Standard

     Section 1 of the Sherman Act ("Section 1") outlaws "[e]very

contract, combination . . . , or conspiracy, in restraint of

trade or commerce among the several States."  15 U.S.C. § 1.  To

establish a conspiracy in violation of Section 1, then, proof of

joint or concerted action is required.  Monsanto Co. v. Spray-
Rite Service Corp., 465 U.S. 752, 761 (1984).  In particular,
plaintiffs must show (1) "a combination or some form of
concerted action between at least two legally distinct economic
entities" that, (2) "constituted an unreasonable restraint of
trade either per se or under the rule of reason."  Primetime 24
Joint Venture v. Nat'l Broad. Co., 219 F.3d 92, 103 (2d Cir.
2000) (citation omitted); see Capital Imaging Assocs, P.C. v.
Mohawk Valley Medical Assocs, Inc., 996 F.2d 537, 542 (2d Cir.
1993).  Overall, "[c]ircumstances must reveal a unity of purpose
or a common design and understanding, or a meeting of minds in
an unlawful arrangement."  Monsanto, 465 U.S. at 764 (citation
omitted); Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.
1987).

        Notwithstanding its broad language, Section 1 does not
disallow any and all agreements; it "outlaws only unreasonable
restraints."  Leegin Creative Leather Prods., Inc. v. PSKS,
Inc., 551 U.S. 877, 885 (2007) (citation omitted).  Thus, in
many cases, "antitrust plaintiffs must demonstrate that a
particular contract or combination is in fact unreasonable and
anticompetitive before it will be found unlawful."  Texaco Inc.
v. Dagher, 547 U.S. 1, 5 (2006).  Some agreements, however, "are
so plainly anticompetitive that no elaborate study of the
industry is needed to establish their illegality."  Id.

(citation omitted).  Such agreements are illegal per se, and are not subject to the rule of reason.  The per se rule thus "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."  Leegin, 551 U.S. at 886.

By contrast, under the rule of reason, "the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market."  Geneva Pharms Tech Corp. v. Barr Labs Inc., 386 F.3d 485, 506-07 (2d Cir. 2004) (citation omitted).

> If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement.  Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means.  Ultimately, the fact finder must engage in a careful weighing of the competitive effects of the agreement -- both pro and con -- to determine if the effects of the challenged restraint tend to promote or destroy competition.

Id. at 507 (citation omitted).

Use of the per se rule is limited to restraints "that would always or almost always tend to restrict competition and decrease output," and is appropriate "only after courts have had considerable experience with the type of restraint at issue."  Leegin, 551 U.S. at 886 (citation omitted).  "Under the Sherman Act a combination formed for the purpose and with the effect of

106

raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940). Generally speaking, price-fixing agreements or agreements to divide markets that are horizontal in nature -- meaning that the parties to the agreement are "competitors at the same level of the market structure," Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (citation omitted) -- are per se unlawful. Starr v. Sony BMG Music Entm't, 592 F.3d 314, 326 n.4 (2d Cir. 2010); Leegin, 551 U.S. at 886 ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices."). In other words, "they are prohibited despite the reasonableness of the particular prices agreed upon." Starr, 592 F.3d at 326 n.4. Non-price restrictions that are otherwise lawful are also "per se unlawful if undertaken as part of an illegal scheme to fix prices." Monsanto, 465 U.S. at 760 n.6 (citation and emphasis omitted).

By contrast, vertical price restraints, such as resale price maintenance agreements, that do not involve price-fixing are subject to the rule of reason. See Leegin, 551 U.S. at 882. A manufacturer has a right to refuse to deal "with whomever it likes, as long as it does so independently." Monsanto, 465 U.S. at 761.

A plaintiff may rely on either direct or circumstantial evidence to establish that a defendant entered into an agreement in violation of the antitrust laws.  <u>Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.</u>, 709 F.3d 129, 136 (2d Cir. 2013) (pleading standard).  Direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  <u>Id</u>.

Because unlawful conspiracies tend to form in secret, however, proof of a conspiracy will rarely consist of explicit agreements.  Rather, conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  <u>Anderson News</u>, 680 F.3d at 183 (citation omitted).  In fact, even direct evidence in antitrust cases "can sometimes require a factfinder to draw inferences to reach a particular conclusion."  <u>In re Publ'n Paper Antitrust Litig.</u>, 690 F.3d 51, 64 (2d Cir. 2012) ("Perhaps on average circumstantial evidence requires a longer chain of inferences." (citation omitted)).  Circumstantial evidence is no less persuasive than direct evidence; indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 100 (2003).

Thus, to prove an antitrust conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that

reasonably tends to prove that the [defendant] and others had a
conscious commitment to a common scheme designed to achieve an
unlawful objective."  Monsanto, 465 U.S. at 764 (citation
omitted).  The evidence must also "prove defendants had the
intent to adhere to an agreement that was designed to achieve an
unlawful objective; specific intent to restrain trade is not
required."  Geneva Pharms, 386 F.3d at 507.  Since "the essence
of any violation of § 1 [of the Sherman Act] is the illegal
agreement itself," Summit Health, Ltd. v. Pinhas, 500 U.S. 322,
330 (1991), the evidence must demonstrate a "meeting of the
minds."  Monsanto, 465 U.S. at 765.  In evaluating the existence
of an antitrust conspiracy, courts consider the "totality of the
evidence."  Publ'n Paper, 690 F.3d at 64; see Cont'l Ore Co. v.
Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) ("The
character and effect of a conspiracy are not to be judged by
dismembering it and viewing its separate parts, but only by
looking at it as a whole." (citation omitted)).  Just as a
conspiracy's "failure to achieve its ends" after an intended
period may be "strong evidence" that the conspiracy did not in
fact exist, Matsushita Electric Indus. Co., Ltd. v. Zenith Radio
Corp., 475 U.S. 574, 592 (1986), the success of the conspiracy
in achieving its goals may confirm the very existence of the
conspiracy.  See Oreck Corp. v. Whirlpool Corp., 563 F.2d 54, 63
(2d Cir. 1977) ("Proof that a combination was formed for the

purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act." (citation omitted)); cf. United States v. Quinones, 511 F.3d 289, 308 (2d Cir. 2007) (defendants' cocaine purchases "were obviously relevant to proof of the existence of th[e narcotics] conspiracy" charged).

"Unambiguous evidence of an agreement to fix prices . . . is all the proof a plaintiff needs" to establish a violation of Section 1. Publ'n Paper, 690 F.3d at 63 (citation omitted). Where the evidence of conspiracy is "ambiguous," however, "antitrust law limits the range of permissible inferences" that may be drawn. Matsushita, 475 U.S. at 588; see Apex, 822 F.2d at 253. Where conduct is as consistent with permissible competition as with illegality, a plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita, 475 U.S. at 588 (citation omitted). Thus, "standing alone," ambiguous conduct is inadequate to support an inference of illegality. Id. Moreover, where a plaintiff's theory of recovery is implausible -- in other words, "if the claim is one that simply makes no economic sense," id. at 587 -- it takes "strong direct or circumstantial evidence to satisfy Matsushita's tends to exclude standard." Publ'n Paper, 690 F.3d at 63 (citation omitted).

"By contrast, broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." Id. (citation omitted).

Even where a plaintiff relies on ambiguous evidence, however, to prove its claim, the plaintiff does not bear the burden of showing that the existence of a conspiracy is the "sole inference" to be drawn from the evidence. Id. The plaintiff is only required to present evidence that is sufficient to allow the fact-finder "to infer that the conspiratorial explanation is more likely than not." Id. (citation omitted).

