# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
UNITED STATES OF AMERICA,                )
)
Plaintiff,                       )
)
v.                               )        Civil Action No. 12-cv-2826 (DLC)
)
APPLE, INC., *et al.*,                     )
)
Defendants.                      )
_____)


_____
)
THE STATE OF TEXAS, *et al.*,               )
)
Plaintiffs,                      )
)
v.                               )        Civil Action No. 12-cv-03394 (DLC)
)
PENGUIN GROUP (USA) INC., *et al.*,        )
)
Defendants.                      )
_____)


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PROPOSED INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

I.   LEGAL STANDARD FOR EFFECTIVE SHERMAN ACT REMEDY .......................... 3

II.  THE RESTRICTIONS ON APPLE'S CONDUCT SET FORTH IN SECTION III OF
     THE PFJ ARE NECESSARY AND APPROPRIATE...................................................... 5

III. CONDUCT REQUIRED OF APPLE BY SECTION IV OF THE PFJ IS NECESSARY
     AND APPROPRIATE ................................................................................................... 10

IV.  THE ANTITRUST COMPLIANCE AND OVERSIGHT REQUIREMENTS OF
     SECTIONS V AND VI OF THE PFJ ARE NECESSARY AND APPROPRIATE........ 12

     A.   External Monitor ................................................................................................. 12

     B.   Internal Antitrust Compliance Officer ................................................................ 15

V.   CUSTOMARY ACCESS AND JURISDICTION PROVISIONS ARE NECESSARY
     AND APPROPRIATE ................................................................................................... 16

EXHIBIT 1 (Proposed Final Judgment in *United States v. Apple, Inc.*)

EXHIBIT 2 (Judgment in a Criminal Case in *United States v. AU Optronics Corp.*, No. 3:09-cr-
     00110-SI (N.D. Cal. Sept. 20, 2012))

EXHIBIT 3 (Final Judgment in *United States v. Microsoft Corp.*, No. 98-1232 (Docket No. 746)
     (D.D.C. Nov. 12, 2002))

EXHIBIT 4 (Excerpt from Deposition of Kevin Saul, Feb. 22, 2013)

## TABLE OF AUTHORITIES

**Cases**

*Alberti v. Klevenhagen*, 46 F.3d 1347 (5th Cir. 1995)...................................................... 14

*Cronin v. Browner*, 90 F. Supp. 2d 364 (S.D.N.Y. 2000) ............................................. 12

*Erie Ry. v. Heath*, 8 F. Cas. 761 (S.D.N.Y. 1871) ........................................................ 13

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................ 3, 4

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)....................................................... 9

*FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ..................................................................................................... 13

*In re The Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182 (S.D.N.Y. 2009)........... 13

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)........................................ 3, 4

*NLRB v. Express Pub. Co.*, 312 U.S. 426 (1941) ...................................................... 3, 8

*Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir.1982).............................................................. 13

*Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) ................................. 8

*U.S. Commodity Futures Trading Comm'n v. Kim*, No. 11-CV-1013 (DLC), 2011 WL 1642772 (S.D.N.Y. Apr. 15, 2011) .......................................................................... 13

*United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707 (1944)................................... 4

*United States v. Capitol Service, Inc.*, 756 F.2d 502 (7th Cir. 1985) ............................... 8

*United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ................................... 3, 4

*United States v. Glaxo Grp. Ltd.*, 410 U.S. 52 (1973).................................................. 12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................................................. 16

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................................ 9

*United States v. Int'l Salt Co.*, 332 U.S. 392 (1947)..................................................... 3, 4

*United States v. Keyspan Corp.*, 763 F. Supp. 2d 633 (S.D.N.Y. 2011) ....................................... 13

*United States v. Local 295 of Int'l Bhd. of Teamsters*, 784 F. Supp. 15 (E.D.N.Y. 1992) ........... 13

*United States v. Microsoft Corp.*, 231 F. Supp. 2d 144 (D.D.C. 2002) ....................................... 14

*United States v. Microsoft Corp.*, No. 1:98-cv-01232-CKK (Docket No. 746) (D.D.C. Nov. 12, 2002) ................................................................................................................. 13

