**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,                                          :
:
                              Plaintiff,                           :
:
            v.                                                     :          12 Civ. 2826 (DLC)
:
APPLE INC.,                                                        :
:
                              Defendant.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
THE STATE OF TEXAS,                                                :
THE STATE OF CONNECTICUT, *et al.*,                                :
:
                              Plaintiffs,                          :
:
            v.                                                     :          12 Civ. 3394 (DLC)
:
PENGUIN GROUP (USA) INC., *et al.*,                                :
:
                              Defendants.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**APPLE INC.'S MEMORANDUM OF LAW IN RESPONSE TO**
**PLAINTIFF UNITED STATES' PROPOSED FINAL JUDGMENT AND**
**PLAINTIFF STATES' PROPOSED ORDER ENTERING PERMANENT INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD FOR INJUNCTIVE RELIEF .................................................. 4

ARGUMENT ...................................................................................................... 6

I.   An Injunction Is Unnecessary Because Plaintiffs Have Already Achieved Their
     Legitimate Remedial Objectives ................................................................. 6

II.  The Proposed Injunction Terms Are Unnecessary, Overbroad, Vague, and Punitive ........... 9

     A.   A Ten-Year External Compliance Monitorship Would Be Unprecedented and
          Unwarranted ................................................................................... 9

     B.   The Proposed Regulation of the App Store Is Untethered to the Court's
          Findings or the Evidence Presented at Trial ......................................... 13

     C.   Plaintiffs' Regulation of Apple's Other Content Platforms Is Similarly
          Unwarranted ................................................................................... 17

     D.   Any Injunction Should Apply Only to Apple's Relationships with the Publisher
          Defendants ..................................................................................... 20

     E.   Plaintiffs' Proposed Ten-Year Term is Punitive and Will Chill Competition ............ 21

     F.   Several Other Provisions of the Proposed Injunction Are Vague and Would Be
          Unconstitutional .............................................................................. 23

APPLE'S PROPOSED REMEDY ....................................................................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. United States*,
509 U.S. 544 (1993)................................................................................................ 24

*American Needle, Inc. v. National Football League*,
130 S. Ct. 2201 (2010).................................................................................. 3, 13, 14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)................................................................................................ 16

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013)............................................................................................ 15

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004).................................................................................... 4, 6, 7, 8

*F.T.C. v. Colgate-Palmolive Co.*,
380 U.S. 374 (1965).................................................................................. 11, 13, 14

*FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012).......................................................................................6, 19

*Hartford-Empire Co. v. United States*,
323 U.S. 386 (1945).................................................................................. 4, 5, 18, 21

*In the Matter of Toys "R" Us, Inc.*,
1997 WL 832584 (F.T.C. Sept. 25, 1997) ............................................................ 11

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947).................................................................................................. 4

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).......................................................................................... 10, 19

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951).............................................................................................. 5, 7

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984).............................................................................................. 3, 12

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002) ..................................................... 5, 14, 16, 18, 22

*Pac. Bell Tel. v. LINKLINE Commc'ns*,
555 U.S. 433 (2009)................................................................................................ 14

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ................................................................................... 6, 19, 24

*Sorrell v. IMS Health, Inc.*,
  131 S. Ct. 2653 (2011) ................................................................................. 20, 24

*Standard Oil Co. of N.J. v. United States*,
  221 U.S. 1 (1911) ............................................................................................... 4

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ......................................................................................... 12

*United States v. AMC Entm't, Inc.*,
  549 F.3d 760 (9th Cir. 2008) ........................................................................ 6, 20

*United States v. Apple Inc.*,
  889 F. Supp. 2d 623 (S.D.N.Y. 2012) ......................................................... 2, 7, 8

*United States v. AU Optronics Corp.*,
  No. 3:09-00110, (N.D. Cal. Oct. 2, 2012) ...................................................... 10

*United States v. Blue Cross Blue Shield Mich.*,
  No. 2:10-cv-14155 (E.D. Mich. Mar. 25, 2013) ................................................ 5

*United States v. Columbia Artists Mgmt., Inc.*,
  662 F. Supp. 865 (S.D.N.Y. 1987) ..................................................................... 5

*United States v. Concentrated Phosphate Export Ass'n, Inc.*,
  393 U.S. 199 (1968) ............................................................................................ 5

*United States v. Glaxo Grp.*,
  410 U.S. 52 (1973) ............................................................................................. 4

*United States v. Imperial Chem. Indus.*,
  105 F. Supp. 215 (S.D.N.Y. 1952) ........................................................... 4, 7, 9, 15

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................... 2, 4, 15

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995) ........................................................................... 2

*United States v. Nat'l Lead Co.*,
  332 U.S. 319 (1947) ....................................................................................... 4, 11

*United States v. Or. State Med. Soc'y*,
  343 U.S. 325 (1952) .................................................................................... 5, 8, 17

*United States v. Visa U.S.A., Inc.*,
   163 F. Supp. 2d 322 (S.D.N.Y. 2001)...................................................................... 5, 18

*United States v. W.T. Grant Co*.,
   345 U.S. 629 (1953)........................................................................................ 5, 8, 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969)................................................................................................... 2

**Statutes**

15 U.S.C. §§ 1, 4........................................................................................................ 6

**Other Authorities**

2A Phillip E. Areeda & Herbert Hovenkamp,
   *Antitrust Law*  (3d ed. 2010) ..................................................................................... 4

*Guilty of Competition*,
   Wall St. J., July 11, 2013 ........................................................................................... 1

L. Gordon Crovitz,
   *A Judge Convicts Apple of Competition*, Wall St. J., July 21, 2013 .......................... 1

Miriam Hechler Baer, *Governing Corporate Compliance*,
   50 B.C. L. Rev. 949 (2009).................................................................................... 12

Roger Parloff, *US v. Apple Could Go to the Supreme Court*,
   CNNMoney (June 5, 2013)........................................................................................ 1

Sharon Pian Chan, *Long Antitrust Saga Ends for Microsoft*,
   Seattle Times (May 11, 2001).................................................................................. 12

Steve Lohr & John Markoff,
   *Windows Is So Slow, But Why?*, N.Y. Times (Mar. 27, 2006) ................................. 12

*The E-Book Price-Fixing Conspiracy*,
   N.Y. Times, July 13, 2013 ......................................................................................... 1

U.S. Dep't of Justice Antitrust Div.,
   *Antitrust Division Policy Guide to Merger Remedies* 4 (2011)........................ 3, 4, 15

Vikramaditya Khanna & Timothy L. Dickinson,
   *The Corporate Monitor:  The New Corporate Czar*,
   105 Mich. L. Rev. 1713 (2007)................................................................................ 12

# INTRODUCTION

Plaintiffs' proposed injunction is a draconian and punitive intrusion into Apple's business, wildly out of proportion to any adjudicated wrongdoing or potential harm. Plaintiffs propose a sweeping and unprecedented injunction as a tool to empower the Government to regulate Apple's businesses and potentially affect Apple's business relationships with thousands of partners across several markets. Plaintiffs' overreaching proposal would establish a vague new compliance regime—applicable only to Apple—with intrusive oversight lasting for ten years, going far beyond the legal issues in this case, injuring competition and consumers, and violating basic principles of fairness and due process. The resulting cost of this relief—not only in dollars but also lost opportunities for American businesses and consumers—would be vast.

