UNITED STATES DISTRICT COURT
DISTRICT OF NEW YORK
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br> Plaintiff,<br><br>v.<br><br>**APPLE INC., et al**<br><br>**Defendants.** | Case No. 12-cv-2826 (DLC)<br>Judge Denise L. Cote |

**BRIEF AMICUS CURIAE OF CONSUMER FEDERATION OF AMERICA
IN SUPPORT OF THE PLAINTIFF**

Damian R. Cavaleri, Esq.
HOGUET NEWMAN
REGAL & KENNEY, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808
dcavaleri@hnrklaw.com

David A. Balto, Esq.
LAW OFFICES OF DAVID BALTO
1325 G Street NW
Suite 500
Washington D.C. 20005
 (202) 789-5424
david.balto@yahoo.com

Christopher L. Sagers
James A. Thomas Distinguished Professor of Law
Cleveland State University
2121 Euclid Ave., LB 138
Cleveland, OH  44115
c.sagers@csuohio.edu

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

STATEMENT OF AMICUS CURIAE ........................................................................................... 1

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    A.  Full Adoption of the PFJ is Warranted ............................................................................. 3

    B.  The PFJ's Specific Details are Measured and Carefully ................................................... 6

CONCLUSION ............................................................................................................................... 7

## TABLE OF AUTHORITES

**Page**

**Cases**

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) .................................................................................................. 2

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) .................................................................................................... 1

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) ...................................................................................................... 1

*United States v. Int'l Salt Co.*,
   332 U.S. 392 (1947) (abrogated on other grounds). ................................................. 2

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596, 610 (1972)……………………………………………………………1

**Other Authority**

O'Brien, *Apple fires back, calls DOJ e-book remedies 'draconian and punitive'*, THE LOS
   ANGELES TIMES, August 2, 2013, *available at* http://www.latimes.com/business/technology/la-
   fi-tn-apple-calls-doj-ebook-remedies-draconian-and-punitive-20130802,0,1375996.story ....... 2

Paul Sloan, *Meet iTunes Radio, Apple's Long-Awaited Streaming Music Service,* CNET, June
   10, 2013, *available at* http://news.cnet.com/8301-13579_3-57588505-37/meet-itunes-radio-
   apples-long-awaited-streaming-music-service/. ........................................................... 4

## STATEMENT OF AMICUS CURIAE

The Consumer Federation of America (CFA) writes in support of the Justice Department's (DOJ) requested relief in the above referenced matter. CFA is composed of over 280 state and local affiliates representing consumer, senior-citizen, low-income, labor, farm, public power and cooperative organizations. CFA represents consumer interests before federal and state regulatory and legislative agencies, participates in judicial proceedings as amicus curiae, and conducts research and public education. CFA has followed this case closely, having expressed our concerns about e-book pricing to the Senate Judiciary Committee and filed Tunney Act Comments in the consent decrees entered into by the publishers.

CFA was one of the first consumer groups to examine the impact of the Internet on consumers, concluding in a January 1990 paper that it would be a very consumer-friendly and citizen friendly space.[1] Since then, CFA has participated in virtually every major federal regulatory, legislative and judicial proceeding in the U.S. that would significantly impact the ability of the Internet and the digital revolution to promote the consumer Interest and has advanced the consumer view in policy and academic publications.

## INTRODUCTION

The antitrust laws, as the "the Magna Carta of free enterprise," are "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). *See also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984) (*quoting N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4–5 (1958)) ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and

---

[1] Marc Cooper, Expanding the Information Age for the 1990s: A Pragmatic Consumer Analysis, January 11, 1990.

unfettered competition as the rule of trade."). Such laws are denied their proper dignity if violations are met without fitting remedies, especially in a case like this one: in this case, This Court's decision found violation that were egregious and unremorseful. CFA, a leading consumer advocacy group, urges the Court to exercise the broad remedial powers given it by the antitrust laws to adopt in full DOJ's Proposed Final Judgment (PFJ). Although defendant characterizes it as "draconian,"[2] the remedy is not unusual by comparison to prior antitrust remedial orders, and it is appropriate in light of the significance of the violation, the gravity of the consumer harm, and defendant's continued denial—even following this Court's formal findings that its executives willfully disregarded the law and failed to testify honestly—that it has engaged in any wrongdoing.

## ARGUMENT

In antitrust matters, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case," *United States v. Int'l Salt Co.*, 332 U.S. 392, 400-01 (1947) (abrogated on other grounds), and may "fashion appropriate restraints on . . . future activities both to avoid a recurrence of the violation and to eliminate its consequences," *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978). "The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Id.* at 698. In particular, a court may do more than simply prohibit conduct already determined illegal, since a wrongdoer may simply find other paths to the illegal objective.

---

[2] *E.g.*, Chris O'Brien, *Apple fires back, calls DOJ e-book remedies 'draconian and punitive'*, THE LOS ANGELES TIMES, August 2, 2013, *available at* http://www.latimes.com/business/technology/la-fi-tn-apple-calls-doj-ebook-remedies-draconian-and-punitive-20130802,0,1375996.story

Full adoption of the PFJ is within the Court's powers and is appropriate to this case. CFA first offers several specific reasons that strong remedial intervention is appropriate, and second explains why several of the PFJ's specific provisions are needed.

