# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-cv-2826 (DLC) |
| ) | |
| APPLE, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

| | |
|---|---|
| _____ ) | |
| THE STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 12-cv-03394 (DLC) |
| ) | |
| PENGUIN GROUP (USA) INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' REVISED PROPOSED INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

I.     PLAINTIFFS' MODIFICATIONS TO THE PROPOSED INJUNCTION ADDRESS
       CONCERNS RAISED BY THE COURT AND APPLE .................................................... 3

II.    AN EXTERNAL MONITOR IS REQUIRED ................................................................... 5

III.   REQUIRING APPLE TO ALLOW E-BOOK RETAILERS TO PROVIDE
       HYPERLINKS TO THEIR WEBSITES WITHOUT COMPENSATING APPLE IS
       NECESSARY FOR RESTORING PRICE COMPETITION............................................. 8

IV.    PROVISIONS IN SECTIONS III.F AND III.G PROHIBITING APPLE FROM
       REPEATING ITS ILLEGAL CONDUCT ARE APPROPRIATE ................................. 11

CONCLUSION........................................................................................................................ 12

The United States of America and the Plaintiff States (collectively, "Plaintiffs") respectfully submit this memorandum in support of their revised proposed injunction.  (A copy of Plaintiffs' revised proposed injunction is attached to the Declaration of Lawrence E. Buterman in Support of Plaintiffs' Revised Proposed Injunction ("Buterman Declaration") as Exhibit 1; a redline comparing it to Plaintiffs' initial proposed injunction is attached as Buterman Declaration Exhibit 2).

## INTRODUCTION

This Court found that key executives at Apple, with the knowledge and support of their in-house counsel, orchestrated a blatant price-fixing conspiracy to raise e-book prices and end retail e-book price competition.  Despite having been found liable and not credible under oath, Apple, its executives and its counsel, continue to assert they did nothing wrong.  (Aug. 9, 2013 Tr. ("Tr.") at 63-64, 66).  They resist proposed changes intended to strengthen their internal compliance processes, refuse to undertake basic efforts aimed at restoring price competition in the marketplace, and even decline to commit to not repeating their anticompetitive practices in other content markets.  Quite simply, Apple wants to continue business as usual, regardless of the antitrust laws.  Under these circumstances, this Court should have no confidence that Apple on its own effectively can ensure that its illegal conduct will not be repeated.  There must be significant oversight by someone not entrenched in Apple's culture of insensitivity to basic tenets of antitrust law.

In response to the Court's instruction that the parties meet and confer in an attempt to arrive at a mutually-acceptable injunction, Apple proposed to Plaintiffs a series of terms that impose virtually no limitations on the company's conduct beyond those already in place through the Publisher Defendants' settlements.  In fact, in several respects, Apple's post-trial proposed

injunction is *less* restrictive than the injunctions agreed to by the Publisher Defendants as part of their pre-trial settlements.

Plaintiffs appreciate the Court's concern that the e-books market is rapidly evolving and that an injunction against Apple should avoid unnecessarily hindering that process, and require no more than is necessary to protect consumers and encourage price competition.  (Tr. at 66).  Thus, Plaintiffs have proposed a significant modification to their initial injunction proposal— cutting the length of the proposed injunction from ten years to five years.  Through this revision, Plaintiffs seek to limit the possibility that changes in industry circumstances will cause the decree to outlive its usefulness and unnecessarily harm Apple.  At the same time, Plaintiffs propose retaining the ability to seek a limited number of one-year extensions should circumstances make continuation of the decree necessary.  In addition to shortening the length of the Final Judgment, Plaintiffs also have modified the proposed injunction to require the staggered renegotiation of the Publisher Defendants' contracts in the manner suggested by the Court—hopefully minimizing the possibility of future collusion.  And, Plaintiffs have removed other language from the initial proposed injunction that Apple contends affect its ability to effectively run its App Store.

Beyond explaining Plaintiffs' proposed modifications to the injunction (*see* Section I), this submission focuses on what Plaintiffs believe are the three major points of contention between the parties:  the requirement of an external monitor to ensure full compliance with the Final Judgment (*see* Section II); the requirement that Apple allow e-book retailers to provide links to their websites without compensating Apple in order to restore price competition (*see* Section III); and the inclusion of provisions prohibiting Apple from engaging in similar anticompetitive conduct in other content markets (*see* Section IV).  As set forth below, after

extensive discussions with Apple, Plaintiffs still believe these provisions are appropriate and necessary to curing the effects of Apple's illegal conduct and ensuring that that conduct not be repeated.

