**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

UNITED STATES OF AMERICA,       :

          Plaintiff,      :

                            :

     v.                  :       12 Civ. 2826 (DLC)

APPLE INC.,                :

          Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

THE STATE OF TEXAS,      :
THE STATE OF CONNECTICUT, *et al.*,  :

          Plaintiffs,     :

     v.                  :       12 Civ. 3394 (DLC)

PENGUIN GROUP (USA) INC., *et al.*,  :

          Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT APPLE INC.'S OBJECTIONS**
**TO THE COURT'S ORDER FILED ON NOVEMBER 21, 2013**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

OBJECTIONS ..................................................................................................... 3

I.     The Court Lacks Jurisdiction to Modify the Injunction During Apple's Appeal ................................................................................................ 3

II.    The Modifications to the Injunction Are Not Authorized by Rule 53 and Violate the Separation of Powers, Which Is Highlighted by Mr. Bromwich's Conduct to Date .................................................................. 5

        A.    The Court's Proposed Amendments Are Not Authorized by Rule 53 and Would Violate the Separation of Powers ........................................ 5

        B.    Mr. Bromwich Has Already Exceeded His Authority ............................. 10

III.   The Court Cannot Simultaneously Receive *Ex Parte* Reports from the Monitor and Preside Over the Pending Damages Trial and Putative Class Action .................................................................................................. 15

IV.   The Court's Proposed Order Deprives Apple of Its Right to a "Disinterested Prosecutor" ........................................................................ 20

        A.    The Monitor's Personal Financial Interest in the Proceedings Is Unconstitutional .................................................................................... 20

        B.    Mr. Bromwich's Excessive Fees, Which He Refuses to Justify as Either Reasonable or Customary, Violate the Final Judgment ................. 22

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benjamin v. Fraser*,
    343 F.3d 35 (2d Cir. 2003) ................................................................. 7

*Bloom v. Illinois*,
    391 U.S. 194 (1968).......................................................................... 10

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978).......................................................................... 23

*Buckley v. Valeo,*
    424 U.S. 1 (1976)............................................................................. 11

*Caperton v. A.T. Massey Coal Co.*,
    556 U.S. 868 (2009)...................................................................... 21, 25

*City of N.Y. v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011) ............................................................... 8

*Cobell v. Norton*,
    334 F.3d 1128 (D.C. Cir. 2003)............................................... 7, 9, 11, 12

*Diamondstone v. Macaluso*,
    148 F.3d 113 (2d Cir. 1998) ............................................................. 20

*Griggs v. Provident Consumer Disc. Co.*,
    459 U.S. 56 (1982)............................................................................ 3

*Heckler v. Chaney*,
    470 U.S. 821 (1985).......................................................................... 10

*Ideal Toy Corp. v. Sayco Doll Corp.*,
    302 F.2d 623 (2d Cir. 1962) ............................................................... 4

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004) ................................................... 19, 20, 21

*In re Murchison*,
    349 U.S. 133 (1955).......................................................................... 25

*In re Peterson*,
    253 U.S. 300 (1920)........................................................................... 6

*Int'l Ass'n of Machinists v. E. Airlines, Inc.*,
    847 F.2d 1014 (2d Cir. 1988) ........................................................... 3, 4

## TABLE OF AUTHORITIES *(cont.)*

**Page(s)**

*Juan F. v. Weicker*,
   37 F.3d 874 (2d Cir. 1994) ................................................................. 6, 8

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
   925 F.2d 556 (2d Cir. 1991) ................................................................. 4

*La Buy v. Howes Leather Co.*,
   352 U.S. 249 (1957).............................................................................. 5, 7

*Leonhard v. United States*,
   633 F.2d 599 (2d Cir. 1980) ................................................................. 4

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) .............................................................................. 4

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980)............................................................................... 23

*Missouri v. Jenkins*,
   515 U.S. 70 (1995)................................................................................ 11

*Mistretta v. United States*,
   488 U.S. 361 (1989)............................................................................... 9

*Morrison v. Olson*,
   487 U.S. 654 (1988)............................................................................... 10

*Muskrat v. United States*,
   219 U.S. 346 (1911)............................................................................... 10

*N.Y. State Ass'n for Retarded Children Inc. v. Carey*,
   706 F.2d 956 (2d Cir. 1983) ................................................................. 8

*Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*,
   337 U.S. 582 (1949)............................................................................... 9

*People ex rel. Clancy v. Superior Court*,
   39 Cal. 3d 740 (1986) .......................................................................... 24

*Plaut v. Spendthrift, Inc.*,
   514 U.S. 211 (1995)............................................................................... 12

*Reed v. Rhodes*,
   691 F.2d 266 (6th Cir. 1982) ............................................................... 7

*Sierra Club v. U.S. Army Corps of Engineers*,
   701 F.2d 1011, 1048 (2d Cir. 1983) ..................................................... 9

**TABLE OF AUTHORITIES** *(cont.)*

**Page(s)**

*Tumey v. Ohio*,
   273 U.S. 510, 532 (1927)..............................................................................................25

*United States v. AT&T*,
   552 F. Supp. 131 (D.D.C. 1982) ................................................................................13

*United States v. ITT Cont'l Baking Co.*,
   420 U.S. 223 (1975)......................................................................................................8

*United States v. Nixon*,
   418 U.S. 683 (1974)....................................................................................................11

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009)...................................................................................7

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987)...............................................................................2, 9, 23, 24, 25

**Constitution**

U.S. Const. Art. III § 1...................................................................................................7

**Statutes**

28 U.S.C. § 455(a) ........................................................................................................20

**Other Authorities**

2 The Records of the Federal Convention of 1787 (Max Farrand, ed., 1911) ...............9

Code of Conduct for United States Judges, Canon 3(A)(4).........................................20

Fed. R. Civ. P. 53 Advisory Committee's Note.....................................................18, 19

Goodwin Proctor Press Release, Oct. 18, 2013, *available at*
   http://www.goodwinprocter.com/News/Press-Releases/2013/10_18_13_Goodwin-
   Partner-Michael-R-Bromwich-Appointed-Antitrust-Monitor-for-Apple.aspx.........27

Robert Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual
   Conference of the United States Attorneys (Apr. 1, 1940).........................................24

The Federalist No. 78 (A. Hamilton) (J. Cooke ed. 1961)...........................................10

Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor: The New
   Corporate Czar?*, 105 Mich. L. Rev. 1713, 1716 (2007) ...........................................8

## <u>TABLE OF AUTHORITIES</u> *(cont.)*

**<u>Page(s)</u>**

**Rules**

Fed. R. Civ. P. 53 ................................................................................................................. 1, 5, 7

Fed. R. Civ. P. 53(a) ............................................................................................................... 5, 6

Fed. R. Civ. P. 53(a)(1) ............................................................................................................... 8

Fed. R. Civ. P. 53(a)(1)(A) ......................................................................................................... 6

Fed. R. Civ. P. 53(a)(1)(C) .................................................................................................... 6, 15

Fed. R. Civ. P. Rule 65(d) ........................................................................................................... 7

## INTRODUCTION

Michael Bromwich is already operating in an unfettered and inappropriate manner, outside the scope of the Final Judgment, admittedly based on secret communications with the Court, and trampling Apple's rights; the Court's proposal out of the blue to grant him even greater powers as monitor would only make things worse. Since his appointment, Mr. Bromwich has run far afield from his mandate and informed Apple that his fee structure is designed to "generate profits" for himself and the law firm he has retained to make up for the antitrust experience he lacks. The $1,100 hourly rate he proposes for himself and the $1,025 rate for his legal support system are higher than Apple has ever encountered for any task—and he insists on adding a 15% markup on top of that. Apple does not know what prompted the Court's proposed amendments to the Final Judgment but objects for the following reasons:

*First*, the Court lacks jurisdiction to substantively amend the September 5 Final Judgment during the pendency of Apple's appeal. The proposed amendments would authorize the monitor to interview Apple's personnel without counsel and to report the substance of those interviews to the Court *ex parte*—neither of which is allowed by the Final Judgment. The proposed amendments therefore would impermissibly expand the scope of the monitorship beyond what is set forth in the Final Judgment.

*Second*, because the additional authority conferred by the proposed amendments is not "judicial" in nature, the amendments would exceed this Court's authority under Federal Rule of Civil Procedure 53 and the constitutional separation of powers. To make matters worse, Mr. Bromwich has already exceeded in multiple ways the mandate this Court originally afforded him—pressing for immediate interviews with the very top executives at the company, such as CEO Tim Cook, and including others who have nothing whatsoever to do with the day-to-day

operation of the business unit at issue—including lead designer Jony Ive and board member Al Gore—even before the 90-day deadline for Apple's compliance has run.  *See* Boutrous Decl. Exs. A at 2, B at 4.  Mr. Bromwich's unreasonable investigation to date has been anything but "judicial," and the Court cannot constitutionally further augment his mandate.

*Third*, the proposed amendments would unfairly prejudice Apple's defense in the ongoing *parens patriae* and class action damages actions by giving the presiding judge access to *ex parte* oral briefings regarding *ex parte* interviews with Apple personnel and potentially revealing privileged, confidential, and irrelevant information about Apple to the Court, and even the plaintiffs and the public.  Such *ex parte* communications would certainly lead a reasonable observer to question the impartiality of these proceedings, and could be potential grounds for judicial disqualification in this case and the pending damages trial.

*Fourth*, it is unconstitutional for Apple to be investigated by an individual whose personal financial interest is for as broad and lengthy an investigation as possible.  Mr. Bromwich's extraordinary fee demand has already generated nearly 75% of a yearly judicial salary (almost $140,000) over the course of only two weeks, and he has refused to propose any sort of budget going forward.  Other than to emphasize his need to "generate profits," he has refused to justify this approach by past billing practices in this area, even though the Final Judgment expressly limits his fees to what is "reasonable and customary."  Due process "requires a disinterested prosecutor with the unique responsibility to serve the public … and to seek justice that is unfettered."  *Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 814–15 (1987) (Blackmun, J., concurring).  The proposed amendments would violate this important right.

Apple has diligently accommodated Mr. Bromwich's premature and inappropriate demands (*see* Boutrous Decl. Exs. C, D), but it has become clear over the past six weeks that Mr.

Bromwich views himself as an independent investigator whose role is to interrogate Apple personnel about matters unrelated to the injunction in an effort to ferret out any wrongdoing, all at Apple's expense. The Court's Final Judgment imposing a monitor was unprecedented, and the proposed expansion of the monitor's authority to investigate would be contrary to law and unconstitutional.

## OBJECTIONS

## I. The Court Lacks Jurisdiction to Modify the Injunction During Apple's Appeal

This Court lacks jurisdiction to impose the proposed amendments because, as described above and as set forth in more detail below, the amendments would materially modify the injunction the Court filed on September 5, 2013. That injunction—including its validity and scope—is presently on appeal to the Second Circuit (Dkt. 379 at 1), which deprives this Court of jurisdiction to further modify the injunction.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982) (per curiam). After a party notices an appeal, the district court's authority is narrowly circumscribed. The Court may take actions "only 'in aid of the appeal or to correct clerical errors,' and may not 'adjudicate substantial rights directly involved in the appeal.'" *Int'l Ass'n of Machinists v. E. Airlines, Inc*., 847 F.2d 1014, 1017 (2d Cir. 1988) (quoting *Leonhard v. United States*, 633 F.2d 599, 609–10 (2d Cir. 1980)).

Because injunctions must "not impose unnecessary restrictions" and the "procedure prescribed" should "not [be] unduly burdensome," new terms affecting Apple's substantive and procedural rights under the injunction bear directly on the validity of the injunction itself. *Lorain Journal Co. v. United States*, 342 U.S. 143, 156 (1951).

The limited jurisdiction the Court retains under Rule 62(c) to "suspend, modify, restore or grant an injunction" "has been narrowly interpreted to allow district courts to grant only such relief as may be necessary to preserve the status quo pending an appeal ...." *Int'l Ass'n of Machinists*, 847 F.2d at 1018; *see also Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 564–65 (2d Cir. 1991). This exception is meant only to "preserve the status of the case as it sits before the court of appeals," protecting the appellate court's exercise of exclusive jurisdiction. *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962). The proposed amendments to the Final Judgment in no way maintain the status quo.

