UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | 12 Civ. 2826 (DLC) |
| APPLE INC., *et al.*, | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| THE STATE OF TEXAS, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 12 Civ. 03394 (DLC) |
| PENGUIN GROUP (USA), INC., *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF MICHAEL R. BROMWICH**

I, MICHAEL R. BROMWICH, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am the Managing Principal of The Bromwich Group LLC, a consulting firm incorporated in the State of Delaware. I am also a partner in the law firm Goodwin Procter LLP. Goodwin Procter is not involved in this matter.

2.     I am an attorney licensed to practice in the State of New York and the District of Columbia. I am a member of the bar of the United States District Court for the Southern District of New York, the United States Court of Appeals for the Second Circuit, and many other courts.

3.     I have been a practicing lawyer for 33 years. I have spent approximately 14 years in public service, as Assistant United States Attorney for the Southern District of New York (1983-1987); Associate Counsel for the Office of Independent Counsel: Iran-Contra (1987-1989; 1990-1991); Inspector General for the Department of Justice ("DOJ") (1994-1999); Director of the Bureau of Ocean Energy, Management, Regulation, and Enforcement in the Department of the Interior (2010-2011); and Director of the Bureau of Safety and Environmental Enforcement in the Department of the Interior (2011).

4.     I have been doing oversight work of various kinds for approximately 20 years in both government and the private sector. As Inspector General of the DOJ, I had oversight authority over the entire DOJ, which included not only its litigating divisions but also its component agencies – i.e., the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Prisons, and many others.

5.     From 1999 to 2010, I was a partner with the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"). During my tenure with the firm, I headed the Internal Investigations, Compliance, and Monitoring practice group. My practice included, among other things, conducting an internal investigation of a company alleged to have committed antitrust violations, and representing an individual in an international criminal price-fixing investigation.

6.     Between 2002 and October 2013, I was selected on three different occasions to serve as a monitor. In 2002, I was jointly selected by the City of Washington, DC, Washington's Metropolitan Police Department ("MPD"), and the DOJ to monitor MPD. In 2009, I was jointly selected by the Government of the Virgin Islands, the Virgin Islands Police Department ("VIPD"), and the DOJ to monitor VIPD. Earlier this year, I was selected by one of the largest companies in the world to monitor it in connection with the resolution of various criminal and civil proceedings. In each of my previous monitoring assignments, I have selected subject matter experts to assist me in performing my monitoring responsibilities.

7.     On two other occasions in 2013, after a thorough vetting and interviewing process, major international companies have selected me as one of three candidates submitted to the DOJ to serve as a corporate monitor. In both of those cases, DOJ selected a different candidate. The vetting process required me to supply multiple references from my previous monitoring assignments. Those references included top-

level executives of organizations I had monitored with whom I had enjoyed uniformly positive and constructive relationships.

8.      On various occasions since 2003, I have spoken at meetings and conferences about my approach to monitoring. I have stressed the principles of openness, collaboration, cooperation, and fidelity to the document that establishes the scope of the monitoring assignment. The other monitoring assignments I have held have uniformly been collegial and collaborative. I have never before been accused of exceeding the scope of my monitoring authority. In fact, I have counseled other monitors and potential monitors on the importance of observing the limits of the monitoring assignment. Even though conducting oversight can lead to honest differences of opinion and conflicts, to my knowledge, no representative of any entity I have monitored has ever complained about the style or substance of my monitoring activities. My approach to monitoring in this matter does not differ from the approach I have followed in my other monitoring assignments.

9.      In a monitoring proposal submitted to DOJ on September 18, 2013, in connection with this matter, I specifically articulated my view of the monitoring activities I would undertake if selected. This included work prior to the monitor's assessment of Apple's compliance program. I emphasized the importance of gaining an initial understanding of the company's pre-existing antitrust policies, and the steps the company was taking to change and upgrade them. I detailed my plan, to be implemented at the outset of the monitorship, to learn about the various activities being undertaken by the company to respond to the Final Judgment. I said that obtaining such information at the outset of the monitorship would help educate the monitoring team about the issues and challenges facing the company, and in turn would help shape the monitor's activities and the sequence of items to be monitored.[1]

10.     In my interview with DOJ and the Plaintiff States on September 19, 2013, and in my interview with the Court on October 10, 2013 I elaborated on my views about the importance of beginning the monitoring work immediately upon appointment. To the best of my recollection, I also touched on the importance of having preliminary meetings and/or interviews with members of the Board of Directors and senior management of the Company promptly after appointment.

11.     In my three previous monitoring assignments, the top management of the organizations, up to and including the heads of the organizations, have made themselves promptly available for meetings, interviews, and discussions concerning the subject matter of the monitoring assignment. My requests for meetings, background interviews, and subject matter presentations have been responded to fully and completely, and the monitored entities have frequently offered more meetings, interviews, and materials than I have requested. My experience has been that early meetings, interviews, and discussions with top management are necessary to provide the monitor and his team with important background and context, and to establish

---

[1]      In connection with my proposal, DOJ vetted me for personal and professional conflicts of interest. This process included providing information about financial investments, professional engagements, and personal relationships, among other things.

relationships with top executives and others in the monitored entity – relationships that are crucial to a successful monitorship. I have never before had a request for a meeting or interview in a monitoring assignment rejected or even deferred. I have never before been advised that requests for introductory meetings with members of senior management were unduly disruptive. Members of senior management of the companies and organizations I have monitored have uniformly encouraged me to contact them directly in the event that I or members of my team were not getting what we needed.

