**From:** Kyle Andeer [mailto:kandeer@apple.com]
**Sent:** Thursday, October 17, 2013 12:08 AM
**To:** mbromwich@goodwinprocter.com; Nigro, Barry
**Subject:** Introduction

Hi Michael & Barry,

I wanted to drop you a quick note of introduction in light of today's news.  I am responsible for Apple's in-house antitrust/competition legal team; I have spent three years here after a decade at the DOJ and the FTC.

I don't believe I have met either of you before but I am looking forward to it.  The circumstances (at least from my perspective) could be better but I am committed to working with both of you and developing a best of class antitrust compliance program for iTunes.  We are already hard at work developing such a program working with our internal compliance team here at Apple and Kevin Arquit and Matt Reilly at Simpson Thacher.  We are hopeful that the program that we will present to you in 90 days will meet our lofty goals.  That said, we recognize and expect that you will have thoughts and comments.  I really do hope this can be a collaborative effort.

I thought it might be helpful to at least introduce myself at the outset.  I am more than willing to get on a call (or a plane) at any time if that would be of interest.   And Michael, I apologize for using your Goodwin address . . . I did not have one for your consulting practice.  Let me know if there is a better contact.

Kyle


Kyle Andeer | Apple Legal | Senior Director, Competition Law & Policy/Commercial & Retail Law
1 Infinite Loop, Cupertino, California 95014 | T (408) 862-9307 | C (408) 464-2006 | kandeer@apple.com
The information in this e-mail and any attachment(s) is intended solely for the personal and confidential use of the designated recipients.  This message may be an attorney-client communication protected by privilege.  If you are not the intended recipient, you may not review, use, copy, forward, or otherwise disseminate this message.  Please notify us of the transmission error by reply e-mail and delete all copies of the message and any attachment(s) from your systems.

**From:** Michael Bromwich [michael.bromwich@bromwichgroup.com]
**Sent:** Wednesday, October 23, 2013 6:58 PM
**To:** Kyle Andeer
**Cc:** Nigro, Barry; Cirincione, Maria
**Subject:** Monitoring Letter
**Attachments:** Apple Monitoring Letter -- 10-23.doc

Dear Kyle,

I have attached a draft letter that sets forth our duties and responsibilities as the external antitrust compliance monitor under the Final Judgment, and touches on other matters relevant to our monitoring work, including information about fees, expenses, and confidentiality. This letter is specifically tailored to the provision of monitoring services under the Final Judgment. Accordingly, it is different in various ways from the engagement letter that would be appropriate if Apple were a client of a law firm or my consulting firm.

Before I provided a signed version of the letter, I wanted to make sure it should be addressed to you rather than someone else at Apple, and give you the opportunity to suggest any revisions to Section 10 of the letter dealing with confidentiality. I realize this may be a sensitive issue and I wanted to make sure the language I have crafted is acceptable. I am willing to consider reasonable modifications.

Please confirm that you should be the recipient of this letter (or provide an alternative addressee) and suggest any reasonable changes to the confidentiality language as promptly as you can.

Thanks very much.

*MRB*



The Bromwich Group LLC
901 New York Avenue, NW 5th Floor
Washington, DC 20001


October 23, 2013


Kyle Andeer, Esquire
Apple Inc.
1 Infinite Loop
Cupertino, California  95014

     Re:   External Antitrust Compliance Monitoring

Dear Mr. Andeer:

     This letter sets forth the terms under which The Bromwich Group LLC, a Delaware limited liability company ("the Bromwich Group" or "we"), will discharge its responsibilities to the Court as the External Compliance Monitor ("monitor") under the Plaintiff United States' Final Judgment in *United States of America v. Apple, Inc. et al.,* and the Plaintiff States' Order Entering Permanent Injunction (collectively the "Final Judgment") in *The State of Texas, et. al., v. Penguin Group (USA) Inc. et al.,* Civil Action No. 1:12-CV-3394, dated September 5, 2013, in the United States District Court for the Southern District of New York.   A copy of the Final Judgment is attached as Exhibit A. A copy of the Court's October 16, 2013 order appointing Michael R. Bromwich as the monitor is attached as Exhibit B.

     1.  Monitoring.  We will be undertaking the monitoring responsibilities and duties described in Section VI. of the Final Judgment and Permanent Injunction.

     2.  Term of Appointment.  Pursuant to Section VI of the Final Judgment, we will serve as monitor for a period of two years, commencing on October 16, 2013 ("date of appointment"), provided that the appointment will not expire before Apple completes two years of the training required by Section V.C. of the Final Judgment.  In addition, the appointment may be extended by the Court  from the date of appointment, either *sua sponte* or on application of the United States or any Plaintiff State, by one or more one-year periods.

3.  Scope of Authority.  Pursuant to the Final Judgment, we have the power and authority to review and evaluate Apple's internal antitrust policies and procedures, and the training program required by Section V.C. of the Final Judgment, and to recommend changes to address any perceived deficiencies in the antitrust policies, procedures, and training.  The review of Apple's antitrust policies and procedures is to determine whether they are reasonably designed to detect and prevent violations of the antitrust laws.  The review of Apple's antitrust training program is to determine whether it is sufficiently comprehensive and effective.

4.  Written Reports.   As required by the Final Judgment, we will provide a written report to Apple, the United States, the Representative Plaintiff States, and the Honorable Denise L. Cote, United States District Judge for the Southern District of New York, no later than 180 days after the date of appointment – i.e., April 14, 2014 – setting forth our assessment of the company's internal antitrust compliance policies, procedures, and training as they exist on January 14, 2014 (*i.e.*, 90 days after the date of the appointment).  If appropriate, we will make recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance.

Thereafter, we will provide additional written reports at six month intervals throughout the term of the monitoring appointment.  In addition, at our discretion, or at the request of the Court, the United States, or the Representative Plaintiff States, we may provide additional written reports, in addition to the reports required at six month intervals, setting forth additional recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance.  With respect to any recommendations contained in any written reports, we will follow the procedures set forth in Section VI.E. of the Final Judgment.

5.  Potential Violations and Referrals.  Pursuant to the Final Judgment, if we discover or receive evidence that suggests a violation of either the Final Judgment or the antitrust laws, we must promptly provide that information to the United States and the Representative Plaintiff States without taking any further action.

6.  Cooperation.  The Final Judgment requires Apple to assist us to perform our monitoring responsibilities and forbids it from taking any action that interferes with or impedes our efforts to discharge our responsibilities.  The Final Judgment specifically recognizes that we may engage in the following activities, among others:

a.  interview any Apple personnel;

b.  inspect and copy any documents in the possession, custody or control of Apple;

c.  require Apple to provide compilations of documents, data, or other information, and to submit reports to us containing such material in the form we may specify.

2

Any objection to our activities must be conveyed in writing to the United States and the Representative Plaintiff States within 10 calendar days of the action or actions giving rise to the objection.

7. <u>Personnel.</u> Subject to the approval of the United States after consultation with the Representative Plaintiff States, we may hire persons reasonably necessary to fulfill our monitoring responsibilities. We have requested, and the Court has specifically ordered, that Bernard A. (Barry) Nigro of Fried, Frank, Harris Shriver & Jacobson assist us in discharging our monitoring responsibilities. We will add other personnel, from Fried Frank and elsewhere, as necessary and appropriate to discharge our responsibilities.

8. <u>Compensation.</u> The Final Judgment provides that the monitor and the members of his team be compensated on reasonable and customary terms commensurate with each person's experience and responsibility. The billing rate for Mr. Bromwich is $ 1,100 per hour. The billing rate for Mr. Nigro is be $ 1,025 per hour. The billing rate for other Fried Frank lawyers will be at their usual and customary billing rate, and additional lawyers and other personnel who provide services to the Bromwich Group as part of our monitoring efforts in this matter will be billed at rates commensurate with their experience and responsibility. In addition, The Bromwich Group will charge a management/administrative fee of 15% for managing and administering this matter. The 15% fee will be based only on fees billed for monitoring services, not on expenses. We will provide invoices on a monthly basis. We expect payment to be made within 30 days of your receipt of the invoice.

9. <u>Expenses.</u> The Final Judgment provides for expenses to be compensated so long as they are consistent with reasonable expense guidelines. Our invoices will provide a detailed itemization of expenses, including but not limited to transportation (air and local), lodging, meals, telephone, copying, data storage, and information technology. Payment of all fees and expenses is due within 30 days of receipt of invoice.

11. <u>Confidentiality</u>. In connection with our monitoring activities, Apple will be required to disclose to us in oral, written and other forms, certain confidential, proprietary and sensitive information. So long as it is consistent with our duties and obligations under the Final Judgment, we will treat all such information in strict confidence and will not disclose or publish such information to any other person and will undertake all steps reasonably necessary to prevent such disclosure; provided, however, that we may disclose such information under any of the following circumstances:

    (a) After lawful receipt by us from third parties subject to no restriction of confidentiality;

    (b) If already known us at the time of disclosure or independently developed by the recipient without the use of the disclosed information;

    (c) In the case of the Company, to those of its employees and other personnel working on this matter who need to know such information

in connection with the provision of the monitoring services required by the Final Judgment;

(d) If required to do so pursuant to a legally binding disclosure requirement or by order of a court or other governmental body; or

(e) If required in order to fulfill our duties and responsibilites as defined by the Final Judgment, including disclosure to the Court, the United States, or the Representative Plaintiff States. We will not, however, disclose any privileged information to the United States or Representative Plaintiff States.

12. <u>Dispute Resolution</u>. Any objections by Apple to actions by the Monitor in must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection. In the event those objections cannot be resolved, they will be submitted to the Court.

14. <u>Relationship Between This Letter and the Final Judgment.</u> In the event of any inconsistency between this Letter and the Final Judgment, the terms of the Final Judgment govern.

Very truly yours,

THE BROMWICH GROUP LLC

By:_____
     MICHAEL R. BROMWICH
     Managing Principal

**From:** Kyle Andeer [kandeer@apple.com]
**Sent:** Wednesday, October 23, 2013 8:50 PM
**To:** Michael Bromwich
**Cc:** Nigro, Barry; Cirincione, Maria
**Subject:** Re: Monitoring Letter

Michael,

Thank you for the draft; it raises a number of issues and we will respond as quickly as we can.

Kyle

On Oct 23, 2013, at 3:58 PM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:

Dear Kyle,

I have attached a draft letter that sets forth our duties and responsibilities as the external antitrust compliance monitor under the Final Judgment, and touches on other matters relevant to our monitoring work, including information about fees, expenses, and confidentiality. This letter is specifically tailored to the provision of monitoring services under the Final Judgment. Accordingly, it is different in various ways from the engagement letter that would be appropriate if Apple were a client of a law firm or my consulting firm.

Before I provided a signed version of the letter, I wanted to make sure it should be addressed to you rather than someone else at Apple, and give you the opportunity to suggest any revisions to Section 10 of the letter dealing with confidentiality. I realize this may be a sensitive issue and I wanted to make sure the language I have crafted is acceptable. I am willing to consider reasonable modifications.

Please confirm that you should be the recipient of this letter (or provide an alternative addressee) and suggest any reasonable changes to the confidentiality language as promptly as you can.

Thanks very much.

*MRB*
<Apple Monitoring Letter -- 10-23.doc>

**From:**        Michael R. Bromwich [michael.bromwich@bromwichgroup.com]
**Sent:**        Thursday, October 24, 2013 2:37 PM
**To:**          Kyle Andeer
**Cc:**          Nigro, Barry; Cirincione, Maria
**Subject:**     Board and Audit Committee

Kyle,

When we met on Tuesday, you mentioned that the Board will be meeting next week and then not meeting again for six months. In light of that, I wanted to offer to have a brief initial phone call with the Board and/or the Audit Committee next week. I can't come out there in person, but I thought its members might be interested in an introductory call during which I could answer any questions they might have.

Please let me know if you can make this work. If not, we can track them down later on.

Thanks very much.

MRB

**From:**       Kyle Andeer [kandeer@apple.com]
**Sent:**       Thursday, October 24, 2013 2:49 PM
**To:**         Michael R. Bromwich
**Cc:**         Nigro, Barry; Cirincione, Maria; Matthew J. Reilly
**Subject:**    Re: Board and Audit Committee

Michael,

I was mistaken, there is no Board meeting next week.  Please copy Matt Reilly on all future communications.

Kyle
On Oct 24, 2013, at 11:37 AM, "Michael R. Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Kyle,
>
> When we met on Tuesday, you mentioned that the Board will be meeting next week and then not meeting again for six months. In light of that, I wanted to offer to have a brief initial phone call with the Board and/or the Audit Committee next week. I can't come out there in person, but I thought its members might be interested in an introductory call during which I could answer any questions they might have.
>
> Please let me know if you can make this work. If not, we can track them down later on.
>
> Thanks very much.
>
> MRB

| | |
|---|---|
| **From:** | Kyle Andeer [kandeer@apple.com] |
| **Sent:** | Friday, October 25, 2013 10:45 PM |
| **To:** | Michael Bromwich |
| **Cc:** | Nigro, Barry; Cirincione, Maria |
| **Subject:** | Re: Monitoring Letter |
| **Attachments:** | Apple Travel Policy for Suppliers-2.doc; ATT00001.htm; Apple - OSPP - Updated for Competition 10_23_13.docx; ATT00002.htm |

Dear Michael,

Thank you for sharing your draft letter  It is very helpful in that it tees up a number of different issues that make sense to address at the outset of our relationship.  As you noted, the treatment of confidential information is one of several issues that will require additional research and thought.  Although the disclosure of such information is highly unlikely given the narrow scope of the External Compliance Monitor's responsibilities, we agree that this is an issue we should seek to address at the outset.  It likely makes sense for us to execute one of our "customary confidentiality agreements" as contemplated in the Final Judgment.  Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).  We will provide a full response on these and other issues in the next week, as well as a retention obligations agreement and confidentiality agreements to address this point.

