UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                    Plaintiff,          :    12 Civ. 2826 (DLC)
            -v-                         :
                                        :
APPLE INC., et al.,                     :
                                        :
                    Defendants.         :    OPINION & ORDER
                                        :
----------------------------------------X
                                        :
THE STATE OF TEXAS, et al.,             :
                                        :
                    Plaintiffs,         :    12 Civ. 3394 (DLC)
            -v-                         :
                                        :
PENGUIN GROUP (USA) INC., et al.,       :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

APPEARANCES:


For the plaintiff the United States:

Mark W. Ryan
Lawrence E. Buterman
Daniel McCuaig
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530


For the plaintiff States:

For State of Texas, Liaison Counsel for Plaintiff States

Gabriel Gervey
Eric Lipman
David Ashton
Office of the Attorney General of Texas

P.O. Box 12548
Austin, TX 78711

For State of Connecticut, <u>Liaison Counsel for Plaintiff States</u>

W. Joseph Nielsen
Gary M. Becker
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106


<u>For the defendant Apple, Inc.</u>:

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave, N.W.
Washington, DC 20036


DENISE COTE, District Judge:

On December 14, 2013, defendant Apple, Inc. ("Apple") filed a motion by order to show cause for a stay of one aspect of the injunctive relief granted by this Court's Final Judgment of September 5, 2013 ("Judgment").  The motion is addressed to the External Compliance Monitor ("Monitor") position created in the Judgment.

Apple originally premised its motion for a stay of the monitorship on several arguments that it is no longer pursuing. By the time Apple filed its reply brief and presented its oral

argument on the motion, Apple's motion for a stay was premised on an application to disqualify the Monitor, along with its contention that it would be irreparably harmed if the Court denied that application.  It contends that the millions of dollars in fees that it expects to be paying the Monitor over the course of the next two years, and the Monitor's desire to interview company executives and Board members constitutes irreparable harm.  On Monday, January 13, during oral argument on this motion, the Court advised Apple that it would be denying its application and would be filing an Opinion shortly to explain its reasons.  This Opinion, together with the Court's observations at the January 13 conference, contains those reasons.

In brief, many of the arguments which Apple once made (and is no longer pursuing) have been waived or are moot.  In addition, Apple has access to a dispute resolution mechanism which has and will be in place to ensure that the Monitor does not exceed the bounds of the Injunction.  Finally, there has been no showing that the Monitor should be disqualified or that Apple will suffer irreparable harm.  For these and all of the other reasons stated herein, Apple's request for a stay is denied.

BACKGROUND

On July 10, 2013, following a bench trial, this Court found that Apple had violated Section 1 of the Sherman Act by participating fulsomely in a price fixing conspiracy with various book publishers, in which Apple facilitated and encouraged the publishers to collectively raise e-book prices in an illegal restraint of trade.  United States v. Apple Inc., 12 Civ. 2826 (DLC), 2013 WL 3454986 (S.D.N.Y. July 10, 2013) ("Trial Opinion").  The Court issued a Final Judgment and Order Entering Permanent Injunction ("Injunction") on September 5. Among other things, the Injunction created the position of Monitor.  See Injunction § VI.

To put Apple's stay motion in context, it is helpful to lay out the factual circumstances surrounding the adoption of the Monitor provision in the Injunction, the terms of Injunction that concern the Monitor, the process by which a Monitor was chosen, the interactions between the Monitor and Apple in the months following the Monitor's appointment, and the procedural history associated with the filing of this motion for a stay.

I.   The Adoption of the External Monitor Provision in the Injunction and Apple's Involvement in the Injunction Drafting Process

On the day the Trial Opinion was filed, the Court issued a scheduling Order requiring the plaintiffs to submit a proposed

4

injunction ("Proposed Injunction") by July 19, and for Apple to submit any submissions related to the Proposed Injunction by August 2.  Pursuant to that Order, the plaintiffs submitted on July 19 their Proposed Injunction, which provided inter alia, for the creation of an "External Monitor" position.  As described in the Proposed Injunction, the External Monitor would for a period of ten years "have the power and authority to monitor Apple's compliance with the terms of this Final Judgment, to review and evaluate Apple's existing internal antitrust compliance policies and procedures, and to recommend to Apple changes to address any deficiencies in those policies and procedures."

Apple submitted its memorandum of law setting forth its objections to the Proposed Injunction on August 2.  In that filing, Apple did not object to the Court's authority -- constitutional or otherwise -- to appoint an External Monitor according to the terms set forth in the Proposed Injunction. Instead, Apple objected, in sum, that the Court should not impose an External Monitor because "[e]xternal monitorships can be extremely costly and burdensome, and in a case like this would have few benefits."  Apple acknowledged that the Government could properly obtain injunctive relief in an antitrust case not only to cure the ill effects of past illegal conduct, but also to "'assure the public freedom from its

5

continuance.'" (quoting <u>United States v. Glaxo Grp.</u>, 410 U.S. 52, 64 (1973) (citation omitted)).  It emphasized, however, its view that several provisions in the Proposed Injunction were punitive, vague or unnecessary.

A conference was held on August 9 to discuss, among other things, Apple's motion to stay all further proceedings against it as well as the terms of any injunction.  After the request for a stay was denied, the Court addressed the schedule for remaining proceedings, the terms of the Proposed Injunction, and Apple's objections to it.  Before addressing the particular terms of the Proposed Injunction, the Court described in detail the legal standard it would apply.

As of the date of the conference, Apple had been on notice of the plaintiffs' proposal for an External Monitor for two weeks.  The Court had hoped that Apple would submit evidence of antitrust compliance reform which would render the appointment of an External Monitor unnecessary.  As the Court said at the conference:

> My preference would be to appoint no external compliance monitor.  I would prefer that Apple adopt a vigorous in-house antitrust enforcement program and convince the plaintiffs, and this Court, that there is no need for a monitor.

The Court emphasized the narrow scope of its aim, explaining that

> I don't want to do more than necessary here.  I want
> to protect the market, protect the consumer, encourage
> price competition, and . . . allow this market to
> develop and change and prosper in ways we all can't
> imagine today.  And that goes for Apple as well.

Disappointingly, Apple made little showing at or before the August 9 conference that it had taken to heart the seriousness of the price fixing conspiracy it orchestrated.  Nor did Apple provide the Court with any evidence that it was seriously reforming its internal antitrust compliance policies to prevent a repeat of its violation.  Apple's submissions failed to demonstrate that it took seriously the burden that its participation in the price fixing conspiracy imposed on consumers and on the resources of the federal and state governments that were compelled to bring Apple and the publishers into federal court to put an end to that harm. Instead, as the Court noted at the August 9 conference, "[a]ll I have [from] Apple's submission is a very cryptic reference to the fact that it enhanced some compliance program it adopted at some point during this litigation." [1]  The Court explained that it

> would have appreciated a presentation by Apple that a
> monitor is unnecessary.  At this point, it has made no
> such showing.  There is no admission of wrongdoing.
> There is no contrition.  There is no showing of any

---

[1] In its August 2 submission, Apple stated that is "has an antitrust compliance program, which it has enhanced with a special antitrust legal department since the conduct that the Court found violated Section 1 in this case occurred."

> awareness of illegality or the danger of collusion by
> publisher defendants to raise eBook prices.  <u>There is
> no showing of institutional reforms to ensure that its
> executives will never engage again in such willful and
> blatant violations of the law.</u>

(Emphasis added.)

After hearing the Court's comments on their disputes
regarding several provisions in the Proposed Injunction, the
parties agreed to confer with each other further regarding its
terms.  On August 23, Apple and the plaintiffs each filed a
revised proposed injunction in anticipation of a conference to
be held on August 27.  In a supporting submission, Apple
acknowledged the Court's expressed preference that Apple itself
adopt a "vigorous in-house antitrust enforcement program."  In
its letter to the Court, it explained that it had hired, since
the underlying activities which formed the basis of the
litigation, two seasoned antitrust lawyers with extensive
experience at both the Department of Justice ("DOJ") and the
Federal Trade Commission ("FTC"), that it had improved its
compliance programs, and that the lessons it had learned from
this lawsuit would be incorporated into advising its employees.
An attachment to the letter added, <u>inter alia</u>, that Apple
intended to establish an annual formal antitrust compliance
training program, publish a revised compliance guide, and
institute regular auditing by an "Antitrust Compliance
Director."  In light of these steps, Apple argued that the

appointment of an External Monitor was "unreasonable and unjustified" and would be punitive.  Apple made no argument that the appointment of an External Monitor would be beyond the Court's power.

