**Report of the External Compliance Monitor**

**United States v. Apple, Inc., et al., No. 1:12-CV-2826, and**

**The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394**

Michael R. Bromwich
External Compliance Monitor
April 14, 2014

**Executive Summary**

This report ("Report") is the first in a series by the External Compliance Monitor ("Monitor"), appointed by this Court in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 ("e-books Litigation").  In the September 5, 2013 Final Judgment and Order Entering Permanent Injunction (the "Final Judgment"), this Court ordered the Monitor, within 180 days of appointment, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."[1]  Specifically, the Final Judgment requires the Monitor to evaluate whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[2]

To be comprehensive and effective, an antitrust compliance program must be tailored to the structure, functions, and operations of the company for which it has been designed.  This is because these characteristics will make the company vulnerable to particular antitrust risks, and it is these risks that an effective compliance program must account for and address.  This principle—that an effective compliance program must be tailored to a company's specific needs—echoes this Court's findings in the e-books Litigation, where the Court noted that compliance programs are not "one size fits all."[3]  Apple has also acknowledged the importance of adapting a compliance program to match the company's specific characteristics, and recognized the value of designing a compliance program specifically fit for Apple.

The Court has also addressed particular issues Apple must confront in designing an enhanced antitrust compliance program.  For example, the Court found that Apple needed to make a "sincere commitment to reform its culture . . . to one that includes a commitment to understand and abide by the requirements of the law."[4]  The Court also singled out Apple's senior leadership, stating that the conduct underlying the e-books Litigation "demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," including among "Apple lawyers and its highest level executives."[5]

---

[1] Final Judgment § VI.C.

[2] *Id.*

[3] 1/13/14 Tr. 45-46.

[4] *Id.* at 20.

[5] 8/27/13 Tr. 17.

Since the Monitor's appointment on October 16, 2013 ("Appointment"), the monitoring team has sought to learn about Apple in order to understand the company's antitrust risks and vulnerabilities.  Just as this information is critical to developing an antitrust compliance program that is comprehensive and effective, this information is also critical to the Monitor's *evaluation* of that program's comprehensiveness and effectiveness.

As discussed in this Report, the monitoring team has experienced extended and unexpected delays in its efforts to evaluate Apple's antitrust compliance policies, procedures, and training (Apple's "Antitrust Compliance Program").  These delays, which this Court characterized as Apple "doing its best to slow down the process, if not stonewall the process,"[6] ran counter to the Final Judgment's requirement that Apple "take no action to interfere with or impede the External Compliance Monitor's accomplishment of its responsibilities."[7]  To fully convey the development of the monitorship and the context for the Monitor's current assessment, a substantial portion of this initial Report describes the chronology of our activities and the obstacles we have faced.  Regrettably, much of that was played out in court filings that mischaracterized our attempts to obtain basic information necessary to perform our responsibilities.  Rather than conducting interviews, reviewing documents, and working with Apple to evaluate its Antitrust Compliance Program, we were required, starting in late November and continuing until the United States Court of Appeals for the Second Circuit denied Apple's motion to stay the monitorship in early February, to respond to challenges that sought to undermine our ability to do the job we were appointed to perform and to cease our activities while these challenges worked their way through the courts.

After the Second Circuit panel issued its decision in early February, we took steps to reestablish contact and to attempt to "reset" our relationship with Apple, as this Court had directed during the January 13, 2014 proceedings and in its January 16, 2014 opinion.  Those steps prompted constructive responses from Apple.  As more fully described in this Report, the relationship between Apple and the monitoring team has significantly improved over the past six weeks and has become more focused on achieving the goal of enhancing Apple's Antitrust Compliance Program pursuant to the Final Judgment.  Even so, the information that Apple has provided to the monitoring team regarding its Antitrust Compliance Program enhancements, and related information regarding the company generally, is only in its early stages.  The monitoring team has conducted only brief interviews of a limited number of Apple employees, most of whom were lawyers.  Our unsuccessful attempts to speak with senior members of the company are of particular importance given this Court's findings regarding the involvement of senior personnel in the events underlying the e-books

---

[6] 1/13/14 Tr. 41.

[7] Final Judgment § VI.G.

Litigation and our need to evaluate the commitment of Apple's leadership to an effective antitrust compliance program.

In addition, the monitoring team received the information discussed in this Report only days before beginning to prepare this Report.  Apple provided the Monitor with the majority of the written materials related to its antitrust compliance enhancements on February 26, 2014, in response to this Court's February 19, 2014 and February 20, 2014 Orders.  Apple and the monitoring team had an initial meeting to discuss the proposed Antitrust Compliance Program on March 4, 2014 ("March 4 Meeting").  The revised policies, procedures, and training documents Apple has provided are in draft form, and Apple has represented that its Antitrust Compliance Program materials are "works in progress."  The monitoring team still lacks a significant amount of the information it needs to fulfill its monitoring obligations.  For these reasons, and others described in this Report, the Monitor's assessment of Apple's antitrust compliance policies, procedures, and training remains preliminary.

Based on the information Apple has provided to date, our view is that Apple has made a promising start to enhancing its Antitrust Compliance Program, but that Apple still has much work to do.  The Assessment and Recommendations section of this Report identifies important components of Apple's Antitrust Compliance Program and, to the extent we are able, sets forth our initial assessment and recommendations based on the limited information we have obtained.  These components include:

- **An Antitrust Risk Assessment.**  We have received little information about any antitrust risk assessment that might underlie Apple's most recent enhancements to its antitrust compliance policies, procedures, and training. We recommend that Apple conduct a thorough and comprehensive antitrust risk assessment.  The information learned in conducting the risk assessment will serve as a guide for Apple's Antitrust Compliance Program; our evaluation of that Program cannot be complete without an understanding of how it addresses the antitrust risks Apple faces.

- **Apple's Antitrust Compliance Policies.**  We recommend that Apple move forward with tailoring its Antitrust and Competition Policy to each of its relevant businesses.  Our understanding is that Apple's current revised policy is intended to have company-wide application, but we believe that the company could benefit from the creation of antitrust policies that are specifically tailored to its distinct businesses and the activities of the employees in those businesses.  As discussed in the Report, Apple has advised us that it agrees with this view.  In addition, the relationship between the written materials comprising Apple's Antitrust Compliance Program, including the Antitrust and Competition Policy, the Competition and Trade Practices excerpt from the Business Conduct Policy, and the antitrust compliance e-book, is not clear.  Our assessment of the relationship and

iii

relative coherence of these written materials, as well as their substantive comprehensiveness, will depend largely on additional information we expect to receive from Apple.

- **Communications Regarding the Antitrust Compliance Program.** Apple has provided us with preliminary information regarding its general communications plan to increase awareness of and commitment to antitrust compliance throughout the company. The planned communications incorporate messages from Apple executives. However, we currently have little evidence on which to base conclusions about changes in the commitment to antitrust compliance among senior Apple personnel, or the effectiveness of the communications plan, both of which will contribute to the effectiveness of Apple's new policies and procedures. We hope to learn more from Apple about these important components of Apple's Antitrust Compliance Program.

- **Role of the Competition Law and Policy Group.** We hope to learn more about the day-to-day role played by Apple's Competition Law and Policy Group, which includes recently hired in-house attorneys specializing in antitrust and competition law. In particular, we are unclear about when and how the group is involved in day-to-day business operations. Such information will affect our review of the group's potential contribution to Apple's Antitrust Compliance Program and its ability to detect and prevent antitrust violations.

- **Role of the Antitrust Compliance Officer.** The Final Judgment required Apple to hire an internal Antitrust Compliance Officer, whom the Court vested with significant responsibility. Apple hired Deena Said to serve in this critical role. Ms. Said has been selected by Apple to supervise and manage its enhancements to its antitrust compliance program and to ensure Apple's compliance with other requirements imposed by the Final Judgment.

- **Oversight of the Antitrust Compliance Program.** The information received from Apple suggests that the Antitrust Compliance Program is primarily overseen by the Audit and Finance Committee, the Competition Law and Policy Group, and the Antitrust Compliance Officer. In addition to more specific observations we make in the Report regarding oversight of the Program, we believe it is essential that there be a direct and meaningful reporting relationship between the Antitrust Compliance Officer and Apple's Audit and Finance Committee. We recommend that Ms. Said, the Antitrust Compliance Officer, and Dr. Ronald Sugar, the Chair of the Audit and Finance Committee, confer regularly regarding Ms. Said's work, as well as the progress being made by the company with respect to the Antitrust Compliance Program generally.

iv

- **Business Conduct Helpline.**  We have not monitored the operations of the Helpline, which is a telephone service through which Apple employees can report compliance questions and concerns. We need to gain a better understanding of the volume and types of antitrust-related calls typically received on the Helpline, the process for escalating antitrust-related calls that require attention, and the perceived effectiveness of the Helpline among Apple employees.

- **Board Members, Officers, and Employees.**  Sections V.A-V.C of the Final Judgment impose on Apple specific compliance-related obligations with respect to particular Apple personnel.  We are required to evaluate whether the training these individuals receive is sufficiently comprehensive and effective.  For Apple to achieve that goal, and for the monitoring team to evaluate Apple's efforts, the process used to identify these employees should be transparent, dynamic, and informed by an antitrust risk assessment.  Apple has not yet provided us with adequate information regarding the process by which it identifies Section V.A-V.C employees to enable us to fulfill our monitoring obligations with respect to the training of such employees.

- **Record-Keeping**.  It is important that Apple keep accurate and comprehensive records related to its antitrust compliance efforts.  Based on the information we have obtained thus far, we believe that Apple must improve its record-keeping procedures, and we look forward to receiving additional information from Apple regarding enhancements to these procedures.

- **Apple's Investigation and Reporting of Violations**.  Apple has not yet provided us with information regarding its procedures for investigating potential violations of the Final Judgment or of the antitrust laws.

- **Annual Antitrust Audit**.  Apple and the monitoring team have agreed that Apple will propose a plan to the monitoring team in or around July 2014 for conducting the audit required by Section V.E of the Final Judgment.

- **Training**.  Without more information regarding the identification of employees covered by Section V of the Final Judgment, the monitoring team is unable at this point to assess whether the training Apple has conducted so far, and the training it has scheduled for the future, targets all of the necessary personnel.  In addition, largely due to lack of information, the monitoring team is unable to assess whether Apple's planned training is comprehensive and effective (both in terms of substance and in terms of schedule).

The initial stages of this monitorship have been far more difficult and contentious than we anticipated.  That is regrettable and was avoidable.  As a result, we are less advanced in the process of assessing Apple's efforts to revise its antitrust compliance policies, procedures, and training than we would have been if we had received more cooperation from Apple since our appointment in mid-October.  If the recent cooperation by Apple continues, and we receive substantially more information from the company, we expect to be able to undertake a more thorough and comprehensive assessment of Apple's Antitrust Compliance Program.

As described above, and more fully in this Report, there has been a shift of tone in our relationship with Apple since mid-February, largely attributable to Apple's designation of a new in-house principal point of contact and to changes Apple has made in the outside counsel with whom we deal.  We have started to receive more information, we have seen a greater commitment to resolve lingering disputes, and we are starting to see the original pledges of cooperation and collaboration, which for many months were at odds with the company's actions, fulfilled.  If that continues, the reset this Court sought will have taken place, and we will be on a path to fulfilling the important role the Court appointed us to perform.

**TABLE OF CONTENTS**

I.      Introduction ...................................................................................................... 1

II.     Background of the Monitorship ......................................................................... 2

III.    The Final Judgment .......................................................................................... 6

        A.      Sections III and IV: Prohibited Conduct and Affirmative Obligations ......... 6

        B.      Section V: Antitrust Compliance Officer .................................................. 7

        C.      Section VI: External Compliance Monitor ................................................ 9

IV.     Initial Activities: September to November 2013 .............................................. 11

        A.      Selection of the External Compliance Monitor ......................................... 11

        B.      Initial Communications with Apple .......................................................... 12

        C.      November 18 Interviews and Meeting ...................................................... 18

        D.      Initial Production of Documents .............................................................. 19

        E.      Late November 2013 Correspondence ...................................................... 20

V.      The Court's November 20 Order and Apple's Objections ................................ 21

VI.     December 2013 Interviews of Apple Personnel ............................................... 23

        A.      Overview ................................................................................................. 23

        B.      Initial Interactions with Apple's Antitrust Compliance Officer ............... 24

VII.    Subsequent Correspondence in December ...................................................... 26

VIII.   Apple's December 12, 2013 Motion to Stay ................................................... 27

        A.      The Parties' Filings ................................................................................. 27

        B.      Subsequent Court Proceedings ................................................................ 29

        C.      Proceedings Before the Second Circuit ................................................... 33

IX.     Resumption of Monitoring Activities .............................................................. 33

        A.      Communications with Apple .................................................................... 33

        B.      Additional Document Production ............................................................. 36

        C.      March 4 Meeting with Apple ................................................................... 37

                1.      Overview of Actions Taken to Comply with the Final Judgment ........ 37

                2.      Draft Revisions to Antitrust Compliance Policies ............................. 37

                3.      Draft Revisions to Business Conduct Policy E-book ......................... 38

                4.      Draft Revisions to Online Antitrust Compliance Training ................ 39

                5.      Overview of Live Antitrust Compliance Training Presentations ....... 40

vii

**X.**    Assessment and Recommendations ...................................................................41

    A.   Context of the Assessment .....................................................................41

    B.   **Antitrust Risk Assessment** .....................................................................45

        1.   Overview ..................................................................................45

        2.   Existing Risk Assessment Structure .........................................46

    C.   **Apple's Revised Antitrust Compliance Policies** ..............................47

        1.   Policies ....................................................................................47

            (a) Antitrust and Competition Policy...................................47

            (b) Business Conduct Policy (Competition and Trade Practices Section).......49

            (c) Compliance E-book .......................................................50

    D.   **Apple's Revised Antitrust Compliance Procedures**..........................50

        1.   Communications Regarding the Antitrust Compliance Program.....................51

        2.   Role of the Competition Law and Policy Group .................52

        3.   Role of the Antitrust Compliance Officer .........................53

        4.   Oversight of the Antitrust Compliance Program................54

        5.   Business Conduct Helpline ...............................................56

        6.   Section V Procedures ........................................................58

            (a) Employees Covered by Sections V.A-V.C of the Final Judgment ...........58

            (b) Review of Agreements ...................................................60

            (c) Record-Keeping.............................................................61

            (d) Apple's Investigation and Reporting of Violations...................62

            (e) Annual Antitrust Audit ..................................................63

            (f) Other Procedures ...........................................................63

    E.   **Apple's Revised Antitrust Compliance Training Program**...........................64

**XI.**   Conclusion .........................................................................................................67

## I.      Introduction

The Monitor appointed by this Court in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394, respectfully submits this Report pursuant to Section VI.C of the Final Judgment. Section VI.C of the Final Judgment requires the Monitor, within 180 days of appointment, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."  Under Section VI.C, the Monitor is to provide written reports at six-month intervals for the duration of the monitorship; this Report is the first in a series of semiannual reports that we[1] will submit to the Court.[2]

This Report is based on the Monitor's work since his Appointment.  Even though six months have passed since Appointment, and in some respects much activity has taken place, we have not made nearly as much progress as we would have anticipated in reviewing and assessing Apple's antitrust compliance policies, procedures, and training.  The preliminary status of our evaluation is due to a lack of information necessary to perform a comprehensive assessment.  To date, we have conducted brief initial interviews with a limited number of Apple employees, most of whom were lawyers, and received documents and brief video clips from Apple related to the company's enhanced policies, procedures, and training.  Our failed attempts to speak with senior members of the company are of particular importance, considering our need to evaluate the commitment of Apple's leadership to an effective antitrust compliance program.  The Monitor and Apple also had one substantive meeting on March 4, 2014 (the March 4 Meeting) regarding the enhancements Apple has made to its antitrust policies, procedures, and training.  The bulk of this information was provided in late February and early March.  As a result, the monitoring team will need far more information to perform a comprehensive assessment of Apple's revised antitrust compliance policies, procedures, and training, and to provide recommendations that

---

[1] Throughout this report, the use of pronouns such as "he," "we," and "our" refer in some instances to the Monitor individually and in other cases to the monitoring team.

[2] According to the reporting schedule set forth in the Final Judgment, the completion date for the initial report is 180 days after the Final Judgment, or April 14, 2014.  Subsequent reports must be submitted at 180-day intervals throughout the two-year monitorship.  In general, the period covered by each monitoring report will extend through the month ending approximately 45 days before the report is due. For example, this report would ordinarily have covered activities and developments through the end of February, the report due in the middle of October will cover activities through the end of August, and so forth. Because of the delays and interruptions in our activities, which will be fully described below, we have decided to extend the reporting period covered by this report into March 2014 to cover an important set of meetings the monitoring team had with Apple on March 4, 2014, and the resolution of certain lingering fee disputes on March 5, 2014.

are appropriate for Apple.  Even so, we believe this initial Report contains useful information regarding Apple's early efforts to strengthen its antitrust compliance policies, procedures, and training.

To fully convey the development of the monitorship and the context for the Monitor's current assessment, it is necessary to explain the history of the monitorship and our activities since Appointment.  We, therefore, include relevant background information regarding this Court's decision to require a Monitor, the Monitor's obligations under the Final Judgment, activities conducted by the Monitor since Appointment, interactions between Apple and the Monitor, and a summary of the proceedings[3] before this Court related to the Monitor's work.  We then discuss the revised antitrust compliance materials that Apple provided to us in late February ("February 26 Submission") and discussed at the March 4 Meeting.  We conclude by making an initial assessment of Apple's antitrust compliance policies, procedures, and training and preliminary recommendations regarding future enhancements.

By agreement, we provided Apple with a draft of this Report on March 28, 2014, so that the company could identify confidential or proprietary information that it believed should not be shared with the plaintiffs to this litigation, the United States Department of Justice ("DOJ") and thirty-three U.S. states and territories (the "Plaintiff States" and, collectively with DOJ, the "Plaintiffs").  After incorporating the modest redactions Apple requested, we provided a draft of the Report to the Plaintiffs on April 1, 2014 and requested comments directed to the factual accuracy of the report by April 4.  We requested that Apple identify any factual errors or inaccuracies in the draft report and notify us of such errors or inaccuracies by the same date.  In response to those comments from Apple and the Plaintiffs, we have made various changes to the Report that we thought were appropriate in light of the comments we received.[4]

## II.     Background of the Monitorship

On July 10, 2013, after a three-week bench trial, this Court ruled that Apple had violated Section 1 of the Sherman Act.[5]  The Court concluded that, when Apple simultaneously negotiated agency agreements to sell five publishers' e-books through

---

[3] As a general matter, this Report briefly summarizes the aspects of the proceedings that are most relevant for present purposes.  It does not attempt to provide a comprehensive narrative of all aspects of the e-books Litigation.

[4] In addition, because the redactions requested by Apple were so modest, we were able to redraft those passages of the report that implicated Apple's confidentiality concerns such that we eliminated the need for redactions while fully preserving the substance of the Report.

[5] 15 U.S.C. § 1.

its iBooks Store in late 2009 and early 2010, it "facilitat[ed] and encourag[ed]" the publishers' "collective, illegal restraint of trade."[6]

The Court concluded further that the Plaintiffs were entitled to injunctive relief against Apple.[7]  After entering its ruling on liability, the Court held a series of proceedings to determine the nature and scope of the injunction, with input from Apple and the Plaintiffs.  The same day that it issued its opinion on the merits, the Court issued a scheduling order that required the Plaintiffs to submit a proposed injunction by July 19 and required Apple to file any related submissions by August 2.[8]  The Plaintiffs proposed the creation of a ten-year external monitorship under which the monitor would "have the power and authority to monitor Apple's compliance with the terms of [the] Final Judgment, to review and evaluate Apple's existing internal antitrust compliance policies and procedures, and to recommend to Apple changes to address any deficiencies in those policies and procedures."[9]  Apple objected to the Plaintiffs' proposal, arguing that the proposed monitorship was unnecessary and would be burdensome and costly.[10]

The Court held its first hearing regarding the injunction on August 9, 2013 ("August 9 Hearing").  During that hearing, the Court noted Apple's "vehement[] object[ion]" to the appointment of an external monitor.[11]  However, the Court explained that Apple had made no showing that the appointment of a monitor was in fact unnecessary.[12]  The Court explained that it would rather not appoint an external monitor, and would prefer instead to be able to rely on a "vigorous in-house antitrust enforcement program" adopted by Apple.[13]  However, as the Court would later explain in its January 16, 2014 opinion denying Apple's motion for a stay of the monitorship,

> Apple made little showing at or before the August 9 conference that it had taken to heart the seriousness of the price fixing conspiracy it orchestrated.  Nor did Apple provide the Court with any evidence that it was seriously reforming its internal antitrust compliance policies to

---

[6] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013).  The five publishers, also defendants in the litigation, reached settlements with the Plaintiffs before trial.  *See id.* at 645.

[7] *Id.*

[8] *See United States v. Apple Inc.*, Nos. 12-cv-2826, 12-cv-3394, 2014 WL 171159, at *1 (S.D.N.Y. Jan. 16, 2014).

