**NON-CONFIDENTIAL VERSION**

**Third Report of the External Compliance Monitor**

**United States v. Apple, Inc., et al., No. 1:12-CV-2826, and**

**The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394**

**Michael R. Bromwich**
**External Compliance Monitor**
**April 14, 2015**

NON-CONFIDENTIAL VERSION

## Executive Summary

This is the third semi-annual Report submitted pursuant to Section VI.C of the Final Judgment in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 (the "ebooks Litigation").

In the September 4, 2013 Final Judgment and Order Entering Permanent Injunction (the "Final Judgment"), this Court ordered the Monitor to submit reports every six months "setting forth his … assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."[1] The Monitor is required to evaluate whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[2]

The third reporting period, which ran from September 1, 2014 through the end of February 2015,[3] was marked by both progress and setbacks.  We made progress because we obtained important information necessary to fulfill our responsibilities under the Final Judgment, and we were able to confirm progress that Apple has made in developing and implementing its Program.  More specifically, we have now interviewed all the members of Apple's Board of Directors and all members of its Executive Team ("ET").  We met with Apple on a number of occasions and received materials from the company that are important to our assessments.

Our central task, as established by the Final Judgment, is to review and assess Apple's revised antitrust compliance policies, procedures, and training ("Antitrust Compliance Program" or "Program").  Our activities during this reporting period helped us to understand Apple's business and the antitrust risks associated with the company's activities, to extend our knowledge of Apple's Legal and Compliance functions, and to evaluate Apple's implementation of the recommendations we made in our October 14, 2014 report ("Second Report").

---

[1] Final Judgment § VI.C.

[2] *Id.*

[3] The period from September 1 through October 14 was devoted largely to the preparation of the Second Report.

NON-CONFIDENTIAL VERSION

Despite the progress we have made since October, we have also experienced significant setbacks. Apple's cooperation diminished substantially toward the end of the reporting period, and some of our longstanding requests for information remain in dispute. First, Apple objected on privilege grounds to providing important information related to its antitrust risk assessment, which we sought in order to facilitate our evaluation of the Program. Apple has also inappropriately attempted to limit the Monitor's activities by permitting us to monitor only a select set of live training sessions, which is both contrary to the Final Judgment and in contravention of the commitment it made last summer not to limit the sessions we could monitor. Moreover, toward the end of the third reporting period, Apple argued that certain requests for compliance-related documents and information were outside the scope of the monitorship because they did not relate solely and specifically to antitrust compliance. We explained that our requests were meant to fill information gaps for relevant parts of the Antitrust Compliance Program that were either incomplete or untested, but Apple has continued to press its objections even though the requests were limited and imposed minimal burdens on the company. Finally, at the end of the third reporting period, Apple's communications with us reverted to the more adversarial tone taken in the first few months of the monitorship, including attempts to prescribe and limit how the Monitor should conduct his reviews and write his reports. Numerous disputes relating to our requests for information and interviews, as well as our ability to monitor training, remain unresolved. We have conducted no interviews since January, and Apple has rejected our recent requests for interviews.

In spite of these significant difficulties, our assessment is that Apple has made progress in developing a Program that is comprehensive and effective, including implementing numerous recommendations we made in our previous reports that are designed to make important and significant improvements. At our request, Apple developed an Implementation Plan that described the actions it intended to take to fully implement those recommendations. In the Assessment and Recommendations section of this Report, we evaluate the status of Apple's progress in light of the criteria set forth in the Final Judgment. We also describe Apple's progress in implementing our recommendations, which are designed to assist Apple in satisfying those criteria. Finally, we identify components of the Program that we cannot fully evaluate, either because Apple has not yet completed its work or because it has not yet provided enough information.

*Risk Assessment*

In our Second Report, we recommended that Apple undertake a formal antitrust risk assessment as a central component of its Antitrust Compliance Program, and for the assessment to be "institutionalized, dynamic, and continuing."[4]  We also recommended that Apple develop a procedure for reporting the results of the risk assessment to the Risk Oversight Committee ("ROC") and Audit & Finance Committee ("AFC"), and provide a formal report regarding the risk assessment and its results for review and analysis by the ROC and AFC.

We agreed to hold in abeyance our request to receive the results of Apple's risk assessment with the understanding that Apple would provide information regarding the process followed for the assessment, evidence of how the risk assessment results were incorporated into the Program, and interviews of key stakeholders to whom the results of the assessment would be presented. Apple provided a memorandum ("Risk Assessment Memo") regarding its process.  According to the Risk Assessment Memo, Apple launched a process in response to our recommendation that included interviewing a number of legal and business personnel to assess antitrust risk in their lines of business. However, the Risk Assessment Memo did not discuss other important details, such as the rationale for the steps it took as part of the assessment and the reasons for selecting the Apple employees who were interviewed.  Most importantly, Apple has not yet informed us of any instance in which the risk assessment has resulted in modifications or enhancements to the Antitrust Compliance Program.

Consistent with the agreement we reached with Apple, we will be interviewing certain Board and Executive Team members who received the risk assessment presentation, which may significantly augment our knowledge of the risk assessment process.  However, at this point, we have insufficient information to fully evaluate Apple's risk assessment process.  Accordingly, we are recommending that Apple submit its risk assessment to the Court *ex parte* and *in camera*.

*Policies*

We recommended in the Second Report that Apple enhance the substantive content and dissemination of its Antitrust and Competition Law Policy ("Policy").  Specifically, we recommended that Apple expand the Policy to

---

[4] Second Report 83.

cover additional substantive issues, such as employee hiring agreements and interlocking directorates; include contact information for all members of the CLPG and the Antitrust Compliance Officer ("ACO"); require relevant employees to certify to having read and agreed with the Policy; and take additional action to ensure that the Policy is thoroughly disseminated, comprehended, and used.

Apple has implemented these recommendations. Apple expanded the substantive coverage of its Policy, added contact information for the CLPG and ACO, and agreed to further expand the Policy to additional issues identified by its antitrust risk assessment. Further, Apple added the Policy to the electronic tool that certain employees use to complete certifications required by the Final Judgment and has agreed to require certification regarding the Policy as part of the same process. Apple has also revised its online training to require employees who receive the training to read and certify compliance with the Policy. In addition, Apple added questions about the Policy to the employee interviews the ACO conducted as part of her Final Judgment-required audit, and the company has stated its intention to increase communications regarding the Policy.

We will continue to monitor the ongoing dissemination-related efforts Apple described in its Implementation Plan. In addition, we recommend in this Report that Apple adopt a process for periodically reviewing and updating the Policy to ensure that relevant antitrust risks are adequately addressed as changes occur in the legal and regulatory environment, in the industry, and in Apple's business practices.

*Procedures*

At the beginning of the monitorship, Apple had few formal antitrust compliance procedures in place. In our Second Report, we made a number of recommendations regarding the development and implementation of adequate procedures for the Antitrust Compliance Program. Among other things, these recommendations addressed the need to investigate potential antitrust violations; use incentives and disciplinary procedures to encourage compliance with the Program and antitrust compliance generally; take additional steps to gather feedback about various aspects of the Program, including training; conduct Program audits that extend beyond those prescribed by the Final Judgment; and improve the accuracy of Program records.

Apple implemented several of our recommendations. It created a set of procedures to detect, investigate, and report potential and actual antitrust violations ("Investigation Procedure"). Apple also created a set of procedures related to the company's participation in standard-setting activities. In addition,

Apple conducted interviews and distributed a survey to employees to collect feedback to improve the Antitrust Compliance Program and told us that it planned to develop a "feedback procedure to document the process and mechanisms for gaining feedback." Apple also developed a plan to enhance communications regarding the Program. In the absence of any actual antitrust complaints being communicated through the Helpline, and in order to test its efficacy, Apple submitted a fictitious antitrust-related allegation through the Helpline web reporting portal. Finally, Apple told us that it planned to initiate an electronic tracking system to record training attendance and was considering implementing a similar system to track employee feedback.

We did not, however, receive enough information from Apple to fully assess its efforts, and some of Apple's efforts to implement our recommendations remain incomplete or insufficient.

First, we have concluded that Apple's procedures to detect, investigate, and report antitrust allegations are vague in some places and confusing in others. In addition, we have no insight into the critical issue of how the Investigation Procedure will be applied in practice — the Procedure itself is new and untested, Apple did not provide us with information regarding past investigations of alleged antitrust or Final Judgment violations, and Apple has refused to provide information regarding its procedures for other types of compliance investigations, which we believe would shed light on how the newly-developed Investigation Procedure for alleged antitrust violations will be used in practice. We identified other deficiencies, including that the procedures lack sufficient guidance regarding the handling of allegations that are initially reported to managers, which constitute the bulk of allegations reported at Apple; fail to address potential conflicts of interest; and lack sufficient reporting and documentation guidance.

Second, Apple told us that the Business Conduct team would work with Human Resources to ensure that additional language regarding ethical behavior was highlighted in the company's annual review materials. To evaluate these modifications, we asked Apple to provide us with blank versions of its personnel evaluation forms to confirm that such forms specifically refer to ethics and compliance considerations. We also requested that Apple produce any policies, procedures, and standards used to determine employee discipline for substantiated violations of Apple's Business Conduct Policy or other ethics and compliance violations. Apple refused to provide any of this information, and otherwise provided no information regarding its efforts to work with Human Resources to revise the annual performance review materials.

<u>Third,</u> Apple has not provided any information regarding its efforts to undertake Antitrust Compliance Program audits.

In addition to those outstanding recommendations from the Second Report, and others discussed in the body of this Report, we make several additional recommendations for procedural improvements, including recommendations related to updating Apple's Program, modifying its Investigation Procedure, and improving its mechanisms for collecting feedback.

*Training*

When we issued the Second Report, we had recently monitored several live antitrust training sessions – two in person and others by video.  As a result of that monitoring, we made several recommendations to improve the substance and format of future live sessions.  Apple agreed to implement our training-related recommendations, including through revisions of its live training materials and the provision of training to additional employees.  Because we did not monitor any antitrust training sessions during this reporting period, we cannot evaluate most aspects of Apple's progress toward implementing our training-related recommendations or make further recommendations to improve Apple's training.  Apple conducted few sessions during this reporting period, and we either were not permitted to monitor those sessions or were told about them after they had occurred.

Apple did provide us with slide presentations from training sessions that took place after we issued our Second Report.  However, most of the presentations are quite similar, do not include much text, and contain substantial redactions.  This precluded us from meaningfully assessing whether the sessions were, as Apple has contended, tailored to the needs of particular groups of employees.

Apple's efforts during this reporting period do suggest that the company has made progress toward implementing our recommendation that it provide live antitrust training to additional employees who it determines might encounter antitrust risk in their lines of business.  Apple provided live antitrust training to relatively high-level employees in the company's finance and procurement groups.  Moreover, the training session it offered to a group of attorneys on procurement-related issues is a step toward satisfying the recommendation that Apple provide tailored antitrust training to its in-house attorneys.  Apple also told us that it intends to provide live training in the fourth reporting period to Business Conduct personnel, to employees who report directly to the company's Senior Vice-President of Worldwide Marketing, to additional Marketing employees, and to a broader group of in-house attorneys.

NON-CONFIDENTIAL VERSION

As we described in our Second Report, Apple provided training to its Board of Directors in August 2014; however, because we did not receive the video recording of that session at that time, we were unable to assess it until the current reporting period.  We found that the content of the Board training was of a high quality; it provided a thorough, high-level overview of a broad set of antitrust issues that appropriately matched the audience.  The Board session was interactive, and, in subsequent interviews, Board members reacted favorably to the training session, remarking on the high level of interaction with the trainer and the appropriateness of the subject matter coverage.

This Report recommends that Apple build on the strengths of last year's Board training sessions, as well as its ET training session.  Apple should expand the content of the antitrust training sessions to include a more comprehensive discussion of Board and executive oversight responsibilities with respect to antitrust compliance, including the critical role that directors and senior executives play in promoting a culture of compliance, and the need for Board members and senior executives to remain apprised of the risks the company faces.  We recommend that this material be covered during the live Board and ET sessions, rather than solely through written materials provided to training participants, as it was for the 2014 Board training.

In addition, we recommend additional live training for those responsible for handling potential antitrust concerns.  We recommend that Apple provide specialized training to managers who might be expected to receive antitrust compliance–related allegations from the employees they supervise.  We learned during this reporting period that employees report a significant majority of compliance allegations to their managers, rather than through the Helpline or other avenues.  We also recommend that Apple provide live antitrust training to the personnel who are responsible for fielding antitrust questions or allegations that are submitted through the Business Conduct Helpline.

*Senior Commitment to Compliance*

In the Second Report, we made a series of recommendations regarding ways in which the ET and senior and mid-level managers could improve Apple's compliance culture.  We had concluded that the ET, as a group, traditionally has had little direct involvement in compliance issues or oversight and that its members had made little effort to specifically emphasize the importance of compliance issues in their communications with Apple personnel.  We stated that the ET had an obligation to actively monitor the Program and to use their platform as senior executives to communicate about compliance generally, and antitrust compliance specifically.  We also concluded that the management

methods of senior and mid-level managers at Apple, which include frequent meetings and interactions with their direct reports, provide opportunities to foster a culture of antitrust compliance at high levels in the management chain. We described in the Second Report our expectation that senior and mid-level managers would accept the challenge of the company's General Counsel to "waterfall" information about the revised Antitrust Compliance Program to the rest of the company, and contribute to an increased sensitivity to antitrust issues within the company.

While certain senior managers have taken steps to provide further antitrust training to their personnel, Apple has not demonstrated that the overall behavior of senior managers has materially changed. Apart from a handful of examples of ET members requesting antitrust and Business Conduct training for their teams, we have no information on which to conclude generally that Apple's senior managers have made efforts to implement our recommendation. In particular, we are unaware of efforts by managers to better communicate information about their compliance-related expectations and the consequences associated with compliance or noncompliance. We hope to receive additional information from Apple regarding its efforts to strengthen its culture of antitrust compliance.

*Oversight*

In our First and Second Reports, we made recommendations relating to the three oversight bodies for the Antitrust Compliance Program: the ACO, the CLPG, and the AFC.

With respect to the ACO, our Second Report concluded that she had not assumed the type of role expected pursuant to the Final Judgment. We emphasized the need for the ACO to play a more independent role. Among other things, we stressed the need for her to have access to appropriate financial and human resources to carry out her obligations.

During this reporting period, we observed that the ACO has become increasingly involved in the types of activities we had initially envisioned for her role, although we still do not view her role as consistent with what the Final Judgment contemplated. For example, the ACO reports directly to Apple's Chief Compliance Officer, which may limit her ability or willingness to question potentially risky business decisions or decisions regarding the Program. We therefore recommend that the Chair of the AFC conduct her performance evaluations. Finally, we recommend that Apple consider making the AFC—rather than Apple management—responsible for setting the ACO's compensation.

With respect to the Board, our First and Second Reports emphasized the importance of Board oversight of the Antitrust Compliance Program, as made clear by the U.S. Sentencing Guidelines and other compliance and corporate governance authorities.  We highlighted the need for a strong and direct reporting relationship between the ACO and the AFC, the Board's designated committee for risk oversight.  We specifically underscored the importance of the ACO's reports to the AFC; support from the AFC; and relationship with the AFC Chair.  To strengthen this relationship, we recommended that the ACO and the Chair of the AFC participate in a monthly call or meeting regarding the ACO's work as well as the status of Apple's activities under the Final Judgment.  We further recommended that the AFC take a more active role with respect to the Program and that the AFC review the effectiveness of the ET's management of antitrust risk and its promotion of Apple's Program.

In response to our recommendations, Apple provided Program materials to the Board, including Apple's Statement of Compliance with the Final Judgment and a copy of the Monitor's Second Report.  Apple also stated its intention to provide the AFC with additional information, including its Investigation Procedure, and for the ACO to meet monthly with the AFC Chair.[5]  Apple has not yet confirmed whether the AFC will review the effectiveness of the ET's management of antitrust risk.

Board oversight has undeniably increased since the Second Report.  We are aware of increased communications between company personnel and the Board regarding the Antitrust Compliance Program during this reporting period.  In addition, the ACO's November 2014 written report to the Board was more robust and detailed than any of the previous reports she had provided.  Even so, we continue to lack critical information on which to base our assessment of the Board's engagement regarding, and active oversight of, the Program, including the Board's reaction to the company's antitrust risk assessment and other Program components that we believe should be provided to the Board.

\*      \*      \*

This Report shows the ways in which Apple has continued to develop and improve its Antitrust Compliance Program.  To be sure, Apple's Program is far

[5] According to Apple's response to a draft version of this Report, it has now provided to the AFC its Investigation Procedure, the Implementation Plan, the Risk Assessment Memo, and the updated Policy.  In addition, it has represented that the AFC Chair met with the ACO in January, February, and March.

NON-CONFIDENTIAL VERSION

more comprehensive than it was when the Final Judgment was issued, and Apple is to be commended for the progress it has made over the past eighteen months.  Nevertheless, significant gaps remain in Apple's Program, which it will have to work hard to complete during the next reporting period.  Our assessment of those efforts will be possible only if Apple provides us with the access and the information we need and cooperates with us more fully than it has over the last few months.

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.      Introduction ................................................................................................1

II.     Background of the Monitorship .................................................................2

III.    The Final Judgment .................................................................................3

        A.      Sections III and IV: Prohibited Conduct and Affirmative Obligations ..........4

        B.      Section V: Antitrust Compliance Officer ...........................................5

        C.      Section VI: External Compliance Monitor ..........................................6

IV.     First Reporting Period: September 2013 to March 2014 .............................8

        A.      Selection of the External Compliance Monitor ...................................8

        B.      The Beginning of the Monitorship: October and November 2013 ................8

        C.      Interviews and Challenges to the Monitorship: December 2013 to
                February 2014 ...............................................................................11

                1.      December Interviews .........................................................11

                2.      Subsequent Correspondence in December ...........................11

                3.      Apple's December 12, 2013 Motion to Stay ..........................12

                4.      Subsequent District Court Proceedings ................................13

                5.      Proceedings before the Second Circuit ................................14

        D.      Resumption of Monitoring Activities: February to March 2014 ................15

V.      Second Reporting Period: March to August 2014 ....................................16

        A.      Interviews and Meetings .................................................................16

                1.      Board of Directors ...........................................................16

                2.      ET ................................................................................17

                3.      Personnel in Content Businesses .......................................17

                4.      Compliance and Legal Personnel ......................................18

        B.      Documents ...................................................................................18

        C.      Issues .........................................................................................18

VI.     Third Reporting Period: September 2014 to February 2015 ......................20

        A.      Objectives ...................................................................................20

        B.      Interviews, Documents, and Meetings ...............................................21

|  |  | 1. | Interviews | 21 |
|  |  | 2. | Documents | 23 |
|  |  | 3. | Meetings | 24 |
|  | C. | | Challenges and Obstacles | 25 |
|  |  | 1. | Risk Assessment | 25 |
|  |  | 2. | 2015 Training Plan | 30 |
|  |  | 3. | Dispute Regarding the Scope of the Monitorship | 31 |
|  |  | 4. | Scheduling of Employee Interviews | 33 |
| VII. | | | Assessment and Recommendations | 34 |
|  | A. | | Context of the Assessment | 34 |
|  | B. | | Antitrust Risk Assessment | 36 |
|  |  | 1. | Recommendations from the First and Second Reports | 36 |
|  |  | 2. | Apple's Response to the Recommendations | 38 |
|  |  | 3. | Further Assessment and Recommendations | 45 |
|  | C. | | Apple's Antitrust Compliance Policies | 46 |
|  |  | 1. | Recommendations from the Second Report | 46 |
|  |  | 2. | Apple's Response to the Recommendations | 48 |
|  |  | 3. | Further Assessment and Recommendations | 50 |
|  | D. | | Apple's Antitrust Compliance Procedures | 50 |
|  |  | 1. | Establishing Adequate Procedures | 50 |
|  |  | 2. | Detection, Investigation, and Reporting of Violations | 51 |
|  |  | 3. | Development of Procedures for Particularly Risky Business Activities | 58 |
|  |  | 4. | Incentives and Disciplinary Procedures | 59 |
|  |  | 5. | Formal Feedback Procedures | 60 |
|  |  | 6. | Identification of Critical Employees | 63 |
|  |  | 7. | Review of Publisher Agreements | 64 |
|  |  | 8. | Audits | 65 |
|  |  | 9. | Communications Regarding the Antitrust Compliance Program | 67 |
|  |  | 10. | Business Conduct Helpline | 68 |
|  |  | 11. | Record-Keeping | 70 |

E.    Apple's Revised Antitrust Compliance Training Program ........................... 71

    1.   Overview ....................................................................................... 71

    2.   Recommendations from the Second Report ................................. 72

    3.   Apple's Response to the Recommendations ................................. 74

    4.   Further Assessment and Recommendations ................................. 76

F.    Senior Commitment to Compliance ................................................. 78

    1.   Recommendations from the Second Report ................................. 78

    2.   Apple's Response to the Recommendations ................................. 80

    3.   Further Assessment and Recommendations ................................. 81

G.    Oversight of the Antitrust Compliance Program ........................... 81

    1.   Role of the ACO ............................................................................ 81

    2.   Role of the CLPG .......................................................................... 85

    3.   Role of the Board .......................................................................... 86

VIII.    Conclusion ....................................................................................... 90

NON-CONFIDENTIAL VERSION

## I.    Introduction

The External Compliance Monitor ("Monitor") respectfully submits this third semi-annual Report pursuant to Section VI.C of the Final Judgment in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 (the "ebooks Litigation").

Section VI.C of the Final Judgment required the Monitor, within 180 days of appointment, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."  Section VI.C requires the Monitor to provide written reports at six-month intervals for the duration of the monitorship.  The initial report ("First Report") was filed with the Court on April 14, 2014.  The second semi-annual report ("Second Report") was filed with the Court on October 14, 2014.  This Third Report covers the period from September 1, 2014, through the end of February 2015.

Our First Report provided a detailed account of some of the obstacles and challenges we[6] faced at the outset of our work.  Those obstacles and challenges necessarily limited our assessment of Apple's antitrust compliance policies, procedures, and training.  During the reporting period covered by our Second Report, Apple provided us with sufficient access to personnel and materials that we could begin to discharge our central responsibilities under the Final Judgment.  In addition, during the second reporting period, on June 30, 2014, Apple took a number of significant steps to revise and enhance its antitrust compliance program.  These included disseminating a substantially revised antitrust policy, and requiring several thousand employees to take a new, online antitrust training course.  In addition, during the second reporting period, Apple conducted a number of live training sessions for various groups of employees within the company and held separate training sessions for members of its Executive Team ("ET") and Board of Directors.  Because of the significant amount of work Apple had done to revise and expand its antitrust policies, procedures, and training ("Antitrust Compliance Program" or "Program"), we were in a position to begin to provide a meaningful assessment of the Program and to make a number of recommendations for its improvement.

---

[6] Throughout this report, the use of pronouns such as "he," "we," and "our" refer in some instances to the Monitor individually and in other cases to the monitoring team.

NON-CONFIDENTIAL VERSION

During the period covered by this Report, we continued to make progress in conducting the work required by the Final Judgment, and Apple provided enough access to personnel and documents for us to move forward.  However, as described in this Report, Apple's cooperation diminished substantially towards the end of the reporting period, and its resistance to routine and reasonable requests increased.  Apple responded to many of our requests, but not without varying levels of resistance, and some requests remain in dispute.

Even without the full cooperation required by the Final Judgment, we were able to continue our work during the third reporting period, the focus of which was Apple's implementation of the recommendations we made in the First and Second Reports.  As of the end of January, we had finally interviewed all members of Apple's Board of Directors and ET.[7]  The information gathered from these interviews has enhanced our understanding of how antitrust compliance issues are handled at the highest levels of the company, an area about which the Court expressed concern.[8]

Although this Report will focus primarily on our activities over the past six months, we have prepared the Report so that it can stand on its own, without requiring frequent reference to our First and Second Reports.[9]  Accordingly, we have included brief sections on the background of the monitorship, the Final Judgment, and relevant events from the two previous reporting periods, although we cover these matters in far less detail here than in our First and Second Reports.

## II.    Background of the Monitorship

On July 10, 2013, after a three-week bench trial, this Court ruled that Apple had violated Section 1 of the Sherman Act.[10]  The Court concluded that Apple "facilitat[ed] and encourag[ed]" a "collective, illegal restraint of trade" by

---

[7]  We had originally requested these interviews in October 2013.

[8]  *See, e.g.,* 8/27/13 Tr. 17 (noting that the conduct underlying the ebooks Litigation "demonstrated a blatant and aggressive disregard for the requirements of the law," including among "Apple lawyers and its highest-level executives").