Conduct that stems from independent decisions is permissible under Section 1, see Starr, 592 F.3d at 321, as are "independent responses to common stimuli," and "interdependence unaided by an advance understanding among the parties." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 n.4 (2007) (citation omitted). As a result, while evidence of parallel conduct is probative of an antitrust conspiracy, such evidence "alone cannot suffice." Apex, 822 F.2d at 252; Matsushita, 475 U.S. at 588. Instead, to infer a horizontal agreement through parallel conduct, a court may draw inferences from "plus factors" to rule out purely interdependent decision making by

111

rivals.  Mayor, 709 F.3d at 136 (citation omitted).  Plus

factors commonly considered by courts include "a common motive

to conspire, evidence that shows that the parallel acts were

against the apparent individual economic self-interest of the

alleged conspirators, . . . evidence of a high level of

interfirm communications," id., and the "use of facilitating

practices" like information sharing.  Todd v. Exxon Corp., 275

F.3d 191, 198 (2d Cir. 2001).  An abrupt shift from defendants'

past behavior and near-unanimity of action by several defendants

may also strengthen the inference.  See Interstate Circuit v.

United States, 306 U.S. 208, 222 (1939); Toys "R" Us, Inc. v.

FTC, 221 F.3d 928, 935 (7th Cir. 2000).  For instance, a

"complex and historically unprecedented change[] in pricing

structure made at the very same time by multiple competitors,

and made for no other discernible reason," may provide

sufficient evidence of an illegal conspiracy.  Mayor, 709 F.3d

at 137 (citation omitted) (discussion of pleading standard).

      Per se price-fixing agreements may also include those where

a vertical player participates in and facilitates a horizontal

conspiracy.  See Toys "R" Us, 221 F.3d at 934, 936.  Where a

vertical actor is alleged to have participated in an unlawful

horizontal agreement, plaintiffs must demonstrate both that a

horizontal conspiracy existed, and that the vertical player was

a knowing participant in that agreement and facilitated the

scheme.  See, e.g., id. at 936; Interstate Circuit, 306 U.S. at
225-29 (1939).

B. Analysis of the Evidence

The Plaintiffs have shown through compelling evidence that
Apple violated Section 1 of the Sherman Act by conspiring with
the Publisher Defendants to eliminate retail price competition
and to raise e-book prices.  There is overwhelming evidence that
the Publisher Defendants joined with each other in a horizontal
price-fixing conspiracy.  Through that conspiracy, the Publisher
Defendants raised the prices of many of their New Releases and
NYT Bestsellers above the $9.99 price at which they had
previously been sold through Amazon.  They also raised the
prices of many of their backlist e-books.  The Plaintiffs have
also shown that Apple was a knowing and active member of that
conspiracy.  Apple not only willingly joined the conspiracy, but
also forcefully facilitated it.

There is little dispute that the Publisher Defendants
conspired together to raise the prices of their e-books.[58]  They
shared a common motivation: the elimination of the "wretched"

---

[58] During summation Apple chose not to concede that the
plaintiffs had proven at trial that the Publisher Defendants
engaged in a horizontal price fixing conspiracy.  Apple did not
expend an effort, however, to argue that such a conspiracy did
not exist or that the evidence was insufficient to find that it
existed.  Apple confined its argument to its purported lack of
knowledge that the Publisher Defendants were conspiring with
each other.

$9.99 retail price that Amazon, the chief distributor of their e-books, chose for many of their New Releases, including NYT Bestsellers.  They believed that this price point in the nascent but swiftly growing e-book market would, if left unchallenged, unalterably affect the consumer perception of the value of a book and severely undermine their more profitable physical book business.  To protect their then-existing business model, the Publisher Defendants agreed to raise the prices of e-books by taking control of retail pricing.

From late 2008 through 2009, the Publisher Defendants had collectively tried through a variety of means to pressure Amazon to raise the prices of their e-books.  Their efforts proved futile.  Then, through agency agreements that each Publisher Defendant executed with Apple over the course of just three days in January 2010, and with Amazon (and other e-retailers) in the weeks that followed, the Publisher Defendants simultaneously switched from a wholesale to an agency model for the distribution of their e-books.  When the iPad went on sale and the iBookstore went live in early April 2010 (or shortly thereafter, in the case of Penguin), each of the Publisher Defendants used their new pricing authority to raise the prices of their e-books overnight and substantially.

This price-fixing conspiracy would not have succeeded without the active facilitation and encouragement of Apple.

Before Apple even met with the Publisher Defendants in mid-
December 2009, it was fully aware that the Publishers were
adamantly opposed to Amazon's $9.99 price point and were
actively searching for an effective means, including through
collective action, to pressure Amazon to raise its prices.
Inspired by the impending Launch of the revolutionary iPad,
scheduled for January 27, Apple seized the moment.

Apple met with the Publishers in December 2009 and heard
their unanimous condemnation of the $9.99 price point and desire
to raise e-book prices.  Volunteering that it was willing to
price e-books as high as $14.99 in an e-bookstore, Apple won
their rapt attention.  Apple then presented a strategy -- the
agency Agreements -- that would allow the Publishers to take
control of and raise e-book retail prices in a matter of weeks.
Knowing full well, however, that the Publisher Defendants wanted
to raise e-book retail prices significantly above the $9.99
price point, even in some instances above the retail prices of
the corresponding physical book, Apple placed pricing
restrictions or caps on categories of e-books to ensure that the
prices in its iBookstore were "realistic" and didn't embarrass
Apple.  In negotiating the caps for its pricing tiers, Apple
understood that it was setting the new retail prices at which
e-books would be sold.

Apple had several reasons for engaging as it did with the
Publisher Defendants.  It wanted to announce a well-stocked
iBookstore in less than two months, when it launched its iPad;
it wanted to avoid competing with Amazon, an arch rival in the
market, on the basis of price; and it wanted a guaranteed profit
on any new business it entered.  To accomplish these goals,
Apple was willing to offer the Publisher Defendants a roadmap
for raising retail e-book prices well above Amazon's $9.99 price
point and urged the Publisher Defendants to use that roadmap to
do so.  In short, Apple convinced the Publisher Defendants that
Apple shared their goal of raising e-book prices, and helped
them to realize that goal.

Apple included the MFN, or price parity provision, in its
Agreements both to protect itself against any retail price
competition and to ensure that it had no retail price
competition.  Apple fully understood and intended that the MFN
would lead the Publisher Defendants inexorably to demand that
Amazon switch to an agency relationship with each of them.  As
Apple's Cue reminded Macmillan's Sargent, this was no more than
what the Publisher Defendants had already assured Apple that
they wanted to, and would, do.

Because of the MFN, Apple concluded that it did not need to
include as an explicit term in its Agreements a demand that a
Publisher Defendant move all of its resellers to agency.  The

116

MFN was sufficient to force the change in model.  The economics
of the Agreements were, simply put, "terrible" for the
Publishers.  The Publisher Defendants already expected to lose
revenue from their substitution of an agency model for the
wholesale model of e-book distribution.  Unless a Publisher
Defendant followed through and transformed its relationships
with Amazon and other resellers into an agency relationship, it
would be in significantly worse terms financially as a result of
its agency contract with Apple.  As significantly, unless the
Publisher Defendants joined forces and together forced Amazon
onto the agency model, their expected loss of revenue would not
be offset by the achievement of their ultimate goal: the
protection of book value.

A chief stumbling block to raising e-book prices was the
Publishers' fear that Amazon would retaliate against any
Publisher who pressured it to raise prices.  Each of them could
also expect to lose substantial sales if they unilaterally
raised the prices of their own e-books and none of their
competitors followed suit.  This is where Apple's participation
in the conspiracy proved essential.  It assured each Publisher
Defendant that it would only move forward if a critical mass of
the major publishing houses agreed to its agency terms.  It
promised each Publisher Defendant that it was getting identical
terms in its Agreement in every material way.  It kept each

117

Publisher Defendant apprised of how many others had agreed to
execute Apple's Agreements.  As Cue acknowledged at trial, "I
just wanted to assure them that they weren't going to be alone,
so that I would take the fear awa[y] of the Amazon retribution
that they were all afraid of."  As a result, the Publisher
Defendants understood that each of them shared the same set of
risks and rewards.