*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990)........................................ 9

*United States v. Sasso*, 215 F.3d 283 (2d Cir. 2000) .................................................. 13

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950).................................................. 3, 8, 12, 16

*United States v. Vulcan Soc'y, Inc.*, No. 07-CV-2067 (NGG)(RLM), 2010 WL 2160057

   (E.D.N.Y. May 26, 2010) ................................................................... 14

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)........................................ 3

**Statutes**

15 U.S.C. § 4 ................................................................................ 3

15 U.S.C. § 26 ............................................................................... 3

**Other Authorities**

9C Wright & Miller, *Federal Practice & Procedure* § 2602.1 (3d ed. 2008)............................. 14

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:  Raising Rivals' Costs

   to Achieve Power over Price*, 96 Yale L.J. 209 (1986) ............................................ 7

Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor:  The New Corporate

   Czar?*, 105 Mich. L. Rev. 1713 (2007)............................................................ 13, 14

## INTRODUCTION

This Court found that Apple knowingly participated in an illegal price-fixing conspiracy with five book publishers to raise e-book prices and eliminate retail e-book price competition. The conspiracy caused substantial harm to consumers.  "Some consumers had to pay more for e-books; others bought a cheaper e-book rather than the one they preferred to purchase; and it can be assumed that still others deferred a purchase altogether rather than pay the higher price" (Opinion at 98).  Absent Apple's participation in the conspiracy, "it is unlikely" that any of these consumer harms would have occurred (Opinion at 118).

Apple's illegal conduct was orchestrated by the highest levels of management, and was aided and abetted by an Apple in-house lawyer.  As this Court found, many of the Apple executives that testified at trial have not been candid about the events of the conspiracy.  Several Apple employees "were noteworthy for their lack of credibility" (Opinion at 143 n.66), and, at times during the trial, their denials were "brazen" (Opinion at 84 n.47).  Apple's willing embrace of *per se* unlawful price fixing demonstrates a callous disregard for U.S. consumers and the plain requirements of the U.S. antitrust laws.

Plaintiffs propose a Final Judgment (the "Proposed Final Judgment" or "PFJ"; attached as Exhibit 1) that will halt Apple's anticompetitive conduct, restore lost competition, and prevent recurrences of the same or similar violations of the antitrust laws.  The PFJ takes into account Apple's pervasive disregard for the requirements of the antitrust laws.  At the same time, the PFJ is not unduly burdensome, and allows Apple to compete vigorously and lawfully, thereby balancing the goal of minimal invasiveness with remedial objectives.

The Proposed Final Judgment incorporates key aspects of the consent decrees entered against the Publisher Defendants, and adds certain other requirements tied to the Court's specific

findings regarding Apple's misconduct.  As such, the PFJ contains three general categories of provisions.  First, Apple is prohibited from engaging in conduct similar to, or having the same result as, the conspiratorial conduct for which it has been found liable.  This category includes provisions that preclude Apple from entering into contracts that would, in any way, fix the price that any of its competitors charge for content.  It restricts Apple's ability to share with one publisher information that it learns from another publisher in order to prevent Apple from "facilitat[ing] . . . collective action" (Opinion at 152) by e-book publishers.  Apple also is barred, for five years, from either enforcing its retail price MFNs against publishers or accepting limitations on its own ability to price-compete with respect to e-books.  Apple also may not discriminate against rival e-books apps and may not agree with any other e-book retailer to fix retail e-book prices.

Second, the PFJ requires Apple to take proactive steps to ameliorate the harm its conspiracy caused to competition and consumers.  In particular, Apple must terminate its existing agency agreements with each Publisher Defendant.  Apple also must "reset" its treatment of competing e-bookstores on Apple platforms so that, for two years, it again allows its rivals to include hyperlinks to their own e-bookstores within their e-book apps.  And Apple is required promptly to provide the United States and the Representative Plaintiff States any information Apple acquires that reasonably suggests collusion among content suppliers.