Plaintiffs' theories of antitrust liability against Apple, as the Court recognized, arose "from the specific events that unfolded in the trade e-book market as 2009 became 2010." Op. at 158. The opinion explicitly "does not seek to paint with a broader brush." *Id.* But that is precisely what plaintiffs' proposed injunction seeks: to leverage the Court's findings to obtain an unwarranted and dangerous oversight of Apple's content businesses. Plaintiffs' antitrust theories are controversial and involve interpreting and harmonizing Supreme Court authority. Apple has strong arguments for appeal from this Court's July 10 ruling, which has generated significant debate and discussion.[1] But taking this Court's findings on their face for purposes of this injunction proceeding, the Court should reject plaintiffs' proposal for several reasons.

*First*, the proposed injunction seeks unnecessary relief for harms *already remedied* by the

---

[1] *See, e.g.*, L. Gordon Crovitz, *A Judge Convicts Apple of Competition*, Wall St. J., July 21, 2013, at A15; Editorial, *The E-Book Price-Fixing Conspiracy*, N.Y. Times, July 13, 2013, at A18 (Apple's agency agreements with the publishers "brought much-needed competition to the e-book marketplace .... That is healthier for the publishers and for consumers, too"); Editorial, *Guilty of Competition*, Wall St. J., July 11, 2013, at A14; Roger Parloff, *US v. Apple Could Go to the Supreme Court*, CNNMoney (June 5, 2013, 12:36 PM), http://tech.fortune.cnn.com/2013/06/05/us-v-apple-could-go-to-the-supreme-court/.

publishers' consent decrees.  Those agreements required the publishers to terminate and renegotiate their agency agreements with Apple; eliminated the publishers' ability to use retail price MFNs for a five-year period; and prohibited the publishers from entering into agency agreements without discounting for a two-year period.  The Court endorsed these terms, concluding they were "reasonably calculated to restore retail price competition to the market for trade e-books, to return prices to their competitive level, and to benefit e-books consumers and the public generally, at least as to the competitive harms alleged in the Complaint."  *United States v. Apple Inc.*, 889 F. Supp. 2d 623, 632 (S.D.N.Y. 2012).

As a result of the publishers' consent decrees, there is no threat or recurrence of the conduct underlying the Court's finding of a Sherman Act violation.  Because this Court is "not at liberty to enjoin 'all future [potential] violations of the antitrust laws … unrelated to violations found by the court'" (*United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *Zenith Radio Corp. v. Hazeltine Research*, *Inc.*, 395 U.S. 100, 132-33 (1969))), it should reject plaintiffs' proposal, which in very large part asks the Court to do just that.

*Second*, the proposed injunction contains broad, invasive, and vague provisions that are untethered to the actual findings of antitrust liability in this case, in violation of hornbook law.  Indeed, plaintiffs' proposal flouts the requirement that the relief be "tailored to fit the wrong creating the occasion for the remedy."  *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) (en banc, per curiam).  For example, plaintiffs' proposal would dictate terms for e-book retailer *apps* available through the App Store and regulate Apple's dealings with app providers, as well as in several other content markets.  But there is no justification for this invasion into any of Apple's businesses that were not directly at issue in this lawsuit, for which no conspiracy allegations were made, and that were not found unlawful in the Court's decision.

Apple's unilateral conduct was not at issue, nor could it be as a matter of antitrust law.  *See*, *e.g.*, *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2209 & n. 2 (2010). Likewise, plaintiffs' extraordinary suggestion that the Court appoint an external monitor to oversee Apple for a ten-year period is wholly unjustified by law or fact and goes far beyond any "logical nexus" with the alleged violation.  U.S. Dep't of Justice Antitrust Div., *Antitrust Division Policy Guide to Merger Remedies* 4 (2011) ("DOJ Policy Guide") ("There should be a close, logical nexus between the proposed remedy and the alleged violation—and the remedy should fit the violation and flow from the theory or theories of competitive harm").

As this Court recognized, "our nation's antitrust laws should be applied with care," with courts being "sensitive to the unique features of any market and the ambiguities of commercial conduct to avoid chilling lawful competition."  Op. 155.  Antitrust law's well-established concern for "deterr[ing] or penaliz[ing] perfectly legitimate conduct" (*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) makes equally clear that this Court must not enjoin lawful conduct or create sweeping remedies that chill such conduct for fear of a finding of contempt.  The Court found that agency agreements generally, and the core terms here—MFN and price caps—are lawful and could be deemed competitive.  Op. 132.  But the proposed injunction would make these terms unavailable to Apple, even after the publishers' consent decrees expire, and would therefore harm Apple's ability to compete fairly with other retailers.

This Court also found that "Apple is one of America's most admired, dynamic, and successful technology companies," which has produced "innovative devices" popular around the world (Op. 26) and "transform[ed] American culture," *id.* at 30.  Especially in these circumstances, the Court should impose a remedy that is "carefully tailored" to the alleged violation (DOJ Policy Guide at 3), not a sweeping mandate, disconnected from the issues,

evidence, and arguments in this case, that would hurt competition rather than foster it.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

Injunctive relief sought by the Government serves two related purposes: (1) "the 'undoing' of what the antitrust violation achieved," and (2) the "creat[ion of] a situation in which unrestrained competition can occur."  2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 325a, 325c (3d ed. 2010).  "The purpose of relief in an antitrust case is … [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance."  *United States v. Glaxo Grp.*, 410 U.S. 52, 64 (1973); *accord F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004); *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 78 (1911).