### A. Full Adoption of the PFJ is Warranted

First, the underlying conduct was willful and defendant remains unrepentant.[3] Conduct of a sort often prosecuted criminally was proven to have occurred, and to have been knowingly orchestrated by defendant's highest management[4] and an in-house attorney and other executives with key responsibility for developing Apple's content businesses.[5]

Second, the consumer harm was very substantial and was proven by overwhelming direct evidence. Soon after the release of iBookstore the price of the majority of new and bestselling books rose from $9.99 to the $12.99 and $14.99 price tiers, both in the iBookstore and on other retailers' websites. Within the 5 month period after Publisher Defendants' switch to the agency model, over 92% of new releases and over 99% of bestsellers sold on iBookstore were priced at the negotiated caps. After moving to the agency model, Amazon's prices increased by "14.2% for New Releases, 42.7% for their NYT Bestsellers, and 18.6% across all of the Publisher Defendants' e-books" (Opinion at 94). These price changes cost consumers hundreds of millions

---

[3] Apple has engaged in other willful violations in the past. *See* Edward Moyer, *Steve Jobs threatened Palm with patents over no-poaching deal, says court filing*, C|NET, *available at* http://news.cnet.com/8301-13579_3-57565314-37/steve-jobs-threatened-palm-with-patents-over-no-poaching-deal-says-court-filing/.

[4] Former Apple CEO Steve Jobs admitted to his biographer that Apple had "told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.'" (Opinion at 104) Apple's lead e-books negotiator Eddy Cue stated that "book prices are becoming too low" and that the only way to get "some level of reasonable pricing" "is for the industry to go to the agency model" (Opinion at 42). Apple executive Peter Alcorn observed that the MFN "forc[ed] people off the [A]mazon model and onto ours," PX-0065, at APLEBOOK-00369168, and that "any decent MFN forces the model" (Opinion at 48). Mr. Jobs also wanted publishers to specifically "move Amazon to the agent model . . . for new releases for the first year" (Opinion at 50 n.24). After iBookstore launched Mr. Jobs was asked by a reporter why people would buy a book for $14.99 when the same book was available for $9.99. Mr. Jobs answered "that won't be the case" "the price will be the same" (Opinion at 85).

[5] Apple attorney Kevin Saul, who has had lead responsibilities in developing Apple content businesses, created the MFN, and called it an "elegant solution" to Apple's problem of having to price compete with Amazon (Opinion at 48).

of dollars[6] and caused other consumers to delay e-book purchases or not purchase e-books at all. In fact, Publisher Defendants sold an estimated 13%-15% fewer e-books after switching to the agency model (Opinion at 97). However, the prices of e-books fell substantially once this enforcement action was brought. Moreover, to date some of the publishers have settled claims for damages to consumers for over $200 million. One of the highest damage awards in recent history.

Third, defendant Apple is even now in a position to engage in similar conduct in other developing digital distribution businesses, and will be sorely tempted to use similar strategies or to devise new ones to neutralize competitive threats. Apple is known to have other content distribution projects underway, and executives directly responsible for the conduct in this case have key responsibility in those other lines of business.[7]

As a major influence in high technology markets, Apple is in a position to derail the consumer benefits of the ongoing transition to digital distribution, and to cause serious harms in so doing. Electronic commerce gives buyers of copyrighted content the benefit of comparison shopping from several e-book retailers at once. Electronic commerce also offers distinct advantages to sellers of copyrighted content. Sellers face a much lower cost of doing business because they do not have to print, ship, and place their books in brick-and-mortar stores which have limited display space. Sellers can experiment with new pricing models and receive instantaneous data on the success or failure of sales and different price points.[8] Sellers can also target content to buyers based on their unique preferences. The low entry barriers of the digital

---

[6] The five Publisher Defendants agreed to settlement damages totaling $218,883,000.
[7] *See, e.g.,* Paul Sloan, *Meet iTunes Radio, Apple's Long-Awaited Streaming Music Service,* C|NET, June 10, 2013, *available at* http://news.cnet.com/8301-13579_3-57588505-37/meet-itunes-radio-apples-long-awaited-streaming-music-service/ (noting that Apple's new streaming music service was unveiled to the press shortly before trial began in this case, and indicating that an Apple official with chief responsibility for developing it was Eddy Cue).
[8] The digital platform has spawned several new models of distribution of copyrighted works. Examples include subscription models for movies and music, personalized radio stations, and major online retailers allowing creators to self-publish.

platform, assuming competition is allowed to proceed, foster innovation in the price and service that retailers provide their customers.