## I.   PLAINTIFFS' MODIFICATIONS TO THE PROPOSED INJUNCTION ADDRESS CONCERNS RAISED BY THE COURT AND APPLE

During the August 9 conference, the Court made clear that an injunction against Apple is necessary in light of the blatant price fixing that Apple engaged in, and the harm the conspiracy caused to consumers through increased prices and destruction of competition.  (Tr. 53, 63-64). While the Court noted that the injunction need not be limited to proscribing against the precise conspiratorial conduct (Tr. 50), it stated that it wanted to fashion a remedy that would as narrowly as possible create, restore and promote price competition in the e-books market (Tr. at 61).  The Court further observed that the publishing industry is changing rapidly, and that an injunction in this case should not limit innovation or keep the market from developing.  (*See, e.g.*, Tr. 53, 66).

Plaintiffs' initial proposed injunction sought to limit intrusion on Apple's lawful business operations while still accomplishing the required remedial objectives.  Based on the views expressed by the Court, Plaintiffs have further tapered the requested relief to ensure that the injunction does not impede Apple's ability to compete vigorously.  Specifically, Plaintiffs have changed the initial term of the injunction from ten years to five years.  To be clear, Plaintiffs dispute any notion that provisions limiting improper conduct or requiring antitrust compliance are unnecessarily invasive or harmful to competition.  Nonetheless, by shortening the length of the applicability of those provisions, Plaintiffs ensure that Apple will not be "locked in" for an extended time to a set of terms of which changes in the industry could alter the import.

At the same time, however, Plaintiffs are cognizant that five years might not be enough time to restore competition to the e-books market and to ensure that Apple changes its troublesome business practices to prevent a recurrence of the illegal conduct.  Thus, Plaintiffs propose to retain the right to seek one-year extensions of the injunction if circumstances require them.  The granting of an extension would be at the sole discretion of the Court, and Apple would be free to argue why it believes an extension is unwarranted.  Plaintiffs would have the ability to seek up to five one-year extensions.  (We note that the decree in the *Microsoft* case likewise was for five years with a provision allowing the court to extend it.  *See* Final Judgment, *United States v. Microsoft Corp.*, No. 98-1232 (Docket No. 746) at 15 (D.D.C. Nov. 12, 2002)).[1] By conditioning the length of the injunction on Apple's conduct during the initial term, Plaintiffs are incentivizing Apple to comply fully with the Final Judgment, while at the same time providing a built-in remedy if Apple does not.

In addition to this significant modification, Plaintiffs have adopted the staggered negotiation proposal made by the Court during the conference.  (Tr. at 65).  Section III.C of the revised proposed injunction lays out a timetable for the renegotiation of the Publisher Defendants' contracts with Apple, with the order generally reflecting the sequence in which the Publisher Defendants settled with Plaintiffs.  Plaintiffs agree with the Court that staggering the negotiations helps ensure that the Publisher Defendants will not be able to "negotiate collectively" with Apple in order to effectuate contracts that will result in higher e-book prices.

Finally, there are several minor language changes, reflected in Exhibit 2, that Plaintiffs have made in order to address concerns raised by Apple during the meet and confer process. One noteworthy change involves the language of Section IV.B of the injunction, requiring that

---

[1] A copy of the Final Judgment in *United States v. Microsoft Corp.* was attached as Exhibit 3 to Plaintiffs' Memorandum of Law in Support of Proposed Injunction (Docket No. 329, Aug. 2, 2013).

"[f]or any E-book App that any Person offered to consumers through Apple's App Store as of July 10, 2013, Apple shall continue to permit such Person to offer that E-book App, or updates to that E-book App, on the same terms and conditions between Apple and such Person or on terms and conditions that are more favorable to such Person."  As Plaintiffs understand it, Apple believes that the phrase "on the same terms and conditions between Apple and such Person or on terms and conditions that are more favorable to such Person" effectively "regulates" what Apple may do with the entire App Store, and thus hampers Apple's ability to effectively manage its App Store.  While Plaintiffs disagree that requiring Apple to not discriminate against e-book apps—as it has done in the past—would hamper Apple's lawful App Store activities, Plaintiffs nonetheless have removed the clause from the revised proposed injunction.  Plaintiffs believe that adopting such a change will not unduly compromise the necessary relief.