The Final Judgment contemplates an external compliance monitor of limited scope and duration. *See* Dkt. 374 § VI. The Court crafted the injunction specifically "to rest as lightly as possible on the way Apple runs its business," and did not "charge[ the monitor] with assessing Apple's compliance generally with the terms of the final judgment." Dkt. 371 (Aug. 27, 2013 Hr'g Tr.) at 8–9, 17–18. Although the Department of Justice asked for a monitor with sweeping powers to review Apple's compliance with the antitrust laws for a period of ten years (*see* Dkt. 330 at 14), the Court authorized a monitor solely to review and report on Apple's antitrust compliance and training programs as they exist 90 days after the monitor's appointment. Dkt. 374 § VI. The Court authorized the appointed monitor to interview Apple personnel "who may have counsel present" "subject to the[ir] reasonable convenience." *Id*. § VI.G.1. The monitor was also directed to make a report 180 days after appointment by the Court, which would be provided to Apple, the United States, the plaintiff states, and the Court. *Id*. § VI.C.

But as set forth below, the proposed amendments—which would allow Mr. Bromwich to interview Apple personnel *ex parte* (Dkt. 410 ¶ 3) and deliver *ex parte* oral briefings *every month* to the Court (*id.* ¶ 4), which the Court would have authority to publish to the public (*id.* ¶ 5)—

would dramatically expand the monitor's role as set forth in the Final Judgment and would aggravate Mr. Bromwich's overreaching assertion of authority to date. As a matter of law, these substantive changes are prohibited while the Final Judgment is on appeal to the Second Circuit.

## II.    The Modifications to the Injunction Are Not Authorized by Rule 53 and Violate the Separation of Powers, Which Is Highlighted by Mr. Bromwich's Conduct to Date

The monitor's authority, especially if augmented through the proposed amendments, would violate the Federal Rules of Civil Procedure and constitutional separation of powers. Although Rule 53 authorizes the Court to appoint a special master, that authority is limited to what is necessary "to aid judges in the performance of specific *judicial duties*." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (emphasis added); *see also In re Peterson*, 253 U.S. 300, 312–13 (1920). Rule 53 does not authorize district courts to appoint special masters or monitors to exercise authority not otherwise allowed by Article III. *Ex parte* interviews and communications with the Court and Apple's adversaries are not part of the "judicial duty" courts exercise under Article III. Especially when considered along with Mr. Bromwich's own misguided view of the scope of his authority under the September 5 Final Judgment and his unreasonable actions so far, it is clear that the investigation the Court has proposed to authorize Mr. Bromwich to undertake would far exceed the Court's authority under Rule 53 and violate separation of powers.

### A.    The Court's Proposed Amendments Are Not Authorized by Rule 53 and Would Violate the Separation of Powers

To the extent that a "monitor" may be appointed by the Court as a "special master[], albeit by another name" (*Juan F. v. Weicker*, 37 F.3d 874, 880 (2d Cir. 1994)), the Court's appointment authority is governed by Rule 53, as the Court acknowledged for the first time in its November 21 order (Dkt. 410). In relevant part, Rule 53(a) provides that a court "may appoint a

5

master only to: … address … posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1).

A valid appointment under Rule 53(a) gives a master (or monitor) the authority to address issues *that would otherwise be addressed* "by an available district judge or magistrate judge." Fed. R. Civ. P. 53(a)(1)(C); *see La Buy*, 352 U.S. at 256 (masters may "aid judges in the performance of specific judicial duties"). Examples of appropriate delegations include giving masters "the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt." *Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). These are judicial functions normally exercised by Article III judges; and masters, as "quasi-judicial officers," exercise this delegated *judicial power*. *Benjamin*, 343 F.3d at 45; *see also Reed v. Rhodes*, 691 F.2d 266, 269 (6th Cir. 1982) (special masters act "in a quasi-judicial capacity"); *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003) ("Special Master-Monitor ... was serving as a judicial officer"). But there is no long-standing tradition of charging monitors with "wide-ranging extrajudicial duties" to fill "an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1149 (D.C. Cir. 2009).

The parties here did not enter into a consent decree and confer authority on a special master by contract. *Cf.* Fed. R. Civ. P. 53(a)(1)(A) (a court may appoint a master to "perform duties consented to by the parties"). Generally, "[c]orporate monitors are appointed as part of a negotiated settlement before judgment between a firm and a government enforcement agency." Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor: The New Corporate Czar?*, 105 Mich. L. Rev. 1713, 1716 (2007). And in such cases, consent decrees "'should be

construed basically as contracts.'" *Juan F.*, 37 F.3d at 878 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37 (1975)); *see also N.Y. State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956, 963 (2d Cir. 1983) (upholding appointment of special master pursuant to consent judgment because the "powers of the Special Master to inspect, to interview, and to make recommendations [went] no further than those agreed to in the Consent Judgment"); *cf. City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 146 (2d Cir. 2011) ("Parties may consent to settlement terms that would otherwise, if imposed unilaterally, violate Rule 65(d) or a defendant's due process rights").  Apple, by contrast, *opposed* appointment of a monitor in a civil antitrust case as unprecedented, unwarranted, and legally improper, reserved all of its rights to challenge the appointment, and has appealed the Final Judgment.  *See* Dkt. 331 at 9–13 (opposing appointment of external monitor); Dkt. 379 (notice of appeal).  "When a party has for a nonfrivolous reason denied its consent, ... the district court must confine itself (and its agents) to its accustomed judicial role."  *Cobell*, 334 F.3d at 1142; *see also Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011, 1048 (2d Cir. 1983) (vacating appointment of special master due to the "highly intrusive nature of the mandate given the special master").

In the absence of agreement between the parties, Rule 53 does not authorize the Court to delegate duties to a master which *the Court itself* would be powerless to perform.  Nor could it.

The Constitution vests the federal courts with "[t]he judicial power."  U.S. Const. art. III § 1.  And the judicial power is "the only kind of power that federal judges may exercise by virtue of their Article III commissions."  *Young*, 481 U.S. at 816 (Scalia, J., concurring in the judgment); *see also Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 590 (1949) ("it was 'generally supposed that the jurisdiction given [to Article III judges] was constructively limited to cases of a Judiciary nature'") (quoting 2 The Records of the Federal

Convention of 1787, at 430 (Max Farrand, ed., 1911)); *Mistretta v. United States*, 488 U.S. 361, 385 (1989) ("According to express provision of Article III, the judicial power of the United States is limited to 'Cases' and 'Controversies'"); *Muskrat v. United States*, 219 U.S. 346, 355 (1911) ("The power conferred on [federal courts] is exclusively judicial, and it cannot be required or authorized to exercise any other") (internal quotation marks omitted).   The "executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the constitution." *Morrison v. Olson*, 487 U.S. 654, 677 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 123 (1976)).   Indeed, as Alexander Hamilton famously observed, the judiciary "must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."  The Federalist No. 78, at 522–523 (A. Hamilton) (J. Cooke ed., 1961).   Courts may issue injunctions, but they do not have unlimited power to conduct investigations in the name of *enforcing* those injunctions or otherwise policing the conduct of the enjoined litigant.