12.     On October 17, 2013, the day following my selection, I received an email from Kyle Andeer, Apple's Senior Director for Competition Law & Policy, introducing himself and suggesting an early discussion about the monitoring assignment. (Bromwich Exhibit A; Apple Exhibit D)

13.     On October 22, 2013 at Mr. Andeer's request, we met in New York at the offices of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"). In addition to Mr. Andeer, Theodore J. Boutrous Jr. from Gibson Dunn and Kevin J. Arquit and Matthew J. Reilly from Simpson Thacher & Bartlett LLP ("Simpson Thacher") attended the meeting in-person.[2]

14.     At the meeting on October 22, I outlined in detail my views of the monitoring assignment. I addressed staffing, my approach to monitoring, our specific responsibilities under the Final Judgment, and the initial steps we would be taking.

15.     In describing my approach, I stated, among other things, that our authority is limited to the scope of the Final Judgment, that we intended immediately to open lines of communication to the company, that we would remain accessible to all parties, the importance of guarding our independence, and our hope to have a collaborative relationship with Apple. I said that during the initial 90-day period, I wanted to make use of the time – while the company was revising its antitrust policies, procedures, and training – to understand a) the company's reporting oversight structure for antitrust compliance, b) the company's existing antitrust policies and procedures, c) the ongoing processes to revise and update its policies and procedures, d) the overall role of the Audit and Finance Committee in compliance matters, and e) the role of the company's Risk Oversight Committee. I also invited Mr. Andeer and Apple's representatives, as I had invited DOJ and the Plaintiff States, to identify portions of the case record that they recommended we review to have a balanced appreciation for the background and context of the monitoring assignment. We also requested a short list of documents relevant to the issues described above.

16.     I advised Mr. Andeer that I would like to have preliminary meetings or interviews with members of the Board of Directors and members of senior management during the week of November 18, a month in the future. In past monitorships, such meetings have generally taken place within days or at most two weeks of the beginning

---

[2]     In light of Apple's complaints about our initial bill for work performed in October, it is worth noting that only one of the seven people attending the meeting is based in New York; four of the seven are based in Washington, DC. Even so, Mr. Andeer asked that the meeting be held in New York and we agreed to meet there.

of the monitoring assignment. I have never waited as long as a month to have such meetings and interviews. Mr. Andeer responded that the company was very concerned about the request for interviews with Board members and senior executives, that they were very busy, and that we would see "a lot of anger" about the case that still existed within the company. I told Mr. Andeer and Apple's outside lawyers that we would be very respectful of the time of Board Members and senior executives, that I would conduct the interviews personally, that I would limit each interview to one hour, and that I would be very flexible about scheduling in deference to the schedules of Board members and senior management. I explained that tone at the top of the company is very important in assessing the company's response to the Final Judgment, and to assessing the commitment to compliance of its leaders. Mr. Arquit said it was important for the "residue of tension" to wear off before we interviewed senior executives. Mr. Andeer added that Apple executives would "never get over the case" and that they were still extremely angry. Mr. Andeer suggested that any plan that included interviews of senior Apple executives was problematic because they did not expect to have to deal with me or other members of the monitoring team. He also said that many people in the company were fearful. I told him that I have found the best way to address such fears was to address them directly and have me speak with the people who are most fearful to dispel those concerns. Mr. Andeer said he agreed that it might be a good idea to do so. At no time did Mr. Andeer or any of the company's outside counsel suggest that we would be prohibited from doing monitoring work until January 14, 2014.

17.     At the time I made the request on October 22 to have preliminary meetings or interviews with members of the Board of Directors and members of senior management, I had reviewed not only the Court's July 10, 2013 Opinion and Order but also the transcript of the August 27, 2013 status conference in this matter. During that proceeding, the Court observed that "Apple lawyers and its highest level executives" had been involved in a price-fixing conspiracy and had demonstrated "a blatant and aggressive disregard [] for the requirements of the law." August 27, 2013 Tr. At 17. I would have sought meetings and interviews early in the process with Board members and senior management in any event, but the Court's observations and comments, quoted above, further strengthened my view that such early meetings and interviews were essential first steps in the monitoring process in this matter.

18.     On October 23, 2013, the DOJ reviewed a draft letter that I prepared regarding the monitoring relationship with Apple, including fees and expenses. Later that day, I sent the draft engagement letter by email to Mr. Andeer and invited him to suggest appropriate revisions to the section in the letter discussing confidentiality. (Bromwich Exhibit B) I did not invite comments on other aspects of the letter, which involved fees and expenses, because the Final Judgment made clear that the responsibility for approving fees and expenses resided with DOJ and the Plaintiff States, not with Apple. On that same day, Mr. Andeer responded by email that the engagement letter raised "a number of issues." (Bromwich Exhibit C)

19.     On October 24, 2013, I sent an email to Mr. Andeer offering to have a brief introductory telephone call with the Apple Board of Directors and/or the Audit and Finance Committee during the week of October 28 to answer any questions the members had regarding my appointment. (Bromwich Exhibit D) My offer was motivated by Mr.