I do want to raise concerns with the compensation and expense terms outlined in your letter which are in tension with the terms of the Final Judgment which require the External Monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).   From our perspective they do not reflect the competitive realities of the marketplace.  We expect that your firm – like all of Apple's legal service providers – will comply with Apple's Outside Service Provider Policy ("OSP") (attached) and its standard expense policy (also attached).

1.  Administrative Fee.  You request that the Bromwich Group be paid a "management/ administrative fee" of 15% of all billable hours.  As you will note in the attached policies, Apple does not pay any of its legal vendors a "management/administrative fee."

2.  Hourly Rates.  You have requested that Apple pay you $1,100 per hour and Mr. Nigro $1,025 per hour.  These rates are very high, particularly when compared to the average rate Apple pays a law firm partner ($565 per hour).  Even if one looks at the top 25%, the average rate per partner is $801 per hour.  Apple is prepared to  compensate you at $800 per hour and Mr. Nigro at a rate of $700 per hour.  With the foregoing principles in mind, we also ask that you provide the hourly rate for Maria Cirincione.

3.  Additional Personnel.  Pursuant to Apple's Outside Service Provider Policy, the Bromwich Group (and Fried Frank) should notify Apple before adding new timekeepers to its team and provide a rational for the additional resources. As you appreciate, this is a standard requirement that ensures costs do not spiral out of control.

4.  Expense policy.  Apple expects that you will adhere to its standard expense policy (attached) Apple will pay for coach airfare, lodging at Apple preferred hotels, and per diems of $15 for breakfast, $25 for lunch and $30 for dinner.  The policy also outlines our guidelines on telephone and copying charges.  Apple will not reimburse for data storage and information technology services.  This is consistent with these policies is in keeping with the "reasonable expense guidelines" language in Section VI.I of the Final Judgment.

5.  Budget and Invoicing.  The Bromwich Group should submit an expected budget for its services for the coming year.  As you know this is standard practice in any engagement, including in monitorships.  In addition, Apple expects that your invoices will describe time spent on tasks and a description of those tasks.  Apple reserves the right to challenge fees that are excessive, outside the scope your responsibilities, and/or unjustified pursuant to Sections VI.I. and VI.J. of the Final Judgment.

6.  Billing.  Apple requires firms to submit invoices - within 30 days of service - via an electronic portal.  We can set up a meeting with our eBilling team as soon as you are ready.  Apple will also require a signed W9 in order to pay invoices for your firm.

7.  Marketing.  Apple does not allow the firms it works with to market their representation of Apple (see OSP at 6).  We noted that your firm, Goodwin Proctor, your consulting practice, The Bromwich Group, and Mr. Nigro's firm, Fried Frank all issued press releases announcing your appointments.  We ask that you please refrain from using Apple's name in any marketing materials or media communications.

The requests in your letter do not reflect market realities.  That raises significant concerns on our part.  We sincerely hope that you will reflect on these points and that we can work out these issues without going to the Department of Justice and the courts.  Please let me know if you would like to discuss.

Best regards,

Kyle



# Outside Service Provider Policy

### Effective June 6, 2012

## General

As an Outside Service Provider ("OSP"), you play an important role in helping us deliver expert and innovative services to Apple Inc. ("Apple"). We greatly value our relationship with you and want to ensure that this relationship is mutually beneficial. To that end, this Policy will help you understand and satisfy our quality service requirements, which are integral to our business relationship. This Policy is applicable to all services you provide to Apple or its affiliates. By accepting an engagement to provide services to us, you agree to comply with this Policy, its Attachments and any supplemental instructions provided by Apple.

## Roles and Responsibilities

We may designate an Apple Relationship Lead to act as Apple's point of contact for general communications and inquiries during your engagement as an OSP. Additionally, we will assign an Apple Matter Lead to manage each Matter for Apple, including approving scopes of work, resource requirements, budgets, etc. A "Matter" is an engagement of your firm for goods or services to Apple or Apple designate.

You will appoint an OSP Relationship Lead who will take ultimate responsibility for all substantive work product that you produce and/or services you provide. The OSP Relationship Lead will ensure that your work product is of the highest level of competency and quality and delivered in the most efficient manner feasible. You will designate an OSP Matter Lead to manage each Matter. The OSP Matter Lead will act as the primary point of contact with respect to any given Matter and keep the Apple Matter Lead informed of ongoing developments with respect to assigned matters.

Only authorized parties may retain or oversee OSP services, or approve invoices on behalf of Apple. For Board Matters, an authorized representative of the Board of Directors, the Corporate Secretary of Apple, the relevant committee of the Board of Directors and individual Apple director(s) are considered authorized parties. For all other matters, the only authorized parties are the Apple Chief Executive Officer, the Apple Chief Financial Officer, an Apple Lawyer, Apple Government Affairs, Apple Tax Vice President or Senior Director, Apple Vice President of Internal Audit, and Senior Managers or Directors of Apple's Global Security team.

## Engagement of Services

Whenever you accept engagement on a new Matter, you will first confirm no actual or potential conflicts of interest in accordance with this Policy. Before beginning work on a Matter you will provide a fee estimate, as well as a list of timekeepers proposed to work on the new Matter along with their respective hourly rate(s) using the template available in Mitratech's e-billing system, Collaborati (or from Apple upon request). Occasionally, the Apple Matter Lead may request a project strategy for new Matters. If this is the case, the OSP Matter Lead must develop and submit for approval a strategy for addressing the Matter's scope of work, staffing, and resource management.

The Apple Matter Lead will review the submitted documents and either approve them or advise the OSP Relationship Lead of any discrepancies and required modifications. You will not initiate work on any Matter without the Apple Matter Lead's approval.

**Fees; Alternate Fee Arrangements; Billable Charges; Invoicing; Budgets; Electronic Billing; Withholding Tax Considerations; Payment**

Every bill submitted to us as of the Effective Date will comply with this Policy and is deemed an assertion by you that the services and disbursements reflected on the bill are both reasonable and necessary for every matter.

You will only charge fees to us at the lesser of (i) our agreed discounted rates; or (ii) the lowest price offered to any other client for similar services. Furthermore, fees for professional services will reflect either an hourly rate or an alternative fee arrangement. By "professional services" we mean any service rendered by lawyers, paralegals, consultants, accountants, engineers, lobbyists, or other legal service providers in the performance of their foreseeable duties.

New timekeepers or changes in professional service rates require Apple's express approval. You will submit for approval requests for a new timekeeper or rate increase to LGSTKSubmission@apple.com a minimum of fifteen (15) calendar days prior to the requested effective date. Apple will consider no more than one rate increase request for any reason (including promotion or other increases) in a twelve (12) month period, and no more than one timekeeper form submission per month. If Apple requires you to issue invoices electronically, then all submissions will conform to the timekeeper template and instructions available in Collaborati. If Apple requires you to issue paper invoices, then all submissions will conform to the timekeeper template and instructions available from Apple upon request to LGSTKSubmission@apple.com. The option to submit requests for new timekeepers or a timekeeper rate increase only extends to providers of professional services.

Fees that are billed for goods or any non-professional services will be based on pre-approved rates. For the purposes of this Policy, goods include any item that is tangible and movable at the time of procurement.

## Alternative Fee Arrangements

For mutually agreed upon alternate fee arrangements, invoices should include all timekeeper and expense details with the appropriate line item adjustment reflecting the arrangement total. You will use task code 'ADFEE' for the line item adjustment. Alternate fee arrangement invoices that fail to provide these details will be rejected.

## Billable Charges

Administrative tasks may be factored in as part of your hourly rate or alternative fee arrangements, but not charged separately. Such administrative tasks will include, but are not limited to, work performed by summer associates, interns, law clerks, first year associates, conflicts lawyers or staff, secretaries, librarians, file clerks, administrators, messengers, word processors, proofreaders, docket/calendaring personnel, litigation support staff, meeting coordinators, or any other administrative personnel.

Charges for work that exceed twelve (12) hours per day on an Apple matter must be pre-approved by the responsible Apple Matter Lead. Additionally, you will not bill for professionals not pre-approved by the responsible Apple Matter Lead.

You may only charge expenses that are consistent with the predetermined expense codes provided below. We will not authorize disbursements that do not conform to the permissible expense codes or do not reflect actual expenses without mark-ups. You will pass through to us all discounts, rebates, or other similar reductions made available to you for third party expenses.

| Expense Code | Description | Detailed Instructions |
|---|---|---|
| E101 | Copying | Only pre-approved large volume (>500 pages) B/W copy charges at $0.03/page |
| E102 | Outside printing | Only pre-approved large volume (>500 pages) color copy charges at $0.15/page |
| E105 | Telephone | Only conference call charges |

| E107 | Delivery services/messengers | Only overnight delivery services |
|---|---|---|
| E110 | Out-of-town travel | Pre-approval required by Apple Matter Lead; only coach airfare with no travel agent fee; lodging at an Apple preferred hotel or its equivalent |
| E111 | Meals | Only out-of-town travel meals adhering to per diem limits* |
| E112 | Court fees | |
| E113 | Subpoena fees | |
| E114 | Witness fees | Pre-approval required by Apple Matter Lead |
| E115 | Deposition transcripts | Pre-approval required by Apple Matter Lead for video transcripts |
| E116 | Trial transcripts | |
| E117 | Trial exhibits | |
| E118 | Litigation support vendors | Pre-approval required by Apple Matter Lead |
| E119 | Expert | Pre-approval required by Apple Matter Lead |
| E120 | Private investigators | Pre-approval required by Apple Matter Lead |
| E121 | Arbitrators/mediators | Pre-approval required by Apple Matter Lead |
| E122 | Local counsel | Pre-approval required by Apple Matter Lead |
| E123 | Other professionals | Pre-approval required by Apple Matter Lead |
| E125 | Translation | |
| E126 | Drawings | Pre-approval required by Apple Matter Lead |
| E127 | Patent and Trademark Records | |
| E128 | Searching and Monitoring | |
| E129 | Official Fees, excluding post-issuance patent eminence, trademark renewal fees | Pre-approval required by Apple Matter Lead for any late fees |
| E130 | Post-Issuance Patent Maintenance and Trademark Renewal Fees | |

*Per Diem out-of-town travel meal limits, in accordance with Apple's Travel Policy

| Region | Currency | Breakfast | Lunch | Dinner |
|---|---|---|---|---|
| Americas | US Dollars | 25 | 25 | 50 |
| EMEIA | Euros/GBP | 20 | 35 | 40 |
| Japan | Yen | 3,000 | 4,000 | 8,000 |
| Australia | AU Dollars | 30 | 30 | 50 |
| Asia (except Japan) | US Dollars | 25 | 25 | 60 |

Unless otherwise expressly approved by the Apple Matter Lead, we will only reimburse travel expenses for actual time spent by you working on an Apple Matter while traveling. You will submit receipts and supporting documentation for all travel related expenses regardless of the amount. For all other expenses, you will submit supporting documentation when the total disbursement in any category exceeds $500.

All services procured through a TPP whom you have hired on our behalf require prior approval by the Apple Matter Lead. TPP invoices and compliance with this Policy are your responsibility. You will promptly pay TPPs that you engage to work on a Matter and submit the TPP invoice to us for reimbursement at the actual cost and without mark-up or other administrative fee.

## Invoicing

You must submit invoices monthly for each separate matter. Every invoice must be itemized with separate time entries for each task performed and cost entries for each disbursement incurred. We will not accept block billing. Each time and cost entry requires a task code. Refer to Attachment C for the full list of acceptable task/expense codes.

You will ensure that each itemized time entry briefly describes each specific task performed and its purpose. Additionally, every task performed must reflect actual time spent recorded in tenth-of-an-hour increments. If Apple requires you to issue invoices electronically, then you will include an Apple reference number on all invoices in lieu of the purchase order (PO) number. The appropriate Apple reference number is available in Collaborati. If Apple requires you to issue paper invoices, then you should continue to include the purchase order (PO) number on your invoices.

You will submit all invoices in local currency no later than thirty (30) calendar days after the end of each month in which services were rendered or expenses incurred.

We may reduce payment for persistent failure to comply with our invoice submission requirements. We reserve the right to refuse payment for invoices submitted or containing line items that are more than 180 calendar days after the end of the month in which the work was performed and for invoices that do not conform to this Policy.

Invoices submitted after sixty (60) calendar days are subject to a reduction of charges as follows:

| Days After End of Billing Period | Percentage of Reduction of Charges |
|---|---|
| 61 – 90 | 3% |
| 91 – 120 | 15% |
| 121 – 180 | 50% |
| 181+ | 100% |

## eBilling

We require our OSPs to submit electronic invoices (LEDES 1998B format) for Apple Inc. via Collaborati. To register with Mitratech, please contact us at LGSHelp@apple.com. You will submit invoices for our affiliates in paper format to the Apple Matter Lead. Invoices for our affiliates will need to be submitted through Collaborati at a future date upon our request.

## Budgets

We may request a budget for any engagement. You will submit requested budgets in Collaborati and ensure that submitted budgets include anticipated costs for TPPs, including but not limited to local counsel, subcontractors, experts, etc. If, at any time, you reasonably foresee that expenses will exceed the budget or that the budget will change due to new assumptions, you will submit a revised budget with an explanation of the circumstances for such variance in Collaborati.

## Payment

We will make every effort to process invoices that comply with this Policy for prompt payment. Apple payment terms are net forty-five (45) calendar days of the invoice date. We will pay invoices in local currency, unless the Apple Matter Lead requires otherwise. We will not pay any interest or service charges on the outstanding balance in the event that payment is delayed for any reason. We will only pay you for the correct and undisputed portion of submitted invoices.