On August 27, the Court held another conference to finalize the terms of an injunction.  The Court made a set of proposals regarding several sections of the parties' most recent drafts of an injunction.  When it came to a discussion of the appointment of an External Monitor, the Court cited legal authority for the appointment of an External Monitor, and described the legal standards that governed such an appointment as well as the limitations on the role of an External Monitor.  The Court also observed that the trial had demonstrated a "blatant and aggressive disregard at Apple for the requirements of the law." The Court noted that "Apple executives used their considerable skills to orchestrate a price-fixing scheme that significantly raised the prices of E-Books" and that "[t]his conduct included Apple lawyers and its highest-level executives."  It then noted that, even after the Court's August 9 admonition that Apple should provide evidence of a robust internal antitrust compliance program so that the Court would not be forced to impose an External Monitor, Apple had failed to make such a showing.  The Court explained that:

> Apple has been given several opportunities to
> demonstrate to the Court that it has taken the lessons
> of this litigation seriously.  I am disappointed to
> say that it had not taken advantage of those
> opportunities.

The Court also described how it had invited a presentation by

Apple that a monitor was unnecessary at the August 2 conference,

but that Apple still had made no such presentation:

> I invited and expected a detailed and persuasive
> presentation of the steps Apple was committed to take
> to ensure that the government need never again expend
> its resources to bring Apple into court for violations
> of the Country's antitrust laws.  Apple's August 19
> letter to the government is its most detailed response
> in this regard and it is inadequate.

Consequently, the Court explained that:

> [A]lthough I have been reluctant to appoint a monitor
> for several reasons . . .  I believe based on the
> record before me now that I should.  I believe that a
> monitor with a carefully defined role can help ensure
> that competition is restored and preserved.

In deciding to make the creation of an Monitor position a

part of the Injunction, the Court tailored the Monitor's role

narrowly -- departing from the more expansive monitorship the

Department of Justice had proposed -- and reduced the

presumptive term from five years to two.[2]  As the Court explained

at the August 27 conference:

> I am giving the monitor a somewhat different function
> than that proposed by the plaintiffs.  The monitor
> will not be charged with assessing Apple's compliance

---

[2] The plaintiffs' August 23 proposal was for an injunction,
including the term of an External Monitor, to run for five
years.

> generally with the terms of the final judgment.  This
> could be a very expensive and intrusive undertaking.
> The monitor, however will have two other important
> tasks . . . .  The monitor will evaluate Apple's
> internal antitrust compliance policies . . . [and]
> will evaluate Apple's antitrust training program.

The Court finally noted its hope that Apple's professed

commitment to reforming its antitrust compliance policies and

maintaining a culture of respect for the antitrust laws of this

country was genuine:

> I am hopeful that Apple will bring its culture of
> excellence and exceptionalism to this task . . . .
> But, even if it chooses not to create a model program,
> it must create a meaningful training program, one that
> is comprehensive and effective.  To ensure that it
> does so, I will use a monitor. . . .  Apple could, of
> course, think of this training and any improvements to
> its policies and procedures as mere window dressing,
> the price it must pay to appear to comply with the
> injunction.  I trust, however, that it will make a
> sincere commitment to reform its culture.

After the Court described each of its proposed revisions to

the parties' drafts, there was a break in the conference so that

the parties could reflect on the proposals and address the Court

again.  The Court noted that all of the parties' previously

expressed objections were preserved.  After that break, Apple

made a number of requests regarding other provisions in the

proposed injunction, but it did not take issue with any of the

Court's remarks concerning the rationale for the appointment of

a Monitor or with the Court's proposals for the tasks to be

undertaken by such a person.

On September 5, DOJ provided the Court with a revised proposed injunction, "the form of which has been agreed to by the parties." While the letter noted that Apple was reserving all of its appellate rights, Apple did not separately raise with the Court any additional objection about the substance or wording of the revised proposed injunction. Among other things, it made no objection to the description of the tasks assigned to the Monitor or to the description of his compensation.

II.   The Terms of the External Monitor Component of the Injunction

On September 5, the Court entered the Injunction which included the Monitor component. The appointment of the Monitor was for a period of two years, subject to one year extensions by the Court if the Court deemed such extensions necessary. Injunction § VI.A.

Under the terms of the Injunction, the Monitor has two main tasks. Reviewing and producing recommendations and reports about: 1) Apple's antitrust compliance policies and procedures; and 2) Apple's antitrust training program. The Injunction provided that the Monitor would submit a written report to Apple, the plaintiffs, and the Court 180 days after the Monitor's appointment assessing Apple's antitrust compliance policies, procedures and training. Id. § VI.C. The Monitor was directed to provide additional reports at six month intervals

12

thereafter, and Apple was provided with a mechanism to object to any report.

The Injunction provided for the setting of the Monitor's compensation, as approved by DOJ.  Section VI.I provided that

> The compensation of the [Monitor] and any persons hired to assist the [Monitor] shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities and consistent with reasonable expense guidelines.

The Injunction also required Apple to assist the Monitor in the discharge of his or her responsibilities.  Section VI.G provided that "Apple shall assist the External Compliance Monitor in performance of the responsibilities set forth in [the Injunction]," and that "Apple shall take no action to interfere with or to impede the [Monitor's] accomplishment of its responsibilities." Id. § VI.G.  It allowed the Monitor "on reasonable notice to Apple" to interview "any" Apple personnel, and permitted Apple personnel to have counsel present.  It also gave the Monitor the right to inspect and copy "any" documents. Id.

Finally, the Injunction set forth a process to govern the resolution of any of Apple's objections to the Monitor's conduct.  Section IV.H of the Injunction provided that prior to bringing any objection to the Court:

> Any objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed

13

in writing to the United States and the Representative
Plaintiff States within ten calendar days after the
action giving rise to the objection.

Id. at VI.H.

III. The Selection of a Monitor

On September 27, the Court issued an Order providing a
process for the plaintiffs to propose candidates for the
position of External Monitor, requiring prompt service of notice
of the proposed candidates on Apple, and allowing for Apple to
have the opportunity to object to the candidates proposed.  On
September 30, the plaintiffs submitted the names of two
candidates to the Court to serve as the Monitor.[3]  In that
letter, the plaintiffs suggested that the Court conduct in
person interviews with the candidates.  One of the proposed
candidates was Michael Bromwich ("Bromwich").  The plaintiffs
suggested that Bromwich be assisted by antitrust specialist
Bernard Nigro ("Nigro").

On October 7, Apple submitted a letter objecting to both of
the candidates.  Its objection to Bromwich was brief, and
essentially confined to the argument that Nigro was an antitrust
specialist and that a dual-monitor structure was unnecessary.

---

[3] The plaintiffs' candidate proposals, and Apple's objections,
were to be submitted to the Court in camera to protect the
reputations of the candidates.

14

Apple, however, made a lengthy objection to the other candidate.[4]
Apple did not object to the Court conducting in-person
interviews in aid of selection of a Monitor.  Indeed, the
Injunction made Apple responsible for reasonable expenses
incurred by the candidates for any interview by the Court.  Id.
at § VI.A.  Following interviews with both of the Monitor
candidates by the Court, the Court appointed Michael Bromwich as
Monitor on October 16.

IV.  The Monitor's Interactions with Apple

The record shows that Apple's relationship with the Monitor
began on a hopeful and collaborative note, but promptly
deteriorated on the basis of a number of disagreements.  Two of
these disagreements concerned the Monitor's requests to
interview members of Apple's Board and certain Apple executives,
and the Monitor's fee schedule.  To put Apple's objections to
the Monitor's conduct into context, it will be helpful to lay
out in some detail the Monitor's interactions with Apple as set
out in the record the parties have submitted to the Court in
connection with Apple's application for a stay.

1.  The Monitor's Initial Efforts to Schedule Preliminary
    Interviews with Apple Executives and Board Members

On October 17, the day after the Monitor was appointed,
Apple's Kyle Andeer, a Senior Director for Competition Law &

---

[4] The objection was without merit and concerned asserted
conflicts of interests.

Policy and for Commercial & Retail Law ("Andeer"), seized the
initiative and wrote to the Monitor to suggest an early call or
visit.  He explained that he was committed to working with the
Monitor to develop a "best of class" antitrust compliance
program for iTunes, and that Apple was already hard at work
developing that program in consultation with Keven Arquit
("Arquit") and Matt Reilly ("Reilly"), two Simpson Thacher
partners.

The Monitor had his first meeting with Apple in New York on
October 22.  Present at the meeting were Andeer, Gibson Dunn's
Theodore J. Boutrous, Jr. ("Boutrous"),[5] and Simpson Thacher's
Arquit and Reilly.  The Monitor addressed his staffing and
approach to monitoring.  He acknowledged that his authority was
limited to the scope of the Judgment and that he wanted to use
the initial ninety day period to understand the company's
oversight structure for antitrust compliance, its existing
policies and procedures, the role of the Board's Audit and
Finance Committee's in compliance matters, among other things.
The Monitor requested preliminary meetings or interviews with
members of the Board of Directors and senior management the week
of November 18 -- just shy of a month away -- and described

---

[5] Boutrous had appeared at the August 27, 2013 conference to
discuss the terms of the Injunction.

documents that he believed were relevant that he would like to see.