[9] *Id.*

[10] *Id.* at *2.

[11] 8/9/13 Tr. 66.

[12] *See id.* ("There is no showing of any awareness of illegality or the danger of collusion by publisher defendants to raise eBook prices.  There is no showing of institutional reforms to ensure that [Apple's] executives will never engage again in such willful and blatant violations of the law.").

[13] Id.

prevent a repeat of its violation.  Apple's submissions failed to demonstrate that it took seriously the burden that its participation in the price fixing conspiracy imposed on consumers and on the resources of the federal and state governments that were compelled to bring Apple and the publishers into federal court to put an end to that harm.[14]

Apple and the Plaintiffs filed revised proposed injunctions on August 23, 2013. In response to the Court's remark during the August 9 Hearing that it hoped Apple would adopt a "vigorous in-house antitrust enforcement program," Apple also submitted a letter to DOJ dated August 19, 2013 ("August 19 Letter"), in which it pointed out, among other things, that it had recently added to the Apple in-house legal staff two experienced antitrust lawyers who had spent significant amounts of time in government service.[15]  Apple also noted in the letter that it had already made initial plans to strengthen its antitrust compliance programs, including by establishing formal annual antitrust compliance training, revising its antitrust compliance guide, and instituting regular auditing by an "Antitrust Compliance Director."[16]

On August 27, 2013, the Court held a hearing ("August 27 Hearing") at which it addressed the parties' submissions.  During that hearing, the Court noted again its concerns regarding Apple's attitude toward antitrust compliance.  The Court stated that the conduct underlying the e-books Litigation "demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," including among "Apple lawyers and its highest-level executives."[17]  The Court observed that Apple still had not made a persuasive showing that the appointment of a monitor was unnecessary,[18] and the Court noted specifically the need for Apple to implement a robust antitrust training program:

> I want to address the issue of training separately.  Neither Mr. Cue nor Mr. Saul, his assigned in-house counsel, could remember any training on antitrust issues.  They are responsible, with others in Mr. Cue's section, with negotiating the content licenses for Apple's business.  They and those on their teams need to understand what the law requires and how to conform their business practices to the law.  Not everyone will need four hours of training.  It[s] length is not critical.  It[s] clarity and effectiveness are.

---

[14] *Apple*, 2014 WL 171159, at *2.

[15] *Id.* at *3.

[16] *Id.*

[17] 8/27/13 Tr. 17.

[18] Id.

. . .

> What is important is not the number of minutes but the quality of any time devoted to training.  The training needs to make an impression, to be memorable, and to be helpful to an employee who wants to succeed for Apple but to do so within the bounds of the law.  The training needs to be tailored to each employee's position and the situations that employee is likely to encounter.[19]

At the August 27 Hearing, the Court explained that it would tailor the scope of the monitorship more narrowly than the Plaintiffs had requested and would limit the monitor's responsibilities to evaluating Apple's internal antitrust compliance policies and procedures and its antitrust compliance training program.[20]  Moreover, the Court ruled that it would set the monitorship's presumptive term at two years, rather than the five- or ten-year term the Plaintiffs had requested.[21]  Finally, while the Court made clear that it had "tried to fashion an injunction that intrudes as little as possible on [Apple's] business,"[22] the Court expressed the hope that Apple would view the Final Judgment as a valuable opportunity:

> I am hopeful that Apple will bring its culture of excellence and exceptionalism to this task.  I am hopeful that it will devote its considerable resources and creativity to construct a training program that will be a model for American business.
>
> But, even if it chooses not to create a model program, it must create a meaningful training program, one that is comprehensive and effective. . . .
>
> Apple could, of course, think of this training and any improvements to its policies and procedures as mere window dressing, the price it must pay to appear to comply with the injunction.  I trust, however, that it will make a sincere commitment to reform its culture.  I believe that it is in Apple's long-term interest to make these reforms and change its culture to one that includes a commitment to understand and abide by the requirements of the law.[23]

---

[19] *Id.* at 18-19.

[20] *Id.* at 17-18.

[21] *Id.* at 17-18, 20.

[22] *Id.* at 20.
[23] *Id.* at 19-20.

The Court held an additional proceeding on September 5, 2013, during which the terms of the injunction were finalized.  The Court issued the Final Judgment later that day.

### III.      The Final Judgment

As summarized below, the Final Judgment prohibits Apple from engaging in certain types of conduct; requires Apple to take specified affirmative actions, including revising its antitrust compliance training and policies and hiring an internal Antitrust Compliance Officer; and defines the responsibilities of the Monitor.  The Final Judgment also provides a mechanism for resolving Apple's objections to the activities of the Monitor.

####       A.      Sections III and IV: Prohibited Conduct and Affirmative Obligations

Section III of the Final Judgment prohibits Apple from entering and maintaining certain types of agreements and from engaging in specified types of communications with e-book publishers.  In particular, Sections III.A through III.C bar Apple from "enforc[ing] any Retail Price MFN in any agreement with an E-book Publisher relating to the sale of E-books,"[24] from "enter[ing] into any agreement with an E-book Publisher relating to the sale of E-books that contains a Retail Price MFN," and from "enter[ing] into or maintain[ing] any agreement with a Publisher Defendant that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts or any other form of promotions to encourage consumers to purchase one or more E-books."

Section III.D of the Final Judgment prohibits Apple from retaliating against or punishing an e-book publisher "for refusing to enter into an agreement with Apple relating to the sale of E-books or for the terms on which the E-book Publisher sells E-books through any other E-book Retailer," as well as from threatening such retaliation or punishment and urging another party to engage in such retaliation or punishment. Section III.E prohibits Apple from sharing information related to its negotiations and contractual agreements with one e-book publisher with any other e-book publishers. Finally, Sections III.F and III.G prohibit Apple from "enter[ing] into or maintain[ing] any agreement" with an e-book publisher or retailer "where such agreement likely will increase, fix, or set the price" at which other e-book retailers can acquire or sell e-books or affect other terms on which e-books are sold.

---

[24] An "MFN" is a "most-favored nation" clause, or a clause under which one party to a contract promises to treat the other party as favorably as it treats any other entity in some specified respect.  The Court found that, while the inclusion of an MFN clause in a contract is not necessarily unlawful in and of itself, the MFN clauses incorporated in Apple's contracts with the publisher defendants were an important element of Apple's unlawful conduct in this case, as they were "the term that effectively forced the Publisher Defendants to eliminate retail price competition and place all of their retailers on the agency model."  *See Apple*, 952 F. Supp. 2d at 698-701.

The Final Judgment also imposes affirmative obligations on Apple.  For example, Section IV.A requires Apple to modify or terminate its agreements with the publisher defendants as necessary to bring the agreements into compliance with the Final Judgment.  Section IV.B requires Apple to "apply the same terms and conditions to the sale or distribution of an E-book App through Apple's App Store as Apple applies to all other apps sold or distributed through Apple's App Store."  Finally, Section IV.C provides that Apple must "furnish to the United States and the Representative Plaintiff States, within ten business days of receiving such information, any information that reasonably suggests to Apple that any E-book Publisher has impermissibly coordinated or is impermissibly coordinating the terms on which it supplies or offers its E-books to Apple or to any other Person."

      B.      Section V: Antitrust Compliance Officer

Section V of the Final Judgment requires Apple to designate an internal Antitrust Compliance Officer to oversee the company's antitrust compliance efforts and to undertake many of the company's specific responsibilities under the Final Judgment.  Under Section V, Apple's Audit Committee or another committee of outside directors was obligated, within thirty days of the effective date of the Final Judgment,[25] to "designate a person not employed by Apple as of the Effective Date of the Final Judgment to serve as Antitrust Compliance Officer, who shall report to the Audit Committee or equivalent committee of Apple's Board of Directors and shall be responsible, on a full-time basis until the expiration of [the] Final Judgment, for supervising Apple's antitrust compliance efforts and performance" of enumerated antitrust compliance–related tasks.

Specifically, Section V requires the Antitrust Compliance Officer to:

- "[F]urnish[] a copy of [the] Final Judgment, within thirty days of its Effective Date, to each member of Apple's Board of Directors, to its Chief Executive Officer, to each of its Senior Vice-Presidents, and to each of Apple's employees engaged, in whole or in part, in activities relating to Apple's iBook Store."[26]

- "[F]urnish a copy of [the] Final Judgment in a timely manner to each officer, director, or employee who succeeds to any position identified in Section V.A of [the] Final Judgment."[27]

---

[25] The Final Judgment was entered on September 5, 2013.  Section VIII.A made the Final Judgment's effective date thirty days after entry, or October 6, 2013.  Accordingly, the deadline for Apple to designate its Antitrust Compliance Officer was November 5, 2013.

[26] Final Judgment § V.A.

[27] *Id.* § V.B.

- "[E]nsur[e] that each person identified in Sections V.A and V.B of [the] Final Judgment, and appropriate employees in Apple iTunes and App Store businesses, receives comprehensive and effective training annually on the meaning and requirements of [the] Final Judgment and the antitrust laws, such training to be delivered by an attorney with relevant experience in the field of antitrust law."[28]

- "[O]btain, within sixty days after the Effective Date of [the] Final Judgment and on each anniversary of the Effective Date of [the] Final Judgment, from each person identified in Sections V.A and V.B of [the] Final Judgment, and thereafter maintain[], a certification that each such person (a) has read, understands, and agrees to abide by the terms of [the] Final Judgment; and (b) is not aware of any violation of [the] Final Judgment or the antitrust laws or has reported any potential violation to the Antitrust Compliance Officer."[29]

- "[C]onduct[], in consultation with the External Compliance Monitor, an annual antitrust compliance audit covering each person identified in Sections V.A and V.B of [the] Final Judgment, and maintain[] all records pertaining to such audits."[30]

- "[C]ommunicat[e] annually to Apple's employees that they may disclose to the Antitrust Compliance Officer, without reprisal, information concerning any potential violation of [the] Final judgment or the antitrust laws."[31]

- "[T]ak[e] appropriate action, within three business days of discovering or receiving credible information concerning an actual or potential violation of [the] Final Judgment, to terminate or modify Apple's conduct to assure compliance with [the] Final Judgment" and, "within seven days of discovering or receiving such information, provid[e] to the United States and the Representative Plaintiff States a description of the actual or potential violation of [the] Final Judgment and the corrective actions taken."[32]

- "[F]urnish[] to the United States and the Representative Plaintiff States on a quarterly basis electronic copies of any non-privileged communications with any

---

[28] *Id.* § V.C.

[29] *Id.* § V.D.

[30] *Id.* § V.E.

[31] *Id.* § V.F.

[32] *Id.* § V.G.

Person containing allegations of Apple's noncompliance with any provisions of [the] Final Judgment or violations of the antitrust laws."[33]

- "[M]aintain[], and furnish[] to the United States, the Representative Plaintiff States, and the External Compliance Monitor on a quarterly basis, a log of all oral and written communications, excluding privileged or public communications, between or among any person identified in Sections V.A or V.B of [the] Final Judgment" and other specified persons outside Apple, "including, but not limited to, an identification (by name, employer, and job title) of the author and recipients of and all participants in the communication, the date, time, and duration of the communication, the medium of the communication, and a description of the subject matter of the communication."[34]

- "[P]rovid[e] to the United States and the Representative Plaintiff States annually, on or before the anniversary of the Effective Date of [the] Final Judgment, a written statement as to the fact and manner of Apple's compliance with Sections III, IV, and V of [the] Final Judgment."[35]

    C.      Section VI: External Compliance Monitor

Section VI of the Final Judgment provides for the appointment of an External Compliance Monitor for a presumptive two-year term.[36]  As set forth in Section VI.B, the External Compliance Monitor is empowered "to review and evaluate Apple's existing internal antitrust compliance policies and procedures and the training required by Section V.C . . . , and to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[37]

The specific duties of the Monitor are as follows:

- To "conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his . . . appointment, are reasonably designed to detect and prevent violations of the antitrust laws."[38]

---

[33] *Id.* § V.H.

[34] *Id.* § V.I.

[35] *Id.* § V.J.

[36] The Court may extend the external compliance monitorship by one or more one-year periods, either *sua sponte* or on the application of any Plaintiff, "if necessary to ensure effective relief."  *Id.* § VIII.C.

[37] *Id.* § VI.B.

[38] *Id.* § VI.C.

- To "conduct a review to assess whether Apple's training program, required by Section V.C of [the] Final Judgment, as it exists 90 days after his . . . appointment, is sufficiently comprehensive and effective."[39]

- Within 180 days of appointment and at six-month intervals thereafter, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."[40]

- To provide the Plaintiffs promptly with any evidence the Monitor "discovers or receives" that suggests "that Apple is violating or has violated [the] Final Judgment or the antitrust laws."[41]

Apple, for its part, is required to "assist the External Compliance Monitor in performance of his duties and to refrain from "interfer[ing] with" or "imped[ing]" the Monitor's work.[42]   The Final Judgment specifically authorizes the External Compliance Monitor, "in connection with the exercise of his . . . responsibilities under . . . Section VI, and on reasonable notice to Apple," to:

- "[I]nterview, either informally or on the record, any Apple personnel, who may have counsel present; any such interview to be subject to the reasonable convenience of such personnel and without restraint or interference by Apple."[43]

- "[I]nspect and copy any documents in the possession, custody, or control of Apple."[44]

- "[R]equire Apple to provide compilations of documents, data, or other information, and to submit reports to the External Compliance Monitor

---

[39] Id.

[40] Id. Section VI.D of the Final Judgment authorizes the External Compliance Monitor, "at any time prior to the expiration of [the] Final Judgment," to "provide one or more additional written reports to Apple, the United States, the Representative Plaintiff States, and the Court setting forth additional recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."  Such reports may be provided on the External Compliance Monitor's initiative or at the request of the Court or any Plaintiff.  Id. § VI.D.

[41] Id. § VI.F.

[42] Id. § VI.G.

[43] Id. § VI.G.1.

[44] Id. § VI.G.2.

containing such material, in such form as the External Compliance Monitor may reasonably direct."[45]

The Final Judgment also provides a mechanism for the resolution of objections that Apple may have to the Monitor's activities. Section VI.H requires that "[a]ny objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection." If the parties are unable to reach agreement after such consultation, the Court will promptly schedule a conference, pursuant to its normal procedures, to resolve the dispute.[46]

## IV. Initial Activities: September to November 2013

This section of the Report provides an overview of our activities from Appointment through the end of November 2013. This section, like the rest of the report, does not provide a comprehensive narrative of the initial activities of the Monitor, but instead addresses activities and events most relevant to the Report. Moreover, much of what follows is outlined in the Court's opinion of January 16, 2014,[47] and in various documents the parties and the Monitor have submitted to the Court. Nonetheless, we believe it is important to provide some detail in this Report regarding our interactions with Apple, as well as to put in context the limitations on our current ability to evaluate and assess Apple's revised antitrust compliance policies, procedures, and training programs.[48]

### A. Selection of the External Compliance Monitor

The Court issued an order on September 27, 2013 ("September 27 Order") governing the monitor selection process. The September 27 Order provided that the Plaintiffs would propose candidates and that Apple would then have the opportunity to object. The Plaintiffs submitted the names of two candidates to serve as monitor on September 30, 2013, one of whom was Michael R. Bromwich. In their submission, Plaintiffs specified, as had Mr. Bromwich in his application to serve as monitor, that he would be assisted by Bernard A. Nigro Jr. of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"). On October 7, 2013, Apple submitted a letter in which it objected

---

[45] *Id.* § VI.G.3.

[46] *See, e.g.*, *Apple*, 2014 WL 171159, at *12.

[47] *See id.* at *6-11.

[48] In its oral argument before the United States Court of Appeals for the Second Circuit, on February 4, 2014, opposing the Monitor's filing of a declaration in opposition to Apple's Motion for a Stay, Apple argued that the reports authorized under section VI.D of the Final Judgment are the appropriate vehicles for presenting the Monitor's perspective on interactions with Apple.

to both of the candidates the Plaintiffs had proposed.  After an in-person interview of Mr. Bromwich and Mr. Nigro, the Court issued on October 16, 2013 an order ("October 16 Order") appointing Mr. Bromwich as the Monitor in this case.  The October 16 Order further provided that Mr. Nigro would assist Mr. Bromwich.

Immediately after Appointment, the Monitor sought to assemble a small team to assist in fulfillment of his obligations under the Final Judgment.  The Monitor selected Maria R. Cirincione of Fried Frank and Sarah W. Carroll of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP as members of the monitoring team.

B.      Initial Communications with Apple[49]

On October 17, 2013, the day after the Monitor's appointment, Kyle Andeer, Apple's Senior Director for Competition Law & Policy, sent an introductory email to the Monitor.  In his email, Mr. Andeer explained that he was "committed to working with" the monitoring team and "developing a best of class antitrust compliance program for iTunes."  He stated that Apple was already "hard at work developing such a program" with assistance from Simpson Thacher & Bartlett LLP ("Simpson Thacher"), Apple's outside antitrust counsel.  Mr. Andeer stated in his email that he welcomed speaking with the Monitor by telephone or in person.

On October 22, 2013, members of the monitoring team met with representatives of Apple ("October 22 Meeting") at the New York offices of Gibson, Dunn & Crutcher LLP ("Gibson Dunn").  (Mr. Andeer had requested that the meeting take place in New York.)  Present on behalf of Apple were Mr. Andeer, Theodore J. Boutrous Jr. of Gibson Dunn, and Kevin J. Arquit and Matthew J. Reilly of Simpson Thacher.

The Monitor began the meeting by describing his approach to the monitoring assignment in this case, including staffing, our responsibilities under the Final Judgment, and some of the initial steps we planned to take.  He explained that the Monitor's actions are limited by the terms of the Final Judgment, that the Monitor has no license to claim broader powers, that we wanted to maintain open lines of communication with Apple throughout the process, that we would always be accessible to all parties to the litigation, that we intended to guard the Monitor's independence zealously, and that we hoped to have a collaborative relationship with Apple throughout the monitorship.  Apple's representatives reiterated that the company was committed to ensuring that it had an effective and robust antitrust compliance program.

During the October 22 Meeting, we also explained that we planned to use the initial 90-day period under the Final Judgment, during which Apple was to revise its

---

[49] In commenting on this section of the draft report, Apple noted that it disagrees with our characterization of the disputes regarding the scope of the Monitor's activities and compensation.

12

policies, procedures and training,[50] to gain necessary background knowledge regarding the company.  Specifically, we explained that, in order to assess whether Apple's revised antitrust compliance policies, procedures, and training materials were reasonable and effective for the company, it would be important to understand matters such as Apple's reporting oversight structure for antitrust compliance; Apple's existing antitrust policies, procedures, and training; the ongoing processes to revise and update Apple's policies and procedures; and the roles of the Audit and Finance Committee and Risk Oversight Committee in compliance matters.  We asked Apple to provide us with documents relevant to those issues.[51]

The Monitor also asked to schedule a series of brief preliminary meetings or interviews with various Apple personnel that he believed would be helpful to understanding Apple's businesses and structure.  Understanding the specifics about Apple as a company is critical to our ability to evaluate whether the antitrust compliance policies, procedures, and training are effective as tailored to Apple, rather than measured against what might make sense for a different Fortune 100 company.  Because this Court had specifically expressed concern with Apple's compliance at the highest levels of the company (among its lawyers and "highest level executives"), the Monitor requested preliminary meetings or interviews during the week of November 18, 2013, approximately a month from the date of the October 22 meeting, with members of Apple's Board of Directors (or "Board"), senior management, and senior personnel responsible for the iBooks Store, iTunes, and the App Store.

Mr. Andeer responded to the request for interviews by stating that Apple was concerned about interviews with Board members and senior management because the proposed interviewees were busy and there remained "a lot of anger" regarding the e-books Litigation.  In response, the Monitor explained that he believed early interviews with high-level personnel are essential, particularly given that the commitment of a company's managers to compliance tends to be important in understanding how the company will respond to a mandate like the Final Judgment.  The Monitor also expressed flexibility regarding the timing and length of these brief preliminary interviews.  Mr. Andeer said that any plan that included interviews of senior Apple personnel was problematic because those individuals did not expect to have to deal with the Monitor directly.[52]

---

[50] Section VI.C of the Final Judgment requires the Monitor to evaluate Apple's antitrust compliance policies, procedures and training as they exist 90 days after the Monitor's appointment, or on January 14, 2014.

[51] As described below, we reiterated this October 22 request on numerous occasions.

[52] Early interviews and meetings with top executives are completely standard in monitoring assignments, even when there are not specific findings, like those made by this Court, of high-level, executive participation in the conduct that led to the monitorship.