[9]  Apple has harshly criticized this approach, most recently in a March 20, 2015 email from Associate General Counsel Douglas Vetter.  That email and the subsequent exchange of emails with the Monitor are attached as Exhibit A (redacted from the non-confidential version of the Report).

[10]  15 U.S.C. § 1.

five major publishers when it simultaneously negotiated agency agreements to sell the publishers' ebooks through its iBooks Store in late 2009 and early 2010.[11]

The Court concluded that the plaintiffs—the United States Department of Justice ("DOJ") and thirty-three U.S. states and territories (the "Plaintiff States" and, collectively with DOJ, the "Plaintiffs")—were entitled to injunctive relief against Apple. After hearings in August 2013 on the contours of the injunction, the Court created the position of external compliance monitor. As the Court would later explain in a January 16, 2014 opinion, it decided a monitorship was necessary because

> Apple made little showing at or before the August 9 conference that it had taken to heart the seriousness of the price fixing conspiracy it orchestrated. Nor did Apple provide the Court with any evidence that it was seriously reforming its internal antitrust compliance policies to prevent a repeat of its violation. Apple's submissions failed to demonstrate that it took seriously the burden that its participation in the price fixing conspiracy imposed on consumers and on the resources of the federal and state governments that were compelled to bring Apple and the publishers into federal court to put an end to that harm.[12]

At a hearing on August 27, 2013, the Court explained that the monitor's responsibilities would include evaluating Apple's internal antitrust compliance policies, procedures, and training program.[13] The Court set the external compliance monitor's presumptive term at two years.[14] The Court held an additional proceeding on September 5, 2013, during which the terms of the injunction were finalized, and issued the Final Judgment later that day.

## III.    The Final Judgment

The Final Judgment prohibits Apple from engaging in certain types of conduct; requires Apple to take specified actions, including revising its antitrust

---

[11] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013). The five publishers, also defendants in the litigation, reached settlements with the Department of Justice and the plaintiff states before trial. *See id.* at 645. Apple appealed the District Court's finding of liability to the Second Circuit; that appeal is pending.

[12] *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 267 (S.D.N.Y. 2014).

[13] 8/27/13 Tr. 17-18.

[14] *Id.* at 17-18, 20.

compliance policies and training and hiring an internal Antitrust Compliance Officer; and defines the responsibilities of the Monitor.

    A.    Sections III and IV: Prohibited Conduct and Affirmative Obligations

Section III of the Final Judgment prohibits Apple from entering and maintaining certain types of agreements and from engaging in specified types of communications with ebook publishers.  Sections III.A through III.C bar Apple from "enforc[ing] any Retail Price MFN in any agreement with an E-book Publisher relating to the sale of E-books,"[15] from "enter[ing] into any agreement with an E-book Publisher relating to the sale of E-books that contains a Retail Price MFN," and from "enter[ing] into or maintain[ing] any agreement with a Publisher Defendant that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts or any other form of promotions to encourage consumers to purchase one or more E-books."

Section III.D of the Final Judgment prohibits Apple from retaliating against or punishing an ebook publisher "for refusing to enter into an agreement with Apple relating to the sale of E-books or for the terms on which the E-book Publisher sells E-books through any other E-book Retailer," as well as from threatening such retaliation or punishment or urging another party to engage in such retaliation or punishment.  Section III.E prohibits Apple from sharing information related to its negotiations and contractual agreements with one ebook publisher with any other ebook publisher.  Finally, Sections III.F and III.G prohibit Apple from "enter[ing] into or maintain[ing] any agreement" with an ebook publisher or retailer "where such agreement likely will increase, fix, or set the price" at which other ebook retailers can acquire or sell ebooks or affect other terms on which ebooks are sold.

The Final Judgment also imposes affirmative obligations on Apple.  Section IV.A requires Apple to modify or terminate its agreements with the publisher defendants as necessary to bring the agreements into compliance with the Final Judgment.  Section IV.B requires Apple to "apply the same terms and conditions to the sale or distribution of an E-book App through Apple's App Store as Apple applies to all other apps sold or distributed through Apple's App

---

[15] An "MFN" is a "most-favored nation" clause—a clause under which one party to a contract typically promises to treat the other party as favorably as it treats any other entity.  The Court found that, while the inclusion of an MFN clause in a contract is not necessarily unlawful, the MFN clauses incorporated in Apple's contracts with the publisher defendants were an important element of Apple's unlawful conduct in this case, as they were "the term that effectively forced the Publisher Defendants to eliminate retail price competition and place all of their retailers on the agency model."  *See Apple*, 952 F. Supp. 2d at 698-701.

Store."  Finally, Section IV.C provides that Apple must "furnish to the United States and the Representative Plaintiff States, within ten business days of receiving such information, any information that reasonably suggests to Apple that any E-book Publisher has impermissibly coordinated or is impermissibly coordinating the terms on which it supplies or offers its E-books to Apple or to any other Person."

B.      Section V: Antitrust Compliance Officer

Section V of the Final Judgment required Apple to appoint an internal Antitrust Compliance Officer ("ACO") to oversee the company's antitrust compliance efforts and the company's specific responsibilities under the Final Judgment.  Under Section V, Apple's Audit Committee was obligated, within thirty days of the effective date of the Final Judgment, to "designate a person not employed by Apple as of the Effective Date of the Final Judgment to serve as Antitrust Compliance Officer, who shall report to the Audit Committee or equivalent committee of Apple's Board of Directors and shall be responsible, on a full-time basis until the expiration of [the] Final Judgment, for supervising Apple's antitrust compliance efforts."

Section V requires the ACO to provide copies of the Final Judgment to certain Apple personnel and their successors ("Section V.A Personnel");[16] ensure that Section V.A Personnel, as well as "appropriate employees in [the] Apple iTunes and App Store business," receive "comprehensive and effective training annually" regarding the Final Judgment and the antitrust laws;[17] and obtain annual certifications that Section V.A Personnel have read and understand the Final Judgment and are not aware of unreported potential violations of the Final Judgment or the antitrust laws.[18]  "[I]n consultation with" the Monitor, the ACO is required to conduct an annual antitrust compliance audit covering all Section V.A Personnel.[19]

The ACO must inform Apple employees annually of their right to disclose to her, without fear of reprisal, information regarding potential violations of the Final Judgment and the antitrust laws.[20]  If she discovers or receives credible information concerning such a violation, the ACO must ensure that Apple terminates or modifies its conduct.  She must provide the Plaintiffs with

---

[16] Final Judgment §§ V.A-V.B.

[17] *Id.* § V.C.

[18] *Id.* § V.D.

[19] *Id.* § V.E.

[20] *Id.* § V.F.

information regarding the actual or potential violation and the subsequent corrective action.[21]

The ACO is also required to communicate certain information to the Plaintiffs: she must provide, on a quarterly basis, non-privileged communications containing allegations of noncompliance with the Final Judgment or antitrust violations,[22] as well as a log of communications between Section V.A Personnel and other specified persons outside of Apple.[23]  Finally, the ACO must provide the Plaintiffs annually with a written statement regarding Apple's compliance with Sections III, IV, and V of the Final Judgment.[24]

C.      Section VI: External Compliance Monitor

Section VI of the Final Judgment provides for the appointment of an External Compliance Monitor ("Monitor") for a presumptive two-year term.[25] The Monitor is required "to review and evaluate Apple's existing internal antitrust compliance policies and procedures and the training required by Section V.C . . . , and to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[26]

The specific duties of the Monitor are:

- To "conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his . . . appointment, are reasonably designed to detect and prevent violations of the antitrust laws."[27]

- To "conduct a review to assess whether Apple's training program, required by Section V.C of [the] Final Judgment, as it exists 90 days after his . . . appointment, is sufficiently comprehensive and effective."[28]

---

[21] *Id.* § V.G.

[22] *Id.* § V.H.

[23] *Id.* § V.I.

[24] *Id.* § V.J.

[25] The Court may extend the external compliance monitorship by one or more one-year periods, either *sua sponte* or on the application of any Plaintiff, "if necessary to ensure effective relief."  *Id.* § VI.A.

[26] *Id.* § VI.B.

[27] *Id.* § VI.C.

[28] *Id.*

- Within 180 days of appointment and at six-month intervals thereafter, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."  In addition, the Monitor may provide additional written reports if requested by the Plaintiffs and the Court, or on his own initiative.[29]

- To provide the Plaintiffs promptly with any evidence the Monitor "discovers or receives" that suggests "that Apple is violating or has violated [the] Final Judgment or the antitrust laws."[30]

Apple is required to "assist the External Compliance Monitor in performance" of his duties and to refrain from "interfer[ing] with" or "imped[ing]" the Monitor's work.[31]  The Final Judgment specifically authorizes the Monitor, "in connection with the exercise of his . . . responsibilities under . . . Section VI, and on reasonable notice to Apple," to:

- "[I]nterview, either informally or on the record, any Apple personnel, who may have counsel present; any such interview to be subject to the reasonable convenience of such personnel and without restraint or interference by Apple."[32]

- "[I]nspect and copy any documents in the possession, custody, or control of Apple."[33]

- "[R]equire Apple to provide compilations of documents, data, or other information, and to submit reports to the External Compliance Monitor containing such material, in such form as the External Compliance Monitor may reasonably direct."[34]

---

[29] *Id.* § VI.D.

[30] *Id.* § VI.F.

[31] *Id.* § VI.G.

[32] *Id.* § VI.G.1.

[33] *Id.* § VI.G.2.

[34] *Id.* § VI.G.3.

The Final Judgment provides a mechanism for the resolution of objections that Apple may have to the Monitor's activities: "[a]ny objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection."[35]  If the parties are unable to reach agreement, the Court will schedule a conference to resolve the dispute.[36]

## IV.   First Reporting Period: September 2013 to March 2014

This section of the Report provides a brief overview of our activities during the first reporting period, which lasted from the Monitor's appointment through early March 2014.  A more comprehensive account of our activities during this period appears in the First Report, at pages 11 to 41.

### A.   Selection of the External Compliance Monitor

On October 16, 2013, the Court issued an order ("October 16 Order") appointing Michael R. Bromwich as the Monitor in this case and providing that Bernard A. Nigro Jr. of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") would assist him.  The Monitor assembled a small team to assist in fulfillment of his obligations,[37] selecting Maria R. Cirincione of Fried Frank and Sarah W. Carroll of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell") as members of the monitoring team.  In June 2014, Lee Turner Friedman of Robbins Russell joined the team.

### B.   The Beginning of the Monitorship: October and November 2013

On October 22, 2013, after initial communications between Apple and the Monitor, members of the monitoring team met with Apple representatives in New York.  At the meeting, the Monitor described his approach to the monitoring assignment.  He explained that we planned to use the initial 90-day period under the Final Judgment[38] to gain important background information

---

[35] *Id.* § VI.H.

[36] *See, e.g., Apple,* 992 F. Supp. 2d at 277.  By Order dated February 19, 2014, the Court referred this matter to Magistrate Judge Michael H. Dolinger for resolution of any disputes that might arise, subject to appeal to the Court.

[37] *See* Final Judgment § VI.I ("The External Compliance Monitor may hire, subject to the approval of the United States, after consultation with the Representative Plaintiff States, any persons reasonably necessary to fulfilling the External Compliance Monitor's responsibilities.").

[38] Section VI.C of the Final Judgment requires the Monitor to evaluate Apple's antitrust compliance policies, procedures, and training as they exist 90 days after the Monitor's appointment, or on January 14, 2014.

that would be necessary to undertake a meaningful assessment.  He explained that we needed to understand Apple's reporting oversight structure for antitrust compliance; Apple's existing antitrust policies, procedures, and training; the ongoing processes to revise and update Apple's policies and procedures; and the roles of the Audit and Finance Committee ("AFC") and Risk Oversight Committee ("ROC") in compliance matters.  We asked Apple to provide us with documents relevant to those issues.[39]

We also asked to schedule some brief preliminary meetings or interviews with various Apple personnel that would be helpful to understanding Apple's businesses and structure.  Because the Court had specifically expressed concern with Apple's compliance at the highest levels of the company, the Monitor asked to schedule interviews with members of Apple's Board of Directors ("Board"), senior management, and senior personnel responsible for the iBooks Store, iTunes, and the App Store for the week of November 18, 2013.  Apple's representatives responded, in substance, that the proposed interviewees were busy and there remained "a lot of anger" regarding the ebooks Litigation.  Apple expressed concern about interviews of senior company personnel.  Apple also expressed concern when the Monitor mentioned his desire to observe antitrust compliance training in person.

In an October 31, 2013 letter, Apple's lawyers outlined the company's objections to the timing and scope of our proposed activities, asserting that we should not interview senior Apple employees or Board members until at least 90 days after the monitorship began (that is, after January 14, 2014).  The Monitor replied by letter the next day and enclosed a separate letter addressed to Tim Cook, Apple's Chief Executive Officer, and D. Bruce Sewell, Apple's General Counsel, in which he outlined his responsibilities and the principles to which the monitoring team would adhere.  In the Cook-Sewell letter, the Monitor expressed concern that Apple had provided none of the documents he had requested and had scheduled no interviews.  In a November 4 response, Mr. Sewell promised that, on some later date, he would provide a "comprehensive update on [Apple's] progress" and would "facilitate whatever meetings [were] appropriate for [the Monitor] to fully and completely discharge [his] responsibilities."  He explained, however, that the newly hired ACO would "dedicate the next two months to developing new training materials and redesigning [Apple's] compliance program," and that she needed to work "uninterrupted" during that period.

---

[39] As described below, we reiterated this October 22 request on numerous occasions.

Approximately a week later, Apple reluctantly offered to schedule interviews with two Apple employees—Tom Moyer, the company's Chief Compliance Officer; and Gene Levoff, Senior Director and Associate General Counsel.  On November 18, we conducted one-hour interviews with Mr. Moyer and Mr. Levoff, which provided helpful background about the company and its overall compliance and risk management systems.  However, our requests for additional interviews were either rejected or ignored.

On November 22, 2013, we sent a letter to Apple's Board of Directors because of Apple's overall lack of cooperation to that point.  In the month since we had assumed our responsibilities, Apple had scheduled only two interviews out of the many we had requested, and even those required significant negotiation with the company.  We thought it was important to promptly bring our concerns to the attention of Apple's oversight body.  The letter to the Board explained our responsibilities under the Final Judgment, described our disappointment at Apple's lack of cooperation, and concluded by expressing hope that our relationship with Apple would become more positive.  We never received any response from the Board or any of its members.[40]

On November 20, 2013, the Court issued an order ("November 20 Order"), pursuant to Federal Rule of Civil Procedure 53(b)(2), regarding a proposed amendment to the October 16 Order that appointed the Monitor.  The November 20 Order included a proposal that the Court receive periodic *ex parte* briefings from the Monitor.  On November 27, Apple objected to the November 20 Order, alleging that the monitoring team was "operating in an unfettered and inappropriate manner, outside the scope of the Final Judgment, admittedly based on secret communications with the Court, and trampling Apple's rights."  In addition, Apple objected to our requests to interview Board members and senior executives, most of whom Apple claimed were "not . . . relevant to [our] mandate"; our attempts to begin work before expiration of the 90-day period for revision of Apple's antitrust compliance policies and training; and our "personal financial interest [in conducting] as broad and lengthy an investigation as possible."

In response to Apple's November 27 filing, the Court issued an order on December 2, 2013 ("December 2 Order"), stating that neither the parties nor the Monitor had "informed the Court about the Monitor's fees, the work of the Monitor or of any problems associated with that work.  There has been no *ex*

---

[40]  In subsequent interviews, members of the Board advised us that the Board determined that the issues raised in the November 22 letter were "a management matter," rather than a Board matter, and that it was therefore unnecessary for the Board to respond.  We viewed management's lack of cooperation as an oversight matter within the purview of the Board.

*parte* communication between the Court and the Monitor or between the Court
and any of the parties about these issues."  The December 2 Order provided that,
because of Apple's objection, the Court would not receive *ex parte* briefings or
reports from the monitoring team, and that Apple must resolve its additional
objections to the monitorship in accordance with Section VI.H of the Final
Judgment.[41]

    C.     Interviews and Challenges to the Monitorship: December 2013 to
          February 2014

          1.     December Interviews

      In early December 2013, we interviewed nine Apple employees, including
the head of Apple's internal audit function, the head of its Competition Law and
Policy Group, and the Chair of the Apple Board's Audit and Finance Committee.
The December 2013 interviews provided information about each interviewee's
job responsibilities, some information about Apple's structure and business
operations, and preliminary information about Apple's compliance programs,
including the role of its Audit and Finance Committee, the Risk Oversight
Committee, and the company's Helpline.  Some of the interviews also helped us
to begin to understand Apple's general practices in negotiating contracts with
publishers.

      On December 10, 2013, we interviewed Apple's General Counsel, Mr.
Sewell, by telephone.  Among other matters, Mr. Sewell discussed the structure
of the legal and compliance departments at Apple, including comparisons to
other companies with which he is familiar; the evolution of Apple's antitrust
compliance functions during his time at the company; and his experience with
the ebooks Litigation.[42]

          2.     Subsequent Correspondence in December

      On December 17, Apple's outside counsel sent a letter to Plaintiffs,
addressing, among other things, the scope of our responsibilities and proposing

---

[41] Section VI.H of the Final Judgment provides that "[a]ny objections by Apple to actions
by the External Compliance Monitor in fulfillment of the External Compliance Monitor's
responsibilities must be conveyed in writing to the United States and the Representative Plaintiff
States within ten calendar days after the action giving rise to the objection."

[42]  As described below, we interviewed Mr. Sewell in January 2015.  Even though he
holds the central position in management dealing with compliance issues, Apple resisted
permitting the interview to last more than 45 minutes.  *See* Exhibit B (redacted from the non-
confidential version of the Report).

that we adhere to a monitoring plan prepared by Apple.[43]  Apple's proposal
would have put Apple in charge of determining whom we could interview and
which documents Apple would provide.  The proposal was antithetical to the
notion of an independent monitor.

>           3.      Apple's December 12, 2013 Motion to Stay

On December 12, 2013, Apple filed a Motion by Order to Show Cause for a
Stay of the Injunction Pending Appeal ("Motion to Stay").  Apple contended that
we were "conducting a roving investigation that is interfering with Apple's
business operations," as well as "risking the public disclosure of privileged and
confidential information" and "imposing substantial and rapidly escalating
costs" that Apple would be unable to recover if it prevailed on appeal.  Among
other things, Apple claimed that our "inappropriate demand for access to
Apple's senior leadership—including officers, directors, and employees who
have little or nothing to do with antitrust compliance or the iBooks Store—ha[d]
already inflicted significant and irreparable harm by interfering with Apple's
ability to manage its business."  Apple also contended that, in the absence of a
stay, it would suffer irreparable injury through the disclosure of privileged or
confidential information and through its payment of costs and expenses
associated with the monitorship.[44]

On December 30, 2013, the Plaintiffs filed their opposition to Apple's
Motion to Stay, arguing that Apple had shown neither a likelihood of success on
the merits nor irreparable harm.  Attached as an exhibit to the Plaintiffs' brief
was a seventeen-page declaration prepared by the Monitor, which provided the
Court with factual responses to the assertions in Apple's December 17 filing and
attached as exhibits a number of our communications with Apple.  On January 7,
2014, Apple filed a letter with the Court arguing that the Monitor should be

---

[43] The plan Apple proposed provided that "there [would] be no further interviews of
Apple employees or Board members by Mr. Bromwich prior to his review of Apple's revised
antitrust compliance policies, procedures, and training materials"; that after January 14, 2014,
Apple would provide us with certain materials required by the Final Judgment and we would, in
turn, provide Apple with recommendations regarding those materials; that Apple would make
"certain Apple executives and employees" available for interviews after January 14, 2014; and
that "Mr. Bromwich [would] not seek interviews with Apple's employees and Board members
who are not relevant to his mandate of assessing Apple's revised antitrust compliance policies
and procedures and Apple's antitrust training program."  Letter from Noreen Krall, Apple Inc.,
to Lawrence J. Buterman, Dep't of Justice & Eric Lipman, Office of the Tex. Attorney Gen. (Dec.
17, 2013).

[44] The December 17 filing contained numerous mischaracterizations and
misrepresentations.  *See* First Report 27-28.

disqualified because submission of the declaration allegedly showed impermissible bias against Apple.

### 4.    Subsequent District Court Proceedings

On January 13, 2014, this Court held a hearing on the parties' filings.  The Court expressed its disappointment at the acrimonious relationship between Apple and the monitoring team, noting that it had been unaware "that the monitor was making all these requests and Apple was doing its best to slow down the process if not stonewall the process."[45]  The Court described the 90 days prior to Apple's implementation of revised policies and training as

> the period when the monitor could be expected to want to get the documents he needs and conduct the interviews he needs so that he would be in a position, on the 90th day, to look at whatever Apple submitted to him as its revised, improved new procedures and training program and practices, so that he could efficiently and effectively, and hopefully in a way to Apple helpfully, comment on it and give Apple the benefit of his best advice and counsel so that Apple could have the kind of program put in place that's required by Article VI.[46]

The Court also emphasized that the Final Judgment, not Apple, controls the monitorship, and that the monitoring team must be able to gather enough information about the company to understand its structure and how it works:

> In terms of practices and policies and training programs, it's not one size fits all.  This is to be an effective program within Apple. [The Monitor] has to understand enough about Apple and its business and these practice[s], policies, and training programs in order to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training.  And looking at paragraph C, these policies and procedures, which are antitrust compliance policies and procedures, have to be reasonably

---

[45] 1/13/14 Tr. 41.

[46] Id. at 42.  In retrospect, Apple's arguments about the significance that should be attached to the 90 days provided for in the Final Judgment to allow Apple to revise its antitrust compliance policies, procedures, and training are somewhat ironic.  Although Apple did, as the Court suggested, submit some draft materials for the Monitor to review in late February, the revisions to Apple's antitrust policies, procedures, and training, including materials that the Monitor had not previously reviewed, were not completed until June 30, more than five months after the 90-day period expired.

designed to detect and prevent violations of the antitrust law, within Apple, within its business.  They have to be comprehensive and effective within Apple, within its business.[47]

The Court denied Apple's Motion to Stay and rejected its attempt to disqualify the Monitor, stating that it would file an opinion explaining further its reasoning and analysis.  The Court granted a 48-hour stay from the filing of that opinion to allow Apple to appeal to the Second Circuit.

On January 16, the Court issued its opinion on Apple's pending motions.  The Court explained its reasons for denying Apple's Motion to Stay, including that some of Apple's arguments had been waived or had become moot, that the dispute resolution mechanisms under the Final Judgment were sufficient to ensure that our activities did not exceed the bounds of the Final Judgment, and that Apple had made no showing that the Monitor should be disqualified or that Apple would suffer irreparable harm if the stay were denied.[48]  Although the Court denied Apple's Motion to Stay, the parties agreed that the Court would stay Section VI of the Final Judgment until January 21, 2014 to allow Apple to pursue its appeal to the Second Circuit.

5.      Proceedings before the Second Circuit

On January 21, 2014, the Second Circuit issued an order establishing a briefing schedule and granting the administrative stay Apple had requested until a panel resolved Apple's motion for a stay pending appeal.  On February 4, 2014, a three-judge motions panel heard argument on Apple's motion to stay the injunction pending appeal, and on February 10, 2014, the panel issued an order ("February 10 Order") denying the motion.  The February 10 Order explained that, as the parties had agreed at oral argument, the Final Judgment assigns the Monitor the task of "assess[ing] the appropriateness of the compliance programs adopted by Apple and the means used to communicate those programs to its personnel," including ensuring that "Apple's employees particularly, senior executives and board members are being instructed on what those compliance policies mean and how they work."

We had ceased all monitoring work during the pendency of the temporary stays granted by this Court and the Second Circuit.  As a practical matter, we were prevented from carrying out our responsibilities for two full months following the filing of the December 12 Motion to Stay.  With the issuance of the

---

[47] *Id.* at 45-46.

[48] *Apple*, 992 F. Supp. 2d at 266.

Second Circuit's February 10 Order, the administrative stay was lifted, and we resumed our monitoring activities.

> **D.  Resumption of Monitoring Activities: February to March 2014**

Our monitoring activities resumed promptly after the Second Circuit's ruling.  On March 4, 2014, we met with Doug Vetter, Apple's Vice President and Associate General Counsel; Kyle Andeer, Apple's Senior Director of Competition Law & Policy; Tom Moyer, Apple's Chief Compliance Officer; Deena Said, Apple's ACO; and Matt Reilly, one of Apple's outside attorneys from Simpson Thacher & Bartlett LLP ("Simpson Thacher") ("March 4 Meeting").  The purpose of the meeting was for Apple to share with us the progress it had made in revising its antitrust compliance policies, procedures, and training over the previous several months.