Working against its own internal deadline, Apple achieved
for this industry in a matter of weeks what the Publisher
Defendants had been unable to accomplish for months before Apple
became their partner.  In the words of Simon & Schuster's Reidy,
Apple herded cats.  Apple gave the Publishers a deadline and
required them to examine with care but quickly how committed
they were to challenging Amazon and altering the landscape of
e-book pricing.  And when it appeared a Publisher Defendant
might be too scared to commit to this dramatic business change,
Cue reminded that Publisher Defendant that Apple's entry into
the market represented a once-in-a-lifetime opportunity to
eliminate Amazon's control over pricing.  As he warned Penguin
just days before the Launch, "There is no one outside of us that
can do this for you.  If we miss this opportunity, it will
likely never come again."

Without the collective action that Apple nurtured, it is
unlikely any individual Publisher would have succeeded in

unilaterally imposing an agency relationship on Amazon.  Working together, and equipped with Apple's agency Agreements, Apple and the Publisher Defendants moved the largest publishers of trade e-books and their distributors from a wholesale to agency model, eliminated retail price competition, and raised e-book prices.

The evidence of this conspiracy can be found in Jobs's admissions to a reporter, to James Murdoch, and to his biographer; in contemporaneous e-mails pulled from the files of Apple, the Publishers, Amazon, and others; in the web of telephone calls among Publisher Defendants' CEOs surrounding each turning point in the presentation and execution of the Agreements;[59] and as compellingly, in the circumstantial evidence.  This circumstantial evidence includes the following:

---

[59] Apple has contended that the existence of any conversations among the Publisher Defendants CEOs during their negotiations with Apple is neither unusual nor incriminating.  This is not the occasion to describe the metes and bounds of lawful communication among competitors when they are engaged in simultaneous negotiations with either a common supplier or a shared distributor.  Instead, the Court focuses here on the ways in which the Publisher Defendants' frequent discussions are relevant to this Opinion, including that the Publisher Defendants' denials at trial that they discussed the Apple Agreement with one another in those communications, or that those conversations occurred at all, in the face of overwhelming evidence to the contrary, strongly supports a finding of consciousness of guilt.  They knew they were coordinating their efforts to raise the e-book prices and jointly confront Amazon, and have tried to hide that fact.  Moreover, the pattern of their coordination in meetings and telephone calls, and their expectation that they would not compete on price -- all of which was apparently well established before Apple reached out to them but continued throughout their negotiations with Apple -- serves as strong evidence of this conspiracy.

each of the Publisher Defendants shared the identical goal to raise the $9.99 price point to protect its physical book business; the agency Agreements represented an "abrupt shift" from the past model for the distribution of e-books; the Publisher Defendants each demanded that Amazon adopt this new model within days of each other; the agency model protected Apple from price competition; the rise in trade e-book prices to or close to the price caps established in the Agreements was large and essentially simultaneous; in adopting a model that deprived each of them of a stream of expected revenue from the sale of e-books on the wholesale model, the Publisher Defendants all acted against their near-term financial interests; and each of the Publisher Defendants acted in identical ways even though each was also afraid of retaliation by Amazon.  See Toys "R" Us, 221 F.3d at 935-36; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 110 (2d Cir. 2002).

In sum, the Plaintiffs have shown not just by a preponderance of the evidence, see Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983), but through compelling direct and circumstantial evidence that Apple participated in and facilitated a horizontal price-fixing conspiracy.  As a result, they have proven a per se violation of the Sherman Act. See Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 346-47 (1982); Toys "R" Us, 221 F.3d at 936.  If it were necessary to

120

analyze this evidence under the rule of reason, however, the
Plaintiffs would also prevail.

Apple has not shown that the execution of the Agreements
had any pro-competitive effects.[60]  The form Agreements
eliminated retail price competition, and there is no evidence
that the Publisher Defendants have ever competed with each other
on price.  To the contrary, several of the Publishers' CEOs
explained that they have not competed with each other on that
basis.  The pro-competitive effects to which Apple has pointed,
including its launch of the iBookstore, the technical novelties
of the iPad, and the evolution of digital publishing more
generally, are phenomena that are independent of the Agreements
and therefore do not demonstrate any pro-competitive effects
flowing from the Agreements.  In any event, the Plaintiffs have
shown that the Agreements did not promote competition, but
destroyed it.  The Agreements compelled the Publisher Defendants
to move Amazon and other retailers to an agency model for the
distribution of e-books, removed the ability of retailers to set
the prices of their e-books and compete with each other on
price, relieved Apple of the need to compete on price, and
allowed the Publisher Defendants to raise the prices for their
e-books, which they promptly did on both New Releases and NYT

---

[60] Plaintiffs have defined the relevant market as trade e-books
in the United States; Apple does not dispute that
characterization.

Bestsellers, as well as backlist titles.  Apple's experts did little to counter the evidence of this across-the-board price increase in e-books sold by the Publisher Defendants and by Random House when it moved to agency.[61]  Because of this rise in prices, and at least until Random House also adopted the agency model, the Publisher Defendants sold fewer e-books than they otherwise would have done.  For this and many other reasons, if it were necessary to evaluate Apple's conduct under the rule of reason, Plaintiffs have carried their burden to show a violation of Section 1 of the Sherman Act under that test as well.


APPLE'S ARGUMENTS

Apple vigorously contested its liability at trial.  This Opinion turns now to Apple's principal arguments in its defense.

Apple's defense has somewhat shifted over time.  Apple in its opening statement identified five essential links in the chain of evidence that the Plaintiffs had to establish at trial.[62]  They were:

---

[61] The testimony by Apple's experts that the prices of e-books generally, including self-published e-books, decreased on average in the years following the introduction of the iBookstore, does not affect this conclusion.  The Apple experts did not offer any scientifically sound analysis of the cause for this purported price decline or seek to control for the factors that may have led to it.

[62] In its pretrial memorandum of law, Apple's defense focused almost exclusively on Monsanto's "tends to exclude" standard and its contention that Plaintiffs' evidence is insufficient to

First is that the publishers sign Apple's agency agreements
with an MFN and price caps.

The second is that that MFN sharpened the publishers'
incentives to demand agency from Amazon.

The next is that that demand for agency convinces a
company, Amazon, of the futility of continued resistance to
agency.

Amazon adopts agency in circumstances where absent the
Apple MFN it would not have adopted agency.

And the final chain in the alleged conspiracy is that the
publishers raise prices to the price caps by agreement.

All of these links in the chain are required for the
government to meet its burden of proving that Apple
participated in a price fixing scheme.

Apple also highlighted in its opening how much Apple likes low

prices and that it did not know how the Publishers would price

their e-books under the agency model.

Over the course of the trial, Apple abandoned each of these

arguments.  All of the "links" that Apple identified in its

opening statement were established at trial, and Apple did not

argue otherwise in its summation.  Apple similarly abandoned by

summation its theory that Apple was unaware that the Publisher

Defendants would use their new pricing authority to raise e-book

prices; over the course of the trial, Apple's witnesses admitted

that they expected the Publisher Defendants to raise their

---

exclude the possibility of independent action.  This remains
Apple's chief argument in its defense.

e-book prices to Apple's price caps.  Instead, in the end, Apple appears to make six principal arguments in its defense.

First, it relies on the Supreme Court's decision in Monsanto, 465 U.S. 752, to assert that Apple is entitled to a verdict in its favor since the evidence does not "tend to exclude" the possibility that Apple acted in a manner consistent with its lawful business interests.  Second, Apple argues that it never intended to conspire with the Publisher Defendants to raise e-book prices.  Third, Apple argues that the Plaintiffs have failed to show that the Publisher Defendants actually "increased" e-book prices since, in the absence of Amazon's adoption of an agency model, the Publisher Defendants would have simply withheld e-books from Amazon.  Apple also offers its own reading of different portions of the trial record, and that reading will be addressed as its fourth set of contentions. Fifth, Apple presents additional legal arguments suggesting that its conduct must be analyzed under the rule of reason.  Finally, Apple argues that a verdict in favor of the Plaintiffs will set a dangerous precedent and will discourage businesses from entering other markets.  Each of these defenses will be discussed in turn.