Finally, the PFJ seeks to ensure Apple's future compliance with the antitrust laws and the PFJ.  Apple must hire a new full-time internal Antitrust Compliance Officer, responsible for ensuring adherence to the antitrust laws, who will be hired by and report directly and exclusively to the Audit Committee of Apple's Board of Directors.  The PFJ also calls for an External Compliance Monitor, appointed by this Court, with the authority to oversee Apple's compliance

with the PFJ, and to oversee Apple's internal antitrust compliance provisions.  Apple also will be required to provide to the United States and the Representative Plaintiff States reasonable access to Apple's documents, information, and personnel.

## I.    LEGAL STANDARD FOR EFFECTIVE SHERMAN ACT REMEDY

This Court is "invested with jurisdiction to prevent and restrain violations" of the Sherman Act.  15 U.S.C. § 4.[1]  It also is "invested with large discretion to model [its] judgment[] to fit the exigencies of the particular case."  *United States v. Int'l Salt Co.*, 332 U.S. 392, 400-01 (1947) (abrogated on other grounds).

Permanent injunctive relief ordered in a Sherman Act case must:  (i) end the violation; (ii) prevent a recurrence of the same or a similar violation; and (iii) restore competition in the market.  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).

In preventing "a recurrence of the violation," the Court is not limited to imposing "a simple proscription against the precise conduct [the violator] previously pursued."  *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698.  Rather, "'[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'"  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941)); *see also United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950) (relief "may range broadly through practices connected with acts actually found to be illegal"); *United States v. Bausch & Lomb Optical Co.*,

---

[1] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, the Court also has jurisdiction to issue the requested injunction on behalf of the Plaintiff States.

321 U.S. 707, 727 (1944) ("Of course, a mere prohibition of the precise scheme would be ineffectual to prevent restraints.").

Thus, the Court may prohibit otherwise lawful conduct if it "represents a reasonable method of eliminating the consequences of the illegal conduct" or preventing its resumption. *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698.  As the Supreme Court has explained:

> The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do.  And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market.  When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.  The usual ways to the prohibited goal may be blocked against the proven transgressor and the burden put upon him to bring any proper claims for relief to the court's attention.

*Int'l Salt*, 332 U.S. at 400.

"A public interest served by [Sherman Act equity] suits [brought by the United States] is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.  If th[e] decree accomplishes less than that, the Government has won a lawsuit and lost a cause."  *Id.* at 401; *see also Ford*, 405 U.S. at 573 n.8 (rejecting contention that the court was entitled only to restore the status quo ante and explaining "[t]here is no power to turn back the clock").  The means a court uses to restore the competition eliminated by an antitrust violator's conduct depend on "the special needs of the individual case."  *Ford*, 405 U.S. at 573.  And, "'it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to remedy are to be resolved in its favor.'"  *Id.* at 575 (quoting *du Pont*, 366 U.S. at 334).

**II.   THE RESTRICTIONS ON APPLE'S CONDUCT SET FORTH IN SECTION III OF THE PFJ ARE NECESSARY AND APPROPRIATE**

Section III of the Proposed Final Judgment contains targeted prohibitions on certain conduct closely related to the conspiracy proved at trial.  As the Court found, "Apple fully understood and intended" that its retail price MFN "would lead the Publisher Defendants inexorably to demand that Amazon switch to an agency relationship with each of them" (Opinion at 116).  Accordingly, Sections III.A and III.B prohibit Apple, for five years, from enforcing any existing retail price MFNs relating to e-books or agreeing to any new ones.  These provisions largely mirror provisions of the Publisher Defendant consent decrees, *see, e.g.*, Final J. as to Defs. The Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), Inc. (Docket No. 259) § V.C ("Penguin Final Judgment"), except that the form of MFN prohibited here is more narrowly defined to track more closely the MFN Apple designed for e-books.

Section III.C prohibits Apple, for five years, from entering into e-book agreements with Publisher Defendants that limit Apple's ability to discount e-books.  This provision is more modest than its analog in the Publisher Defendant consent decrees, *see, e.g.*, Penguin Final Judgment §§ V.B, VI.B, in that it constrains only the distribution relationships between each Publisher Defendant and Apple (rather than between each Publisher Defendant and every e-book retailer, as in the Publisher Defendant consent decrees).  However, it also is broader in two respects:  (i) it lasts for five years rather than two; and (ii) it contains no carve-out allowing Apple to agree that its gross margins must be at least zero across a Publisher Defendant's entire catalog.