Equally important is what a court's grant of relief may *not* do.  "In an equity suit, the end to be served is not punishment of past transgression."  *Int'l Salt Co. v. United States,* 332 U.S. 392, 401 (1947).  "The purpose of the decree, therefore, is effective and fair enforcement, *not punishment*."  *United States v. Nat'l Lead Co.*, 332 U.S. 319, 338 (1947) (emphasis added); *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945) ("we may not impose penalties in the guise of preventing future violations").  As a result, the relief granted must "not embody harsh measures when less severe ones will do."  Areeda, *supra*, ¶ 325a.

Any injunctive relief imposed "should be tailored to fit the wrong creating the occasion for the remedy."  *Microsoft*, 253 F.3d at 107.  "A court ... must base its relief on some clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended."  *Id.* at 105.  Thus, "[o]nly those provisions *reasonably necessary* to accomplish correction and adjustment of a dislocated competitive situation may be applied."  *United States v. Imperial Chem. Indus.*, 105 F. Supp. 215, 220 (S.D.N.Y. 1952) (emphasis added); *see also* DOJ Policy Guide at 3-4.  Injunctions should "not impose unnecessary restrictions," and "the procedure prescribed" should "not [be]

4

unduly burdensome." *Lorain Journal Co. v. United States*, 342 U.S. 143, 156 (1951).  Courts have therefore rejected injunctions unnecessary to remedy a violation of Section 1.  *See*, *e.g.*, *Hartford-Empire*, 323 U.S. at 413 ("The injunction as drawn is not directed at any combination, agreement or conspiracy"); *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 146 (D.D.C. 2002) ("There is no need to 'remedy' conduct for which no liability was ascribed"); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 410 (S.D.N.Y. 2001) (rejecting provisions as "overbroad, uncertain, and risk prohibiting practices that may be on balance procompetitive").

A critical element in determining the need for injunctive restrictions is whether the challenged practices continue.  *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than ... mere possibility").  Here, the actions were found unlawful only in the unique circumstances of the e-books market in 2009 and 2010, Op. 158, and are therefore unlikely to repeat.  Since the "sole function" of an injunction "is to forestall future violations," there must be "a real threat of future violation."  *United States v. Or. State Med. Soc'y*, 343 U.S. 325, 333 (1952).  The "mere possibility" of a recurrent violation is insufficient.  *W.T. Grant*, 345 U.S. at 633.  Accordingly, courts have denied injunctive relief where the "likelihood of further violations is sufficiently remote to make injunctive relief unnecessary."  *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968); *see*, *e.g.*, *W.T. Grant*, 345 U.S. at 633-36 (no injunctive relief where the challenged conduct was discontinued and defendants disclaimed any intention to revive them); *see also United States v. Blue Cross Blue Shield Mich.*, No. 2:10-cv-14155 (E.D. Mich. Mar. 25, 2013), ECF No. 246 (motion to dismiss action where challenged agreements were made void and ineffective); *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 866-67 (S.D.N.Y. 1987) (DOJ motion to terminate consent

order in light of changed circumstances in the industry).

Due process also constrains both the scope and terms of any injunction. Thus, injunctions, like any other remedy, must conform to the due process mandate that "the government provide citizens and other actors with sufficient notice as to what behavior complies with the law." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). Where an injunction burdens a defendant for conduct that took place "before the government gave fair notice" that such conduct violated the law, "the injunction violates due process." *Id.* at 762; *see also FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("regulated parties should know what is required of them so they may act accordingly"). Defendants must also receive fair notice of the precise *terms* of the injunction so they can order their conduct to avoid violating them (*see Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam) ("basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed")), which here cannot include punishment, given that neither Section 1 nor Section 4 of the Sherman Act authorizes punitive injunctions, *see* 15 U.S.C. §§ 1, 4.

## ARGUMENT

The proposed injunction is unnecessary, overbroad, vague, and punitive. The terms plaintiffs propose would violate the legal standard for injunctive relief and due process.

## I. An Injunction Is Unnecessary Because Plaintiffs Have Already Achieved Their Legitimate Remedial Objectives

The publishers' consent decrees have already accomplished the only legitimate objectives for plaintiffs' request for injunctive relief—"to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm." *F. Hoffman-La Roche*, 542 U.S. at 170. The Court found that the consent decrees are "closely related to the violations alleged" in the case, and are aimed at "undoing the price-fixing conspiracy, ensuring

that price-fixing does not immediately reemerge, and ensuring compliance." *Apple*, 889 F. Supp. 2d at 632-33.   In approving the decrees, the Court held that "it is reasonable to conclude that these remedies will result in a return to the pre-conspiracy status quo." *Id.* at 633.

The proposed injunction contains numerous unnecessary provisions for harms already remedied as a result of the publishers' consent decrees.  It would require Apple to terminate its *current* agency agreements with the publisher defendants.  Section IV.A.  And for the next five years—three years longer than the corresponding term in the publishers' consent decrees—Apple would be enjoined from entering into any agreement with a publisher defendant "that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts," effectively ending its ability to enter into agency agreements.   Section III.C.  Apple would not be able to enforce, or enter into, any retail-price MFN in any agreement with any e-book publisher relating to the sale of e-books for five years.  Sections III.A-B.

The Court's consent decrees already accomplish plaintiffs' objectives, and therefore achieve all that is "necessary to protect the public from further anticompetitive conduct."  *F. Hoffman-La Roche*, 542 U.S. at 170; *see also Lorain Journal*, 342 U.S. at 156 ("While the decree should anticipate probabilities of the future, it is equally important that it do[es] not impose *unnecessary* restrictions") (emphasis added); *Imperial Chem. Indus.*, 105 F. Supp. at 220 ("Only those provisions *reasonably necessary* to accomplish correction and adjustment of a dislocated competitive situation may be applied") (emphasis added).   The decrees "unravel[] both the [Apple] Agency Agreements and agreements with other e-book retailers implementing the broader shift to agency pricing." *Apple*, 889 F. Supp. 2d at 632.

Plaintiffs do not allege that any party has failed to comply with those decrees, or that Apple failed to cooperate; they therefore do not allege, let alone demonstrate, any "real threat of

future violation or a contemporary violation of a nature likely to continue or recur." *Or. State Med. Soc'y*, 343 U.S. at 333.  As a result, there is no further need for injunctive relief at all beyond Apple's formally being bound by terms consistent with the prior decrees. *See*, *e.g.*, *W.T. Grant*, 345 U.S. at 633-36.