Indeed, the present technological transition, like others throughout history, has the potential for substantially reorganized institutions and business models that would be of great social value. However, market participants like Apple have strong incentives to thwart it if they can.  The chief effect of technological improvements in healthy markets is that cost savings in production and distribution are competed away and enjoyed as consumer savings. For example, consumers could benefit substantially from disintermediation in content markets and cannibalization of the revenues earned from traditional media. (*Cf.* Opinion at 15-16.) Disintermediation could increase consumer choice and lower prices, and the threat of disintermediation would encourage traditional intermediaries to innovate in their products and delivery models. For example, major online retailers have already allowed self-publishing in music[9] and video games.

Finally, failure to take strong remedial steps in a case involving egregious conduct would send a very bad message to the business community and the public. This trial received prominent press attention and was the focus of much public discussion. Anything less than a comprehensive remedy could signal that antitrust compliance can be an afterthought and that antitrust penalties are merely a cost of doing business. Such a result would increase costs to consumers who are already suffering from a weak economy and would strike a blow to confidence in the protections of law.

---

[9] Generally through music aggregation companies.

### B. The PFJ's Specific Details Are Measured and Carefully Tailored

The DOJ's PFJ is a reasonable and measured method to remedy the conduct challenged in this case and similar conduct that could reasonably be expected from defendant Apple in coming years.

For the most part, the PFJ is straightforward and uncontroversial, as most of its substantive terms—like the specific bans on conduct found to have been illegal at trial, the ban on relaying information among publishers, and the appointment of independent internal and external monitors—are like those common in most antitrust remedial orders, especially for a defendant that orchestrated a naked horizontal price-fixing conspiracy and caused hundreds of millions of dollars in consumer injury.

CFA highlights here certain specific aspects of the proposed remedy which we believe are vital to restoring competition in e-books and preventing harm in similar markets.

First, certain provisions retain the Court's jurisdiction to examine conduct in content distribution markets other than e-books. As mentioned Apple is currently developing content distribution businesses, including streaming music and video, that raise problems similar to those in the distribution of e-books. It is critical therefore that Section III.F prohibits agreements that likely affect prices charged by third party retailers, and various provisions of Part VI empower the External Compliance Monitor to review Apple's business more generally and its antitrust compliance program.

Second, Sections IV.B. and IV.C. of the PFJ attempt to restore the critical role of price shopping. Section IV.B requires Apple to permit e-book rivals to continue to offer their apps through Apple's App Store, and to update those apps, on terms and conditions no worse than Apple offers to any other app developer. Section IV.C requires Apple, for two years, to permit

any e-book retailer to include in its e-book app a hyperlink to its own e-bookstore, without paying any fee or commission to Apple. Apple used to allow such hyperlinking so this measure is largely a return to pre-conspiracy terms. Section IV.C's fee and commission restrictions will also serve as a prophylactic measure to prevent Apple from surreptitiously interfering with e-book pricing. These provisions are important because of the strength of Apple's iOS platform. In the quarter ending June 2013 Apple claimed 42% of all smartphone sales and 32% of all tablet sales, despite many consumers holding out for the newest versions of Apple's products.[10] Both of these provisions are essential for e-book rivals to compete and offer consumers a choice on Apple's traditionally closed platform.

Finally, the PFJ's requirements for independent internal and external monitors are crucial in light of Apple's willful violation and pervasive disregard of the antitrust laws. The Court found Apple witnesses' testimony to be "brazen" (Opinion at 84 n.47) and "noteworthy" for its "lack of credibility" (Opinion at 143 n.66). Apple's own internal counsel was involved in some of the wrongful conduct and Apple's antitrust compliance program was clearly lacking. Horizontal price fixing is a textbook *per se* violation and well known in antitrust law to be illegal. Mr. Jobs' public comments demonstrate either lack of knowledge or disregard for basic antitrust principles at Apple's highest level of management. Therefore, internal and external monitoring is necessary to assure that this or other forms of illegal conduct do not recur and are not uncommon in cases this strong with this level of willful conduct.

## CONCLUSION

The antitrust violations in the case are egregious and caused substantial harm to consumers. The PFJ is a careful and focused remedy that will alleviate the harm caused by its

---

[10] Apple traditionally releases new versions of the iPad and iPhone every year during the holiday quarter.

anticompetitive scheme. The remedies outlined in the PFJ are a reasonable method of eliminating the consequences of Apple's illegal conduct.

Dated: August 8, 2013

                                                Respectfully submitted,

                                                    /s/ Damian R. Cavaleri, Esq.
Damian R. Cavaleri, Esq. (DC 2558)
HOGUET NEWMAN
REGAL & KENNEY
10 East 40th Street
New York, New York 10016
(212) 689-8808
dcavaleri@hnrklaw.com

David A. Balto, Esq.
LAW OFFICES OF DAVID BALTO
1325 G Street NW
Suite 500
Washington D.C. 20005
(202) 789-5424
david.balto@yahoo.com

Christopher L. Sagers
James A. Thomas Distinguished Professor of Law
Cleveland State University
2121 Euclid Ave., LB 138
Cleveland, OH  44115
c.sagers@csuohio.edu

*Counsel for Amicus Curiae*