## II.    AN EXTERNAL MONITOR IS REQUIRED

During the August 9 conference, the Court stated its preference "that Apple adopt a vigorous in-house antitrust enforcement program and convince the plaintiffs, and this Court, that there is no need for a monitor."  (Tr. at 66).  The Court noted that Apple had not made any such showing, and that there was no indication that Apple recognized the severity of its actions or was undertaking institutional reforms to ensure its executives would never again engage in such willful and blatant violations of the law.  (Tr. at 66).  Our recent communications with Apple reinforce Plaintiffs' concern that Apple's in-house enforcement program will be insufficient to change the corporate culture, and that the company cannot be left to solely police itself.

The Court's findings in this case are persuasive that Apple's existing internal compliance program is inadequate.  Serious violations of the antitrust laws occurred at Apple while its current program was in effect, and they were orchestrated by key executives and even a member

of Apple's legal team.  In our prior submission, Plaintiffs attached the deposition testimony of

Apple's counsel, Mr. Saul, who testified to being unable to recall having received any form of

general or specific antitrust training.  *See* Pls.' Mem. of Law in Supp. of Proposed Inj. (Docket

No. 329) at 16 & Ex. 4.  Likewise, Mr. Cue, the ringmaster of the price-fixing conspiracy,

testified at his deposition that he was unsure whether he ever received Apple's Antitrust and

Competition Law Policy, and whether he took annual training.  Cue Dep., at 13:3-23 (Buterman

Declaration Exhibit 3).  Effective antitrust compliance requires corporate executives who know

legal boundaries; it needs to empower lawyers with the ability to say "no" to bad behavior, even

if proposed by senior executives; and it obligates employees to tell the truth and to confess error

when bad behavior occurs.  Apple fails all of these fundamentals.

   The past is prologue.  While Apple asserts it has "enhanced" its antitrust compliance

program "with a special antitrust legal department," Apple Inc.'s Mem. of Law in Resp. to Pl.

United States' Proposed Final J. & Pl. States' Proposed Order Entering Permanent Inj. (Docket

No. 330) at 10, the reality is that Apple has merely enhanced its capabilities in defending

litigation against antitrust violations.  Rather than tasking its experienced antitrust counsel with

focusing on actual antitrust compliance, Apple directed that counsel to supervise Apple's legal

defense in this matter, *e.g.*,:  to work directly with Apple's outside litigation counsel, to

contribute to Apple's brief-writing and strategic decisions, to assist in defending depositions of

Apple employees, and generally to champion against any insinuation that Apple may have

violated the antitrust laws.  Plaintiffs and this Court should be legitimately skeptical that Apple's

stated key modification to its internal compliance program going forward, the hiring of two

additional former government litigators, will significantly affect antitrust compliance.

This Court found that the conspiracy was hatched and carried out at the highest levels of Apple, by individuals running the company and shaping its identity.  They violated the antitrust laws not in secret, but in plain sight of Apple's internal lawyers—who were either unwilling or unable to stop the illegal conduct.  Almost all of these executives are still at Apple, in positions of *increased* authority.  It is simply unreasonable to assume that an internal compliance lawyer, entrenched in that culture and beholden to those executives for his or her position and remuneration, will alone be able to effectuate the necessary changes.

Raising further concerns regarding Apple's commitment to antitrust compliance is that Apple's initial revisions to the proposed injunction wholly gutted the internal compliance provisions put forth by Plaintiffs.  Even after extensive discussions, Apple continues to resist basic tenets of an effective internal antitrust compliance program, including:  making sure that its internal compliance officer not be a current employee rooted in Apple's existing culture of non-compliance (§ V); establishing a mandatory minimum for employees of just four hours of training on the requirements of the Final Judgment and antitrust compliance (§ V.C); and requiring that Apple log potentially improper communications with competitors or e-book publishers (§ V.I).  Many of these provisions appear almost identically in the Publisher Defendants' decrees, as well as in any number of Final Judgments in cases brought by the Department of Justice.

Finally, given Apple's unwillingness to appreciate that its conduct violated the antitrust laws and harmed consumers, it is difficult to understand how leaving it to the company to solely police itself going forward will remedy its antitrust violations and deter future ones.  "When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of anti-trust laws, courts will not assume that it has been abandoned without clear

proof." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). Apple has not offered any such proof here. As this Court noted, "[t]here is no admission of wrongdoing. There is no contrition. There is no showing of any awareness of illegality or the danger of collusion by publisher defendants to raise eBook prices. There is no showing of institutional reforms to ensure that its executives will never engage again in such willful and blatant violations of the law." (Tr. at 66). That stance continues to this day.