Federal courts do not, for example, have the autonomous power to punish litigants for criminal contempt as a means of enforcing their judgments.  *See Bloom v. Illinois*, 391 U.S. 194, 207 (1968).  The enforcement of court orders, like the enforcement of legislation, is reserved to the executive branch.  Likewise, governmental investigation of potentially illegal conduct (such as disregard for a court order or ongoing antitrust violations) is a quintessentially executive function.  *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *Buckley*, 424 U.S. at 138; *United States v. Nixon*, 418 U.S. 683, 693 (1974).  "There simply are certain things that courts, in order to remain courts, cannot and should not do." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).   And because these powers are not part of the judicial authority conferred by Article III, district courts may not authorize "quasi-judicial" special masters or monitors to undertake them.  *See* Fed. R. Civ. P. 53(a)(1)(C).

The unilateral investigation the Court has empowered Mr. Bromwich to undertake is not a judicial function, and therefore cannot be delegated by the Court.  The injunction, particularly as the Court proposes to amend it and in light of how Mr. Bromwich interprets his authority (*see infra* pp. 10–16), goes well beyond any reasonable and limited role of assessing compliance and training policies (as they exist 90 days after entry), and plainly (and wrongly) vests the monitor with wide-ranging, intrusive, and excessive inquisitorial powers of a sort reserved to prosecutors. *See Cobell*, 334 F.3d at 1141 (reversing appointment of monitor where district court "authorized the Monitor to engage in ex parte communications, and required the [defendant] to 'facilitate and assist' the Monitor, to 'provide him with access to any offices or employees to gather information,' and to pay his hourly fees and expenses") (alterations omitted).  Indeed, the injunction gives the monitor the same powers that it bestows on the Department of Justice and State Attorneys General.  *Compare* Dkt. 374 § VII.A.1-2 (plaintiffs permitted "access [to] inspect and copy" documents, and "to interview ... Apple's officers, employees, or agents"), *with id.* § VI.G.1–3 (monitor may interview witnesses and demand documents).

If the proposed amendments were adopted, Mr. Bromwich's powers would *exceed* those of the government entities, because he would be authorized to interview witnesses *ex parte*, and report *ex parte* to the Court.  Dkt. 410 ¶¶ 3–4; *compare* Dkt. 374 § VII.A.2 (Apple personnel may have counsel present during interviews) *with id.* § VII.C ("No information or documents obtained by [the plaintiffs] ... shall be divulged … to any person other than an authorized representative of the Executive Branch of the United States, the Attorney General's Office of any Plaintiff State, or the External Compliance Monitor, except in the course of legal proceedings").

Roving investigations with a commission to ferret out wrongdoing—including the powers to "interview," "inspect," and "discover evidence"—are well outside the boundaries of "[t]he

judicial power." Rather, they are prosecutorial powers vested in the President by Article II, § 1. The Court may not, therefore, appoint a monitor "to act[] as an internal investigator" who "report[s] ... to the district court." *Cobell*, 334 F.3d at 1141.

The separation of powers is no mere "remedy to be applied when specific harm, or risk of specific harm, can be identified." *Plaut v. Spendthrift, Inc.*, 514 U.S. 211, 239 (1995). Rather, it is "a *structural safeguard*" embedded in our constitutional system. *Id.*; *see also Nat'l Mut. Ins.*, 337 U.S. at 590–91 ("The doctrine of separation of powers is fundamental in our system"). Appointing special masters to oversee ongoing compliance with antitrust injunctions "could contravene the separation of powers doctrine because it would involve the creation of a substantial quasi-legislative, quasi-executive bureaucracy within the Judicial Branch of government." *United States v. AT&T*, 552 F. Supp. 131, 168 n.158 (D.D.C. 1982). The Court's proposed amendment would turn a "quasi-judicial" monitor into a mini-executive—a role Mr. Bromwich has quickly embraced and, as discussed below, already abused.

## B.     Mr. Bromwich Has Already Exceeded His Authority

Mr. Bromwich's interpretation of his mandate and his conduct to date have exceeded the authority that this Court could permissibly and constitutionally delegate to him, and highlight the serious problems with the Final Judgment and the proposed amendments.

After Apple reached out to Mr. Bromwich on October 17 (Boutrous Decl. Ex. D)—the day after he was appointed—the parties agreed to meet in New York on October 22. At that meeting, Mr. Bromwich declared that he would begin interviewing Apple's top executives and board members starting on November 18. Apple explained, however, that the timing of the requests was premature given that Apple was still putting its new compliance and training programs in place in advance of the January 14 deadline. *See id*. Ex. E.

The terms of the Final Judgment are clear that the monitor's "review of Apple's internal antitrust compliance policies and procedures and antitrust training program is not to commence until '90 days after his or her appointment.'"   Boutrous Decl. Ex. A at 1 (quoting Dkt. 374 § VI.C).  Indeed, at the August 27 hearing, the Court stated:

> I don't think that the [Monitor] should conduct a review or assessment of the current policies.  I would expect that Apple would revise its current policy substantially and procedures and create an effective training program.  That will require some time.  So I think this should be revised to have the [Monitor] doing an assessment in three months from appointment and *beginning to engage Apple in a discussion at that point*.

Dkt. 371 (Aug. 27, 2013 Hr'g Tr.) at 20–21 (emphasis added).  Accordingly, Apple explained that Mr. Bromwich's request "to begin interviewing Apple's entire board and its executive team, as well as additional senior executives on November 18 is premature, not authorized by the Final Judgment, and would not only be disruptive to Apple's business operations but also directly contrary to Judge Cote's intent."  Boutrous Decl. Ex. A at 2; *see also id.* at 3 ("It makes no sense and would be extremely disruptive, to schedule those interviews before Apple has completed its internal assessment and developed its new antitrust training program").