Andeer's representation at the October 22 meeting that the Board would be meeting during the week of October 28 and then not again for another six months. Mr. Andeer responded that same day to inform me that he had been mistaken about the Board's meeting schedule.[3]  (Bromwich Exhibit E)

20.     On October 25, 2013, Mr. Andeer sent an email to me in response to the draft monitoring letter that I provided. (Bromwich Exhibit F)  Mr. Andeer's email raised concerns regarding compensation and expense terms outlined by the letter. His email notified me of Apple's requirement that the monitoring team strictly adhere to Apple's policies for outside service providers, including expenses, that we notify Apple before adding new personnel, and that we submit a budget, among other requirements.  In addition, Mr. Andeer said that Apple "does not allow the firms it works with to market their representation of Apple," complaining of what he alleged were press releases that had been issued by Goodwin Procter, my consulting firm, and Fried Frank.[4]

21.     On October 26, 2013, I responded to Mr. Andeer's email of the previous day. (Bromwich Exhibit G)  I explained that the relationship between Apple and the Monitor was not the same as the relationship between Apple and a supplier or vendor, and that my purpose in providing the draft letter was to invite his comments regarding the treatment of confidentiality, an issue about which he and Apple's outside counsel had expressed concern at the October 22 meeting.  I provided specific responses to each of the points in Mr. Andeer's October 25 email.

22.     On October 28, 2013, Mr. Andeer responded to my October 26 email, asking me to confirm that DOJ had approved the terms and conditions of the engagement letter. (Bromwich Exhibit H)  Mr. Andeer's email also requested that I provide various data on my billing rates and administrative fee, as well as other information about billing rates.

23.     On October 29, 2013, Barry Nigro sent an email response to Mr. Andeer's October 28 email at my request. (Bromwich Exhibit I)  Mr. Nigro's email reiterated that the arrangement between the Monitor and Apple could not be governed by a "standard arrangement between a client and its lawyers or a client and its consultant," and that the Final Judgment did not provide Apple the right to negotiate or approve the fees charged or expenses incurred by the Monitor.

24.     Also on October 29, a member of my team sent an email to Mr. Andeer reiterating a request for documents from Apple, which I initially made at the October 22 meeting in New York. (Bromwich Exhibit J)  The email confirmed our request for items such as Apple's past compliance policies and procedures, documents that explain the reporting structure for Apple's compliance system, documents that explain the role and membership of the Audit & Finance and Risk Oversight Committees, training materials, and organization charts.  It also asked for materials related to the compliance

---

[3]     We subsequently learned that Apple has Board meetings four times per year.

[4]     Goodwin Procter issued a notice on its web site to clarify that I was handling this matter through my consulting firm.  My consulting firm did not issue a press release, although it did provide a two-sentence statement in response to numerous press inquiries.

enhancements Apple highlighted in a letter that the company sent to the DOJ on August 19, 2013, and that Mr. Andeer had provided to me at the October 22 meeting.

25.     On October 31, 2013, Mr. Boutrous sent a letter notifying me of Apple's objections to the timing and scope of my activities as Monitor, and to the financial terms of the engagement letter. (Bromwich Exhibit K; Apple Exhibit A)  This was the first time that Apple or its counsel had suggested that our proposed activities were in conflict with the Final Judgment, or were an inappropriate expansion of the scope of my responsibilities, rather than contrary to the hopes and expectations of Apple.  Mr. Boutrous's letter included Apple's proposed confidentiality agreement.

26.     On November 1, 2013, I responded to Mr. Boutrous by letter (Bromwich Exhibit L), and attached a separate letter to Timothy Cook, Apple's Chief Executive Officer, and D. Bruce Sewell, Apple's General Counsel. (Bromwich Exhibit M; Apple Exhibit M)  In my letter to Mr. Boutrous, I reiterated my hope for a constructive relationship and my disappointment at not yet having received the materials I requested at the October 22 meeting with Apple and its outside counsel.  I explained that my reason for writing directly to Mssrs. Cook and Sewell was to establish a line of communication with the senior managers of the company, as I had done in previous successful monitorships.[5]  I had become concerned that the company was using its outside counsel as a shield to prevent interaction between senior management and my monitoring team.

27.     In my November 1 letter to Messrs Cook and Sewell, I introduced myself, outlined my responsibilities under the Final Judgment, and repeated the principles that we would follow in our monitoring activities, including fidelity to the contours of the monitor's role as set forth in the Final Judgment.  I pointed out that the company had failed to provide any of the materials it had promised, and that we had received no response to our request for brief preliminary interviews.  The letter pointed to the aspects of the Final Judgment that supported our request to interview senior executives and members of the Board but again expressed flexibility in scheduling such interviews. At no point in my letters to Mr. Boutrous or Mssrs. Cook and Sewell did I suggest that Apple's employees or senior management would be interviewed outside the presence of counsel, or even meet with me in a non-interview context without counsel if that was their preference.[6]

28.     On November 4, 2013, Mr. Boutrous responded by email to my November 1 letter. (Bromwich Exhibit N)  He asked to speak with me by telephone and enclosed a separate letter to me from Mr. Sewell. (Bromwich Exhibit O)  In his letter,

---

[5]     Contrary to the claims in the papers Apple has filed with the Court on November 27 and December 13, (see Apple's Dec. 12, 2013 Memorandum of Law, at 5, 8, 16-17, and 19; Apple's Nov. 27, 2013 Objections, at 1, 13-18) this request for a direct line of communication was not intended to deprive Apple Board Members, senior executives, or employees of their right to have counsel present during interviews.