## APPLE TRAVEL POLICY FOR SUPPLIERS

### Air Travel

- It is the Traveler's responsibility to choose the least expensive flight
- Book travel at least fourteen (14) days in advance whenever possible. Plan carefully to reduce or eliminate costly changes to itinerary.
- Take advantage of lower airfare alternatives whenever possible, such as:  using non-refundable airfares, non- upgradeable fares, connections and alternate airports.
- Choice of airlines or flight routings due to membership in mileage programs or traveler preference which results in higher cost to Apple is not permitted.
- Apple will reimburse only for Coach class.
- Travelers may upgrade to a higher class with personal mileage upgrade programs provided the cost of the flight is less than or equal to the lowest available fare within Apple guidelines.
- If issuance of a new airline ticket is required due to change(s) in itinerary, the traveler must request that the unused ticket be credited against the new ticket's cost.
- Airline club memberships, travel insurance and upgrades are not reimbursable

### Ground Transportation

- Use rental cars when alternate transportation such as taxis, shuttles, or public transportation is not cost effective or a reasonable alternative.
- The mid-size rental category or lower is acceptable.
- The selection of higher-priced rentals to earn mileage on airline programs is not permitted.
- Refuel prior to returning the rental car to avoid the higher refueling costs.
- Apple will not reimburse for additional insurance costs. Supplier will incur the expense if additional insurance is selected.
- Tolls and parking required for business are reimbursable.
- Tips for taxis are reimbursable up to a maximum of 15 percent.
- Traffic and parking tickets are not reimbursable.

### Meals

- Reasonable costs of personal meals only are reimbursable up to the following limits.

Breakfast        $15
Lunch            $25
Dinner           $30

- Meal tips are reimbursable up to a maximum of 15 percent.

Original receipts for all reimbursable expenses must be provided to Apple as provided in the

Agreement.

**Lodging**

- Hotel/motel accommodations are to be in the moderate price range.
- Book travel at least fourteen (14) days in advance whenever possible. Plan carefully to reduce or eliminate costly changes to itinerary.
- "No-show" charges are not reimbursable.
- Telephone calls, laundry charges, or personal entertainment, such as in-room videos, spa or hotel health club charges, are not reimbursable.
- Sample of Apple Preferred Hotels – Cupertino Area:
    - Hotel Cypress, Cupertino, CA - $187 – (408) 253 8900 - .25 miles
    - Cupertino Inn, Cupertino, CA  - $142 – (408) 996 7700 - .70 miles
    - Fairmont San Jose, CA - $177 – (408) 998  1900   - 7.8 miles
    - Intercontinental Hotel , San Francisco CA -  $195 – (415) 616 6500 – 37 miles
    - Hilton, San Francisco, CA  - $195 – (415) 433 6600 – 38 miles

**From:** Michael Bromwich [michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, October 26, 2013 11:47 AM
**To:** Kyle Andeer
**Cc:** Nigro, Barry; Cirincione, Maria
**Subject:** Re: Monitoring Letter
**Attachments:** Apple -- 10-26 Letter.pdf

Dear Kyle,

Thanks very much for your response to my cover note and our draft letter. Unfortunately, I think you may have misconceived its purpose.  It was not to begin a negotiation about fees, rates, and expenses, nor was it meant to provide you with an opportunity to provide us with guidelines that are applicable to providers of legal services where Apple is the client -- but that are inapplicable to firms providing independent monitoring services.  It was to give you an opportunity to modify or revise the confidentiality provision.  In light of your response, it probably makes sense to execute any enhancements to the confidentiality agreement separately.  I have attached a signed copy of the monitoring letter.  The only change is the date.

Without responding to each item in your note, I wanted to clarify the following:

1.  Administrative fees are completely standard for consulting firms.  The Bromwich Group is not a law firm and does not practice law.  The normal range for the administrative/management fees for consulting firms is between 10% and 25%.  Therefore, the 15% is at the low end of the range.

2.  We will add additional personnel, whether from Fried Frank or elsewhere, only as necessary and appropriate.  We will keep you informed if we add personnel performing significant substantive responsibilities but not if we use a lawyer to do a discrete research project or a legal assistant to provide support.  We will do this as a courtesy and we do not intend to provide a rationale.  It will be because we need additional assistance.

3.  On expenses, please advise whether your lawyers from Gibson Dunn working on this matter, your Wilmer lawyers working on the Samsung matter in the ND of California, and other lawyers working on high-end litigation and corporate matters follow these expense guidelines without exception.  If they do, we will seriously consider doing so.  We are happy to receive from you a list of Apple's preferred hotels.

4.  We are serving as an independent compliance monitor pursuant to a Court order, not as counsel to Apple subject to its direction and control.  Accordingly, we will not be providing a budget. You are incorrect in stating that this is standard practice in monitorships.  We will do everything we reasonably can to keep fees and expenses to a minimum.  We plan to provide you each month with a statement of the number of hours spent by each timekeeper on this matter but not to provide descriptions of the amount of time spent on specific tasks.  We will maintain such records and will share them with the Department of Justice, the Plaintiff States, and the Court if requested to do so.

5.  We will submit our invoices directly to you, or to someone you designate.  We will be happy to execute W-9s.

6.  My consulting firm did not issue a press release.  Goodwin Procter posted an item on its web site without my advance knowledge or consent to clarify that the firm itself would not be involved in the monitorship.

We very much look forward to your responses to the various substantive matters we discussed on Tuesday and to your confirming the particulars of our initial visit to Cupertino the week of November 18.

Best regards.


*MRB*


On Fri, Oct 25, 2013 at 10:45 PM, Kyle Andeer <kandeer@apple.com> wrote:

Dear Michael,

Thank you for sharing your draft letter  It is very helpful in that it tees up a number of different issues that make sense to address at the outset of our relationship.  As you noted, the treatment of confidential information is one of several issues that will require additional research and thought.  Although the disclosure of such information is highly unlikely given the narrow scope of the External Compliance Monitor's responsibilities, we agree that this is an issue we should seek to address at the outset.  It likely makes sense for us to execute one of our "customary confidentiality agreements" as contemplated in the Final Judgment.  Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).  We will provide a full response on these and other issues in the next week, as well as a retention obligations agreement and confidentiality agreements to address this point.

I do want to raise concerns with the compensation and expense terms outlined in your letter which are in tension with the terms of the Final Judgment which require the External Monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).   From our perspective they do not reflect the competitive realities of the marketplace.  We expect that your firm – like all of Apple's legal service providers – will comply with Apple's Outside Service Provider Policy ("OSP") (attached) and its standard expense policy (also attached).

1.  Administrative Fee.  You request that the Bromwich Group be paid a "management/ administrative fee" of 15% of all billable hours.  As you will note in the attached policies, Apple does not pay any of its legal vendors a "management/administrative fee."

2.  Hourly Rates.  You have requested that Apple pay you $1,100 per hour and Mr. Nigro $1,025 per hour.  These rates are very high, particularly when compared to the average rate Apple pays a law firm partner ($565 per hour).  Even if one looks at the top 25%, the average rate per partner is $801 per hour.  Apple is prepared to  compensate you at $800 per hour and Mr. Nigro at a rate of $700 per hour.  With the foregoing principles in mind, we also ask that you provide the hourly rate for Maria Cirincione.

3.  Additional Personnel.  Pursuant to Apple's Outside Service Provider Policy, the Bromwich Group (and Fried Frank) should notify Apple before adding new timekeepers to its team and provide a rational for the additional resources. As you appreciate, this is a standard requirement that ensures costs do not spiral out of control.

4.  Expense policy.  Apple expects that you will adhere to its standard expense policy (attached) Apple will pay for coach airfare, lodging at Apple preferred hotels, and per diems of $15 for breakfast, $25 for lunch and $30 for dinner.  The policy also outlines our guidelines on telephone and copying charges.  Apple will not reimburse for data storage and information technology services.  This is consistent with these policies is in keeping with the "reasonable expense guidelines" language in Section VI.I of the Final Judgment.

5.  Budget and Invoicing.  The Bromwich Group should submit an expected budget for its services for the coming year.  As you know this is standard practice in any engagement, including in monitorships.  In addition, Apple expects that your invoices will describe time spent on tasks and a description of those tasks.  Apple reserves the right to challenge fees that are excessive, outside the scope your responsibilities, and/or unjustified pursuant to Sections VI.I. and VI.J. of the Final Judgment.

6.  Billing.  Apple requires firms to submit invoices - within 30 days of service - via an electronic portal.  We can set up a meeting with our eBilling team as soon as you are ready.  Apple will also require a signed W9 in order to pay invoices for your firm.

7.  Marketing.  Apple does not allow the firms it works with to market their representation of Apple (see OSP at 6).  We noted that your firm, Goodwin Proctor, your consulting practice, The Bromwich Group, and Mr. Nigro's firm, Fried Frank all issued press releases announcing your appointments.  We ask that you please refrain from using Apple's name in any marketing materials or media communications.

The requests in your letter do not reflect market realities.  That raises significant concerns on our part.  We sincerely hope that you will reflect on these points and that we can work out these issues without going to the Department of Justice and the courts.  Please let me know if you would like to discuss.

Best regards,

Kyle

On Oct 23, 2013, at 3:58 PM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:

Dear Kyle,

I have attached a draft letter that sets forth our duties and responsibilities as the external antitrust compliance monitor under the Final Judgment, and touches on other matters relevant to our monitoring work, including information about fees, expenses, and confidentiality.  This letter is specifically tailored to the provision of monitoring services under the Final Judgment.  Accordingly, it is different in various ways from the engagement letter that would be appropriate if Apple were a client of a law firm or my consulting firm.

Before I provided a signed version of the letter, I wanted to make sure it should be addressed to you rather than someone else at Apple, and give you the opportunity to suggest any revisions to Section 10 of the letter dealing with confidentiality.  I realize this may be a sensitive issue and I wanted to make sure the language I have crafted is acceptable.  I am willing to consider reasonable modifications.

Please confirm that you should be the recipient of this letter (or provide an alternative addressee) and suggest any reasonable changes to the confidentiality language as promptly as you can.

Thanks very much.

*MRB*
<Apple Monitoring Letter -- 10-23.doc>

**From:** Kyle Andeer [kandeer@apple.com]
**Sent:** Monday, October 28, 2013 6:02 PM
**To:** Michael Bromwich
**Cc:** Nigro, Barry; Cirincione, Maria
**Subject:** Re: Monitoring Letter

Dear Michael,

Thank you for your letter. I am in Brussels this week but our counsel will respond to the letter and other issues in due course.

I am disappointed by your position on rates and other fees. They do not reflect market realities. I would ask that you confirm that the Department of Justice has approved the financial terms and conditions of your engagement including the administrative fee, the hourly rates, and the expenses. See Final Judgment. VI.I ("The External Compliance Monitor and any persons hired to assist the External Compliance Monitor shall serve at the cost and expense of Apple, on such terms and conditions as the United States, after consultation with the Representative Plaintiff States, approves, including, but not limited to, the execution of customary confidentiality agreements.").

Apple also asks that you provide: (a) the actual hourly billing rates that clients are charged by your law firms for your services (including any standard/regular discounts); (b) the billing rates (net of discounts, fee caps, or write offs) you have received in the past serving as a monitor; (c) administrative fees paid to the Bromwich Group in the past (and whether the government has ever paid you an administrative fee); (d) any information that would support your claim that administrative fees are standard for the Bromwich Group; (e) the justification for applying an administrative fee to Fried Frank's billings (and whether you have applied this fee to billings by third part vendors in past monitoring engagements); and (f) any other information about your billing rates and practice that may be relevant. I also repeat my request for Ms. Cirincione's actual billing rate (including any standard/regular discounts) charged her other clients.

This information will help us assess whether we need to object to these terms. I can also confirm that Gibson, Wilmer and our other legal vendors abide by our expense policy.

Best regards,
Kyle

On Oct 26, 2013, at 8:47 AM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:


Dear Kyle,

Thanks very much for your response to my cover note and our draft letter. Unfortunately, I think you may have misconceived its purpose. It was not to begin a negotiation about fees, rates, and expenses, nor was it meant to provide you with an opportunity to provide us with guidelines that are applicable to providers of legal services where Apple is the client -- but that are inapplicable to firms providing independent monitoring services. It was to give you an opportunity to modify or revise the confidentiality provision. In light of your response, it probably makes sense to execute any enhancements to the confidentiality agreement separately. I have attached a signed copy of the monitoring letter. The only change is the date.

Without responding to each item in your note, I wanted to clarify the following:

1.  Administrative fees are completely standard for consulting firms.  The Bromwich Group is not a law firm and does not practice law.  The normal range for the administrative/management fees for consulting firms is between 10% and 25%.  Therefore, the 15% is at the low end of the range.

2.  We will add additional personnel, whether from Fried Frank or elsewhere, only as necessary and appropriate.  We will keep you informed if we add personnel performing significant substantive responsibilities but not if we use a lawyer to do a discrete research project or a legal assistant to provide support.  We will do this as a courtesy and we do not intend to provide a rationale.  It will be because we need additional assistance.

3.  On expenses, please advise whether your lawyers from Gibson Dunn working on this matter, your Wilmer lawyers working on the Samsung matter in the ND of California, and other lawyers working on high-end litigation and corporate matters follow these expense guidelines without exception.  If they do, we will seriously consider doing so.  We are happy to receive from you a list of Apple's preferred hotels.

4.   We are serving as an independent compliance monitor pursuant to a Court order, not as counsel to Apple subject to its direction and control.  Accordingly, we will not be providing a budget. You are incorrect in stating that this is standard practice in monitorships.  We will do everything we reasonably can to keep fees and expenses to a minimum.  We plan to provide you each month with a statement of the number of hours spent by each timekeeper on this matter but not to provide descriptions of the amount of time spent on specific tasks.  We will maintain such records and will share them with the Department of Justice, the Plaintiff States, and the Court if requested to do so.