The Monitor received the first push-back from Apple in response to this initial request for interviews.  Apple placed the Monitor on notice of its objection to his meeting with members of its Board or company executives.  Apple's representative explained, <u>inter alia</u>, that its Board members and senior executives were very busy and that there was "a lot of anger" about the case within Apple.  He added that Apple's senior executives did not expect to have to deal with the Monitor.  He also informed the Monitor that the Board would be meeting during the week of October 28 and would not be meeting again for another six months.  Apple assured the Monitor, however, that the company was committed to ensuring that it had an effective and robust compliance program.

On October 24, the Monitor wrote to Andeer and offered to have a "brief initial phone call" with the Board and/or its Audit Committee the following week since Andeer had advised the Monitor that there would not be another meeting again for six months.  The Monitor explained that this would give Board members the opportunity to ask any questions they might have.  Andeer responded with a request that Simpson Thacher's Reilly be copied on all future communications and indicated that there would was no Board meeting scheduled for the following week.

17

2.   <u>The Monitor and Apple Disagree as to the Terms of the
     Implementation of the Monitorship.</u>

On October 23, the Monitor sent Andeer a draft letter
setting forth a description of the duties and responsibilities
of the Monitor under the Judgment.  The draft included
information about the Monitor's fee and issues of
confidentiality.  The next day, Andeer sent the Monitor a
lengthy response to the October 23 draft letter describing the
Monitor's duties.  In the response, Apple objected to the
Monitor's fee of $1,100 per hour and the fee for Mr. Nigro of
$1,025 per hour.  Apple offered to compensate them at the rate
of $800 and $700, respectively, and indicated that "like all of
Apple's legal service providers" that the Monitor must comply
with Apple's Outside Service Provider Policy and its standard
expense policy.

Over the next few days, Apple and the Monitor continued to
disagree with each other over the Monitor's fees.  On October
26, the Monitor responded that the October 23 draft had been
provided to give Apple an opportunity to revise the
confidentiality provisions, not to negotiate fees since the
Monitor was serving as an independent compliance monitor and not
as a provider of legal services to Apple.  On October 28, Andeer
responded that he was disappointed by the Monitor's position on
rates and other fees.  On October 29, Nigro explained his view

18

that it was inappropriate for the Monitor to engage in a
negotiation regarding fees with the entity that it is
monitoring.  Nigro also represented that the October 23 draft,
which recited the Monitor's fees, had been shared with DOJ
before being provided to Apple.

Then, following up on the Monitor's request for documents
made on October 22, the Monitor requested in writing on October
29 that Apple provide materials related to its past and current
antitrust compliance policies, procedures, and training
materials, among other things.  The Monitor did not receive any
of these materials until after his first visit to Apple, which
occurred on November 18.

On October 31, Apple's outside counsel Boutrous wrote to
the Monitor to present formal objections to his fees and
interview requests.  He also assured the Monitor that Apple was
fully committed to ensuring that its training program and
procedures for antitrust compliance were "robust and effective."
The letter raised three issues.  First, Boutrous represented
that it would be "extremely disruptive," would make no sense,
and would be premature for the Monitor to interview Apple Board
members or executives until ninety days after the beginning of
the monitorship.  Boutrous relied on Section VI.C of the
Judgment, which requires the Monitor to review Apple's policies

and procedures as they exist ninety days after his appointment.[6] As for the Monitor's proposed fees, Boutrous took the position that they were not reasonable and customary for a lawyer or monitor, and that it appeared that the DOJ had not yet approved them. Finally, he asked the Monitor to execute an attached non-disclosure agreement. Boutrous advised the Monitor to direct any future communication on these issues to him and that he had provided the plaintiffs with notice of Apple's three objections.

As Boutrous had represented, on October 31, he wrote to plaintiffs to complain about certain actions taken by the Monitor, including a request to interview the entire Board and many executives. He also objected to the Monitor's fees as "well above" those typically paid to law firm partners. Boutrous and plaintiffs' counsel discussed these objections on November 4.

   3.   The Monitor's November 1 Letters to Apple CEO Cook and General Counsel Sewell

The Monitor responded to the Boutrous letter on November 1. He declined to execute Apple's proposed confidentiality agreement for several reasons, including the fact that it could

---

[6] Apple does not contend in this motion that the Injunction did not permit the Monitor to begin work until ninety days after his appointment. While the Injunction requires the Monitor to review the substance of Apple's compliance program as it exists ninety days after his appointment, the monitorship began with the appointment. Any monitor would be expected to prepare diligently upon appointment to perform all assigned tasks.

strip this Court of jurisdiction over any dispute.  The Monitor
noted that he had still received none of the materials requested
on October 22.  He explained that he wanted to get off to a fast
start, and hoped that Apple would reconsider its position
blocking any interview with anyone from the company other than
its attorneys.  The Monitor enclosed letters to be provided to
Tim Cook ("Cook") and Bruce Sewell ("Sewell"), Apple's CEO and
General Counsel, respectively.  In those letters, the Monitor
introduced himself, shared some information about his
responsibilities, expressed hope for a constructive
relationship, and voiced concerns about his initial interactions
with the company.  Among other things, the Monitor expressed his
belief that his relationship with Apple need not and should not
be adversarial.  He informed these executives that he had not
yet received any of the materials he had requested and had been
denied access to executives and Board members.  The Monitor
represented that he had assured Apple's counsel that any initial
interviews would be limited to one hour.

On Monday, November 4, Boutrous assured the Monitor that
the letters to Cook and Sewell had been delivered, attached a
response from Sewell, and asked to speak to the Monitor by
telephone to find a "smooth path to our shared objectives."  In
his letter, Sewell reported that Apple's new internal Antitrust
Compliance Officer ("ACO") would dedicate the next two months to

developing new training material and redesigning Apple's
compliance program, but that that officer needed to work without
interruption in doing so.[7]  Sewell assured the Monitor that the
ACO would eventually reach out to the Monitor to provide a
comprehensive report "so you can begin your monitoring
function."  While Sewell expressed a desire to collaborate with
the Monitor, he explained that he had a disagreement with the
Monitor over the scope and timing of any meetings and referred
to the request for documents about antitrust policies and
practices as a request for "voluminous historical documents".

        That same day, the Monitor renewed his request to schedule
preliminary meetings during the next two weeks with Apple
representatives.  In a November 5 letter to Sewell, the Monitor
explained that in each of the four monitorships with which he
had been involved over the past eleven years, the Monitor had
met with top management within two weeks of appointment.  The
Monitor also described the documents which he had requested, and
argued that they were narrowly drawn requests.  He added that no
one had previously suggested that the request was anything other
than modest and reasonable and expressed a willingness to
discuss the issue further.  There is no other evidence that any

---

[7] Section V of the Injunction requires Apple to hire an ACO who
will report to the Board's Audit Committee and be responsible
for supervising Apple's antitrust compliance efforts.

representative of Apple ever took issue with the scope of the Monitor's document request.

On November 6, the Monitor spoke with Boutrous and Daniel G. Swanson of Gibson Dunn.  In that discussion, Boutrous stated that it was not Apple's position that the Monitor should not start work, including interviews, before January 14, 2014. Boutrous suggested that the Monitor interview Sewell and others during the week of November 18 or in early December to help bring the Monitor up to speed, even though Apple employees would view the interviews as "formidable" in concept.  Boutrous acknowledged that the interviews might ease the road going forward.

But, Boutrous then wrote to the Monitor on November 7 to propose that any interviews occur the week of December 2.  He listed nine potential persons for interviews.  The Monitor responded that same day that he wanted to keep trying to schedule interviews for the week of November 18.  The Monitor asked to add Messrs. Cook, Phil Schiller, Eddie Cue and two to three Board members who he believed were based near Apple's headquarters to the list of nine persons.[8]  Combining Apple's

---

[8] In making this motion for a stay, Apple contends that the Monitor made a particular effort to interview Vice President Al Gore, who is now an Apple Board member.  The parties' submissions only reveal a single request by the Monitor to interview Gore in particular, and that was made in the Monitor's request of November 7 to interview two or three Board members

list of nine persons, and the Monitor's request for an
additional five to six persons, this constitutes a list of
fourteen to fifteen persons for interviews by the Monitor.

4.    The Tone in the Interactions between Apple and the
      Monitor Shifts Again.

On Saturday, November 9, Boutrous acknowledged that the
Monitor had planned to be out of the country the week of
December 2, but requested that the Monitor rearrange his
schedule to conduct any interviews that week.  He represented
that the nine persons listed in his November 7 email would be
available for interviews and the new ACO will be "up and
running."

That same day the Monitor insisted that the visits occur
the week of November 18, or if Apple preferred, the week of
November 11.  Noting that Apple had been on notice since October
22 that the Monitor intended to visit that week, the Monitor
asked Apple to confirm which of the 15 persons identified in
their exchange of correspondence was "unavailable for as little
as an hour any day the week of November 18."  This email of
November 9 and the Boutrous response of November 11 reflect a
shift in tone.  They both express disappointment with the other.
Boutrous characterized the Monitor's approach as "unreasonable,

who the Monitor believed were based near Apple's headquarters.
The Monitor's request listed the three by name; one of those
names was Gore.