13

Finally, the Monitor also informed Apple at the October 22 Meeting that the monitoring team would like to observe live antitrust compliance training sessions.  He explained that such observations would be very important to our evaluation of the comprehensiveness and effectiveness of the new training programs Apple was preparing to implement in accordance with Section V.C of the Final Judgment.  Mr. Andeer expressed concern about that proposal.  He stated the view that the training sessions would be protected by attorney-client privilege, since he planned to provide employees with advice based on real-world examples during the sessions.  We responded that we did not believe our presence would waive Apple's attorney-client privilege, since we would be acting as an extension of the Court in observing the sessions, but we agreed that the concern was valid, and we stated that Apple and the monitoring team should conduct legal research regarding the issue.[53]

We sent Mr. Andeer an email on October 29, 2013 following up on the document request we had made at the October 22 Meeting.  The email confirmed the Monitor's request for the following documents:

- Apple's past and current antitrust compliance policies and procedures;

- Documents that explain or discuss the reporting oversight structure for compliance (both antitrust and general compliance);

- Documents that explain or discuss the role of the Audit and Finance Committee, and specifically with respect to compliance;

- Documents that explain or discuss the members that make up, and the role of, the Risk Oversight Committee, and specifically with respect to the Committee's compliance role;

- Past and current antitrust compliance training manuals and other written training materials;

- Organization charts for Apple's iBooks Store, iTunes, and App Store divisions; and

- Documents related to the compliance enhancements Apple highlighted in the August 19 Letter, which Apple provided to us at the October 22 Meeting.

---

[53] There were several additional communications following the October 22 meeting between Mr. Andeer and members of the monitoring team.  Because they focused primarily on the terms and conditions under which the Monitor and the members of his team would be compensated, including fees and expenses, rather than on the substantive responsibilities of the Monitor, we are not summarizing those communications here.

On October 31, 2013, Mr. Boutrous of Gibson Dunn sent a letter to the Monitor outlining Apple's objections to the timing and scope of our contemplated activities.  His letter also asserted that we should not interview senior Apple employees or Board members until after January 14, 90 days after the monitorship began.  In advancing this position, Mr. Boutrous relied on the language in the Final Judgment that provided Apple with 90 days to revise its antitrust compliance policies and procedures, as well as certain comments made by the Court before the issuance of the Final Judgment.  Our strong view was that the Final Judgment did not contemplate the Monitor remaining sidelined during the first 90 days of appointment.  Apple later abandoned its position, and our view was subsequently vindicated by the Court.[54]

We viewed the responses at the October 22 Meeting and the objections raised in Mr. Boutrous's October 31 letter as quite troubling.  They were inconsistent with both the requirements of the Final Judgment and Apple's pledges to cooperate fully with the Monitor.  Concerned that an immediate course correction was necessary, we responded by letter the next day and enclosed a separate letter addressed to Tim Cook, Apple's Chief Executive Officer, and D. Bruce Sewell, Apple's General Counsel.  In the letter to Mr. Boutrous, we reiterated the hope for a constructive relationship.  The letter explained that the Monitor had chosen to write directly to Mr. Cook and Mr. Sewell (through the cover letter to Mr. Boutrous) to establish a direct line of communication with the senior managers of the company, as the Monitor had done in successful monitorships in the past.  We hoped that our letter would alert the company's executives to the needed course correction regarding the company's relationship with the Monitor.

Our November 1 response to Mr. Boutrous's letter also explained that, in our experience with other monitorships involving specific required deadlines that the monitored entity was required to meet, the monitor had always performed work before those deadlines arrived; indeed, no monitored entity had ever argued that the work should not begin until those deadlines had passed.  We explained that early contact with top managers was an important step in developing a cordial, collaborative relationship.  We also reiterated the desire to take a reasonable, pragmatic, and flexible approach and to accommodate the schedules of the company's executives.

In the November 1 letter to Mssrs. Cook and Sewell, the Monitor introduced himself, outlined his responsibilities under the Final Judgment, and repeated the principles to which the monitoring team would adhere in our monitoring activities.  He expressed the hope for a constructive relationship and explained that the relationship with Apple should not be adversarial.  As in the November 1 letter to Mr. Boutrous, the Monitor expressed concern that we had not yet received any of the documents Apple had promised and that the company had not meaningfully responded to our request for

---

[54] *See Apple*, 2014 WL 171159, at *8 n.6.

brief preliminary interviews with certain Apple personnel.  The letter cited the sections of the Final Judgment that supported our request to interview senior executives and members of the Board and again expressed our readiness to be flexible in scheduling such interviews.

Mr. Sewell responded to the November 1 letter on November 4, 2013.  In his letter, he promised that he would provide us with a "comprehensive update on [Apple's] progress" and would "facilitate whatever meetings are appropriate for [the Monitor] to fully and completely discharge [his] responsibilities."  He referred to our prior requests to Apple as calling for "voluminous historical documents," which suggested that he had been misinformed about the nature of our modest requests.  He also explained that the newly hired Antitrust Compliance Officer (or "ACO") would "dedicate the next two months to developing new training materials and redesigning [Apple's] compliance program," and that she needed to work "uninterrupted" during that period.[55]  Mr. Sewell promised that the ACO would "reach out" to the Monitor with a "comprehensive report" at some point in the future "so [the Monitor] could begin [his] monitoring function."  Finally, he emphasized that Apple's disputes with our team should "in no way diminish the fact that executives at the highest levels of management . . . are extremely attentive to the issue of compliance with the Final Judgment and are taking active steps to meet the remediation time line expressed by Judge Cote."

On November 5, 2013, the Monitor responded to Mr. Sewell's November 4 letter.  The response again emphasized the importance of establishing prompt contact with top executives at the company, making clear that such contact establishes the groundwork for a successful and productive monitorship.  The Monitor also reiterated his request to meet briefly with the newly hired ACO and to conduct one-hour introductory interviews of selected senior executives at the company, including Mr. Sewell and Mr. Cook.  Finally, the Monitor attempted to correct the misconception apparently communicated to Mr. Sewell that our previous document requests sought "voluminous historical documents."[56]

On November 6, 2013, members of the monitoring team spoke by telephone with Mr. Boutrous and Daniel G. Swanson, another attorney at Gibson Dunn representing Apple.  During the call, Mr. Boutrous abandoned the position that we should not start our monitoring work, including interviews, before Apple had implemented its revised

---

[55] The ACO appears to have played a more modest role in developing new training materials and designing Apple's antitrust compliance than suggested by Mr. Sewell's November 4 letter.  However, in its response to the draft report, Apple contended that the ACO has "participat[ed] substantively in drafting the revised antitrust compliance and training materials and coordinating with Apple's compliance team and outside counsel in revising the program."

[56] Apple eventually responded to the October 22 document request by producing approximately 303 pages of documents on November 21.

antitrust policies and training.  Instead, he proposed a limited first round of interviews to include Mr. Sewell; Tom Moyer, Apple's Chief Compliance Officer and Head of Global Security; Deena Said, Apple's newly hired ACO; and others during the week of November 18, 2013 or after the Thanksgiving holiday, in order to help the monitoring team get "up to speed."  In the interim, Mr. Boutrous promised to provide the background materials we had initially requested at the October 22 Meeting.

The next day, Mr. Boutrous informed the Monitor that the week of November 18 was "looking bad from a scheduling standpoint" for interviews.  However, he provided a list of nine potential interviewees: Mr. Sewell; Mr. Moyer; Gene Levoff, Senior Director and Associate General Counsel—Corporate Law; Doug Vetter, Vice President and Associate General Counsel; Mr. Andeer; Ms. Said; Annie Persampieri, Legal Counsel, iBooks Store; Keith Moerer, Director, iTunes; and Rob McDonald, Head of the iBooks Store for the United States.  At the Monitor's request, Mr. Boutrous said he would check how many of those people were available for interviews during the week of November 18.  However, Mr. Boutrous represented shortly thereafter that only a few potential interviewees were available that week.

By this point, the monitoring team had developed serious concerns about an emerging pattern of non-cooperation that was inconsistent with the terms of the Final Judgment and inconsistent with the pledges made by company representatives.  The Monitor told Mr. Boutrous that we understood that not everyone on the list Apple had generated would be available, but that we would like to interview as many people on the list as possible during the week of November 18.  The Monitor said he would also like to interview Mr. Cook; Phil Schiller, Apple's Senior Vice President of Worldwide Marketing; Eddy Cue, Senior Vice President of Internet Software and Services; and members of Apple's Board of Directors whom he understood to reside in Northern California.  He listed a number of topics that he thought it would be fruitful to discuss at the outset of the monitorship, but said that we would welcome Apple's suggestions regarding which of these topics to focus on in the initial interviews and which to leave for subsequent discussions.

In response, Mr. Boutrous asked us to defer initial interviews for two additional weeks, until the week of December 9, 2013, even though we had previously advised Apple that members of the monitoring team had scheduling conflicts during that week. We asked him which of the potential interviewees were available during the week of November 18, and we offered to conduct the interviews during the week of November 11 instead if that was more convenient.  Again, we considered it more than adequate to give Apple a month's notice, and we were concerned at the broad requests for further delays.

On November 11, 2013, Mr. Boutrous responded that Apple had made a reasonable proposal regarding interviews and that our approach was "unreasonable, unnecessary, and unwarranted."  The Monitor had a brief telephone call with Mr.

Boutrous that evening, in which he asked him to make additional efforts to arrange
interviews during the week of November 18 and stated that Apple's failure to make a
single person available for an interview within a month of Appointment was wholly
inconsistent with the company's stated commitment to cooperate with the monitoring
team.

On November 12, Mr. Boutrous emailed the Monitor to propose interviews of
two Apple employees—Mr. Moyer and Mr. Levoff—on November 18.  The Monitor
agreed to the offer and reiterated the hope and expectation that Apple would make
additional personnel available for interviews while the monitoring team was in
California, a point we repeated in an email three days later.[57]  We also repeated our
October 22 request for documents, noting that, despite repeated assurances that they
would be forthcoming, Apple had not yet provided us with any documents.  Mr.
Boutrous responded that Apple planned to provide us with documents in response to
the October 22 request.

C.      November 18 Interviews and Meeting

On November 18, we had one-hour interviews with Mr. Moyer and Mr. Levoff.
As a first step, we agreed to these time limits, even though we had originally offered
them only in connection with interviews of senior management and Board members in
deference to their schedules and responsibilities.  Even with this limitation, the
interviews of Mr. Moyer and Mr. Levoff were informative and instructive as
background about the company and its overall compliance and risk management
systems.

During his interview, Mr. Moyer offered a presentation summarizing Apple's
Business Conduct and Compliance Program.  The presentation provided an overview of
the structure of Apple's compliance functions and of the core components of the
company's compliance policies and training.  Mr. Moyer also showed us an e-book
Apple had developed to communicate its Business Conduct policy to employees.
Through Mr. Levoff's interview, we learned about important components of Apple's
risk management and compliance structures—Apple's Audit and Finance Committee
and its Risk Oversight Committee.[58]  This introductory information was useful, but Mr.
Moyer's and Mr. Levoff's interviews covered just a small portion of what we hoped to
learn from them.

On that same day, before the interviews, we met with Noreen Krall, Apple's Vice
President and Chief of Litigation.  The meeting focused on confidentiality, fees, and

---

[57] We also requested that, during our upcoming trip to California, we meet briefly with the newly
selected Antitrust Compliance Officer.

[58] Apple was represented in person at both interviews by Mr. Reilly.  Mr. Boutrous and one of Mr. Reilly's
colleagues from Simpson Thacher participated by telephone.

related matters, although we had not requested to meet with Ms. Krall and were not told in advance why she was added to the agenda.  At the meeting, we expressed frustration regarding Apple's resistance to providing us with basic introductory information and making personnel available for preliminary interviews.  We attempted to make arrangements for additional interviews and noted that it would be convenient and cost-effective to schedule additional interviews for November 19 or November 20, when members of our team would still be in Northern California.  We also informed Ms. Krall that, although it posed significant scheduling difficulties, we would be willing to return to California during the week of December 2 to conduct interviews.

Later that day, after the interviews, we emailed Ms. Krall to reiterate our request that Apple arrange additional interviews for November 19 and 20 and during the week of December 2.  Ms. Krall responded by email later that day.  She informed us that, "due to preexisting schedule conflicts," which were not further described, Apple could not make any personnel available for interviews on November 19 or 20.  However, she said that Apple would attempt to schedule additional interviews for December 4, 5, and 6.  In our response to that email, we asked whether Ms. Krall had checked the availability of the Apple Board members whom we understood to live or work in the area.[59]  She did not respond.

On November 19, 2013, we emailed Ms. Krall, as well as Apple's outside counsel, to inform them that we would be in New York and Washington, D.C. the following week and hoped we could meet briefly with the Board members whom we believed resided in those cities.  We again offered to limit the meetings to one hour each and requested that Apple suggest alternative dates if the dates we had suggested did not work.  Ms. Krall responded on November 21, explaining that she was checking Dr. Sugar's availability to meet in California on December 4, 5, or 6.  She did not address our request to meet with Andrea Jung, the Board member whom we believed to be located in New York.

D.     Initial Production of Documents

On November 21, 2013, three days after the initial interviews, Apple finally produced sixteen documents to the monitoring team.  Those documents, which comprised a total of 303 pages, included the following:

- Slides from a presentation regarding Apple's business conduct and compliance program.[60]

---

[59] These three members of the Board were Arthur Levinson, Bill Campbell, and former Vice President Al Gore.

[60] This was the same presentation that Mr. Moyer had given to our team during the November 18 meeting; we had requested a copy of the slides.

- The text of two undated training modules for Apple employees regarding compliance issues, both of which briefly address antitrust issues, including issues concerning reseller pricing.

- Four additional excerpts from training modules, one of which appears to be from 2012, and the others of which are undated.

- A document entitled "Antitrust and Competition Law Policy" and dated March 2009.

- Five versions of Apple's Business Conduct policy document, dating from January 2008 to January 2012.

- A May 15, 2012 document that summarizes various antitrust concerns related to employee recruiting practices.

- Two training documents, one of which is dated February 2013 and is entitled "US Education Sales: Legal Update and Antitrust Compliance Training"; the second of which is dated October 2013, is entitled "Competition Law Training," and appears to be tailored to competition concerns under European law.

E.      Late November 2013 Correspondence

On November 22, 2013, we sent a letter to Apple's Board of Directors through Ms. Krall.  We took this step because of what we viewed as a disturbing lack of cooperation from Apple in the month since we had assumed our responsibilities. Although Apple personnel had repeatedly promised to cooperate with us, the company's actions told a different story.  The Monitor had been treated from the outset as an adversary and an interloper, rather than a court officer with a defined mission specified by the Final Judgment.  We thought it was important that we bring our concerns to the attention of Apple's governing body before the company continued much further down this counterproductive road.

The letter to the Board began by explaining our responsibilities under the Final Judgment.  It also described our disappointment at Apple's lack of cooperation in the early stages of our work, particularly given our clear explanation at the initial October 22 Meeting of the importance of building a strong foundation with Apple's senior employees and members of its Board.  We described our largely unsuccessful efforts to schedule employee interviews for the week of November 18 and the unexplained and lengthy delays in Apple's responses to our requests, including our request for documents.  The letter concluded by expressing hope that our relationship with Apple would become collaborative and positive, and we requested the Board's support in working toward that goal.

Later that day, we received a letter from Mr. Reilly, who asserted that our requests to speak with Apple employees and Board members were inconsistent with direction this Court had provided. He also argued that our communications were "incredibly disruptive" and "counter-productive" to Apple's efforts to improve its antitrust compliance training and policies. The letter claimed that our review should not begin "in substance" until "on or around January 14, 2014" and that Apple's actions to date had therefore "gone far above and beyond" what the Final Judgment required the company to do.[61] Nonetheless, "[i]n the spirit of cooperation," the letter included a proposed interview schedule for December 4-6 that included ten Apple employees (including Ms. Krall and the two employees we had interviewed on November 18), as well as Dr. Sugar. Mr. Reilly also offered in the letter to schedule a telephone interview of Bruce Sewell.

On November 25, 2013, Mr. Sewell sent us an email in which he outlined the steps Apple had taken to respond to our requests. He expressed the hope that Apple and the monitoring team would "continue to work cooperatively to conduct [the interviews proposed by Mr. Reilly] as efficiently and effectively as possible and to address any further requests that [we] may have." Mr. Sewell's note was, to a considerable degree, divorced from the reality of the antagonistic tone Apple had taken in its responses to our requests. We responded the same day, requesting additional information regarding some of the individuals that Mr. Reilly had proposed that we interview. In our response, we also expressed the hope that Mr. Sewell could help us schedule interviews with additional senior executives and Board members.

## V.    The Court's November 20 Order and Apple's Objections

On November 20, 2013, the Court issued an order ("November 20 Order"), pursuant to Federal Rule of Civil Procedure 53(b)(2), which governs the use of "masters," regarding a proposed amendment to the October 16 Order that appointed the Monitor. As the Court later explained in its January 16, 2014 opinion, "Rule 53(b)(2) provides that an 'appointing order . . . must state' certain enumerated characteristics of 'the master's duties,' including *inter alia* whether the master may communicate *ex parte* with the Court or with the parties."[62] The November 20 Order therefore included proposals to further clarify each term of the monitorship enumerated in Rule 53(b)(2), including "a proposal that the Monitor could brief the Court *ex parte* and orally at least once a month."[63] Without this clarification, it was unclear whether the monitoring team

---

[61] This was the same argument raised in Gibson Dunn's October 31 letter, although Mr. Boutrous disclaimed it in our November 6 telephone call with him. We believed Apple's arguments about timing and scope were inconsistent with the Final Judgment. The Court's January 16 Opinion denying Apple's Motion to Stay validated that view. *See Apple*, 2014 WL 171159, at *8 n.6.

[62] *Id.* at *12.

[63] *Id.*

could communicate with the Court in any manner other than filing our formal reports. The November 20 Order, which the Court later described as having been "issued in the hope that the further definition of the Monitor's duties would be a collaborative process consistent with Apple's stated commitment to reforming its antitrust compliance policies," provided that the parties would have the opportunity to file objections to the proposals it set forth.[64]

On November 27, Apple filed objections to the November 20 Order.  In its filing, Apple alleged, in short, that we were "operating in an unfettered and inappropriate manner, outside the scope of the Final Judgment, admittedly based on secret communications with the Court, and trampling Apple's rights."  In addition to objecting to the Court's proposed modification of the October 16 Order appointing Mr. Bromwich as the Monitor, Apple objected, among other things, to our requests to interview Board members and senior executives, most of whom Apple claimed were "not . . . relevant to [our] mandate"; our attempts to begin work before expiration of the ninety-day period for revision of Apple's antitrust compliance policies and training documents; and our "personal financial interest [in conducting] as broad and lengthy an investigation as possible."[65]

Even judged by the standards of extremely aggressive advocacy, these claims were hyperbolic and divorced from the facts.  None of the Monitor's limited activities to date had exceeded the bounds of the Final Judgment; the suggestion that we had engaged in extensive *ex parte* communications with the Court outside the selection process was pure fantasy; the preliminary interviews we had requested with Board members and senior executives were central to our mandate;[66] and the suggestion that we would extend our monitoring assignment for self-interested financial reasons was baseless.[67]

In response to Apple's November 27 filing, the Court issued an order on December 2, 2013 ("December 2 Order"), in which it explained that, since issuance of the October 16 Order, neither the parties nor the Monitor had "informed the Court about the Monitor's fees, the work of the Monitor or of any problems associated with

---

[64] Id.

[65] On December 1, 2013, we forwarded to Ms. Krall, Mr. Boutrous, Mr. Reilly, and the Plaintiffs various profane and abusive emails the Monitor received from members of the public after Apple submitted its November 27 filing.

[66] The importance of these interviews in fulfilling our mandate was confirmed by this Court, *see* 1/13/14 Tr. 43-44; *Apple*, 2014 WL 171159, at *25, and ultimately by the Second Circuit.

[67] In many pieces of its correspondence and in multiple court filings, Apple has referred to our requests for interviews as indicating that our work constitutes an "investigation." This rhetoric never matched the benign reality that we were seeking one-hour interviews with senior executives and Board members to obtain important background information.  The requested interviews had no investigative purpose whatsoever.

that work.  There has been no *ex parte* communication between the Court and the Monitor or between the Court and any of the parties about these issues."  The December 2 Order provided that, because of Apple's objection, the Court would not receive *ex parte* briefings or reports from the monitoring team.  Finally, the December 2 Order directed Apple to resolve its additional objections to the monitorship in accordance with Section VI.H of the Final Judgment, which requires Apple to "convey[] in writing to the United States and the Representative Plaintiff States" any objections to actions by the External Compliance Monitor "within ten calendar days after the action giving rise to the objection."[68]  The December 2 Order explained that if, after Apple submitted a timely objection to the Plaintiffs, the parties were unable to resolve an issue, any party could seek a conference with the Court by submitting a short letter outlining the issues in dispute.  The Court would then "promptly schedule a conference to give all parties, and if appropriate the Monitor, an opportunity to be heard on the matter."