At the March 4 Meeting, Apple provided a summary of the steps it had taken to comply with the Final Judgment.  Much of the meeting focused on draft documents that Apple had prepared as part of its efforts to revise its antitrust compliance program.[49]  These included a revised Antitrust and Competition Law Policy, a revised antitrust section of Apple's Business Conduct Policy, and proposed revisions to Apple's Business Conduct Policy ebook.  Apple also showed us an online compliance training program addressed to corruption issues, which as a matter of style and aesthetic would serve as the model for the online antitrust training program still in development, as well as some proposed text of the online antitrust course.  Apple's representatives informed us that some of the policy and training documents were ready to be circulated to employees, but that they planned to introduce them simultaneously in June 2014, so that they could make a "big splash" that would catch employees' attention.[50]  Later in the meeting, Mr. Andeer provided us with abbreviated oral summaries of the two live training presentations he had made to employees since the issuance of the Final Judgment.[51]  The March 4 Meeting was the last substantive

---

[49] We had expected that we would be presented with completed versions of Apple's revised antitrust policies and procedures at the meeting, rather than incomplete drafts.  However, it became clear that at least one of the reasons the materials were still in draft form was to solicit our views—and consider making changes based on our comments—before distributing them to Apple employees.

[50] Apple did not explain at the time why it settled on the June 2014 date or which aspects of its program would delay its full implementation until that time.  Apple subsequently advised us that the timing was dictated by the desire to release all elements of the program at the same time rather than issue them piecemeal.

[51] The substance of these summaries was described at pages 40-41 of our First Report.

contact between Apple and the monitoring team before the preparation of the First Report, which we filed with the Court on April 14, 2014.

## V.    Second Reporting Period: March to August 2014

This section of the Report provides a brief overview of our activities during the second reporting period.  A more comprehensive account of our activities during that period appears at pages 22 to 39 of the Second Report.

We made significant progress during the second reporting period, which ran from the March 4 Meeting through the end of August 2014.[52]  We obtained far more information than during the initial reporting period, which aided us significantly in fulfilling our responsibilities under the Final Judgment.  Even so, we continued to deal with delays in our receipt of requested materials and with Apple's rejection of certain requests for information.[53]  Our primary objectives during the second reporting period were to develop a better understanding of Apple's business, to learn more about Apple's Legal and Compliance functions and their role within the company, and to review and assess the revised antitrust policies, procedures, and training that were introduced to Apple employees as part of the new Antitrust Compliance Program rollout on June 30, 2014 (the "June 30 Rollout").

### A.    Interviews and Meetings

Between March 2014 and August 2014, we interviewed thirty-six people affiliated with Apple, including one outgoing Board member (by telephone); seven of the ten members of Apple's ET, including CEO Tim Cook; ten employees who report directly to Eddy Cue in his Internet Software and Services group; and four members of Apple's Legal team, among others.

#### 1.    Board of Directors

On July 30, we conducted a telephone interview with William V. Campbell, who had resigned in mid-July from Apple's Board of Directors.  Mr. Campbell, who served on Apple's AFC from 2006 until his resignation, discussed his views on the compliance-related responsibilities of the AFC and provided us

---

[52] The period from the March 4 Meeting through April 14 was largely devoted to the preparation of the First Report.

[53] For example, in a set of interviews scheduled for June, Apple unilaterally determined that the interviews would be limited to one hour, even though previous substantive interviews had lasted significantly longer.  Though the interviews were eventually extended, the disruption could have been entirely avoided by prior consultations.  Apple also chose not to video-record certain training sessions without notifying us in advance of that decision.

with information regarding the types of oversight the Board exercises, his own interactions with Apple's compliance function, and his perception of Apple's response to the Final Judgment and other matters related to antitrust compliance.

### 2. ET

During the second reporting period, we interviewed seven of the ten members of Apple's ET, including Tim Cook, Apple's CEO, and Eddy Cue, Apple's Senior Vice President of Internet Software and Services.  As previously mentioned, we had interviewed an eighth member of the ET, Mr. Sewell, by telephone during the previous reporting period.

From the outset, we viewed the ET interviews as particularly important to the fulfillment of our mandate under the Final Judgment, given this Court's specific concerns regarding compliance among Apple's highest-level personnel.[54] The ET interviews enhanced our understanding of Apple's business, the antitrust risks the company faces, and the ways in which the company has responded to those risks.  The interviews provided overviews of specific areas of Apple's business, as well as helpful insight into the perspectives of ET members concerning compliance at Apple.[55]

### 3. Personnel in Content Businesses

During the second reporting period, we also interviewed several senior but non–ET employees whose work relates to Apple's content businesses.  We interviewed ten of Mr. Cue's direct reports, as well as a number of less senior employees within Mr. Cue's Internet Software and Services organization.[56]  Like the ET interviews, these interviews provided us with relevant and helpful information regarding Apple's business and the antitrust risks its activities might pose, which is critical to our ability to assess whether Apple's Antitrust Compliance Program is comprehensive and effective.  We learned the steps

---

[54] *See, e.g.*, 8/27/13 Tr. 17 (noting that the conduct underlying the ebooks Litigation "demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," including among "Apple lawyers and its highest-level executives").

[55] We interviewed the two remaining members of Apple's ET — Phil Schiller, Senior Vice President of Worldwide Marketing; and Jonathan Ive, Senior Vice President of Design — in the reporting period covered by this Third Report.

[56] Apple selected many of the personnel we interviewed in November 2013, December 2013, and April 2014 based on its assessment that speaking with them would help us understand the company's content businesses.  In April 2014, we also interviewed several people we had specifically requested.  Starting with the June 2014 interviews, we specifically requested interviews based on information we had obtained about the roles of various Apple personnel.

Apple had taken, both before and after issuance of the Final Judgment, to mitigate the antitrust risks associated with its content businesses. For example, we interviewed Mr. Cue's direct reports about their access to legal and compliance resources when confronted with situations they view as presenting potential compliance risks, the ways in which Apple lawyers are embedded in business units and assist in the day-to-day decision-making of non-attorney employees, and the availability and sufficiency of antitrust compliance training and other resources both before and after issuance of the Final Judgment.

4.    Compliance and Legal Personnel

In April, we interviewed Sean Dillon and Brendan McNamara, two of the three attorneys hired to join Mr. Andeer in Apple's Competition Law & Policy Group ("CLPG"). Those interviews improved our understanding of how the CLPG interacts with Apple's business personnel, the steps the CLPG has taken to assess and mitigate the antitrust risks Apple faces, and the CLPG's involvement in the revision of Apple's antitrust compliance program.

During the second reporting period, we also interviewed several compliance and legal personnel who are not members of the CLPG. The goal of these interviews was to learn how the relevant personnel work with Apple's businesses, as well as with Apple's antitrust specialists, and to learn more about the evolution of Apple's antitrust compliance program.

B.    Documents

In addition to our interviews with Apple personnel, we requested and received various Apple documents during the second reporting period. These were discussed at pages 28 to 30 of our Second Report.

C.    Issues

Although our Second Report noted the development of a more professional and productive relationship with Apple, the Report also described several difficulties that we had encountered. These included challenges to the scope and length of our First Report, which Magistrate Judge Michael Dolinger firmly rejected following a hearing on May 9, 2014;[57] challenges to our ability to

---

[57] *See* 5/9/14 Tr. 38-39 ("[T]o the extent that Apple is criticizing the monitor and saying it shouldn't have to pay for the time spent on at least part of the report, I find that objection to be utterly and completely groundless. The report is an appropriate document. It is necessary for the monitor to be able to set forth the context for the substance that he presents. And whatever went on procedurally and otherwise that led to, shall we say, at least some delays in the monitor being able to grapple with the substance of what Apple was proposing to do in compliance with

NON-CONFIDENTIAL VERSION

specify which Apple personnel we needed to interview, which Judge Dolinger also rejected, emphasizing in his ruling the discretion that is inherent in a monitorship such as this one;[58] and disputes about the extent to which we would be able to monitor antitrust compliance training sessions in person.[59] These issues are described in far more detail at pages 31 to 35 of our Second Report. As will be discussed later in this Report, the latter two issues have reemerged as significant obstacles to the discharge of our responsibilities.

In addition to these issues, our Second Report addressed Apple's refusal to allow us to monitor New Employee Orientation or to provide us with videotapes of companywide town hall meetings. Apple argued that neither New Employee Orientation nor town hall meetings contain antitrust-related information and that our attendance at the orientation sessions "would cause significant disruption to an important multi-day orientation."[60] These issues are discussed more fully at pages 36 to 37 of our Second Report. Apple's position on these matters has not changed. Finally, pages 37 to 39 of our Second Report discussed at length the issues surrounding our recommendation in the First Report that Apple conduct an antitrust risk assessment; those issues are also discussed in Section VII.B of this Report. The issues surrounding the risk assessment, and our access to it, were the subject of significant discussion and disagreement during the third reporting period and are discussed below.

---

the judgment, that has to be and is appropriately explained in the report. Apple's request insofar as it's premised on this objection, its request not to have to pay the full invoice is emphatically denied.").

[58] *See id.* at 40 ("It is apparent that the monitor must be able . . . to determine step by step what additional information he requires and how best to achieve and obtain that information."); *id.* at 41 ("[Although] the monitor has very specific tasks to perform and specific issues to deal with, he must be given some fairly broad discretion in deciding how to proceed.").

[59] Apple ultimately agreed in June 2014 to let us video-monitor the Board and ET training sessions in 2014 and to live-monitor those sessions in 2015. Apple further agreed that we could live-monitor any non-executive training sessions that we chose and that it would also video-record all of those sessions. Apple's response to a draft version of this Report asserts that it never made this commitment.

[60] The discussion regarding access to companywide town hall meetings continued until the Monitor requested a representation that none of the videotaped town hall meetings addressed either antitrust or compliance. On March 20, 2015, Apple represented that no videotaped town hall meetings since January 2010 covered either subject.

## VI. Third Reporting Period: September 2014 to February 2015

We continued to make progress during the third reporting period, which ran from September 1, 2014 through the end of February 2015,[61] and we obtained important additional information necessary to fulfill our responsibilities under the Final Judgment. Particularly toward the end of the reporting period, however, and as described in Section VI.C below, Apple rejected some of our requests for information and unilaterally deemed certain requests to be outside the scope of the monitorship. As a result, we still lack full information regarding some matters that we view as important to a thorough assessment of Apple's Antitrust Compliance Program.

### A. Objectives

Our primary objective during this reporting period was to review and assess Apple's revised Antitrust Compliance Program in light of the company's efforts since we issued the Second Report in October 2014. In fulfilling that purpose, we sought to achieve several additional goals.

First, we worked to enhance our understanding of Apple's business and the antitrust risks associated with the company's activities. As noted in our previous reports to the Court, we knew comparatively little about the structure and operation of Apple's business when we issued our First Report. Information about the aspects of a company's operations that create antitrust risks and vulnerabilities, however, is critical both to the development of a comprehensive and effective antitrust compliance program and to our evaluation of that program. Because Apple has been unwilling to provide the monitoring team with substantive information relating to the antitrust risk assessment it has been conducting, *see* Section VI.C.1, *infra*, we have been compelled to gather facts through interviews and documents to make our own judgments as to which risks Apple's Antitrust Compliance Program must address to be comprehensive and effective. For that reason, we continued to devote effort during the third reporting period to furthering our understanding of Apple's business.

Our second goal during this reporting period was to further our understanding of Apple's Legal and Compliance functions, including their role in equipping business personnel to address and mitigate antitrust risks, as well as the practices and procedures that are used to address compliance issues that arise in Apple's business. During the third reporting period, we interviewed additional members of the Legal and Compliance groups. We also gained

---

[61] The period from September 1 through October 14 was devoted largely to the preparation of the Second Report.

additional information from Apple business personnel regarding their contacts and communications with Apple lawyers and compliance personnel.

Third, we focused during this reporting period on evaluating Apple's implementation of the recommendations we made in the Second Report. Since our knowledge of the company was very limited when we filed the First Report, the Second Report was our first meaningful opportunity to make substantive recommendations regarding the company's Antitrust Compliance Program. We had a number of discussions with Apple representatives—particularly the company's ACO and its outside counsel—regarding the concrete steps the company has taken – and is taking – to address the recommendations we made in the Second Report. Implementation of the recommendations remains ongoing, and we expect our monitoring of that implementation to occupy much of our time during the fourth reporting period, as it did during the third reporting period.

B.       Interviews, Documents, and Meetings

1.       Interviews

Between September 2014 and February 2015, we interviewed thirty-two people affiliated with Apple, including seven Board members and three members of the ET. These interviews took place during three trips to Apple's California headquarters (October 21-22, December 2-3, and January 27-28), as well as two trips to New York (October 31 and December 18) and one trip to Los Angeles (December 15) for the specific purpose of interviewing Board members.

(a)       Board of Directors

As stated above, we interviewed seven members of Apple's Board during this reporting period; we have now interviewed the full Board. We conducted 90-minute interviews with Al Gore, Andrea Jung, and Millard Drexler in October; with Ronald Sugar, Robert Iger, and Susan Wagner in December; and with Board Chair Arthur Levinson in January. These interviews were productive, providing us with important information regarding Board oversight of Apple's Antitrust Compliance Program. While the Second Report noted that we had very little information regarding Board oversight, the interviews we conducted during this reporting period have put us in a much better position to assess the Board's role in overseeing Apple's Antitrust Compliance Program.

(b)       ET

We also interviewed the two members of Apple's ET with whom we had not met during the second reporting period—Phil Schiller, Apple's Senior Vice

President of Worldwide Marketing; and Jonathan Ive, Apple's Senior Vice President of Design. These two interviews were useful, helping to complete our high-level understanding of the areas of Apple's business, and executive involvement in antitrust compliance matters. In January, we also conducted a productive second interview with Mr. Sewell, Apple's General Counsel and the member of the ET to whom the compliance function reports.

(c)     Business Personnel

During this reporting period, we also interviewed a number of business people whose activities we preliminarily determined could well create antitrust risk. In earlier reporting periods, we had focused our interviews of business people on personnel in the Internet Services and Software group, since that was the primary group that was involved in the conduct underlying the ebooks Litigation. During this reporting period, we extended our interviews to personnel in other groups that might encounter antitrust issues, including members of Apple's Operations, Marketing, and Engineering teams. As in the second reporting period, we interviewed these employees about the contours of their business, the nature of their communications with third parties, and their knowledge of Apple resources available to educate and assist employees with antitrust issues. On multiple occasions, we requested that Apple inform us if it had reason to believe that any of the personnel on our list were unlikely to provide relevant information.[62]

(d)     Compliance and Legal Personnel

During the third reporting period, we also interviewed several Apple lawyers and compliance personnel. Business personnel had identified the lawyers we interviewed as those whom they consulted most frequently regarding business activities and potential antitrust issues. In addition, in January, we interviewed the lawyer who oversees Apple's participation in standard-setting organizations ("SSOs").[63]

---

[62] Except for Apple's February 2015 blanket objection to conducting further interviews of business personnel, Apple notified us on one occasion regarding an employee who was unlikely to provide helpful information. On this occasion, Apple notified us minutes before the interview was scheduled to begin, and we modified the interview in response to Apple's notification.

[63] SSOs are organizations made up of industry participants and are one source of industry standards. Activities associated with standard-setting and SSO participation have been known to raise antitrust risk. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988) (reinstating the lower court's jury verdict for the plaintiffs, which found the actions of standard-setting association members in violation of the antitrust laws); *Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679 (1978) (holding the association's Code of Ethics, which prohibited competitive bidding, to be illegal); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S.

22

On the compliance side, we interviewed Chris Keller, Apple's Vice President of Internal Audit and an important participant in Apple's Enterprise Risk Management program. We also met for the first time with Joe Santosuosso, Apple's Director of Business Conduct and Global Compliance.

2.    Documents

In addition to our interviews with Apple personnel, we requested and received various Apple documents during the reporting period. Perhaps most importantly, on December 31, at our request, Apple sent the monitoring team and the Plaintiffs a spreadsheet setting forth its plan for implementing each of the recommendations in the Second Report to which it had not objected ("Implementation Plan"). Apple agreed to implement nearly all of the recommendations we made in the Second Report. The Implementation Plan listed each recommendation from the Second Report; summarized Apple's responses or objections to each recommendation, if any; and outlined Apple's plan for implementing the recommendations to which it had not objected. It did not include information about when Apple expected to implement each recommendation, and some descriptions of Apple's plans for implementation were vague. Although Apple has provided us with some information regarding actions it has taken in accordance with its Implementation Plan, many of the specific actions listed on the Implementation Plan have not yet been taken or are incomplete. The Implementation Plan frames our assessment in Section VII, *infra*, of the current state of Apple's Antitrust Compliance Program, and we anticipate that, to a significant extent, the Implementation Plan will guide our activities during the fourth reporting period.

Apple provided us with a number of additional documents during this reporting period. When we met with Apple representatives on January 14, 2015, they provided us with a list of the employee groups anticipated to receive antitrust training in 2015, a three-page document setting forth Apple's proposed procedures for detecting and investigating potential antitrust and Final Judgment violations, and documentation associated with the audit that Apple's ACO conducted as required by Section V.E of the Final Judgment.[64]

---

656 (1961) (holding a cause of action existed under Sections 1 and 2 of the Sherman Act based on association members' agreement not to provide gas to customers using products not certified by the association).

[64] As noted in the Second Report, Ms. Said presented us in July 2014 with a proposal for the audit, on which we provided comments. *See* Second Report 104-05. Our assessment of Ms. Said's auditing procedures is set forth in Section VII.D.8, *infra*.

Among the other documents Apple produced during this reporting period were the slides associated with the antitrust training that was provided to the Board in late August, as well as other training sessions that occurred during this reporting period; revised versions of some antitrust compliance materials; documentation associated with presentations to Apple's Board regarding the Antitrust Compliance Program; and a memorandum outlining Apple's procedure for conducting an antitrust risk assessment.

In late January, as the end of the third reporting period approached, we made a number of follow-up document requests.  Apple produced documents in response to those requests on a rolling basis, completing its production on February 27.  As explained in more detail below, Apple declined to produce documents in response to several requests, based on claims of privilege and assertions that the requests exceeded the scope of the monitorship.

      3.      Meetings

We had a number of meetings with Apple personnel during this reporting period.  We met with Ms. Said a number of times, primarily regarding Apple's implementation of the recommendations we made in the First and Second Reports.  We also met with Mr. Andeer, Mr. McNamara, and Ms. Said in October to discuss the status of Apple's antitrust risk assessment.[65]

On January 14, we met with Ms. Said, Mr. Andeer, Mr. McNamara, and Mr. Reilly at Simpson Thacher's Washington, D.C., office ("January 14 Meeting"). We expected that this meeting would include a substantial affirmative presentation by Apple regarding the status of its efforts to enhance the Antitrust Compliance Program, similar to the March 4 Meeting.  We found the January 14 Meeting to be less useful than the March 4 Meeting had been—Apple seemed less prepared to provide us with an in-depth, substantive overview of the status and future of the Antitrust Compliance Program.

At the January 14 Meeting, Ms. Said provided us with an overview of several documents she had prepared, including a procedure for investigating potential antitrust violations (discussed in Section VII.D.2)[66] and two memoranda regarding her Section V.E Audit (discussed in Section VII.D.8)[67].  We also had a

---

[65] *See* Section VI.C.1, *infra*.

[66] Exhibit C (redacted from the non-confidential version of the Report).

[67] Exhibit D (redacted from the non-confidential version of the Report).

preliminary discussion regarding Apple's live antitrust training plan for 2015, which is discussed in more depth below, and Ms. Said provided a partial overview of Apple's Implementation Plan.[68]

### C.    Challenges and Obstacles

Our relationship with Apple remained workable through the end of January, and was certainly more productive than it was during the first few months of the monitorship.  Nonetheless, the company raised several challenges and obstacles that warrant brief discussion, and those difficulties increased significantly at the end of the reporting period.

#### 1.    Risk Assessment

As explained in the Second Report, one of our central recommendations has been that Apple undertake a formal risk assessment to identify antitrust-related risks the company faces.  For example, we explained in the First Report,

> An antitrust risk assessment is a fundamental component of any antitrust compliance program, and a systematic assessment of the risks that arise from Apple's businesses, the activities of its employees, and its third-party interactions will help ensure that its Antitrust Compliance Program makes sense for Apple.  We believe that such an assessment is a key component in making Apple's Antitrust Compliance Program comprehensive and effective. . . . [I]f current and geographically relevant risk assessments do not exist, Apple should conduct an antitrust risk assessment to identify the specific needs that the company should be addressing through its Antitrust Compliance Program.[69]

Apple did not object to the recommendation in the First Report, but we received little information about whether and how Apple was implementing it until the very end of the second reporting period.  When we requested documents in July 2014 relating to "[a]ny antitrust risk assessments prepared since March 2014," Simpson Thacher told us that, *if* a written risk assessment existed—and Simpson Thacher did not tell us whether one did, in fact, exist—Apple would be concerned about waiving privilege by producing it to us.

---

[68] Exhibit E (redacted from the non-confidential version of the Report).  Because of Apple scheduling conflicts, we were not able to complete the discussion of the Implementation Plan at the January 14 Meeting; we therefore continued the discussion with Ms. Said by telephone a few days later.

[69] First Report 45-47.

In late August 2014 meetings and correspondence with Mr. Vetter, Mr. Andeer, and Ms. Said, Apple provided some preliminary information regarding its efforts to evaluate antitrust risk within the company.  We were told that the CLPG was engaged in ongoing discussions and "white-boarding" of antitrust risk, including weekly meetings devoted solely to discussing antitrust risks Apple faces; we were advised that the CLPG began to hold these meetings shortly after issuance of the First Report.  In our August 2014 conversations with Apple, the company continued to emphasize its privilege concerns associated with sharing risk assessment–related information with the Monitor.  Mr. Vetter also asserted that it was unnecessary to reduce the CLPG's findings to writing, since those findings are consistently shared across a broad group of legal and compliance personnel, although he did not explain how or how often.

In the Second Report, we again emphasized the importance of Apple's conducting a comprehensive and formal antitrust risk assessment.  We explained that the representations Apple made at the end of the second reporting period suggested that the company had taken several positive steps toward implementing a risk assessment process, but we noted that, when we issued the Second Report, we "lack[ed] clarity on the process by which results of any risk assessment efforts [would] be incorporated in Apple's Antitrust Compliance Program."[70]  We therefore recommended that Apple develop "a formal process for identifying, ranking, and connecting . . . risks to the Program, especially with respect to new risks that develop as Apple's business and relevant markets evolve."[71]  We also recommended that Apple explicitly assign ownership of the antitrust risk assessment process within the company and that the risk assessment "result in a formal report that is reviewed and analyzed by the Risk Oversight Committee and the Audit and Finance Committee."[72]  Finally, we observed that Apple's privilege and work product concerns had thus far hampered our ability to confirm that Apple had in place a sufficient risk assessment process, but we expressed confidence that the company would be able to provide us with adequate detail to evaluate the process without revealing privileged information.[73]

During the third reporting period, after making these recommendations, we worked to obtain additional information about Apple's processes for

---

[70] Second Report 82.

[71] *Id.*

[72] *Id.* at 83.

[73] *Id.* at 84.

assessing antitrust risk.  On October 22 we met with Mr. Andeer, Mr. McNamara, Ms. Said, and Mr. Vetter to discuss the status of Apple's efforts to assess antitrust risk ("October 22 Meeting").  Mr. Andeer began by providing an overview of the efforts he made when he arrived at Apple in late 2010 to understand the antitrust risks the company faced.  He explained that, shortly after joining the company, he had met with Apple lawyers and business people, as well as the company's outside counsel, to discuss Apple's past and pending antitrust matters, and had reviewed documents associated with active and past antitrust litigation in which the company had been involved.  Mr. Andeer said that, in conjunction with Apple's broader enterprise risk management ("ERM") function, he had also identified particular antitrust issues that might present risk for the company and opined on how they fit into Apple's ERM framework.  After Mr. Dillon and Mr. McNamara joined the CLPG in 2011 and 2014, respectively, Mr. Andeer explained, the group regularly discussed the antitrust risks Apple faced.  He said the members of the CLPG "white-boarded" their thoughts regarding antitrust risk, although they did not memorialize them in any permanent form.[74]

Later in the October 22 Meeting, Mr. McNamara provided an overview of Apple's efforts to assess antitrust risk in response to our recommendations.  He said that, around June 2014, Mr. Andeer had asked him to spearhead the risk assessment, working alongside Ms. Said.  He explained that he and Ms. Said had chosen business units on which to focus and then interviewed in-house lawyers who support those business units; at the time of the October 22 Meeting, Mr. McNamara reported that he and Ms. Said had recently completed interviewing the lawyers they had identified and had just begun interviewing business people in the relevant business units.  Mr. McNamara stated that he had developed a questionnaire to assist him in conducting the interviews.[75]  Mr. Andeer and Mr. McNamara said that, after the interviews were finished, the CLPG expected to present the results of the risk assessment to relevant "stakeholders," likely including Apple's ET, ROC, and AFC.