A. The <u>Monsanto</u> Decision and Apple's Independent Business
   Interests

Throughout these proceedings, Apple has relied on <u>Monsanto</u>
and its "tends to exclude" formulation as the crown jewel of its
defense.  According to Apple, any fact-finder in this case must
begin by answering the following question: "Does the evidence
show that Apple acted to facilitate a conspiracy among the
Publisher Defendants to force Amazon onto agency and raise
prices, or rather was its conduct just as consistent with
independent, unilateral action?"  If the evidence regarding
participation in a conspiracy is ambiguous, then Apple contends
that, under <u>Monsanto</u>, the fact-finder may only find Apple liable
if it concludes that Apple's participation in a conspiracy is
"the more likely explanation" for its conduct.  Apple also
asserts that when the most natural inference from the evidence
is that a defendant had a legitimate, independent reason for its
actions, then no fact-finder may infer that it engaged in a
conspiracy.

Applying this reading of precedent, Apple argues that it
had legitimate, independent business reasons for executing the
Agreements with the Publisher Defendants, and that these
independent business reasons necessarily render any evidence of
its participation in a conspiracy ambiguous.  Because the
Plaintiffs have been unable to show that Apple did not have

125

legitimate reasons for acting as it did, Apple asserts that the
Plaintiffs have failed to exclude the possibility that Apple
acted lawfully.  As a result, according to Apple, Monsanto
dictates that a verdict be entered in its favor.  Apple misreads
Monsanto and its progeny.  It also perceives ambiguity where
none exists.

In Monsanto, 465 U.S. 752, the Supreme Court upheld a jury
verdict that a manufacturer had engaged in a per se illegal
vertical price-fixing scheme with "some of its distributors."
The goal of the conspiracy was the termination of a rival
distributor that was running a "discount operation."  Id. at
756, 764-65.  Because a manufacturer and its distributors "have
legitimate reasons to exchange information about the prices and
the reception of their products in the market," id. at 762, and
because of dangers that flow from permitting an inference of
conspiracy to be drawn "from highly ambiguous evidence," id. at
763, the Court held that a plaintiff must present evidence of
"something more" than complaints from distributors to the
manufacturer about their cost-cutting rival.  Id. at 764.  Using
the phrase upon which Apple seizes, the Court observed that
there "must be evidence that tends to exclude the possibility
that the manufacturer and nonterminated distributors were acting
independently."  Id. (emphasis supplied).  In other words,
direct or circumstantial evidence must be present that "tends to

prove that the manufacturer and others had a conscious
commitment to a common scheme designed to achieve an unlawful
objective." Id. (citation omitted).

Applying that standard, the Court examined the evidence
presented at trial, and held that the direct and circumstantial
evidence supported the jury's finding that there was an
agreement between the manufacturer and one or more distributors
to maintain prices. Id. at 767. In doing so, it noted that the
choice between "two reasonable interpretations of the testimony"
is properly left for the fact-finder. Id. at 768 n.12.

Two years later, in Matsushita, 475 U.S. 574, the Court
returned to this topic in the context of summary judgment
practice. It observed that "anti-trust law limits the range of
permissible inferences from ambiguous evidence in a § 1 case."
Id. at 588. The Court explained that "if the factual context
renders respondents' claim implausible -- if the claim is one
that simply makes no economic sense -- respondents must come
forward with more persuasive evidence to support their claim
than would otherwise be necessary." Id. at 587. Moreover,
where there is conduct "as consistent with permissible
competition as with illegal conspiracy," that conduct "standing
alone" will not support an inference of conspiracy. Id. at 588.
Thus, to "survive a motion for summary judgment or for a
directed verdict, a plaintiff . . . must present evidence that

127

tends to exclude the possibility that the alleged conspirators acted independently." Id. (citation omitted).  Applying these principles to the case at hand, the Court noted that there could be no inference of a conspiracy when the accused "had no rational economic motive" to engage in a conspiracy and its conduct was "consistent with other, equally plausible explanations." Id. at 596.  Therefore, to support liability, the evidence must "tend to exclude the possibility" that the accused engaged in legitimate behavior rather than engaging in "an economically senseless conspiracy." Id. at 597-98 (citation omitted).

These discussions of the "tend to exclude" formulations in Monsanto and Matsushita have occasioned commentary by academicians and courts of appeal.  The Court of Appeals for the Second Circuit has warned that "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff." Publ'n Paper, 690 F.3d at 63.  According to the Second Circuit,

> [i]t is important not to be misled by Matsushita's statement . . . that the plaintiff's evidence, if it is to prevail, must "tend . . . to exclude the possibility that the alleged conspirators acted independently."  The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct.  Not only did the court use the word "tend," but the context made clear that the Court was simply requiring sufficient evidence to allow a reasonable fact-finder to infer that the conspiratorial explanation is more likely than not.

Id. (citing Phillip E. Areeda and Herbert Hovenkamp,
Fundamentals of Antitrust Law, § 14.03(b), at 14-25 (4th ed.
2011)).  Accordingly, "if a plaintiff relies on ambiguous
evidence to prove its claim, the existence of a conspiracy must
be a reasonable inference that the jury could draw from that
evidence; it need not be the sole inference."  Id.
Characterizing as a "trap" the fallacy that "if no single item
of evidence presented by the plaintiff points unequivocally to
conspiracy, the evidence as a whole cannot defeat summary
judgment," the Court of Appeals for the Seventh Circuit has
opined that the question for the fact-finder is simply "whether,
when the evidence was considered as a whole, it was more likely
that the defendants had conspired to fix prices than that they
had not conspired to fix prices."  In re High Fructose Corn
Syrup Antitrust Litigation, 295 F.3d 651, 655-56 (7th Cir.
2002).

    For the reasons described earlier in this Opinion, there is
abundant direct and circumstantial evidence, and this Court has
found, that Apple knowingly and intentionally participated in
and facilitated a horizontal conspiracy to eliminate retail
price competition and to raise the retail prices of e-books.
Apple made a conscious commitment to join a scheme with the
Publisher Defendants to raise the prices of e-books.  See
Monsanto, 465 U.S. at 764.  Apple did not and could not have

129

acted independently to achieve the results it achieved here.   It
required the coordinated effort and conscious commitment of the
Publisher Defendants and Apple to change the business model for
the distribution of e-books, impose that new model on Amazon
against its will, and effect a significant increase in the
retail prices of e-books.   The finding that Apple engaged in an
illegal conspiracy is based not simply on a finding that the
"conspiratorial explanation is more likely than not," Publ'n
Paper, 690 F.3d at 63; it is based on powerful direct evidence
corroborated by compelling circumstantial evidence.   Even if
Apple had been successful at trial in showing that the evidence
of its participation in the asserted conspiracy was equally
balanced between two reasonable interpretations, Monsanto, 465
U.S. at 768 n.12, and it was not, the Plaintiffs have shown by a
preponderance of the evidence that Apple violated the antitrust
laws.

     This conclusion is based on an evaluation of the entirety
of the evidentiary record, including those portions on which
Apple relies in arguing that it acted in ways that were
consistent with its independent business interests.   It is not
surprising that Apple chose to further its own independent,
economic interests.   Such a motivation, however, does not
insulate a defendant from liability for illegal conduct.   It has
long been observed that it is of "no consequence, for purposes

of determining whether there has been a combination or
conspiracy under s[ection] 1 of the Sherman Act, that each party
acted in its own lawful interest." United States v. General
Motors Corp., 384 U.S. 127, 142 (1966).

To the extent that Apple is arguing that the evidence of
its participation with the Publisher Defendants in the
conspiracy is ambiguous, it is wrong.  Instead, the evidence not
only "tends to exclude the possibility" that Apple acted
independently; it overwhelmingly demonstrates that it did not.