These two "expansions" on Apple's ability to restrict its own pricing authority are appropriate.  Unlike the prior Publisher Defendant settlements, the relief proposed here is based on a full, adjudicated record, where the Court has made detailed findings about the nature and

extent of Apple's misconduct.  For that reason, Plaintiffs are entitled to bolstered relief that ensures Apple cannot evade its antitrust compliance obligations going forward.

Additionally, while the two-year prohibition against Publisher Defendant interference with retail price competition was intended to serve "as a means to ensure a cooling-off period and allow movement in the marketplace away from collusive conditions," United States' Resp. to Public Comments on the Proposed Final J. (Docket No. 81), at 13, there is reason to believe the Publisher Defendants may be positioning themselves to pick things back up where they left off as soon as their two-year clocks run.  The e-book distribution contracts that the Publisher Defendants have entered into under their consent decrees are disappointingly similar to one another.  And, multiple Publisher Defendant CEOs have come to court and offered non-credible testimony on Apple's behalf (*see, e.g.*, Opinion at 71 n.38, 143 n.66), with one even claiming that he was proud of his actions, both at the time he took them and still today.  John Sargent Test., Trial Tr. 1141:4-9.[2]  Ensuring that Apple can discount e-books and compete on retail price will make it more difficult for the Publisher Defendants to prohibit other retailers from doing so, and will help to ensure that the ongoing effective relief consumers are currently enjoying under the Publisher Defendant consent decrees does not prove entirely ephemeral.

Section III.D prohibits Apple from retaliating, threatening, or punishing any publisher for refusing to do business with Apple or for the terms on which the publisher does business with other e-book retailers.  This section is intended to prevent Apple from again leveraging its power

---

[2] *See also* Letter from John Sargent to Authors, Illustrators and Agents, http://www.tor.com/blogs/2013/02/a-message-from-john-sargent (Feb. 8, 2013) (explaining that not settling would have meant that Macmillan's "business would have a pricing disadvantage for two years" and that settling ensured that, "[a]s with the other settling publishers, retailers will now be able to discount Macmillan e-books for a limited time," but promising that "this round will shortly be over"); Letter from John Sargent to Macmillan Trade Authors, Illustrators, and Agents, http://www.tor.com/blogs/2012/12/a-message-from-john-sargent (Dec. 19, 2012) (claiming the discounting provisions of the April 2012 consent decrees "would mean that retailers who felt they needed to match prices with Amazon would have no revenue from e-books from five of the big publishers (and possibly the sixth) for two years. Not no profit, no revenue.  For two years.").

in its other content distribution stores to force publishers to accept e-book distribution terms that have the purpose and effect of raising retail prices at the e-bookstores of Apple's rivals (*see* Opinion at 101).

Section III.E prohibits Apple from serving as an information conduit among publishers. It largely mirrors the prohibition in the Publisher Defendant consent decrees against sharing competitively sensitive information with each other.  *See, e.g.*, Penguin Final Judgment § V.F. The purpose of this section is to prevent Apple from once again providing the publishers sufficient information about each others' plans and concerns to assure them that they are moving as a group to accomplish something that no one publisher would risk attempting on its own (*see* Opinion at 75, 117-18).

Section III.F prohibits Apple from entering agreements with content suppliers that are likely to increase the price at which other retailers can acquire or sell the content—it is a prohibition against again raising rivals' costs or prices and leaving consumers to suffer the consequences.[3]  As the Court observed, "competitive" behavior that is designed to hobble rivals rather than outperform them on the merits is "the opposite of competition"—it is "the eradication of retail price competition" (Opinion at 57 n.26).

The evidence at trial established that Apple aided the Publisher Defendants in forcing Amazon, its rival, to increase the prices at which it could sell content.  (Opinion at 90 & n.52, 116-17).  And Mr. Cue testified at trial that he takes the same approach in each of the digital content markets where he negotiates distribution deals.  Eddy Cue Test., Trial Tr. 1761:10-21,

---

[3] *See generally* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:  Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209, 224 (1986) ("Raising rivals' costs can be a particularly effective method of anticompetitive exclusion. . . . By embedding a collusive agreement in a vertical contract that raises input prices by restraining sales to rivals, the firm reduces coordination costs, making it more efficient at preventing cheating and distributing the gains from collusion.  Thus, these strategies involve creating additional horizontal market power through the mechanism of vertical contracts.").