That is because plaintiffs have already obtained the relief necessary "to redress anticompetitive harm." *F. Hoffman-La Roche*, 542 U.S. at 170.  As the Court found concerning the publishers, "[b]y effectively disallowing the Settling Defendants from using the agency model for at least two years, subject to limited exceptions, and from using Price MFNs for at least five, the proposed Final Judgment appears reasonably calculated to restore retail price competition to the market for trade e-books, to return prices to their competitive level, and to benefit e-books consumers and the public generally." *Apple*, 889 F. Supp. 2d at 632; *see also* Case No. 12 Civ. 2826, ECF Nos. 119, 259, 286-1.

Plaintiffs' proposal that Apple now be forced to terminate its *renegotiated* agreements with the publishers (*see* Section IV.A) cannot be justified.  Plaintiffs nowhere point to facts revealed at trial (and subsequent to approval of the consent decrees) that require any relief beyond what the decrees provide.  Nor could they: Average market prices were below pre-agency levels even by early 2011 and continued to decline thereafter; prices are by all accounts and appearances as low or lower today.  *See*, *e.g.*, DX-719; Op. 122 n.61; Trial Tr. 1506:19-1507:1 (Ashenfelter); *id.* at 1510:19-1516:2; DX-473.  And the publisher defendants' share of e-book sales has fallen, accounting for fewer than 30% of sales in March 2012.  *See* DX-437.  In this environment, where the consent decrees and new agreements have remedied the Section 1 violation that this Court found, forcing Apple to renegotiate lawful agreements is far from "reasonably necessary to accomplish correction and adjustment of" the alleged "dislocated

competitive situation." *Imperial Chem. Indus.*, 105 F. Supp. at 220.

## II.     The Proposed Injunction Terms Are Unnecessary, Overbroad, Vague, and Punitive

If the Court does issue an injunction, it should be narrowly tailored to the alleged unlawful conduct. Plaintiffs' proposal includes an unwarranted ten-year external compliance monitorship, and regulates areas of Apple's business, like the App Store and Apple's relationships with providers of content other than e-books, which bear no relation to the wrongdoing alleged in this case. These overbroad and vague terms violate principles of equity and antitrust law, as well as Apple's constitutional rights to fair notice of judicial penalties.

### A.     A Ten-Year External Compliance Monitorship Would Be Unprecedented and Unwarranted

Plaintiffs have grossly overreached in their proposal to appoint a third party to "monitor Apple's compliance with the terms of [the proposed] Final Judgment, to review and evaluate Apple's existing internal antitrust compliance policies and procedures, and to recommend to Apple changes to address any deficiencies in those policies and procedures." Section VI.B. The proposed provision effectively requests a decade-long roving mandate to parse *all* of Apple's business conduct, across all of its myriad businesses, for antitrust compliance. Under the proposed injunction, the external monitor would have authority to conduct reviews into and report on all of Apple's internal antitrust compliance policies and procedures, and would be required to file quarterly reports regarding Apple's compliance with the final judgment for the entirety of the ten-year judgment period. *See*, *e.g.*, Section V.E (requiring an annual antitrust compliance audit of all Apple officers and directors, as well as iBookstore employees); Section V.H (requiring Apple to turn over communications regarding noncompliance with the "Final Judgment *or* the antitrust laws"); Section VI.G (imposing a duty on the external monitor to turn over information regarding compliance with the "Final Judgment *or* the antitrust laws")

(emphasis added).  This unduly burdensome remedy is plainly punitive, not to mention out of proportion to the circumstances of this case, and it flies in the face of law and practice.

Apple is aware of only a single litigated price-fixing case in which the court imposed an external compliance monitorship as part of a final judgment: *United States v. AU Optronics Corp.*. No. 3:09-00110, (N.D. Cal. Oct. 2, 2012), ECF No. 976 at 3.  But *AU Optronics* was a *criminal* case involving allegations of naked price-fixing.  *Id.*  And the Government argued that, "from its very inception, AUO's standard operating procedure has been collusion.  AUO has never known any other way of doing business and has never willingly operated lawfully."  ECF No. 948, at 53.  There was no conceivable procompetitive conduct associated with the Section 1 violation.  *See id.* at 1-7, 17-18.  And the defendant had "an inherent business culture of collusion" and "no antitrust compliance program whatsoever."  *Id.* at 54.  As a result, "[a] new corporate culture [had to] be created, and [the defendant had] neither the will nor the experience to institute these new business practices on its own."  *Id.* at 53.  Under these unusual and extreme circumstances, the Court imposed a three-year monitorship.  *Id.*, ECF No. 976, at 2-3.

The contrast with this case could not be clearer.  Far from having "an inherent business culture of collusion" and "never willingly operat[ing] lawfully," Apple is "an esteemed company" (Op. 158), a leading innovator, and one of the foremost contributors to economic growth in the nation.  Apple has an antitrust compliance program, which it has enhanced with a special antitrust legal department since the conduct that the Court found violated Section 1 in this case occurred.  And as this Court recognized, "having the creativity and commitment of Apple invested in the enhancement of a product like the iBookstore is extremely beneficial to consumers and competition."  Op. 156 n.69; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 891 (2007) ("New products and new brands are essential to a dynamic

economy").  Plaintiffs' attempt to impose a more onerous and burdensome monitorship than was imposed in *AU Optronics* is nonsensical and unlawful.

Plaintiffs' proposed injunction seeks even broader relief than what was imposed in *Toys "R" Us*, where a "dominant" player with market power was enjoined from enforcing or entering into agreements that caused the anticompetitive restraints at issue, which were still largely in effect at the time of the remedy.  *See In the Matter of Toys "R" Us, Inc.*, 1997 WL 832584, at *48, *57, *77 (F.T.C. Sept. 25, 1997).  Given that "[e]ach of the provisions addresse[d] conduct that might be used by [Toys "R" Us] to perpetuate the restraint," the relief was "necessary to cause [Toys "R" Us] to discontinue the challenged conduct and dissipate the anticompetitive effects."  *Id.* at *58.  The FTC did not seek to appoint an independent compliance monitor.  *Id.*

During the parties' meet-and-confer session, plaintiffs suggested that the Court's credibility findings related to three Apple employees warrant a heavy-handed monitorship, but this fundamentally misunderstands the purpose of external monitoring of a defendant's compliance.[2]  An injunction must be tethered to the specific issues and violations warranting relief; a court's credibility findings do not give a plaintiff the right to smear the company and its personnel on a wholesale basis in order to obtain an overly broad and punitive injunction.  *See Nat'l Lead Co.*, 332 U.S. at 338 ("The purpose of the decree is ... not punishment."); *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395-96 (1965) (injunction must "[have] a reasonable relation to the unlawful practices found to exist").  Plaintiffs' suggestion that Apple is somehow unsavory is not only baseless—the Court found that Apple was "esteemed" (Op. 158) and "admired" (*id.* at 26), and its products "revolutionary" (*id.* at 27)—but is also not a permissible

---

[2]  It also ignores the fact that the responsibility for internal supervision of compliance with the injunction would not be vested in any of the witnesses at trial, but, under Section V of the plaintiffs' proposal, in a newly-created post of Antitrust Compliance Officer who would report to the company's Audit Committee (or its equivalent).

basis for the severity of the proposed injunction.  *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) (punishment may not be based on "dissimilar acts, independent from the acts upon which liability was premised"; rather, a "defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business").