While Apple argues that an external monitor would be "extremely costly and burdensome" (Docket No. 330 at 12), Plaintiffs respectfully submit that failing to appoint a monitor will prove extremely costly to consumers and the marketplace. Nonetheless, any costs and burdens on Apple have been significantly lessened by Plaintiffs' proposed modification to the length of the injunction.

III.   **REQUIRING APPLE TO ALLOW E-BOOK RETAILERS TO PROVIDE HYPERLINKS TO THEIR WEBSITES WITHOUT COMPENSATING APPLE IS NECESSARY FOR RESTORING PRICE COMPETITION**

Section IV.C of Plaintiffs' proposed injunction contains a provision requiring Apple, for two years only, to permit any e-book retailer to include in its e-book app a hyperlink to its own e-bookstore, without paying any fee or commission to Apple. This provision requires Apple to return to its pre-conspiracy policy of providing other retailers, like Amazon, Barnes & Noble and Kobo, a simple, costless means for readers to purchase e-books from those retailers. The provision is intended, and is necessary, to restore and protect retail e-book price competition— key goals of injunctive relief in an antitrust case.

During the August 9 conference, Apple's counsel argued that the provision should not be adopted because it was "absurd" to suggest that Apple had changed its apps policy to discriminate against e-book retailers. (Tr. at 60). Counsel further argued that the provision

should be rejected because, *inter alia*, Apple has an "in app purchase rule, which uniformly applies across the board" under which Apple gets a 30 percent commission on all goods sold. (Tr. at 60-61 ("Apple's policies that regulate the app store, [are] uniformly[] applicable to each and every one of the 850,000 apps in its store, from Amazon's apps, to Zappos.com's apps, to Kobo's apps.")). As Apple's counsel told the Court, "[o]ur view is that if there is a hyperlink in Amazon.com, to a particular book, we get from a defendant publisher, we get 30 percent. The same way if there is a hyperlink to buy shoes, we get 30 percent across the board." (Tr. at 62).

These statements are incorrect. Apple misrepresented the factual circumstances surrounding this matter, including how the App Store operated and operates. It simply is not true that Apple receives a 30 percent commission from all retailers for all goods sold through apps. To use Apple's counsel's own examples, one can buy shoes today on an iPad using a Zappos app. *See* Zappos.com, Zappos App for iPad® Mobile Device, http://www.zappos.com/zappos-ipad-app (containing a description of Zappos's iPad app) (Buterman Declaration Exhibit 4). Similarly, one can buy countless goods on an iPad, including physical books, directly from an Amazon.com app. *See* screenshot from Amazon's iPad app (Buterman Declaration Exhibit 5). In both of those situations, the purchases do not go through Apple's payment system, and Apple does not receive a 30 percent commission on these physical goods. *See* Apple Inc., Getting Started with In-App Purchase on iOS and OS X, https://developer.apple.com/in-app-purchase/In-App-Purchase-Guidelines.pdf at 2 (Buterman Declaration Exhibit 6) (Apple's in-app purchase guidelines, specifying that when app developers employ in-app purchasing, "You receive 70% of the purchase price of each item you sell within your app, paid to you on a monthly basis – no credit card fees apply." However, "You must deliver your digital good or service within your app. Do not use In-App Purchase to sell real-world goods and services.").

This is the same way that e-books were sold prior to 2011—with e-book sales being made outside the app.  However, in 2011, Apple specifically modified its App Store Review Guidelines to add a provision that precluded digital book sellers from linking to their websites for purchasing purposes.[2]  *See* APLEBOOK-03306618, at 11.13 ("Apps that link to external mechanisms for purchases or subscriptions to be used in the app, such as a 'buy' button that goes to a web site to purchase a digital book, will be rejected") (Buterman Declaration Exhibit 9).[3] This change left e-book retailers with only one option if they wanted to continue selling e-books through their apps:  use Apple's in-app purchase system and give Apple a 30 percent commission on each book sold.  Contrary to Apple's statement, this policy change was instituted specifically to retaliate against Amazon for competitive conduct that Apple disapproved of.  *See* APLEBOOK-03345725; APLEBOOK-03345727; APLEBOOK-03345975 (Buterman Declaration Exhibit 11).  In the words of Apple's founder, "we didn't have a policy and now we do."  APLEBOOK-03345975.  Mr. Cue testified to the change at trial.  Cue Test., Trial Tr. 2029:3-21.