Despite its good-faith and legitimate concerns, Apple nonetheless sought to accommodate Mr. Bromwich's demands and agreed to arrange interviews with nine high-level business and legal executives if Mr. Bromwich was willing to wait until the week of December 2.  *See* Boutrous Decl., Ex. C.  Mr. Bromwich nonetheless continued to demand to "interview/meet Tim Cook, Phil Schiller, and Edd[y] Cue," as well as any other "Senior VPs who touch antitrust-related issues in a meaningful way."  *Id.* Ex. B at 4.  He also sought to interview three members of Apple's Board of Directors—including Al Gore—who happen to live in or frequently visit Northern California.  *Id.* at 5.

Most of the executives and board members Mr. Bromwich sought to interview are not

11

even relevant to his mandate.  By contrast, Apple's proposed interviewees were the key individuals involved in rolling out Apple's enhanced compliance and training efforts. Nevertheless, because Apple could not produce its entire slate of directors and board members on a few weeks' notice, Mr. Bromwich accused Apple of not taking "its obligations and [Mr. Bromwich's] responsibilities under the Final Judgment very seriously."  Boutrous Decl. Ex. B at 2.  He then demanded that Apple "[b]e prepared to support any representations concerning [the] availability [of the individuals he wanted to interview] with *detailed copies of their schedules for that entire week*."  *Id.* (emphasis added).  He said he "was not prepared to drag things out any longer" than the week of November 18.  *Id.*

Mr. Bromwich's "demands and approach [were] unreasonable, unnecessary and unwarranted, and [went] well beyond the scope of the Final Judgment and Judge Cote's guidance."  Boutrous Decl., Ex. B at 1.  The Final Judgment states that all Apple interviews "be subject to the *reasonable convenience* of such personnel and without restraint or interference by Apple" (Dkt. 374 § VI.G.1 (emphasis added)), but Mr. Bromwich reasserted his demand for a "slate of interviews and meetings next week."  Boutrous Decl. Ex. E at 1.

Apple offered to make available on November 18 for interviews its Chief Compliance Officer and Head of Global Security (Tom Moyer), and Associate General Counsel and Legal Liaison to the Audit and Finance Committee (Gene Levoff).  *See* Boutrous Decl. Ex. F at 1.[1]

Mr. Bromwich accepted this proposal (Boutrous Decl., Ex. F at 1 ("We accept")), and on

---

[1]  Apple again urged Mr. Bromwich to postpose the meetings until the week of December 2 or December 9 so that he could interview others, including Bruce Sewell (Apple's General Counsel) and Deena Said (the new Antitrust Compliance Officer).  *See* Boutrous Decl. Ex. F at 2 ("Apple respectfully submits that this will be more efficient and effective in getting you the information you seek and in working together to ensure that the company has comprehensive and effective antitrust compliance and training programs").

November 18, he interviewed Messrs. Moyer and Levoff (Boutrous Decl. ¶ 3).  He also met with Noreen Krall (Apple's Chief Litigation Counsel) to discuss Mr. Bromwich's fees and the details of the confidentiality agreement.  *See id*.

Not content to wait, however, Mr. Bromwich pressed for more interviews.  Upon learning that Apple General Counsel Bruce Sewell was attending the important *Apple v. Samsung* trial during the week of November 18, Mr. Bromwich proposed to "stop by the courthouse and meet him." *Id*. Ex. H.  Mr. Bromwich also again sought to interview the new Antitrust Compliance Officer, even though the day of the interviews was literally her first day on the job. *Id*.

Mr. Bromwich's incessant "demands for immediate attention" compelled Apple to once again explain how "incredibly disruptive" Mr. Bromwich's requests had become.  *See* Boutrous Decl. Ex. I at 1.  Apple reminded Mr. Bromwich that the "reason for th[e] three-month window is of course to provide Apple and its counsel with time to develop new, comprehensive antitrust training and compliance materials in accordance with the Final Judgment, without hampering Apple's business." *Id.* at 2.  And Apple tried to persuade Mr. Bromwich that his "continual requests for additional interviews and other information before January 14, 2014[] affirmatively hamper Apple's efforts to develop a new antitrust training and compliance program as efficiently and effectively as possible within the deadline set by Judge Cote." *Id.* at 3.  Nevertheless, "[i]n the spirit of cooperation," Apple proposed a schedule for eleven additional interviews to take place between December 4 and 6. *Id.* at 4.

Not only has Mr. Bromwich continued to press for interviews with Apple's Board members and senior executives, he has begun contacting them directly (not through counsel) in an explicit effort to "promote" a "relationship between the company liaisons and the monitoring team that is *unfiltered through outside counsel*." Boutrous Decl. Ex. J at 5 (emphasis added).

His letter, sent directly to the board members, specifically asking them to respond without aid of their counsel, is manifestly inappropriate.

Even worse, Mr. Bromwich does not base his aggressive investigative approach on the terms of the Court's Final Judgment or statements on the record, but rather on his *ex parte* conversations with the Court.

For example, the record indicates quite clearly that the monitor's duties do not commence until January 14.  *See* Dkt. 374 § VI.C ("The [Monitor] shall conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, *as they exist 90 days after his or her appointment*, are reasonably designed to detect and prevent violations of the antitrust laws. The [Monitor] shall also conduct a review to assess whether Apple's training program, ... *as it exists 90 days after his or her appointment*, is sufficiently comprehensive and effective.") (emphasis added); Dkt. 384 (appointing monitor on October 16, 2013).  This makes sense given that the monitor's first report is not due until 180 days after the monitor's appointment.  Dkt. 374 § VI.C; *see also* Dkt. 375 (Sept. 5, 2012 Hr'g Tr.) at 10 ("we have provided for a six-month report from the monitor"); *id*. ("I would appreciate six-month reports").

Mr. Bromwich, however, has determined that his duties must commence *immediately*. And his basis for rejecting Apple's reading of the record is what he termed his "distinct advantage of *having discussed [his] intentions to get off to a fast start directly with [the Court] during the interviewing process*."  Boutrous Decl. Ex. K (emphasis added).  He gives "that discussion far more weight" than what he called Apple's "snippets of transcript taken out of context" (*id.* (emphasis added))—*i.e.*, the public record.  *See also id*. Ex. L at 1 ("[I]n my interviews during the monitor selection process with the Department of Justice and the Plaintiff States, and separately with Judge Cote, I made clear that one of the keys to a successful

14

monitorship was getting off to a fast start and promptly making contact with top executives at the company ....  There was no suggestion at any time from anyone that these activities needed to be deferred for 90 days after the appointment of the External Compliance Monitor.")  It is exceedingly problematic and disturbing that Apple does not know how many of these conversations occurred or what has been discussed.