[6]     My frame of reference is provided by my experience: in none of my three other monitorships has the monitored entity hired outside counsel.  This reflected the view of two public agencies and one company that the monitorship was not an adversary process and should not be approached in that way.

Mr. Sewell promised to provide me with a "comprehensive update on [Apple's] progress" and to "facilitate whatever meetings are appropriate for [me] to fully and completely discharge [my] responsibilities as the external monitor." He described my prior requests for documents from Apple as calling for "voluminous historical documents." On that same day, I responded to Mr. Boutrous's letter. (Bromwich Exhibit P) I explained that, in my experience with other monitorships involving specific required deadlines, the monitored entities had never argued that I was barred from beginning my monitoring work prior to the expiration of such deadlines. I also reiterated my desire to be reasonable and flexible in my approach and to accommodate the schedules of the company's executives in a fair and reasonable way.

29.    On November 5, I emailed Mr. Boutrous to propose times for a call to discuss the open issues, as requested by his November 4 email to me. (Bromwich Exhibit Q) I included with my email a response to Mr. Sewell's November 4 letter. (Bromwich Exhibit R; Apple Exhibit L) In that letter, I explained to Mr. Sewell the importance of establishing prompt contact with top executives at the company and that such contact establishes the groundwork for a successful and productive monitorship. I also reiterated my request to meet with the newly hired Antitrust Compliance Monitor, Deena Said, as well as to conduct one-hour introductory interviews with Mr. Sewell and Mr. Cook. I also attempted to correct the misconception apparently communicated to Mr. Sewell that my previous document requests sought "voluminous historical documents."[7]

30.    On November 6, I spoke by telephone with Mr. Boutrous and Daniel G. Swanson of Gibson Dunn, Mr. Nigro, and Maria Cirincione, a member of the monitoring team. During the call, Mr. Boutrous stated that it was not Apple's position that the Monitor should not start work, including interviews, prior to the January 14, 2014 deadline, which was in fact the position Mr. Boutrous had taken in his October 31 letter.[8] Rather, he proposed a first round of interviews to include Mr. Sewell; Tom Moyer, Apple's Chief Compliance Officer; Ms. Said, Apple's Antitrust Compliance Monitor; and others during the week of November 18 or after Thanksgiving. He said that the interviews would help to bring my team "up to speed." Mr. Boutrous also said that, while Apple employees view the interviews as formidable in concept, actually participating in the interviews would ease the road going forward. In the interim, Mr. Boutrous proposed to provide my team with the background materials I had requested. Mr. Boutrous said that he did not believe that confidentiality would be an obstacle to Apple providing those materials. He made no reference to the materials as "voluminous." With respect to the open issue regarding fees, Mr. Boutrous said that both he and Mr. Swanson were familiar with my rates and were likely more in agreement with me regarding the appropriateness of that level of rates than with Apple.

---

[7]    Nothing further had been requested at that time beyond the few items outlined at the October 22 meeting.

[8]    "However, it makes no sense, and would be extremely disruptive, to schedule those interviews before Apple has completed its internal assessment and developed its new antitrust training program." (Bromwich Exhibit K; Apple Exhibit A).

31.     On November 7, I sent an email to Mr. Boutrous that addressed Apple's expense guidelines, and reiterated my hope to receive Apple's list of proposed employee interviews for the week of November 18. (Bromwich Exhibit S)

32.     Mr. Boutrous responded to my November 7 email by email that same day. (Bromwich Exhibit T; Apple Exhibit C) He asserted that the week of November 18 was "looking bad from a scheduling standpoint." I had initially proposed the week of November 18 for interviews at the October 22 meeting, and this was the first time Apple had suggested that the week of November 18 was inconvenient. Mr. Boutrous suggested a list of potential interview candidates. The list included nine people, but not a single member of the Board and no senior executive other than Mr. Sewell.

33.     I responded to Mr. Boutrous by email that same day and asked him to "keep trying [to schedule] for the week of November 18." (Bromwich Exhibit U) I continued to believe that providing a month's notice was sufficient for Apple to permit me to interview some of the people I had requested. I acknowledged that not all of the people with whom we had requested interviews would be available that week. I suggested other interview candidates for the week of November 18 or thereafter and listed the types of very basic information I was hoping to gather from these interviews.

34.     On November 9, Mr. Boutrous responded to my email to say that he was checking on the week of November 18 and would report back. (Bromwich Exhibit V) I informed him that I would plan to fly to California the evening of Sunday, November 17 for a start time on Monday morning, November 18, unless the company preferred to begin the interviews on Tuesday. (Bromwich Exhibit W) I reiterated my request for the documents initially requested at the October 22 meeting.