5.  We will submit our invoices directly to you, or to someone you designate.  We will be happy to execute W-9s.

6.  My consulting firm did not issue a press release.  Goodwin Procter posted an item on its web site without my advance knowledge or consent to clarify that the firm itself would not be involved in the monitorship.

We very much look forward to your responses to the various substantive matters we discussed on Tuesday and to your confirming the particulars of our initial visit to Cupertino the week of November 18.

Best regards.


*MRB*


On Fri, Oct 25, 2013 at 10:45 PM, Kyle Andeer <kandeer@apple.com> wrote:

Dear Michael,

Thank you for sharing your draft letter  It is very helpful in that it tees up a number of different issues that make sense to address at the outset of our relationship.  As you noted, the treatment of confidential information is one

of several issues that will require additional research and thought.  Although the disclosure of such information is highly unlikely given the narrow scope of the External Compliance Monitor's responsibilities, we agree that this is an issue we should seek to address at the outset.  It likely makes sense for us to execute one of our "customary confidentiality agreements" as contemplated in the Final Judgment.  Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).  We will provide a full response on these and other issues in the next week, as well as a retention obligations agreement and confidentiality agreements to address this point.

I do want to raise concerns with the compensation and expense terms outlined in your letter which are in tension with the terms of the Final Judgment which require the External Monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).   From our perspective they do not reflect the competitive realities of the marketplace.  We expect that your firm – like all of Apple's legal service providers – will comply with Apple's Outside Service Provider Policy ("OSP") (attached) and its standard expense policy (also attached).

1.  Administrative Fee.  You request that the Bromwich Group be paid a "management/ administrative fee" of 15% of all billable hours.  As you will note in the attached policies, Apple does not pay any of its legal vendors a "management/administrative fee."

2.  Hourly Rates.  You have requested that Apple pay you $1,100 per hour and Mr. Nigro $1,025 per hour.  These rates are very high, particularly when compared to the average rate Apple pays a law firm partner ($565 per hour).  Even if one looks at the top 25%, the average rate per partner is $801 per hour.  Apple is prepared to compensate you at $800 per hour and Mr. Nigro at a rate of $700 per hour.  With the foregoing principles in mind, we also ask that you provide the hourly rate for Maria Cirincione.

3.  Additional Personnel.  Pursuant to Apple's Outside Service Provider Policy, the Bromwich Group (and Fried Frank) should notify Apple before adding new timekeepers to its team and provide a rational for the additional resources. As you appreciate, this is a standard requirement that ensures costs do not spiral out of control.

4.  Expense policy.  Apple expects that you will adhere to its standard expense policy (attached) Apple will pay for coach airfare, lodging at Apple preferred hotels, and per diems of $15 for breakfast, $25 for lunch and $30 for dinner.  The policy also outlines our guidelines on telephone and copying charges.  Apple will not reimburse for data storage and information technology services.  This is consistent with these policies is in keeping with the "reasonable expense guidelines" language in Section VI.I of the Final Judgment.

5.  Budget and Invoicing.  The Bromwich Group should submit an expected budget for its services for the coming year.  As you know this is standard practice in any engagement, including in monitorships.  In addition, Apple expects that your invoices will describe time spent on tasks and a description of those tasks.  Apple reserves the right to challenge fees that are excessive, outside the scope your responsibilities, and/or unjustified pursuant to Sections VI.I. and VI.J. of the Final Judgment.

6.  Billing.  Apple requires firms to submit invoices - within 30 days of service - via an electronic portal.  We can set up a meeting with our eBilling team as soon as you are ready.  Apple will also require a signed W9 in order to pay invoices for your firm.

7.  Marketing.  Apple does not allow the firms it works with to market their representation of Apple (see OSP at 6).  We noted that your firm, Goodwin Proctor, your consulting practice, The Bromwich Group, and Mr. Nigro's firm, Fried Frank all issued press releases announcing your appointments.  We ask that you please refrain from using Apple's name in any marketing materials or media communications.

The requests in your letter do not reflect market realities.  That raises significant concerns on our part.  We sincerely hope that you will reflect on these points and that we can work out these issues without going to the Department of Justice and the courts.  Please let me know if you would like to discuss.

Best regards,

Kyle

On Oct 23, 2013, at 3:58 PM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:

Dear Kyle,

I have attached a draft letter that sets forth our duties and responsibilities as the external antitrust compliance monitor under the Final Judgment, and touches on other matters relevant to our monitoring work, including information about fees, expenses, and confidentiality.  This letter is specifically tailored to the provision of monitoring services under the Final Judgment.  Accordingly, it is different in various ways from the engagement letter that would be appropriate if Apple were a client of a law firm or my consulting firm.

Before I provided a signed version of the letter, I wanted to make sure it should be addressed to you rather than someone else at Apple, and give you the opportunity to suggest any revisions to Section 10 of the letter dealing with confidentiality.  I realize this may be a sensitive issue and I wanted to make sure the language I have crafted is acceptable.  I am willing to consider reasonable modifications.

Please confirm that you should be the recipient of this letter (or provide an alternative addressee) and suggest any reasonable changes to the confidentiality language as promptly as you can.

Thanks very much.

*MRB*
<Apple Monitoring Letter -- 10-23.doc>


<Apple -- 10-26 Letter.pdf>

| | |
|---|---|
| **From:** | Nigro, Barry |
| **Sent:** | Tuesday, October 29, 2013 10:31 AM |
| **To:** | 'Kyle Andeer' |
| **Cc:** | Cirincione, Maria; Michael Bromwich |
| **Subject:** | RE: Monitoring Letter |

Dear Kyle,

Mike Bromwich asked me to respond to your latest e-mail.  Your note continues to approach this matter as though this were a conventional relationship between Apple and counsel retained by Apple rather than an arrangement under which Mr. Bromwich and I were appointed by the Court to perform certain highly-specialized services following a judicial finding of antitrust liability.  The language you quote makes this point -- we "serve at the cost and expense of Apple, on such terms and conditions as the United States, after consultation with the Representative Plaintiff States, approves, including, but not limited to, the execution of customary confidentiality agreements."  This language makes clear that the arrangement between the external antitrust compliance monitor and Apple is not a standard arrangement between a client and its lawyers or a client and its consultant.

Unlike the conventional situation where Apple selects its own counsel or consultant, Apple's role in the selection process was limited.  In the selection process, Apple had the right to suggest candidates and raise objections to the candidates selected by DOJ and the Plaintiff States.  Your emails seem to suggest that you believe Apple has a larger role to play in managing its relationship with the external monitor, and, in particular, in determining its fees and expenses.  The Order, however, does not provide that Apple will be permitted to negotiate or approve fees and expenses.

We do not believe it is appropriate for us to engage in a negotiation with the entity we have been charged with monitoring under Judge Cote's Order.  We view this exchange as unfortunate and had hoped that by now we could have been focused on substantive matters, such as Apple's antitrust compliance program.  We will represent to you that the Department of Justice was in fact provided with a proposed draft of the October 23, 2013 letter, including the provisions relating to fees and expenses.

We hope that having provided this information, we can move forward with the important work we were selected to do.

Sincerely,

Barry

**Bernard (Barry) A. Nigro Jr.**
barry.nigro@friedfrank.com | Tel: +1.202.639.7373 | Fax: +1.202.639.7003

**Fried, Frank, Harris, Shriver & Jacobson LLP**
801 17th Street, NW, Washington, DC  20006
friedfrank.com

---

**From:** Kyle Andeer [mailto:kandeer@apple.com]
**Sent:** Monday, October 28, 2013 6:02 PM
**To:** Michael Bromwich

**Cc:** Nigro, Barry; Cirincione, Maria
**Subject:** Re: Monitoring Letter

Dear Michael,

Thank you for your letter. I am in Brussels this week but our counsel will respond to the letter and other issues in due course.

I am disappointed by your position on rates and other fees. They do not reflect market realities. I would ask that you confirm that the Department of Justice has approved the financial terms and conditions of your engagement including the administrative fee, the hourly rates, and the expenses. See Final Judgment. VI.I ("The External Compliance Monitor and any persons hired to assist the External Compliance Monitor shall serve at the cost and expense of Apple, on such terms and conditions as the United States, after consultation with the Representative Plaintiff States, approves, including, but not limited to, the execution of customary confidentiality agreements.").

Apple also asks that you provide: (a) the actual hourly billing rates that clients are charged by your law firms for your services (including any standard/regular discounts); (b) the billing rates (net of discounts, fee caps, or write offs) you have received in the past serving as a monitor; (c) administrative fees paid to the Bromwich Group in the past (and whether the government has ever paid you an administrative fee); (d) any information that would support your claim that administrative fees are standard for the Bromwich Group; (e) the justification for applying an administrative fee to Fried Frank's billings (and whether you have applied this fee to billings by third part vendors in past monitoring engagements); and (f) any other information about your billing rates and practice that may be relevant. I also repeat my request for Ms. Cirincione's actual billing rate (including any standard/regular discounts) charged her other clients.

This information will help us assess whether we need to object to these terms. I can also confirm that Gibson, Wilmer and our other legal vendors abide by our expense policy.

Best regards,
Kyle

On Oct 26, 2013, at 8:47 AM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:


Dear Kyle,

Thanks very much for your response to my cover note and our draft letter. Unfortunately, I think you may have misconceived its purpose. It was not to begin a negotiation about fees, rates, and expenses, nor was it meant to provide you with an opportunity to provide us with guidelines that are applicable to providers of legal services where Apple is the client -- but that are inapplicable to firms providing independent monitoring services. It was to give you an opportunity to modify or revise the confidentiality provision. In light of your response, it probably makes sense to execute any enhancements to the confidentiality agreement separately. I have attached a signed copy of the monitoring letter. The only change is the date.

Without responding to each item in your note, I wanted to clarify the following:

1.  Administrative fees are completely standard for consulting firms.  The Bromwich Group is not a law firm and does not practice law.  The normal range for the administrative/management fees for consulting firms is between 10% and 25%.  Therefore, the 15% is at the low end of the range.

2.  We will add additional personnel, whether from Fried Frank or elsewhere, only as necessary and appropriate.  We will keep you informed if we add personnel performing significant substantive responsibilities but not if we use a lawyer to do a discrete research project or a legal assistant to provide support.  We will do this as a courtesy and we do not intend to provide a rationale.  It will be because we need additional assistance.

3.  On expenses, please advise whether your lawyers from Gibson Dunn working on this matter, your Wilmer lawyers working on the Samsung matter in the ND of California, and other lawyers working on high-end litigation and corporate matters follow these expense guidelines without exception.  If they do, we will seriously consider doing so.  We are happy to receive from you a list of Apple's preferred hotels.

4.  We are serving as an independent compliance monitor pursuant to a Court order, not as counsel to Apple subject to its direction and control.  Accordingly, we will not be providing a budget. You are incorrect in stating that this is standard practice in monitorships.  We will do everything we reasonably can to keep fees and expenses to a minimum.  We plan to provide you each month with a statement of the number of hours spent by each timekeeper on this matter but not to provide descriptions of the amount of time spent on specific tasks.  We will maintain such records and will share them with the Department of Justice, the Plaintiff States, and the Court if requested to do so.

5.  We will submit our invoices directly to you, or to someone you designate.  We will be happy to execute W-9s.

6.  My consulting firm did not issue a press release.  Goodwin Procter posted an item on its web site without my advance knowledge or consent to clarify that the firm itself would not be involved in the monitorship.

We very much look forward to your responses to the various substantive matters we discussed on Tuesday and to your confirming the particulars of our initial visit to Cupertino the week of November 18.

Best regards.


*MRB*


On Fri, Oct 25, 2013 at 10:45 PM, Kyle Andeer <kandeer@apple.com> wrote:

Dear Michael,

Thank you for sharing your draft letter  It is very helpful in that it tees up a number of different issues that make sense to address at the outset of our relationship.  As you noted, the treatment of confidential information is one of several issues that will require additional research and thought.  Although the disclosure of such information is highly unlikely given the narrow scope of the External Compliance Monitor's responsibilities, we agree that this is an issue we should seek to address at the outset.  It likely makes sense for us to execute one of our

"customary confidentiality agreements" as contemplated in the Final Judgment. Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013). We will provide a full response on these and other issues in the next week, as well as a retention obligations agreement and confidentiality agreements to address this point.

I do want to raise concerns with the compensation and expense terms outlined in your letter which are in tension with the terms of the Final Judgment which require the External Monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013). From our perspective they do not reflect the competitive realities of the marketplace. We expect that your firm – like all of Apple's legal service providers – will comply with Apple's Outside Service Provider Policy ("OSP") (attached) and its standard expense policy (also attached).

1. Administrative Fee. You request that the Bromwich Group be paid a "management/ administrative fee" of 15% of all billable hours. As you will note in the attached policies, Apple does not pay any of its legal vendors a "management/administrative fee."

2. Hourly Rates. You have requested that Apple pay you $1,100 per hour and Mr. Nigro $1,025 per hour. These rates are very high, particularly when compared to the average rate Apple pays a law firm partner ($565 per hour). Even if one looks at the top 25%, the average rate per partner is $801 per hour. Apple is prepared to compensate you at $800 per hour and Mr. Nigro at a rate of $700 per hour. With the foregoing principles in mind, we also ask that you provide the hourly rate for Maria Cirincione.

3. Additional Personnel. Pursuant to Apple's Outside Service Provider Policy, the Bromwich Group (and Fried Frank) should notify Apple before adding new timekeepers to its team and provide a rational for the additional resources. As you appreciate, this is a standard requirement that ensures costs do not spiral out of control.