24

unnecessary and unwarranted." He argued that it went well beyond the scope of the Judgment and this Court's guidance to the parties and Monitor. The Monitor proposed a telephone call, and on November 11 the Monitor and Boutrous spoke.

In a brief conversation on November 11, the Monitor asked that Apple make additional efforts to arrange interviews for the week of November 18, and advised Boutrous that a failure to permit a single interview within a month of appointment was inconsistent with Apple's stated commitment to cooperate with the Monitor. Boutrous describes the conversation as cordial.

On November 12, Boutrous continued to urge the Monitor to make the trip to Apple in December, when a "fuller slate of folks" would be available for interviews, including Sewell and the ACO. He did, however, offer to have two individuals available for interviews the week of November 18. The Monitor promptly accepted the offer to interview the two individuals, but expressed the hope that others in the list of fifteen would become available for interviews and that the materials requested on October 22 could be made available. Boutrous assured the Monitor on November 13 that the materials would be provided, identifying outside counsel Matt Reilly from Simpson Thacher as the attorney who would be coordinating that production.

On Friday, November 15, the Monitor advised Boutrous that he had not yet received any of the materials. On Sunday,

Apple's counsel advised the Monitor that three interviews had been scheduled for Monday morning to discuss confidentiality, Apple's compliance program, and to give the Monitor an overview of the Audit Committee for the Board.

On November 18, the Monitor conducted one-hour interviews with (1) Chief Compliance Officer Tom Moyer, and (2) Gene Levoff, an attorney with responsibilities relating to the Audit and Finance Committee and risk management. Boutrous and two Simpson Thacher attorneys were present during the interviews. Apple had also arranged for the Monitor to meet Noreen Krall, its Chief of Litigation, to discuss fees and confidentiality issues.

5.   The Monitor's Efforts to Interview Apple Board Members and Executives Following November 18

The Monitor advised Apple on November 18 that the morning's interviews had gone smoothly and been informative. He expressed hope that additional interviews could be arranged for that week, or if necessary the period between December 4 to 6. Apple promptly advised the Monitor that no more interviews would be scheduled for that week, but that it had started to work on a schedule for December 4 to 6.

On November 19, the Monitor asked to meet with two Apple Board members -- Andrea Jung and Dr. Ronald Sugar ("Sugar") -- in New York and Washington, D.C. in the next few days. On

November 21, Apple asked the Monitor to be patient, and said that it would check to see if Sugar would be available for an interview in California during the Monitor's early December visit.

On November 21, Apple provided some of the documents responsive to the Monitor's requests on October 22 and 29.  This is the only production Apple has made to the Monitor.

6.   The Monitor's November 22 Letter to Board Members

On November 22, the Monitor sent Apple's counsel a letter for its Board of Directors and asked that it be circulated to them promptly.  The letter described the Judgment and expressed disappointment at the lack of cooperation he had received from Apple.  He explained that he had wanted to have initial interviews with executives and members of the Board to introduce himself, lay the foundation for a relationship, and learn some basic facts about Apple's compliance framework.  Despite proposing on October 22 that he visit Cupertino for those intial interviews the week of November 18, Apple only made two individuals available for interviews during that trip and in advance of the trip did not provide any of the materials the Monitor had requested.

On November 22, Simpson Thacher's Reilly wrote to the Monitor.  He characterized the Monitor's requests for interviews as "inconsistent with Judge Cote's direction and counter-

productive to Apple's extensive efforts to develop a comprehensive new antitrust training and monitoring program," as well as disruptive.  Reilly noted that Apple had already made two senior Apple attorneys available for interviews in November and had provided the Monitor with some documents and would be providing more.  Reilly proposed a schedule for twelve interviews in early December, and suggested that a small number of additional interviews with executives and content managers take place in early February.  He noted that counsel would attend any meetings between the Monitor and an Apple business executive or manager.

Sewell wrote to the Monitor on November 25, expressing hope that Apple and the Monitor could work cooperatively to conduct interviews.  He noted that Apple had now confirmed interviews with approximately a dozen senior Apple witnesses for December. The Monitor promptly thanked Sewell for his note, but continued to express hope that the other executives and Board members with whom he had asked to meet could be made available.[9]

7.   The Interviews between December 4 and 6

Between December 4 and 6, the Monitor interviewed Sugar, Apple's Chair of the Board of Director's Audit Committee, and nine Apple employees.  Two of the nine were employees that the

---

[9] The Monitor questioned the relevance of four out of the twelve of Apple's proposed interviewees.

Monitor had already interviewed in November; the Monitor had not asked for second interviews of these individuals.  On December 10, the Monitor interviewed Sewell by telephone.  Outside counsel for Apple attended each interview, as well as Apple's ACO.  On December 6, Apple wrote to the plaintiffs for a second time to complain about the Monitor.

Since his appointment, Apple has permitted the Monitor to conduct 13 hours of interviews of eleven persons during two visits to California.  These interviews have included one Board member and one senior executive.  Seven of the eleven people interviewed are lawyers.  In response to the request for documents, the Monitor has been provided with 303 pages of documents.

    8.   The Proposals in the Court's November 20 Order

Unaware of any of these interactions between the Monitor and Apple, that the Monitor was having difficulty obtaining cooperation from Apple, or that Apple had complaints about the Monitor, the Court issued an Order dated November 20 pursuant to Federal Rule of Civil Procedure 53(b)(2) to give the parties notice of a "proposed" amendment to the Order of October 16 appointing Bromwich as Monitor ("November 20 Order").  Rule 53(b)(2) provides that an "appointing order . . . must state," certain enumerated characteristics of "the master's duties," including inter alia whether the master may communicate ex parte

with the Court or with the parties.  The Order included proposals for clarifying each of the terms of the monitorship that Rule 53(b)(2) enumerates.  These included a proposal that the Monitor could brief the Court _ex parte_ and orally at least once a month.  The Court solicited objections as to each proposal from the parties.  The November 20 Order was issued in the hope that the further definition of the Monitor's duties would be a collaborative process consistent with Apple's stated commitment to reforming its antitrust compliance policies.

On November 27, Apple submitted objections to the proposals.  Apple alleged that entry of the proposals would constitute a litany of purported constitutional violations, and contended that _ex parte_ oral briefings as to the state of Apple's antitrust compliance and training program "is grounds for disqualification of a judge presiding over continuing proceedings in the matter and in related litigation."  Apple also raised a number of objections unrelated to the proposals, which related to the Monitor's conduct so far.

None of the proposals in the Order of November 27 were ever enacted.  In light of Apple's particularly strong objections to the _ex parte_ oral briefing proposal, the Court issued an Order dated December 2, in which it stated that it would not enact the proposal to allow _ex parte_ communications between the Monitor

and the Court in light of Apple's objection.[10]   In response to
Apple's complaints about the Monitors conduct, the Court
reminded the parties, through that same Order, that any
objections to the Monitor's performance must be addressed
through the procedure set forth in Section VI.H of the
Injunction, i.e., that any concerns must be raised with the
other party within ten days of the event being objected to.   To
the extent Apple had not made timely objections about the
Monitor, the Order advised Apple that the Court would entertain
its current objections after Apple consulted with DOJ, but would
require Apple in the future to comply with the provisions of the
Injunction regarding any complaints.   The Court reminded the
parties that after consultation between DOJ and Apple about any
timely objection to the Monitor's conduct, the Court would, per
its normal procedures of which all parties are aware, "promptly"
schedule a conference to resolve any dispute.

     9.   <u>Apple Files the Instant Stay Motion.</u>

     Apple did not choose to use the opportunity offered by the
December 2 Order to conclude the meet and confer process with
DOJ in an effort to resolve any outstanding complaints about the
Monitor, and then to bring remaining objections to the Court's
attention.   Instead, on December 13, Apple filed the instant

---

[10] November 27 was the Wednesday before Thanksgiving; December 2
was the Monday following Thanksgiving.

motion by order to show cause for a stay of Section VI of the injunction pending appeal.  Despite the absence of any order adopting any of the proposals in the November 20 Order, Apple predicated its motion for a stay in significant part on objections to those proposals.  Apple also predicated its motion for a stay on its stated view that the term "ex parte" as used in the proposals in the November 20 Order meant "uncounseled" rather than "outside of the presence of the opposing party (i.e., Apple or DOJ)."  The motion was also predicated on objections as to how the Monitor has acted thus far.  DOJ submitted a responsive letter that same day.

In response to the parties' submissions, the Court held a telephone conference to schedule briefing on Apple's motion for a stay.  In that conference, the Court reminded the parties that the proposals in the November 20 Order had not been entered, and explained that the term ex parte as used in the November 20 Order carried its ordinary meaning, i.e., that Apple or the plaintiffs need not be present during the Monitor's communications with the other side -- and did not mean "uncounseled."  Apple was given an opportunity to amend its motion in light of these statements.  It declined to do so.