## VI.   December 2013 Interviews of Apple Personnel

### A.   Overview

From December 4 to December 6, 2013, consistent with the proposal in Mr. Reilly's November 22 letter, we interviewed the following nine Apple employees and one member of Apple's Board of Directors at Apple's offices at 250 S. Mathilda Avenue in Sunnyvale, California:

- Chris Keller, Vice President, Internal Audit

- Doug Vetter, Vice President and Associate General Counsel

- Kyle Andeer, Senior Director, Competition Law & Policy

- Annie Persampieri, Corporate Counsel, Internet Services & Software

- Deena Said, Antitrust Compliance Officer

- Dr. Ronald Sugar, Director and Chair of the Audit and Finance Committee

- Rob McDonald, Head, U.S. iBooks Store

---

[68] The December 2 Order provided that, to the extent that Apple's November 27 objections were "untimely and were submitted without first notifying the Department of Justice in writing of the objections, the Court [would] entertain these objections after Apple ha[d] consulted with the Department of Justice."  In the future, however, the Court said, Apple would be required to adhere to the dispute-resolution procedures provided in the Final Judgment.

- Tom Moyer, Chief Compliance Officer (by telephone)

- Gene Levoff, Associate General Counsel, Corporate Law

- Keith Moerer, Director, iTunes

All of the people we interviewed were among those proposed in Mr. Reilly's November 22 letter. Two of the interviewees were Mr. Moyer and Mr. Levoff, whom we had previously interviewed on November 18 (and had not requested to interview again), and six of the interviewees were attorneys. As with our previous sessions with Mr. Moyer and Mr. Levoff, all of the interviews, except Ms. Said's, were limited to one hour in length.

The December 2013 interviews provided an introduction to each interviewee's job responsibilities, as well as some information about Apple's structure and business operations. The interviews also provided initial information about Apple's compliance programs, including the functions of the Audit and Finance Committee and the Risk Oversight Committee, as well as Apple's Helpline. Some of the interviews, particularly Mr. Moerer's and Mr. McDonald's, helped us to begin to understand Apple's general practices in negotiating contracts with publishers.

Through these interviews, we also began to learn about steps Apple was taking to comply with the Final Judgment, including its hiring of an ACO, its collection of the employee certifications required by Section V.D, and the live training sessions that Mr. Andeer had conducted to ensure that relevant personnel understood the requirements of the Final Judgment.[69] At least two outside lawyers for Apple attended each interview, either in person or by telephone. Mr. Boutrous attended Dr. Sugar's interview as his personal counsel and as counsel for Apple.

B.       Initial Interactions with Apple's Antitrust Compliance Officer

Notably, the December 2013 interviews provided our first opportunity to interact with Deena Said, the ACO whom Apple had recently hired pursuant to Section V of the Final Judgment. Ms. Said attended all of the December 4-6 interviews except for Dr. Sugar's.[70] We interviewed Ms. Said for approximately one and a half hours on December 5, 2013.

---

[69] When we met with Mr. Andeer and his colleagues at the March 4 Meeting, we learned more about the substance of the live training sessions.

[70] We requested that Ms. Said not attend Dr. Sugar's interview because we intended to ask Dr. Sugar about the process by which Ms. Said was selected as Apple's ACO. The Final Judgment requires the ACO to be designated by and report to the Audit and Finance Committee, which Dr. Sugar chairs.

In her interview, Ms. Said stated that she was a 2009 graduate of the Golden Gate University School of Law.  Before being hired by Apple, she had worked since law school at Hitachi Data Systems Corporation ("Hitachi"), the U.S. subsidiary of the Japanese company.  From August 2009 to May 2010, Ms. Said was a Compliance Specialist at Hitachi, and in May 2010, she was given the title of Legal Counsel – Business Law.  Ms. Said told us that her compliance work at Hitachi had focused primarily on the Foreign Corrupt Practices Act and "anti-bribery" generally, but she said she also did some antitrust-related compliance work, including work on an antitrust training course that Hitachi introduced while she was at the company.  Ms. Said explained to us that, while at Hitachi, she assisted in upgrading the company's overall compliance training program, including e-learning modules, and played a significant role in revising Hitachi's Code of Conduct, which incorporated an antitrust law policy.  She said she had also focused on "tone at the top," by which she explained that she meant engaging the company's top executives to ensure that they understood the importance of compliance.  She expressed the hope that she would work with top executives at Apple in the same way.

Our December 5 interview of Ms. Said, as well as documents subsequently provided by Apple, outlined the broad contours of the process by which Ms. Said was selected for the ACO position.  Apple's recruiting department conducted the initial search for ACO candidates, advertising the position on Applejobs.com, LinkedIn, CareerBuilder.com, Monster.com, and Hispanic-Jobs.com.[71]  An Apple recruiter telephoned Ms. Said several days after she submitted her online application and referred her to Mr. Andeer.  According to Ms. Said, she was initially interviewed by Mr. Andeer by telephone.  She was then interviewed in person on October 25, 2013, by Mr. Andeer; Mr. Moyer; several Apple employees who do work related to the company's Helpline, training, and channels compliance; and a member of Apple's legal department who focuses on employment law.  Ms. Said did not interview with the Audit and Finance Committee or any other members of the Board.

Ms. Said explained that Apple called her a few hours after her interviews had ended and extended a verbal, unofficial job offer.  When making the offer, Apple noted that Ms. Said's selection was subject to Board approval.  In her interview, Ms. Said told us that Apple confirmed the offer in writing on October 30, 2013.  According to documents provided to us by Apple, the Audit and Finance Committee designated Ms.

---

[71] Ms. Said told us that, although the posted advertisements stated that the position required only an undergraduate degree, Apple personnel told her during the interview process that they hoped to hire an attorney for the position.  We were surprised to learn that Apple would have considered a non-lawyer for this position given its importance under the Final Judgment.  In response to the draft report, Apple stated that it conducted a broad search to ensure that it identified the largest possible pool of qualified candidates.  It argued that "traditionally, this type of position has often been filled by non-lawyers."  In addition, Apple pointed out that the candidate it ultimately hired was in fact a lawyer.

Said as the Antitrust Compliance Officer by unanimous written consent on October 31, 2013.  Ms. Said's first day in her new position was November 18, 2013.

## VII.   Subsequent Correspondence in December

On December 10, 2013, we sent Mr. Reilly an email thanking him for arranging the interviews earlier that month and asking when it would be most convenient to conduct additional interviews.  We also emphasized our willingness to meet with Apple at any time to discuss issues or concerns that might arise.

That same day, we interviewed Mr. Sewell by telephone, with Ms. Said, Mr. Reilly, and a Simpson Thacher associate also joining the call.  Once again, the interview was cordial and productive.  Among other matters, Mr. Sewell discussed the structure of the legal and compliance departments at Apple, including some comparisons to those at other companies with which he is familiar; the evolution of Apple's antitrust compliance functions during his time at the company; and his experience with the e-books Litigation.[72]

On December 17, Apple's outside counsel sent us a copy of a letter Ms. Krall had written to the Plaintiffs.  The letter addressed the scope of our responsibilities, as well as the financial terms and timing of our monitoring assignment.  In the letter, Apple proposed that our total fees for 2014 and 2015 be capped at $250,000; that we conduct no further work until after January 14, 2014, when the 90 days provided in the Final Judgment for Apple to revise its antitrust policies and procedures had passed; and that we adhere to a plan set out by Apple.  Among other things, the plan Apple proposed provided that "there [would] be no further interviews of Apple employees or Board members by Mr. Bromwich prior to his review of Apple's revised antitrust compliance policies, procedures, and training materials"; that after January 14, 2014, Apple would provide us with certain materials required by the Final Judgment and we would, in turn, provide Apple with recommendations regarding those materials; that Apple would make "certain Apple executives and employees" available for interviews after January 14, 2014; and that "Mr. Bromwich [would] not seek interviews with Apple's employees and Board members who are not relevant to his mandate of assessing Apple's revised antitrust compliance policies and procedures and Apple's antitrust training program."

Paired with the Motion to Stay, described below, this letter was the most aggressive step in the series of attempts Apple had made to limit our ability to conduct our work and to replace the Monitor's independent judgment with its own.  Apple's

---

[72] We asked Mr. Sewell whether Apple had considered restructuring its compliance function so that the compliance officer would not report through the General Counsel.  He responded that he was unaware of other companies that structure their compliance functions in that way and that he believed it was a corporate best practice to have the compliance officer report to the General Counsel.

proposal would have put Apple in charge of determining whom we could interview and which documents would be provided, and it would have placed unrealistic financial constraints on our activities.  The proposal was antithetical to the notion of an independent monitor and wholly inconsistent with the Final Judgment.

## VIII.   Apple's December 12, 2013 Motion to Stay

### A.      The Parties' Filings

Without prior notice to the Monitor, or any meaningful effort to have any further discussions, on December 12, 2013, Apple filed in this Court a Motion by Order to Show Cause for a Stay of the Injunction Pending Appeal ("Motion to Stay").  Echoing many of the arguments it had made in its November 27 filing, Apple contended that we were "conducting a roving investigation that is interfering with Apple's business operations," as well as "risking the public disclosure of privileged and confidential information" and "imposing substantial and rapidly escalating costs" that Apple would be unable to recover if it prevailed on appeal.  Apple argued that it had a substantial possibility of success on appeal because, it asserted, the Court had improperly modified the Final Judgment with the amendments it proposed by the November 20 Order, the Final Judgment was not authorized by Federal Rule of Civil Procedure 53 and violated the constitutional separation of powers, and the Final Judgment "deprive[d] Apple of its right to a 'disinterested prosecutor' without 'a personal interest, financial or otherwise.'"

As for irreparable injury, Apple claimed that our "inappropriate demand for access to Apple's senior leadership—including officers, directors, and employees who have little or nothing to do with antitrust compliance or the iBooks Store—ha[d] already inflicted significant and irreparable harm by interfering with Apple's ability to manage its business."  It asserted that the Monitor had "consistently demanded that Apple's senior leaders meet with him on his schedule and on short notice—sometimes as short as two days" and that our "investigation significantly interfere[d] with the ability of Apple's managers to lead the company."  Apple also contended that, in the absence of a stay, it would suffer irreparable injury through the disclosure of privileged or confidential information and through its payment of costs and expenses associated with the monitorship.

The December 17 filing contained a number of serious mischaracterizations and misrepresentations of our previous interactions with Apple and of our conduct.  For one, Apple's repeated assertions that we were conducting a "roving investigation" and exercising "broad investigatory powers" were inconsistent with the modest requests we had made for documents and interviews, consistent with our mandate under the Final Judgment.  Apple's claims that we had inappropriately sought interviews with members of Apple's Board of Directors and senior management overlooked the flexibility that we had offered in scheduling the interviews, as well as the fact that such

interviews are commonplace in monitorships and are often crucial to assessing a
company's compliance programs.  Interviews with individuals at Apple's senior levels
are of particular relevance to monitoring Apple's antitrust compliance policies,
procedures, and training, given the Court's findings regarding the conduct of senior
executives in the e-books matter.[73]  Contrary to Apple's contention, we also never
suggested that we intended to interview Apple personnel outside the presence of
counsel; indeed, at least two outside counsel for Apple have attended every interview
we have conducted to date.  This is only a sampling of the remarkable number of
distortions and misrepresentations included in the Motion to Stay.  In the pages of the
Motion to Stay, our modest and completely ordinary requests became an existential
threat to one of the most successful companies in the world.

On December 30, 2013, the Plaintiffs filed their opposition to Apple's Motion to
Stay.  The Plaintiffs argued that our requests for early interviews with high-level Apple
personnel and Board members were both consistent with standard practice in other
monitorships and especially appropriate in this case, where the Court found that senior
executives played an important role in Apple's negotiations with the publisher
defendants.  The Plaintiffs also argued that the Court had not abused its broad
discretion in appointing an external monitor; that, insofar as Apple objected to our
actions, it was required to follow the dispute-resolution procedure outlined in Section
VI of the Final Judgment; and that Apple's arguments under Federal Rule of Civil
Procedure 53 and the U.S. Constitution were not likely to succeed on appeal.  The
Plaintiffs also asserted that Apple had not established that it would suffer irreparable
harm absent a stay of the monitorship and, finally, that a stay would harm the public
interest.  Attached as an exhibit to the Plaintiffs' brief was a seventeen-page declaration
prepared by the Monitor.  The declaration provided a detailed summary of our
interactions with Apple and provided some background regarding the Monitor's
experiences in other monitorships.  The declaration also attached a number of our
communications with Apple as exhibits.

On January 7, 2014, Apple filed a letter with the Court arguing that the Monitor
should be disqualified because submission of the declaration allegedly showed
impermissible bias against Apple.  Apple asserted that the concerns raised by the
declaration were "compounded" by the conduct of the monitoring team, including our
"reliance on pre-appointment conversations with the Court and plaintiffs as grounds
for expanding [the Monitor's] mandate beyond the terms of the Final Judgment," our
"active collaboration with plaintiffs to broaden the scope of [the Monitor's] mandate in
this manner and oppose Apple's motion for stay," our "financial demands," and our
"adversarial, inquisitorial, and prosecutorial communications and activities."  The letter
also contended that our "asserti[on] [of] non-judicial investigative powers" violated
Rule 53 and the U.S. Constitution because of what Apple viewed as our unreasonable

---

[73] *See infra* note 102.

demands for interviews and other information regarding the company.  Apple also objected again to our alleged efforts to interview Apple personnel outside the presence of counsel.[74]

The letter reflected Apple's apparent distress at having a balanced presentation of the facts submitted to the Court.  For the first time since Apple's original public filings on November 27, we had an opportunity, through the declaration, to provide the Court with a detailed chronology of our interactions with Apple, including the frustrations we had experienced in attempting to obtain relevant documents and conduct interviews with senior management and members of the Board of Directors.

That same day, Apple filed a reply brief in support of its motion to stay the injunction, in which it, again, objected strenuously to the Monitor's filing of a declaration with this Court.

B.     Subsequent Court Proceedings

On January 13, 2014, this Court held a hearing on the parties' filings, including the Motion to Stay and Apple's January 7, 2014 letter seeking disqualification.  On behalf of Apple, Mr. Boutrous argued that we were conducting a "nonjudicial, inquisitorial, roaming investigation that [was] interfering with Apple's business operations" and violating the Final Judgment, Federal Rule of Civil Procedure 53, and the Constitution.  As in Apple's written filings, Mr. Boutrous focused in particular on the Monitor's submission of a declaration.  He also asserted that we had immediately "demand[ed]" interviews with various Apple personnel "without regard to relevance" and "without regard to any of the rules that would govern the taking of evidence in a courtroom."[75]  Mr. Boutrous also reiterated Apple's objections to the financial terms of

---

[74] These claims were supported by no evidence.  We had not expanded our mandate beyond the Final Judgment; indeed, we had scrupulously adhered to it and frequently referred to it as our touchstone.  We had not engaged in any activities that could be fairly characterized as adversarial, inquisitorial, or prosecutorial; we had attempted to engage in the ordinary work of a monitor.  And, despite Apple's repeated claims, we had never attempted to interview Apple personnel outside the presence of counsel.  The claims in the January 7 letter, like the allegations in the December 12 Motion to Stay, bore no resemblance to our actual activities.

[75] Mr. Boutrous asserted at oral argument that the Monitor "seem[ed] to have a fixation on interviewing Al Gore without regard to whether Al Gore has any connection to the specifics in this case."  1/13/14 Tr. 7.  Upon questioning by the Court, Mr. Boutrous proceeded to claim that the Monitor had "referred to Mr. Gore several times both in initial discussions" with Apple and in subsequent letters and emails.  *Id.* at 7-8.

As the Court correctly observed from the bench during the January 13 hearing and in its January 16 opinion, the Monitor made a single reference to Mr. Gore in his written communications with Apple.  *See Apple*, 2014 WL 171159, at *9 n.8.  That reference was in connection with a request to interview the three members of Apple's Board of Directors whom we understood to live in Northern California when we

29

the monitorship that had been established pursuant to the Final Judgment.  In addition, he summarized some of the early steps Apple had taken to comply with the Final Judgment and to improve its antitrust compliance training and policies, including the hiring of Ms. Said and the retention of Simpson Thacher to assist in upgrading Apple's antitrust compliance materials.

After DOJ responded on behalf of the Plaintiffs to Apple's arguments, the Court expressed its disappointment at the state of the relationship between Apple and the monitoring team.  The Court noted that it had been unaware "that the monitor was making all these requests and Apple was doing its best to slow down the process if not stonewall the process."[76]  The Court described the 90 days prior to Apple's implementation of revised policies and training as

> the period when the monitor could be expected to want to get the documents he needs and conduct the interviews he needs so that he would be in a position, on the 90th day, to look at whatever Apple submitted to him as its revised, improved new procedures and training program and practices, so that he could efficiently and effectively, and hopefully in a way to Apple helpfully, comment on it and give Apple the benefit of his best advice and counsel so that Apple could have the kind of program put in place that's required by Article VI.[77]

As the Court noted, however, we had been effectively stymied during that 90-day period, which on the day of the hearing was one day short of expiring.

The Court also emphasized that the Final Judgment, not Apple, controls the monitorship, and that it is critical that the monitoring team be able to gather enough information about the company to understand the context in which Apple's revised antitrust compliance policies and training will function:

> In terms of practices and policies and training programs, it's not one size fits all.  This is to be an effective program within Apple.  [The Monitor] has to understand enough about Apple and its business and these practice[s], policies, and training programs in order to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training.  And looking at paragraph C, these policies and procedures, which are antitrust compliance policies and procedures, have to be reasonably designed to detect and prevent violations of the antitrust

---

traveled to the area.  Aside from that request, we never specifically identified Mr. Gore as a potential interviewee in our interactions with Apple.

[76] 1/13/14 Tr. 41.

[77] *Id.* at 42.

law, within Apple, within its business. They have to be comprehensive and effective within Apple, within its business.[78]

The Court noted that Section VI.G of the Final Judgment requires Apple to "assist the monitor" and to refrain from interfering with the fulfillment of our responsibilities under the Final Judgment.[79] Furthermore, the Court noted, Section VI.G authorizes us to interview Apple personnel without restraint or interference and to inspect and copy documents in Apple's possession.[80] The Court expressed the hope that the parties would "press a restart button" on their relationship and that Apple "would come to see that it is in its interest to comply" with all of the provisions of the Final Judgment.[81] Summarizing, the Court explained,

> Now, Apple is not in a position to define for the monitor the scope of the monitor's duties or how the monitor carries out those duties. The injunction is the path we shall all follow. And if the monitor ever imposes upon Apple in a way that is inappropriate or difficult or intrusive, there will be a process. And there has been a process in place and there will be a process in place so that Apple can be heard, because, again, I intend no disruption of Apple's business and have tried to craft an injunction that can rest as lightly upon it as possible and yet achieve the very legitimate ends of this injunction.

> So I am hopeful that Apple will show it is serious about cooperating with the monitor going forward, assisting him so he can perform his function, and not interfere with that. I expect the Department of Justice to be responsive to any complaints that Apple might have or requests—it doesn't have to be a [complaint]—a request or a discussion, and to work in cooperation and collaboration with the monitor and Apple to resolve outstanding issues, and to do so promptly. I expect the monitor to adhere to the terms of his mandate in Article VI, and also to work collaboratively and cooperatively with Apple and the Department of Justice so that his responsibilities can be performed effectively and efficiently and promptly.[82]

The Court reiterated the dispute resolution process outlined by the Final Judgment and informed the parties that it was not improper for the Monitor to have submitted a declaration, but rather was "essential" to the Court's understanding of the

---

[78] *Id.* at 45-46.

[79] *Id.* at 46.

[80] *Id.*

[81] *Id.* at 47.

[82] *Id.* at 47-48.

interactions between Apple and the Monitor.[83]  Further, the Court advised the parties and the Monitor that it was referring them to a United States Magistrate Judge for the resolution of fee-related disputes.  After making these observations and the referral, the Court denied Apple's Motion to Stay and rejected its attempt to disqualify the Monitor, stating that it would file an opinion explaining further its reasoning and analysis.  Finally, the Court announced that it would allow Apple a 48-hour stay from the filing of that opinion to allow Apple to appeal to the Second Circuit.

On January 16, the Court issued its opinion on Apple's pending motions.  The Court explained that it was denying Apple's Motion to Stay for a number of reasons: some of the arguments Apple made had been waived or had become moot, the dispute resolution mechanisms under the Final Judgment were sufficient to ensure that our activities did not exceed the bounds of the Final Judgment, and Apple had made no showing that the Monitor should be disqualified or that Apple would suffer irreparable harm if the stay was denied.[84]  The Court also provided a detailed summary of the interactions between Apple, the Plaintiffs, and the monitoring team from the hearings preceding issuance of the Final Judgment through the filing of the January 16 opinion.[85]  In addition, the Court again emphasized Apple's obligation under the Final Judgment to provide us with documents we requested and to permit us to interview Apple personnel:

> A monitorship would be of little use at all if a monitor were only permitted to receive, review and opine on company-vetted documents.  Apple cites to no case holding that a monitor may never conduct interviews and there are many examples to the contrary. . . . There is therefore no legal basis for Apple to object to the Injunction's provisions which permit the Monitor to conduct interviews and inspect documents.[86]

Although the Court denied Apple's Motion to Stay, the parties agreed that the Court would stay Section VI of the Final Judgment until noon on January 21, 2014 to allow Apple to pursue its appeal to the Second Circuit.