At the end of the October 22 Meeting, Apple reiterated that it was unwilling to share the substance of the antitrust risk assessment with the Monitor, either orally or in writing, based on concerns that disclosure might

---

[74] Although Apple has contended, during the October 22 Meeting and elsewhere, that the work of the CLPG has been an extended series of risk assessments, we have concluded that the only systematic antitrust risk assessment took place after the recommendation contained in our First Report.

[75] Apple provided the monitoring team with a sample questionnaire (on a non-waiver basis), which was tailored to iTunes, the iBooks Store, and the App Store, in August 2014.  As discussed below, Apple has been unwilling to give us additional questionnaires.

waive its attorney-client privilege. The Monitor offered various ways in which he could obtain some information regarding the risk assessment while accommodating Apple's concerns, but Apple said it was not willing to provide any information about the substance of its assessment, regardless of any accommodation the Monitor might make.

On November 13, Apple transmitted its objections to the recommendations set forth in the Second Report, a substantial number of which turned on Apple's unwillingness to memorialize its antitrust risk assessment in writing or to provide the Monitor with any information about the findings of the risk assessment. On November 25, the Monitor met with Mr. Reilly and Ms. Razi of Simpson Thacher to discuss Apple's objections to the recommendations from the Second Report; Ms. Said participated by telephone. At that meeting, Simpson Thacher explained that Apple was willing to document its risk assessment *procedures* but would not reduce to writing the risk assessment itself. Mr. Reilly said that, due to privilege concerns, Apple would not be willing to provide the monitoring team with the same oral risk assessment report that it would provide to the ET, AFC, and Board. Apple again rejected the Monitor's suggestions regarding potential means of accommodating the company's privilege concerns while giving the monitoring team meaningful information about the results of the risk assessment. Mr. Reilly asked whether the Monitor might, instead, be satisfied with a detailed description of the process Apple had followed. The Monitor expressed willingness to consider that option and asked Apple to send him a proposal setting forth the type of information it would provide regarding its risk assessment procedure.

On December 22, Ms. Razi sent the Monitor an email setting forth Apple's position regarding the risk assessment recommendation. Apple asserted that the Second Report had required only a "formal" risk assessment, not a written risk assessment, and stated that, in any event, Apple would not create a written record of its risk assessment or provide written documentation to the Board, the Monitor, or any other audience. Ms. Razi wrote that this position was "both consistent with best practice and necessary to protect indisputably attorney-client privileged and work product materials." She also provided a short summary of the information we had previously received from Mr. Andeer and others regarding the CLPG's informal efforts to evaluate antitrust risk. Finally, she wrote that Mr. McNamara and Ms. Said remained engaged in their risk-assessment effort; that Apple would share the results of that assessment with the ET, the AFC, and the ERM Committee in March 2015; and that, when that process reached its conclusion, Apple would "provide the ECM with a written description of the process that Mr. McNamara and Ms. Said undertook to conduct this risk assessment, whom they met with, and the individuals/groups that were informed of the risk assessment's results."

On December 24, the Monitor responded to Ms. Razi by email, stating that Apple's written proposal had been disappointing and inadequate, offering nothing beyond what Apple had previously committed to provide.  After receiving the Monitor's email, Apple contacted the Plaintiffs, asking to meet and confer regarding the disputed issues.

On December 30, members of the monitoring team spoke with Ms. Razi by telephone regarding Apple's risk assessment–related objections.  Ms. Razi emphasized that Apple had agreed to conduct what she characterized as a "formal" antitrust risk assessment but objected to the Monitor's recommendations that the assessment be memorialized in writing and be disclosed to the monitoring team.  The Monitor reiterated that Apple's December 22 proposal regarding the information it was willing to share was insufficient.  He explained that, if Apple was not willing to disclose the substance of the risk assessment, he would need to understand what factors went into the substantive analysis and what changes were made as a result of the analysis.  The Monitor explained that, to accomplish that task, he would need to do several things, including interview people who had received the results of the assessment, with the understanding that privilege concerns would prevent inquiry into specific details, and would need to see the ways in which Apple changed its antitrust policies, procedures, and trainings in response to the findings of the risk assessment.  Ms. Razi said that suggestion was acceptable and represented a very helpful accommodation of Apple's concerns.

On January 2, Ms. Razi sent an email confirming that agreement and expressing Apple's continued objection to memorializing its risk assessment in writing even for Apple's internal stakeholders; she also communicated that objection to the Plaintiffs.  On January 7, the Monitor sent the Plaintiffs a letter explaining the agreement he had reached with Ms. Razi and stating that he would hold in abeyance the recommendation that Apple reduce to writing the results of its antitrust risk assessment, notwithstanding his continuing belief that Apple's objection on that point was ill-founded.

Despite this basic agreement, there continued to be disputes as to the information Apple would provide to the Monitor regarding its new, more formal risk assessment.  In particular, at the January 14 Meeting, the Monitor asked whether Apple would be willing to provide the monitoring team with the questionnaires that Mr. McNamara and Ms. Said had used in conducting their risk assessment.  As noted above, in August 2014, Apple had given us a single questionnaire, tailored to the iTunes, iBooks Store, and App Store business units,

but had represented that similar questionnaires also existed for other areas of Apple's business.[76]  In response to the Monitor's request at the January 14 Meeting, Apple stated that the single questionnaire Apple had provided would give the Monitor a sufficient sense of the form and substance of the additional questionnaires, and that the questionnaires were nondisclosable attorney work product.  Mr. Andeer stated that he was not willing to provide the monitoring team with any information in addition to that which Apple had already agreed to produce—that is, information regarding the process followed, personnel interviewed, and groups to which the results were transmitted.

On January 20, the monitoring team sent Apple an email requesting various documents, including "[r]isk assessment questionnaires with redactions for material asserted to be attorney-client privileged."  Two days later, Simpson Thacher responded to the document request, asserting that, with respect to the request for questionnaires, Apple would maintain its privilege objection. Simpson Thacher reiterated that position on February 27, when it made its final document production of the third reporting period.  This issue remains unresolved.

>    2.    2015 Training Plan

At the January 14 Meeting, Apple provided its preliminary live antitrust training plan for 2015.  Although it did not include the dates of the training sessions, the training plan listed the various groups to which Apple intended to provide antitrust training and identified, for each group, the type of monitoring Apple intended to permit—"Live," "Recording," or "None."  In total, the plan designated four sessions for live monitoring (the antitrust training provided to the Board, the ET,[77] Marketing employees, and iBooks Store employees), two sessions for video monitoring (the antitrust training provided to App Store and iTunes Content employees), and three sessions for no monitoring whatsoever (the antitrust training provided to Apple lawyers and two additional sessions for iTunes Content employees).

We discussed the training plan during the January 14 Meeting.  Mr. Andeer explained that, to promote interaction between the trainer and the personnel attending the session, Apple hoped to train employees in smaller groups and in less formal settings during 2015 than it had in 2014, and he

---

[76] In response to our draft report, Apple notes that it provided us with the one questionnaire explicitly on a non-waiver basis.

[77] Mr. Sewell had agreed to the live monitoring of the 2015 Board and ET training sessions in a meeting with the Monitor in June 2014.

asserted that the Monitor's presence had a "chilling effect" on participation in the sessions. The Monitor responded that he would be happy to discuss ways to facilitate the monitoring of training while decreasing the "chilling effect" that Mr. Andeer claimed. He also noted that, as discussed in the Second Report, Apple had promised in June 2014 to video-record all of its live training sessions and to permit live monitoring of any sessions the Monitor chose.[78] Ms. Said responded that she understood that point but hoped that the monitoring team might be willing to adjust the agreement to accommodate Apple's concerns associated with the monitoring of training. The Monitor responded that he wanted Apple to abide by the commitment it had made in June 2014, to video-record all training sessions and permit the live monitoring of whichever sessions he chose (which he assured Apple would be a small minority of the sessions the company conducted).

On February 27, Apple sent the monitoring team an updated version of the 2015 training plan. Although this version included training dates and the names of the groups to be trained, it did not represent a change from Apple's proposal on the monitoring of training. It designated the same four sessions for live monitoring, the same two sessions for video monitoring, and seven other sessions for no monitoring whatsoever. Apple's proposal represents an inappropriate attempt by the company to limit the Monitor's activities[79] and is contrary to the commitment Apple made to the Monitor in June 2014. As of the filing of this Report, this issue remains unresolved.[80]

### 3.    Dispute Regarding the Scope of the Monitorship

Toward the end of the third reporting period, Apple objected that certain requests for compliance-related documents and information were outside the

---

[78] *See* Second Report 35.

[79] *See* 1/13/14 Hr'g Tr. 47-48 ("Apple is not in a position to define for the monitor the scope of the monitor's duties or how the monitor carries out those duties."). In spite of the Court's clear direction on such issues, Apple continues to try to assert control over how the Monitor discharges his obligations, *see* Exhibit A (redacted from the non-confidential version of the Report), and even how it conducts its interviews, *see* Exhibit B (redacted from the non-confidential version of the Report). Senior management has explicitly endorsed these positions. *See* Exhibit F (redacted from the non-confidential version of the Report).

[80] According to the training plan, Mr. Andeer led live training sessions on February 16, March 4, and March 18 (for "hardware/procurement lawyers," "Business Conduct," and "Phil Schiller's direct reports," respectively). We were not aware until February 27, after the first session had taken place, that Apple had scheduled these sessions, although Apple would not have permitted us to monitor these sessions—short of Court intervention—even if we had known.

scope of the monitorship because they did not relate solely and specifically to antitrust compliance.  Apple made these objections even though we explained that our requests were meant to fill information gaps for relevant parts of the Antitrust Compliance Program that were either incomplete or untested.[81]

The first request was for information about compliance-related incentives and discipline at Apple.  As discussed in more substance in Section VII.D.4, *infra*, we recommended in the Second Report that Apple improve its communication to employees of the rewards and discipline they might encounter for compliant and noncompliant behavior.[82]  When we issued the Second Report, we had relatively limited information regarding that subject, and, during this reporting period, we attempted to learn more about the specific ways in which employees' personnel evaluations, compensation, and advancement would reflect compliance-related considerations.  Multiple interviewees told us that Apple had a standard form for personnel evaluations, which arguably left room for managers to make compliance-related assessments, but the details were vague and interviewees gave us conflicting explanations.

For that reason, on January 20, we sent Apple a list of document requests, including a request for current materials or guidance used during personnel evaluations.[83]  Simpson Thacher responded by email on January 22, informing us that Apple objected to the request as "outside the scope (*i.e.*, it is a general compliance issue not related to antitrust specifically)" but that Apple would be willing to discuss the issue further.  On February 27, Simpson Thacher reiterated that Apple was not willing to provide the documents we had requested.  Simpson Thacher stated on March 3 that Apple's antitrust and Business Conduct policies included information about potential disciplinary procedures and that Apple did "not intend to provide non-antitrust-related information."

---

[81]  Apple's views on the scope of the monitorship, and its attempt to threaten the withholding of fees when it disapproves of the monitoring team's activities and the substance of its reports, is reflected in the email attached as Exhibit A (redacted from the non-confidential version of the Report).

[82]  This recommendation was derived in part from a specific provision of the United States Sentencing Guidelines.  "The organization's compliance and ethics program shall be promoted and enforced consistently throughout the organization through (A) appropriate incentives to perform in accordance with the compliance and ethics program; and (B) appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct."  2014 Guidelines Manual, § 8B2.1(b)(6).

[83]  We did not request evaluation forms reflecting information regarding specific employees.  We were interested merely in the framework Apple would use, as a general matter, to assess employee performance.

A similar issue arose with respect to Apple's procedures for investigating compliance-related allegations.  At the January 14 Meeting, Apple provided us with a memorandum setting forth its proposed procedures for investigating potential antitrust violations.  Apple repeatedly asserted, however, that there had been no antitrust complaints for it to investigate since the date of the Final Judgment, so the policy had never been applied in practice.  The Monitor therefore requested information regarding Apple's more general procedures for investigating compliance-related complaints.  Specifically, on January 30, we requested, among other things, "[a]ny handbooks, guidelines, or written procedures of any kind governing the investigation and documentation of allegations of misconduct prepared and/or used by Internal Audit, Employee Relations, Human Resources, or Global Security."  According to witnesses we interviewed, these are the four units within Apple that conduct compliance-related investigations.

During a February 25 telephone conference, members of the monitoring team discussed this issue with Simpson Thacher attorneys; Simpson Thacher stated that Apple objected to producing the documents we had requested, again on the grounds that they were not narrowly tailored to antitrust compliance.  On another call two days later, Simpson Thacher reiterated Apple's unwillingness to produce these documents.  In a March 3 email, Simpson Thacher stated Apple's position once again: that "investigation procedures unrelated to antitrust are irrelevant here."  Simpson Thacher asked the monitoring team to provide a written description of "what it is that you are looking for that relates to antitrust issues" and expressed willingness to continue meeting and conferring to discuss whether there was additional information Apple could provide regarding the implementation of its antitrust investigation procedures.

4.      Scheduling of Employee Interviews

Late in this reporting period, Apple said it was unwilling to schedule a set of employee interviews we had requested for mid-February.  Since mid-2014, our practice had been to submit to Apple a list of the employees we wanted to interview; Apple would then schedule some of those employees for interviews on our next trip to California, and the employees that Apple did not schedule for interviews would generally remain on the list of requests and be carried over to the next set of interviews.

After the January 2015 interviews, several names remained on our list of interview requests from 2014.  The Monitor advised Apple that he would like to schedule interviews with those employees and a few others for mid-February.  Mr. Vetter immediately expressed firm opposition to that request.  On February 2, we sent Simpson Thacher a list of approximately eleven interviews we wanted

to conduct.  That same day, Ms. Razi responded, asking to schedule a call to discuss the issue.  In her email, Ms. Razi asserted that some of our requests were redundant with interviews we had already conducted and that other requests were not relevant to antitrust compliance, as they related to Apple's general procedures for investigating potential compliance issues, *see* Section VI.C.3, *supra.*

On February 3, the Monitor and Ms. Razi discussed the issue by telephone.  Ms. Razi explained that Apple thought the Monitor had already conducted a sufficient number of interviews and therefore wanted him to justify any further interviews with a "specific need."  The Monitor responded that that position was inconsistent with the Final Judgment, which authorizes the Monitor to interview individuals with whom he deems it useful to speak without interference from Apple, subject only to the requirement that the witnesses be relevant to the Monitor's responsibilities as defined by the Final Judgment.  The next day, Simpson Thacher informed us that it intended to raise the issue for discussion with the Plaintiffs.  Later that day, Mr. Reilly sent the Plaintiffs a letter in which he asserted that our February interview request was unreasonable because some of the interviews the Monitor sought were redundant with interviews he had already conducted, while others were insufficiently related to the monitorship.

On February 10, the Monitor sent a letter to the Plaintiffs in response.  The letter explained that Apple's rejection of the February interview requests was unfortunate and that the timing of Apple's objection was puzzling, given that several of the personnel with whom we had requested interviews had been on the list of interview requests for months without objection.  The Monitor also emphasized that the Final Judgment gives him discretion regarding the interviews and other information he seeks and that, in any event, the interviews he had sought for February were both relevant and nonduplicative.  Nonetheless, he offered, as a gesture of good faith, to defer the February interviews until further discussions with Apple, and to make no further efforts to conduct the interviews during the week of February 16.

The next day, representatives for Apple, the Plaintiffs, and the monitoring team met to discuss the issue, and Simpson Thacher and the Monitor further discussed it by telephone on February 25, but no resolution was reached.

## VII.   Assessment and Recommendations

### A.   Context of the Assessment

The Final Judgment requires the Monitor to assess whether Apple's policies and procedures are "reasonably designed to detect and prevent

violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[84] The Monitor is also charged with "recommend[ing] to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[85]

During this reporting period, we reviewed Apple's implementation of the recommendations we made in our First and Second Reports. As noted in Section VI.B.2, *supra*, Apple agreed to adopt nearly all of the recommendations we made in the First and Second Reports. At our request, on December 31, 2014, Apple provided us with an Implementation Plan, which sets forth the steps the company intends to take to implement each of the recommendations we made in the Second Report.

During the third reporting period, we assessed Apple's implementation of our recommendations, and we anticipate that we will focus on Apple's subsequent steps to implement the recommendations during the next reporting period. The Implementation Plan therefore serves as one of the criteria by which to assess Apple's efforts to upgrade and revise its Antitrust Compliance Program.

As set forth more fully below, although we were able to gather important new information during this reporting period, we remain unable to assess Apple's implementation of many of the recommendations we made in the First and Second Reports. In some cases, Apple's efforts remain incomplete, and in others, Apple has not yet provided us with the information necessary to fully evaluate what, if anything, it has done in response to our recommendations. Using the information we currently have, this Section of the Report assesses Apple's efforts to implement the recommendations. It also offers some further recommendations based on new information learned during this reporting period. A complete list of those additional recommendations is contained in the attached Appendix.

Our view is that Apple continues to make progress toward developing the fundamental components of a sound antitrust compliance program. Apple's Antitrust Compliance Program is much more developed than it was before the Court issued the Final Judgment, and when we issued our First Report.[86]

---

[84] Final Judgment § VI.C.

[85] *Id.*

[86] Apple's General Counsel has stated that the company "would have done exactly the same things with or without a monitorship." *See* Exhibit F (redacted from the non-confidential

Nonetheless, there is more remaining for Apple to do, as we describe in detail throughout this Section.

Based on our work to date, including the information received during this reporting period, we have two central concerns regarding the Program.  First, we are currently unable to conclude that Apple has conducted a sufficient antitrust risk assessment and has incorporated the results of the assessment into its Antitrust Compliance Program.  As explained in Section VI.C.1, *supra*, we have provisionally agreed not to seek the risk assessment itself.  However, Apple agreed to provide us with detailed information regarding its risk assessment *process*, as well as the actions it takes in response to the assessment.  To date, Apple has provided us with incomplete information regarding both of these topics.  We are therefore unable to determine that the company has satisfactorily implemented our risk assessment–related recommendations.

Second, we remain concerned regarding Apple's development of adequate procedures for the Program.  In the Second Report, we made a number of recommendations aimed at developing and strengthening the procedures associated with the implementation of Apple's Program.  Apple did not object to these recommendations.  During this reporting period, the company belatedly developed some of the procedures we had recommended, including a procedure for investigating potential antitrust violations.  Apple has not yet, however, developed the full set of procedures we recommended.  Moreover, as set forth below, although the procedures that Apple has developed are a useful start, we believe they should be substantially improved.

> B.      Antitrust Risk Assessment

> 1.      Recommendations from the First and Second Reports

We recommended in the First Report that Apple undertake a formal antitrust risk assessment as a central component of its Antitrust Compliance Program.[87]  Subsequently, in the Second Report[88] and in several communications with Apple over the last year, we explained in detail the importance of conducting an antitrust risk assessment as a prerequisite to developing a comprehensive and effective Program.  We communicated to Apple the characteristics of an effective risk assessment, including that it comprise a

---

version of the Report).  Our assessment, many of Apple's actions, and the company's own Risk Assessment Memo and Implementation Plan suggest that is not the case.

[87] *See* First Report 45-47.

[88] *See* Second Report 74-84.

"systematic assessment of the risks that arise from Apple's businesses, the activities of its employees, and its third-party interactions;" that it consider the company's historical antitrust concerns; and that it include a "formal . . . process that is dynamic, so that Apple's Antitrust Compliance Program continues to develop as Apple's business changes and expands and as the antitrust regulatory environment changes."[89]  As we have discussed with Apple on multiple occasions, and as we set forth in our semi-annual reports, the primary purpose of our recommendation regarding an antitrust risk assessment was to ensure that Apple establishes a process for identifying and ranking antitrust risks and regularly addressing those risks through a comprehensive and effective Antitrust Compliance Program.

Apple's initial efforts to satisfy the First Report's recommendation were inadequate.  Apple provided very little information about its efforts to implement the recommendation until the end of the reporting period covered by the Second Report.  At that time, Apple described several informal activities that the company had undertaken since Mr. Andeer was hired in 2010, which the company claimed amounted to a sufficient risk assessment effort.  At the same time, the company strongly questioned the need to conduct a formal antitrust risk assessment.

The informal efforts that Apple described at the end of the second reporting period consisted largely of day-to-day counseling activities undertaken by Apple's antitrust lawyers in the normal course of their work as they learned about the company and addressed specific issues that arose.  Apple told us that Mr. Andeer began his tenure at Apple in 2010 by meeting with Apple lawyers and business leaders to understand the aspects of the business they support and operate, respectively, and to discuss antitrust issues relevant to those aspects of the business.  Apple also told us that members of the CLPG identify risks on a daily basis based on questions posed by Apple personnel.  In addition, we understood from Apple that the CLPG engages in internal discussions of antitrust risk.  Apple also pointed to support from outside counsel and Mr. Andeer's elevated access to undisclosed products as part of Apple's informal effort to assess risk.  Our understanding as of the Second Report was that these reactive efforts were not part of a proactive, formal antitrust risk assessment process and that no written documentation was maintained for these efforts.  A more complete description of these matters is included on pages 78 to 81 of the Second Report.

---

[89] *Id.* at 74 (citing First Report 45).

In the Second Report, we specifically recommended that Apple develop a formal risk assessment process that was "institutionalized, dynamic, and continuing."[90]  We also recommended that Apple explicitly assign ownership of the assessment to the appropriate Apple personnel, develop a procedure for reporting the results of the antitrust risk assessment to the ROC and AFC, and provide a formal report regarding the risk assessment and its results for review and analysis by the ROC and AFC.

### 2.  Apple's Response to the Recommendations

Throughout our discussions, Apple has asserted conflicting positions with respect to the antitrust risk assessment recommendation.  At times, Apple has asserted that its informal efforts prior to our recommendation satisfied its obligation.  At other times, Apple has claimed that conducting a formal risk assessment runs counter to compliance best practices, even though Apple has in the past produced formal, risk assessment reports, including in written format, with respect to other compliance and regulatory risks.  Indeed, we received a heavily redacted antitrust risk assessment for various years beginning in 2011.

In response to our recommendation, Apple undertook additional efforts relating to its antitrust risk assessment.  As discussed in Section VI.C.1 above, Apple strongly objected to our requests to disclose information about these efforts.  Apple ultimately said it would not commit its antitrust risk assessment to writing and would not provide a written report of its risk assessment to Apple's ROC and AFC.  We have no insight into the substance of the presentation that was given.

Instead of providing the risk assessment to the monitoring team, as we requested, Apple agreed only to provide a detailed description of its process for conducting the risk assessment, evidence that would reflect the actions it took in response to the risk assessment (including but not limited to changes to its antitrust policies, procedures, and training), and interviews of the key stakeholders (including the ET, AFC, and Board) to whom the risk assessment would be presented.[91]

Apple provided two pieces of information in response to our recommendation and requests for information regarding its risk assessment.

---

[90] *Id.* at 83.

[91] In response to a draft version of the Report, Apple stated that this paragraph misrepresents what it agreed to provide to the Monitor regarding the antitrust risk assessment.  If this means that Apple is withdrawing from its prior commitment to provide us with information about the actions it is taking in response to the risk assessment, that would be very troubling.

First, Apple provided a questionnaire entitled, "Interview Outline for iTunes (App Store, iBooks Store, Music, Movies, Television)."[92] ███████████████████
███████████████████████████████████████████ In multiple discussions, Apple representatives told us that the company had developed separate questionnaires for other relevant business units.  As discussed in Section VI.C.1, *supra*, Apple has refused to provide access to any of these other questionnaires.

Second, after lengthy disputes, as described in Section VI.C.1, *supra*, Apple provided on February 20 a short memorandum summarizing its efforts to conduct a more formal antitrust risk assessment ("Risk Assessment Memo").



[93]

(a)      Formal Risk Assessment

Essentially, Apple has argued that a company need not conduct a formal risk assessment so long as it has capable antitrust counsel that are properly engaged in day-to-day counseling.

First, Apple has mischaracterized our recommendation that it conduct periodic, formal risk assessments as a condemnation of its previous, less formal efforts.  In fact, our Second Report acknowledged Apple's informal efforts to

---

[92] As noted previously, Apple provided the questionnaire on a non-waiver basis.