In asserting that its behavior was consistent with its
legitimate business interests and with standard business
practices,  Apple emphasizes the following: it wanted to enter
and compete successfully in the e-books market; it did not want
to begin a business in which it would sustain losses; it wanted
to avoid the windowing or withholding of e-books from its e-
bookstore; the agency model, particularly one with price caps
and an MFN, was a logical fit; and it was helpful to advise
Publishers that it was offering the same terms to their
competitors and would open the iBookstore only if it reached
agreements with enough of them to have a successful e-bookstore.
Apple contends that each of these practices was and is a lawful
business practice.  It argues that no proper inference that
Apple conspired to raise price can be drawn from the several
terms in the Agreements or the components of Apple's negotiating

131

strategy because the Supreme Court has found actions of this type essential to the operation of efficient markets.

The Plaintiffs do not argue, and this Court has not found, that the agency model for distribution of content, or any one of the clauses included in the Agreements, or any of the identified negotiation tactics is inherently illegal.  Indeed, entirely lawful contracts may include an MFN, price caps, or pricing tiers.  Lawful distribution arrangements between suppliers and distributors certainly include agency arrangements.  It is also not illegal for a company to adopt a form "click-through" contract, negotiate with all suppliers at the same time, or share certain information with them.  Indeed, as Apple indicates, many common business practices have been found necessary for the efficient distribution of goods and services. See Monsanto, 465 U.S. at 763-64.  That does not, however, make it lawful for a company to use those business practices to effect an unreasonable restraint of trade.  And here, the evidence taken as a whole paints quite a different picture -- a clear portrait of a conscious commitment to cross a line and engage in illegal behavior with the Publisher Defendants to eliminate retail price competition in order to raise retail prices.

Apple urges the Court to focus solely on each of the terms of the Agreements and to conclude that there is nothing

132

inherently illegal in those terms or the contract as a whole.
By asking the Court to focus exclusively on whether the final
terms of the Agreements by themselves reflect an agreement in
restraint of trade, Apple ignores the six weeks of negotiations
leading up to their execution, when the conspiracy and Apple's
participation in it took shape, and the weeks that followed,
during which time the import of the Agreements became apparent.
The Court is obligated to consider the totality of the evidence.
Therefore, the Agreements must be considered in the context of
the entire record.  When that is done, it becomes evident that
the caps for the price tiers were the fiercely negotiated new
retail prices for e-books and that the MFN was the term that
effectively forced the Publisher Defendants to eliminate retail
price competition and place all of their e-tailers on the agency
model.

Apple also argues that it is particularly unfair to find
that it engaged in illegal conduct since Amazon and Google,
among others, used similar negotiating tactics and included
nearly identical terms, including MFNs, when they subsequently
executed their own agency agreements with the Publishers.  There
are several reasons that this is not a persuasive argument.

First, it is no defense to participation in an illegal
price fixing conspiracy to suggest that others did it too.
Second, focusing on the precise terms of agency agreements and

the extent to which they may have been similar is far too narrow
a focus.  The issue is not whether an entity executed an agency
agreement or used an MFN, but whether it conspired to raise
prices.  Apple has pointed to no evidence that either Amazon or
Google desired either to eliminate retail price competition or
to raise retail prices.  Quite the contrary.  Amazon was adamant
in its support of retail price competition and lower prices.  It
did not relinquish its control over retail pricing easily.  As
Penguin's Shanks described at trial, when Penguin demanded that
Amazon yield its discretion over retail pricing, Amazon "yelled
and screamed and threatened.  It was a very unpleasant meeting."
For its part, Google had been negotiating wholesale distribution
agreements with Publishers and only switched to agency
agreements at their insistence.  Amazon was so hopeful that the
Publisher Defendants would relent and revert to a wholesale
model once they saw how much money they were losing with the
agency model that it added a "model-parity" clause in its
agreements.

     In sum, Apple's independent business reasons for creating
an e-bookstore and for adopting an agency model to do so have
not created any ambiguity in the evidentiary record that should
require hesitation before finding Apple liable.  The totality of
the evidence leads inextricably to the finding that Apple chose

to join forces with the Publisher Defendants to raise e-book prices and equipped them with the means to do so.

B. Apple's Intent

Apple's second defense is related to its first.  It argues that it never intended to conspire with the Publisher Defendants to raise the retail prices of e-books.  Apple emphasizes that it was the Publisher Defendants who raised the prices, and Apple should not be found liable just because those Publishers used Apple's Agreements as a tool to force an industry change to the agency model and then used their newly acquired price-setting authority to raise the retail prices of e-books.

Apple asserts it was solely focused on accomplishing its core business objectives and on providing the best possible e-reading experience for consumers.  Apple identifies those business objectives as the development of an iBookstore with comprehensive content and competitive pricing.[63]  At trial, its witnesses stressed the benefits that accrued to readers from its iPad (color functionality, backlit screen, and video capability) and from the iBookstore e-reader software (landscape view option, an attractive page-curl function, and an end-to-end platform to browse, buy, and read an e-book in one seamless interface).

---

[63] Apple uses the term "competitive" to convey that it wanted its prices to be the lowest in the marketplace, not to convey that it wanted prices arrived at through the process of competition.

These business considerations undoubtedly drove Apple's
conduct throughout its negotiations with the Publisher
Defendants.  Of course, Apple hoped to launch a new content
store that was both profitable and popular.  It described with
enthusiasm at trial the improvements to the iBookstore that
allowed cooks to learn the proper technique for preparing boeuf
bourguignon by watching Julia Child, and allowed children to run
their fingers over a color touchscreen while reading the
illustrated pages of Winnie the Pooh.  But, as the trial
evidence made abundantly clear, there was more to Apple's entry
into the trade e-book market than the presentation of innovative
software on a remarkable device.

Apple's entirely appropriate or even admirable motives do
not preclude a finding that Apple also intentionally engaged
with the Publisher Defendants in a scheme to raise e-book
prices.  From its very first meetings with the Publishers, Apple
appealed to their desire to raise prices and offered them a
vision of how they could reach that objective.  By the end of
the trial, Apple's witnesses no longer denied that they fully
understood that the Publisher Defendants would raise e-book
prices to the Agreements' pricing caps as soon as the iBookstore
appeared on the market.  Understanding that no one Publisher
could risk acting alone in an attempt to take pricing power away
from Amazon, Apple created a mechanism and environment that

136

enabled them to act together in a matter of weeks to eliminate all retail price competition for their e-books.  The evidence is overwhelming that Apple knew of the unlawful aims of the conspiracy and joined that conspiracy with the specific intent to help it succeed.  Apple's desire to create a profitable iBookstore on a superior e-reader does not obliterate the abundant record evidence that Apple made a commitment to act as the Publisher Defendants' partner in raising e-book prices materially above $9.99.

In a related argument, Apple contends that the Plaintiffs have paid unwarranted attention to the mechanism of an agency agreement and to the Agreements' MFN clause.  Apple asserts that several reasons unrelated to price increases motivated its decision to endorse the agency model for distributing e-books along with an MFN clause, and that these business decisions thus cannot serve as evidence that Apple had any culpable intent to raise e-book prices.  With respect to the agency model, Apple emphasizes that it was entering the e-book market at a time of turmoil, when Publishers were at war with their principal distributor.  It points out that Barnes & Noble was actively considering the adoption of the agency model and that two of the Publishers -- Hachette and HarperCollins -- recommended the agency model to Apple at their December meetings.

137

But, the Plaintiffs have not argued that there is anything
inherently wrong with an agency model or that Apple should not
have advocated for its adoption.  The question instead is
whether competitors joined forces to eliminate price competition
and raise prices and whether Apple knowingly and actively
participated in that conspiracy.  The Apple agency Agreements
are important because they were the instrument that the
conspirators chose to effect their scheme.