1776:15-1777:8.  Section III.F is thus an appropriate restraint on Apple's ability to orchestrate

conduct in other markets, as it did in e-books, with anticompetitive results.  *See generally U.S.*

*Gypsum*, 340 U.S. at 90-91 (upholding "extension of the decree to include all gypsum products

instead of patented gypsum board alone" and "enlargement of the geographical scope of the

decree to include all interstate commerce"); *United States v. Capitol Service, Inc.*, 756 F.2d 502,

506-07 (7th Cir. 1985) (upholding nationwide injunction where "the complaint, discovery, and

trial were all limited to the Milwaukee market").

       Section III.F is sufficiently detailed to allow Apple to know what conduct is prohibited.

*Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997) (an injunction when "read

as a whole . . . [must provide] people 'of ordinary intelligence' . . . 'a reasonable opportunity to

know what is prohibited'").  It is closely linked to the anticompetitive conduct that Apple has

already engaged in, and simply prohibits Apple from engaging in that same conduct in other

content markets.  *See Express Pub. Co.*, 312 U.S. at 435 ("A federal court has broad power to

restrain acts which are of the same type or class as unlawful acts which the court has found to

have been committed or whose commission in the future unless enjoined, may fairly be

anticipated from the defendant's conduct in the past.").  Of course, if Apple is concerned about

whether certain conduct is permissible, it has the right to seek clarification or modification of the

injunction at any time.

       Apple may protest that Section III.F is unduly burdensome and likely to chill

procompetitive activity because it requires Apple to refrain from entering or maintaining

agreements that are "likely" to raise its rivals' costs or prices without offering Apple sufficient

guidance as to exactly what is forbidden.  But the purpose of Section III.F is to prevent

anticompetitive behavior rather than merely ameliorate it after the fact—a prospective and

probabilistic test is thus required.  Such tests are commonplace and appropriate in antitrust law, where some uncertainty is inevitable and where the United States bears the burden of establishing the violation.  For instance, when the United States sues to block a merger, it need not prove that anticompetitive effects are *certain* to flow from the challenged combination. Rather, it meets its burden by showing that those effects are *reasonably likely*.  *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011); *see also United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (Posner, J.) ("The defendants' argument that section 7 prevents *probable* restraints and section 1 *actual* ones is word play.  Both statutes as currently understood prevent transactions likely to reduce competition substantially.") (emphases in original).  Similarly, the Supreme Court has rejected the argument that the failure to find that a practice actually resulted in anticompetitive effects is a barrier to liability under Section One of the Sherman Act.  *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461-62 (1986) (holding a concerted effort to withhold information from consumers "is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence").  Here, in addition to showing the clear adverse effect of Defendants' agreement on trade e-book prices (Opinion at 94-95), the evidence at trial established that Apple aided the Publisher Defendants in presenting the agency model as an ultimatum to Amazon (Opinion at 90-91 & n.52).  Section III.F accordingly is an entirely appropriate restraint on Apple's ability to orchestrate similar anticompetitive results in the future.

Finally, Section III.G prohibits Apple from agreeing with its e-book rivals to the terms on which they sell e-books to consumers.  At trial, Mr. Cue admitted that he initially proposed that Apple allocate the trade e-books, music, and video markets with Amazon rather than competing

against Amazon to sell trade e-books.  Eddy Cue Test., Trial Tr. 1719:13-24; Pls.' Ex. PX-0027.

Now that Apple's other avenues for avoiding price competition against Amazon have been

exposed and are being foreclosed by the PFJ, it is important that Apple not be permitted to fall

back to schemes to fix or allocate the trade e-books market with other e-book retailers.