External monitorships can be extremely costly and burdensome, and in a case like this would have few benefits.  *See*, *e.g.*, Miriam Hechler Baer, *Governing Corporate Compliance*, 50 B.C. L. Rev. 949, 990 (2009) ("compliance regulation endures because it aids the two groups most invested in its proliferation: the DOJ and the compliance industry"); Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor:  The New Corporate Czar*, 105 Mich. L. Rev. 1713, 1728-29 (2007) (ongoing supervisory remedies more costly than other remedies).  It makes no sense to inflict such an unprecedented burden on Apple, "one of America's most admired, dynamic, and successful technology companies."  Op. 26.  Requiring Apple to employ an external compliance monitor, and make all of Apple's officers, directors, and iBookstore employees log their communications with e-book retailers and publishers, will place bureaucratic tentacles around Apple's e-books business, stifling the company's ability to innovate and compete.  *See Monsanto*, 465 U.S. at 763 ("A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market").  Observers have pointed to such negative effects arising out of Microsoft's consent decree, which lasted for nearly ten years.  *See*, *e.g.*, Sharon Pian Chan, *Long Antitrust Saga Ends for Microsoft*, Seattle Times (May 11, 2001), http://seattletimes.com/html/microsoft/ 2015029604_microsoft12.html (Microsoft became "much more cautious and much less aggressive," "slowly reacting to the world around them, rather than trying to get in there fast"); Steve Lohr & John Markoff, *Windows Is So Slow, But Why?*, N.Y. Times (Mar. 27, 2006),

http://www.nytimes.com/2006/03/27/technology/27soft.html (Microsoft's consent decree may have played a role in the delayed release of Microsoft's new operating system).

Rather than foster "unrestrained competition," the proposed injunction would undermine Apple's legitimate operations and slow procompetitive innovation throughout the technology sector. Its burdensome monitorship provision would force Apple into a rigid business posture affecting far more than its e-books operations, and its cost to the American economy could dwarf its cost to Apple. This provision serves neither the American consumer nor the purposes of antitrust law, and it should not be included in any injunction this Court issues.

**B.     The Proposed Regulation of the App Store Is Untethered to the Court's Findings or the Evidence Presented at Trial**

The proposed injunction also aims to dictate the terms on which Apple offers e-reader apps *on its App Store*, even though there was no evidence admitted at trial, or finding by the Court, that the conspiracy involved the App Store. Plaintiffs' proposed injunction would require Apple to carve out an exception to its blanket rule—applicable to the more than 850,000 apps in the App Store—that a commission applies to in-app sales of digital goods, and it would allow e-book retailers to make such sales commission-free. *See* Section IV.C. But although plaintiffs' proposed findings of fact included allegations regarding the App Store's treatment of e-book retailer apps (ECF No. 233-1 ¶¶ 35, 203), the evidence cited in support of those proposed findings (which did not involve an alleged conspiracy) was not admitted at trial, and the claim was effectively abandoned. The Court should therefore reject this proposed term in the injunction, because it is not based on the evidence or the Court's findings and is unrelated to the Court's underlying liability finding. *See Colgate-Palmolive*, 380 U.S. at 394-95 (injunction must "[have] a reasonable relation to the unlawful practices found to exist"); *American Needle*, 130 S. Ct. at 2009.

Apple is under no duty to allow other retailers to offer apps on the iPad in the first place, much less on terms that subsidize their operations. *Pac. Bell Tel. v. LINKLINE Commc'ns*, 555 U.S. 433, 450 (2009) ("if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous"). Nevertheless, Apple allows all e-book retailer apps that are compliant with its policies—including those offered by Amazon, Barnes & Noble and other competing e-book retailers—to be offered in its App Store. Trial Tr. 1908:5-1909:21 (Cue). It also permits consumers to download e-books purchased through another e-book retailer's website or bookstore onto its e-reader devices without charge.

There was no evidence admitted at trial, and certainly no finding by this Court, that Apple's general policy requiring e-book retailers to pay a commission on in-app digital sales was part of the conspiracy that this Court found. Likewise, there is no evidence that Apple conspired to restrain the distribution of e-book apps or to impose less favorable terms on such apps. Rather, the Court found that Apple had an *independent, non-conspiratorial* preference for making e-book sales through the iBookstore over the App Store to avoid customer confusion. *See* Op. 28 ("By November 2009, Apple … concluded that selling e-books as individual apps was 'flawed'"). This cannot support an antitrust claim. *See American Needle*, 130 S. Ct. at 2209.

Without any basis in the evidence or the Court's findings, the proposed regulation of the App Store is simply outrageous and cannot be included in an injunction. An injunction must bear a "reasonable relation to the unlawful practices found to exist" (*Colgate-Palmolive*, 380 U.S. at 394-95), and "[t]here is no need to 'remedy' conduct for which no liability was ascribed," *Microsoft*, 224 F. Supp. 2d at 146. The court should reject these proposed terms, which are not

remotely consistent with plaintiffs' liability case.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).   In other words, "[t]here should be a close, logical nexus between the proposed remedy and the alleged violation—and the remedy should fit the violation and flow from the theory or theories of competitive harm."  DOJ Policy Guide at 4.

Plaintiffs suggested during the parties' meet-and-confer that Section IV.C is justified by the Court's observation that "Cue attributed Random House's capitulation in part to 'the fact that I prevented an app from Random House from going live in the app store this week.'"  Op. 101. But the Court's remark was made merely in the context of explaining how Random House's experience "confirms each of the observations just made about the prices and sales of the five Publisher Defendants" (*id.* at 100), *not* in expounding the scope of the violation or the nature of the conspiracy.  It also had nothing to do with other e-book retailers and their apps.  The speculation of an Apple witness regarding the motivation of a non-defendant hardly justifies plaintiffs' fossilizing proposal.[3]  Because the Court's observation was not a basis for the liability finding, it cannot support the onerous and punitive injunction plaintiffs seek to impose.  *See Microsoft*, 253 F.3d at 107 (requiring a "significant causal connection between the conduct enjoined or mandated and the violation").