As Plaintiffs noted previously, the effect of Apple's change, which was to make it more difficult for consumers using Apple devices to compare e-book prices among different retailers, and for consumers to purchase e-books from other retailers on Apple's devices.  Allowing e-book retailers to include these costless hyperlinks, for a limited two-year period, is not a regulation of the App Store.  Indeed, effectuating the provision requires Apple to make no

---

[2] Initially, Apple announced a change to its terms to mandate that if an app allowed customers the ability to purchase books outside of the app, "that the same option is also available to customers from within the app with in-app purchase."  *See* Claire Cain Miller & Miguel Helft, *Apple Moves to Tighten Control of App Store*, N.Y. Times, Feb. 1, 2011(Buterman Declaration Exhibit 7).  However, after receiving pushback, Apple modified its position to outright ban links.  *See* David Carnoy, *What Apple's Latest Rules Change Means for Kindle, Nook, and Kobo E-reader Apps*, CNET Reviews, June 9, 2011 (Buterman Declaration Exhibit 8).

[3] An October 2010 version of Apple's App Store Review Guidelines contains no comparable provision.  *See* APLEBOOK-03322259 (Buterman Declaration Exhibit 10).

change whatsoever to its iBookstore or App Store.  However, returning to the pre-conspiracy policy will result in greater price transparency, and keep Apple from continuing to reap profits from its collusive behavior.  As the Supreme Court has noted, curing the ill effects of illegal conduct is a purpose of relief in an antitrust case, *see U.S. v. Glaxo Group Ltd*, 410 U.S. 52, 64 (1973), and Plaintiffs submit that this is a key provision to repair the harm to competition caused by Apple.

## IV.   PROVISIONS IN SECTIONS III.F AND III.G PROHIBITING APPLE FROM REPEATING ITS ILLEGAL CONDUCT ARE APPROPRIATE

Mr. Cue, found by this Court to have orchestrated this conspiracy and to have failed to testify credibly at trial, runs all of Apple's content businesses.  According to his trial testimony, he negotiates deals in those markets in the same manner he did the e-books deals.  Cue Test., Trial Tr. 1761:10-21, 1776:15-1777:8.  And, he believes firmly that his e-books conduct in all respects has been appropriate.  Under these circumstances, Section III.F of Plaintiffs' proposed injunction, which prohibits Apple from entering agreements, for any type of content, that are likely to fix the prices at which other retailers can sell or acquire that content, is both necessary and prudent to prevent future violations of the antitrust laws.[4]  *See generally U.S. v. U.S. Gypsum Co.*, 340 U.S. 76, 90-91 (1950) (upholding "extension of the decree to include all gypsum products instead of patented gypsum board alone" and "enlargement of the geographical scope of the decree to include all interstate commerce"); *U.S. v. Capitol Serv., Inc.*, 756 F.2d 502, 506-07 (7th Cir. 1985) (upholding nationwide injunction where "the complaint, discovery, and trial were all limited to the Milwaukee market"); *see also Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 698 (1978) (court is not limited to imposing "a simple proscription against the precise conduct previously pursued").

---

[4] The fact that Apple protests this provision reasonably leads to concerns regarding what Apple is doing, and plans to do, in those other content markets, like music and television.

As for Section III.G, that provision, which prohibits Apple from agreeing to fix e-book prices with other e-book retailers or otherwise set the terms on which retailers sell e-books, is intended to prohibit Apple from engaging in conduct that Mr. Cue admitted under oath he already proposed Apple to consider.  Cue Test., Trial Tr. 1719:13-24; Pls.' Ex. PX-0027. Apple's refusal to agree to this proscription on its conduct is particularly troublesome in light of the fact that Apple also has objected to having to log communications with its retail competitors—making detection by Plaintiffs of any potential collusion more difficult.

## CONCLUSION

For the aforementioned reasons, and those set forth in Plaintiffs' August 2 memorandum, Plaintiffs respectfully request that the Court enter an injunction against Apple as set forth in Exhibit 1.


Dated:  August 23, 2013


                              Respectfully submitted,


                              _____

                              Mark W. Ryan
                              Lawrence E. Buterman
                              Stephen T. Fairchild
                              Adam C. Speegle
                              United States Department of Justice
                              Antitrust Division
                              450 Fifth Street, NW, Suite 4000
                              Washington, DC 20530
                              (202) 532-4753
                              Mark.W.Ryan@usdoj.gov

                              *On Behalf of the United States of America*

Gabriel Gervey
Eric Lipman
David Ashton
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711
(512) 463-1262
Gabriel.Gervey@texasattorneygeneral.gov

W. Joseph Nielsen
Gary M. Becker
Assistant Attorneys General
Office of the Attorney General of
Connecticut
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov

*On Behalf of the Plaintiff States*

13