As these communications and activities make clear, Mr. Bromwich has no intention of limiting his role to the terms of the Final Judgment or to handling judicial matters that the Court itself could not "effectively and timely address[]."  Fed. R. Civ. P. 53(a)(1)(C).  Rather, cloaked in the mandate given to him by this Court, he is asserting investigative powers that belong exclusively to the Executive Branch and is assuming that he can function without regard to the restrictions imposed by the Federal Rules of Civil Procedure, or any other rules, that govern discovery and exchange of information in a civil case.

The Court has no authority to travel the country to interview Apple's employees (particularly without counsel present), review all of Apple's corporate documents, or initiate contempt charges against Apple, all at Apple's expense, and it may not escape that constitutional limitation by appointing a "quasi-judicial officer" to accomplish that end.  Because the Court's proposed amendments purport to confer executive powers on a quasi-judicial officer, they are not supported by Rule 53 and violate the constitutional separation of powers.

## III. The Court Cannot Simultaneously Receive *Ex Parte* Reports from the Monitor and Preside Over the Pending Damages Trial and Putative Class Action

The injunction, if modified as proposed, would allow the monitor to "communicate with a party or a party's agent on an *ex parte* basis if reasonably necessary" (Dkt. 410 ¶ 3), and would direct the monitor to "provide the Court with *ex parte* oral briefings at least once a month, or more frequently as the Monitor or Court decide in the exercise of their discretion is appropriate"

15

(*id.* ¶ 4).  This is a 180-degree turn from the September 5 order, which authorized interviews with "counsel present."  Dkt. 374 § VI.G.1.  This invitation to Mr. Bromwich to circumvent Apple's counsel risks disclosure of privileged and confidential information to the Court and raises serious due process concerns—particularly while the Court is simultaneously presiding over proceedings on the class and state plaintiffs' claims for damages and penalties.

"Ex parte communications between a master and the court present troubling questions." Fed. R. Civ. P. 53(b) Advisory Committee's Note; *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289, 311 (3d Cir. 2004) (ex parte contacts with consulting advisors are an "egregious problem").  For this reason, the Rules Advisory Committee advises that "[o]rdinarily the [appointment] order should prohibit such communications."  Fed. R. Civ. P. 53(b) Advisory Committee's Note.

These "troubling questions" are magnified here where *ex parte* contact with the Court may be preceded by *ex parte* contact with Apple personnel.  The Final Judgment permits Mr. Bromwich to conduct interviews (but *with counsel present* and subject to *reasonable convenience*), to "inspect any documents in the possession, custody, or control of Apple," and to "require Apple to provide compilations of documents, data, or other information" related to his responsibilities as expressly delineated.  Dkt. 374 § VI.G.2–3.

As discussed above, however, Mr. Bromwich has already shown a proclivity to leap far beyond his mandate, and now this Court proposes amendments that would give him power to interview Apple personnel *ex parte*, something he will no doubt be quick to exploit.  Indeed, the day after the Court filed its proposed amendments, Mr. Bromwich directly contacted Apple's entire Board of Directors, citing the Court's order and encouraging them to "promote" a "direct relationship between the company liaisons and the monitoring team that is unfiltered through outside counsel."  Boutrous Decl. Ex. J at 5.  The proposed amendments would allow Mr.

Bromwich to then take such "unfiltered" information to the Court, again without Apple's counsel present (Dkt. 410 ¶ 4), and the Court would be allowed in turn to disclose the information to the public (*id.* ¶ 5), including, of course, Apple's adversaries in the *parens patriae* and putative class action seeking nearly $1 billion pending before this Court.

Receipt of such information, delivered *ex parte*, is grounds for disqualification of a judge presiding over continuing proceedings in the matter and in related litigation.  *See* 28 U.S.C. § 455(a) ("Any ... judge … of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"); *see also In re Kensington*, 368 F.3d at 310 ("If judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result").  It is also a violation of the ethics rules.  *See* Code of Conduct for U.S. Judges, Canon 3(A)(4) ("a judge should not initiate, permit, or consider *ex parte* communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers").[2]  Where a presiding judge who is expected to render impartial rulings based on a transparent record developed in open court in compliance with the rules of evidence receives any (much less regular) *ex parte* briefings regarding information that a monitor has gathered by interviewing the defendant's employees and reviewing the defendant's corporate documents, "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal."  *Diamondstone v. Macaluso*, 148 F.3d 113, 121 (2d Cir. 1998); *see also Kensington*, 368 F.3d at 310 ("ex parte communications run contrary to our adversarial trial

---

[2]  The Code of Conduct recognizes four exceptions to the general rule against *ex parte* communications (Canon 3(A)(4)(a)–(d)), none of which is applicable here.

system"); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009) (due process may require disqualification where the circumstances offer the temptation "to the average ... judge to ... lead him not to hold the balance nice, clear and true") (internal quotation marks omitted).

In *Kensington*, for example, the Third Circuit ordered the district judge to recuse himself from two asbestos-related bankruptcy proceedings over which he was presiding after the judge appointed consulting advisors who had played a role in other asbestos-related litigation and then engaged in *ex parte* communications with these advisors. 368 F.3d at 294. Describing the *ex parte* meetings with the advisors as an "egregious problem," the Third Circuit held that the district judge's "unrecorded" *ex parte* communications with those advisors "support[ed] disqualification," in part because there was "no official record of what was said." *Id*. at 309–10. The exact same concerns are present here.

The twin *ex parte* provisions in the proposed amendments risk—indeed, they *encourage*—disclosure of privileged and confidential information, including information wholly unrelated to the very narrow scope of Mr. Bromwich's assigned role. Without counsel present, interviewees might unknowingly disclose information protected by the attorney-client privilege in describing the contents of privileged conversations to Mr. Bromwich—information which Mr. Bromwich would then be free to convey *ex parte* to the Court. Dkt. 410 ¶ 4. According to the proposed amendments, once the information is in the Court's hands, the Court has discretion to reveal that information to the public. Dkt. 410 ¶ 5. There is no legitimate need to allow Mr. Bromwich to potentially gain access to privileged and confidential information as well as information having nothing to do with his narrow mandate—which Apple could not be compelled to disclose—through *ex parte* conversations with Apple's personnel.