35.     Later in the day on November 9, Mr. Boutrous emailed to notify me that the week of November 18 was "very bad in terms of scheduling" and that only a few of the people I had requested or he had proposed were available at that time. (Bromwich Exhibit X) Mr. Boutrous requested that I change my schedule to come to California the week of December 9, a week during which I had previously told him I was unavailable. I responded to Mr. Boutrous by email that same day, expressing my disappointment. (Bromwich Exhibit Y) I asked him to identify which of the people on the list of interviewees were unavailable the week of November 18 and to confirm that he had conveyed my request to speak with them. I offered to rearrange my schedule to accommodate Apple by flying out to Cupertino during the week of November 11 if that was more convenient for Apple and the people I had asked to interview.

36.     On November 11, Mr. Boutrous responded that my proposal regarding the requested interviews was "unreasonable, unnecessary, and unwarranted." (Bromwich Exhibit Z; Apple Exhibit B) I responded by email to Mr. Boutrous that same day and suggested that we try to make progress on the outstanding issues by phone. (Bromwich Exhibit AA; Apple Exhibit E) During a brief phone call that evening, I requested that Mr. Boutrous make additional efforts to arrange interviews the week of November 18, and that a failure to permit a single interview within a month of my appointment was inconsistent with the company's stated commitment to cooperate with our monitoring responsibilities.

37.    On November 12, Mr. Boutrous emailed me to propose two interviews for Monday, November 18 of Tom Moyer, the company's Chief Compliance Officer and Gene Levoff, an in-house attorney with various responsibilities relating to the Audit and Finance Committee and risk management functions. (Bromwich Exhibit BB)  I responded by email to Mr. Boutrous that same day and accepted his offer. (Bromwich Exhibit CC; Apple Exhibit F)  I reiterated my hope that Apple would provide additional Apple personnel for interviews during my visit, and repeated once again the request for the documents initially requested at the October 22 meeting.  Mr. Boutrous outlined the logistics for the interviews and suggested that Apple "plan[ned] to get [me] material in response to [my] 10/22 request." (Bromwich Exhibit DD)

38.    On November 15, 2013, I emailed Mr. Boutrous to reiterate my hope that Apple would identify additional employees for my team to interview during the November 18 trip. (Bromwich Exhibit EE; Apple Exhibit H)  As to Ms. Said, the newly-hired Internal Antitrust Compliance Officer, I said, "it would be useful to meet [her] if only briefly during our visit."  I repeated once more my request for the documents initially requested at the October 22 meeting.

39.    On November 17, 2013, Mr. Swanson emailed me an agenda for the November 18 interviews. (Bromwich Exhibit FF; Apple Exhibit G)

40.    On November 18, 2013, I conducted one-hour interviews of Mr. Moyer and Mr. Levoff at Apple's satellite offices at 250 S. Mathilde Avenue, Sunnyvale. The interviews were informative and instructive.  They provided some basic information about Apple's compliance structure and its approach to compliance issues.  Even though these two interviews were the only ones scheduled, Apple insisted on limiting them to one hour each, consistent with my original offer concerning senior management and Board members, even though Mr. Moyer and Mr. Levoff fit into neither category.  Apple was represented at the interviews by Mr. Boutrous (by phone), Mr. Reilly, and one of Mr. Reilly's colleagues from Simpson Thacher (by phone).  None of Apple's lawyers raised an objection to any questions asked during the interviews, other than an occasional reminder to the witnesses that they were not to provide any attorney-client privileged information.

41.    On that same date, I also met with Noreen Krall, Apple's Vice-President and Chief of Litigation, who had been added to the agenda by Apple.  Ms. Krall had no substantive information to provide, but instead discussed fees, confidentiality, and related matters.  I told Ms. Krall that it would be convenient and cost-effective to arrange additional interviews for November 19 or November 20, when I would still be in Northern California.  I also told her that in view of Apple's failure to permit the interviews I had requested during the week of November 18, I would be willing to rearrange my schedule and return to California during the week of December 2 to conduct additional interviews, which was one of the alternatives Apple had earlier proposed.

42.    Later on November 18, I emailed Ms. Krall to reiterate my suggestion that we arrange additional interviews for November 19 and 20 and/or the week of

December 2. (Bromwich Exhibit GG)  Ms. Krall responded by email later that day and informed me that "due to preexisting scheduling conflicts," Apple would not make additional personnel available for interviews on November 19 or 20.  However, she stated that Apple would schedule additional interviews for December 4, 5, and 6.  In my response to that email, I asked whether Ms. Krall had checked the availability of members of Apple's Board of Directors whom I understood to live or work in the area. She failed to respond. (Bromwich Exhibit HH)[9]

43.     On November 19, I emailed Ms. Krall, as well as Apple's outside counsel from Gibson Dunn and Simpson Thacher.  (Bromwich Exhibit II; Apple Exhibit S)  I informed them that I would be in New York on November 21 and 22, during which time I hoped to meet with Andrea Jung, a member of Apple's Board of Directors, and that I would be in Washington, D.C., on November 25, during which time I hoped to meet with Ronald Sugar, a member of Apple's Board of Directors and the Chair of the Audit and Finance Committee.[10]  I again offered to limit the meetings to one hour each and requested that Apple suggest alternative dates if Ms. Jung and Dr. Sugar were unavailable on the dates that I had suggested.  Ms. Krall responded on November 21, explaining that she was checking Dr. Sugar's availability to meet in California on December 4, 5, or 6 and promised to provide an agenda for those meetings by the end of the week. (Bromwich Exhibit JJ)  Ms. Krall did not address my request for a meeting with Ms. Jung.