4. Expense policy. Apple expects that you will adhere to its standard expense policy (attached) Apple will pay for coach airfare, lodging at Apple preferred hotels, and per diems of $15 for breakfast, $25 for lunch and $30 for dinner. The policy also outlines our guidelines on telephone and copying charges. Apple will not reimburse for data storage and information technology services. This is consistent with these policies is in keeping with the "reasonable expense guidelines" language in Section VI.I of the Final Judgment.

5. Budget and Invoicing. The Bromwich Group should submit an expected budget for its services for the coming year. As you know this is standard practice in any engagement, including in monitorships. In addition, Apple expects that your invoices will describe time spent on tasks and a description of those tasks. Apple reserves the right to challenge fees that are excessive, outside the scope your responsibilities, and/or unjustified pursuant to Sections VI.I. and VI.J. of the Final Judgment.

6. Billing. Apple requires firms to submit invoices - within 30 days of service - via an electronic portal. We can set up a meeting with our eBilling team as soon as you are ready. Apple will also require a signed W9 in order to pay invoices for your firm.

7. Marketing. Apple does not allow the firms it works with to market their representation of Apple (see OSP at 6). We noted that your firm, Goodwin Proctor, your consulting practice, The Bromwich Group, and Mr. Nigro's firm, Fried Frank all issued press releases announcing your appointments. We ask that you please refrain from using Apple's name in any marketing materials or media communications.

The requests in your letter do not reflect market realities. That raises significant concerns on our part. We sincerely hope that you will reflect on these points and that we can work out these issues without going to the Department of Justice and the courts. Please let me know if you would like to discuss.

**From:** Cirincione, Maria
**Sent:** Tuesday, October 29, 2013 12:07 PM
**To:** 'Kyle Andeer'
**Cc:** 'Michael Bromwich'; Nigro, Barry
**Subject:** Apple - Document Request Follow-Up
**Attachments:** Aug. 19 Letter to L. Buterman.pdf

Kyle,

As a follow-up to our meeting on October 22 in New York, below is a list of materials that we discussed and you agreed to provide to us.   We understood from our discussion, and from Gibson Dunn's August 19 letter to Lawrence Buterman ("Aug. 19 Letter"), that these are existing Apple materials.

- Apple's past and current antitrust compliance policies and procedures (except for the December 2012 Code of Business Conduct, which we have from Apple's website)

- Documents that explain or discuss
    - the reporting oversight structure for compliance (both antitrust and general compliance)
    - the role of the Audit Committee, and specifically with respect to compliance
    - the members that make up, and the role of, the Risk Oversight Committee, and specifically with respect to the Committee's compliance role

- Past and current antitrust compliance training manuals and other written training materials

In addition, you mentioned that Apple has previously created organization charts for the DOJ and that you would be able to do the same for us.  We would like to take you up on your offer and request organization charts for the iBookstore, iTunes, and App Store divisions.   Previously created organization charts are sufficient, with the understanding that you will send updated versions as they are available.

Finally, the Aug. 19 Letter (attached) outlines the steps Apple has taken, and plans to take, with respect to Apple's commitment to legal compliance.  To the extent written materials associated with these steps are not duplicative of the requests outlined above, we would like to review copies of these documents.

Please feel free to send materials directly to me.  We encourage you to send them as they are available, rather than waiting to collect and send them all at once.  Of course, please do not hesitate to contact us if you have any questions.

Regards,

Maria

**Maria R. Cirincione**
maria.cirincione@friedfrank.com | Tel: +1.202.639.7044

**Fried, Frank, Harris, Shriver & Jacobson LLP**
801 17th St., NW, Washington, DC  20006

friedfrank.com

 Please consider the environment before printing this email



---------- Forwarded message ----------
From: **Richman, Cynthia** <CRichman@gibsondunn.com>
Date: Thu, Oct 31, 2013 at 11:51 AM
Subject: Apple/e-books
To: "michael.bromwich@bromwichgroup.com" <michael.bromwich@bromwichgroup.com>
Cc: "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com>


Mr. Bromwich: Please see the attached letter from Ted Boutrous.


Thank you.


**Cynthia E. Richman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8234 • Fax +1 202.530.9691
CRichman@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Theodore J. Boutrous Jr.
Direct: +1 213.229.7804
Fax: +1 213.229.6804
TBoutrous@gibsondunn.com

October 31, 2013

VIA E-MAIL

Michael R. Bromwich
The Bromwich Group LLC
901 New York Avenue, NW 5th Floor
Washington, D.C. 20001

Re:     External Antitrust Compliance Monitoring

Dear Michael:

It was a pleasure meeting you last week, and Apple looks forward to working with you to achieve our shared objective of developing a comprehensive and effective antitrust training program consistent with Judge Cote's Final Judgment.  Apple is fully committed to ensuring that its antitrust training program, and its policies and procedures related thereto, are both robust and effective.

I am writing to follow up on three issues arising from our discussion last week and your recent correspondence (letter of October 23, 2013[1] and e-mails on October 26 and 29, 2013).  First, Apple believes that the timing and scope of your requests are inconsistent with the letter and spirit of the Final Judgment.  Judge Cote was very clear that the injunction should be narrowly tailored to address the antitrust violation she found in this case and sought to avoid unnecessarily burdening Apple or limiting its ability to innovate and do business in this dynamic industry.  *See* Hearing Transcript, *United States v. Apple Inc.*, *et al.*, No. 1:12-CV-2826, at 8-9 (Aug. 27, 2013) ("I want this injunction to rest as lightly as possible on the way Apple runs its business.") (hereinafter "Aug. 27, 2013 Hearing Tr.").[2]  Notably in this regard, the Final Judgment provides that the External Compliance Monitor's review of Apple's internal antitrust compliance policies and procedures and antitrust training program is not to commence until "90 days after his or her appointment."  Final Judgment at § VI.C.  Second, Apple also has concerns over the financial terms of your engagement, which the Final Judgment requires be "reasonable and customary" and approved by the

---

[1] As you are aware, Apple received a letter from you, in draft form, on October 23, 2013, which was not finalized until October 26, 2013.

[2] *See also* Aug. 27, 2013 Hearing Tr. at 27 ("I'm trying to think about, as I've indicated, where the real risks are and to minimize the burdens on Apple.")

**BROMWICH EXHIBIT K**

# GIBSON DUNN

October 31, 2013
Page 2

Department of Justice ("DOJ"). Third, we also need to ensure that the confidentiality of any information Apple may share with you during the course of your activities as monitor is appropriately protected.

Apple is hopeful that these issues can be resolved quickly so that we can move forward together to achieve the objectives of the Final Judgment. Each of these issues is discussed in more detail below.

### 1.     Timing and Scope of Monitor's Responsibilities

As you mentioned at the outset of our introductory meeting, the Final Judgment defines the scope of your responsibilities in a manner that is clear and straightforward. The monitor's primary responsibility is to "conduct a review . . . [of] Apple's internal antitrust compliance policies and procedures, *as they exist 90 days after his or her appointment*" and to "also conduct a review to assess whether Apple's training program, required by Section V.C of this Final Judgment, *as it exists 90 days after his or her appointment*, is sufficiently comprehensive and effective." Final Judgment at § VI.C (emphasis added).

During the August 27 hearing Judge Cote explained, "I don't think that the [Monitor] should conduct a review or assessment of the current policies. I would expect that Apple would revise its current policy substantially and procedures and create an effective training program. That will require some time. So I think this should be revised to have the [Monitor] doing an assessment in three months from appointment and *beginning to engage Apple in a discussion at that point*." Aug. 27, 2013 Hearing Tr. at 20-21(emphasis added).

Apple is in the process of revising and enhancing its compliance training programs to ensure that they are robust, comprehensive, effective, and compliant with the terms of the Final Judgment. In this regard, Apple will soon be bringing on board its new Antitrust Compliance Officer, as directed by the Final Judgment, and adding new lawyers with antitrust compliance expertise in the legal department. In light of the express language of the Final Judgment, as well as Judge Cote's elaboration at the August 27 hearing, the time period for your review of Apple's antitrust policies and procedures and training program does not commence until January 14, 2013 (90 days from the date of appointment).

Accordingly, your request to begin interviewing Apple's entire board and its executive team, as well as additional senior executives on November 18 is premature, not authorized by the Final Judgment, and would not only be disruptive to Apple's business operations but also directly contrary to Judge Cote's intent. We fully understand and expect that there will be a need to conduct interviews with certain personnel at some point once Apple's new training programs are up and running. And you have Apple's assurance that it will be a most willing partner in facilitating those meetings. Furthermore, there will be ample opportunity over the course of your engagement to determine whether Apple's new training program is consistent with the Judge's Order and is effective in its impact.

**BROMWICH EXHIBIT K**

# GIBSON DUNN

October 31, 2013
Page 3

However, it makes no sense, and would be extremely disruptive, to schedule those interviews before Apple has completed its internal assessment and developed its new antitrust training program.

**2. Financial Terms and Fiduciary Responsibilities**

The Final Judgment requires the monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I. Apple has already raised concerns regarding your hourly fees, the administrative fee you seek to impose in addition to those fees, the need for additional personnel, and finally, adherence to a defined expense policy. Apple does not believe your proposed fee structure is reasonable and customary, whether for a monitor or a lawyer, and respectfully objects to it. Moreover, your dictate that we simply accept these fees and costs at face value without any support or explanation is inconsistent with the company's fiduciary responsibilities to its shareholders, and to the customary practices of Apple and other companies in conducting business or legal activities. And, while the Final Judgment requires DOJ and Plaintiff States to approve your fee and expense structure (*see* Final Judgment at § VI.I), it appears from your correspondence you have not secured such approval but instead have simply submitted your proposed approach to DOJ and it has not acted upon it.

**3. Confidentiality**

To protect the confidentiality of any information Apple may share with you during the monitorship, we have attached a non-disclosure agreement for your signature that is consistent with Apple's standard confidentiality agreements and the Stipulated Protective Order in this matter. Apple also reserves its right to assert attorney-client privilege and work product protections as appropriate throughout this process. Finally, Apple again requests that, consistent with its policies, you, the Bromwich Group, Goodwin Procter, and Fried Frank refrain from using Apple's name in any marketing materials or media communications like the press release Goodwin Procter issued announcing your appointment and containing a direct quote from you.

* * * * *

Concurrent with this response, Apple has submitted to DOJ and Plaintiff States a notice of its objections. Please direct any future communications on these issues to me. As we work to resolve these issues, Apple will continue to focus its efforts on its internal assessment and enhancement of its antitrust policies and procedures and the training program mandated by the Final Judgment. As you know, Apple has retained seasoned antitrust practitioners and former government officials at the law firm of Simpson Thacher to aid it in this process. We appreciate an honest and open dialogue on these issues, and look forward to

GIBSON DUNN

October 31, 2013
Page 4


working with you to establish antitrust compliance policies and training programs that are comprehensive and effective in satisfaction of the Final Judgment.


Very truly yours,

s/ Theodore J. Boutrous, Jr.

Theodore J. Boutrous, Jr.



Enclosure

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into and is effective as of _____ (the "Effective Date") by and between Michael Bromwich, on behalf of the Bromwich Group, and Bernard Nigro (hereinafter "ECM") and Apple Inc. ("Apple" and, collectively, the "Parties") in connection with Section VI.I of the September 5, 2013 Final Judgment (the "Final Judgment") entered in *United States of America v. Apple, Inc.*, No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013) (the "Action"), and consistent with the May 7, 2012 Stipulated Protective Order entered in the Action (the "Protective Order").

Whereas, the Final Judgment contemplates that the Parties will execute customary confidentiality agreements in connection with ECM's monitoring responsibilities pursuant to the Final Judgment; and

Whereas, Apple contemplates that certain highly sensitive information and materials may be disclosed in connection with ECM's performance of his responsibilities pursuant to the Final Judgment; and

Whereas, the Parties agree that such materials should be kept confidential subject to the terms and conditions set forth below,

NOW, THEREFORE, the Parties do hereby agree and stipulate as follows:

1. **DEFINITION OF CONFIDENTIAL INFORMATION.** ECM agrees that all information disclosed by Apple to ECM in any manner in connection with ECM's monitoring responsibilities pursuant to the Final Judgment will be considered and referred to collectively in this Agreement as "Confidential Information." Confidential Information, however, does not include information that: (a) is now or subsequently becomes generally available to the public through no fault or breach on the part of ECM; (b) ECM can demonstrate to have had rightfully in his possession prior to disclosure to ECM by Apple; (c) is independently developed by ECM without the use of any Confidential Information; or (d) ECM rightfully obtains from a third-party who has the right to transfer or disclose it to ECM without limitation.

2. **NONDISCLOSURE AND NONUSE OF CONFIDENTIAL INFORMATION.** ECM agrees to protect Apple's Confidential Information, using at least the same degree of care that he uses to protect his own confidential and proprietary information of similar importance, but no less than a reasonable degree of care. ECM agrees to use Apple's Confidential Information for the sole purpose of performing his monitoring responsibilities in connection with the Final Judgment. ECM will not disclose, publish, or disseminate Confidential Information to anyone, and will not use Confidential Information in any manner, except as set forth in this Agreement.

3. **INADVERTENT DISCLOSURE BY APPLE OF PRIVILEGED OR PROTECTED INFORMATION.** If Apple inadvertently discloses to ECM material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection that ECM is not authorized to receive pursuant to the Final Judgment, the applicable privilege and/or protection will not be waived if Apple makes a request for return of such inadvertently produced material promptly after learning of its inadvertent production. Upon such notice, ECM will promptly return or destroy the materials subject to privilege and/or protection.

4.    **INADVERTENT DISCLOSURE BY ECM OF CONFIDENTIAL INFORMATION.**
In the event of disclosure by ECM of any Confidential Information to any person or persons not authorized to receive such disclosure pursuant to this Agreement, ECM will promptly notify Apple of the disclosure and provide to Apple all known relevant information concerning the nature and circumstances of the disclosure. ECM will promptly thereafter take all reasonable measures to retrieve the improperly disclosed material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made. Unauthorized or inadvertent disclosure will not change the confidential status of any Confidential Information.