On December 30 the plaintiffs submitted their opposition to Apple's stay motion.  Attached to the plaintiffs' opposition was a declaration by the Monitor disputing Apple's characterization

of his conduct and attaching additional documents to supplement the record.[11]   On January 7, Apple submitted its reply, in which it largely abandoned the arguments in its initial memorandum, which relied on the un-entered proposals and on Apple's stated prior understanding that ex parte meant uncounseled.   Apple incorporated new arguments into its motion for a stay and focused exclusively on the Monitor's conduct in discharging his duties under the Injunction and on his submission of a declaration attached to the plaintiffs' opposition to this stay request.   It argued that the Monitor must be disqualified and that Apple was entitled to a stay in the event the Court denied that application.

Also on January 7, Apple submitted along with its reply a letter making objections to the Monitor's conduct to be resolved through the procedure set forth in the Injunction (and not as part of the stay application).   Through the letter, Apple contends: 1) that the Monitor should be disqualified because he filed an affidavit attached to the plaintiffs' opposition; 2) the scope of the Monitor's activities violates Apple's rights; 3) the Monitor seeks impermissible direct contact with Apple personnel; and 4) the Monitor's fee structure is impermissible. DOJ contends that Apple has not met and conferred with DOJ on

---

[11]  In support of its motion for a stay, Apple had submitted only some of its correspondence with the Monitor.

several of these issues before bringing them to the Court's
attention, as required both by the terms of the Injunction and
this Court's general practice.

On January 13, oral argument was held in connection with
this stay motion.  At oral argument, Apple continued to argue
for the Monitor's disqualification, and that it was entitled to
a stay if the Court disagreed.  The Court denied the application
to disqualify the Monitor or to grant a stay but agreed to a 48
hour stay following the filing of this Opinion to allow Apple to
appeal this Order.

DISCUSSION

The standard in evaluating a stay application is well
established:

> (1) whether the stay applicant has made a strong showing
> that he is likely to succeed on the merits; (2) whether
> the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially
> injure the other parties interested in the proceeding;
> and (4) where the public interest lies.

S.E.C. v. Citigroup Global Markets Inc., 673 F.3d 158, 162 (2d
Cir. 2012) (per curiam) (citation omitted).  "[The third and
fourth] factors merge when the Government is the opposing
party."  Nken v. Holder, 556 U.S. 418, 435 (2009).  These
factors operate as a "sliding scale" where "[t]he necessary
'level' or 'degree' of possibility of success will vary
according to the court's assessment of the other stay factors .

. . . [and] [t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay." Thapa v. Gonzales, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted). "A stay is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." Nken, 556 U.S. at 427 (citation omitted); see also Maldonado-Padilla v. Holder, 651 F.3d 325, 327-28 (2d Cir. 2011) (quoting Nken, 556 U.S. at 427).


I.    Likelihood of Success on the Merits

The first factor, a strong showing of a likelihood of success on the merits, requires "more than a mere possibility of relief." Nken, 556 U.S. at 434 (citation omitted). To demonstrate a "strong showing that it is likely to succeed on the merits" Apple has the burden of demonstrating "a substantial possibility, although less than a likelihood, of success" on appeal. Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002) (citation omitted).

Apple's arguments in support of a stay have shifted significantly in the course of briefing this motion and even more so at oral argument. In addition, Apple has at times conflated different arguments. So, this Opinion will attempt to

isolate which arguments have not been abandoned and determine their precise form.

As described in the foregoing, Apple initially predicated its stay motion on a hybrid claim that: 1) the Court had impermissibly expanded the Injunction through its never-entered proposals in the November 20 Order; 2) Section VI of the Injunction itself was unconstitutional as ordered; and 3) the Monitor's conduct has had the practical effect of expanding the scope of the Injunction and rendering it unconstitutional as applied.  By the time of its reply, and as it emphasized at oral argument, it now bases its request for a stay principally, if not entirely, on the Monitor's submission of a declaration in response to Apple's motion for a stay.  It argues that that submission reflects that the Monitor "is not disinterested, [but] . . . has taken an adversarial, rather than judicial, stance towards Apple," and requires that he be disqualified. These arguments, even those Apple has waived or abandoned, will be addressed in turn.

### 1.   The Proposals in the November 20 Order

Apple initially argued in this motion that the Injunction had been modified impermissibly through the adoption of proposals outlined in the November 20 Order.  The proposals were made to address topics outlined in Rule 53(b)(4), Fed. R. Civ. P.  As recited above, the Court never issued an Order

36

implementing those proposals, and promptly issued an Order to
respond to Apple's particularly vociferous objection that the
Monitor and the Court not engage in <u>ex parte</u> communications.  As
previously stated above, following the Court's observation in a
telephone conference of December 13 that the proposals had never
been adopted, Apple was given an opportunity to amend its motion
for a stay.  It declined that opportunity, but abandoned these
arguments in its reply.  Consequently, they need not be
addressed any further.

    2.  <u>Section VI of the Injunction as Ordered</u>

    Apple initially contended that Section VI of the Injunction
was unconstitutional as ordered.  In its reply, Apple drops this
argument as well and focuses entirely on the manner in which the
monitorship is being implemented.[12]

    A court's inherent equitable power to appoint a monitor
under the terms set forth in Section VI of the Injunction is, of
course, well established.  And Rule 53 of the Federal Rules of
Civil Procedure provides an additional source of authority --
supplementing a court's inherent power to craft its equitable

_____

[12] Apple makes no argument in its reply that Section VI of the
Injunction is unconstitutional as ordered.  Although one header
of Apple's reply reads "[The Monitor's] support of plaintiffs in
opposition to Apple's motion also highlights <u>the injunction's</u>
and [The Monitor's] violation of the separation of powers"
(emphasis added), there is no argument in the text of that
section that the Injunction itself, separate from the Monitor's
implementation of it, violates the separation of powers.

remedies -- to appoint a monitor with powers set forth in the
Injunction.

  "The power of the federal courts to appoint special masters
to monitor compliance with their remedial orders is well
established."  City of New York v. Mickalis Pawn Shop, LLC, 645
F.3d 114, 145 (2d Cir. 2011) (citation omitted). "[A]s with any
other [equitable] remedial tool" a district court has "broad
discretion" to appoint a compliance monitor.  United States v.
Yonkers Bd. of Educ., 29 F.3d 40, 44 (2d Cir. 1994) (per
curiam).  Because "the relief" in an antitrust case must be
"effective to redress the violations" and "to restore
competition," United States v. E.I. Du Pont De Nemours & Co.,
366 U.S. 316, 326 (1961), "[t]he District Court is clothed with
'large discretion' to fit the decree to the special needs of the
individual case."  Ford Motor Co. v. United States, 405 U.S.
562, 573 (1972)(citation omitted).  In particular, external
monitors have been found to be appropriate where consensual
methods of implementation of remedial orders are "unreliable" or
where a party has proved resistant or intransigent to complying
with the remedial purpose of the injunction in question.
Yonkers Bd. of Educ., 29 F.3d at 44.  Thus, "a monitor may
report on a defendant's 'compliance with the district court's
decree and help implement that decree."  United States v. Philip
Morris USA Inc., 566 F.3d 1095, 1150 (D.C. Cir. 2009) (per

curiam) (citation omitted); see also, e.g., Local 28 of Sheet
Metal Workers' Int'l Ass'n v. E.E.O.C., 478 U.S. 421, 481-82
(1986) (affirming as permissible a district court's "appointment
of [a monitor] with broad powers to supervise [] compliance with
the court's orders").

Comparison of the limitations the law imposes on the powers
of a monitor with the narrowly tailored terms of the Monitor's
powers in the Injunction confirms that Section VI of the
Injunction is a clearly permissible exercise of judicial power.
The law requires that a monitor's actions must always be
conducted subject to "careful review by the trial judge."
Mickalis Pawn Shop, LLC, 645 F.3d at 145 (citation omitted).
Here, the Monitor's actions are subject to oversight by the
Court and Apple has a procedure to bring any disputes to the
Court for resolution.  Section VI.E of the Injunction requires
Apple to bring any complaints about the Monitor promptly to the
attention of DOJ in an attempt to resolve them with DOJ.
Pursuant to the practices of this Court, with which Apple is
well familiar, the Court will act promptly to resolve any
disputes that remain.

Rule 53 of the Federal Rules of Civil Procedure provides
additional authority for appointment of a compliance monitor in
addition to a court's inherent equitable authority.  Rule 53
provides that

> [A] court may appoint a master . . . [to] address
> pretrial and <u>posttrial</u> matters that cannot be effectively
> and timely addressed by an available district judge or
> magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1)(C) (emphasis added).  The advisory
committee notes to Rule 53 provide context for understanding the
rule:

> Post-Trial Masters. Courts have come to rely on masters
> to assist in framing and enforcing complex decrees . . .
> Amended Rule 53 authorizes appointment of post-trial
> masters for these and similar purposes. . . .  Reliance
> on a master is appropriate when a complex decree requires
> complex policing, particularly when a party has proved
> resistant or intransigent.  This practice has been
> recognized by the Supreme Court, <u>see</u> <u>Local 28, Sheet</u>
> <u>Metal Workers' Internat. Assn. v. EEOC</u>, 478 U.S. 421,
> 481-82 (1986).