---

[83] *Id.* at 50.

[84] *Apple*, 2014 WL 171159, at *1.

[85] *See id.* at *1-14.

[86] *Id.* at *17; *see also id.* at *62 ("[T]he Monitor has important work to do, and where that work properly includes interviews of Board members or executives, then the Monitor must be permitted to conduct those interviews.  After all, the Injunction permits the Monitor to interview 'any Apple personnel' when he is doing so in the exercise of his responsibilities and on reasonable notice to Apple.").

C.    Proceedings Before the Second Circuit

When Apple filed its Emergency Motion to Stay Injunction Pending Appeal in the Second Circuit, it also requested an administrative stay while the Second Circuit considered the motion, which the Plaintiffs did not oppose.  On January 21, 2014, the Second Circuit issued an order establishing a briefing schedule and granting the administrative stay until a panel determined Apple's motion for a stay pending appeal.

On February 4, 2014, a three-judge motions panel heard argument on Apple's motion to stay the injunction pending appeal, and on February 10, 2014, the panel issued an order ("February 10 Order") denying the motion.  The February 10 Order explained that, as the parties had agreed at oral argument, the Final Judgment tasks the Monitor with "assess[ing] the appropriateness of the compliance programs adopted by Apple and the means used to communicate those programs to its personnel," including ensuring that "Apple's employees particularly, senior executives and board members are being instructed on what those compliance policies mean and how they work."  As the appeals court noted, the Monitor is not authorized to "investigate whether such personnel [are] in fact complying with the antitrust or other laws."  Moreover, the February 10 Order provided that "the monitor [is] empowered to demand only documents relevant to his authorized responsibility as so defined, and to interview Apple directors, officers, and employees only on subjects relevant to that responsibility."[87]

We had ceased all monitoring work during the pendency of the temporary stays granted by this Court and the Second Circuit, which amounted to a period of more than three weeks.  And as a practical matter, we were effectively prevented from carrying out our responsibilities for two full months following the filing of the December 12 Motion to Stay. With the issuance of the Second Circuit's February 10 Order, the administrative stay was lifted, and we resumed our monitoring activities.

## IX.    Resumption of Monitoring Activities

A.    Communications with Apple

After the Second Circuit panel issued its decision, we promptly took steps to reestablish contact and to attempt to "reset" our relationship with Apple, as this Court had directed during the January 13, 2014 proceedings and in its January 16, 2014 opinion.  On February 11, 2014, the day after the Second Circuit's ruling, we contacted Apple's outside counsel to request an update on the status of the various document

---

[87] From our perspective, the Second Circuit's Order simply confirmed the scope of the Final Judgment as we had interpreted and applied it.  Our understanding of the Final Judgment was starkly different from the extravagant claims Apple had made about our interpretation.  Apple attributed that far broader view—including broad investigative and quasi-prosecutorial authority—to us repeatedly, but we never held that view, and it did not match our activities or requests.  It was a completely artificial construct.

productions Apple had promised and to ask whether Apple personnel would be willing to make a presentation to us regarding the company's revised antitrust compliance policies and training.[88]  We expressed flexibility regarding the location and timing of that presentation but suggested that Washington, D.C. would be a logical choice.

On February 14, 2014, Doug Vetter—Apple's Vice President and Associate General Counsel, and one of the Apple lawyers we had interviewed in early December—responded to our communications with outside counsel.  Mr. Vetter explained that he was our newly designated "point of contact" at Apple and that all communications from the monitoring team to Apple should be addressed to him.  He expressed hope that Apple and the monitoring team could move forward productively and collaboratively, and he informed us that Apple had recently hired two new in-house competition lawyers: Per Hellstrom, formerly of the European Commission's Directorate-General for Competition; and Brendan McNamara, former Assistant Chief of the Mergers II Division of the Federal Trade Commission's Bureau of Competition.

Mr. Vetter also noted in his email that Mr. Andeer had recently conducted a 90-minute live antitrust training session for the worldwide iBooks Store team.  Mr. Vetter explained that the iBooks Store team had "now received live training on both the antitrust laws and the meaning of the Final Judgment."  He stated further that Apple had retained David Boies and Richard Feinstein of Boies, Schiller & Flexner LLP to conduct antitrust training for the company's executive team and Board of Directors.  With respect to the presentation we had requested, Mr. Vetter proposed that he and other Apple personnel travel to Washington, D.C. in early March to share with us their progress on revisions to Apple's antitrust compliance policies and training programs.  He also referred to the need to schedule additional interviews and to Apple's plans to provide us with access to documents.

We immediately agreed to the Washington, D.C., meeting that Mr. Vetter had proposed.  In that email, we also suggested holding joint monthly meetings with Apple and representatives for the Plaintiffs.  In addition, we informed Apple that we intended to send a letter to the Court suggesting periodic status conferences in an attempt to avoid some of the disputes that had characterized the first four months of the monitorship.  Mr. Vetter responded two days later with an outline of Apple's plans for the meeting, which was scheduled for March 4, 2014.  He expressed willingness to have monthly meetings with the monitoring team but explained that he did not think such meetings should involve the Plaintiffs.  He also wrote that he believed regular status conferences with the Court were unnecessary.

On February 18, 2014, we sent a letter to the Court providing an update on the status of our monitoring activities.  The letter explained that we were fully prepared to

---

[88] That same day, we also emailed Apple's outside counsel to schedule fee dispute resolution proceedings before Magistrate Judge Dolinger.

reset our relationship with Apple and to attempt to overcome the obstacles that had prevented us from making adequate progress.  We briefly outlined the communications we had had with Apple since the Second Circuit denied Apple's Motion to Stay, and we proposed that the Court consider holding periodic status conferences with the parties, although we noted that Apple did not think such conferences were necessary.

The Court issued an order on February 19, 2014 ("February 19 Order") that required Apple to provide to us "on a rolling basis, with final production being made no later than February 26," the documents we had requested, "including those the Monitor requested in October, as well as any additional documents that Apple wishes the Monitor to review."  The February 19 Order provided a procedure for the parties and the Monitor to resolve disputes regarding the appropriateness of our document requests.  In addition, the February 19 Order denied our request for periodic status conferences, although it stated that the parties or the Monitor could renew the request at a later date.  Finally, the February 19 Order referred the matter to Magistrate Judge Dolinger for resolution of "any disputes that arise in connection with the monitorship, subject to appeal to [the] Court."

The next day, February 20, 2014, Apple submitted a letter, through outside counsel, to the Court.  Apple expressed "agree[ment]" with the Court's ruling regarding periodic status conferences before the Court and explained why it believed such conferences were unnecessary.  Apple also represented that it "intend[ed] to produce all non-privileged documents on or before February 26 that are both responsive to Mr. Bromwich's document requests, including those propounded in October, and consistent with the scope of his mandate as interpreted by the Second Circuit."  Finally, Apple wrote that it did not object to the Court's referral of disputes to Magistrate Judge Dolinger but "reserve[d] all its prior objections concerning the monitorship and the monitor's activities."

Later on February 20, 2014, the Court issued an order in response to Apple's letter ("February 20 Order").  The February 20 Order explained that "Apple may not unilaterally decide to withhold a document requested by the Monitor on the ground that Apple has concluded that the Monitor's document request is not 'consistent with the scope of [the Monitor's] mandate as interpreted by Second Circuit.'"  The Court therefore ordered Apple to "follow the procedures outlined in the February 19 Order in making its document production, including the dispute resolution procedures," and to produce a privilege log regarding any responsive documents it believed should be withheld on grounds of privilege.

Representatives of Apple, the Plaintiffs, and the monitoring team appeared before Magistrate Judge Dolinger on March 5, 2014.  At that proceeding, the billing rates for the monitoring team were fully resolved.  Through subsequent communications, Apple and the monitoring team have resolved additional billing-related disputes and

have identified a limited number of discrete issues whose resolution Apple and the monitoring team have agreed to defer.

    B.      Additional Document Production

On February 26, consistent with the Court's February 20 Order, Apple provided us with its February 26 Submission, which comprised two sets of additional documents.

The first set of documents consisted of a binder containing forty-nine document tabs (nine of which contained documents that were duplicates of other documents contained in the same binder). In a cover memorandum from Ms. Said, Apple described the documents in the binder as "reflect[ing] Apple's significant work in compliance with the Court's September 5, 2013 Final Judgment and in revising its Antitrust Compliance Program." Ms. Said explained in the memorandum that the binder was divided into two primary sections—the first section documenting "Apple's compliance with the Court's September 5, 2013 Final Judgment," and the second section documenting "Apple's efforts to build a compliance program in accord with the seven elements of an effective compliance program." By our count, the binder includes 474 non-duplicative pages, of which 271 consist of the full text of Apple's agreements with the defendant publishers, terms and conditions relating to the App Store, and correspondence related to those documents.

The second set of documents that Apple produced in its February 26 Submission consists of thirty-two documents comprising 290 pages. These documents are stored in a secure online data room, although Apple also provided us with hard-copy versions. Many of the documents in the second set relate to Apple's Audit and Finance Committee and Risk Oversight Committee. They include the charters of those Committees, various presentations that have been made to the Audit and Finance Committee regarding perceived risks Apple faces,[89] semiannual briefing memoranda and presentations prepared by Mr. Moyer regarding compliance issues and compliance initiatives at Apple,[90] the same summary of the Final Judgment that was included in the first set of documents provided in the February 26 Submission, the text of an undated draft e-learning course entitled "Antitrust & Competition at Apple," and five organization charts for various business components at Apple. Apple also provided us in this production with short video clips that it intends to include in its revised online antitrust compliance training.

We emailed Mr. Reilly on March 1, 2014 to ask whether the documents Apple provided to us in the February 26 Submission constituted Apple's full response to our

---

[89] These presentations are heavily redacted. In its comments on the draft report, Apple represents that the redactions were based on valid invocations of the attorney-client privilege.

[90] These memoranda and presentations also have significant redactions.

prior document requests.  On March 3, 2014, Mr. Reilly confirmed that Apple's production was the "entire production responsive to [our] document request."

C.      March 4 Meeting with Apple

On March 4, 2014, we met with Mr. Vetter, Mr. Andeer, Mr. Moyer, Ms. Said, and Mr. Reilly at Apple's offices at 901 15th Street, N.W., in Washington, D.C.  The purpose of the meeting, which lasted for approximately three and a half hours, was for Apple to share with us the progress it had made in revising its antitrust compliance policies, procedures, and training.

1.      Overview of Actions Taken to Comply with the Final Judgment

The meeting began with a detailed presentation of the steps Apple has taken to comply with the provisions of the Final Judgment.  The presentation included provisions of the Final Judgment that are outside the scope of the Monitor's review, as set forth in the Final Judgment, such as those that require Apple to renegotiate its agreements with publishers and to log certain employee communications with publishers.  Mr. Moyer led the discussion, with occasional input from Mr. Andeer and Ms. Said.  The discussion was keyed to many of the documents in the first set Apple produced to us on February 26.  Among other points, Apple described to us the various audits of publisher contracts that Ms. Said reported she has been conducting to ensure compliance with the Final Judgment, the steps Apple has taken to familiarize employees with Ms. Said and make clear that she is available as a resource regarding antitrust issues, and the various ways in which Apple has incorporated the requirements of the Final Judgment into its training and proposed revised policies.

2.      Draft Revisions to Antitrust Compliance Policies

The Apple representatives then discussed the company's proposed revised Antitrust and Competition Law Policy and Business Conduct Policy.[91]  The proposed Antitrust and Competition Law Policy, which is six pages long,[92] begins with a short

---

[91] Based on the representations that had been made to us and to the Court between October and January, we had expected that we would be presented with completed antitrust policies and procedures, rather than drafts.  However, during the course of our discussions, it became clear that at least one of the reasons the materials were still in draft form was to solicit the views of the monitoring team on the drafts and consider making changes to the materials based on our comments before distributing them to Apple employees.

[92] At the March 4 meeting, Ms. Said said that "the team" went through five or six revisions of the document to ensure that it included everything that was important to Apple.  Mr. Andeer added that, before his team reviewed the policy, it was fifteen pages long.  The competition law team then identified those issues it believed were "truly necessary" to include.  Mr. Andeer said that, if there was one thing he wanted employees to remember after reading the policy, it was that they should "see a red flag" and

letter to employees from Mr. Sewell.  Mr. Sewell's letter explains the importance of competition and innovation and the need for Apple to "work vigilantly to prevent antitrust violations."  The letter also notes that employees are obligated to report potential antitrust issues, either to Ms. Said or to Apple's Business Conduct Helpline, and refers employees to their "local legal counsel" or to Apple's competition law team if they have questions regarding the policy.

The draft Antitrust and Competition Law Policy itself sets forth Apple's policies regarding various types of business conduct, including dealings with competitors (price-fixing, market allocation, group boycotts, and bid-rigging) and dealings with resellers, distributors, and suppliers (price maintenance, tying, exclusive arrangements, and facilitating unlawful agreements).  The policy concludes by stating that employees should consult with legal or competition counsel whenever they have questions regarding the appropriateness of particular actions.  Moreover, directors, officers, and employees who learn of misconduct must immediately report it, and "Apple will not tolerate retaliation against any individual filing a good-faith complaint . . . or for participating in the investigation of any such complaint."

The proposed revisions to Apple's Business Conduct Policy begin with language similar to that in Mr. Sewell's introduction to the Antitrust and Competition Law Policy, explaining why competition and innovation are important and emphasizing that avoiding harm to competition is "not merely the law but it's the right thing to do."  The document, which is about half a page long, lists several types of behavior that employees should not engage in: agreements and exchanges of information with competitors regarding price and other competitively significant terms, agreements with competitors to allocate markets, agreements with resellers on "the resale pricing of Apple products without legal approval," and violations of fair bidding processes.

3.    Draft Revisions to Business Conduct Policy E-book

Apple also provided us with proposed revisions to the antitrust section of Apple's Business Conduct Policy e-book.  The e-book section begins with the language Apple has drafted for the Business Conduct Policy itself, but the e-book will also include a number of interactive components, including a video "Q&A" with Mr. Andeer and video excerpts from live training sessions Mr. Andeer has conducted.  It also includes several pages of text explaining why antitrust matters to Apple, what types of behavior the antitrust laws prohibit, what red flags employees should look for, and when employees should get help with antitrust issues.  The proposed text states that Apple's lawyers, including the competition law team, are available to answer questions; that employees must report suspected violations of antitrust law to Ms. Said or the Helpline; and that Apple will not tolerate retaliation against employees who

---

contact him or Ms. Said if they were in a situation in which they were dealing with a competitor or a group of competitors.

report violations or participate in investigations.  At the end of the draft Apple provided to us, there is a placeholder for a "flip-through gallery" of images and text that will depict the impact that antitrust violations have on consumers, using real-life examples from around the world.  Apple told us that it is in the process of selecting those examples.

4.      Draft Revisions to Online Antitrust Compliance Training

Mr. Moyer also showed us an online compliance training course regarding corruption-related issues.  He said that the corruption course would serve as the stylistic model for Apple's new online antitrust training course, which is still being developed.  (Mr. Moyer emphasized the importance of designing these online training courses to fit the Apple aesthetic so that employees will take them seriously.  Indeed, the corruption course he showed us was sleek and elegant.)  Apple also provided us with the proposed text of the online antitrust course in the second set of documents in the February 26 Submission.

The online antitrust course begins with a short video in which Ms. Said explains why competition is important and emphasizes Apple's anti-retaliation policy, among other things.  Mr. Moyer explained that he had decided to include videos of Ms. Said at the beginning and end of the online training course in order to make employees aware of her role as ACO and of her availability as a resource.  The draft online course then includes several text screens that explain why antitrust matters; provides an overview of important antitrust laws in the United States, the European Union, and China; and describes different types of conduct that present antitrust risks.

Mr. Moyer stressed the importance of making the online training highly interactive.  In connection with each category of potentially anticompetitive conduct the online course describes, Apple is producing an interactive tool for employees to use— for example, a quiz that requires employees to predict whether various hypothetical scenarios would violate the antitrust laws or a game in which employees must categorize potential responses to a hypothetical antitrust problem as "bad" or "good." Like the draft policy documents, the draft training course refers employees to the competition legal team, Ms. Said, and the Helpline, and assures employees that they will not face retaliation for filing complaints or participating in investigations.  It closes with another video featuring Ms. Said, as well as a Final Assessment in which employees must answer a series of questions regarding what conduct is permissible in various situations.  (The draft that Apple provided us suggests that employees must correctly answer eight of the ten questions in the Final Assessment in order to receive credit for completing the course; they are permitted to retake the assessment if needed.)

At the March 4 Meeting, the Apple representatives informed us that some of the policy and training documents were ready to be circulated to employees, but they plan

to wait to introduce them all simultaneously in June 2014, when all of the materials are ready, so that they can make a "big splash" that will catch employees' attention.[93]

5.    Overview of Live Antitrust Compliance Training Presentations

Later in the meeting, Mr. Andeer provided us with abbreviated summaries of the two live training presentations he has made to employees since the issuance of the Final Judgment.  He said that each training session was about ninety minutes long: his presentations lasted for about sixty minutes, and he responded to questions from employees for about thirty minutes.  Mr. Andeer said that he received many questions at each of the training sessions.

The first presentation, which Mr. Andeer gave in September and December 2013 to groups of iBooks Store employees and other personnel identified by Apple as covered by Sections V.A and V.B of the Final Judgment, is an overview of the Final Judgment.[94]  Mr. Andeer said that, with the presentation, he had tried to make the Final Judgment easily comprehensible to the employees, most of whom do not have legal training.  The presentation slides set forth various "[d]os and don'ts (for now)" under the Final Judgment, including with respect to MFNs, discounting of "Big 6" publisher titles, threats and retaliation, information sharing, terms affecting other retailers' prices,[95] and App Store terms and conditions.  Mr. Andeer explained that he "walked [employees] through" the Final Judgment, section by section, and also emphasized to them that he and other members of the legal team are available to speak with them about potential antitrust issues they might face.

The second presentation, which Mr. Andeer gave at a "worldwide summit" of iBooks Store employees in early February 2014, was a general overview of antitrust law. In the presentation, which Mr. Andeer said was more interactive and "free-flowing"

---

[93] Apple did not explain why it settled on the June 2014 date, and which aspects of its program are delaying its full implementation until that time.  In its comments on the draft report, Apple pointed out that we did not request an explanation during the meeting.

[94] Apple has provided us with lists of employees who represented that they planned to attend each live training session.  Apple is unable to confirm which employees actually attended, although Mr. Andeer said he believed the attendance rate was high and said that Apple plans to document attendance at future sessions more rigorously.  Ms. Said also notified us on March 18 that Apple plans to launch an electronic tool that will ask employees to confirm their attendance at past training sessions.  The electronic tool will also ask employees a series of questions that Apple will use to evaluate the effectiveness of its live training.

[95] Mr. Andeer told us that trainees had an especially large number of questions regarding the prohibition on conduct affecting price at other retailers.  He said employees expressed concern that many types of conduct by Apple could theoretically have some effect on the prices that other retailers would charge. Mr. Andeer said that, in response to these questions, he has told employees that they should focus on the terms in Apple's agreements and what is best for Apple, rather than speculating about the behavior of other e-book retailers.

than the presentation regarding the Final Judgment, Mr. Andeer said he particularly emphasized the types of conduct that he believes are the most significant potential pitfalls for employees of Apple or a similar company. He said he believes that the biggest risks involve communications with competitors and groups of competitors. In presentations of this type, therefore, he emphasizes potential penalties—particularly criminal penalties—for those types of antitrust violations.

Mr. Andeer said that he incorporates real-life examples throughout his training sessions that he believes employees will find relevant and helpful to understanding the antitrust concepts he is explaining. The slides for this presentation contain much less text than do the slides for the Final Judgment presentation; many slides have no text whatsoever and include only an evocative image that Mr. Andeer used to launch his oral presentation on the relevant topic.[96] One of the final slides states that "[a]ntitrust [v]iolations MUST be reported" and lists Ms. Said as the relevant contact, with Ms. Persampieri and Apple's competition lawyers listed under the subheading "[q]uestions or concerns." The next slide lists the relevant "[t]akeaways" as "Apple is under scrutiny," "Aggressive regulatory landscape," "Talking about a competitor's price is risky," and "Awareness of what you say."

The Apple representatives noted that the company has scheduled additional live antitrust training sessions for coming months, including training sessions that David Boies and Richard Feinstein of Boies, Schiller & Flexner LLP are scheduled to lead in May for Apple's Board of Directors and executive team.

## X.  Assessment and Recommendations

### A.  Context of the Assessment

As described above, the Final Judgment requires the Monitor to evaluate whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[97] More specifically, the Final Judgment provides that "[t]he External Compliance Monitor shall have the power and authority to review and evaluate Apple's existing internal antitrust policies and procedures" and further provides that the Monitor is to review and evaluate "the training program required by Section V.C."[98] The Monitor is also charged with

---

[96] Mr. Andeer explained at the March 4 Meeting that his presentation slides generally do not include much text. He made the Final Judgment presentation slides more text-heavy, he explained, because the Final Judgment is complex and difficult for many employees to understand, so he wanted to be able to take with them – and be able to refer later to – a document explaining its terms.