[93] *See* Risk Assessment Memo 5.

assess antitrust risk, including communications with business leaders and legal support personnel and broader risk discussions within the CLPG and across the compliance team, as a "reasonable foundation for assessing potential antitrust risk."[94]  However, as we noted above, Apple's informal efforts are the type of ordinary-course problem solving and counseling that are necessary to avoid antitrust risks that arise in routine business activities.  This is the kind of support we would expect the CLPG to provide on a daily basis, and we have never suggested that Apple cease these efforts.  However, for a company of Apple's size and scope, our recommendation concluded that these efforts do not take the place of formal, antitrust risk assessments.

Second, Apple's argument ignores that we specifically recommended that the risk assessment be dynamic, replicable, and conducted on a periodic basis.  Our recommendation did not require that a static assessment inform Apple's program.  In fact, the only way Apple's antitrust risk assessment could present, in the company's words, a ████████████████████████████████ is if Apple structured it that way.  Our recommendation called for an antitrust risk assessment that would be regularly reviewed, revised, and updated.

A formal risk assessment, which is conducted on a periodic basis and includes a process for updating and modifying the company's antitrust policies, procedures, and training to account for new information, is an essential component of a comprehensive and effective antitrust compliance program.[95]  A risk assessment allows a company to proactively manage risk with appropriate resources and controls, rather than react to issues as they arise and only if they are detected.  Apple's objection to a formal risk assessment inappropriately suggests that ordinary-course counseling is a "preferred" *substitute* for a formal,

---

[94] Second Report 81.

[95] The United States Sentencing Guidelines require periodic risk assessments.  *See* U.S. Sentencing Guidelines Manual § 8B2.1(c) (2011), *available at* http://www.ussc.gov/guidelines-manual/2011/2011-8b21 ("The organization shall periodically assess the risk of criminal conduct and shall take appropriate steps to design, implement, or modify each requirement set forth in subsection (b) to reduce the risk of criminal conduct identified through this process.").  The OECD has issued similar guidance on the importance of risk assessments, *see* OECD Good Practice Guidance on Internal Controls, Ethics, and Compliance, adopted 18 February 2010, *available at* http://www.oecd.org/investment/anti-bribery/anti-briberyconvention/44884389.pdf, as has the United Kingdom, *see* Ministry of Justice, The Bribery Act 2010 (Mar. 2011), *available at* http://www.justice.gov.uk/downloads/legislation/bribery-act-2010-guidance.pdf.  Finally, the International Chamber of Commerce's Antitrust Compliance Toolkit includes risk identification and assessment as a foundational element of a compliance program. *See* ICC Comm'n on Competition, The ICC Antitrust Compliance Toolkit (2013), *available at* http://www.iccwbo.org/Advocacy-Codes-and-Rules/Document-centre/2013/ICC-AntitrustCompliance-Toolkit/.

regular antitrust risk assessment.  In support of its position, Apple's Risk Assessment Memo cites the ABA Antitrust Compliance manual, which states,

> Audits and risk assessments should be redundant if the in-house commercial lawyer works on a day to day basis with the business to evaluate and mitigate risk.  Again the best model is that the commercial lawyer is so integrated into the business that audits and risk assessments are an ongoing process.[96]

We agree that integration of legal support personnel into the business is an effective day-to-day approach—we have discussed this approach in positive terms in our previous reports.[97]  However, a properly working system of providing antitrust advice does not obviate the need for a formal risk assessment.

Indeed, the ABA manual that Apple cites does not state that day-to-day counseling is a substitute for a formal antitrust risk assessment.  To the contrary, the manual states that a "real time response to developments is necessary, but not sufficient."[98]  In addition, the manual suggests

> discussions on a regular, frequent basis with the managers in charge of the divisions and departments where antitrust problems can occur, so that you know when compliance training needs to be repeated or when a situation not addressed by your compliance manual has developed.[99]

The manual goes on to state:

> Only a periodic, regularly scheduled review will keep your compliance program up-to-date with developments that do not make headlines.  Legal developments that are extremely important to your company but few others may not get much attention from the press.  Changes in state

---

[96] Am. Bar Ass'n, Antitrust Compliance: Perspectives and Resources for Corporate Counselors 87 (2d ed. 2010).

[97] *See* First Report 53 ("[W]e believe that an effective Antitrust Compliance Program requires [the Competition Law and Policy Group's] vigilance that extends, as appropriate, into day-to-day business operations."); *see also* Second Report 123 ("We understand that contact between lawyers embedded in business units and the CLPG is frequent, with the CLPG playing the role of expert substantive advisors on antitrust issues.  We believe this role for the CLPG is consistent with Apple's business structure and is appropriate.").

[98] Am. Bar Ass'n, Antitrust Compliance: Perspectives and Resources for Corporate Counselors 13 (2d ed. 2010).

[99] *Id.* at 12.

laws may be reported in newspapers for those states, but not in the national media.  And . . . changes in your company's operations that do not strike your business managers as implicating the antitrust laws may not come to your attention.  Thus, you need to conduct a periodic review of your program in which you search out and incorporate the lower profile developments that have not come to your attention on their own.[100]

Despite making arguments against the need for a formal risk assessment, Apple agreed, if only as an "accommodation" to the Monitor, to undertake a risk assessment exercise more consistent with our recommendation.  Our evaluation of Apple's approach is discussed in Section VII.B.3 below.

<div align="center">(b)      Written Risk Assessment</div>

We view Apple's decision not to commit its risk assessment to writing as misguided.  In support of its position that it should not prepare a written risk assessment, Apple has pointed to certain authorities that advocate against backward-looking reviews of potential violations of compliance policies.  Apple's decision not to commit its risk assessment to writing undermines an important purpose of our recommendation—to ensure a continuing, dynamic process whereby antitrust risks are identified, addressed, and incorporated into the company's Antitrust Compliance Program.  A written record of the risk assessment would allow the company to build and maintain institutional knowledge of the issues and mitigating remedies in a way that is unaffected by movement within the company or the departure of key personnel.

The development of a written antitrust risk assessment is consistent with Apple's established approach for overseeing various regulatory and compliance risks, which has been in place and formally documented in writing since before the imposition of the Final Judgment.

---

[100] *Id.* at 13.



Our recommendation anticipated that the CLPG would implement an analogous, routine, and comprehensive process for evaluating antitrust risks as a component of the enhanced Antitrust Compliance Program.

(c)      Apple's Response to the Recommendations

As discussed above, Apple has not provided the monitoring team with full information regarding its antitrust risk assessment.  The monitoring team's information regarding Apple's risk assessment has been limited to the Risk Assessment Memo and a single questionnaire we have been told was used during interviews of certain personnel in the iTunes business.  In addition, we have not yet been able to test the limited information Apple has provided, including through interviews of relevant personnel.

Although we have agreed to accept considerably less detail about the risk assessment than we had initially requested, the Risk Assessment Memo falls short of the level of detail Apple had agreed to provide.  The monitoring team's agreement to provisionally forego receiving the substantive results of the antitrust risk assessment was based on Apple's promise to provide adequate detail regarding the process followed for conducting the assessment.  Instead of providing that level of detail, the Risk Assessment Memo was an advocacy document that discussed at length topics unrelated to Apple's actual efforts to undertake the risk assessment, such as the background and experience of the members of the CLPG, and Apple's reasons for resisting in the first instance our recommendation that it conduct a formal antitrust risk assessment.

We learned from the Risk Assessment Memo that Apple's risk assessment efforts involved a set of activities that went beyond the informal efforts the company had previously employed: interviews of legal and business personnel conducted by Brendan McNamara, a member of the CLPG, and Ms. Said. However, Apple's description of these interviews lacked important details, including some that Apple initially told us it would provide.

████████████████████████  We would have expected
Apple to interview a mix of business personnel at various levels of seniority,
including key, non-executive managers.  Personnel involved in the day-to-day
operations of the company know how business operations actually work, as
opposed to how they have been designed to work.  Yet, individuals the
monitoring team has learned are particularly relevant to the Antitrust
Compliance Program and Apple's compliance with the Final Judgment, such as
the company's General Counsel; the AFC Chairman; the company's Chief
Compliance Officer; other senior managers, such as the Head of the U.S. iBooks
Store; and other lower-level, relevant personnel, such as iBooks account
managers, were not interviewed.

In addition, we expected Apple's risk assessment efforts to include more
than just personnel interviews.  Although we agree that personnel interviews
should be a central component of an antitrust risk assessment, speaking to
employees alone may not yield a complete picture of the relevant risks.  For
example, as part of the risk assessment, Mr. McNamara or Ms. Said might have
sought to learn about or participated in meetings or other activities that are
particularly relevant to antitrust risk (e.g., trade association meetings, SSO
meetings, or supplier discussions), worked (perhaps with outside counsel) to
review recent regulatory developments that might affect Apple's operations,
tested employee knowledge of the Antitrust Compliance Program and in
particular the training they received, reviewed relevant company documents
(e.g., Board minutes, third-party complaints, SEC disclosures, key contracts), and
reviewed records of past antitrust compliance issues experienced at Apple.  If
Apple has in fact undertaken these activities as part of its antitrust risk
assessment, the Risk Assessment Memo does not reflect them.   Nor does the
Risk Assessment Memo establish whether the risk assessment process is a one-
time accommodation to the Monitor, or if it will be become an integral part of
Apple's Program and therefore be repeated periodically.

However, by far the most troubling shortcoming of Apple's Risk
Assessment Memo is the absence of information on how, if at all, the results of
the risk assessment have affected the Antitrust Compliance Program.  The Risk
Assessment Memo contains a lone sentence that touches briefly, in general terms,
on this critical element:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████ [104]

Apple has provided no specific information regarding how the risk assessment has contributed to modifying or enhancing the Antitrust Compliance Program. Not only was this the very information Apple promised to provide in lieu of disclosing to us its risk determinations, but it was the primary purpose behind our recommendation. Without this information, we are unable to assess whether the risk assessment was adequate and served the purpose behind the recommendation.

### 3. Further Assessment and Recommendations

We are concerned, especially given the company's experience with two recent, significant federal antitrust investigations, that the company has so strongly opposed incorporating an antitrust risk assessment into its Program as we have recommended, and only reluctantly agreed to take limited steps to implement it.

At this point, we have insufficient information to determine whether Apple's efforts have fulfilled our recommendation. We know that Apple's antitrust lawyers are engaged in day-to-day counseling, which we knew and considered when we issued the Second Report. We also know that Mr. McNamara and Ms. Said spoke to 19 lawyers and 18 business people to assess risk in the company's business activities. We know little more.

Apple has not informed us of any instance in which the risk assessment has produced modifications of, and enhancements to, the Antitrust Compliance Program. We understand that Apple will not object to our interviewing recipients of the risk assessment presentation, and that process may significantly augment our knowledge of the results of the risk assessment.[105] However, at this point, we cannot know whether Apple's risk assessment efforts have been sufficient and, therefore, whether the company has fully implemented our recommendation.

For these reasons, we are unable to make further recommendations regarding the company's risk assessment. Because Apple has objected to providing to us its risk assessment on privilege grounds, our ability to evaluate

---

[104] Risk Assessment Memo 7.

[105] However, some of Apple's comments to a draft version of this Report now call this into question.

the assessment will remain limited.  Accordingly, we recommend that Apple submit the results of its risk assessment, and associated materials withheld on privilege grounds, to the Court *ex parte* and *in camera*.

> C.    Apple's Antitrust Compliance Policies

The Final Judgment requires the Monitor to evaluate whether Apple's antitrust policies are "reasonably designed to detect and prevent violations of the antitrust laws."[106]  In the Second Report, we assessed three Apple policy documents: the Antitrust and Competition Law Policy (or the "Policy"), the section on Competition and Trade Practices in the companywide Business Conduct Policy, and the Antitrust and Competition Law chapter of the companywide Business Conduct ebook.  As we described in detail in the Second Report, Apple issued revised versions of the Antitrust and Competition Law Policy and the ebook as part of its June 30 Rollout.[107]

> 1.    Recommendations from the Second Report

> (a)    Antitrust and Competition Law Policy

In the Second Report, we assessed the version of the Antitrust and Competition Law Policy that Apple disseminated to employees in connection with the June 30 Rollout.  We explained that we viewed the Policy to be the most critical of Apple's antitrust policy documents because it was the primary substantive antitrust guide provided to employees.  We stated that, in general, we thought the Policy's style, format, and level of detail made it a useful tool for the Apple personnel who would need it the most.

In our assessment of the Policy in the Second Report, we considered, and made recommendations related to, several important factors:

- **Whether the Policy affirmatively communicated Apple's standard of conduct with respect to antitrust compliance.**  We concluded that the Policy clearly and effectively communicated Apple's standard of conduct.

- **Whether the Policy comprehensively covered the relevant substantive antitrust issues.**  We concluded that the Policy adequately covered most antitrust issues that would be relevant to

---

[106] Final Judgment § VI.B.

[107] *See* Second Report 57-58, 61-63.

Apple and its affiliated individuals.  However, we recommended that Apple expand the Policy to cover additional substantive issues, including antitrust concerns related to employee hiring agreements and the service of senior executives and Board members on other companies' boards, as well as any additional issues Apple identified through its antitrust risk assessment.

- **Whether the Policy adequately explained Apple's anti-reprisal policy and provided employees with sufficient information to elevate antitrust-related questions, concerns, and potential violations.**  We concluded that the Policy adequately communicated Apple's anti-reprisal policy, but we recommended that Apple add to the Policy the contact information for all members of the CLPG and the ACO.

- **Whether the Policy was adequately disseminated.**  We recommended that Apple improve its dissemination of the Policy to employees.  The statistics Apple provided to us did not establish how many employees had read the Policy.  Moreover, Apple's online antitrust training course, which required employees to certify that they had read and understood the Policy, had a technical flaw that allowed employees to complete the course without actually reviewing the Policy.  We therefore recommended that Apple require relevant employees—including, at a minimum, all Section V employees—to certify separately that they have read, understand, and agree to comply with the Policy.

- **Whether employees appropriately comprehended and used the Policy.**  We observed that most of the employees we interviewed after the June 30 Rollout exhibited some confusion about the existence of the Antitrust and Competition Law Policy.  We therefore recommended that Apple take additional action to ensure that the Policy is thoroughly disseminated, comprehended, and used.

    (b)    Business Conduct Policy (Competition and Trade Practices Section)

The Second Report also assessed the Competition and Trade Practices section of Apple's Business Conduct Policy, which is Apple's version of a business code of conduct and is publicly available on Apple's website.  During the second reporting period, Apple confirmed that the Competition and Trade Practices section of the Business Conduct Policy was a shorter summary of the

more comprehensive Antitrust and Competition Law Policy; Apple explained that the summary of antitrust issues in the Business Conduct Policy was meant to capture the most important antitrust compliance points that would be relevant to a companywide audience. We concluded in the Second Report that the Competition and Trade Practices section of the Business Conduct Policy satisfied this purpose, and we made no further recommendations for its improvement.

<div align="center">(c)     Business Conduct ebook (Antitrust and Competition Law Chapter)</div>

In the Second Report, we explained that the Business Conduct ebook is an interactive and polished expansion and elaboration of the Business Conduct Policy. Apple first made the ebook available in fall 2012, and, as part of the June 30 Rollout, Apple introduced a new ebook chapter regarding antitrust and competition issues. We concluded in the Second Report that the new ebook chapter was a helpful, user-friendly supplemental resource for employees. We explained that the ebook had great potential as an additional vehicle for presenting antitrust compliance messages to Apple employees, although we noted that few of the employees we interviewed after the Rollout had reviewed the new antitrust and competition law chapter.

<div align="center">2.     Apple's Response to the Recommendations</div>

Apple's Implementation Plan indicated that the company would take several steps to implement our recommendations regarding the Antitrust and Competition Law Policy.[108]

<div align="center">(a)     Dissemination</div>

In response to our recommendation that Apple improve the Policy's dissemination throughout the company, Apple's Implementation Plan

[redacted]

[109]

---

[108] Because the Second Report made no formal recommendations regarding the Business Conduct Policy or ebook, the Implementation Plan does not address those documents.

[109] During the January 14 Meeting, Apple clarified that it was adding the full text of the Policy to the online training so that employees would be required to review it before completing

<div align="center">48</div>

███████████████████████████████████████████████

███████████████████████████████ Apple noted that, when it sent us the Implementation Plan, the Policy was available on three separate Apple intranet sites.

The Implementation Plan also referred to Apple's intention to develop a plan to increase communications to employees regarding the Policy and other components of the Antitrust Compliance Program.  The communications plan, which Apple provided to us on February 27 and which we discuss in further detail in Section VII.D.9, *infra*, ████████████████████████████

████████████████████████████████████████████████

(b)     Content of the Policy

Apple also agreed to implement our recommendation to expand the substantive coverage of the Policy to address antitrust concerns related to employee hiring agreements and interlocking directorates, as well as any additional issues identified during the course of its antitrust risk assessment.[110] Moreover, Apple agreed to add contact information for the CLPG and ACO, as we had recommended.

In late January, Apple provided us with a draft revised version of the Policy, which incorporated these recommendations and made some additional changes.  We offered to review the draft to provide preliminary feedback, and the company accepted that offer.  We found that Apple had appropriately implemented our recommendations from the Second Report.  We provided some additional comments aimed at further improving the Policy.

---

the antitrust training course.  As noted above, we had observed that, although the version of the online course that was released in mid-2014 included a link to the Policy, a technical flaw allowed employees to complete the course without actually opening and reviewing the Policy, as Apple had intended them to do.

[110] The Implementation Plan noted Apple's belief "that including specific coverage related to hiring agreements and interlocking directorates in a policy intended for the entire company is unnecessary and counterproductive."  Apple stated that it would nonetheless expand the Policy to cover those issues.

Ms. Said responded to our comments by email on February 16, indicating that Apple would adopt most, but not all, of our suggestions. We accepted Apple's explanations regarding the comments it chose not to implement. [111]

### 3.    Further Assessment and Recommendations

Apple has taken positive steps toward implementing the recommendations we made in the Second Report to improve the dissemination and the content of its Antitrust and Competition Law Policy. We will continue to monitor the ongoing dissemination-related efforts Apple described in its Implementation Plan and will further assess these efforts in our next report. In addition, we recommend that Apple adopt a process for periodically reviewing and updating the Policy to ensure that relevant antitrust risks are adequately addressed as changes occur in the legal and regulatory environment, industry, and in Apple's business practices.

In the third reporting period, as a result of our interviews, we learned of an additional antitrust-related Apple policy: Apple's Standards Legal Policy. Apple had not previously presented this document to us as part of its Antitrust Compliance Program. The document is very brief, and we have no information regarding its origin, use, or distribution. Because Apple provided the document at the end of the third reporting period, we have not yet had discussions with Apple to address our questions and are therefore unable to fully assess it. We will do so in the near future.

### D.    Apple's Antitrust Compliance Procedures

### 1.    Establishing Adequate Procedures

No corporate compliance program is self-executing. Every program requires a set of procedures to implement the company's policies. The Final Judgment explicitly recognizes the importance of the Program's procedures. [112]

---

[111] Apple chose not to accept our suggestion that the Antitrust and Competition Law Policy incorporate cautions regarding the company's participation in SSOs and trade association meetings and discuss appropriate conduct for Apple employees in dealing with such organizations. Apple told us that its Antitrust and Competition Law Policy was meant to serve as a company-wide policy, rendering reference to these topics inappropriate. Apple also told us that standard-setting activities were covered by a separate policy—the Standards Legal Policy. At a minimum, we believe the Antitrust and Competition Law Policy should refer to the company's Standards Legal Policy, the new Apple Internal Standards Process, and any additional procedures the company adopts as a result of the antitrust risk assessment to guard against antitrust risk.

[112] *See* Final Judgment § VI.

At the beginning of the monitorship, Apple had few formal antitrust compliance procedures in place.  Our First and Second Reports recommended that Apple establish procedures for various components of the Antitrust Compliance Program, and Apple has gradually incorporated some procedures into its Program.[113]

Below we discuss the procedures we view as most critical to Apple's Program at this time; our assessment of Apple's efforts to implement these procedures, including its response to our previous recommendations; and our further assessment and recommendations.  In addition to the specific procedures described below, we note the importance of procedures to guide the periodic review and update of the Program's components: its policies, procedures, and training.[114]  We recommend that Apple develop these procedures, which we anticipate will go hand-in-hand with the company's risk assessment and audit processes.  As explained further herein, we do not yet have enough information about the risk assessment and audit processes to offer more specific recommendations regarding the development of procedures to review and update the Program components.

<blockquote>2.    Detection, Investigation, and Reporting of Violations</blockquote>

<blockquote>(a)    Recommendations from the Second Report</blockquote>

We recommended in the Second Report that Apple develop formal procedures to detect, investigate, and report (if necessary) potential and actual antitrust violations.  We based this recommendation on three important considerations.

First, the Final Judgment requires Apple to take specific action within three business days of discovering or receiving credible information concerning an actual or potential violation of the Final Judgment.[115]  The Final Judgment also

---

[113] Again, Apple's General Counsel has recently claimed that the company has done nothing it would not have done in the absence of the monitoring team.  *See* Exhibit F (redacted from the non-confidential version of the Report).  The lack of procedures before the monitorship began belies that claim.

[114] *See* Brent Snyder, Deputy Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, Compliance is a Culture, Not Just a Policy, Remarks as Prepared for the International Chamber of Commerce/United States Council of International Business Joint Antitrust Compliance Workshop (Sept. 9, 2014), *available at* http://www.justice.gov/atr/public/speeches/308494.pdf.

[115] The Final Judgment requires Apple, within three business days of discovering or receiving credible information concerning an actual or potential violation of the Final Judgment, to terminate or modify its conduct to assure compliance.  Final Judgment § V.G.  Apple must also provide to the Plaintiffs, within seven business days of discovering such information, a

requires Apple to provide to the Plaintiffs on a quarterly basis any non-privileged communications regarding allegations of Apple's noncompliance with any provision of the Final Judgment or with the antitrust laws.[116]  Apple agreed during the second reporting period that it needed to develop procedures to meet these obligations.

Second, a comprehensive and effective compliance program, particularly one that satisfies both the Department of Justice's standards for a "proactive compliance program"[117] and the U.S. Sentencing Guidelines, must include procedures for detecting, investigating, and reporting potential violations.  The Sentencing Guidelines state that an organization must "exercise due diligence to prevent and detect criminal conduct,"[118] "establish standards and procedures to prevent and detect criminal conduct,"[119] and "take reasonable steps to respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program."[120]

Finally, the Final Judgment requires Apple's Program to be "reasonably designed to *detect and prevent* violations of the antitrust laws."[121]  A set of procedures to accomplish these goals must therefore be a core element of Apple's Antitrust Compliance Program.

(b)      Apple's Response to the Recommendations

To implement our recommendation that it develop formal procedures to detect, investigate, and report potential and actual antitrust violations, Apple created a document entitled "Apple Investigations Procedure: Antitrust," which it provided to us in January 2015.  ██████████████████████

---

description of the actual or potential violation of the Final Judgment and corrective actions taken. *See id.*

[116] *Id.* § V.H.

[117] Snyder, *supra* note 114.

[118] U.S. Sentencing Guidelines Manual § 8B2.1(a)(1).

[119] *Id.* § 8B2.1(b)(1).

[120] *Id.* § 8B2.1(b)(7).  Although the Sentencing Guidelines speak in terms of criminal conduct, they have long been viewed more broadly as the basis for effective corporate ethics and compliance programs.  *See* Snyder, *supra* note 114 ("The [Sentencing] Guidelines set out several common-sense principles that, when applied, increase the likelihood that a compliance program will be effective. . . . These are the sort of things that the Division looks for when evaluating a company's compliance program.").

[121] Final Judgment § VI.C (emphasis added).



These descriptions were brief and abstract. For example, We had expected significantly more detail about the specific steps Apple would take in handling potential antitrust issues.

We informed Ms. Said on January 27 that the document Apple had provided was insufficient and fell far short of our recommendation to develop a formal investigation procedure for antitrust allegations. We provided feedback regarding the procedures document and recommended that Apple make revisions.