With respect to the MFN, Apple asserts that its sole
intention in crafting that provision was to protect itself from
price competition.  It highlights the MFN's function in <u>lowering</u>
consumer-facing prices, not raising them, and claims this fact
undercuts any inference that the provision was intended as a
mechanism to compel an industry-wide shift in price upward.
But, just as Apple had multiple motivations in its negotiations,
there was more than one function for the MFN.  The MFN did lower
the prices in the iBookstore below the price caps set in the
tiers if a Publisher did not immediately move its other
resellers to an agency arrangement.  As described above,
however, for that very same reason the MFN <u>also</u> forced the
Publishers to convert all of their e-book distribution
arrangements to agency arrangements and to raise e-book prices.
Otherwise, a bad economic arrangement became a disastrous one
for the Publishers.  That is why Apple labeled the MFN an

"elegant" alternative to its initial demand that the Publishers move all of their e-book retailers to an agency model.[64]  Without that explicit requirement, Apple achieved the same end by means of the MFN.[65]

Finally, Apple argues that the contentious nature of the negotiations -- particularly with respect to the caps on the price tiers -- proves that there was no meeting of the minds to raise prices and therefore no conspiracy.  But the fact that provisions, even key provisions, in the Agreements were the focus of hard-fought negotiations does not preclude a finding of liability.  As the Seventh Circuit observed, "[a] co-conspirator who used his power to guide or direct other conspirators qualifies as an organizer even though his control was not absolute.  The need to negotiate some details of the conspiracy with the cartel members also does not strip a defendant of the

---

[64] Apple argued at trial that the MFN gave it more protection against price discrimination by Publishers than the requirement that the Publishers move all retailers to an agency arrangement. That is so as a theoretical matter, but there is no basis to find based on the trial record that Apple ever had reason to fear that the Publishers would use their power over retail pricing to lower prices anywhere.  Instead, the evidence is that Apple feared retail price competition with Amazon.  Apple preferred to compete with Amazon on the strength of its device rather than through price wars.

[65] Apple argued in summation, relying again on the Monsanto decision, that if the MFN had both illegal and legal purposes, then the existence of a lawful purpose would prevent a finding of liability.  For the reasons described above, this argument misreads both the law and the record evidence.

organizer role." <u>United States v. Andreas</u>, 216 F.3d 645, 679-80 (7th Cir. 2000).

It is true that the Publisher Defendants pushed for price caps, and thereby e-book prices, that were higher than those Apple thought consumers would "realistically" be willing to pay. But that was in the context of their overarching agreement to raise prices above the $9.99 industry norm.  It is also worth remembering that, when the Publisher Defendants pushed back during negotiations and asked for more and higher price caps, Apple agreed on January 16 to their demands.  A meeting of the minds to raise e-book prices by working together could not be more clear on this record.

C. Windowing

A third defense that Apple introduced toward the end of the trial is that there was literally no "increase" in e-book prices and by definition therefore no conspiracy to raise e-book prices.  It reasons that, but for its entry into the market, the Publisher Defendants would have withheld their books from Amazon.  As a result, there would have been no established $9.99 price to raise.  Apple argued in summation that, while its entry into the market meant that e-books were now available at $14.99 and $12.99, without their entry those e-books would not have been available at all.

140

This creative argument fails for several reasons.  While it is difficult to know how the threats in late 2009 of four of the Publishers to withhold e-books from Amazon would have played out in 2010 if Apple had not entered the scene, there is no reason to find that windowing would have become widespread, long-lasting, or effective.  Indeed, the Publishers (as well as Apple) realized that the delayed release of e-books was a foolish and even dangerous idea.  The two largest Publishers -- Random House and Penguin -- never announced an intention to withhold e-books from Amazon.  Those that did announce plans to window e-books only did so for 37 titles.  At least one Publisher did internal research that showed that it would never make up sales lost due to the windowing of e-books.  A Publisher had to assume that the lost sales were lost for good and that a competitor had gained a new reader in the process, unless the reader chose to purchase the e-book through the iBookstore or another e-tailer.  The Publishers also recognized, and Apple concurred, that the delayed release of e-books encouraged piracy and posed an existential threat to the legitimate e-book industry.

Second, there was never any threat (before Apple encouraged one) to withhold all e-books.  Many of the Publisher Defendants' most popular books were not, nor were they slated to be, windowed, including True Compass, the e-book Jobs bought for

$14.99 at the Launch.  Moreover, the Publisher Defendants raised the prices not just of New Releases but also of their backlist e-books.

Finally, it is ironic for Apple to claim credit for the end to windowing when it was Apple that encouraged the Publisher Defendants to present Amazon with a blanket threat of windowing for a seven month period, i.e., the defined term of a New Release in the Apple Agreements.  As Amazon testified, it was that threat, delivered simultaneously by five of the Big Six, that left it with no alternative but to sign agency agreements with each of them.  Viewed from any perspective, Apple's conduct led to higher consumer prices for e-books.

D. Characterization of the Evidence

Confronted with the substantial evidence of its participation in a conspiracy with the Publisher Defendants, Apple has offered a counter-narrative of the events that transpired in December 2009 and January 2010.  To the extent that its version of key events has not already been addressed, it will be done so here and treated as Apple's fourth principal defense.  Broadly speaking, Apple contends that the trial record shows that Apple acted independently and as a lawful participant in a series of negotiations that would be unexceptional for any new market entrant.

142

In making these assertions Apple must surmount several
hurdles.  First and foremost, the Plaintiffs' reading of the
evidence is consistent with the documents.  There is a
voluminous documentary record in this case which repeatedly
demonstrates Apple's willingness to join with the Publisher
Defendants to eliminate retail price competition and raise the
prices for e-books.  The Opinion has quoted liberally from a
fraction of these documents.  The attempts by several witnesses
to circumnavigate this documentary record were entirely
unsuccessful and informed this Court's analysis of their
credibility.[66]

Second, the circumstantial evidence provides ample
corroboration for the Plaintiffs' theory of the case.  There is
very little dispute about the circumstantial evidence, and Apple
has not been able to construct a persuasive alternative reading
of this evidence.

---

[66] This Opinion has already described several instances in which
testimony given by Cue and Sargent was unreliable.  Other
witnesses who were noteworthy for their lack of credibility
included Moerer, Saul, and Reidy.  Their demeanor changed
dramatically depending on whether Apple or the Plaintiffs were
questioning them; they were adamant in denials until confronted
with documents or their prior deposition testimony; instead of
answering questions in a straightforward manner, they would pick
apart the question and answer it narrowly or avoid answering it
altogether.  Thus, the findings in this Opinion are informed by
the documentary record, the circumstantial evidence, including
an understanding of the competitive landscape in which these
events were unfolding, and that portion of each witness'
testimony that appeared reliable and credible.

Finally, Apple is confronted with the fact that the conspiracy succeeded.  It not only succeeded, it did so in record-setting time and at the precise moment that Apple entered the e-book market.

Apple's narrative, by contrast, ignores much of the evidence or relies on strained readings thereof.  To adopt Apple's theory, a fact-finder would be confronted with the herculean task of explaining away reams of documents and blinking at the obvious.  A few remaining examples of Apple's contentions concerning the evidence follow.

### 1. Initial Meetings with the Publishers

Apple repeatedly argued at trial that its initial round of meetings with the Publishers in mid-December 2009 was merely an information-gathering exercise.  It emphasizes that no binding commitments were entered into at these meetings and that a draft contract was not even circulated until weeks after the meetings. While Apple hoped to add an announcement of the iBookstore to the Launch of the iPad on January 27, as of these meetings it had no idea whether that would be possible.

Apple's entry into the conspiracy had to start somewhere, and the evidence is that it started at those initial meetings in New York City with the Publishers.  Apple is a sophisticated company and had done its homework before its team flew to New York from California.  It understood the depth of the

144

Publishers' unhappiness with, and indeed fear of, the $9.99 price point and used that unhappiness and fear as its leverage. While the Apple team did listen in those meetings (and in doing so heard repeated expressions of anger at Amazon's pricing strategy), Apple also came prepared with a script. Using that script, across all its meetings, it set out several of its own conditions for entry into the market, but also offered the enticement that it knew would be music to the Publishers' ears: Apple was willing to sell its e-books at prices as high as $14.99. From that moment on, Apple had the Publishers' full attention.