III.     **CONDUCT REQUIRED OF APPLE BY SECTION IV OF THE PFJ IS
         NECESSARY AND APPROPRIATE**

Section IV.A requires Apple to terminate its agency agreements with the Publisher

Defendants upon the Final Judgment taking effect.  Those agreements contain limitations on

Apple's retail price setting authority prohibited by Section III.C.  Termination is thus necessary

as part of any effective injunction.

Sections IV.B and IV.C address Apple's treatment of rival e-book app providers.  Section

IV.B requires Apple to permit these rivals to continue to offer their apps through Apple's App

Store, and to update those apps, on terms and conditions no worse than Apple offers to any other

app developer.  In other words, Apple may not use its position as a powerful app distributor to

stifle competition in the trade e-books market now that that market is freed from Apple and the

Publisher Defendants' collusive activities.

Section IV.C requires Apple, for two years, to permit any e-book retailer to include in its

e-book app a hyperlink to its own e-bookstore, without paying any fee or commission to Apple.

This section thus requires Apple, for a relatively brief period of time, to return to its own pre-

iBookstore policy of allowing Amazon, Barnes & Noble, and other e-book app providers to offer

a simple, costless means for readers to purchase e-books directly from the third party.  *See* Eddy

Cue Test., Trial Tr. 2027:23-2029:21.

This provision is intended to reset competition among trade e-book retailers and deny

Apple the benefits of its conspiracy.  In 2011, shortly after adding Random House's titles to the

10

iBookstore, Apple forced its retailer rivals to remove the hyperlinks from their e-book apps (in order to avoid paying Apple a 30 percent commission on their sales).  By doing so, Apple made it more difficult for consumers using Apple devices to compare e-book prices among different retailers, and for consumers to purchase e-books from other retailers on Apple's devices.  At the time, as a result of Apple's collusive agreements, prices for the most popular e-books tended to be the same across retailers, and many consumers likely determined that shopping around for a better e-book price was a waste of time.

With the Publisher Defendant consent decrees now operative, price competition has returned to the marketplace, and consumers using Apple's devices should have an easy means to determine whether price shopping has become worth their while.  Section IV.C accomplishes this by providing for greater price transparency.  Without the costless hyperlinks mandated by Section IV.C, Apple likely would keep captive customers who incorrectly believe that prices are still all the same and, therefore, use the iBookstore just because Apple has made it so much harder to purchase e-books from any other retailer.  Thus in essence, without the provision, Apple will continue to reap profits from its collusive behavior by capitalizing on its customers' lack of awareness of revitalized price competition among e-book retailers.

Finally, Section IV.D requires Apple to provide to the United States and the Representative Plaintiff States any evidence of unlawful coordination among content suppliers that Apple uncovers.  This section does no more than require responsible corporate behavior on Apple's part, and the facts of this case make such a requirement highly appropriate.  Specifically, Apple knew that the Publisher Defendants wanted to coordinate, unlawfully, to raise e-book prices.  But instead of informing the government of its suspicions, Apple chose to join the

conspiracy.  Requiring Apple to report such conduct will facilitate detection by Plaintiffs and discourage Apple from succumbing to the temptation to repeat its transgressions.

## IV.  THE ANTITRUST COMPLIANCE AND OVERSIGHT REQUIREMENTS OF SECTIONS V AND VI OF THE PFJ ARE NECESSARY AND APPROPRIATE

The Proposed Final Judgment contains provisions that require Apple to take steps to ensure compliance with other provisions of the PFJ and the antitrust laws.  These compliance obligations are necessary to rectify the harm caused and threatened by Apple's illegal conduct. Specifically, implementing these compliance measures will fulfill the Court's "duty to compel action by the [wrongdoer] that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance."  *U.S. Gypsum*, 340 U.S. at 88; *accord United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973).

### A.    External Monitor

Under Section VI, the Court will appoint an External Compliance Monitor to oversee Apple's compliance with the other terms of the PFJ, including Apple's antitrust compliance programs.  Appointment of an external monitor is appropriate here because Apple's executives refuse to accept responsibility for their wrongdoing:  they have consistently held to the view that their conduct was appropriate, and that they intend to do nothing differently in the future. Further, Apple executives have been found to have failed their duty of candor with this Court. Accordingly, mere reliance on the word of those same executives that they are complying with the Court's remedy order is insufficient.