Nor would regulating the App Store serve to remedy a "dislocated competitive situation" (*Imperial Chem. Indus.*, 105 F. Supp. at 220), as is necessary to warrant an injunction.  In fact, the App Store indisputably benefits the nation's economy.  *See* DX-714 ¶ 20 (Cue Decl) (by

---

[3]  This is especially so when there is no dispute about Random House's motivation for adopting agency.  The only Random House witness at trial, executive Madeline McIntosh, explained that: "Even though we received short-term benefits by staying on a wholesale model with Amazon, Random House ultimately decided that its interests would be best served by using an agency model with e-retailers.  That decision was primarily driven by our relationships with bricks-and-mortar resellers, such as Barnes & Noble, Books-a-Million, Indigo, and independent bookstores." DX-713 ¶ 23 (McIntosh Decl.).  Plaintiffs did not dispute this, did not argue that Ms. McIntosh was "not a truth teller," (Trial Tr.. 1638:6-10), and declined to cross-examine her (and dropped Random House CEO Markus Dohle as a witness) because "we do not believe that Ms. McIntosh's affidavit has any bearing on any issues that … concern matters at issue now," *id.* at 1623:23-1624:1.

Spring 2013, consumers had downloaded 40 billion apps).  Rather, this requirement would promote a competitive imbalance and serve to entrench Amazon's dominant position.  To the extent the injunction would give Amazon the advantage of in-app purchasing through a hyperlink without requiring it to pay Apple for the privilege of direct access to Apple's iPad customers, the injunction simply protects Amazon—"the dominant e-retailer for books" (Op. 156)—from competition.  But the purpose of the antitrust laws is "the protection of competition, not competitors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *see also Microsoft*, 224 F. Supp. 2d at 185 (proposed injunction terms "antithetical to the goal of the remedy" where they "will provide significant benefit to competitors, but have not been shown to benefit competition").  The Court should reject the provision which, "[r]ather than rectify[ing] injury to consumers caused by diminished competition ... merely serve[s] to shield [defendant's] competitors from the rigors of the marketplace."  *Microsoft*, 224 F. Supp. 2d at 185.

Similarly, prohibiting Apple from negotiating certain terms that are available to its competitors, such as retail price MFNs with non-defendant publishers, or restrictions on their own ability to set prices and offer discounts after the publisher consent decrees expire, would place Apple at a competitive disadvantage by limiting its flexibility to choose a business model. *Cf.* DX-714 ¶ 64 (Amazon, as a large book retailer, could use its leverage to get more favorable terms than Apple could negotiate); Trial Tr. 1824:2-13 (Cue).[4]  These provisions seek to punish Apple and harm competition rather than correct any wrongdoing or benefit consumers.

Plaintiffs' proposal that Apple's commercial approach to existing e-book apps be frozen

---

[4] This is not some theoretical concern.  Amazon remains the largest physical and e-book retailer, with a 65% share of the e-book market.  It has negotiated business model and price MFNs, price caps, exclusivity of content from publishers and authors, and multi-year agreements.  There was substantial evidence from publishers of both actual and feared retaliation across all of Amazon's business activity.  There is absolutely no basis in the record for the proposition that Amazon was harmed by its switch to agency, or that Apple should be judicially handicapped in order for Amazon to have a fair opportunity to compete on the merits.

in amber for 10 years (*see* Section IV.B) also is unrelated to any violation found by the Court and is not necessary to "forestall future violations" of the antitrust laws. *Or. State Med. Soc'y*, 343 U.S. at 333.  There are a host of legitimate reasons why Apple, in operating the App Store, might seek over time to alter terms or even seek to migrate e-book apps to the iBookstore.  There is no connection between Apple's treatment of then-existing e-book apps and the actual antitrust violation that the Court found, and the Court should therefore reject the proposed injunction.

### C.   Plaintiffs' Regulation of Apple's Other Content Platforms Is Similarly Unwarranted

Plaintiffs seek to regulate every one of Apple's content offerings, even though there is no connection whatsoever between those businesses and the Court's findings in this case.  Plaintiffs would prohibit Apple from entering into or maintaining "any agreement with any E-book Publisher or *supplier of any other form of content* (e.g., music, other audio, movies, television shows, or apps) where such agreement likely will increase, fix, or set the price at which other E-book Retailers or retailers of other forms of content can acquire or sell E-books or other forms of content" for the entire ten-year period of the judgment.  Section III.F (emphasis added). Plaintiffs would also require Apple to provide "any information that reasonably suggests to Apple that its *suppliers of any form of content* (e.g., books, music, other audio, movies, television shows, or apps) have impermissibly coordinated or are impermissibly coordinating on the terms on which they supply or offer their content to Apple or to any other Person."  Section IV.D (emphasis added).  This absurdly broad proposal is not only disconnected from any evidence adduced at trial or findings made by this Court, but would open Apple up to liability in virtually every content market for the actions of content producers, over which it has no control.

Neither the evidentiary record nor the Court's opinion offers any support for bridling any content businesses other than the iBookstore.  The relevant market in the case is trade e-books in

the United States.  Op. 121 n.60.  The Court found that Apple "orchestrate[ed]" a conspiracy in that market to "eliminate retail price competition in order to raise e-book prices."  *id.* at 9.  While Apple strongly disagrees with this conclusion, no aspect of it or the Court's opinion could possibly justify a broad intrusion into any of Apple's businesses unrelated to the allegations and evidence in this case.  An injunction cannot be imposed that would subject Apple to contempt for agreements that have effects *outside of the market* that was the focus of this case (trade e-books), and for conduct neither related to any conspiracy, nor circumscribed by antitrust law.  *See W.T. Grant*, 345 U.S. at 635; *Hartford-Empire*, 323 U.S. at 413; *Visa U.S.A.*, 163 F. Supp. 2d at 410. Courts have roundly rejected proposed remedies that "venture[] into areas of conduct which, at best, are only tangentially related to the conduct for which [defendant] has been found liable." *Microsoft*, 224 F. Supp. 2d at 144 (rejecting plaintiffs' proposed remedial provisions that "bear only a remote relationship to the liability findings").