This potential disclosure of privileged information is particularly problematic here where

there is ongoing litigation.  In addition to the risk of the judge being prejudiced by information received by the monitor, there is a very real risk that the plaintiff states and putative class plaintiffs will benefit from the investigation, as Mr. Bromwich retains and discloses to the Court information that the Court proposes it will potentially disclose on the public record.

Additionally, *ex parte* communications between Mr. Bromwich and the Court create confusion as to the scope of his powers and responsibilities.  For example, as discussed above, Apple reads this Court's order and statements on the record to mean that the monitor's principal duties do not commence until January 14.  Mr. Bromwich, however, on the basis of apparent *ex parte* communications with the Court, claims that his duties commence immediately and that he is authorized to immediately interview the top officials and the board before Apple even has a chance to revise its compliance and training programs as envisioned by the Court.  This assertion of authority on the basis of private conversations between Mr. Bromwich and the Court is the antithesis of the rule of law.  There can be no doubt that the Final Judgment and this Court's explanation of it on the public record define the scope of his role and responsibilities, but Mr. Bromwich is using private conversations with the Court as a basis for exceeding his authority.

No litigant could possibly take comfort in the objectiveness of a court's judgment in ruling on fiercely contested motions and proceedings when the court is regularly meeting privately with a judicially appointed investigator charged with looking to uncover evidence of possible wrongdoing by that litigant.  And to the extent the Court actually intended to unleash Mr. Bromwich as its agent in this manner, such order transforms the Court from an impartial arbiter of "Cases" and "Controversies" into Apple's litigation adversary.  Apple therefore objects to the Court's proposed amendments and requests that the Court disclose the existence and scope of any *ex parte* communications it has had with Mr. Bromwich.

## IV.   The Court's Proposed Order Deprives Apple of Its Right to a "Disinterested Prosecutor"

The Due Process Clause entitles a defendant to a disinterested prosecutor.  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980) (citing *Bordenkircher v. Hayes,* 434 U.S. 357, 365 (1978)).   This requirement prevents executive decisions from being tainted by "a personal interest, financial or otherwise."  *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808 (1987) (internal quotation marks omitted).   The monitorship the Court has imposed—particularly with the proposed amendments—would violate this due process protection.

### A.   The Monitor's Personal Financial Interest in the Proceedings Is Unconstitutional

Mr. Bromwich views his role as akin to that of an independent prosecutor or investigator assigned by the Court to investigate a single corporate citizen.   He regularly cites his independence in seeking to commence interviews with Apple executives and board members even before Apple has had a chance to revise its antitrust compliance and training programs as contemplated by the Court.  *See* Boutrous Decl. Ex. M at 2 ("Apple and the other parties must respect our independence"); *id.* Ex. N at 3 (asserting that providing details about his invoices would "compromise [his team's] independence").   The Final Judgment itself directs the monitor to keep his eyes and ears open for any signs of illegal behavior and to pass such information along to the plaintiffs.  Dkt. 374 § VI.F ("If the [Monitor] ... discovers ... evidence that suggests ... that Apple is violating or has violated this Final Judgment or the antitrust laws, the [Monitor] shall promptly provide that information to the United States and the Representative Plaintiff States").   Thus, unlike a normal law enforcement officer or prosecutor, Mr. Bromwich does not have "a detached and impartial view of all groups in his community," but rather a singular focus on Apple.   Robert Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual

Conference of the United States Attorneys (Apr. 1, 1940).

Moreover, Mr. Bromwich is not disinterested.  The Court's proposed amendments incorporate the Final Judgment's requirement that Apple pay Mr. Bromwich for the time he spends investigating Apple.  *See* Dkt. 410 ¶ 8; Dkt. 374 ¶ VI.I ("The [Monitor] shall serve at the cost and expense of Apple").  And *Apple's adversaries*, including the plaintiff states, have the authority to approve the expenses that Mr. Bromwich intends to bill to Apple.  *See* Dkt. 374 § VI.I.  They too have every incentive to inflict on Apple the broadest and most expensive investigation possible.

This "personal incentive" to run as broad and intrusive an investigation as possible deprives Apple of its due process right to a neutral prosecutor.  *See Young*, 481 U.S. at 804 ("A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client"); *People ex rel. Clancy v. Superior Court*, 39 Cal. 3d 740, 746 (1986) ("When a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated").  To the extent Article III courts are empowered to appoint private lawyers to police their injunctions, those lawyers must be "disinterested," just like "a public prosecutor who undertakes such a prosecution."  *Young*, 481 U.S. at 804.  As an arm of the court, such an appointed lawyer must meet the highest standards of financial impartiality.  *See Caperton*, 556 U.S. at 886 (recusal required "whether or not *actual* bias exists or can be proved," so long as the financial interest "offer[s] a *possible* temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true") (emphasis added) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

The proposed amendments provide by reference that the appointment shall "be for a period of two years."  Dkt. 374 § VI.A; Dkt. 410 ¶ 6.  Likewise, the order provides that the Court

"may *sua sponte* ... extend the appointment by one or more one-year periods."  Dkt. 374 § VI.A.

Mr. Bromwich is therefore financially incentivized to recommend extending the appointment

period—at Apple's expense.   Indeed, Mr. Bromwich has repeatedly expressed the need to

establish a fee structure that will allow him to "generate profits."   *See* Boutrous Decl. Ex. N at 2,

Ex. O at 2.  This is a vicious circle that violates due process.  *Young*, 481 U.S. at 814-15

(Blackmun, J., concurring) (due process "requires a disinterested prosecutor with the unique

responsibility to serve the public, rather than a private client, and to seek justice that is

unfettered"); *Caperton*, 556 U.S. at 876 ("It is axiomatic that '[a] fair trial in a fair tribunal is a

basic requirement of due process'") (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  There

is no support in the federal rules or the Constitution for ordering Apple to self-fund the

investigation of itself by a court-appointed lawyer, acting on the Court's behalf, who has a

financial incentive to make the investigation as expansive and expensive as possible.