44.     On November 21, 2013, a month after the materials were requested, Apple provided its first and only set of materials in response to our requests for documents.  The documents Apple provided included a presentation prepared and given by Mr. Moyer at his November 18 interview, excerpts from various training modules, the Antitrust and Competition Law Policy section from Apple's Code of Conduct, five versions of Apple's Business Conduct Policy from various years, and two 2013 antitrust training presentations.  The total quantity of materials we received was 303 pages.

45.     On November 22, in the face of Apple's failure to produce more than two witnesses earlier that week and none of the senior executives or Board Members I had requested, its refusal to allow me even to meet the company's new Antitrust Compliance Officer, and its delays in producing documents, we sent a letter to Apple's Board of Directors through Ms. Krall, Apple's in-house counsel. (Bromwich Exhibit KK; Apple Exhibit J)  The letter began by explaining the responsibilities the Court had imposed when it appointed me as the Monitor in this matter.  I described my disappointment at Apple's lack of cooperation to date, particularly given that I told Mr. Andeer and Apple's outside counsel in our first meeting that I thought it very important, based on

---

[9]     On multiple occasions, Apple's counsel has highlighted my offer to meet with Mr. Sewell at the federal courthouse in San Jose as an apparent example of overreaching or inappropriate activity.  (Apple's Dec. 12, 2013 Memorandum of Law, at 4 and 16; Apple's Nov. 27, 2013 Objections, at 13)  To the contrary, it was one of many efforts to take Mr. Sewell and others up on their offers to work cooperatively with us, and to do so with minimal inconvenience to Apple executives.  (Bromwich Exhibit EE)

[10]    Based on information on Apple's web site, I had the mistaken belief that Dr. Sugar was based in Northern Virginia.  In fact, he is based in Southern California.

my experience in previous monitorships, to build a relationship with Apple's senior employees and members of its Board. I concluded the letter by expressing hope that my relationship with Apple would become collaborative and positive and requesting the Board's support in working toward that goal. In response to Ms. Krall's suggestion that sending copies of the letter directly to the Board Members was "not necessary or customary in our communication with Board members," we did not do so.

46.     Later on November 22, I received a letter from Mr. Reilly. (Bromwich Exhibit LL; Apple Exhibit I) He asserted that my requests to speak with Apple employees and Board members were "incredibly disruptive" and "counter-productive" to Apple's efforts to improve its antitrust compliance training and policies. He provided no evidence to support the claims that the requests, which Apple had not complied with, were "incredibly disruptive." Mr. Reilly claimed that my review should not begin "in substance" until "on or around January 14, 2014" and that Apple had therefore "gone far above and beyond" what the Final Judgment required of it by meeting with me on October 22, permitting me to interview two Apple employees on November 18, and providing me with some documents the day before. The letter did also include a proposed interview schedule for December 4-6 that included ten Apple employees (including Ms. Krall and the two employees I had interviewed on November 18) and included Dr. Sugar, the Chair of Apple's Audit and Finance Committee. Mr. Reilly also offered in the letter to schedule a telephone interview of Bruce Sewell on December 9.

47.     On November 25, Mr. Sewell sent me an email in which he recited the steps Apple had taken to respond to my requests. (Bromwich Exhibit MM; Apple Exhibit P) He also expressed the hope that we would "continue to work cooperatively to conduct [the interviews proposed by Mr. Reilly] as efficiently and effectively as possible and to address any further requests that you may have." I responded the same day, stating that I was looking forward to the December 4-6 interviews and requested information regarding some of the individuals who had been put on the schedule but with whom I had not requested to meet. (Bromwich Exhibit NN) I also expressed the hope that Mr. Sewell could help me set up interviews with additional senior executives and Board members, and I noted my belief that it would be to Apple's advantage to facilitate those interviews early in the monitorship.

48.     On November 27, Apple filed its Objections to the Court's Order Filed on November 21, 2013. On December 1, on my behalf, Ms. Cirincione forwarded to DOJ and the Plaintiff States, as well as to Ms. Krall, Mr. Boutrous, and Mr. Reilly, various profane and abusive emails I had received from members of the public that were prompted by Apple's Objections filed with this Court on November 27. (Bromwich Exhibit OO)

49.     On December 4-6, I interviewed Dr. Sugar and nine Apple employees (including the two employees I had interviewed on November 18) in Sunnyvale, California. We played no role in determining whom we would be interviewing, and we had no say in the location of the interviews.[11] In advance, Apple's counsel advised us

---

[11]     In my 20 years of doing oversight work, I have never before had the entity over which I was exercising oversight unilaterally dictate who could be interviewed, even in those instances in

that all interviews were to be held at Apple's satellite offices at 250 S. Mathilde Avenue, Sunnyvale. Until Dr. Sugar's interview, we had not been advised that he and Mr. Boutrous were flying from Los Angeles solely for the interview.