5.    **AUTHORIZED DISCLOSURE OF CONFIDENTIAL INFORMATION BY ECM.**
Information and materials designated as Confidential Information pursuant to this Agreement may only be disclosed by ECM to the persons and in the manner set forth below:

(a)    To the extent necessary to discharge ECM's monitoring responsibilities pursuant to the Final Judgment, attorneys, employees, and associates of ECM, including attorneys and employees of The Bromwich Group LLC, and attorneys and employees of Fried, Frank, Harris, Schriver & Jacobson.

(b)    United States Department of Justice attorneys and employees, in connection with their enforcement or monitoring of compliance with the Final Judgment;

(c)    Attorneys and employees of the Attorney General's Office of any Representative Plaintiff State (as defined in the Final Judgment), in connection with their enforcement or monitoring of compliance with the Final Judgment; and

(d)    The Court and all persons assisting the Court in the Action, in connection with enforcement or monitoring of the Final Judgment, including law clerks, court reporters, and stenographic or clerical personnel.

In addition, before any information designated as Confidential Information may be disclosed to any person described in subparagraphs 5(a)-(c) above, he or she must first read this Agreement or must have otherwise been instructed on his or her obligations pursuant to this Agreement, and must execute the Agreement included as Appendix A hereto prior to receiving Confidential Information. Each individual described in subparagraphs 5(a)-(c) above and to whom Confidential Information is disclosed must not disclose that information to any other individual, except as set forth in this Agreement.

Nothing in this Agreement prevents disclosure by ECM of Confidential Information to any current employee of Apple, and nothing in this Agreement prevents the United States or any Representative Plaintiff State (as defined in the Final Judgment), subject to taking appropriate steps to preserve the confidentiality of such information, from using or disclosing Confidential Information as permitted or required by the Final Judgment, for law enforcement purposes, or as may otherwise be required by law or binding court order.

6.  **NOTICE OF DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION IN COURT PROCEEDINGS.**   Before disclosure of Confidential Information is made to any person or persons not authorized to receive the information pursuant to paragraph 5 above, ECM must give Apple at least ten (10) calendar days' advance notice in writing, including the name(s), address(es), and employer(s) of the person(s) to whom the disclosure will be made and the reason for the disclosure.  If, within that ten-day period, Apple objects to the disclosure, ECM must make a written request to the United States and Representative Plaintiff States (as defined in the Final Judgment) within ten (10) calendar days' receipt of Apple's objection.  In addition, in connection with any disclosure or use of Confidential Information in any court proceeding, ECM must take reasonable steps to maintain the confidentiality of those materials, including but not limited to filing documents under seal and satisfying the other requirements of paragraph 20 of the Protective Order.

7.  **PROCEDURES UPON COMPLETION OF ECM'S MONITORING RESPONSIBILITIES.**   The obligations imposed by this Agreement survive the termination of ECM's monitoring responsibilities as set forth in the Final Judgment.  Within ninety (90) days after termination of ECM's monitoring responsibilities in connection with the Final Judgment, ECM must certify to Apple in writing that it has destroyed or returned to Apple all Confidential Information and that it has endeavored in good faith to ensure that any Confidential Information disclosed pursuant to paragraph 5 above has been destroyed or returned to Apple.  However, nothing in this paragraph prevents the United States or the Representative Plaintiff States (as defined in the Final Judgment) from retaining or using Confidential Information, subject to taking appropriate steps to preserve the confidentiality of such information, as permitted or required by the Final Judgment, for law enforcement purposes, or as may otherwise be required by law or binding court order.

8.  **EQUITABLE RELIEF.**   ECM hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to Apple that may be difficult to ascertain.  Accordingly, ECM agrees that Apple will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.

9.  **NO IMPLIED WAIVER.**   Apple's failure or delay in exercising any of its rights will not constitute a waiver of such rights unless expressly waived in writing.

10.  **ENTIRE AGREEMENT AND GOVERNING LAW.**   This Agreement, in conjunction with the terms set forth in the Final Judgment, constitutes the entire Agreement with respect to the Confidential Information disclosed pursuant to this Agreement and supersedes all prior or contemporaneous oral or written Agreements concerning such Confidential Information. This Agreement may not be amended except by written Agreement signed by authorized representatives of both Parties.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding that body of California law concerning conflicts of law.  The Parties further submit to and waive any objections to the exclusive jurisdiction of and venue in the United States District Court for the Southern District of New York for any litigation arising out of this Agreement.

Understood and agreed to by the parties:

MICHAEL BROMWICH:

By: _____

Name: _____

Title: _____

BERNARD NIGRO:

By: _____

Name: _____

Title: _____

On behalf of APPLE INC.:

By: _____

Name: _____

Title: _____

## Appendix A

I am employed as _____ by _____.  I hereby certify that:

1.      I have read the Confidentiality Agreement between Michael Bromwich and Apple Inc. (the "Agreement") and understand its terms.

2.      I agree to be bound by the terms of the Agreement, including the terms relating to disclosure of Confidential Information (as defined in the Agreement) in paragraph 5 and the terms relating to the destruction or return of Confidential Information in paragraph 7 of the Agreement.

3.      I agree to use the information provided to me in connection with the Agreement only for the purpose of enforcement and monitoring of the Final Judgment (as defined in the Agreement).

4.      I understand that my failure to abide by the terms of the Agreement will subject me, without limitation, to liability for breach of the Agreement and this Appendix A.

5.      I submit to the jurisdiction of the United States District Court for the Southern District of New York solely for the purpose of enforcing the terms of the Agreement and this Appendix A and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said court.

I make this certificate on this _____ day of _____ , _____.

By:  _____

Name:  _____

Title:  _____



The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC 20001

November 1, 2013

**BY FEDERAL EXPRESS AND EMAIL**

Theodore J. Boutrous Jr., Esq.
333 South Grand Avenue
Los Angeles, CA 90071-3197

Dear Ted:

   Thank you for your October 31 letter. We very much look forward to working with you and Apple to achieve what your letter describes as the shared objective of achieving robust and effective antitrust compliance policies, procedures, and training.

   With respect to Apple's concerns regarding confidentiality, we are in full agreement about the importance of preserving the confidentiality of Apple's business information. We can assure you that we take this concern seriously and will take necessary steps to safeguard this information. However, we were appointed by the Court and operate under its continuing supervision. In that light, we think it would be inappropriate for us to consent to a provision such as Paragraph 10 that would potentially strip the Court of jurisdiction in any dispute arising under the Agreement. We doubt our authority to enter into such an agreement, but in any event we decline to do so. At our meeting on October 22, we raised the possibility of operating under the Protective Order entered in the underlying litigation. Please let us know if that option is acceptable to you or advise us in what respects you believe it to be inadequate.

   We understand that you have filed objections with the DOJ and Plaintiff States regarding the other concerns addressed in your letter. We look forward to the resolution of these matters in the very near future, consistent with the Final Judgment.

   We believe that it is important to begin our relationship on a constructive and collaborative note. In my view, it is unfortunate that ten days after our October 22 meeting, we have received none of the materials we requested at the meeting, nor any indication of when we will receive them, and our request for interviews beginning the week of November 18 has been met with stiff resistance. You should know that our intention to get a fast start on our work

Theodore J. Boutrous Jr., Esq.
Page 2
November 1, 2013


following our appointment, including conducting interviews with executives and Board members, was fully shared with DOJ, the Plaintiff States, and the Court during the external monitor selection process.  We respect your right to object to our requests but it means that, in the meantime, we will be blocked from meeting with anyone from the company other than its legal representatives.  In every other monitoring or oversight assignment I have ever had, such meetings occurred within days, or at most a couple of weeks, following my selection or appointment.  We hope that Apple will reconsider its position on the interviews and that we will be able to overcome these obstacles promptly.

To advance our goal of establishing direct communication with management of the company, we request that you share the attached letter with Tim Cook and Bruce Sewell.  We will send originals of the letter directly to Mr. Cook and Mr. Sewell by Federal Express.  We had prepared the letter before receiving your October 31 letter because we strongly believe that we need to establish communications with principals of the company itself, not only with its lawyers.  We see no reason to delay this communication.

Please confirm when the enclosure letter has been delivered to Mr. Cook and Mr. Sewell.

Very truly yours,

Michael R. Bromwich /mec

Michael R. Bromwich

Enclosure

cc (w/encl.):  Bernard A. Nigro, Jr.



The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC  20001

November 1, 2013

**BY FEDERAL EXPRESS AND**
**BY E-MAIL VIA THEODORE J. BOUTROUS, JR.**

Mr. Timothy D. Cook
Chief Executive Officer
Apple Inc.

D. Bruce Sewell, Esq.
Senior Vice President and General Counsel
Apple Inc.
One Infinite Loop
Cupertino, CA  95014

Dear Gentlemen:

As you know, on October 16, 2013, I was selected by the Honorable Denise L. Cote, United States District Judge for the Southern District of New York, to serve as the external antitrust compliance monitor pursuant to the Final Judgment in *United States v. Apple, Inc. et al.,* Civil Action No. 1:12-CV-2826.[1]  I want to take this opportunity to introduce myself, to share with you some information about my responsibilities, to express my hope for a constructive and collaborative relationship, and to express some concern about our initial interactions with the company.

I have been conducting oversight in the public and private sectors for twenty years, have served as an independent monitor for two public agencies, have worked with companies of all sizes and types as a private sector lawyer, and am currently serving as the independent monitor for one of the largest companies in the world.  I am well aware that this litigation was hotly contested, that the company is appealing the Court's September 5 Final Judgment ("Final Judgment"), and that the company opposed the creation of the external monitor position.

---

[1]   Judge Cote further ordered that Bernard A. Nigro, Jr. of Fried Frank, Harris, Shriver & Jacobson assist me on this matter.

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 2
November 1, 2013


I view all of this as prologue but as fundamentally irrelevant to my responsibilities as the independent monitor.  It presents no bar whatsoever to our developing a constructive and harmonious working relationship.  Our monitoring responsibilities are clearly described in the Court's Final Judgment.  The principal responsibilities are:

- to review and evaluate Apple's internal antitrust compliance policies and procedures;

- to review Apple's antitrust compliance training program and ensure that it satisfies the specific requirements of the Court's Final Judgment;

- to make recommendations regarding Apple's antitrust policies, procedures, and training;

- to work with Apple's newly-appointed Antitrust Compliance Officer, including in connection with the annual antitrust compliance audit the company is required to conduct; and

- to submit semi-annual reports to Apple, the Department of Justice ("DOJ"), the Plaintiff States in the litigation, and the Court and to submit any additional reports that may be requested or may be necessary or appropriate.

As we advised your counsel last week during an in-person meeting ("October 22 Meeting"), we will adhere to several basic principles in conducting our monitoring activities. First, we will follow the specific contours of the monitor's role as set forth in the Final Judgment.  Second, we will be accessible at all times to Apple, the other parties in the litigation, and the Court.  Our independence does not require remoteness; in fact, it requires the opposite. Third, Apple and the other parties must respect our independence.  We are not counsel to Apple, nor a consultant to Apple, nor are we affiliated with the DOJ or the Plaintiff States.  We were selected by the Court and ultimately we report to the Court.  Finally, the relationship we have with Apple need not – and should not – be adversarial.  In fact, the only sure road to failure, for both Apple and the monitoring team, is if we are treated as an adversary and given anything less than the full and complete cooperation of the company and its top management.

In the October 22 Meeting, we made initial requests to obtain a limited set of documentary materials and to conduct brief preliminary interviews of various members of top management and the Board during the week of November 18.  These requests were in line with requests I have made in every matter of this type in which I have previously been involved and are central to our ability to discharge our responsibilities.  Your counsel suggested that senior management and the Board would find it disconcerting to be interviewed at this time and repeatedly asked for justifications for our requests.  After the October 22 Meeting, your

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 3
November 1, 2013

counsel, through two emails, attempted to negotiate issues related to our monitorship that, according to the Final Judgment, are not subject to negotiation.  Yesterday, we received a letter ("October 31 Letter") from your counsel formally objecting to our request to interview senior Apple personnel prior to January 14, 2014.  To date, we have not received any requested documentary materials.

Our obligation and authority to speak with you and Apple's senior leaders come directly from Judge Cote's Final Judgment and findings.  At the August 27, 2013 hearing, to which your counsel specifically referred in the October 31 Letter, Judge Cote highlighted the central role played in the matters that were at issue by Apple's "lawyers and highest level executives." Hearing Transcript, *United States v. Apple, et al.,* No. 1:12-CV-2826, at 17 (Aug. 27, 2013). Accordingly, in outlining some of the specific activities the monitor is authorized to undertake, the Final Judgment listed as the first item the authority to "interview, either informally or on the record, any Apple personnel . . . ."  Section VI.G.1.  In the context of the Final Judgment as a whole, it is clear that the most important interviews will involve senior management and the Board.  When your counsel expressed concern about tying up executives and Board members with time-consuming interviews, I assured them that each of these initial interviews would be limited to one hour.  Although we will do everything possible to accommodate the busy schedules and other commitments of the people we seek to interview, we do not believe the blanket refusal to consent to any interviews prior to the middle of January is consistent with our mandate, and it contradicts the company's pledges to cooperate fully with us.

The success of our relationship depends in large part on the interest, attention and commitment given to this matter by Apple's top management, including both of you.  It cannot be delegated away.  To ensure that we establish a proper and productive relationship from the outset, I respectfully request that you take a direct interest in making sure that the people within the company who will be overseeing Apple's compliance with the Final Judgment provide us with full and complete cooperation consistent with its obligations under Paragraph VI.G of the Final Judgment.