<u>Id.</u> advisory committee notes (2003 amendments).  The Advisory
Committee Notes to Rule 53 also state that:

> The master's role in enforcement may extend to
> investigation in ways that are quite unlike the
> traditional role of judicial officers in an adversary
> system.

<u>Id.</u>

The role of Rule 53 as a supplement, and not a substitute,
to a court's inherent authority to appoint a monitor has been
long recognized:

> [R]ule 53 does not terminate or modify the district
> court's inherent equitable power to appoint a person,
> whatever be his title, to assist it in administering a
> remedy.  The power of a federal court to appoint an agent
> to supervise the implementation of its decrees has long
> been established.

Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir. 1982) (collecting cases).

In any event, although Apple was integrally involved in the Injunction drafting process following the liability trial, it never raised during that process the constitutional issues it raised in its initial memorandum in support of a stay here, and any such arguments addressed to the terms of the Injunction as ordered would be waived for purposes of this stay motion.  As described above, the plaintiffs put Apple on notice that they were seeking an External Monitor on July 19, through their Proposed Injunction.  Apple had from July 19 until September 5 (when the Injunction was entered) to make an objection about the constitutionality of Section VI of the Injunction.  The Court specifically solicited objections from Apple and Apple comprehensively raised its objections about the creation of the monitor position in a filing of August 2.  Nowhere in that filing, nor in any other place, did Apple contend that the Court was without authority to appoint a monitor in this case.  Instead, Apple objected to the appointment of an external monitor as burdensome.[13]

---

[13] Apple tacitly acknowledges that it has waived this argument in its statement in its reply that its objections are "primarily the way in which the injunction is being implemented."  This statement was Apple's response to the plaintiffs' contention that Apple had waived its arguments as to the constitutionality of the terms of Section VI itself.

In its initial stay memorandum, Apple appeared as well to object to the terms of the Injunction that allow the Monitor to interview Apple employees and inspect Apple documents as an unconstitutional exercise of the Court's authority.  As reflected in its reply and its oral argument on January 13, however, Apple has also abandoned this objection.

As was true with its broader constitutional argument about a court's power to appoint a monitor in this case, Apple never argued prior to the entry of the Injunction that any specific component of Section VI was beyond the Court's power to include in the Injunction.  In fact, on the day of the entry of the Injunction on September 5, the Court received a letter from DOJ with a proposed injunction -- which was entered unmodified -- in which DOJ represented that "the form of which has been agreed to by the parties."  Section VI.G allows the Monitor "in connection with the exercise of [his] responsibilities under this Section VI, and on reasonable notice to Apple . . . [to] 1. Interview, either informally or on the record any Apple personnel, who may have counsel present . . . [and] 2. Inspect and copy any documents in the possession, custody or control of Apple."

A court's power to permit a monitor to conduct interviews and request documents, constrained by court supervision, is well established.  See, e.g., Sheet Metal Workers' Int'l Ass'n, 478

U.S. at 481-82.  A monitorship would be of little use at all if a monitor were only permitted to receive, review and opine on company-vetted documents.  Apple cites to no case holding that a monitor may never conduct interviews and there are many examples to the contrary.

For example, Apple relies principally in this motion for a stay on the decision by the Court of Appeals for the District of Columbia in Cobell v. Norton, 334 F.3d 1128 (D.C. Cir. 2003). Cobell concerned "the propriety of a federal court authorizing its agent to interfere with the affairs of another branch of the federal government."  Id. at 1142.  In Cobell, the monitor was appointed to investigate the Department of the Interior.  But even in that very different context which raised serious separation of powers concerns, the Cobell court endorsed the use of a monitor to interview employees and inspect documents. Discussing with approval the monitor imposed in the case of Ruiz, 679 F.2d 1115 (5th Cir.), the Cobell court said:

> Ruiz illustrates the limits of the mandate a district
> court may permissibly give its agent.  There the district
> court . . . entered an injunction and appointed a special
> master, assisted by several monitors to monitor
> implementation of the relief ordered.  The special master
> was given unlimited access to [the defendants'] premises
> and records as well as the power to conduct confidential
> interviews.

Cobell, 334 F.3d at 1142 (citation omitted) (emphasis added).

There is therefore no legal basis for Apple to object to the Injunction's provisions which permit the Monitor to conduct interviews and inspect documents.  Apple never suggested that there was a legal basis to make such an objection prior to the entry of the Injunction and no longer pursues that line of argument now.

3.   The Monitor's Conduct Since his Appointment

In its motion for a stay, Apple argued that the Injunction did not authorize the Monitor to conduct interviews during the first ninety days of his appointment.  That ninety day period has now passed, and any complaints regarding it are now moot and could provide no basis for a motion for a stay.

In making this objection about the monitorship, Apple relied principally on that portion of Section VI of the Injunction that requires the Monitor to review Apple's compliance policies and procedures as they exist ninety days following his appointment.  Section VI.C. provides that the Monitor:

> [S]hall conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his or her appointment, are reasonably designed to detect and prevent violations of the antitrust laws.

The Monitor was appointed on October 16 and the ninety days were up on January 14.  Even if this objection were not moot,

44

however, it would be without merit for several additional reasons.

Apple's argument that the Monitor should not have begun his work during the first ninety days of his appointment, including conducting interviews and reviewing documents, is predicated on a strained and unreasonable reading of the Injunction. Nothing in Section VI contemplates that the Monitor should not start work until three months following his appointment. The ninety-day window was created for a different purpose. The Court suggested to the parties, when the Injunction's terms were being fashioned, that Apple have the opportunity of ninety days to revise its policies and procedures, and that the Monitor be required to comment on those revised practices. Apple has taken advantage of that window of opportunity to retain Simpson Thacher counsel to assist it in crafting an improved compliance program. Apple is to be commended for doing so. Indeed, this decision by Apple to seek outside assistance and amend its compliance program will, it is to be hoped, be of benefit to Apple and the public. It is a decision that is directly traceable to the creation of the monitorship.

But, this window of opportunity for Apple does not suggest that the Monitor was expected to, or authorized to, sit idle for the first three months of his appointment. In order for a Monitor to be in a position to evaluate and comment on Apple's

45

revised compliance program in a meaningful and timely way, any
monitor would be expected to use the intervening period between
his appointment and the ninetieth day to become familiar with
the relevant aspects of the company, its personnel and
procedures.  He would need to be in a position to assess whether
the revised program was an adequate program not in an abstract
sense, but whether it might be an effective program for Apple.
After all, as the Injunction explicitly states, the Apple
policies, procedures and training all have a single purpose:
"ensuring antitrust compliance" by Apple as it moves forward
with its business.  Section VI.C.

Moreover, to the extent that Apple had any objection to a
specific request or practice of the Monitor, it had available to
it the procedure for making objections that are described in the
Injunction and with which Apple is thoroughly familiar from its
appearances before this Court for roughly two years.  For the
avoidance of doubt, the Court reminded the parties at the oral
argument on January 13, 2014, that Apple must promptly raise any
objection about the Monitor's conduct with the Monitor, and if
the objection remains unresolved, with DOJ.  If the Monitor,
DOJ, or Apple are dissatisfied with the outcome of those
discussions, they must promptly bring the dispute to the
attention of the Court by letter.  All parties must participate
in good faith in this meet and confer process, and act in a

46

timely fashion.  It is important that complaints not fester and that the working relationship between the Monitor and Apple proceed as smoothly as possible so that the important work of the Monitor can be completed on schedule.

Perhaps in recognition that its purported reading of the Injunction -- that the Monitor should not conduct interviews or obtain Apple documents during the first ninety days of his appointment -- was unlikely to have any traction, Apple ultimately did not stand on this objection during the ninety-day period.  It provided the Monitor with some, limited access to personnel and documents.  Moreover, while it presented this objection to the Monitor and to DOJ, it did not raise it with the Court in a timely fashion.

Finally, as was true with its constitutional arguments, by the time it submitted its reply and made its oral presentation in Court, Apple had abandoned this purported violation of the Injunction as a ground on which it was seeking a stay.  Thus, for each of these reasons, Apple has not shown that the Monitor's work during the first ninety-days of his appointment requires a stay.

4.  <u>Disqualification of Bromwich as Monitor</u>

As currently structured, the core of Apple's argument for a stay is its contention that Bromwich must be disqualified as a Monitor.  It makes essentially two arguments in this regard.  It

argues that his financial stake in his appointment as a Monitor requires his disqualification.  Secondly, and it is this ground which Apple emphasizes, it contends that Bromwich's submission of a declaration in connection with this motion practice demonstrates that he may not serve as an impartial monitor. Apple has not shown even a possibility of success with either argument.

As already noted, many of the arguments that Apple presented in its original motion for a stay are no longer being pursued by Apple as a reason for the issuance of a stay.  In its reply, Apple emphasizes Bromwich's submission of a declaration in connection with DOJ's filing of its opposition to the request for a stay, and argues that that submission is evidence that Bromwich has taken on an "adversarial, rather than judicial, stance towards Apple."  Similarly, at oral argument, Apple focused its argument that it had shown a likelihood of success on this motion for a stay on the argument that Bromwich must be disqualified from serving as the Monitor.  In addition to the Monitor's filing of a declaration, Apple stressed that Bromwich was pursuing a broader mandate that that authorized by the Injunction's terms and that he is relying on ex parte communications with the Court to define the parameters of his work.