[97] Final Judgment § VI.C.

[98] *Id.* Section V.C requires Apple to "ensur[e] that each person identified in Sections V.A and V.B of [the] Final Judgment, and appropriate employees in Apple iTunes and App Store businesses, receives

"recommend[ing] to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[99]  We refer to Apple's antitrust compliance policies, procedures, and training collectively as Apple's "Antitrust Compliance Program."

To be effective and comprehensive, an antitrust compliance program must fit the structure, functions, and operations of the company it is designed to serve.  As this Court recognized, compliance programs are not "one size fits all."[100]  This is why we have sought information that would allow us to fully understand the company's antitrust risk areas, to understand the priorities that have been assigned to those risks, and to develop recommendations to help Apple create an Antitrust Compliance Program that satisfies the requirements of the Final Judgment.

As discussed above, before issuing the Final Judgment, this Court determined that improvements to Apple's Antitrust Compliance Program were needed.  For example, at the first hearing regarding issuance of an injunction in this matter, the Court noted that there had been "no showing of institutional reforms to ensure that [Apple's] executives will never engage again in such willful and blatant violations of the law."[101]  At the August 27 Hearing, the Court explained that the conduct underlying the e-books Litigation "demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," including among "Apple lawyers and its highest-level executives."[102]  The Court stated that Apple needed to make a "sincere commitment to reform its culture . . . to one that includes a commitment to understand and abide by the requirements of the law."[103]

Although Apple is appealing the Court's findings, it has been working to enhance its Antitrust Compliance Program.  In its August 19 Letter to DOJ, which was part of its effort to demonstrate to the Plaintiffs and the Court the adequacy of its antitrust compliance efforts, Apple described efforts it had made prior to April 2010, efforts it had made since April 2010, and efforts it intended to make in the future.  Apple stated that it had "already taken steps to fortify its antitrust compliance programs and policies" and that its "redoubled commitment" and "additional

---

comprehensive and effective training annually on the meaning and requirements of [the] Final Judgment and the antitrust laws, such training to be delivered by an attorney with relevant experience in the field of antitrust law."

[99] Id.

[100] 1/13/14 Tr. 45-46.  Similarly, Apple emphasized at the March 4 meeting that its proposed Antitrust Compliance Program has been designed "for Apple."  "For Apple" was a term that the company used several times in discussing its new Antitrust Compliance Program.

[101] 8/9/13 Tr. 66.

[102] 8/27/13 Tr. 17.  This Court also found that "Apple executives used their considerable skills to orchestrate a price-fixing scheme."  Id.

[103] Id. at 20.

resources" would "foster a robust culture of antitrust compliance at Apple."[104]  We
understand that Apple began working to enhance its Antitrust Compliance Program
after DOJ initiated its investigation.[105]

Against this background, we have conducted an initial assessment of the
components of Apple's Antitrust Compliance Program.  Our judgment is that Apple
has made a promising start in enhancing its Antitrust Compliance Program since
issuance of the Final Judgment, but that it still has much work to do.[106]  The written
materials that Apple has produced to us and statements Apple employees have made in
interviews make clear that Apple has made enhancements to its Antitrust Compliance
Program in an effort to satisfy the Final Judgment and more generally to improve its
compliance efforts.  We also understand that, in addition to hiring the Antitrust
Compliance Officer, Apple has recently hired two new in-house competition lawyers to
join the Competition Law and Policy Group.  Moreover, Apple retained the law firm of
Simpson Thacher, and specifically Kevin J. Arquit and Matthew J. Reilly, to assist the
company in improving its Antitrust Compliance Program.[107]  Mr. Arquit, Mr. Reilly,
and other members of the Simpson Thacher team bring important antitrust experience
and expertise to the Apple team, and should be able to contribute valuably to the
enhancement of Apple's Antitrust Compliance Program.  We commend these and other
steps that Apple has taken so far, but as Apple has acknowledged, more is required.[108]

---

[104] August 19 Letter at 1, 4.  Mr. Andeer also confirmed in his December 6, 2013 interview that, prior to
the issuance of the Final Judgment, Apple had already decided that it should "increase the profile of
compliance."  He told us that there was a "general sense" at Apple that the company needed to do more
to promote compliance.  He said this sense did not necessarily arise from the e-books Litigation; instead,
he said, the company has grown in size and has a profile that is even bigger than its revenues suggest.

[105] We do not have a complete understanding of Apple's antitrust compliance efforts prior to issuance of
the Final Judgment or prior to April 2010.  The August 19 Letter provides some information regarding the
pre-existing program, and Apple has provided us with some documents related to its pre-existing
program.  Neither source, however, fully explains the program.  When we interviewed Dr. Sugar on
December 5, 2013, he told us that his assessment of Apple's Antitrust Compliance Program at that time
was that it was in "good shape" but that it "could be improved."

[106] Our responsibilities do not extend to monitoring Apple's compliance with every provision of the Final
Judgment.  Section V of the Final Judgment assigns a number of oversight and monitoring responsibilities
to the Antitrust Compliance Officer.

[107] Before entering private practice, Mr. Arquit served as General Counsel of the Federal Trade
Commission and Director of its Bureau of Competition.  Mr. Reilly recently joined Simpson Thacher after
serving as Assistant Director of the Federal Trade Commission, Bureau of Competition, where he served
for five years as the head of the FTC's Mergers IV division, among other leadership roles.  Mr. Arquit and
Mr. Reilly are assisted by other respected lawyers who have relevant antitrust experience.

[108] At the March 4 Meeting, Mr. Andeer, Ms. Said, and Mr. Moyer said that the upgrades to the Antitrust
Compliance Program are still in their early stages.  In addition, many of the written materials associated
with the Antitrust Compliance Program are in draft form.

When we resumed our work in February 2014, a full month after the date as of which we were to evaluate the revised Antitrust Compliance Program, many of the materials Apple provided to us were neither complete nor polished and, according to Apple, were "works in progress."  Some of the materials we received in Apple's February 26 Submission, and discussed with Apple at the March 4 Meeting, were in draft form and were organized in a way that was difficult to follow.

Apple has provided information about the three primary components of its Antitrust Compliance Program: its policies, procedures and training.  However, as discussed above, Apple has not provided, and we have thus far been unable to acquire, all of the information that would be useful in assessing whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective" for Apple.

For example, Apple has not provided information related to its current antitrust risk assessment process.[109]  An antitrust risk assessment would evaluate the risks posed by Apple's businesses, employees, and third-party interactions.  The Antitrust Compliance Program materials that we have received so far suggest that Apple has structured its Antitrust Compliance Program around the specific requirements of the Final Judgment; it does not appear to have conducted a risk assessment to identify those businesses and employees that require the most attention and the specific antitrust issues that merit emphasis.  Without Apple having systematically identified and assigned priorities to the antitrust risks it faces, it is difficult for the Monitor to evaluate whether Apple's Antitrust Compliance Program is reasonably designed to detect and prevent antitrust violations for Apple, and whether its training is sufficiently comprehensive and effective for Apple.  Because we believe it is important for Apple to implement (and inform us of) a structured antitrust risk assessment process, we discuss that proposal at greater length below.

Our analysis of Apple's revised Antitrust Compliance Program is also constrained by our limited information regarding critical factors.  In particular, we still lack a full understanding of Apple's corporate structure, a specific understanding of the functions of each business unit and sub-business unit, and a sufficient understanding of the division of responsibilities among categories of Apple employees.[110]  This

---

[109] Apple has provided us with highly redacted versions of some documents that relate to historical risk assessments.  However, we are not aware of any such current risk assessment, nor has Apple said that it performed a risk assessment in connection with its efforts to make the upgrades required by the Final Judgment.

[110] Apple provided five pages of iTunes organization charts, with employee names and sub-business units, in its February 26 Submission.  However, the organization charts do not explain the listed employees' business functions.  In addition, Apple has provided no context for the organization charts.  We do not believe the charts cover the entire iTunes business, but we have insufficient information on

information is critical both to Apple's development of its Antitrust Compliance Program and to the Monitor's evaluation because it will provide important insight into Apple's antitrust risk.  We expect our subsequent reviews of Apple's Antitrust Compliance Program to be strengthened by this additional information.

B.    Antitrust Risk Assessment

1.    Overview

An antitrust risk assessment is a fundamental component of any antitrust compliance program, and a systematic assessment of the risks that arise from Apple's businesses, the activities of its employees, and its third-party interactions will help ensure that its Antitrust Compliance Program makes sense for Apple.  We believe that such an assessment is a key component in making Apple's Antitrust Compliance Program comprehensive and effective.[111]  Simply applying general compliance concepts in response to Final Judgment requirements, or adopting an off-the-shelf compliance program, without incorporating known or expected risks that specifically relate to Apple, is unlikely to lead to an effective and comprehensive Antitrust Compliance Program for the company.

A risk assessment, which should be conducted periodically and as a regular part of Apple's compliance efforts, would also make the Antitrust Compliance Program dynamic;  it would allow the company to respond to new risks as they develop.  The assessment, if done well, would detect new risks that Apple could then take into account in its Antitrust Compliance Program in an effort to prevent violations.  The assessment should consider antitrust concerns that have historically been important for the company, including non-public instances in which antitrust issues have been detected and addressed internally.  The Monitor could also use the information learned during the assessment to evaluate whether Apple's policies and procedures have been reasonably designed to detect and prevent violations of the antitrust laws and whether Apple's antitrust training program, based on the systematic identification and assessment of those risks, is sufficiently comprehensive and effective for Apple.

---

which to base a definitive judgment.  We are also unable to determine whether the charts include all employees named in Sections V.A to V.C of the Final Judgment.  We will seek clarification from Apple.

[111] When we interviewed Mr. Andeer on December 6, 2013, he also expressed the view that Apple's antitrust compliance efforts should not focus narrowly on the company's obligations under the Final Judgment.  Rather, he said he wanted to take a "top-to-bottom look" at "everything [Apple is] doing in the antitrust and competition space" to improve Apple's antitrust compliance.  We believe such an assessment is a prerequisite to designing a comprehensive and effective Antitrust Compliance Program for Apple.

2.      Existing Risk Assessment Structure

According to information Apple has provided, the Audit and Finance Committee is generally responsible for overseeing risk assessment.  The Audit and Finance Committee consists of independent members of Apple's Board of Directors and, according to its charter, is responsible for monitoring and overseeing "compliance with legal, regulatory and public disclosure requirements" as well as enterprise risk management.[112]  The Risk Oversight Committee, which consists of Apple executives and senior employees, assists the Audit and Finance Committee in fulfilling its oversight responsibilities with regard to risks faced by the company.[113]

We understand that Apple has previously evaluated antitrust risks through the Risk Oversight Committee's Enterprise Risk Management Program.[114]  A Risk Oversight Committee Update related to the Enterprise Risk Management Program for the first quarter of 2011 showed that "Antitrust Competition" was evaluated as a "residual risk" with a specified "residual rating."[115]  For the second quarter of 2011, a version of that document identifies antitrust as a "Key Risk"[116] and "Antitrust Strategic—US" as a "Legal—Inherent Risk" with a qualitatively specified probability.[117]  A 2011 document entitled "Enterprise Risk Oversight Yearend Review" names antitrust as a "key risk focus area,"[118] and antitrust is listed as a focus area in various Enterprise Risk Management Quarterly Updates from 2012 and 2013.  While Apple has provided the Monitor with redacted documents revealing these high-level conclusions, we have

---

[112] Audit and Finance Committee Charter, at 1 (Apple Document 000001).

[113] Risk Oversight Committee Charter, at 1 (Apple Document 000007).

[114] When we interviewed Mr. Andeer on December 6, 2013, he told us that, shortly after he joined Apple in 2010, he and Mr. Moyer discussed what they viewed as the most pressing antitrust risks Apple faced and then implemented training to address those risks.  Mr. Moyer told us on November 18, 2013 that his team planned to conduct a risk analysis to help shape policies and procedures, training, and communications.  In addition, when we interviewed Mr. Levoff on November 18, 2013, he told us that the internal audit group "was working on open antitrust risk assessments."  We have not heard anything more about the risk assessments to which Mr. Moyer and Mr. Levoff referred, nor have we received documents reflecting those risk assessments.

Mr. Moyer also told us that his team meets with competition law experts on a quarterly basis and shares this information with the Risk Oversight Committee.  We believe such consultations are valuable and should be formally incorporated into Apple's antitrust compliance policies and procedures.  We look forward to learning more about the consultations and how they will inform Apple's antitrust risk assessment.

[115] Apple Document 000045.  Apple has not explained the meaning of "residual risk" or "residual rating" or any of the other determinations made regarding antitrust risk in this document.

[116] Apple Document 000056.

[117] Apple Document 000062.

[118] Apple Document 000112.

no information that would inform us of the factual basis for Apple's conclusions regarding antitrust risk, the specific antitrust issues that Apple perceived to pose risks, or any priorities assigned to those risks.[119]  Apple has not provided information connecting the results of its historical risk assessments to its current efforts to enhance the Antitrust Compliance Program.

Moreover, although Apple may have conducted antitrust risk assessments in the past, Apple has not provided us with information suggesting that it has incorporated a formal antitrust risk assessment in its revised Antitrust Compliance Program.  If the results of the risk assessments conducted by the Risk Oversight Committee are current and geographically relevant, this information is important to the monitoring team's analysis of Apple's Antitrust Compliance Program, and Apple should provide it to us. On the other hand, if current and geographically relevant risk assessments do not exist, Apple should conduct an antitrust risk assessment to identify the specific needs that the company should be addressing through its Antitrust Compliance Program.  This information is critical to Apple's development, and the Monitor's analysis, of an Antitrust Compliance Program that is comprehensive and effective for Apple.

C.       Apple's Revised Antitrust Compliance Policies

1.       Policies

The Monitor is required to evaluate whether Apple's antitrust policies are "reasonably designed to detect and prevent violations of the antitrust laws."[120]  Apple's revised antitrust policy materials appear to consist primarily of three documents.[121] First, Apple provided us with a revised version of its Antitrust and Competition Policy. Second, Apple also provided proposed changes to a short section on Competition and Trade Practices in the company-wide Business Conduct Policy.  Third, Apple provided us with proposed changes to the section on Antitrust and Competition Law in its company-wide compliance e-book.

(a)       Antitrust and Competition Policy

Apple's current draft Antitrust and Competition Policy is a revision of an earlier policy.  In the August 19 Letter, Apple informed DOJ that, prior to April 2010, it had a formal, written antitrust policy that was provided to every employee.  In addition, Apple provided us on November 21, 2013, with a document entitled "Antitrust and

---

[119] In response to the draft report, Apple pointed out that one document, an update for November 2012, contained an appendix setting out general risks relating to competition.  Apple Document 000158-000160.

[120] Final Judgment § VI.B.

[121] Apple prepared a summary of the Final Judgment and distributed it to Apple employees whom Apple identified as covered by Sections V.A and V.B of the Final Judgment.

Competition Law Policy" that was updated in March 2009.  Apple's current draft
appears to reflect revisions to that document, although it is unclear whether the March
2009 version is the immediate predecessor of the currently proposed policy or whether
there are intermediate versions that Apple has not provided to us.

We believe the revised Antitrust and Competition Policy is generally an
improvement over the March 2009 version.[122]  As mentioned earlier in this Report, the
current draft includes a letter from Bruce Sewell that emphasizes each employee's
responsibility to guard against antitrust violations.  The language of the revision is also
clearer and more comprehensible than that of its predecessor.  In addition, the draft
emphasizes that antitrust risks often exist in "gray areas" and that employees should
leave difficult judgment calls to antitrust specialists.

Apple's draft Antitrust Compliance Policy contains the standard elements that
we would expect to see in an antitrust compliance policy.  It includes a statement about
the company's commitment to complying with the antitrust laws of the United States
and other jurisdictions.  It also contains a brief overview of the substantive provisions of
the antitrust laws, as well as a list of practices that employees must avoid and must
report if encountered or suspected.  The policy also describes certain activities that
employees must not undertake without first consulting with counsel.  Finally, the policy
includes a procedure for reporting potential or actual violations of the antitrust laws or
the policy, and states Apple's policy prohibiting retaliation against individuals filing
"good-faith" complaints.[123]  These generic elements of the policy generally appear
satisfactory.  However, at present, the monitoring team lacks sufficient information
about the company and its operations—including the results of an antitrust risk
assessment—that we would need to fully evaluate the policy's effectiveness, given the
specific risks the company faces.

One key question is whether it is appropriate to develop separate antitrust
policies tailored to the antitrust risks faced by at least some of its business units.  Our
understanding is that the current Antitrust and Competition Policy has company-wide
application.  However, at the October 22 Meeting, Mr. Andeer expressed an intention to
create tailored policies for each of the Apple businesses.  He cited iTunes as an example

---

[122] At Apple's specific request, on March 10, 2014 we provided our initial reactions to various aspects of
the draft policy, many of which related to tone and language.  Little more than a week later, Apple
implemented our suggestions.

[123] We recommend that Apple include a description of its anti-reprisal policy in every antitrust policy
document, set of procedures, communication to employees, and training, and that references to the policy
be appropriately highlighted.  We also recommend that the anti-reprisal policy be emphasized in the
certification employees are asked to sign regarding adherence to the Antitrust Compliance Program and
antitrust laws, possibly by asking employees to acknowledge, in response to a separate, stand-alone
question, that they understand that Apple will not retaliate against any employee that reports a
complaint or concern.  We note that Apple's November 20, 2013 message to employees regarding the
Final Judgment did not contain language regarding its anti-reprisal policy.

of a business that might require its own tailored policy.  We do not yet have enough information about Apple's business units to assess whether the single policy that Apple has written and shared with us is sufficient for the company, or whether it would be better for Apple to develop tailored policies for at least some business units.[124]

(b)     Business Conduct Policy (Competition and Trade Practices Section)

The Competition and Trade Practices section of the Business Conduct Policy, like the Antitrust and Competition Policy, is a revision of a previously existing document. In the August 19 Letter, Apple told DOJ that, prior to April 2010, its Business Conduct Policy included a section on "Competition and Trade Practices" and Frequently Asked Questions ("FAQs"), available in eleven languages.[125]  We understand that the currently proposed version of the Competition and Trade Practices excerpt, which is contained on a single page of the Business Conduct Policy, reflects revisions to a December 2012 version, which was provided to us in Apple's February 26 Submission.

The relationship between the Antitrust and Competition Policy and the Competition and Trade Practices excerpt in the Business Conduct Policy is somewhat unclear to us.  Our understanding is that the Competition and Trade Practices excerpt may be intended to be an abbreviated version of the Antitrust and Competition Policy, designed for dissemination to all Apple employees.  If this is correct, the excerpt should refer readers to the stand-alone Antitrust and Competition Policy, as well as to any other policies tailored for specific Apple businesses.  In any event, in order to evaluate these policies and determine whether they are "reasonably designed to detect and prevent violations," we need to understand how the employees, senior executives, and Board members to whom they are directed will make use of them.  For that purpose, we will need to speak further not only with the architects of these policies but also with members of the target audience—Apple employees, executives, and Board members—who have used, or should be using, one or more of these resources.  Such information is necessary in order to understand how the policies affect employee comprehension of antitrust issues and the resources available when help is needed.  We have not yet had the opportunity to obtain this type of information.

---

[124] In its comments on the draft report, Apple advised us that it does intend to tailor its revised antitrust compliance training program for different employee groups.  *See infra* note 163.  According to Apple, for example, the training relating to e-books employees "likely will not be identical to the training for iTunes employees as a whole, and the training for rank-and-file employees will be different from the trainings for senior executives and the Board of Directors."  We will follow up on this point in our future monitoring and in future reports.

[125] Between April 2010 and issuance of the Final Judgment, Apple made its Business Conduct Policy available in a total of eighteen languages.

(c)    Compliance E-book

Apple has informed us that the compliance e-book was completed in the fall of 2012 and has since been revised a number of times.  We learned at the March 4 Meeting that, before issuance of the Final Judgment, the e-book included only one page dedicated to antitrust compliance.  As of our brief interview with Mr. Moyer on November 18, 2013, the e-book had been distributed to all U.S. employees, with a planned global distribution (including the retail division) sometime in 2014.

In its February 26 Submission, Apple provided us with a current version of the Competition and Trade Practices section of the e-book, as well as a revised version of that section containing proposed changes.  Both versions begin with language from the Competition and Trade Practices section of Apple's Business Conduct Policy. We learned from Apple that the proposed e-book will also include a video "Q&A" with Mr. Andeer and video excerpts from live training sessions Mr. Andeer has conducted.  The proposed version also has a placeholder for a "flip-through gallery" of images and text that will depict the impact that antitrust violations have on consumers, using actual examples from around the world.  We were advised that Apple is in the process of selecting those examples.