On February 27, Apple provided a revised and expanded set of procedures ("Investigation Procedure"). The Investigation Procedure

The Detection Procedures section provides an overview of the ways in which Apple employees can report allegations of potential antitrust violations. Over the last year, Apple has made it easier for employees to report potential violations, and these reporting avenues are briefly described in this section of the Investigation Procedure. This section also refers to Apple's Escalation Procedures for reports made to the Helpline and Whistleblower Line. Apple created the Escalation Procedures in early 2014 to provide additional guidance to Business Conduct employees who manage the Helpline for identifying and properly routing antitrust issues that employees report.[122]

The Investigations Procedure Overview Although Apple has made significant improvements in the latest version of the procedure document, many of the points are addressed very

---

[122] On February 27, Apple provided the monitoring team with an allegation referral matrix. We understand from Apple that the matrix identifies the personnel who should be contacted when various issues are reported to the Helpline and Whistleblower Line. The matrix indicates that antitrust issues should be reported to Ms. Said.

briefly and in very general terms.  For example, Apple added almost no detail to the descriptions of the investigation process, including the investigation of potential Final Judgment violations.  In addition, ███████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

The Investigations Checklist recaps and elaborates on information included in the Investigations Procedure Overview; it is presented in a step-by-step format.  The checklist includes steps for determining the type of investigation needed, determining whether additional resources are needed, planning the investigation, interviewing employees, creating documentation, and closing the investigation.

<div style="text-align:center">(c)      Further Assessment and Recommendations</div>

Although the revised Investigation Procedure is substantially improved from the initial draft Apple provided in January, we believe further revisions and refinement are needed.  As set out more specifically below, we found the procedures to be vague and superficial in some places, and confusing in others.  Of equal importance, we have no insight regarding how the Investigation Procedure will be applied in practice—the Procedure itself is new and untested, Apple did not provide us with information regarding past investigations of alleged antitrust or Final Judgment violations,[123] and Apple has refused to provide information regarding its procedures for other types of internal investigations.  We therefore are left with little evidence of how Apple investigations operate in practice, which might fill the gaps left by the Investigation Procedure.  Our interviews of Business Conduct personnel suggest that Apple's procedures for investigating allegations of compliance violations are neither formal nor always consistent, and Apple's Investigation Procedure does not contain specific provisions that would promote consistency.  Our more specific concerns with the Investigation Procedure are discussed in detail below.

First, the Investigation Procedure does not appropriately account for the important role Apple managers play in fielding reports of allegations from employees.  We learned during our interviews of Business Conduct employees that managers are the initial recipients of approximately three out of every four

---

[123] On February 23, Apple's counsel provided information regarding the investigation of an allegation relating to antitrust and compliance with the Final Judgment.  Apple did not provide enough information for us to evaluate the investigation or to determine whether the investigation followed the Investigation Procedure.

allegations reported.  As written, the Investigation Procedure does not provide sufficient guidance regarding the handling of allegations that are initially reported to managers.  Managers are listed as one of several "direct lines" to report potential allegations, along with the CLPG and Ms. Said, Apple legal counsel, and Internal Audit.  We recommend that Apple modify the Investigation Procedure to require managers to notify the Business Conduct team after receiving an allegation from an employee so that the allegations can be centrally tracked.  We also recommend that Apple modify its Investigation Procedure to ensure that employee reports of allegations made directly to Apple managers follow the same referral process as reports received through the Helpline and Whistleblower Line.

The Investigation Procedure also creates, and fails to address, possible conflicts of interest.  First, Ms. Said is a member of the team assigned to conduct the investigation, but she is also charged with auditing the Antitrust Compliance Program.  This dual role has the potential to present a conflict; she cannot be in the position of reviewing work that she performed, which would be the case if she audited the implementation of the Investigation Procedure, a task she should perform as part of her regular auditing and monitoring of the Program.  We recommend that Apple modify its Investigation Procedure to address this issue.

In addition, the Investigation Procedure should offer a more specific solution where a member of the investigative team was involved in the allegation at issue—for example, if a member of the CLPG provided advice related to the matter under investigation.  The procedures ███████████████████████████ [124] and ███████████████████████████████████████████████████████████ [125]  We recommend that Apple include specific direction regarding when an uninvolved third party must conduct the investigation, as well as specific guidance as to which group within Apple will oversee the investigation.

In response to feedback we provided in January, the Investigations Procedure ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[124] Investigation Procedure 4 (emphasis added).

[125] Investigation Procedure 7.

[redacted] This was an important addition that we commend Apple for making.

At present, however, the procedures require that Apple investigate only "credible" allegations of violations of the Final Judgment. We believe that all potential Final Judgment violations must be investigated sufficiently to *determine* whether they are credible, although of course we recognize that, once Apple has conducted a sufficient preliminary investigation to make that determination, it may handle credible and noncredible allegations very differently. We recommend that Apple revise its procedures to require at least a preliminary initial investigation of any alleged violation of the Final Judgment to determine whether it is credible.

We also recommend that Apple modify the Investigation Procedure to make clear how promptly an investigation must be initiated after evidence of a potential violation is discovered, and how quickly Apple must take action after an allegation is found to be credible. Because the Final Judgment requires Apple to terminate or modify its conduct within three days of discovering or receiving credible information concerning an actual or potential violation of the Final Judgment, the Investigation Procedure should mandate prompt action to determine whether an allegation is credible. In addition, the Investigation Procedure should mandate, consistent with the Final Judgment, that Apple terminate or modify its conduct within three days of determining that an allegation is credible.

The [redacted] We cannot draw a conclusion regarding how these remedies compare to Apple's handling of other types of misconduct. We recommend that Apple modify its procedure to provide for at least the possibility of imposing financial penalties for substantiated allegations.

We also recommend that Apple strengthen the "reporting" section of the Investigation Procedure. [redacted]

NON-CONFIDENTIAL VERSION

[REDACTED] [126] [REDACTED] At a
minimum, the ACO should report confirmed cases of employee misconduct
related to the antitrust laws or the Final Judgment to the AFC.  We also believe it
prudent for Apple to share all credible allegations of antitrust and Final
Judgment violations with the ET and relevant business groups.  We recommend
that Apple make these requirements explicit in the Investigation Procedure.

With respect to the Investigation Procedure's documentation
requirements, we recommend that Apple consistently document the completion
of an antitrust internal investigation.  The " [REDACTED]
[REDACTED]
[REDACTED] While we agree that it is appropriate to document these aspects of
an investigation, we think it is also necessary to document the final result of an
investigation—that is, whether the allegation has been substantiated—which will
determine whether Apple must report the allegation to the Plaintiffs under the
Final Judgment, whether disciplinary action needs to be taken, and how aspects
of the Antitrust Compliance Program may need to be updated. [REDACTED]
[REDACTED] We think Apple should take a similar approach with respect
to the results of an investigation into a potential antitrust or Final Judgment
violation, and we recommend that Apple revise the Investigation Procedure
accordingly.

Finally, we recommend that Apple make more explicit in the Investigation
Procedure how antitrust and Final Judgment allegations should be logged.  We
understand that Apple's Business Conduct team logs all of the allegations it
receives in a central database, which the team uses to track the follow-up for each
allegation.  The primary recipient of an allegation is responsible for logging the
allegation in the database.  We recommend that Apple take the same approach
with respect to antitrust and Final Judgment allegations and make that clear in
the Investigation Procedure.

---

[126] Investigation Procedure 6 (emphasis added).

3.      Development of Procedures for Particularly Risky Business
         Activities

(a)      Recommendations from the Second Report

In the Second Report, we recommended that Apple adopt procedures to
detect and prevent potential violations arising in business areas its antitrust risk
assessment identified as posing a moderate or high level of antitrust risk.  We
envisioned, for example, that Apple might create specific prescriptive guidance
for employees participating in trade association meetings, meeting with
competitors, or engaging in other activities that could create antitrust risk.  In the
Second Report, we concluded that Apple had not yet adopted such procedures.

(b)      Apple's Response to the Recommendations

Apple's Implementation Plan does not address whether Apple will
develop procedures to detect and prevent potential antitrust violations in areas
that the company's antitrust risk assessment has determined pose a moderate or
high level of antitrust risk.  We believe guidance related to risky activities should
be one of the important outputs of Apple's antitrust risk assessment effort.
Apple has claimed in generic terms that it has generated new procedures as a
result of the risk assessment—the Risk Assessment Memo Apple produced to us
on February 20 ██████████████████████████████████████████████████
████████████████████████████████████[127]—but Apple
has not provided us with any such guidance documents, or even a more specific
description of those documents.

Apple did recently create a set of procedures related to standard-setting
activities, which include the creation and implementation of standards to
facilitate interoperability in the technology industry.  Based on information we
learned during interviews, standard-setting activities constitute an important
aspect of Apple's business operations and also implicate potential antitrust risk
for the company.  Apple told us that it participates in 76 standard-setting
organizations and was engaged in some 475 different standards-related activities
(such as working groups) across these organizations.

---

[127] After providing the Risk Assessment Memo, Apple told us that it had completed its
antitrust risk assessment efforts, but that it had not yet developed or modified any guidance or
procedures as a result.  This information is inconsistent with the language in the Risk Assessment
Memo, which ██████████████████████████████████████████████████████████████

Based on our interviews, it was not clear to us whether Apple had formal procedures in place to govern its participation in SSOs or other standard-setting activities. We requested on January 30 that Apple provide its current procedures regarding standard-setting activities, including procedures for elevating standards-related activities to Legal, for involving Legal in standards implementation decisions, and for documenting the review of proposed standard-setting activities. We also asked Apple to provide its policy regarding standard-setting and any other policies or written guidance related to dealings with SSOs. Apple informed us that Ms. Said would be creating a document to respond to our requests, which Apple provided on February 27 ("Apple Internal Standards Process"). Apple also provided a one-page document entitled "Apple's Standards Legal Policy."

The Apple Internal Standards Process document is short, confusing, and incomplete. It also does not appear to cover all of the relevant topics identified by our request. Similarly, the Standards Legal Policy, discussed in Section VII.C.3, is superficial. After reviewing these documents, we were left with several questions. Because Apple provided these documents at the end of the third reporting period, we have not yet discussed our questions with Apple. We plan to do so during the next reporting period.

Besides the Internal Standards Process, we are aware of no other procedures that Apple has created, or plans to create, with respect to particularly risky business activities identified by the antitrust risk assessment.

(c)     Further Assessment and Recommendations

Apple has created one set of procedures in response to our recommendation—the Internal Standards Process—and our preliminary review of this document has led us to the conclusion that it could be improved. Based on the information Apple has provided, we do not think Apple has adequately implemented this recommendation. We will evaluate Apple's procedures if and when Apple provides further information regarding its efforts.

4.     Incentives and Disciplinary Procedures

(a)     Recommendations from the Second Report

In the First Report, we emphasized that Apple should adopt and disseminate within the company information about appropriate incentives and disciplinary measures to encourage employees to abide by the antitrust laws and Apple's antitrust compliance policies. During the second reporting period, Apple described its ongoing efforts to encourage employees to abide by the law and company policy. Among these efforts, Apple said, were the inclusion of

compliance and ethics in annual employee performance reviews, consideration of ethics matters as a significant factor in identifying candidates for promotion, and recognition of the importance of work performed by Business Conduct staff through compensation and promotions.  A fuller discussion of these efforts can be found at pages 97 to 98 of the Second Report.

Taking into account Apple's reported efforts on these issues, we recommended that Apple take further steps to use incentives and disincentives to encourage awareness of, and compliance with, the Antitrust Compliance Program and to communicate compliance expectations.  We also recommended that Apple further disseminate information within the company about such incentives and disincentives.

(b)      Apple's Response to the Recommendations

Apple's Implementation Plan █████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████      To evaluate these modifications, we requested that Apple provide any policies, procedures, and standards used to determine employee discipline for substantiated violations of Apple's Business Conduct Policy or other ethics and compliance violations.  We also asked Apple to provide us with blank versions of its personnel evaluation forms to confirm that such forms specifically refer to ethics and compliance considerations.  As discussed in Section VI.C.3, Apple has refused to provide any of this information, and has otherwise provided no information regarding its efforts to work with Human Resources to revise the annual performance review materials.

(c)      Further Assessment and Recommendations

We are unable to assess Apple's efforts to satisfy our recommendation because Apple has refused to provide the necessary information.  We attempted to obtain some information by asking Apple employees in interviews about how personnel evaluations allowed for the inclusion of compliance considerations, but the interviewees provided vague and inconsistent responses.  We will reevaluate Apple's efforts if and when the company provides the requested information.

5.      Formal Feedback Procedures

(a)      Recommendations from the Second Report

In the First Report, we recommended that Apple implement procedures to obtain systematic feedback from employees regarding the Antitrust Compliance

Program, including but not limited to the Helpline and training sessions. Apple responded to our recommendation by distributing survey questions to employees who had attended the September and December 2013 training sessions. We concluded that the survey was a positive step, but that Apple should do more to gather employee feedback to assess the Program.

In the Second Report, we therefore recommended that Apple implement a procedure to collect feedback immediately after every live and online training session, and that the company retain such feedback in a way that could easily be accessed and used to update and improve training sessions. This recommendation is related to our further recommendation, discussed in Section VII.D.11, that Apple store and track employee feedback through an electronic system. We also recommended in the Second Report that Apple identify other components of the Antitrust Compliance Program that could be enhanced through employee feedback.

(b)     Apple's Response to the Recommendations

As discussed in Section VII.D.10, Apple's Implementation Plan reflected that Apple interviewed five employees regarding their experience participating in live training sessions and distributed a survey to all live trainees.[128] Each of the five employees interviewed was asked a total of six questions, while the survey contained fifteen "yes" or "no" questions. We understand that Apple is developing a survey to accompany the online training that it launched in March 2015. Apple has not yet provided us with the online survey or its results. Apple's Implementation Plan also ███████████████████████████████

██████████████████████

(c)     Further Assessment and Recommendations

Based on the information Apple has provided, we see significant improvement in Apple's efforts to collect and use employee feedback to improve its Antitrust Compliance Program, but we believe the company should do more. First, consistent with our recommendations in Section VII.D.10(c) regarding solicitation of Helpline-related feedback, we recommend that Apple expand the number of interviews it conducts and create interview questions that are more probing. With respect to the number of interviews, five employees who are each asked six questions are unlikely to provide a representative or helpful set of responses. We recommend that Apple collect feedback from a broader group of employees in the future.

---

[128] The materials provided by Apple reflect survey results from 49 employees.

Regarding our recommendation to develop more probing feedback questions, we discussed this issue with Ms. Said on January 27. We suggested that Ms. Said consider revising the interview and survey questions to make them less likely to suggest a positive response. Ms. Said agreed with our suggestions and told us that she would work to revise the interview and survey questions. As of the date of this Report, we have not received Ms. Said's revised interview or survey questions.

Our assessment of Apple's feedback procedures is limited because we still lack certain important information. Apple stated in its Implementation Plan that it would develop processes and mechanisms for collecting employee feedback, but we have not yet received any information regarding that plan. We expect that this plan will provide a set of procedures for collecting, recording, and incorporating employee feedback into the Program. We also expect the plan to identify other aspects of the Program that will be the subject of employee feedback. Further, we do not have enough information from Apple to determine whether the interviews and survey discussed above were completed soon enough after the training sessions to produce the most meaningful feedback possible. We recommend that Apple incorporate steps into its plan that will ensure feedback is collected from employees as soon as possible after training takes place.

We believe that the plan should include specific steps for incorporating employee feedback into the Antitrust Compliance Program. Based on our review of employee responses to Ms. Said's interviews and survey, we continue to believe that employee feedback is a valuable resource for Program improvements. Although most of the substantive responses were favorable, some of the more critical comments offered important suggested improvements. For example, the comments included requests that the live training sessions include more examples, a "shorter briefing document," more visuals such as videos, a one- or two-page summary of the Final Judgment, and an opportunity to ask questions. One comment stated, "The course felt as if it were something that needed to be done to fulfill a requirement, not something that welcomed interactivity or feedback from those in the training." These comments are important, and Apple should take them into account when revising the Program. We recommend that Apple develop specific steps for incorporating employee feedback into the Program. For example, Apple might consider scheduling meetings or online group discussions to occur shortly after each round of feedback is collected to discuss ways the Program can be enhanced to reflect that feedback.

We look forward to seeing revisions to the feedback procedures along the lines we have recommended.

### 6. Identification of Critical Employees

#### (a) Recommendations from the Second Report

As of the First Report, Apple had provided little information regarding its process for identifying employees subject to certain Final Judgment requirements ("Section V Personnel") and tracking the satisfaction of those requirements.[129]  At that time, Apple had not given us complete employee lists for relevant business units or organization charts, explained its process for identifying Section V Personnel, or validated the accuracy of its process for tracking completion of Final Judgment requirements.  We noted that, during the first reporting period, Apple's process for identifying employees "engaged, in whole or in part, in activities relating to Apple's iBook Store" and "appropriate employees in Apple iTunes and App Store businesses" was unclear and ill-defined.[130]  Moreover, our review at that time revealed discrepancies in Apple's process for identifying Section V Personnel and ensuring the satisfaction of Final Judgment requirements.  In the Second Report, we concluded that Apple's process for identifying Section V Personnel remained unclear, and we stated that we needed more information, including detail regarding the job responsibilities of particular employees.

In the Second Report, we also recommended that Apple develop a procedure for identifying other critical employees who might not fall into the Section V Personnel category, but who might nonetheless present antitrust risk to Apple.  We recommended that Apple use its antitrust risk assessment to identify critical employees and that it take steps to ensure that the Antitrust Compliance Program mitigates risks associated with these employees.  We recommended that Apple provide live antitrust training to all employees it determined might expose the company to moderate to high antitrust risk.  We further

---

[129] Three important provisions of the Final Judgment apply to Section V Personnel.  First, Section V.A requires that Apple's Board of Directors, its Chief Executive Officer, each of its Senior Vice-Presidents, and each of its employees who, in whole or in part, engage in activities "relating to Apple's iBook Store" receive a copy of the Final Judgment.  Section V.B requires that any officer, director, or other employee who succeeds to any V.A Employee position also receive a copy of the Final Judgment.  Section V.C of the Final Judgment requires specific training for all V.A and V.B Employees, as well as for "appropriate employees in the Apple iTunes and App Store businesses."

[130] *See* Second Report 101.

recommended that Apple provide, at a minimum, online antitrust training to employees who present a lesser degree of antitrust risk.

(b)     Apple's Response to the Recommendations

Apple's Implementation Plan did not contain a specific proposal for implementing our recommendation regarding the identification of critical employees.  On February 27, Apple provided us with a memorandum from Ms. Said entitled "Process for Identifying New Employees Relevant to the Final Judgment," which was a revised version of the procedures for identifying newly hired employees as Section V Personnel.  In general, the revised document

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████  The memo does not discuss procedures for the identification of other critical employees, which we recommended Apple develop.

(c)     Further Assessment and Recommendations

The revised memorandum regarding Apple's procedure for identifying newly hired Section V Personnel significantly increases the transparency of the process, but we still have questions regarding the consistency and accuracy of the approach.  For example, Apple's process for identifying existing employees who become subject to Section V due to a role change is unclear.  In addition, the procedures for determining which employees are subject to Section V.C appear to rely somewhat heavily on employee titles, which Apple has told us since the beginning of the monitorship do not necessarily indicate employee functions.  Because Apple provided the revised memorandum at the end of the third reporting period, we intend to ask Apple for additional clarity regarding these procedures.

Apple has not provided any information regarding the identification of other critical employees outside of the Section V category and has therefore not satisfied our recommendation.

7.     Review of Publisher Agreements

We determined during the second reporting period that Apple had adopted an appropriate procedure for reviewing revisions to publisher agreements.  We understand that the process for reviewing such revisions has not changed since the Second Report.  Accordingly, we have no reason at this

time to further address Apple's procedures for reviewing revisions to publisher agreements.

        8.      Audits

        (a)      Recommendations from the Second Report

Section V.E of the Final Judgment requires the Antitrust Compliance Officer, in consultation with the Monitor, to conduct an annual antitrust compliance audit covering each person identified in Sections V.A and V.B of the Final Judgment, and to maintain all records pertaining to such audit. We refer to this audit as the "Section V.E Audit."

During the second reporting period, Ms. Said proposed a plan for conducting the Section V.E Audit, which included the review of various documents to ensure that the Section V.E requirements were satisfied. In the Second Report, we made specific recommendations to augment Ms. Said's proposal for the Section V.E Audit.[131] We recommended that Ms. Said interview a representative sample of Section V.A and V.B employees regarding particular components of the Antitrust Compliance Program. We also recommended that Ms. Said develop and distribute a survey to a group of Section V.A and V.B employees that was broader than the interview group, and that Ms. Said speak with a sample of personnel who had consulted with members of the CLPG to gauge whether the CLPG had been helpful and responsive in addressing antitrust issues. Finally, we recommended that Ms. Said review and make recommendations for enhancing New Employee Orientation training materials that discussed antitrust compliance.

In addition to the Section V.E Audit, we recommended in the Second Report that Ms. Said conduct regular Antitrust Compliance Program audits. This is consistent with one of the central principles of an effective compliance program established by the United States Sentencing Guidelines.[132] We explained that these additional audits were distinct from the monitoring activities that Ms. Said had undertaken since her hire. We recommended that Ms. Said develop auditing procedures that would permit her, on an annual basis,

---

[131] *See* Second Report 104-05.

[132] Section 8B2.1(B)(5) provides that a company should "ensure that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct; [and] evaluate periodically the effectiveness of the organization's compliance and ethics program."

to review various components of the Program.  We recommended that Ms. Said consider conducting the audits in conjunction with Apple's Internal Audit Group.  We also recommended that Ms. Said share the results of the audits with Apple's Audit and Finance Committee.

<div align="center">(b)    Apple's Response to the Recommendations</div>

To implement our recommendations, Ms. Said interviewed five employees and distributed a survey to all employees who received live training. We discuss these efforts in greater detail in Sections VII.D.5 and VII.D.10 of the Report.  Apple has not provided any information regarding its efforts to interview personnel who had consulted with the CLPG to gauge the CLPG's helpfulness and responsiveness.  Apple also informed us that it would not modify the New Employee Orientation training materials, which it has represented do not include anything related to antitrust.  Ms. Said told us that, because only five minutes of the orientation was allotted to discussion of compliance issues, she did not believe that it made sense to incorporate a specific discussion of antitrust compliance during that time.  We accepted this explanation.

On January 14, Ms. Said provided us with a memo summarizing her "Audit Observations."  The memo contained a bulleted summary of Ms. Said's efforts to satisfy the Section V.E Audit requirements, including the document review she described in her initial proposal during the second reporting period, the fictitious allegation she submitted to the Helpline (described in Section VII.D.10(b)), her interviews and survey, and a very brief overview of the results of the Audit.  Ms. Said also provided a revised version of the Audit Proposal she had initially submitted during the second reporting period, with modifications to reflect the addition of the interviews and survey to the audit process.

Neither Ms. Said's Audit Observations nor Audit Proposal memoranda contained procedures for the Antitrust Compliance Program Audits we recommended in the Second Report.

<div align="center">(c)    Further Assessment and Recommendations</div>

We provided our preliminary feedback regarding Ms. Said's efforts to implement our recommendation at a meeting with her on January 27.  We explained that Ms. Said's efforts, as described in the Audit Proposal and Audit Observations memoranda, fell short of implementing the recommendation.  We also said that Ms. Said's Section V.E Audit, in conjunction with broader Antitrust Compliance Program Audits, would need to replace in some measure our external monitoring when the monitorship ends.  Apple has not provided any

information regarding the recommended Antitrust Compliance Program Audits. We understand that Apple plans to provide a revised audit procedure in the near future.  We reserve our assessment of Apple's efforts to satisfy the audit recommendation until we receive Apple's revised audit proposal.  We also note our recommendation in Section VII.D.10(c) regarding the incorporation of future Helpline and Whistleblower Line audits into the formal audit procedures for Apple's Antitrust Compliance Program.

9.      Communications Regarding the Antitrust Compliance Program

(a)      Recommendations from the Second Report

In the Second Report, we recommended that Apple implement procedures to guarantee that employees receive frequent, routine, and up-to-date communications regarding the Antitrust Compliance Program.  We distinguished these procedures for enhancing communication about the Program from senior management's efforts to promote a compliance culture through their own communications.  Specifically, we recommended that the Program managers undertake efforts to keep employees updated regarding modifications to the Program and other important items, including compliance updates on relevant antitrust regulatory developments and important case studies.  We explained that Program and compliance updates would ensure that employees have the information they need to make sure their activities are lawful and appropriate and also understand the ongoing relevance of antitrust issues; we noted that this attention would help signal that Apple's leaders were committed to ongoing antitrust compliance.

(b)      Apple's Response to the Recommendations



Apple's Implementation Plan

On February 27, Apple provided its communications plan for the Antitrust Compliance Program for 2015.  It contains a total of twelve entries for various communications that were planned for the year.  Five of the entries describe planned emails to notify specific employees of their obligations to submit certifications required by the Final Judgment.  Another five entries refer to plans to announce the availability of online and live training, including through emails from senior executives to the employees they oversee.  One entry reflects the addition of the revised Antitrust and Competition Law Policy to AppleWeb.  Finally, one entry

(c)     Further Assessment and Recommendations

The communications plan Apple produced to us on February 27 makes significant progress toward implementing our recommendations from the Second Report, although it does not fully satisfy them. First, we commend Apple for developing a formal, organized plan. As a matter of substance, we also think Apple has developed a good plan for updating employees regarding Program modifications and other important Program developments.