The suggestion that Apple came to those New York meetings with no agenda is at odds with recitations of the meetings laid out in the contemporaneous documentary record. It is also at odds with common sense, and any appreciation of the daunting task that Apple had set for itself. Cue and his team are accomplished professionals. Apple had been studying the publishing industry for months. Newspapers were prominently featuring stories about the Publishers' battle with Amazon over pricing. Apple had less than two months to get commitments from the Publishers that it could announce at the Launch. Cue was personally invested in making that happen. The idea that Apple was simply a passive participant in the coordinated meetings that it had scheduled with the Publishers is not credible.

145

One could ask why Apple has taken pains to argue that the
mid-December meetings were simply a commercial listening tour.
It may matter to Apple because it is beyond dispute that Apple
offered the Publishers a $14.99 price point at those meetings.
Any finding that this was not a casual comment but a component
of Apple's considered strategy confirms that Apple intended from
the very beginning to assist the Publishers to shift the price
of e-books upward.

    2. <u>Conspiracy by Telepathy</u>

Apple asserts that there were too few meetings and
telephone calls between Apple and any individual Publisher to
establish its membership in the Publisher Defendants'
conspiracy.  Since there can be "no conspiracy by telepathy,"
Apple argues, there is insufficient evidence of a "meeting of
the minds" to further any unlawful purpose between Apple and the
Publisher Defendants.

Counting telephone calls during the key six-week period,
particularly one that was interrupted by the Christmas and New
Year holidays, is hardly a litmus test for knowing and
intentional participation in a conspiracy.  As Apple has
observed, albeit in another context, it is the substance of the
contacts, not their number, that counts.[67]

---

[67] While admitting that very few e-books were actually withheld
from Amazon by the four Publishers, Apple's Cue observed at

146

But, it is worth observing that in the short time between December 15 and January 26, Cue made three separate trips to New York City from Cupertino.  His last trip was unprecedented in length -- it lasted nine days -- and as Cue described, for that entire period, if he was not eating or sleeping, he was negotiating.  He also sent members of his team to New York to meet with the Publishers when he was not there, such as Moerer's trip to New York in the days following Apple's distribution of the Draft Agreement.

Cue and the Publishers also exchanged many telephone calls.  Some of the more dramatic of these calls have already been highlighted.  For example, Cue called three Publishers in late December to confirm that they would be willing to adopt an agency model across all of their resellers of e-books if that were a pathway to higher prices.  He told Hachette's Thomas over the telephone that Apple was providing "the best chance for publishers to challenge the 9.99 price point."  Cue called Reidy on January 21 to enlist her help in convincing Macmillan's Sargent to execute the Agreement, and called Sargent to assist Macmillan's agency negotiations with Amazon.

And, of course, in this era, telephone calls are only one avenue of electronic communication.  Cue and Moerer each

---

trial that what mattered was which books were withheld, not how many.

exchanged numerous e-mails with the Publishers, many of which
corroborate in writing Apple's commitment to the Publisher
Defendants' scheme to raise e-book prices, including Cue's
January 16 e-mail to the Publisher Defendants providing them
with "significantly more tiers and higher prices" for e-books;
Cue's message reminding Sargent of his commitment to move Amazon
to agency and asserting that he "didn't believe we are asking
you to do anything, you haven't told us you are doing" in
following through with that promise; and Cue's blunt appeal to
HarperCollins that the "basic deal" Apple is providing to the
Publishers with its Agreement is "new release hardback pricing
maximums which are way higher than $9.99 -> &12.99 or $14.99 for
most."

In any event, while this conspiracy was complex to execute,
its terms were relatively simple and required no extended
discussion.  The issue was whether Apple and the Publishers
would join together to eliminate Amazon's power to set retail
prices and then to raise prices to the point that Apple would
permit.  The most hotly contested negotiations revolved around
just how high those prices would go.  The risks and rewards of
joining the conspiratorial enterprise were also easy to
understand.  The evidence is overwhelming that Apple and the
Publisher Defendants' "minds met" and they moved as one to
achieve their conspiratorial objective.

### 3. Steve Jobs's Statements

Compelling evidence of Apple's participation in the conspiracy came from the words uttered by Steve Jobs, Apple's founder, CEO, and visionary.  Apple has struggled mightily to reinterpret Jobs's statements in a way that will eliminate their bite.  Its efforts have proven fruitless.

Jobs's statements to James Murdoch that he understood the Publishers' concerns that "Amazon's $9.99 price for new releases is eroding the value perception of their products . . . and they do not want this practice to continue," and that Apple was thus "willing to try at the [$12.99 and $14.99] prices we've proposed," underscored Apple's commitment to a scheme with the Publisher Defendants to raise e-book prices.  Jobs's purchase of an e-book for $14.99 at the Launch, and his explanation to a reporter that day that Amazon's $9.99 price for the same book would be irrelevant because soon all prices will "be the same" is further evidence that Apple understood and intended that Amazon's ability to set retail prices would soon be eliminated. When Jobs told his biographer the next day that, in light of the MFN, the Publisher Defendants "went to Amazon and said, 'You're going to sign an agency contract or we're not going to give you the books,'" Jobs was referring to the fact that Sargent was in Seattle that very day to deliver Macmillan's ultimatum to Amazon.

Apple could find no effective way at trial to escape the
import of Jobs's remarks.  While Apple stressed particular
aspects of these statements, when taken as a whole and in
context the statements remain powerful evidence of
conspiratorial knowledge and intent.  For example, Apple pointed
to one line in Jobs's e-mail to James Murdoch where he muses
about Amazon's $9.99 price point, "who knows, maybe they are
right."  But, focusing on that one line ignores paragraphs of
statements, over two days of e-mails, in which Jobs tried to
persuade Murdoch, and through him HarperCollins, to join with
Apple in an effort to get control of and raise e-book prices.
The sentence also does nothing to controvert Jobs's intent to
raise e-book prices; it simply indicates his doubts over
consumers' reaction to these higher prices.  Jobs sums up his
argument to Murdoch by urging him to "[t]hrow in with apple and
see if we can all make a go of this to create a real mainstream
ebooks market at $12.99 and $14.99."  In this and every other
instance, Apple's efforts to explain away Jobs's remarks have
been futile.

### 4. The Publishers Raised Prices, Not Apple

Apple argues that, even if the Agreements "sharpened" the
Publishers' incentives to force Amazon to distribute their e-
books as an agent, at the end of the day it was the Publishers
who had to decide whether to convert to an agency distribution

150

system and it was the Publishers who had to decide whether to raise e-book prices once they were in charge of retail pricing. As Jobs maintained in response to consumer complaints, and as Cue asserted from the witness stand, Apple did not raise prices; the Publishers raised prices.  Apple claims it should not be held liable for the "business decisions" the Publisher Defendants made in the early part of 2010.

Apple is correct that the conspiracy required the full participation of the Publisher Defendants if it were to achieve its goals.  It is also correct that the Publishers wanted to change Amazon's pricing policies and to raise e-book prices, and that they had wanted to do that for many months before Apple arrived on the scene.  But, those facts do not erase Apple's own intentions in entering into this scheme.  Apple did not want to compete with Amazon on price and proposed to the Publishers a method through which both Apple and the Publishers could each achieve their goals.[68]  Apple was an essential member of the charged conspiracy and was fully complicit in the scheme to raise e-book prices even though the Publisher Defendants also had their own roles to play.

---

[68] The record is equivocal on whether Apple itself desired higher e-book prices than those offered at Amazon.  It is unequivocal though that Apple embraced higher prices so convincingly that the Publishers believed that Apple was content with, and even wanted, higher prices, and that Apple's cooperation with the Publisher Defendants enabled them to raise prices.