There is "considerable room" for appointing monitors when the purpose of doing so is "to enforce a judicial decree."  *Cronin v. Browner*, 90 F. Supp. 2d 364, 377 (S.D.N.Y. 2000).  The power of a federal court to appoint a monitor to supervise the implementation of its decrees has

long been established.[4]  *E.g.*, *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009).  Indeed, the use of a court-imposed monitor to oversee aspects of corporate operations extends in this district back to the struggle for control of the Erie Railroad between Jay Gould and Cornelius Vanderbilt.  *See Erie Ry. v. Heath*, 8 F. Cas. 761 (S.D.N.Y. 1871).  More recently, courts have continued to exercise their equitable powers to appoint monitors to oversee the operations of corporate wrongdoers.  *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Kim*, No. 11-CV-1013 (DLC), 2011 WL 1642772 (S.D.N.Y. Apr. 15, 2011); *In re The Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182, 210 (S.D.N.Y. 2009).[5]

This precedent for court-ordered outside oversight extends to corporations found to have violated the Sherman Act.  Recently, defendant AU Optronics Corp. was convicted for price-fixing in violation of Section One of the Sherman Act.  The court ordered the defendant to hire, at its expense, an "independent monitor . . . to monitor [its] antitrust compliance program." Exhibit 2 at 3.  Similarly, the Final Judgment in *United States v. Microsoft Corp.*, No. 1:98-cv-01232-CKK (Docket No. 746) (D.D.C. Nov. 12, 2002), required the appointment of a three-person, independent technical committee "to assist in enforcement of and compliance with" the Final Judgment in that case.  Exhibit 3 at 9.  The *Microsoft* technical committee was "empowered broadly to monitor Microsoft's compliance with its obligations under the Final

---

[4] Such court-appointed agents have been identified by a "plethora of titles: 'receiver,' 'Master,' 'Special Master,' 'master hearing officer,' 'monitor,' 'human rights committee,' 'Ombudsman,' and others.  The function is clear, whatever the title."  *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982).  This brief uses the term "monitor" when discussing case law that uses any such title.

[5] Federal enforcement of civil RICO violations—where the Court has narrower authority in crafting remedies than when addressing Sherman Act violations, *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 641 (S.D.N.Y. 2011)—"provides the modern antecedents for ongoing supervisors or monitors after a court judgment." Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor:  The New Corporate Czar?*, 105 Mich. L. Rev. 1713, 1717 (2007).  Second Circuit courts have recognized that the imposition of a monitor in RICO actions to prevent recurrence of wrongdoing is an appropriate equitable remedy.  *See, e.g.*, *United States v. Sasso*, 215 F.3d 283, 288 (2d Cir. 2000); *United States v. Local 295 of Int'l Bhd. of Teamsters*, 784 F. Supp. 15, 22 (E.D.N.Y. 1992).

Judgment."  *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 196 (D.D.C. 2002) (quotation and brackets omitted).

An outside compliance monitor is similarly appropriate here.  The appointment of a monitor is proper "'when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed.'" *United States v. Vulcan Soc'y, Inc.*, No. 07-CV-2067 (NGG)(RLM), 2010 WL 2160057, at *4 (E.D.N.Y. May 26, 2010) (quoting 9C Wright & Miller, *Federal Practice & Procedure* § 2602.1 (3d ed. 2008)).  Corporate monitors are particularly justifiable where, as here, there has been "wrongdoing that causes a great deal of harm."  Khanna & Dickinson, 105 Mich. L. Rev. at 1729.

The above factors all counsel in favor of a corporate monitor to oversee Apple's compliance with the PFJ.  The PFJ contains obligations on Apple's conduct that are essential to ensure appropriate relief.  An external monitor, familiar with the antitrust laws, will help ensure that Apple complies with these obligations, without requiring significant costs on the part of Plaintiffs or this Court.  Instead, those costs will be borne by Apple, who, as the wrongdoer, is the appropriate party to bear them.  *See, e.g.*, *Alberti v. Klevenhagen*, 46 F.3d 1347, 1363-64 (5th Cir. 1995) (party that is the "primary cause" of harm should bear costs of monitor).