Section III.F of the proposed injunction goes far beyond what plaintiffs have previously proposed and anything that could possibly be justified.  As plaintiffs conceded before trial, the only basis for a remedy extending to Apple's other businesses is "to ensure that Apple does not operate its other businesses such as the App Store in a manner that allows Apple to evade the purposes of the decree *and limit e-book competition*."  ECF No. 233-2 ¶ 88 (emphasis added).

Nor can plaintiffs take Apple's other content businesses captive on the ground that Apple employed similar negotiation strategies in other markets.  The Court's decision specifically and expressly refused to find these negotiation tactics themselves illegal—holding, for example, that "entirely lawful contracts may include an MFN, price caps, or pricing tiers," and that it is "not illegal for a company to adopt a form 'click-through' contract, negotiate with all suppliers at the same time, or share certain information with them."  Op. 132.  Although the Court further

concluded that in *this* case, Apple had used these lawful business practices to facilitate a specific conspiracy in the e-books market among the publisher defendants (*see id.* at 132, 157)—in no way did the Court find that Apple's negotiation strategy created even a risk of collusive activity in any other content market.  *See id.* at 158 ("The question in this case has always been a narrow one").  The Court stated specifically that it did "not seek to paint with a broader brush."  *Id.*

Section III.F is also alarmingly vague.  It would force Apple to guess whether its business agreements with any individual content supplier "likely will increase" the prices at which other retailers "can … sell E-books or other forms of content."  Section III.F.  But "[m]any decisions a [seller] makes and carries out through concerted action can lead to higher prices.  A [seller] might, for example, contract with different suppliers to obtain better inputs that improve product quality.…  Yet no one would think these actions violate the Sherman Act because they lead to higher prices."  *Leegin*, 551 U.S. at 896-97.  Under the proposed injunction, Apple would risk contempt if any competing retailer made an *independent* and *perfectly lawful* decision to match such pricing.  Similarly, Apple would be at risk if the price it agreed to pay for content convinced a supplier to hold out for a comparable price from its other customers (since "such agreement likely will increase, fix or set the price at with other [retailers] can acquire … content," Section III.F), a scenario that is not only perfectly lawful but is an ordinary attribute of a competitive market.  Apple should not be open to potential liability for this perfectly lawful conduct.

This section's broad and vague restrictions also violate due process.  "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Schmidt*, 414 U.S. at 476.  This "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause."  *Fox Television Stations, Inc.*, 132 S. Ct. 2307 at 2317.  A corporation

laboring under an injunction is "entitled to know the rules by which the game will be played." *AMC Entm't, Inc.*, 549 F.3d at 768.

### D. Any Injunction Should Apply Only to Apple's Relationships with the Publisher Defendants

The proposed injunction would apply broadly to the thousands of independent and self-publishers who have relationships with Apple but who had no involvement in the conspiracy the Court found. The Court did not condemn the terms of Apple's agency agreements, or its negotiation tactics, as inherently illegal. *See* Op. 132; *id.* at 157. Rather, what was "wrongful," the Court found, "was the *use* of those components *to facilitate a conspiracy with the Publisher Defendants.*" *Id.* at 157 (emphasis added). Nevertheless, the proposed injunction would place a five-year blanket prohibition on Apple's enforcing or entering into any agreement with *any* e-book publisher relating to the sale of e-books that contains a retail price MFN—thereby interfering with the contractual rights of thousands of publishers who are not parties to this case. *See* Sections III.A-B. While plaintiffs have disclaimed any such intent, the injunction is vague enough that it could also effectively prohibit Apple from employing price caps in its agreements with non-defendant e-book publishers for a period of ten years. *See* Section III.F.

Plaintiffs also seek to place oversight on communications between all of Apple's iBookstore employees and *all* e-book publishers. *See* Section V.I. All such terms reach well beyond what is reasonably necessary to eliminate collusion between Apple and the publisher defendants with regard to their e-book prices and could chill protected commercial speech as well as procompetitive conduct. *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2659 (2011) ("Speech in aid of … marketing" subject to heightened scrutiny).

Plaintiffs presented no proof, and the Court's opinion presents no findings, in support of an actual or potential conspiracy between Apple and non-defendant publishers to raise trade e-

book prices.  Far from evincing a desire on the part of these publishers to raise prices, the undisputed evidence demonstrated that independent publishers' and self-publishers' e-book prices *fell* following implementation of the Apple agency agreements.  *See* Op. 122 n.61; Trial Tr. 1506:19-1507:1 (Ashenfelter); *id.* at 1510:19-1516:2; DX-719; DX-473.   Moreover, the evidence did not support a finding that Apple itself actually desired higher e-book prices.  *See* Op. 151 n.68 ("The record is equivocal on whether Apple itself desired higher e-book prices than those offered at Amazon").  Nor did plaintiffs allege that Apple could influence Amazon's business model by having an MFN and/or price caps in its contracts with these other publishers. In fact, evidence presented at trial demonstrated that with the exception of the publisher defendants and Random House, all publishers with agency agreements with Apple with price caps and MFNs employ a wholesale model with Amazon.  *See*, *e.g.*, Trial Tr. 835:10-15 (Porco); *see also* DX-317; DX-331; DX-332.

To the extent, therefore, that the proposed remedy would restrict Apple's ability to contract with parties outside any alleged conspiracy, it bears no logical nexus to the violation or anticompetitive harm and is not warranted.  *See Hartford-Empire*, 323 U.S. at 413 (modifying injunction that "binds every defendant forever irrespective of his connection with any other or of the independence of his action").

### E.     Plaintiffs' Proposed Ten-Year Term is Punitive and Will Chill Competition

Plaintiffs' proposed injunction exacerbates all of the foregoing concerns by imposing an unprecedented ten-year term on the entire judgment.  Such a lengthy injunction is unnecessary and would be improper, given the unique circumstances surrounding the violation the Court found, the nascent state of the e-book business, the lawfulness and procompetitive nature of the underlying contract terms, and the fact that such a time period was unnecessary with respect to Apple's co-conspirators, who actually set all the prices challenged.   Indeed, the publishers'

consent decrees have five-year terms, with some of their more restrictive provisions, such as the prohibition on agency agreements, limited to two years. *See* ECF Nos. 119, 259, 286-1. Two years is twice the length of the Apple agency agreements, which carried a short, one-year term. The Court's ruling thus does not anticipate, let alone require, a hand in the market well beyond the "specific events that unfolded in the trade e-book market as 2009 became 2010" and lasting into the next decade. Op. 158.