> **B.**     **Mr. Bromwich's Excessive Fees, Which He Refuses to Justify as Either Reasonable or Customary, Violate the Final Judgment**

The Court's proposed amendments incorporate the Final Judgment's statement that

"compensation of the [Monitor] shall be on reasonable and customary terms commensurate with

the individuals' experience and responsibilities and consistent with reasonable expense

guidelines."   Dkt. 410 ¶ 8; Dkt. 374 § VI.I.   Mr. Bromwich's billing rates, the 15% "service

charge," and his refusal to justify his fees for this monitorship all directly conflict with the

Court's Final Judgment, and aggravate the due process concern with his investigation.

Mr. Bromwich has proposed an hourly rate for himself of $1,100.   *See* Boutrous Decl.

Ex. O at 2.  And *because he lacks any antitrust experience*, Mr. Bromwich has also retained the

law firm Fried Frank to assist him, whose partner's hourly rate is $1,025.   *Id.* at 3.   Mr.

Bromwich has made no attempt to justify why his lack of any substantive experience with the

matter at issue justifies hiring another law firm with a four-digit billing rate.

As Apple explained to Mr. Bromwich, of all known past Apple matters, "not a single partner had an effective billing rate as high as or higher than those that [Mr. Bromwich has] proposed." Boutrous Decl. Ex. O at 1. And Mr. Bromwich's rates in this matter dramatically exceed what he has quoted in the past. For instance, in a proposal to monitor the New Orleans Police Department five months ago, he suggested a $495 hourly rate, without an administrative fee, which the Department of Justice termed "relatively expensive." *Id*. Ex. O at 2.

On top of these rates, Mr. Bromwich proposes to charge a 15% "administrative fee" to be applied to all fees generated by him, Fried Frank, and other lawyers from other firms he proposes to include on his team.[3] *See* Boutrous Decl. Ex. O at 2, Ex. N at 2–3. This is unprecedented in Apple's experience; no law firm Apple has ever engaged has charged a 15% administrative fee on top of the billing rate (*id*. Ex. O at 2), and Mr. Bromwich has not identified a single other instance in which he has collected such a fee from a corporate client or monitored entity. *Id*. Ex. N at 2–3. Mr. Bromwich appears to be simply taking advantage of the fact that there is no competition here or, in his view, any ability on the part of Apple, the subject of his authority, to push back on his demands.

---

[3] Mr. Bromwich has sought to justify this 15% markup on the grounds that he is handling this assignment through his "consulting firm," the Bromwich Group, rather than through Goodwin Proctor—the law firm where he is a partner and which is located in the same office building as the Bromwich Group. Boutrous Decl. Ex. O at 2. But this Court appointed Mr. Bromwich himself, not the Bromwich Group, to serve as monitor (Dkt. 384), and Mr. Bromwich has not cited anything to suggest that it is "reasonable and customary" for lawyers to form consulting groups to handle monitorships and charge additional fees on that basis. Moreover, this distinction seems slippery at best, given that Goodwin Proctor issued a press release, clearly meant to drum up more business, trumpeting, "Goodwin Partner Michael R. Bromwich Appointed Antitrust Monitor for Apple." *See* Goodwin Proctor Press Release, Oct. 18, 2013, *available at* http://www.goodwinprocter.com/News/Press-Releases/2013/10_18_13_Goodwin-Partner-Michael-R-Bromwich-Appointed-Antitrust-Monitor-for-Apple.aspx.

Mr. Bromwich flatly refused Apple's request that Mr. Bromwich provide a budget and a work plan and adhere to Apple's billing guidelines, and rejected Apple's proposal of a fee structure comparable to that of the many major law firms working on Apple matters.  *See* Boutrous Decl. Ex. N at 3–4.  And he has refused to justify either his rates or his billing practices as being either "reasonable" or "customary."  *See id.* at 3 ("your requests for additional support for the administrative fee, and for the billing rates of ... other timekeepers ... are ... a thinly-veiled attempt to substitute a fee negotiation and approval process, in which Apple sets the terms of the relationship, for the process the Court prescribed in its September 5 Order").  Nor has the Department of Justice been able to defend his demands as either "reasonable" or "customary."

As a result of the foregoing and Mr. Bromwich's overbroad view of his mandate, Mr. Bromwich's invoice for his first two weeks of work was for $138,432.40.  *See* Boutrous Decl. Ex. O at 3.  (As a supposed agent of the Court, he racked up nearly 75% of a district judge's yearly pay in only two weeks.)  These charges were incurred before any documents were exchanged, interviews scheduled, or meaningful travel conducted, and indeed before the 90-day deadline triggering his review of Apple's compliance and training programs under the injunction.

The Final Judgment does not give Mr. Bromwich a blank check to unilaterally impose his billing practices.  His total failure to engage with Apple on whether his billing structure is "reasonable" or "customary" plainly violates the Final Judgment and confirms that he is not a disinterested pubic official seeking to fulfill the public interest as required by due process.

## CONCLUSION

The proposed amendments in the Court's November 21, 2013 order are unnecessary, contrary to law, and unconstitutional.  The Court therefore should not amend the injunction as proposed, and should issue an order directing Mr. Bromwich to limit his monitorship to the four

corners of the Final Judgment and this Court's contemporaneous statements on the public record

explaining it.

Dated:  November 27, 2013                    Respectfully submitted,


                                             By:    __/s/ Theodore J. Boutrous, Jr._____
                                                    Theodore J. Boutrous, Jr.

                                                    Theodore J. Boutrous, Jr. (*Pro Hac Vice*)
                                                    Daniel G. Swanson (*Pro Hac Vice*)
                                                    Gibson, Dunn & Crutcher LLP
                                                    333 South Grand Avenue
                                                    Los Angeles, CA  90071
                                                    (213) 229-7000
                                                    tboutrous@gibsondunn.com
                                                    dswanson@gibsondunn.com

                                                    Cynthia Richman (*Pro Hac Vice*)
                                                    Gibson, Dunn & Crutcher LLP
                                                    1050 Connecticut Avenue, N.W.
                                                    Washington, DC  20036
                                                    (202) 955-8500
                                                    crichman@gibsondunn.com

                                                    Howard E. Heiss
                                                    Edward N. Moss
                                                    O'Melveny & Myers LLP
                                                    Times Square Tower
                                                    7 Times Square
                                                    New York, NY  10036
                                                    (212) 326-2000
                                                    hheiss@omm.com

                                                    *On behalf of Defendant Apple Inc.*