50.    We accepted the roster of interviews without objection and without any requests for adjustment, apart from a time change on December 6, even though it included only one Board member and no members of top management.[12] All the interviews were strictly limited to an hour, with the exception of the interview of Ms. Said, which Apple's outside counsel allowed to extend for an additional 30 minutes. At least two outside lawyers for Apple attended each of the interviews, either in person or by phone. Mr. Boutrous attended Dr. Sugar's interview as his personal counsel as well as counsel for Apple. With the exception of Dr. Sugar's interview, Ms. Said attended all the interviews because, according to Apple's counsel, "she hopes these interviews will provide her with valuable information that will [be] helpful in her duties."[13] Apple was represented at the interviews by Mr. Reilly, one of Mr. Reilly's colleagues from Simpson Thacher (by phone), and Ms. Said. None of Apple's lawyers raised an objection to any questions asked during the interviews, other than an occasional reminder to the witnesses that they were not to provide any attorney-client privileged information.[14]

51.    On December 10, I sent Mr. Reilly an email in which I thanked him for arranging the December 4-6 interviews and asked when it would be most convenient for me to conduct additional interviews. (Bromwich Exhibit PP) I explained that, especially with the coming of the holiday season, it might make sense to conduct the additional interviews after January 14, 2014, but said that I would leave the choice to Apple. I expressed my willingness to meet with Apple at any time to discuss issues or concerns that Apple might have, and I stated that I would welcome the chance to discuss Apple's concerns regarding fee-related issues at Apple's earliest convenience.

52.    I interviewed Mr. Sewell by telephone on December 10. The interview was cordial and professional. At the end of the interview, I advised Mr. Sewell of my note to Mr. Reilly and expressed the hope that we could resolve the outstanding issues promptly.

53.    On December 17, I received a copy of a letter from Ms. Krall to DOJ and the Plaintiff States. The letter addressed the financial terms of the monitoring

---

which I have dealt with very sensitive matters, including highly classified matters of national security.

[12]    Mr. Levoff appeared on the list of interviews for December 4-6 even though we had previously interviewed him on November 18. We had not requested to speak with Mr. Levoff in the first instance, much less requested to speak with him again.

[13]    I asked that Ms. Said be excluded from Dr. Sugar's interview because I planned to ask him about the process that led to her selection as the company's internal antitrust compliance officer. We subsequently learned that neither Dr. Sugar nor anyone above the level of Mr. Andeer had met Ms. Said.

[14]    Mr. Reilly abruptly ended one of the interviews but not because of any substantive objection. He ended the interview because I asked a follow-up question after the hour set for the interview had expired.

assignment, the timing of the monitor's assignment, and the scope of the monitor's responsibilities.

    a.  The section on the financial terms of engagement proposed a fee cap lower by a factor of at least 10 than any monitorship I have been involved in or have knowledge about.

    b.  The section on the timing of the monitor's assignment suggested that the monitor be prohibited from doing any further work until January 14 ("No further work by Mr. Bromwich is necessary until after January 14"), presumably including the review of documents that have already been provided and other work not requiring interaction with Apple. It provides no reason for this complete prohibition.

    c.  The section on the scope of the monitor's responsibilities proposed a short list of activities deemed appropriate by Apple after January 14. Taken as a whole, these permissible items amount to a mechanical and limited approach to monitoring, including arrogating to Apple the power to dictate whom it is relevant and appropriate to interview. If accepted, the proposal as a whole would, in my judgment, nullify the Court's September 5 Order.

    54.    In the two months since my appointment, we have been given access to Apple personnel for substantive interviews or discussions for a total of thirteen hours spread over two visits to California. We have been given access to only one member of the Board of Directors and one senior executive (by phone). Of the eleven people we have been permitted to interview, seven are lawyers rather than business people. The interviews have not taken place at Apple's corporate headquarters in Cupertino, California, but instead at a remote location several miles away in Sunnyvale, California. This is far less access than I have ever received during a comparable period of time in the three other monitorships I have conducted. We have been provided, a month after we were told that all the materials would be produced promptly, only 303 pages of documents, which constitutes an incomplete response to the requests we made on October 22.

    55.    I have reviewed the recent filings of Apple's counsel in this matter, including its November 27, 2013, Objections to the Court's Order Filed on November 21, 2013, and its Memorandum of Law in Support of Its Motion by Order to Show Cause for a Stay of the Injunction Pending Appeal. The characterization of our activities as a "roving investigation," (Apple's Dec. 12, 2013 Memorandum of Law, at 1) "a broad and amorphous inquisition," (*Id.* at 3) and "unauthorized and unconstitutional investigatory efforts" (*Id.* at 6) bear no relation whatsoever to the activities we have attempted to conduct. During the course of my career, I have conducted scores of investigations in both the public and private sector, supervised hundreds of others, and conducted many hundreds of interviews. The request for limited preliminary background interviews to learn about corporate structure, process, culture, and tone does not convert monitoring into an investigation of any kind, much less into a "roving investigation" or a "broad and amorphous inquisition. (*Id.* at 1 and 3)"

14

56.     Attached hereto as Bromwich Exhibit A is an email from Kyle Andeer to Michael R. Bromwich, sent on October 17, 2013.

57.     Attached hereto as Bromwich Exhibit B is a draft engagement letter from Michael R. Bromwich to Kyle Andeer, sent on October 23, 2013.