I am prepared to meet with you, or to speak with you by telephone, at any time regarding these matters.  I look forward to working with you and your colleagues as Apple fulfills its obligations under the Final Judgment and, in the words of your counsel, as it seeks to develop a world-class antitrust compliance program.

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 4
November 1, 2013


     Please feel free to share this letter with members of your Board and with other members of senior management.

                      Very truly yours,

                      Michael R. Bromwich

cc: Bernard A. Nigro, Jr.



From: **Boutrous Jr., Theodore J.** <TBoutrous@gibsondunn.com>
Date: Mon, Nov 4, 2013 at 9:08 PM
Subject: e-books/Apple
To: "Michael R. Bromwich" <michael.bromwich@bromwichgroup.com>


> Michael:  Thank you for your letters of November 1st.  As requested, we delivered your letter to Mr. Cook and Mr. Sewell and we've attached Mr. Sewell's response.
>
> I think it would  be productive for us to speak by phone.  I really want to work with you find a smooth path to our shared objectives.  Are you available on Wednesday?
_____
This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
_____

1

BROMWICH EXHIBIT C



November 4, 2013


Michael R. Bromwich
The Bromwich Group LLC
901 New York Avenue, NW
5th Floor
Washington, D.C. 20001

Re:     *United States v. Apple Inc., et al.*, Civil Action No. 1:12-cv-2826 (DLC)

Dear Michael:

        Thank you for your letter of November 1st. I am looking forward to working with you to ensure Apple's antitrust policies and training programs are comprehensive, effective, and fully compliant with the terms of the Final Judgment. Apple is actively working to achieve these goals and has been since the Court entered the Final Judgment in September. The internal Antitrust Compliance Officer ("ACO") has been designated by the audit committee. The ACO will dedicate the next two months to developing new training materials and redesigning our compliance program. The ACO needs this time to work uninterrupted on developing these materials. As this work progresses and we prepare to launch our revised program the ACO will reach out to you with a comprehensive report so you can begin your monitoring function.

        I too intend to provide you with a comprehensive update on our progress and facilitate whatever meetings are appropriate for you to fully and completely discharge your responsibilities as the external monitor. However, for the moment it appears we have a disagreement over scope and timing. I am aware that Apple's lawyers are presently addressing our concerns with aspects of your proposed work plan (including requests for voluminous historical documents and immediate interviews before any enhanced policies are established) with you and representatives from the Department of Justice and the Plaintiff States. These disputes in no way diminish the fact that executives at the highest levels of management, including myself and Mr. Cook, are extremely attentive to the issue of compliance with the Final Judgment and are taking active steps to meet the remediation time line expressed by Judge Cote.

Apple
1 Infinite Loop
Cupertino, CA 95014

T 408 996-1010
F 408 996-0275
www.apple.com



Michael R. Bromwich
November 4, 2013
Page 2


Apple shares your objective of establishing a constructive relationship and I look forward to collaborating with you.


Sincerely,



Bruce Sewell, General Counsel


Cc: Tim Cook, Chief Executive Officer

From: **Michael Bromwich** <michael.bromwich@bromwichgroup.com>
Date: Mon, Nov 4, 2013 at 10:07 PM
Subject: Re: e-books/Apple
To: "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com>


Ted,

Thanks for your note and Bruce Sewell's letter.  I'm available tomorrow and Wednesday.

Like you, I'm very interested in resolving the issues that have arisen at the outset of our relationship.  I'm hopeful that you can help persuade senior management at Apple that the important work described in Mr. Sewell's letter is not at all inconsistent with our beginning the work we have been selected to do.  I would be less than candid if I didn't tell you I am disappointed that his view seems to be that our work begins only when the court-imposed deadline to revise its antitrust compliance policies, procedures and training has passed.

As I'm sure you know, many monitorships involve specific deadlines the monitored entity is required to meet.  To my knowledge, the existence of such deadlines has never been viewed as a reason for the monitor to defer his work until the deadlines have passed.  In the three other monitorships I have done over the past eleven years, I have met with top management of the company or organization within 14 days of beginning of my responsibilities.  Those introductory meetings, without resistance or delay in any instance, have helped pave the way for cordial, collaborative relationships that have proceeded smoothly and with an absolute minimum of tension.  I am confident the same can be the case here.

We intend to be reasonable and flexible in our approach to this matter, and accommodating to the busy schedules of the company's executives.  We look forward to working out a schedule for preliminary meetings and discussions later this month, either next week or the week of November 18, that reflect an appropriate balance between our needs and the company's interests.

Let me know the best times for you to speak tomorrow or Wednesday.

Best regards.


*MRB*

1

On Mon, Nov 4, 2013 at 9:08 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

> Michael:  Thank you for your letters of November 1st.  As requested, we delivered your letter to Mr. Cook and Mr. Sewell and we've attached Mr. Sewell's response.
>
> I think it would  be productive for us to speak by phone.  I really want to work with you find a smooth path to our shared objectives.  Are you available on Wednesday?
_____

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
_____



**From:** Michael Bromwich <michael.bromwich@bromwichgroup.com>
**Date:** November 5, 2013 at 5:34:42 PM EST
**To:** "Theodore J. Boutrous Jr." <TBoutrous@gibsondunn.com>
**Subject: Re: e-books/Apple**

Ted, I've got a meeting at 3:00 pm that may last until close to 4:30.  Can you do it earlier and if not, can you do it at 4:30 pm?

I wanted to provide Bruce Sewell with a response to his letter, which I have attached.  Please pass it on to him and Tim Cook.

Thanks.

MRB

On Tue, Nov 5, 2013 at 3:06 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:
Michael:

Would 3:30 or 4:00 pm eastern time tomorrow work for you?

**Theodore J. Boutrous Jr.**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Monday, November 04, 2013 7:08 PM
**To:** Boutrous Jr., Theodore J.
**Subject:** Re: e-books/Apple

Ted,

Thanks for your note and Bruce Sewell's letter.  I'm available tomorrow and Wednesday.

Like you, I'm very interested in resolving the issues that have arisen at the outset of our relationship.  I'm hopeful that you can help persuade senior management at Apple that the important work described in Mr. Sewell's letter is not at all inconsistent with our beginning the work we have been selected to do.  I would be less than candid if I didn't tell you I am disappointed that his view seems to be that our work begins only when the court-imposed deadline to revise its antitrust compliance policies, procedures and training has passed.

As I'm sure you know, many monitorships involve specific deadlines the monitored entity is required to meet.  To my knowledge, the existence of such deadlines has never been viewed as a reason for the monitor to defer his work until the deadlines have passed.  In the three other monitorships I have done over the past eleven years, I have met with top management of the company or organization within 14 days of beginning of my responsibilities.  Those introductory meetings, without resistance or delay in any instance, have helped pave the way for cordial, collaborative relationships that have proceeded smoothly and with an absolute minimum of tension.  I am confident the same can be the case here.

We intend to be reasonable and flexible in our approach to this matter, and accommodating to the busy schedules of the company's executives.  We look forward to working out a schedule for preliminary meetings and discussions later this month, either next week or the week of November 18, that reflect an appropriate balance between our needs and the company's interests.

Let me know the best times for you to speak tomorrow or Wednesday.

Best regards.


*MRB*


On Mon, Nov 4, 2013 at 9:08 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

> Michael:  Thank you for your letters of November 1st.  As requested, we delivered your letter to Mr. Cook and Mr. Sewell and we've attached Mr. Sewell's response.
>
> I think it would  be productive for us to speak by phone.  I really want to work with you find a smooth path to our shared objectives.  Are you available on Wednesday?
_____
 This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
_____



The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC  20001


November 5, 2013


**BY EMAIL**

D. Bruce Sewell, Esq.
Senior Vice President and General Counsel
Apple, Inc.
One Infinite Loop
Cupertino, CA  95014

Dear Bruce:

Thanks very much for your letter of November 4.  I am pleased to hear about the work that Apple has been doing with respect to antitrust compliance since the Court entered the Final Judgment on September 5, including the selection of the internal Antitrust Compliance Officer ("ACO").  Based on your letter, it appears that we fully share the objective of establishing and maintaining a professional, constructive, and collaborative relationship.

First, let me briefly respond to your suggestion that our interactions with Apple should not begin in any meaningful way until the expiration of the 90 days provided by the Final Judgment.  The Final Judgment makes clear that our initial assessment of the company's antitrust policies, procedures, and training should be as they exist *as of* January 14, 2014, but the Final Judgment in no way precludes us from beginning our work upon appointment.  Indeed, in my interviews during the monitor selection process with the Department of Justice and the Plaintiff States, and separately with Judge Cote, I made clear that one of the keys to a successful monitorship was getting off to a fast start and promptly making contact with top executives at the company, including conducting preliminary interviews.  These early contacts lay the groundwork

D. Bruce Sewell, Esq.
November 5, 2013
Page 2

for the type of relationship that benefits both the company and the monitor. There was no suggestion at any time from anyone that these activities needed to be deferred for 90 days after the appointment of the External Compliance Monitor.

I have no doubt, as you suggest, that your newly selected ACO will be quite busy over the next two months, but I also have no doubt that he or she would be available for a brief meeting within the next 2-3 weeks. I am sure the same is true for many of the senior executives in the company, including you and Mr. Cook. That is why from the outset we have been willing to limit each of these initial sessions to one hour. From our perspective, we would benefit from an early window into the work the company has been doing since the Final Judgment. From your perspective, there is a substantial benefit in allowing us to become aware of those efforts as they are taking place rather than having them summarized for the first time when they are complete. It would allow us to comment about such activities in our semi-annual reports and make clear that our information was based on something other than an after-the-fact report.

As I am sure you are aware, monitors often have specific deadlines, some of which can be very demanding. Even so, the existence of such deadlines has never, to my knowledge, been viewed as a reason for the monitor to defer his work until the deadlines have passed. I have been involved in four monitorships over the past eleven years, three as monitor and one as counsel to the monitored entity. In every case, the monitor has met with the top management within 14 days of appointment. Those introductory meetings and interviews have helped create the foundation for the type of relationships that must exist between the monitor and entity being monitored. In none of these cases was the work of the monitor deferred until any of the deadlines, even those that were most demanding, had passed.

As to your concern about a request for "voluminous historical documents," I am afraid you may have been misinformed. Our requests were limited to the company's compliance policies and training materials, organization charts for three specific business divisions, information that describes the company's compliance reporting structure and the roles played by the Audit and Risk Oversight Committees, and any materials referred to in an August 19 letter sent to the Department of Justice, which was provided to us in New York on October 22, that are not duplicative of our other requests. These are very specific and narrowly drawn requests, and we have heard no previous suggestion that the volume was viewed as significant. My impression is that they were viewed as quite modest and reasonable. If that impression is incorrect, we would welcome further discussion on the issue.

D. Bruce Sewell, Esq.
November 5, 2013
Page 3


I am scheduled to speak with Mr. Boutrous tomorrow to discuss these issues. Our hope is that you will fully authorize him to resolve these issues so that we can move forward without further delay. I ask that you support our efforts to begin our work as promptly as possible, including meeting with me at your earliest convenience.

Please feel free to contact me at any time to discuss these matters directly. I can be reached at 202-682-4268.

Very truly yours,



Michael R. Bromwich

cc:     Tim Cook, Chief Executive Officer
        Theodore J. Boutrous Jr., Esq.
        Bernard A. Nigro Jr., Esq.

BROMWICH EXHIBITS

| | |
|---|---|
| **From:** | Michael Bromwich [michael.bromwich@bromwichgroup.com] |
| **Sent:** | Thursday, November 07, 2013 3:01 PM |
| **To:** | Theodore J. Boutrous Jr. |
| **Cc:** | Nigro, Barry; Cirincione, Maria |
| **Subject:** | Apple -- Expense Guidelines |
| **Attachments:** | Apple -- Letter to Boutrous -- 11-7.PDF |

Dear Ted,

As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to. As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.

Again, I want to thank you for the very productive discussion we had yesterday. We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.

Best regards.


*MRB*

**The**
**Bromwich**
**Group**

The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC 20001

November 7, 2013

**BY E-MAIL**

Theodore J. Boutrous Jr., Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Re:     *U.S. v. Apple, Inc., et al.*, **No. 1:12 CV-2826**

Dear Ted:

As discussed on our call yesterday, I am writing to outline the expense policies we will follow in connection with serving as the External Compliance Monitor. We reviewed and considered Apple's standard expense policies in light of our obligations pursuant to the Final Judgment, including our obligation to remain independent and to maintain expenses at a level that is reasonable and customary. As we explained yesterday, we will do everything we reasonably can to keep expenses to a minimum, consistent with our responsibilities to the Court.

We are happy to commit to use our best efforts to adhere to the following guidelines:

- **Air Travel** – We will seek to obtain the lowest available, refundable, coach fare on the flight that matches best with our travel plans. If Apple advises us that it prefers we purchase nonrefundable fares, we will do so, provided that Apple pays any expenses associated with changes in travel plans.

- **Ground Transportation** – We agree to follow Apple's Travel Policy for Suppliers with respect to ground transportation.

Theodore J. Boutrous Jr., Esq.
November 7, 2013
Page 2

- **Out-of-Town Meals** – We agree to adhere to the per diem rates in Apple's Outside Service Provider Policy ($25/$25/$50 for breakfast/lunch/dinner plus 15% tip).

- **Lodging** – We agree to adhere to Apple's Travel Policy for Suppliers with respect to lodging, except that Apple will reimburse for "no show" charges due to changes in travel plans.

- **In-house Copying** – We agree to provide in-house copying services at 12 cents per page for black-and-white copies.

- **External Copying** – We agree to pass through external copying services at cost.

- **Delivery Services** – We agree to pass through overnight and in-town delivery services at cost.

- **International and Conference Telephone Calls** – We agree to pass through international and conference telephone calls at cost.