The law in this Circuit regarding disqualification largely arises in the context of the disqualification of a judicial officer.  Section 455 of Title 28 of the United States Code, upon which Apple relies, reads as follows:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
    (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . [or]
    (4) He knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

28 U.S.C. § 455.  "The standard for disqualification under 28 U.S.C. § 455(a) is an objective one; the question is whether an objective and disinterested observer, knowing and understanding all of the facts and circumstances, could reasonably question the court's impartiality."  S.E.C. v. Razmilovic, 2013 WL 6172543, at *12 (2d Cir. July 22, 2013) (citation omitted).

a.  Fee Dispute

Apple first contends that the Monitor must be disqualified because the way the Monitor is implementing Section VI deprives Apple of its constitutional right to a "disinterested prosecutor" who is without "a personal interest, financial or otherwise" as required by, inter alia, Young v. United States ex

49

rel. Vuitton et Fils S.A., 481 U.S. 787, 808 (1987) (citation
omitted).  This reference to Vuitton and the "disinterested
prosecutor" criterion is of little assistance, however, since
the Monitor is not a prosecutor.  In fact, Section VI.F
expressly prohibits prosecutorial investigative activity.
Section VI provides that, if in the normal course of his duties,
the Monitor "discovers or receives evidence that suggests . . .
that Apple is violating or has violated this Final Judgment or
the antitrust laws," the Monitor shall report that information
to DOJ and "take no further action including seeking information
from Apple . . . to investigate any such potential violation of
the Final Judgment or the antitrust laws."  (Emphasis added.)
The Monitor's status as a court-appointed monitor is material
because Young turned on the impropriety of a prosecutor having a
financial interest in the outcome of a prosecution, as opposed
to a monitor or special master being merely paid for his time on
a basis that is not contingent on the outcome.

Apple's argument is ultimately that it is unconstitutional
to pay a court-appointed monitor at an hourly rate because that
creates an incentive for the Monitor to conduct as lengthy of an
investigation as possible.  But Apple cites no authority for the
proposition that a monitor cannot be paid at an hourly rate.
Under the terms of the Injunction, it is the United States that
must approve the "terms and conditions" on which the Monitor

will serve.  Section VI.I.  The compensation is set at
"reasonable and customary terms commensurate with the
individual['s] experience and responsibilities."  Id.  Apple
made no objection to this or any other wording or particular
component of Article VI.  It simply opposed the appointment of
any monitor.

In any event, this is a dispute that may be resolved by
parties acting in good faith.  As already explained, when it
comes to the hourly rate for the Monitor's compensation, Apple
has already offered to pay $800 per hour instead of the $1,100
approved by DOJ.  As recently as December 30, DOJ reached out to
Apple to reiterate its offer to adjust the terms of the
Monitor's compensation, and conveyed to Apple that the Monitor
is willing to adjust his current fee structure.  While Apple had
previously made its own proposals for Bromwich's hourly rate,
Apple did not respond to either the initial DOJ offer or the
renewed December 30 offer to discuss and resolve the matter.

Once again, this is an issue on which the Injunction's and
this Court's normal dispute resolution process have been and are
available to Apple.  At the January 13 oral argument on this
motion, the Court advised the parties that it would refer them
to a Magistrate Judge to attempt to resolve this fee dispute.[14]

---

[14] In making that reference, the Court added that Apple should be
prepared to provide appropriate benchmarks to the Magistrate

If the parties cannot agree on mutually acceptable terms then they can petition this Court through the normal process to resolve the dispute.  A stay motion is not a proper vehicle for this complaint.

Moreover, Apple's "disinterested prosecutor" argument is belied by the fact that Section VI has various provisions to protect Apple from any fee-increasing incentive.  Section VI.J requires the Monitor to "act diligently [and] in a cost-effective manner."  Apple has a mechanism to make any objections to the plaintiffs and ultimately the Court as to whether the Monitor is acting efficiently pursuant to that Section, and the Court is charged with ultimate adjudication of any complaints that the Monitor is acting pursuant to a perverse incentive.

---

Judge in the event it continues to argue that the Monitor's fees are excessive for an attorney with his experience and responsibilities in this monitorship.  Such benchmarks should include the customary hourly rates for the Simpson Thacher attorneys whom Apple has hired to assist Apple in revising the compliance program that the Monitor will be reviewing, and any other benchmarks that Apple may wish to offer.  Apple may no longer be contending, however, that the Monitor's rates are too high when judged against the customary rates in the profession for comparable work.  It argued on January 13 that a lower rate should be paid here since Apple has not consented to the retention of a monitor, and the Monitor is serving the Court and the public in taking on this assignment.  So long as Apple participates in a good faith effort to resolve this dispute in a conference before the Magistrate Judge, it may offer any benchmark it wishes.

b.   <u>The Monitor's Declaration</u>

In its reply, and again on January 13, Apple shifted the focus of its attacks on the Monitor to an argument that the Monitor's declaration filed in connection with the plaintiffs' opposition to a stay renders him "Apple's litigation adversary" and demonstrates that he must be removed as Monitor pursuant to 28 U.S.C. § 455(b)(1).  Apple contends that the Monitor "has a personal bias or prejudice concerning a party, [and] personal knowledge of disputed evidentiary facts concerning the proceeding."  This is now the principal focus of Apple's application for a stay.  Apple has not shown, however, that it is likely to succeed in obtaining a stay of the monitorship by disqualifying the Monitor on this ground either.[15]

The Monitor's submission of a declaration was proper and necessary.  When Apple filed the instant stay motion, it predicated its argument on several, serious attacks bearing on the conduct and the character of the Monitor in connection with his conduct of the monitorship.  These allegations were grounded in factual statements.  To evaluate the truth and understand the context of the assertions, it was essential to hear from the Monitor.  In many instances, the Monitor was the only person who

---

[15] Apple has not provided any legal authority to support the proposition that the denial of a disqualification motion of a monitor, particularly one made months after the appointment and on the ground that the monitor filed an affidavit about his efforts to conduct the monitorship, is an appealable order.

could confirm or deny the accuracy of Apple's assertions.  As
this Court's agent, it was the Monitor's duty to provide the
Court with his understanding of the full factual story so that
the Court could render an informed judgment, address this
motion, and oversee the monitorship.  It would be surprising if
a party subject to a monitor could escape the monitorship by
launching a cascade of attacks on the monitor and then
disqualify the monitor for responding.

　　　The declaration provides no basis to find that the Monitor
is acting out of personal bias or prejudice, as Apple asserts.
In making this argument, Apple misreads the meaning of § 455's
"personal knowledge" and "personal bias or prejudice"
provisions.  As the Second Circuit recently reiterated:

> To be disqualifying under § 455, [t]he alleged bias
> and prejudice . . . must stem from an extrajudicial
> source and result in an opinion on the merits <u>on some
> basis other than what the judge has learned from his
> participation in the case</u>.

<u>Razmilovic</u>, 2013 WL 6172543, at *12 (emphasis supplied)
(citation omitted).  Here, the Monitor's declaration stemmed
from facts acquired in connection with the discharge of his
duties as Monitor.

　　　c.　<u>Scope of Monitorship</u>

　　　Finally, in connection with the disqualification argument,
Apple complains as well about the manner in which the Monitor

54

has performed his duties.[16]  As described in this Opinion, there
is a mechanism in place to protect Apple's rights.  If Apple has
reason to believe that the Monitor is exceeding the scope of his
duties, as defined in the Injunction, Apple must discuss it
promptly with the Monitor, if necessary with DOJ, and if still
unsatisfied, bring it to the Court's attention.  Apple's first
such application to the Court was in a letter of January 7, long
after it filed its motion for a stay.  Apple has not shown,
therefore that it is likely to prevail on an application for a
stay on the ground that Bromwich should be disqualified from
serving as the Monitor for this reason either.

     As for the suggestion that the Monitor has engaged
improperly in ex parte communications, this appears to be a
reference to two events.  The first is the Court's own interview
with Bromwich during the selection process.  This was permitted
by the terms of the Injunction, and the parties were informed at
the time that it had occurred.  Apple made no objection to this
provision of the Injunction or at the time of the Monitor's
appointment.  There was nothing exceptional or disqualifying

---

[16] Apple's objections in this regard include a question that the
Monitor asked Dr. Sugar, which Apple's counsel instructed him
not to answer; the Monitor's pursuit of interviews before
January 14, including an interview with Board member Gore; and
his ex parte interview with the Court during the selection
process.  None of these actions alone or together would suggest
disqualification is warranted, and Apple makes no developed
argument that they do.

from the fact that the Court conducted ex parte interviews of candidates in selecting a Monitor and this provides no basis for disqualifying the chosen candidate.  Nor is that interview process a basis to suggest that the scope of the Monitor's duties were in some way altered from those defined in the Injunction.  Apple has never made any objection to the Injunction's description of the discrete tasks assigned to the Monitor, and makes none now.  The Monitor's own letters to Apple consistently refer to the Injunction as the instrument that defines his authority, and it is that document to which the Court will refer in resolving any dispute about the scope of his assignment.