We understand that the Competition and Trade Practices section of the compliance e-book will be a supplemental resource for employees company-wide and is meant to complement Apple's Antitrust and Competition Policy.  We are impressed with the potential of the proposed e-book section as a vehicle for communicating additional information regarding antitrust compliance.  The draft is consistent with what we have learned about the style of communication that resonates with Apple personnel.  We also believe the e-book presents Apple's compliance message in a way that will be useful and convenient for Apple employees and will help to make concepts that can be difficult for non-lawyers to understand more comprehensible, without excessive simplification.  Nonetheless, our comments regarding our need for further information about Apple's particular antitrust vulnerabilities applies with equal force to our review of the substantive antitrust material included in the e-book.

D.    Apple's Revised Antitrust Compliance Procedures

Apple has provided the monitoring team with information regarding the enhancement of its antitrust compliance procedures in connection with its obligations under the Final Judgment.  We begin with a discussion of Apple's procedures related to the communication of Apple's Antitrust Compliance Program to employees.  We then discuss procedures related to the role of the Competition Law and Policy Group and the Antitrust Compliance Officer, as well as procedures regarding oversight of the Antitrust Compliance Program.  Next, we discuss Apple's Business Conduct Helpline, including a written set of escalation procedures for employee calls received on the Business Conduct Helpline.  Finally, this section discusses procedures Apple has

implemented that are aimed at satisfying specific requirements of Section V of the Final Judgment.

1.    Communications Regarding the Antitrust Compliance Program

An assessment of Apple's antitrust compliance procedures would be incomplete without a discussion of the way Apple communicates its policies (as well as its general commitment to compliance) to Apple employees.  As an initial matter, we have little evidence on which to base conclusions about changes in the commitment to antitrust compliance among senior personnel, which is a critical factor in determining whether Apple's new policies and procedures will be effective.[126]  This assessment cannot be based merely on reviewing written policies.  Instead, our evaluation of any improvements in the commitment of Apple's Board and senior leadership must be based on other sources of information, including interviews with people occupying those positions.  However, at this point, our information on this issue is extremely limited.  To date, we have briefly spoken with only one member of the Audit and Finance Committee, Dr. Ronald Sugar.  We have not spoken with other members of the Board or a single member of the executive team, apart from a brief telephone interview with the company's General Counsel.  These contacts are insufficient to support an assessment of the commitment of the company's Board and senior executives to effective and comprehensive antitrust compliance.

Apple has highlighted what it views as especially critical aspects of its program to communicate the importance of antitrust compliance, including communications intended to emphasize senior executives' commitment to antitrust compliance.  At the March 4 Meeting, Apple emphasized the opening letter from Mr. Sewell at the beginning of the Antitrust and Competition Policy.[127]  Apple pointed to the letter as an example of the commitment of Apple's senior executives to antitrust compliance.  The letter urges Apple's employees to "work vigilantly to prevent antitrust violations" and asserts the importance of vigorous competition.  In addition to the letter at the beginning of the Antitrust and Competition Policy, Apple also provided an email from Mr. Sewell, which was sent to all employees in connection with the Business Conduct Policy.[128]  The letter and email from Mr. Sewell are positive signals of the importance

---

[126] *See supra* notes 101 and 102.

[127] Apple has also provided a brief (less than a minute) video presentation featuring Mr. Cook that focuses generally on compliance (not specifically on antitrust compliance).

[128] The email from Mr. Sewell urges employees to "set aside a little time to review Apple's Business Conduct Policy" and announces a new version of the Policy available to employees in "iBooks format."

attached to compliance, but by themselves, they do not support any conclusion about the commitment to antitrust compliance of Apple's senior executives.[129]

Apple has provided us with information regarding its more general communications plan to increase awareness of and commitment to antitrust compliance. We learned from Apple that, as of the March 4 Meeting, the company was in the early stages of developing an internal antitrust compliance website (called the "Antitrust Intraweb Site" in Apple's February 26 Submission), which will include resources and information on antitrust law and the Final Judgment, as well as contact information for reporting suspected antitrust violations. The company also will launch antitrust "marketing segments" through Appleweb and RetailMe, the company's intranet sites for corporate and retail employees, respectively. Apple has explained to the monitoring team that it will launch the Antitrust Intraweb Site and the marketing segments from the intranet sites at the same time that the enhanced online antitrust training program is launched, which Apple told us will occur in June 2014.[130]

We believe it will be important for us to view these resources first-hand when they are ready, rather than relying on Apple's report to us regarding their anticipated effectiveness. It will also be important for us to interview Apple personnel regarding their reactions to the material. Finally, we are also interested in how Apple will measure the use and effectiveness of the new antitrust marketing materials and, in particular, the Antitrust Intraweb Site.

2.    Role of the Competition Law and Policy Group

Apple has provided us with limited information regarding the role of the Competition Law and Policy Group. Based on information we have learned from Mr. Andeer, we believe the group is not formally structured—Apple's competition lawyers do not have separate, designated spheres of responsibility. Instead, members of the

---

[129] Prior to April 2010, and presumably during the time of the conduct underlying the e-books Litigation, all Apple employees received an annual email from Apple's General Counsel emphasizing the importance of the Business Conduct Policy and requesting that employees report any violation of the law. August 19 Letter, at 2. This Court found that, as of the August 27 Hearing, the commitment of Apple's senior leaders to antitrust compliance was deficient. *See supra* notes 102 and 103.

A strong commitment to antitrust compliance by Apple's senior executives and the Board is critical to the success of Apple's Antitrust Compliance Program. The Court's statements at the August 9 and 27 Hearings, alone, make this point clear. *See id.* However, Apple's antitrust history also supports this conclusion. In 2010, Apple entered a settlement with DOJ over allegations of its participation in non-solicitation agreements with five other high-tech firms, restraining competition for highly skilled employees. DOJ's complaint alleged direct involvement by Apple's senior executives. *See* Complaint at 4, *United States v. Adobe Systems, Inc., et al.* (D.D.C. 2010) (No. 1:10-cv01629), *available at* http://www.justice.gov/atr/cases/f262600/262654.htm.

[130] Although the Training Plan provided in the February 26 Submission indicates an estimated launch date of May 2014, Mr. Moyer told us at the March 4 Meeting that the projected launch is June 2014.

group appear to handle various issues interchangeably.  Mr. Andeer also told us that he views his role, and the role of the Competition Law and Policy Group generally, to be relevant for "landmark events."  He cited a contemplated transaction or new market entry as examples of "landmark events" that would involve his team's input.  We agree that the Competition Law and Policy Group should be directly involved in these matters.  However, we believe that an effective Antitrust Compliance Program requires vigilance that extends, as appropriate, into day-to-day business operations, as informed by an antitrust risk assessment.

We would like to learn more about the day-to-day role the Competition Law and Policy Group plays.  In particular, we would like more information with respect to how the group's involvement in business operations is triggered.  This information will inform our review of whether the group's role and its practical application will contribute to Apple's Antitrust Compliance Program and its ability to detect and prevent antitrust violations.

3.      Role of the Antitrust Compliance Officer

We believe that the role of the Antitrust Compliance Officer has great potential to contribute to the success of Apple's Antitrust Compliance Program.  Consistent with the requirements of the Final Judgment, Apple has positioned Ms. Said as the "face of Apple's antitrust compliance" in some of its antitrust compliance materials (including those still in development) and in its communications to employees.[131]  We, therefore, view Ms. Said's position as the hub of the program—the Antitrust Compliance Officer is responsible for the program and for ensuring its operational success.  It will be important for Ms. Said to make herself available to employees to address questions and concerns.[132]  We think that Apple has taken steps in the right direction to emphasize the importance of Ms. Said's role and to enhance the presence of the Antitrust Compliance Officer.[133]

---

[131] For example, Ms. Said appears in a video message regarding antitrust compliance at the beginning and end of the online e-learning course.  Ms. Said also has attended the live trainings Mr. Andeer has already conducted, during which Mr. Andeer introduced her and explained her new position.  We recommend that Apple include reference to Ms. Said's position and contact information on the new Antitrust Intraweb Site, as well as the AppleWeb and RetailMe communications that are scheduled to launch in June of 2014.

[132] Ms. Said told us on December 6, 2013 that she planned to use antitrust resources to become more familiar with the antitrust laws.  We would highly recommend that she do so and that she obtain training in addition to that planned for Apple's Board, executives, and employees.  In the first instance, we would like to know whether Ms. Said will attend all of the planned training sessions, including those planned for Apple's Board and executives.

[133] We understand that Apple formally announced Ms. Said's appointment to all employees in the Legal, Security & Government Affairs organization in December 2013.  We also understand that information

53

We hope to learn more about Ms. Said's vision for Apple's Antitrust Compliance Program.  When we interviewed Ms. Said on December 6, 2013, she told us that, at Mr. Moyer's request, she had prepared a work plan for planned enhancements to Apple's Antitrust Compliance Program.  She described the work plan as a "dynamic document" and said that it was very "big."  During Ms. Said's interview, Mr. Reilly said that he was impressed with the work plan and that he wanted to make sure that the final Antitrust Compliance Program included all of the "big stuff" in Ms. Said's work plan. We would like to review the work plan in order to understand the goals of the planned enhancements and the future trajectory of the Antitrust Compliance Program.

4.    Oversight of the Antitrust Compliance Program

Based on the information Apple has provided, we understand that oversight of the Antitrust Compliance Program is shared among three levels of authority.  First, Ms. Said, with overall compliance support from Mr. Moyer, is responsible for the day-to-day operations of the program and is directly accountable to the Board of Directors, through the Audit and Finance Committee.  Second, the Competition Law and Policy Group is responsible for reviewing and approving business actions that are identified as having antitrust implications, as well as the substantive content of Apple's written antitrust policies and training program.[134]  Third, the Audit and Finance Committee is responsible for ultimate oversight of the Antitrust Compliance Program.

The Audit and Finance Committee should be knowledgeable about the content and operation of the program and appropriately supervise its implementation.  In particular, the reporting relationship between the Antitrust Compliance Officer and the Audit and Finance Committee is a critical factor in achieving a successful Antitrust Compliance Program. The U.S. Sentencing Guidelines suggest that the person with operational responsibility for the compliance program should report directly to the Board, or an appropriate committee of the Board.[135]  We currently know little about Ms. Said's relationship with, and support from, the Audit and Finance Committee.  To date,

---

regarding Ms. Said's role, along with her contact information, is available to employees on the Business Conduct webpage.

[134] When we interviewed Ms. Said on December 6, 2013, she told us that Mr. Andeer "owns the content" of the Antitrust Compliance Program.

[135] "Individual(s) with operational responsibility shall report periodically to high-level personnel and, as appropriate, to the governing authority, or an appropriate subgroup of the governing authority."  U.S. Sentencing Commission, Organizational Compliance Guidelines § 8B2.1.(b)(2)(C).

In its February 26 Submission, Apple included a February 19, 2014 memorandum from Ms. Said to the Antitrust File that referred to "Apple's efforts to build a compliance program in accord with the seven elements of an effective compliance program."  With Apple's goal in mind, throughout Section X of the Report, we refer to the U.S. Sentencing Guidelines and its various provisions outlining the seven elements of an effective compliance program.  We have not yet undertaken an analysis of how Apple's Antitrust Compliance Program aligns with the seven elements.

we are only aware of only a single, brief, non-substantive meeting between Ms. Said and the Audit and Finance Committee, which took place on her first day of employment, and which she has characterized as a brief "meet and greet."  We also understand that Ms. Said will be providing an oral report to the Audit and Finance Committee quarterly, as well as a written report to the Audit and Finance Committee semi-annually.

We believe the appropriate reporting relationship for Apple's Antitrust Compliance Officer will ultimately depend on what is effective for Apple, given Apple's business operations, this Court's findings, and the requirements of the Final Judgment.  This Court found that the anticompetitive conduct at issue was formulated and implemented at the most senior levels of the company.[136]  Because Apple needs to guard against similar risks in the future, we believe it is essential that there be a strong and direct reporting relationship between the Antitrust Compliance Officer and the Audit and Finance Committee, which consists entirely of outside directors.

The reporting relationship between the Antitrust Compliance Officer and the Audit and Finance Committee must be genuine.  Ms. Said's quarterly reports to the Audit and Finance Committee should be more than perfunctory.  Ms. Said should include detail and substance in her reports, and the outside directors should have an opportunity to question her on anything and everything relating to her role as the Antitrust Compliance Officer.

Ms. Said will need a great deal of support from the Audit and Finance Committee, and specifically from Dr. Sugar, the Chairman of the Committee,[137] as she oversees the implementation of Apple's enhancements to its Antitrust Compliance Program.  Ms. Said has been "authorized to contact the [Audit and Finance Committee] directly with any questions or issues."[138]  However, authorization alone is hardly a guarantee of a direct and meaningful relationship.  Given Ms. Said's recent arrival at the company, we would expect Dr. Sugar and other members of the Audit and Finance Committee to work actively with her to fulfill her responsibilities to the Board and under the Final Judgment, including through frequent and substantive meetings.[139]  We

---

[136] *See supra* note 102.

[137] In our December 5, 2013 interview of Dr. Sugar, he described to us his extensive compliance background and, in particular, with respect to the highly regulated defense industry.  We believe this background will make Dr. Sugar a particularly important resource to Ms. Said.  In response to our draft report, Apple noted that Dr. Sugar stated that Ms. Said would have any resources she needed, including the ability to speak with him about antitrust compliance issues on a regular basis.  This report describes the types of interaction we believe should occur between the ACO and the Audit and Finance Committee. *See, e.g.*, *supra* and *infra* notes 135-141.

[138] February 19, 2014 Memorandum to the Antitrust File from Thomas Moyer, Chief Compliance Officer.

[139] Ms. Said provided us with a memorandum dated February 19, 2014 that lists Apple employees with whom she has met and with whom she will continue to meet (annually and on an "ad hoc basis") to

recommend that Ms. Said and Dr. Sugar participate in a regular monthly call or meeting regarding Ms. Said's work, as well as the status of the activities under the Final Judgment and the Antitrust Compliance Program generally.[140] We understand that both Mr. Moyer and Mr. Keller have regular interaction with Dr. Sugar, and we would expect that the Antitrust Compliance Officer would as well, especially because she reports directly to the Audit and Finance Committee and is responsible for supervising Apple's antitrust compliance efforts under the Final Judgment.[141]

For Ms. Said to succeed in her role, as that role is envisioned in the Final Judgment, her independence as the Antitrust Compliance Officer needs to be protected. It is important that Ms. Said feel comfortable presenting candid reports without influence from senior management.  Ms. Said's direct relationship with the Audit and Finance Committee will help to ensure she is able to maintain her independence.  The resources and support she receives from the company will also be important.[142]  As we move forward, we expect to gain greater insight into the effectiveness of Ms. Said's role, including how she handles antitrust compliance issues brought to her attention, as the monitorship progresses.

5.      Business Conduct Helpline

The Business Conduct Helpline ("Helpline"), like other previously discussed components of the Antitrust Compliance Program, is not new.  The Helpline has existed since sometime before 2009.[143]  Mr. Moyer told us that, under his oversight (which

---

remain informed of business developments and antitrust risks. Some of the individuals on Ms. Said's list might warrant more frequent and formal meetings, rather than annual or ad hoc meetings (e.g., Dr. Sugar, Mr. Moyer, and Mr. Andeer).  We recommend that Ms. Said determine the frequency of these meetings based on various factors.  We also recommend that Ms. Said develop a specific plan for regular meetings with each individual on the list, including the information she hopes to learn from each of them. Of course, ad hoc meetings driven by events are important as well.  Ms. Said's plan for meeting with the individuals she has identified should be influenced by the results of the antitrust risk assessment and modified as appropriate based on continuing risk assessments.

[140] For example, given that Apple has not fully implemented its new enhanced Antitrust Compliance Program, and given the pending status of many of its components, we would expect Dr. Sugar to be fully informed of the work being done and to contribute his experience and feedback as Chair of the Audit and Finance Committee.  The U.S. Sentencing Guidelines state that an "organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program." U.S. Sentencing Commission, Organizational Compliance Guidelines §8B2.1.(b)(2)(A).

[141] Final Judgment § V.

[142] In our December 5, 2013 interview of Dr. Sugar, he recommended that we speak with Ms. Said directly regarding the sufficiency of resources provided to her by the company to fulfill her compliance obligations.  Dr. Sugar told us that he did not want to "quantify" the resources.  We have not had the opportunity for a lengthy conversation with Ms. Said since shortly after she started at Apple, but we plan to discuss this with her in the future.

[143] *See* August 19 Letter, at 2.

began in that year), employee use of the Helpline has increased by approximately by 700 percent, which he views as evidence that there is broad awareness of the Helpline within the company.

Although we have not monitored the operations of the Helpline, Apple shared information with us about its operation at the March 4 Meeting. The Helpline is operated by employees of Apple as well as by a third-party provider,[144] but all calls are ultimately referred to Kathleen Emery, who manages the Helpline and reports to Mr. Moyer. Apple has told us that the Helpline is global and that Ms. Emery has counterparts in Europe and Asia.

A successful helpline is an important component of any effective compliance program.[145] To gauge whether Apple's Helpline is equipped to contribute to the effectiveness of Apple's Antitrust Compliance Program, we need additional information. First, we need a better understanding of the volume and types of antitrust calls typically received on the Helpline. Mr. Moyer has indicated that approximately 90 percent of the calls to the Helpline take the form of questions, rather than complaints or allegations. Understanding the types of antitrust questions received, and the process for routing and resolving these calls, will help us to understand the effectiveness of the Helpline and will inform Apple's antitrust policies, procedures and training.[146] Information regarding changes in the volume of antitrust-related calls will also help us to evaluate the results of antitrust compliance training and the effectiveness of policy language and other communications urging employees to use the Helpline.

It also may be helpful to speak with a sample of employees regarding their experience with the Helpline.[147] Hearing first-hand from employees will help us understand why employees choose to use (or choose not to use) the Helpline and how effective employees perceive it to be. We also need to speak candidly with employees about whether they feel comfortable communicating through the Helpline, about their perspective regarding Apple's policy against employee retaliation for filing a complaint, and about whether they believe that their comments will be treated anonymously and

---

[144] At the March 4 Meeting, Apple told us that employees can choose between speaking with an Apple employee or a third-party provider when they call the Helpline.

[145] The U.S. Sentencing Guidelines states that an effective compliance program must have "a system, which may include mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation." U.S. Sentencing Commission, Organizational Compliance Guidelines § 8B2.1(b)(5)(C).

[146] For example, we are interested in understanding whether Ms. Said will receive a report of every antitrust inquiry, how Ms. Said will test whether employees are sufficiently aware of the Helpline as a tool, and whether the number of antitrust calls increases after the enhanced antitrust training is launched.

[147] *See supra* note 145.

confidentially if desired.  It will be important for us to assess whether employees feel they are able to communicate their comments without fear of retribution.[148]

Based on the information Apple has provided to date, we also have additional questions regarding the escalation process for antitrust-related calls that require further attention.  We understand that Ms. Emery and her team route calls related to antitrust issues to Ms. Said.  Apple provided some information regarding escalation of antitrust-related calls in its February 26 Submission, but we would need to understand more about the process by which antitrust issues are identified and properly escalated.

     6.     Section V Procedures

     (a)     Employees Covered by Sections V.A-V.C of the Final Judgment

An important component of Apple's Antitrust Compliance Program is the identification, maintenance, and audit of the list of employees covered by Sections V.A to V.C of the Final Judgment ("Section V Employee List" and each member of the list a "Section V Employee").

Three important provisions of the Final Judgment apply to Section V Employees.[149]  First, Section V.A requires that Apple's Board of Directors, its Chief Executive Officer, each of its Senior Vice-Presidents, and each of its employees that, in whole or in part, engage in activities "relating to Apple's iBook Store" (together, "V.A Employees") receive a copy of the Final Judgment.  Section V.B requires that any officer, director, or other employee who succeeds to any V.A Employee position (together, "V.B Employees") also receive a copy of the Final Judgment.  Section V.C of the Final Judgment requires specific training for all V.A and V.B Employees, as well as "appropriate employees in the Apple iTunes and App Store businesses" ("V.C Employees").

Apple provided information to the monitoring team regarding Apple's identification of Section V Employees.  In its February 26 Submission, Apple provided the list of employees who had certified receipt and understanding of the Final Judgment pursuant to Section V.D of the Final Judgment, as well as the list of employees who had provided certifications in connection with the communications log requirement imposed by Section V.I of the Final Judgment.  (Both of these lists include the same employees.)  Apple provided us with a February 19, 2014 Memorandum from Ms. Said to the Antitrust File, which attempts to describe, in general terms, how the Section V

---

[148] Id.

[149] We do not discuss the fourth main requirement that applies to V.A and V.B Employees, which is imposed by Section V.I of the Final Judgment.

Employee Lists were created.[150]  After reviewing this memorandum and discussing the process at the March 4 Meeting, we remain uncertain of the factors that are used to determine whether an employee is included on the list.