We also recommended, however, in the Second Report that Apple provide employees with substantive antitrust-related updates that are not specifically tethered to the policies, procedures, and training associated with the Program. We reiterate that recommendation: Ms. Said and other Program managers should work with the CLPG to incorporate substantive antitrust updates into the communications plan and target the updates to relevant audiences within Apple. We anticipate that the CLPG would identify the subject matter of these substantive antitrust updates and that Ms. Said and her team would then disseminate them. Combining these updates on antitrust law with the Program updates that are reflected on Ms. Said's current communications plan will ensure that employees who may be affected by such developments stay current on relevant antitrust developments, understand the ongoing relevance of antitrust issues, and perceive strong commitment by senior leaders to antitrust compliance.

10.     Business Conduct Helpline

(a)     Recommendations from the Second Report

In the Second Report, we recommended that Apple take steps to improve the efficacy of its Helpline, which is a telephone service and web portal through which Apple employees can report compliance-related questions and concerns. As we explained in the Second Report, a helpline is critical to an effective compliance program. Our understanding is that most Apple employees would not necessarily use the Helpline as their first means of seeking antitrust-related assistance or reporting a potential antitrust violation. Apple has represented that, as of the date of this Report, the Helpline has not received a single call implicating the antitrust laws or the Final Judgment. We concluded, however, that it is important for Apple to continue to maintain the Helpline effectively, as it provides one of several opportunities for Apple employees to report antitrust issues and questions. Based on information we learned during interviews of employees, we recommended that Apple take steps to audit the effectiveness of the Helpline by speaking candidly with employees.

We learned for the first time during this reporting period that Apple also has a separate Whistleblower Line that is run by a third party but that Apple employees may also use it to raise questions and concerns.  Apple has represented that the same people that field calls to the Business Conduct Helpline also receive referrals from the third-party service that operates the Whistleblower Line.  Apple has told us that, as a substantive matter, calls to the Helpline and the Whistleblower Line are handled in the same manner and that, like the Helpline, the Whistleblower Line has not received a single call implicating the antitrust laws or the Final Judgment.

(b)     Apple's Response to the Recommendations

To implement our recommendation that she audit the Helpline's effectiveness, Ms. Said incorporated questions regarding the Helpline into the interviews she conducted and the survey she distributed to solicit feedback regarding the Antitrust Compliance Program (in response to a separate recommendation regarding Program feedback).  She interviewed a total of five employees who had taken the live antitrust training and asked the following questions:

1.  Are you familiar with Apple's helpline?
2.  Do you understand your right to report any violations without threat of retaliation?

All five of the employees interviewed answered these questions in the affirmative.  Ms. Said also distributed a survey to all live trainees that included those same two questions.  Apple provided survey responses from 49 employees who completed the survey.  Again, the responses were positive.

Ms. Said separately interviewed three Business Conduct employees regarding their work on the Helpline.  She asked the following questions:

1.  After attending the live training, and completing the online training, do you feel comfortable identifying potential [antitrust] issues that come through the helpline?
2.  How would you handle any potential [antitrust] issues?
3.  Do you know who to contact if you have any questions?
4.  Is there anything Kyle [Andeer]/myself and team could do to make it easier for you?

All of the responses to these questions seemed to reflect that the Business Conduct employees who responded understand their roles regarding handling

69

antitrust allegations that are reported through the Helpline.  We note that two responses indicated a desire for additional live training.

In addition to interviewing Apple personnel, Ms. Said submitted a fictitious antitrust "test case" report to the Helpline.  We view such a report as a potentially effective way to measure the efficacy of the Helpline in addressing an antitrust-related report, particularly when there are no other actual antitrust reports the handling of which can be evaluated.

Ms. Said told the monitoring team that she submitted the Helpline test case through the Helpline web portal reporting tool.  The test case was a fictitious report regarding a manager instructing employees to tell resellers the exact price at which to sell an Apple product.  The submission generated an "Alertline System Report" with the relevant case details.  Kathleen Emery, a member of the Business Conduct team, forwarded the report to Ms. Said and Joe Santosuosso, the Director for Business Conduct and Compliance, the same day it was received.  Based on the information provided, it appears as though the test case was properly reported and routed to the appropriate personnel.

We understand that Ms. Said planned to submit another test case to the Helpline by phone around the time of the launch of the revised online antitrust training.  We look forward to receiving those results.

<div align="center">(c)      Further Assessment and Recommendations</div>

We recommend that Ms. Said continue to conduct regular tests of the Helpline and expand her audits to the Whistleblower Line.  These audits should be formally incorporated into Ms. Said's audit plan, as we discuss further in Section VII.D.8(c), *supra*.

<div align="center">11.      Record-Keeping</div>

<div align="center">(a)      Recommendations from the Second Report</div>

In the First and Second Reports, we emphasized the importance of accurate record-keeping as a component of Apple's antitrust compliance efforts. During the first and second reporting periods, we identified discrepancies in Apple's training records.  We noted in the Second Report that accurate record-keeping would become even more important as Apple continued to develop its Program, including with respect to recording Program feedback.  We recommended that Apple take steps to improve the accuracy of its training records, including by considering investing in technology to electronically track training attendance.  We also recommended that Apple record and track

employee feedback in a way that can be easily accessed and used to update and improve the Antitrust Compliance Program, perhaps, again, through an electronic system.

        (b)     Apple's Response to the Recommendations

Apple's Implementation Plan provided that the company would initiate an electronic tracking system to record training attendance. Ms. Said stated that she would also continue to maintain a manual sign-in sheet as a backup to the electronic method. Ms. Said explained that she was exploring the idea of electronically tracking employee feedback using the same electronic attendance tool.

        (c)     Further Assessment and Recommendations

Apple has not provided further information regarding the improvements that Ms. Said described at the January 14 Meeting, and so we are unable to assess whether Apple has satisfied the recommendation to improve its record-keeping efforts, either with respect to training attendance or employee feedback. We look forward to receiving this information so that we can make a further assessment.

     E.     Apple's Revised Antitrust Compliance Training Program

        1.     Overview

The Final Judgment requires Apple to provide antitrust compliance training to each member of its Board of Directors, its Chief Executive Officer, and its Senior Vice-Presidents; each of its employees engaged, in whole or in part, in activities relating to the iBooks Store; and the successors of all of the individuals in these categories.[133]  In addition, Apple must extend its training program to "appropriate employees in [the] Apple iTunes and App Store businesses."[134] However, as Apple has recognized, employees outside the categories listed above may also expose the company to antitrust risk, and should therefore also receive antitrust training. Section VII.D.6 of this Report discusses the company's identification of employees to receive antitrust training. This section of the Report considers the substantive aspects of the training.

As we emphasized in the First and Second Reports, training is a fundamental component of any antitrust compliance program. By implementing

---

[133] *See* Final Judgment §§ V.A-V.C.

[134] *Id.*

a strong antitrust compliance training program, Apple can increase employees' ability to comply with the antitrust laws, as well as their willingness to do so. Antitrust training should provide employees with sufficient information to know when they should report questionable conduct and when they need to seek guidance from a lawyer or a manager.

The Final Judgment includes numerous specific references to training. The Court also noted during the August 27 Hearing that training sessions should be "tailored to each employee's position and the situations that employee is likely to encounter."[135]  Consistent with the Court's conclusions, Apple must continue to identify employees whose positions require them to obtain antitrust education, classify employees by the level and type of training that is appropriate for them based on their responsibilities, and tailor training sessions appropriately.

2.      Recommendations from the Second Report

During the second reporting period, Apple provided live antitrust training to various employees in the Internet Software and Services business unit, as well as to the ET and to the Board of Directors.[136]  Apple permitted us to monitor most of these sessions, either live or by video.  Although the content of the live training sessions we monitored was generally good, we had expected the sessions to be more tailored to particular audiences—for example, the sessions provided to iTunes, App Store, and Productivity Group employees were almost identical.  Apple provided various explanations for this lack of tailoring: Mr. Andeer explained that those groups faced very similar issues, so little differentiation could be expected, while Ms. Said told us that logistical details associated with the trainings had caused the training groups to become "diluted," mixing employees from different business units, which necessitated a more general approach.

We recommended in the Second Report that Apple's future live training sessions—both those offered to high-level executives and those offered to lower-level employees—incorporate more specific examples and discussion relating to the specific activities and antitrust risks that are relevant to different groups of employees.  We also recommended that Apple make constructive use of its own past encounters with antitrust allegations, using them as real-life examples for

---

[135] 8/27/13 Tr. 18-19.

[136] For a detailed overview of those sessions' content, see Second Report 64-72.  Because we did not receive the materials associated with the training provided to the Board of Directors until late September, we deferred our assessment of that training session to this Report.

both executive and non-executive training sessions, regardless of whether Apple agreed with the allegations.

We also made recommendations related to the format and style of the sessions that would promote interaction between the trainer and the personnel attending the sessions.  With the exception of the ET training session, we observed little interaction between the trainer and audience during the training sessions.  Apple claimed that our monitoring of the training sessions caused the lack of interaction, a claim of which we were—and remain—skeptical, despite its being repeated numerous times by Apple personnel and their counsel.  In any event, we recommended that Apple handle the presence of monitoring team members at future training sessions in a way that would promote interaction, including by giving a more appropriate instruction to trainees at the beginning of the session.[137]  We further recommended that Apple hold future training sessions in a more informal setting that would encourage greater participation—for example, in a conference room, as opposed to a large, auditorium-style room.  In addition, we recommended that Apple make accommodations to train employees who faced moderate to high levels of antitrust risk in person, rather than remotely, as had been the case for some trainees during the second reporting period.

Finally, we recommended that Apple provide live antitrust training sessions to additional business people, including Marketing, Sales, and Procurement employees, as well as others that Apple might identify through its antitrust risk assessment efforts.  We also recommended that Apple provide a specialized antitrust training session for Apple legal personnel, since many employees had told us that they frequently consulted the lawyers assigned to their business group and considered those lawyers to be their first and most relied upon resource when they encountered antitrust questions.

In addition to live antitrust training sessions, Apple introduced a new online antitrust training course as part of the June 30 Rollout.  More than five thousand employees took the course during the second reporting period, and we understand that designated employees will be required to complete it annually.[138]  We concluded in the Second Report that the online course was generally impressive and satisfied the need for broad-based antitrust training that could be offered to large numbers of Apple employees.  The course adequately addressed antitrust risks at a high level and tested user

---

[137] *See* Second Report 112-13.

[138] For a detailed description of the online training course, see Second Report 58-61.

comprehension in an effective manner.  We also determined that Apple had reasonably identified the employees who would be required to undergo online training, and we noted that we had received very positive feedback from employees whom we interviewed regarding the course.

>   3.   Apple's Response to the Recommendations

Apple's Implementation Plan reflects the company's agreement to implement our training-related recommendations, including through revision of its live training materials and provision of training to additional employees. During the third reporting period, we did not monitor any antitrust training sessions, either live or by video; the last training sessions Apple permitted us to monitor took place in August 2014.[139]  We therefore cannot evaluate most aspects of Apple's progress toward implementing our training-related recommendations.  As discussed below, however, Apple provided us during the third reporting period with slides from several training sessions provided to employees Apple considered to be outside of the Section V training requirement, including employees who report to Apple's Chief Financial Officer, employees who report to Apple's Senior Vice-President of Operations, employees who work for the Beats organization,[140] and certain Apple attorneys who do procurement-related work.

With respect to our recommendation that Apple further tailor its training sessions to particular audiences, the slides for the small number of sessions Apple conducted during the third reporting period are generally quite similar and do not include much text.  This precludes us from assessing whether the sessions were adapted to the needs of particular groups of employees through, for instance, the use of specific examples.  Some of the slides contain substantial redactions; because Apple has not included these redactions on its privilege log,[141] we are in no position to assess why text was redacted or whether the

---

[139] Apple held some training sessions, during both the second and third reporting periods, without giving us advance notice and without video-recording the sessions.  *See, e.g.*, Second Report 22 n.62.

[140] Apple acquired Beats Music and Beats Electronics in May 2014.  *See* Press Release, Apple, Apple to Acquire Beats Music & Electronics (May 28, 2014), *available at* http://www.apple.com/pr/library/2014/05/28Apple-to-Acquire-Beats-Music-Beats-Electronics.html.  Beats Music is a subscription streaming music services, while Beats Electronics produces headphones, speakers, and audio software.  *Id.*

[141] On March 31, 2015, Apple provided a revised privilege log including entries for redactions to training sessions conducted on November 10, 2014; November 11, 2014; November 15, 2014; and February 13, 2015.  From the descriptions provided on the log, it is still not clear whether Apple has in fact tailored its training sessions to specific audiences.  For example, the description of the redactions to the November 10 training states, "Advice of Counsel re:

redacted material may have contributed to the tailoring of the sessions.  Apple may have taken initial steps to implement our recommendation that it incorporate examples drawn from its own experience—for example, the training session for high-level Operations employees included a (fully redacted) slide with the heading, "Lessons from eBooks."  Without a window on the substance of the slide, we have no way to assess it.

That said, the slides associated with the session for attorneys regarding procurement issues are significantly different from the slides for business personnel.  They are heavily redacted, which precludes us from making a full assessment, but the content that is not redacted reflects a more detailed overview of relevant legal issues, including ██████████████████████████ ███████████████████████████████████████████████ [142]  Drawing on the limited information we have, Apple appears to have tailored this training session to an audience of attorneys.

With respect to our recommendations aimed at increasing interaction between trainer and personnel being trained, we are unable to assess whether Apple made progress during this reporting period.  Reviewing slides provides us with no opportunity to determine whether employees asked questions during the relevant session or whether employees were engaged by what the trainer was saying.

Finally, Apple's efforts during the third reporting period suggest that the company has made progress toward implementing our recommendation that it provide live antitrust training to additional employees who it determines might encounter antitrust risk in their lines of business.  During this reporting period, Apple provided live antitrust training to relatively high-level employees in the company's finance and procurement groups.  Moreover, the training session it offered to a group of attorneys on procurement-related issues is a step toward satisfying the recommendation that Apple provide tailored antitrust training to its in-house attorneys.  Apple's training plan for 2015, which the company produced to us at the very end of this reporting period, reflects that the company also plans to provide live training in the coming months to Business Conduct

---

Application of Antitrust Law Principles to Specific Apple Practices and Markets, and Consequences of the Final Judgment."  The description of the redactions to the November 14 training session states, "Advice of Counsel re: Antitrust Law Principles and Markets."

[142] There is one "Case Study" slide that is fully redacted; we are in no position to determine whether this slide implemented our recommendation that Apple's training include real-life examples from the company's own history.

personnel; to employees who report directly to Phil Schiller, the company's Senior Vice-President of Worldwide Marketing; to additional Marketing employees; and to a broader group of in-house attorneys. We expect that the company's antitrust risk assessment results will also have an impact on the employees identified for live and online training.

    4.      Further Assessment and Recommendations

    (a)      Live Training

      As stated above, we did not monitor any antitrust training sessions during this reporting period—we only received slides for training sessions, which, with the exception of the sessions described above, were largely similar to slides we received during previous reporting periods. We therefore have little basis on which to offer further assessment and recommendations in this Report regarding Apple's antitrust training program, with one exception: the training session that David Boies provided to Apple's Board of Directors on August 27, 2014. Although that training session took place during the second reporting period, we did not receive the materials related to it until September 23, which was too late for us to analyze in the Second Report.[143] We therefore deferred our assessment of the Board training session until this Report.[144]

      Many of the Second Report's observations regarding the training Mr. Boies provided to Apple's ET[145] also apply to the Board training, because the content was quite similar. The content of the Board training was generally appropriate, providing a thorough, high-level overview of a broad set of antitrust issues that appropriately matched the audience. In addition, Mr. Boies briefly discussed antitrust concerns related to interlocking directorates, an issue that is specifically relevant to Board members, and he summarized Apple's obligations under the Final Judgment and with respect to the recent employee-poaching case involving Apple. Like the ET training session, the Board session was interactive—significantly more so than the non-executive training sessions we monitored during the second reporting period. The Board members we interviewed during this reporting period reacted favorably to the training session, remarking on the high level of interaction with Mr. Boies and the appropriateness of the content he covered.

---

[143] Second Report 64 & n.117.

[144] *Id.*

[145] *See id.* at 107-15.

NON-CONFIDENTIAL VERSION

We recommend, however, that Apple expand the content of the antitrust training it offers to the Board in 2015, as well as to the ET.  In particular, the Board and ET training sessions should include a more comprehensive discussion of Board and executive oversight responsibilities with respect to antitrust compliance.  While Mr. Boies's oral presentation focused on substantive principles of antitrust law, he also provided the Board with additional slides ███████████████████████████████████████████████████████ He told Apple's Board members that he did not have time to discuss the slides during the live session but that they should consider reviewing them after the training session ended.  Among other things, those materials ████████████████████ ███████████████████████████████ We believe it is important to reinforce these principles, and with specific respect to antitrust compliance, among Apple's Board members and senior executives.  We therefore recommend that Apple incorporate these topics into its 2015 Board and ET training sessions (1) with respect to antitrust compliance, not only corruption, cybersecurity, and data privacy, and (2) in a live training session, rather than through written materials that training participants are invited to review on their own time.

We also recommend that Apple provide specialized training to managers who might be expected to receive antitrust compliance–related allegations from the employees they supervise.  As noted in Section VII.D.2, *supra*, we learned during this reporting period that employees report a significant majority of compliance allegations to their managers, rather than through the Helpline or other avenues.  To ensure that managers properly escalate the allegations they receive, Apple should provide managers in relevant groups with additional training—live, online, or in some other format—that will help them understand the types of antitrust issues that might arise in their lines of business, as well as the procedures they should follow in referring those allegations to the proper recipients.[146]

We recommend that Apple provide additional live antitrust training to the personnel who are responsible for managing the company's Business Conduct Helpline.  As part of her audit, which is described in Section VII.D.8, *supra*, the ACO interviewed three Business Conduct employees whose work we understand to focus on the Helpline.  When asked whether they felt comfortable identifying potential antitrust issues that came through the Helpline, one of the

---

[146] If Apple already provides this type of training to managers, the company has not provided us with information about it.

three interviewees responded that he or she "[w]ould benefit from additional live training." This was after the employees had attended live training and completed online training. Since these employees' ability to identify and properly route potential antitrust issues is critical to the effectiveness of the Helpline, we recommend that Apple provide them with additional live training that is tailored to their responsibilities. [147]

Finally, as described at length in Section VI.C.2 above, Apple has reneged on its commitment to allow video recording and in-person monitoring of all live antitrust compliance training sessions, instead stating in its 2015 training plan that it will allow live monitoring at only four live training sessions and will limit video recording to two sessions.[148] Not only do these unilateral limitations violate Apple's previous commitment, made in June 2014, they also inappropriately dictate the terms of our monitoring of live training.

(b)    Online Training

Apple is currently in the process of revising its online antitrust training course for 2015. We have not had the opportunity to review the revised course, and so we defer our assessment of the updated online training to our next report.

Information obtained during this reporting period reinforces our conclusion in the Second Report that the online training Apple provided to employees in 2014 was well-designed and appropriate. Interviewees consistently praised the online training course, and some interviewees found particular aspects of the training memorable, even several months after they completed it. We look forward to reviewing the updated online antitrust training course during the next reporting period.

F.    Senior Commitment to Compliance

1.    Recommendations from the Second Report

In the First and Second Reports, we strongly emphasized the central role that senior company personnel play in an effective compliance program, noting the importance of a visible and continuing commitment to compliance from senior leadership. We cited support for this concept among the compliance community, statements by this Court, and representatives of the Department of

---

[147] As explained in Section VII.D.10, *supra*, it is our understanding that the same personnel manage both the Helpline and the Whistleblower Line.

[148] Apple's response to a draft version of this Report asserts that it never made this commitment.

Justice.[149]  We believe that what senior leaders say and do—and what they do not say and do—affects the importance employees attach to the Antitrust Compliance Program and ultimately may affect their actions in day-to-day operations.  In our reports, we stressed the need for Apple's senior leadership to give life to the Program.

During the first reporting period, we concluded that Apple's senior executives, as well as its senior and mid-level managers, could and should do more to reinforce the culture of compliance at Apple.  We recommended that senior executives devote more time and attention to compliance matters and address compliance issues more directly and specifically.  We concluded that senior and mid-level managers could also have a powerful impact on antitrust compliance throughout the company, given their intimate knowledge of specific operations and ability to make an impact on a continuing basis.  In the Second Report, we directed a series of recommendations to the ways in which these two groups (the ET and senior and mid-level managers) could improve Apple's compliance culture.

In the Second Report, we also concluded that the ET, as a unit, traditionally has had little direct involvement in compliance issues or oversight.  Apple was unwilling to respond to our requests for information aimed at determining the frequency with which the ET addressed compliance issues generally, or antitrust issues specifically.  Based on the information available to us, we reaffirmed our conclusion in the First Report that it was rare for members of the ET to explicitly and specifically discuss the importance of compliance with Apple employees.  It was our view that the ET was relatively detached from compliance issues and that its members had made little effort to emphasize the importance of compliance issues in their communications with Apple personnel.  We stated that the ET had an obligation to actively monitor the Program and to use their platform as senior executives to communicate about compliance generally, and antitrust compliance specifically.  We also emphasized the need for the ET to set an example for employees to follow and to communicate important compliance messages that convey information about conduct expectations, incentives, accountability, and consequences.

In the Second Report, we also concluded that the management style of senior and mid-level managers at Apple provides opportunities to foster a culture of antitrust compliance.  Senior executives and managers described management at Apple as "hands on," holding frequent meetings with direct

---

[149] *See* Second Report 116-117.

reports and indirect staff, as well as weekly full staff meetings.  We reported that Mr. Sewell had instructed members of the ET to "waterfall" information about the revised Antitrust Compliance Program to their staffs and to the rest of the company.  In response to this instruction, some individual senior managers informed us of their plans to schedule staff meetings to discuss antitrust issues and to instruct direct reports to share the information with their respective teams.  Other senior managers told us they planned to request that Mr. Andeer provide training specifically tailored to their direct reports and teams.

We described in the Second Report our expectation that senior and mid-level managers would accept Mr. Sewell's challenge and contribute to an increased sensitivity to antitrust issues within the company, as well as a broader awareness of the Antitrust Compliance Program.  We noted the potential use of staff meetings and other forums to convey information about the new Program, Apple's commitment to fostering a culture of compliance, and the managers' expectation that employees will strictly comply with Apple's policies and procedures.

2.      Apple's Response to the Recommendations

While a couple of senior managers took steps to provide further antitrust training to their personnel during this reporting period, Apple has not demonstrated that the overall behavior of senior managers has materially changed.  Two of Apple's ten ET members, Luca Maestri, Apple's Chief Financial Officer, and Jeff Williams, Apple's Senior Vice-President of Operations, requested that Mr. Andeer train their teams on antitrust issues related to their day-to-day activities.  We understand that Mr. Andeer completed those trainings in late summer and fall of 2014.  In addition, Angela Ahrendts, Apple's Senior Vice-President for Retail and Online Stores, and Dan Riccio, Apple's Senior Vice-President for Hardware Engineering, have asked Tom Moyer to present to their respective organizations regarding Business Conduct, but Apple has not confirmed that these presentations have taken place.  Besides these examples, we have no additional information on which to conclude generally that Apple's senior managers have made efforts to implement our recommendation.

Apple has pointed to other examples of efforts by managers to stress compliance-related matters, and some of these have been impressive, but they have been generally unrelated to Mr. Sewell's request to "waterfall" information about the Antitrust Compliance Program, or to our recommendation regarding the obligation of senior managers to communicate with staff regarding the Antitrust Compliance Program.  These efforts have included Mr. Cook's September 2014 letter to consumers regarding Apple's commitment to privacy, and a small number of specific examples of senior managers emphasizing their

concerns about certain non-antitrust compliance issues.  While these examples reflect instances of senior-level attention to compliance, they do not demonstrate the actions we expected to observe in light of our recommendation and Mr. Sewell's instruction.  In particular, we are unaware of steps taken by managers to better communicate information about their conduct expectations, incentives, accountability, and consequences with respect to antitrust compliance.  If Apple senior managers have increased their efforts in other relevant ways, Apple has not shared this information with us.