151

Apple also attempts to argue in this regard that it cannot be held responsible for the Publisher Defendants' actions because it never knew the Publishers were working together to raise prices.  To the contrary, the evidence consistently points not only to Apple's awareness but also its facilitation of the Publisher Defendants' collective action.  From the beginning, Apple conducted its campaign with the understanding that it wanted all six, and needed at least four, of the Publishers to join its terms.  Cue urged the Publisher Defendants' CEOs to have discussions with one another to clarify aspects of the Agreements or to convince others to sign on.  This enterprise depended on joint action.  As Apple fully appreciated, the Publishers required the protection offered by collective action if they were to succeed in taking control over prices from Amazon and changing the public's perception about how much books should cost.

E. Per Se Liability

Apple strenuously objects to the Plaintiffs' contention that this case may be analyzed as a per se violation of the Sherman Act.  It asserts that there are two reasons why this Court may only apply a rule of reason analysis.  The first hinges on the fact that Apple is a vertical player vis-à-vis the Publisher Defendants, and that courts apply the rule of reason in assessing the legality of agreements between vertical players

152

in an industry.  Second, it contends that Plaintiffs' reliance
on the traditional "hub and spoke" conspiracy cases which found
per se violations of the antitrust laws, such as Toys "R" Us,
221 F.3d 928, and Interstate Circuit, 306 U.S. 208, is not
appropriate here because Apple was a new market entrant and not
a dominant player.  Both of these arguments fail.

While vertical restraints are subject to review under the
rule of reason, Leegin, 551 U.S. at 907, Apple directly
participated in a horizontal price-fixing conspiracy.  As a
result, its conduct is per se unlawful.  The agreement between
Apple and the Publisher Defendants is, "at root, a horizontal
price restraint" subject to per se analysis.  In re: Elec. Books
Antitrust Litig., 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012).  As
such, it is not properly viewed as either a vertical price
restraint or solely through the lens of traditional "hub and
spoke" conspiracies.

In any event, the fact that Apple was not a dominant player
in the relevant market in no way diminishes the instructive
value of the traditional hub and spoke conspiracy cases here.
Courts have never found that the vertical actor must be a
dominant purchaser or supplier in order to be considered a
traditional "hub," only that this is "generally" the case.  See
Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d
237, 255 (3d Cir. 2010).  Moreover, as Apple has conceded in its

filings, the "hub" defendant's liability in those cases existed because "there was no doubt . . . that the 'hub' defendant was aware of the purported scheme -- the only question was whether the horizontal defendants agreed to it."  See Interstate Circuit, 306 U.S. at 222 (defendant organized and implemented the plan); Toys "R" Us, 221 F.3d at 933 (defendant communicated messages from manufacturer to manufacturer and "served as the central clearinghouse for complaints about breaches in the agreement").  Here we have every necessary component: with Apple's active encouragement and assistance, the Publisher Defendants agreed to work together to eliminate retail price competition and raise e-book prices, and again with Apple's knowing and active participation, they brought their scheme to fruition.

The observations of the Supreme Court in Interstate Circuit are equally apt here:

> [i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.  Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.  They knew that the plan, if carried out, would result in a restraint of commerce, which . . . was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan.

306 U.S. at 226–27.

F. Avoiding a Dangerous Precedent

Finally, Apple warns that a ruling against Apple would set a dangerous precedent.  It predicts that a finding that it violated the antitrust laws will deter entry into concentrated markets and punish innovation.  It contends that its conduct was pro-competitive and created a healthier market.  Censuring Apple for entering a tumultuous new market, in Apple's view, will have a "chilling and confounding . . . effect not only on commerce but specifically on content markets throughout this country."

It is certainly true that our nation's antitrust laws should be applied with care.  Courts must be sensitive to the unique features of any market and the ambiguities of commercial conduct to avoid chilling lawful competition.  Providing new entrants with the ability to access markets has long been a mainstay of our economy and any court should be wary of discouraging such access or interfering with the natural evolution of markets.  See, e.g., United States v. Grinnell Corp., 384 U.S. 563, 589 (1966).  As the Second Circuit observed in Capital Imaging, 996 F.2d 537, "[a]ntitrust law is not intended to be available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it."  Id. at 539.

It is not entirely clear to what Apple is alluding, however, when it describes its pro-competitive behavior and

155

creation of healthy competition.  If it is alluding to the
Launch of the iPad, a revolutionary device that has encouraged
innovation and competition, then its conduct can fairly be
described as pro-competitive.  But, this case has been only
incidentally about the iPad.  The iBookstore was not an
essential feature of the iPad, and the iPad Launch would have
occurred without any iBookstore.  It was the pre-existing,
remarkable features of the iPad that made the iBookstore an
obvious addition to the device.

If Apple is alluding to the fact that Amazon's Kindle
bookstore was the dominant e-retailer for books in 2009, and
that the arrival of the iBookstore created another e-retailer,
that is true.  But, as this Opinion explains, Apple demanded, as
a precondition of its entry into the market, that it would not
have to compete with Amazon on price.  Thus, from the consumer's
perspective -- a not unimportant perspective in the field of
antitrust -- the arrival of the iBookstore brought less price
competition and higher prices.[69]

If Apple is suggesting that Amazon was engaging in illegal,
monopolistic practices, and that Apple's combination with the

---

[69] As for some of the notable features of the iBookstore itself,
features such as a page curl, Apple was not the first to invent
these concepts.  Nonetheless, having the creativity and
commitment of Apple invested in the enhancement of a product
like the iBookstore is extremely beneficial to consumers and
competition.

Publisher Defendants to deprive a monopolist of some of its
market power is pro-competitive and healthy for our economy, it
is wrong.  This trial has not been the occasion to decide
whether Amazon's choice to sell NYT Bestsellers or other New
Releases as loss leaders was an unfair trade practice or in any
other way a violation of law.  If it was, however, the remedy
for illegal conduct is a complaint lodged with the proper law
enforcement offices or a civil suit or both.  Another company's
alleged violation of antitrust laws is not an excuse for
engaging in your own violations of law.  Nor is suspicion that
that may be occurring a defense to the claims litigated at this
trial.

     If Apple is suggesting that an adverse ruling necessarily
implies that agency agreements, pricing tiers with caps, MFN
clauses, or simultaneous negotiations with suppliers are
improper, it is wrong.  As explained above, the Plaintiffs have
not argued and this Court has not found that any of these or
other such components of Apple's entry into the market were
wrongful, either alone or in combination.  What was wrongful was
the use of those components to facilitate a conspiracy with the
Publisher Defendants.

     It is doubtful that Apple is suggesting that the only way
it could have entered the e-book market was to agree with the
Publisher Defendants to raise e-book prices.  Apple, often

through expert negotiations conducted by Cue, has entered many new content markets.  It did not attempt to argue or show at trial that the price of admission to new markets must be or is participation in illegal price-fixing schemes.

While a Court must take seriously a prediction that its decision will harm our nation's economy, particularly when made by skilled counsel on behalf of an esteemed company, it is difficult to see how competition will be stifled by the ruling in this Opinion.  This Opinion's findings arise from the specific events that unfolded in the trade e-book market as 2009 became 2010.  It does not seek to paint with a broader brush.

In the end, it is essential to remember that the antitrust laws were enacted for "the protection of competition, not competitors."  Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).  The question in this case has always been a narrow one: whether Apple participated in a price-fixing scheme in violation of this country's antitrust laws.  Apple is liable here for facilitating and encouraging the Publisher Defendants' collective, illegal restraint of trade.  Through their conspiracy they forced Amazon (and other resellers) to relinquish retail pricing authority and then they raised retail e-book prices.  Those higher prices were not the result of regular market forces but of a scheme in which Apple was a full participant.

CONCLUSION

Based on the trial record, and for the reasons stated herein, this Court finds by a preponderance of the evidence that Apple conspired to restrain trade in violation of Section 1 of the Sherman Act and relevant state statutes to the extent those laws are congruent with Section 1.  A scheduling order will follow regarding the Plaintiffs' request for injunctive relief and damages.


SO ORDERED:

Dated:     New York, New York
           July 10, 2013

           _____
                      DENISE COTE
              United States District Judge

159

Appendix A