Apple executives have also demonstrated sufficient resistance and intransigence to support the appointment of a monitor.  For example, Mr. Cue testified that in his recent negotiations with several music labels to supply content for iTunes Radio, he used the same negotiating tactics that facilitated collusion with the e-book publishers.  Eddy Cue Test., Trial Tr. 1761:10-21, 1776:15-1777:8.  Nor were Mr. Cue and his Apple colleagues willing to acknowledge their past behavior, even when confronted with documentary evidence that

contradicted their sworn testimony.  For example, even after Mr. Cue was presented with a series of e-mails demonstrating that he was aware that Macmillan CEO John Sargent would be traveling to Seattle to negotiate with Amazon instead of attending the iPad launch event, Mr. Cue continued to insist that he was not aware of Mr. Sargent's Amazon negotiations, testifying that he would "keep answering" questions about his knowledge of those negotiations "the same way."  Eddy Cue Test., Trial Tr. 1773:16-22.  As the Court noted, Mr. Cue's denial was "brazen" (Opinion at 84 n.47).

Through the course of the trial, it became clear that Apple lacks sufficient internal controls to prevent the reoccurrence of the wrongdoing found here.  Apple's *counsel*— Mr. Saul—was the creator of the MFN clause that Apple used to economically bind the publishers to move all of their other retailers to the agency model.  And this Court found Mr. Saul's testimony—that of an officer of the Court—to be "noteworthy" for its "lack of credibility" (Opinion at 143 n.66).

The record here demonstrates the effect when a company as large as Apple knowingly violates the antitrust laws.  Consumers suffer great harm.  The appointment of an external monitor will ensure Apple implements the provisions of the PFJ, discourage senior management from orchestrating similar behavior, and provide its employees with sufficient training and oversight to minimize the risk of recurrence.

## B.     Internal Antitrust Compliance Officer

Section V of the PFJ requires Apple to hire an internal Antitrust Compliance Officer ("ACO"), who will report to Apple's Audit Committee.  The ACO should be a new Apple employee dedicated full time to antitrust compliance.  This person should be hired by and report

directly to Apple's outside directors, and not be supervised by the very people who orchestrated this illegal scheme.

Among the ACO's duties—which essentially mirror those assigned to the Publisher Defendants' ACOs under their consent decrees, *see, e.g.*, Penguin Final Judgment § VII—will be the institution of a robust antitrust training program, including training on the terms of the Final Judgment ultimately entered in this case, and the antitrust laws more generally. Such training is especially important for Apple, given that, when questioned, its executives were unable to recall having received any form of general or specific antitrust training. *E.g.*, Kevin Saul Dep., at 52:1-7 (Exhibit 4).

## V.   CUSTOMARY ACCESS AND JURISDICTION PROVISIONS ARE NECESSARY AND APPROPRIATE

Section VII includes inspection provisions that are customary in United States antitrust decrees. *See generally United States v. Grinnell Corp.*, 384 U.S. 563, 579 (1966) (directing district court to reconsider denial of "important and customary" inspection rights); *U.S. Gypsum*, 340 U.S. at 95. These provisions allow the United States or the Representative Plaintiff States to review documents and speak with individuals for the purpose of determining or securing compliance with the PFJ. There is no reason to omit these standard access provisions here.

Finally, under Section VIII, and as is customary in antitrust cases won by the government, the term of the PFJ is ten years, although as noted above some provisions would expire sooner. This Court would retain jurisdiction to enforce the Final Judgment.

Dated:  August 2, 2013

Respectfully submitted,

_____

Mark W. Ryan
Lawrence E. Buterman
Daniel McCuaig
David Z. Gringer
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
(202) 532-4753
Mark.W.Ryan@usdoj.gov

*On Behalf of the United States of America*

Gabriel Gervey
Eric Lipman
David Ashton
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711
(512) 463-1262
Gabriel.Gervey@texasattorneygeneral.gov

W. Joseph Nielsen
Gary M. Becker
Assistant Attorneys General
Office of the Attorney General of
Connecticut
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

*On Behalf of the Plaintiff States*

18