Plaintiffs' ten-year term will only serve to stifle competition, not enhance it. For example, placing a vague, ten-year restriction on Apple's ability to enter into certain agreements with digital content suppliers (Section III.F) will undoubtedly have a chilling effect on the types of agreements that Apple enters into across its business, and will affect Apple's decision to enter into new content markets, or expand in existing ones, regardless of any potential conspiracy. This, for sure, will harm consumers.

The benefits of plaintiffs' onerous terms are also doubtful. Not only are many of them unrelated to the alleged wrongdoing, as explained above, but technology changes quickly, and the technology at issue in this case will likely be obsolete before the ten-year term expires. The chilling effect of injunctive relief is all the more alarming where, as here, the industry at issue is marked by rapid evolution. Thus, in *New York v. Microsoft Corp.*, the court specifically rejected plaintiffs' proposed ten-year term for the remedy where "the industry at issue in this case is remarkable for its constant and rapid change." 224 F. Supp. 2d at 184. The court observed that "[i]mposing a remedy in this case is not unlike trying to shoe a galloping horse," and acknowledged that "[w]ere the Court to impose a ten-year term, it is likely that, by the latter half of the term, the market will have long since sent the horse to pasture in favor of more advanced technology." *Id.*; *see also id.* ("it is beyond the capacity of this Court … to craft a remedy in

2002, for antitrust violations which commenced in the mid-1990s, which will be appropriately tailored to the needs of a rapidly changing industry in 2012").  Here, plaintiffs' proposed onerous terms are both harmful in the short term and, due to the pace of digital innovation, likely to be obsolete before the ten-year term expires.

### F.    Several Other Provisions of the Proposed Injunction Are Vague and Would Be Unconstitutional

The proposed injunction also places unnecessary restrictions—much broader than analogous provisions in the publishers' consent decrees—on Apple's ability to negotiate and communicate with e-book publishers, potentially subjecting Apple to contempt for entirely lawful and necessary business practices.

First, the injunction would prohibit Apple from retaliating against, punishing, or threatening to punish an e-book publisher for refusing to enter into "an agreement with Apple relating to the sale of E-books" or "for the terms on which the E-book publisher sells E-books through any other E-book retailer."   Section III.D.  This prohibition is vague and susceptible to mischief by enterprising publishers who could easily transform this provision from a shield to a sword.  For example, if Apple were to resist a contractual term pressed by a publisher, the publisher could accuse Apple of refusing the term in "retaliation" to "punish" the publisher for its deal with another e-book retailer.  Apple would then face potential contempt, despite legitimate business justifications for its refusal.  The parallel provision in the publisher consent decrees is limited to retaliation against an e-book retailer for conduct that the publisher defendant was prevented by the decree from limiting or restricting.  *See*, *e.g.*, ECF No. 119 (HarperCollins, Hachette, Simon & Schuster Final Judgments), Section V.D.  Thus, there was some limiting principle tethering the restriction to the conduct at issue.  By contrast, the proposed injunction leaves Apple to speculate helplessly about which of its innumerable business decisions affecting

competitors will expose it to "the threat of judicial punishment." *Schmidt*, 414 U.S. at 476.  Due process and "basic fairness" demand better. *Id.*

The proposed injunction would also prohibit Apple from communicating, directly or indirectly, to any e-book publisher "any non-public competitively sensitive information it learns from any other E-book publisher," including "present" retail prices and a wide variety of other (specified) data and information. *See* Section III.E.  This provision is drafted so broadly that it could prohibit Apple from even listing the price of an e-book (*i.e.*, the present retail price) on the iBookstore.  The publisher consent decrees are tailored to address this problem by providing that publisher defendants are not prohibited from communicating "the cover prices or wholesale or retail prices of books sold in any format to potential purchasers," and by specifying a number of other exceptions.  *See* ECF No. 119, Section V.F.  But no such limitation or exception appears in the proposed injunction, even though "[s]peech in aid of … marketing" is "protected by the Free Speech Clause of the First Amendment." *Sorrell*, 131 S. Ct. at 2659.  Indeed, "permanent injunctions ... are classic examples of prior restraints" that trigger even "greater protection" than subsequent punishment. *Alexander v. United States*, 509 U.S. 544, 550 (1993).  Plaintiffs have not explained how their proposed restriction of commercial speech could withstand such "heightened judicial scrutiny." *Sorrell*, 131 S. Ct. at 2659.

Significantly, both these restrictions would remain in place for ten years, placing Apple at a competitive disadvantage vis-à-vis both its negotiating counterparties (*i.e.*, e-book publishers), as well as other e-book retailers who do not face similar restraints.  At a minimum, these provisions should be reduced to five years, consistent with the publisher decrees, and should be redrafted to conform with the publisher consent decree terms.

## APPLE'S PROPOSED REMEDY

Apple does not believe it violated the antitrust laws, and, in any event, the conduct for

which the Court found it liable has ended and cannot recur as a result of the publishers' consent decrees.  In light of these facts, no further injunction is warranted.  However, if the Court does issue an injunction, its terms should be narrowly tailored to redress the specific conduct this Court found anticompetitive.

A potentially valid injunction could include: (1) reasonable limitations on Apple's ability to share information (akin to the publishers' consent decrees, *see* ECF No. 259 at 12-13; ECF No. 119 at 12-13; ECF No. 174-1 at 11-12); (2) a prohibition, tracking the publishers' consent decrees, on retail price MFNs in agreements with the publisher defendants; and (3) reasonable antitrust training obligations for Apple, lasting a reasonable term.  No further relief can be justified under the legal standard governing antitrust injunctions or the Constitution.

## CONCLUSION

The Court should reject plaintiffs' proposed injunction outright, or in the alternative enter a narrower and more modest injunction that is carefully tailored to the Court's findings, the legal theories and issues in the case, and the evidence admitted at trial.

Dated:  August 2, 2013                              Respectfully submitted,


By:   _____/s/_____
          Orin Snyder
          Lisa H. Rubin
          Gibson, Dunn & Crutcher, LLP
          200 Park Avenue, 47th Floor
          New York, NY  10166
          (212) 351-4000
          osnyder@gibsondunn.com

          Daniel G. Swanson (*Pro Hac Vice*)
          Daniel S. Floyd (*Pro Hac Vice*)
          Gibson, Dunn & Crutcher, LLP
          333 South Grand Avenue
          Los Angeles, CA  90071
          (213) 229-7000

dfloyd@gibsondunn.com

Cynthia Richman (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
Edward N. Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple Inc.*