58.     Attached hereto as Bromwich Exhibit C is an email from Kyle Andeer to Michael R. Bromwich, sent on October 23, 2013.

59.     Attached hereto as Bromwich Exhibit D is an email from Michael R. Bromwich to Kyle Andeer, sent on October 24, 2013.

60.     Attached hereto as Bromwich Exhibit E is an email from Kyle Andeer to Michael R. Bromwich, sent on October 24, 2013.

61.     Attached hereto as Bromwich Exhibit F is an email from Kyle Andeer to Michael R. Bromwich, sent on October 25, 2013.

62.     Attached hereto as Bromwich Exhibit G is an email from Michael R. Bromwich to Kyle Andeer, sent on October 26, 2013.

63.     Attached hereto as Bromwich Exhibit H is an email from Kyle Andeer to Michael R. Bromwich, sent on October 28, 2013.

64.     Attached hereto as Bromwich Exhibit I is an email from Barry Nigro to Kyle Andeer, sent on October 29, 2013.

65.     Attached hereto as Bromwich Exhibit J is an email from Maria Cirincione to Kyle Andeer, sent on October 29, 2013.

66.     Attached hereto as Bromwich Exhibit K is a letter from Theodore J. Boutrous, Jr. to Michael R. Bromwich, sent on October 31, 2013.

67.     Attached hereto as Bromwich Exhibit L is a letter from Michael R. Bromwich to Theodore J. Boutrous, Jr., sent on November 1, 2013.

68.     Attached hereto as Bromwich Exhibit M is a letter from Michael R. Bromwich to Timothy Cook, sent on November 1, 2013.

69.     Attached hereto as Bromwich Exhibit N is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 4, 2013.

70.     Attached hereto as Bromwich Exhibit O is a letter from Bruce Sewell to Michael R. Bromwich, sent on November 4, 2013.

71.     Attached hereto as Bromwich Exhibit P is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 4, 2013.

72.     Attached hereto as Bromwich Exhibit Q is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 5, 2013.

73.     Attached hereto as Bromwich Exhibit R is a letter from Michael R. Bromwich to Bruce Sewell, sent on November 5, 2013.

74.     Attached hereto as Bromwich Exhibit S is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 7, 2013.

75.     Attached hereto as Bromwich Exhibit T is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 7, 2013.

76.     Attached hereto as Bromwich Exhibit U is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 7, 2013.

77.     Attached hereto as Bromwich Exhibit V is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 9, 2013.

78.     Attached hereto as Bromwich Exhibit W is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 9, 2013.

79.     Attached hereto as Bromwich Exhibit X is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 9, 2013.

80.     Attached hereto as Bromwich Exhibit Y is an email from Michael R. Bromwich to Theodore Bromwich, sent on November 9, 2013.

81.     Attached hereto as Bromwich Exhibit Z is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 11, 2013.

82.     Attached hereto as Bromwich Exhibit AA is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 11, 2013.

83.     Attached hereto as Bromwich Exhibit BB is an email from Theodore Boutrous to Michael R. Bromwich, sent on November 12, 2013.

84.     Attached hereto as Bromwich Exhibit CC is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 12, 2013.

85.     Attached hereto as Bromwich Exhibit DD is an email from Theodore Boutrous to Michael R. Bromwich sent on November 13, 2013.

86.     Attached hereto as Bromwich Exhibit EE is an email from Michael R. Bromwich to Theodore Boutrous, sent on November 15, 2013.

87.     Attached hereto as Bromwich Exhibit FF is an email from Daniel Swanson to Michael R. Bromwich, sent on November 17, 2013.

88.     Attached hereto as Bromwich Exhibit GG is an email from Michael R. Bromwich to Noreen Krall, sent on November 18, 2013.

89.     Attached hereto as Bromwich Exhibit HH is an email from Michael R. Bromwich to Noreen Krall, sent on November 18, 2013.

90.     Attached hereto as Bromwich Exhibit II is an email from Michael R. Bromwich to Noreen Krall, sent on November 19, 2013.

91.     Attached hereto as Bromwich Exhibit JJ is an email from Noreen Krall to Michael R. Bromwich, sent on November 21, 2013.

92.     Attached hereto as Bromwich Exhibit KK is a letter from Michael R. Bromwich to Apple's Board Members, sent on November 22, 2013.

93.     Attached hereto as Bromwich Exhibit LL is a letter from Matthew Reilly to Michael R. Bromwich, sent on November 22, 2013.

94.     Attached hereto as Bromwich Exhibit MM is an email from Bruce Sewell to Michael R. Bromwich, sent on November 25, 2013.

95.     Attached hereto as Bromwich Exhibit NN is an email from Michael R. Bromwich to Bruce Sewell, sent on November 25, 2013.

96.     Attached hereto as Bromwich Exhibit OO is an email from Maria Cirincione to DOJ and the Plaintiff States, as well as to Noreen Krall, Theodore Boutrous, and Matthew Reilly, sent on November 27, 2013.

97.     Attached hereto as Bromwich Exhibit PP is an email from Michael R. Bromwich to Matthew Reilly, sent on December 10, 2013.


        I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: December 30, 2013                     Respectfully submitted,

                                             Michael R. Bromwich