- **Other Expenses** – To the extent that other expenses not specifically identified above are incurred (e.g., online legal research charges), we agree to limit these expenses to a level that is customary and reasonable.

We believe these guidelines are reasonable, comply with the Final Judgment, and are consistent with Apple's desire to minimize expenses.

Some of the policies developed by Apple for its dealings with outside vendors, including outside counsel, are inappropriate for an independent monitor because they interfere with his independence and lodge too much control or authority with Apple, which is the entity being monitored, or are otherwise inappropriate. After careful review, we believe the guidelines, other than those specifically described above, are either inapplicable or inappropriate as applied to our relationship with Apple.

Theodore J. Boutrous Jr., Esq.
November 7, 2013
Page 3

      Please let me know if you have any questions.

                Very truly yours,

                Michael R. Bromwich

cc:  Bernard A. Nigro Jr.

| | |
|---|---|
| **From:** | Boutrous Jr., Theodore J. [TBoutrous@gibsondunn.com] |
| **Sent:** | Thursday, November 07, 2013 3:17 PM |
| **To:** | Michael Bromwich |
| **Cc:** | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G. |
| **Subject:** | Re: Apple -- Expense Guidelines |

Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.  Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                            Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.
>
> Best regards.

*MRB*

<Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

BROMWICH EXHIBIT 6

**From:** Michael Bromwich [michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 3:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January. I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations,

1

which can then be later followed up on with interviews.  I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson).  My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.



*MRB*


On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:
Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.  Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                        Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

Dear Ted,

As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to. As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.

Again, I want to thank you for the very productive discussion we had yesterday. We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.

Best regards.


*MRB*

<Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

**From:** Boutrous Jr., Theodore J. [TBoutrous@gibsondunn.com]
**Sent:** Saturday, November 09, 2013 2:13 PM
**To:** Michael Bromwich
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia
**Subject:** RE: Apple -- Expense Guidelines

Checking to see what can be pulled together for that week  Will report back

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted.  Let's keep trying for the week of November 18.  The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well.  And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can.  The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue.  If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1.  A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2.  Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3.  Overview of the structure and operation of the Risk Management Committee.

4.  Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring.  I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January.  I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews.  I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson).  My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:
Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.  Assumed

responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                     Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.
>
> Best regards.
>
>
> *MRB*
>
> <Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

| | |
|---|---|
| **From:** | Michael R. Bromwich [michael.bromwich@bromwichgroup.com] |
| **Sent:** | Saturday, November 09, 2013 2:30 PM |
| **To:** | Boutrous Jr., Theodore J. |
| **Cc:** | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com |
| **Subject:** | Re: Apple -- Expense Guidelines |

Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.

Also, we would be grateful for any of the materials we originally requested October 22.

Best.

MRB

On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

> Checking to see what can be pulled together for that week  Will report back
>
>
> **Theodore J. Boutrous Jr.**
>
> **GIBSON DUNN**
>
> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue, Los Angeles, CA 90071-3197
> Tel +1 213.229.7804 • Fax +1 213.229.6804
> TBoutrous@gibsondunn.com • www.gibsondunn.com
>
>
> **From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
> **Sent:** Thursday, November 07, 2013 12:58 PM
> **To:** Boutrous Jr., Theodore J.
> **Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
> **Subject:** Re: Apple -- Expense Guidelines
>
> Thanks, Ted.  Let's keep trying for the week of November 18.  The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well.  And then we're into the holidays when we can expect people to be traveling everywhere.
>
> We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can.  The list you have generated is an excellent start.
>
> In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue.  If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

1

In addition, we would be very interested in gathering information while we are out there on the following.

1.  A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2.  Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3.  Overview of the structure and operation of the Risk Management Committee.

4.  Overview of the role of the Audit Committee in compliance

5.  Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6.  Discussion of the tools and methods currently used within the company to promote compliance.

7.  Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8.  Existing system for imposing discipline on company personnel who violate compliance policies.

9.  Mechanisms for reporting compliance violations and preventing retaliation.


These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring.  I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January.  I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews.  I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson).  My understanding is that Mr. Gore either lives of frequently visits Northern California.  If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:
Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling, so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.
 Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                        Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.

Best regards.

*MRB*

<Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

| | |
|---|---|
| **From:** | Boutrous Jr., Theodore J. [TBoutrous@gibsondunn.com] |
| **Sent:** | Saturday, November 09, 2013 4:01 PM |
| **To:** | Michael R. Bromwich |
| **Cc:** | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com |
| **Subject:** | RE: Apple -- Expense Guidelines |

Michael:

        I have now heard back and, unfortunately, that week is very bad in terms of scheduling. I know you will be out of the country the week of December 2, but we would very much appreciate it if you could work on your scheduling conflicts the week of December 9 and make the trip that week. Apple will be able to have a full slate of interviewees for you to meet with that week along the lines of my prior email and the new ACO will have had time to get acclimated and up and running. This will get things off to a strong start and would be much better from the standpoints of efficiency and effectiveness. It doesn't make sense to have you fly all the way to California only to meet with a few people the week of November 18. In the meantime, we can start getting you some of the information you have requested. We are also working on a new confidentiality arrangement based on the protective order. Can we make this work?

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael R. Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 11:30 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.

Also, we would be grateful for any of the materials we originally requested October 22.

Best.

MRB

On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

      Checking to see what can be pulled together for that week  Will report back

**Theodore J. Boutrous Jr.**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January. I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews. I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson). My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.


*MRB*


On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:
Thank you Michael. I look forward to reviewing this and very much appreciated our call yesterday. The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2. I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary. Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                              Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.
>
> Best regards.
>
>
> *MRB*
>
> <Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

| From: | Michael Bromwich [michael.bromwich@bromwichgroup.com] |
|---|---|
| Sent: | Saturday, November 09, 2013 5:48 PM |
| To: | Boutrous Jr., Theodore J. |
| Cc: | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com |
| Subject: | Re: Apple -- Expense Guidelines |

Ted,

This is a very disappointing response, and very much at odds with what my understanding was during and after our call last Wednesday.  The company was put on notice on October 22 that we intended to make our initial visit the week of November 18.  Your response suggests that our request was not -- and is not -- taken seriously by the company.   Apple is a can-do company, and I am confident that they can pull this together.  If they maintain that they cannot, that suggests to me that they do not take its obligations and my responsibilities under the Final Judgment very seriously.  The questions below need only be answered if the company maintains that that it unable to comply with our request for a series of interviews and meetings the week of November 18.

Please advise which of the 15 people (Sewell, Moyer, Levoff, Vetter, Andeer, Said, Persamperi, Moerer, McDonald, Cook, Schiller, Cue) identified in your e-mail and my response are unavailable for as little as an hour any day the week of November 18 (Monday through Friday). Be prepared to support any representations concerning their unavailability with detailed copies of their schedules for that entire week.

Please confirm that contact has been made with the 2-3 Board members identified in my e-mail who appear to work in the vicinity of Apple's headquarters, and that they are also unavailable for a meeting/interview of similar length.

Please advise which of the subjects identified in my recent e-mail cannot be addressed in a presentation/discussion (with almost two weeks notice) and why that is the case.

I remain willing to upend my schedule and make the trip this coming week rather than the week of November 18 if that will mean the company is better able to comply with our quite reasonable requests.  I am not prepared to drag things out any longer than that.

Thanks.


*MRB*


On Sat, Nov 9, 2013 at 4:01 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Michael:

            I have now heard back and, unfortunately, that week is very bad in terms of scheduling.  I know you will be out of the country the week of December 2, but we would very much appreciate it if you could work on your scheduling conflicts the week of December 9 and make the trip that week.  Apple will be able to have a full slate of interviewees for you to meet with that week along the lines of

my prior email and the new ACO will have had time to get acclimated and up and running. This will get things off to a strong start and would be much better from the standpoints of efficiency and effectiveness. It doesn't make sense to have you fly all the way to California only to meet with a few people the week of November 18. In the meantime, we can start getting you some of the information you have requested. We are also working on a new confidentiality arrangement based on the protective order. Can we make this work?

**Theodore J. Boutrous Jr.**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael R. Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 11:30 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.

Also, we would be grateful for any of the materials we originally requested October 22.

Best.

MRB

On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

Checking to see what can be pulled together for that week  Will report back

**Theodore J. Boutrous Jr.**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January. I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews. I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson). My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Thank you Michael. I look forward to reviewing this and very much appreciated our call yesterday. The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2. I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee

Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.
Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes
(including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a
joint path to achieving the objectives of this effort.

                          Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com>
wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a
> letter that sets forth the items included in Apple's expense policies that we
> feel comfortable signing on to.  As you will see, we have no objection to
> agreeing to follow those polices that don't raise independence concerns or
> otherwise seem inappropriate. Please let us know if you have any
> questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had
> yesterday.  We look forward to receiving the list of people and groups the
> company is proposing we meet and/or interview the week of November 18
> so we can reach closure on the issue as soon as possible and schedule the
> trip.
>
> Best regards.
>
>
> *MRB*
>
> <Apple -- Letter to Boutrous -- 11-7.PDF>

This message may contain confidential and privileged information. If it has been sent to you in
error, please reply to advise the sender of the error and then immediately delete this message.

| From: | Boutrous Jr., Theodore J. [TBoutrous@gibsondunn.com] |
|---|---|
| Sent: | Monday, November 11, 2013 10:48 AM |
| To: | Michael Bromwich |
| Cc: | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia |
| Subject: | RE: Apple -- Expense Guidelines |

Dear Michael:

      I am very surprised and disappointed in your email below.  I thought that we had set things on a productive and collaborative path in our call last week and with my follow up list of potential interviewees (which was much broader and longer than the one I had suggested during the cordial November 6 call).  During our call, I specifically noted that the week of November 18 might not be feasible or convenient and suggested that the week of December 2 (the week after the intervening Thanksgiving holiday week) might work well.  When I then followed up and proposed December 2, you responded in your November 7 email that you would be in Europe the week of December 2 and had some other scheduling conflicts that week and the week of December 9.  I then simply wrote back and asked if you could reshuffle your schedule so that we could make the December 9 timeframe work.

      Your response below was not in the spirit of our efforts and offer to host you at Apple headquarters for a full slate of interviews and provide other information well in advance of the date on which your review of the new compliance and training programs is to commence under the Final Judgment (January 14).  As set forth in my October 31 letter, Judge Cote and the Final Judgment could not have been clearer regarding the timing and scope of your review and the need to avoid unduly intruding on Apple's business operations.  The Final Judgment is also clear that any "interview [is] to be subject to the reasonable convenience of such personnel…."  Final Judgment at VI.G.1.  Contrary to your suggestions below, and as Apple's General Counsel Bruce Sewell made clear in his letter to you and I emphasized when we spoke and in my letter to you and in my conversations with the Justice Department and States on these issues, Apple takes its obligations and responsibilities under the Final Judgment very seriously.  To that end, and among the other things it is doing on this front, Apple has made a reasonable proposal regarding the requested interviews and for working collaboratively and productively with you.  Under the circumstances, your demands and approach are unreasonable, unnecessary and unwarranted, and go well beyond the scope of the Final Judgment and Judge Cote's guidance.

                                   Ted

**Theodore J. Boutrous Jr.**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 2:48 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Ted,

This is a very disappointing response, and very much at odds with what my understanding was during and after our call last Wednesday. The company was put on notice on October 22 that we intended to make our initial visit the week of November 18. Your response suggests that our request was not -- and is not -- taken seriously by the company. Apple is a can-do company, and I am confident that they can pull this together. If they maintain that they cannot, that suggests to me that they do not take its obligations and my responsibilities under the Final Judgment very seriously. The questions below need only be answered if the company maintains that that it unable to comply with our request for a series of interviews and meetings the week of November 18.

Please advise which of the 15 people (Sewell, Moyer, Levoff, Vetter, Andeer, Said, Persamperi, Moerer, McDonald, Cook, Schiller, Cue) identified in your e-mail and my response are unavailable for as little as an hour any day the week of November 18 (Monday through Friday). Be prepared to support any representations concerning their unavailability with detailed copies of their schedules for that entire week.

Please confirm that contact has been made with the 2-3 Board members identified in my e-mail who appear to work in the vicinity of Apple's headquarters, and that they are also unavailable for a meeting/interview of similar length.

Please advise which of the subjects identified in my recent e-mail cannot be addressed in a presentation/discussion (with almost two weeks notice) and why that is the case.

I remain willing to upend my schedule and make the trip this coming week rather than the week of November 18 if that will mean the company is better able to comply with our quite reasonable requests. I am not prepared to drag things out any longer than that.

Thanks.


*MRB*


On Sat, Nov 9, 2013 at 4:01 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Michael:

        I have now heard back and, unfortunately, that week is very bad in terms of scheduling. I know you will be out of the country the week of December 2, but we would very much appreciate it if you could work on your scheduling conflicts the week of December 9 and make the trip that week. Apple will be able to have a full slate of interviewees for you to meet with that week along the lines of my prior email and the new ACO will have had time to get acclimated and up and running. This will get things off to a strong start and would be much better from the standpoints of efficiency and effectiveness. It doesn't make sense to have you fly all the way to California only to meet with a few

people the week of November 18.  In the meantime, we can start getting you some of the information you have requested.  We are also working on a new confidentiality arrangement based on the protective order.  Can we make this work?

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael R. Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 11:30 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.

Also, we would be grateful for any of the materials we originally requested October 22.

Best.

MRB

On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

> Checking to see what can be pulled together for that week  Will report back

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

BROMWICH EXHIBIT Z

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically,

probably in early January.  I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews.  I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson).  My understanding is that Mr. Gore either lives of frequently visits Northern California.  If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.  Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store

Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States


I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

                Ted
Sent from my iPad


On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.
>
> Best regards.
>
>
>
> *MRB*
>
> <Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---