　　　The second context in which there is a reference to ex parte communications arises from the following.  The Monitor sent letters addressed to Cook and Sewell directly to those addressees at the same time that he sent them to Apple's counsel and asked them to forward a copy.  Apple has objected.  It is unclear from the parties' submissions whether they have conferred regarding this objection and whether it remains unresolved.  If Apple is unable to resolve this dispute with the Monitor and DOJ, then the Court will promptly address it.  Again, this is not a ground for disqualification or for finding a substantial likelihood that Apple will succeed in obtaining his disqualification and a stay of the Monitor's work.  To be

56

clear, the Injunction permits Apple officers, employees or agents to have "counsel present" during any interviews, Section VI.A.2, and Apple's counsel has been present at each of the interviews that the Monitor has conducted.

In sum, Apple has largely abandoned the grounds on which it brought this application for a stay.  It has also waived its right to raise many of grounds.  It now principally contends that it will succeed on appeal because it has shown the Monitor should be disqualified.  It has failed to make a showing that it is substantially likely to succeed in any application for a stay on this ground or any other ground it has asserted.


II.  Irreparable Harm

To demonstrate ongoing "irreparable harm" such that a stay is proper, a party must show that it will suffer injury which "cannot be remedied" absent a stay.  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (citation omitted).  The party seeking the stay has the burden of showing "injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  Dexter 345, Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011) (citation omitted).  Apple has not made any showing that it will be irreparably harmed.

In its reply, Apple asserts two grounds for finding that it will be irreparably harmed if its application for a stay is not granted.  First, any fees it might pay the Monitor will be unrecoverable; and second, the Monitor's requests for interviews are "time-consuming and intrusive" and "interfere[] with the company's business operations."  What these two irreparable harm arguments "have in common is that they are speculative, hyperbolic, and" at least somewhat "of [Apple's] own making." NML Capital, Ltd. v. Republic of Argentina, 727 F.3d 230, 246 (2d Cir. 2013).  These arguments will be addressed in turn.

1.   The Monitor's Fees Do Not Constitute "Irreparable Harm."

Apple asserts that paying the Monitor according to the terms of the compensation DOJ approved constitutes ongoing irreparable harm.  The provisions in the Injunction describing the compensation of the Monitor have already been described in this Opinion.  And, as further described, Apple did not object to these provisions in the Injunction, and both DOJ and the Monitor have offered to engage in a negotiation with Apple regarding the Monitor's compensation.  The Court has also ordered the parties to participate in settlement discussions with the Magistrate Judge in an effort to resolve this dispute. Apple has already offered to pay an hourly rate of $800 to the Monitor, which leaves a spread of $300 between Apple's proposed

rate and the rate approved by DOJ.  There is simply no showing
that the existence of this dispute constitutes irreparable harm
to Apple.[17]

Apple has also failed to show that it will be irreparably
harmed by any final amount it must ultimately pay because of the
existence of a monitorship.  If the Monitor's bills are
unreasonable, Apple may object using the dispute mechanism
outlined above.  Moreover, Apple can assist in making the
Monitor's use of his time "cost-effective", as required by the
Injunction.  Section VI.I.  It can do so by following the
Injunction's requirement that it "take no action to interfere
with or to impede the External Compliance Monitor's
accomplishment of its responsibilities."  Section VI.G.  After
all, an entity cannot claim irreparable harm because of
increased expenses where its cooperation would have resulted in
a more cost-effective process.  See NML Capital, Ltd., 727 F.3d
at 246 (declining to find irreparable harm when the injury was
"almost entirely of the [defendant's] own making").

In sum, Apple has failed to show that the payment of the
Monitor's fees constitutes irreparable harm.  Moreover, paying
fees to comply with a remedial order is typically not cognizable
as "irreparable harm" because "ordinary compliance costs are

_____

[17] For obvious reasons, Apple has not attempted to show that any
payment to the Monitor in this case will constitute a material
financial obligation.

typically insufficient to constitute irreparable harm." <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 115 (2d Cir. 2005); <u>see also</u> <u>Am. Hosp. Ass'n v. Harris</u>, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."). And Apple has not shown that this case should qualify as an exception to that ordinary rule.

    2.  <u>Requests for Interviews</u>

    Apple also argues in its reply that the Monitor's requests for interviews of its executives constitute irreparable harm. In its initial memorandum in support of a stay, Apple asserted that the Monitor's interview requests "has already inflicted significant and irreparable harm by interfering with Apple's ability to manage its business."  Apple further contended that the Monitor's conduct has affected Apple's "ability to identify and exploit new business opportunities" and threatened Apple with "loss of market share growth" and "the development and marketing of new and innovative products."

    Over three months, Apple has permitted the Monitor to conduct thirteen hours of interviews spread across two visits to California.  Seven of the eleven people interviewed have been lawyers.  The Monitor has also been provided with 303 pages of documents.  If this limited amount of access constitutes

"irreparable harm" to Apple then the standard for irreparable harm is low indeed.

In its reply, Apple appears to have backed away from its claim that the effort required to prepare for and participate in thirteen hours of interviews with predominately Apple attorneys is harming its market growth and product innovation.  It is now tailoring its irreparable harm argument more narrowly.  It argues in its reply that any interviews that the Monitor might have with its executives and Board members will be a "time-consuming and intrusive process that interferes with the company's business operations."

There are at least three reasons why this does not constitute irreparable harm.  First, in the event Apple believes that any future request of the Monitor exceeds the scope of his authority under the Injunction, it has recourse to the dispute resolution mechanism described above.  Second, without any showing of substantial injury to its business to date, Apple's argument amounts to little more than speculation about future harm to its business.  And third, Apple has every reason to expect that the Court, which is responsible for supervising the Monitor's work, is sensitive to the need not to interfere unnecessarily with Apple's business.  The Court only imposed a Monitor after Apple failed to show that the appointment was unnecessary.  The Court sua sponte limited the length of the

Monitor's term and narrowed the definition of his assignment.
The Court created breathing room for Apple to unilaterally
revise and improve its compliance program, even after Apple had
failed to take the opportunities which were given to it this
past summer to show that it would do so without the imposition
of a Monitor.

That said, the Monitor has important work to do, and where
that work properly includes interviews of Board members or
executives, then the Monitor must be permitted to conduct those
interviews.  After all, the Injunction permits the Monitor to
interview "any Apple personnel" when he is doing so in the
exercise of his responsibilities and on reasonable notice to
Apple.  Section VI.G.  Again, Apple did not object to this
clause or any other particular clause in Section VI.


III. The Public Interest

"[T]he public interest in vigilant enforcement of the
antitrust laws" is indisputable.  Lawlor v. Nat'l Screen Serv.
Corp., 349 U.S. 322, 329 (1955).  At trial, this Court found
that Apple's lawyers and its highest executives orchestrated a
price fixing scheme with blatant and aggressive disregard for
the requirements of the law.  Consumers of e-books -- including
Apple's own consumers -- suffered hundreds of millions of
dollars in harm, and the federal Government and the plaintiff

States were forced to expend taxpayer money to bring the harm to an end.  Section VI was imposed to ensure that Apple reformed its policies such that this would never happen again.

While Apple would prefer to have no Monitor, it has failed to show that it is in the public interest to stop his work.  If anything, Apple's reaction to the existence of a monitorship underscores the wisdom of its imposition.  A monitorship is nothing less than "a necessary and . . . unavoidable consequence" of Apple's violation of the antitrust laws.  Nat'l Soc. of Prof'l Engineers v. United States, 435 U.S. 679, 697 (1978).  "The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do."  Int'l Salt Co. v. United States, 332 U.S. 392, 400 (1947).

The deterioration of the relationship between Apple and the Monitor is unfortunate and disappointing.  Hopefully, that relationship can be "reset" and placed on a productive course.  But it is strongly in the public's interest for the Monitor to remain in place.  A monitorship which succeeds in confirming the existence of a genuine and effective antitrust compliance program within Apple, is in the interest of not only the American public, but also Apple.

CONCLUSION

Apple's motion to suspend operation of Section VI of the Injunction because the Monitor must be disqualified, or on any other grounds preserved and argued to this Court, is denied. Apple's motion for a stay of this ruling pending its appeal to the Second Circuit is denied with the following exception. Apple is granted a stay of Section VI of the Injunction from the filing of this Opinion until Tuesday, January 21, 2014, at noon, in order to pursue an appeal of this Opinion and Order denying a stay, on the condition that Apple file its motion for a stay by Saturday, January 18, 2014 at noon.


        SO ORDERED:

Dated:    New York, New York
          January 16, 2014


                              _____
                              DENISE COTE
                        United States District Judge