On March 18, 2014, Ms. Said provided additional information in response to our request for clarity regarding the list of employees to whom the Final Judgment was provided (V.A and V.B Employees).  Ms. Said provided a list of recipients' names.  In addition, she explained that Mr. Andeer; Mr. Robert Windom, Senior Counsel for iTunes; Ms. Persampieri, Counsel for the iBooks Store; Emily Blumsack, Counsel for the App Store; and others within the iTunes Legal Team "worked to identify those employees that were relevant to Sections V.A and V.B of the Final Judgment."  Ms. Said explained that the attorneys listed "worked with their clients to ensure that Apple captured all relevant employees."

In addition to Board Members, the Chief Executive Officer, and Senior Vice-Presidents, all iBooks Store employees, as well as any non-iBooks Store employees whose activities could be considered "related to Apple's iBook Store," must be included as Section V Employees.  However, it is unclear to us whether Apple's lists of V.A and V.B Employees include all such individuals.  We understand that the decision whether to include certain employees with functions "related to Apple's iBook Store" may, in certain cases, require a careful analysis of an individual employee's responsibilities.  However, neither the identification process, nor the process for modification going forward, has been clearly documented or explained.  As a result, we continue to need more information before we can evaluate Apple's procedures regarding V.A and V.B Employees.  We also require additional information regarding the identification of the complete set of Section V Employees, including V.C Employees.

All Section V Employees must receive training on both the Final Judgment and the antitrust laws.  Apple provided to us the attendance list for the live training sessions conducted in September and December 2013 (on the Final Judgment) and in February 2014 (on the antitrust laws).  However, Apple told us at the March 4 Meeting that these attendance lists reflect who accepted invitations to the sessions, but do not reliably identify who actually attended.[151]  In addition, our review of the organization charts Apple has provided suggests that employee names may be missing from the attendance

---

[150] According to Apple, its corporate structure and business operations do not lend themselves to bright lines.  Ms. Said's February 19, 2014 Memorandum to the Antitrust File (provided in Apple's February 26 Submission) explains that the iTunes organizations are "fluid[]" and that, for this reason, identifying employees covered by Final Judgment requirements requires a "hands on approach."

[151] Mr. Andeer told us at the March 4 Meeting that the attendance lists were generated using his Outlook calendar invite acceptances.  Apple was unable to confirm whether those employees who accepted Mr. Andeer's Outlook invitation actually attended, or whether all attendees were present for the entirety of the training.  Apple told us at the March 4 Meeting that they plan to improve their attendance tracking for trainings.

lists.  For example, we note that while certain iBooks Store employees were listed as attendees of the September and December trainings, one of their apparent counterparts on the organization chart was not listed.  When we interviewed Mr. McDonald, he told us that he manages that employee,[152] and her job title on the organization chart provided by Apple indicates that she is an iBooks Store employee.  Likewise, another employee, who an organization chart indicates is an iBooks Store employee apparently on the same organizational level as Mr. McDonald, does not appear on any of the attendance lists.  Although there could be reasonable explanations for these discrepancies, these examples highlight our current lack of information regarding Apple's process for identifying Section V Employees.

As Apple conducts future risk assessments, we believe Apple will modify its list to add, and in some cases possibly remove, employees based on the antitrust risk posed by their position and responsibilities.  Further, once identified, the list of Section V Employees will inform Apple's decisions regarding other components of the Antitrust Compliance Program.  For these reasons, we need more information from Apple regarding the Section V Employee identification process.

In addition to information regarding the Section V Employee identification process, we need a list that includes the business sub-unit affiliation, job description, and core function of each employee on the list.  With this information, we will be able to provide a more comprehensive evaluation of the Section V Employee identification process, as well as the antitrust training and audit components of Apple's Antitrust Compliance Program.  We view the Section V Employees, and the process used to identify the group, as the starting point of Apple's antitrust training program.  Identifying Section V Employees through a transparent and dynamic process based on an antitrust risk assessment is important to developing an Antitrust Compliance Program that is reasonably designed to detect and prevent antitrust violations.

(b)     Review of Agreements

We understand that the Antitrust Compliance Officer has reviewed agreements between Apple and the publisher defendants as part of Apple's obligation to amend these agreements under Section IV.A of the Final Judgment.  Ms. Said explained to us that she has access to Apple's online contract repository, which includes the latest versions of these agreements.  We also understand that Ms. Said will continue to review these agreements "periodically" to ensure that no changes are made to the agreements in violation of the Final Judgment.[153]

---

[152] Mr. McDonald told us that the employee specializes in the distribution of education-related content.

[153] At the March 4 Meeting, Apple presented its process for antitrust review of defendant publisher agreements in connection with its obligations under the Final Judgment.  However, we have not reviewed these agreements, nor do we believe it is within our mandate to do so.  We have focused

Apple has told us that Ms. Said will also be responsible for monitoring iBooks Store–related agreements with publishers who were not named in the e-books Litigation.  We learned that there are various categories of publisher agreements depending on the size of the publisher involved, and we understand that a member of the Competition Law and Policy Group does not always review these contracts and modifications.  We need more information regarding which types of contractual agreements receive review by the Competition Law and Policy Group and with what frequency that review takes place.  For certain contractual agreements and modifications, it may be appropriate to require formal approval by the Competition Law and Policy Group.  We understand from Apple that review of contractual modifications related to the defendant publishers has, so far, been a joint effort between Ms. Said and Apple's legal team, although Apple has not described the precise process for contract review.  Some level of antitrust expertise is required to identify contractual modifications that might raise antitrust concerns.  While we believe Ms. Said can and should play an important role in monitoring contractual changes, a member of the Competition Law and Policy Group should immediately and directly review contractual modifications Ms. Said identifies as potentially problematic.

(c)     Record-Keeping

It is important that Apple keep accurate and comprehensive records of its antitrust compliance efforts.  Many of the requirements of the Final Judgment are predicated on accurate and detailed records; more generally, an antitrust compliance program that is reasonably designed to detect and prevent violations of the antitrust laws requires accurate record-keeping.

We understand that Ms. Said will be maintaining records regarding the identification of Section V Employees, antitrust training attendance, employee communications logging, and other important items required by the Final Judgment. As noted above, Ms. Said has provided us with records relating to Sections V.D and V.I of the Final Judgment.  She has also provided lists of employees who accepted an invitation to attend the training sessions Mr. Andeer conducted in September and December 2013 and in February 2014.

We believe that Apple can improve its record-keeping procedures for the Antitrust Compliance Program. For example, as stated above, we were told at the March 4 Meeting that the training lists for the live training sessions Mr. Andeer conducted regarding the Final Judgment and the antitrust laws reflected expected attendance, rather than the actual list of attendees.  One of the primary goals of the live trainings is to ensure that employees are educated about these important topics. If the

---

instead on whether Apple's internal procedures and resources for detecting and preventing antitrust misconduct, including procedures and resources related to the review of contractual provisions for antitrust issues, are reasonably designed for such a purpose.

company cannot be sure who received the training, its efficacy is substantially diminished.  We hope to receive more information from Apple on the ways in which it will maintain records of important components of the Antitrust Compliance Program.[154]

        (d)      Apple's Investigation and Reporting of Violations

      Apple has not yet provided us with information regarding its procedures for investigating potential violations of the Final Judgment or of the antitrust laws.  Section V.G of the Final Judgment requires Apple, within three business days of discovering or receiving credible information concerning an actual or potential violation of the Final Judgment, to terminate or modify Apple's conduct to assure compliance, and to provide to the Plaintiffs, within seven business days of discovering such information, a description of the actual or potential violation of the Final Judgment and corrective actions taken.  Section V.H of the Final Judgment requires Apple to provide to the Plaintiffs on a quarterly basis any non-privileged communications regarding allegations of Apple's noncompliance with any provisions of the Final Judgment or violations of the antitrust laws.  Ms. Said told us on December 6, 2013 that she believed a process should be in place with respect to Apple's obligations under both Sections V.G and Section V.H of the Final Judgment.  We would like to receive more information from Apple regarding the development of these processes.[155]

      Apple has advised us that the company has not received any information regarding a potential or actual violation of the Final Judgment.[156]

---

[154] On March 18, 2014, Ms. Said notified the monitoring team of a proposed enhancement to Apple's record-keeping procedures for training enhancements.  Ms. Said proposed that Apple provide a sign-in sheet at every live training session and that Ms. Said, or her designee, attend each training session and be responsible for record keeping.  For past trainings, Ms. Said proposed that an electronic certification tool be used to track which employees actually attended.  We believe that a sign-in system (paper or electronic) that appropriately tracks accurate attendance is needed.  For past trainings, we also believe an electronic certification tool will be a sufficient method of tracking attendance that was not accurately recorded at the time, so long as the language of the certification refers to the Final Judgment and communicates the importance of attendance and accurate responses concerning whether the employee actually attended the training.

[155] Separate and apart from the Final Judgment requirements regarding detection and reporting of violations, we believe that a comprehensive and effective compliance program must include procedures for detecting, investigating, and reporting potential violations.  The U.S. Sentencing Guidelines state that an "organization shall take reasonable steps to respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program."  U.S. Sentencing Commission, Organizational Compliance Guidelines § 8B2.1.(b)(7).

[156] Apple provided information to the monitoring team in its February 26 Submission about a complaint received by DOJ regarding the application of terms and conditions to the sale or distribution of e-book apps through the App Store.

(e)     Annual Antitrust Audit

Section V.E requires the Antitrust Compliance Officer, "in consultation with the External Compliance Monitor," to conduct an annual audit covering Section V.A and V.B Employees, and to maintain records of such an audit.  At the March 4 Meeting, Ms. Said invited the monitoring team's input regarding the audit requirement.  Apple and the monitoring team agreed that Apple would propose a plan to the monitoring team sometime around July 2014 for conducting the audit.  The Monitor suggested that Apple complete the audit within a reasonable time (i.e., within 30 or 60 days) following the anniversary of the Final Judgment.

(f)     Other Procedures

Apple has not provided information related to procedures developed to provide appropriate incentives to Apple employees to abide by the company's policies and to discipline employees who do not.  We believe that such procedures will be important to ensuring that Apple employees are aware of the new policies and procedures and choose to abide by them.  We will be seeking additional information regarding Apple's plans, if any, regarding incentives and discipline related to the Antitrust Compliance Program.

We also recommend that Apple implement procedures to receive formal feedback from employees regarding enhancements to the Antitrust Compliance Program.  Feedback regarding the Helpline, training sessions, and other components of the program will help Apple gauge the effectiveness of these components and determine how best to communicate with employees about antitrust compliance issues. We understand from the March 4 Meeting that Apple already plans to conduct quizzes and spot audits after live trainings in order to assess employee comprehension of the topics discussed during the training.  We think this is a positive step and we would encourage additional interactive checks to assess training comprehension.  We look forward to receiving more information from Apple on additional ways to receive feedback from employees and to incorporate feedback into the program.

We understand that Apple employees are currently required to certify adherence to the Business Conduct Policy upon hiring and annually.  The monitoring team recommends that Apple also require all employees to certify compliance with the Antitrust and Competition Policy upon hiring and annually.  We believe the process of affirmatively acknowledging the Antitrust and Competition Policy will remind employees about antitrust and competition issues and may prompt employees to come forward with questions more frequently.  We view this certification as separate from the requirements imposed by Section V.D of the Final Judgment,[157] and we believe it should

---

[157] Apple modified the phrasing of its summary of the Final Judgment provided to employees in response to the Monitor's March 10 Comments.  We recommend that Apple make similar modifications to the

be required of all employees.  We look forward to receiving additional information from Apple regarding implementation of the certification procedure.

E.      Apple's Revised Antitrust Compliance Training Program

Apple is required to provide training to each member of its Board of Directors, its Chief Executive Officer, and its Senior Vice-Presidents; each of its employees engaged, in whole or in part, in activities relating to the iBook Store; and the successors of all of the individuals in these categories.[158]  In addition, Apple must extend its training program to cover "appropriate employees in [the] Apple iTunes and App Store businesses."[159]

Training is a fundamental component of any comprehensive and effective antitrust compliance program.  It is the process by which Apple educates its employees regarding the laws and policies that apply to the company generally and, more importantly, to the day-to-day responsibilities of employees.  We believe that Apple can achieve two main purposes through its training program, both of which will contribute significantly to the company's improved antitrust compliance: an increased ability of employees to comply with the antitrust laws, and an increased willingness of employees to comply with the antitrust laws.  At a minimum, employees must have sufficient information to know when they should report questionable conduct and when to seek guidance.

Recognizing the importance of training as a tool to improve Apple's compliance with the antitrust laws, this Court made specific reference to training in the Final Judgment.  The Court noted during the August 27 Hearing that training sessions should be "tailored to each employee's position and the situations that employee is likely to encounter."[160]  We agree with the Court's conclusions, and we believe Apple must carefully develop its training schedule, identify employees whose positions require antitrust education, classify employees by the level and type of training that is appropriate for them based on their responsibilities, and tailor trainings appropriately for every general category of Apple employee in need of training, from the Board of Directors generally, to the Chair of the Audit and Finance Committee responsible for the Antitrust Compliance Officer's activities, to the company's sales and marketing employees.

---

language included on the online certification tool for receipt and agreement to abide by the terms of the Final Judgment. The language regarding Apple's appeal should not detract from the requirements of the Final Judgment and from the seriousness of antitrust compliance.

[158] *See* Final Judgment §§ V.A-V.C.

[159] Id.

[160] 8/27/13 Tr. 18-19.

When determining what level and type of training is appropriate for a given employee, Apple should consider the risks associated with that employee's specific functions and responsibilities.[161]  This determination should be made as part of the company's antitrust risk assessment.  Based on this process, Apple should tailor the type of training to be provided to employees.[162]  We understand that, at least as of our interview of Ms. Said on December 6, 2013, Apple intended to create separate training programs for different employee groups.  Ms. Said told us that she and Mr. Andeer planned to create three separate training programs for different groups of employees. We need to understand more about the distinctions among these training sessions and about how they have been tailored to each group of individuals.[163]

Based on the information Apple has provided, we understand that Mr. Andeer has already provided four live training sessions since the Final Judgment—two on the meaning of the Final Judgment (one to U.S. iBooks Store employees and the other to the global iBooks Store),[164] one on fundamental antitrust issues to the global iBooks Store, and an antitrust training course on "Deals 101" to New Global Sales Managers.  Future planned training sessions include an antitrust training scheduled to be conducted by Mr. Boies and Mr. Feinstein in May for both the Board of Directors and "Executives,"[165] a second antitrust training on "Deals 101" for New Global Sales Managers,[166] and "to be determined" antitrust trainings for App Store employees, iTunes Leadership, Eddy Cue's direct reports, and in-house legal counsel.[167]  An antitrust e-learning course is scheduled to be released in May 2014 to the iTunes, Sales (Channel and iPhone), and marketing employees.

---

[161] When we interviewed Mr. Andeer on December 6, 2013, he told us that he believed the Final Judgment called for training to educate all Apple business people, with special emphasis on those working with the iBooks Store.

[162] Live training should be provided to employees at the highest risk levels.  Online training may be reserved for those employees that present minimal antitrust risk.  At a minimum, Section V Employees should receive live training.

[163] As noted above, Apple advised us in its comments on the draft report that it intends to tailor its revised training program to different personnel groups, including rank-and-file employees in different business units, senior executives, and the Board of Directors.

[164] We understand the September 2013 training on the Final Judgment requirements also included phone attendees.

[165] It is unclear from the information provide by Apple whether the Board member and "Executive" training is scheduled to include both training on the antitrust laws and training on the Final Judgment, as required by the Final Judgment.

[166] Apple was scheduled to conduct this training on March 23, 2014.  Apple notified us on March 18, 2014 that this training would be postponed due to an individual's paternity leave.

[167] Apple has described the training sessions for in-house legal counsel as "Train the Trainer" sessions.

Without more information regarding the identification of Section V Employees, it is difficult for us to assess whether the training Apple has conducted so far, and the training it has scheduled for the future, targets all of the necessary personnel.  For example, based on the information we have received from Apple, we cannot sufficiently identify the employees who are responsible for developing pricing and marketing plans, monitoring competitors' activities, attending trade association meetings, or otherwise having contact with competitors' representatives.

Largely due to lack of information, it is currently difficult for us to assess whether Apple's planned training schedule is comprehensive and effective.  Although the training sessions Apple has conducted and planned appear to be a good start, the monitoring team needs a better understanding of whether other business groups or employees should also receive antitrust training.  We also need more detailed information regarding the duration of each session, the number of expected attendees, a description of the purpose of the training, and the contemplated frequency of the training (e.g., annual, quarterly, upon hiring).  We also look forward to observing future training sessions and obtaining Mr. Andeer's speaking notes for past presentations.[168]

Apple has provided us with copies of the presentation slides that Mr. Andeer used during his training on the Final Judgment (September and December 2013) and his general training on the antitrust laws (February 2014).  Apple advised us that the Final Judgment training slides were distributed to employees, but that the general antitrust training slides were used only as a visual aid during the training session.  We noted in the March 4 Meeting that the slides provide little information with respect to the substantive material covered in the training sessions.[169]  Although the slides for the Final Judgment presentation contain far more written material than do the slides for the general antitrust presentation, neither provides enough information for a non-participant to be able to assess the comprehensiveness of the training that took place.  At the March 4 Meeting, Mr. Andeer provided a brief oral summary of the topics covered at the training sessions he conducted, but this is not the same as witnessing the training sessions in person.

---

[168] In light of Apple's privilege concerns, we have agreed to receive a video recording of the next antitrust training session Mr. Andeer is scheduled to conduct.  The video recording will be redacted for privileged information.  At the March 4 Meeting, Mr. Andeer promised to provide us with his speaking notes from past training sessions.  We also hope to reach an agreement with Apple by which we can observe live training sessions in person, without a waiver of Apple's privilege.  We believe it is very important for us to observe live training sessions in order to evaluate the comprehensiveness and effectiveness of Apple's antitrust training program.

[169] The antitrust law overview slides have minimal written material and largely contain pictures and other symbols, which Mr. Andeer used to launch his oral discussion of substantive concepts.  Mr. Andeer explained that he believes his presentations are most effective when designed in this way.  That may be true, but it is difficult for us to judge the training without more information.

We recommended to Apple at the March 4 Meeting that the company provide employees with copies of its antitrust training materials and that it make the same materials accessible through the Antitrust Intraweb Site.  We understand that Mr. Andeer does not typically include detailed written material in his training presentations and share the view that visual aids, such as pictures and headlines, can make antitrust training sessions more effective.  So long as other resources provided to employees at the training session effectively capture and convey the information employees need regarding the antitrust laws and the company's compliance policies, it is not necessary to add duplicative written information to the slides from training sessions.  The other resources provided to the employees in conjunction with the training should be useful and effective and accessible through the Antitrust Intraweb Site.

In addition to the materials Apple provided in connection with its live trainings, Apple provided a hardcopy template of a draft e-learning course and a set of hypothetical scenarios related to various antitrust violations.[170]  In general, we think the e-learning course has the potential to be an effective training tool for Apple.  The course includes interactive tools and quizzes that will help to keep employees engaged and will reinforce antitrust concepts in a memorable way.  However, at present, the monitoring team lacks sufficient information about the company and its operations—including the results of an antitrust risk assessment—to fully evaluate the effectiveness of the e-learning course for Apple.

An important factor in our evaluation of the e-learning course will be how Apple identifies employees that receive the e-learning course.  We understand that, in addition to core business training, Apple provides more focused training to certain groups of employees on certain "key laws."  Employees are required to receive these training "sub-modules" depending on their roles.  Mr. Moyer told us on November 18, 2013 about his plan to make antitrust another required sub-module for certain employees.  We understand that the antitrust e-learning course is the fruit of these efforts.  We need more information about which employees will receive the antitrust e-learning course.

## XI.   Conclusion

The initial stages of this monitorship were far more difficult and contentious than we anticipated.  That is regrettable and was avoidable.  As a result, we are less advanced in the process of assessing Apple's efforts to revise its antitrust compliance policies, procedures, and training than we would have been if we had received more cooperation from Apple since our appointment in mid-October.

Nonetheless, starting in late February, there has been a shift of tone in our relationship, largely attributable to Apple's designation of a new in-house principal

---

[170] It is unclear how the hypothetical scenarios fit into the general training program.  We look forward to additional information from Apple regarding the use of the hypothetical scenarios.

point of contact and to changes Apple has made in the outside counsel with whom we deal.  We have started to receive more information, we have seen a greater commitment to resolve lingering disputes, and we are starting to see the original pledges of cooperation and collaboration, which for many months were at odds with the company's actions, fulfilled.  If that continues, the reset this Court sought will have taken place, and we will be on a path to fulfilling the important role the Court appointed us to perform.

April 14, 2014

Michael R. Bromwich
External Compliance Monitor
The Bromwich Group LLC

Bernard A. Nigro Jr.
Maria R. Cirincione
Fried, Frank, Harris, Shriver &
Jacobson LLP

Sarah W. Carroll
Robbins, Russell, Englert, Orseck,
Untereiner & Sauber LLP

68