> 3.     Further Assessment and Recommendations

Apple's Implementation Plan suggested that this recommendation would be fully implemented, but we have seen relatively little evidence of that.  We hope to receive additional information from Apple during the fourth reporting period regarding actions that reflect a stronger commitment to compliance among its senior personnel and to strengthen its culture of antitrust compliance.[150]

> G.     Oversight of the Antitrust Compliance Program

In our First and Second Reports, we identified three levels of oversight for the Antitrust Compliance Program.[151]  We identified Ms. Said, the ACO, as the person with primary responsibility for the day-to-day operation of the Program and with direct accountability to the Board of Directors.  We identified the CLPG as the group responsible for reviewing and advising on business issues that have antitrust implications, as well as for the substantive content of Apple's Program.  Finally, we identified the AFC as having ultimate oversight of the Program, with support from the Risk Oversight Committee.

> 1.     Role of the ACO

> (a)     Recommendations from the Second Report

The Second Report emphasized that Ms. Said must carry out her obligations pursuant to the Final Judgment with independence and authority.

---

[150] In response to a draft version of the Report, Apple contended that we have misrepresented the role of the Executive Team in fostering a culture of compliance at Apple, pointing to several anecdotes witnesses related to us about the interest and concern certain executives have shown regarding specific compliance issues.  These instances are commendable, but we believe that more can and should be done, as Apple has acknowledged in agreeing to implement this recommendation.

[151] *See* Second Report 121-22.

Our view was and continues to be based on the Final Judgment's requirement that Apple "designate a person not employed by Apple . . . to serve as the Antitrust Compliance Officer," to "report to the Audit and Finance Committee," and to "supervis[e] Apple's antitrust compliance efforts."[152]

We concluded, after observing Ms. Said's function through the second reporting period, that Ms. Said had assumed a role that did not embody the independence and authority contemplated by Section V of the Final Judgment. We determined that Ms. Said's role had developed into that of an antitrust compliance program project manager, and not the type of Antitrust Compliance Officer described in the Final Judgment as responsible for "supervising Apple's antitrust compliance efforts."  At the time, we understood Ms. Said to be focused on the administrative aspects of the Program, rather than designing substantive elements.  In addition, we understood that Ms. Said did not have the same level of access to undisclosed products as senior antitrust counsel, and we had no information on which to base a conclusion that Ms. Said had been called upon to provide substantive antitrust input into the Program.

We did not fault Ms. Said for the way her role had taken shape, but viewed it as a consequence of her relative lack of substantive antitrust training, Apple's management structure, and the way the company allocates authority. To enhance Ms. Said's ability to more substantively guide the Program, we recommended that Ms. Said be provided elevated access to information about confidential product offerings.  We concluded that, as a court-mandated official with significant responsibility for Apple's Antitrust Compliance Program, Ms. Said should have access to the same information as Apple's chief competition counsel.

Although we stated that Ms. Said had not assumed the type of role we expected pursuant to the Final Judgment, we reserved judgment in the Second Report regarding whether Ms. Said's more limited responsibilities made sense within the context of Apple's overall Antitrust Compliance Program.

After we submitted the Second Report, Ms. Said expressed disagreement with our characterization of her role.  She told us that the activities we attributed to her position in the Second Report actually were handled by a contract employee who reported to her.  Ms. Said asserted that she possessed decision-making authority regarding the Program, citing her ability to call Antitrust Compliance Program meetings and to determine items placed on the meeting agenda.  Ms. Said told us that she had been able to wield influence regarding the

---

[152] Final Judgment § V.

Program, but conceded that doing so had not been an easy task.  We accepted Ms. Said's representations, noting that our view of her role could have been due, at least in part, to the relatively limited insight Apple had provided to us regarding her working relationship with others at the company and the extent of her authority.  In October, we suggested having further discussions to determine ways to gain additional insight into Ms. Said's role, but those discussions have not yet taken place.

In addition to emphasizing the need for Ms. Said to assume a role of independence and authority, we stressed in the Second Report that Ms. Said must have access to appropriate financial and human resources to carry out her obligations.  Ms. Said has consistently told us that she has adequate access to resources.  We have generally accepted Ms. Said's representation.  However, during the second reporting period and since that time, we have experienced delays in receiving documents and other information in response to our requests, which may be due in part to a shortage of resources.[153]  We informed Apple's counsel of the company's obligation to provide Ms. Said with sufficient resources to fulfill her Final Judgment obligations, but we never received additional information in connection with this potential concern.

(b)     Apple's Response to the Recommendations

Apple's Implementation Plan ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████  Apple informed us that Ms. Said had been disclosed on the Beats Electronics acquisition and Apple Pay, two confidential projects. Apple did not provide further information regarding Ms. Said's independence or authority regarding the Antitrust Compliance Program, including whether she had taken proactive steps to independently expand the scope of the Program or its oversight.

Since the Second Report, however, we have observed that Ms. Said has become increasingly involved in the types of activities we had initially envisioned for her role.  Prior to the Second Report, Ms. Said had reported to the AFC in person on only one occasion and had provided brief, summary written reports on two occasions.  Since the Second Report, she has met individually with each of the current Board members and, in November 2014, she presented

---

[153] On at least one recent occasion, Apple's counsel stated that Ms. Said was "overwhelmed" by the monitoring team's requests, which were modest and entirely appropriate given our information needs and should have been fully manageable for a company of Apple's size and resources.

to the AFC a much more substantive and detailed report regarding Apple's efforts to comply with the Final Judgment.[154]  Similarly, she has worked to complete Apple's antitrust risk assessment, alongside one of the members of the CLPG.  We have also had more contact with Ms. Said since the Second Report, and she has presented herself within the company, more than before, as the face of the Antitrust Compliance Program.

<div align="center">(c)     Further Assessment and Recommendations</div>

Despite the noticeable improvements described above, we still do not view Ms. Said as the figure of authority we believe the Final Judgment contemplated.  We do not think this is attributable to anything that Ms. Said has done inappropriately or failed to do; instead, we believe it is almost entirely attributable to the way Apple has structured Ms. Said's position within the company.  Ms. Said is a member of the Business Conduct team and reports directly to Mr. Moyer.  In our discussions with her, Ms. Said has referred to Mr. Moyer as her direct supervisor.  Pursuant to the Final Judgment, Ms. Said should not answer to anyone regarding her work on Apple's Antitrust Compliance Program except for the Board (and, by delegation, the AFC), yet that is not the case.

In addition, Ms. Said's November 2014 report to the AFC, while more substantive and detailed than her prior reports, had the style of an advocacy document, rather than an independent and clinical report.  The report asserted that the company was "100% Compliant with the eBooks Final Judgment," and labeled many Final Judgment requirements as "Complete" when in fact they are ongoing obligations.  These aspects of the report are misleading because they could give the AFC the impression that Apple has fulfilled its obligations under the Final Judgment, including the implementation of the Monitor's recommendations, which is not accurate.  Our view is that the report made Ms. Said appear to be an advocate for the company instead of an impartial steward of the Antitrust Compliance Program.

Because Ms. Said's role is different from what we believe the Final Judgment envisioned, Apple lacks an independent, authoritative voice to promote antitrust compliance and develop the polices, procedures, and training associated with the Program.  Although Ms. Said has shown herself to be diligent, well-organized, and able, she lacks the substantive antitrust expertise[155]

---

[154] Exhibit G (redacted from the non-confidential version of the Report).

[155] We note that Ms. Said attended an antitrust training course at the end of her first year as the ACO.  The course, which was provided by The Practising Law Institute ("PLI"), was called

<div align="center">84</div>

that would help her challenge Mr. Andeer or other members of the CLPG, if and when that became necessary. Ms. Said's subordinate reporting relationship to Mr. Moyer and other senior members of the compliance and legal teams may also limit her ability to challenge potentially risky business decisions at the company or decisions regarding the Antitrust Compliance Program. We understand the advantages of having Ms. Said be fully integrated with her compliance, legal, and CLPG colleagues, but she needs to have independent authority and decision-making ability. Her responsibility is to the Board.

Many of the changes in Ms. Said's role that we have witnessed since the Second Report have been quite positive. As discussed above, her interaction with the Board and AFC has increased sharply.[156] We recommend that Apple continue to take steps to increase Ms. Said's independence and authority with respect to the management of the Antitrust Compliance Program, consistent with the requirements of the Final Judgment. We recommend that Apple provide Ms. Said full access to undisclosed products and projects, rather than limit her disclosure to when Apple's senior management determines disclosure is "necessary and appropriate to fulfill her responsibilities under the Final Judgment." In addition, we recommend that Dr. Sugar or another member of the AFC with appropriate knowledge of, and familiarity with, Ms. Said's work conduct her performance evaluation. Finally, we recommend that Apple consider making the AFC—rather than Apple management—responsible for setting Ms. Said's compensation.

    2.      Role of the CLPG

    (a)      Recommendations from the Second Report

As we explained in the Second Report, the CLPG is a specialized resource that plays an important role in Apple's Antitrust Compliance Program. During the second reporting period, we learned that business personnel tend to direct their initial antitrust inquires to the lawyers who are assigned to their business groups, who then elevate those inquiries to the antitrust specialists in the CLPG. The CLPG's most direct contact with the businesses, we learned, tends to be at higher levels of the company and on significant transactions and issues. We concluded in the Second Report that the CLPG's role appeared to be consistent with Apple's business structure and appropriate in the context of the Antitrust

---

"Antitrust Counseling & Compliance 2014." We are not aware of any further substantive training that Ms. Said has sought or completed before or after she took the PLI course.

[156] *See* Second Report 124-28 (recommending an increase in the frequency and substance of interactions between Ms. Said and the Board).

NON-CONFIDENTIAL VERSION

Compliance Program.  We did not make any specific recommendations in the Second Report regarding the role of the CLPG.

             (b)     Further Assessment and Recommendations

At this time, we have no further recommendations regarding the role of the CLPG.

          3.     Role of the Board

             (a)     Recommendations from the Second Report

In the First and Second Reports, we emphasized the importance of Board oversight of the Antitrust Compliance Program, as made clear by the U.S. Sentencing Guidelines and other compliance authorities.[157]  We highlighted the need for a strong and direct reporting relationship between the ACO and the AFC, the Board's designated committee for risk oversight.  We stressed that this reporting relationship must be genuine and that the ACO's reports to the AFC must be more than perfunctory—they should, for example, include adequate detail regarding Program components, address issues and concerns associated with the Program, solicit feedback and input from the AFC, and address any concerns the AFC raises.  We further emphasized that the ACO's ability to perform her role, including by presenting candid reports to the AFC, would require support and resources from the AFC.  We specifically underscored the importance of the ACO's relationship with Dr. Sugar, the current AFC Chair.  To strengthen this relationship, we recommended that the ACO and Dr. Sugar participate in a monthly call or meeting regarding Ms. Said's work, as well as the status of Apple's activities under the Final Judgment.

As of the Second Report, Apple had provided us with no information to suggest that the AFC had taken an active oversight role in connection with the Program, either in connection with the ACO's duties or otherwise.  Active oversight means more than receiving regular reports.[158]  We therefore expressed the preliminary conclusion that Board oversight for Apple's Antitrust Compliance Program was significantly absent.  We recommended that the AFC take a more active role with respect to the Program and that the AFC be "fully informed regarding high-risk areas, the effectiveness of reporting mechanisms, protocols for detecting violations and investigating complaints, and other

---

[157] *See* Second Report 124 & n.201.

[158] *See* Snyder, *supra* note 114.

important aspects of the program."[159]  We also recommended that the AFC review the effectiveness of the ET's management of antitrust risk and its promotion of Apple's Program.  Finally, we recommended that the AFC actively participate in defining the threshold at which it would receive updates regarding the Program and potential antitrust risks.

<div align="center">(b)      Apple's Response to the Recommendations</div>

Apple's Implementation Plan included several items in response to these recommendations, some of which had occurred before the Second Report and which we had already considered when we made our recommendations.  For example, Apple listed a preliminary meeting between the ACO, Mr. Moyer, and Dr. Sugar at the beginning of 2014 to review the draft Program materials.  Apple also listed the ACO's quarterly updates to the AFC.

In addition to items of which we were already aware when we issued the Second Report, Apple's Implementation Plan listed additional steps toward satisfying the recommendation for increased Board oversight.  The Implementation Plan indicated that the Board had received a copy of Apple's Statement of Compliance with the Final Judgment and a copy of the Monitor's Second Report.[160]  The Implementation Plan also ███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████  The Implementation Plan did not state whether or when Apple would share the results of the company's antitrust risk assessment with the AFC, but based on Apple's subsequent representations, we understand that Apple did so in March.[161]

There are components of the Program that the Implementation Plan did not suggest would be shared with the AFC.  For example, the Implementation Plan did not state that Apple would share with the AFC the company's revised Program audit procedures or any other important Program components contemplated by our recommendation regarding increased oversight.[162]  Apple

---

[159] Second Report 126.

[160] The Board was not provided a copy or a summary of the Monitor's First Report.  We have not received an explanation from management regarding the decision not to provide it.

[161] In response to a draft version of the Report, which stated that we had no information about whether such meetings had taken place, Apple advised us that "Ms. Said has spoken with Dr. Sugar in January, February, and March."  We know nothing more about those discussions.

[162] On April 3, 2015, Apple informed us that, on March 9, Bruce Sewell provided the results of the antitrust risk assessment to the AFC, with a member of the ROC also in attendance.  Apple also informed us that it planned to deliver the results of the risk assessment to the ET "within the next month" but that the presentation had not yet been scheduled.

also has not provided information regarding our recommendation that the AFC review the effectiveness of the ET's management of antitrust risk and its promotion of Apple's Program. As far as we know, Apple has no plans to do so.

Apple formally objected to our recommendation that the AFC actively participate in defining the threshold at which the Board would receive updates regarding the Program and potential antitrust risks. The company stated that it would be "impractical (if not impossible) to define an objective 'threshold' by which the company can determine when to elevate risks to the Board." Apple advised us that Mr. Sewell participates in meetings of the "relevant committees" and exercises his judgment regarding when to report matters to the full Board, and Apple took the position that this approach would be most effective for ensuring that the Board was aware of potentially significant antitrust risks.

(c)    Further Assessment and Recommendations

In the third reporting period, we completed our interviews of Apple's Board members, which provided us with valuable insight into the Board's performance of its oversight role. It is clear that the Board relies heavily on senior management and, in particular, Mr. Sewell for information related to compliance, including antitrust compliance. Many Board members expressed a strong degree of trust and confidence in Mr. Sewell and Mr. Cook, including trust in their judgment regarding which information to share with the Board. Board members expressed very positive reactions to Ms. Said, although many of them have had limited contact with her. Most members of Apple's Board readily acknowledged that they rely largely on senior management, including Mr. Sewell, to appropriately raise and report on compliance topics.[163]

Having now interviewed all of Apple's Board members and questioned them about the Program, we have seen an increase in Board oversight over the Program. Apple reported significantly more communications between company personnel and the Board regarding the Antitrust Compliance Program during this reporting period. For example, as discussed in Section VII.G.1, *supra,* Ms. Said met individually with each Board member during the third reporting period to discuss the Program and the Monitor's reports. Also as discussed in Section VII.G.1, Ms. Said's November 2014 written report to the Board was more robust and detailed than any of the previous reports she had provided. In our interviews, some Board members stated that visibility into the topic of antitrust

---

[163] One potential exception is Dr. Sugar, the Chair of the AFC. In both of our meetings with him, he has told us that he frequently speaks with Apple personnel outside the context of quarterly Board meetings regarding issues that he determines to be important.

compliance had improved; one AFC member estimated that AFC discussion of antitrust issues had increased by more than 50 percent.  In addition, Apple has communicated its intent for Ms. Said to meet with Dr. Sugar every month regarding the status of the Program.  Because we have no direct knowledge of Ms. Said's oral reports, meetings with Board members, or discussions with Dr. Sugar, we cannot assess the length, quality, or impact of those communications.  However, the fact that these communications are now taking place is positive.

Despite these increased communications, Apple's Board must do more to rigorously oversee the Program.  Neither the AFC nor the full Board currently exercises the level of oversight that we would expect for a company that has experienced at least two major antitrust investigations and is subject to a Final Judgment that imposes specific requirements on its Board of Directors.  While Board members exhibited familiarity with the ebooks case, the Final Judgment, and the Antitrust Compliance Program, we have seen no evidence that either the Board or AFC was significantly involved in the Program's development.  Indeed, we learned during this reporting period that neither the full AFC nor the full Board was provided with the Program materials prior to the June Rollout.[164]  We are not aware that Ms. Said received substantive suggestions or follow-up questions from Board or AFC members after they received her November 2014 report or had their individual meetings with her.  Finally, we are not aware whether Ms. Said has shared with the Board Apple's Implementation Plan, or with what frequency Ms. Said plans to update the Board regarding future Program developments.

In addition, we continue to lack critical information on which to base our assessment of the Board's engagement regarding, and active oversight of, the Program.  Apple informed us on April 3, 2015 that the company's General Counsel presented the results of the antitrust risk assessment to the AFC, and that a member of the ROC also attended the presentation.  Board member reactions to the risk assessment,[165] as well as the follow-up activity directed or sanctioned by the Board as a result, are extremely relevant to our evaluation of the sufficiency of the Board's oversight.[166]  We do not yet have this critical

---

[164] Ms. Said informed us that she reviewed the Program materials with Dr. Sugar in advance of the June Rollout.  It is not clear whether Dr. Sugar provided specific input regarding the Program.

[165] During our interviews we learned that some Board members with whom we spoke at the end of 2014, including AFC members, were unaware that an antitrust risk assessment was under way.

[166] The risk assessment will not only guide the Program but also inform the Board about the company's vulnerabilities and antitrust compliance needs.  It is difficult to conclude that the

information.  Apple informed us on April 9 that it had provided to the AFC the revised Investigation Procedure, Implementation Plan, Risk Assessment Memo, and revised Antitrust Compliance Policy.  Apple has not informed us whether its audit procedures will be shared with the Board or AFC.  These procedures are critical to a successful program, and they fall within the purview of the Board's oversight responsibilities.  The Board's response to this information will also affect our assessment of the Board's execution of its oversight obligations.

Finally, we will need to further assess the effectiveness of Apple's preferred approach for elevating antitrust risks to the AFC and the Board, which relies heavily on the judgment and discretion of Mr. Sewell.  Based on Apple's representations, we have agreed to suspend our recommendation regarding the AFC's involvement in defining a threshold for the elevation of antitrust risks.  We nonetheless view this as an important issue that deserves continuing attention.

## VIII.   Conclusion

Apple continues to develop and improve its Antitrust Compliance Program.  It has made progress toward implementing the numerous recommendations we made in our previous reports.  Notably, during this reporting period, Apple developed an Implementation Plan that described the actions it intended to take to fully implement those recommendations.  Nonetheless, significant gaps remain in Apple's Program.  We have been unable to assess some components because Apple has not completed them, and we have been unable to assess others because Apple has not provided enough information.  In particular, we have not yet been able to assess the efficacy and impact of Apple's antitrust risk assessment.  Further, Apple has not implemented sufficient procedures to promote and ensure antitrust compliance.  Finally, we believe that Apple's Program continues to lack an authoritative and independent Antitrust Compliance Officer and adequate Board oversight.

Unfortunately, Apple's cooperation with the monitoring team sharply declined at the end of the third reporting period.  Apple rejected our requests to interview business personnel, declined to provide certain documents and information, and has unilaterally identified a small number of training sessions it will allow us to monitor in 2015, breaching the company's prior agreement that we could monitor any sessions we deemed necessary.  In addition, Apple's communications with us during this time, including communications from

---

Board is actively overseeing Apple's compliance efforts if it is unaware that a major component, like the antitrust risk assessment, is taking place.

senior managers, often attempted to prescribe how the Monitor should conduct his review.  At the end of the third reporting period, we were working to resolve a number of disputes relating to our requests for information and interviews, as well as our ability to monitor training.

We look forward to working with the company to resolve the disputes that have hampered our review during this reporting period and to provide the assessments and recommendations that the Final Judgment requires of us.

April 14, 2015

Michael R. Bromwich
External Compliance Monitor
The Bromwich Group

Bernard A. Nigro Jr.
Maria R. Cirincione
Fried, Frank, Harris, Shriver & Jacobson LLP

Sarah W. Carroll
Lee Turner Friedman
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP

NON-CONFIDENTIAL VERSION

## APPENDIX

### New Recommendations Made in the Third Report

This is a list of recommendations made for the first time in this Report. It does not repeat recommendations previously made in our First and Second Reports.

Antitrust Risk Assessment

- Apple should submit the results of its risk assessment, and associated materials withheld on privilege grounds, to the Court *ex parte* and *in camera* (46)

Antitrust Compliance Policies

- The Antitrust and Competition Law Policy should refer to Apple's Standards Legal Policy, Internal Standards Process, and any additional procedures the company adopts as a result of the antitrust risk assessment to guard against antitrust risk (50 n.111)

- Apple should adopt a process for periodically updating and reviewing its Antitrust and Competition Law Policy to ensure that relevant antitrust risks are adequately addressed as changes occur in the legal and regulatory environment, industry, and Apple's business practices (51-52)

Antitrust Compliance Procedures

- Detection, Investigation, and Reporting of Violations

  o Apple's Investigation Procedure should appropriately account for the important role Apple managers play in fielding reports of allegations from employees (55)

    ▪ Apple should modify the Investigation Procedure to require managers to notify the Business Conduct team after receiving an allegation from an employee so that the allegations can be centrally tracked (55)

    ▪ Apple should modify the Investigation Procedure to ensure that employee reports of allegations made directly to Apple managers follow the same referral process as reports received through the Helpline and Whistleblower Line (55)

i

- o Apple should modify the Investigation Procedure to address potential conflicts of interest (55-56)

  - ▪ The Investigation Procedure should include specific direction as to when an uninvolved third party must conduct the investigation, as well as specific guidance as to which group within Apple will oversee the investigation on behalf of the company (56)

- o Apple should modify the Investigation Procedure to require at least a preliminary initial investigation of any alleged violation of the Final Judgment to determine whether it is credible (56)

- o Apple should modify the Investigation Procedure to make clear how promptly an investigation must be initiated after evidence of a potential violation is discovered, and how quickly Apple must take action after an allegation is found to be credible.  The Investigation Procedure should also mandate that Apple terminate or modify its conduct within three days of determining that an allegation is credible (56-57)

- o Apple should modify the Investigation Procedure to provide for at least the possibility of imposing financial penalties for substantiated allegations (57)

- o Apple should strengthen the "reporting" section of the Investigation Procedure to require, at a minimum, that the ACO report confirmed cases of employee misconduct related to the antitrust laws or the Final Judgment to the AFC.  The Investigation Procedure should also make clear that Apple will share all credible allegations of antitrust and Final Judgment violations with the ET and relevant business groups (57)

- o Apple should revise the Investigation Procedure to require that the final results of an investigation be documented (57-58)

- o Apple should revise the Investigation Procedure to make clear that allegations related to antitrust and the Final Judgment will be logged in a central database (58)

NON-CONFIDENTIAL VERSION

- Formal Feedback Procedures

  - Apple should expand the number of interviews it conducts to obtain employee feedback and should incorporate interview questions that are more probing (62)

  - Apple should develop processes and mechanisms for collecting employee feedback that ensure that feedback is collected as soon as possible after training takes place (62)

  - Apple's plan for collecting employee feedback should include specific steps for incorporating employee feedback into the Antitrust Compliance Program (63)

- Communications Regarding the Antitrust Compliance Program

  - The ACO should work with the CLPG to incorporate substantive antitrust updates into Apple's antitrust communications plan and target the updates to relevant audiences within Apple (68-69)

- Business Conduct Helpline

  - The ACO should conduct regular tests of the Helpline and expand her audits to the Whistleblower Line.  These actions should be formally incorporated into the ACO's audit plan (71)

<u>Antitrust Compliance Training</u>

- Apple should expand the content of the live antitrust training it offers to the Board and ET to include a more comprehensive discussion of Board and executive oversight responsibilities with respect to antitrust compliance (77-78)

- Apple should provide specialized training to managers who might be expected to receive antitrust compliance–related allegations from the employees they supervise (78)

- Apple should provide additional live antitrust training to the personnel who are responsible for managing the company's Business Conduct Helpline (78)

**NON-CONFIDENTIAL VERSION**

<u>Oversight of the Antitrust Compliance Program</u>

- Role of the ACO

    - Apple should continue to take steps to increase the ACO's independence and authority regarding the management of the Antitrust Compliance Program (85-86)

    - Apple should provide the ACO with full access to undisclosed products and projects (86)

    - A member of the AFC with appropriate knowledge of the ACO's work should conduct her performance evaluation (86)

    - Apple should consider making the AFC, rather than Apple management, responsible for setting the ACO's compensation (86)

- Role of the Board

    - Apple's Board should more rigorously oversee the Antitrust Compliance Program (89-90)